**Annex A**

**Proceeds to Attached Judgment Creditors**

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration | Amount of Satisfied Attached Judgment as of August 29, 2025 | Amount of Satisfied Attached Judgment as of June 30, 2026 |
|---|---|---|---|---|
| 1 | Crystallex Corporation | Cash consideration | $1,011,018,992.13 | $1,019,679,606.70 |
| 2 | Tidewater Caribe S.A., Tidewater Investment SRL | Cash consideration | $78,367,516.55 | $81,306,469.53 |
| 3 | Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (Petrozuata/Hamaca Judgment) | Cash consideration | $1,382,827,041.91 | $1,410,946,090.03 |
| 4 | OI European Group B.V. | Cash consideration | $673,880,564.08 | $686,901,600.91 |
| 5 | Huntington Ingalls Incorporated | Cash consideration | $139,252,318.14 | $139,450,093.97 |
| 6 | ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd. | Cash consideration | $118,798,982.45 | $118,908,075.68 |

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration | Amount of Satisfied Attached Judgment as of August 29, 2025 | Amount of Satisfied Attached Judgment as of June 30, 2026 |
|---|---|---|---|---|
| 7 | Red Tree Investments, LLC (19-cv-2519 (S.D.N.Y.); 19-cv-2523 (S.D.N.Y.); Fee Judgment in cases 22-mc-00068 and 22-mc-00069) | Cash consideration | $328,744,433.06 | $347,095,930.57 |
| 8 | Rusoro | Non-cash consideration | $1,542,598,861.95 | $1,568,585,159.10 |
| 9 | ConocoPhillips Gulf of Paria B.V. Corocoro Judgment | Cash consideration | $48,253,645.22 | $48,296,957.36 |
| 10 | Koch | Non-cash consideration | $466,674,070.75 | $470,881,329.32 |
| 11 | Gold Reserve | Cash consideration | $500,000,000.00 (if the Additional Consideration is accepted by Gold Reserve) | $500,000,000.00 (if the Additional Consideration is accepted by Gold Reserve) |

## Exhibit A

**Proposed Dalinar SPA Termination Order**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Misc. No. 17-151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF | ) | |
| VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AUTHORIZING TERMINATION OF THE DALINAR SPA**

Upon the *Special Master's Updated Final Recommendation*, dated August 29, 2025 (D.I.___) (the "**Recommendation**"),[1] of Robert B. Pincus, in his capacity as Special Master for the United States District Court for the District of Delaware (the "**Special Master**") in the above captioned case, requesting the entry of an order authorizing the Special Master to terminate that certain Stock Purchase Agreement between Dalinar Energy Corporation ("**Dalinar**") and the Special Master, dated June 25, 2025 (the "**Dalinar SPA**") in order to enter the proposed Stock Purchase Agreement between Amber Merger Sub LLC ("**Amber**"), a wholly-owned subsidiary of Amber Energy Inc., an affiliate of Elliott Investment Management L.P., and the Special Master, attached as Exhibit B to the Recommendation (the "**Amber SPA**");

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**"), the Recommendation, or the Dalinar SPA (as defined in the Recommendation) (as applicable).

**IT IS HEREBY ORDERED THAT:**

1.      In accordance with sections 6.16(d) and 8.1(d) of the Dalinar SPA, the Special Master is authorized to terminate the Dalinar SPA in order to execute the Amber SPA attached as Exhibit B to the Recommendation.

2.      The Special Master is authorized, after termination of the Dalinar SPA, to enter into a stock purchase agreement with Amber; *provided*, *that*, the effectiveness and enforceability of such stock purchase agreement and the transactions contemplated thereby as against the Special Master are subject to further approval by the Court as contemplated by the Recommendation.

Dated: _____, 2025

_____
HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

**<u>Exhibit B</u>**

**Amber Stock Purchase Agreement**

**B-1**

Amber Draft 8/29/2025

# STOCK PURCHASE AGREEMENT

dated as of

[●], 2025

between

AMBER MSUB LLC

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware


NOTE: STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT IN ALL RESPECTS TO THE CONFIDENTIALITY AGREEMENT SIGNED BETWEEN THE SPECIAL MASTER (AS DEFINED HEREIN) AND RECIPIENT (OR ITS AFFILIATE).  CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION.  NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS ...................................................3

    Section 1.1.    Certain Defined Terms ...................................................................3
    Section 1.2.    Other Definitional and Interpretive Matters ..............................3

ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING ....................................5

    Section 2.1.    Sale and Purchase of Shares .......................................................5
    Section 2.2.    Closing ........................................................................................5
    Section 2.3.    Closing Deliveries of the Parties ...............................................6

ARTICLE III PURCHASE PRICE; CLOSING DATE PAYMENTS ......................................6

    Section 3.1.    Purchase Price .............................................................................6
    Section 3.2.    Closing Transaction Expenses; Funds Flow Memorandum .................6
    Section 3.3.    Good Faith Deposit .....................................................................7
    Section 3.4.    Closing Date Payments by the Buyer .........................................7
    Section 3.5.    Withholding ................................................................................9

ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER ...............................................................................................9

    Section 4.1.    Corporate Existence; Title to Shares............................................9
    Section 4.2.    Governmental Authorization .....................................................10
    Section 4.3.    Non-Contravention ...................................................................10
    Section 4.4.    Capitalization ...........................................................................11
    Section 4.5.    Subsidiaries; Non-Controlled Entities. ....................................11
    Section 4.6.    Financial Statements ................................................................12
    Section 4.7.    Absence of Certain Changes ....................................................13
    Section 4.8.    No Undisclosed Material Liabilities .........................................13
    Section 4.9.    Legal Proceedings ....................................................................14
    Section 4.10.    Taxes .........................................................................................14
    Section 4.11.    Company Benefit Plans; Employment.......................................15
    Section 4.12.    Compliance with Laws; Permits ...............................................20
    Section 4.13.    Regulatory Matters ...................................................................20
    Section 4.14.    Environmental Matters .............................................................21
    Section 4.15.    Title to Properties .....................................................................22
    Section 4.16.    Material Contracts ....................................................................22
    Section 4.17.    Intellectual Property and Data Privacy .....................................25
    Section 4.18.    Brokers; Financial Advisor .......................................................27
    Section 4.19.    Real Property ............................................................................27
    Section 4.20.    Affiliate Transactions ...............................................................28
    Section 4.21.    Insurance ...................................................................................29
    Section 4.22.    No Additional Representations .................................................29

i

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER ..........................30
    Section 5.1.    Existence and Power ..............................................................................30
    Section 5.2.    Authorization .........................................................................................30
    Section 5.3.    Governmental Authorization .................................................................31
    Section 5.4.    Non-Contravention ................................................................................31
    Section 5.5.    Litigation ...............................................................................................31
    Section 5.6.    Regulatory Matters ................................................................................31
    Section 5.7.    Financing ...............................................................................................33
    Section 5.8.    Solvency ................................................................................................34
    Section 5.9.    Purported Equity Pledge .......................................................................34
    Section 5.10.    Claim Obligations. ................................................................................35
    Section 5.11.    Closing Consideration ...........................................................................35
    Section 5.12.    No Additional Representations ..............................................................35

ARTICLE VI COVENANTS ...........................................................................................................36
    Section 6.1.    Conduct of the Business Pending the Closing .....................................36
    Section 6.2.    Access to Information ............................................................................43
    Section 6.3.    Regulatory Approvals; Third Party Consents .......................................45
    Section 6.4.    Further Assurances ................................................................................49
    Section 6.5.    Confidentiality ......................................................................................49
    Section 6.6.    Indemnification, Exculpation and Insurance ........................................49
    Section 6.7.    Public Announcements ..........................................................................50
    Section 6.8.    Employee Matters ..................................................................................51
    Section 6.9.    The Buyer's Obligations in Respect of Debt Financing ......................54
    Section 6.10.    Company's Obligations in Respect of Debt Financing.........................56
    Section 6.11.    Tax Matters ............................................................................................60
    Section 6.12.    R&W Insurance Policy ...........................................................................61
    Section 6.13.    Notices of Certain Events .....................................................................61
    Section 6.14.    No Control of Other Party's Business ...................................................63
    Section 6.15.    [Reserved] .............................................................................................63
    Section 6.16.    Competing Proposals. ...........................................................................63
    Section 6.17.    Section 280G .........................................................................................64
    Section 6.18.    Financial Statements .............................................................................64
    Section 6.19.    Interim Period Incentive Bonuses .........................................................64
    Section 6.20.    Transaction Support Agreement ...........................................................65

ARTICLE VII CONDITIONS TO CLOSING ..................................................................................65
    Section 7.1.    Conditions Precedent to Obligations of the Parties .............................65
    Section 7.2.    Conditions Precedent to Obligations of the Buyer ..............................65
    Section 7.3.    Conditions Precedent to Obligations of the Special Master ................66
    Section 7.4.    Frustration of Closing Conditions.........................................................66

ARTICLE VIII TERMINATION .....................................................................................................66
    Section 8.1.    Termination ...........................................................................................66
    Section 8.2.    Effect of Termination............................................................................68

ARTICLE IX MISCELLANEOUS ...................................................................................68

    Section 9.1.    Survival .................................................................................68
    Section 9.2.    Expenses ...............................................................................68
    Section 9.3.    Governing Law .....................................................................69
    Section 9.4.    Dispute Resolution; Consent to Jurisdiction........................69
    Section 9.5.    Consent to Service of Process; Waiver of Jury....................69
    Section 9.6.    Entire Agreement .................................................................69
    Section 9.7.    Amendments and Waivers ....................................................70
    Section 9.8.    Notices .................................................................................71
    Section 9.9.    Severability ..........................................................................72
    Section 9.10.    Binding Effect; Assignment .................................................72
    Section 9.11.    No Third Party Beneficiaries ...............................................72
    Section 9.12.    Non-Recourse ......................................................................72
    Section 9.13.    Specific Performance ...........................................................73
    Section 9.14.    Successors and Assigns........................................................73
    Section 9.15.    Release .................................................................................73
    Section 9.16.    Counterparts .........................................................................75
    Section 9.17.    Debt Financing Sources .......................................................75
    Section 9.18.    Special Master and his Representatives' Judicial Immunity ...............76
    Section 9.19.    Special Master Indemnification ...........................................76

ANNEX A

Definitions

EXHIBITS

Exhibit A – Form of Escrow Agreement
Exhibit B – Form of Paying Agent Agreement
Exhibit C – Form of Closing Release
Exhibit D – Form of Sale Order

## <u>DEFINED TERMS</u>

| Term | Section |
|------|---------|
| Acceptable Confidentiality Agreement | Section 6.10(a)(x) |
| Acquired Companies | Annex A |
| Additional Judgment Creditors | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Affiliate Transactions | Section 4.20 |
| Agreement | Preamble |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| April 2021 Order | Recitals |
| April Scheduling Order | Recitals |
| Attached Judgment | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| August Scheduling Order | Recitals |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Bonus Amounts | Section 6.8(g) |
| Business Day | Annex A |
| Business Unit | Annex A |
| Buyer | Preamble |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Releasing Party | Section 9.15(a) |
| Buyer Released Party | Section 9.15(b) |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Cause | Section 1.2(a)(x) |
| CITGO Petroleum | Annex A |
| CITGO Petroleum Guarantees | Section 6.1(b)(xi) |
| Claim | Annex A |
| Claimholders | Recitals |
| Closing | Section 2.2 |
| Closing Consideration | Annex A |
| Closing Transaction Expenses | Annex A |
| Closing Transaction Expenses Statement | Section 3.2(a) |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Commitment Letters | Section 5.7(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |

| Term | Section |
|---|---|
| Company Benefit Plan | Annex A |
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Competing Proposal | Annex A |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Court | Recitals |
| Credit Bid Amount | Recitals |
| Credit Bid Purchase Price | Section 3.5(e) |
| Debt | Annex A |
| Debt Commitment Letter | Section 5.7(a) |
| Debt Financing | Section 5.7(a) |
| Debt Financing Commitments | Section 5.7(a) |
| Debt Financing Documents | Annex A |
| Debt Financing Source | Annex A |
| Debt Payoff Amount | Annex A |
| December Order | Recitals |
| Definitive Debt Documents | Section 6.9(c)(ii) |
| Deposit Amount | Recitals |
| Deposit Amount Release Date | Section 3.3(b) |
| Deposit Forfeiture Termination Event | Annex A |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| Economic Sanctions/Trade Laws | Annex A |
| Execution Date | Preamble |
| Environmental Laws | Annex A |
| EPP | Annex A |
| Equitable Exceptions | Annex A |
| Equity Commitment Letter | Annex A |
| Equity Financing | Section 5.7(a) |
| Equity Financing Commitments | Section 5.7(a) |
| Equity Financing Sources | Annex A |
| Equity Interests | Annex A |
| Equity Pledge Litigation | Annex A |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Recitals |

| Term | Section |
|------|---------|
| Evercore | Recitals |
| Expense Reimbursement Amount | Annex A |
| Expense Reserve Holdback Account | Annex A |
| Expense Reserve Holdback Amount | Annex A |
| Financings | Section 5.7(a) |
| Financial Statements | Section 4.6(a) |
| Final Recommendation Date | Section 6.3(a) |
| FIRPTA Certificate | Section 2.3(a)(iii) |
| Funds Flow Memorandum | Section 3.2(b) |
| GAAP | Section 4.6 |
| GLAS | Annex A |
| Good Industry Practice | Annex A |
| Governmental Body | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| Indemnitees | Section 6.6(a) |
| Indenture | Annex A |
| Initial Outside Date | Section 8.1(b) |
| Intellectual Property | Section 4.17(a) |
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| IRS | Annex A |
| January Order | Recitals |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| June Scheduling Order | Recitals |
| KM | Recitals |
| KNI | Recitals |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Koch | Recitals |
| Law | Annex A |
| Legal Proceeding | Annex A |
| Legal Restraint | Section 8.1(c) |
| Lien | Annex A |
| Lookback Date | Annex A |
| Material Contract | Section 4.16(a) |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |
| MUFG | Annex A |

| Term | Section |
|---|---|
| Negative Consequences | Annex A |
| New Indemnification Agreements | Section 6.6(a) |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |
| Non-Union Affected Employees | Section 6.8(c) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| Payoff Letters | Section 3.4(a) |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDVSA | Recitals |
| Performance Incentive Program | Section 6.8(g) |
| Permit | Annex A |
| Permitted Liens | Annex A |
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Post-Closing Tax Period | Annex A |
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(f) |
| Procedures Summary | Annex A |
| Prohibited Modification | Section 6.9(c)(ii) |
| Purchase Price | Annex A |
| Purported Equity Pledge | Recitals |
| R&W Insurance Policy | Section 6.12 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Record Holders | Recitals |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Release | Annex A |
| Replacement Financing | Section 6.9(f) |
| Representatives | Annex A |
| Required Amount | Section 5.7(e) |

| Term | Section |
|------|---------|
| RRP | Annex A |
| Rusoro | Recitals |
| Sale Hearing | Annex A |
| Sale Order | Annex A |
| Sale Process Parties | Annex A |
| Sale Procedures Order | Recitals |
| Sanctions Target | Annex A |
| Security Incident | Annex A |
| Senior Management | Section 6.1(b)(v) |
| Sensitive Data | Annex A |
| Shares | Recitals |
| Solvent | Annex A |
| Special Master | Preamble |
| Special Master and Company Related Parties | Section 8.3(d) |
| Special Master Released Parties | Section 9.15(a) |
| Special Master Releasing Parties | Section 9.15(b) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Debt | Annex A |
| Specified Information | Annex A |
| Subsidiary | Annex A |
| Superior Proposal | Annex A |
| Stalking Horse Agreement | Annex A |
| Stalking Horse Bidder | Annex A |
| Systems | Annex A |
| Tax or Taxes | Annex A |
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Topping Bidder | Annex A |
| Topping Bidder Agreement | Annex A |
| Topping Bidder SPA Date | Annex A |
| Transaction Documents | Annex A |
| Transaction Support Agreement | Recitals |
| Transactions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |
| WARN Act | Section 4.11(p) |
| 2020 Bondholders | Annex A |
| 2020 Bonds | Annex A |

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of [●], 2025 (the "Execution Date") is entered into by and between Amber MSub LLC, a Delaware limited liability company (the "Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court").

**W I T N E S S E T H :**

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "Specified Litigation") pursuant to (i) that certain Order entered by the Court on April 13, 2021 [D.I. 258] (the "April 2021 Order"), (ii) that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order"), (iii) the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "Sale Procedures Order"), (iv) that certain Order entered by the Court on December 31, 2024 [D.I. 1517] (the "December Order"), (v) that certain Order entered by the Court on January 27, 2025 [D.I. 1554] (the "January Order"), (vi) that certain Order entered by the Court on April 25, 2025 [D.I. 1745] (the "April Scheduling Order"), (vii) that certain Order entered by the Court on June 13, 2025 [D.I. 1809] (the "June Scheduling Order"), and (viii) that certain Order entered into by the Court on August 22, 2025 [D.I. 2110] (the "August Scheduling Order", and, together with the April 2021 Order, the May Order, the Sale Procedures Order, the December Order, the January Order, the April Scheduling Order and the June Scheduling Order, collectively, the "Sale Process Orders").

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA"), owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, each of Rusoro Mining Ltd. ("Rusoro"), Koch Minerals Sàrl ("KM"), and Koch Nitrogen International Sàrl ("KNI" and, together with KM, "Koch", "and, collectively, with Rusoro, the "Record Holders") is a creditor who is a party to the Specified Litigation and have each obtained a writ of attachment by January 12, 2024 (each, a "Specified Litigation Claim"),

and each such Specified Litigation Claim is secured by a valid and duly perfected lien on the Shares.

WHEREAS, the Buyer intends to effectuate a credit bid in respect of certain obligations owed to the Record Holders pursuant to those certain writs of attachment in *Rusoro Mining Limited v. Bolivarian Republic of Venezuela*, Case No. 21-mc-481-LPS (D. Del.) and *Koch Minerals Sàrl et al. v. Bolivarian Republic of Venezuela*, Case No. 22-mc-156-LPS (D. Del.), for a portion of the Purchase Price equal to the aggregate amount of principal of $[●] plus the aggregate amount of accrued interest on judgments held by the Record Holders from the date hereof through the Closing in accordance with that certain Order entered by the Court on April 25, 2024 [D.I. 1136] (the "Credit Bid Amount"), which, in conjunction with the Closing Consideration and other amounts to be paid by Buyer hereunder, will be in exchange for the transfer to the Buyer, as applicable, of the Shares.

WHEREAS, on the date of the Sale Order Entry, the Buyer shall deposit with Acquiom Clearinghouse LLC, in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000 (such amount, the "Deposit Amount") in cash, to be held in the Escrow Account pursuant to the terms of that certain Escrow Agreement, to be entered into on or prior to the date of the Sale Order Entry, by and among the Special Master, the Buyer and the Escrow Agent, in substantially the form attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time, the "Escrow Agreement"), to be released in accordance with the provisions of this Agreement and the Escrow Agreement.

WHEREAS, on October 27, 2016, PDVSA, as issuer, entered into the 2020 Indenture whereby PDVSA issued the 2020 Bonds which were purportedly secured, in part, by a pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company (the "Purported Equity Pledge").

WHEREAS, at the Closing, the Buyer intends to effectuate a consensual exchange of the 2020 Bonds for cash in accordance with the terms of that certain Transaction Support Agreement, dated August 12, 2025, by and among Amber Energy Inc. and certain 2020 Bondholders party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Transaction Support Agreement") and pursuant to which Transaction Support Agreement the requisite 2020 Bondholders consent to the consummation of the transactions contemplated hereby and the release and full termination of the Purported Equity Pledge;

WHEREAS, at the Closing (as defined below), the Buyer shall deposit the Closing Consideration (as defined below) with the Escrow Agent in cash pursuant to the terms of the Escrow Agreement, to be released to those creditors of the Bolivarian Republic of Venezuela (the "Republic") or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders") or the Buyer, in accordance with the provisions of the Escrow Agreement and that certain Paying Agent Agreement, to be entered into on or prior to the date of the Sale Order Entry by and among the Buyer, the Special Master and Acquiom Financial LLC, in its capacity as paying agent (the "Paying Agent"), in substantially the form attached hereto as Exhibit B (as amended, restated, supplemented or otherwise modified from time to time, the "Paying Agent Agreement").

2

WHEREAS, the Parties acknowledge that, as part of an integrated plan that includes the acquisition by the Buyer of the Shares pursuant to this Agreement, immediately after Closing, (i) the Buyer intends to merge downstream with and into the Company, with the Company surviving and (ii) a to-be-formed Delaware limited liability company and, after giving effect to the acquisition and the merger contemplated by the foregoing clause (i), wholly owned direct subsidiary of the Company intends to merge with and into CITGO Petroleum (as defined below), with CITGO Petroleum surviving.

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETIVE MATTERS

Section 1.1.    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

Section 1.2.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step is to be taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "day" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    Exhibits/Schedules. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication,

3

acknowledgment or representation that such item or matter is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)     <u>Herein</u>. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     <u>Inclusive Terms</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The term "any" means "any and all." The term "or" shall not be exclusive and shall mean "and/or."

(viii)     <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)     <u>Bolivarian Republic of Venezuela</u>. Any reference herein to the "Bolivarian Republic of Venezuela" or the "Republic" shall include any successor nation thereto, and shall encompass any and all governments and administrations that purport to be Venezuela's legitimate governing body.

(x)     <u>Special Master and the Acquired Companies</u>. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such obligation. With respect to any obligation of the Special Master hereunder to "<u>Cause</u>" any of the Acquired Companies to take an action or refrain from taking an action, or which

4

otherwise requires action (or refraining from action) by any such Acquired Company, such obligation shall be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action), including by seeking an order from the Court with respect to such action or refraining from taking such action.  For the avoidance of doubt, none of the Acquired Companies, PDVSA or the Republic is a party hereto, and the Special Master shall not be deemed to be in breach of any of its obligations under this Agreement as a result of a failure by the Special Master to Cause any of the Acquired Companies to take any action or refrain from taking any action prior to the Sale Order Entry.

(xi)    "Made Available." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document, item or information has been posted to the VDR or transmitted directly by email from the Special Master's advisors to the Buyer or its Representatives at least two (2) Business Days prior to the Execution Date.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

## ARTICLE II

## SALE AND PURCHASE OF THE SHARES; CLOSING

Section 2.1.    Sale and Purchase of Shares. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

Section 2.2.    Closing. The consummation of the sale and purchase of Shares (the "Closing") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no later than the tenth (10th) Business Day after satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.3.    <u>Closing Deliveries of the Parties</u>.

(a)    <u>Deliveries by the Special Master</u>. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    <u>Affirmation</u>. An affirmation, executed by the Special Master, stating that the Special Master has used reasonable best efforts to cause the Chief Financial Officer of the Company to confirm the satisfaction of the conditions set forth in <u>Section 7.2(a)</u> as of the Closing Date;

(ii)    <u>Stock Certificate</u>. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master; and

(iii)    <u>FIRPTA Certificate</u>. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2) (such certificate and notice issued by the Company, the "<u>FIRPTA Certificate</u>").

(b)    <u>Deliveries by the Buyer</u>. At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Special Master:

(i)    <u>Closing Certificate</u>. A certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u>; and

(ii)    <u>Closing Release</u>. A counterpart to the Closing Release, duly executed by the Buyer and each Record Holder as of the Closing.

## ARTICLE III

## PURCHASE PRICE; CLOSING DATE PAYMENTS

Section 3.1.    <u>Purchase Price</u>.  The aggregate consideration payable by the Buyer for the Shares shall be the Purchase Price. The Purchase Price shall not be subject to any adjustments (including, for the avoidance of doubt, with respect to the Debt Payoff Amount) other than as set forth in the definition of Purchase Price. The Incremental Consideration included in the Purchase Price may be used only to (x) to extinguish $500,000,000 of the Attached Judgment of Gold Reserve Ltd., (y) to extinguish all or a portion of other Attached Judgments as determined by the Special Master in consultation with the Buyer or (z) as otherwise determined by the Court.

Section 3.2.    <u>Closing Transaction Expenses; Funds Flow Memorandum</u>.

(a)    No later than five (5) Business Days prior to the Closing Date, the Special Master shall provide the Buyer with a written statement (the "<u>Closing Transaction Expenses Statement</u>") reflecting the Special Master's calculation of Closing Transaction Expenses in accordance with the definition of Closing Transaction Expenses hereunder, along with reasonable

supporting documentation. The Closing Transaction Expenses Statement shall be binding on the Parties for purposes of this <u>Section 3.2</u> and shall be used to determine the Purchase Price.

(b)    No later than one (1) Business Day after the Special Master's delivery of the Closing Transaction Expenses Statement, the Special Master shall distribute to the Buyer a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement (the "<u>Funds Flow Memorandum</u>"). The Special Master will consider in good faith the Buyer's reasonable comments and changes to the Funds Flow Memorandum. The Parties agree that the Buyer shall be entitled to rely on the Funds Flow Memorandum in making payments under <u>Section 3.4</u> and the Buyer shall not be responsible for the calculations or the determinations regarding such calculations in the Funds Flow Memorandum or liable for any claim by any Claimholder that any payments made in accordance with the Funds Flow Memorandum were not made in accordance with the Priority Order [D.I. 996], dated March 1, 2024 in the Specified Litigation or were otherwise improper.

Section 3.3.    <u>Good Faith Deposit</u>. On the date of the Sale Order Entry, the Buyer shall deposit into the Escrow Account with the Escrow Agent an amount equal to Deposit Amount in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or, at the direction of the Special Master, the Paying Agent, in accordance with the provisions of this Agreement, the Escrow Agreement and the Sale Procedures Order. The Deposit Amount will be distributed out of the Escrow Account as follows (and the Buyer and the Special Master hereby agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the Deposit Amount to the Paying Agent by wire transfer of immediately available funds out of the Escrow Account;

(b)    if a Deposit Forfeiture Termination Event occurs, the Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Paying Agent Account; and

(c)    if this Agreement is terminated for any reason other than as contemplated by <u>Section 3.3(b)</u>, the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

Section 3.4.    <u>Closing Date Payments by the Buyer</u>.

(a)    <u>Payment in respect of Debt</u>. At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the Debt Payoff Amount by wire transfer of immediately available funds to the Persons as specified in the "payoff letters" or similar documents, executed by the applicable lender(s) (or agent thereof) or as set forth in the applicable indenture with respect to each item of Specified Debt (the "<u>Payoff Letters</u>").

7

(b)     Payment in respect of the Closing Transaction Expenses. At the Closing, the Buyer shall pay, or cause to be paid, the Closing Transaction Expenses to the applicable recipients as set forth on the Closing Transaction Expenses Statement by wire transfer of immediately available funds to such Persons.

(c)     Payment in respect of Expense Reserve Holdback Amount. At the Closing, the Buyer shall pay, or cause to be paid, to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount as set forth in the Funds Flow Memorandum. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the date of the delivery of the Closing Transaction Expenses Statement by the Special Master related to the Transactions or any Action related to or arising therefrom for investment bankers, third-party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) and such amount shall be paid or distributed at the direction of the Special Master; provided, that any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after all Actions, if any, brought against the Special Master relating to the Transactions have been definitively adjudicated by a court of final determination.

(d)     Payment in respect of Reimbursement for Advanced Transaction Expenses. At the Closing, in accordance with the May Order, the Buyer shall pay, or cause to be paid, an amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount") as set forth in the Funds Flow Memorandum.

(e)     Payment in respect of Closing Consideration. At the Closing, the Buyer shall pay, or cause to be paid (including by causing the Record Holders to pay), (i) an amount equal to the sum of the Credit Bid Amount and (ii) an aggregate amount of cash equal to the Closing Consideration to the Paying Agent Account (together with the Credit Bid Amount, the "Credit Bid Purchase Price") as set forth in the Funds Flow Memorandum. The portion of the Credit Bid Purchase Price equal to the Credit Bid Amount shall be paid by means of a credit against an amount equal to the Credit Bid Amount that is due and owing under the Specified Litigation Claims by the delivery of an executed Closing Release by the Buyer and the Record Holders as set forth in Section 2.3(b)(ii). The Closing Consideration distributed by the Paying Agent to a Claimholder shall constitute partial or full and final satisfaction of payment of the applicable Attached Judgment, as applicable, to the extent of the amount distributed, including any and all claims in respect of such Attached Judgment that have been, could have been, or may have been, or may be asserted against the Company or any of its Subsidiaries.

(f)     Payment in respect of Termination Fee and Expense Reimbursement Amount. At the Closing, the Buyer shall pay, or cause to be paid, in each case as set forth in the Funds Flow Memorandum, (i) an amount to the Stalking Horse Bidder equal to the Termination Fee, and (ii) an amount to the Topping Bidder equal to the Expense Reimbursement Amount.

Section 3.5.    Withholding. Notwithstanding anything to the contrary in this Agreement, except as otherwise provided for in this Section 3.5, the Buyer shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that the Buyer shall (i) prior to making any deduction or withholding of any amount pursuant to this Section 3.5 (and in any event no later than ten (10) days prior to making any payment hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made. The Buyer acknowledges and agrees that, other than a deduction or withholding attributable to the failure of the Company to provide the FIRPTA Certificate described in Section 2.3(a)(iii), no withholding applies to the Closing Consideration under Chapter 3 or Chapter 4 of the Code and any and all payments of the Closing Consideration made by the Buyer or its Affiliates (including any Acquired Company) shall be made without deduction or withholding for any Taxes imposed under Chapter 3 or Chapter 4 of the Code.

**ARTICLE IV**

**REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER**

It is represented and warranted to the Buyer based solely upon the Specified Information furnished by the Designated Managers to the Special Master in accordance with the Procedures Summary that, as of the Topping Bidder SPA Date and as of the Closing, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "Company Disclosure Schedules") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules):

Section 4.1.    Corporate Existence; Title to Shares.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the

9

aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "Company Charter"), and the by-laws of the Company (the "Company By-Laws"). There is no pending or, to the Knowledge of the Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

(b)    The Special Master (or his counsel or advisors) is in possession of the original certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. To the extent provided by, and subject to the decrees of, the Sale Procedures Order, the Special Master has the legal capacity, power and authority to (i) execute and deliver this Agreement and each other Transaction Document to which the Special Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

(c)    This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, will constitute, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto), subject to the Sale Order Entry, will constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2.    Governmental Authorization. Except as set forth in Section 4.2 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 4.2 of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the "Sale Order Entry"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.3.    Non-Contravention. Except as set forth in Section 4.3 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in Section 4.2, (a) result in any Negative Consequences under the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or, to the Knowledge of the Company (and based only on information made available to the Acquired Companies with respect to the Non-Controlled Entities prior to the Topping Bidder SPA Date), any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i)

10

Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.4.    Capitalization.

(a)     The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)     Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in Section 4.4(b) of the Company Disclosure Schedules, there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company. The Company is not a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

Section 4.5.    Subsidiaries; Non-Controlled Entities.

(a)     Section 4.5(a) of the Company Disclosure Schedules reflects a true and complete list of each entity in which the Company owns, directly or indirectly, any Equity Interests (excluding Equity Interests owned directly or indirectly by Non-Controlled Entities), and with respect to each entity (except as otherwise provided in this Section 4.5(a)), sets forth the following information: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof (with respect to Company Subsidiaries only); and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder (with respect to Company Subsidiaries only).  Except as set forth in Section 4.5(a) of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other entity.

(b)     Each Company Subsidiary and, to the Knowledge of the Company, each non-Controlled Entity, is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole. Each Company Subsidiary: (i) is duly qualified or authorized to do business as a foreign corporation or entity and

11

is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)     The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary.

(d)     The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Purported Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

Section 4.6.    Financial Statements.

(a)     Section 4.6(a) of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "Audited Financial Statements"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "Company Balance Sheet") as of September 30, 2024 (the "Company Balance Sheet Date") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the nine-month period then ended (the "Interim Financial Statements" and, collectively with the Audited Financial Statements, the "Financial Statements"). Except as set forth in the notes to the Financial Statements and with the exception of the absence of normal year-end audit adjustments and footnotes in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)    The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on Section 4.6(b) of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.7.    Absence of Certain Changes. Except as contemplated by this Agreement, from the Company Balance Sheet Date to the date of this Agreement:

(a)    the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)    there has not been a Company Material Adverse Effect; and

(c)    no Acquired Company has entered into, terminated, amended or otherwise modified any Contracts set forth in Section 4.20 of the Company Disclosure Schedules (Affiliate Transactions).

Section 4.8.    No Undisclosed Material Liabilities. The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(a)    liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(b)    liabilities incurred since the Company Balance Sheet Date in the Ordinary Course and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(c)    liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(d)    liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(e)    liabilities or obligations set forth in Section 4.8(e) of the Company Disclosure Schedules.

Section 4.9.    Legal Proceedings As of the Topping Bidder SPA Date, except for the
Specified Litigation and as set forth in Section 4.9 of the Company Disclosure Schedules and as
would not, individually or in the aggregate, be reasonably likely to be material to the business of
the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or,
to the Knowledge of the Company, threatened in writing against the Acquired Companies before
or by any Governmental Body (whether local, state, federal or foreign). As of the Topping Bidder
SPA Date, except as would not, individually or in the aggregate, be reasonably likely to be material
to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its
Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or
other Governmental Body (other than Orders of general applicability which do not impact the
Acquired Companies in a manner that is materially different than the impact of similarly situated
companies).

Section 4.10.    Taxes. Except as set forth in the Company Balance Sheet (including the
notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to
have a Company Material Adverse Effect:

(a)    all income and other material Tax Returns required to be filed with any
Taxing Authority by, or with respect to, the Acquired Companies have been filed (taking into
account any applicable extensions) in accordance with all applicable Laws, the Acquired
Companies have paid, or caused to be paid, all material Taxes shown as due and payable on such
Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material
respects;

(b)    all material amounts of Taxes which any of the Acquired Companies were
obligated to withhold from amounts owing to any employee, creditor, owner or third party have
been fully and timely paid;

(c)    except as set forth in Section 4.10(c) of the Company Disclosure Schedules,
as of the Topping Bidder SPA Date, there is no Legal Proceeding or Claim in respect of any Tax
or Tax Return (each, a "Tax Proceeding") now proposed in writing or pending against or with
respect to the Acquired Companies;

(d)    except as set forth in Section 4.10(d) of the Company Disclosure Schedules,
none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond
the Topping Bidder SPA Date or agreed to any extension of time beyond the Topping Bidder SPA
Date with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to
file Tax Returns obtained in the Ordinary Course);

(e)    except as set forth in Section 4.10(e) of the Company Disclosure Schedules,
the Acquired Companies are not a party to, are not bound by and do not have any obligation under
any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement,
except for (i) any such agreement or arrangement solely between or among the Acquired
Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary
purpose of which does not relate to Taxes;

14

(f)     no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

(g)     none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting made on or prior to the Company Balance Sheet Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Company Balance Sheet Date, or (iv) prepaid amount received on or prior to the Company Balance Sheet Date;

(h)     none of the Acquired Companies has participated in any "reportable transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

(i)     there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this Section 4.10 with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.11.   Company Benefit Plans; Employment.

(a)     The Special Master has provided the Buyer with a list (set forth in Section 4.11(a) of the Company Disclosure Schedules) identifying each material Company Benefit Plan as of the Topping Bidder SPA Date.

(b)     With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service determination, opinion or advisory letter, and (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan. For purposes of this Section 4.11(b), summary plan descriptions and summaries of material modification available at https://www.hr.citgo.com as of five (5) Business Days prior to the Execution Date are considered

15

to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final) with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no  Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Acquired Company or any of their respective ERISA Affiliates currently sponsors, maintains, or contributes to (or is obligated to contribute to) or has, within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)     Except as set forth in Section 4.11(e) of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Topping Bidder SPA Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which would serve as a basis for the institution of such proceedings.

(f)     Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption. Each trust funding any Company Benefit Plan which is intended to

16

meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)      Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in <u>Section 4.11(g)</u> of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment medical or welfare benefits, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plan. To the Company's Knowledge, since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

(h)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's Knowledge, any third-party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in <u>Section 4.11(h)</u> of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, as of the Topping Bidder SPA Date, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder.

(j)      Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (y) as set forth in <u>Section 4.11(j)</u> of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in conjunction with any other event) will or could reasonably be expected to (i) accelerate the time

17

of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth in Section 4.11(j) of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k)     No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

(l)     Except as set forth in Section 4.11(l) of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, (i) the Acquired Companies are in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health, and wages, hours, worker classification, immigration, whistleblower protections, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there are no actual or, to the Knowledge of the Company, as of the Execution Date, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

(m)     To the Knowledge of the Company, as of the Topping Bidder SPA Date, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company as of the Execution Date, does any such employee have an intention to do so.

(n)     Except as set forth in Section 4.11(n) of the Company Disclosure Schedules, (i) as of the Topping Bidder SPA Date, none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "Collective Bargaining Agreement") with any labor union, works council, or other labor organization (each, a "Union") and no such agreement is being negotiated by any of the Acquired Companies (each such Collective Bargaining Agreement set forth in Section 4.11(n) of the Company Disclosure Schedules, a "Company Collective Bargaining Agreement"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any employees of an Acquired Company not covered by a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to

bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, hand billing, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against any Acquired Company.

(o)    Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened related to any allegations made by any current or former employee of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above.

(p)    Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "WARN Act") and have not incurred any material liability or material obligation under the WARN Act.

(q)    Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)    No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since the Lookback Date there have not been, any material workers' compensation claims, insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies. Except as would not, individually or in the aggregate, be reasonably

19

likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)    Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing.

Section 4.12.    Compliance with Laws; Permits.

(a)    Except as set forth in Section 4.12(a) of the Company Disclosure Schedules, since the Lookback Date, (i) to the Knowledge of the Company, none of the Acquired Companies has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(b)    Except as set forth in Section 4.12(b) of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.13.    Regulatory Matters.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(a) of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, authorized, solicited or received, the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "Government Official") (A) for the purpose of (1) influencing

20

any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(b) of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Topping Bidder SPA Date none of the Acquired Companies is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(c) of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.14.    Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any

21

matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances have been Released in or under, and no Hazardous Substances are migrating from, (x) properties currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Topping Bidder SPA Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.15.  Title to Properties. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Topping Bidder SPA Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to conduct their business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.16.  Material Contracts.

      (a)    <u>Section 4.16(a)</u> of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "<u>Material Contract</u>" shall mean any Contract to which any Acquired Company is a party or to which any assets, properties, or businesses of any Acquired Company are bound as of the Topping Bidder SPA Date (in each case, excluding (i) Contracts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course)  that:

           (i)    (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

           (ii)    (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

           (iii)    grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

           (iv)    was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $15,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any material non-monetary ongoing obligation on any Acquired Company (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

           (v)    limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

           (vi)    is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect

to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)    relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)    is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base salary in excess of $400,000, (B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(ix)    is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(x)    is a Contract between or among any Acquired Company, on the one hand, and any Governmental Body, on the other hand;

(xi)    is a term Contract with one of the ten largest suppliers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date); and

(xii)    is a term Contract with one of the ten largest customers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date).

(b)    Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

24

(c)    Since the Lookback Date, no Acquired Company has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

Section 4.17.    Intellectual Property and Data Privacy.

(a)    Section 4.17(a) of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Topping Bidder SPA Date ("Registered Intellectual Property"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software programs or applications, and (v) trade secrets, know- how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost information, customer information, business plans, marketing plans, and proposals (collectively, "Intellectual Property") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "Company Intellectual Property" and to the extent owned by the Acquired Companies the "Company Owned Intellectual Property"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

(b)    (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property. The Acquired Companies have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful,

25

accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)     Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any written claim to the Acquired Companies of ownership in respect of any of the Company Owned Intellectual Property.

(e)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

(f)     Since the Lookback Date, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations.

(g)     The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)     The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in

accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or are in the process of addressing, all material issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.18.  Brokers; Financial Advisor. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.

Section 4.19.  Real Property.

(a)    Section 4.19(a) of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Topping Bidder SPA Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired Companies  (individually, a "Real Property Lease" and, collectively, the "Real Property Leases"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "Vesting Instruments"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)    Section 4.19(b) of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("Owned Real Property" and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "Real Property"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire, sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)     Section 4.19(c) of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "Jointly Owned Properties"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)     To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)     The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Acquired Company and each parcel of Real Property (i) are now, and have been since the Lookback Date, in material compliance with all declarations of covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements since the Lookback Date.

(g)     There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)     Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.20.    Affiliate Transactions. Except as set forth in Section 4.20 of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement

28

with PDVSA or its Affiliates (excluding the Acquired Companies and their Subsidiaries), on the other hand, pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.21.  Insurance. Section 4.21 of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

Section 4.22.  No Additional Representations.

(a)    Except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)    Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations,

29

warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or implied, beyond those expressly given by the Buyer in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Special Master that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the Company simultaneously with the execution of this Agreement (the "Buyer Disclosure Schedules"):

Section 5.1.    Existence and Power. The Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation and has all requisite limited liability company powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign limited liability company and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Buyer to consummate the Transactions or perform its obligations under this Agreement.

Section 5.2.    Authorization. The Buyer has all requisite limited liability company power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer in connection with the consummation of the Transactions (the "Buyer Documents"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transactions have been duly authorized by all necessary limited liability company or organizational action on the part of the Buyer, and no shareholder or other similar approval is required in connection with the Buyer's execution, delivery and performance of the Transactions. The sole member of the Buyer has duly approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3.     Governmental Authorization. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions require no Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 5.3 of the Buyer Disclosure Schedules and (b) the OFAC License.

Section 5.4.     Non-Contravention. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions do not and will not, assuming compliance with the matters referred to in Section 5.2 and Section 5.3, (a) contravene or conflict with the certificate of incorporation or by-laws of the Buyer, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer or any of the Buyer Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or any of the Buyer Subsidiaries or to a loss of any benefit to which the Buyer or any of the Buyer Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or any license, franchise, permit or other similar authorization held by the Buyer or any of the Buyer Subsidiaries or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer or any of the Buyer Subsidiaries, other than a lien on the stock of the Company in connection with the Debt Financing. As of the Execution Date, there is no Effect that would reasonably be expected to prevent, or impede or interfere with, the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5.     Litigation. Except as set forth in Section 5.5 of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer, threatened in writing against or affecting, the Buyer, any of the Buyer Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (b) affect the legality, validity or enforceability of any Debt Financing. The Buyer is not subject to any Order of any Governmental Body that would reasonably be expected to (x) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (y) affect the legality, validity or enforceability of any Debt Financing.

Section 5.6.     Regulatory Matters.

(a)     In the three (3) years prior to the Execution Date, (i) none of the Buyer or any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries, in each case in such capacity, has violated any applicable Anti-Corruption Law in any material respect, and (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries, or any Equity Financing Source, in each case in such capacity, has offered, paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment

31

and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage. Without limiting the generality of the foregoing, none of the Buyer or any of the Buyer Subsidiaries, any of their respective directors, officers, employees, Affiliates or, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source is a Venezuelan national or has any relationship to Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof.

(b)      (i) The Buyer, each of the Buyer Subsidiaries and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Equity Financing Sources, Representative, and other persons acting for or on behalf of any of the foregoing Persons, in each case in such capacity, are, and at all times in the three (3) years prior to the Execution Date, have been in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and Money Laundering Laws and (ii) in the three (3) years prior to the Execution Date none of the Buyer or any of the Buyer Subsidiaries has been a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)      Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect, in the three (3) years prior to the Execution Date (i) none of the Buyer, any of the Buyer Subsidiaries or, to the Knowledge of the Buyer, any Equity Financing Source, has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any actual, alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, and (iii) the Buyer, each of the Buyer Subsidiaries and, to the Knowledge of the Buyer, the Equity Financing Sources have at all times made and maintained accurate books and records in compliance with Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws, (iv) the Buyer, each of the Buyer Subsidiaries and, to the Knowledge of the Buyer, each of the Equity Financing Sources have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws, and (v) in the three (3) years prior to the Execution Date, the Buyer, the Buyer Subsidiaries have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws.

(d)     Except as set forth in <u>Section 5.6(d)</u> of the Buyer Disclosure Schedules, the Buyer, the Buyer Subsidiaries, the Record Holders, each Record Holder's Subsidiaries and, to the Knowledge of the Buyer, the Equity Financing Sources, are each not a "foreign person" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

Section 5.7.    <u>Financing</u>.

(a)     On the Execution Date, the Buyer has delivered to the Special Master true, correct, and complete copies of (i) the executed Equity Commitment Letters from the Equity Financing Sources, which Equity Commitment Letters each provide that the Special Master is an express third party beneficiary thereto (the "<u>Equity Financing</u>", and the commitments under the Equity Commitment Letters, the "<u>Equity Financing Commitments</u>") and (ii) (A) a fully-executed commitment letter from each of the Debt Financing Sources identified therein (together with all annexes, schedules, and exhibits thereto, as amended from time to time as permitted herein, each a "<u>Debt Commitment Letter</u>" and collectively, the "<u>Debt Commitment Letters</u>", and the commitments under the Debt Commitment Letters, the "<u>Debt Financing Commitments</u>"; the Debt Commitment Letters and the Equity Commitment Letters, collectively, the "<u>Commitment Letters</u>"), pursuant to which, and subject to the terms and conditions of which, the lenders party thereto have committed to lend the amounts set forth therein to the Buyer for the purpose of funding the Transactions in accordance with the terms set forth therein (the "<u>Debt Financing</u>" and, together with the Equity Financing, the "<u>Financings</u>"), and (B) each related fee letter (collectively, the "<u>Fee Letters</u>"), which copy of such Fee Letter may be redacted to remove only the fees, "market flex" and other economic terms set forth therein so long as such redacted information does not adversely affect the conditionality, availability or aggregate principal amount of the Debt Financing.

(b)     As of the Execution Date, the Equity Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification is contemplated). The Equity Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms.

(c)     As of the Execution Date , the Debt Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect except in accordance with both (x) the implementation of "market flex" provisions set forth in the applicable Fee Letters and (y) this Agreement (and no such amendment, restatement or modification is contemplated except any amendment, restatement or modification to add additional Debt Financing Sources). As of the Execution Date, the Debt Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms. There are no agreements, side letters or arrangements (other than the Debt Commitment Letters and the Fee Letters) relating to the Debt Financing Commitments or the Debt Financing that imposes or permits the imposition of conditions precedent to the funding of the Debt Financing on the Closing Date or would otherwise affect the availability of the Debt Financing on the Closing Date. As of the Execution Date, the Buyer and the Debt Financing Sources are not in breach of any of the terms or conditions set forth

in the Debt Commitment Letters. As of the Execution Date, no event has occurred which, with or without notice, lapse of time or both, constitutes a default or breach on the part of the Buyer under any term or condition of the Commitment Letters, and the Buyer does not have any reason to believe that it will be unable to satisfy, on a timely basis, any term or condition of closing to be satisfied by it contained in the Debt Commitment Letters, or that the full amount of the Equity Financing or the Debt Financing will not be available to the Buyer on the Closing Date. On the Execution Date, the Buyer has fully paid any and all commitment fees or other fees that, in each case, are required by the Debt Financing Commitments or any Fee Letter to be paid on or before the Execution Date. On the Execution Date, the Debt Commitment Letters contain all of the conditions precedent to the obligations of the parties thereunder to make the full amount of the Debt Financing available to the Buyer on the terms set forth therein and there are no contingencies that would permit the Debt Financing Sources to reduce the total amount of the Debt Financing below the Required Amount or impose any additional conditions precedent to the availability of the Debt Financing. As of the Execution Date, none of the Debt Financing Commitments have been terminated or withdrawn, no lender has notified the Buyer of its intention to terminate or withdraw the Debt Financing Commitments, and the Buyer does not know of any facts or circumstances that may be expected to result in any of the conditions set forth in the Debt Commitment Letters not being satisfied. To the extent this Agreement must be in a form acceptable to any lender providing Debt Financing, such lender or lenders have approved this Agreement.

(d)    The obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

(e)    The aggregate proceeds from the Debt Financing (net of original issue discount, upfront fees and other fees, premiums and charges payable in connection therewith, after giving effect to the maximum amount of "market flex" provided under the Debt Financing Commitments and each Fee Letter) together with the Equity Financing and Buyer's cash on hand will be sufficient for satisfaction of all of the Buyer's obligations under this Agreement and to consummate the Transactions, including the payment of the Closing Consideration, repayment of the Specified Debt and the payment of all associated costs and expenses (including the Closing Transaction Expenses) (collectively, the "Required Amount").

Section 5.8.    Solvency. The Buyer is Solvent as of the Execution Date. Assuming (x) the accuracy of the representations and warranties set forth in Article IV, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9.    Purported Equity Pledge. The Buyer acknowledges the existence of the 2020 Bonds, the Purported Equity Pledge and the Equity Pledge Litigation, without admitting to the validity of the 2020 Bonds or the Purported Equity Pledge.

Section 5.10.  <u>Claim Obligations.</u>.  <u>Schedule 5.10</u> sets forth, as of the date hereof, the principal amount due and owing under the Specified Litigation Claims. For the avoidance of doubt, such amount includes all interest, fees, expenses and premiums that have accrued in connection with the Specified Litigation Claims after the commencement of the applicable Specified Litigation.

Section 5.11.  <u>Closing Consideration</u>.  The Buyer will not provide any consideration to any holder of an Attached Judgment (as defined in the Sale Procedures Order) at the Closing unless each other holder of an Attached Judgment senior to such holder (as set forth in the Priority Order (as defined below)) has either (i) received cash in full in satisfaction of its Attached Judgment, (ii) consented to receive non-cash consideration in satisfaction of its Attached Judgment or (iii) consented to release its attachment (in which case it may, at its election, attempt to execute its judgment against other property besides the PDVH Shares). Nothing in this <u>Section 5.11</u> precludes a bidder from offering, as part of its bid, non-cash consideration, including non-cash consideration to holders of Attached Judgments that are junior to holders of Attached Judgment who have, as of the time of the bid, not provided consent consistent with (ii) or (iii) above. The Special Master, as part of his obligation to make a recommendation to the Court as to which of the Qualified Bids is highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order), shall consider the value of non-cash consideration and the likelihood of obtaining consents consistent with this provision. As part of the Special Master's recommendation of a Successful Bid, he will advise the Court as to whether he received Qualified Bids including a component of non-cash consideration, what that non-cash consideration was and which creditors it would be offered to, and how he evaluated the non-cash component in reaching his recommendation.

Section 5.12.  <u>No Additional Representations</u>.

(a)     Except for the representations and warranties expressly made by the Buyer in (i) this <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer makes (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer hereby disclaims any such other representations or warranties.

(b)     Except for the specific representations and warranties expressly made by the Special Master in <u>Article IV</u>, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired Companies provided to,

35

or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in Article IV or in any certificate delivered pursuant to this Agreement.

## ARTICLE VI

## COVENANTS

Section 6.1.    Conduct of the Business Pending the Closing.

(a)    During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, or (z) any action taken, or omitted to be taken, by the Acquired Companies as set forth in Section 6.1(a) or (b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to use their reasonable best efforts to (i) conduct their business in the Ordinary Course, (ii) preserve intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations), (iii) comply in all material respects with all applicable Laws and (iv) preserve and maintain all material Permits.

(b)    Without limiting the generality of Section 6.1(a), except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies not to:

(i)    (A) amend or propose any change in the Company Charter or Company By-Laws, (B) permit any Company Subsidiary to amend or propose any change in such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)    (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

(iii)    (A) other than with respect to growth or enhancing capital expenditures or commitments, which are addressed in (B) and (C) below, make or authorize any capital expenditures or commitments, except (I) for 2025, in accordance with the capital budgets of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iii)(A)(I)

of the Company Disclosure Schedules, (II) for 2026, in accordance with the capital budgets to be adopted by the Acquired Companies for 2026 (which such capital budgets will not exceed, in the aggregate, the 2026 projection included in the medium term plan set forth in Section 6.1(b)(iii)(A)(II) of the Company Disclosure Schedules by more than 10% (the "MTP")), and (III) for any subsequent year, in accordance with the capital budgets of the Acquired Companies to be adopted by the Acquired Companies for such subsequent year (which such capital budgets will not exceed, in the aggregate, the projection included in the MTP for such subsequent year by more than 15%) (each of the foregoing, a "CapEx Budget") (provided, that, the Acquired Companies may make or authorize capital expenditures or commitments in excess of any applicable CapEx Budget so long as such excess expenditures do not, in the aggregate, result in an expenditure above 120% of the aggregate amount included in the applicable CapEx Budget), (B) approve any Authorization for Expenditure (AFE) or any growth or enhancing capital expenditures or projects in excess of $15,000,000 (except, during 2025, for any projects as provided in the applicable CapEx Budget and for 2026, 2027 and subsequent years, as provided in the MTP), (C) with respect to any line item in excess of $15,000,000 for growth or enhancing capital expenditures in any CapEx Budget, make or authorize an increase with respect to such line item in excess of 20% of the applicable budgeted amount, or (D) propose or vote in favor of any capital expenditures or commitments that would reasonably be expected to require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of $3,000,000 in the aggregate for all Non-Controlled Entities;

(iv)    make or authorize any turnaround or catalyst expenditures or commitments, except (A) for 2025, in accordance with the turnaround/catalyst budget of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iv)(A)(I) of the Company Disclosure Schedules, (B) for 2026, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted by the Acquired Companies for 2026 (which such turnaround/catalyst budgets will not exceed the 2026 projection included in the MTP by more than 10%), and (C) for any subsequent year, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted for such subsequent year (which such turnaround/catalyst budget will not exceed, in the aggregate, the projection included in the MTP for such subsequent year by more than 15%) (each turnaround/catalyst budget described in clauses (A)-(C), a "Turnaround/Catalyst Budget"); (provided, that, (1) the Acquired Companies may make or authorize turnaround or catalyst expenditures or commitments in excess of any applicable Turnaround/Catalyst Budget so long as such excess expenditures collectively do not result in an expenditure above 120% of the aggregate amount included in the applicable Turnaround/Catalyst Budget and (2) to the extent any turnaround project is expected to exceed the applicable budgeted amount in the applicable Turnaround/Catalyst Budget by more than 20%, the Acquired Companies will provide Buyer with a detailed explanation of such deviation promptly following such approval or expenditure, and provided, further, that, to the extent that the Acquired Companies determine that any turnaround/catalyst project included in the Turnaround/Catalyst Budget for a specific year should instead, in whole or in part, be executed in 2026 or a subsequent year, the inclusion of the remaining expenses with respect thereto in the Turnaround/Catalyst Budget 2026 or such subsequent year, as applicable, will not count towards the variance cap applicable to the Turnaround/Catalyst Budget to

be adopted for such subsequent year and will not require the prior written consent of
Buyer);

        (v)      except as required under any Company Benefit Plan or Company
Collective Bargaining Agreement, (A) increase the compensation of any ███████████
████████████ of any Acquired Company (such current and former
employees, together, "<u>Senior Management</u>"), or take any action to accelerate the vesting
or payment, or fund or in any other way secure the payment of, compensation or benefits
under any Contract, Company Benefit Plan or otherwise for or to any current or former
director, officer, manager, employee, contractor or consultant of any Acquired Company;
provided that nothing in this <u>Section 6.1(b)(v)</u> shall prohibit (x) providing annual increases
to compensation based on merit (with respect to the immediately preceding performance
period only), market-based adjustments or tenure in the Ordinary Course and in accordance
with standards, policies and practices of the Acquired Companies in place as of the
Execution Date and disclosed to the Buyer, or (y) making, in the Ordinary Course and in
accordance with standards, policies and practices of the Acquired Companies in place as
of the Execution Date and disclosed to the Buyer, annual cash bonus and long term cash
incentive grants that (I) do not provide for single trigger vesting upon the Closing and (II)
do not provide for full vesting and payout of performance-based components in the case of
a qualifying termination of the recipient after the Closing; (B) make, grant or promise any
equity or equity-based compensation, severance, change of control, retention, termination
or similar compensation or benefits to any current or former director, officer, manager,
employee, contractor or consultant of any Acquired Company; provided, that, nothing in
this <u>Section 6.1(b)(v)</u> shall prohibit making, granting or promising severance, change of
control, retention, termination, or similar compensation or benefits in amounts which are
less than $1,000,000 in the aggregate; (C) amend, adopt, establish, agree to establish, enter
into or terminate any Company Benefit Plan or establish, adopt or enter into any plan,
agreement, program, policy, practice, trust or other arrangement that would be a Company
Benefit Plan if it were in existence as of the Execution Date for the benefit of any current
or former director, officer, manager, employee, contractor or consultant of any Acquired
Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) amendments to
any Company Benefit Plan in the Ordinary Course that do not materially increase the costs
to the Acquired Companies of such Company Benefit Plan, or (y) renewals or replacements
of any Company Benefit Plan on commercially reasonable terms no less favorable in the
aggregate to the Acquired Companies than the terms of the Company Benefit Plan being
renewed or replaced; (D) terminate (other than for "cause" (as determined by the Company
consistent with its practices)) any member of Senior Management; or (E) except as required
by applicable Law, adopt or enter into any collective bargaining agreement, or amend in
any material respect any Company Collective Bargaining Agreement (and, for the
avoidance of doubt, nothing in this <u>Section 6.1(b)</u> shall restrict the Acquired Companies
from entering into a successor collective bargaining agreement to any Company Collective
Bargaining Agreement that expires prior to Closing) (provided, that, for the avoidance of
doubt, to the extent any action with respect to employees or Company Benefit Plans is not
prohibited by this <u>Section 6.1(b)(v)</u>, then <u>Section 6.1(b)(xii)</u> will not be deemed to restrict
any such action);

(vi)    acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business organization, division or other business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in Section 6.1(b)(vi) of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets pursuant to the receivables securitization transaction evidenced by the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions included in the capital expenditures permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)    propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity in the Ordinary Course so long as such acquisition would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities;

(viii)    (A) sell, lease, license, pledge or otherwise encumber (including by the grant of any option or any Preferential Right thereon) (other than by Permitted Liens) or subject to any Lien, abandon, cancel, let lapse or convey or dispose of, directly or indirectly, any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in Section 6.1(b)(xiv)) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, pledge or otherwise encumber (including by the grant of any option or any Preferential Right thereon) (other than by Permitted Liens) or subject to any Lien, abandon, cancel, let lapse or convey or dispose of, directly or indirectly, any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in Section 6.1(b)(viii) of the Company Disclosure Schedules, (II) sales of inventory to customers in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among (1) CITGO Petroleum and any Subsidiary thereof (the "CITGO Petroleum Subsidiaries"), (2) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (3) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), or (y) dispositions pursuant to the Receivables Securitization Facility;

(ix)  (A) incur, create or otherwise become liable for any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person (other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility as in effect on the date hereof and without giving effect to any amendments or modifications thereto that would increase the maximum amount available to be borrowed or advanced thereunder or (II) indebtedness for borrowed money incurred in the Ordinary Course that, in the case of this clause (II) does not exceed $50.0 million in the aggregate, or (III) finance leases in an aggregate principal amount not to exceed $250.0 million outstanding at any time) or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring, creating or otherwise becoming liable for any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company));

(x)  prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrowed money in excess of $10,000,000 in the aggregate, in each case, for cash, other than (A) for transactions among (1) CITGO Petroleum and any CITGO Petroleum Subsidiary, (2) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (3) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility, (C) prepayment and repayment of revolving loans in the Ordinary Course and (D) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the 2021 Indenture, the 2023 Indenture, the 1995 Loan Agreement, the 1998 Loan Agreement, the 2002 Loan Agreement and the under the Master Reimbursement Agreement instrument governing such indebtedness for borrowed money as in effect on the Execution Date;

(xi)  (A) other than in the Ordinary Course, materially modify, amend, fail to exercise any renewal rights, terminate or waive any material right under any Material Contract or any material Vesting Instrument (other than amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date) or (B) enter into any Contract that would be a Material Contract if in effect as of the Execution Date, other than in the Ordinary Course (including entry into indemnification agreements with directors or officers in substantially the same form as indemnification agreements made available to the Buyer prior to the date hereof), and provided, that, with respect to this Clause (B), such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the ability of CITGO Petroleum to execute guarantees of the Company's payment obligations pursuant to the Contracts disclosed in Section 6.6(a)

of the Company Disclosure Schedules or New Indemnification Agreements (such guarantees, collectively, the "CITGO Petroleum Guarantees") and; provided, further, that no Acquired Company shall enter into, amend or renew any Contract with PDVSA;

(xii)    except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xiv)) used by it;

(xiii)    (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments by (1) CITGO Petroleum in any CITGO Petroleum Subsidiary, (2) by a CITGO Petroleum Subsidiary in another CITGO Petroleum Subsidiary or (3) by any Acquired Company (other than CITGO Petroleum and any CITGO Petroleum Subsidiary) into another Acquired Company (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), (II) pursuant to capital calls required pursuant to the terms of existing Contracts to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);

(xiv)    (A) (I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting periods or Tax accounting methods currently in effect, (II) other than in the Ordinary Course, settle any Tax Proceeding, or (III) other than in the Ordinary Course, file any amended Tax Return, in each case of the foregoing clauses (I), (II) and (III), if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies, taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); provided, that, for the avoidance of doubt, the foregoing will not prohibit the Acquired Companies from taking any action in good faith as a result of, or to comply with, changes in applicable Tax Laws;

(xv)    authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract providing for any of the foregoing with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvi)    other than as set forth in Section 6.1(b)(xvi) of the Company Disclosure Schedules, declare, set aside, make or pay dividends or similar distributions (whether in cash, stock or property) on or with respect to the Shares or otherwise, other than dividends or similar distributions between or among the Company and the Company Subsidiaries; provided, that, for the avoidance of doubt, nothing in this Agreement will limit the Acquired Companies' ability to satisfy payables to PDVSA described on Section

41

4.20 of the Company Disclosure Schedules; provided, further, that (i) in no event shall any dividend or distribution be made, directly or indirectly, to PDVSA (other than the satisfaction of "Payables to Affiliates" as described on Section 4.20 of the Company Disclosure Schedules) and (ii) any distributions from any Company Subsidiary to the Company is in the Ordinary Course;

(xvii)   (A) settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount payable by an Acquired Company in excess of $15,000,000 in the aggregate or (II) that would impose any material non-monetary relief (excluding customary confidentiality obligations) on the Acquired Companies, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); or

(xviii)  agree or commit to do any of the foregoing (or, with respect to any of the foregoing restrictions which expressly relates to the Non-Controlled Entities, vote in favor of or propose that any Non-Controlled Entity agree or commit to take any such restricted action).

(c)     Notwithstanding the foregoing, during the Interim Period, the Acquired Companies may (i) utilize any and all available Cash to repay and make required payments of outstanding Debt under the 2021 Indenture, the 2023 Indenture, the 1995 Loan Agreement, the 1998 Loan Agreement, the 2002 Loan Agreement and the under the Master Reimbursement Agreement or other Debt (other than Debt for borrowed money or Debt evidenced by notes, debentures, bonds or other similar instruments), provided, that such payments do not exceed the amounts owed and outstanding and (ii) amend, restate, refinance or terminate any outstanding Debt or the Receivables Securitization Facility, or replace such Debt or Receivables Securitization Facility with new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property) including in the form of, but not limited to, a new securitization facility, an asset based loan or other revolving credit facility (and the Acquired Companies may vote in favor or propose that a Non-Controlled Entity do any of the foregoing, as applicable); provided that, (x) the Special Master shall Cause the Acquired Companies to consult in advance with the Buyer and in good faith take the Buyer's views into account regarding any such new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property), (y) no new Debt shall increase the amount of Debt being refinanced or replaced or include prepayment or make-whole premiums or penalties or otherwise limit or restrict the Acquired Companies right to repay outstanding Debt at the Closing and (z) any such repayment of outstanding Debt, or amendment, restatement, refinancing, termination or replacement of outstanding Debt or the Receivables Securitization Facility is determined in good faith by the Company's board of directors to be in the best interest of the Acquired Companies (or the applicable Non-Controlled Entity).

(d)     In the event that the Closing does not occur by the first anniversary of the Execution Date, the dollar amounts in this Section 6.1 shall, without further action, increase by an incremental 10% on each anniversary of the Execution Date.

(e)     Notwithstanding anything to the contrary herein, nothing in this Agreement will restrict the Acquired Companies from taking actions to prevent or mitigate the effects of any

damage to property or injury to any person or the environment in emergency circumstances, as reasonably determined in good faith by the Acquired Companies, so long as the Acquired Companies (i) use Good Industry Practices with respect to such circumstances and (ii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in any event, no later than one (1) Business Day) after such action is taken.

(f)     For the avoidance of doubt, nothing in this Agreement, including the provisions of this Section 6.1 or Section 6.3, in any way impairs the right of the Acquired Companies or PDVSA to object to the approval or execution of this Agreement or the approval or consummation of the Transactions, including on appeal, and the taking of any actions in connection therewith.

(g)     Notwithstanding anything in this Agreement to the contrary, to the extent that the Venezuela Parties propose a Competing Proposal which constitutes, or could reasonably be expected to lead to, a Superior Proposal, nothing in this Agreement will prohibit the Venezuela Parties from proposing that the Acquired Companies take actions otherwise prohibited by this Section 6.1 or any other provision of this Agreement in connection therewith (including, for the avoidance of doubt, the actions described in Section 6.1(b)(b)(xvi)) and, subject to the termination of this Agreement pursuant to Section 8.1(f) in connection with the entry into a definitive agreement with respect to such Competing Proposal by the Venezuela Parties, the Acquired Companies committing to take such actions if permitted by applicable Law.

Section 6.2.     Access to Information.

(a)     During the Interim Period, the Special Master shall (i) Cause the Designated Contacts or such other members of the Company's senior management team as may be reasonable and appropriate from time to time and upon reasonable advance notice to be available to meet and confer with Buyer and its Representatives, (ii) Cause the Designated Contacts or such other members of the Company's senior management team as may be appropriate time to time to provide, upon reasonable advance notice and at the Buyer's sole cost and expense, responses to the Buyer's questions and requests as the Buyer and its Representatives may from time to time reasonably request, and (iii) Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies; provided, that (i) any such access and activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (ii) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies.  Notwithstanding anything herein to the contrary, no such access or disclosure shall be required if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Special Master shall Cause the Company to, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense

agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply.  There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates.  All requests for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "Designated Contacts").  Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions.

(b)    Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

(c)    For a period commencing on the Closing Date and ending on the latest of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention).  Notwithstanding anything in this Section 6.2(c) to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Parties will, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply.  The Buyer agrees to cause the Company to hold all the books and records of the Acquired Companies existing on the

Closing Date and not to destroy or dispose of any thereof for a period of twelve (12) months after the finalization of any appeal of the sale and purchase of the Shares or for a longer period of time as may be required by Law.

Section 6.3.    Regulatory Approvals; Third Party Consents.

(a)    Each of the Parties shall, if required by applicable Law, within thirty (30) calendar days following the date on which the Special Master files a notice with the Court to recommend the Buyer as the Successful Bidder (the "Final Recommendation Date"), file or supply, or in the case of the Special Master Cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than ten (10) Business Days thereafter), file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws (other than the HSR Act). The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all fees, costs, expenses and other charges in connection with compliance with this Section 6.3 (including filing fees).

(b)    Neither Party shall (i) consent to any voluntary extension of any waiting period; (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Laws; or (iii) consent to any other voluntary delay of the consummation of the Transactions at the behest of any Governmental Body, in each case, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    The Buyer shall, at its own expense, (i) within ten (10) Business Days after the Final Recommendation Date, submit the OFAC License Application; (ii) promptly supply any additional information and documentary material that may be requested by OFAC in relation to the OFAC License Application; (iii) seek and obtain, prior to submitting the OFAC License Application and any other filing with or submission to OFAC, written consent from the Special Master, which consent shall not be unreasonably withheld or delayed; (iv) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or material contacts with OFAC or other Governmental Body in relation to the OFAC License Application; and (v) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the OFAC License Application.  The Special Master shall cooperate, and shall Cause the Company to cooperate with and provide any information or assistance reasonably requested by the Buyer to prepare, submit and obtain approval of the OFAC License Application.

(d)    The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in Section 6.3(a). The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws. In furtherance of the foregoing, at

45

least once every two weeks following the Final Recommendation Date, the Buyer shall provide the Special Master a written update, in reasonable detail, on the status and progress of, or any other developments regarding, the OFAC License Application (and/or any other filings or material contacts with OFAC or other Governmental Body in relation to the OFAC License Application) and the HSR Filing (and/or any material contracts with the relevant Governmental Bodies in relation to the HSR Filing). Following receipt of any such update, the Special Master may, but shall not be obligated to, provide the Buyer with written feedback if it disagrees with or otherwise has concerns regarding, the actions, timing or strategy employed by the Buyer with respect to the OFAC License Application and the HSR Filing, and, upon receipt thereof, the Buyer will use commercially reasonable efforts to address any such written feedback.

(e)     Notwithstanding anything to the contrary in this Agreement, the Buyer (x) shall take, (y) shall cause its Subsidiaries to take, and (z) solely in the event of a Regulatory Toggle Event, Buyer shall, and shall cause its Affiliates to take, in each case, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x) avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Laws (including Antitrust Laws) as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Affiliates or Subsidiaries (including, following the Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies), to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); and (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv), or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); provided, that in each of the foregoing clauses (i), (ii), (iii), (iv), (v) and (vi), such clauses shall apply to Affiliates solely in the event of a Regulatory Toggle Event. Notwithstanding the foregoing, for the avoidance of doubt, neither the Buyer nor any Subsidiary or Affiliates of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions. "Regulatory Toggle Event" shall mean the earlier of (x) one hundred and fifty (150) days after the

46

Initial Outside Date or (y) entry of an Order by any Governmental Body restraining (other than a temporary restraining order), enjoining or prohibiting the Transactions under the Antitrust Laws.

(f)    In addition and without limiting the other provisions of this Section 6.3, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Laws (including Antitrust Laws), including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; provided, however, that such litigation in no way limits the obligation of the Buyer to take the actions set forth in Section 6.3(e).

(g)    Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person (including having any employee or director of Buyer or any Subsidiary become an employee or director of any of the issuers listed on Section 6.3(g) of the Company Disclosure Schedules), if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions. In addition to and without limiting the generality of the foregoing, the Buyer shall cause its Affiliates not to acquire or agree to acquire (A) any downstream assets (other than minority interests in securities, which shall be governed by clause (B) of this Section 6.3(g)) if such acquisition or agreement would reasonably be expected to impose any delay in the obtaining of, or increase the risk of not obtaining, the applicable approval required under the HSR Act, or (B) beneficial ownership (as defined under Section 13(d) of the Exchange Act) of more than 10% of a voting class of registered equity securities of any of the issuers listed on Section 6.3(g) of the Company Disclosure Schedules.

(h)    Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; provided, however, that

materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion. Notwithstanding the foregoing, the Buyer shall determine, direct and control the strategy and process by which the Parties will seek required approvals under the Antitrust Laws and the Buyer shall approve any filings and submissions before they are made. In furtherance of the foregoing, the Buyer shall have the absolute right to determine the strategy for which it will propose, execute, carry out or agree or submit to any action or remedy contemplated by Section 6.3(e), including by defending through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Laws (including Antitrust Laws) without having proposed, executed, carried out or agreed or submitted to any such action or remedy (subject to Buyer's obligations in the event of a Regulatory Toggle Event, which obligations shall require that following a Regulatory Toggle Event, Buyer shall, and shall cause its Affiliates to comply with its obligations in Section 6.3(e)). Notwithstanding this Section 6.3(h) and Section 6.7 (Public Announcements), the Special Master acknowledges and agrees that, following the Execution Date and the issuance of Buyer's press release pursuant to Section 6.7, the Buyer and its Affiliates and each of their respective Representatives may contact Governmental Bodies and federal, state and local officials in connection with the Transaction and respond to inquiries (including informal in-person meetings) from such Persons and their representatives in each case, in connection with the Transaction for purposes of discussing the Buyer's identity and go-forward plans with respect to the Acquired Companies and impacts on stakeholders; provided, that (i) this sentence shall not apply to any communications with Department of Justice, Federal Trade Commission, or OFAC; (ii) such communications shall not disclose substantive non-public information regarding the terms and conditions of the Transactions; (iii) prior to providing any such Person with written materials containing substantive non-public information regarding the Transactions, the Buyer shall provide the Special Master with copies of such written materials at least forty-eight (48) hours in advance of dissemination; and (iv) upon the reasonable request of the Special Master from time to time, the Buyer shall provide the Special Master with reasonable updates on the status of communications permitted pursuant to this sentence.

Section 6.4.    <u>Further Assurances</u>. Subject to, and not in limitation of, <u>Section 6.3</u>, until the Closing or earlier termination of this Agreement, each of the Parties shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision hereof and the actions contemplated hereby and (b) use its best efforts to, at the earliest practicable date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions.

Section 6.5.    <u>Confidentiality</u>. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between Elliott Investment Management L.P. and the Special Master dated January 5, 2024 (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with <u>Section 6.10</u>. Effective as of the Closing, the Confidentiality Agreement shall terminate and be of no further force or effect.

Section 6.6.    <u>Indemnification, Exculpation and Insurance</u>.

(a)    From and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "<u>Indemnitees</u>") pursuant to the Organizational Documents of the Acquired Companies in effect on the Execution Date (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Execution Date) or pursuant to the Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules in effect as of the Execution Date (as the same may be amended to reflect the CITGO Petroleum Guarantees) or indemnification Contracts entered into during the Interim Period between an Acquired Company, on the one hand, and an Indemnitee first hired or engaged by the Acquired Companies during the Interim Period, on the other hand (which such Contracts will not be materially less favorable to the Acquired Companies than those Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules) ("<u>New Indemnification Agreements</u>").

(b)    The indemnification and exculpation provisions of the Acquired Companies' Organizational Documents and indemnification Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees under <u>Section 6.6(a)</u>, unless such amendment or modification is required by Law. From and after the Closing, the Buyer agrees to cause the Acquired Companies to maintain in effect in accordance with their respective terms (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation, Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May 5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and not to amend the foregoing in any manner that would adversely affect the rights of the applicable Indemnitees thereunder, unless such modification is required by Law.

(c)    Prior to the Closing, the Company may, or, immediately upon the Closing if the Company has not already done so, the Buyer shall cause the Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or "runoff" insurance program currently available to be purchased under the existing directors' and officers' liability insurance plan covering the Acquired Companies' directors and officers, to the extent such plan remains available as of the Closing on materially the same terms and conditions; provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy. To the extent that such plan is no longer available on materially the same terms and conditions at the Closing, prior to the Closing, the Buyer shall, or, immediately upon the Closing, shall cause the Company, to purchase a directors' and officers' liability "tail" or "run-off" insurance program, selected by the Company prior to the Closing, for a period of six (6) years after the Closing (such coverage shall have an aggregate coverage limit over the term of such policy in an amount no less than the aggregate coverage limit under the Company's existing directors' and officers' liability policy, and in all other respects comparable to such existing coverage); provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy.

(d)    The provisions of this Section 6.6 are intended to be for the benefit of, and shall be enforceable by, each Indemnitee.

(e)    In the event that the Buyer, the Company or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Buyer and of the Company shall assume all of the obligations of the Buyer and the Company set forth in this Section 6.6.

Section 6.7.    Public Announcements. The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special Master may issue (x) the initial press release announcing the execution of this Agreement that has been agreed upon by the Buyer and the Special Master, (y) any press release or public announcement so long as any statements contained therein concerning the Transactions are consistent with previous releases or announcements made by the applicable Party with respect to which such Party has complied with the provisions of this Section 6.7, and (z) such other release or announcement that, upon the advice of outside counsel, is required by Law or the rules and

regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of its Affiliates, are listed. For the avoidance of doubt, nothing in this <u>Section 6.7</u> shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions, (b) disclosing this Agreement or the substance or any relevant details of the Transactions on a confidential basis to any of its Representatives (<u>provided</u>, that such Representatives have been informed of such party's confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this <u>Section 6.7</u> or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8.     <u>Employee Matters</u>.

(a)     The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the Execution Date (or as adopted or amended to the extent permitted by <u>Section 6.1(b)</u>). No provision of this <u>Section 6.8(a)</u> shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this <u>Section 6.8</u> will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)     As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the Closing (the "<u>Union Affected Employees</u>") on the terms therein, including with respect to employee wages and benefits.

(c)     For a period of twelve (12) months  following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who is not subject to or covered by a Company Collective Bargaining Agreement (the "<u>Non-Union Affected Employees</u>," together with the Union Affected Employees, the "<u>Affected Employees</u>"), compensation and employee benefits which are no less favorable than those provided to the Non-Union Affected Employees prior to the Closing.  Notwithstanding the generality of the foregoing, for a period of twelve (12) months following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each Non-Union Affected Employee, (i) a base salary or wage rate (as applicable), in each case, that is no less favorable than that provided to such Non-Union Affected Employee immediately prior to the Closing, (ii) short-term and long-term incentive compensation opportunities and Responsibility Incentive (as such term is defined in the

51

CITGO Petroleum Corporation 2024 Compensation and Incentive Omnibus Plan for Salaried Employees or its successor), in each case, that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, (iii) all other compensation and employee benefits (including any defined benefit pension and post-retirement health and welfare benefits) that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, and (iv) severance payments, entitlements and benefits that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing. Except as required by applicable Law, for the period beginning on the Closing Date and ending on the first anniversary thereof, the Buyer agrees to cause the Acquired Companies to maintain in effect and without reduction retiree health and life insurance benefits for the individuals who are participants in the Acquired Companies' retiree health and life insurance benefits as of immediately prior to the Closing Date and individuals who become eligible to participate in such retiree health and life insurance benefits during the period beginning on the Closing Date and ending on the one year anniversary thereof.

(d)     The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and benefit accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent recognized by any of the Acquired Companies immediately prior to the Closing, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(e)     The Buyer will (or will cause the Acquired Companies to) use commercially reasonable efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee may be eligible to participate in after the Closing, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Closing under any welfare plan maintained for the Affected Employee immediately prior to the Closing, and (ii) for the first plan year of eligibility, provide each Affected Employee with credit for any co-payments and deductibles, paid by such Affected Employee prior to the Closing, in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such Affected Employee is eligible to participate in after the Closing. References to "Affected Employee" in this Section 6.8(e) shall also refer to the applicable Affected Employee's eligible dependents.

(f)     Upon the Buyer's request (and at the Buyer's sole cost and expense), the Special Master shall Cause the Company to adopt and maintain an employee retention plan in form and substance as proposed by the Buyer in writing. Any such employee retention plan shall be in addition to, and shall not replace or substitute any existing Company Benefit Plan.

(g)     To the extent any awards under any cash bonus, sales and other incentive plans of the Acquired Companies ("Bonus Amounts") with respect to a performance period completed prior to the Closing remain unpaid as of the Closing Date, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies.  With respect to Bonus Amounts for the performance period in which the Closing occurs, the Buyer shall cause such Bonus Amounts to be calculated and paid in the

52

Ordinary Course to the eligible employees of the Acquired Companies based on the actual level of Company performance for such performance period.  Without limiting in any way any rights an Affected Employee may have under any Company Benefit Plan, if an Affected Employee participating in the CITGO Petroleum Corporation Performance Incentive program for salaried employees (the "Performance Incentive Program") has a qualifying termination of employment entitling the Affected Employee to severance under a severance program, agreement or arrangement of the Buyer or the Acquired Companies and such termination occurs during the period that begins on the Closing Date and ends on the date on which Bonus Amounts under the Performance Incentive Program are paid for the performance period in which the Closing occurs, then such Affected Employee will not lose eligibility, solely due to the termination of employment, for payment of any Bonus Amount under the Performance Incentive Program for performance periods completed prior to the Closing or for the performance period in which the Closing occurs; provided, that any such Bonus Amounts shall be paid to such employee at the same time as such awards are paid to other participants in the Performance Incentive Program, and provided, further, that any such Bonus Amount for the performance period in which the termination of employment occurs shall be prorated based on the number of completed months of employment during the performance period prior to the termination of employment.

(h)     The provisions contained in this Section 6.8 shall not (i) be treated as an amendment or other modification of any Company Benefit Plan, Company Collective Bargaining Agreement or other employee benefit plan, agreement or other arrangement, (ii) limit the right of the Buyer or any Acquired Company to terminate any employee at any time and for any reason or (iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is not a party to this Agreement. The benefits and compensation provided to each Affected Employee following the Closing Date shall be subject to the requirements of applicable Law. Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired Companies any obligation to (A) retain any Affected Employee in its or their employ for any amount of time or (B) maintain any terms and conditions of employment other than as expressly set forth above, subject to applicable Law and the Acquired Companies' existing contractual obligations to the respective Affected Employee.

(i)     From and after the Execution Date, the Buyer will cooperate with and provide all information reasonably requested by the Acquired Companies and their representatives in connection with any notice to be filed by the Acquired Companies with the PBGC pursuant to ERISA Section 4043 and the regulations thereunder as a result of the Transactions or in connection with any related requests for information from the PBGC.  To the extent such notice is required to be filed prior to Closing, the Special Master shall Cause the Acquired Companies to (i) cause the applicable plan sponsor and plan administrator to timely file such notice with the PBGC and (ii) prior to such filing, provide Buyer a reasonable opportunity to review and comment on such notice.

(j)     Not less than thirty (30) days prior to the Closing, the Special Master shall Cause the Acquired Companies to contribute to the grantor trust established for the EPP and the RRP such funds as are required to be contributed to such trust pursuant to the terms of the EPP and RRP.

Section 6.9.    The Buyer's Obligations in Respect of Debt Financing.

(a)    The Buyer acknowledges and agrees that the Special Master, the Company and their respective Affiliates have no responsibility for any financing that Buyer may raise in connection with the Transactions.

(b)    Concurrently with the execution and delivery of this Agreement, the Buyer has delivered to the Special Master fully executed versions of the Debt Commitment Letters.

(c)    The Buyer shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing contemplated by the Debt Financing Commitments on or prior to the Closing Date, including to:

(i)    maintain in effect (A) the Equity Commitment Letters from and after the Execution Date and (B) the Debt Commitment Letters from and after the Execution Date, subject to the Buyer's right to amend, modify, supplement, restate, assign, substitute or replace the Debt Commitment Letters in accordance with Section 6.9(e) herewith;

(ii)    negotiate and enter into definitive financing agreements (the "Definitive Debt Documents") with respect to the Debt Financing that reflect the terms contained in the Debt Commitment Letters (including any "market flex" provisions related thereto) or such other terms of the definitive credit documentation (but for the avoidance of doubt, not closing conditions) that are acceptable to the Buyer and the Debt Financing Sources that apply after the Closing, so that such agreements are in effect no later than the Closing Date; provided, however, that in no event shall any change to the Definitive Debt Documents (1) be reasonably expected to (A) adversely affect Buyer's ability to timely consummate the Transactions or (B) make the timely funding of the Debt Financing, or the satisfaction of the conditions to obtaining the Debt Financing less likely to occur in any respect, (2) reduce the aggregate amount of the Financing, (3) impose new or additional conditions or expand upon (or amend or modify in any manner adverse to the interests of the Company) the conditions precedent to the Debt Financing as set forth in the Debt Commitment Letters, (4) adversely affect the ability of Buyer to enforce its rights against the other parties to the Debt Financing Commitment Letters, the Fee Letter or any Definitive Debt Document or (5) reasonably be expected to prevent, delay, impede or impair the Closing (clauses (1) through (5), a "Prohibited Modification");

(iii)    [Reserved];

(iv)    satisfy on a timely basis all conditions applicable to the Buyer contained in the Debt Financing Commitments and Equity Financing Commitments, including the payment of any commitment, engagement or placement fees required as a condition to the Debt Financing or the Equity Financing, as applicable;

(v)    consummate the Debt Financing (including by instructing the Debt Financing Sources to fund the Debt Financing in accordance with the Debt Commitment Letters, instructing the Equity Financing Sources to fund the Equity Financing in accordance with the Equity Commitment Letters and enforcing the Buyer's rights under

the Debt Commitment Letters (including if necessary or appropriate to commence, participate in and diligently pursue Legal Proceedings against or involving any of the Persons that have committed to provide any portion of, or otherwise with respect to, the Debt Financing)) at or prior to the date that the Closing is required to be effected in accordance with Section 2.2 (the Buyer acknowledges and agrees that it is not a condition to Closing under this Agreement, nor to the consummation of the Transactions, for the Buyer to obtain the Debt Financing or any Replacement Financing); and

(vi)     comply with its obligations under the Debt Commitment Letters.

Subject to the terms and upon satisfaction of the conditions set forth in the Debt Commitment Letters, the Buyer shall use its reasonable best efforts (including, if necessary or appropriate, initiating Legal Proceedings) to cause the lenders and the other Persons providing such Debt Financing to provide the Debt Financing on the Closing Date.

(d)     The Buyer shall provide to the Special Master copies of all agreements and other documents relating to the Debt Financing and, shall keep the Special Master reasonably informed on a current basis and in reasonable detail of material developments in respect of the financing process relating thereto. Without limiting the generality of the foregoing, the Buyer shall provide the Special Master prompt (and in no event later than forty-eight (48) hours after obtaining knowledge) written notice (i) of any expiration or termination of, or any breach, default or violation (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach, default or violation) by any party to the Debt Commitment Letters or definitive agreements related to the Debt Financing of which the Buyer becomes aware, (ii) of the receipt of any written notice or other written communication, in each case from any Debt Financing Source with respect to any (x) actual or potential breach, default, violation, termination or repudiation by any party to the Debt Commitment Letters or definitive agreements related to the Debt Financing of any provision of the Debt Commitment Letters or definitive agreements related to the Debt Financing, (y) any actual dispute or disagreement between or among any parties to the Debt Commitment Letters or definitive agreements related to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at the Closing, and (iii) if at any time for any reason the Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing on the terms and conditions contemplated by the Debt Financing Commitments or definitive agreements related to the Debt Financing. As soon as reasonably practicable, but in any event within forty-eight (48) hours after the Special Master delivers to the Buyer a written request therefor, the Buyer shall provide any information reasonably requested by the Special Master relating to any circumstance referred to in clause (i), (ii) or (iii) of the immediately preceding sentence; provided, that the right of the Special Master to request such information shall not limit the obligations of the Buyer to promptly provide such information as otherwise required by this Section 6.9(d).

(e)     Prior to the Closing, the Buyer shall not, without the prior written consent of the Special Master, agree to, or permit, any amendment, restatement, amendment and restatement, replacement, supplement, or other modification of, or waiver or consent under, the Debt Commitment Letters or other documentation relating to the Debt Financing which would constitute a Prohibited Modification. For purposes of this Section 6.9, the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," "Debt Financing

Sources," shall include the Debt Financing Commitment or documents related thereto as permitted to be amended, amended and restated, replaced, supplemented, modified, waived or consented to by this Section 6.9(e). The Buyer shall promptly deliver to the Special Master copies of any such amendment, restatement, amendment and restatement, replacement, supplement, modification, waiver or consent. The Buyer shall not agree to or permit the withdrawal, repudiation, termination or rescission of any Debt Commitment Letter or Definitive Debt Document or any provision thereof (except in connection with Replacement Financing). Further, for the avoidance of doubt, if from and after the Execution Date the Debt Financing (or any Replacement Financing) has not been obtained, the Buyer shall continue to be obligated to consummate the Transactions subject only to the satisfaction or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(f)     If, notwithstanding the use of reasonable best efforts by the Buyer to satisfy its obligations under Section 6.9(b), (c), (d) and (e), any of the Debt Financing or the Debt Financing Commitments (or any definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, the Buyer shall (i) promptly notify the Special Master of such expiration, termination, or unavailability and the reasons therefor and (ii) use its reasonable best efforts promptly to arrange for alternative financing ("Replacement Financing") (which shall be sufficient, together with the Equity Financing and cash on hand of the Buyer, to pay the Required Amount and shall not, without the prior written consent of the Special Master, include any conditions to such Replacement Financing that are more onerous than, or in addition to, the conditions set forth in the Commitment Letters, as applicable, to replace the financing contemplated by such expired, terminated, or unavailable commitments or arrangements). The Buyer shall deliver to the Special Master true, correct and complete copies of all contracts or other arrangements pursuant to which any such alternative source shall have committed to provide any portion of the Replacement Financing (provided that any fee letters in connection therewith may be redacted in a manner consistent with the Fee Letter provided as of the Execution Date). To the extent applicable, the Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to arrange and consummate the Replacement Financing on the terms and conditions described in such contracts or other arrangements relating thereto on or before the Closing Date, including (A) using reasonable best efforts to (x) satisfy on a timely basis, all terms, covenants and conditions set forth therein; (y) enter into definitive agreements with respect thereto on the terms and conditions set forth therein and (z) consummate the Replacement Financing at or prior to the Closing and (B) if necessary or appropriate, seeking to enforce its rights thereunder. In the event that Replacement Financing is obtained in accordance with this Section 6.9(f), the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," and "Debt Financing Sources" shall include the commitments in respect of the Replacement Financing or the documents related thereto, as applicable. Notwithstanding the foregoing, compliance by the Buyer with the provisions of this Section 6.9(f) shall not relieve the Buyer of their obligation to consummate the Transactions whether or not the Debt Financing is available.

Section 6.10.   Company's Obligations in Respect of Debt Financing.

(a)     Subject to Section 6.10(b), prior to the Closing, the Special Master shall Cause the Acquired Companies to use commercially reasonable efforts to provide to the Buyer such customary cooperation in connection with the arrangement of the Debt Financing as is reasonably requested by the Buyer. Such assistance shall include Causing the Acquired Companies

56

to use commercially reasonable efforts to do the following, at the Buyer's sole expense, in connection with the Debt Financing:

         (i)     as promptly as practicable, to furnish, or cause to be furnished, to the Buyer, the Required Information;

         (ii)     causing the Company's employees with the title of executive vice president or above to participate in a reasonable number of meetings, presentations, sessions with rating agencies or other customary syndication activities;

         (iii)     (A) assisting with the preparation of appropriate and customary materials for a rating agency presentation, a bank information memorandum and a lender presentation reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute a customary authorization letter with respect to the bank information memorandum that authorizes distribution of information to prospective lenders;

         (iv)     to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing;

         (v)     assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Financings);

         (vi)     furnishing the Buyer at least three (3) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least ten (10) Business Days prior to the Closing Date;

         (vii)     solely with respect to financial information and data derived from the Acquired Companies' historical books and records, provide reasonable and customary assistance to the Buyer with the preparation of pro forma financial information and pro forma financial statements to the extent reasonably requested by the Buyer or the Debt Financing Sources and customary to be included in any marketing materials or Offering Documents or of the type required by the Debt Commitment Letters and is historically prepared by the Acquired Companies (provided, that none of the Acquired Companies or any of their respective Representatives shall (i) be responsible for the preparation of any pro forma financial statements or pro forma adjustments thereto or (ii) be required to provide any financial information relating to (A) the proposed debt and equity capitalization that is required for such pro forma financial information or assumed interest rates and fees and expenses relating to such debt and equity capitalization, (B) any post-Closing or pro forma cost savings, synergies, capitalization, ownership or other pro forma

adjustments desired to be incorporated into any information used in connection with the Debt Financing or (C) any information related to Buyer or any adjustments that are not directly related to the acquisition of the Company);

(viii)    [Reserved];

(ix)    cooperate with the Buyer to obtain customary corporate and facilities credit ratings, landlord waivers and estoppels, non-disturbance agreements as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date;

(x)    subject to an executed confidentiality agreement containing confidentiality provisions that are not less favorable in any material respect to the Special Master than those contained in the Confidentiality Agreement (an "Acceptable Confidentiality Agreement"), taking all actions reasonably requested in writing and reasonably necessary and customary to (A) permit the Debt Financing Sources and their respective Representatives to evaluate the Acquired Companies' current assets, properties, rights, inventory, cash management and accounting systems, and policies and procedures relating thereto for the purpose of establishing collateral arrangements to the extent customary and reasonable and (B) establish bank and other accounts and blocked account agreements and lock box arrangements in connection with the foregoing, provided that such agreements and arrangements will only be effective upon Closing;

(xi)    subject to an Acceptable Confidentiality Agreement, granting the Debt Financing Sources on reasonable terms and upon reasonable written request, at reasonable times and on reasonable notice at times and locations to be mutually agreed, access to the Acquired Companies' properties, rights, assets and cash management and accounting systems (including cooperating in and facilitating the completion of field examinations, collateral audits, asset appraisals and surveys) for the purpose of establishing collateral arrangements required to be in place pursuant to the Financings;

(xii)    subject to an Acceptable Confidentiality Agreement, furnishing the Buyer and the Debt Financing Sources all existing field examinations, collateral audits and asset appraisals and surveys of the Acquired Companies to the extent prepared in the Ordinary Course and other information prepared and available in the Ordinary Course as necessary to enable the Buyer to furnish the "Borrowing Base Certificate" required to be delivered pursuant to clause 4(b) of Exhibit E to the Debt Commitment Letters;

(xiii)    [Reserved]; and

(xiv)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing).

(b)     Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)     require the entry by the Special Master or any Acquired Company into any agreement or commitment, or the taking of any action, that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)     unreasonably interfere with the ongoing operations of the Acquired Companies; or

(iii)     include any action that the Special Master or the Company reasonably believes would require any of the Acquired Companies to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law, (D) take any action that could subject any director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) cause any director or manager of the Company or any of its Affiliates to pass resolutions or consents to approve or authorize the execution of the Debt Financing (other than continuing directors or managers), (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or certification that, in the good faith determination of the Company, is not true, (I) require the delivery of any financial statements in a form or subject to a standard different than those provided to the Buyer on or prior to the Execution Date, (J) provide any cooperation or information that does not pertain to the Acquired Companies or (K) provide (i) any description of all or any component of the Financings (including any such description to be included in any liquidity or capital resources disclosure or any "description of notes"), (ii) projections, risk factors or other forward-looking statements relating to all or any component of the Financings, or (iii) any solvency certificate or similar certification in connection with the Financings (which items (i) through (iii) shall be the sole responsibility of the Buyer). In no event shall the Special Master be in breach of Section 6.10(a) because of the Company's failure to deliver any financial or other information that is not currently readily prepared in the Ordinary Course at the time requested by the Buyer or to obtain review of any financial or other information by its accountants.

(c)     Notwithstanding anything to the contrary contained herein, it is understood and agreed by the Parties that the failure of the Special Master or the Company to comply with the provisions of this Section 6.10 shall not give rise to a failure of a condition precedent set forth in Section 7.2(b) or a termination right pursuant to Section 8.1(e).

(d)     The Buyer shall promptly reimburse the Acquired Companies, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket costs and expenses incurred by the Acquired Companies, the Special Master, and/or their

respective Representatives in connection with the cooperation contemplated by Section 6.10(a), including (i) attorneys' fee and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing (excluding any costs incurred in connection with the preparation, review and/or audit of historical financial statements). The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(e)     Any information provided pursuant to this Section 6.10 shall be subject to the Confidentiality Agreement; provided, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing or with respect to the Equity Financing or any other equity financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

(f)     Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing, by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financing or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(g)     The Special Master shall Cause the Acquired Companies to assist in the delivery of the Payoff Letters and all other termination and release documentation reasonably necessary to provide for or evidence the release of all guarantees supporting and all Liens securing the Specified Debt, including, if applicable, UCC termination statements, deed of trust releases, mortgage releases or intellectual property releases in fully executed and authorized form, subject to the conditions to effectiveness and release thereof as set forth in the Payoff Letters, no later than three (3) Business Days prior to the Closing Date (or such later date as is agreed to by the Buyer in its reasonable discretion).

Section 6.11.   Tax Matters.

(a)     All Transfer Taxes shall be paid by the Buyer; provided, however, that, at the option of the Buyer, those certain Transfer Taxes related to any sale and/or transfer of Owned Real Property, including real estate transfer, stamp, documentary, recording and other similar fees or Taxes or governmental charges, together with any interest, penalties or additions to such Transfer Taxes, shall be borne by either Buyer or the Company consistent with local law where such Owned Real Property is located.  Further, upon the reasonable request of the Buyer, the Special Master shall cooperate, and shall Cause the Company to cooperate, in timely making all filings, returns, reports and forms as necessary or appropriate to comply with the provisions of all applicable Laws in connection with the payment of Transfer Taxes, and shall cooperate in good

faith to minimize, to the fullest extent possible under such laws, the amount of any Transfer Taxes payable; provided, that in no event shall the Special Master or the Company or any of its Subsidiaries or their respective Representatives, be required to execute or deliver any filings, returns, reports or forms in connection therewith.  The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes.  For the avoidance of doubt, all Transfer Taxes arising from the transactions contemplated under this Agreement shall be for the account of the Buyer and shall not reduce or otherwise adjust the Closing Consideration.

(b)    The Special Master shall Cause the Company to prepare and deliver the FIRPTA Certificate set forth in Section 2.3(a)(iii).

Section 6.12.    R&W Insurance Policy.  In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "R&W Insurance Policy"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.13.    Notices of Certain Events.

(a)    During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)    any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA);

(iv)    any circumstance or occurrence that has or would reasonably be expected to have a Company Material Adverse Effect;

(v)    any notice or written communication from any Governmental Body that is commencing any investigation or enforcement action against the Acquired Companies;

(vi)    any communications (whether oral or written) with the U.S. Department of Justice or the U.S. Department of the Treasury (including OFAC), other than communications made in the Ordinary Course, whether or not in connection with the Transactions (together with a written summary of the material terms of any such communications); and

(vii)    any item or information referred to in, or received by the Special Master pursuant to, Section 6.13(b);

provided, that any failure to comply with this Section 6.13(a) shall not constitute the failure of any condition set forth in Article VII to be satisfied; provided, further, that no such notification (and no other notification required to be given under any other Section of this Agreement) shall affect the representations, warranties, covenants or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement.

(b)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)    access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

(ii)    contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)    the status of the Acquired Companies' business and financial condition; and

(iv)    access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)    copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)      copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)     documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)     notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied; and

(v)      notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect.

Section 6.14.  No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.15.  [Reserved]

Section 6.16.  Competing Proposals.

(a)      This Agreement is subject to approval by the Court.

(b)      The Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal; unless otherwise ordered by the Court.

(c)      Notwithstanding anything to the contrary set forth above, in the event that prior to the Sale Hearing, the Special Master receives an unsolicited Competing Proposal (each such unsolicited Competing Proposal, an "Unsolicited Competing Proposal"), the Special Master shall file such Unsolicited Competing Proposal publicly on the docket for the Specified Litigation.

(d)      The Special Master and the Buyer acknowledge that this Agreement and the Transactions are subject to the Sale Process Orders and the Sale Order Entry. In the event of any conflict between this Agreement and the Sale Process Orders or the Sale Order, the Sale Process Orders or the Sale Order, as applicable, shall govern. The Special Master and the Buyer shall comply with the Sale Process Orders and the Sale Order.

Section 6.17.  Section 280G. No later than ten (10) days prior to the Closing Date, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis.

Section 6.18.  Financial Statements. During the Interim Period, the Special Master shall Cause the Acquired Companies to furnish to the Buyer, in each case, to the extent such financial statements are prepared by the Acquired Companies and CITGO Petroleum in the Ordinary Course:

(a)    within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements income and cash flow showing the financial position of each of (i) the Acquired Companies and (ii) CITGO Petroleum, as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies and CITGO Petroleum, respectively, on a consolidated basis in accordance with GAAP; and

(b)    within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the each of (x) the Acquired Companies and (y) CITGO Petroleum, as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies and CITGO Petroleum, respectively, for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year.  The applicable consolidated balance sheet and related statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies or CITGO Petroleum, as applicable, on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes).

Section 6.19.  Interim Period Incentive Bonuses.

(a)    In the event that the Acquired Companies comply in all material respects (as reasonably determined by the Buyer acting in good faith) with the covenants set forth in Section 6.1 of this Agreement, the Buyer shall, within ninety (90) days after Closing Date, cause the Company to make cash bonus payments in an aggregate amount equal to $25,000,000 (less applicable withholding), such bonuses to be made in such amounts and to such band 5 and band 99 employees of the Acquired Companies as specified and identified in writing within seventy-five (75) days after the Closing Date by the then current Chief Executive Officer of the Company in consultation with the then current Chief Operating Officer of the Company.

(b)    In addition to the bonus amount contemplated by <u>Section 6.19(a)</u> above, in the event that the Acquired Companies comply in all material respects (as reasonably determined by the Buyer acting in good faith), with the covenants and agreements as set forth in <u>Section 6.19(b)</u> of the Company Disclosure Schedule, the Buyer shall, within ninety (90) days after Closing Date, cause the Company to make cash bonus payments in an aggregate amount equal to $25,000,000 (less applicable withholding), such bonuses to be made in such amounts and to such band 5 and band 99 employees of the Acquired Companies as specified and identified in writing within seventy-five (75) days after the Closing Date by the then current Chief Executive Officer of the Company in consultation with the then current Chief Operating Officer of the Company.

Section 6.20.    <u>Transaction Support Agreement</u>. Prior to the Closing, the Buyer shall not, and shall cause its Affiliates not to, consent to any termination, amendment, waiver or other modification of the Transaction Support Agreement that would reasonably be expected to prevent or materially delay the Buyer's ability to obtain the Debt Financing or consummate the Transactions without the prior written consent of the Special Master.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1.    <u>Conditions Precedent to Obligations of the Parties</u>. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)    there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    the Sale Order Entry shall have occurred;

(c)    the OFAC License shall have been obtained;

(d)    the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted;

(e)    the approvals, clearances or expirations of waiting periods set forth in <u>Section 7.1(e)</u> of the Company Disclosure Schedules shall have been obtained; and

(f)    the Company shall have delivered the FIRPTA Certificate as set forth in <u>Section 2.3(a)(iii)</u>.

Section 7.2.    <u>Conditions Precedent to Obligations of the Buyer</u>. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part):

(a)     the Company Fundamental Representations shall be true and correct in all material respects (without giving effect to any "materiality", "Company Material Adverse Effect" or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such Company Fundamental Representation, by its terms, is expressly limited to a specific date, in which case, as of such specific date);

(b)     the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

(c)     no Company Material Adverse Effect shall have occurred and remain ongoing; and

(d)     the Sale Order shall be in full force and effect in all respects and not subject to any stay.

Section 7.3.     <u>Conditions Precedent to Obligations of the Special Master</u>. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part):

(a)     the representations and warranties of the Buyer set forth in <u>Article V</u> shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or (ii) otherwise prevent, hinder, or delay the consummation of the Transactions; and

(b)     the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

Section 7.4.     <u>Frustration of Closing Conditions</u>. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in <u>Section 7.1</u>, <u>Section 7.2</u>, or <u>Section 7.3</u>, as the case may be, to be satisfied if such failure was caused by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party.

## ARTICLE VIII

## TERMINATION

Section 8.1.     <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry, except as otherwise specified below) as follows:

(a)    by mutual written consent of the Special Master (which consent shall be subject to approval of the Court) and the Buyer;

(b)    by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Execution Date (such date, the "Initial Outside Date" and, as may be automatically extended pursuant to this Section 8.1(b), the "Outside Date"); provided, that if the Closing has not occurred by the Initial Outside Date due to the nonsatisfaction of any of the conditions set forth in Section 7.1(c) (OFAC License), Section 7.1(d) (HSR Act), Section 7.1(e) (Other Antitrust Approvals), Section 7.1(f) (FIRPTA Certificate) or Section 7.2(d) (Sale Order), then the Initial Outside Date shall be extended automatically for up to two (2) consecutive periods of ninety (90) calendar days each ( and in no event shall the Outside Date extend beyond the date that is one hundred eighty (180) calendar days after the Initial Outside Date); provided, that notwithstanding the foregoing, the Special Master and/or the Buyer shall have the right to request an extension of the Outside Date by the Court for good cause; provided, further, that the right to terminate this Agreement pursuant this Section 8.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has caused or resulted in the failure of the Closing to occur on or before the Outside Date;

(c)    by the Special Master or the Buyer, by written notice to the other Party, if: there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any Order preventing, enjoining or making illegal the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order shall become final and non-appealable (any such Law, Order, a "Legal Restraint"); provided that the right to terminate this Agreement under this Section 8.1(c) shall not be available to any Party whose failure to fulfill any obligation under Section 6.3 hereof has principally caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved or lifted;

(d)    by the Buyer, by written notice to the Special Master, if there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2(a) or Section 7.2(b), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; provided, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.1(e) if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.3;

(e)    by the Special Master (subject to approval of the Court), by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.3(a) or Section 7.3(b), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; provided, that the Special Master shall not have the right to terminate this Agreement pursuant to this Section 8.1(e) if the Special Master is then

in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>;

(f)    by the Special Master, after being ordered to terminate this Agreement by the Court, as a result of one or more of the Venezuela Parties (as defined in the Sale Procedures Order) proposing an alternative to the Transactions and such alternative is approved by the Court;

(g)    by the Special Master or the Buyer, by written notice to the other Party, if the Court issues an order in which it denies the Special Master's recommendation to designate this Agreement as the Successful Bid; or

(h)    by the Special Master or the Buyer, by written notice to the other Party, if the Transaction Support Agreement has been terminated in accordance with its terms and is no longer in full force and effect.

Section 8.2.    <u>Effect of Termination</u>. In the event that this Agreement is validly terminated in accordance with <u>Section 8.1</u>, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer, the Special Master or the Acquired Companies; <u>provided</u>, that the Confidentiality Agreement and the provisions of <u>Section 3.3</u>, this <u>Section 8.2</u>, and <u>Article IX</u> hereof shall survive any such termination and remain valid and binding obligations of each of the Parties.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1.    <u>Survival</u>. None of the representations and warranties contained in this Agreement or any of the other Transaction Documents (including any certificate to be delivered pursuant to this Agreement) and none of the covenants of any party required to be performed before the Closing (including obligations with which the Special Master agrees to Cause the Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties or any of their Affiliates or any of their respective Representatives or any other Person shall have any liability whatsoever with respect to any such representation, warranty, covenant or agreement, and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto. The provisions of this <u>Section 9.1</u> will not, however, prevent or limit a cause of action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until such covenants or agreements have been performed or satisfied.

Section 9.2.    <u>Expenses</u>. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each Party to this Agreement will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other

professional fees), and the Special Master Transaction Expenses shall be paid in accordance with Section 3.4(b) and the Advanced Transaction Expenses shall be paid in accordance with Section 3.4(d).

Section 9.3.    Governing Law. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4.    Dispute Resolution; Consent to Jurisdiction. Without limiting any Party's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in Section 9.7 (as may be updated from time to time in accordance with Section 9.7).

Section 9.5.    Consent to Service of Process; Waiver of Jury.

(a)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of Section 9.7.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5(B).

Section 9.6.    Entire Agreement.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement

69

between the Parties with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or the other Transaction Documents. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)    The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties hereby agreeing that neither Party shall have any remedies or causes of action (whether in contract, tort, statute or otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)    All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

(d)    The Transactions relate to the purchase and sale of the Shares conducted pursuant to Section 324 of the Delaware General Corporation Law and the Sale Procedures Order, under which the Special Master has the authority to carry out the Transactions herein contemplated to be carried out by him.  In connection therewith, the Designated Managers have furnished Specified Information to the Special Master.  The Special Master, the Designated Managers, the Acquired Companies, its direct or indirect Subsidiaries and their respective Representatives have no liabilities or obligations hereunder or in respect of the Transactions for monetary damages or other relief (other than, if the conditions applicable thereto are satisfied, the Special Master's obligations to transfer the Shares and take or cause to be taken other actions under this Agreement and the Sale Procedures Order) except as expressly provided in <u>Section 9.13</u>. By executing this Agreement, each of the Parties waives on their behalf and on the behalf of their respective Representatives and forever relinquishes any right, claim or cause of action for damages or any other form of monetary relief against the Special Master, or any such Person based on, relating to or arising out of the Specified Information, this Agreement and any of the Transactions.

Section 9.7.    <u>Amendments and Waivers</u>. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master. No waiver by any Party of any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such

waiver. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  Any amendment to, or the Special Master's waiver of, a provision of this Agreement of which the Acquired Companies or the Venezuela Parties are third-party beneficiaries in accordance with <u>Section 9.11</u> will require the prior written consent of the Company to the extent such amendment or waiver would be reasonably likely to adversely impact the Acquired Companies or the Venezuela Parties.

Section 9.8.    <u>Notices</u>.  All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

| | |
|---|---|
| If to the Special Master, to: | Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware |
| | ████████████████ |
| | ████████████████████ |
| | ██████████████████████ |
| With a copy to: | Weil, Gotshal & Manges LLP, counsel to the Special Master<br>767 Fifth Avenue<br>New York, NY 10153<br>Email: Horizon.Notice@weil.com |
| If to the Buyer, to: | Amber MSub LLC<br>c/o Elliott Investment Management L.P.<br>360 S. Rosemary Ave, 18th Floor<br>West Palm Beach, FL 33401 |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Attention:  Project Horizon<br>E-mail:    HorizonAkinCore@akingump.com |

Section 9.9.   Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.10.   Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer without the prior written consent of the Special Master; provided, that the consent of the Special Master shall not be required for any assignment by the Buyer of (i) its rights (but not its obligations) hereunder as collateral to the Debt Financing Sources under the definitive documents governing the Debt Financing after the Closing Date and (ii) its rights and obligations hereunder to any controlled Affiliate of the Buyer (provided, that any assignment pursuant to this proviso shall in no event release the Buyer from its obligations hereunder and, effective as of such assignment, the Buyer shall remain jointly and severally liable with the assignee for the performance of any obligations arising under, or in connection with, this Agreement) or (b) the Special Master, without the prior written consent of the Buyer.

Section 9.11.   No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth in Section 6.6; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in Section 9.12; (c) the Buyer Released Parties and the Special Master Released Parties as set forth in Section 9.15; (d) the Debt Financing Sources as set forth in Section 9.17; and (e) the Acquired Companies and their Representatives with respect to Section 4.22, Section 5.12 and Section 9.1. All of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12.   Non-Recourse. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "Non-Parties"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party hereby irrevocably waives and releases all such liabilities, obligations and Related Claims against any such Non-Party. Without limiting the rights of any Party hereto against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person

claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party. In no event shall any Person be liable for the Fraud of any other Person, and a claim for Fraud may only be asserted against the Person that committed such Fraud; provided, that, in no case will any claim for Fraud be asserted against the Special Master.

Section 9.13.   Specific Performance.

(a)      The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with Section 8.1, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be granted in connection therewith. Such remedies shall be in addition to and not in substitution for any other remedy to which such party is entitled at law or in equity.

(b)      Each Party hereto hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

(c)      The Parties agree that (i) by seeking the remedies provided for in this Section 9.13, no Party shall in any respect waive its right to seek at any time any other form of relief that may be available to it under this Agreement or any other Transaction Document (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 9.13 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 9.13 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 9.13 prior to or as a condition to exercising any termination right under Article VIII, nor shall the commencement of any Legal Proceeding pursuant to this Section 9.13 or anything set forth in this Section 9.13 restrict or limit any Party's right to terminate this Agreement in accordance with the terms of Article VIII or pursue any other remedies under this Agreement any other Transaction Document that may be available then or thereafter.

Section 9.14.   Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Special Master and the other Parties.

Section 9.15.   Release.

(a)     Effective as of the Closing Date, except for any rights or obligations under this Agreement or any of the other Transaction Documents each of the Buyer and the Company on behalf of itself and each of its Affiliates and Representatives and each of its current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "Buyer Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges (A) the Special Master and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns, the Designated Managers, the other Company Employees listed in the Procedures Summary, (B) any other current or former employees, directors, officers, partners, members or managers of the Acquired Companies who participated in the Buyer's due diligence and investigation of the Acquired Companies, the preparation of the Company Disclosure Schedules or the preparation, negotiation or consummation of the Transactions or otherwise participated in the sale process contemplated by the Sale Procedures Order and any other individuals as reasonably agreed by Buyer and the Special Master during the Interim Period (the Persons described in the immediately preceding clause (A) and clause (B), collectively, the "Special Master Released Parties") of and from any and all actions, claims, causes of action, controversies, demands, rights, indemnities, guaranties, suits, proceedings, obligations, liabilities, executions, judgments, damages, duties, debts, dues, offsets, powers, privileges, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether in contract or in tort, in law or in equity which the Buyer Releasing Parties now has or in the future may have against each of the Special Master Released Parties and the Debt Financing Sources, in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the business or operations of the Acquired Companies, the Transactions, or the ownership of Shares by the Special Master Released Parties, in each case, occurring or arising on or prior to the date of the Closing Date. The Buyer, on behalf of itself and each Buyer Releasing Party, covenants and agrees that no Buyer Releasing Party shall assert any such claim against the Special Master Released Parties; provided, however, that nothing herein shall operate as a release of any causes of action or liabilities unknown to the Buyer Releasing Party as of the Closing Date arising out of willful misconduct, fraud or criminal acts of a Special Master Released Party.

(b)     Effective as of the Closing Date, except for any rights or obligations under this Agreement or any of the other Transaction Documents, the Special Master and on behalf of himself and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective successors and assigns (collectively, the "Special Master Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges the Buyer, the Company, the Debt Financing Sources, their respective Affiliates and Representatives and each of its and their respective current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "Buyer Released Parties") of and from any and all actions, claims, causes of action, controversies, demands, rights, indemnities, guaranties, suits, proceedings, obligations, liabilities, executions, judgments, damages, duties, debts, dues, offsets, powers, privileges, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or

derivatively, whether in contract or in tort, in law or in equity which the Special Master Releasing Parties now has or in the future may have against each of the Buyer Released Parties, in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the business or operations of the Acquired Companies or the Transactions, in each case, occurring or arising on or prior to the date of the Closing Date. The Special Master, on behalf of itself and each Special Master Releasing Party, covenants and agrees that no Special Master Releasing Party shall assert any such claim against the Buyer Released Parties; provided, however, that nothing herein shall operate as a release of any causes of action or liabilities unknown to the Special Master Releasing Party as of the Closing Date arising out of willful misconduct, fraud or criminal acts of the Buyer, the Company or a Debt Financing Source.

Section 9.16.   Counterparts. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in ".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17.   Debt Financing Sources. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)     agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)     agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letters or any other applicable definitive document relating to the Debt Financing;

(c)     without limiting the rights of the Buyer under the Debt Commitment Letters and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

(d)     agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with Section 9.7;

(e)    irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)    knowingly, intentionally and voluntarily waives, to the fullest extent permitted by Law, trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)    without limiting the rights of the Buyer under the Debt Commitment Letters and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(h)    agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.17 and that such provisions and the definitions of "Debt Commitment Letter," "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18.    Special Master and his Representatives' Judicial Immunity. The Buyer agrees that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer further agrees that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

Section 9.19.    Special Master Indemnification.  From and after the Closing, the Buyer shall, and shall cause each Acquired Company to, indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, the Special Master against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including attorneys' fees, that are incurred by Special Master, arising out of or related to this Agreement. Further, from and after the Closing, the Buyer shall, or shall cause the Acquired Companies to, advance any expenses (including fees and expenses of legal counsel) of the Special Master under this Section 9.19 (including in connection with enforcing the indemnity and other obligations referred to in this Section 9.19), as incurred, to the fullest extent permitted under applicable Law. Buyer's obligations pursuant to this Section 9.19 shall in no event exceed $10,000,000 in the aggregate.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

AMBER MSUB LLC, as the Buyer


By: _____
Name:
Title:


ROBERT B. PINCUS, as the Special Master


By: _____
Name:
Title:

## ANNEX A

### DEFINITIONS

"<u>Acquired Companies</u>" means, collectively, the Company and each of the Company Subsidiaries.

"<u>Additional Judgment Creditors</u>" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"<u>Advanced Transaction Expenses</u>" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; <u>provided</u>, that (i) in no event shall any direct or indirect equity investor in the Buyer be deemed an "Affiliate" of the Buyer other than Elliott Associates, L.P. and Elliott International, L.P. and their respective Affiliates and (ii) "Affiliates" shall in no event include any portfolio company of Elliott Investment Management, L.P., Elliott Associates, L.P. or Elliott International, L.P.

"<u>Anti-Corruption Laws</u>" means any applicable Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"<u>Attached Judgment</u>" means a judgment held by a Claimholder and listed in the Final Priority Order [D.I. 1102] in the Specified Litigation.

"<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

"Business Unit" each of (a) Corpus Christi Refinery, (b) Crude Supply & Trading, (c) Lake Charles Refinery, (d) Lemont Refinery, (e) Lights Oils Marketing, (f) Logistics, (g) Lubricants, (h) Procurement, (i) Product Supply & Trading, (j) Specialty Products, and (k) Terminals & Pipelines.

"Buyer Subsidiary" means any Subsidiary of the Buyer, as of the Execution Date.

"Cash" means the cash and cash equivalents of the Acquired Companies; provided, that Cash shall (a) exclude (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; and shall (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies.

"CITGO Petroleum" means CITGO Petroleum Corporation, a Delaware corporation.

"Claim" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"Closing Consideration" means $[●], plus the aggregate amount of accrued interest on judgments held by Claimholders (other than the Claimholders junior to Koch) from the date hereof through the Closing in accordance with that certain Order entered by the Court on April 25, 2024 [D.I. 1136], minus the Deposit Amount, minus the Credit Bid Amount, plus the Incremental Consideration.

"Closing Release" means that certain release, dated the Closing Date, in the form attached hereto as Exhibit C or otherwise in form and substance acceptable to the Special Master.

"Closing Transaction Expenses" means the Special Master Transaction Expenses that are unpaid as of the Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, agreement, arrangement, program, policy, or practice, (f) each health or welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has any liability and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares) and Section 4.4 (Capitalization).

"Company Material Adverse Effect" means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions pursuant to the terms of this Agreement, in each case, other than Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation or (y) results in or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) any weather-related or other force majeure event or outbreak (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters); (D) pandemics, epidemics, COVID-19 measures, acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing or other response to any Governmental Bodies (including requirements for business closures, restrictions on operations or "sheltering-in-place"); (E) Effects resulting from the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions, including the impact thereof on the relationships of the Acquired Companies with customers, suppliers, partners, employees or Governmental Bodies; (F) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has

requested in writing or consented to when asked under Section 6.1; (G) changes in applicable Law or in GAAP or in accounting standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" or funding freeze of the U.S. federal government (including any of its agencies); (H) any failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (I) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); (J) compliance with, or any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including Section 6.3(d); or (K) Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation; provided, that in the case of clauses (A), (B), (C), (D) and (G), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect.

"Company Subsidiary" means any Subsidiary of the Company.

"Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates) (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof), (B) to effect any other transaction pursuant to which any other alternative to the Transactions would be consummated, or (C) relating to any reorganization, recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof).

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"Debt" means, with respect to the Acquired Companies, without duplication, the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds,

performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) non-current liabilities; (vii) post-retirement welfare benefits and unfunded or underfunded pensions; (viii) to the extent drawn, obligations under the Receivables Securitization Facility; and (ix) all obligations of the type referred to in clauses (i) through (viii) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (ix) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same). Debt shall not include (A) any amounts included in Closing Transaction Expenses, (B) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not become drawable as a result of the Transactions, (C) any intercompany Debt of the Company and its wholly owned Subsidiaries and (D) any Taxes.

"Debt Financing Documents" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"Debt Financing Source" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to the Debt Commitment Letters (as modified by any joinder agreement, amendment, or other modification thereto as permitted hereunder) or any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective Affiliates, and such Person's (and their respective Affiliates') former, current or future equityholders, members, employees, officers, directors, attorneys, agents or advisors and, in each case, their respective successors and assigns; provided, however, that neither the Buyer nor any of its Affiliates shall constitute a Debt Financing Source.

"Debt Payoff Amount" means the aggregate principal amount of the Specified Debt, plus all accrued but unpaid interest, fees and other amounts payable thereon (including any premiums, penalties, breakage costs and any other fees, expenses or other obligations relating thereto), in each case, calculated as of the Closing Date or as of the Redemption Date as defined in the applicable indenture to such item of Specified Debt.

"Deposit Forfeiture Termination Event" means the occurrence of this Agreement being terminated (i) by the Special Master or the Buyer pursuant to Section 8.1(b) (Outside Date) (if the Special Master could otherwise have terminated pursuant to Section 8.1(e) (Buyer Breach)) or Section 8.1(c) (Legal Restraint), provided, however, that termination pursuant to Section 8.1(c) (Legal Restraint) shall not constitute a Deposit Forfeiture Termination Event to the extent that such Legal Restraint was not caused by any action or inaction of the Buyer in breach of this Agreement

A-5

or related to Buyer's identity or (ii) by the Special Master pursuant to <u>Section 8.1(e)</u> (Buyer Breach).

"<u>Designated Managers</u>" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"<u>Economic Sanctions/Trade Laws</u>" means all applicable Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the applicable Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

"<u>Environmental Laws</u>" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"<u>EPP</u>" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"<u>Equitable Exceptions</u>" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Commitment Letters" means the equity commitment letters executed by each Equity Financing Source on the Execution Date.

"Equity Financing Sources" means the Persons set forth in Section 1.1(a) of the Buyer Disclosure Schedules.

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

"Equity Pledge Litigation" means the case of Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-10023 (KPF) (S.D.N.Y.) that was initiated on October 29, 2019 by PDVSA, the Company and CITGO Holding, Inc. against GLAS and MUFG in their capacities as collateral agent and trustee, respectively, for the 2020 Bondholders, disputing the Purported Equity Pledge.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"ERISA Affiliate" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement in respect of the Deposit Amount.

"Existing Senior Secured Notes" means the 6.375% Senior Secured Notes, the 7.000% Senior Secured Notes and the 8.375% Senior Secured Notes, or any of them.

"Expense Reimbursement Amount" means the amount required to be paid to the Topping Bidder pursuant to and in accordance with Section 8.3 of the Topping Bidder Stock Purchase Agreement, which amount shall not exceed $30,000,000 in the aggregate, of reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment fees, incurred by the Topping Bidder and its Affiliates in connection with the Transactions (provided, that the Topping Bidder has provided written confirmation of the amount of such expenses), as set forth by the Special Master in the Funds Flow Memorandum.

"Expense Reserve Holdback Account" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

"Expense Reserve Holdback Amount" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"Evaluation Criteria" means the non-exhaustive list of criteria, as approved by the Court pursuant to the January Order, based on which the Special Master shall determine which bid to recommend as the stalking horse bid, base bid or Successful Bid, if any and as applicable.

"Fraud" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; provided, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "Fraud" does not include any Claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means any of the practices, methods, standards, procedures and actions which could reasonably be expected to be used or taken by a reasonably prudent operator of properties or other assets, as applicable, similar to the applicable properties or other assets of the Acquired Companies, in each case, in light of the facts and circumstances known as of the relevant time of measurement. "Good Industry Practice" is not intended to be limited to the optimal practice, method, standard, procedure or action to the exclusion of all others, but rather is intended to include a range of practices, methods, standards or actions that meet the foregoing qualifications.

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or Taxing Authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"Government Contract" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the Topping Bidder SPA Date. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

"Hazardous Substance" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "radioactive", a "pollutant," a "contaminant," or words of similar meaning, including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Incremental Consideration" means $███████ in cash.

"Indenture" means the indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee ("MUFG"), GLAS Americas LLC, as collateral agent ("GLAS"), Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

"Interest Rate" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, plus (y) one percent (1.0%).

"Interim Period" means the period beginning on the date of the Sale Order Entry and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"IRS" means the United States Internal Revenue Service.

"Judgment Creditors" means the judgment holders in the Specified Litigation.

"Knowledge of the Buyer" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in Section 1.1(b) of the Buyer Disclosure Schedules after due inquiry.

"Knowledge of the Company" or "Company's Knowledge" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"Knowledge of the Special Master" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, policy, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, enforcement action, complaint, proceeding, or investigation of any nature, civil, criminal, public or private.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Lookback Date" means the date that is three (3) years prior to the Topping Bidder SPA Date.

"Money Laundering Laws" means any law or regulation regarding money laundering financial recordkeeping and reporting requirements or terrorism financing, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"Negative Consequences" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Offering Documents" means prospectuses, private placement memoranda, information memoranda, syndication memoranda and packages and lender and investor presentations in each case to the extent the same are customary and required in connection with the Debt Financing.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past practice, taken as a whole.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws, partnership agreements, limited liability company agreement, operating agreement, or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

A-10

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Liens" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent so reflected or reserved; (c) Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course; (e) zoning, building code, entitlement and other land use restrictions and Environmental Laws; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) gaps in the chain of title for Intellectual Property evident from the public records of the Governmental Body maintaining the applications or registrations therefor; (i) Liens set forth in Section 1.1(d) of the Company Disclosure Schedules; (j) the Purported Equity Pledge; (k) Claims or Legal Proceedings seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies and (l) such other minor imperfections in title, charges, easements, restrictions and encumbrances which are, individually or aggregate, *de minimis* to the Acquired Companies, taken as a whole.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"PFAS" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date.

"Preferential Right" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"Procedures Summary" means the procedures described in Section 1.1(e) of the Company Disclosure Schedules.

"Purchase Price" means the Closing Consideration, plus the Deposit Amount, plus the Credit Bid Amount, plus the Advanced Transaction Expenses Amount, plus the Closing Transaction Expenses, plus the Expense Reserve Holdback Amount, plus the Debt Payoff Amount, plus the Termination Fee, plus the Expense Reimbursement Amount.

"Related Claim" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction, validity or enforcement of this Agreement (including any Legal Proceeding based upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"Release" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"Representatives" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"Required Information" means (i) the audited consolidated balance sheet of the Company as of December 31, 2024 and December 31, 2023 and the related audited consolidated statements of income and cash flows for the fiscal years then ended, (ii) the unaudited condensed consolidated balance sheet of the Company as of the last date of each subsequent fiscal quarter, other than the fourth fiscal quarter in any fiscal year, ending after December 31, 2023, and at least forty five (45) days prior to the Closing Date, and the related unaudited condensed consolidated statements of income and cash flows for the three months then ending and for the portion of the year to date and (iii) historical information reasonably requested by the Buyer in the Buyer's preparation of the pro forma financial statements referred to in Section 6.10(a)(viii) (after giving effect to the proviso thereto), provided, that notwithstanding anything to the contrary in this definition or otherwise, nothing herein shall require the Company to provide (or be deemed to require the Special Master to Cause the Company to prepare) any (1) description of all or any portion of the Debt Financing, including any "description of notes," "plan of distribution" and information customarily provided by investment banks or their counsel or advisors in the preparation of Offering Documents for private placements of non-convertible bonds pursuant to Rule 144A under the Securities Act, (2) risk factors relating to, or any description of, all or any component of the financing contemplated thereby, (3) historical financial statements or other information required by Rule 3-05, Rule 3-09, Rule 3-10, Rule 3-16, Rule 13-01 or Rule 13-02 of Regulation S-X under the Securities Act; any compensation discussion and analysis or other information required by Item 10, Item 402 and Item

601 of Regulation S-K under the Securities Act or XBRL exhibits; or any information regarding executive compensation or related persons related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A, (4) other information customarily excluded from Offering Documents for private placements of non-convertible high- yield bonds pursuant to Rule 144A under the Securities Act in a "Rule 144A-for-life" offering, (5) consolidating financial statements, separate Subsidiary financial statements, related party disclosures, or any segment information, including any required by FASB Accounting Standards Codification Topic 280, (6) financial information that the Acquired Companies do not prepare or maintain in the ordinary course of business (other than the historical financial statements and other historical information expressly set forth in the foregoing clauses (i) to (iii)), (7) information not reasonably available to the Acquired Companies under their respective current reporting systems (other than the historical financial statements and other historical information expressly set forth in the foregoing clauses (i) to (iii)) or (8) projections (the information described in this proviso, the "Excluded Information"). Financial statements referred to in the foregoing clauses (i) and (ii) will be prepared in accordance with GAAP and the unaudited financial statements referred to in clause (ii) will be reviewed by the independent accountants of the Company as provided in the procedures specified by AU-C 930; provided, that no opinion shall be required with respect to such review of such unaudited financial statements. Notwithstanding anything included herein to the contrary, no Required Information shall be required to be provided after the satisfaction of the ten (10) Business Day period referred to in <u>Section 2.2</u> or the date on which the Debt Financing has been consummated (including if the proceeds of the Debt Financing are placed into escrow upon consummation).

"<u>RRP</u>" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"<u>Sale Hearing</u>" means the Court's hearing to consider the Special Master's motion to approve the Sale Order.

"<u>Sale Order</u>" means an order of the Court substantially in the form attached hereto as <u>Exhibit D</u>, with such changes and modifications reasonably acceptable to the Buyer and the Special Master.

"<u>Sale Process Parties</u>" means, as set forth in Sale Procedures Order, Crystallex International Corporation**,** the Bolivarian Republic of Venezuela**,** PDVSA, the Company, CITGO Petroleum Corporation**,** and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"<u>Sanctions Target</u>" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the Topping Bidder SPA Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or

prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"Security Incident" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master and Company Related Parties" means the Special Master, the Company and each of their respective former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master.

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Debt" means the Debt set forth in Section 1.1(f) of the Company Disclosure Schedules.

"Specified Information" means information furnished by Designated Managers to the Special Master (a) as used in Article IV, with respect to the representations and warranties relating to the Acquired Companies, and (b) as used in Section 6.10, in connection with such covenant.

"Stalking Horse Agreement" means that certain Stock Purchase Agreement, dated as of March 21, 2025, by and among the Stalking Horse Bidder, the Special Master and Red Tree Investments, LLC (solely for the limited purposes set forth therein).

"Stalking Horse Bidder" means Red Tree Acquisitions, LLC, a Delaware limited liability company.

"Subsidiary" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (a) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (b) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (c) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Superior Proposal" means a Competing Proposal made by a Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under any definitive agreement entered into relating to a Superior Proposal or any Affiliates thereof) on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher or better bid for the Shares based upon the Evaluation Criteria.

"Systems" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

"Tax" or "Taxes" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition; and (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and

(d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"Tax Returns" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"Taxing Authority" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

"Termination Fee" means the amount required to be paid to the Stalking Horse Bidder pursuant to and in accordance with Section 8.3 of the Stalking Horse Agreement, which amount shall not exceed $75,000,000 in the aggregate, of actual and documented out-of-pocket expenses incurred by the Stalking Horse Bidder and its Affiliates in connection with the negotiation and execution of the Stalking Horse Agreement, the other transaction documents contemplated thereby and the transactions contemplated thereby (provided that the Stalking Horse Bidder has provided written confirmation of the amount of such expenses), as set forth by the Special Master in the Funds Flow Memorandum.

"Topping Bidder" means Dalinar Energy Corporation, a Delaware corporation.

"Topping Bidder Agreement" means that certain Stock Purchase Agreement, dated as of June 25, 2025 (the "Topping Bidder SPA Date"), by and between the Topping Bidder and the Special Master.

"Transaction Documents" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, the Debt Commitment Letters, the Equity Commitment Letters, and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, gross receipts, registration, duty, securities transactions or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"Treasury Regulations" means the regulations promulgated under the Code.

"VDR" means the virtual data room established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order.

"2020 Bonds" means the 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000, issued by PDVSA pursuant to the Indenture.

"2020 Bondholders" means the holders of the 2020 Bonds.

<u>Exhibit A</u>

Form of Escrow Agreement

(Attached.)

<u>Exhibit B</u>

Form of Paying Agent Agreement

(Attached.)

<u>Exhibit C</u>

Form of Closing Release

(Attached.)

Exhibit D

Form of Sale Order

(Attached.)

**B-2**

Akin Draft 8/22/25
Privileged & Confidential

---

**COMPANY DISCLOSURE SCHEDULES**

**TO THE**

**STOCK PURCHASE AGREEMENT**

by and among

AMBER MSUB LLC

**and**

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

_____

Dated as of [●], 2025

_____

**[THIS COMPANY DISCLOSURE SCHEDULE IS SUBJECT TO REVISION BY THE SPECIAL MASTER AND/OR THE COMPANY AT ANY TIME AND MUST BE KEPT CONFIDENTIAL IN ACCORDANCE WITH THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BETWEEN THE RECIPIENT OF THIS DOCUMENT AND THE SPECIAL MASTER.]**

---

## TABLE OF CONTENTS

Section 1.1(d)  Permitted Liens ................................................................................3

Section 1.1(e)  Procedures Summary ........................................................................5

Section 1.1(f)  Specified Debt ...................................................................................6

Section 4.1  Corporate Existence; Title to Shares .....................................................7

Section 4.2  Governmental Authorization ................................................................8

Section 4.3  Non-Contravention ...............................................................................9

Section 4.4  Capitalization ......................................................................................25

Section 4.5  Subsidiaries; Non-Controlled Entities ...............................................26

Section 4.6  Financial Statements ...........................................................................30

Section 4.7  Absence of Certain Changes ...............................................................31

Section 4.8  No Undisclosed Material Liabilities ...................................................32

Section 4.9  Legal Proceedings ...............................................................................33

Section 4.10  Taxes ..................................................................................................34

Section 4.11  Company Benefit Plans; Employment ..............................................37

Section 4.12  Compliance with Laws; Permits .......................................................47

Section 4.13  Regulatory Matters ............................................................................50

Section 4.14  Environmental Matters ......................................................................52

Section 4.15  Title to Properties ..............................................................................55

Section 4.16  Material Contracts ..............................................................................56

Section 4.17  Intellectual Property and Data Privacy ...........................................127

Section 4.18  Brokers; Financial Advisor .............................................................137

Section 4.19  Real Property ...................................................................................138

Section 4.20  Affiliate Transactions ......................................................................144

Section 4.21  Insurance ..........................................................................................145

Section 6.1  Conduct of the Business Pending the Closing ...................................177

Section 6.3(g)  Regulatory Approvals; Third Party Consents ...............................181

Section 6.6(a)  Indemnification, Exculpation and Insurance ................................182

Section 6.19(b)  Interim Period Incentive Bonuses ..............................................183

Section 7.1  Conditions Precedent to the Obligations of the Parties .....................187

## COMPANY DISCLOSURE SCHEDULE

This Company Disclosure Schedule (this "Disclosure Schedule") is being delivered pursuant to and forms part of that certain Stock Purchase Agreement (the "Agreement"), dated as of [●], 2025 by and between Amber MSub LLC ("Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article IV of the Agreement are made and given subject to this Disclosure Schedule.

This Disclosure Schedule is being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order. The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions and all of the representations, warranties and covenants set forth in the Agreement are qualified in their entirety by such fact. The foregoing disclosure is deemed disclosed against each section of this Disclosure Schedule.

The disclosure of any matter in any section of this Disclosure Schedule of any facts or circumstances shall be deemed to be an adequate response and disclosure of such facts or circumstances with respect to all representations or warranties calling for disclosure of such information, if it is reasonably apparent from a disclosure item or the documentation referenced that another disclosure section is also applicable. The disclosure of any matter or item in any schedule shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Special Master or the Company to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement. The disclosure of any Contract will be deemed modified by any subsequent amendments thereto.

In no event shall the listing of any matter in this Disclosure Schedule be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Special Master or the Company that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of this Disclosure Schedule. All information and disclosures contained herein are made as of the date of the Agreement and their accuracy is confirmed only as of that date and not at any time thereafter, except as otherwise provided in the Agreement.

**Section 1.1(d)**

**Permitted Liens**

1. Liens on metals and the right to receive metals arising out of any transaction in the Ordinary Course relating to the sale and/or use of precious metals or other catalyst necessary or useful for the operation of refinery assets of the Acquired Companies in the Ordinary Course; provided that such Liens do not encumber assets other than the catalyst and the related metals and the proceeds of the foregoing.

2. Liens on equipment of the Acquired Companies granted in the Ordinary Course.

3. Liens securing the obligations under the Indenture, dated as of February 11, 2021, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee) ("2021 Indenture").

4. Liens securing the obligations under the Indenture, dated as of September 20, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee) ("2023 Indenture").

5. Liens securing the obligations under the Loan Agreement by and between Gulf Coast Industrial Development Authority, as Issuer, and CITGO Petroleum Corporation, dated as of April 1, 1998 ("1998 Loan Agreement").

6. Liens securing the obligations under the Loan Agreement between Illinois Development Finance Authority, as Issuer, and CITGO Petroleum Corporation, dated as of June 1, 2002 ("2002 Loan Agreement").

7. Liens securing the obligations under the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, as the Seller, CITGO Petroleum Corporation, as the Servicer, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as Program Administrator (as amended by that certain Amendment No. 1 to Receivables Purchase Agreement, dated as of September 30, 2021, that certain Amendment No. 2 dated as of September 20, 2022, that certain Amendment No. 3 dated as of April 15, 2024 and that certain Amendment No. 4, dated as of September 5, 2024 (the "Receivables Purchase Agreement").

8. Liens securing the obligations under the Purchase and Sale Agreement, dated as of December 18, 2022, among CITGO AR2008 Funding Company, LLC, as Purchaser, and CITGO Petroleum Corporation, as Seller (as amended by that certain Amendment No. 1 to

3

Purchase and Sale Agreement, dated as of September 20, 2022 and that certain Amendment No. 2 to Purchase and Sale Agreement, dated as of April 15, 2024, the "<u>Purchase and Sale Agreement</u>").

9.  Pledges or deposits in the ordinary course of business in connection with (i) workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and (ii) public utility services provided to the Acquired Companies.

10. Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), and leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, incurred in the Ordinary Course.

11. Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) that are customary in the banking industry.

12. Liens securing the obligations under the Master Reimbursement Agreement, dated as of December 6, 2024, between CITGO Petroleum Corporation and Barclays Bank PLC, as the Bank (the "Master Reimbursement Agreement"), not to exceed an aggregate face amount of $200.0 million at any one time.

**<u>Section 1.1(e)</u>**

**Procedures Summary**

1.  To be provided under separate cover.

**<u>Section 1.1(f)</u>**

**Specified Debt**



## Section 4.1

## Corporate Existence; Title to Shares

**(a)**

    1.  None.

**(b)**

    1.  None.

## Section 4.2

### Governmental Authorization

1. All notifications and information required to be filed or supplied pursuant to the HSR Act.



**<u>Section 4.3</u>**

**Non-Contravention**





























---

[2] <u>Note to Draft</u>: Additional CITGO Petroleum Guarantees are expected to be executed as contemplated by Section 6.6(a) in the Agreement.





## Section 4.4

### Capitalization

**(a)**

    1.  None.

**(b)**

    1.  None.

## Section 4.5

**Subsidiaries; Non-Controlled Entities**

**(a)**

| Entity | Jurisdiction | Authorized Equity Interests | Outstanding Equity Interests |
|---|---|---|---|
|  |  |  |  |





**(b)**



**(c)**

1. None.

**(d)**

1. Items listed on Section 1.1(d) of the Company Disclosure Schedule are incorporated by reference.
2. 

| Pledgor(s) | Pledged Equity | % Owned / Type of Interest | Certificate No. |
|---|---|---|---|

## **Section 4.6**

## **Financial Statements**

**(a)**

    1.  See attached.

**(b)**

    1.  None.

## Section 4.7

### Absence of Certain Changes

**(a)**

    1. █████████████████████████████████

**(b)**

    1. None.

**(c)**

    1. None.

## Section 4.8

### No Undisclosed Material Liabilities

**(a)**

    1.  None.

**(b)**

    1.  None.

**(c)**

    1.  None.

**(d)**

    1.  None.

**(e)**

    1.  None.

## <u>Section 4.9</u>

**Legal Proceedings**

1.  See Exhibit 4.9 attached hereto. For the avoidance of doubt, nothing in Exhibit 4.9 will be deemed to broaden the scope of the representations and warranties included in Article IV of the Agreement and no Person makes any representations or warranties with respect to any detail provided beyond the scope of such representations and warranties.[3]

2.  Items listed in <u>Sections 4.12</u> and <u>4.14</u> of the Company Disclosure Schedules are incorporated herein by reference. To the extent other matters described, listed or contained within the Company Disclosures Schedules are "Legal Proceedings" they are incorporated as if set forth fully herein.

---

[3] **Note to Draft**: To include all unresolved matters listed on the Material Litigation and Claims Tracker

**<u>Section 4.10</u>**

**Taxes**

**(a)**

    1.  None.

**(b)**

    1.  None.

**(c)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---|---|---|---|---|---|



**(d)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---|---|---|---|---|---|

**(e)**

    1. ████████████████████████████████
       ██████████████████████

**(f)**

    1. None.

**(g)**

    1. None.

**(h)**

    1. None.

**(i)**

    1. None.

**Section 4.11**

**Company Benefit Plans; Employment**

(a)







**(d)**

    1.  None.

**(e)**

(i)

    1.  None.

(ii)

    1.  None.

(iii)



(iv)

(v)

   1.  None.

**(f)**

   1.  None.

**(g)**

**(h)**

**(i)**

   1.  None.

**(j)**

(i), (iii)



**(k)**

    1.  None.

**(l)**

    1.

**(m)**

1. None.

**(n)**

████████████████████████

- ████████████████████████
  ████████████████████

- ████████████████████████
  ████████████████████████
  ████████████████████████

- ████████████████████████
  ██ ██ ████ ███ ██ ███ ██ ███ ██ ██ ██
  ████████████████████

- ████████████████████████
  ████████████████████████
  ████████████████

- ████████████████████████
  ████████████████████████
  ████████████████

- ████████████████████████
  ████████████████████████
  ████

- ████████████████████████
  ████████████████████████
  ████████████

- ████████████████████████
  ████████████████████████
  ██████████████

- ████████████████████████
  ████████████████████████
  ████████████

████████████████████████
████████████████████████
████████



**(o)**

    1.  None.

**(p)**

    1.  None.

**(q)**

    1.  None.

**(r)**

    1.  None.

**(s)**

    1.  None.

**(t)**

1. None.

## Section 4.12

### Compliance with Laws; Permits

**(a)**

1.  Items 1, 2, and 4 listed on <u>Section 4.14</u> of the Company Disclosure Schedules and Item 1 listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.







**(b)**

1.  Items 1, 2, and 4 listed on <u>Section 4.14</u> and Item 1 listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

2.

**Section 4.13**

**Regulatory Matters**

**(a)**

    1.  Items listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

**(b)**

(i)

    1.  None.

(ii)

    1. ██████████████████████████████████████████████
██████████████████

    2.  Items listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

**(c)**

    1.  Items listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

    2. ████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
███████████████████



## Section 4.14

### Environmental Matters

1. See Exhibit 4.14A attached hereto.[4]

2. See Exhibit 4.14B attached hereto.[5]

3. Item 1 listed on Section 4.9 of the Company Disclosure Schedules is incorporated herein by reference. Items 2-27 listed on Section 4.12(a) and Item 2 listed on Section 4.12(b) of the Company Disclosure Schedules are incorporated herein by reference.

4. **Updates since the SLR Report**:



---

[4] **Note to Draft**: the SLR Environmental, Health and Safety Due Diligence Assessment will be attached as an exhibit (VDR #1.4.18.1).

[5] **Note to Draft**: the current ECL report (VDR #1.4.13.57) will be attached as an exhibit.





## **Section 4.15**

### **Title to Properties**

1.  None.

## Section 4.16

### Material Contracts

**(a)**

**(i)**

(A)

- ██████████████████
- ██████████████████████████████████
  ████████████████████████████
- ██████████████████████████████████
  ███████████████████████████████
    - ████████████████████████████
      ████████████████████████████
      ████████████████████████████
- ██████████████████████████████████
  ████████████████████████████
    - ████████████████████████████
      ████████████████████████████
      ████████████████████████████
- ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████
- ██████████████████████████████████
  ██████████████
    - ████████████████████████████
      ████████████████
- ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ████████
- ██████████████████████████████████
  ████████████████████████████













**(iv)**



---

[6] **Note to Draft**: the Master Settlement Agreement Tracker (VDR # 1.5.1.29) will be attached as
an exhibit.



































_Lubricants:_





















































































## Section 4.17

## Intellectual Property and Data Privacy

**(a)**

**(i)**

| Country | Serial No. | Filing Date | Patent No. | Issue Date | Title | Owner |
|---------|-----------|-------------|------------|------------|-------|-------|
|  |  |  |  |  |  |  |

**(ii)**

1.  See Exhibit 4.17(a)(ii) attached hereto.[9]

**(iii)**



| Domain Name | Account Holder |
|-------------|----------------|
|  |  |

---

[9] **Note to Draft**: The CITGO Trademark Status Report will be attached as an exhibit (VDR #2.1.6.3.9).













**(iv)**

| Registration No. | Registration Date | Title | Owner |
|---|---|---|---|



**(b)**

    1.  None.

**(c)**

    1.  None.

**(d)**

    1.  None.

**(e)**

    1.  

**(f)**

(i)





## Section 4.18

### Brokers; Financial Advisor

1. None.

**<u>Section 4.19</u>**

**Real Property**

**(a)**





**(b)**

| Refineries | Physical Addresses |
|---|---|
|  |  |

| Terminals | Physical Addresses |
|---|---|



| Lubricants | Physical Addresses |
|---|---|

| Miscellaneous | Physical Addresses |
|---|---|
|  |  |

**(c)**

| Jointly Owned Property | Physical Addresses | Ownership Structure | Acquired Company's Ownership Percentage |
|---|---|---|---|
|  |  |  |  |

**(d)**

1. None

**(e)**

1. None.

**(f)**

1. None.

**(g)**

1. None.

**(h)**

1. None.

**Section 4.20**

**Affiliate Transactions**



## **Section 4.21**

### **Insurance**

1.  See attached.

| Insured | Coverage Group | Coverage | Policy Effective | Policy Expiration | Insurer Group | Insurer Company | Policy # |
|---------|----------------|----------|------------------|-------------------|---------------|-----------------|----------|







149











154







157



































174





## Section 6.1

### Conduct of the Business Pending the Closing

**(a)**

    1.  None.

**(b)**

■

    ■ ██████████████████████████████████████
        ██████████████████████████████

■

    ■ ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ████████████████████████

**(iii)**

(A)(I)

    1.  [To be provided under separate cover].

(A)(II)

    1.  [To be provided under separate cover].

(A)(III)

    1.  [To be provided under separate cover].

(B)

    1.  [●].

(C)

    1.  [●].

(D)

    1.  [●].

**(iv)**

(A)(I)

    1.  [To be provided under separate cover].

(B)

    1.  [To be provided under separate cover].

(C)

    1.  [To be provided under separate cover].

(B)

    1.  [●].

(C)

    1.  [●].

(D)

    1.  [●].

**(v)**

(A) – (C)

    1.





### Section 6.3(g)

**Regulatory Approvals; Third Party Consents**

- ▆ ▆▆▆▆▆▆▆▆▆
- ▆ ▆▆▆▆▆▆▆▆▆▆
- ▆ ▆▆▆▆▆▆▆▆▆▆▆▆
- ▆ ▆▆
- ▆ ▆▆▆
- ▆ ▆▆▆▆▆▆▆▆▆▆
- ▆ ▆
- ▆ ▆▆
- ▆ ▆▆▆
- ▆▆▆
- ▆▆▆▆
- ▆▆▆▆

### Section 6.6(a)

**Indemnification, Exculpation and Insurance**

1. The Indemnification Agreements.

## Section 6.19(b)

### Interim Period Incentive Bonuses

(i)      [[Reserved.];

(ii)     [Reserved.];



(vi)    [Reserved.];

(vii)   [Reserved.];

(viii)  [Reserved.];

(ix)





## Section 7.1

### Conditions Precedent to the Obligations of the Parties

**(e)**

1. Approval pursuant to the HSR Act.



**B-3**

Akin Draft 8/22/2025
Confidential

---

**BUYER DISCLOSURE SCHEDULES**

**TO THE**

**STOCK PURCHASE AGREEMENT**

by and among

AMBER MSUB LLC,

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

---

Dated as of [●], 2025

---

**[THESE BUYER DISCLOSURE SCHEDULES ARE SUBJECT TO REVISION BY BUYER AT ANY TIME PRIOR TO SIGNING AND MUST BE KEPT CONFIDENTIAL IN ACCORDANCE WITH THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BETWEEN THE RECIPIENT OF THIS DOCUMENT AND BUYER.]**

---

## TABLE OF CONTENTS

Section 1.1(a)  Equity Financing Sources .................................................................................2

Section 1.1(b)  Knowledge of the Buyer ...................................................................................3

Section 5.1  Existence and Power ..............................................................................................4

Section 5.2  Authorization ..........................................................................................................5

Section 5.3  Governmental Authorization ..................................................................................6

Section 5.4  Non-Contravention .................................................................................................7

Section 5.5  Litigation .................................................................................................................8

Section 5.6  Regulatory Matters..................................................................................................9

Section 5.7  Financing................................................................................................................10

Section 5.8  Solvency.................................................................................................................11

Section 5.9  Purported Equity Pledge .......................................................................................12

Section 5.10  Claim Obligations ................................................................................................13

Section 5.11  Closing Consideration..........................................................................................14

Section 5.12  No Additional Representations ............................................................................15

## BUYER DISCLOSURE SCHEDULES

These Buyer Disclosure Schedules (these "Disclosure Schedules") are being delivered pursuant to and form part of that certain Stock Purchase Agreement (the "Agreement"), dated as of [●], 2025 by and between Amber MSub LLC ("Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article V the Agreement are made and given subject to these Disclosure Schedules.

These Disclosure Schedules are being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order.  The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions as of the date of this Agreement.

The disclosure of any matter in any section of the Buyer Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Buyer Disclosure Schedules in which it is reasonably apparent on the face of such disclosure item or the documentation referenced that another disclosure section is also applicable. The disclosure of any matter or item in any schedule shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Buyer to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement.

The references to any instrument, report or other document shall be deemed to include any and all exhibits, schedules, annexes and other attachments to such document (but shall not include any amendment, modification or supplement unless specifically identified and listed).

In no event shall the listing of any matter in these Disclosure Schedules be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Buyer that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of these Disclosure Schedules. All information and disclosures contained herein are made as of the date of the Agreement and their accuracy is confirmed only as of that date and not at any time thereafter, except as otherwise provided in the Agreement.

**Section 1.1(a)**

**Equity Financing Sources**

1. Elliott Associates, L.P., a Delaware limited partnership
2. Elliott International, L.P., a Cayman Islands limited partnership
3. Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts
4. Carronade Capital Master, LP
5. Crown/Carronade Segregated Portfolio
6. Rubric Capital Management LP
7. Jefferies Capital Services, LLC
8. Silver Point Capital, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate
9. FM Amber Investments LLC
10. Manifest Energy Transition Company, LLC
11. Gregory J. Goff

## <u>Section 1.1(b)</u>

### Knowledge of the Buyer



## **Section 5.1**

### **Existence and Power**

1. None.

## **Section 5.2**

### **Authorization**

1. None.

## Section 5.3

### Governmental Authorization

1. All notifications and information required to be filed or supplied pursuant to the HSR Act.
2. All notifications and information required to be filed or supplied in Mexico with the competent Mexican merger control authority.
3. All notifications and information required to be filed or supplied in Morrocco with the Moroccan Competition Council.
4. All notification and information required to be filed or supplied in the Netherlands with the competent Dutch merger control authority.
5. [All notification and information required to be filed or supplied in Spain with the Spanish National Competition and Markets Commission or the Council of Ministers, as applicable.][1]

---

[1] **Note to Company**: Buyer is amenable to removing this item upon confirmation that CITGO's revenues in FY2024 in Spain were below the applicable threshold determined by applicable Antitrust Laws.

## Section 5.4

### Non-Contravention

1.  None.

## **Section 5.5**

### **Litigation**

1. None.

## <u>Section 5.6</u>

### Regulatory Matters

(a)

    1.  None.

(b)

    1.  None.

(c)

    1.  None.

(d)

    1.  ███████

## <u>Section 5.7</u>

### Financing

(a)

    1.  None.

(b)

    1.  None.

(c)

    1.  None.

(d)

    1.  None.

(e)

    1.  None.

## Section 5.8

### Solvency

1. None

## <u>Section 5.9</u>

### Purported Equity Pledge

1. None.

**Section 5.10**

**Claim Obligations**

1.  $[2,021,258,255.42][2].

---

[2] **Note to Draft**: To be updated to include claim amounts as of the Execution Date.

13

**<u>Section 5.11</u>**

**Closing Consideration**

1.  None.

## **Section 5.12**

### **No Additional Representations**

(a)

    1.  None.

(b)

    1.  None.

**B-4**

*Agreed Form*
Confidential

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is entered into and effective this [•] day of [•], 2025, by and among Acquiom Clearinghouse LLC, a Delaware limited liability company (the "Escrow Agent"), Amber MSub LLC, a Delaware limited liability company (the "Buyer")[1] and Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Special Master" and together with the Buyer, the "Parties"), in connection with that certain Stock Purchase Agreement, dated as of [•], 2025 (the "Purchase Agreement"), by and between the Buyer and the Special Master. As between the Parties, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, the Buyer and the Special Master have entered into the Purchase Agreement on [•], 2025;

WHEREAS, the Buyer, the Special Master and Acquiom Financial LLC (the "Paying Agent") have entered into that certain Payments Administration Agreement (the "Paying Agent Agreement"), dated on or about the date hereof, pursuant to which the Paying Agent has established an account (the "Paying Account") for the purpose of receiving funds disbursed from the Escrow Accounts (as defined below) pursuant to this Agreement;

WHEREAS, the Buyer and the Special Master desire for the Escrow Agent to open two separate, distinct and non-commingled escrow accounts into which the Buyer will deposit (or cause to be deposited), funds to be held and disbursed in accordance with this Escrow Agreement;

WHEREAS, on the date hereof, the Buyer shall deposit $50,000,000.00 (the "Deposit Amount") by wire transfer of immediately available funds with the Escrow Agent as provided by the Purchase Agreement; and

WHEREAS, on the Closing Date, the Buyer shall deposit (or cause to be deposited) an amount in cash equal to the Expense Reserve Holdback Amount (as defined in the Purchase Agreement) by wire transfer of immediately available funds (the "Holdback Escrow Funds", and together with the Deposit Amount, the "Escrow Funds") with the Escrow Agent for the purpose of establishing a separate source of funds to secure and satisfy the Special Master's compensation and out-of-pocket costs, fees and expenses incurred by the Special Master pursuant to Section 3.4(c) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises herein, the parties hereto agree as follows:

## I.    Terms and Conditions

---

[1] **Note to Bidder**: Prior to the entry of the Escrow Agreement, the Escrow Agent will require the Buyer to complete a KYC via an electronic questionnaire. A link to the electronic questionnaire will be sent to the Buyer's desired contact person.

1.1    <u>Appointment of the Escrow Agent</u>. Buyer and the Special Master hereby appoint the Escrow Agent as their escrow agent, and the Escrow Agent hereby accepts its duties as provided herein.

1.2    <u>Deposit Escrow Account (Deposits)</u>. Immediately following the execution of this Agreement, the Buyer shall deposit, or cause to be deposited, the Deposit Amount by wire transfer of immediately available funds to the Escrow Agent using the wire instructions set forth on <u>Schedule I</u>. As promptly as practicable following receipt of the Deposit Amount, the Escrow Agent shall deposit the Deposit Amount into a separate, distinct and non-commingled interest bearing escrow account, insured by the Federal Deposit Insurance Corporation ("<u>FDIC</u>") established by the Escrow Agent to hold the Deposit Amount (the "<u>Deposit Escrow Account</u>"). The Escrow Agent shall maintain the Deposit Escrow Account as set forth on <u>Exhibit B</u>. The Deposit Amount shall not be used for any purposes other than as set forth in this Escrow Agreement and the Purchase Agreement.

1.3    <u>Deposit Escrow Account (Disbursements)</u>. The Escrow Agent shall retain the Deposit Amount in the Deposit Escrow Account and shall not make any disbursement of all or any portion of the Deposit Amount except in accordance with the following <u>Sections 1.3.1</u>, <u>1.3.2</u> and <u>1.3.3</u>:

1.3.1

(a)    If the Closing occurs, then in accordance with Section 3.3(a) of the Purchase Agreement, the Buyer and the Special Master shall deliver to the Escrow Agent joint written instructions signed by an authorized representative of the Buyer listed on <u>Exhibit A-1</u> hereto and the Special Master ("<u>Joint Instructions</u>") to disburse the Deposit Amount to the Paying Account by wire transfer of immediately available funds out of the Deposit Escrow Account, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, disburse the Deposit Amount in accordance with and as specified in such Joint Instructions. The Joint Instructions shall specify the amount of funds to be disbursed from the Deposit Escrow Account and shall identify the payee to whom the disbursement shall be made, which shall be either the Buyer or the Paying Account. For purposes of this Agreement, "<u>Business Day</u>" shall mean any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

(b)    Notwithstanding anything to the contrary in this Agreement, all withholding and tax reporting (other than tax reporting of interest income earned with respect to the Escrow Earnings) of amounts paid pursuant to this Agreement shall be governed exclusively by the Paying Agent Agreement, and in no event shall the Escrow Agent withhold tax from any amounts paid pursuant to this Agreement. Buyer acknowledges and agrees that no withholding applies to any payments of Closing Consideration paid pursuant to this Agreement under Chapter 3 or Chapter 4 of the Code.

1.3.2    If the Purchase Agreement is terminated as a result of a Deposit Forfeiture Termination Event, then pursuant to Section 3.3(b) of the Purchase Agreement, the Buyer and the Special Master shall promptly (and in any event within five (5) Business

2

Days of such termination) deliver Joint Instructions to the Escrow Agent, directing the release of (a) the Deposit Amount to the Paying Account in accordance with the wire instructions set forth on Schedule I, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, release the Deposit Amount in accordance with and as specified in such Joint Instructions and (b) the balance of the Deposit Escrow Account after giving effect to the distribution described in the immediately preceding clause (a) to the Buyer in accordance with the wire instructions provided by the Buyer in such Joint Instruction. The Escrow Agent shall release the balance of the Deposit Escrow Account as described in the immediately preceding clause (b) within two (2) Business Days from the receipt of the Joint Instructions.

1.3.3    If the Purchase Agreement is terminated for any reason other than a Deposit Forfeiture Termination Event, then pursuant to Section 3.3(c) of the Purchase Agreement, the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver Joint Instructions to the Escrow Agent directing the release of the balance of the Deposit Escrow Account to the Buyer or its designees, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, disburse the Deposit Amount in accordance with and as specified in such Joint Instructions.

1.4    Holdback Escrow Account (Deposits). At the Closing, and in accordance with Section 3.4(c) of the Purchase Agreement, the Buyer shall deposit, or cause to be deposited, the Expense Reserve Holdback Amount by wire transfer of immediately available funds to the Escrow Agent using the wire instructions set forth on Schedule I. As promptly as practicable following receipt of any portion of the Holdback Escrow Funds, the Escrow Agent shall deposit such portion of the Holdback Escrow Funds into a separate, distinct and non-commingled escrow account established by the Escrow Agent (the "Holdback Escrow Account", and together with the Deposit Escrow Account, the "Escrow Accounts"). The Escrow Agent shall maintain the Holdback Escrow Account as set forth on Exhibit B. No Holdback Escrow Funds shall be used for any other purposes other than as set forth in this Escrow Agreement and the Purchase Agreement.

1.5    Holdback Escrow Account (Disbursements). After the Closing occurs and subject to Section 3.4(c) of the Purchase Agreement, at any time and from time to time, within two (2) Business Days from the receipt of the Special Master's written instructions, signed by the Special Master ("Special Master Instructions"), the Escrow Agent shall disburse the Holdback Escrow Funds (or a portion of such funds) held in the Holdback Escrow Account as instructed in such Special Master Instructions and this Section 1.5. The Special Master Instructions shall specify the amount of funds to be disbursed from the Holdback Escrow Account to the Paying Account. Disbursements of funds from the Holdback Escrow Account shall be made in accordance with the payment instructions set forth in such Special Master Instructions.

1.6    Escrow Earnings. All interest and income from the investment of the Escrow Funds (the "Escrow Earnings") shall become part of the Escrow Funds and shall be re-invested and disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

## II.    Provisions as to the Escrow Agent

2.1    This Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Agreement against the Escrow Agent. In performing its duties and obligations under this Agreement, or upon the claimed failure to perform such duties or obligations, the Escrow Agent shall have no liability in connection herewith except for the Escrow Agent's fraud, willful misconduct or gross negligence. In no event shall the Escrow Agent be liable hereunder for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Agreement. Any wire transfers of funds made by the Escrow Agent pursuant to this Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time, including without limitation call-back procedures. The Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to such security procedures may result in a delay in accomplishing such funds transfer and the Parties agree that the Escrow Agent shall not be liable for any loss caused by any such delay, other than as a result of the Escrow Agent's fraud, willful misconduct or gross negligence. No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability in connection with this Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with the performance of this Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.2    This Agreement constitutes the entire agreement between the Escrow Agent, the Buyer and the Special Master in connection with the subject matter of this Agreement, and no other agreement entered into between the Buyer and the Special Master, or either of them, including, without limitation, the Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent; *provided*, that to the extent there exists a conflict between the terms and provisions of this Agreement and the Purchase Agreement, solely as between the Buyer and the Special Master, the terms and provisions of the Purchase Agreement will control.

2.3    Except in cases of the Escrow Agent's fraud, willful misconduct or gross negligence, the Escrow Agent shall be protected in acting upon any written instructions, notice, request or instrument which the Escrow Agent in good faith reasonably believes to be genuine and what it purports to be. The Escrow Agent may consult with nationally recognized outside legal counsel with expertise in the matter at issue in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting reasonably and in good faith in accordance with the advice of such counsel.

2.4    In the event of any disagreement between the Buyer and the Special Master, or between either or both of them and any other person, resulting in adverse claims or demands being made in connection with the matters covered by this Agreement, or in the event that the Escrow

Agent reasonably and in good faith is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any such claims or demands on it, or refuse to take any other action hereunder (but only for so long as such disagreement continues or such reasonable doubt exists), and in any such event, the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act (absent the Escrow Agent's fraud, willful misconduct or gross negligence), and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of the Buyer and the Special Master and all other interested persons shall have been fully and finally adjudicated by a court of competent jurisdiction or (ii) all disagreements been adjudged and all reasonable doubt resolved by agreement among the Buyer and the Special Master and all other interested persons, and the Escrow Agent shall have been notified thereof in writing signed by the Buyer and the Special Master. Notwithstanding the preceding sentence, the Escrow Agent may in its reasonable discretion obey the order, judgment, decree or levy of any court of competent jurisdiction or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision thereof having authority over the Escrow Agent, and the Escrow Agent is hereby authorized in its reasonable discretion, to comply with and obey any such orders, judgments, decrees or levies and it shall not be liable to any of the Parties or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree being subsequently reversed, modified, annulled, set aside or vacated. The rights of the Escrow Agent under this Section 2.4 are cumulative of all other rights which it may have by Law (as defined in the Purchase Agreement) or otherwise.

2.5    The Buyer agrees to indemnify the Escrow Agent from and against any and all reasonable, documented and out-of-pocket losses, liabilities and expenses (collectively, "Losses") which the Escrow Agent incurs in connection with its performance under this Agreement; *provided*, that the Escrow Agent shall not be entitled to indemnity with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been caused by the Escrow Agent's fraud, willful misconduct or gross negligence. Notwithstanding anything in this Agreement to the contrary, in no event shall the Buyer or the Special Master be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits) of the Escrow Agent, even if such Party has been advised of the likelihood of such loss or damage and regardless of the form of action; *provided*, this sentence shall not prejudice the Escrow Agent's right to be indemnified by the Buyer for Losses paid by the Escrow Agent to third parties. This Section 2.5 shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

2.6    Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Agreement without further act, and the Escrow Agent (or its successor) shall provide prompt written notice of such transfer to Buyer and the Special Master.

2.7    The Escrow Agent may resign and be discharged at any time from its duties or obligations hereunder by providing written notice to the Buyer and the Special Master. In addition, the Buyer and the Special Master may jointly terminate, with or without cause, this Agreement by providing written notice to the Escrow Agent. Such resignation or termination shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such

written notice has been furnished. The Buyer and the Special Master shall promptly appoint a mutually agreeable successor escrow agent following receipt or delivery, as applicable, of any such notice of resignation or termination (as applicable). In the event no successor escrow agent has been appointed on or prior to the date such resignation or termination is to become effective, (i) the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all Escrow Funds and other property (if any) then held by the Escrow Agent and shall thereupon be relieved of all further duties and obligations under this Agreement and (ii) the Buyer and the Special Master (or either of them acting alone) may apply to the Court for the appointment of a successor escrow agent or other appropriate relief. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

## III.    Compensation of the Escrow Agent

3.1     The Escrow Agent hereby acknowledges and agrees that no fees, expenses or other compensation for the Escrow Agent's services as contemplated by this Agreement will be payable by the Parties, as set forth on Exhibit B hereto. Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Special Master will not be responsible for any fees or other liabilities in connection with this Agreement.

## IV.    Miscellaneous

4.1     During the term of this Agreement, the Escrow Funds shall be deposited as indicated in Exhibit B. Any interest will accrue on the Escrow Funds deposits, beginning the day immediately following the day the Escrow Funds deposits are received, based on the daily average balances of the Escrow Funds so held in the Escrow Accounts. Any interest will be credited monthly and become part of the Escrow Funds. Deposits into the Escrow Accounts are insured, subject to the applicable rules and regulations of the FDIC, in the standard FDIC insurance amount of $███████, including principal and accrued interest, and are not secured. The Escrow Agent or its affiliates may receive compensation from third parties based on balances deposited in the Escrow Accounts.

4.2     The Buyer and the Special Master agree that, subject to the terms and conditions of this Agreement, for U.S. federal, state and local income tax purposes, the Buyer shall be treated as the owner of the Escrow Funds until such funds are released in accordance with this Agreement and all Escrow Earnings shall be reported as having been earned by the Buyer for U.S. federal, state and local income tax purposes as of the end of the calendar year in which it was earned, whether or not such income was disbursed during such calendar year, to the extent required by the United States Internal Revenue Service ("IRS"), on IRS Form 1099 (or other appropriate form as required by U.S. Law of the Escrow Agent). Upon Joint Instructions delivered to the Escrow Agent by the Buyer and the Special Master and within ten (10) days following the end of each calendar quarter, the Escrow Agent shall release and disburse to any account or accounts designated by the Buyer from the Escrow Funds held in the Escrow Accounts an amount equal to twenty-one (21%) percent of the Escrow Earnings earned since the preceding calendar quarter on the Escrow Funds held in the Escrow Accounts (if any). Any residual interest that posts after the final distribution of the Escrow Funds shall be delivered (i) to the Buyer in an amount equal to twenty-one (21%) percent of the amount of such residual interests and (ii), with respect to any amounts in excess of the amount distributed to the Buyer under clause (i), to the Paying Account in accordance with the

wire instructions set forth on Schedule I or as otherwise set forth in Joint Instructions. On or before the execution and delivery of this Agreement, each of the Buyer and the Special Master shall provide to the Escrow Agent a correct, duly completed, dated and executed current IRS Form W-9 or Form W-8, whichever is appropriate, or any successor forms thereto, in a form and substance satisfactory to the Escrow Agent (which such forms the Escrow Agent shall be permitted to transmit to the depository institution where the Escrow Funds are held) including appropriate supporting documentation and/or any other form, document, and/or certificate required or reasonably requested by the Escrow Agent to validate the form provided. Except for the delivery and filing of tax information reporting forms required pursuant to the Internal Revenue Code of 1986, as amended, to be delivered and filed with the IRS by the Escrow Agent, as escrow agent hereunder, or by the institution where the Escrow Accounts are held, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return with respect to any funds held pursuant to this Agreement or any income earned thereon.

4.3    The Escrow Agent shall provide monthly reports of transactions and balances to the Buyer and the Special Master as of the end of each month, until the disbursement of all Escrow Funds. This Agreement shall terminate upon the earlier to occur of (x) final disbursement of all Escrow Funds in accordance with this Agreement or (y) delivery to the Escrow Agent of a written notice of termination executed jointly by the Buyer and the Special Master, in each case, after which this Agreement shall be of no further force and effect except that the provisions of Sections 2.5, 4.4, 4.5, 4.9 and 4.13 shall survive termination.

4.4    Any notice, request for consent, report, or any other communication required or permitted in this Agreement, including the monthly reports described in Section 4.3, shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the email address given below, and email confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other parties hereto in writing:

If to the Escrow Agent:

Acquiom Clearinghouse LLC
950 17th Street, Suite 1400
Denver, CO 80202

If to the Buyer:

Amber MSub LLC
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor

7

West Palm Beach, FL 33401
Attention: Mike Tomkins
Email:  mtomkins@elliottmgmt.com,
egreenberg@elliottmgmt.com

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention: Project Horizon
Email: HorizonAkinCore@akingump.com

If to the Special Master:

Robert B. Pincus in his capacity as Special
Master for the United States District Court for the District of Delaware
██████████████
███████████████████
Email: ████████████████████

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Email: Horizon.Notice@weil.com

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party.

4.5     This Agreement (including any claims, issues, controversies or matters arising hereunder, whether arising in law, contract, tort or equity) shall be governed by and construed according to the Laws of the State of Delaware, without regard to conflicts of laws rules or principles. Except as otherwise permitted herein, neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto. This Agreement shall inure to and be binding upon the parties hereto and their respective successors, heirs and permitted assigns. EACH PARTY AND THE ESCROW AGENT ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY AND THE ESCROW AGENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY OR THE ESCROW AGENT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY AND THE ESCROW AGENT CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY OR THE ESCROW AGENT HAS REPRESENTED,

EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY OR THE ESCROW AGENT WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 4.5.</u>

4.6    The terms of this Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion.

4.7    If any provision of this Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.8    This Agreement is for the sole benefit of the Buyer, the Special Master and the Escrow Agent, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The Escrow Agent shall have the right to perform any of its duties hereunder through its affiliates, agents, attorneys, custodians or nominees; *provided*, that such right shall not relieve the Escrow Agent of any of its duties or obligations hereunder.

4.9    No party to this Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

4.10    All titles and headings in this Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.11    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

4.12    Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, each of the Parties shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the forms of <u>Exhibit A-1</u> and <u>A-2</u> hereto, respectively (each, a "<u>Certificate of Incumbency</u>") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on

behalf of the applicable Party. Until such time as the Escrow Agent receives from a Party a new Certificate of Incumbency replacing the most recent Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent. Whenever this Agreement provides for joint written notices, joint written instructions or other joint actions to be delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on any joint written notice, instructions or action executed by persons named in such Certificate of Incumbency.

4.13    The Buyer and the Escrow Agent agree that in no circumstance shall the Special Master or his Representatives (as defined in the Purchase Agreement) be personally or otherwise liable for any amounts or obligations owed to the Buyer, and the Special Master and his Representatives are acting as an arm of the Court (as defined in the Purchase Agreement) and are entitled to judicial immunity in the performance of their duties in connection herewith.

4.14    Following the date hereof, each Party and the Escrow Agent shall deliver to the other Parties or the Escrow Agent, as applicable, such further information and documents and shall execute and deliver to the other Parties or the Escrow Agent, as applicable, such further instruments and agreements as any other Party or the Escrow Agent, as applicable, shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other Party or the Escrow Agent, as applicable, the benefits hereof.

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:**

**To help the U.S. Government fight the funding of terrorism and money laundering activities, federal Law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When a party opens an account, the Escrow Agent will ask for each party's name, address, date of birth, or other appropriate information that will allow the Escrow Agent to identify such party. The Escrow Agent may also ask to see each party's driver's license or other identifying documents.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

ACQUIOM CLEARINGHOUSE LLC, as the Escrow Agent

By:_____
Name:
Title:

AMBER MSUB LLC, as the Buyer

By:_____
Name:
Title:

ROBERT B. PINCUS, solely in his capacity as the Special Master

_____

*[Signature Page to Escrow Agreement]*

**EXHIBIT A-1**

**Certificate of Incumbency
(List of Authorized Representatives)**

Client Name: AMBER MSUB LLC

As an authorized officer of the above referenced entity, I hereby certify that each person listed below is an authorized signer for such entity, and that the title and signature appearing beside each name is true and correct.

**Name** **Title** **Signature**          **Phone**          **Alt. Phone** **Email**

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:[2]

_____.
          Date

By:_____
Name:
Title:

---

[2] **Note to Draft:** The specimen signature page of each authorized signer (including those delivered in counterpart) must include the signature of the witnessing authorized officer. It is permissible for an authorized signer to witness and date his/her own signature if such signer is also an authorized officer of the referenced entity.

**EXHIBIT A-2**

**Certificate of Incumbency**

Client Name: ROBERT B. PINCUS, solely in his capacity as the Special Master

In my capacity as the Special Master, I hereby certify that the signature appearing beside my name is true and correct.

| **Name** | **Title** | **Signature** | **Phone** | **Alt. Phone** | **Email** |
|---|---|---|---|---|---|
| | | | | | |

IN WITNESS WHEREOF, this certificate has been executed by the Special Master on:

_____.
　　　　Date

**SCHEDULE I**

WIRE TRANSFER INSTRUCTIONS

[Date]
[Via Email]
[Via Fax]
Acquiom Clearinghouse LLC
950 17th Street, Suite 1400
Denver, CO 80202
Attention:
Telephone:
Facsimile:
E-mail:

RE: [Buyer Representative] and Special Master – Escrow Agreement, dated [●], 2025 Escrow Account number [xxxxxxxxx].

Reference is hereby made to that certain Escrow Agreement, dated [●], 2025 by and among Acquiom Clearinghouse LLC, a Delaware limited liability company, as the Escrow Agent, Amber MSub LLC, a Delaware limited liability company and Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Escrow Agreement")

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section [●] of the Escrow Agreement, the Parties hereby instruct the Escrow Agent to release [$] to the specified party or parties as instructed below from Escrow Account number [xxxxxxxxx]

[BANK NAME]
ABA #:
Account Name:
Bank Address:
Beneficiary Name:
Beneficiary Account #:
Reference:
Attention:

Thank you.

_____
[Buyer Representative]

_____
Robert B. Pincus, solely in his capacity as the Special Master

**EXHIBIT B**

<u>**SCHEDULE OF ESCROW AGENT FEES**</u>



---

[3] **Note to Draft**: The final interest rate will be determined based on the aggregate amounts to be held in escrow.

**B-5**

*Agreed Form*
Confidential

# PAYMENTS ADMINISTRATION AGREEMENT

This Payments Administration Agreement (this "Agreement") is entered into as of [●], 2025 by and among Amber MSub LLC, a Delaware limited liability company ("Buyer"), Robert B. Pincus, solely in his capacity as special master (the "Special Master" and together with Buyer, the "Parties") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"), and Acquiom Financial LLC, a Colorado limited liability company (in its capacity as the payments administrator, "Agent"), in connection with the Stock Purchase Agreement, dated as of [___], 2025 (as may be amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Purchase Agreement"), by and between Buyer and the Special Master, which contemplates the sale of all of the issued and outstanding capital stock (the "Shares") of PDV Holding, Inc., a Delaware corporation (the "Company") to Buyer. This Agreement is entered into for the benefit of the creditors who are party to the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) and have obtained a writ of attachment on or before January 12, 2024 (a "Claim") and such Claim is secured by a valid and duly perfected lien on the Shares (collectively, the "Creditors", and together with the Expense Amount Recipients (as defined below), collectively, "Payees"). Solely as between the Parties, capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings given to such terms in the Purchase Agreement.

**1.     Appointment.** The Parties hereby engage Agent as the payments administrator concerning the Account (as defined below) for the purposes set forth herein, and Agent hereby accepts such appointment and agrees to perform the services set forth herein.

**2.     Account; Fees.** The Special Master (or its counsel or designee) will advise Agent of the closing date of the transactions contemplated by the Purchase Agreement and will instruct Agent of the date that Agent shall commence payments hereunder (such date, the "Initial Payment Date"). At least three (3) Business Days prior to the Initial Payment Date, the Parties will provide, or cause to be provided, to Agent completed account opening forms and, no later than the Initial Payment Date, the Special Master (or its counsel or designee) will provide an executed copy of the Purchase Agreement. Agent shall establish and administer a regulated broker-dealer paying account and any related trust or custodial account for unclaimed funds (collectively, the "Account") for the purposes set forth herein. The funds in the Account are non-interest-bearing [and insured by the Federal Deposit Insurance Corporation up to the applicable limits].[1] On or before 10:00 a.m. Eastern Time on the Initial Payment Date, Buyer shall wire, or cause to be wired, the necessary and immediately available funds to the Account pursuant to the wire instructions on Exhibit A and will pay, or cause to be paid, the fees on Exhibit B that are due as of such time. Upon receipt of such funds, Agent shall promptly provide the Special Master with written confirmation (email being sufficient) to the appropriate email addresses or notice addresses as set forth on the signature pages hereto that the funds have been received by Agent on behalf of and for the benefit of the Payees. Following the Initial Payment Date, the Parties and/or Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent") pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Buyer, the Special Master and the Escrow Agent, may from time to time deposit or cause to be deposited additional funds pursuant to the Purchase Agreement (collectively, "Additional Amounts") to fund additional payments through the Account as contemplated hereunder (collectively, "Additional Payments"),

---

[1] Note to Draft: SRS to confirm that funds in Account are FDIC-insured (and applicable limits).

including payments to the Expense Amount Recipients with respect to the Special Master's compensation and out-of-pocket costs, fees and expenses incurred by the Special Master after the Closing out of the funds deposited with the Escrow Agent in accordance with the Purchase Agreement (collectively, "Approved Expense Amounts"). For purposes of this Agreement, "Expense Amount Recipient" shall mean any recipient of any Approved Expense Amount.

**3.    Payee Materials; Review.**

a.    **Delivery of Payee Materials.** Agent shall make any documents and other information required to be returned by the Payees (collectively, the "Payee Materials"), available to the applicable Payees on the date directed by the Special Master (or its counsel or designee) (each, a "Solicitation Date"). Each Payee shall deliver the duly completed Payee Materials, documentation representing their Claims that is satisfactory to the Special Master, any required tax forms and information (including an Internal Revenue Service ("IRS") Form W-9 or appropriate Form W-8, as applicable), and all other required materials (each such Payee that has done so, a "Tendering Payee") prior to, and as a condition to, payment. Agent shall be provided with tax forms for each recipient (other than recipients of transaction expenses as set forth on the Spreadsheet) prior to being required to make payments to such persons. If payment is to be made to a person other than the registered Payee, Agent shall not be required to process such payment until the required Payee Materials and other necessary materials have been properly completed by the new recipient. Agent shall further make available, electronically or by email, the Payee Materials to the Special Master.

b.    **Examination of Documents.** Agent shall examine the materials received from each Tendering Payee to ascertain whether they appear to have been properly completed and executed in accordance with the instructions set forth in the Payee Materials. In the event Agent determines that any document has been improperly completed or executed, or that any other irregularity exists, Agent shall attempt to cause such irregularity to be corrected. As to any irregularity that Agent cannot resolve, Agent shall promptly provide notice to the Special Master for instructions and final determination.

c.    **Maintaining Records and Reports.** Agent shall keep and maintain complete and accurate ledgers showing the amount of cash paid to each Payee. Upon making payment to Payees, Agent shall, if so requested by the Special Master, make available the Payee Materials to the Special Master. Agent shall, in accordance with its standard procedures, preserve electronic versions of all documents (physical and electronic) described in this section and received by Agent, and will dispose of any physical documents no earlier than ninety (90) days after receipt, *provided* that Agent makes available copies of such documents to the Special Master (or its counsel or designee) prior to such disposal.

**4.    Spreadsheets; Payments.**

a.    **Delivery of Spreadsheets.** The Special Master (or its counsel or designee), in consultation with Buyer, shall deliver to Agent a spreadsheet (the "Initial Closing Spreadsheet") containing (in each case to the extent applicable) Payees that will be paid any amounts on the Initial Payment Date, payment amounts, email and physical addresses of such Payees, tax characterizations, and, if applicable, withholding amounts. The Initial Closing Spreadsheet shall also contain any other information and documents required to solicit and verify the Payee Materials and other necessary materials. The Special Master (or its counsel or designee) shall prepare a preliminary form of such Initial Closing Spreadsheet and deliver such Initial Closing Spreadsheet,

subject to completion and further changes by the Special Master (or its counsel or designee), in consultation with Buyer, as reflected in the final Initial Closing Spreadsheet, by 2:00 pm Eastern Time at least two (2) Business Days prior to the Solicitation Date. The Special Master (or its counsel or designee), in consultation with Buyer, shall deliver such Initial Closing Spreadsheet by 2:00 p.m. Eastern Time at least two (2) Business Days prior to the Initial Payment Date; *provided*, that if the Initial Closing Spreadsheet is delivered after such time, the Parties acknowledge that any substantial revisions could delay the Solicitation Date, and all payments will be made on a commercially reasonable efforts basis and may be delayed to the next Business Day. Should any revisions to the Initial Closing Spreadsheet be required, the Special Master (or its counsel or designee), in consultation with Buyer, shall deliver a revised Initial Closing Spreadsheet to Agent any time prior to 10:00 a.m. Eastern Time on the Initial Payment Date (such final form of the Initial Closing Spreadsheet, the "Closing Spreadsheet"). Any subsequent payments of Additional Payments shall be made pursuant to written disbursement instructions delivered to Agent by the Special Master (or its counsel or designee), in consultation with Buyer (each such subsequent instructions, a "Subsequent Spreadsheet" and together with the Closing Spreadsheet, "Spreadsheets").

b.    **Payments.** With respect to all payments hereunder other than payments of Approved Expense Amounts, subject to sufficient funds being available in the Account, Agent shall pay each Payee that has properly signed and completed all required documents no later than two (2) full Business Days after receipt of the applicable Spreadsheet the amount due to such Payee pursuant to such Spreadsheet less any applicable withholding. Except as provided below, all payments shall be in United States (U.S.) dollars and shall be made by ACH, check or wire transfer in accordance with the Payee Materials (if applicable) or as otherwise specified on the Spreadsheets. The Parties hereby direct Agent to make available to the Payees, subject to eligibility, the option to receive their payments in a foreign currency (the "Foreign Currency Payment Option"). If a Payee elects the Foreign Currency Payment Option, the Parties hereby direct Agent to deliver such Payee's payment to the currency exchange provider conducting the exchange on behalf of the Payee (the "Currency Exchange Provider") and acknowledge and agree that the Payee shall receive by wire its converted payment directly from Currency Exchange Provider generally within two (2) Business Days of the Currency Exchange Provider initiating the currency exchange. Any payments made pursuant to this Agreement shall be considered payments in United States (U.S.) dollars for tax reporting and withholding purposes. Agent shall provide prompt written notice (email being sufficient) to the Parties of any payments or disbursements of funds from the Account pursuant to Section 4.b and Section 4.c hereunder.

c.    **Expense Amount Recipients.** Solely with respect to the disbursement by Agent of any Approved Expense Amounts after the Closing, within two (2) Business Days of receipt of written instructions signed by the Special Master that attach (i) a copy of an order of the Court that authorizes payment of such Approved Expense Amount (each such order, an "Order") and (ii) the applicable Spreadsheet, then, subject to sufficient funds being available in the Account, the Agent shall pay each Expense Amount Recipient the amount due to such Expense Amount Recipient pursuant to such Order and Spreadsheet less any applicable withholding. All payments shall be in United States (U.S.) dollars and shall be made by ACH, check or wire transfer in accordance with the Payee Materials (if applicable) or as otherwise specified on the applicable Spreadsheet. Any payments made pursuant to this Agreement shall be considered payments in United States (U.S.) dollars for tax reporting and withholding purposes.

  d. **Employee Compensation Payments.** The Parties hereby represent that no payments deposited in the Account will be deemed employee compensation payments.

**5. Tax Matters.**[2]

  a. **U.S. Payees.** For distributions to U.S. persons (actual or presumed), Agent shall complete tax reporting required by U.S. law of Agent. Unless otherwise set forth on the applicable Spreadsheet as interest or other reportable income (collectively, "Other Income") not reportable on Forms 1099-B, Agent shall report payments to U.S. persons (actual or presumed) as gross proceeds on Forms 1099-B.

  b. **Foreign Payees.** Except for distributions identified on the Spreadsheet as Other Income, Agent shall not withhold on distributions made to Payees that demonstrate their status as non-U.S. persons in accordance with U.S. Treasury Regulations ("Foreign Payees"). Agent shall report distributions to Foreign Payees that are identified on the Spreadsheet as domestic source Other Income for which withholding may be required (as set forth on the Spreadsheet) on Forms 1042-S, using Buyer's Federal Employer Identification Number ("FEIN"). Agent shall withhold from such distributions the applicable amounts (as set forth on the Spreadsheet or as otherwise directed by the Special Master) and shall remit such taxes to the appropriate authorities on Buyer's FEIN. To the extent direction is not otherwise provided by the Special Master to Agent, Agent may, after notice to the Special Master, consult with tax counsel in connection with making any tax form validation or withholding determinations hereunder.

  c. **Compensation Payments.** Without limitation to section 4.d. above, Agent shall not be responsible for performing any tax reporting for distributions that constitute employment-related compensation payments.

  d. **Withholding.** Notwithstanding anything to the contrary in this Agreement, Agent shall comply with any instruction from the Special Master to withhold tax from any amounts paid pursuant to this Agreement. The Agent and Buyer acknowledge and agree that, other than a deduction or withholding attributable to the failure of the Company to provide the FIRPTA Certificate (as defined in the Purchase Agreement) described in Section 2.3(a)(iii) of the Purchase Agreement, no withholding applies to any payments of Closing Consideration paid pursuant to this Agreement under Chapter 3 or Chapter 4 of the Code.

**6. Exculpation; Indemnification.** Agent shall not be liable for any loss to any Party in connection herewith except to the extent that its fraud, bad faith, gross negligence or willful misconduct was the primary cause of any loss to any Party. Notwithstanding anything in this Agreement to the contrary, in no event shall Agent be liable for special, incidental, punitive, indirect, or consequential losses or damages of any kind (including but not limited to lost profits) (all of the foregoing, "Excluded Damages") even if it has been advised of the likelihood of such loss or damage and regardless of the form of action; *provided*, that this sentence shall not apply to Excluded Damages that are required by final adjudication to be paid by Buyer to a third party plaintiff or any consequential losses that are reasonably foreseeable. Buyer shall indemnify Agent for any reasonable, documented and out-of-pocket losses, liabilities and expenses arising out of or in connection with this Agreement, except to the extent caused by Agent's fraud, bad faith, gross negligence or willful misconduct. This section shall survive the resignation or removal of Agent and the termination of this Agreement. Agent shall have no obligation to make or facilitate any

---

[2] NTD: Remains subject to tax review.

payment unless Buyer shall have provided, or cause to be provided, the necessary readily available funds in accordance with the terms hereof to make such payments and shall not be liable or responsible for any delay or failure of Buyer or other person or entity to comply with any of their respective obligations. In no event shall the Special Master or any of his consultants, agents, attorneys, accountants, advisors, financing sources and other representatives (individually, "Representatives") be personally or otherwise liable for any amounts or obligations owed to the Agent or any other party in connection herewith, as the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties. This section shall survive the resignation or removal of Agent and the termination of this Agreement. Notwithstanding anything to the contrary herein, Buyer hereby agrees that any obligation for indemnification under this Agreement shall be borne 100% by Buyer.

**7.    Miscellaneous.**

a.    **Confidentiality.** Agent shall, and shall cause its officers, employees, advisors and agents to, hold all documents and information (including, but not limited to, names, addresses, bank accounts, tax identification numbers and amounts receivable) furnished by the Parties to Agent, whether on, before or after the date hereof, in connection with the engagement of Agent hereunder (including the terms of the Purchase Agreement, the transactions contemplated thereby and the identity of the parties thereto) (the "Confidential Information") in strict confidence. Agent shall only use the Confidential Information for the sole purpose of performing its obligations, duties and responsibilities contemplated by this Agreement and shall only communicate such Confidential Information to (i) the recipients of documents or funds hereunder, (ii) Agent's officers, employees, advisors and agents who have a need to know such information in order to perform Agent's obligations, duties and responsibilities contemplated by this Agreement and who are subject to obligations of confidentiality to Agent and Parties no less stringent than Agent's obligations hereunder and (iii) as required by law, rule, regulation or legal process after prior written notice (to the extent legally permissible) to the applicable Party hereunder and taking reasonable steps to obtain protective treatment of such Party's Confidential Information.

b.    **Agent's Duties, Compliance.** Agent hereby represents that it is a registered broker-dealer and member of the Financial Industry Regulatory Authority (FINRA) and Securities Investor Protection Corporation (SIPC). Agent's duties shall be limited to those specifically set forth herein, which shall be deemed purely ministerial in nature. Agent may take any actions it determines in good faith is reasonably necessary to comply with applicable laws, rules and regulations including, without limitation, in connection with verification of identities under Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001; provided that, to the extent permitted by applicable law, Agent shall provide notice to the Parties promptly after taking such action. Agent may perform any of its duties hereunder directly or through affiliates or agents (including the bank where the Account is held); provided that, Agent shall be liable to the Parties on account of any action or omission by any affiliate or agent to the same extent that any affiliate or agent is liable to Agent, except that Agent shall be fully liable for the actions and omissions of such affiliates or agents to the extent that Agent acted with fraud, bad faith, gross negligence, or willful misconduct in the selection of such affiliate or agent. Notwithstanding anything to the contrary herein, payments for securities held by a securities depository (not directly in the name of the applicable beneficial holder) may be subject to additional requirements and processing time. Agent will not be required to provide any services that would require it to register as a transfer agent or money

services business, be licensed as a money transmitter or obtain a banking license, and any provisions herein shall be deemed automatically modified to provide for such alternative services as necessary to avoid such registration or licensure. Agent is not required to have knowledge of the terms of, or compliance by any party with, any other agreement between the Parties in connection herewith. In the event of any conflict between the terms and provisions of this Agreement, those of the Purchase Agreement, any exhibit attached to this Agreement, or any other agreement among the Parties, as between Agent and the Parties, the terms and conditions of this Agreement shall control, and as between the Parties, the Purchase Agreement shall control.

      c.    **Definition of Business Day.** "<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

      d.    **Notices.** Any notices, requests, instructions, claims, demands or other communications given pursuant to this Agreement shall be in writing and shall be delivered, and shall be deemed given, as follows (i) on the date delivered in person, (ii) on the date sent by email if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, (iii) on receipt after dispatch by registered or certified mail (postage prepaid and return receipt requested) or (iv) on the next Business Day if transmitted by national overnight courier, in each case to the applicable addresses set forth on the signature pages hereto. Either Party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other Party.

      e.    **Authorized Representatives.** The persons designated as "<u>Authorized Representatives</u>" on the signature page are authorized to act on behalf of the applicable Party. Agent may rely upon, and shall not be liable for acting upon, any written notice, document, instruction or request furnished hereunder (including instructions or documents provided by an Authorized Representative of a Party or such Party's counsel, or provided by a Payee or a person acting on behalf of such Payee) and, in each case, reasonably believed in good faith by it to be genuine and to have been signed or presented by the proper entity or individual in accordance with the terms of this Agreement without inquiry and without requiring substantiating evidence of any kind. Without limiting the intent of the foregoing, Agent may in its sole but reasonable discretion (i) employ or decline to employ any process or procedure that it is reasonably deemed necessary or advisable to carry out its responsibilities set forth herein, including, without limitation, in connection with the confirmation of identities (including Payee identities), account information or payment instructions and (ii) determine the sufficiency of any documents or instructions delivered to it hereunder including, without limitation, Payee Materials required as a condition of payment. Without limiting the foregoing, the specified Party acknowledges and agrees that Agent may authenticate Payees by sending a one time passcode (OTP) to the Payee email addresses included in the applicable Spreadsheet and that this procedure constitutes a commercially reasonable method of authenticating the identity of such Payees. Agent may rely on the continued authority of each Authorized Representative until Agent has been duly notified in writing by the applicable Party of any updates to its Authorized Representatives.

      f.    **Resignation, Termination.** The Special Master may terminate this Agreement and discharge Agent from its duties or obligations hereunder by giving fifteen (15) days' advance written notice of such termination to Agent specifying a date when such termination shall take effect. Agent's sole responsibility after such notice period expires shall be to deliver the remainder of any funds deposited into the Account pursuant to this Agreement to an account designated by

6

the Special Master. Additionally, this Agreement shall automatically terminate upon completion of all distributions required hereunder, including any Additional Amounts. No termination of this Agreement shall relieve any party hereto from any liability incurred prior to such termination.

g.      **Amendments, Waivers.** Except for changes to the Authorized Representatives as set forth above, the provisions of this Agreement may be altered, amended or supplemented, in whole or in part, only by a writing signed by Agent and the Parties. No waiver by any party hereto of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.

h.      **Assignment.** Neither this Agreement nor any right or interest of a party hereunder may be assigned in whole or in part without the prior written consent of Agent and the Parties; *provided* that any entity into which Agent may be merged or converted or with which it may be consolidated shall be the successor and deemed assignee of Agent hereunder without further act, and Agent may assign its rights and obligations under this Agreement to any entity to which all or substantially all the payments administration business may be transferred.

i.      **Third Party Beneficiaries.** Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any person other than the Parties or Agent and their respective successors or permitted assigns.

j.      **Governing Law.** This Agreement, and any claims, causes of action or proceedings (whether at law or in equity, based upon contract, tort, statute or otherwise) that may be based upon or arise out of or related to this Agreement or the negotiation, execution, performance, breach, interpretation, construction or validity of this Agreement, shall be governed by, construed and enforced in accordance with internal laws of the State of Delaware, without giving effect to any laws, provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statute of limitations of any other jurisdiction.

k.      **Submission to Jurisdiction.** Agent and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) any claims, causes of action or proceedings (whether at law or in equity, based upon contract, tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction or validity of this Agreement.

l.      **Waiver of Jury Trial.** BUYER, THE SPECIAL MASTER AND AGENT HEREBY WAIVE ANY RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY CLAIMS, CAUSES OF ACTION OR PROCEEDINGS BASED UPON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, PERFORMANCE, BREACH, INTERPRETATION, CONSTRUCTION OR VALIDITY OF THIS AGREEMENT.

m.      **Third Party Fees.** Agent (or its affiliates) may receive fees from third parties as transaction fees based on balances deposited and may receive, directly or indirectly, fees and other revenue from Payees for service level upgrades requested by such Payees including but not limited to the Foreign Currency Payment Option, in which case such fees or revenue shall be deducted from the applicable payments. Any such compensation based on balances deposited may be

reflected as a reduction or waiver of fees that Agent or its affiliates otherwise would have charged for services to be rendered hereunder. If any provision of this Agreement is determined to be prohibited or unenforceable, then such provision shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof.

n.    **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties hereto hereby consent to conducting business electronically and all signatures of the parties to this Agreement may be transmitted by facsimile or email or other electronic or digital means, and such facsimile, email or other electronic delivery will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

o.    **Authority.** The individual signing below on behalf of a party is authorized by that party to execute this Agreement on behalf of that party and to legally and validly bind that party to the terms of this Agreement.

*[Signature pages follow.]*

   **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**ROBERT B. PINCUS, solely in his Capacity as Special Master**


By:_____
Robert B. Pincus
Special Master for the United States District Court for the District of Delaware
Address: PO Box 4570 Wilmington, DE 19807
Email: RBPincus@gmail.com

With copies to (which shall not constitute notice to the Special Master):
Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Attention: Matthew S. Barr
            Eoghan P. Keenan
            Chase A. Bentley
Email:  Horizon.Notice@weil.com

[Authorized Representative 1:
  Name: Robert Pincus
  Email: ███████████████████]



**AMBER MSUB LLC**


By:_____
Name:
Title:
Address: 360 S. Rosemary Ave, 18th Floor
            West Palm Beach, FL 33401
Email:

With Copies to (which shall not constitute notice to the Buyer):

Akin Gump Strauss Hauer & Feld LLP, counsel to the Buyer
One Bryant Park
New York, NY  10036
Attention: Project Horizon
Email: HorizonAkinCore@akingump.com

**ACQUIOM FINANCIAL LLC**

By: _____
Name: _____
Title: _____

Acquiom Financial LLC
950 17th Street, Suite 1400
Denver, CO 80202

**Exhibit A**

**<u>Wire Instructions</u>**

**<u>Account Wire Instructions:</u>**

[*To be provided by Agent.*]

**Exhibit B**

**Fee Schedule**



**Note:** Any service requested that is not detailed in this fee schedule may be provided for an additional charge.

Securities products and Payments services offered through Acquiom Financial LLC, an affiliate broker-dealer of SRS Acquiom Inc. and member FINRA/SIPC.

**Note:** *Any service requested that is not detailed in this fee schedule may be provided for an additional charge.*

*Securities products and payments services offered through Acquiom Financial LLC, an affiliate broker-dealer of SRS Acquiom Inc. and member FINRA/SIPC.*

**B-6**

Exhibit C

**Form of Release**

**Agreed Form**

[●], 2025

Special Master
PO Box 4570
███████████████████
███████████████████

RE:    **CLOSING RELEASE**

Ladies and Gentlemen:

Reference is made to (a) the case of Crystallex International Corp. v. Bolivarian Republic of Venezuela (D. Del. Case. No. 17-151-LPS) to which each of Rusoro Mining Ltd., Koch Minerals Sarl and Koch Nitrogen International Sarl (each a "Record Holder") is a party (or a successor in interest of a party), (b) the respective judgments entered in favor of, or assigned to the Record Holders on [●] (each, a "Claim") as a creditor of the Bolivarian Republic of Venezuela or PDVSA, (c) that certain Stock Purchase Agreement, dated as of [●], 2025 (the "Agreement"), by and between Amber MSub LLC, a Delaware limited liability company (the "Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court") and (d) the deposit made by the Buyer with Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent"), of $50,000,000 (such amount, the "Deposit Amount") in cash, pursuant to the terms of that certain Escrow Agreement, dated as of [●], 2025, by and among the Special Master, the Buyer and the Escrow Agent. Capitalized terms used in this letter agreement (this "Release Letter") without definition have the respective meanings given to them in the Agreement.

Pursuant to Section 3.4(e) of the Agreement, the Buyer and the Record Holders have agreed to pay, at the Closing, an amount equal to the Credit Bid Amount by means of a credit against such amounts due and owing under the Claims owed to the Record Holders effective immediately upon the Closing. The Buyer and the Record Holders hereby deliver to the Special Master this Release Letter in accordance with Section 2.3(b)(ii) of the Agreement.

In our capacity as the Record Holders and the Buyer we hereby confirm that the (a) obligations of PDVSA or the Bolivarian Republic of Venezuela (together, the "Venezuela Parties"), as the case may be, to the Record Holder relating to or arising out of the Claims, including principal, accrued interest, costs, expenses and fees for an amount equal to the Claims (the "Forfeited Claim Amount") are hereby deemed satisfied, (b) all commitments and other agreements and obligations of the Venezuela Parties to the Record Holders related to or arising out of the Claims are hereby irrevocably terminated (without recourse and without representation or warranty of any kind (either express or implied)) with no further action on the part of the Venezuela Parties, the Special Master, the Record Holders or the Buyer and (c) all guarantees provided by the Venezuela Parties to each of the Record Holders relating to their respective Claim are hereby irrevocably terminated (without recourse and without representation or warranty of any kind (either express or implied)) with no further action on the part of the Venezuela Parties,

4932-2093-6032

the Special Master, the Record Holder and (d) any security interest or Lien granted to the Record Holder from the Venezuela Parties to secure the Claims (collectively, the "Existing Liens") are hereby irrevocably terminated.

The Record Holder and the Buyer hereby authorize (a) the Special Master to direct the Venezuela Parties or the Company to file or send, as applicable, and (b) the Venezuela Parties or the Company to file or send, as applicable, UCC-3 termination statements with respect to the Existing Liens. By its signature below, each of the Record Holders and the Buyer hereby agrees that such Record Holder and the Buyer will, at its sole cost and expense, execute, as applicable, and deliver to the Venezuela Parties, the Company and the Special Master any such additional lien releases, discharges of security interests, pledges and guarantees, and other similar discharge or release documents, and take such further actions as are reasonably requested, in each case, to release the Existing Liens.

If any term or other provision of this Release Letter is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Release Letter shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereunder is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Release Letter so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner such that the transactions contemplated hereunder are consummated as originally contemplated to the greatest extent possible.

This Agreement shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Without limiting the right of any party hereto to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Release Letter and to decide any dispute which may arise or result from, or be connected with, this Release Letter, any breach or default hereunder, or the transactions contemplated hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Court.

This Release Letter may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Release Letter constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Release Letter shall become effective when it has been executed by the Buyer and the Record Holder, and thereafter shall be binding upon and inure to the benefit of the parties hereto and

their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page to this Release Letter by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Release Letter.

To the extent there exists a conflict between the terms and provisions of this Release Letter and the Agreement, the terms and provisions of the Agreement will control.

[REMAINDER OF PAGE INTENTIONALLY LEFT
BLANK]

Very truly yours,

Amber MSub LLC, as the Buyer


By: _____
  Name:  [●]
  Title:  [●]

Koch Minerals Sarl, as Record Holder


By:
_____
  Name:  [●]
  Title:  [●]

Koch Nitrogen International Sarl, as Record Holder


By: _____
  Name:  [●]
  Title:  [●]]

Rusoro Mining Ltd., as Record Holder


By:_____
  Name:  [●]
  Title:  [●]

**<u>Exhibit [C]</u>**

**Proposed Sale Order**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------
CRYSTALLEX INTERNATIONAL CORP.,   )
   )
       Plaintiff,   )
   )
      v.   )   Misc. No. 17-151-LPS
   )
BOLIVARIAN REPUBLIC OF VENEZUELA,   )
   )
      Defendant.   )
---------------------------------------------------------------

**ORDER (I) APPROVING STOCK PURCHASE AGREEMENT,
(II) AUTHORIZING SALE OF THE PDVH SHARES
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS, AND (III) GRANTING RELATED RELIEF**

Upon the updated recommendation, dated August 29, 2025 (the "**Recommendation**"),[1] of

Robert B. Pincus, in his capacity as Special Master for the United States District Court for the

District of Delaware (the "**Special Master**") in the above captioned case (the "**Action**"),

recommending entry of an order authorizing and approving the sale of the PDVH Shares pursuant

to, among other things, 28 U.S.C. § 2004, Rules 53 and 69 of the Federal Rules of Civil Procedure,

Section 324 of Title 8 of the Delaware Code, the Court's equitable powers to enforce its orders

and judgments, and the All Writs Act; and this Court having taken into consideration this Court's

prior orders, including the *Order Regarding Special Master* [D.I. 277] (the "**Special Master**

**Order**"), the *Memorandum Order* [D.I. 646], the *Final Priority Order* [D.I. 1102] (the "**Final**

**Priority Order**"), and the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding*

*Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed*

---

[1]    Capitalized terms used but not herein defined shall have the meanings ascribed to such terms
in the Sale Procedures Order, the Recommendation or the Stock Purchase Agreement (each as
herein defined), as applicable and as context may require.

*Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481], (the "**Sale Procedures Order**", and the bidding procedures for the sale of the PDVH Shares approved thereby, the "**Bidding Procedures**"); the *Memorandum Order Regarding Sale Process and Litigation* [D.I. 1517] (the "**December 2024 Order**"), the *Order* [D.I. 1741] designating Red Tree Investments, LLC as the Stalking Horse (the "**Stalking Horse Order**"), and the *Order Regarding Schedule for the Remainder of the Marketing Process* [D.I. 1745] (the "**April 2025 Scheduling Order**"), the *Order* entering a schedule proposed by the Special Master [D.I. 1809] (the "**June 2025 Scheduling Order**"), the *Order* [D.I. 2056] continuing the Sale Hearing previously scheduled for August 18, 2025, and the *Scheduling Order* [D.I. 2110] (the "**August 2025 Scheduling Order**") setting the continued hearing to commence September 15, 2025 and providing for the submission of best and final unsolicited bids by August 22, 2025; and four solicited rounds of bidding (the "**Bidding Rounds**") having been held for the consideration of Qualified Bids and the selection of a Successful Bidder (each as defined in the Sale Procedures Order and the Bidding Procedures); and Buyer[2] having submitted the best bid for the PDVH Shares and having been recommended as the Successful Bidder by the Special Master with respect to the PDVH Shares; and this Court having conducted a hearing commencing September 15, 2025 (the "**Sale Hearing**") to consider the Sale Transaction (as defined herein), during which time all interested parties were offered an opportunity to be heard with respect to the Recommendation; and this Court having reviewed and considered (i) the Recommendation and the exhibits thereto; (ii) the Buyer's materials submitted

---

[2]    For the purposes of this Order, "**Buyer**" means Amber Merger Sub LLC (together with its permitted assigns pursuant to Section 9.10 of the Stock Purchase Agreement (as defined below)); *provided*, *however*, that from and after the Closing, the term Buyer shall exclude PDVH and any of its direct or indirect subsidiaries and their respective successors and assigns by merger or otherwise.

in support of its bid, including[3] the Stock Purchase Agreement, dated as of [●], 2025 (together with the exhibits thereto, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stock Purchase Agreement**") attached as <u>**Exhibit A**</u> hereto, by and among the Special Master and Buyer, whereby the Special Master, at the direction of the Court, has agreed to, among other things, sell or cause to be sold the PDVH Shares to Buyer, on the terms and conditions set forth in the Stock Purchase Agreement (the "**Sale Transaction**"); (ii) the notarized affirmations of publication attached hereto as <u>**Exhibit B**</u> (collectively, the "**Publication Affidavits**"); and (iii) the arguments of counsel made, and the evidence therein proffered or adduced at the Sale Hearing; and due notice of the Recommendation, the Sale Hearing, and the form of this Order having been provided; and all objections to the Sale Transaction and the Order having been withdrawn, resolved, or overruled; and it appearing that the relief granted herein is consistent with the directives of the Sale Procedures Order; and upon the record of the Sale Hearing and this Action; and after due deliberation and sufficient cause appearing therefor;

      **IT IS HEREBY FOUND AND DETERMINED THAT**:

      A.    *Jurisdiction and Venue*.  The Court has jurisdiction to grant the relief recommended in the Recommendation pursuant to 28 U.S.C. §§ 1330, 1367, and 1605(a)(6) and its ancillary jurisdiction to enforce federal judgments.  Venue is proper before the Court pursuant to 28 U.S.C. § 1963.  Further, the Court has jurisdiction over the Additional Judgment Creditors (as defined in the Sale Procedures Order and as set forth in the Final Priority Order) and all other interested parties appearing in this proceeding pursuant to 28 U.S.C. § 1367 and over Crystallex International Corporation ("**Crystallex**") pursuant to ancillary jurisdiction for enforcing an arbitral

---

[3]    The term "including," wherever it is used in this Order, means "including, without limitation."

award reduced to a federal judgment. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019).

B.      *Statutory and Rule Predicates*.  The predicates for the relief granted herein include (i) Rules 53 and 69 of the Federal Rules of Civil Procedure, (ii) Section 324 of Title 8 of the Delaware Code, (iii) the Court's general equitable powers to enforce its orders and judgments, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)), (iv) the All Writs Act (*see United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.")), and (v) 28 U.S.C. § 2004.

C.      *Sale Notice*.  As evidenced by the Publication Affidavits and the status reports filed on the Court's public docket on October 23, 2023 [D.I. 771], January 8, 2024 [D.I. 839], and April 16, 2024 [D.I. 1134] (the "**Status Reports**"), and the Court's orders setting deadlines for the Marketing Process including the December 2024 Order, the April 2025 Scheduling Order, the *Order* [D.I. 1779] extending the topping period, the June 2025 Scheduling Order, and the August 2025 Scheduling Order: (i) due, proper, timely, adequate, and sufficient notice of the PDVH Shares being sold, the Recommendation, the Bidding Rounds, the Bidding Procedures (including the bidding process and the deadline for submitting bids for the Bidding Rounds), the Sale Hearing, the Sale Transaction, and the Order was provided by the Special Master; (ii) such notice was and is good, sufficient, and appropriate under the particular circumstances and complies with the Sale Procedures Order, the Bidding Procedures, and applicable law; and (iii) no other or further notice of the Recommendation, the Bidding Rounds, the Bidding Procedures, the Sale Hearing, the Sale

Transaction, or the Order is required.  With respect to Persons whose identities are not reasonably

ascertained by the Special Master, as evidenced by the Publication Affidavits, publication of the

notice each in the national print editions of *USA Today* on January 12, 2024, January 19, 2024,

June 3, 2024, June 10, 2024, February 25, 2025, March 4, 2025, May 5, 2025, and May 12, 2025,

*the Wall Street Journal* on January 12, 2024, January 19, 2024, June 1, 2024, June 8, 2024,

February 24, 2025, March 3, 2025, May 3, 2025, and May 10, 2025, the *Delaware State News* on

January 12, 2024, January 19, 2024, June 2, 2024, June 11, 2024 (e-edition), June 12, 2024 (print

edition), February 26, 2025, March 5, 2025, May 7, 2025, and May 14, 2025, the *Delaware News*

*Journal* on January 12, 2024, January 19, 2024, June 4, 2024, June 11, 2024, February 25, 2025,

March 4, 2025, May 6, 2025, and May 13, 2025, as well as the Venezuelan publication *La Razón*

on June 9, 2024, March 2, 2025, March 9 2025, May 4, 2025, and May 11, 2025, was sufficient

and reasonably calculated under the circumstances to reach such Persons and is in compliance with

the Sale Procedures Order, Bidding Procedures, and applicable law including Section 324 of

Title 8 of the Delaware Code (collectively, the "**Publication Notices**").

        D.     *Notice and Opportunity to Object.*  As evidenced by the Publication Affidavits and

the Status Reports [D.I. 771, 839 & 1134], a fair and reasonable opportunity to object to, and be

heard with respect to, the Recommendation, the Bidding Rounds, and the Sale Transaction has

been given to any and all Persons who are or could be entitled to notice pursuant to the Sale

Procedures Order and the Bidding Procedures, including, but not limited to, the following:

(i) Buyer by its counsel Akin Gump Strauss Hauer & Feld and Quinn Emanuel Urquhart &

Sullivan, LLP; (ii) PDVH Holding, Inc. ("**PDVH**"), by its counsel Eimer Stahl LLP ("**Eimer**

**Stahl**"); (iii) CITGO Petroleum Corporation ("**CITGO**"), by its counsel Eimer Stahl;

(iv) Petróleos de Venezuela, S.A., by its counsel Curtis, Mallet-Prevost, Colt & Mosle LLP

("**PDVSA**"); (v) the Bolivarian Republic of Venezuela (the "**Republic**"), by its counsel Munger,

Tolles & Olson LLP; (vi) Crystallex International Corporation, by its counsel Gibson Dunn &

Crutcher, LLP; (vii) Phillips Petroleum Company Venezuela Limited and ConocoPhillips

Petrozuata B.V. ("**ConocoPhillips**"), by their counsel Wachtell, Lipton, Rosen & Katz;

(viii) Former Additional Judgment Creditor, Altana Credit Opportunities Fund SPC, Altana Credit

Opportunities Fund 1 SP, and Altana Funds Ltd. Cayman, by their counsel Bayard, P.A.;

(ix) Additional Judgment Creditor, ACL1 Investments Ltd., ACL2 Investments Ltd. and LDO

(Cayman) XVIII Ltd., by their counsel Riley & Jacobson, PLC; (x) Additional Judgment Creditor,

Contrarian Capital Fund I, L.P., Contrarian Dome du Gouter Master Fund, LP, Contrarian Capital

Senior Secured, L.P., Contrarian EM II, LP, Contrarian Emerging Markets, L.P., Boston Patriot

Summer St LLC, Polonius Holdings, LLC, Emma I Master Fund, L.P., E1 SP, a Segregated

Account of EMAP SPC, and Contrarian Capital Management, L.L.C., Contrarian Funds, L.L.C.,

by their counsel MoloLamken LLP; (xi) Additional Judgment Creditor, Gold Reserve Inc., by its

counsel Norton Rose Fulbright US LLP; (xii) Additional Judgment Creditor, Huntington Ingalls

Incorporated, f/k/a, Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., by its

counsel Alston & Bird, LLP; (xiii) Additional Judgment Creditor, Koch Minerals Sàrl and Koch

Nitrogen International Sàrl, by their counsel Alston & Bird, LLP and Stinson LLP;

(xiv) Additional Judgment Creditor, OI European Group B.V., by its counsel Morgan, Lewis &

Bockius LLP; (xv) Former Additional Judgment Creditor, Pharo Gaia Fund, Ltd., Pharo Macro

Fund, Ltd., and Pharo Trading Fund, Ltd., by their counsel Bayard, P.A.; (xvi) Additional

Judgment Creditor, Red Tree Investments, LLC, by its counsel MoloLamken LLP; (xvii) Former

Additional Judgment Creditor, Rudi Lovati and Alessandro Lucibello Piani, by their counsel

Duane Morris LLP; (xviii) Additional Judgment Creditor, Rusoro Mining Limited, by its counsel

DLA Piper LLP (US); (xvix) Additional Judgment Creditor, Saint-Gobain Performance Plastics Europe, by its counsel Alston & Bird, LLP; (xx) Additional Judgment Creditor, Siemens Energy, Inc., by its counsel Reed Smith LLP; (xxi) Additional Judgment Creditor, Tenaris S.A., Talta-Trading e Marketing Sociedade Unipessoal Lda., and Gramercy Distressed Opportunity Fund LLC, by their counsel (a) Debevoise & Plimpton LLP and (b) Halloran Farkas and Kittila LLP; (xxii) Additional Judgment Creditor, Tidewater Investment SRL and Tidewater Caribe S.A., by their counsel Covington & Burling LLP; (xxiii) Additional Judgment Creditor, Valores Mundiales, S.L. and Consorcio Andino, S.L., by their counsel Covington & Burling LLP; (xxiv) Mobil Cerro Negro Holding, LLC., Venezuela Holdings, B.V., and Mobil Cerro Negro, Ltd., by their counsel Connolly Gallagher LLP; (xxv) Banco San Juan Internacional, Inc., by its counsel McCollom D'Emilio Smith Uebler LLC; (xxvi) G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, and G&A Strategic Investments VII LLC, by their counsel Andrew H. Sauder of Dailey LLP; (xxvii) Girard Street Investment Holdings LLC, by its counsel Andrew H. Sauder of Dailey LLP; (xxviii) Refineria Di Korsou N.V., by its counsel Gellert Scali Busenkell & Brown, LLC; (xxvix) Ricardo Devengoechea, by his counsel Werb & Sullivan; (xxx) all Persons or entities known by the Special Master to hold any judgment or have asserted any lien, claim, encumbrance, or other interest in the PDVH Shares, for whom identifying information and addresses are available to the Special Master (the parties listed at ii-xxx, the "**Interest Parties**"); (xxxi) the United States Department of Treasury's Office of Foreign Assets Control ("**OFAC**"); and (xxxii) all other Persons as a result of Publication Notice or other notice (the parties listed at i–xxxii above, the "**Notice Parties**").

E.    *Reasonable Discretion.*  The Special Master has exercised his reasonable discretion in offering the PDVH Shares for sale, in units and as a whole, and has demonstrated good, sufficient, and sound justifications for approval of and entry into the Stock Purchase Agreement and the other agreements, documents, and instruments deliverable thereunder or attached thereto or referenced therein (collectively, the "**Transaction Documents**") and for approval of the Sale Transaction.  The Special Master's entry into and performance under the Transaction Documents (i) constitutes a sound and reasonable exercise of the Special Master's discretion consistent with the exercise of his duties to the Court in accordance with the Bidding Procedures and his responsibilities under the Sale Procedures Order and Bidding Procedures, (ii) represents the best opportunity for the Notice Parties, as applicable, to recover value from the PDVH Shares on account of any judgments or Claims they may have against the Republic or PDVSA, and (iii) is reasonable and appropriate under the circumstances.  Evidence of the Special Master's reasonable discretion in entering into and performing under the Transaction Documents includes (y) the Purchase Price, as defined in the Stock Purchase Agreement, and the other terms set forth in the Transaction Documents, which constitute the best offer received for the PDVH Shares; and (z) the Sale Transaction on the terms set forth in the Transaction Documents presents an orderly sale of the PDVH Shares and the best opportunity to maximize the value of the PDVH Shares and maximize distributions to the holders of Attached Judgments and the opportunity for recoveries to the Notice Parties, as applicable, including Crystallex, ConocoPhillips, and the Additional Judgment Creditors.

F.    *Compliance with the Sale Procedures Order, December 2024 Order, Evaluation Criteria, April 2025 Scheduling Order, June 2025 Scheduling Order, and August 2025 Scheduling Order.*  On October 11, 2022, this Court entered the *Sixth Revised Proposed Order (A) Establishing*

*Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] approving the initial Bidding Procedures for the PDVH Shares.  On December 31, 2024, this Court entered the December 2024 Order.  On January 27, 2025, this Court entered a *Memorandum Order* [D.I. 1554] (the "**January 2025 Order**") which adopted evaluation criteria for Stalking Horse Bids, Base Bids, and Successful Bids (the "**Evaluation Criteria**").  On April 25, 2025, this Court entered the April Scheduling 2025 Order.  On June 13, 2025, this Court entered the June 2025 Scheduling Order.  On August 22, 2025, this Court entered the August 2025 Scheduling Order.  The Bidding Procedures are substantively and procedurally fair, and non-collusive, and provided a full, fair, and reasonable opportunity for any entity or Person to make an offer to purchase the PDVH Shares. The Special Master complied with the Bidding Procedures, the Sale Procedures Order, the December 2024 Order, the April 2025 Scheduling Order, the June 2025 Scheduling Order, and the August 2025 Scheduling Order in all respects.  Buyer complied with the Bidding Procedures, the Sale Procedures Order, the December 2024 Order, the April 2025 Scheduling Order, the June 2025 Scheduling Order, and the August 2025 Scheduling Order in all respects except as properly waived by the Special Master in the exercise of his duties to the Court in accordance with the Bidding Procedures.  Buyer subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the PDVH Shares.  The Bidding Rounds were duly noticed and conducted fairly and in good faith, without collusion, and in accordance with the Sale Procedures Order and the Bidding Procedures.  All potential bidders and other potentially interested parties have been afforded a full, fair, and reasonable opportunity to submit

bids for the PDVH Shares and participate in the Bidding Rounds.  The Special Master complied with the Evaluation Criteria.

G.    *Marketing Process.*  As demonstrated by the Recommendation, the Publication Affidavits, the testimony and other evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing: (i) the Special Master and his investment banker, Evercore Group L.L.C., engaged in a robust and extensive Marketing Process pursuant to the Sale Procedures Order, the Bidding Procedures, and the December 2024 Order; (ii) the Special Master and his Advisors, as defined in the Sale Procedures Order, conducted the Marketing Process in good faith and in a fair and open manner; (iii) the Marketing Process provided all potential bidders sufficient information to enable them to make an informed judgment on whether to make a bid to purchase the PDVH Shares and the terms of any such bid; (iv) the Marketing Process, the Bidding Procedures, and the Bidding Rounds were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to conduct due diligence and make an offer to purchase the PDVH Shares and submit higher or better offers for the PDVH Shares than Buyer's bid; (v) the Special Master considered any and all bids submitted in good faith and in accordance with his duties under the Sale Procedures Order; (vi) the Special Master and Buyer have negotiated and undertaken their roles leading to the entry into the Stock Purchase Agreement in diligent, non-collusive, fair, reasonable, and good faith manner; and (vii) the Marketing Process conducted by the Special Master pursuant to the Sale Procedures Order and the Bidding Procedures obtained the best value for the PDVH Shares.

H.    *Fair and Adequate Consideration; Best Value.*  The consideration to be provided by Buyer under the Stock Purchase Agreement is fair, adequate, and reasonable consideration for the PDVH Shares and constitutes an adequate price for the purchase of the PDVH Shares under

10

the terms of the Sale Procedures Order. Such consideration constitutes the best bid for the PDVH Shares. As a result, Buyer's bid represents the best opportunity to maximize distributions to the holders of Attached Judgments and the opportunity for recoveries to the Notice Parties, as applicable, including Crystallex, ConocoPhillips, and the Additional Judgment Creditors. Prompt approval of the Sale Transaction is the best means to preserve and maximize the value of the PDVH Shares and maximize distributions to Crystallex, ConocoPhillips, and the Additional Judgment Creditors. The total consideration to be provided by Buyer under the Transaction Documents reflects Buyer's reliance on each term and provision in this Order and in the Transaction Documents, and Buyer would not be willing to enter into the Transaction Documents or acquire the PDVH Shares without each and every protection set forth in the Transaction Documents and this Order, including in paragraphs I (*The Bidding and Sale Process Were Conducted in Good Faith*), J (*No Successor or Other Derivative Liability*), K (*The Shares Are Free and Clear of Any Claim, Lien, Interest, or Encumbrance*), L (*Necessary Condition*), M (*Validity of Transfer*), S (*Opportunity to Participate in Marketing Process*), 2 (*Objections Overruled*), 6 (*Consummation of Sale Transaction(s)*), 11 (*Transfer of PDVH Shares Free and Clear*), 13 (*Injunction*), 14 (*Release of Claims as to Buyer and other Entities; Recordation*), 15 (*Releases by Holders of Any Attached Judgments*), 18 (*No Successor or Other Derivative Liability*), 19 (*Non-Interference*), and 23 (*Provisions Non-Severable*). The Transaction Documents were not entered into, nor is the Sale Transaction being consummated, for the purpose of hindering, delaying, or defrauding present or future creditors of PDVSA under the laws of the United States, any state, territory, possession, the District of Columbia or otherwise, and none of the parties to the Transaction Documents nor

11

any of their direct or indirect Affiliates[4] or subsidiaries are consummating the Sale Transaction for any other fraudulent or improper purpose.

       I.     *The Bidding and Sale Process Were Conducted in Good Faith*.  The Transaction Documents and the Sale Transaction were negotiated, proposed, and entered into, and are being undertaken by the Special Master, Buyer, and the other parties to the Transaction Documents and their respective management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers, representatives, and advisors, in good faith, without collusion or fraud, and from arm's length bargaining positions, for fair consideration and fair value under the circumstances, and with representation by competent counsel of their choosing at all times.  There has been no fraud, unfairness, surprise, or mistake, and the sale price is not so low as to shock the conscience.  Likewise, the value to be paid by Buyer upon consummation of the Sale Transaction is the product of arm's length negotiations between the Special Master, Buyer, and the other parties to the Transaction Documents, and their respective representatives and advisors, in good faith and without collusion or fraud.  Buyer has proceeded in good faith in all respects and at all times in that, among other things, (i) Buyer complied with the provisions of the Sale Procedures Order and Bidding Procedures, including compliance with confidentiality obligations and restrictions under the Sale Procedures Order and the Bidding Procedures and any applicable non-disclosure or confidentiality agreement; (ii) Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Sale Procedures Order; (iii) all consideration to

---

[4]    For the purposes of this Order, "**Affiliate**" means any Person (as defined in the Stock Purchase Agreement) that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

be provided by Buyer and all other material agreements or arrangements entered into by Buyer and the Special Master in connection with the Sale Transaction have been disclosed and are appropriate; and (iv) the negotiation and execution of Transaction Documents were at arm's length and in good faith; as such, Buyer is entitled to all of the benefits, immunities, and protections afforded by applicable law.  Other than agreements among the Special Master, Buyer, and any other parties as reflected in the Transaction Documents and herein, the Purchase Price in respect of the PDVH Shares was not controlled by any agreement, including any agreement among potential bidders.  The Special Master, Buyer, and other parties to the Transaction Documents shall be, and shall be deemed to be, acting in good faith, and are authorized to close the Sale Transaction immediately upon entry of this Order (subject to satisfaction of any other conditions precedent in the Transaction Documents).

J.    *No Successor or Other Derivative Liability.*    Except as otherwise expressly provided herein or in the Transaction Documents, upon and after Closing, and to the greatest extent allowed by applicable law (whether in effect now or in the future), Buyer and Buyer Affiliates[5] shall not have any liability, or any other obligation, of or related to the Republic, PDVSA, or their respective Affiliates, including any liability or obligation arising under or related to the sale and transfer of the PDVH Shares to Buyer.  Upon the closing, Buyer will not assume the liabilities of PDVSA.  Buyer and Buyer Affiliates are not, and the consummation of the Sale Transaction will not render Buyer or Buyer Affiliates a continuation of or a mere continuation of, and Buyer is not holding itself out as a continuation of or a mere continuation of, the Republic, PDVSA or their enterprises or operations, and there is no continuity or common identity between Buyer and the

---

[5]    For the purposes of this Order, "**Buyer Affiliates**" means an Affiliate of Buyer; *provided*, *however*, that the term "Buyer Affiliate" shall exclude PDVH and any of its direct or indirect subsidiaries and their respective successors and assigns by merger or otherwise.

Republic or PDVSA or their subsidiaries or Affiliates. Accordingly, the Sale Transaction does not amount to a consolidation, merger, de facto merger, acquisition of all or substantially all assets, or similar transaction of Buyer or Buyer Affiliates with or into the Republic or PDVSA, and Buyer, and Buyer Affiliates are not, and shall not be deemed, as a result of the consummation of the Sale Transaction, past practice, historical operations, course of dealing, or otherwise: (i) to be a successor to the Republic, PDVSA or their Affiliates, (ii) to be a continuation, a mere continuation or substantial continuation of the Republic, PDVSA or the enterprise(s) of the Republic, PDVSA or their Affiliates, or (iii) to be liable for, or be subject to any obligations relating to, any acts or omissions of the Republic, PDVSA, any of their Affiliates, or an insider of the Republic, PDVSA or any of their Affiliates in the conduct of their business or related to the PDVH Shares, including with respect to the Attached Judgments and any judgment whose holder sought to have such judgment be an Attached Judgment, other than as set forth in the Transaction Documents. Without limiting the generality of the foregoing, and except as otherwise provided in the Transaction Documents, Buyer and Buyer Affiliates shall not be liable for any Claims against PDVSA or any of its Affiliates, and Buyer and Buyer Affiliates shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing, whether now existing or hereafter arising, whether asserted or unasserted, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, matured or unmatured, legal or equitable, non-contingent or contingent, or otherwise, with respect to the business operations of the Republic, PDVSA, their Affiliates, or the PDVH Shares. To the extent there are any perfected Liens on the PDVH Shares, the same shall only attach to the proceeds of the Sale Transaction ultimately attributable to the property against which such perfected Liens applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and

effect that such perfected Liens applied prior to the Sale Transaction, subject to any rights, claims, and defenses of PDVSA.  Buyer would not have entered into the Transaction Documents and would not acquire the PDVH Shares but for the foregoing protections against potential claims against it based upon successor or similar liability, vicarious liability, or any other legal, equitable or other doctrine, whether existing now or in the future, and those protections' effectiveness.  A sale of the PDVH Shares without the foregoing protections would yield substantially less value for Crystallex, ConocoPhillips, and the Additional Judgment Creditors.

K.      *The Shares Are Free and Clear of Any Claim, Lien, Interest, or Encumbrance*. Except as otherwise expressly provided herein, the Special Master is authorized and directed to sell the PDVH Shares to Buyer free and clear of any (i) right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, (ii) equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and (iii) loss, liability, demand, claim, chose in action, any derivative vicarious, transferee, or successor or similar liability claims, rights, or causes of action, judgment, entitlement, residue, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs) whatsoever), whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise (a "**Claim**") and any mortgage, lien (whether consensual, statutory or arising under any Law), pledge, charge, security interest, financing

15

statement, hypothecation, Preferential Right, easement, plot restriction, deed restriction, encumbrance of any kind, or other interest in property arising from an attachment, writ or other enforcement or execution of a judgment or Claim (a "**Lien**").  Following the Sale Transaction, the Notice Parties, as applicable, shall have no recourse against Buyer or Buyer Affiliates or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic, PDVSA, or their respective Affiliates.

L.    *Necessary Condition*.   Buyer would not have entered into the Transaction Documents and will not consummate the transactions contemplated thereby (i) if the sale of the PDVH Shares was not free and clear of all Claims and Liens, including any rights or Claims based on any successor, vicarious, or transferee liability, except as otherwise provided in the Transaction Documents; or (ii) if Buyer would, or in the future could, be liable for any such Claims and Liens. Failure to provide such relief in this Order would frustrate the Sale Procedures Order and the other orders of this Court in the Action.  The total consideration to be provided under the Transaction Documents reflects Buyer's reliance on this Order to provide it with title to and possession of the PDVH Shares free and clear of all Claims pursuant to this Court's broad equitable authority under the All Writs Act, and 28 U.S.C. § 2004.  A sale of the PDVH Shares without the foregoing protections would yield substantially less value for Crystallex, ConocoPhillips, and the Additional Judgment Creditors.

M.    *Validity of Transfer*.  The transfer of the PDVH Shares to Buyer will be a legal, valid, and effective transfer of the PDVH Shares, including for the purposes of Title 8 of the Delaware Code and Article 8 of Title 6 of the Delaware Code, and will vest Buyer with any legal, equitable and beneficial right, title, and interest of PDVSA in and to the PDVH Shares, free and clear of all Claims and Liens.  The consummation of the Sale Transaction is legal, valid, and

properly authorized under all applicable law, and all of the applicable requirements of applicable law have been complied with in respect of the Sale Transaction. Entities providing financing in connection with the Sale Transaction may rely in all respects on all of the provisions of this Order.

N.     *Required Approval*. Buyer has demonstrated that (i) Buyer has made, or will make in a timely manner (a) all filings and disclosures necessary to comply with the regulations of OFAC and (b) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings; (ii) Buyer has a plan and the ability to obtain or make all requisite shareholder, governmental, regulatory, or other third-party approvals, consents and notifications, (iii) the proposed timing to undertake the actions required to obtain or make such approvals, consents and notifications is reasonable; (iv) the Sale Transaction is reasonably likely, after taking into consideration antitrust and any other regulatory matters, Buyer's prior experience, Buyer's commitment to take all action necessary, proper or advisable for Buyer to consummate the Sale Transaction prior to the Closing Date, and any other relevant considerations, to be consummated within a time frame acceptable to the Special Master and the Court; and (v) Buyer has consented to the Special Master, in his discretion, sharing with U.S. Government regulators, including OFAC, information pertaining to the Sale Transaction.

O.     *Sale Authority*. The Court has authority to sell the PDVH Shares to Buyer pursuant to (a) Rule 69(a) of the Federal Rules of Civil Procedure, (b) Section 324 of Title 8 of the Delaware Code, (c) Rule 53 of the Federal Rules, (d) the Court's general equitable powers to enforce its orders and judgments (*see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)); *see also IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 311 (3d Cir. 2006)), (e) the All Writs Act (*see United States v. N.Y.*

*Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained . . . .")), and (f) 28 U.S.C. § 2004.  The Court is in possession and control of the PDVH Shares, and is authorized to sell, transfer, assign, convey, and deliver all title, interest, and/or rights of PDVSA in the PDVH Shares to Buyer, as required by the Stock Purchase Agreement, under applicable law.

P.     *Sale Order Required by Buyer*.  Entry of this Order approving the Stock Purchase Agreement is a requirement of the Stock Purchase Agreement and such requirement is an appropriate condition precedent to Buyer's consummation of the Sale Transaction.

Q.     *Power and Authority*.  The Special Master (i) has full power and authority to execute the Transaction Documents and (ii) has all of the power and authority necessary to consummate the transactions contemplated by the Transaction Documents.  Upon entry of this Order, other than any consents identified in the Transaction Documents, the Special Master needs no consent or approval from any other Person to consummate the Sale Transaction.

R.     *Binding Contract*.  The Transaction Documents are valid and binding contracts among the Special Master and Buyer and such other applicable parties thereto and shall be enforceable pursuant to their terms.  The Transaction Documents, the Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon each of the Republic, PDVSA, PDVH, CITGO, and their respective Affiliates.

S.     *Opportunity to Participate in Marketing Process*.  This Action has been pending since June 19, 2017.  In that time, this Action, the Marketing Process, and the Sale Transaction have received substantial national and international media coverage. The Court has held at least

18

21 public hearings and status conferences regarding the subject matter of the PDVH Shares, the claims against the Republic, PDVSA, and/or PDVH, and proceedings related thereto. The Marketing Process additionally conformed to the Notice Procedures laid out in the Sale Procedures Order, and gave notice to any parties that may have an interest in the PDVH Shares, including the Sales Process Parties, creditors of the Republic and/or PDVSA, potential bidders with interests in the PDVH Shares, and any other parties with any interests in the PDVH Shares. The Special Master, in accordance with the Sale Procedures Order, has published Sale Notices at least eight (8) times since the Launch Date, in at least four different publications. Each Sale Notice described the assets being sold (*i.e.*, the PDVH Shares), the Bidding Procedures, and the Marketing Process. The Sale Notices provided notice of key dates and deadlines for the Marketing Process, including, among other things, the Launch Date, the First Round Indication of Interest Deadline, the Second Round deadline to submit a Binding Bid, the stalking horse bid deadline, and the topping period deadline. In addition to the Sale Notices, all parties with a valid interest or perfected lien in the PDVH Shares have received notice from the Special Master of important Marketing Process and Sale Transaction-related milestones through a multitude of reports, motions, and notices submitted to the Court, as well as in regular, public, status conferences. Accordingly, persons holding judgments or Claims against the Republic, PDVSA, and/or PDVH and all parties with an interest in the sale of the PDVH Shares have had sufficient notice of and an opportunity to participate in the Marketing Process. The failure of the holder of a judgment against, or other creditor of, the Republic, PDVSA and/or their Affiliates (whether now or in the future) to participate in the Marketing Process, to seek to become an Additional Judgment Creditor, or to successfully become an Additional Judgment Creditor shall not be grounds for challenging the Sale Transaction or this

Order or to bring claims against Buyer or Buyer Affiliates whether existing now or in the future, and this Order shall be binding upon all such current or future creditors.

T.    *Legal and Factual Bases*.    The legal and factual bases set forth in the Recommendation, and at the Sale Hearing, establish just cause for the relief granted herein.

U.    *Necessity of Order*.    The Sale Transaction represents the best bid for the PDVH Shares and, without the relief in this Order, the Special Master does not believe the Marketing Process would yield such comparable value.    The Special Master believes the Marketing Process provides the best opportunity to maximize the value of the PDVH Shares and maximize distributions to the holders of Attached Judgments and the opportunity for recoveries to the Notice Parties, as applicable, including Crystallex, ConocoPhillips, and the Additional Judgment Creditors, and is not aware of a better alternative proposed by the Republic, PDVSA, PDVH, CITGO, or any other party.

**IT IS HEREBY ORDERED THAT:**

1.    *Recommendation Is Adopted*.    To the extent not already approved pursuant to the Sale Procedures Order, the Recommendation is adopted and the relief recommended therein is granted and approved as set forth herein.

2.    *Objections Overruled*.    Except in the case of objections described in [paragraphs [●] and [●] of this Order,] all objections, if any, and any and all joinders thereto, to the Recommendation or the relief granted herein that have not been previously overruled, withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing, by stipulation filed with this Court, or as provided in this Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.    Parties who did not properly object to the entry of this Order in accordance with the Sale Procedures Order, or who withdrew their objections thereto, have, and are deemed to have, consented to the relief granted herein in respect of the Sale

Transaction and the Transaction Documents for all purposes. All holders of liens, claims, interests, and encumbrances against the PDVH Shares who did not object, or withdrew their objections to the Sale Transaction, or whose objections to the Sale Transaction were overruled either implicitly or explicitly, are deemed to have consented to the Sale Transaction. To the extent there are any perfected Liens on the PDVH Shares, the same shall only attach to the proceeds of the Sale Transaction ultimately attributable to the property against which such perfected Liens applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such perfected Liens applied prior to the Sale Transaction, subject to any rights, claims, and defenses of PDVSA.

3.    *Notice*. Notice of the Recommendation, the Bidding Rounds, the Bidding Procedures, the Sale Transaction, and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with the Sale Procedures Order and the Bidding Procedures.

4.    *Fair and Adequate Purchase Price*. The consideration to be provided by Buyer under the Stock Purchase Agreement is fair, adequate, and reasonable consideration for the PDVH Shares and constitutes (i) fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia and any other applicable law and (ii) an adequate price for the purchase of the PDVH Shares under the circumstances of this Action and the terms of the Sale Procedures Order. Such consideration constitutes the best bid for the PDVH Shares.

5.    *Approval of the Transaction Documents*. Except as otherwise provided herein, the Transaction Documents, including all of the transactions contemplated thereby, including, without limitation, the Debt Financing and documents related thereto and all of the terms and conditions

21

thereof, are hereby authorized and approved in their entirety.  The failure specifically to include any particular provision of the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents, and the entry into the Transaction Documents by the Special Master, be authorized and approved in their entirety except as otherwise provided herein.

6.    *Consummation of Sale Transaction(s).*  Pursuant to 28 U.S.C. § 2004, Federal Rule of Civil Procedure 69, Section 324 of Title 8 of the Delaware Code, the All Writs Act, and the broad equitable powers of the Court, the Court is authorized and empowered to transfer the PDVH Shares in accordance with the terms of the Transaction Documents and the terms of this Order. The Special Master, his Advisors and agents, are authorized and directed to execute, deliver, and perform their obligations under and comply with the terms of the Transaction Documents and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Transaction Documents and this Order without leave of Court.  All Interest Parties and any Persons or entities acting in concert with them are prohibited and enjoined from taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order; *provided* that, the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order in a court of competent jurisdiction; *provided*, further, that the foregoing restriction in this sentence shall not apply to any act of a United States regulatory agency required to implement the Sale Transaction.   PDVH, CITGO and each of their direct and indirect subsidiaries,

representatives, employees, agents, designees, successors, or assigns (collectively, the "**CITGO Related Parties**") are directed to comply with all interim operating covenants contained within the Stock Purchase Agreement or any other Transaction Document, including but not limited to those contained in Section 6.1 (*Conduct of the Business Pending the Closing*) of the Stock Purchase Agreement, and the Special Master is authorized to seek this Court's assistance if, in his reasonable judgment, any of PDVH, CITGO or CITGO Related Parties fail to comply with the interim operating covenants under the Stock Purchase Agreement or any other Transaction Document.  Without limiting the foregoing, PDVH, CITGO and CITGO Related Parties are directed and hereby ordered to comply with all obligations and covenants contained in the Stock Purchase Agreement and Transaction Documents (regardless of, and independent of, any obligation for the Special Master to "cause" those parties to comply with such obligations and covenants), including, but not limited to, the obligations and covenants set forth in Section 2.3 (*Closing Deliveries of the Parties*), Section 3.1 (*Purchase Price*), Section 3.4 (*Closing Date Payments by Buyer*), Section 3.5 (*Withholding*), Section 6.1 (*Conduct of the Business Pending the Closing*), Section 6.2 (*Access to Information*), Section 6.3 (*Regulatory Approvals; Third Party Consents*), Section 6.7 (*Public Announcements*), Section 6.8 (*Employee Matters*), Section 6.10 (*Company's Obligations in Respect of Debt Financing*), Section 6.11 (*Tax Matters*), Section 6.13 (*Notices of Certain Events*), Section 6.17 (*280G*) and Section 6.18 (*Financial Statements*),  of the Stock Purchase Agreement, and the Special Master is authorized to seek this Court's assistance and/or an order from the Court to compel compliance if, in his reasonable judgment, PDVH, CITGO or CITGO Related Parties fail to comply with such obligations or covenants under the Stock Purchase Agreement or other Transaction Documents.  Any failure by PDVH, CITGO or the CITGO Related Parties to comply, or cause compliance, with any obligation or covenant

contained in the Stock Purchase Agreement and Transaction Documents may result in a contempt order and appropriate sanctions against the violating entity, as well as the individual directors, officers or employees responsible for the violation.

7.      *Execution of Transaction Documents*.  The Special Master, his Advisors and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments, and documents that may be reasonably necessary or desirable to implement the Transaction Documents, including the transfer and, as applicable, the assignment of all the PDVH Shares, and to take all further actions as may be (i) reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to Buyer, or reducing to Buyer's possession, the PDVH Shares and/or (ii) necessary or appropriate to the performance of the obligations contemplated by the Transaction Documents, all without further order of this Court.

8.      *Payment of Transaction Expenses*.  The Special Master shall continue to file periodic status reports requesting the Court's approval of the Special Master's Transaction Expenses.  Any approved but unpaid Transaction Expenses as of the Closing shall be paid to the Special Master from the proceeds of the Sale Transaction prior to any distributions on account of Attached Judgments.

9.      *Special Master Expense Reserve Holdback*.  The Special Master shall be entitled to direct a portion of the sale proceeds, in an amount reasonably determined by the Special Master and approved by the Court prior to the closing of the Sale Transaction, to be deposited into an escrow account for the purpose of paying any out-of-pocket costs, fees, or expenses incurred by the Special Master on or after the closing of the Sale Transaction for the Special Master, investment bankers, third party consultants, legal counsel and any other Representatives (as defined in the

Stock Purchase Agreement) or Advisors (as defined in the Sale Procedures Order) and approved

by the Court, including any fees or expenses related to implementation, indemnification or

reimbursement for any liability, legal costs, or court costs, or any further adjudication, of the Sale

Transaction or this Order. Any such amounts remaining in escrow after all such costs, fees and

expenses incurred by the Special Master have been so paid or distributed shall be paid to the

Additional Judgment Creditors in compliance with the Final Priority Order, this Order, and any

further order of the Court deemed necessary by the Special Master.

10.    *Document Acceptance*.  Each and every federal, state, local, or foreign government

or governmental or regulatory authority, agency, board, bureau, commission, court, department,

or other governmental entity is hereby authorized and directed to accept any and all documents

and instruments necessary and appropriate to consummate the transactions contemplated by the

Transaction Documents.

11.    *Transfer of PDVH Shares Free and Clear*.  Pursuant to applicable law, the Special

Master is authorized and directed to transfer the PDVH Shares in accordance with the terms of the

Stock Purchase Agreement and this Order.  The transfer of the PDVH Shares by the Special Master

to Buyer in accordance with the Stock Purchase Agreement and this Order shall: (i) be valid, legal,

binding, and effective; (ii) vest Buyer with all right, title, and interest in and to the PDVH Shares;

and (iii) be free and clear of all Claims and Liens against the PDVH Shares, pursuant to this Court's

broad equitable authority, except as otherwise provided in the Transaction Documents.  Following

the consummation of the Sale Transaction, the Notice Parties shall have no recourse against Buyer

or Buyer Affiliates, or against the PDVH Shares, on account of those parties' respective judgments

or other Claims against the Republic, PDVSA or their respective Affiliates.  On the Closing Date,

this Order shall be considered, and shall constitute, for any and all purposes, a full and complete

general assignment, conveyance and transfer of the PDVH Shares, transferring good and marketable and indefeasible title and interest in all of the PDVH Shares to Buyer with effect at Closing of the Sale Transaction in accordance with the Transaction Documents.  The provisions of this Order authorizing and approving the transfer of the PDVH Shares free and clear of all interests shall be self-executing, and neither the Special Master or Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implementation the provisions of this Order and the Stock Purchase Agreement.

12.    *Endorsement of Certificates; Registration of Transfer*.  The Special Master is authorized and directed to execute on behalf of PDVSA and deliver to Buyer, at Closing, the stock certificates representing the PDVH Shares duly endorsed in blank and any executed stock powers or other instruments of transfer necessary to transfer to Buyer good and marketable title to the PDVH Shares and otherwise proceed with the Sale Transaction.  PDVH is directed, at Closing, to register the transfer of the PDVH Shares to Buyer upon the books and records of PDVH. Following the Closing, the sale of the PDVH Shares to Buyer shall be, and shall be deemed to be, "made and confirmed" as contemplated by Section 324 of Title 8 of the Delaware Code and, upon a certified copy of this Order being left with any officer or director or with the registered agent of PDVH, Buyer shall be entitled to the PDVH Shares and all income, or dividends which may have been declared, or become payable thereon since the attachment laid, subject to the terms of the Stock Purchase Agreement.

13.    *Injunction*.  Pursuant to the All Writs Act, and except as otherwise provided in the Stock Purchase Agreement, the Transaction Documents, or this Order, all Persons (and their respective successors and assigns) including the Republic, PDVSA, PDVH, CITGO, Crystallex,

ConocoPhillips, the Additional Judgment Creditors, judgment holders or other creditors of the Republic or PDVSA (or their respective Affiliates) who are not Additional Judgment Creditors, all debt security holders, equity security holders or putative equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold, now or in the future, Claims against the Republic, PDVSA, or the PDVH Shares, arising under or out of, in connection with, or in any way relating to, the Republic, PDVSA, the PDVH Shares prior to the Closing, the operation of PDVH or ownership of the PDVH Shares by PDVSA prior to the Closing, or the Sale Transaction, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Buyer, Buyer Affiliates, or any of their respective successors or assigns including taking any of the following actions with respect to any Claims either directly or indirectly: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Buyer, Buyer Affiliates, and any of their respective successors or assigns; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, Buyer Affiliates, and any of their respective successors or assigns; (iii) creating, perfecting, or enforcing any Claim against Buyer, Buyer Affiliates, and any of their respective successors or assigns, and the PDVH Shares; (iv) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due against Buyer, Buyer Affiliates, any of their respective successors or assigns, or the PDVH Shares; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof.

14.    *Release of Claims as to Buyer and other Entities; Recordation.*  Except as expressly set forth in the Stock Purchase Agreement, the Transaction Documents, or this Order, this Order (i) shall be effective as a determination that, as of the Closing, all Claims have been unconditionally released, discharged and terminated as to Buyer, Buyer Affiliates, and the PDVH Shares, and that the conveyances and transfers described herein and in the Stock Purchase Agreement and the Transaction Documents have been effected, and (ii) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that Buyer is the assignee and owner of the PDVH Shares, free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**").  All Recording Officers are authorized and directed to strike recorded encumbrances, claims, liens, and other interests against the PDVH Shares recorded prior to the date of this Order. A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other interests against the PDVH Shares recorded prior to the date of this Order. All Recording Officers are hereby authorized and directed to accept for filing any and all of the documents and instruments necessary, advisable or appropriate, and appropriate to consummate the transactions contemplated by the Stock Purchase Agreement.

15.    *Releases by Holders of Any Attached Judgments.*  Immediately upon the later of (i) the indefeasible receipt by a holder of an Attached Judgment of an amount sufficient to satisfy

28

its Attached Judgment based upon the available proceeds from the Sale Transaction (the "**Sale Proceeds**") or (ii) the Closing, the holder of an Attached Judgment (a) shall have, and shall be deemed to have, automatically released all of the security interests, liens and pledges, including its Attached Judgment, as defined in the Stock Purchase Agreement, and any other Claims on the Shares securing the Attached Judgment with no further action (the "**Lien Release**"), whether or not the holder's Attached Judgment was satisfied in full or at all from the Sale Proceeds, and (b) is authorized and directed to take any such actions as may be reasonably requested by the Court to evidence the release of such security interests, liens and pledges, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Court or Buyer or as may be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.  This Order is, and shall be deemed to be, in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

16.     *Licenses*.    In accordance with the Sale Procedures Order and the Bidding Procedures, Buyer shall obtain all required permit(s), license(s), registration(s), governmental authorization(s) or approval(s) or similar grant(s), including pursuant to the Hart-Scott-Rodino Act and any other applicable antitrust laws and all licenses required by OFAC relating to the transfer or conveyance of the PDVH Shares to Buyer under the Stock Purchase Agreement and the Transaction Documents, within a customary amount of time.  Buyer and its legal counsel and advisors shall coordinate in good faith with the Special Master's Advisors to discuss and explain Buyer's regulatory and other consent analysis, strategy, and timeline for securing all such approvals and consents in accordance with the terms of the Stock Purchase Agreement to facilitate the timely Closing of the Sale Transaction.

17.    *Distribution and Application of Sale Proceeds.*  In accordance with the Transaction Documents, prior to the Closing, the Special Master and his Advisors shall provide to Acquiom Financial LLC, a Colorado limited liability company, in its capacity as payments administrator (the "**Paying Agent**"), a spreadsheet pursuant to that certain Payments Administration Agreement, to be executed before the entry of this Order, by and among Buyer, the Special Master and the Paying Agent, which shall indicate, among other things, that, at the Closing, Buyer will pay the Closing Consideration (as defined in the Stock Purchase Agreement) to the Paying Agent, and the Paying Agent will pay to:

    i.    the Special Master and his Advisors, any approved but unpaid Transaction Expenses as of the Closing;

    ii.    the Sale Process Parties and the Additional Judgment Creditors, any Transaction Expenses paid as of Closing; and

    iii.    the holders of any Attached Judgments, in accordance with the terms of the Stock Purchase Agreement and the Final Priority Order.

The remaining sale proceeds will be distributed in accordance with the terms of the Stock Purchase Agreement and other Transaction Documents.  Following the payments provided for in this paragraph, all Liens that existed prior to Closing in or on the PDVH Shares shall attach to the remaining proceeds of the Sale Transaction in the same order of priority and with the same extent, validity, force, and effect that such Liens had prior to the Sale Transaction.

18.    *No Successor or Other Derivative Liability.*  By virtue of the Sale Transaction, neither Buyer nor any of Buyer Affiliates shall be deemed to have effected a consolidation, merger, or de facto merger of Buyer and any of Buyer Affiliates with or into PDVSA and Buyer and Buyer Affiliates are not, and shall not be deemed, as a result of the consummation of the Sale Transaction:

(i) to be a successor to PDVSA, (ii) to be an alter ego or a mere continuation or substantial continuation or a successor in any respect of PDVSA, including within the meaning of any foreign, federal, state or local law, or (iii) to be liable for, or be subject to any obligations relating to, any acts or omissions of PDVSA in the conduct of its business or arising under or related to the PDVH Shares, other than as set forth in the Stock Purchase Agreement.  To the maximum extent available under applicable law, Buyer's acquisition of the PDVH Shares shall be free and clear of any successor or similar liability claims and other types of transferee liability of any kind or character whatsoever, whether known or unknown, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent at the time of the Closing.  The operations of Buyer and Buyer Affiliates shall not be deemed a continuation of PDVSA's business operations, the PDVH Shares, or any Liabilities of PDVSA as a result of the acquisition of the PDVH Shares. Following consummation of the Sale Transaction, the Notice Parties shall have no recourse against Buyer or Buyer Affiliates, or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic or PDVSA.  The consideration given by Buyer shall constitute valid and valuable consideration for the releases of any potential successor or similar liability claims and other types of transferee liability of any kind or character whatsoever, which releases shall be deemed to have been given in favor of Buyer by all holders of such claims.

19.    *Non-Interference*.  Following the Closing Date, no holder of an adverse interest in the PDVH Shares, nor any other person or entity, shall interfere with Buyer's title to the PDVH Shares based on or related to such adverse interest or any actions that Buyer, Buyer Affiliates, PDVH, PDVH's subsidiaries and Affiliates (including CITGO Holding, Inc. and CITGO), the Republic or PDVSA have taken or may take related to the Sale Transaction or this Action or any related action.

20.     *Judicial Immunity & Exculpation*.  The Special Master is entitled to judicial immunity in the performance of his duties as authorized by the Special Master Order, the Sale Procedures Order, the Bidding Procedures, and this Order, including implementation of the Sale Transaction.  The Special Master's Advisors are entitled to judicial immunity in connection with all actions taken at the direction of, on behalf of, or otherwise in connection with representation of, or advising, the Special Master.  No person or entity, including Buyer, shall be permitted to pursue any cause of action or commence or prosecute any suit or proceeding against the Special Master or the Advisors, or their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors or assigns, for any reason whatsoever relating to this Action, implementation of the Sale Procedures, or in connection with the Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order or any other orders of the Court, or any act or omission by the Special Master or any Advisor in connection with the foregoing.  All interested persons and entities, including but not limited to the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder or Buyer, and all persons acting in concert with them, are hereby enjoined and restrained from pursuing any such cause of action or commencing any such action or proceeding. If any person or entity attempts to pursue any such cause of action or commence any suit or proceeding against the Special Master or any of the Advisors with knowledge of this Order (or continues to pursue or prosecute any cause of action, suit or proceeding after having received notice of this Order), the Court shall issue an order to show cause to such person or entity and a hearing will be scheduled to consider appropriate relief, which may include payment of fees and expenses incurred by the Special Master or any of the Advisors in connection therewith. To the maximum extent permitted by applicable law, neither the Special Master nor his Advisors nor their respective employees, officers, directors, attorneys,

auditors, representatives, agents, successors and assigns will have or incur, and are hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of all actions taken to implement the Marketing Process, Sale Procedures, Bidding Procedures, or Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order and all other orders of the Court.

21.    *Modification of Stock Purchase Agreement.*  Subject to the terms of the Transaction Documents, including the Stock Purchase Agreement, and any related agreements, documents, or other instruments, the Transaction Documents may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court; *provided*, that any proposed material modification, amendment or supplement to the Transaction Documents shall be served on the Interest Parties and the PDVSA 2020 Bondholders, at least three (3) business days' prior to its proposed execution and, if objected to by any Interest Parties and/or the PDVSA 2020 Bondholder Parties, shall be subject to further Court order absent an agreement of the parties thereto and an objecting party.

22.    *Conflicts; Precedence.*  In the event that there is a direct conflict between the terms of this Order and the terms of the Transaction Documents, the terms of this Order shall control. The failure to specify or include any particular provisions of the Stock Purchase Agreement or the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Stock Purchase Agreement, the Transaction Documents, and the Sale Transaction be authorized and approved in their entirety.

23.     *Provisions Non-Severable*.  The transactions contemplated under the Transaction Documents (including the Sale Transaction) and in this Order are inextricably linked and collectively constitute a single, integrated transaction, and each provision of the Transaction Documents is incorporated into and part of this Order as if fully set forth herein.  Buyer would not have entered into the Transaction Documents and would not acquire the PDVH Shares but for its reliance on each term and provision in this Order and in the Transaction Documents being valid and enforceable pursuant to its terms.  The total consideration to be provided by Buyer under the Transaction Documents reflects Buyer's reliance on each term and provision in this Order and in the Transaction Documents.  As such, each term and provision in this Order and in the Transaction Documents is integral to the Sale Transaction, nonseverable and mutually dependent.

24.     *Retention of Jurisdiction*.  This Court shall retain jurisdiction to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Order and the Stock Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith) and (ii) adjudicate disputes related to this Order and the Stock Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith); *provided*, that no entity or person, including the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder, or Buyer, or any persons acting in concert with them, may commence or pursue any cause of action of any kind that arose or arises from, in whole or in part, the Special Master Order, the Sale Procedures Order, the Bidding Procedures, this Order, any other orders of this Court in this Action, or any cause of action related to the Sale Transaction, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause

of action against such party; _provided_, _further_, that no entity or person, including the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder, or any persons acting in concert with them, may commence or pursue any cause of action of any kind against Buyer or Buyer Affiliates that arose or arises from, in whole or in part, this Order or the Sale Transaction, including any successor or similar liability, transferee liability, or other liability or obligation arising under or related to the sale and transfer of the PDVH Shares to Buyer, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause of action against such party.

25. _Effectiveness of Order._  This Order shall become effective and enforceable immediately upon its entry and its provisions shall be self-executing.


IT IS SO ORDERED this____day of_____, 2025.


_____
The Honorable Leonard P. Stark
Circuit Judge, United States Court of Appeals
for the Federal Circuit

## Exhibit A

**Stock Purchase Agreement**

## Exhibit B

**Publication Affidavits**

## Exhibit [D]

**Commitment Letters Regarding Consent to Accept Non-cash Consideration**

# D-1

*Execution Version*

<u>COMMITMENT LETTER</u>

This **COMMITMENT LETTER** (this "***Commitment Letter***") is made as of this 11th day of
August, 2025 (the "***Effective Date***"), by and among (i) Amber Energy Inc., a Delaware corporation
(together with its Affiliates, "***Amber Energy***") and (ii) Rusoro Mining Ltd., a British Columbia corporation
("***Rusoro***").  For purposes of this Commitment Letter, Amber Energy and Rusoro each may be referred to
individually as a "***Party***," and together as the "***Parties***."

**WHEREAS**, Amber Energy has submitted a bid to acquire 100% of Petroleos de Venezuela, S.A.'s
("***PDVSA***") equity interest in PDV Holding, Inc. ("***PDVH***") (such transaction, the "***PDVH Transaction***");

**WHEREAS**, Rusoro has obtained and served a writ of attachment *fieri facias* against PDVSA's
equity interest in PDVH in the following supplemental proceeding:  *Rusoro Mining Ltd. v. Bolivarian
Republic of Venezuela*, No. 21 Misc. 481 (D. Del.) (including, for the avoidance of doubt, all accrued
interest as of the Closing (as defined below), the "***Rusoro Claim***");

**WHEREAS**, in accordance with the *Sixth Revised Proposed Order (A) Establishing Sale and
Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed
Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and
(D) Regarding Related Matters* [D.I. 481] (as amended, modified, supplemented, or superseded,
the "***Bidding Procedures Order***"), dated October 4, 2022, in the case of *Crystallex International
Corporation v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del.), Amber Energy has submitted
a bid (as modified from time to time, the "***Bid***") for the purchase of 100% common shares of PDVH, which
bid shall comply with the Bidding Procedures Order; and

**WHEREAS**, in connection with the evaluation and possible negotiation and documentation of the
Bid, the Parties wish to memorialize the terms and conditions under which Rusoro will accept the Cash
Consideration (as defined below) and the Non-Cash Consideration (as defined below) as consideration for
the extinguishment of the Rusoro Claim (which constitutes an Attached Judgment Claim as defined in the
Bidding Procedures Order) in connection with the consummation of the PDVH Transaction in accordance
with the terms set forth in the Bid as may be modified from time to time should the bid be named the
Successful Bid (as defined in the Bidding Procedures Order) (the extinguishment of the Rusoro Claim is
referred to as the "***Transaction***;" the consummation the PDVH Transaction as contemplated by the Bid is
referred to as the "***Closing***;" and the date on which the Closing occurs is referred to as the "***Closing Date***").

**NOW**, **THEREFORE**, unless or until this Commitment Letter has been terminated in accordance
with the terms hereof, the Parties hereby agree as follows:

1.  <u>Rusoro Claim Treatment</u>.  On the Closing Date, if (x) the United States District Court for the
    District of Delaware (the "***Court***")  enters a sale order approving Amber Energy as the purchaser
    of the shares of PDVH and (y) the Closing occurs, then, at the Closing, Rusoro shall accept, in
    exchange for extinguishing the Rusoro Claim, Convertible Notes (as such term is defined in the
    term sheet attached hereto as **<u>Exhibit A</u>**, and also including, for the avoidance of doubt, the penny
    warrants described in such term sheet and in the governance term sheet attached hereto as **<u>Exhibit B</u>**
    (the "***Warrants***")) issued by CITGO Petroleum Corporation, a Delaware corporation, in an
    aggregate principal amount equal to $650,000,000 (the "***Non-Cash Consideration***"), which
    Convertible Notes issued to Rusoro shall include its *pro rata* share of all Warrants allocated to
    holders of the Convertible Notes, and $200,000,000 in cash consideration (the "***Cash
    Consideration***"); <u>provided</u>, that the Cash Consideration shall be increased by (a) up to $25,000,000
    in cash consideration contemplated to be provided to claimants with claims junior to the Rusoro
    Claim that is ultimately not provided to such claimants (pursuant to an agreement with, or direction

from, any such junior claimant) (it being understood that no claimant junior to Koch Minerals Sarl and Koch Nitrogen International shall receive any consideration without the prior written consent of Rusoro, in its sole discretion) plus (b) the maximum amount of expense reimbursement allowed to increase the aggregate recovery under the TSA (as defined below) (i.e., $60,000,000) less the expense reimbursement actually incurred and provided for thereunder (provided, that if the actual incurred and provided expense reimbursement under the TSA equals or exceeds $60,000,000 then the amount determined under this clause (b) shall equal zero ($0)). The Non-Cash Consideration and the Cash Consideration shall each be earned, due, and payable on the Closing Date at the Closing. In exchange for the Non-Cash Consideration and the Cash Consideration, Rusoro agrees to extinguish all of the Rusoro Claim upon payment of the Non-Cash Consideration and the Cash Consideration, in each case on the terms contemplated under this Commitment Letter, on the Closing Date.

    a.   Adjustments to Non-Cash Consideration and Cash Consideration. In the event that Amber Energy elects to reduce the size of the Convertible Notes issuance at the Closing, the Non-Cash Consideration shall be adjusted downward by $17.81, and the Cash Consideration adjusted upward by $17.81, for each $100 of reduction in the size of the Convertible Notes issuance; provided, that for the avoidance of doubt, in such a reduction in size of the Convertible Notes issuance at the Closing, Rusoro's *pro rata* share of all Convertible Notes (and the Warrants issued in connection therewith) shall remain unchanged (it being understood that, in the event of an increase in the size of the Convertible Notes issuance at the Closing, Rusoro's *pro rata* share shall be diluted on a *pro rata* basis).

    b.   Transaction Support Agreement. The Parties acknowledge and agree that Rusoro's obligations under this Agreement shall be subject in all events to the requirement that Amber Energy submit a Bid (including by supplementing a Bid) that includes a transaction support agreement (a "***TSA***") signed by holders of Petróleos de Venezuela, S.A.'s 8.50% senior secured notes due in 2020 (the "***2020 Bonds***") representing more than two-thirds of the outstanding principal amount of 2020 Bonds (the "***Consenting 2020 Holders***"), with such TSA to provide that, effective upon the Closing, each Consenting 2020 Holder shall transfer, convey, and assign to Amber Energy (or its designee) all of the 2020 Bonds held by such Consenting 2020 Holder, in each case, in exchange for cash and/or non-cash consideration; provided, for the avoidance of doubt, that such TSA shall reflect the agreement-in-principle with the Consenting 2020 Holders as of the date of this Agreement, consisting of (x) $2,065,000,000 in cash plus (y) up to $60,000,000 in expense reimbursement.

2.   Efforts. The Parties shall each use all commercially reasonable efforts to cause the transactions contemplated by this Commitment Letter to be consummated on the terms contemplated by this Commitment Letter and use commercially reasonable efforts to promptly notify the Special Master of the execution of this Commitment Letter and take any commercially reasonable action requested by the Special Master in connection therewith; provided, that the foregoing shall not obligate Rusoro to file any pleading, provide any testimony, or otherwise take any position in court. Neither the immediately preceding sentence, nor anything else in this Commitment Letter, shall require Rusoro to accept any consideration in respect of the Rusoro Claim (or any portion thereof) other than consideration that is (a) (i) in the forms described in Section 1 above, as modified pursuant to Section 1.a) above and (b) in the amounts contemplated by this Commitment Letter. Amber Energy will keep Rusoro reasonably informed about communications or events regarding the PDVH Transaction.

3. <u>Representations and Warranties Regarding Rusoro</u>. As a material inducement to Amber Energy to execute and perform its obligations under this Commitment Letter, Rusoro represents and warrants to Amber Energy as follows:

    a. **Organization; Authority; Enforceability**. Rusoro is a British Columbia corporation duly formed, validly existing, and in good standing under the laws of British Columbia, Canada. Rusoro has the power, authority, and capacity to execute, deliver, and perform under this Commitment Letter. The execution, delivery, and performance by Rusoro have been duly authorized, and upon execution and delivery at the Closing, these agreements will be enforceable according to their terms, subject to limitations imposed by bankruptcy, insolvency, reorganization, moratorium, or other Laws affecting creditors' rights generally, and general equitable principles. For the avoidance of doubt, no consents, approvals, or other actions are required in connection with any litigation financing arrangements in order for Rusoro to authorize, execute, deliver, or perform this Agreement or to consummate the transactions contemplated hereby.

    b. **Title to Rusoro Claim**. Rusoro has sole and exclusive ownership of the Rusoro Claim and related rights, free from any Liens except for any Liens incurred in connection with obtaining litigation financing in connection with Rusoro pursuing, and ultimately obtaining, the Rusoro Claim. There are no agreements that would prohibit Rusoro's performance under this Commitment Letter if Amber Energy consummates the PDVH Transaction on the terms contemplated by this Commitment Letter. Rusoro possesses the power, authority, and legal capacity to extinguish the Rusoro Claim on the terms contemplated by this Commitment Letter. The aggregate judgment principal, inclusive of award, pre-award interest, costs, and fees, but excluding post-judgment interest, is $1,327,783,315.53. As of May 31, 2025, the Rusoro Claim has accrued approximately $207,208,735.58 in post-judgment interest. Assuming a Closing Date of December 31, 2025, the aggregate Rusoro Claim is estimated to total approximately $1,553,080,308.10.

    c. **No Violation; Consents**. None of the actions taken by Rusoro under this Commitment Letter will result in a violation of organizational documents, Law, Order, or any Contract to which Rusoro is a party. No consent or approval from any Person or Governmental Body is required for the execution and delivery of this Commitment Letter by Rusoro. No representation or warranty is given regarding the Laws, Orders, or Permits of the Bolivarian Republic of Venezuela.

    d. **Legal Proceedings**. Aside from Venezuela's objections to the PDVH Transaction, there are no pending or known threatened Legal Proceedings against Rusoro that challenge the validity of the Rusoro Claim or seek to hinder performance under this Commitment Letter. Rusoro is not bound by any Order related to the Rusoro Claim or the related Transferred rights, nor are there unsatisfied judgments, penalties, or awards against Rusoro relating to these claims.

    e. **Solvency**. Rusoro is Solvent as of the date of this Commitment Letter. As used in this Commitment Letter, "*Solvent*" means, when used with respect to any Person, that, as of any date of determination, (i) the fair value of the assets of such Person and its subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, contingent, subordinated, or otherwise, of such Person and its subsidiaries on a consolidated basis, (ii) the present fair salable value of the property of such Person and its subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of such Person and its subsidiaries on a consolidated basis on their debts and

liabilities as they become absolute and matured, (iii) such Person and its subsidiaries on a consolidated basis will be able to pay their debts and liabilities, subordinated, contingent, or otherwise, as they become absolute and matured and become due in the usual course of their affairs, and (iv) such Person and its subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the business in which they are engaged as such businesses are now conducted and proposed to be conducted following the Closing Date.

4. <u>Representations and Warranties of Amber Energy</u>.  As a material inducement to Rusoro to execute and perform its obligations under this Commitment Letter, Amber Energy represents and warrants to Rusoro as follows:

    a. **Organization; Authority**.  Amber Energy is a corporation duly incorporated, validly existing, and in good standing under the laws of Delaware.  Amber Energy has the power, authority, and capacity to execute, deliver, and perform under this Commitment Letter and related documents (collectively, the "***Amber Energy Documents***").  The execution, delivery, and performance by Amber Energy have been duly authorized, and upon execution and delivery at the Closing, these agreements will be enforceable according to their terms, subject to limitations imposed by bankruptcy, insolvency, reorganization, moratorium, or other Laws affecting creditors' rights generally, and general equitable principles.

    b. **No Violation**.  None of the actions taken by Amber Energy under this Commitment Letter or any Amber Energy Document will result in a violation of Amber Energy's organizational documents, Law, Order, or any Contract to which Amber Energy is a party.  No consent or approval from any Person or Governmental Body is required for the execution and delivery of this Commitment Letter or any Amber Energy Document by Amber Energy.

    c. **Legal Proceedings**.  Apart from Venezuela's objections to the PDVH Transaction, there are no pending or known threatened Legal Proceedings against Amber Energy that could impair performance under this Commitment Letter.

    d. **Solvency**.  Amber Energy and any designee will be Solvent as of the Closing Date and immediately after the transactions contemplated hereby.

    e. **Commitment Letters**.  Upon the execution of a stock purchase agreement by and between the Special Master and Amber Energy with respect to the PDVH Transaction (the "***Stock Purchase Agreement***") and thereafter, Amber Energy shall have committed debt and equity financing (as evidenced by fully executed debt and equity financing commitment letters, which shall have been provided to Rusoro on the date of the execution of the Stock Purchase Agreement) sufficient to consummate the Transaction and the Closing.

5. <u>Conditions Precedent to Obligations of the Parties</u>.  The respective obligations of each of the Parties to consummate the Transaction are subject to the satisfaction, on or prior to the Closing, of the following condition:

    a. the PDVH Transaction has been consummated by Amber Energy substantially simultaneously with the Closing and such transaction provides for Rusoro receiving consideration in the forms and amounts contemplated by this Commitment Letter.

4

6.  <u>Conditions Precedent to Obligations of Amber Energy</u>.  The obligations of Amber Energy to consummate the Transaction are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by Amber Energy in whole or in part to the extent permitted by applicable Law):

   a.  the representations and warranties in <u>Section 3</u> shall be true and correct in all material respects as of the date of this Commitment Letter and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date); and

   b.  Rusoro shall have performed and complied with in all material respects all of the covenants, obligations, and agreements hereunder required to be performed or complied with by Rusoro prior to the Closing.

7.  <u>Conditions Precedent to Obligations of Rusoro</u>.  The obligations of Rusoro to consummate the Transaction are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by Rusoro in whole or in part to the extent permitted by applicable Law):

   a.  the representations and warranties in <u>Section 4</u> shall be true and correct in all material respects as of the date of this Commitment Letter and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date); and

   b.  Amber Energy shall have performed and complied with in all material respects all of the covenants, obligations, and agreements hereunder required to be performed or complied with by Amber Energy prior to the Closing Date.

8.  <u>Definitive Documents</u>.  Each Party hereby agrees to negotiate in good faith the definitive form of, and execute, where applicable, any documents, deeds, agreements, filings, notifications, letters, and instruments (collectively, the "***Definitive Documents***") reasonably required or desirable in order to implement the Rusoro Claim treatment provided for hereunder.  The Definitive Documents shall be reasonably acceptable to each Party.

9.  <u>Term and Termination</u>.  This Commitment Letter may be terminated (a) by either Party, if a TSA is not entered into within ten (10) calendar days of this Commitment Letter, (b) by either Party, upon the valid termination of the TSA, (c) by Amber Energy, by prior written notice to Rusoro, if there shall have been a breach by Rusoro of any of its representations, warranties, covenants, or agreements contained in this Commitment Letter, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Sections 5</u> or <u>6</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to thirty (30) calendar days after providing written notice of such breach to Rusoro; <u>provided</u>, that Amber Energy shall not have the right to terminate this Commitment Letter pursuant to this <u>Section 9(c)</u> if Amber Energy is then in breach of this Commitment Letter and such breach would result in the failure of any of the conditions set forth in <u>Sections 5</u> or <u>7</u>, (d) by Rusoro, by prior written notice to Amber Energy, if there shall have been a breach by Amber Energy of any of its representations, warranties, covenants, or agreements contained in this Commitment Letter, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Sections 5</u> or <u>7</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been

5

cured prior to thirty (30) calendar days after providing written notice of such breach to Amber Energy; provided, that Rusoro shall not have the right to terminate this Commitment Letter pursuant to this Section 9(d) if Rusoro is then in breach of this Commitment Letter and such breach would result in the failure of any of the conditions set forth in Sections 5 or 6, (e) by either Party, upon the occurrence of the date on which the Court enters a sale order approving as the purchaser of the shares of PDVH a party other than Amber Energy, or (f) by either Party, upon the occurrence of the valid termination of the Stock Purchase Agreement.

10. Effect of Termination.  In the event that this Commitment Letter is validly terminated in accordance with Section 9, this Commitment Letter shall immediately become null and void and Amber Energy and Rusoro shall be relieved of their duties and obligations arising under this Commitment Letter after the date of such termination and such termination shall be without liability to Rusoro or Amber Energy, respectively; provided, that the provisions of Sections 10 through 20 hereof shall survive any such termination and remain valid and binding obligations of Amber Energy and Rusoro; provided, further, that no Party shall be relieved of liability to the extent such termination shall result from the fraud or any breach of this Commitment Letter by a Party prior to termination.

11. Confidentiality.  The terms and conditions of this Commitment Letter, including its existence, and the discussions related hereto, are subject to the terms of that certain Mutual Confidentiality Agreement, dated as of June 18, 2025, by and among Elliott Investment Management L.P. and Rusoro.

12. Governing Law; Venue; Waiver of Jury Trial.  This Commitment Letter will be governed by and construed under the laws of the State of New York, without regard to conflicts of laws principles that would cause the application of the laws of any jurisdiction other than the State of New York. Each of the Parties consents to the exclusive jurisdiction of any state or federal court located in New York, New York, in the event of any litigation arising out of, in connection with or with respect to, this Commitment Letter.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS COMMITMENT LETTER.

13. Equitable Relief; Injunctions; Specific Performance; Damages.  The Parties agree that irreparable harm would occur, and that monetary damages would not be a sufficient remedy, in the event that the terms and provisions of this Commitment Letter were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each Party agrees, on behalf of itself and its Affiliates, that the other Party shall be entitled to injunctive relief (without posting a bond or other security), including an injunction or injunctions to prevent any continuing breach or violation of the terms and provisions of this Commitment Letter, and the remedy of specific performance to enforce specifically the terms and provisions hereof.  The foregoing remedies shall not be deemed to be the exclusive remedy for any breach or violation of this Commitment Letter, but shall instead be in addition to any and all other remedies to which such Party may be entitled at law or in equity. The Parties acknowledge and agree that in no event shall either Party be liable to the other Party for any special, indirect, incidental, consequential, or punitive damages, including, but not limited to, loss of business, loss of profits, or loss of revenue, whether based on contract, negligence, tort, or any other legal theory, regardless of whether advised of the possibility of such damages and irrespective of the number or nature of claims.

14. Severability.  If any provision of this Commitment Letter shall be determined by a court of competent jurisdiction to be void or unenforceable in any jurisdiction, the validity and effectiveness

of such provision in any other jurisdiction, and the validity and effectiveness of the remaining provisions, shall not be affected.

15. <u>Transfer of Claims</u>.  Rusoro hereby agrees that, prior to the valid termination of this Commitment Letter pursuant to <u>Section 9</u>, it shall not Transfer any of the Rusoro Claims or associated rights absent (a) Amber Energy's prior written consent (in its sole discretion) and (b) the transferee executing a joinder to this Commitment Letter, and that any such Transfer in violation of the foregoing shall be void *ab initio*.

16. <u>Expenses</u>.  Except as herein otherwise provided, Rusoro and Amber Energy shall bear their respective direct and indirect expenses incurred in connection with the negotiation, preparation, execution, and performance of this Commitment Letter and the transactions contemplated hereby, including all fees and expenses of their respective Representatives.

17. <u>Amendments; Waivers</u>.  Any provision of this Commitment Letter may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Commitment Letter, or in the case of a waiver, by the Party against whom the waiver is to be effective.

18. <u>Miscellaneous</u>.  No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. This Commitment Letter may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same agreement.  A person who is not a Party to this Commitment Letter shall have no right to enforce any term of this Commitment Letter.  No Party shall assign this Commitment Letter or any of such Party's rights or obligations hereunder without the prior written consent of the other Party.  This Commitment Letter (together with the confidentiality obligations between the Parties) constitutes the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes and preempts all prior understandings, agreements (written or oral), representations, and/or discussions that may have related to the subject matter hereof in any way.  The headings and captions used in this Commitment Letter are used for convenience only and are not to be considered in construing or interpreting this Commitment Letter.

19. <u>Remedies Not Exclusive</u>.  Unless otherwise expressly stated in this Commitment Letter, no right or remedy described or provided in this Commitment Letter is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Commitment Letter, at Law or in equity.

20. <u>Non-Recourse</u>.  Except as expressly provided herein or permitted or imposed by applicable Law, no past, present, or future director, officer, employee, incorporator, stockholder, member, partner, equity holder, Affiliate, agent, attorney, or Representative of Amber Energy or Rusoro or any of their respective Affiliates shall have any liability for any obligations or liabilities of Amber Energy or Rusoro, respectively, under this Commitment Letter or any Amber Energy Documents, respectively, or for any claim based on, in respect of or by reason of the transactions contemplated hereby and thereby.

*[Remainder of This Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties hereto have executed this Commitment Letter as of the day and year first above written.

**AMBER ENERGY INC.**

By: _____
Name:    Elliot Greenberg
Title:    Vice President and Secretary

**RUSORO MINING LTD.**

By: _____
Name:    Gordon Keep
Title:    Authorized Signatory

Docusign Envelope ID: 2561C653-BF46-4A68-805C-CA0483A5E450

IN WITNESS WHEREOF, the Parties hereto have executed this Commitment Letter as of the day and year first above written.

**AMBER ENERGY INC.**


By:    _____
Name:
Title:


**RUSORO MINING LTD.**


By:  *Gordon Keep*   _____
Signed by:
9B6A1FDB8E49447...
Name:    Gordon Keep
Title:    Authorized Signatory

## ANNEX A

## CERTAIN DEFINITIONS

1.      "**Affiliate**" means, with respect to a specified Person, any other Person or member of a group of Persons acting together that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified Person.

2.      "**Contract**" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, purchase order, task order, commitment or other arrangement, understanding, undertaking, commitment, or obligation, whether oral or written.

3.      "**control**" (including the terms "controlling," "controlled by," and "under common control with") means the possession, whether direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

4.      "**Governmental Body**" means any competent government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign or domestic, federal, state, or local or any legislature, agency, bureau, branch, department, division, commission, quasi-governmental body, or other instrumentality or authority thereof, or any court, tribunal, justice, or arbitrator (public or private).

5.      "**Law**" means any foreign, federal, state, or local law (including common law), constitution, convention, statute, code, ordinance, rule, regulation, treaty, Order, or other requirement that is enacted, adopted, promulgated, or applied by any Governmental Body.

6.      "**Legal Proceeding**" means any judicial, administrative or arbitral action, petition, pleas, charge, complaint, suit, demand, litigation, arbitration, mediation, hearing, investigation, inquiry, proceeding, or claim (including any counterclaim) by or before a Governmental Body.

7.      "**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, reservation, lease, sublease, license, conditional sale or other title retention agreement, preemptive right, community property interest, collateral assignment, infringement charge, option, warrant, right of first refusal, easement, right of way, servitude, proxy, voting trust or agreement, transfer restriction under any equity holder or similar agreement (including, without limitation, any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise or transfer or any other restriction attributable of ownership of any asset), encumbrance, or any other restriction or limitation whatsoever.

8.      "**Order**" means any order, decision, verdict, injunction, judgment, decree, ruling, writ, subpoena, mandate, precept, command, directive, consent, approval, award, assessment, or arbitration award of a Governmental Body.

9.      "**Permit**" means any permit, license, certificate, authorization, approval, waiver, registration, accreditation, quality certification, franchise, or right issued or granted by any Governmental Body.

10.      "**Person**" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, limited liability partnership, joint venture, estate, trust, association, organization, Governmental Body, or other entity of any kind or nature.

11.    "***Representatives***" means, with respect to any Person, such Person's Affiliates and its and their respective equityholders, financing sources, officers, directors, managers, employees, agents, advisors (including investment bankers and financial advisors), attorneys, accountants, and other representatives.

12.    "***Transfer***" means to (a) sell, transfer, assign, hypothecate, pledge, or otherwise dispose of, directly or indirectly, any right, title, participation, or interest in or with respect to any claim, in whole or in part, or (b) deposit any claim into a voting trust, or to grant a proxy or enter into a voting agreement with respect to any claim.

## EXHIBIT A

**Convertible Note Financing**

**Summary of Principal Terms and Conditions**

**(Attached.)**

Project Horizon[1]
Convertible Note Financing
Summary of Principal Terms and Conditions

| | |
|---|---|
| Issuer: | CITGO Petroleum Corporation, a Delaware corporation (the "**Issuer**"). |
| Transactions: | As set forth in Exhibit A to the Commitment Letter. |
| Administrative Agent and Collateral Agent: | [●] or an affiliate, designee, or sub-agent thereof (in such capacity, the "**CN Agent**").[2] |
| Convertible Notes: | Convertible notes of the Issuer (the "**Convertible Notes**")[3] denominated in U.S. dollars in an initial aggregate principal amount (the "**Initial Principal Amount**") equal to $3,650,000,000, subject to increase by an amount not to exceed $570,000,000 in the aggregate, or decrease as determined by Sponsor (such amount as determined prior to the Closing Date by the Sponsor in its sole and absolute discretion, the "**Flex Amount**") (with all Holders (other than the Specified Writholders) committing to participate in such Flex Amount in accordance with their Pro Rata Shares) |
| | Each Initial Holder shall commit to purchase the percentage of the Initial Principal Amount set forth opposite such Initial Holder's name on Schedule I attached to the Commitment Letter (such percentage being such Initial Holder's "**Pro Rata Share**"). |
| Holders: | On the Closing Date, the Initial Holders and after the funding on the Closing Date, any permitted assignee that becomes a noteholder in accordance with the terms of the Convertible Note Documentation (as defined herein) (collectively, the "**Holders**"). |
| Purpose: | The proceeds of the issuance of the Convertible Notes will be used by the Issuer on the Closing Date, together with any cash on hand at |

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Commitment Letter, including the exhibits thereto, including the Governance Term Sheet (as defined below).

[2] Note to Draft:   To be a third-party agent.

[3] Note to Draft:   The Convertible Notes Documentation will provide for a single class of Convertible Notes, however, Convertible Notes held by the Specified Writholders (i) will have no right or obligation to fund any portion of the Flex Amount and (ii) will not be entitled to voting rights where specified in this term sheet. Mechanism for allocating cash and Convertible Note consideration to maintain the Specified Writholders' pro rata ownership to be addressed in separate agreements with the Specified Writholders. In addition, full voting rights shall be automatically restored to the Convertible Notes held by the Specified Writholders upon any permitted transfer to any third party (including any other Holder).

the Issuer and its subsidiaries or proceeds received from any other debt financing, to pay the Acquisition Costs and to consummate the Refinancing and to finance working capital and for general corporate purposes.

Guarantees:           All obligations of the Issuer (the "***Issuer Obligations***") under the Convertible Notes and the other Convertible Note Documentation will be unconditionally guaranteed (the "***Guarantees***") jointly and severally by Amber Parent and each of its direct or indirect subsidiaries (collectively, the "***Guarantors***"), except for Excluded Subsidiaries, consistent with the First Lien Term Facility (as defined in the Commitment Letter).

Security:           As of the Closing Date, the Issuer Obligations and the Guarantees will be secured by a third priority lien (with intercreditor arrangements to be agreed with the First Lien Term Facility and the ABL Facility (as defined in the Commitment Letter)). In addition, the Holders of the Convertible Notes will agree to payment subordination to all accounts payable and the other types of liabilities included as line items under "Current Liabilities" on the Issuer's most recent balance sheet, in each case as determined in accordance with U.S. GAAP, consistently applied, pursuant to the section titled "Documentation" of Exhibit B to the Commitment Letter. If the Issuer incurs secured Indebtedness after the Closing Date (whether pursuant to the First Lien Term Facility (including any refinancing or replacement thereof), a second lien facility or otherwise), then Holders of the Convertible Notes will agree to subordinate their lien to any such Indebtedness.

Maturity:           The Convertible Notes will mature on the date that is 20 years after the issuance thereof (the "***Maturity Date***").

Unless the Convertible Notes are converted before the Maturity Date, an amount equal to the Liquidation Preference (as defined herein) will become due and payable in cash on the Maturity Date.

Liquidity Right:           Beginning on and after the eighth anniversary of the initial issuance of Convertible Notes, the Holders of a majority of the principal amount of Convertible Notes then outstanding held by Holders other than those affiliated with Elliott (other than the Specified Writholders) (the "***Non-Elliott Majority***") will have the right to cause the Issuer or Amber Parent to form a special committee of the Board (the "***Special Committee***") to consider a process to effect a Change of Control, IPO, or other similar or alternative transaction or refinancing. The Special Committee will use commercially

2

reasonable efforts to inform the Non-Elliott Majority with respect to material updates with respect to such efforts from time to time.

In addition, beginning on and after the eighth anniversary of the initial issuance of the Convertible Notes, one or more Holders (including, for the avoidance of doubt, the Specified Writholders) of at least 10% of the aggregate Liquidation Preference of the Convertible Notes at such time may request that the Issuer and Amber Parent use commercially reasonable efforts to help such Holder market and sell all or a portion of its Convertible Notes to a potential permitted transferee, including making management available for management presentations, the preparation of confidential information memorandums (and similar presentations), permitting the provision of confidential information for potential purchasers pursuant to customary confidentiality agreements, and other customary actions.

|  |  |
|---|---|
| Interest Rate: | Interest will accrue in kind and in no event will interest be mandatorily payable in cash (other than at maturity). The Initial Principal Amount of the Convertible Notes will accrete at a rate *per annum* of ███████, accruing on a daily basis, and compounding quarterly and on the Maturity Date. |

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days.

|  |  |
|---|---|
| Liquidation Preference: | The Holders will be entitled to a liquidation preference (the "***Liquidation Preference***") on the Convertible Notes equal to the amount required to deliver to the Holders, as of the applicable date of determination, the greater of: (x) a ████ multiple on the Initial Principal Amount and (y) a ██████ internal rate of return on the Initial Principal Amount (compounding quarterly). |

Other than with respect to certain payments pursuant to the terms of management equity arrangements, any cash dividends or other cash distributions of the Issuer or by Amber Parent shall first be paid to the Holders of the Convertible Notes and shall be applied to reduce the Liquidation Preference thereof on a dollar-for-dollar basis (unless and until the aggregate Liquidation Preference has been reduced to $0) prior to any cash dividends or other cash distributions on any other classes of equity interests of the Issuer.

Following such time as the Liquidation Preference on the Convertible Notes has been reduced to $0, and subject in all events to applicable restricted payment capacity under the Convertible Notes Documentation and the terms of any *pari passu* or senior indebtedness, the Convertible Notes will share in any other cash

dividends on an as-converted basis, and no dividend may be made by the Issuer or Amber Parent except in accordance with the foregoing.[4] For the avoidance of doubt, the reduction of the Liquidation Preference on the Convertible Notes to $0 shall not affect the rights and preferences otherwise provided to Holders under the Convertible Note Documentation.

<u>Pro Rata Payments</u>:

All payments to Holders (including on account of purchases, repurchases, exchanges or similar transactions by the Issuer or any of its subsidiaries, or any fees or other economics with respect thereto) will be made on a pro rata basis based on principal amount of Convertible Notes held by each Holder.

<u>Optional Conversion</u>:

The Convertible Notes will not be convertible at the option of any Holder.

<u>Mandatory Conversion</u>:

In the event of a Qualified IPO (as defined herein), Change of Control (as defined herein) or other Liquidation Event (to be customarily defined) (each a "***Conversion Event***"), the Convertible Notes shall automatically convert into limited partnership interests ("***Amber Parent LP Interests***") in Amber Energy Topco, L.P., a Delaware limited partnership and indirect parent entity of the Issuer or any applicable successor or parent entity thereof ("***Amber Parent***"). The Convertible Notes will convert into (and the Convertible Note Documentation will include an acknowledgement by Amber Parent of its obligation to issue in connection therewith):

(a) a percentage of the fully-diluted equity interest in Amber Parent in the aggregate (which amount may be, but shall not be less than, 0%), calculated at the applicable time of conversion, equal to the quotient of (a) the remaining Liquidation Preference (if any) <u>divided by</u> (b) the total equity value of Amber Parent (including the value of any preferential interests) implied in the applicable Conversion Event or by the fair market value at the time of conversion (and all fair market value determinations shall be made by the Board in its reasonable discretion), which percentage will not exceed 100%; *provided*, *however*, that (1) in connection with any Conversion Event and in lieu of the conversion contemplated by this <u>clause (a)</u>, the Issuer shall have the option to pay all or a portion of the Liquidation Preference in cash so long as such cash is paid on a pro rata basis among Holders (based on principal amount then outstanding held by

---

[4] <u>Note to Draft</u>: The right to participate in cash dividends on an as-converted basis shall be documented as a right possessed by the ██ warrants in Amber Parent that are issued to holders of the Convertible Notes.

each Holder); and (2) in no event shall the conversion of the Liquidation Preference result in the Holders receiving, in the aggregate, more than 100% of the fully-diluted equity of Amber Parent (and the organizational documents of Amber Parent will provide that upon conversion of the Convertible Notes, the Amber Parent LP Interests issued pursuant to this clause (a) may represent 100% of the fully diluted equity of Amber Parent), and any remaining portion of the Liquidation Preference shall be extinguished; and

(b) ▉▉▉ of the fully-diluted equity interest in Amber Parent in the aggregate, calculated at the Closing Date[5] (subject to dilution with respect to issuances of equity securities by, or securities convertible or exchangeable into securities of, Amber Parent following the Closing Date including, but not limited to, management incentive equity and securities issued upon conversion of the Convertible Notes pursuant to clause (a) above; *provided*, *however*, that the terms of the Convertible Notes shall include customary anti-dilution protection relating to issuances of equity securities in Amber Parent below fair market value at the time of issuance).

The Convertible Notes will require that, upon conversion of the Convertible Notes, each Holder will receive the same type and proportion of consideration as received by the other Holders with respect to the Amber Parent LP Interest received upon conversion in accordance with the foregoing (including the right to elect to "rollover" into non-cash consideration or the right to elect cash consideration).

Notwithstanding the foregoing, in the event that the equity value of Amber Parent implied by the Conversion Event (including the value of any preferential interests) is less than the remaining Liquidation Preference as of immediately prior to such Conversion Event, then upon the election of the holders of Convertible Notes representing at least two-thirds of the then-outstanding principal amount, the Convertible Notes shall not convert upon such Conversion Event but shall instead remain outstanding.[6] The Convertible Note Documentation will provide that each Holder of Convertible Notes

---

[5] <u>Note to Draft</u>:    Note that the right to convert into ▉▉▉ of the equity of Amber Parent will be documented as warrants issued to holders of the Convertible Notes instead of a feature of the Convertible Notes themselves. Final documentation will reflect this, and any equity-like rights set forth in this term sheet that are specific to holders of Convertible Notes will attach to the warrants instead.

[6] <u>Note to Draft</u>: For the avoidance of doubt, this paragraph will cease to have any force or effect upon an exchange of the Convertible Notes into preferred equity as contemplated by the "Exchange" section below.

agrees to refrain from voting against conversion as described in the immediately preceding sentence upon Elliott's determination, in its reasonable discretion, that converting the Convertible Notes into equity of Amber Parent would be likely to improve third party ratings of the Issuer or its affiliates and be in the best economic interest of the Holders of Convertible Notes.

"***Qualified IPO***" means (i) the closing of the first underwritten public offering of common equity interests of Amber Parent (or any newly formed holding company or subsidiary thereof formed pursuant to a Recapitalization Transaction or otherwise) pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, with an aggregate gross offering size of at least $500,000,000 (inclusive of any equity sold by any selling stockholders) and such interests being listed on the New York Stock Exchange or the Nasdaq Global Select Market and, (ii) with respect to any Holder, any other registration of common equity interests of Amber Parent (or any newly formed holding company or subsidiary thereof formed pursuant to a Recapitalization Transaction or otherwise) pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, or pursuant to the Securities Act of 1934, as amended, and following which such interests are listed on the New York Stock Exchange, the Nasdaq Stock Market, or such other national stock exchange (or equivalent non-U.S. securities exchange), that such Holder elects to treat as a Qualified IPO.

"***Change of Control***" will be customarily defined and will include (i) the sale, lease, transfer, conveyance, or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Amber Parent and its subsidiaries, taken as a whole, to any "*person*" or "*group*" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) other than to Elliott or one or more of its direct or indirect affiliates or (ii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that Elliott ceases to possess, directly or indirectly through one or more affiliates, the power to direct the management and policies of Amber Parent and its subsidiaries, whether through the ownership of voting securities, by contract or otherwise (it being understood that neither the grant nor the exercise of customary board designation rights (where Elliott continues to control a majority of the voting power of the board) or other bona fide minority protections will constitute a Change of Control).

Redemption:
    The Convertible Notes will not be subject to redemption at the option of any Holder or the Issuer.

Exchange:
    At the election of the Holders of Convertible Notes representing at least a majority of the then-outstanding principal amount (including the affirmative election of at least one other Holder who is not Elliott or its affiliates), which election may be exercised at any time after Closing, each Holder of Convertible Notes will exchange its Convertible Notes for an equal face amount of convertible preferred equity on economic and legal terms that are substantially similar to the applicable terms of the Convertible Notes *mutatis mutandis*, except that the obligations thereunder would not be "indebtedness" and the terms under "Guarantees" and "Security" would be inapplicable.[78]

Documentation:
    The Convertible Note Documentation (as defined below) shall contain the payments, conditions to closing and issuance, conversion, redemption, representations and warranties, affirmative and negative covenants, and events of default expressly set forth in this Convertible Note Term Sheet and as otherwise mutually agreed and reasonably acceptable to the parties thereto.

    The definitive documentation for the Convertible Notes, the (the "***Convertible Note Documentation***") will be based on the Documentation Principles (as defined below).

    As used in this Convertible Note Term Sheet, "***Documentation Principles***" means documentation to be initially prepared by counsel to Amber Parent and its subsidiaries and shall contain the terms set forth in this Exhibit B and be mutually negotiated in good faith within a reasonable time period to be determined mutually by the parties based on the expected Closing Date.

Conditions to Closing:
    The issuance of the Convertible Notes on the Closing Date will be subject solely to the satisfaction (or waiver by each Initial Holder) of the applicable Conditions set forth in Exhibit C to the Commitment Letter.

---

[7] Note to Draft: Upon the exchange of Convertible Notes into preferred equity, the warrants will be cancelled automatically.

[8] Note to Draft: The economic and legal terms of the convertible preferred equity would, for the avoidance of doubt, include those terms attaching to the ▮▮ warrants issued by Amber Parent (including the right to participate in cash dividends on an as-converted basis referred to in Footnote 4 above).

| | |
|---|---|
| <u>Affirmative Covenants</u>: | Information rights to be addressed in the governance term sheet set forth in <u>Exhibit D</u> to the Commitment Letter (the "***Governance Term Sheet***"). |
| | For the avoidance of doubt, the information rights in the Governance Term Sheet shall inure to the benefit of each Holder for so long as such Holder continues to hold 50% or more of the initial principal amount of Convertible Notes held by such Holder as of the Closing Date. |
| <u>Financial Covenants</u>: | None. |
| <u>Negative Covenants</u>: | The Holders will have only the following negative covenants set forth in the organizational documents of Amber Parent (and which Holders will have all rights and remedies at law and at equity to enforce, including the right to seek specific performance), which may only be amended, modified, waived or terminated by the Non-Elliott Majority: |

(a) a restriction on (i) the designation or maintenance of unrestricted subsidiaries or any such similar or analogous concept and (ii) except as a result of issuances with respect to which the Holders are afforded the right to participate in accordance with the terms of the organizational documents of Amber Parent and the Convertible Note Documentation, the creation of any subsidiaries other than direct or indirect wholly owned subsidiaries of Amber Parent (subject to customary exceptions in the case of <u>clause (i)</u> and this <u>clause (ii)</u>, *e.g.*, bona fide investments, operational and similar joint ventures and/or strategic partnerships, director-qualifying shares and other similar foreign-ownership requirements, etc.) (i.e., "anti-short circuit" provisions);

(b) except for certain payments pursuant to the terms of management equity arrangements and other customary exceptions (e.g., tax distributions, management and monitoring fees (subject to a cap on the amount of such management and monitoring fees per annum consistent with the analogous cap set forth in the First Lien Term Facility in effect on the Closing Date), reimbursement of overhead and operating expenses, and repurchases of equity from current or former employees, officers, and directors), a restriction on direct or indirect dividends or other distributions, including repurchases (or other restricted payments), to equityholders of the Issuer, other than cash dividends or cash distributions made in accordance with "Liquidation Preference" above

(with the Liquidation Preference being payable in cash dividends only); and

(c) a prohibition on related party transactions (including with Elliott or any "associate" (as defined in the Securities Exchange Act of 1934, as amended) of Elliott or Amber Parent), subject to customary exceptions (e.g., transactions that are immaterial, on arms'-length terms or bona fide commercial transactions approved by a majority of disinterested director(s)).

<u>Amendments:</u>    Amber Parent will not amend its organizational documents in a manner that adversely and disproportionately affects a Holder in its capacity as a Holder of Convertible Notes or in its capacity as a prospective holder of Class A-2 Units in Amber Parent on an as-converted basis, as applicable, relative to the rights of other similarly situated Holders holding Convertible Notes or Class A-2 Units, as applicable, without approval by such affected Holder (including, for the avoidance of doubt, the consent of any Specified Writholder that is so adversely and disproportionately affected).

The terms of the Convertible Notes may be amended, modified, waived or terminated by the consent of the Holders of Convertible Notes representing a majority of the then-outstanding principal amount (excluding the Specified Writholders), including the consent of at least one other Holder who is not Elliott or its affiliates; <u>provided</u>, <u>however</u>, that any amendment, modification, waiver, or termination (a)(i) that adversely and disproportionately affects a Holder in its capacity as a Holder of Convertible Notes or in its capacity as a prospective holder of Class A-2 Units in Amber Parent on an as-converted basis, as applicable, relative to the rights of other similarly situated Holders holding Convertible Notes or Class A-2 Units, as applicable (it being acknowledged and agreed that any amendment, modification or waiver of the negative covenants may have such an adverse effect), or (ii) the sacred right regarding the release of all or substantially all of the collateral securing the Notes shall require approval by such affected Holder (including in the case of clauses (a)(i) and (a)(ii), for the avoidance of doubt, the consent of the Specified Writholders) or (b) to the preemptive rights shall require the consent of the Holders of Convertible Notes representing a majority of the then-outstanding principal amount (including, for the avoidance of doubt, the Specified Writholders), other than Elliott or its affiliates.

In addition, each Holder (including, for the avoidance of doubt, the Specified Writholders) will have certain sacred rights with respect to any amendment, modification, waiver or termination relating to the

outstanding principal amount or payment currency, the Liquidation Preference, the Maturity, "Mandatory Conversion" rights, any pro rata payment requirements or amendments to the payment waterfall as among the outstanding Convertible Notes, the bankruptcy Events of Default, the interest rate and interest payment dates, the amendment provisions or release of all or substantially all of the collateral securing the Notes or the value of the guarantees except, solely in the case of such releases, as otherwise permitted in the Convertible Note Documentation, and the information rights as set forth in the Governance Term Sheet (it being understood and agreed that the Board's exercise of any right to approve or withhold information, in each case, expressly set forth in the Governance Term Sheet, shall not be deemed to be an amendment, modification, waiver or termination in respect of such information rights).

Events of Default:    Customary events of default for (i) payment default (including at maturity), (ii) failure to comply with conversion provisions of Convertible Notes when required under the Convertible Note Documentation, and (iii) customary bankruptcy and insolvency events. Upon an Event of Default, the Non-Elliott Majority will have customary rights and remedies, including the ability to require the Liquidation Preference then outstanding to be due and payable immediately in cash by the Issuer.

Preemptive Rights:    The Holders of Convertible Notes will be entitled to preemptive rights, as described in the Governance Term Sheet.

Anti-Dilution:    The Convertible Note Documentation will include only customary structural anti-dilution conversion rate and price adjustments with respect to the Convertible Notes and the anti-dilution protections set forth under "Mandatory Conversion".

Voting:    The Convertible Notes will not confer upon the Holders the right to vote or to consent or to receive notice as a limited partners in respect of meetings of partners for the election of managers or any other matters or any rights whatsoever as stockholders except as otherwise expressly provided in the Convertible Note Documentation.

Additional matters related to the governance of Amber Parent and the Issuer are described in the Governance Term Sheet.

Assignments:    After the Closing Date, the Holders will be permitted to directly or indirectly transfer or assign Convertible Notes or any interest therein to any person other than Restricted Parties, provided, that each Holder shall provide the Company with not less than five business days' advance written notice of any such transfer. "*Restricted Parties*" shall mean (a) those persons that are separately identified in

10

writing by Elliott to the Holders prior to the execution of the Commitment Letter, together with any persons identified in writing by Elliott to the Holders at any time and from time to time following the execution of the Commitment Letter (including any affiliate of the foregoing (other than a bona fide debt fund affiliate (as defined below))), provided, that with respect to any additional Restricted Parties identified by Elliott after the execution of the Commitment Letter, upon request by any Holder, Elliott shall provide such Holder with a bona fide, articulable and reasonable rationale for the inclusion of such person as a Restricted Party (it being acknowledged and agreed that the rationale for any Restricted Party's identification as such as of the execution of the Commitment Letter shall be deemed to be reasonable), and to the extent Elliott is not able to provide a bona fide, articulable and reasonable rationale for the inclusion of such person as a Restricted Party, such person shall not be so designated; and (b) operating entities who are engaged in a substantially similar line of business as and are a bona fide competitor to the Issuer and its subsidiaries, and any affiliate thereof (other than a bona fide debt fund affiliate) that is either (i) clearly identifiable solely on the basis of similarity of its name or (ii) identified in writing by Elliott to the Holders at any time and from time to time (each, a "**_Competitor_**"). For purposes of the foregoing, a "bona fide debt fund affiliate" of a Competitor is a debt fund, investment vehicle, regulated bank entity or unregulated entity primarily engaged in, or that advises funds or other investment vehicles that are primarily engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course of business for financial investment purposes and with respect to which persons involved with the investment in the relevant Competitor, or the management, control or operation thereof, directly or indirectly, possesses the power to direct or cause the investment policies of such fund, vehicle or entity are independent from the Disqualified Lender.

Governing Law:        New York.[9]

---

[9] Note to Draft:  If Preferred Equity is issued, Delaware will be the governing law.

**EXHIBIT B**

**Governance Term Sheet**

**(Attached.)**

<u>**PROJECT HORIZON**</u>

<u>**GOVERNANCE TERM SHEET**</u>

<u>**AMBER ENERGY TOPCO L.P.**</u>

*The following is a description of certain post-closing equity arrangements in connection with the proposed acquisition (the "**Acquisition**") of 100% of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (together with its subsidiaries, "**PDVH**") by Amber Energy Inc., a Delaware corporation ("**Amber**" or the "**Buyer**"). This Term Sheet does not constitute a binding commitment to enter into the Acquisition, provide financing for the Acquisition or to enter into any definitive agreement on the terms described herein or otherwise and will have no force or effect until a definitive agreement or agreements, if any, are executed by the parties with respect to the subject matter contained herein. This Term Sheet is not an exhaustive list of all items and drafting issues to be addressed in the definitive documents to be entered into in connection with the Acquisition.*

| | |
|---|---|
| ***Parties*:** | "***Elliott***" means certain affiliates of Elliott Investment Management L.P., a Delaware limited partnership. |
| | "***Topco***" means Amber Energy Topco L.P., a newly formed Delaware limited partnership. The "***Company***" refers collectively to Topco and its subsidiaries. |
| | "***General Partner***" means Amber Energy Topco GP LLC, a newly formed Delaware limited liability company controlled by Elliott, which shall serve as the general partner of Topco. |
| | "***Investor***" means each of Elliott and any other holder of Units, and collectively, the "***Investors***". |
| ***Investment Objective*:** | Topco's objective will be to, directly or indirectly through one or more intermediate entities (including Amber), acquire, hold and dispose of ownership interests in PDVH and to take actions related thereto. |
| ***Capital Structure*:** | Equity interests in Topco will be divided into three classes of common units ("***Units***") referred to as "***Class A-1 Units***," "***Class A-2 Units***" (which, together with the Class A-1 Units, are referred to as "***Class A Units***") and "***Class B Units***." |
| | Upon the closing of the Acquisition (the "***Closing***"), Class A-1 Units will be issued to the Investors in exchange for their respective capital contributions at a fixed price of ▓▓▓▓ per Class A-1 Unit. |
| | At the Closing, CITGO Petroleum Corporation, a Delaware corporation and indirect subsidiary of Topco, will issue to certain investors, including Elliott (the "***Convertible Noteholders***") convertible secured notes (the |

"*Convertible Notes*") that convert into Class A-2 Units.[1,2] Class A-2 Units will be issued exclusively upon the conversion or exercise, as applicable, of such Convertible Notes or warrants in accordance with their terms. No Class A-2 Units will be issued or outstanding at or as of the Closing. In the definitive documentation for the Convertible Notes and warrants, Topco will covenant and agree to issue Class A-2 Units upon conversion or exercise, as applicable, of the Convertible Notes and warrants.

Class B Units will be issued pursuant to a management incentive plan (the "*MIP*") to employees and other natural persons who are Incentive Equity Grantees (as defined below); provided, that no Class B Units shall be issued to Elliott or any of its affiliates or any of their respective employees.[3]

Except for (i) Class A-1 Units, (ii) Class B Units issued pursuant to the MIP, if any, (iii) the Convertible Notes and (iv) any warrants issued to the Convertible Noteholders (the "*warrants*" and the Convertible Noteholders in their capacity as holders of warrants, the "*warrantholders*"), there will be no equity securities or securities convertible into equity securities of Topco issued or outstanding at or as of the Closing and there will be no options, warrants or instruments convertible into or exercisable or exchangeable for equity securities of Topco outstanding at or as of the Closing. The holders of Class B Units (whether vested or unvested) shall have no voting rights for any Class B Units held by such holders.

*Use of Proceeds*: The proceeds of the subscriptions for the Class A-1 Units shall be used to finance a portion of the purchase price of the Acquisition, to pay transaction expenses and to fund the balance sheet and working capital of the Company (including PDVH).

*Governance*: Board Composition

The General Partner shall delegate its entire authority to manage the business and affairs of Topco to a board of managers (the "*Board*"). The Board will have six managers (each, a "*Manager*") comprised as follows: (a) four Managers designated by Elliott (the "*Elliott Designees*"); (b) the then-current chief executive officer of the Company (the "*CEO Manager*"); and (c) for so long as it holds any Convertible Notes or any interests in Topco following conversion thereof, one manager designated by Oaktree Capital Management, L.P. ("*Oaktree*," and such manager, the "*Oaktree Manager*"); provided, that notwithstanding the foregoing, Oaktree's right to appoint one manager shall apply (on a proportionate basis) to the board of managers (or equivalent governing body) of Topco,

[1] **Note to Draft**: The terms (including conversion terms) applicable to the convertible secured notes are set forth in the Convertible Notes term sheet.
[2] **Note to Draft**: Note that the right to convert into ▮▮▮ of the equity of Topco will be documented as warrants issued to holders of the Convertible Notes instead of a feature of the Convertible Notes themselves. Final documentation will reflect this, and any equity-like rights set forth in this term sheet that are specific to holders of Convertible Notes will attach to the warrants instead.
[3] **Note to Draft**: MIP terms (including allocation methodology and vesting, forfeiture and redemption terms) are set forth in the MIP term sheet.

or any holding company or subsidiary of Topco from time to time that effectively functions as the board of directors (or equivalent governing body) of the Company. Two of the Elliott Designees appointed under clause (a) shall be designated as "*EIM Managers*."

Removal and Replacement of Managers

Elliott will have the right to remove and replace the Elliott Designees at any time and for any reason, and to fill any vacancies otherwise resulting in such manager positions. Oaktree will have the right to remove and replace the Oaktree Manager at any time and for any reason, and fill any vacancy otherwise resulting in such Oaktree Manager position.

Board Action

Each Manager will have one vote; provided, that each EIM Manager shall have three votes. Any EIM Manager may exercise the vote on behalf of any absent or vacant EIM Manager. All actions of the Board will be taken by a majority vote of those present at a meeting at which a quorum is present, and will require the approval of the EIM Managers. Any action of the Board may be taken by the written consent of Managers holding a majority of the voting power and will require the written consent of the EIM Managers; provided, that Topco shall promptly provide notice to all Managers of such written consent.

The Board shall hold regularly scheduled meetings at least once per calendar quarter or as otherwise determined by the chairperson of the Board. Meetings of the Board may also be called by a majority of the Board, by any EIM Manager or by the CEO Manager upon not less than 24 hours' prior notice. Managers will be able to attend such meetings by videoconference or telephone, if necessary, and such attendance shall constitute presence at a meeting.

At every meeting of the Board, a quorum shall require the attendance, whether in person, telephonically, virtually or in any other manner permitted by applicable law, of (a) the number of managers representing a majority of the voting power of the Board and (b) at least one EIM Manager.

Observers

Elliott shall be entitled to designate observers to the Board.

In addition, for so long as a Designated Noteholder (together with its affiliates on an aggregate basis) continues to hold more than 50% of the original principal amount of the Convertible Notes held by such Designated Noteholder (together with its affiliates on an aggregate basis) as of the Closing, such Designated Noteholder shall be entitled to designate two observers to the Board. "*Designated Noteholder*" means Carronade Capital Management, LP.

Duties of Managers and Officers

To the maximum extent permitted by applicable law, Topco and each limited partner will waive any claims against the General Partner, any

Manager and any limited partner, in each case, for any breach of any duties (including fiduciary duties), including as may result from a conflict of interest. Officers (other than any officer affiliated with Elliott) will have the duties of officers under Delaware law applicable to officers of corporations organized under the Delaware General Corporation Law.

**Related Party Transactions:**   Without the approval of a majority of the disinterested Managers (which, for the avoidance of doubt, shall exclude the EIM Managers), the Company may not enter into any transaction or contract with Elliott (or its controlled affiliates) with a value or cost to the Company, as the case may be, in excess of $10 million other than (a) transactions entered into in the ordinary course of business on an arms-length basis, (b) in connection with the exercise of an Investor's rights granted under the LPA and other transactions contemplated by the LPA or (c) purchases by Elliott or its affiliates of any indebtedness or debt securities issued by the Company (subject to the Company's compliance with the preemptive rights described below, if applicable). All Related Party Transactions not approved by a majority of the disinterested Managers shall be on arm's length terms no less favorable to the Company than those available from unrelated third parties. For the avoidance of doubt, such approval rights shall be in addition to any approval or consent rights provided to the Convertible Noteholders set forth in the definitive documentation governing the Convertible Notes (the "**Convertible Notes Documentation**").

**Management Delegation:**   Matters to be delegated by the Board to the chief executive officer and his or her reports will be commensurate with those customarily delegated to persons holding such positions at companies of a similar size in a similar industry and shall be pursuant to a written delegation of authority policy. All other matters concerning the business and affairs of the Company will be a decision of the Board.

**Amendments:**   In addition to the consents otherwise expressly provided for hereunder and provided to the Convertible Noteholders in the Convertible Notes Documentation, any amendment, modification, termination or waiver (however effectuated, including by merger, consolidation, division or similar transaction act or adoption of a new agreement, "**Amendment**") to any provision of the LPA or other agreements or organizational documents in which the provisions of this Term Sheet are contained or other agreements to which an Investor is party shall require the consent of (i) Elliott, (ii) each other Investor who holds Class A-1 Units and (iii) each other Investor who holds Class A-2 Units representing more than 5% of the equity interests of Topco on a fully diluted basis at such time if such Amendment (x) adversely affects any tag along right, preemptive right or any other specific right granted to such Investor or (y) adversely and disproportionately affects such Investor in its capacity as a holder of a particular class of Units relative to the rights of other Investors holding the same class of Units (without giving effect to such Investors', specific tax or economic positions, or any other matters that are personal to such Investor). Notwithstanding the foregoing, any Amendment to the LPA that adversely affects the rights of any holder of Class A-2 Units relative

4

to the other holders of Class A-2 Units shall require the written consent of such adversely affected holder.

Notwithstanding anything to the contrary but subject to the preemptive rights described below and any limitations set forth in the Convertible Notes Documentation, an Amendment made to reflect (a) the terms and conditions of any new class or series of equity securities established in accordance with the terms of the LPA (including any Amendment to reflect the exchange of Convertible Notes into convertible preferred equity as contemplated by the Convertible Notes term sheet) and any restrictions, rights, preferences and privileges associated therewith or (b) the restrictions on or rights of any person who purchases equity securities after the date hereof shall, in each case of clauses (a) and (b), require only the approval of the Board.

The foregoing consent rights will terminate upon consummation of an IPO except to the extent that Topco remains an equityholder of the IPO issuer or is the partnership in an Up-C or similar reorganization in connection with an IPO.

**Preemptive Rights:**

If Topco or any of its wholly owned subsidiaries proposes to issue (x) any new debt securities or indebtedness to Elliott or its affiliates, including in connection with an issuance to a third party in which Elliott or its affiliates participates, or (y) any new equity securities, including any securities convertible into, or exercisable or exchangeable for, equity securities, then in each case of clause (x) and clause (y), each Preemptive Rightsholder (as defined below) will have customary preemptive rights to purchase its *pro rata* share of such debt, equity or equity-like securities of the Company at the same price and on the same terms and conditions that the Company proposes to issue such securities (to maintain its ownership on a fully diluted basis), subject to customary exceptions including: (a) equity or equity-based securities issued to managers, employees, bona fide consultants and other bona fide advisors and service providers ("***Incentive Equity Grantees***") (none of which is to Elliott, any of its affiliates or any of their respective employees, or any Convertible Noteholder solely by virtue of its ownership of Convertible Notes) as compensation for services provided to the Company; (b) issuances or grants of securities in connection with any Unit split or recapitalization of Topco in which the economic and voting rights of the Units are preserved in all material respects and each holder of Units participates on a *pro rata* basis; (c) securities issued upon the exercise of outstanding convertible securities; (d) securities issued to a non-affiliated seller as consideration for the Company's purchase of stock or assets or other property of such seller; (e) securities issued to the public in an initial public offering; (f) securities issued in connection with any debt financing or other bona fide strategic partnership with a third-party commercial entity (excluding Elliott and its affiliates) for purposes related to the business of the Company (and not for the primary purposes of a financing transaction or arrangement unrelated to such business purposes); and (g) securities issued by a wholly owned subsidiary of Topco to Topco or another wholly owned subsidiary of Topco. The preemptive rights will contain a customary mechanism permitting Topco to issue equity or equity-like

securities to any person subject to the obligation to comply with the preemptive rights within a specified time period (not more than 90 days) following the closing of any such transaction. As used herein, the term "***Preemptive Rightsholder***" means each holder of Class A Units and each holder of Convertible Notes, participating pro rata on an as-converted basis (giving effect to the liquidation preference of the Convertible Notes at the time of such determination and at the valuation implied by such proposed issuance) based on the Board's good faith determination of fair market value of Class A Units (including the Convertible Notes on an as-converted basis) at such time (and <u>provided</u>, that so long as such determination is made by the Board acting in good faith, it shall be final and binding on each limited partner and each Convertible Noteholder).

Other than the related party transaction provisions, amendment provisions and the preemptive rights described above, the LPA shall not contain any restrictions or other limitations on the ability of the Company to issue additional indebtedness, debt or equity securities (including convertible and/or preferred debt or equity securities with such terms and other rights and preferences as may be determined by the Board in its sole discretion) following the Closing; <u>provided</u>, that in no event shall the Company issue equity securities for a purchase price less than fair market value as determined in good faith by the Board.

|  |  |
|---|---|
| ***Information Rights***: | For so long as any limited partner continues to hold 50% or more of the Units of each class of Units held by such limited partner as of the initial issuance date of such Units to such holder (as adjusted for any splits, combinations, equity dividends or similar actions), and subject to certain customary exceptions (e.g., not in violation of any restrictive covenants), the Company shall (a) make available to such holder quarterly and annual financial statements (in each case, together with management's written commentary, discussion and analysis of such financial statements), and (b) conduct (and invite such limited partners to attend) conference calls not less frequently than once per calendar quarter, conference calls to consist of the Company's senior management discussing the Company's financial condition and result of operations for the applicable period; provided, that no foreign investor (for purposes of CFIUS) shall be permitted access to any material non-public technical information, as that term is defined in Section 721 of the U.S. Defense Production Act of 1950, as amended, and CFIUS implementing regulations at 31 C.F.R. Part 800 (together, "***CFIUS Rules***"); nor have any involvement in any substantive decision-making, as those terms are defined in the CFIUS Rules regarding (i) the use, development, acquisition, safekeeping, or release of sensitive personal data of U.S. citizens maintained or collected by any portfolio company or (ii) the use, development, acquisition, or release of critical technologies, as that term is defined in the CFIUS Rules; and provided, further, that the Board may elect to withhold any such information from any Investor if the Board makes a good faith determination that disclosure of such information to such Investor reasonably could be expected to result in public disclosures of such information that are more likely than not to cause material harm to the Company. Without limiting the foregoing, any Investor (including any |

warrantholder) may make public disclosures of Company-related information solely to the extent (x) required by the applicable law or relevant exchange rules for the publicly listed securities of such Investor or (y) approved by the Board in advance; <u>provided</u>, that any disclosure pursuant to the immediately preceding clause (x) that discloses the financial performance of the Company shall in all events be subject to advance approval by the Board, which shall act in good faith and shall cooperate with such Investor to enable such Investor to satisfy its obligations under such applicable law or exchange rules while limiting the extent of such disclosure to the maximum reasonably possible. For the avoidance of doubt, basic tax reporting, such as an Investor's K-1 or similar form, and any reasonable information required for tax reporting and the preparation of tax returns shall be made available to each holder of Units.

The information rights described above shall inure to the benefit of each Convertible Noteholder and warrantholder, and may be satisfied by posting on a private data site accessible to such holder.

***Transfer Restrictions*:**  Prior to the occurrence of a Change of Control resulting in any equity interests of the Company becoming publicly traded or a Qualified IPO (as such terms are defined in the Convertible Notes Documentation), without the consent of the Board, no Investor shall (directly or indirectly) sell, assign, pledge, exchange, or transfer its Units in the Company to any third party, in each case other than customary permitted transfers (e.g., transfers to permitted affiliates, transfers for estate planning purposes (including with respect to the Specified Writholder, transfers of equity interests in the Specified Writholder) and transfers by (x) Elliott and its affiliates and the Dragged Investors (as defined below) in each case pursuant to the exercise of the drag-along rights described below and (y) Tag Along Investors (as defined below) pursuant to the exercise of the tag along rights described below (each, a "***Permitted Transfer***" and each such transferee of a Permitted Transfer, a "***Permitted Transferee***"); <u>provided</u>, that notwithstanding anything else to the contrary but subject to the tag-along rights described below, Elliott and its affiliates may freely transfer (directly or indirectly) the Units held by them at any time and from time to time without approval by the Company or the Board. Subject in all events to the Convertible Notes documentation, if a Convertible Noteholder transfers Convertible Notes to a third party, then concurrently with such transfer, the applicable warrantholder shall transfer to such third party a pro rata portion of the warrants held by such warrantholder (and such concurrent transfer of the warrants shall not be subject to approval by the Company or the Board); warrants shall only be transferable in connection with a transfer of the Convertible Notes. Class B Units shall be non-transferable.

Direct and indirect transfers to (a) any existing holding company owned and controlled by a limited partner, or (b) any new company formed by any limited partner for purposes of holding its Units in Topco shall be subject to the same transfer restrictions, tag along rights and other provisions applicable to direct transfers of Units.

Without limiting the foregoing, any acquirer of Units must agree to execute a joinder to the LPA and be bound by the provisions of the LPA, and to make customary representations including as to its status as a "qualified purchaser" and "accredited investor" (as defined in Rule 501 pursuant to the Securities Act of 1933, as amended).

Subject to the restrictions contained herein, no Investor shall be entitled to transfer any Units at any time unless the Board is reasonably satisfied that such transfer would not: (1) violate applicable securities laws; (2) cause Topco to become subject to the registration requirements of the Investment Company Act of 1940; (3) cause Topco to become subject to the registration requirements of Section 12(g) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***") or the reporting obligations under Section 15(d) of the Exchange Act; (4) be a non-exempt "prohibited transaction" under the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder ("***ERISA***") or the U.S. Internal Revenue Code of 1986, as amended (the "***Code***") or cause all or any portion of the assets of Topco or its subsidiaries to constitute "plan assets" under ERISA or Section 4975 of the Code; (5) cause Topco to violate the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or the Clayton Antitrust Act of 1914; (6) violate any CFIUS Rules if any proposed transferee is a "foreign person"; or (7) result in a transfer of Units to any person who is subject to sanctions or included on any Specially Designated Nationals and Blocked Persons list maintained by the United States Office of Foreign Assets Control.

| | |
|---|---|
| ***Competing Entities/Investments:*** | Subject to customary restrictions on use of the Company's confidential information, each party will acknowledge that Elliott, Oaktree, the Specified Writholder and each institutional investor holding Class A-1 Units, Convertible Note Interests and/or Convertible Notes may hold or pursue other investments that compete with the business of the Company. |
| ***Tag Along Rights:*** | Each holder of Class A Units shall have customary tag along rights solely with respect to proposed transfers of equity securities of Topco by any other holder (other than transfers pursuant to (a) a Drag-Along Transaction, (b) Permitted Transfers or (c) an IPO). In the event a limited partner desires to transfer or sell any of its Units (such selling limited partner, the "***Tag Seller***") and the applicable conditions (if any) in the prior sentence are satisfied (such transfer, a "***Tag Along Sale***"), such Tag Seller must give at least 20 days' written notice to all other holders of Class A Units (the "***Tag Along Investors***"), with such written notice specifying in reasonable detail the identity of the Proposed Transferee(s), the number of Class A Units to be transferred and the material terms and conditions of the transfer ("***Tag Along Sale Notice***"). |

The Tag Along Investors may irrevocably elect to participate in such Tag Along Sale by giving written notice of such irrevocable election to the Tag Seller within 20 days after receipt of the Tag Along Sale Notice. For each Tag Along Investor, with respect to the Class A Units to be transferred, such participation shall be *pro rata*.

Each Tag Along Investor participating in such Tag Along Sale shall transfer its Class A Units on the same terms and conditions (including, to the extent applicable, the same form and type of consideration, and in the same proportions, as is offered to Elliott).

If the Tag Along Investors have not elected to participate in the contemplated transfer before the expiration of the 20-day period after receipt of the Tag Along Sale Notice, then the Tag Seller may transfer the Class A Units specified in the Tag Along Sale Notice at a price and on other material terms no more favorable in the aggregate to the Proposed Transferee(s) thereof than specified in the Tag Along Sale Notice within a 120-day period beginning with the delivery of the Tag Along Sale Notice. If any of the Tag Seller's Class A Units are not transferred during such 120-day period, they shall be subject to the tag along procedures again before the Tag Seller can sell the Class A Units.

Notwithstanding the foregoing, no tag along rights shall apply in connection with any transfers of Class A Units made by Elliott at any time prior to the first (1st) anniversary of the Closing to one or more (x) limited partners in any fund of investment vehicle managed by Elliott funds, or any affiliate of any such limited partner, or (y) Convertible Noteholders or affiliate thereof.

For the avoidance of doubt, if a transaction (x) constitutes a Tag Along Sale and (y) results in the conversion of the Convertible Notes into Class A-2 Units in accordance with their terms, then Convertible Noteholders shall be permitted to exercise the foregoing tag along rights with respect to the Class A-2 Units issued or issuable upon conversion of the Convertible Notes.

**Drag–Along Rights:**

Elliott shall be entitled to customary drag-along rights and be entitled to drag the other Investors ("***Dragged Investors***") in order to consummate a sale of the Company to an unaffiliated third party ("***Drag-Along Transaction***").

Each Dragged Investor shall take all necessary and desirable actions in connection with the consummation of a sale of the Company (whether in such person's capacity as a limited partner, manager or otherwise) as reasonably requested by Elliott as long as the proceeds of such Drag-Along Transaction are paid proportionally with respect to the Class A-1 Units and Class A-2 Units, on a collective basis, including the right to elect to receive cash or "rollover" securities (including (a) subject to customary limitations with respect to non-competition, non-solicitation and certain other restrictive covenants, in each case, as executed by Elliott, executing and delivering any and all agreements, instruments, consents, waivers, releases and other documents in substantially the same forms and on the same terms (in each case, to the extent applicable) as executed by Elliott (including any applicable purchase agreement, stockholders agreement and/or indemnification and/or contribution agreement, with customary representations and warranties; provided, that other than with respect to indemnification obligations unique to a holder of Units (e.g., with respect to representations and warranties given by such holder with respect to such holder) which shall be borne on a several

and not joint and several basis, all such indemnification obligations shall be borne ratably among the applicable holders of Topco equity based on ownership (subject to an overall cap of the proceeds received by such Investor in connection with such sale of the Company)), (b) furnishing information and copies of documents, (c) with respect to management holders only, filing applications, reports, returns, filings and other documents or instruments with governmental entities, participating in management meetings and preparing pitchbooks and confidential information memorandums, and providing assistance with legal, accounting, tax, financial, benefits and other forms of due diligence, (d) cooperating with the Company and Elliott with such sale of the Company, (e) with respect to management holders only, agreeing to any restrictive covenants as necessary, and (f) waiving any dissenters rights, appraisal rights or similar rights in connection with such sale of the Company, and (g) bearing its *pro rata* portion of the expenses incurred pursuant to any sale of the Company; <u>provided</u>, that all such expenses shall be paid by the Company and borne by the Dragged Investors through a *pro rata* reduction on the proceeds they receive from such Drag-Along Transactions and no Dragged Investor shall be required to pay any out-of-pocket amounts (other than de minimis expenses) in connection with any Drag-Along Transactions.

For the avoidance of doubt, no limited partner other than Elliott shall have the right to force a sale of the Company, IPO or similar exit transaction with respect to the Company.

| | |
|---|---|
| ***IPO***: | In the event that the Board approves an IPO, including any related Recapitalization Transaction (as described below), the Investors shall be required to cooperate and take all necessary or desirable actions in connection with the consummation of the IPO as determined by the Board, subject to customary protections, including that each Investor (including, for the avoidance of doubt, each Convertible Noteholder with respect to Class A-2 Units received upon conversion thereof) will participate ratably with Elliott in the IPO and on the same terms and conditions as Elliott and otherwise as set forth in Recapitalization Transaction below. |
| ***Recapitalization Transaction***: | Prior to but subject to consummation of an IPO, if the Board determines to effect a transaction in which one or more classes or series of Units or other equity securities issued by Topco or any of its direct or indirect subsidiaries are, in whole or in part, on a *pro rata* basis among all holders of such securities, converted into, or exchanged for, Interests or other equity securities issued by (a) Topco or any of its direct or indirect subsidiaries, (b) any newly formed holding company or subsidiary of Topco and/or (c) any affiliated person of Topco, in each case in connection with effecting an IPO (a "***Recapitalization Transaction***"), each Investor of Topco will exchange or convert its *pro rata* amount of such Units or other equity securities of Topco held by such Investor, and each such Investor shall receive its *pro rata* amount of the same securities and other consideration in respect of each such equity security exchanged or converted except for immaterial differences, if any, arising from the |

10

respective rights of the underlying converted or exchanged equity securities and/or the respective rights of each of the Investors set forth in this Term Sheet; provided that for the avoidance of doubt, any securities exchanged in respect of Class A-2 Units, Convertible Note Interests and/or Convertible Notes shall in each case provide the same rights and economic equivalent entitlements as such underlying converted or exchanged security other than in respect of immaterial differences. Such IPO shall occur promptly following the consummation of such Recapitalization Transaction and, if such IPO is not consummated within 120 days (or such longer period as Elliott may agree to, subject in all events to the Board's continued pursuit of such IPO) following such Recapitalization Transaction, then, at Elliott's sole discretion, such Recapitalization Transaction shall immediately be unwound.

***Registration Rights*:**    The LPA will provide for (i) customary piggyback registration rights in connection with an IPO for each holder of equity of the IPO entity and (ii) customary post-IPO demand registration rights in favor of the holders of a majority of the Class A-2 Units (or equity of the IPO entity received in exchange therefor) received upon conversion of Convertible Notes held by Convertible Noteholders other than those affiliated with Elliott.

***Corporate Opportunities*:**    The organizational documents of Topco will include customary waivers of the corporate opportunities doctrine as it applies to Elliott, Oaktree, the Specified Writholder, each institutional investor holding Class A-1 Units, Convertible Note Interests and/or Convertible Notes and each of their respective affiliates and all of their respective designees and nominees, in each case, subject to customary restrictions on use of the Company's confidential information.

***Indemnification; D&O Insurance*:**    The Company will obtain and maintain customary directors' and officers' liability insurance (as approved by the Board) to be in effect at all times.

The organizational documents of the Company will contain exculpation and indemnification rights for managers, directors and officers to the maximum extent allowable under applicable law.

***Confidentiality*:**    Customary confidentiality provisions, subject to customary exceptions.

Subject in all events to the prior written consent of the Board, and the execution and delivery by each prospective transferee of a confidentiality agreement in form and substance reasonably acceptable to the Company, a limited partner shall be permitted to disclose certain confidential information to prospective investors in connection with a contemplated sale of some or all of the Units held by such limited partner.

***Documentation*:**    The terms of the Units and the governance terms described herein will be documented in a limited partnership agreement of Topco (the "*LPA*") containing the terms described herein. The LPA shall provide that each Convertible Noteholder is a third-party beneficiary of the LPA, entitled to enforce the terms of the LPA directly against Topco and the other parties thereto, with all rights and remedies at law and equity. The initial draft of the LPA will be prepared by Elliott's legal counsel.

***Governing Law; Jurisdiction*:**  This Term Sheet shall be governed and construed in accordance with the laws of the State of Delaware applicable to contracts to be made and performed entirely therein without giving effect to the principles of conflicts of law thereof or of any other jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or for recognition or enforcement of any judgment relating thereto, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal court of the United States of America sitting in the State of Delaware), (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and any appellate court from any thereof, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and (d) waives, to the fullest extent it may legally and effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware). Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

*Execution Version*

## AMENDMENT TO COMMITMENT LETTER

This AMENDMENT TO COMMITMENT LETTER (this "***Amendment***"), dated as of August 22, 2025 (the "***Amendment Effective Date***"), is entered into by and between Amber Energy Inc., a Delaware corporation ("***Amber Energy***") and Rusoro Mining Ltd., a British Columbia corporation ("***Rusoro***"). Amber Energy and Rusoro are referred to herein as the "***Parties***" and each, a "***Party***". Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to them in the Commitment Letter (as defined below).

## RECITALS

WHEREAS, the Parties previously entered into that certain Commitment Letter dated as of August 11, 2025 (the "***Commitment Letter***"); and

WHEREAS, in accordance with Section 17 of the Commitment Letter, the Parties desire to amend the Commitment Letter as set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as set forth below.

1.   **Amendment**. As of the Amendment Effective Date, the Commitment Letter is hereby amended as follows:

(a)   Section 1 of the Commitment Letter is hereby amended and restated in its entirety to read as follows:

"1.   <u>Rusoro Claim Treatment</u>. On the Closing Date, if (x) the United States District Court for the District of Delaware (the "***Court***") enters a sale order approving Amber Energy as the purchaser of the shares of PDVH and (y) the Closing occurs, then, at the Closing, Rusoro shall accept, in exchange for extinguishing the Rusoro Claim, Convertible Notes (as such term is defined in the term sheet attached hereto as **Exhibit A**, and also including, for the avoidance of doubt, the penny warrants described in such term sheet and in the governance term sheet attached hereto as **Exhibit B** (the "***Warrants***")) issued by CITGO Petroleum Corporation, a Delaware corporation, in an aggregate principal amount equal to $650,000,000 (the "***Non-Cash Consideration***"), which Convertible Notes issued to Rusoro shall include its *pro rata* share of all Warrants allocated to holders of the Convertible Notes, and $400,000,000 in cash consideration (the "***Cash Consideration***"); <u>provided</u>, that the Cash Consideration shall be increased by the maximum amount of expense reimbursement allowed to increase the aggregate recovery under the TSA (as defined below) (<u>i.e.</u>, $60,000,000) <u>less</u> the expense reimbursement actually incurred and provided for thereunder (<u>provided</u>, that if the actual incurred and provided expense reimbursement under the TSA equals or exceeds $60,000,000 then the amount determined under this clause (b) shall equal zero ($0)). The Non-Cash Consideration and the Cash Consideration shall each be earned, due, and payable on the Closing Date at the Closing. In exchange for the Non-Cash Consideration and the Cash Consideration, Rusoro agrees to extinguish all of the Rusoro Claim upon payment of the Non-Cash Consideration and

the Cash Consideration, in each case on the terms contemplated under this Commitment
Letter, on the Closing Date.

   a.   Adjustments to Non-Cash Consideration and Cash Consideration.  In the event that
        Amber Energy elects to reduce the size of the Convertible Notes issuance at the
        Closing, the Non-Cash Consideration shall be adjusted downward by $17.81, and
        the Cash Consideration adjusted upward by $17.81, for each $100 of reduction in
        the size of the Convertible Notes issuance; provided, that for the avoidance of
        doubt, in such a reduction in size of the Convertible Notes issuance at the Closing,
        Rusoro's pro rata share of all Convertible Notes (and the Warrants issued in
        connection therewith) shall remain unchanged (it being understood that, in the
        event of an increase in the size of the Convertible Notes issuance at the Closing,
        Rusoro's pro rata share shall be diluted on a pro rata basis).

   b.   Transaction Support Agreement. The Parties acknowledge and agree that Rusoro's
        obligations under this Agreement shall be subject in all events to the requirement
        that Amber Energy submit a Bid (including by supplementing a Bid) that includes
        a transaction support agreement (a "*TSA*") signed by holders of Petróleos de
        Venezuela, S.A.'s 8.50% senior secured notes due in 2020 (the "*2020 Bonds*")
        representing more than two-thirds of the outstanding principal amount of 2020
        Bonds (the "*Consenting 2020 Holders*"), with such TSA to provide that, effective
        upon the Closing, each Consenting 2020 Holder shall transfer, convey, and assign
        to Amber Energy (or its designee) all of the 2020 Bonds held by such Consenting
        2020 Holder, in each case, in exchange for cash and/or non-cash consideration;
        provided, for the avoidance of doubt, that such TSA shall reflect the agreement-in-
        principle with the Consenting 2020 Holders as of the date of this Agreement,
        consisting of (x) $2,065,000,000 in cash plus (y) up to $60,000,000 in expense
        reimbursement."

   2.   **Effect of Amendment**.  Except to the extent specifically modified herein, the
Commitment Letter shall continue in full force and effect, enforceable in accordance with its terms.
Except as expressly set forth herein, this Amendment is not a consent to any waiver or modification
of any other terms or conditions of the Commitment Letter or any of the instruments or documents
referred to in the Commitment Letter and shall not prejudice any right or rights which the Parties
may now or hereafter have under or in connection with the Commitment Letter or any of the
instruments or documents referred to therein.  After the Amendment Effective Date, any reference
to the Commitment Letter shall mean the Commitment Letter as amended hereby.

   3.   **Governing Law**.  This Amendment will be governed by and construed under the
laws of the State of New York, without regard to conflicts of laws principles that would cause the
application of the laws of any jurisdiction other than the State of New York.  Each of the Parties
consents to the exclusive jurisdiction of any state or federal court located in New York, New York,
in the event of any litigation arising out of, in connection with or with respect to, this Amendment.

   4.   **Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY
WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING,
CROSS CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON

CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AMENDMENT.

      5.     **Amendments**.  Any provision of this Amendment may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Amendment, or in the case of a waiver, by the Party against whom the waiver is to be effective.

      6.     **Counterparts**.  This Amendment may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same agreement.

      7.     **Confidentiality**.  The terms and conditions of this Amendment, including its existence, and the discussions related hereto, are subject to the terms of that certain Mutual Confidentiality Agreement, dated as of June 18, 2025, by and among Elliott Investment Management L.P. and Rusoro.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed as of the Amendment Effective Date.

**AMBER ENERGY INC.**

By: _____

Name: Elliot Greenberg

Title: Vice President

**RUSORO MINING LTD.**

By: _____

Name: Gordon Keep

Title: Authorized Signatory

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed as of the Amendment Effective Date.

**AMBER ENERGY INC.**

By: _____
Name:
Title:

**RUSORO MINING LTD.**

By: _____
Name:    Gordon Keep
Title:    Authorized Signatory

# D-2

*Execution Version*
**CONFIDENTIAL**

<u>**SUPPORT AGREEMENT**</u>

This **SUPPORT AGREEMENT** (this "***Support Agreement***") is made as of this 11th day of August, 2025 (the "***Effective Date***"), by and among (i) Amber Energy Inc., a Delaware corporation (together with its Affiliates, "***Amber Energy***"), (ii) Koch Minerals Sàrl ("***Koch Minerals***"), and (iii) Koch Nitrogen International Sàrl ("***Koch Nitrogen***" and, together with Koch Minerals, the "***Koch Parties***" and each individually, a "***Koch Party***"). Amber Energy and each Koch Party may be referred to individually as a "***Party***" and together as the "***Parties***."

**WHEREAS**, in accordance with the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (as amended, modified, supplemented or superseded, the "***Bidding Procedures Order***"), dated October 4, 2022, in the case of *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del.), Amber Energy has submitted a bid (as modified from time to time in accordance with the terms hereof, the "***Bid***") to acquire from Petroleos de Venezuela, S.A. 100% of the common shares of PDV Holding, Inc. ("***PDVH***"; such acquisition is referred to herein as the "***PDVH Transaction***");

**WHEREAS**, each Koch Party owns an Attached Judgment (as defined in the Bidding Procedures Orders) (each, a "***Koch Claim***" and collectively, the "***Koch Claims***");

**WHEREAS**, in connection with the evaluation and possible negotiation and documentation of the Bid, the Parties wish to memorialize the terms and conditions under which Koch will accept the Cash Consideration (as defined below) and the Non-Cash Consideration (as defined below) in exchange for the extinguishment of the Koch Claims should the Bid be named the Successful Bid (as defined in the Bidding Procedures Order) (the extinguishment of such Koch Claims is referred to as the "***Transaction***;" the consummation of the PDVH Transaction as contemplated by the Bid is referred to as the "***Closing***;" and the date on which the Closing occurs is referred to as the "***Closing Date***").

**NOW**, **THEREFORE**, unless or until this Support Agreement has been terminated in accordance with the terms hereof, the Parties hereby agree as follows:

1. <u>Koch Claims</u>. In the event that (x) the United States District Court for the District of Delaware (the "***Court***") enters a sale order approving Amber Energy as the purchaser of the shares of PDVH and (y) the Closing occurs, then, at the Closing, the Koch Parties shall accept, in exchange for extinguishing the Koch Claims, Convertible Notes (as such term is defined in the term sheet attached hereto as **Exhibit A**, which Amber Energy confirms is substantially identical to the term sheet attached as Exhibit B to the commitment letter(s) delivered by the Initial Holders referred to therein) issued by CITGO Petroleum Corporation, a Delaware corporation, in an aggregate principal amount equal to $150,000,000, which Convertible Notes issued to the Koch Parties shall include their respective *pro rata* shares of the penny warrants described in such term sheet and in the governance term sheet attached hereto as **Exhibit B**, which Amber Energy confirms is substantially identical to the term sheet attached as Exhibit D to the commitment letter(s) delivered by the Initial Holders referred to therein (the "***Warrants***"), allocated to holders of the Convertible Notes (the Convertible Notes and the Warrants are referred to collectively as the "***Non-Cash Consideration***") and $0.00 in aggregate cash consideration (the "***Cash Consideration***"). The Non-Cash Consideration and the Cash Consideration shall each be earned, due, and payable on the Closing Date at the Closing. In exchange for the Non-Cash Consideration and the Cash Consideration, each Koch Party agrees to extinguish its respective Koch Claim in full on the Closing Date, in each case on the terms contemplated under this Support Agreement. The Parties

acknowledge and agree that the obligations of the Koch Parties hereunder are several, not joint and several, and the rights and obligations of each Koch Party hereunder apply solely with respect to (and to the extent of) the applicable Koch Claim held by such Koch Party. For the purposes of the term sheets attached hereto as **Exhibit A** and **B**, the Parties agree and acknowledge that the Koch Parties are a "Specified Writholder" as such term is used therein.

    a.   <u>Adjustments to Non-Cash Consideration and Cash Consideration</u>. In the event that Amber Energy elects in its sole discretion to reduce the size of the Convertible Notes issuance at the Closing, the aggregate Non-Cash Consideration shall be adjusted downward by $4.11, and the aggregate Cash Consideration adjusted upward by $4.11, for each $100 of reduction in the size of the Convertible Notes issuance; <u>provided</u>, that for the avoidance of doubt, in such a reduction in size of the Convertible Notes issuance at the Closing, the Koch Parties' *pro rata* share of all Convertible Notes (and the Warrants issued in connection therewith) shall remain unchanged. In the event that Amber Energy elects in its sole discretion to increase the size of the Convertible Notes issuance at the Closing, the Koch Parties' respective allocations of the Convertible Notes and Warrants shall be diluted on a *pro rata* basis.

    b.   <u>Bid Materials</u>. The Parties acknowledge and agree that each Koch Party's obligation under this Support Agreement shall be subject in all events to the requirement that Amber Energy submit a Bid (including by supplementing a Bid). The Koch Parties shall have a consent right over amendments, waivers or modifications to the Bid (including any supplemental Bid) or the transactions contemplated thereby if (and only if) any such amendment, waiver, or modification would reasonably be expected to disproportionately affect the Koch Parties in an adverse manner in their capacities as holders of Convertible Notes or Warrants as of the Closing or otherwise impair the Koch Parties' rights under this Support Agreement.

    c.   <u>Consent Rights</u>. The Koch Parties shall have a consent right over amendments, waivers, or modifications to the stock purchase agreement by and between the Special Master and Amber Energy with respect to the PDVH Transaction (the "***Stock Purchase Agreement***") or any other transaction-related documentation in connection with any topping or competing bid submitted by a third party seeking to acquire the common shares of PDVH if (and only if) any such amendment, waiver, or modification would reasonably be expected to disproportionately affect the Koch Parties in an adverse manner in their capacities as a holder of Convertible Notes or Warrants as of the Closing or otherwise impair the Koch Parties' rights under this Support Agreement.

    d.   <u>Transaction Support Agreement</u>. The Parties acknowledge and agree that each Koch Party's obligation under this Agreement shall be subject in all events to the requirement that the Bid (including any amendment, modification or supplement thereto) includes a transaction support agreement (a "***TSA***") signed by holders of Petróleos de Venezuela, S.A.'s 8.50% senior secured notes due in 2020 (the "***2020 Bonds***") representing more than two-thirds of the outstanding principal amount of 2020 Bonds (the "***Consenting 2020 Holders***"), with such TSA to provide that, effective upon the Closing, each Consenting 2020 Holder shall transfer, convey, and assign to Amber Energy (or its designee) all of the 2020 Bonds held by such Consenting 2020 Holder, in each case, in exchange for cash and/or non-cash consideration. The Koch Parties shall have a consent right over amendments, waivers or modifications to the TSA or the transactions contemplated thereby if (and only if) any such amendment, waiver, or modification would reasonably be expected to disproportionately affect the Koch Parties in an adverse manner in their capacities as

holders of Convertible Notes or Warrants as of the Closing or otherwise impair the Koch Parties' rights under this Support Agreement.

2. <u>Efforts</u>. The Parties shall each use all commercially reasonable efforts to cause the transactions contemplated by this Support Agreement to be consummated on the terms contemplated by this Support Agreement and use commercially reasonable efforts to promptly notify the Special Master of the execution of this Support Agreement and take any commercially reasonable action requested by the Special Master in connection therewith; provided, however, that the foregoing shall not restrict or inhibit the ability of the Koch Parties to participate in one or more alternative transactions with respect to the acquisition of PDVH or the shares of PDVH (an "***Alternative Bid***") (and Amber Energy expressly acknowledges that (a) the Koch Parties have agreed to participate in such an Alternative Bid by Dalinar Energy Corporation (a subsidiary of Gold Reserve Ltd.) and (b) nothing in this Support Agreement shall be deemed to (i) restrict or inhibit the ability of the Koch Parties to continue to participate in such an Alternative Bid or require the Koch Parties to breach any agreement in effect as of the date hereof among the Koch Parties, Dalinar Energy and/or the other members of the consortium participating in such Alternative Bid, or (ii) obligate the Koch Parties to file any pleading, provide any testimony, or otherwise take any position in court (including that the Koch Parties support Amber Energy's Bid over any Alternative Bid or that the Koch Parties believe that Amber Energy's Bid is superior to any other submitted bid for reasons including, without limitation, closing certainty). Without limiting the foregoing, the Koch Parties shall not file or cause to be filed any motion, objection, pleading, or other document with the Court, or otherwise communicate to the Special Master or the Court, that, indicates that the Koch Parties support an Alternative Bid (including the Stalking Horse Bid, the bid selected in the Special Master's Final Recommendation, and any other bid recommended by the Special Master) over Amber Energy's Bid or that the Koch Parties believe that any Alternative Bid (including the Stalking Horse Bid, the bid selected in the Special Master's Final Recommendation, and any other bid recommended by the Special Master) is superior to Amber Energy's bid for any reason. Neither the immediately preceding sentence, nor anything else in this Support Agreement, shall require the Koch Parties to accept any consideration in respect of the Koch Claims (or any portion thereof) other than consideration that is (a) in the forms described in <u>Section 1</u> above, as modified pursuant to <u>Section 1.a)</u> and <u>Section 1.b)</u> above and (b) in the amounts contemplated by this Support Agreement. Amber Energy will keep the Koch Parties reasonably informed about communications or events regarding the PDVH Transaction.

3. <u>Representations and Warranties Regarding the Koch Parties</u>. As a material inducement to Amber Energy to execute and perform its obligations under this Support Agreement, each Koch Party represents and warrants to Amber Energy solely as to itself and on a several and not a joint and several basis as follows:

   a. **Organization; Authority; Enforceability**. Such Koch Party is a société à responsabilité limitée duly formed, validly existing, and in good standing under the laws of Switzerland. Such Koch Party has the power, authority, and capacity to execute, deliver, and perform its obligations under this Support Agreement and related documents (the "***Koch Documents***"). The execution, delivery, and performance of the Koch Documents by such Koch Party have been duly authorized, and upon execution and delivery at the Closing, these agreements will be enforceable according to their terms, subject to limitations imposed by bankruptcy, insolvency, reorganization, moratorium, or other Laws affecting creditors' rights generally, and general equitable principles.

   b. **Title to Koch Claims**. The applicable Koch Party has sole and exclusive ownership of the Koch Claim held by it and related rights, free from any Liens. There are no agreements that

3

would prohibit such Koch Party's performance under this Support Agreement if Amber Energy consummates the PDVH Transaction on the terms contemplated by this Support Agreement. Such Koch Party possesses the power, authority, and legal capacity to the contribute to Amber Energy, or otherwise extinguish, the Koch Claim held by it on the terms contemplated by this Support Agreement. The Koch Parties hereby represent and warrant with respect to the Koch Claims that (i) the aggregate judgment principal, inclusive of award, pre-award interest, costs, and fees, but excluding post-award interest, is $387,212,536.30, (ii) as of May 31, 2025, such Koch Claims have accrued approximately $78,222,042.94 in post-award interest, and (iii) assuming a Closing Date of December 31, 2025, the aggregate amount of the Koch Claims is estimated to total approximately $468,387,418.29.

c.   **No Violation; Consents**. None of the actions taken by such Koch Party under this Support Agreement or any other Koch Document will result in a violation of organizational documents, Law, Order, or any Contract to which such Koch Party is a party. No consent or approval from any Person or Governmental Body is required for the execution and delivery of this Support Agreement or any Koch Documents by such Koch Party. No representation or warranty is given regarding the Laws, Orders, or Permits of the Bolivarian Republic of Venezuela.

d.   **Legal Proceedings**. Aside from Venezuela's objections to the PDVH Transaction, there are no pending or known threatened Legal Proceedings against the Koch Parties that challenge the validity of the Koch Claims or seek to hinder performance under this Support Agreement. Such Koch Party is not bound by any Order related to the Koch Claim held by it or the related transferred rights, nor are there unsatisfied judgments, penalties, or awards against such Koch Party relating to the Koch Claims.

e.   **Solvency**. Such Koch Party is Solvent as of the date of this Support Agreement. As used in this Support Agreement, "***Solvent***" means, when used with respect to any Person, that, as of any date of determination, (i) the fair value of the assets of such Person and its subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, contingent, subordinated, or otherwise, of such Person and its subsidiaries on a consolidated basis, (ii) the present fair salable value of the property of such Person and its subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of such Person and its subsidiaries on a consolidated basis on their debts and liabilities as they become absolute and matured, (iii) such Person and its subsidiaries on a consolidated basis will be able to pay their debts and liabilities, subordinated, contingent, or otherwise, as they become absolute and matured and become due in the usual course of their affairs, and (iv) such Person and its subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the business in which they are engaged as such businesses are now conducted and proposed to be conducted following the Closing Date.

4.   <u>Representations and Warranties of Amber Energy</u>. As a material inducement to the Koch Parties to execute and perform their respective obligations under this Support Agreement, Amber Energy represents and warrants to the Koch Parties as follows:

a.   **Organization; Authority**. Amber Energy is a corporation duly incorporated, validly existing, and in good standing under the laws of Delaware. Amber Energy has the power, authority, and capacity to execute, deliver, and perform under this Support Agreement and related documents (collectively, the "***Amber Energy Documents***"). The execution,

delivery, and performance by Amber Energy have been duly authorized, and upon execution and delivery at the Closing, these agreements will be enforceable according to their terms, subject to limitations imposed by bankruptcy, insolvency, reorganization, moratorium, or other Laws affecting creditors' rights generally, and general equitable principles.

b. **No Violation**. None of the actions taken by Amber Energy under this Support Agreement or any Amber Energy Document will result in a violation of Amber Energy's organizational documents, Law, Order, or any Contract to which Amber Energy is a party. No consent or approval from any Person or Governmental Body is required for the execution and delivery of this Support Agreement or any Amber Energy Document by Amber Energy.

c. **Legal Proceedings**. Apart from Venezuela's objections to the PDVH Transaction, there are no pending or known threatened Legal Proceedings against Amber Energy that could impair performance under this Support Agreement.

d. **Solvency**. Amber Energy and any designee is Solvent as of the date of this Support Agreement, and will be Solvent as of the Closing Date and immediately after the transactions contemplated hereby.

e. **Commitment Letters**. As of the execution of the Stock Purchase Agreement and thereafter, Amber Energy shall have committed debt and equity financing (as evidenced by fully executed debt and equity financing commitment letters, which shall have been provided to the Koch Parties on the date of the execution of the Stock Purchase Agreement) sufficient to consummate the PDVH Transaction and the Closing.

5. <u>Conditions Precedent to Obligations of the Parties</u>. The respective obligations of each of the Parties to consummate the Transaction are subject to the satisfaction, on or prior to the Closing, of the following condition: the PDVH Transaction has been consummated by Amber Energy substantially simultaneously with the Closing.

6. <u>Conditions Precedent to Obligations of Amber Energy</u>. The obligations of Amber Energy to consummate the Transaction are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by Amber Energy in whole or in part to the extent permitted by applicable Law):

a. the representations and warranties in <u>Section 3</u> shall be true and correct in all material respects as of the date of this Support Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date); and

b. the Koch Parties shall have performed and complied with in all material respects all of the covenants, obligations, and agreements hereunder required to be performed or complied with by the Koch Parties prior to the Closing.

7. <u>Conditions Precedent to Obligations of the Koch Parties</u>. The obligations of the Koch Parties to consummate the Transaction are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Koch Parties in whole or in part to the extent permitted by applicable Law):

     a.  the representations and warranties in <u>Section 4</u> shall be true and correct in all material respects as of the date of this Support Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date); and

     b.  Amber Energy shall have performed and complied with in all material respects all of the covenants, obligations, and agreements hereunder required to be performed or complied with by Amber Energy prior to the Closing Date.

8.  <u>Definitive Documents</u>. Each Party hereby agrees to negotiate in good faith the definitive form of, and execute, where applicable, any documents, deeds, agreements, filings, notifications, letters, and instruments (collectively, the "***Definitive Documents***") reasonably required or desirable in order to implement the Koch Claims treatment provided for hereunder. The Definitive Documents shall be reasonably acceptable to each Party.

9.  <u>Term and Termination</u>. This Support Agreement may be terminated (a) by either Party, if a TSA is not entered into within 10 calendar days of this Support Agreement, (b) by either Party, upon termination of the TSA, (c) by Amber Energy, by prior written notice to the Koch Parties, if there shall have been a breach by any Koch Party of any of its representations, warranties, covenants, or agreements contained in this Support Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Sections 5</u> or <u>6</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to thirty (30) calendar days after providing written notice of such breach to the Koch Parties; <u>provided</u>, that Amber Energy shall not have the right to terminate this Support Agreement pursuant to this <u>Section 9(c)</u> if Amber Energy is then in breach of this Support Agreement and such breach would result in the failure of any of the conditions set forth in <u>Sections 5</u> or <u>7</u>, (d) by the Koch Parties, by prior written notice to Amber Energy, if there shall have been a breach by Amber Energy of any of its representations, warranties, covenants, or agreements contained in this Support Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Sections 5</u> or <u>7</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to thirty (30) calendar days after providing written notice of such breach to Amber Energy; <u>provided</u>, that the Koch Parties shall not have the right to terminate this Support Agreement pursuant to this <u>Section 9(d)</u> if either Koch Party is then in breach of this Support Agreement and such breach would result in the failure of any of the conditions set forth in <u>Sections 5</u> or <u>6</u>, (e) by either Party, upon the occurrence of the date on which the Court enters a sale order approving as the purchaser of the shares of PDVH a party other than Amber Energy, or (f) by either Party, upon the occurrence of the valid termination of the Stock Purchase Agreement.

10.  <u>Effect of Termination</u>. In the event that this Support Agreement is validly terminated in accordance with <u>Section 9</u>, this Support Agreement shall immediately become null and void and Amber Energy and the Koch Parties shall be relieved of their duties and obligations arising under this Support Agreement after the date of such termination and such termination shall be without liability to the Koch Parties or Amber Energy, respectively; <u>provided</u>, that the provisions of <u>Sections 10</u> through <u>20</u> hereof shall survive any such termination and remain valid and binding obligations of Amber Energy and the Koch Parties; <u>provided</u>, <u>further</u>, that no Party shall be relieved of liability to the extent such termination shall result from the fraud or any breach of this Support Agreement by a Party prior to termination.

11. <u>Confidentiality</u>. The terms and conditions of this Support Agreement, including its existence, and the discussions related hereto, are subject to the terms of that certain Confidentiality Agreement, dated July 11, 2024, by and among Elliott Investment Management L.P. and the Koch Parties.

12. <u>Governing Law; Venue; Waiver of Jury Trial</u>. This Support Agreement will be governed by and construed under the laws of the State of New York, without regard to conflicts of laws principles that would cause the application of the laws of any jurisdiction other than the State of New York. Each of the Parties consents to the exclusive jurisdiction of any state or federal court located in New York, New York, in the event of any litigation arising out of, in connection with or with respect to, this Support Agreement. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS SUPPORT AGREEMENT.

13. <u>Equitable Relief; Injunctions; Specific Performance; Damages</u>. The Parties agree that irreparable harm would occur, and that monetary damages would not be a sufficient remedy, in the event that the terms and provisions of this Support Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each Party agrees, on behalf of itself and its Affiliates, that the other Party shall be entitled to injunctive relief (without posting a bond or other security), including an injunction or injunctions to prevent any continuing breach or violation of the terms and provisions of this Support Agreement, and the remedy of specific performance to enforce specifically the terms and provisions hereof. The foregoing remedies shall not be deemed to be the exclusive remedy for any breach or violation of this Support Agreement, but shall instead be in addition to any and all other remedies to which such Party may be entitled at law or in equity. The Parties acknowledge and agree that, with respect to any claim arising out of, in connection with or with respect to, this Support Agreement, in no event shall either Party be liable to the other Party for any special, indirect, incidental, consequential, or punitive damages, including, but not limited to, loss of business, loss of profits, or loss of revenue, whether based on contract, negligence, tort, or any other legal theory, regardless of whether advised of the possibility of such damages and irrespective of the number or nature of claims.

14. <u>Severability</u>. If any provision of this Support Agreement shall be determined by a court of competent jurisdiction to be void or unenforceable in any jurisdiction, the validity and effectiveness of such provision in any other jurisdiction, and the validity and effectiveness of the remaining provisions, shall not be affected.

15. <u>Transfer of Claims</u>. Each Koch Party hereby agrees that, prior to the valid termination of this Support Agreement pursuant to <u>Section 9</u>, it shall not Transfer any of the Koch Claims or associated rights (other than to an Affiliate of the Koch Parties to which it also assigns this Support Agreement and all of its rights and obligations hereunder), and that any such Transfer shall be void *ab initio*.

16. <u>Expenses</u>. Except as herein otherwise provided, the Koch Parties and Amber Energy shall bear their respective direct and indirect expenses incurred in connection with the negotiation, preparation, execution, and performance of this Support Agreement and the transactions contemplated hereby, including all fees and expenses of their respective Representatives.  Amber Energy shall bear the full direct and indirect expenses incurred in connection with the negotiation, preparation, execution, and performance of the Bid, the Stock Purchase Agreement and the transactions contemplated thereby, including all fees and expenses of its Representatives in connection therewith.

17. <u>Amendments; Waivers</u>. Any provision of this Support Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Support Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

18. <u>Miscellaneous</u>. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. This Support Agreement may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same agreement. A person who is not a Party to this Support Agreement shall have no right to enforce any term of this Support Agreement. No Party shall assign this Support Agreement or any of such Party's rights or obligations hereunder without the prior written consent of the other Party, except that any Koch Party may assign this Support Agreement and its rights and obligations hereunder to any Affiliate thereof to which it transfers its Koch Claim in accordance with Section 15. This Support Agreement (together with the confidentiality obligations between the Parties) constitutes the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes and preempts all prior understandings, agreements (written or oral), representations, and/or discussions that may have related to the subject matter hereof in any way. The headings and captions used in this Support Agreement are used for convenience only and are not to be considered in construing or interpreting this Support Agreement.

19. <u>Remedies Not Exclusive</u>. Unless otherwise expressly stated in this Support Agreement, no right or remedy described or provided in this Support Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Support Agreement, at Law or in equity.

20. <u>Non-Recourse</u>. Except as expressly provided herein or permitted or imposed by applicable Law, no past, present, or future director, officer, employee, incorporator, stockholder, member, partner, equity holder, Affiliate, agent, attorney, or Representative of Amber Energy or the Koch Parties or any of their respective Affiliates shall have any liability for any obligations or liabilities of Amber Energy or the Koch Parties, respectively, under this Support Agreement, any Koch Documents or any Amber Energy Documents, respectively, or for any claim based on, in respect of or by reason of the transactions contemplated hereby and thereby.

*[Remainder of This Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties hereto have executed this Support Agreement as of the day and year first above written.

**AMBER ENERGY INC.**

By: _____

Name:   Elliot Greenberg

Title:   Vice President and Secretary

**KOCH MINERALS SÀRL**

By: _____

Name:   Matthew Vermeeren

Title:   Manager

**KOCH NITROGEN INTERNATIONAL SÀRL**

By: _____

Name:   Matthew Vermeeren

Title:   Manager

[Signature Page to Support Agreement]

IN WITNESS WHEREOF, the Parties hereto have executed this Support Agreement as of the day and year first above written.

**AMBER ENERGY INC.**

By: _____
Name:
Title:

**KOCH MINERALS SÀRL**

By: _____
Name:    Matthew Vermeeren
Title:    Manager

**KOCH NITROGEN INTERNATIONAL SÀRL**

By: _____
Name:    Matthew Vermeeren
Title:    Manager

# ANNEX A

## CERTAIN DEFINITIONS

1.    "***Affiliate***" means, with respect to a specified Person, any other Person or member of a group of Persons acting together that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified Person.

2.    "***Contract***" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, purchase order, task order, commitment or other arrangement, understanding, undertaking, commitment, or obligation, whether oral or written.

3.    "***control***" (including the terms "controlling," "controlled by," and "under common control with") means the possession, whether direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

4.    "***Governmental Body***" means any competent government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign or domestic, federal, state, or local or any legislature, agency, bureau, branch, department, division, commission, quasi-governmental body, or other instrumentality or authority thereof, or any court, tribunal, justice, or arbitrator (public or private).

5.    "***Law***" means any foreign, federal, state, or local law (including common law), constitution, convention, statute, code, ordinance, rule, regulation, treaty, Order, or other requirement that is enacted, adopted, promulgated, or applied by any Governmental Body.

6.    "***Legal Proceeding***" means any judicial, administrative or arbitral action, petition, pleas, charge, complaint, suit, demand, litigation, arbitration, mediation, hearing, investigation, inquiry, proceeding, or claim (including any counterclaim) by or before a Governmental Body.

7.    "***Lien***" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, reservation, lease, sublease, license, conditional sale or other title retention agreement, preemptive right, community property interest, collateral assignment, infringement charge, option, warrant, right of first refusal, easement, right of way, servitude, proxy, voting trust or agreement, transfer restriction under any equity holder or similar agreement (including, without limitation, any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise or transfer or any other restriction attributable of ownership of any asset), encumbrance, or any other restriction or limitation whatsoever.

8.    "***Order***" means any order, decision, verdict, injunction, judgment, decree, ruling, writ, subpoena, mandate, precept, command, directive, consent, approval, award, assessment, or arbitration award of a Governmental Body.

9.    "***Permit***" means any permit, license, certificate, authorization, approval, waiver, registration, accreditation, quality certification, franchise, or right issued or granted by any Governmental Body.

10.    "***Person***" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, limited liability partnership, joint venture, estate, trust, association, organization, Governmental Body, or other entity of any kind or nature.

11.     "***Representatives***" means, with respect to any Person, such Person's Affiliates and its and their respective equityholders, financing sources, officers, directors, managers, employees, agents, advisors (including investment bankers and financial advisors), attorneys, accountants, and other representatives.

12.     "***Transfer***" means to (a) sell, transfer, assign, hypothecate, pledge, or otherwise dispose of, directly or indirectly, any right, title, participation, or interest in or with respect to any claim, in whole or in part, or (b) deposit any claim into a voting trust, or to grant a proxy or enter into a voting agreement with respect to any claim.

## EXHIBIT A

**Convertible Note Financing**

**Summary of Principal Terms and Conditions**

**(Attached.)**

Project Horizon[1]
Convertible Note Financing
Summary of Principal Terms and Conditions

| | |
|---|---|
| Issuer: | CITGO Petroleum Corporation, a Delaware corporation (the "***Issuer***"). |
| Transactions: | As set forth in Exhibit A to the Commitment Letter. |
| Administrative Agent and Collateral Agent: | [●] or an affiliate, designee, or sub-agent thereof (in such capacity, the "***CN Agent***").[2] |
| Convertible Notes: | Convertible notes of the Issuer (the "***Convertible Notes***")[3] denominated in U.S. dollars in an initial aggregate principal amount (the "***Initial Principal Amount***") equal to $3,650,000,000, subject to increase by an amount not to exceed $570,000,000 in the aggregate, or decrease as determined by Sponsor (such amount as determined prior to the Closing Date by the Sponsor in its sole and absolute discretion, the "***Flex Amount***") (with all Holders (other than the Specified Writholders) committing to participate in such Flex Amount in accordance with their Pro Rata Shares)

Each Initial Holder shall commit to purchase the percentage of the Initial Principal Amount set forth opposite such Initial Holder's name on Schedule I attached to the Commitment Letter (such percentage being such Initial Holder's "***Pro Rata Share***"). |
| Holders: | On the Closing Date, the Initial Holders and after the funding on the Closing Date, any permitted assignee that becomes a noteholder in accordance with the terms of the Convertible Note Documentation (as defined herein) (collectively, the "***Holders***"). |
| Purpose: | The proceeds of the issuance of the Convertible Notes will be used by the Issuer on the Closing Date, together with any cash on hand at |

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Commitment Letter, including the exhibits thereto, including the Governance Term Sheet (as defined below).

[2] Note to Draft:   To be a third-party agent.

[3] Note to Draft:   The Convertible Notes Documentation will provide for a single class of Convertible Notes, however, Convertible Notes held by the Specified Writholders (i) will have no right or obligation to fund any portion of the Flex Amount and (ii) will not be entitled to voting rights where specified in this term sheet. Mechanism for allocating cash and Convertible Note consideration to maintain the Specified Writholders' pro rata ownership to be addressed in separate agreements with the Specified Writholders. In addition, full voting rights shall be automatically restored to the Convertible Notes held by the Specified Writholders upon any permitted transfer to any third party (including any other Holder).

the Issuer and its subsidiaries or proceeds received from any other debt financing, to pay the Acquisition Costs and to consummate the Refinancing and to finance working capital and for general corporate purposes.

Guarantees:    All obligations of the Issuer (the "***Issuer Obligations***") under the Convertible Notes and the other Convertible Note Documentation will be unconditionally guaranteed (the "***Guarantees***") jointly and severally by Amber Parent and each of its direct or indirect subsidiaries (collectively, the "***Guarantors***"), except for Excluded Subsidiaries, consistent with the First Lien Term Facility (as defined in the Commitment Letter).

Security:    As of the Closing Date, the Issuer Obligations and the Guarantees will be secured by a third priority lien (with intercreditor arrangements to be agreed with the First Lien Term Facility and the ABL Facility (as defined in the Commitment Letter)). In addition, the Holders of the Convertible Notes will agree to payment subordination to all accounts payable and the other types of liabilities included as line items under "Current Liabilities" on the Issuer's most recent balance sheet, in each case as determined in accordance with U.S. GAAP, consistently applied, pursuant to the section titled "Documentation" of Exhibit B to the Commitment Letter. If the Issuer incurs secured Indebtedness after the Closing Date (whether pursuant to the First Lien Term Facility (including any refinancing or replacement thereof), a second lien facility or otherwise), then Holders of the Convertible Notes will agree to subordinate their lien to any such Indebtedness.

Maturity:    The Convertible Notes will mature on the date that is 20 years after the issuance thereof (the "***Maturity Date***").

Unless the Convertible Notes are converted before the Maturity Date, an amount equal to the Liquidation Preference (as defined herein) will become due and payable in cash on the Maturity Date.

Liquidity Right:    Beginning on and after the eighth anniversary of the initial issuance of Convertible Notes, the Holders of a majority of the principal amount of Convertible Notes then outstanding held by Holders other than those affiliated with Elliott (other than the Specified Writholders) (the "***Non-Elliott Majority***") will have the right to cause the Issuer or Amber Parent to form a special committee of the Board (the "***Special Committee***") to consider a process to effect a Change of Control, IPO, or other similar or alternative transaction or refinancing. The Special Committee will use commercially

2

reasonable efforts to inform the Non-Elliott Majority with respect to material updates with respect to such efforts from time to time.

In addition, beginning on and after the eighth anniversary of the initial issuance of the Convertible Notes, one or more Holders (including, for the avoidance of doubt, the Specified Writholders) of at least 10% of the aggregate Liquidation Preference of the Convertible Notes at such time may request that the Issuer and Amber Parent use commercially reasonable efforts to help such Holder market and sell all or a portion of its Convertible Notes to a potential permitted transferee, including making management available for management presentations, the preparation of confidential information memorandums (and similar presentations), permitting the provision of confidential information for potential purchasers pursuant to customary confidentiality agreements, and other customary actions.

| | |
|---|---|
| Interest Rate: | Interest will accrue in kind and in no event will interest be mandatorily payable in cash (other than at maturity). The Initial Principal Amount of the Convertible Notes will accrete at a rate *per annum* of ▮▮▮▮, accruing on a daily basis, and compounding quarterly and on the Maturity Date. |

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days.

| | |
|---|---|
| Liquidation Preference: | The Holders will be entitled to a liquidation preference (the "***Liquidation Preference***") on the Convertible Notes equal to the amount required to deliver to the Holders, as of the applicable date of determination, the greater of: (x) a ▮▮▮ multiple on the Initial Principal Amount and (y) a ▮▮▮▮ internal rate of return on the Initial Principal Amount (compounding quarterly). |

Other than with respect to certain payments pursuant to the terms of management equity arrangements, any cash dividends or other cash distributions of the Issuer or by Amber Parent shall first be paid to the Holders of the Convertible Notes and shall be applied to reduce the Liquidation Preference thereof on a dollar-for-dollar basis (unless and until the aggregate Liquidation Preference has been reduced to $0) prior to any cash dividends or other cash distributions on any other classes of equity interests of the Issuer.

Following such time as the Liquidation Preference on the Convertible Notes has been reduced to $0, and subject in all events to applicable restricted payment capacity under the Convertible Notes Documentation and the terms of any *pari passu* or senior indebtedness, the Convertible Notes will share in any other cash

3

dividends on an as-converted basis, and no dividend may be made by the Issuer or Amber Parent except in accordance with the foregoing.[4] For the avoidance of doubt, the reduction of the Liquidation Preference on the Convertible Notes to $0 shall not affect the rights and preferences otherwise provided to Holders under the Convertible Note Documentation.

| | |
|---|---|
| <u>Pro Rata Payments</u>: | All payments to Holders (including on account of purchases, repurchases, exchanges or similar transactions by the Issuer or any of its subsidiaries, or any fees or other economics with respect thereto) will be made on a pro rata basis based on principal amount of Convertible Notes held by each Holder. |
| <u>Optional Conversion</u>: | The Convertible Notes will not be convertible at the option of any Holder. |
| <u>Mandatory Conversion</u>: | In the event of a Qualified IPO (as defined herein), Change of Control (as defined herein) or other Liquidation Event (to be customarily defined) (each a "***Conversion Event***"), the Convertible Notes shall automatically convert into limited partnership interests ("***Amber Parent LP Interests***") in Amber Energy Topco, L.P., a Delaware limited partnership and indirect parent entity of the Issuer or any applicable successor or parent entity thereof ("***Amber Parent***"). The Convertible Notes will convert into (and the Convertible Note Documentation will include an acknowledgement by Amber Parent of its obligation to issue in connection therewith): |

> (a) a percentage of the fully-diluted equity interest in Amber Parent in the aggregate (which amount may be, but shall not be less than, 0%), calculated at the applicable time of conversion, equal to the quotient of (a) the remaining Liquidation Preference (if any) <u>divided by</u> (b) the total equity value of Amber Parent (including the value of any preferential interests) implied in the applicable Conversion Event or by the fair market value at the time of conversion (and all fair market value determinations shall be made by the Board in its reasonable discretion), which percentage will not exceed 100%; *provided*, *however*, that (1) in connection with any Conversion Event and in lieu of the conversion contemplated by this <u>clause (a)</u>, the Issuer shall have the option to pay all or a portion of the Liquidation Preference in cash so long as such cash is paid on a pro rata basis among Holders (based on principal amount then outstanding held by

---

[4] <u>Note to Draft</u>: The right to participate in cash dividends on an as-converted basis shall be documented as a right possessed by the ██ warrants in Amber Parent that are issued to holders of the Convertible Notes.

4

each Holder); and (2) in no event shall the conversion of the Liquidation Preference result in the Holders receiving, in the aggregate, more than 100% of the fully-diluted equity of Amber Parent (and the organizational documents of Amber Parent will provide that upon conversion of the Convertible Notes, the Amber Parent LP Interests issued pursuant to this clause (a) may represent 100% of the fully diluted equity of Amber Parent), and any remaining portion of the Liquidation Preference shall be extinguished; and

(b) ▆▆ of the fully-diluted equity interest in Amber Parent in the aggregate, calculated at the Closing Date[5] (subject to dilution with respect to issuances of equity securities by, or securities convertible or exchangeable into securities of, Amber Parent following the Closing Date including, but not limited to, management incentive equity and securities issued upon conversion of the Convertible Notes pursuant to clause (a) above; *provided*, *however*, that the terms of the Convertible Notes shall include customary anti-dilution protection relating to issuances of equity securities in Amber Parent below fair market value at the time of issuance).

The Convertible Notes will require that, upon conversion of the Convertible Notes, each Holder will receive the same type and proportion of consideration as received by the other Holders with respect to the Amber Parent LP Interest received upon conversion in accordance with the foregoing (including the right to elect to "rollover" into non-cash consideration or the right to elect cash consideration).

Notwithstanding the foregoing, in the event that the equity value of Amber Parent implied by the Conversion Event (including the value of any preferential interests) is less than the remaining Liquidation Preference as of immediately prior to such Conversion Event, then upon the election of the holders of Convertible Notes representing at least two-thirds of the then-outstanding principal amount, the Convertible Notes shall not convert upon such Conversion Event but shall instead remain outstanding.[6] The Convertible Note Documentation will provide that each Holder of Convertible Notes

---

[5] Note to Draft:    Note that the right to convert into ▆▆ of the equity of Amber Parent will be documented as warrants issued to holders of the Convertible Notes instead of a feature of the Convertible Notes themselves. Final documentation will reflect this, and any equity-like rights set forth in this term sheet that are specific to holders of Convertible Notes will attach to the warrants instead.

[6] Note to Draft: For the avoidance of doubt, this paragraph will cease to have any force or effect upon an exchange of the Convertible Notes into preferred equity as contemplated by the "Exchange" section below.

agrees to refrain from voting against conversion as described in the immediately preceding sentence upon Elliott's determination, in its reasonable discretion, that converting the Convertible Notes into equity of Amber Parent would be likely to improve third party ratings of the Issuer or its affiliates and be in the best economic interest of the Holders of Convertible Notes.

"*Qualified IPO*" means (i) the closing of the first underwritten public offering of common equity interests of Amber Parent (or any newly formed holding company or subsidiary thereof formed pursuant to a Recapitalization Transaction or otherwise) pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, with an aggregate gross offering size of at least $500,000,000 (inclusive of any equity sold by any selling stockholders) and such interests being listed on the New York Stock Exchange or the Nasdaq Global Select Market and, (ii) with respect to any Holder, any other registration of common equity interests of Amber Parent (or any newly formed holding company or subsidiary thereof formed pursuant to a Recapitalization Transaction or otherwise) pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, or pursuant to the Securities Act of 1934, as amended, and following which such interests are listed on the New York Stock Exchange, the Nasdaq Stock Market, or such other national stock exchange (or equivalent non-U.S. securities exchange), that such Holder elects to treat as a Qualified IPO.

"*Change of Control*" will be customarily defined and will include (i) the sale, lease, transfer, conveyance, or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Amber Parent and its subsidiaries, taken as a whole, to any "*person*" or "*group*" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) other than to Elliott or one or more of its direct or indirect affiliates or (ii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that Elliott ceases to possess, directly or indirectly through one or more affiliates, the power to direct the management and policies of Amber Parent and its subsidiaries, whether through the ownership of voting securities, by contract or otherwise (it being understood that neither the grant nor the exercise of customary board designation rights (where Elliott continues to control a majority of the voting power of the board) or other bona fide minority protections will constitute a Change of Control).

| | |
|---|---|
| Redemption: | The Convertible Notes will not be subject to redemption at the option of any Holder or the Issuer. |
| Exchange: | At the election of the Holders of Convertible Notes representing at least a majority of the then-outstanding principal amount (including the affirmative election of at least one other Holder who is not Elliott or its affiliates), which election may be exercised at any time after Closing, each Holder of Convertible Notes will exchange its Convertible Notes for an equal face amount of convertible preferred equity on economic and legal terms that are substantially similar to the applicable terms of the Convertible Notes *mutatis mutandis*, except that the obligations thereunder would not be "indebtedness" and the terms under "Guarantees" and "Security" would be inapplicable.[78] |
| Documentation: | The Convertible Note Documentation (as defined below) shall contain the payments, conditions to closing and issuance, conversion, redemption, representations and warranties, affirmative and negative covenants, and events of default expressly set forth in this Convertible Note Term Sheet and as otherwise mutually agreed and reasonably acceptable to the parties thereto. |
| | The definitive documentation for the Convertible Notes, the (the "***Convertible Note Documentation***") will be based on the Documentation Principles (as defined below). |
| | As used in this Convertible Note Term Sheet, "***Documentation Principles***" means documentation to be initially prepared by counsel to Amber Parent and its subsidiaries and shall contain the terms set forth in this Exhibit B and be mutually negotiated in good faith within a reasonable time period to be determined mutually by the parties based on the expected Closing Date. |
| Conditions to Closing: | The issuance of the Convertible Notes on the Closing Date will be subject solely to the satisfaction (or waiver by each Initial Holder) of the applicable Conditions set forth in Exhibit C to the Commitment Letter. |

---

[7] Note to Draft: Upon the exchange of Convertible Notes into preferred equity, the warrants will be cancelled automatically.

[8] Note to Draft: The economic and legal terms of the convertible preferred equity would, for the avoidance of doubt, include those terms attaching to the ▮▮ warrants issued by Amber Parent (including the right to participate in cash dividends on an as-converted basis referred to in Footnote 4 above).

<u>Affirmative Covenants</u>:  Information rights to be addressed in the governance term sheet set forth in <u>Exhibit D</u> to the Commitment Letter (the "***Governance Term Sheet***").

For the avoidance of doubt, the information rights in the Governance Term Sheet shall inure to the benefit of each Holder for so long as such Holder continues to hold 50% or more of the initial principal amount of Convertible Notes held by such Holder as of the Closing Date.

<u>Financial Covenants</u>:  None.

<u>Negative Covenants</u>:  The Holders will have only the following negative covenants set forth in the organizational documents of Amber Parent (and which Holders will have all rights and remedies at law and at equity to enforce, including the right to seek specific performance), which may only be amended, modified, waived or terminated by the Non-Elliott Majority:

(a) a restriction on (i) the designation or maintenance of unrestricted subsidiaries or any such similar or analogous concept and (ii) except as a result of issuances with respect to which the Holders are afforded the right to participate in accordance with the terms of the organizational documents of Amber Parent and the Convertible Note Documentation, the creation of any subsidiaries other than direct or indirect wholly owned subsidiaries of Amber Parent (subject to customary exceptions in the case of <u>clause (i)</u> and this <u>clause (ii)</u>, *e.g.*, bona fide investments, operational and similar joint ventures and/or strategic partnerships, director-qualifying shares and other similar foreign-ownership requirements, etc.) (i.e., "anti-short circuit" provisions);

(b) except for certain payments pursuant to the terms of management equity arrangements and other customary exceptions (e.g., tax distributions, management and monitoring fees (subject to a cap on the amount of such management and monitoring fees per annum consistent with the analogous cap set forth in the First Lien Term Facility in effect on the Closing Date), reimbursement of overhead and operating expenses, and repurchases of equity from current or former employees, officers, and directors), a restriction on direct or indirect dividends or other distributions, including repurchases (or other restricted payments), to equityholders of the Issuer, other than cash dividends or cash distributions made in accordance with "Liquidation Preference" above

8

(with the Liquidation Preference being payable in cash dividends only); and

(c) a prohibition on related party transactions (including with Elliott or any "associate" (as defined in the Securities Exchange Act of 1934, as amended) of Elliott or Amber Parent), subject to customary exceptions (e.g., transactions that are immaterial, on arms'-length terms or bona fide commercial transactions approved by a majority of disinterested director(s)).

Amendments:    Amber Parent will not amend its organizational documents in a manner that adversely and disproportionately affects a Holder in its capacity as a Holder of Convertible Notes or in its capacity as a prospective holder of Class A-2 Units in Amber Parent on an as-converted basis, as applicable, relative to the rights of other similarly situated Holders holding Convertible Notes or Class A-2 Units, as applicable, without approval by such affected Holder (including, for the avoidance of doubt, the consent of any Specified Writholder that is so adversely and disproportionately affected).

The terms of the Convertible Notes may be amended, modified, waived or terminated by the consent of the Holders of Convertible Notes representing a majority of the then-outstanding principal amount (excluding the Specified Writholders), including the consent of at least one other Holder who is not Elliott or its affiliates; provided, however, that any amendment, modification, waiver, or termination (a)(i) that adversely and disproportionately affects a Holder in its capacity as a Holder of Convertible Notes or in its capacity as a prospective holder of Class A-2 Units in Amber Parent on an as-converted basis, as applicable, relative to the rights of other similarly situated Holders holding Convertible Notes or Class A-2 Units, as applicable (it being acknowledged and agreed that any amendment, modification or waiver of the negative covenants may have such an adverse effect), or (ii) the sacred right regarding the release of all or substantially all of the collateral securing the Notes shall require approval by such affected Holder (including in the case of clauses (a)(i) and (a)(ii), for the avoidance of doubt, the consent of the Specified Writholders) or (b) to the preemptive rights shall require the consent of the Holders of Convertible Notes representing a majority of the then-outstanding principal amount (including, for the avoidance of doubt, the Specified Writholders), other than Elliott or its affiliates.

In addition, each Holder (including, for the avoidance of doubt, the Specified Writholders) will have certain sacred rights with respect to any amendment, modification, waiver or termination relating to the

9

outstanding principal amount or payment currency, the Liquidation Preference, the Maturity, "Mandatory Conversion" rights, any pro rata payment requirements or amendments to the payment waterfall as among the outstanding Convertible Notes, the bankruptcy Events of Default, the interest rate and interest payment dates, the amendment provisions or release of all or substantially all of the collateral securing the Notes or the value of the guarantees except, solely in the case of such releases, as otherwise permitted in the Convertible Note Documentation, and the information rights as set forth in the Governance Term Sheet (it being understood and agreed that the Board's exercise of any right to approve or withhold information, in each case, expressly set forth in the Governance Term Sheet, shall not be deemed to be an amendment, modification, waiver or termination in respect of such information rights).

Events of Default:    Customary events of default for (i) payment default (including at maturity), (ii) failure to comply with conversion provisions of Convertible Notes when required under the Convertible Note Documentation, and (iii) customary bankruptcy and insolvency events. Upon an Event of Default, the Non-Elliott Majority will have customary rights and remedies, including the ability to require the Liquidation Preference then outstanding to be due and payable immediately in cash by the Issuer.

Preemptive Rights:    The Holders of Convertible Notes will be entitled to preemptive rights, as described in the Governance Term Sheet.

Anti-Dilution:    The Convertible Note Documentation will include only customary structural anti-dilution conversion rate and price adjustments with respect to the Convertible Notes and the anti-dilution protections set forth under "Mandatory Conversion".

Voting:    The Convertible Notes will not confer upon the Holders the right to vote or to consent or to receive notice as a limited partners in respect of meetings of partners for the election of managers or any other matters or any rights whatsoever as stockholders except as otherwise expressly provided in the Convertible Note Documentation.

Additional matters related to the governance of Amber Parent and the Issuer are described in the Governance Term Sheet.

Assignments:    After the Closing Date, the Holders will be permitted to directly or indirectly transfer or assign Convertible Notes or any interest therein to any person other than Restricted Parties, provided, that each Holder shall provide the Company with not less than five business days' advance written notice of any such transfer. "**_Restricted Parties_**" shall mean (a) those persons that are separately identified in

10

writing by Elliott to the Holders prior to the execution of the Commitment Letter, together with any persons identified in writing by Elliott to the Holders at any time and from time to time following the execution of the Commitment Letter (including any affiliate of the foregoing (other than a bona fide debt fund affiliate (as defined below))), provided, that with respect to any additional Restricted Parties identified by Elliott after the execution of the Commitment Letter, upon request by any Holder, Elliott shall provide such Holder with a bona fide, articulable and reasonable rationale for the inclusion of such person as a Restricted Party (it being acknowledged and agreed that the rationale for any Restricted Party's identification as such as of the execution of the Commitment Letter shall be deemed to be reasonable), and to the extent Elliott is not able to provide a bona fide, articulable and reasonable rationale for the inclusion of such person as a Restricted Party, such person shall not be so designated; and (b) operating entities who are engaged in a substantially similar line of business as and are a bona fide competitor to the Issuer and its subsidiaries, and any affiliate thereof (other than a bona fide debt fund affiliate) that is either (i) clearly identifiable solely on the basis of similarity of its name or (ii) identified in writing by Elliott to the Holders at any time and from time to time (each, a "**_Competitor_**"). For purposes of the foregoing, a "bona fide debt fund affiliate" of a Competitor is a debt fund, investment vehicle, regulated bank entity or unregulated entity primarily engaged in, or that advises funds or other investment vehicles that are primarily engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course of business for financial investment purposes and with respect to which persons involved with the investment in the relevant Competitor, or the management, control or operation thereof, directly or indirectly, possesses the power to direct or cause the investment policies of such fund, vehicle or entity are independent from the Disqualified Lender.

Governing Law:     New York.[9]

---

[9] Note to Draft:  If Preferred Equity is issued, Delaware will be the governing law.

**<u>EXHIBIT B</u>**

**Governance Term Sheet**

**(Attached.)**

**PROJECT HORIZON**

**GOVERNANCE TERM SHEET**

**AMBER ENERGY TOPCO L.P.**

*The following is a description of certain post-closing equity arrangements in connection with the proposed acquisition (the "**Acquisition**") of 100% of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (together with its subsidiaries, "**PDVH**") by Amber Energy Inc., a Delaware corporation ("**Amber**" or the "**Buyer**"). This Term Sheet does not constitute a binding commitment to enter into the Acquisition, provide financing for the Acquisition or to enter into any definitive agreement on the terms described herein or otherwise and will have no force or effect until a definitive agreement or agreements, if any, are executed by the parties with respect to the subject matter contained herein. This Term Sheet is not an exhaustive list of all items and drafting issues to be addressed in the definitive documents to be entered into in connection with the Acquisition.*

| | |
|---|---|
| ***Parties***: | "***Elliott***" means certain affiliates of Elliott Investment Management L.P., a Delaware limited partnership. |
| | "***Topco***" means Amber Energy Topco L.P., a newly formed Delaware limited partnership. The "***Company***" refers collectively to Topco and its subsidiaries. |
| | "***General Partner***" means Amber Energy Topco GP LLC, a newly formed Delaware limited liability company controlled by Elliott, which shall serve as the general partner of Topco. |
| | "***Investor***" means each of Elliott and any other holder of Units, and collectively, the "***Investors***". |
| ***Investment Objective***: | Topco's objective will be to, directly or indirectly through one or more intermediate entities (including Amber), acquire, hold and dispose of ownership interests in PDVH and to take actions related thereto. |
| ***Capital Structure***: | Equity interests in Topco will be divided into three classes of common units ("***Units***") referred to as "***Class A-1 Units***," "***Class A-2 Units***" (which, together with the Class A-1 Units, are referred to as "***Class A Units***") and "***Class B Units***." |
| | Upon the closing of the Acquisition (the "***Closing***"), Class A-1 Units will be issued to the Investors in exchange for their respective capital contributions at a fixed price of ▉▉▉▉ per Class A-1 Unit. |
| | At the Closing, CITGO Petroleum Corporation, a Delaware corporation and indirect subsidiary of Topco, will issue to certain investors, including Elliott (the "***Convertible Noteholders***") convertible secured notes (the |

"*Convertible Notes*") that convert into Class A-2 Units.[1,2] Class A-2 Units will be issued exclusively upon the conversion or exercise, as applicable, of such Convertible Notes or warrants in accordance with their terms. No Class A-2 Units will be issued or outstanding at or as of the Closing. In the definitive documentation for the Convertible Notes and warrants, Topco will covenant and agree to issue Class A-2 Units upon conversion or exercise, as applicable, of the Convertible Notes and warrants.

Class B Units will be issued pursuant to a management incentive plan (the "*MIP*") to employees and other natural persons who are Incentive Equity Grantees (as defined below); provided, that no Class B Units shall be issued to Elliott or any of its affiliates or any of their respective employees.[3]

Except for (i) Class A-1 Units, (ii) Class B Units issued pursuant to the MIP, if any, (iii) the Convertible Notes and (iv) any warrants issued to the Convertible Noteholders (the "*warrants*" and the Convertible Noteholders in their capacity as holders of warrants, the "*warrantholders*"), there will be no equity securities or securities convertible into equity securities of Topco issued or outstanding at or as of the Closing and there will be no options, warrants or instruments convertible into or exercisable or exchangeable for equity securities of Topco outstanding at or as of the Closing. The holders of Class B Units (whether vested or unvested) shall have no voting rights for any Class B Units held by such holders.

| | |
|---|---|
| *Use of Proceeds*: | The proceeds of the subscriptions for the Class A-1 Units shall be used to finance a portion of the purchase price of the Acquisition, to pay transaction expenses and to fund the balance sheet and working capital of the Company (including PDVH). |
| *Governance*: | **Board Composition** |

The General Partner shall delegate its entire authority to manage the business and affairs of Topco to a board of managers (the "*Board*"). The Board will have six managers (each, a "*Manager*") comprised as follows: (a) four Managers designated by Elliott (the "*Elliott Designees*"); (b) the then-current chief executive officer of the Company (the "*CEO Manager*"); and (c) for so long as it holds any Convertible Notes or any interests in Topco following conversion thereof, one manager designated by Oaktree Capital Management, L.P. ("*Oaktree*," and such manager, the "*Oaktree Manager*"); provided, that notwithstanding the foregoing, Oaktree's right to appoint one manager shall apply (on a proportionate basis) to the board of managers (or equivalent governing body) of Topco,

---

[1] **Note to Draft**: The terms (including conversion terms) applicable to the convertible secured notes are set forth in the Convertible Notes term sheet.

[2] **Note to Draft**: Note that the right to convert into ▮▮▮ of the equity of Topco will be documented as warrants issued to holders of the Convertible Notes instead of a feature of the Convertible Notes themselves. Final documentation will reflect this, and any equity-like rights set forth in this term sheet that are specific to holders of Convertible Notes will attach to the warrants instead.

[3] **Note to Draft**: MIP terms (including allocation methodology and vesting, forfeiture and redemption terms) are set forth in the MIP term sheet.

or any holding company or subsidiary of Topco from time to time that effectively functions as the board of directors (or equivalent governing body) of the Company. Two of the Elliott Designees appointed under clause (a) shall be designated as "*EIM Managers*."

<u>Removal and Replacement of Managers</u>

Elliott will have the right to remove and replace the Elliott Designees at any time and for any reason, and to fill any vacancies otherwise resulting in such manager positions. Oaktree will have the right to remove and replace the Oaktree Manager at any time and for any reason, and fill any vacancy otherwise resulting in such Oaktree Manager position.

<u>Board Action</u>

Each Manager will have one vote; <u>provided</u>, that each EIM Manager shall have three votes. Any EIM Manager may exercise the vote on behalf of any absent or vacant EIM Manager. All actions of the Board will be taken by a majority vote of those present at a meeting at which a quorum is present, and will require the approval of the EIM Managers. Any action of the Board may be taken by the written consent of Managers holding a majority of the voting power and will require the written consent of the EIM Managers; <u>provided</u>, that Topco shall promptly provide notice to all Managers of such written consent.

The Board shall hold regularly scheduled meetings at least once per calendar quarter or as otherwise determined by the chairperson of the Board. Meetings of the Board may also be called by a majority of the Board, by any EIM Manager or by the CEO Manager upon not less than 24 hours' prior notice. Managers will be able to attend such meetings by videoconference or telephone, if necessary, and such attendance shall constitute presence at a meeting.

At every meeting of the Board, a quorum shall require the attendance, whether in person, telephonically, virtually or in any other manner permitted by applicable law, of (a) the number of managers representing a majority of the voting power of the Board and (b) at least one EIM Manager.

<u>Observers</u>

Elliott shall be entitled to designate observers to the Board.

In addition, for so long as a Designated Noteholder (together with its affiliates on an aggregate basis) continues to hold more than 50% of the original principal amount of the Convertible Notes held by such Designated Noteholder (together with its affiliates on an aggregate basis) as of the Closing, such Designated Noteholder shall be entitled to designate two observers to the Board. "*Designated Noteholder*" means Carronade Capital Management, LP.

<u>Duties of Managers and Officers</u>

To the maximum extent permitted by applicable law, Topco and each limited partner will waive any claims against the General Partner, any

3

Manager and any limited partner, in each case, for any breach of any duties (including fiduciary duties), including as may result from a conflict of interest. Officers (other than any officer affiliated with Elliott) will have the duties of officers under Delaware law applicable to officers of corporations organized under the Delaware General Corporation Law.

**Related Party Transactions:** Without the approval of a majority of the disinterested Managers (which, for the avoidance of doubt, shall exclude the EIM Managers), the Company may not enter into any transaction or contract with Elliott (or its controlled affiliates) with a value or cost to the Company, as the case may be, in excess of $10 million other than (a) transactions entered into in the ordinary course of business on an arms-length basis, (b) in connection with the exercise of an Investor's rights granted under the LPA and other transactions contemplated by the LPA or (c) purchases by Elliott or its affiliates of any indebtedness or debt securities issued by the Company (subject to the Company's compliance with the preemptive rights described below, if applicable). All Related Party Transactions not approved by a majority of the disinterested Managers shall be on arm's length terms no less favorable to the Company than those available from unrelated third parties. For the avoidance of doubt, such approval rights shall be in addition to any approval or consent rights provided to the Convertible Noteholders set forth in the definitive documentation governing the Convertible Notes (the "***Convertible Notes Documentation***").

**Management Delegation:** Matters to be delegated by the Board to the chief executive officer and his or her reports will be commensurate with those customarily delegated to persons holding such positions at companies of a similar size in a similar industry and shall be pursuant to a written delegation of authority policy. All other matters concerning the business and affairs of the Company will be a decision of the Board.

**Amendments:** In addition to the consents otherwise expressly provided for hereunder and provided to the Convertible Noteholders in the Convertible Notes Documentation, any amendment, modification, termination or waiver (however effectuated, including by merger, consolidation, division or similar transaction act or adoption of a new agreement, "***Amendment***") to any provision of the LPA or other agreements or organizational documents in which the provisions of this Term Sheet are contained or other agreements to which an Investor is party shall require the consent of (i) Elliott, (ii) each other Investor who holds Class A-1 Units and (iii) each other Investor who holds Class A-2 Units representing more than 5% of the equity interests of Topco on a fully diluted basis at such time if such Amendment (x) adversely affects any tag along right, preemptive right or any other specific right granted to such Investor or (y) adversely and disproportionately affects such Investor in its capacity as a holder of a particular class of Units relative to the rights of other Investors holding the same class of Units (without giving effect to such Investors', specific tax or economic positions, or any other matters that are personal to such Investor). Notwithstanding the foregoing, any Amendment to the LPA that adversely affects the rights of any holder of Class A-2 Units relative

4

to the other holders of Class A-2 Units shall require the written consent of such adversely affected holder.

Notwithstanding anything to the contrary but subject to the preemptive rights described below and any limitations set forth in the Convertible Notes Documentation, an Amendment made to reflect (a) the terms and conditions of any new class or series of equity securities established in accordance with the terms of the LPA (including any Amendment to reflect the exchange of Convertible Notes into convertible preferred equity as contemplated by the Convertible Notes term sheet) and any restrictions, rights, preferences and privileges associated therewith or (b) the restrictions on or rights of any person who purchases equity securities after the date hereof shall, in each case of clauses (a) and (b), require only the approval of the Board.

The foregoing consent rights will terminate upon consummation of an IPO except to the extent that Topco remains an equityholder of the IPO issuer or is the partnership in an Up-C or similar reorganization in connection with an IPO.

**Preemptive Rights:**

If Topco or any of its wholly owned subsidiaries proposes to issue (x) any new debt securities or indebtedness to Elliott or its affiliates, including in connection with an issuance to a third party in which Elliott or its affiliates participates, or (y) any new equity securities, including any securities convertible into, or exercisable or exchangeable for, equity securities, then in each case of clause (x) and clause (y), each Preemptive Rightsholder (as defined below) will have customary preemptive rights to purchase its *pro rata* share of such debt, equity or equity-like securities of the Company at the same price and on the same terms and conditions that the Company proposes to issue such securities (to maintain its ownership on a fully diluted basis), subject to customary exceptions including: (a) equity or equity-based securities issued to managers, employees, bona fide consultants and other bona fide advisors and service providers ("***Incentive Equity Grantees***") (none of which is to Elliott, any of its affiliates or any of their respective employees, or any Convertible Noteholder solely by virtue of its ownership of Convertible Notes) as compensation for services provided to the Company; (b) issuances or grants of securities in connection with any Unit split or recapitalization of Topco in which the economic and voting rights of the Units are preserved in all material respects and each holder of Units participates on a *pro rata* basis; (c) securities issued upon the exercise of outstanding convertible securities; (d) securities issued to a non-affiliated seller as consideration for the Company's purchase of stock or assets or other property of such seller; (e) securities issued to the public in an initial public offering; (f) securities issued in connection with any debt financing or other bona fide strategic partnership with a third-party commercial entity (excluding Elliott and its affiliates) for purposes related to the business of the Company (and not for the primary purposes of a financing transaction or arrangement unrelated to such business purposes); and (g) securities issued by a wholly owned subsidiary of Topco to Topco or another wholly owned subsidiary of Topco. The preemptive rights will contain a customary mechanism permitting Topco to issue equity or equity-like

securities to any person subject to the obligation to comply with the preemptive rights within a specified time period (not more than 90 days) following the closing of any such transaction. As used herein, the term "***Preemptive Rightsholder***" means each holder of Class A Units and each holder of Convertible Notes, participating pro rata on an as-converted basis (giving effect to the liquidation preference of the Convertible Notes at the time of such determination and at the valuation implied by such proposed issuance) based on the Board's good faith determination of fair market value of Class A Units (including the Convertible Notes on an as-converted basis) at such time (and <u>provided</u>, that so long as such determination is made by the Board acting in good faith, it shall be final and binding on each limited partner and each Convertible Noteholder).

Other than the related party transaction provisions, amendment provisions and the preemptive rights described above, the LPA shall not contain any restrictions or other limitations on the ability of the Company to issue additional indebtedness, debt or equity securities (including convertible and/or preferred debt or equity securities with such terms and other rights and preferences as may be determined by the Board in its sole discretion) following the Closing; <u>provided</u>, that in no event shall the Company issue equity securities for a purchase price less than fair market value as determined in good faith by the Board.

| | |
|---|---|
| ***Information Rights*:** | For so long as any limited partner continues to hold 50% or more of the Units of each class of Units held by such limited partner as of the initial issuance date of such Units to such holder (as adjusted for any splits, combinations, equity dividends or similar actions), and subject to certain customary exceptions (e.g., not in violation of any restrictive covenants), the Company shall (a) make available to such holder quarterly and annual financial statements (in each case, together with management's written commentary, discussion and analysis of such financial statements), and (b) conduct (and invite such limited partners to attend) conference calls not less frequently than once per calendar quarter, conference calls to consist of the Company's senior management discussing the Company's financial condition and result of operations for the applicable period; provided, that no foreign investor (for purposes of CFIUS) shall be permitted access to any material non-public technical information, as that term is defined in Section 721 of the U.S. Defense Production Act of 1950, as amended, and CFIUS implementing regulations at 31 C.F.R. Part 800 (together, "***CFIUS Rules***"); nor have any involvement in any substantive decision-making, as those terms are defined in the CFIUS Rules regarding (i) the use, development, acquisition, safekeeping, or release of sensitive personal data of U.S. citizens maintained or collected by any portfolio company or (ii) the use, development, acquisition, or release of critical technologies, as that term is defined in the CFIUS Rules; and provided, further, that the Board may elect to withhold any such information from any Investor if the Board makes a good faith determination that disclosure of such information to such Investor reasonably could be expected to result in public disclosures of such information that are more likely than not to cause material harm to the Company. Without limiting the foregoing, any Investor (including any |

warrantholder) may make public disclosures of Company-related information solely to the extent (x) required by the applicable law or relevant exchange rules for the publicly listed securities of such Investor or (y) approved by the Board in advance; provided, that any disclosure pursuant to the immediately preceding clause (x) that discloses the financial performance of the Company shall in all events be subject to advance approval by the Board, which shall act in good faith and shall cooperate with such Investor to enable such Investor to satisfy its obligations under such applicable law or exchange rules while limiting the extent of such disclosure to the maximum reasonably possible. For the avoidance of doubt, basic tax reporting, such as an Investor's K-1 or similar form, and any reasonable information required for tax reporting and the preparation of tax returns shall be made available to each holder of Units.

The information rights described above shall inure to the benefit of each Convertible Noteholder and warrantholder, and may be satisfied by posting on a private data site accessible to such holder.

*Transfer Restrictions*:    Prior to the occurrence of a Change of Control resulting in any equity interests of the Company becoming publicly traded or a Qualified IPO (as such terms are defined in the Convertible Notes Documentation), without the consent of the Board, no Investor shall (directly or indirectly) sell, assign, pledge, exchange, or transfer its Units in the Company to any third party, in each case other than customary permitted transfers (e.g., transfers to permitted affiliates, transfers for estate planning purposes (including with respect to the Specified Writholder, transfers of equity interests in the Specified Writholder) and transfers by (x) Elliott and its affiliates and the Dragged Investors (as defined below) in each case pursuant to the exercise of the drag-along rights described below and (y) Tag Along Investors (as defined below) pursuant to the exercise of the tag along rights described below (each, a "***Permitted Transfer***" and each such transferee of a Permitted Transfer, a "***Permitted Transferee***"); provided, that notwithstanding anything else to the contrary but subject to the tag-along rights described below, Elliott and its affiliates may freely transfer (directly or indirectly) the Units held by them at any time and from time to time without approval by the Company or the Board. Subject in all events to the Convertible Notes documentation, if a Convertible Noteholder transfers Convertible Notes to a third party, then concurrently with such transfer, the applicable warrantholder shall transfer to such third party a pro rata portion of the warrants held by such warrantholder (and such concurrent transfer of the warrants shall not be subject to approval by the Company or the Board); warrants shall only be transferable in connection with a transfer of the Convertible Notes. Class B Units shall be non-transferable.

Direct and indirect transfers to (a) any existing holding company owned and controlled by a limited partner, or (b) any new company formed by any limited partner for purposes of holding its Units in Topco shall be subject to the same transfer restrictions, tag along rights and other provisions applicable to direct transfers of Units.

7

Without limiting the foregoing, any acquirer of Units must agree to execute a joinder to the LPA and be bound by the provisions of the LPA, and to make customary representations including as to its status as a "qualified purchaser" and "accredited investor" (as defined in Rule 501 pursuant to the Securities Act of 1933, as amended).

Subject to the restrictions contained herein, no Investor shall be entitled to transfer any Units at any time unless the Board is reasonably satisfied that such transfer would not: (1) violate applicable securities laws; (2) cause Topco to become subject to the registration requirements of the Investment Company Act of 1940; (3) cause Topco to become subject to the registration requirements of Section 12(g) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***") or the reporting obligations under Section 15(d) of the Exchange Act; (4) be a non-exempt "prohibited transaction" under the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder ("***ERISA***") or the U.S. Internal Revenue Code of 1986, as amended (the "***Code***") or cause all or any portion of the assets of Topco or its subsidiaries to constitute "plan assets" under ERISA or Section 4975 of the Code; (5) cause Topco to violate the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or the Clayton Antitrust Act of 1914; (6) violate any CFIUS Rules if any proposed transferee is a "foreign person"; or (7) result in a transfer of Units to any person who is subject to sanctions or included on any Specially Designated Nationals and Blocked Persons list maintained by the United States Office of Foreign Assets Control.

| | |
|---|---|
| ***Competing Entities/Investments*:** | Subject to customary restrictions on use of the Company's confidential information, each party will acknowledge that Elliott, Oaktree, the Specified Writholder and each institutional investor holding Class A-1 Units, Convertible Note Interests and/or Convertible Notes may hold or pursue other investments that compete with the business of the Company. |
| ***Tag Along Rights*:** | Each holder of Class A Units shall have customary tag along rights solely with respect to proposed transfers of equity securities of Topco by any other holder (other than transfers pursuant to (a) a Drag-Along Transaction, (b) Permitted Transfers or (c) an IPO). In the event a limited partner desires to transfer or sell any of its Units (such selling limited partner, the "***Tag Seller***") and the applicable conditions (if any) in the prior sentence are satisfied (such transfer, a "***Tag Along Sale***"), such Tag Seller must give at least 20 days' written notice to all other holders of Class A Units (the "***Tag Along Investors***"), with such written notice specifying in reasonable detail the identity of the Proposed Transferee(s), the number of Class A Units to be transferred and the material terms and conditions of the transfer ("***Tag Along Sale Notice***"). |

The Tag Along Investors may irrevocably elect to participate in such Tag Along Sale by giving written notice of such irrevocable election to the Tag Seller within 20 days after receipt of the Tag Along Sale Notice. For each Tag Along Investor, with respect to the Class A Units to be transferred, such participation shall be *pro rata*.

Each Tag Along Investor participating in such Tag Along Sale shall transfer its Class A Units on the same terms and conditions (including, to the extent applicable, the same form and type of consideration, and in the same proportions, as is offered to Elliott).

If the Tag Along Investors have not elected to participate in the contemplated transfer before the expiration of the 20-day period after receipt of the Tag Along Sale Notice, then the Tag Seller may transfer the Class A Units specified in the Tag Along Sale Notice at a price and on other material terms no more favorable in the aggregate to the Proposed Transferee(s) thereof than specified in the Tag Along Sale Notice within a 120-day period beginning with the delivery of the Tag Along Sale Notice. If any of the Tag Seller's Class A Units are not transferred during such 120-day period, they shall be subject to the tag along procedures again before the Tag Seller can sell the Class A Units.

Notwithstanding the foregoing, no tag along rights shall apply in connection with any transfers of Class A Units made by Elliott at any time prior to the first (1st) anniversary of the Closing to one or more (x) limited partners in any fund of investment vehicle managed by Elliott funds, or any affiliate of any such limited partner, or (y) Convertible Noteholders or affiliate thereof.

For the avoidance of doubt, if a transaction (x) constitutes a Tag Along Sale and (y) results in the conversion of the Convertible Notes into Class A-2 Units in accordance with their terms, then Convertible Noteholders shall be permitted to exercise the foregoing tag along rights with respect to the Class A-2 Units issued or issuable upon conversion of the Convertible Notes.

| | |
|---|---|
| ***Drag–Along Rights***: | Elliott shall be entitled to customary drag-along rights and be entitled to drag the other Investors ("***Dragged Investors***") in order to consummate a sale of the Company to an unaffiliated third party ("***Drag-Along Transaction***"). |

Each Dragged Investor shall take all necessary and desirable actions in connection with the consummation of a sale of the Company (whether in such person's capacity as a limited partner, manager or otherwise) as reasonably requested by Elliott as long as the proceeds of such Drag-Along Transaction are paid proportionally with respect to the Class A-1 Units and Class A-2 Units, on a collective basis, including the right to elect to receive cash or "rollover" securities (including (a) subject to customary limitations with respect to non-competition, non-solicitation and certain other restrictive covenants, in each case, as executed by Elliott, executing and delivering any and all agreements, instruments, consents, waivers, releases and other documents in substantially the same forms and on the same terms (in each case, to the extent applicable) as executed by Elliott (including any applicable purchase agreement, stockholders agreement and/or indemnification and/or contribution agreement, with customary representations and warranties; underlined provided, that other than with respect to indemnification obligations unique to a holder of Units (e.g., with respect to representations and warranties given by such holder with respect to such holder) which shall be borne on a several

and not joint and several basis, all such indemnification obligations shall be borne ratably among the applicable holders of Topco equity based on ownership (subject to an overall cap of the proceeds received by such Investor in connection with such sale of the Company)), (b) furnishing information and copies of documents, (c) with respect to management holders only, filing applications, reports, returns, filings and other documents or instruments with governmental entities, participating in management meetings and preparing pitchbooks and confidential information memorandums, and providing assistance with legal, accounting, tax, financial, benefits and other forms of due diligence, (d) cooperating with the Company and Elliott with such sale of the Company, (e) with respect to management holders only, agreeing to any restrictive covenants as necessary, and (f) waiving any dissenters rights, appraisal rights or similar rights in connection with such sale of the Company, and (g) bearing its *pro rata* portion of the expenses incurred pursuant to any sale of the Company; <u>provided</u>, that all such expenses shall be paid by the Company and borne by the Dragged Investors through a *pro rata* reduction on the proceeds they receive from such Drag-Along Transactions and no Dragged Investor shall be required to pay any out-of-pocket amounts (other than de minimis expenses) in connection with any Drag-Along Transactions.

For the avoidance of doubt, no limited partner other than Elliott shall have the right to force a sale of the Company, IPO or similar exit transaction with respect to the Company.

| | |
|---|---|
| ***IPO***: | In the event that the Board approves an IPO, including any related Recapitalization Transaction (as described below), the Investors shall be required to cooperate and take all necessary or desirable actions in connection with the consummation of the IPO as determined by the Board, subject to customary protections, including that each Investor (including, for the avoidance of doubt, each Convertible Noteholder with respect to Class A-2 Units received upon conversion thereof) will participate ratably with Elliott in the IPO and on the same terms and conditions as Elliott and otherwise as set forth in Recapitalization Transaction below. |
| ***Recapitalization Transaction***: | Prior to but subject to consummation of an IPO, if the Board determines to effect a transaction in which one or more classes or series of Units or other equity securities issued by Topco or any of its direct or indirect subsidiaries are, in whole or in part, on a *pro rata* basis among all holders of such securities, converted into, or exchanged for, Interests or other equity securities issued by (a) Topco or any of its direct or indirect subsidiaries, (b) any newly formed holding company or subsidiary of Topco and/or (c) any affiliated person of Topco, in each case in connection with effecting an IPO (a "***Recapitalization Transaction***"), each Investor of Topco will exchange or convert its *pro rata* amount of such Units or other equity securities of Topco held by such Investor, and each such Investor shall receive its *pro rata* amount of the same securities and other consideration in respect of each such equity security exchanged or converted except for immaterial differences, if any, arising from the |

respective rights of the underlying converted or exchanged equity securities and/or the respective rights of each of the Investors set forth in this Term Sheet; provided that for the avoidance of doubt, any securities exchanged in respect of Class A-2 Units, Convertible Note Interests and/or Convertible Notes shall in each case provide the same rights and economic equivalent entitlements as such underlying converted or exchanged security other than in respect of immaterial differences. Such IPO shall occur promptly following the consummation of such Recapitalization Transaction and, if such IPO is not consummated within 120 days (or such longer period as Elliott may agree to, subject in all events to the Board's continued pursuit of such IPO) following such Recapitalization Transaction, then, at Elliott's sole discretion, such Recapitalization Transaction shall immediately be unwound.

**Registration Rights**:
The LPA will provide for (i) customary piggyback registration rights in connection with an IPO for each holder of equity of the IPO entity and (ii) customary post-IPO demand registration rights in favor of the holders of a majority of the Class A-2 Units (or equity of the IPO entity received in exchange therefor) received upon conversion of Convertible Notes held by Convertible Noteholders other than those affiliated with Elliott.

**Corporate Opportunities**:
The organizational documents of Topco will include customary waivers of the corporate opportunities doctrine as it applies to Elliott, Oaktree, the Specified Writholder, each institutional investor holding Class A-1 Units, Convertible Note Interests and/or Convertible Notes and each of their respective affiliates and all of their respective designees and nominees, in each case, subject to customary restrictions on use of the Company's confidential information.

**Indemnification; D&O Insurance**:
The Company will obtain and maintain customary directors' and officers' liability insurance (as approved by the Board) to be in effect at all times.

The organizational documents of the Company will contain exculpation and indemnification rights for managers, directors and officers to the maximum extent allowable under applicable law.

**Confidentiality**:
Customary confidentiality provisions, subject to customary exceptions.

Subject in all events to the prior written consent of the Board, and the execution and delivery by each prospective transferee of a confidentiality agreement in form and substance reasonably acceptable to the Company, a limited partner shall be permitted to disclose certain confidential information to prospective investors in connection with a contemplated sale of some or all of the Units held by such limited partner.

**Documentation**:
The terms of the Units and the governance terms described herein will be documented in a limited partnership agreement of Topco (the "*LPA*") containing the terms described herein. The LPA shall provide that each Convertible Noteholder is a third-party beneficiary of the LPA, entitled to enforce the terms of the LPA directly against Topco and the other parties thereto, with all rights and remedies at law and equity. The initial draft of the LPA will be prepared by Elliott's legal counsel.

11

| ***Governing Law; Jurisdiction*:** | This Term Sheet shall be governed and construed in accordance with the laws of the State of Delaware applicable to contracts to be made and performed entirely therein without giving effect to the principles of conflicts of law thereof or of any other jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or for recognition or enforcement of any judgment relating thereto, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal court of the United States of America sitting in the State of Delaware), (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and any appellate court from any thereof, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and (d) waives, to the fullest extent it may legally and effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware). Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. |
| --- | --- |

<u>**Exhibit [E]**</u>

**Financing Commitment Letters**

# E-1

*Execution Version*

| | | |
|---|---|---|
| **Apollo Capital Management, L.P.**<br>**Apollo Global Funding, LLC**<br>**9 West 57th St., 41st Floor**<br>**New York, NY 10019** | **Oaktree Capital Management, L.P.**<br>**333 S. Grand Avenue, 28th Floor, Los Angeles, CA 90071** | **Sixth Street Lending Partners**<br>**2100 McKinney Avenue**<br>**Suite 1500**<br>**Dallas, Texas 75201** |
| **Carronade Capital Master, LP**<br>**Crown/Carronade Segregated Portfolio**<br>**17 Old Kings Highway South – Suite 140**<br>**Darien, CT 06820** | **Silver Point Capital, L.P.**<br>**Two Greenwich Plaza, Suite 1**<br>**Greenwich, CT 06830** | **Barclays Bank PLC**<br>**745 Seventh Avenue**<br>**New York, NY 10019** |
| **Jefferies Capital Services, LLC**<br>**520 Madison Avenue New York, NY 10019** | **Diameter Capital Partners LP**<br>**55 Hudson Yards, Suite 29**<br>**New York, NY 10001** | |

**CONFIDENTIAL**

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attn: Christina Park

<u>Project Horizon</u>
<u>First Lien Commitment Letter</u>

Ladies and Gentlemen:

You have advised Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its affiliates (in such capacity, "***ACM***", and together with AGF (as defined below), "***Apollo***"), Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, in each case, within its Global Opportunities Fund or Global Private Debt strategies, or one or more entities owned by such funds or accounts ("***OCM***"), Oaktree Opportunities Fund XII Holdings (Delaware), L.P. ("***OOF***"), Oaktree Value Opportunities Fund Holdings, L.P. ("***OVOF***", and together with OCM and OOF, "***Oaktree***"), Sixth Street Lending Partners ("***Sixth Street***"), Carronade Capital Master, LP ("***CCM***") and Crown/Carronade

Segregated Portfolio ("**CCSP**" and together with CCM, "**Carronade**"), Silver Point Capital, L.P. acting on behalf of certain funds and accounts managed by it or an affiliate ("**Silver Point**"), Barclays Bank PLC ("**Barclays**"), Jefferies Capital Services, LLC ("**Jefferies**") and Diameter Capital Partners LP ("**Diameter**", and together with ACM, Oaktree and Sixth Street, Carronade, Silver Point and Jefferies, collectively, the "**Initial First Lien Lenders**", and, together with the Lead Arrangers the "**Commitment Parties**", "**we**", "**our**" or "**us**"), that Amber Energy Inc., a Delaware corporation ("**Holdings**" or "**you**") controlled, directly or indirectly, by Elliott Investment Management L.P. ("**Elliott**") and its affiliates (including controlled affiliates and controlled investment funds) (collectively, the "**Sponsor**"), intends to cause a newly formed direct or indirect subsidiary of Holdings ("**Purchaser**") to acquire (the "**Acquisition**") directly or indirectly, beneficial ownership of the equity interests of a company previously identified by you to us as "Horizon" (the "**Company**"). You have further advised us that, in connection with the foregoing, you and the Company intend to consummate the other Transactions described in the Transaction Description attached hereto as <u>Exhibit A</u> (the "**Transaction Description**"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Transaction Description, the Summary of Principal Terms and Conditions attached hereto as Exhibit B (the "**First Lien Term Loan Term Sheet**"), or the Conditions attached hereto as <u>Exhibit C</u> (the "**Conditions**"); this commitment letter, the Transaction Description, the First Lien Term Loan Term Sheet and the Conditions, collectively, this "**Commitment Letter**".

      1.    <u>Commitments; Titles and Roles</u>.

In connection with the Transactions, each of the Initial First Lien Lenders is pleased to advise you of its several and not joint commitment to provide, directly or through one or more of its affiliates or managed funds, the percentage of the entire aggregate principal amount of the First Lien Term Facility set forth opposite such Initial First Lien Lender's name on Schedule I hereto (as such schedule may be amended or supplemented in accordance with this Commitment Letter), subject only to the satisfaction (or waiver by the applicable Commitment Parties) of the conditions set forth or referred to in the section entitled "Conditions to Borrowing" in <u>Exhibit B</u> hereto (limited on the Closing Date as indicated therein and in <u>Section 4</u> hereof). Notwithstanding anything to the contrary herein, it is understood and agreed that, subject to your prior consent and cooperation, Apollo may syndicate a portion of its commitments under the First Lien Term Facility.

It is agreed that (i) Apollo Global Funding, LLC ("**AGF**"), Oaktree, Sixth Street, Carronade, Silver Point, Barclays, Jefferies and Diameter will act as joint lead arrangers and joint bookrunners for the First Lien Term Facility (in such capacities, the "**Lead Arrangers**") and (ii) Apollo Administrative Agency LLC or an affiliate, designee or sub-agent thereof will act as administrative agent and collateral agent for the First Lien Term Facility (in such capacity, the "**First Lien Administrative Agent**"). It is further agreed that in all offering or marketing materials in respect of the First Lien Term Facility, AGF shall have "left side" designation and shall appear on the top left and shall hold the leading role and responsibility customarily associated with such "top left" placement. Except as set forth in this Section 1, you agree that no other agents, co-agents, arrangers or bookrunners will be appointed, no other titles will be awarded and no compensation (other than compensation expressly contemplated by this Commitment Letter and the Fee Letter (as defined below)) will be paid to any Lender (as defined below) in order to obtain its commitment to participate in the First Lien Term Facility unless you and we shall so agree.

Except as expressly set forth in Section 9, (a) no Initial First Lien Lender shall be relieved, released or novated from its obligations hereunder (including, subject to the satisfaction of the conditions set forth herein, its obligation to fund the First Lien Term Facility on the date of the consummation of the Acquisition (the date of such funding, the "***Closing Date***")) in connection with any assignment or participation of the First Lien Term Facility, including its commitments in respect thereof, until after the Closing Date has occurred, and we will not enter into any transaction that is designed or intended to relieve us of our commitments set forth herein to fund the First Lien Term Facility (except as otherwise set forth in Section 9), and (b) unless you otherwise agree in writing, each Initial First Lien Lender shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the First Lien Term Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until after the Closing Date has occurred.

2.    Information.

You hereby represent and warrant that (with respect to Information and Projections relating to the Company, its subsidiaries and its and their respective businesses, to your knowledge): (i) all written information and written data, other than (x) the Projections, (y) third party reports and/or memoranda and (z) information of a general economic or industry specific nature (the "***Information***"), that has been or will be made available to any Commitment Party by you or, at your direction, by any of your representatives on your behalf in connection with the transactions contemplated hereby, when taken as a whole, is or will be, when furnished, correct in all material respects and does not or will not, when furnished and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto) and (ii) the Projections that have been or will be made available to us by you or, at your direction, by any of your representatives on your behalf in connection with the transactions contemplated hereby have been or will be, when taken as a whole, prepared in good faith based upon assumptions that are believed by you to be reasonable at the time such Projections are so furnished; it being understood that the Projections are predictions as to future events and are not to be viewed as facts or as a guarantee of performance, that the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material.  You agree that if, at any time prior to the Closing Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if such representations were being made at such time, then you will (or, with respect to the information relating to the Company, its subsidiaries or their respective operations or assets, will, in all instances to the extent not in contravention of the Acquisition Agreement, use commercially reasonable efforts to) promptly supplement the Information and such Projections such that (with respect to Information and Projections relating to the Company, its subsidiaries and their respective businesses, to your knowledge) such representations and warranties are correct in all material respects under those circumstances, it being understood in each case that such supplementation shall cure any breach of such representations and warranties.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the commitments and obligations of the Commitment Parties hereunder or the funding of the First Lien Term Facility

3

on the Closing Date.  The Commitment Parties do not assume any responsibility for the accuracy or completeness of the Information or the Projections.  Without limiting the foregoing, you hereby agree to provide us with updates and information that are material to any material litigation regarding the Company and any of its subsidiaries and affiliates, including with respect to any informational rights you have for such matters under the Acquisition Agreement promptly after your receipt of knowledge thereof.

       3.     <u>Fees</u>.

As consideration for the commitments of the Commitment Parties hereunder, you agree to pay (or cause to be paid) the fees set forth in the Fee Letter, dated as of the date hereof, by and among the Commitment Parties and you (the "***Fee Letter***") if and to the extent due and payable. Once paid, such fees shall not be refundable except as otherwise set forth herein or therein or as otherwise agreed in writing by you and us.

       4.     <u>Conditions</u>.

The commitments of the Initial First Lien Lenders hereunder to fund the First Lien Term Facility on the Closing Date and the agreements of the Commitment Parties to perform the services described herein are subject solely to the conditions set forth in the section entitled "Conditions to Borrowing" in <u>Exhibit B</u> hereto, and upon satisfaction (or waiver by the applicable Commitment Parties in writing) of such conditions, the initial funding of the First Lien Term Facility shall occur; it being understood and agreed that there are no other conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Fee Letter or the First Lien Term Facility Documentation.

Notwithstanding anything to the contrary in this Commitment Letter (including each of the exhibits attached hereto), the Fee Letter, the First Lien Term Facility Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making or accuracy of which shall be a condition to the availability and funding of the First Lien Term Facility on the Closing Date shall be (A) such of the representations and warranties made with respect to the Company in the Acquisition Agreement as are material to the interests of the applicable Commitment Parties (in their capacities as such), but only to the extent that Sponsor (or its applicable affiliates) has the right (taking into account any applicable cure provisions) to terminate its (or such affiliates') obligations under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) as a result of a breach of any of such representations and warranties without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates), or to decline to consummate the Acquisition (in each case in accordance with the terms of the Acquisition Agreement) as a result of a breach of any of such representations and warranties without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates) under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) (to such extent, the "***Specified Acquisition Agreement Representations***") and (B) the Specified Representations (as defined below), and (ii) the terms of the First Lien Term Facility Documentation and the Term Facility Closing Deliverables (as defined in <u>Exhibit C</u>) shall be in a form such that they do not impair the availability or funding of the First Lien Term Facility on the Closing Date if the conditions expressly set forth or referred to in the

4

section entitled "Conditions to Borrowing" in <u>Exhibit B</u> are satisfied (or waived by all Initial First Lien Lenders in writing) (*provided* that to the extent any security interest in any Collateral (as defined in the First Lien Term Loan Term Sheet) is not or cannot be provided, validated, created, perfected and/or given priority on the Closing Date (other than the pledge and perfection of the security interest in the equity interests of Borrower and each Guarantor (other than Holdings) (*provided* that any such certificates, other than certificated equity securities of Borrower, will be required to be delivered on the Closing Date only to the extent actually received from the Company after your use of commercially reasonable efforts to obtain such certificates) and other assets pursuant to which a lien may be perfected by the filing of a financing statement under the Uniform Commercial Code) after your use of commercially reasonable efforts to do so or without undue burden or expense, then the provision, validity, creation, perfection and/or priority of a security interest in such Collateral shall not constitute a condition to the availability of the First Lien Term Facility on the Closing Date, but instead shall be required to be provided, validated, created, perfected and/or given the applicable priority within (x) with respect to delivery of executed (A) mortgages or mortgage amendments for the Company's real property containing refineries located in Lake Charles, LA, Corpus Christi, TX and Lemont, IL (the "***Refinery Properties***") and (B) customary opinions of local counsel in jurisdictions in which each of the Refinery Properties is located, as to the enforceability of the mortgages or mortgage amendments, 10 business days after the Closing Date (or such later date after the Closing Date as the First Lien Administrative Agent shall agree), (y) with respect to mortgagee title policies or date down endorsements to existing mortgagee title policies insuring the enforceability and lien priority of mortgages or existing mortgages as amended by the mortgage amendments, in such amounts as the Lenders shall reasonably require, as well as customary surveys (or existing surveys together with affidavits of no change), in each case, for the Refinery Properties, 60 days after the Closing Date (or such later date after the Closing Date as the First Lien Administrative Agent shall agree), (z) with respect to real property constituting Collateral other than the Refinery Properties (the "***Non-Refinery Properties***"), delivery of executed mortgages, mortgagee title policies and customary surveys with respect to (i) 80% of the aggregate value of the Non-Refinery Properties within 90 days after the Closing Date, and (ii) the remainder of the value of the Non-Refinery Properties within 120 days after the Closing Date, and (aa) otherwise, 120 days after the Closing Date (or such later date after the Closing Date as the First Lien Administrative Agent shall agree). For purposes hereof, "***Specified Representations***" means the representations and warranties given by the Borrower and the Guarantors (after giving effect to the Transactions) set forth in the First Lien Term Facility Documentation relating to organizational existence of the Borrower and the Guarantors; power and authority, due authorization, execution and delivery and enforceability, in each case with respect solely to the First Lien Term Facility Documentation, and the other Transactions; no conflicts with or consents under charter documents, in each case, related to the entering into and the performance of the First Lien Term Facility Documentation, the incurrence of the extensions of credit thereunder on the Closing Date, and consummation of the other Transactions; solvency as of the Closing Date (after giving effect to the Transactions and with solvency being determined as expressly set forth in <u>Annex I</u> to <u>Exhibit C</u> hereto and such determination being true and correct in all respects) of Holdings and its subsidiaries on a consolidated basis; Federal Reserve margin regulations; the use of proceeds of the applicable Facility not violating OFAC, FCPA or the PATRIOT Act; the Investment Company Act; and, subject to the proviso in the immediately preceding sentence, creation, validity and perfection of security interests in the applicable Collateral (as defined in <u>Exhibit B</u>) (subject to permitted liens as set forth in the First Lien Term

Facility Documentation).  This paragraph, and the provisions herein, shall be referred to as the "***Certain Funds Provisions***".

For the avoidance of doubt, compliance by you and/or your affiliates with the terms and conditions of this Commitment Letter (other than the conditions expressly set forth in the section entitled "Conditions to Borrowing" in Exhibit B hereto) is not a condition to the Initial First Lien Lenders' commitments to fund the First Lien Term Loans hereunder on the terms set forth herein. The Commitment Parties acknowledge and agree that any failure of the Company and its subsidiaries to comply with the instructions of the Special Master pursuant to Section 6.10 of the Acquisition Agreement shall not be a condition to the initial borrowing under the First Lien Term Facility or result in a failure to satisfy any condition to the initial borrowing under the First Lien Term Facility.

5.    Indemnity, Exculpation, etc.

To induce the Commitment Parties to enter into this Commitment Letter and the Fee Letter and to proceed with the documentation of the First Lien Term Facility, you agree (i) to indemnify and hold harmless each Commitment Party, its affiliates, managed funds and controlling persons (in each case other than any Excluded Affiliate acting in its capacity as such) and the respective officers, directors, employees, agents, advisors, partners and other representatives of each of the foregoing (each, an "***Indemnified Person***"), from and against any and all losses, claims, damages and liabilities of any kind and nature and related reasonable and documented fees and out-of-pocket expenses, joint or several, to which any such Indemnified Person may become subject, in each case to the extent arising out of, resulting from or in connection with, this Commitment Letter (including the First Lien Term Loan Term Sheet), the Fee Letter, the Transactions or any related transaction contemplated hereby, the First Lien Term Facility or any use of the proceeds thereof or any claim, litigation, investigation or proceeding (including any inquiry or investigation) relating to any of the foregoing (any of the foregoing, a "***Proceeding***"), regardless of whether any such Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other third person, and to reimburse each such Indemnified Person upon written demand for any reasonable and documented fees and out-of-pocket expenses of one counsel for all such Indemnified Persons taken as a whole and, if necessary, of a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnified Persons taken as a whole, and, solely in the case of an actual conflict of interest, one additional counsel in each applicable jurisdiction to the affected Indemnified Persons, and other reasonable and documented fees and out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (in each case, excluding allocated costs of in-house counsel and (without your prior written consent) the fees and expenses of any other third-party advisors); *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (a) the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of such Indemnified Person's controlling persons, controlled affiliates or any of its or their respective officers, directors, employees, agents or partners, in each case, who are involved in or aware of the Transactions (as determined by a court of competent jurisdiction in a final and non-appealable decision), (b) a material breach of the obligations of such Indemnified Person or any of such Indemnified Person's controlling persons or controlled affiliates under this Commitment Letter (including its obligation to fund its

commitments hereunder), the First Lien Term Loan Term Sheet or the Fee Letter (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (c) disputes solely between or among Indemnified Persons to the extent such disputes do not arise from any act or omission of you, the Sponsor, the other Investors, the Company or any of your or their respective affiliates; *provided* that each Indemnified Person, to the extent acting in its capacity as an agent or similar role under the First Lien Term Facility, shall remain indemnified in respect of such disputes; and (ii) to the extent that the Closing Date occurs, to reimburse each Commitment Party from time to time, upon presentation of a summary statement, for all reasonable and documented out-of-pocket expenses (including but not limited to expenses of each Commitment Party's consultants (to the extent any such consultant has been retained with your prior written consent (such consent not to be unreasonably withheld or delayed)), due diligence expenses and reasonable fees, disbursements and other charges of (x) a single counsel to the Commitment Parties in respect of the First Lien Term Facility and (if necessary) of a single local counsel to such Commitment Parties in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions), and (y) of such other counsel retained with your prior written consent (it being understood and acknowledged that you have provided such prior written consent to the engagement of Latham & Watkins LLP as counsel to Oaktree, Vinson & Elkins LLP as counsel to Carronade and Simpson Thacher & Bartlett LLP as counsel to Sixth Street), in each case incurred in connection with the First Lien Term Facility and the preparation, negotiation and enforcement of this Commitment Letter, the Fee Letter, the First Lien Term Facility Documentation and any security arrangements in connection therewith (collectively, the "***Expenses***"). The foregoing provisions in this paragraph shall be superseded in each case, to the extent covered thereby, by the applicable provisions contained in the First Lien Term Facility Documentation upon execution thereof and thereafter shall have no further force and effect. For the avoidance of doubt, the indemnity provided in this paragraph shall not apply to any taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

Notwithstanding any other provision of this Commitment Letter, (i) no Commitment Party, nor its affiliates, managed funds and controlling persons (in each case other than any Excluded Affiliate acting in its capacity as such) and the respective officers, directors, employees, agents, advisors, partners and other representatives of each of the foregoing (it being understood that in no event will this exculpation apply to any Commitment Party or its affiliates or managed funds in their respective capacities as (x) financial advisors to you, the Sponsor, any other Investor or the Company or its subsidiaries in connection with the Acquisition or any other potential acquisition of the Company or (y) co-investors in the Transactions or any potential acquisition of the Company or its subsidiaries (each, a "***Protected Person***")) shall be liable for any damages arising from the use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent that such damages have resulted from (a) the willful misconduct, bad faith or gross negligence of such Protected Person or any of such Protected Person's controlling persons, controlled affiliates or any of its or their respective officers, directors, employees, agents or partners, in each case, who are involved in or aware of the Transactions or (b) any material breach of the obligations of such Protected Person or any of such Protected Person's affiliates under this Commitment Letter, the First Lien Term Loan Term Sheet or the Fee Letter, in the case of clauses (a) and (b), as determined by a court of competent jurisdiction in a final, non-appealable judgment, and (ii) none of us, you (or your affiliates), the Sponsor (or its affiliates), the Company (or its subsidiaries), the other Investors (or their affiliates) or any Protected Person shall be liable for any indirect, special,

punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) in connection with this Commitment Letter, the Fee Letter, the Transactions (including the First Lien Term Facility and the use of proceeds thereunder), or with respect to any activities related to the First Lien Term Facility, including the preparation of this Commitment Letter, the Fee Letter and the First Lien Term Facility Documentation; *provided* that nothing in this clause (ii) shall limit your indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Protected Person with respect to which the applicable Protected Person is entitled to indemnification as set forth in the immediately preceding paragraph (as qualified by clause (i) immediately above).

In case any Proceeding is instituted involving any Indemnified Person for which indemnification is to be sought hereunder by such Indemnified Person, then such Indemnified Person will promptly notify you of the commencement of such Proceeding; *provided*, *however*, that the failure to so notify you will not relieve you of any liability that you may have to such Indemnified Person pursuant to this Section 5, except to the extent you are materially prejudiced by such failure.  In connection with any one Proceeding, you will not be responsible for the fees and expenses of more than one separate law firm for all Indemnified Persons in respect of the First Lien Term Facility, plus additional conflicts and local counsel to the extent provided herein.

You shall not, without the prior written consent of the applicable Indemnified Person (which consent shall not be unreasonably withheld or delayed) (it being understood that withholding consent due to non-satisfaction of any of the conditions described in clause (i) and clause (ii) of this sentence shall be deemed reasonable), effect any settlement of, or consent to the entry of any judgment with respect to, any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (i) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability or claims that are the subject matter of such Proceeding and (ii) does not include any statement as to or admission of fault, culpability, wrongdoing or failure to act by or on behalf of any Indemnified Person.

You shall not be liable for any settlement of any Proceeding effected without your written consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent or if there is a final and non-appealable judgment by a court of competent jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and reasonable and documented legal or other out-of-pocket expenses by reason of such settlement or judgment in accordance with and to the extent provided in the other provisions of this Section 5.  Each Indemnified Person (by accepting the benefits hereof) agrees to, and shall, refund and return any and all amounts paid by you to such Indemnified Person if a court of competent jurisdiction determines in a final and non-appealable determination that such Indemnified Person was not entitled to indemnification or contribution rights with respect to such payment pursuant to this Section 5.

Each Indemnified Person shall, at your expense, give (subject to confidentiality or legal restrictions, and with no obligation for any such Indemnified Person to waive any legal privilege)

such information and assistance to you as you may reasonably request in connection with any Proceeding.

      6.    <u>Sharing of Information, Absence of Fiduciary Relationships, Affiliate Activities</u>.

You acknowledge that the Commitment Parties and/or their affiliates or managed funds may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other persons in respect of which you, the Company and your and its respective affiliates may have conflicting interests regarding the transactions described herein and otherwise. None of the Commitment Parties and their respective affiliates or managed funds will use confidential information obtained from you, the Company, the Investors or any of your or their respective affiliates by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you, the Company, the Investors or your or their respective affiliates in connection with the performance by them or their affiliates of services for other persons, and none of the Commitment Parties and their affiliates or managed funds will furnish any such information to other persons, except to the extent permitted below. You also acknowledge that none of the Commitment Parties and their affiliates or managed funds has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons. In addition, please note that one or more Commitment Parties and/or their respective affiliates and/or managed funds may be working with competing bidders for the Company in connection with providing or arranging debt or equity financing for the acquisition of the Company. You agree to such activities and arrangements, and further agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from, on the one hand, such Commitment Party and/or its affiliates' and/or its managed funds' arranging or providing or contemplating arranging or providing financing for a competing bidder and, on the other hand, our and our affiliates' relationships with you as described and referred to herein.

As you know, certain of the Commitment Parties may be, or may be affiliated with, full service securities firms engaged, either directly or through their affiliates, in various activities, including securities trading, commodities trading, investment management, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, certain of the Commitment Parties and/or their respective affiliates or managed funds may actively engage in commodities trading or trade the debt and equity securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of you, the Company and other companies which may be the subject of the arrangements contemplated by this Commitment Letter for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities. Certain of the Commitment Parties and/or their affiliates or managed funds may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of you, the Company or other companies which may be the subject of the arrangements contemplated by this Commitment Letter or engage in commodities trading with any thereof. You further acknowledge and agree that the Commitment Parties and/or their affiliates or managed funds from time to time may hold investments in, make other loans to or have other relationships with you or the Company or your or the Company's respective subsidiaries and affiliates.

The Commitment Parties and/or their respective affiliates or managed funds may have economic interests that conflict with those of you or the Company and may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and the Commitment Parties have no obligation to disclose any of such interests to you or your affiliates.  You agree that the Commitment Parties will act under this Commitment Letter as independent contractors and that nothing in this Commitment Letter or the Fee Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Parties, on the one hand, and you, the Company, your and its respective equity holders or your or their respective affiliates, on the other hand.  You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter and the Fee Letter are arm's-length commercial transactions between the Commitment Parties and, if applicable, their affiliates or managed funds, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction each Commitment Party and each of its applicable affiliates or managed funds (as the case may be) is acting solely as a principal and has not been, is not and will not be acting as an advisor, an agent or a fiduciary of you, the Company, your and its management, equity holders, creditors, affiliates or any other person, and (iii) the Commitment Parties and their applicable affiliates or managed funds (as the case may be) have not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether the Commitment Parties or any of their respective affiliates have advised or are currently advising you or the Company on other matters) except the obligations expressly set forth in this Commitment Letter and the Fee Letter.  You further acknowledge and agree that (i) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (ii) you are capable of evaluating and understand and accept the terms, risks and conditions of the transactions contemplated hereby, and (iii) we have provided no legal, accounting, regulatory or tax advice, and you contacted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate.  You agree that you will not claim that the Commitment Parties or their applicable affiliates or managed funds, as the case may be, have rendered advisory services of any nature or respect, or owe a fiduciary or similar duty to you or your affiliates, in connection with such transaction or the process leading thereto.

7.    Confidentiality.

You agree that you will not disclose, directly or indirectly, the Fee Letter and the contents thereof or this Commitment Letter, the First Lien Term Loan Term Sheet, the other exhibits and attachments hereto and the contents of each thereof, or the activities of any Commitment Party pursuant hereto or thereto, to any person or entity without prior written approval of the relevant Commitment Parties (which may be provided by electronic means) (such approval not to be unreasonably withheld, conditioned or delayed), except (i) to the Sponsor, Investors and prospective equity investors, the Company (and any sellers or other direct or indirect equityholders with respect to the Company or you), the Special Master and Claimholders (as defined in the Acquisition Agreement) and to your and any of their affiliates and your and their respective Related Parties (as defined below), controlling persons or equity holders and to any other actual and/or potential co-investors, in each case, on a confidential basis (*provided*, that any disclosure of the Fee Letter or its contents (x) until after the Closing Date, to the Company (and any sellers or other direct or indirect equityholders thereof, in each case, other than the Sponsor and its affiliates or respective Related Parties), its affiliates and their respective Related Parties,

controlling persons or equity holders (each in its capacity as such), in each case, other than the Sponsor and its affiliates or respective Related Parties, and (y) at all times to the Special Master and Claimholders, shall, in each case, be redacted in a customary manner), (ii) if the relevant Commitment Parties consent in writing (such consent not to be unreasonably withheld or delayed) to such proposed disclosure, (iii) to the extent such information becomes publicly available other than by reason of improper disclosure in violation of any confidentiality obligation owing to us (including those set forth in this paragraph), (iv) in any legal, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation (including this Commitment Letter (but not the Fee Letter, other than the aggregate fee amount, unless required by the Court (as defined in the Acquisition Agreement) or the Special Master, in which case you shall provide only a version redacted in a customary manner, unless an unredacted version is specifically requested or required by the Court or the Special Master, in which case an unredacted version may be provided), including, without limitation, any applicable rules of any national securities exchange and/or applicable federal securities laws in connection with any Securities and Exchange Commission filings relating to the Acquisition and including to the Court, the Special Master and OFAC, in each case pursuant to the Sale Procedures Order (as defined in the Acquisition Agreement), as may be amended or modified hereafter) or compulsory legal process or as requested by a governmental authority (in which case you agree, to the extent practicable and permitted by law, rule or regulation, to inform us promptly thereof) and/or regulatory authority or (v) to a tax authority, to the extent reasonably necessary in connection with the tax affairs of Holdings and/or its affiliates; *provided* that (A) you may disclose this Commitment Letter (including the First Lien Term Loan Term Sheet and the other exhibits and attachments hereto) and the contents hereof (but not the Fee Letter or the contents thereof) (i) in any proxy, public filing prospectus, offering memorandum, offering circular, syndication materials or other marketing materials in connection with the Acquisition and the First Lien Term Facility in connection with their commitments, or in connection with any public filing relating to the Transactions, and (ii) to the lenders under the ABL Facility, (B) you may disclose the First Lien Term Loan Term Sheet (and the other exhibits and attachments hereto) and the contents thereof (together with the aggregate amount of fees payable under the Fee Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses), to potential Lenders, potential hedging counterparties, potential counterparties to commercial agreements that are customary in the refining industry and to rating agencies in connection with obtaining ratings for the Borrower and the First Lien Term Facility, (C) you may disclose the aggregate fee amounts contained in the Fee Letter as part of Projections, pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering and marketing materials for the First Lien Term Facility, the ABL Facility or any other debt securities or in any public or regulatory filing relating to the Transactions and (D) you may disclose this Commitment Letter (including the First Lien Term Loan Term Sheet and the other exhibits and attachments hereto) and the Fee Letter in connection with the enforcement of your rights hereunder and thereunder.  The provisions of this paragraph shall automatically terminate on the second anniversary of the date hereof.

Each Commitment Party and its affiliates or managed funds shall treat confidentially non-public information provided to it or such affiliates by or on behalf of you hereunder and shall not publish, disclose or otherwise divulge, such information; *provided* that nothing herein shall prevent such Commitment Party and its affiliates or managed funds from disclosing any such information (i) pursuant to the order of any court (including the Court) or administrative agency or in any

pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process based on the reasonable advice of counsel (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (ii) upon the request or demand of any regulatory authority (including any self-regulatory authority) having jurisdiction over such Commitment Party or any of its affiliates or managed funds (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority (including any self-regulatory authority) exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iii) to the extent that such information becomes publicly available other than by reason of improper disclosure by any Commitment Party, any of its affiliates or its managed funds or any of its or their Related Parties in violation of any confidentiality obligations (including those set forth in this paragraph) owing to you, the Company, the Investors or any of your or their respective affiliates or any of your or their Related Parties, (iv) to the extent that such information is received by such Commitment Party or any of its affiliates or managed funds from a third party that is not, to such Commitment Party's knowledge (after due inquiry), subject to any contractual or fiduciary confidentiality obligations owing to you, the Company, the Investors or any of your or their respective affiliates or any of your or their Related Parties, (v) to the extent that such information is independently developed by such Commitment Party or any of its affiliates or managed funds without the use of any confidential information and without violating the terms of this Commitment Letter, (vi) to such Commitment Party's affiliates, limited partners, managed and/or advised accounts or managed funds (in each case, other than any Excluded Affiliates) and to its and their respective members, partners, directors, officers, employees, shareholders, financing sources, investors, prospective investors, legal counsel, independent auditors, professionals, service providers and other experts or agents (such persons, "***Related Parties***") who need to know such information in connection with the Transactions and who are informed of the confidential nature of such information and who are subject to customary confidentiality obligations of professional practice or who agree in writing to be bound by the terms of this paragraph (or language substantially similar to this paragraph) (with such Commitment Party, to the extent such person's compliance with this paragraph is within its control, being responsible for such compliance), (vii) to any direct or indirect contractual counterparty to any swap or derivative transaction relating to you or any of your subsidiaries under the First Lien Term Facility, (viii) for purposes of establishing a due diligence defense in any legal proceedings, (ix) to market data collectors and similar service providers for customary purposes in the lending industry in connection with the First Lien Term Facility (including in connection with the administration and management of the First Lien Term Facility), (x) as is necessary or advisable in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter or the Fee Letter, and (xi) in connection with filings, submissions and any other similar documentation required or customary to comply with Securities and Exchange Commission filing requirements; *provided* that no such disclosure shall be made to the members of Oaktree's or Sona's or any of their respective affiliates' or managed funds' deal teams that are engaged (a) primarily as principals in private equity or venture capital or (b) in the sale of the Company and its subsidiaries, including through the provision of advisory services (any entities described in clause (a) and clause (b), "***Excluded Affiliates***") other than to a limited number of senior employees who are required, in accordance

with industry regulations or such Commitment Party's internal policies and procedures to act in a supervisory capacity and the Commitment Parties' internal legal, compliance, risk management, credit or investment committee members, in each case solely to the extent that any such information that is disclosed to such persons is done on a "need to know" basis solely in connection with the transactions contemplated by this Commitment Letter and any such persons are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of such type confidential; *provided* that the disclosure of any such information pursuant to clause (vii) and clause (viii) above shall be made subject to the acknowledgement and acceptance by such recipient (other than, in respect of clause (viii), a judge in such legal proceeding) that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and each Commitment Party) in accordance with market standards for dissemination of such types of information, which may require "click-through" or other affirmative action on the part of the recipient to access such confidential information and acknowledge its confidentiality obligations in respect thereof. The Commitment Parties' and their affiliates' or managed funds', if any, obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation relating to the First Lien Term Facility upon the initial funding thereunder. The provisions of this paragraph shall otherwise automatically terminate on the second anniversary of the date hereof. It is understood and agreed that the Commitment Parties may advertise or promote its role in arranging or providing any portion of the First Lien Term Facility (including in any newspaper or other periodical, on any website or similar place for dissemination of information on the internet, as part of a "case study" incorporated into promotional materials, in the form of a "tombstone" advertisement or otherwise).

8.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in this Commitment Letter or any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution (as defined below) arising under this Commitment Letter, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority (as defined below) and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers (as defined below) by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Commitment Party that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action (as defined below) on any such liability, including, if applicable:

i.    a reduction in full or in part or cancellation of any such liability;

ii.    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Commitment Letter; or

        iii.     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

     9.    <u>Miscellaneous</u>.

This Commitment Letter and the commitments hereunder shall not be assignable by any party hereto without the prior written consent of each other party hereto (such consent not to be unreasonably withheld or delayed) and any such attempted assignment without such consent shall be null and void; *provided* that each Commitment Party may assign its commitments hereunder (subject to the provisions set forth in this Commitment Letter) to its affiliates, managed funds and/or one or more prospective Lenders (other than Disqualified Lenders); *provided*, *further* that such Commitment Party shall only be released from the portion of its commitments hereunder so assigned to the extent such assignee funds the portion of the commitments assigned to it on the Closing Date on the terms and conditions to such funding set forth herein. This Commitment Letter and the commitments hereunder are intended to be solely for the benefit of the parties hereto (and Protected Persons and Indemnified Persons to the extent expressly set forth herein) and their permitted successors and assigns and do not and are not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Protected Persons and Indemnified Persons to the extent expressly set forth herein) and their permitted successors and assigns. The Commitment Parties reserve the right to employ the services of their affiliates or managed funds or branches in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates or branches certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates, managed funds or branches may agree in their sole discretion and, to the extent so employed, such affiliates and branches shall be entitled to the benefits and protections afforded to, and subject to the provisions governing the conduct of, the Commitment Parties hereunder; *provided* that (i) no Commitment Party shall be relieved of any of its obligations hereunder, including in the event that any affiliate or branch through which it performs its obligations fails to perform the same in accordance with the terms hereof, and (ii) the applicable Commitment Party shall be responsible for any breach by any such affiliate, managed fund or branch referred to in the foregoing <u>clause (i)</u> of the obligations hereunder. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the Commitment Parties and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or other electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures, the electronic matching of assignment terms and

contract formations on the electronic platform DocuSign, digital copies of a signatory's manual signature, and deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  This Commitment Letter (including the exhibits hereto) and the Fee Letter (i) are the only agreements that have been entered into among the parties hereto with respect to the First Lien Term Facility and (ii) supersede all prior understandings, whether written or oral, among us with respect to the First Lien Term Facility and sets forth the entire understanding of the parties hereto with respect thereto.  THIS COMMITMENT LETTER AND THE FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK; *PROVIDED*, *HOWEVER*, THAT (I) THE INTERPRETATION OF THE DEFINITION OF "COMPANY MATERIAL ADVERSE EFFECT" (AS DEFINED IN THE ACQUISITION AGREEMENT) (AND WHETHER OR NOT A COMPANY MATERIAL ADVERSE EFFECT (AS DEFINED IN THE ACQUISITION AGREEMENT) HAS OCCURRED AND/OR IS CONTINUING), (II) THE DETERMINATION OF THE ACCURACY OF ANY SPECIFIED ACQUISITION AGREEMENT REPRESENTATION AND WHETHER AS A RESULT OF ANY INACCURACY THEREOF SPONSOR (OR ITS APPLICABLE AFFILIATES) HAVE THE RIGHT (TAKING INTO ACCOUNT ANY APPLICABLE CURE PROVISIONS) TO TERMINATE ITS (OR SUCH AFFILIATES') OBLIGATIONS UNDER SECTION 8.1 OF THE ACQUISITION AGREEMENT (IN ACCORDANCE WITH THE EXPRESS TERMS THEREOF) AS A RESULT OF A BREACH OF SUCH SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS WITHOUT ANY LIABILITY TO, AND WITHOUT RESULTING IN THE PAYMENT OF ANY FEES, LIQUIDATED DAMAGES OR OTHER AMOUNTS BY, SPONSOR (OR ITS AFFILIATES), OR TO DECLINE TO CONSUMMATE THE ACQUISITION (IN EACH CASE IN ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT) AS A RESULT OF A BREACH OF SUCH SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS WITHOUT ANY LIABILITY TO, AND WITHOUT RESULTING IN THE PAYMENT OF ANY FEES, LIQUIDATED DAMAGES OR OTHER AMOUNTS BY, SPONSOR (OR ITS AFFILIATES) UNDER SECTION 8.1 OF THE ACQUISITION AGREEMENT (IN ACCORDANCE WITH THE EXPRESS TERMS THEREOF) AND (III) THE DETERMINATION OF WHETHER THE ACQUISITION HAS BEEN CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT AND, IN EACH CASE OF THE FOREGOING IN THIS PROVISO, ANY CLAIMS OR DISPUTES ARISING OUT OF ANY SUCH INTERPRETATION OR DETERMINATION OR ANY ASPECT THEREOF SHALL, IN EACH CASE, BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS GOVERNING THE ACQUISITION AGREEMENT AS APPLIED TO THE ACQUISITION AGREEMENT, WITHOUT GIVING EFFECT TO ANY CHOICE-OF-LAW OR CONFLICT-OF-LAW RULES OR PROVISIONS OF ANY JURISDICTION THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

Each of the parties hereto agrees that (i) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including the good faith negotiation of the First Lien Term Facility Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the commitments

provided hereunder are subject solely to conditions as expressly provided herein, and (ii) the Fee Letter is a legally valid and binding agreement of the parties thereto with respect to the subject matter set forth therein.  Promptly following the execution of this Commitment Letter and the Fee Letter, the parties hereto shall proceed with the negotiation in good faith of the First Lien Term Facility Documentation for purposes of executing and delivering the First Lien Term Facility Documentation substantially simultaneously with the consummation of the Acquisition.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

Each of the parties hereto hereby irrevocably and unconditionally (i) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York County (the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding shall only be heard and determined in such New York State court or, to the extent permitted by law, in such federal court, (ii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby in any New York State or in any such federal court, (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, and (iv) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in any other courts to whose jurisdiction such person is subject, by suit on the judgment or in any other manner provided by law; *provided* that with respect to any suit, action or proceeding arising out of or relating to the Acquisition Agreement or the transactions contemplated thereby and that does not involve claims against us or the Lenders or any Indemnified Person or Protected Person, this sentence shall not override any jurisdiction provision set forth in the Acquisition Agreement.  Each of the parties hereto agrees that service of process, summons, notice or document by registered mail addressed to you or us at the addresses set forth above shall be effective service of process for any suit, action or proceeding brought in any such court.  Nothing in this paragraph shall affect the right of any party hereto to serve process in any manner permitted by law, or limit any right that any party hereto may have to bring proceedings against any other party hereto in the courts of any jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L. 107-56 (signed into law October 26, 2001)) (as amended, the "***PATRIOT Act***") and 31 C.F.R. §1010.230 (as amended, the "***Beneficial Ownership Regulation***"), each of us and each of the Lenders may be required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information may include their names, addresses, tax identification numbers and other information that will allow each of us and the Lenders to identify the Borrower and the Guarantors in accordance with the PATRIOT Act and the Beneficial Ownership

Regulation.  This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for each of us and the Lenders.

The indemnification, compensation (if applicable in accordance with the terms hereof and of the Fee Letter), reimbursement (if applicable in accordance with the terms hereof and of the Fee Letter), jurisdiction, governing law, venue, waiver of jury trial, service of process, survival and confidentiality provisions contained herein and in the Fee Letter and the provisions of <u>Section 6</u> of this Commitment Letter shall remain in full force and effect regardless of whether the First Lien Term Facility Documentation shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the Commitment Parties' commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to (a) confidentiality of the Fee Letter and the contents thereof (which, notwithstanding the foregoing, shall automatically terminate on the date that is 2 years after the Signing Date) and (b) your understandings and agreements regarding no agency or fiduciary duty) shall automatically terminate and be superseded, to the extent covered thereby, by the provisions of the First Lien Term Facility Documentation upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.  You may terminate this Commitment Letter and/or the Commitment Parties' commitments with respect to the First Lien Term Facility (or portion thereof) hereunder at any time subject to the provisions of the immediately preceding sentence.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and of the Fee Letter by returning to the Commitment Parties (or their legal counsel), executed counterparts hereof and of the Fee Letter not later than 11:59 p.m., New York City time, on September 5, 2025 (such date, or such earlier date on which executed counterparts hereof and of the Fee Letter are returned to the Commitment Parties, the "***Signing Date***").  The Commitment Parties' respective commitments and the obligations of the Commitment Parties hereunder will automatically expire at such time in the event that the Commitment Parties (or their legal counsel) have not received such executed counterparts in accordance with the immediately preceding sentence.  If you do so execute and deliver to us this Commitment Letter and the Fee Letter at or prior to such time, we agree to hold our commitment to provide the First Lien Term Facility and our other undertakings in connection therewith available for you until the earliest of (i) the date on which the Acquisition Agreement has been validly terminated in accordance with its terms, (ii) consummation of the Acquisition with or without the funding of the First Lien Term Facility, (iii) 11:59 p.m., New York City time, on the date that is 5 business days after the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof, after giving effect to any extensions thereof pursuant to Section 8.1(b) of the Acquisition Agreement as in effect on the date hereof), and (iv) March 5, 2027 (such time, the "***Expiration Date***").  Upon the Expiration Date, this Commitment Letter and the commitments of each of the Commitment Parties hereunder and the agreement of the Commitment Parties to provide the services described herein shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension in writing.

[Remainder of this page intentionally left blank]

18

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

**AMBER ENERGY INC.**

By_____
    Name:
    Title:

[Signature Page to Project Horizon First Lien Commitment Letter]

**[LENDER]**


By_____
     Name:
     Title:

Accepted and agreed to as of
the date first above written:

**AMBER ENERGY INC.**


By_____
   Name:
   Title:

[Signature Page to Project Horizon First Lien Commitment Letter]

Schedule I
Commitments

| Committed First Lien Lender | First Lien Loan (Principal Amount) |
|---|---|
| APOLLO CAPITAL MANAGEMENT, L.P., on behalf of one or more investment funds, separate accounts and other entities owned (in whole or in part), controlled, managed and/or advised by it or its affiliates | |
| Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts | |
| Sixth Street Lending Partners | |
| Carronade Capital Master, LP | |
| Barclays Bank PLC | |
| Silver Point Capital, L.P. | |
| Diameter Capital Partners LP | |
| Jefferies Capital Services, LLC | |
| **Total** | **$3,775,000,000.00** |

EXHIBIT A

<u>Project Horizon</u>
<u>Transaction Description</u>

Capitalized terms used but not defined in this <u>Exhibit A</u> shall have the meanings set forth in the other Exhibits to the Commitment Letter to which this <u>Exhibit A</u> is attached or in the Commitment Letter. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit A</u> shall be determined by reference to the context in which it is used. It is intended that:

a) The Sponsor together with certain other investors arranged by and/or designated by the Sponsor (which may include members of the Company's management) (collectively with the Sponsor, the "***Investors***") intend to cause Purchaser, directly or indirectly through one or more transactions to acquire (the "***Acquisition***"), directly or indirectly, equity interests of the Company pursuant to a Stock Purchase Agreement dated as of the date hereof, by and between the Purchaser and Robert B. Pincus, solely in his capacity as special master (the "***Special Master***") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "***Court***") (together with the schedules, exhibits, and annexes thereto and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in <u>Exhibit C</u> hereto, the "***Acquisition Agreement***").

b) The Investors will make, directly or indirectly, equity contributions in an aggregate amount not less than $25.0 million to Amber Energy Topco L.P. ("***Topco***"), the direct parent of Holdings, in exchange for equity of Topco (the "***Equity Investment***"), with all such contributions to Topco to be in the form of common equity or qualified preferred equity (on terms reasonably satisfactory to the Commitment Parties) and contributed to Holdings, Amber MSub LLC and the Borrower solely in the form of common equity on the Closing Date. On the Closing Date, immediately after the consummation of the Equity Investment and the other Transactions (as defined below), (1) the Sponsor shall own, directly or indirectly, not less than a majority of the voting stock and economic interests of Holdings, (2) Topco shall directly own 100% of voting stock and economic interests of Holdings, (3) Purchaser shall directly own 100% of voting stock and economic interests of PDV Holding, Inc. and, immediately following the Closing, shall merge with and into PDV Holding, Inc. with PDV Holding, Inc. surviving (such that Holdings will directly own 100% of the voting stock and economic interests of PDV Holding, Inc.), (4) PDV Holding, Inc. shall directly own 100% of voting stock and economic interests of Citgo Holding, Inc., and (5) the Initial Borrower shall merge with and into CITGO Petroleum Corporation with CITGO Petroleum Corporation surviving (such that Citgo Holding, Inc. will directly own 100% of the voting stock and economic interests of the surviving entity).

c) On or prior to the date hereof, Holdings has entered into (and has delivered to the Commitment Parties duly executed and complete copies of each of the following): (i) that certain Transaction Support Agreement, dated as of August 12, 2025 (together with the schedules, exhibits, and annexes thereto, as in effect on the date hereof and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in <u>Exhibit C</u> hereto, the

"**2020 Bonds TSA**") with holders of Petróleos de Venezuela, S.A.'s 8.50% senior secured notes due in 2020 (the "**2020 Bonds**") representing more than two-thirds of the outstanding principal amount of 2020 Bonds (the "**Consenting 2020 Holders**"), with such 2020 Bonds TSA providing that, effective upon the Closing, each Consenting 2020 Holder shall transfer, convey, and assign to Holdings (or its designee that is a Loan Party) all of the 2020 Bonds held by such Consenting 2020 Holder (such transferred, conveyed, and assigned 2020 Bonds, collectively, the "**Acquired 2020 Bonds**"), in each case, in exchange for cash and/or non-cash consideration, (ii) that certain Commitment Letter, dated as of August 11, 2025, 2025 (together with the schedules, exhibits, and annexes thereto, as in effect on the date hereof and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in Exhibit C hereto, the "**Rusoro TSA**") with Rusoro Mining Ltd., a British Columbia corporation ("**Rusoro**"), pursuant to which, among other things, Rusoro has agreed to, effective upon the Closing, extinguish the Rusoro Claim (as defined in the Rusoro TSA) in exchange for the consideration set forth in the Rusoro TSA, and (iii) that certain Support Agreement, dated as of August 11, 2025 (together with the schedules, exhibits, and annexes thereto, as in effect on the date hereof and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in Exhibit C hereto, the "**Koch TSA**"; the Koch TSA, taken together with the 2020 Bonds TSA and the Rusoro TSA, collectively, the "**TSAs**" and each individually, a "**TSA**") with Koch Minerals Sàrl ("**Koch Minerals**") and Koch Nitrogen International Sàrl ("**Koch Nitrogen**" and, together with Koch Minerals, collectively, the "**Koch Parties**"), pursuant to which, among other things, the Koch Parties have agreed to, effective upon the Closing, extinguish the Koch Claims (as defined in the Koch TSA) in exchange for the consideration set forth in the Koch TSA.

d) The Borrower will obtain (i) the First Lien Term Facility described in Exhibit B to the Commitment Letter, which will be a senior secured first lien term loan facility in an aggregate principal amount of $3,775.0 million (the "**First Lien Term Facility**"), (ii) an ABL Facility described in Exhibit B to that certain ABL Commitment Letter, dated as of the date hereof (as in effect on the date hereof, the "**ABL Commitment Letter**"), among Barclays Bank PLC, Citi and you, which is a senior secured asset-based revolving credit facility in an aggregate principal amount equal to $2,000.0 million (the "**ABL Facility**" and, together with the First Lien Term Facility, the "**Senior Secured Credit Facilities**"), and (iii) qualified preferred equity (the "**Alternative Preferred Equity**") and/or Third Lien Convertible Notes pursuant to a senior secured third lien convertible notes facility (the "**Third Lien Notes**") to be no less than $3,100.0 million in aggregate principal amount; *provided* that (x) the terms, conditions, and documentation of the ABL Facility shall be consistent with those set forth in the ABL Commitment Letter as of the date hereof and otherwise on terms, conditions, and documentation reasonably satisfactory to the Commitment Parties, and (y) the terms, conditions, and documentation of the Third Lien Notes shall be consistent with those shared with the Commitment Parties on August 22, 2025, and pursuant to that certain Convertible Note Commitment Letter, dated as of the date hereof (as in effect on the date hereof, the "**Third Lien Notes Commitment Letter**"), among the commitment parties thereto and you, and shall provide for the issuance and funding of an aggregate principal amount of no less than $3,100.0 million (with at least $2,420.5 million thereof to be actually funded in cash of which at least

$1,050.0 million thereof will be actually funded in cash by the Sponsor or affiliates or other related funds of the Sponsor) of the Third Lien Notes on the Closing Date (collectively, the "***Acceptable Third Lien Note Terms***"); it being understood and acknowledged that, for purposes of the Acceptable Third Lien Note Terms, any such Alternative Preferred Equity shall also be entirely non-cash pay, funded on the Closing Date in such aggregate minimum amount of $3,100.0 million (with at least $2,420.5 million thereof to be actually funded in cash of which at least $1,050.0 million thereof will be actually funded in cash by the Sponsor or affiliates or other related funds of the Sponsor), and otherwise reasonably satisfactory to the Commitment Parties) and otherwise on terms, conditions, and documentation reasonably satisfactory to the Commitment Parties.

e)   Subject in all respects to the use of proceeds provisions contained in the First Lien Term Loan Term Sheet, the proceeds of the Senior Secured Credit Facilities borrowed on the Closing Date, together with up to $500 million of borrowings under the ABL Facility (provided, however, that, notwithstanding anything to the contrary herein, no borrowings in excess of $50 million may be made under the ABL Facility on the Closing Date unless and until the aggregate principal amount of Alternative Preferred Equity and/or Third Lien Notes that is actually funded in cash on the Closing Date is equal to at least $3,100 million (the "***Closing ABL Draw Condition***"), proceeds from the Alternative Preferred Equity, Third Lien Notes and the Equity Investment, will be applied to (i) pay consideration in connection with the Acquisition and any other payments contemplated by the Acquisition Agreement, (ii) pay the fees and expenses incurred in connection with the Transactions (such fees and expenses, collectively, the "***Transaction Costs***"), (iii) consummate the Refinancing (with the proceeds of the First Lien Term Facility being first applied to pay all such amounts for the Refinancing in full; the amounts set forth in <u>clause (i)</u>, clause <u>(ii)</u> and clause <u>(iii)</u> above, collectively, the "***Acquisition Costs***"), (iv) pay the cash amounts due and owing to the Consenting 2020 Holders in exchange for the Acquired 2020 Bonds held by such holders, in each case, in accordance with the 2020 Bonds TSA, and (v) for working capital and general corporate purposes. The transactions described above (including the payment of the Acquisition Costs), are collectively referred to herein                        as                        the                        "***Transactions***".

f)   The Company or the Borrower, as applicable, will, in each case of the following, with the proceeds of the First Lien Term Facility, (i) redeem and/or offer to purchase or repurchase in full the Company's (x) 6.375% senior secured notes due 2026 (the "***2026 Notes***") and (y) 8.375% senior secured notes due 2029 (the "***2029 Notes***", and together with the 2026 Notes, collectively, the "***Company Notes***") in each case, that remain outstanding on the Closing Date and (ii) repay all outstanding amounts under that certain Receivables Purchase Agreement dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, Barclays Bank PLC, as program administrator, and the various other parties thereto (as amended, modified or otherwise supplemented, the "***Existing AR Facility***"), and in each case of the foregoing clauses (i)-(ii), all such indebtedness and obligations will be repaid in full and any and all liens and security interests will be released and terminated (the transactions described in <u>clauses (f)(i)</u> and <u>(ii)</u>, collectively, the "***Refinancing***").

3

EXHIBIT B

Project Horizon[1]
$3,775,000,000 First Lien Term Facility
Summary of Principal Terms and Conditions

| | |
|---|---|
| Borrower: | Initially, a newly formed wholly owned indirect subsidiary of Holdings that is a Delaware limited liability company (the "***Initial Borrower***"), and, immediately upon the consummation of the Acquisition, the Initial Borrower will merge with and into CITGO Petroleum Corporation, a Delaware corporation (the "***Successor Borrower***," and together with the Initial Borrower, the "***Borrower***"). |
| Transactions: | As set forth in Exhibit A to the Commitment Letter. |
| Administrative Agent and Collateral Agent: | Apollo Administrative Agency LLC or an affiliate, designee or sub-agent thereof (in such capacity, the "***First Lien Administrative Agent***"). |
| Lenders: | On the Closing Date, the Initial First Lien Lenders and after the initial funding on the Closing Date, any Eligible Assignee (as defined below) that becomes a lender in accordance with the terms of the First Lien Term Facility Documentation (collectively, the "***Lenders***"). |
| First Lien Term Facility: | A senior secured term loan facility denominated in U.S. dollars in an aggregate principal amount of $3,775.0 million (the "***First Lien Term Facility***", and the loans under the First Lien Term Facility, the "***First Lien Term Loans***").  The First Lien Term Facility will be available to be drawn on the Closing Date in United States dollars. |
| Purpose: | The proceeds of borrowings under the First Lien Term Facility will be used by the Borrower on the Closing Date, together with any proceeds from borrowings under the Third Lien Notes, the Equity Investment and cash on hand at the Company and its subsidiaries, to pay the Acquisition Costs and to consummate the Refinancing and to finance working capital and for general corporate purposes. |
| Availability: | The First Lien Term Facility will be available in a single drawing on the Closing Date.  Amounts borrowed under |

---

[1]    All capitalized terms used but not defined herein shall have the meanings given to them in the Commitment Letter, including the exhibits thereto.

the First Lien Term Facility that are repaid or prepaid may not be reborrowed.

Defaulting Lenders:

The First Lien Term Facility Documentation (as defined below) will include customary provisions relating to Defaulting Lenders (to be defined in a manner consistent with the Documentation Precedent).

Certain Financial Definitions:

"***First Lien Leverage Ratio***" means the ratio of (a) the First Lien Term Facility and Consolidated Total Funded Indebtedness secured on a first lien basis by the Collateral (for the avoidance of doubt, outstanding borrowings and extensions of credit under the ABL Facility to the extent constituting Consolidated Total Funded Indebtedness), less Holdings' and its subsidiaries' Applicable Cash and Cash Equivalents as of the applicable date of determination, to (b) Adjusted EBITDA.

"***Total Leverage Ratio***" means the ratio of (a) Consolidated Total Funded Indebtedness, less Holdings' and its subsidiaries' Applicable Cash and Cash Equivalents as of the last day of such test period, to (b) Adjusted EBITDA.

"***Applicable Cash and Cash Equivalents***" means an aggregate amount of up to $500.0 million of (i) unrestricted cash and cash equivalents (including, for the avoidance of doubt, balance sheet cash not contemplated to be used for any purpose) and (ii) cash and cash equivalents that are restricted in favor of the First Lien Term Facility, the ABL Facility, and/or the Third Lien Notes (subject to, for the avoidance of doubt, the ABL Intercreditor Agreement and the Third Lien Intercreditor Agreement).

"***Consolidated Total Funded Indebtedness***" means, with respect to Holdings and its subsidiaries, the outstanding principal amount of funded indebtedness for borrowed money and letters of credit (to the extent of any amounts thereunder that are drawn but not reimbursed, cash collateralized or backstopped within three business days) of Holdings and its subsidiaries, provided that Consolidated Total Funded Indebtedness shall exclude (i) the Third Lien Notes and (ii) exceptions

B-2

to be set forth in the First Lien Loan Documentation and reasonably acceptable to the Lenders.

"***Consolidated EBITDA***" as used herein shall be defined as set forth in Annex II to this Exhibit B.

"***Adjusted EBITDA***" means Consolidated EBITDA for the most recently completed 4 fiscal quarter period for which financial statements have been delivered prior to the applicable date of determination.

Guarantees:

All obligations of the Borrower (or, in the case of clause (ii) below, any Guarantor) (the "***Borrower Obligations***") under (i) the First Lien Term Facility and (ii) at the election of Holdings, any interest rate protection, commodity trading or hedging, currency exchange or other swap or hedging arrangements (in each case of the foregoing in this sub-clause (ii), entered into in the ordinary course of business, but other than any obligation of any Guarantor (as defined below) to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act (a "***Swap***") if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (determined after giving effect to any applicable keepwell, support, or other agreement for the benefit of such Guarantor and any and all applicable guarantees of such Guarantor's swap obligations by the Borrower or other Guarantors) at the time the guarantee of such Guarantor becomes or would become effective with respect to such Swap) or cash management arrangements (which in the case of such cash management arrangements, must be entered into in the ordinary course of business consistent with past practices, not involve any affiliate that is not a Guarantor, and may not be for borrowed money) entered into by Holdings or any of its subsidiaries, in each case, with a Lender, the First Lien Administrative Agent, any affiliate of a Lender or the First Lien Administrative Agent or any other person (upon execution of customary documentation consistent

with the Documentation Principles) ("***Hedging/Cash Management Arrangements***"; <u>provided</u>, <u>however</u>, that such Hedging/Cash Management Arrangements guaranteed on a senior basis (and with respect to the Collateral (whether then existing or thereafter in existence), secured on a pari passu basis) with the other Borrower Obligations shall be included only up to an aggregate cap for all such Hedging/Cash Management Arrangements of $1.0 billion (and any such amounts in excess of such cap, shall be excluded from the Borrower Obligations and the Guarantees for all purposes of the Guarantees and any and all Collateral with respect to the First Lien Term Facility)), will be unconditionally guaranteed jointly and severally on a senior basis (the "***Guarantees***") by Holdings and each existing and subsequently acquired or organized direct or indirect subsidiary of Holdings (collectively, the "***Guarantors***", and together with the Borrower, collectively, the "***Loan Parties***"), *provided* that the following subsidiaries ("***Excluded Subsidiaries***") shall not be required to become Guarantors: (a) captive insurance companies (including TRIMARK Insurance Co. Ltd. and Everen Limited), (b) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation existing on the Closing Date or at the time such subsidiary is acquired (so long as not entered into in contemplation thereof and for so long as such prohibition remains in effect), as applicable, from guaranteeing the Borrower Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee (and which consent, approval, license or authorization has not been obtained after the Loan Parties' use of commercially reasonable efforts to obtain such consent, approval, license or authorization); *provided* that such subsidiary shall be subject to customary "liability management exercise" and/or "liability management transaction" protections, including "Chewy" provisions and prohibitions on incurring contractual prohibitions, restrictions, or obligations with respect to any such Guarantee in contemplation of, for any direct or indirect financing, monetization, or similar transaction, or otherwise with any direct or indirect intent or purpose of avoiding such Guarantee requirement, (c) any subsidiary, the provision of a Guarantee by which would reasonably be expected to result in material adverse tax

consequences to Holdings or any of its subsidiaries or direct or indirect parent entities that materially outweigh the impact to the total value of the Collateral (in each case of this clause (c), as mutually agreed by the Required Lenders and the Borrower in writing); provided, however, that (i) any subsidiary that owns all or any portion of the Material Property (or all or any portion of the Equity Interests of a Person that owns all or any portion of the Material Property) shall be deemed not to be an "Excluded Subsidiary" for purposes of the First Lien Term Facility (and shall be required at all times to be a Guarantor and a subsidiary of the Borrower), and (ii) any subsidiary that guarantees the ABL Facility, the Third Lien Notes, or any other indebtedness or claims shall be deemed not to be an "Excluded Subsidiary" for purposes of the First Lien Term Facility (and shall be required at all times to be a Guarantor) and (d) so long as such subsidiary (i) is not a guarantor of any other funded indebtedness of Holdings, the Borrower, and/or their respective subsidiaries, (ii) holds no material assets, and (iii) is in the process of actively being wound down and liquidated, CITGO Cayman Investment LLC.

Notwithstanding the foregoing, the Borrower may, in its sole discretion, elect to cause one or more Excluded Subsidiaries to become Guarantors.

Notwithstanding anything to the contrary herein, in no event shall any Guarantor or item of Collateral be released, if such Guarantor is a borrower or guarantor under the ABL Facility, the Third Lien Notes, or any other indebtedness or claims, or if such item of Collateral secures the ABL Facility, the Third Lien Notes, or any other indebtedness or claims.

For purposes of clarity, and without limiting the terms above, Amber Energy Inc., as Holdings, will at all times be a Guarantor, and each of its direct and indirect subsidiaries shall be subject to the guarantor provisions of the First Lien Term Facility.

| Security: | Subject to the limitations set forth below in this section and subject to the Certain Funds Provision, the Borrower Obligations and the Guarantees will be secured by: (a) a perfected first priority (in the case of the First Lien Term |

B-5

Facility, the Guarantees in respect thereof and the Hedging/Cash Management Arrangements) pledge, in each case subject to liens not prohibited by the First Lien Term Facility Documentation, of the Term Priority Collateral (as defined below) and (b) a perfected second-priority pledge in the ABL Priority Collateral (as defined below) but excluding the Excluded Assets (as defined below) (collectively, the "*Collateral*"). Without limiting anything to the contrary herein, (x) the Purchaser, the Borrower, and/or its applicable affiliates shall deliver to the First Lien Administrative Agent a collateral assignment of all of their rights and interests under the Acquisition Agreement, (y) all deposit accounts, securities accounts, and commodities accounts subject to control agreements in favor of the ABL Facility agent shall also be subject to second priority liens in favor of the First Lien Term Facility on customary intercreditor arrangements to be mutually agreed, and (c) the First Lien Term Facility Documentation shall include and reflect customary lender insurance rights.

"*Term Priority Collateral*" shall mean all Collateral of the Loan Parties other than the ABL Priority Collateral (including, without limitation (but except solely to the extent constituting Excluded Assets), refinery assets, real property, intellectual property, equipment, rights and interests under the Acquisition Agreement, the Acquired 2020 Bonds, and a pledge of the capital stock of each Loan Party's subsidiaries).

"*ABL Priority Collateral*" shall mean all Collateral of the Loan Parties comprising:

(i)     all accounts receivable and credit card receivables (in each case, solely except to the extent constituting proceeds of Term Priority Collateral),

(ii)    all supporting obligations arising from the purchase of crude oil and other hydrocarbon inventory, including any exchange agreements related thereto,

(iii)   all inventory, including all hydrocarbon inventory,

(iv)    all renewable energy tax credits, including, without limitation, all renewable identification numbers,

B-6

(v)    any and all additions, accessions and improvements to, all substitutions and re-placements for and all products of or derived from the foregoing,

(vi)    all cash and cash equivalents, deposit accounts, securities accounts and commodities accounts (including all cash or other funds on deposit therein), except any such accounts which hold solely identifiable proceeds of Term Priority Collateral,

(vii)    all general intangibles (other than intellectual property and capital stock), chattel paper, instruments, documents, commercial tort claims, letter of credit rights, supporting obligations, and other assets, in each case to the extent related to the foregoing <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u> or <u>(vi)</u> and that are owned by a Loan Party or in which a Loan Party otherwise has rights, but not, for the avoidance of doubt, capital stock of the Loan Parties and their subsidiaries,

(viii)    all books and records pertaining to any of the foregoing, and

(ix)    all proceeds of, and all supporting obligation with respect to, any of the foregoing; <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, any intercompany indebtedness by and among the Loan Parties and/or any of their respective subsidiaries shall not be included in the ABL Priority Collateral.

Notwithstanding anything to the contrary, the Collateral shall exclude (including from any applicable security documents) the following: (i) any real property (including its related parcels and assets) (x) with a fair market value of less than $5,000,000 and (y) to the extent that the Borrower is prohibited from granting a security interest in, pledge of, or charge, mortgage, or lien upon any such property or assets by reason of an existing and enforceable negative pledge provision that (1) is not prohibited by the First Lien Term Facility, (2) is in existence on the Closing Date, (3) was not entered into with the intent of impairing or excluding the Collateral, and (4) is listed on a schedule attached to the first lien credit agreement, (ii) motor vehicles, airplanes and other assets subject to certificates of title to the extent a lien therein cannot be perfected by the filing of a UCC

financing statement and letter of credit rights (other than to the extent perfection of the security interest therein is accomplished by the filing of a UCC financing statement) and commercial tort claims reasonably and in good-faith expected to result in a recovery less than an amount to be agreed, (iii) any property of or in which pledges and security interests are prohibited by applicable law, rule or regulation (or would require the consent of any governmental authority or third person to obtain and such consent has not been obtained after the Loan Parties' use of commercially reasonable efforts to obtain such consent) or by any contract binding on such property at the time of its acquisition and not entered into in contemplation thereof, in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable law notwithstanding such prohibition (which such assets cannot be used to pledge or secure other funded debt), (iv) margin stock, (v) any cash and cash equivalents (including securities entitlements and related assets) solely to the extent held in (and only such cash attributable to the following accounts and for such third parties) payroll, healthcare, employee wage and benefits, escrow, fiduciary, trust and other similar accounts (including any securities entitlements or related assets contained therein), including any escrow, fiduciary and trust accounts with respect to taxes of third parties (including sales tax), other than, to the extent constituting or containing identifiable proceeds of other Collateral and, for the avoidance of doubt, any such other cash and cash equivalents (including securities entitlements and related assets) or other deposit, commodities or securities accounts (including any securities entitlements and related assets credited thereto), (vi) any lease, license or other agreement or any property subject to a purchase money security interest, capital lease obligation or similar arrangement, in each case, to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement, purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Guarantor or an affiliate thereof) after giving effect to

the applicable anti-assignment provisions of the Uniform Commercial Code or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable law notwithstanding such prohibition (which such assets cannot be used to pledge or secure other funded debt), (vii) any assets to the extent a security interest in such assets would result in adverse tax consequences to Holdings or any of its subsidiaries or direct or indirect parent entities that materially outweigh the impact to the total value of the Collateral (as mutually agreed in a prior writing by the First Lien Administrative Agent and the Borrower), but in any event, may not include the exclusion of any assets for the direct or indirect purpose of creating an alternative senior financing or benefiting creditors other than the Lenders, (viii) those assets as to which the First Lien Administrative Agent and the Borrower reasonably and mutually agree that the cost of obtaining such a security interest or perfection thereof (including any adverse tax consequences) are excessive in relation to the benefit to the Lenders of the security to be afforded thereby; provided that such assets shall not secure any other indebtedness, (ix) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, and (xi) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such license, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), for such consent or required approval has not been obtained after the Loan Parties' use of commercially reasonable efforts to obtain such consent or approval (which such assets cannot be used to pledge or secure other funded debt) (the foregoing described in clauses (i) through (xi) are, collectively, the "***Excluded Assets***").

Notwithstanding anything to the contrary, the Company's real property containing refineries located in

Lake Charles, LA, Corpus Christi, TX and Lemont, IL (such real property and refineries, together with related inventory, equipment, fixtures, and related personal property, as well as the capital stock in any Loan Party owning any such of the foregoing property, and/or any other assets, rights, agreements, and other interests that are material to the operation of the business of Holdings and its subsidiaries taken as a whole (collectively, the "***Material Property***"), in each case, shall not constitute Excluded Assets at any time and shall, at all times on and after the Closing Date, be directly owned by the Borrower or one of its subsidiaries that is a guarantor and be subject to valid and perfected first-priority liens in favor of the First Lien Term Facility. Notwithstanding anything to the contrary herein, in no event shall any of the Material Property be, directly or indirectly, distributed, sold, disposed, contributed, or otherwise transferred to any non-guarantor, affiliate, or other third party without the prior written consent of each Lender.

Further, notwithstanding anything to the contrary, at all times on and after the Closing Date, (1) the Acquired 2020 Bonds (as well as the equity interests in the Loan Party that owns and holds the Acquired 2020 Bonds) shall not constitute Excluded Assets at any time (and in no event shall the Loan Party that is the holder and owner of the Acquired 2020 Bonds be an Excluded Subsidiary), and (2) the Acquired 2020 Bonds shall be directly owned and held by a Loan Party (other than Holdings) and subject to valid and perfected first-priority liens in favor of the First Lien Term Facility.

All the above-described pledges and security interests shall be created on terms to be set forth in the First Lien Term Facility Documentation.

The priority of the security interests and related creditor rights between the First Lien Term Facility and the ABL Facility will be set forth in an intercreditor agreement consistent with the Documentation Precedent (the "***ABL Intercreditor Agreement***") and the priority of the security interests and related creditor rights between the First Lien Term Facility, on the one hand, and the Third Lien Notes, on the other hand, will be set forth in an intercreditor agreement consistent with the

Documentation Principles (the "***Third Lien Intercreditor Agreement***").

Final Maturity and Amortization:

Commencing on the last day of the second full fiscal quarter ended after the Closing Date, the First Lien Term Facility will amortize in equal quarterly installments in aggregate annual amounts equal to 1.0% per annum of the original principal amount of the First Lien Term Facility (subject to reduction in connection with debt prepayments and repayments), with the balance payable on the date that is 7 years after the Closing Date.

Interest Rates and Fees:

As set forth on Annex I hereto.

Default Rate:

[REDACTED]

Mandatory Prepayments:

Loans under the First Lien Term Facility shall be prepaid with:

a) commencing with the first full fiscal year ending after the Closing Date, within 5 business days after the due date for the annual audited financial statements for such fiscal year, 50% of Excess Cash Flow (as defined as set forth in Annex II to this Exhibit B) if the First Lien Leverage Ratio is greater than 1.00 to 1.00 and 0% of Excess Cash Flow if the First Lien Leverage Ratio is less than or equal to 1.00 to 1.00, in each case, determined after giving effect to such prepayment; provided that with respect to any fiscal year, at the Borrower's option, (i) any voluntary prepayments, buybacks (in an amount equal to the principal amount repurchased) or "yanks" of loans under the First Lien Term Facility, in each case including any premium, make whole or penalty payments thereon, (ii) any capital expenditures, (iii) any investments (other than intercompany investments) not prohibited by the First Lien Term Facility Documentation (including without limitation Permitted Acquisitions), (iv) cash payments in respect of long-term liabilities and any other cash payments that are not expensed during such period and (v) any future capital expenditures or investments, in each case for which an agreement (or commitment or binding letter of intent) then exists to be made within the next 2 fiscal quarters (but without duplication of any amount deducted in

B-11

any other period and subject to reversal if not so paid in such 2 fiscal quarter period) (in each case of clauses (i) through (iv) (but not clause (v)) above) made during such fiscal year and (at the option of the Borrower) thereafter prior to the applicable excess cash flow prepayment date and (in each case of clauses (i) through (v) above) not funded with the proceeds of long term indebtedness (other than any borrowings under the ABL Facility), shall reduce (without duplication) the amount of Excess Cash Flow (and the First Lien Leverage Ratio shall be recalculated for purposes of determining the applicable Excess Cash Flow percentage above, to give pro forma effect to all such voluntary prepayments); *provided* that, at the Borrower's option, prepayments shall only be required under this clause (a) if and to the extent that (A) the Excess Cash Flow prepayment obligation as determined in accordance with the foregoing provisions is greater than the greater of (x) $100.0 million and (y) 10% of Adjusted EBITDA, (B) on a pro forma basis for such payment, the aggregate amount of unrestricted cash and cash equivalents of the Borrower and its subsidiaries would be no less than $1,000.0 million, and (C) on a pro forma basis for such payment, the sum of aggregate amount of unrestricted cash and cash equivalents and undrawn availability under the ABL Facility would be no less than $2,000 million;

b)   within 5 business days after receipt thereof, 100% of the net cash proceeds of non-ordinary course asset sales or other dispositions of property, other than the ABL Priority Collateral (which shall be only excluded to the extent such net cash proceeds thereof are required to be applied, and are so applied, to make permanent paydowns of the ABL Facility and commitment reductions thereunder, with a corresponding permanent reduction in the maximum amount of indebtedness under the ABL Facility indebtedness basket), by Holdings, the Borrower, or subsidiaries of Holdings (including insurance and condemnation proceeds) ("***Asset Sales***") subject to exceptions to be agreed and reasonably acceptable to the Lenders (including an exception for *de minimis* dispositions for which the amount that would be required to prepay the Term Loans is below an

B-12

aggregate amount, for all such dispositions, of
$100.0 million for the life of the First Lien Term
Facility, with only the amount in excess of such
aggregate *de minimis* threshold required to be used
to prepay the Term Loans) and (other than with
respect to the sale of all or substantially all of the
assets constituting the Lake Charles refinery, with
respect to which the Borrower shall not be permitted
to exercise reinvestment rights described herein)
subject to the right to reinvest 100% of such
proceeds, if (A) such proceeds (the "***Reinvestment
Proceeds***") are reinvested in fixed assets for the
business of the Borrower and its subsidiaries (and
not, in any event, Holdings) that will be become
Collateral (or committed to be so reinvested
(including pursuant to any letter of intent)) (x) within
18 months and, if so committed to be reinvested, so
long as such reinvestment is actually completed
within 180 days after the end of such 18 month
period (such period, the "***Reinvestment Period***") or
(y) prior to the receipt of such net cash proceeds (but
after the Closing Date), (B) all such Reinvestment
Proceeds are held at all times in a segregated deposit
account subject to the lien and control of the First
Lien Administrative Agent (subject to the ABL
Intercreditor Agreement; *provided*, that if such net
cash proceeds are on account of Term Priority
Collateral, such account must be a designated Term
Priority Collateral account subject to the first-
priority lien and control of the First Lien
Administrative Agent), and (C) on a pro forma basis
after giving effect to such reinvestment, the Total
Leverage Ratio (with Adjusted EBITDA calculated
for the most recently ended 4 fiscal quarter period for
which financial statements have been delivered prior
to, and cash and cash equivalents calculated as of, the
date of such reinvestment) shall not exceed 3.00 to
1.00; and

c)    within 5 business days after receipt thereof, 100% of
the net cash proceeds of issuances of debt obligations
of subsidiaries of Holdings after the Closing Date
(excluding debt not prohibited under the First Lien
Term Facility Documentation).

Within the First Lien Term Facility, mandatory prepayments shall be applied to inverse order of maturity of remaining scheduled installments of principal of the First Lien Term Facility.

Any Lender under the First Lien Term Facility may elect not to accept its pro rata portion of any mandatory prepayment under <u>clause (a)</u> or <u>(b)</u> above and, solely to the extent that the Borrower has first offered all such proceeds to the other non-declining Lenders on a pro rata basis, then, and only then, to the extent elected by the Borrower (in its sole discretion), under <u>clause (c)</u> above (each a "***Declining Lender***" and the proceeds declined under the applicable facility, "***Declined Proceeds***"). Any prepayment amount declined by a Declining Lender (subject, in all cases, to the prior offering of such initially Declined Proceeds to all non-declining Lenders on a ratable basis) may be retained (or applied as directed) by the Borrower.

<u>Voluntary Prepayments and Reductions in Commitments</u>:

Voluntary prepayments of borrowings under the First Lien Term Facility will be permitted at any time in minimum principal amounts to be agreed upon, without premium or penalty other than any applicable Prepayment Premium as set forth below.

The Borrower may elect to designate any voluntary prepayment as a "***Designated Prepayment***" if either (i) after giving effect to such prepayment the aggregate principal amount of First Lien Term Loans would be equal to or greater than $3,025.0 million or (ii) after giving effect to such prepayment the aggregate principal amount of First Lien Term Loans would be less than $3,025.0 million, then solely the amount required to reduce the aggregate principal amount to $3,025.0 million will be considered the Designated Prepayment.

Any Lender under the First Lien Term Facility may elect not to accept its pro rata portion of any Designated Prepayment (each a "***Designated Declining Lender***") with any such declined portion then offered ratably to each other Lender.  Any prepayment amount declined by a Designated Declining Lender and not accepted by other Lenders (any "***Retained Designated Prepayment***

B-14

*Amount*") may be retained (or applied as directed) by the Borrower.

All voluntary prepayments of the First Lien Term Facility shall be applied in inverse order of maturity of remaining scheduled installments of principal of the First Lien Term Facility.

Prepayment Premium:

In respect of the First Lien Term Facility, subject to any prepayments, repayments or payments in connection with a Specified Event (as defined below) any (a) voluntary prepayment (other than a Designated Prepayment), (b) mandatory prepayment with the proceeds of debt prohibited under the First Lien Term Facility Documentation, (c) any prepayment of First Lien Term Loans from the proceeds of Refinancing Facilities or Other Refinancing Debt, (d) any mandatory assignment of First Lien Term Loans that are required in accordance with the yank-a-bank provisions of the First Lien Loan Documents, (e) any mandatory prepayment with the proceeds of any asset sales (including insurance and condemnation proceeds), and (f) any acceleration of the First Lien Term Loans or any payment of First Lien Term Loans after any voluntary or involuntary acceleration of the obligations in respect of the First Lien Term Facility, foreclosure and sale of, or collection of, the Collateral, sale of the Collateral in any insolvency proceeding, and the restructure, reorganization or compromise of the obligations by the confirmation of a plan of reorganization or any other plan of compromise, (in each case whether before, after or as a result of the occurrence of an event of default or acceleration, including due to a bankruptcy filing), that is made (i) on or before the date that is 24 months after the Closing Date, a customary make-whole provision based on a discount rate equal to the applicable yield to maturity of U.S. Treasury notes with a maturity closest to the second anniversary of the Closing Date plus 50 basis points, (ii) after the date that is 24 months after the Closing Date but on or before the date that is 36 months after the Closing Date shall be subject to a prepayment premium of 2.00%, (iii) after the date that is 36 months after the Closing Date but on or before the date that is 48 months after the Closing Date, shall be subject to a prepayment premium of 1.00%, and (iv) after the date that is 48 months after the Closing Date, shall not be subject to any

B-15

prepayment premium or penalty (the "***Prepayment Premium***").

"***Specified Event***" means any qualified initial public offering (as to be defined and mutually agreed in the First Lien Term Facility Documentation).

The definitive documentation for the First Lien Term Facility shall include customary "Momentive" protections (including, without limitation, the treatment of such Prepayment Premium as liquidated damages) reasonably acceptable to the Lenders, in each case, in respect of the Prepayment Premium.

Documentation:
The definitive documentation for the First Lien Term Facility (including, without limitation, the credit agreement, the security and collateral documents with respect thereto, the ABL Intercreditor Agreement and the Third Lien Intercreditor Agreement, the "***First Lien Term Facility Documentation***") will be based on the Documentation Principles (as defined below).

As used in this First Lien Term Loan Term Sheet, "***Documentation Principles***" means documentation based on that certain Credit Agreement, dated as of September 28, 2023, by and among Star Parent, Inc., the guarantors party thereto from time to time, the lending institutions party thereto from time to time, Goldman Sachs Bank USA, as administrative agent and collateral agent and a lender and the other parties thereto, and, in each case (but subject to the other terms set forth in the Documentation Principles and otherwise in this First Lien Term Loan Term Sheet), the related loan documents (the "***Loan Documents***") executed in connection with such credit agreement (the "***Documentation Precedent***"); such documentation to be initially prepared by counsel to Holdings and its subsidiaries and shall contain the terms set forth in this Exhibit B and be mutually negotiated in good faith within a reasonable time period to be determined mutually by the parties based on the expected Closing Date.  The First Lien Term Facility Documentation (as defined below) shall contain the payments, conditions to closing and borrowing, mandatory prepayments, prepayment premiums, representations and warranties, affirmative and negative covenants and events of default

expressly set forth in this First Lien Term Loan Term Sheet, in each case, applicable to Holdings, the Borrower, and the subsidiaries of Holdings, and shall contain the standards, qualifications, thresholds, exceptions (including materiality), "baskets" and grace and cure periods expressly set forth in this First Lien Term Loan Term Sheet, with such other modifications to be mutually agreed and reasonably acceptable to the parties thereto.    The First Lien Term Facility Documentation will (i) include the First Lien Administrative Agent's customary agency provisions (including, without limitation, the ability of the First Lien Administrative Agent to exercise, in its own and separate discretion, agent rights and remedies pursuant to the First Lien Term Facility Documentation and on behalf of the Lenders (so long as no contrary direction or instruction has been given in writing by the Required Lenders pursuant to the terms and conditions of the First Lien Term Facility Documentation) and certain mechanical provisions not in contravention of anything specifically set forth in this First Lien Term Loan Term Sheet (and subject to the terms and conditions thereof), (ii) cure any mistakes or defects contained in the Documentation Precedent, (iii) include modifications to reflect any relevant changes in law or accounting standards since the date of the Documentation Precedent, (iv) include customary material intellectual property anti-"J.Crew" provisions, the "Serta" protection provision, "Chewy" protection provision, and other customary "liability management exercise" and/or "liability management transaction" protections for the Lenders, (v) remove all "grower" and "builder" basket components and limited conditionality transaction provisions contained in the Documentation Precedent, (vi) include "disqualified preferred stock" (to be defined and mutually agreed in the First Lien Term Facility Documentation) and preferred stock of subsidiaries in the definition of "Indebtedness", (vii) clarify that the negative covenants apply to both direct and indirect actions by the applicable Loan Parties or their respective subsidiaries, (viii) (A) remove any prior notice (i.e., only concurrent notice required) for exercise of any equity pledge related remedies (after the occurrence and during the continuation of an event of default) under the First Lien Term Facility and (B) provide that any such equity pledge shall include an irrevocable and exclusive proxy

B-17

with a customary "no defense" provision, (ix) without limiting any such default or event of default "blockers" set forth in this First Lien Term Loan Term Sheet, add customary default and event of default "blockers" to each of the relevant baskets, and (x) provide that, on and after any default or event of default (and without any action or notice by the First Lien Administrative agent), no continuations or conversions of the First Lien Term Loans to SOFR loans will be permitted, and any expiring SOFR loans shall be automatically converted to ABR Loans. To the extent that any representations and warranties made on, or as of, the Closing Date (or a date prior thereto) are qualified by or subject to "Material Adverse Effect", for purposes of such representations and warranties, the definition thereof shall be "Company Material Adverse Effect" as defined in the Acquisition Agreement.

The ABL Intercreditor Agreement shall be entered into by the First Lien Administrative Agent and the agent with respect to the ABL Facility as of the Closing Date and shall be on terms and conditions reasonably acceptable to the First Lien Administrative Agent and the Lenders, including, without limitation, the following: (a) a cap in an aggregate amount equal to $2,250.0 million with respect to the senior claims of the ABL Facility (but no cap on the amount of the senior claims of the First Lien Term Facility); and (b) a par purchase option in favor of the Lenders with respect to all ABL Facility claims, subject to customary buy-out trigger events (including, without limitation, any bankruptcy or insolvency event of default).

The Third Lien Intercreditor Agreement shall be entered into by the First Lien Administrative Agent and applicable agent or other representative and holders with respect to the Third Lien Notes as of the Closing Date and shall be on terms and conditions acceptable to the First Lien Administrative Agent (acting in its sole discretion), including, without limitation, the following: (a) prior to the irrevocable discharge and payment in full in cash of all obligations under the First Lien Term Facility, a permanent standstill of exercise of remedies by the agent and holders of the Third Lien Notes, with the First Lien Administrative Agent and the Lenders having sole and exclusive authority to pursue

enforcement actions and exercise of remedies with respect to the Collateral and the Loan Parties; (b) the obligations of the Third Lien Notes shall be, at all times, both lien subordinated and payment subordinated, in each case, to the obligations under the First Lien Term Facility; (c) customary turnover and payover provisions (with inclusion of, without limitation and regardless of whether such amounts are allowed under any applicable law, the Bankruptcy Code, or in any insolvency proceeding, default interest and any Prepayment Premium owed on account of the First Lien Term Facility) with respect to the Third Lien Notes in favor of the First Lien Term Facility claimholders; (d) no cap on the First Lien Term Facility obligations or claims; (e) customary and comprehensive "silent junior" provisions for insolvency and related matters restricting the Third Lien Notes agent and holders, including, without limitation, that (i) the Third Lien Notes agent and holders may not propose any debtor-in-possession financings (or object to (and shall be required to support and consent to) any such debtor-in-possession financings provided by, consented to, or otherwise not objected to by the First Lien Administrative Agent or the Lenders), (ii) the Third Lien Notes agent and holders may not request or receive any adequate protection without the prior written consent of the First Lien Administrative Agent, and the Third Lien Notes agent and holders must consent to, and not otherwise object to, any adequate protection requested or provided to the First Lien Administrative Agent and/or any of the Lenders, (iii) the Third Lien Notes agent and holders must consent to (and agree to the automatic release of the liens securing and guarantees supporting the Third Lien Notes so long as such liens attach to the proceeds thereof in the priority otherwise provided for in the Third Lien Intercreditor Agreement), and not otherwise object to, any credit bid by the First Lien Administrative Agent and/or the Lenders or any other sale or disposition under Section 363 of the Bankruptcy Code that is supported by, consented to, or otherwise not objected to by the First Lien Administrative Agent and/or the Lenders, and (iv) the Third Lien Notes agent and holders must consent to, and not otherwise object to, any chapter 11 plan that is supported, consented to, or otherwise not objected to by the First Lien Administrative Agent and/or any of the Lenders, and may not otherwise support any chapter 11

B-19

plan that does not result in the irrevocable discharge and payment in full in cash of the First Lien Term Facility obligations on the effective date thereof; (f) a customary buy-out right in favor of the Third Lien Notes holders on terms to be mutually agreed; provided that (i) such buy-out right must be exercised prior to the earlier of (A) entry of a final order approving any debtor-in-possession financing, and (B) within 30 days following the occurrence of an applicable triggering event of default or the commencement of a bankruptcy or insolvency proceeding, and (ii) the buy-out amount shall consist of 100% of the aggregate principal amount of the First Lien Term Loans, plus accrued and unpaid interest (including any default interest), plus the applicable Prepayment Premium; (g) all payments to, or otherwise on account of, the Third Lien Notes shall be subordinated to the prior discharge and repayment in full in cash of the First Lien Term Facility and expressly prohibited other than permitted payments specifically set forth in this First Lien Term Loan Term Sheet (which shall include interest and other amounts that are solely paid in kind and otherwise capitalized under the Third Lien Notes, with treatment and allowance of any customary and bona fide agency fees and expense reimbursement to be reasonably satisfactory to the First Lien Administrative Agent); (h) any and all amendments, supplements, waivers, or other modifications of the Third Lien Notes documentation shall be prohibited without the prior written consent of the First Lien Administrative Agent; (i) the Third Lien Note holders that are the Sponsor or affiliates or other related funds of the Sponsor shall not, and the Borrower shall cause the Sponsor or affiliates or other related funds of the Sponsor not, to directly or indirectly, assign or sell participations or other interests of more than 49.9% of the Third Lien Notes that they own as of the Closing Date, in each case, without the prior written consent of the Required Lenders in their sole discretion; and (j) the automatic release of liens and guarantees supporting the Third Lien Notes upon a sale, transfer or other disposition of any Collateral or any Loan Party in connection with a sale, transfer, or other disposition permitted by the First Lien Term Facility Documentation and the Third Lien Notes documentation (as in effect on the Closing Date) or otherwise in connection with any sale, transfer or other disposition after any event of default under the First Lien Term

Facility Documentation, exercise of remedies, foreclosure, or pursuant to a sale of Collateral under Section 363 of the Bankruptcy Code agreed to by the First Lien Administrative Agent.

Notwithstanding the foregoing or anything else to the contrary in the First Lien Term Facility Documentation, to the extent applicable, all leases of the subsidiaries of Holdings that are (or would be, if presently in existence) treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update shall be or continue to be accounted for as operating leases regardless of any change in or application of GAAP following such date that would otherwise require such leases to be treated as capital leases.

Any amount set forth herein denominated or to be set forth in the First Lien Term Facility Documentation in U.S. dollars shall be deemed to refer to the Dollar Equivalent (as defined below) of such amount, based on an applicable spot rate of conversion as of the applicable date of determination to be described therein. "***Dollar Equivalent***" means, at any time, (a) with respect to any amount denominated in U.S. dollars, such amount and (b) with respect to any amount denominated in any other currency, the equivalent amount thereof in U.S. dollars as reasonably determined by the First Lien Administrative Agent at such time in accordance with currency equivalent provisions to be agreed on the basis of the spot rate as of the applicable date of determination for the purchase of U.S. dollars with such currency.

For purposes of calculating the First Lien Leverage Ratio, Total Leverage Ratio, Consolidated Total Funded Indebtedness or any financial definition, indebtedness level or ratio including in connection with any covenant test (including on a pro forma basis), the applicable exchange rates shall be selected and determined by the Borrower and shall reflect (i) adjustments to take into account the effect of any interest rate and/or cross currency derivatives Holdings and its subsidiaries have entered into or (ii) with respect to income statement and cash flow items, the interest rate and/or exchange rate calculated by taking the weighted average exchange

rates for the applicable period or any other method otherwise consistent with the exchange rate methodology applied in the financial statements delivered pursuant to the credit agreement, in each case as selected and determined by the Borrower.

Representations and Warranties:    Limited to the following (to be limited, on the Closing Date, to the Specified Representations, and to be applicable to Holdings and all of its subsidiaries): organizational status and good standing; power and authority (other than with respect to the First Lien Term Facility Documentation, subject to Material Adverse Effect), qualification (subject to Material Adverse Effect), due authorization, execution, delivery, binding effect and enforceability of the First Lien Term Facility Documentation; with respect to the First Lien Term Facility Documentation and the Transactions, no violation of, or conflict with, law, organizational documents or material agreements; beneficial ownership; compliance with law (subject to Material Adverse Effect); anti-terrorism and sanctions laws, including the PATRIOT Act and OFAC; FCPA and anti-money laundering laws; litigation (subject to Material Adverse Effect); margin regulations; governmental approvals (subject to Material Adverse Effect, except such approvals pertain to the execution, delivery or performance of the First Lien Term Facility Documentation); Investment Company Act; Federal Power Act; accuracy of disclosure as of the Closing Date; historical financial statements; no Material Adverse Effect since the Closing Date; forward-looking statements in the lender presentation; labor matters (subject to a Material Adverse Effect); taxes (subject to Material Adverse Effect); ERISA (subject to Material Adverse Effect); subsidiaries as of the Closing Date; intellectual property (subject to Material Adverse Effect); environmental laws (subject to Material Adverse Effect); ownership of properties; creation and perfection of liens and other security interests; solvency of Holdings and its subsidiaries (to be defined and determined in a manner consistent with the manner in which solvency is defined and determined in the form of solvency certificate set forth in Annex I to Exhibit C); subject, in the case of each of the foregoing representations and warranties, to customary qualifications and limitations for materiality to be

B-22

provided in the First Lien Term Facility Documentation consistent with the Documentation Principles and mutually agreed. All representations and warranties shall be subject to the bring-downs in connection with delivery of financial statements and other reporting set forth below.

"**Material Adverse Effect**" means (a) on the Closing Date a Company Material Adverse Effect (as defined in the Acquisition Agreement) and (b) after the Closing Date, a material adverse effect on (i) the business or financial condition or results of operations, in each case, of Holdings and its subsidiaries, taken as a whole, (ii) the material rights and remedies (taken as a whole) of the First Lien Administrative Agent under the First Lien Term Facility Documentation (taken as a whole) (other than due to the action or inaction of the First Lien Administrative Agent or the applicable Lenders), or (iii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under the First Lien Term Facility Documentation.

<u>Conditions to Borrowing</u>:    The availability of the borrowing under the First Lien Term Facility on the Closing Date will be subject solely to the satisfaction (or waiver by the Initial First Lien Lenders) of the following: (a) delivery of a customary borrowing notice subject to the Certain Funds Conditions that will also include a statement and certification by a responsible officer of the Borrower as to whether any Liens[2] arising from a valid judgment of a court of competent jurisdiction against any of the Acquired Companies (as defined in the Acquisition Agreement) on the basis of Alter Ego Liability[3], but solely if such Liens secure judgments that are in excess (in the aggregate) of $50.0 million, could reasonably be expected to be placed on the material properties or

---

[2] For this purpose, "*Lien*" means, with respect to any asset, any mortgage, deed of trust, lien, pledge, charge, security interest, assignment for security, hypothecation, charge, writ of attachment, or encumbrance of any kind in respect of such asset.

[3] For this purpose, "*Alter Ego Liability*" shall mean any liability, obligation, judgment, claim, or cause of action of, or against, any of the Acquired Companies, in favor of, or asserted by, any creditor or claimant of the Bolivarian Republic of Venezuela or Petróleos de Venezuela, S.A., a Venezuelan company (or any agency, instrumentality or subdivision, or affiliate thereof), arising from or based upon any theory of alter ego, veil-piercing, successor liability, or any similar legal, equitable, or other doctrine or principle, whether direct or indirect, contingent or otherwise, and whether asserted in law, equity, or otherwise.

material assets (including, without limitation, the Material Property) of the Acquired Companies within one hundred twenty (120) days following the Closing Date (it being understood and agreed that the existence or absence of any such expectation is not itself a condition to borrowing on the Closing Date and the sole and exclusive consequence of any statement of any such expected Lien (but not, for the avoidance of doubt, the actual incurrence of any such Lien in the future, which shall be otherwise subject to the terms and conditions in the First Lien Term Facility Documentation) within such timeframe will be the Borrower agreeing to deliver executed mortgages or mortgage amendments for the Refinery Properties within two business days after the Closing Date) and (b) the applicable Conditions set forth in <u>Exhibit C</u> to the Commitment Letter.

<u>Affirmative Covenants</u>:

Limited to the following (to be applicable to Holdings and all of its subsidiaries):

(a) quarterly (for each of the first 3 quarters of each fiscal year) unaudited financial statements within 60 days after each such fiscal quarter end (or 90 days for each of the first 3 fiscal quarters ending after the Closing Date for which financial statements are required to be delivered), in each case which period shall be extended by the period of any extension permitted by the Securities and Exchange Commission (the "**SEC**"), and compliance certificates and management discussion and analysis with such financial statements (which shall include a bring down of any representations or warranties), and (b) beginning with the first fiscal year ending after the Closing Date; provided that in the case of the fiscal quarter in which the Closing Date occurs, such financial statements may be bifurcated into pre- and post-closing periods, annual audited financial statements, accompanied by an audit opinion from a nationally recognized accounting firm or other accounting firm reasonably acceptable to the First Lien Administrative Agent without any qualification or exception as to "going concern" or the scope of the audit, except any "going concern" qualification or exception as a result of (i) an impending maturity date of any indebtedness, or (ii) any actual or potential inability to satisfy any other financial covenant under any other indebtedness, and for the avoidance of doubt any explanatory or emphasis of

matter paragraphs within 120 days after each fiscal year end (or 150 days in the case of the first such fiscal year end after the Closing Date (*provided* that in the case of the fiscal year in which the Closing Date occurs, such audit may, at the option of the Borrower, be bifurcated into pre and post-closing audits)), in each case which period shall be extended by the period of any extension permitted by the SEC, in each case, for Holdings and its subsidiaries on a consolidated basis; a compliance certificate and management discussion and analysis with such financial statements (which shall include a bring down of any representations or warranties); other information reasonably requested by the First Lien Administrative Agent; prior to an IPO, annual budgets (<u>provided</u> that (i) the Borrower shall not be required to deliver such annual budget if the Borrower's counsel reasonably advises it not to, on account of securities law considerations to the extent the Borrower or any direct or indirect parent thereof has filed a Form S-1 (including a confidential filing) with the Securities and Exchange Commission or certified in writing to the First Lien Administrative Agent that it intends to consummate an IPO within one year of any scheduled budget reporting requirement and (ii) on or after an IPO (x) the requirements under clauses (a) and (b) shall be satisfied by the applicable filings with the SEC and (y) no budget shall be required to be delivered); notices of default, litigation (subject to Material Adverse Effect) and ERISA (subject to Material Adverse Effect); inspections upon reasonable prior notice (subject to limitations on frequency (so long as there is no ongoing event of default), cost reimbursement and the disclosure of information subject to confidentiality obligations, attorney-client privilege or other customary disclosure limitations and *provided* that inspection rights shall be exercisable solely by the First Lien Administrative Agent and solely at the request of the Required Lenders); maintenance of property (subject to casualty, condemnation and normal wear and tear and subject to Material Adverse Effect) and customary insurance (but not, for the avoidance of doubt, flood insurance except to the extent required by applicable law, and with no requirement that the collateral agent be notified prior to cancellation); maintenance of existence (other than with respect to Holdings, each subsidiary of Holdings that is a direct or indirect parent of the Borrower and the

B-25

Borrower, subject to Material Adverse Effect); maintenance of books and records; payment of taxes (subject to Material Adverse Effect); compliance with laws (subject to Material Adverse Effect) (with no specific covenants regarding ERISA or environmental law); provision of information required under the Beneficial Ownership Regulation following written request therefor; quarterly lender calls; and additional guarantors and further assurances on collateral matters.

Financial Covenant:

Limited to a minimum liquidity requirement (i.e., the sum of unrestricted cash and cash equivalents plus unused availability under the ABL Facility) for the Holdings and its subsidiaries of $500.0 million, which such compliance with this financial covenant requirement shall only be tested and reported as of the last day of each fiscal quarter (commencing with the first fiscal quarter ending after the Closing Date) (such financial maintenance covenant, the "Financial Covenant").

Negative Covenants:

Limited to the following (to be applicable to Holdings and all subsidiaries of Holdings) limitations on:

a) the incurrence of debt (including "direct or indirect" incurrences thereof), with exceptions to be agreed and reasonably acceptable to the Lenders, including the ability to incur (i) indebtedness under the First Lien Term Facility, (ii) Third Lien Notes, (iii) [reserved], (iv) non-speculative hedging arrangements, cash management, and banking or treasury obligations; *provided* that the aggregate principal amount of hedging obligations guaranteed and/or secured on a *pari passu* basis with the Borrower Obligations shall not exceed $1.0 billion, (v) purchase money indebtedness and capital leases equal to $300.0 million in the aggregate; (vi) unsecured indebtedness arising from agreements providing for adjustments of purchase price, "earn outs", other contingent consideration obligations and other deferred purchase price obligations entered into in connection with acquisitions, which all such indebtedness shall be subject to an aggregate cap of $100.0 million and may not be incurred or

B-26

guaranteed by any non-Guarantor Subsidiaries, (vii) secured (but on a junior basis to, the ABL Facility and First Lien Term Facility on all Collateral pursuant to a "silent" third lien payment subordination and intercreditor agreement on terms and conditions at least as favorable to the First Lien Administrative Agent and the Lenders as the Third Lien Intercreditor Agreement, and on a senior or pari passu lien priority basis to the Third Lien Notes; collectively, such payment subordination and lien priority terms and conditions described in this parenthetical, a "***Junior Lien Basis***") and/or unsecured (which such unsecured debt must be payment subordinated on terms and conditions at least as favorable to the First Lien Administrative Agent and the Lenders as those subordination terms under the Third Lien Intercreditor Agreement; collectively, such payment subordination on the terms and conditions described in this parenthetical, a "***Junior Unsecured Basis***") indebtedness pursuant to a general basket equal to $600.0 million in the aggregate, and which such indebtedness must also comply with each of sub-clauses (xii) (C), (D) and (E) of this clause (a) (all such indebtedness permitted under this clause (vii), the "***General Debt Basket***"), (viii) indebtedness of non-Guarantor subsidiaries subject to a $25 million cap (<u>provided</u>, that, notwithstanding anything to the contrary, all such indebtedness of non-Guarantor subsidiaries may only be incurred under the basket set forth in this clause (viii)), (ix) indebtedness (with letters of credit (both drawn or undrawn) thereunder counted as indebtedness outstanding for purposes of this clause (ix)) under the ABL Facility subject to a cap (subject to any permanent reduction of such permitted basket capacity in connection with an asset sale sweep under the ABL Facility as described above) equal to the lesser of (x) $2,250.0 million and (y) the borrowing base (which shall be defined as (1) 90% of book value of all accounts receivable owned by the Borrower and its Subsidiaries plus (2) 80% of the book value of all inventory owned by the

Borrower and its Subsidiaries plus (3) 100% of cash and cash equivalents owned by the Borrower and its subsidiaries (subject, in the case of this clause (3), limited solely to cash and cash equivalents that are included in the actual borrowing base for the ABL Facility and limited in any event to an aggregate amount equal to $500 million); provided, that such ABL Facility shall (A) be secured by no assets other than the Collateral and guaranteed by no guarantors other than the Guarantors, and (B) be subject to the ABL Intercreditor Agreement at all times, (x) unlimited unsecured intercompany indebtedness among Loan Parties (subject to subordination arrangements acceptable to the First Lien Administrative Agent), (xi) non-recourse indebtedness of joint ventures subject to a $100.0 million cap on terms and conditions to be agreed, (xii) additional unsecured (if unsecured, on a Junior Unsecured Basis) or junior secured indebtedness (if secured, on a Junior Lien Basis), subject to (A) no existing or continuing event of default, (B) on a pro forma basis, both (1) the Total Leverage Ratio (with Adjusted EBITDA calculated for the most recently ended 4 fiscal quarter period for which financial statements have been delivered prior to, and cash and cash equivalents calculated as of, the date of incurrence) shall not exceed 3.50 to 1.00 and (2) the fixed charge coverage ratio (to be defined in the First Lien Term Facility Documentation) is greater than or equal to 2.00 to 1.00, (C) such indebtedness may not be incurred or guaranteed by any non-Guarantor Subsidiaries or secured by any non-Collateral, (D) the maturity date of any such indebtedness shall be no earlier than 6 months after the maturity date of the Term Loans and the weighted average life to maturity of such indebtedness shall not be shorter than 6 months after the then remaining weighted average life to maturity of the Term Loans, and (E) such indebtedness shall not include or require any cash payments (whether on account of principal, interest, or otherwise) other than regularly scheduled cash interest payments not to exceed

10% per annum (which such permitted cash interest payments shall, in each case, be prohibited during the continuation of any event of default under the First Lien Term Facility Documentation) prior to the date on which the First Lien Term Facility obligations are irrevocably discharged and paid in full in cash (all such indebtedness permitted under this clause (xii), the "**Ratio Debt Basket**"), (xiii) unsecured debt issued in exchange for management equity pursuant to ordinary course compensation agreements subject to terms and conditions to be reasonably agreed, and (xiv) indebtedness on account of industrial revenue bonds not to exceed an aggregate amount of $100.0 million and, if secured, only be secured by the Collateral on a pari passu or junior priority basis (and not a senior basis) to the liens securing the First Lien Term Facility (subject to a customary intercreditor agreement reasonably acceptable to the First Lien Administrative Agent and the Required Lenders);

b) liens (including "direct or indirect" incurrences thereof), with exceptions to be agreed and reasonably acceptable to the Lenders, including permitting liens (i) securing the Borrower Obligations and related Guarantees, (ii) [reserved], (iii) securing purchase money indebtedness or capital leases permitted by clause (a)(v) above secured by the assets being leased and/or acquired, (iv) securing the ABL Facility (subject to the ABL Intercreditor Agreement), and (v) securing indebtedness incurred pursuant to clauses (a)(xii) (subject to an acceptable junior intercreditor agreement);

c) fundamental changes (other than, among others to be agreed and reasonably acceptable to the Lenders, (i) intercompany mergers, consolidations, re-domiciliations, liquidations and dissolutions (so long as, if a Borrower or a Guarantor is merging with a subsidiary that is not a Borrower or a Guarantor, such Borrower or Guarantor is the surviving entity (but not in any event, with respect to Holdings or any subsidiary

B-29

of Holdings that is a direct or indirect parent of the Borrower)), (ii) Permitted Acquisitions, and (iii) dispositions permitted by the First Lien Term Facility Documentation);

d) asset sales (including sales and issuances of capital stock of subsidiaries) and sale leasebacks (and in each case, including "direct or indirect" dispositions), with exceptions to be agreed and reasonably acceptable to the Lenders, including permitting (i) unlimited asset sales, subject solely to the following terms and conditions: (A) all such asset sales are for fair market value as reasonably determined by the Borrower in good faith, (B) the consideration for any such sales in excess of an amount to be agreed is at least 75% cash consideration (the "*75% Cash Consideration Basket*") (but any such permitted non-cash consideration cannot include the assumption of liabilities), and (C) all such proceeds of such asset sales are subject to the terms set forth in the section hereof entitled "Mandatory Prepayments", (ii) sales of obsolete, worn out, uneconomical, negligible or surplus assets or assets no longer used or useful in the business, (iii) intercompany transfers (other than any transfers to Holdings, with transfers of assets from the Borrower or a Guarantor to subsidiaries that are not the Borrower or a Guarantor, in the aggregate with investments by the Borrower and the Guarantors in subsidiaries that are not the Borrower or a Guarantor under (e)(ii) below, capped at the greater of $100.0 million (such shared cap amount for all such utilizations or applications thereof, the "*Shared Non-Loan Party Transfers Basket*"), and (iv) sales of assets in the ordinary course of business and immaterial assets; *provided* that, notwithstanding anything herein to the contrary, the Loan Parties shall not be permitted to directly or indirectly sell, transfer or dispose of any Material Property or any capital stock of any subsidiaries that own Material Property without the consent of the Lenders in their sole discretion;

e) investments (including any direct or indirect transactions and to be defined in a manner consistent with the Documentation Precedent, except that any contract or other agreement that is entered into outside of the ordinary course of business or is not in accordance with prudent industry practices shall constitute an investment), with exceptions to be agreed and reasonably acceptable to the Lenders, including permitting (i) unlimited intercompany investments (with investments by the Borrower and the Guarantors in subsidiaries that are not the Borrower or a Guarantor, in the aggregate with transfers of assets from the Borrower or a Guarantor to subsidiaries that are not the Borrower or a Guarantor subject to the Shared Non-Loan Party Transfers Basket), (ii) investments pursuant to a general basket in an outstanding amount not to exceed $100.0 million in the aggregate (with investments by the Borrower and the Guarantors in subsidiaries that are not the Borrower or a Guarantor, in the aggregate with transfers of assets from the Borrower or a Guarantor to subsidiaries that are not the Borrower or a Guarantor subject to the Shared Non-Loan Party Transfers Basket), subject to pro forma Financial Covenant compliance and no event of default, (iii) so long as no existing or continuing event of default is existing or continuing, investments in a person (including, to the extent constituting an investment, to acquire assets of a person that represents all or substantially all of its assets or a division, business unit or product line, including research and development and related assets in respect of any product), that is engaged in a permitted business, subject to, among other customary conditions to be agreed, (A) pro forma Financial Covenant compliance, and (B) only in persons that become Guarantors and for assets that become Collateral (each such investment, a "***Permitted Acquisition***"), and (iv) subject to pro forma Financial Covenant compliance and no existing or continuing event of default, investments in joint ventures in an aggregate outstanding amount not to exceed $200.0 million

B-31

and subject to certain conditions to be agreed, including (A) such joint venture shall be for a bona fide business purpose (and not for liability management transactions, financing, or other capital raises), (B) none of the Material Property is subject, directly or indirectly and in whole or in part, to the joint venture, and (C) no "grower", "builder" or other additive components (whether based on investment returns or otherwise) to the aggregate cap on such basket;

f) dividends or distributions on, or redemptions of, Holdings' equity interests or subsidiaries' of Holdings' equity interests (including "direct or indirect" dividends, distributions or redemptions), or payments, prepayments, repayments, refinancings, repurchases, redemptions, or other transfers for value (whether in cash or otherwise) of any junior secured, unsecured, or subordinated indebtedness or any equity interests that are not common equity interests (each of the foregoing, a "***Restricted Junior Payment***"), in each case whether directly or indirectly, with exceptions to be agreed and reasonably acceptable to the Lenders, including (i) subject to no event of default and pro forma Financial Covenant compliance, customary exceptions for distributions necessary to pay the Sponsor (and any other Investor) advisory, refinancing, subsequent transaction and exit fees in an aggregate amount per fiscal year not to exceed the lesser of 2% of Adjusted EBITDA and $20.0 million, (ii) customary tax distributions to the extent for taxes generated by the operation of the Borrower and its subsidiaries and for which the direct or indirect equity owners of the Borrower are liable (and to the extent such direct or indirect equity owners actually use such distributions to make those tax payments in cash to the applicable taxing authority), (iii) unlimited Restricted Junior Payments, subject to (A) the prior repayment or prepayment of at least $1,200.0 million in aggregate principal amount of the First Lien Term Facility, (B) no existing or continuing defaults or events of default, (C) no

Restricted Junior Payment may be funded, directly or indirectly, with the proceeds of any ABL Facility borrowing or other extension of credit, (D) on a pro forma basis, the Total Leverage Ratio is less than 2.50 to 1.00, (E) pro forma Financial Covenant compliance, and (F) so long as, on a pro forma basis, the First Lien Leverage Ratio is greater than 1.00 to 1.00, (1) such Restricted Junior Payment as permitted under this sub-clause (iii) is greater than the greater of (x) $100.0 million and (y) 10% of Adjusted EBITDA, (2) on a pro forma basis for such Restricted Junior Payment, the aggregate amount of unrestricted cash and cash equivalents of the Borrower and its subsidiaries would be no less than $1,000.0 million, and (3) on a pro forma basis for such Restricted Junior Payment, the sum of the aggregate amount of unrestricted cash and cash equivalents and undrawn availability under the ABL Facility would be no less than $2,000 million, (iv) following an IPO, dividends or distributions in an aggregate amount per annum not to exceed the greater of 7.0% of market capitalization and 7.0% per annum of the gross proceeds from such IPO and (v) an amount equal to Retained Designated Prepayment Amount if and only to the extent that such amount is applied to such Restricted Junior Payment within 90 days after the corresponding Retained Designated Prepayment Amount was first retained by the Borrower as set forth in the definition of "Retained Designated Prepayment Amount"; provided, further, that any permitted Restricted Junior Payments may be made only in cash (not with any other property);

g) amendments of any documentation governing junior secured indebtedness, unsecured indebtedness, subordinated indebtedness, and/or any equity interests other than common equity interests, in each case, (i) in any manner that is materially adverse to the First Lien Administrative Agent or the Lenders (it being understood and acknowledged that (A) any amendment of the maturity date thereof in effect on the Closing Date (or other modification to the

B-33

weighted average life) of any indebtedness and/or (B) any amendment to permit cash payments prior to the irrevocable discharge and repayment in full in cash of the First Lien Term Facility obligations, in each case, shall be deemed to be materially adverse to the First Lien Administrative Agent and/or the Lenders), or (ii) that is otherwise in violation of any applicable intercreditor or subordination agreement; provided, further, that in no event shall the definitive documentation governing the Third Lien Notes be amended, supplemented, or otherwise modified without the prior written consent of the First Lien Administrative Agent;

(h) compliance with the PATRIOT Act, FCPA, OFAC, sanctions laws, anti-money laundering laws or other anti-terrorism laws;

(i) use of proceeds;

(j) passive holding company covenant with respect to Holdings and each subsidiary of Holdings that is a direct or indirect parent of the Borrower;

(k) lines of business;

(l) changes to organizational documents;

(m) negative pledge clauses and subsidiary distributions;

(n) changes to fiscal year;

(o) limitation on transactions with affiliates (with (x) the definition of "Affiliate" to include, for the avoidance of doubt, Holdings, Topco, Elliott, the Sponsor, and any other affiliate or subsidiary of any of the foregoing, and (y) references to "direct or indirect transactions" and without a dollar or other minimum threshold) exceptions to be agreed and reasonably acceptable to the Lenders, including (i) subject to no existing or continuing event of default and pro forma Financial Covenant compliance, the payment of financial oversight and similar fees (including refinancing, termination and subsequent transaction fees)

B-34

under any management agreement in place on the Closing Date) in an aggregate amount per fiscal year not to exceed the lesser of 2% of Adjusted EBITDA and $20 million, and (ii) subject to no existing or continuing event of default, payment of reasonable and documented out-of-pocket expenses and indemnities of the Sponsor (and/or any other Investors) and to directors;

(p) prohibition on speculative hedging arrangements; and

(q) prohibitions and limitations with respect to the Acquired 2020 Bonds, including (i) prohibitions on, directly or indirectly, any amendments, waivers, modifications, exercises of, consents granted with respect to, or any omission or actions taken or failed to be taken or otherwise permitted, in each case of the foregoing, with respect to the Acquired 2020 Bonds or any direct or indirect right, control, or interest therein that would be reasonably expected to have an adverse effect on the rights and interests of the First Lien Administrative Agent and/or the Lenders, (ii) prohibitions on the direct or indirect enforcement (including any direction, non-direction, or any other direct or indirect action with respect to) of any rights, remedies, or interests on account of the Acquired 2020 Bonds held and/or owned by any Loan Party or any subsidiary thereof, except exclusively at the sole direction of, and only pursued or otherwise taken with, the prior written consent of the First Lien Administrative Agent (acting in its sole discretion); provided, that with respect to any such enforcement, remedies, and/or other actions or omissions as set forth in this sub-clause (ii), the Loan Parties and their respective subsidiaries that hold and/or own the Acquired 2020 Bonds shall, in each case, fully comply with, and follow, any and all instructions and directions provided by the First Lien Administrative Agent with respect thereto, (iii) the Acquired 2020 Bonds (or, for the strict avoidance of doubt, any direct or indirect right, control, or interest therein) shall not be, directly or indirectly,

B-35

assigned, sold, participated, distributed, contributed, transferred, or otherwise disposed of, other than to a non-affiliated third party and in each case subject to the following terms and conditions: (A) no defaults or events of default shall be existing or continuing under the First Lien Term Facility, (B) receipt of (i) fair market value of the applicable Acquired 2020 Bonds and (ii) either cash and/or other assets; provided, that, such other assets become Collateral, (C) the purported pledge of, grant of security interest, and/or any other lien or encumbrance whatsoever securing the equity interests in CITGO Holding, Inc. in favor of the 2020 Bonds must, in each and every case, be fully and irrevocably released and terminated before or substantially concurrently with giving effect to any such transaction, and (D) any net cash proceeds received on account thereof shall be subject to the mandatory prepayment requirement set forth under clause (b) of the section titled "Mandatory Prepayments" above, and (iv) without limiting the foregoing sub-clause (iii), all proceeds received, directly or indirectly, by any Loan Party or any subsidiary thereof on account of a repurchase, redemption, defeasance, compromise, restructuring, exchange, or other settlement of the Acquired 2020 Bonds shall be, for purposes of clarity, treated as an asset sale for the purposes of, and subject to, the mandatory prepayment requirement set forth under clause (b) of the section titled "Mandatory Prepayments" above.

| | |
|---|---|
| Unrestricted Subsidiaries: | Strictly for the avoidance of doubt, and without limiting any of the other terms and requirements set forth herein, the First Lien Term Facility Documentation will not, in any event, permit the designation or maintenance of unrestricted subsidiaries or any such similar or analogous concept. |
| Events of Default: | Limited to (to be applicable to Holdings, the Borrower, and all of their respective subsidiaries): nonpayment of principal when due; nonpayment of interest after a 5 business day grace period; nonpayment of fees, premiums and other amounts after a 5 business day grace |

period; violation of covenants, with certain affirmative covenants to have customary grace periods (but in any event not to exceed 30 days after notice or knowledge thereof); incorrectness of representations and warranties, in each case in any material respect; cross default (after expiration of any grace periods) and cross acceleration to the Third Lien Notes; cross default (after expiration of any grace periods) and cross acceleration to indebtedness in excess of $150.0 million, provided that any event of default under the ABL Facility financial covenant shall be subject only to actual cross acceleration; bankruptcy or other insolvency events of Holdings or its subsidiaries (with a customary grace period for involuntary events of no less than 60 days); unsatisfied monetary judgments in excess of $150.0 million (to the extent not fully covered by adequate insurance or indemnity) that have not been paid, vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; actual or asserted (in writing) invalidity of the First Lien Term Facility Documentation, including material Guarantees or security documents or any material security interest purported to be created thereunder; certain material ERISA events; and change of control (to include a pre- and post-IPO provision and with no continuing director prong).

The definition of "change of control" will require at least 50% ownership of voting interests by Permitted Holders (defined in accordance with the Documentation Principles and to include, and only to include, the Sponsor and customary sponsor affiliates; provided, that the scope of such "change of control" definition shall cover the chain of ownership from the Borrower's subsidiaries, to the Borrower, to CITGO Holding, Inc., to Holdings, to PDV Holding, Inc. (or its successor), and ultimately to the Sponsor (or its affiliate)) prior to any IPO and, thereafter, a "change of control" will be triggered if (i) another person or group (other than any employee benefit plan and/or person acting as the trustee, agent or other fiduciary or administrator, any underwriters in connection with an IPO and/or Permitted Holder or group controlled by a Permitted Holder) acquires more than the greater of (a) 35% of the outstanding voting common stock of Holdings and (b) the percentage of then outstanding voting common

stock of Holdings held, directly or indirectly, by the Permitted Holders, unless the Permitted Holders have, at such time, the right or ability by voting power or otherwise to elect or designate for election 50% or more of the board of directors of Holdings or a direct or indirect parent thereof or (ii) Holdings shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interests in the equity interests of Borrower.

Voting:

Amendments and waivers of the First Lien Term Facility Documentation will require the approval of Lenders holding more than 50% of the aggregate amount of the loans and unused commitments under the First Lien Term Facility (the "***Required Lenders***"), except that (i) the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders or of any other majority or required percentage of the Lenders of any facility, class or tranche, or any other Lenders) shall be required with respect to customary matters including the following: (A) increases in the commitment of such Lender (it being understood that a waiver of any condition precedent, the waiver of any default, event of default or mandatory prepayment, or any modification, waiver or amendment of financial definitions or ratios or of any covenant shall not constitute an increase of any commitment), (B) reductions in or forgiveness of principal (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment or commitment reduction shall not constitute a reduction in or forgiveness of principal), interest (other than a waiver of default interest), fees, or (if any) prepayment premiums (*provided* that any change in the financial definitions or ratios used in calculating any interest rate or fee (or any component definition thereof) shall not constitute a reduction in any rate of interest or fee for purposes of this clause (B)), (C) extensions of scheduled amortization payments, final maturity (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment or commitment reduction, or any modification, waiver or amendment of financial definitions or ratios or of any covenant shall not constitute an extension of any maturity date), interest,

fees, or prepayment premiums (it being understood and agreed that this clause (C) shall not apply to the waiver of default interest), (D) changes to the payment "waterfall" provision (or any substantially similar provision) and express subordination of the obligations under or liens securing the First Lien Term Facility, and (E) amendments or modifications of the "liability management exercise" and/or "liability management transaction" protections in the First Lien Term Facility Documents, including, for the avoidance of doubt, the "J.Crew", "Serta", and "Chewy" provisions, (ii) the consent of 100% of the Lenders will be required with respect to customary matters including the following: (A) decreases to any of the voting percentages and (B) releases of all or substantially all of the value of the Guarantors or releases of all or substantially all of the Collateral (in each case, other than to the extent not prohibited under the First Lien Term Facility Documentation), (iii) customary protections for the First Lien Administrative Agent will be provided, (iv) any amendment or waiver that by its terms affects the rights or duties of Lenders holding loans or commitments of a particular class (but not the Lenders holding loans or commitments of any other class) will require only the requisite percentage in interest of the affected class of Lenders that would be required to consent thereto if such class of Lenders were the only class of Lenders, and (v) any amendments or waivers that would increase the commitments under the First Lien Term Facility or otherwise permit the incurrence of any other indebtedness (including, for the purposes of clarity, any debtor-in-possession financing) that would be guaranteed or secured on a pari passu basis with the First Lien Term Facility shall require such increased commitments or other indebtedness incurrence, as applicable, to be offered to all then-existing Lenders for participation on a pro rata basis as will be more fully set forth in the First Lien Term Facility Documentation (it being understood and acknowledged that, subject to the foregoing ratable opportunity to participate in such increased commitments or other indebtedness, the effectuating amendment and/or waiver shall be subject only to the approval of the Required Lenders); it being understood that, except as expressly provided above, there shall be no "class" voting requirement for amendments, modifications or supplements to the First

Lien Term Facility Documentation. Defaulting Lenders shall be excluded from both the numerator and the denominator in the calculation of the Required Lenders.

Notwithstanding anything to the contrary herein, (a) so long as there are two or more unaffiliated Lenders (where a Lender and its affiliates or approved funds count as one Lender for purposes of this clause (a)) that each hold at least 9.0% of the aggregate First Lien Term Facility commitments and loans, then "Required Lenders" must include at least two such Lenders that each hold at least 9.0% of the aggregate First Lien Term Facility commitments and loans, and (b) so long as ACM, together with its affiliates and related funds, holds at least 33.333333333% of the aggregate First Lien Term Facility commitments and loans, then "Required Lenders" must include a representative affiliated with ACM.

The First Lien Term Facility Documentation shall contain customary provisions for, on a non pro rata basis, replacing, or repaying and terminating the commitments of, (i) Lenders claiming increased costs, tax gross-ups and similar required indemnity payments, (ii) Defaulting Lenders, and (iii) non-consenting Lenders in connection with amendments and waivers requiring the consent of all relevant Lenders, or of all relevant Lenders directly affected thereby, so long as Lenders under the First Lien Term Facility holding more than 50% of the aggregate amount of the loans and commitments under the First Lien Term Facility, or more than 50% (by principal amount) of the directly and adversely affected Lenders under the First Lien Term Facility, shall have consented thereto or participated, as applicable, and any such replacement and/or repayment shall include the payment of the amount described under the heading "Prepayment Premium" above.

In addition, if the First Lien Administrative Agent and the Borrower shall have jointly identified an error, omission, mistake or ambiguity or determined to effect any administrative change of a technical, administrative or immaterial nature in the First Lien Term Facility Documentation; provided that, at the election of the First Lien Administrative Agent in its sole discretion, any such amendment, supplement or other modification shall

not become effective unless the Lenders have received at least five business days' prior written notice thereof and the First Lien Administrative Agent shall not have received within such time period a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

The First Lien Term Facility Documentation shall permit guarantees, collateral documents and related documents to be, together with the credit agreement (and any applicable deadlines with respect thereto), amended and waived with the consent of the First Lien Administrative Agent and the Required Lenders.  The Borrower and the First Lien Administrative Agent may, without the consent of any other person, amend the First Lien Term Facility Documentation to permit the accession as Guarantors, of subsidiaries incorporated or organized in jurisdictions outside the United States (at the Borrower's election in its sole discretion).  With respect to any indebtedness expressly permitted to be incurred under the First Lien Term Facility Documentation, the First Lien Administrative Agent shall be expressly authorized and instructed by the Lenders to, and shall, in each case to the extent the First Lien Administrative Agent's consent or acknowledgement is required therefor under the First Lien Term Facility Documentation, enter into such intercreditor agreement consistent with any terms set forth in, or requirements of, the First Lien Term Facility Documentation; *provided*, that in such event the Borrower shall be required to deliver a certificate certifying that such indebtedness and any related liens are not prohibited from being incurred under the Term Facility Documentation and the intercreditor terms do not violate the First Lien Term Facility Documentation.

The First Lien Administrative Agent shall be entitled to extend any deadline or requirement in connection with compliance with guarantee and security provisions.

| Tax Gross-Up; Increased Cost Protection: | The First Lien Term Facility Documentation will include customary tax gross-up and cost protection provisions to be agreed.  Protection for increased costs will be subject to customary exceptions to be agreed.  The obligation of the Borrower and the Guarantors to gross up for and/or to indemnify Lenders for taxes imposed on payments will be subject to customary exceptions, will include a |

requirement to provide applicable tax related documentation, and will include customary mitigation provisions; *provided* that the tax gross-up will not apply to any withholding taxes imposed by reason of current Sections 1471 through 1474 of the Code (or any amended or successor version to the extent such version is substantively comparable and not materially more onerous to comply with), any regulations and official interpretations thereof, any agreement entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements (and related legislation, rules or official administrative guidance) and any "day one" U.S. federal withholding taxes. Protection for increased costs imposed as a result of rules enacted or promulgated under the Dodd-Frank Act or Basel III (regardless of when enacted or adopted) shall be included in the First Lien Term Facility Documentation (but solely for such costs that would have been included if they had been otherwise imposed under the applicable increased cost provisions).

<u>Assignments and Participations</u>:

After the Closing Date, the Lenders will be permitted to assign loans and/or commitments under the First Lien Term Facility with the consent of the Borrower and the First Lien Administrative Agent (in each case, not to be unreasonably withheld or delayed); *provided*, that (A) no assignment may be made to a natural person, a Disqualified Lender or, except as permitted below, a Restricted Affiliated Lender, (B) no consent of the Borrower shall be required (other than in the case of a proposed assignment to a Disqualified Lender) after the occurrence and during the continuance of any event of default, (C) no consent of the First Lien Administrative Agent or the Borrower, as the case may be, shall be required with respect to an assignment of any Term Loans if such assignment is an assignment to another Lender, an affiliate of a Lender, an approved fund, a Debt Fund Affiliate, the Borrower or any other affiliate of the Borrower (in each case, other than in the case of a proposed assignment to a Disqualified Lender), (D) the Borrower will be deemed to have consented to any assignment of the Term Loans if it has failed to respond to a written request for such consent within 10 business days after receipt of such written request, and (E) the request for any such consent of the Borrower in respect

of any proposed assignment shall be delivered to the Borrower and to a designated contact at the Sponsor as designated in writing by the Borrower to the First Lien Administrative Agent.

Each assignment (other than to another Lender, an affiliate of a Lender or an approved fund) will be in an amount of an integral multiple of $1 million in the case of the First Lien Term Facility (or a lesser amount, if agreed between the Borrower and the First Lien Administrative Agent) or, if less, all of such Lender's remaining loans and commitments of the applicable class. Assignments will not be required to be pro rata among the First Lien Term Facility. The First Lien Administrative Agent shall receive a processing and recordation fee of $[REDACTED] for each assignment (except if waived by the First Lien Administrative Agent), except in the case of any such assignment to an affiliate of the assigning Lender or to the Sponsor (or any other Investor), any Debt Fund Affiliate, Holdings, its subsidiaries or any of their respective affiliates.

The Lenders will be permitted to sell participations in loans and commitments without the consent of the Borrower, the First Lien Administrative Agent or any other Lender and without any other restriction (other than as set forth below) in accordance with applicable law and subject to limitations consistent with the Documentation Principles; *provided* that participations shall not be permitted to Disqualified Lenders, subject to the last two paragraphs of this Section and with the administration of such prohibition otherwise conducted in a manner and pursuant to documentation consistent with the Documentation Principles. Voting rights of participants shall be limited to reductions of principal, interest or fees, extensions of final scheduled maturity or times for payment of interest or fees, and releases of Collateral, in each case requiring the unanimous vote of all Lenders (or all directly and adversely affected Lenders).

Solely to the extent that the Borrower has authorized the First Lien Administrative Agent to disclose, in writing, the list of entities that are Disqualified Lenders to the Lenders' public side of an information wall (or any other equivalent platform necessary for the purpose of any

Lenders' compliance with the requirement under this paragraph), no Lender may at any time enter into a total return swap, total rate of return swap, credit default swap or other derivative instrument under which any obligation in respect of the First Lien Term Facility is a reference obligation (collectively, "***Derivative Products***") with any counterparty that is a Disqualified Lender.

If any Loans are assigned or participated to a Disqualified Lender or in violation of the First Lien Term Facility Documentation, then: (a) the Borrower may (i) terminate any commitment of such person and repay any applicable outstanding Loans (at a price equal to the least of par, the amount such person paid to acquire such Loans and the average trading price for such loans over the immediately prior 5 trading days), without premium, penalty, prepayment fee or breakage, and/or (ii) require such person to assign its rights and obligations to one or more eligible lenders at the price indicated above (which assignment shall not be subject to the processing and recordation fee specified above), (b) no such person shall receive any information or reporting provided by the Borrower, the First Lien Administrative Agent or any other Lender, attend any Lender meetings or have access to any electronic site established for Lenders or confidential communications from counsel to or financial advisors to the First Lien Administrative Agent or the Lenders, (c) for purposes of voting, any loans and commitments held by such person shall be deemed not to be outstanding and such person shall have no voting or consent rights with respect to "required lender" or class votes or consents, (d) for purposes of any matter requiring the vote or consent of each Lender affected by any amendment or waiver, such person shall be deemed to have voted or consented to approve such amendment or waiver if a majority of the affected class so approves, and (e) such person shall not be entitled to any expense reimbursement or indemnification rights and shall be treated in all other respects as a Defaulting Lender.

If any Lender enters into a Derivative Product with a counterparty that is a Disqualified Lender without the consent of the Borrower, then, for purposes of voting, such Lender shall be deemed to have voted or consented

B-44

to approve such amendment or waiver in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Disqualified Lenders and who have not entered into such a Derivative Product.

Non-pro rata distributions and commitment reductions will be permitted without any consent in connection with loan buy-back or similar programs and assignments to, and purchases by, the Sponsor, the other Investors and their respective affiliates (including, without limitation, Holdings and its subsidiaries but excluding Debt Fund Affiliates (as defined below)) (each, a "***Restricted Affiliated Lender***"), including through open-market purchases or other negotiated transactions; *provided* that (i) Holdings and its subsidiaries shall cause any loans or commitments assigned to it or them (including as contemplated by the following clause (ii)) to be cancelled, (ii) [reserved], (iii) the aggregate unpaid principal amount of Term Loans held by all Restricted Affiliated Lenders shall not exceed 25% of the aggregate unpaid principal amount of Term Loans then outstanding (determined as of the time of such purchase), (iv) [reserved], (v) Restricted Affiliated Lenders will not receive information provided solely to Lenders (unless prepared by or on behalf of, or otherwise shared with, the Borrower or its affiliates) and will not be permitted to attend or participate in Lender only meetings or calls and will not be entitled to challenge the First Lien Administrative Agent's and the applicable Lenders' attorney client privilege as a result of their status as Restricted Affiliated Lenders, (vi) [reserved], (vii) [reserved], (viii) Holdings and its subsidiaries may not make any non-pro rata purchase of any loans at any time, (ix) for purposes of any amendment, direction, waiver or modification of the First Lien Term Facility Documentation that does not in each case require the consent of each Lender or each affected Lender or does not adversely affect such Restricted Affiliated Lender (in its capacity as a Lender) in any material respect as compared to other Lenders or deprive them of their pro rata share of any payment, Restricted Affiliated Lenders will be deemed to have voted in the same proportion as non-affiliated Lenders voting on such matter, (x) [reserved], (xi) in the event that any proceeding under the Bankruptcy Code shall be instituted by or against the

Borrower or any Guarantor, each Restricted Affiliated Lender shall acknowledge and agree that it is an "insider" under Section 101(31) of the Bankruptcy Code and, as such, the claims associated with the loans and commitments owned by it shall not be included in determining whether the applicable class of creditors holding such claims has voted to accept a proposed plan for purposes of section 1129(a)(10) of the Bankruptcy Code, or, alternatively, to the extent that the foregoing designation is deemed unenforceable for any reason, each Restricted Affiliated Lender shall vote in such proceedings in the same proportion as the allocation of voting with respect to such matter by those Lenders who are not Restricted Affiliated Lenders, except to the extent that any plan of reorganization proposes to treat the Borrower Obligations held by such Restricted Affiliated Lender in a manner that is less favorable in any material respect to such Restricted Affiliated Lender than the proposed treatment of similar Borrower Obligations held by Lenders that are not Restricted Affiliated Lenders, and (xii) such distributions, commitment reductions, assignments and purchases shall be subject to such other terms and conditions as are consistent with the Documentation Principles.

Debt Fund Affiliates (as defined below) shall be permitted to purchase Loans from the Lenders and shall have all rights of a Lender under the First Lien Term Facility. "*Debt Fund Affiliate*" shall mean a debt fund that is an affiliate of the Sponsor or any other Investor and that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, notes, bonds or similar extensions of credit or securities in the ordinary course of its business and whose managers have fiduciary duties to the investors therein independent of or in addition to their duties to the Sponsor or the other Investors, as applicable, or any of their respective affiliates; *provided* that for any Required Lender vote, Debt Fund Affiliates may not, in the aggregate, account for more than 49.9% of the amounts included in determining whether the Required Lenders have consented to any amendment or waiver.

The First Lien Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Restricted Affiliated Lenders, Debt Fund Affiliates or Disqualified Lenders (including with respect to Derivative Products). Without limiting the generality of the foregoing, the First Lien Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Restricted Affiliated Lender, Debt Fund Affiliate, or Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Restricted Affiliated Lender, Debt Fund Affiliate, or Disqualified Lender or (z) have any liability with respect to or arising out of the voting in any amendment or waiver to any Loan Document by any Restricted Affiliated Lender or Debt Fund Affiliate.

The First Lien Administrative Agent shall be permitted to disclose, verbally or in writing, the list of entities that are Disqualified Lenders upon request by any Lender in connection with any potential assignment or participation (*provided* that such Lender agrees to keep such list confidential).

"**Disqualified Lender**" means each of the following: (a) certain banks, financial institutions and other institutional lenders and investors (which are acceptable to the Initial First Lien Lenders and which may not be amended after delivery and acceptance thereof) that are separately identified in writing by Borrower or Sponsor to the Initial First Lien Lenders prior to the execution of the Commitment Letter by the Initial First Lien Lenders and any affiliate thereof that is either (i) clearly identifiable solely on the basis of similarity of its name or (ii) identified in writing from time to time by Borrower or Sponsor to the Initial First Lien Lenders; and (b) operating entities who are engaged in a substantially similar line of business as and are a bona fide competitor to the Borrower, the Acquired Business and/or their respective subsidiaries and are separately identified in writing by Borrower or Sponsor to the First Lien Administrative Agent from time to time, and any affiliate thereof (other than a bona fide debt fund affiliate

B-47

(defined below)) that is either (i) clearly identifiable solely on the basis of similarity of its name or (ii) identified in writing by Borrower or Sponsor to the Initial First Lien Lenders from time to time (each, a "Competitor"); provided that, with respect to any identification of a Disqualified Lender after the date of the Commitment Letter, (x) if any person (or affiliate thereof) so designated has acquired a loan or commitment under the applicable Facility prior to such designation or is party to a pending trade, such designation shall not invalidate such assignment or trade (and such person shall be a Lender to the extent it continues to hold such loan or commitment), and (y) if a Disqualified Lender so designated has acquired a participation in the applicable Facility prior to such designation (and is not already disqualified under clause (a)(i) or (b)(i)) such designation shall not invalidate such participation; provided, further that any additional Disqualified Lender identified in writing shall not become effective until the fifth business day following receipt thereof by the applicable Initial First Lien Lenders (or First Lien Administrative Agent, as applicable) from you. For purposes of the foregoing, a "bona fide debt fund affiliate" of a Competitor is a debt fund, investment vehicle, regulated bank entity or unregulated entity primarily engaged in, or that advises funds or other investment vehicles that are primarily engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course of business for financial investment purposes and with respect to which persons involved with the investment in the relevant Competitor, or the management, control or operation thereof, directly or indirectly, possesses the power to direct or cause the investment policies of such fund, vehicle or entity are independent from the Disqualified Lender.

<u>Successor Administrative Agent</u>:    The First Lien Administrative Agent may resign at any time upon no less than 10 business days' written notice to the applicable party, subject to the appointment of a successor administrative agent (although if no successor administrative agent is appointed within 30 days, such resignation will still be effective). The successor agent shall be a commercial bank or trust company with a combined capital and surplus of at least $1 billion and,

unless any event of default shall have occurred and be continuing, shall be reasonably acceptable to the Borrower (*provided* that no Disqualified Lender shall be a successor agent). The Borrower shall not be permitted to remove (or otherwise appoint a successor to) the First Lien Administrative Agent.

| | |
|---|---|
| Expenses and Indemnification: | The Borrower shall pay, if the Closing Date occurs, all reasonable and documented out-of-pocket costs and expenses of the First Lien Administrative Agent and the Commitment Parties (without duplication) in connection with the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of the First Lien Term Facility Documentation (limited (i) in the case of legal fees, to the reasonable and documented out-of-pocket fees, disbursements and other charges of the one primary counsel identified herein, of a single local counsel with respect to the First Lien Term Facility in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions), and of one additional counsel due to an actual conflict of interest for all affected parties or otherwise retained (except in the context of enforcement) with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed) and (ii) to advisors or consultants retained (except in the context of enforcement) with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed)). |

The Borrower will indemnify the First Lien Administrative Agent, the Commitment Parties, the Lenders and their affiliates, managed funds and controlling persons, and the directors, officers, employees, partners, counsel, agents, advisors and other representatives, successors and assigns of the foregoing, and hold them harmless from and against any and all losses, liabilities, damages, claims and reasonable and documented fees and out-of-pocket expenses (limited, in the case of legal fees, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel for all indemnified parties and, if necessary, one local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all indemnified parties (and, in the case of an actual conflict of interest, one additional counsel in

B-49

each applicable jurisdiction to the affected indemnified persons)) of any such indemnified person (which, in each case, shall exclude allocated costs of in-house counsel and (without the Borrower's prior written consent (not to be unreasonably withheld or delayed) the fees and expenses of any other third party advisors)) arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such indemnified person is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its affiliates, creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby; *provided* that no indemnified person will be indemnified for any liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from (i)(A) the gross negligence, bad faith or willful misconduct of such person or any of its controlling persons, controlled affiliates or any of the officers, directors, employees, partners or agents, advisors or other representatives, of any of the foregoing, in each case who are involved in or aware of the Transaction (as determined by a court of competent jurisdiction in a final and non-appealable judgment), (B) a material breach of the First Lien Term Facility Documentation by any such person or any of its controlling persons or controlled affiliates (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (C) disputes between and among indemnified persons to the extent such disputes do not arise from any act or omission of the Borrower or any of its affiliates (other than claims against an indemnified person acting in its capacity as First Lien Administrative Agent); or (ii) any settlement entered into by such person without the Borrower's written consent (for the avoidance of doubt, if settled with the Borrower's written consent, or if there is a final judgment for the plaintiff against an indemnified person in any proceeding, the Borrower shall indemnify and hold harmless each indemnified person to the extent and in the manner set forth above). Each indemnified person shall refund and return any and all amounts paid by the Borrower to such indemnified person for fees, expenses, damages, indemnification or contribution to the extent such indemnified person is not entitled to payment of such amounts in accordance with the terms described

B-50

above (as determined by a court of competent jurisdiction in a final and non-appealable determination). None of the indemnified persons and the Borrower and its affiliates and their respective directors, officers, employees, agents, advisors and other representatives shall be liable for any special, indirect, consequential or punitive damages in connection with the First Lien Term Facility (except to the extent of its indemnity or reimbursement obligations hereunder in respect of any losses, claims, damages, liabilities and expenses incurred or paid by an indemnified person to a third party unaffiliated with such indemnified person). For the avoidance of doubt, this paragraph shall not apply to Taxes (as defined in First Lien Term Facility Documentation), except any Taxes that represent losses, damages, claims, etc. arising from any non-Tax claims.

<u>Governing Law and Forum:</u>

New York; *provided, however*, that (i) the interpretation of the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement) (and whether or not a Company Material Adverse Effect (as defined in the Acquisition Agreement) has occurred and/or is continuing), (ii) the determination of the accuracy of any Specified Acquisition Agreement Representation and whether as a result of any inaccuracy thereof Sponsor (or its applicable affiliates) have the right (taking into account any applicable cure provisions) to terminate its (or such affiliates') obligations under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) as a result of a breach of such specified acquisition agreement representations without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates), or to decline to consummate the Acquisition (in each case in accordance with the terms of the Acquisition Agreement) as a result of a breach of such specified acquisition agreement representations without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates) under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) and (iii) the determination of whether the Acquisition has been consummated in accordance with the terms of the Acquisition Agreement and, in each case of the foregoing in this proviso, any claims or disputes arising out of any such interpretation

or determination or any aspect thereof shall, in each case, be governed by, and construed in accordance with, the laws governing the Acquisition Agreement as applied to the Acquisition Agreement, without giving effect to any choice-of-law or conflict-of-law rules or provisions of any jurisdiction that would cause the application of the law of any other jurisdiction.

<u>Counsel to the First Lien Term Loan Administrative Agent and Initial Lenders</u>:                Paul Hastings LLP.

ANNEX I to EXHIBIT B

Interest Rates:                    [REDACTED]

                                   Calculation of interest shall be on the basis of the actual days
                                   elapsed in a year of 360 days (or 365 or 366 days, as the case
                                   may be, in the case of ABR loans where the applicable rate is
                                   determined pursuant to clause (i) of the definition of ABR).

Benchmark Replacement:             [REDACTED]

ANNEX II to EXHIBIT B

<u>Certain Defined Terms</u>

Certain capitalized terms used in Annex II are defined as set forth in Exhibit B.  Capitalized terms used in this Exhibit B and not otherwise defined herein or in Annex I will be defined in the First Lien Term Loan Documentation consistent with the Documentation Principles.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income[4] for such period, adjusted by (x) *adding thereto*, in each case only to the extent (and in the same proportion) deducted in determining such Consolidated Net Income (other than in respect of <u>clauses (f)</u> and <u>(m)</u> below) and without duplication:

(a)     Consolidated Interest Expense *plus* the amount of any letter of credit fees, Commitment Fees or any other unused line fees;

(b)     Consolidated Amortization Expense;

(c)     Consolidated Depreciation Expense;

(d)     Consolidated Tax Expense;[5]

(e)     Consolidated Transaction Expenses;[6]

(f)      (x) pro forma adjustments of the type identified in the Sponsor Model, and (y) at the Borrower Agent's election in its sole discretion, "run-rate" cost savings (net of actual cash savings), expense reductions, other operating changes, improvements, optimizations, actions, initiatives and synergies (excluding revenue synergies, projected increases in revenues or other revenue enhancements) projected by the Borrower to result from actions either taken or expected to be taken in connection with, and within 12 months following, (i) the Transactions, (ii) any acquisition (including the commencement of activities constituting a business) or disposition (including the termination or discontinuance of activities constituting a business), in each case of business entities or of properties or assets constituting a division or line of business (including, without limitation, a product line), (iii) increased pricing and/or volume, (iv) any other operational change, expanded operations, improvement, optimization, actions or initiative (including, to the extent applicable, in connection with the Transactions or any restructuring), (v) new products, new projects or new contracts and/or (vi) creation of, entering into an engagement with or acquisition of new customers (which, in the case of each of <u>sub-clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(v)</u> and <u>(vi)</u> above, will be added to Consolidated EBITDA as so projected until fully

---

[4] Definition of "Consolidated Net Income" to be mutually agreed and shall be consistent with the Documentation Principles; <u>provided</u>, that such definition of "Consolidated Net Income" shall reflect and incorporate any and all such changes to the definition thereof contained in the Documentation Precedent to correspond and match with those such adjustments and other modifications reflected in the definition of Consolidated EBITDA in this Annex II relative to the definition of Consolidated EBITDA (including, without limitation, clauses (a), (b), (e), and (f) of the definition thereof in this Annex II) included in the Documentation Precedent.

[5] Notwithstanding anything to the contrary in the Documentation Principles, in no event shall any Consolidated Tax Expense include any tariffs, excise, hydrocarbon, gasoline, or any other non-income taxes.

[6] Such expenses referenced in the above clause (e) shall be limited to the Transactions on the Closing Date.

realized and calculated on a Pro Forma Basis as though such synergies, cost savings, expense reductions, other operating changes, improvements, optimizations, actions and initiatives, increased pricing and/or volume, new projects and contracts and new customers had been realized (or commenced, acquired or created, as applicable) on the first day of such period), net of the amount of actual benefits realized during such period from such actions; or with respect to actions being taken in connection with acquisitions, dispositions, operational changes, initiatives or such other transactions or occurrences described in this clause (f) which occurred prior to the Closing Date, within 12 months of the Closing Date; *provided*, *further* that, the aggregate amount of adjustments to Consolidated EBITDA permitted to be made for any period pursuant to this clause (f) shall not exceed, together with any adjustments pursuant to the penultimate paragraph of the definition of Pro Forma Basis, 15% of Consolidated EBITDA for such period (calculated after giving effect to such addbacks, exclusions and adjustments).

(g)     any charges, expenses, costs, accruals, reserves, payments, fees or losses of any kind ("**Charges**") (including rationalization, legal, tax, structuring and other Charges) (other than depreciation or amortization expense) related to any consummated, anticipated, unsuccessful or attempted equity offering (including an IPO, whether or not consummated), issuance or repurchase, other Equity Issuance, incurrence by Holdings or any of its Subsidiaries of Indebtedness (including an amendment thereto or a refinancing thereof, whether or not successful, and any costs of surety bonds or similar costs incurred in connection with successful or unsuccessful financing activities), Dividend (including the amount of expenses relating to payments made to option holders of any direct or indirect parent of any Borrower in connection with, or as a result of, any distribution being made to equityholders of such Person, which payments are being made to compensate such option holders as though they were equityholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted under this Agreement), the Acquisition and Transactions (without duplication of clause (e) above), repayment of Indebtedness (including Restricted Debt Payments) or recapitalization or the breakage of any hedging arrangement permitted hereunder or the incurrence of Indebtedness permitted to be incurred hereunder (including a refinancing thereof) (in each case, whether or not successful), including such Charges related to (i) the offering, syndication, assignment and administration of the loans under the Loan Documents and any other credit facilities (including, and together with Charges of S&P, Moody's or any other nationally recognized ratings agency) and (ii) any refinancing, extension, waiver, forbearance, amendment or other modification of the Loan Documents and any other credit facilities or other Indebtedness (in each case, whether consummated, anticipated, unsuccessful, attempted or otherwise);

(h)     (i) any non-cash Charges, impairment Charges (excluding bad debt expense in excess of $10 million in any four fiscal quarter period), write-downs, write-offs, expenses, losses or items (including, without limitation, purchase accounting adjustments under ASC 805 or similar recapitalization accounting or acquisition accounting under GAAP or similar provisions under GAAP, or any amortization or write-off of any amounts thereof (including, without limitation, with respect to inventory, property and equipment, leases, software, goodwill, intangible assets, in-process research and development, deferred revenue, advanced billings and debt line items)) (including any (x) non-cash expense (A) resulting from non-cash inventory adjustments (in a manner to be agreed) or (B) relating to the vesting of warrants, and (y) non-cash increase in expenses due to recapitalization accounting or to purchase accounting associated with the Transactions) or the amortization or write-off of any amounts thereof, in each case including any such Charges, impairment

B.I-2

Charges, write-downs, write-offs, expenses, losses or items pushed down to Holdings and its Restricted Subsidiaries, (ii) net unrealized or realized exchange, translation, performance or other losses relating to foreign currency transactions and foreign exchange adjustments including, without limitation, losses and expenses in connection with, and currency and exchange rate fluctuations and losses or other obligations from, hedging activities or other derivative instruments;

(i)     (i) the amount of management, advisory, monitoring, consulting, refinancing, subsequent transaction and exit fees (including termination fees) and similar fees and expenses and related indemnities and expenses paid or accrued to direct or indirect equity holders of Holdings or any Equity Investor (and each of their Affiliates), and payments for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, to the extent such payments are permitted hereunder, and (ii) directors' fees and expenses paid or accrued by Holdings or its Restricted Subsidiaries or, to the extent paid or accrued with respect to services that relate directly to Holdings or its Restricted Subsidiaries and paid for with amounts distributed by Holdings and its Restricted Subsidiaries, of any direct or indirect parent thereof;

(j)     [reserved];

(k)     Insurance Loss Addbacks; *provided* that if such amount is both (i) added back to Consolidated EBITDA and (ii) not so reimbursed or received by Holdings or its Restricted Subsidiaries within such one year period applicable thereto, then such Insurance Loss Addback shall be subtracted in the subsequent Test Period;

(l)     [reserved];

(m)     any exceptional, extraordinary, unusual, infrequent or non-recurring expenses, losses, lost revenues or Charges incurred; provided that the aggregate amount added back pursuant to this clause (m), when taken in the aggregate with amounts added back with respect to clauses (n), (v), and (y), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

(n)     Charges attributable to or associated with any restructuring (including restructuring charges related to Permitted Acquisitions and other Investments permitted hereunder and adjustments to existing reserves), carve out, integration, implementation of new initiatives, business optimization activities, cost savings, cost rationalization programs, operating expense reductions, synergies and/or similar initiatives, retention, recruiting, relocation, rebranding, signing bonuses, Charges in connection with a single or one-time event (including without limitation, in connection with facility openings, pre-openings, closings, reconfigurations and/or consolidations and/or terminations, reconfigurations and/or consolidations of existing lines of business), research and development, contract termination Charges, stock option and other equity-based compensation expenses, any Charges associated with any stock subscription or shareholder agreement or any employee benefit trust, severance costs, any Charges associated with modifications to any pension or post-retirement employee benefit plan, indemnities and/or any expenses, accruals or reserves (including restructuring costs related to Permitted Acquisitions and other Investments and adjustments to existing reserves), Charges associated with systems design implementation and/or upgrade, software development, project start-up and new operations (including, without limitation, any Charges in connection with entering into a new market) and corporate development and other executive costs, legal and other professional fees and

B.I-3

listing fees, any Charges associated with any modification of any pension or post-retirement employee benefit plan, indemnities and expenses, transaction fees and expenses, management fees and expenses, including, without limitation, any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, for the avoidance of doubt, Public Company Costs); provided that the aggregate amount added back pursuant to this clause (n), when taken in the aggregate with amounts added back with respect to clauses (m), (v), and (y), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

(o)     [reserved];

(p)     non-cash costs and expenses relating to any equity-based compensation or equity-based incentive plan of Holdings (or its direct or indirect parent company) or any of its Restricted Subsidiaries;

(q)     any net losses attributable to the early extinguishment or repayment of Indebtedness (and the termination of any associated Hedging Agreements) including, for the avoidance of doubt, any unamortized fees, costs and expenses paid in connection therewith;

(r)     [reserved];

(s)     [reserved];

(t)     [reserved];

(u)     [reserved];

(v)     any net loss from disposed, abandoned, transferred, closed or discontinued operations (excluding held for sale discontinued operations until actually disposed of); provided that the aggregate amount added back pursuant to this clause (v) when taken in the aggregate with amounts added back with respect to clauses (m), (n), and (y), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

(w)     [reserved];

(x)     [reserved]; and

(y)     all Charges attributable to, and payments of, legal settlements, fines, judgments or orders; provided that the aggregate amount added back pursuant to this clause (y) when taken in the aggregate with amounts added back with respect to clauses (m), (n), and (v), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

and (y) *subtracting therefrom*, in each case only to the extent (and in the same proportion) added in determining such Consolidated Net Income and without duplication, the aggregate amount of (A) all non cash items increasing Consolidated Net Income for such period (other than the accrual of revenue or recording of receivables in the ordinary course of business); (B) any exceptional, extraordinary, unusual or non recurring gains increasing Consolidated Net Income for such period; (C) any net realized gains from

Hedging Agreements, embedded derivatives or other derivatives resulting from actions outside of the ordinary course of trading (provided that, for the avoidance of doubt, gains resulting from ordinary course of trading Hedging Agreements or other derivatives shall not be subtracted pursuant to this clause (C)); (D) any net gain from disposed equity interests or any other assets, or abandoned, transferred, closed or discontinued operations; (E) the amount of any minority interest net income attributable to non-controlling interests in any non-Wholly Owned Subsidiary or any joint venture; and (F) net unrealized or realized exchange, translation or performance income or gains relating to foreign currency transactions and foreign exchange adjustments including, without limitation, income or gains in connection with, and currency and exchange rate fluctuations and income or gains from, hedging activities or other derivative instruments.

Notwithstanding anything herein to the contrary, it is agreed that, for the purpose of calculating the First Lien Leverage Ratio, the Total Leverage Ratio and the Consolidated Interest Coverage Ratio for any period that includes the last four fiscal quarters ended on or prior to the Closing Date, Consolidated EBITDA shall be deemed to be amounts to be agreed for each of foregoing periods, respectively, in each case, as adjusted on a Pro Forma Basis and to give effect to any adjustments in clause (f) above that may become applicable due to actions taken on or after the Closing Date, as applicable; it being agreed that for purposes of calculating any financial ratio or test in connection with a Subject Transaction, Consolidated EBITDA shall be calculated on a Pro Forma Basis in a manner consistent with Consolidated EBITDA for each quarterly period set forth above and the adjustments set forth above in this definition.  Other than for purposes of calculating Excess Cash Flow, Consolidated EBITDA shall be calculated on a Pro Forma Basis to give effect to any Subject Transaction as if it occurred on the first day of the reference period.

"**Excess Cash Flow**" shall mean, for any Excess Cash Flow Period, Consolidated EBITDA for such Excess Cash Flow Period, minus, without duplication:

(a)    Debt Service[7] of the Obligations and Indebtedness under the ABL Facility, in each case, to the extent paid in cash and to the extent such payments are permitted hereunder;

(b)    [reserved];

(c)    [reserved];

(d)    [reserved];

(e)    the aggregate amount of Consolidated Tax Expense (including any direct or indirect distributions for the payment of such Consolidated Tax Expense) paid or payable with respect to such Excess Cash Flow Period and, if payable, for which reserves have been established to the extent required under GAAP; provided, that any such amounts reserved for, and deducted from Excess Cash Flow, in any given Excess Cash Flow Period may not be deducted from Excess Cash Flow when actually paid in the following Excess Cash Flow Period (and, in any event, must be added back in any determination of Excess Cash Flow in the next following Excess Cash Flow Period if not ultimately so paid as reserved for in such preceding Excess Cash Flow Period);

(f)    [reserved];

(g)    the absolute value of, if negative, (x) the amount of Net Working Capital at the end of such Excess Cash Flow Period, minus (y) the amount of Net Working Capital at the end of the prior Excess Cash

[7] The definition of "Debt Service" in the Documentation Precedent will be modified to remove the inclusion of any amortization other than "scheduled" principal amortization payments.

Flow Period (or the beginning of the Excess Cash Flow Period in the case of the first Excess Cash Flow Period);

(h)    [reserved];

(i)    [reserved];

(j)    the aggregate amount added back to Consolidated EBITDA in the calculation of Consolidated EBITDA for such period pursuant to clause (f) thereof;

(k)    any Insurance Loss Addback for such period (but only to the extent such amounts on account thereof are actually reinvested pursuant to the terms of the mandatory prepayment provisions of this Agreement);

(l)    the aggregate amount of non-cash adjustments to Consolidated EBITDA for periods prior to the beginning of the current Excess Cash Flow Period to the extent paid in cash by Holdings and its Restricted Subsidiaries during such Excess Cash Flow Period; provided, that (i) any such non-cash adjustments to Consolidated EBITDA were not be deducted from Excess Cash Flow for any such periods prior to the beginning of the then-current Excess Cash Flow Period and (ii) in the event that such deductions were made prior to the beginning of the current Excess Cash Flow Period, in each case, no deduction may be made in the current Excess Cash Flow Period on account of the cash payments made by Holdings and its Restricted Subsidiaries;

(m)    [reserved]; and

(n)    [reserved];

provided that (x) any amount deducted pursuant to any of the foregoing clauses that will be paid after the close of such Excess Cash Flow Period shall not be deducted again in a subsequent Excess Cash Flow Period (and if such amounts reserved and deducted in a prior Excess Cash Flow Period are not actually paid after the close of such Excess Cash Flow Period, such amounts must be added back to the determination of Excess Cash Flow for the then applicable Excess Cash Flow Period), and (y) any amount deducted pursuant to any of the foregoing clauses for cash amounts paid during any such Excess Cash Flow Period shall not have been the subject of any deduction made during any period prior to the beginning of the current Excess Cash Flow Period and, in such case of a prior deduction, no deduction may be made during the current Excess Cash Flow Period for any such cash payment; plus, without duplication, cash items of income during such Excess Cash Flow Period not included in Consolidated EBITDA.

Notwithstanding anything to the contrary, for purposes of calculating Excess Cash Flow for any Excess Cash Flow Period, for each Permitted Acquisition or other Investment permitted hereunder consummated during such Excess Cash Flow Period, (x) the Consolidated EBITDA of a target of such Permitted Acquisition or other Investment shall be included in such calculation only from and after the first day of the first full fiscal quarter to commence following the date of the consummation of such Permitted Acquisition or other Investment and (y) for the purposes of calculating Net Working Capital, (A) the total assets of a target of such Permitted Acquisition or other Investment (other than cash and Cash Equivalents), as calculated as at the date of consummation of the applicable Permitted Acquisition or other Investment, which may properly be classified as current assets on a consolidated balance sheet of Holdings and its Restricted Subsidiaries in accordance with GAAP (assuming, for the purpose of this clause (A), that such Permitted Acquisition or other similar acquisition has been consummated) and (B) the total liabilities of Holdings and its Restricted Subsidiaries, as calculated as at the date of consummation of the applicable Permitted Acquisition or other Investment, which may properly be classified as current liabilities on a

consolidated balance sheet of Holdings and its Restricted Subsidiaries in accordance with GAAP (assuming, for the purpose of this <u>clause (B)</u>, that such Permitted Acquisition or Investment has been consummated), shall, in the case of both immediately preceding <u>clauses (A)</u> and <u>(B)</u>, be used in calculating the difference between the Net Working Capital at the end of the applicable Excess Cash Flow Period from the date of consummation of the Permitted Acquisition or other Investment.

EXHIBIT C

Project Horizon
Conditions to Closing[8]

Except as otherwise set forth below, the initial borrowing of the First Lien Terms Loans shall be subject to the satisfaction or waiver (by the Initial First Lien Lenders) of the conditions set forth below:

1.  The Acquisition Agreement (including all schedules, exhibits, and annexes thereto) shall be in form and substance reasonably acceptable to the Initial Lenders (it being understood and agreed that the last draft (including the schedules, exhibits, and annexes thereto) of the Acquisition Agreement delivered to the Commitment Parties on August 22, 2025, is reasonably acceptable to the Commitment Parties). The Acquisition shall have been consummated, or substantially simultaneously with the initial borrowing under the First Lien Term Facility, shall be consummated, in all respects in accordance with the Acquisition Agreement, without giving effect to any amendment, or consent or waiver (including, without limitation, any such amendment, consent, or waiver to the schedules, exhibits (including, whether as an exhibit to the Acquisition Agreement or otherwise in the form as entered by the Court (as defined in the Acquisition Agreement), the Sale Order), and annexes thereto) by you, thereto that is adverse to the Commitment Parties (in their capacities as such), without the prior consent of each of the Commitment Parties (such consent not to be unreasonably withheld, delayed or conditioned); it being understood and agreed that, without otherwise limiting the generality and scope of the foregoing sentence, (a) any reduction (or amendment that has the effect of a reduction) in the purchase price of, or consideration for, the Acquisition shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent; (b) any increase (or amendment that has the effect of an increase) in the purchase price of, or consideration for, the Acquisition shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent, except solely to the extent that any such increase is funded entirely with (i) new cash equity contributions in Holdings and its subsidiaries, and/or (ii) the issuance of additional Alternative Preferred Equity or Third Lien Notes; <u>provided</u> that to the extent any such increase is funded with equity interests other than common equity, such equity interests shall be on terms and conditions reasonably satisfactory to the Commitment Parties; (c) any amendment (or amendment that has the effect of a change) to the definition of "Company Material Adverse Effect" in the Acquisition Agreement shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent, and (d) any amendment or waiver (or any other modification that has the effect of such amendment or waiver) to any conditions precedent to closing of the Acquisition (whether in Sections 7.1(a), (b) or (c) or Sections 7.2(a) or (d), or otherwise contained in the Acquisition Agreement) shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent.

2.  The Equity Investment shall have been made, or substantially simultaneously with the initial borrowing under the First Lien Term Facility, shall be made, in at least the amount and consistent with the description thereof, set forth in <u>Exhibit A</u> to the Commitment Letter.

3.  The Commitment Parties shall have received at least 3 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date (x) all documentation and other information about Borrower

---

[8]     Capitalized terms used in this Exhibit C shall have the meanings set forth in the other Exhibits attached to the Commitment Letter to which this Exhibit C is attached (the "***Commitment Letter***").  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit C shall be determined by reference to the context in which it is used.

Exhibit C-1

and the Guarantors as has been reasonably requested in writing at least 10 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date by the Commitment Parties that is required by governmental entities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and (y) with respect to each of you and the Borrower, in each case, to the extent that it qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation to the extent requested in writing by such Commitment Party at least 10 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date.

4.    Subject in all respects to the Certain Funds Provisions, with respect to the First Lien Term Facility, the execution and delivery by the Borrower and the Guarantors of (i) the First Lien Term Facility Documentation which shall, in each case, be consistent with the Commitment Letter, the First Lien Term Loan Term Sheet and the Documentation Principles, and shall be valid, enforceable, and effective, and (ii) customary legal opinions, customary secretary's certificates, customary evidence of authorization, good standing certificates (to the extent applicable) in the jurisdiction of organization of the Borrower and each Guarantor, and a solvency certificate of Holdings' chief financial officer, treasurer, other financial officer or other officer with equivalent duties in substantially the form of Annex I hereto (the items described in this clause (ii), collectively, the "***Term Facility Closing Deliverables***").

5.    The Commitment Parties shall have received the audited consolidated balance sheet of the Company as of December 31, 2024 and December 31, 2023 and each additional fiscal year ending at least 90 days prior to the Closing Date, and the related audited consolidated statements of income and cash flows for the fiscal years then ended (or, the fiscal year then ending, as applicable).

6.    All fees required to be paid on the Closing Date pursuant to the Fee Letter and reasonable and documented out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, to the extent invoiced at least 3 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date, shall, upon the initial funding of the First Lien Term Facility, have been, or will be substantially concurrently, paid (which amounts may be offset against the proceeds of the First Lien Term Facility).

7.    The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects at the Closing Date (as defined in the Acquisition Agreement); provided that to the extent that any Specified Representation is qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, (a) the definition thereof shall be the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement) for purposes of the making or deemed making of such Specified Representation and (b) the same shall be true and correct in all respects.

8.    Since the date of the Acquisition Agreement to the Closing Date (as defined in the Acquisition Agreement), there has not been any Company Material Adverse Effect (as defined in the Acquisition Agreement as in effect on the date hereof) that would result in the failure of a condition precedent to your obligation to consummate the Acquisition under the Acquisition Agreement or that would give you the right (taking into account any notice and cure provisions) to terminate your obligations pursuant to the terms of the Acquisition Agreement.

9.    The Sale Order (as defined in the Acquisition Agreement) shall be in full force and effect in all respects and not subject to any stay.

10.    The Refinancing shall have been, or substantially concurrently with the initial funding of the First Lien Term Facility shall be, consummated.

11.    The ABL Facility shall have become, or substantially concurrently with the initial funding of the First Lien Term Facility shall be, effective on terms, conditions, and documentation as set forth in the ABL Commitment Letter and otherwise as reasonably acceptable to the Initial First Lien Lenders.

12.    With respect to the First Lien Term Facility, the effectiveness of the ABL Facility shall occur, on terms, conditions, and documentation as set forth in the Commitment Letter and otherwise as reasonably acceptable to the Initial First Lien Lenders.

13.    The initial issuance of the Third Lien Notes and/or the Alternative Preferred Equity shall be, or substantially concurrently with the initial funding of the First Lien Term Facility shall be, consummated and made effective on the terms, conditions, and documentation as set forth in the Acceptable Third Lien Note Terms and otherwise as reasonably acceptable to the Initial First Lien Lenders.

14.    After giving effect to the Transactions on a pro forma basis, the aggregate principal amount of Consolidated Total Funded Indebtedness of Holdings, the Borrower and their respective subsidiaries (less Holdings' and its subsidiaries' Applicable Cash and Cash Equivalents) shall not be greater than $3,300 million; provided that such amount may increase by up to $500 million in borrowings under the ABL Facility solely to the extent there will be at least $500 million of unrestricted cash and cash equivalents on Holdings' and its subsidiaries' balance sheet.

15.    The 2020 Bonds TSA shall be in full force and effect and shall not have been amended, supplemented, waived, subject to any consent, omission, or failure to enforce, terminated, or otherwise modified (including, without limitation, with respect to any of the schedules, annexes, or exhibits thereto) in a manner adverse to the Commitment Parties (in their capacities as such), in each case, without the prior consent of each of the Commitment Parties (such consent not to be unreasonably withheld, delayed or conditioned); provided that to the extent that the 2020 Bonds TSA is amended, supplemented, waived, subject to any consent, omission or failure to enforce, terminated, or otherwise modified, in each case, whether directly or indirectly, to increase or add additional consideration to be paid or otherwise provided by Holdings or any of its subsidiaries (or increase or expand the direct or indirect monetary or other material obligations or liabilities thereunder), in each case of the foregoing other than such consideration, obligations, or liabilities as expressly in effect in the 2020 Bonds TSA as of the date hereof, any such amendment, supplement, waiver, consent, omission or failure to enforce, termination, or other modification shall be deemed to be adverse to the interests of the Commitment Parties and shall require each of the Commitment Parties' prior written consent. Substantially concurrently with the initial funding of the First Lien Term Facility, the Consenting 2020 Holders shall transfer, convey, and assign to Holdings (or its designee that is a Loan Party) all of the 2020 Bonds held by such Consenting 2020 Holders that, taken as a whole, constitute the Acquired 2020 Bonds (which, for purposes of clarity, such transferred and acquired 2020 Bonds shall constitute at least two-thirds of the aggregate outstanding principal amount of all the 2020 Bonds), in accordance with the 2020 Bonds TSA.

ANNEX I to
EXHIBIT C

**[HOLDINGS]**

**SOLVENCY CERTIFICATE**

[_____], 20[_]

Pursuant to Section [_] of Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among [_____], the undersigned [chief financial officer] of Holdings hereby certifies as of the date hereof, solely on behalf of Holdings and not in his/her individual capacity and without assuming any personal liability whatsoever, that:

I.      I am familiar with the finances, properties, businesses and assets of Holdings and its Subsidiaries.  I have reviewed the Loan Documents and such other documentation and information and have made such investigation and inquiries as I have deemed necessary and prudent therefor.  I have also reviewed the consolidated financial statements of Holdings and its Subsidiaries, including projected financial statements and forecasts relating to income statements and cash flow statements of Holdings and its Subsidiaries.

II.     On the Closing Date, immediately after giving effect to the Transactions, Holdings and its Subsidiaries (on a consolidated basis) are solvent and (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course and (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital.

All capitalized terms used but not defined in this certificate shall have the meanings set forth in the Credit Agreement.

*[SIGNATURE PAGE TO FOLLOW]*

      IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**[HOLDINGS]**

By: _____
Name:
Title:

**E-2**

*REDACTED Bid Execution Version*

| | | |
|---|---|---|
| **Apollo Capital Management, L.P.** **Apollo Global Funding, LLC** **9 West 57th St., 41st Floor New York, NY 10019** | **Oaktree Capital Management, L.P.** **333 S. Grand Avenue, 28th Floor, Los Angeles, CA 90071** | **Sixth Street Lending Partners 2100 McKinney Avenue Suite 1500 Dallas, Texas 75201** |
| **Carronade Capital Master, LP** **Crown/Carronade Segregated Portfolio** **17 Old Kings Highway South – Suite 140 Darien, CT 06820** | **Silver Point Capital, L.P.** **Two Greenwich Plaza, Suite 1 Greenwich, CT 06830** | **Barclays Bank PLC 745 Seventh Avenue New York, NY 10019** |
| **Jefferies Capital Services, LLC** **520 Madison Avenue New York, NY 10019** | **Diameter Capital Partners LP** **55 Hudson Yards, Suite 29 New York, NY 10001** | |

**CONFIDENTIAL**

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attn: Christina Park

Project Horizon
First Lien Fee Letter

Ladies and Gentlemen:

Reference is made to the first lien commitment letter (including the exhibits and other attachments thereto, the "**Commitment Letter**"), dated as of the date hereof, by and among, Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its affiliates (in such capacity, "**ACM**", and together with AGF (as defined in the Commitment Letter), "**Apollo**"), Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, in each case, within its Global Opportunities Fund or Global Private Debt strategies, or one or more entities owned by such funds or accounts ("**OCM**" or "**Oaktree**"), Sixth Street Lending Partners ("**Sixth Street**"), Carronade Capital Master, LP ("**CCM**") and Crown/Carronade Segregated Portfolio ("**CCSP**" and together with CCM, "**Carronade**"), Silver

Point Capital, L.P. acting on behalf of certain funds and accounts managed by it or an affiliate ("***Silver Point***"), Barclays Bank PLC ("***Barclays***"), Jefferies Capital Services, LLC ("***Jefferies***") and Diameter Capital Partners LP ("***Diameter***", and together with ACM, Oaktree and Sixth Street, Carronade, Silver Point, Barclays and Jefferies, collectively, the "***Initial First Lien Lenders***", and, together with the Lead Arrangers the "***Commitment Parties***", "***we***", "***our***" or "***us***"), and Amber Energy Inc., a Delaware corporation ("***Holdings***" or "***you***"), regarding the Transactions described therein.  This letter agreement is the Fee Letter referred to in the Commitment Letter.   Terms used but not defined in this Fee Letter shall have the meanings assigned thereto in the Commitment Letter.

## First Lien Upfront Fee

As consideration for the Initial First Lien Lenders' commitments to provide the First Lien Term Facility under the Commitment Letter, you agree to pay, subject to the second paragraph under the caption "***General***" below, to each of the Initial First Lien Lenders, as applicable, for its own account, an upfront fee (the "***First Lien Upfront Fee***") equal to [REDACTED]% of the aggregate principal amount of its commitments in respect of each such Initial First Lien Lender's First Lien Term Loans to the extent actually funded on the Closing Date, which may, in each Initial First Lien Lender's sole discretion, be structured in the form of original issue discount and which fees shall be divided among the Initial First Lien Lenders on their pro rata share of the commitment amount of the First Lien Term Facility on the Closing Date.  The First Lien Upfront Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

## AGF Arrangement Fee

As consideration for AGF's services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to AGF, for its own account, an arrangement fee (the "***AGF Arrangement Fee***") in an amount equal to $[REDACTED].  The AGF Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

## Oaktree Arrangement Fee

As consideration for OCM's services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to OCM, for its own account, an arrangement fee (the "***Oaktree Arrangement Fee***") in an amount equal to $[REDACTED].  The Oaktree Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

## Sixth Street Arrangement Fee

As consideration for Sixth Street's services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to Sixth Street (or its designee in its sole discretion), for its own account, an arrangement fee (the "***Sixth Street Arrangement Fee***") in an amount equal to $[REDACTED].  The Sixth Street Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

**Carronade Arrangement Fee**

As consideration for Carronade's services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to Carronade (or its designee in its sole discretion), for its own account, an arrangement fee (the "**_Carronade Arrangement Fee_**") in an amount equal to $[REDACTED]. The Carronade Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

**Silver Point Arrangement Fee**

As consideration for Silver Point's services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to Silver Point (or its designee in its sole discretion), for its own account, an arrangement fee (the "**_Silver Point Arrangement Fee_**") in an amount equal to $[REDACTED]. The Silver Point Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

**Barclays Arrangement Fee**

As consideration for Barclays' services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to Barclays (or its designee in its sole discretion), for its own account, an arrangement fee (the "**_Barclays Arrangement Fee_**") in an amount equal to $[REDACTED]. The Barclays Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

**Jefferies Arrangement Fee**

As consideration for Jefferies' services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to Jefferies (or its designee in its sole discretion), for its own account, an arrangement fee (the "**_Jefferies Arrangement Fee_**") in an amount equal to $[REDACTED]. The Jefferies Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

**Diameter Arrangement Fee**

As consideration for Diameter's services in arranging the First Lien Term Facility pursuant to the Commitment Letter, you agree to pay to Diameter (or its designee in its sole discretion), for its own account, an arrangement fee (the "**_Diameter Arrangement Fee_**") in an amount equal to $[REDACTED]. The Diameter Arrangement Fee will be fully earned and due and payable in full on the Closing Date, if the Closing Date occurs.

**Agency Fee**

As consideration for the First Lien Administrative Agent to act as administrative agent and collateral agent for the First Lien Term Facility, you agree to pay to the First Lien Administrative Agent an annual agency fee in an amount equal to $[REDACTED] (the "**_Agency Fee_**"), which Agency Fee shall be earned by, and payable to, the First Lien Administrative Agent, annually in advance beginning on the Closing Date and, thereafter, on each anniversary of the Closing Date for so long as the First Lien Term Facility is in effect; *provided* that if the First Lien

Term Facility is fully repaid, or the First Lien Administrative Agent resigns or is replaced, on a day that is not the anniversary of the Closing Date, a portion of the Agency Fee will be rebated to the Borrower on the date the First Lien Term Facility is fully repaid, or the First Lien Administrative Agent resigns or is replaced, in proportion to the number of days remaining until (but not including) the next anniversary of the Closing Date.

## First Lien Ticking Fee

In the event that the Closing Date has not occurred as of the [REDACTED] day after the date hereof, in addition to the fees set forth above, you shall pay to the Initial First Lien Lenders, each for its own account, a ticking fee (the "*First Lien Ticking Fee*") equal to [REDACTED]% of the interest rate margin applicable to SOFR based First Lien Term Loans accruing from such [REDACTED] day until the [REDACTED] day after the date hereof, and increasing to [REDACTED]% of the interest rate margin applicable to SOFR based First Lien Term Loans, in each case on the Initial First Lien Lenders' commitments to provide the First Lien Term Facility under the Commitment Letter and continuing to accrue on and thereafter until the Closing Date. The First Lien Ticking Fee shall be conditioned on, and due and payable in full, in cash, immediately upon the occurrence of, the Closing Date and in no event shall accrue on or after the Closing Date.

## Alternate Transaction Fees

If, in connection with the consummation of the Acquisition, or, in lieu of the Acquisition, any similar transaction entered into by the Sponsor, or any of its affiliates, to acquire in whole or in part, directly or indirectly, the assets or any other interest in PDV Holding, Inc., the Company, and/or any of their respective direct or indirect subsidiaries, occurring during the period from the date hereof to the date that is the later of (a) the date that all commitments set forth in the Commitment Letter have been terminated and (b) the [REDACTED] anniversary of the date hereof (which date set forth in this clause (b) shall be extended (x) by up to [REDACTED] in the event the Outside Date is extended under the Acquisition Agreement) and (y) by up to an additional [REDACTED] to match any additional extension of the Outside Date under the Acquisition Agreement so long as Apollo agrees to extend its commitments under the Commitment Letter for a commensurate time) (such date, the "*Expiration Date*"), in which the Acquisition occurs (any such foregoing transaction, an "*Alternate Transaction*"), an institution or a syndicate of lenders (other than the Initial First Lien Lenders and/or its affiliates) provides bank, debt securities or other credit financing (any such financing, the "*Alternate Financing*") to you, the Sponsor or any of your or its respective affiliates in lieu of the First Lien Term Facility, respectively, at the time of the Acquisition or such Alternate Transaction, you agree that, with respect to each Initial First Lien Lender, unless (i) such Initial First Lien Lender otherwise terminated its commitment under the Commitment Letter prior to its stated expiry date (other than a termination as a result of any breach by you of your obligations under the Commitment Letter) or has breached its obligations or otherwise declined to provide the First Lien Term Facility on the terms and conditions of the Commitment Letter (including the First Lien Term Loan Term Sheet) and this Fee Letter, or (ii) such Initial First Lien Lender has failed to reaffirm in writing its willingness to fund the First Lien Term Facility, on the terms and conditions set forth in the Commitment Letter (including the First Lien Term Loan Term Sheet), then you will pay to each of Apollo, Oaktree, Sixth Street, Carronade, Silver Point, Barclays, Jefferies and Diameter, on a pro rata basis, who has not

terminated its commitment, breached or declined to provide the First Lien Term Facility in accordance with the foregoing <u>clause (i)</u>, or failed to reaffirm in writing its willingness to fund the First Lien Term Facility in accordance with the foregoing <u>clause (ii)</u>, as liquidated damages, a fee equal to [REDACTED]% of the Specified Fee Reference Amount, as defined in and set forth opposite such Initial First Lien Lender's name on Schedule I hereto (such fee, the "***First Lien Alternate Transaction Fee***"), which payment or payments of such First Lien Alternate Transaction Fee shall be made on the date of the later to occur of, and subject to the occurrence of, the closing of the Acquisition or such Alternate Transaction, as applicable, and the initial funding of such Alternate Financing. Such payment or payments, as applicable, will be in lieu of and will discharge you from any obligation in respect of any fee provided for herein with respect to the First Lien Term Facility.

## General

You agree that, once paid, the fees or any part thereof payable hereunder will not be refundable under any circumstances. All fees payable hereunder will be paid in immediately available funds. For the avoidance of doubt, you shall be permitted to cause the Borrower to make any payment otherwise required to be made by you hereunder. All amounts payable under this Fee Letter will be made in U.S. dollars and, in any case, shall not be subject to counterclaim or set-off for, or be otherwise affected by, any claim or dispute relating to any other matter. In addition, all such payments shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings (a "***Tax Deduction***") imposed by any national, state or local taxing authority, or will otherwise be grossed up by you in respect of such Tax Deduction, except (i) to the extent such Tax Deduction is imposed on, or measured by reference to, net income and such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any connection of the payee with the jurisdiction of such taxing authority (other than a connection arising solely from the execution, delivery and performance of the Commitment Letter or this Fee Letter, any transaction contemplated by or pursuant to the Commitment Letter or this Fee Letter, or the receipt of payments under the Commitment Letter or this Fee Letter), (ii) to the extent such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any failure of the payee to provide any applicable documentation permitting such payments to be made without (or at a reduced rate of) withholding that is reasonably requested by you and that it is legally eligible to provide, (iii) any U.S. federal withholding tax imposed on amounts payable to or for the account of such payee pursuant to applicable law in effect on the date hereof, or, if later, the date on which (a) such lender or holder (or any other lender or holder), as applicable, acquires an interest in the First Lien Term Loans or any applicable commitment with respect thereto (other than pursuant to an assignment request by us) or (b) such lender or holder (or any other lender or holder), as applicable, changes its lending office, except in each case to the extent that amounts with respect to such taxes were payable either to such lender's or holder's (or such other lender's or holder's), as applicable, assignor immediately before such lender or holder (or such other lender or holder), as applicable, became a party hereto or before such change in lending office, and (iv) any U.S. federal withholding tax imposed pursuant to Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended, as of the date hereof (or any amended or successor version of such Sections that is substantively comparable and not materially more onerous to comply with) or any Treasury Regulations, other official administrative guidance or intergovernmental agreements implementing such Sections.

**<u>Miscellaneous</u>**

   It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the Commitment Letter if accepted in accordance with its terms.  This Fee Letter may not be amended or waived except by an instrument in writing signed by you and us.  This Fee Letter may not be assigned by any party hereto (other than to a permitted assignee of the Commitment Letter in connection with an assignment by you of the Commitment Letter to such permitted assignee) without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld or delayed), and any attempted assignment without such consent shall be null and void. This Fee Letter, and any claim, controversy or dispute arising under, or related to, this Fee Letter (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof), shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.  This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.  This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile transmission or electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

   You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the Commitment Letter.

   [Remainder of this page intentionally left blank]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement between us.

Very truly yours,

**APOLLO CAPITAL MANAGEMENT, L.P.**, on behalf of one or more investment funds, separate accounts and other entities owned (in whole or in part), controlled, managed and/or advised by it or its affiliates

By:   Apollo Capital Management GP, LLC, its general partner

**By**_____
   **Name:**  William B. Kuesel
   **Title:**   Vice President

**APOLLO GLOBAL FUNDING, LLC**

**By**_____
   **Name:**  Daniel M. Duval
   **Title:**   Vice President

[Signature Page to Project Horizon First Lien Fee Letter]

**OAKTREE CAPITAL MANAGEMENT, L.P.**, acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts

**By**_____
    **Name:**
    **Title:**

**By**_____
    **Name:**
    **Title:**

[Signature Page to Project Horizon First Lien Fee Letter]

**SIXTH STREET LENDING PARTNERS**


**By**‌_____
   **Name:**
   **Title:**

[Signature Page to Project Horizon First Lien Fee Letter]

**[CARRONADE CAPITAL MASTER, LP]**, as agent for and on behalf of certain of its affiliated funds, related funds and investment vehicles


By_____
   **Name:**
   **Title:**

[Signature Page to Horizon Fee Letter]

**[SILVERPOINT]**, as agent for and on behalf of certain of its affiliated funds, related funds and investment vehicles


By_____
   **Name:**
   **Title:**

**BARCLAYS BANK PLC**

**By** _____
    **Name:**
    **Title:**

Accepted and agreed to as of
the date first above written:

**AMBER ENERGY INC.**

By: _____
Name:
Title:

[Signature Page to Project Horizon First Lien Fee Letter]

Schedule I
Specified Fee Reference Amounts[1]

| Initial First Lien Lender | Specified Fee Reference Amount (each, a "Specified Fee Reference Amount") |
|---|---|
| APOLLO CAPITAL MANAGEMENT, L.P., on behalf of one or more investment funds, separate accounts and other entities owned (in whole or in part), controlled, managed and/or advised by it or its affiliates | $[REDACTED] |
| Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts | $[REDACTED] |
| Sixth Street Lending Partners | $[REDACTED] |
| Carronade Capital Master, LP | $[REDACTED] |
| Barclays Bank PLC | $[REDACTED] |
| Silver Point Capital, L.P. | $[REDACTED] |
| Diameter Capital Partners LP | $[REDACTED] |
| Jefferies Capital Services, LLC | $[REDACTED] |
| **Total** | $[REDACTED] |

---

[1] Solely for the avoidance of the doubt, the Specified Fee Reference Amounts listed in this Schedule I shall be used solely for purposes of determining any applicable First Lien Ticking Fee and First Lien Alternate Transaction Fee as set forth in this Fee Letter and shall not constitute a commitment to participate in the First Lien Term Facility on the basis of such amounts listed above (it being understood and acknowledged that each Initial First Lien Lender has provided its commitments to participate in the First Lien Term Facility in the amounts as expressly set forth in the Commitment Letter).

**E-3**

**BID EXECUTION VERSION**

**CITIGROUP GLOBAL MARKETS INC.**          **BARCLAYS**
388 Greenwich Street                       745 Seventh Avenue
New York, NY 10013                         New York, NY 10019

**CONFIDENTIAL**

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attn: Christina Park

Project Horizon
ABL Commitment Letter

Ladies and Gentlemen:

You have advised Barclays Bank PLC ("**Barclays**") and Citi (as defined below and, together with Barclays and any Additional Agents (as defined below) appointed pursuant to Section 2, collectively, the "**Commitment Parties**", "**we**", "**our**" or "**us**"), that Amber Energy Inc., a Delaware corporation ("**Holdings**" or "**you**"), controlled, directly or indirectly, by Elliott Investment Management L.P. ("**Elliott**") and its affiliates (including controlled affiliates and controlled investment funds) (collectively, the "**Sponsor**"), intends to cause a newly formed direct or indirect subsidiary of Holdings (the "**Purchaser**") to acquire (the "**Acquisition**") directly or indirectly, beneficial ownership of the equity interests of a company previously identified by you to us as "Horizon" (the "**Company**"). You have further advised us that, in connection with the foregoing, you and the Company intend to consummate the other Transactions described in the Transaction Description attached hereto as Exhibit A (the "**Transaction Description**"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Transaction Description, the Summary of Principal Terms and Conditions attached hereto as Exhibit B (the "**Term Sheet**") or the Conditions attached hereto as Exhibit C (the "**Conditions**"); this commitment letter, the Transaction Description, the Term Sheet and the Conditions attached hereto as Exhibit C, collectively, this "**Commitment Letter**". "**Citi**" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

1.    Commitments.

In connection with the Transactions, each of Citi and Barclays (together with any other initial lender under the ABL Facility that becomes party hereto as an additional "Initial Lender" in accordance with Section 2, each an "**Initial Lender**" and, collectively, the "**Initial Lenders**") is pleased to advise you of its several and not joint commitment to provide directly or through one or more of its affiliates or managed funds, the percentage of the entire aggregate principal amount of the ABL Facility set forth opposite such Initial Lender's name on Schedule I hereto (as such schedule may be amended or supplemented in accordance with this Commitment Letter), subject,

1

only to the satisfaction (or waiver by the Commitment Parties) of the conditions expressly set forth
or referred to in the section entitled "Conditions to Initial Borrowing" in Exhibit B hereto (limited
on the Closing Date (as defined below) as indicated therein and in Section 6 hereof).

      2.    Titles and Roles.

It is agreed that (i) Barclays and Citi will act as joint lead arrangers and joint bookrunners
for the ABL Facility (in such capacities, the "***Lead Arrangers***") and (ii) Citi (or an affiliate thereof)
will act as administrative agent and collateral agent for the ABL Facility (in such capacity, the
"***ABL Administrative Agent***"); *provided* that Barclays may be appointed as co-collateral agent
under certain circumstances as set forth in the fee letter, dated as of the date hereof, by and among
the Commitment Parties and you (the "***Fee Letter***") with respect to the ABL Facility. It is further
agreed that in any Information Materials (as defined below) and all other offering or marketing
materials in respect of the ABL Facility, Citi shall have "left side" designation and shall appear on
the top left and shall hold the leading role and responsibility customarily associated with such "top
left" placement. Except as set forth in this Section 2, you agree that no other agents, co-agents,
arrangers or bookrunners will be appointed, no other titles will be awarded and no compensation
(other than compensation expressly contemplated by this Commitment Letter and the Fee Letter)
will be paid to any Lender (as defined below) in order to obtain its commitment to participate in
the ABL Facility unless you and we shall so agree; *provided* that (i) without limiting the foregoing,
within 10 business days following the Signing Date, you may appoint additional joint lead
arrangers, joint bookrunners, managers, co-managers, agents or co-agents (any such joint lead
arranger, joint bookrunner, manager, co-manager, agent or co-agent, an "***Additional Agent***") for
the ABL Facility and award any Additional Agents any other titles in a manner and with economics
determined by you in consultation with the Lead Arrangers (it being understood that, to the extent
you appoint or confer any titles on and/or allocations to any Additional Agent or confer other titles
in respect of the ABL Facility, (x) the commitments of the Commitment Parties that are Initial
Lenders on the Signing Date in respect of the ABL Facility will be reduced on a pro rata basis
(unless the Commitment Parties otherwise agree) across the ABL Facility by the amount of the
commitments of the Additional Agents so appointed (or their relevant affiliates); and (y) the
economics awarded to such other arrangers shall be in proportion to their commitments assumed
in respect of the ABL Facility, with such reduction allocated to reduce the economics of the
Commitment Parties that are Initial Lenders on the Signing Date in respect of the ABL Facility at
such time on a pro rata basis with respect to the ABL Facility according to the respective amounts
of their commitments), (ii) subject to the second sentence of this Section 2, any Additional Agent
will be listed in the order determined by you in any marketing or other materials, (iii) upon the
execution by any Additional Agent (and, in each case, any relevant affiliate) of customary joinder
documentation, each such Additional Agent (and, in each case, any relevant affiliate thereof) shall
thereafter constitute a "Commitment Party" and a "Lead Arranger" hereunder, and it or its relevant
affiliate providing such commitment shall constitute an "Initial Lender" hereunder, (iv) no
Additional Agent shall hold more commitments in respect of the ABL Facility than the
commitments of either Barclays or Citi, individually and (v) no Additional Agent shall receive
total economics greater than the amount received on the Closing Date by any of the Commitment
Parties that are Initial Lenders on the Signing Date.

Each Commitment Party hereby agrees to cooperate with you in good faith to facilitate and
execute any joinder and/or amendment to, and/or any amendment and restatement of, this

Commitment Letter, the Fee Letter and the other agreements entered into in connection therewith in connection with any appointment or replacement contemplated by this Section 2.

3.    Syndication.

The Lead Arrangers reserve the right, prior to or after the Closing Date (as defined below), to syndicate all or a portion of the Initial Lenders' respective commitments in respect of the ABL Facility hereunder to a group of banks, financial institutions and other institutional lenders and investors identified by the Lead Arrangers in consultation with you and reasonably acceptable to the Lead Arrangers and you (your consent not to be unreasonably withheld or delayed), including, without limitation, any relationship lenders designated by you and reasonably acceptable to the Lead Arrangers (such banks, financial institutions and other institutional lenders and investors, together with the Initial Lenders, the "***Lenders***"); *provided* that (i) the Lead Arrangers agree not to syndicate, assign or participate out our commitments in respect of the ABL Facility to (a) certain banks, financial institutions and other institutional lenders (or related funds of such institutional lenders) identified to the Lead Arrangers by you or the Sponsor in writing prior to the date hereof (or identified in writing after the date hereof; *provided*, that prior to the Closing Date, the disqualification of such person shall be reasonably acceptable to the Lead Arrangers), (b) competitors of the Company and its subsidiaries specified to us by you or the Sponsor in writing from time to time, (c) in the case of clause (a) and clause (b), any of their affiliates (other than, in the case of clause (a) (and except to the extent specifically identified in writing as being a Disqualified Lender by you or the Sponsor), affiliates that are bona fide debt investment funds primarily engaged in, or that advise funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, notes, bonds or similar extensions of credit or securities in the ordinary course of its business and whose managers have fiduciary duties to the investors therein independent of or in addition to their duties to such bank, financial institution or other institutional lender, as applicable, or any of its affiliates (in each case, other than bona fide debt investment funds which are primarily engaged in the foregoing activities but whose investment strategies or historical practices include distressed debt and/or "loan to own" investments, which for the avoidance of doubt shall not be excluded from the definition of "Disqualified Lenders" by virtue of their status as a bona fide debt investment fund)) that are (A) identified by you or the Sponsor in writing from time to time or (B) readily identifiable on the basis of such affiliates' name, (d) Excluded Affiliates (as defined below) and (e) after the Closing Date, any Lender identified to the ABL Administrative Agent (or by the Sponsor on the Borrower's behalf) in name and in writing that the Borrower reasonably believes has made an incorrect representation or warranty (or deemed representation or warranty) with respect to not constituting a "net short lender" (the persons described in clauses (a), (b), (c), (d) and (e) above, collectively, "***Disqualified Lenders***", and no Disqualified Lenders may become Lenders or otherwise participate in the ABL Facility) and (ii) notwithstanding the Lead Arrangers' right to syndicate the ABL Facility and receive commitments with respect thereto, (a) except as expressly provided in Section 2 with respect to a reduction of commitments resulting from the allocation of commitments to Additional Agents, no Initial Lender shall be relieved, released or novated from its obligations hereunder (including, subject to the satisfaction of the conditions set forth herein, its obligation to establish and/or fund the ABL Facility on the date of the consummation of the Acquisition (the date of such funding, the "***Closing Date***")) in connection with any syndication, assignment or participation of the ABL Facility, including its commitments in respect thereof, until after the Closing Date has occurred, and we will not enter into any transaction that is designed or intended

3

to relieve us of our commitments set forth herein to fund the ABL Facility, (b) except as expressly provided in Section 2 with respect to a reduction of commitments resulting from the allocation of commitments to Additional Agents, no assignment or novation by any Initial Lender shall become effective as between you and the Initial Lenders with respect to all or any portion of any Initial Lender's commitments in respect of the ABL Facility until after the initial funding of the ABL Facility and (c) except as expressly provided in Section 2 with respect to a reduction of commitments resulting from the allocation of commitments to Additional Agents, unless you otherwise agree in writing, each Initial Lender shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the ABL Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until after the Closing Date has occurred; *provided* that, to the extent that a person is designated or becomes a Disqualified Lender pursuant to clause (i) above after the date of this Commitment Letter, such event shall not apply retroactively to disqualify any parties that have previously acquired or agreed (in an agreement binding on buyer and seller) to acquire an assignment or participation interest in the ABL Facility, to the extent of the loan or commitment subject to such assignment or participation interest, but shall disqualify any such parties with respect to any subsequent assignments or participations.

Without limiting your obligations to assist with syndication efforts as set forth herein, it is understood that the Initial Lenders' commitments hereunder are not conditioned upon the syndication of, or receipt of commitments in respect of, the ABL Facility and in no event shall the commencement or successful completion of syndication of the ABL Facility, or the obtaining of any ratings, constitute a condition to the availability of the ABL Facility on the Closing Date. The Lead Arrangers may commence syndication efforts promptly upon the Signing Date and as part of their syndication efforts, it is their intent to have Lenders commit to the ABL Facility prior to the Closing Date (subject to the limitations set forth in the preceding paragraph). Until the earlier of (i) the date upon which a Successful ABL Syndication (as defined in the Fee Letter) is achieved and (ii) the date that is 30 days after the Closing Date (or, solely in the event of a Frustrated Syndication (as defined in the Fee Letter), the date that is 30 days after the end of the Cooperation Extension Period (as defined in the Fee Letter)) (such earlier date, the "***Syndication Date***"), you agree actively to assist the Lead Arrangers in seeking to complete a timely syndication of the ABL Facility that is reasonably satisfactory to the Lead Arrangers and you. Such assistance shall include, without limitation, (a) your using commercially reasonable efforts to ensure that any syndication efforts benefit from your existing lending and investment banking relationships and the existing lending and investment banking relationships of the Sponsor and, to the extent practical and appropriate and in all instances not in contravention of the Acquisition Agreement, the Company's existing lending and investment banking relationships, (b) direct telephonic contact between senior management, certain representatives and non-legal advisors of you and the Sponsor, on the one hand, and the proposed Lenders, on the other hand (and, to the extent practical and appropriate and in all instances not in contravention of the Acquisition Agreement, your using commercially reasonable efforts to arrange such contact between senior management of the Company, on the one hand, and the proposed Lenders, on the other hand), in all such cases at times mutually agreed upon, (c) your assistance (including the use of commercially reasonable efforts to cause the Company to assist to the extent practical and appropriate and in all instances not in contravention of the Acquisition Agreement) in the preparation of the Information Materials (as defined below), (d) the hosting, with the Lead Arrangers, of two teleconferences with prospective Lenders at times to be mutually agreed upon (and your using commercially reasonable efforts to

4

cause the officers of the Company to be available for such teleconferences to the extent practical and appropriate and in all instances not in contravention of the Acquisition Agreement), (e) your using commercially reasonable efforts to provide customary forecasts of financial statements of Holdings after giving effect to the Transactions for each year commencing with the first fiscal year following the Closing Date through the term of the ABL Facility (collectively with all other forecasts, financial estimates and other forward looking information, the "*Projections*") (it being acknowledged and agreed by the Lead Arrangers that the Projections were delivered prior to the date hereof), (f) your using commercially reasonable efforts (to the extent practicable and appropriate and not in contravention of the Acquisition Agreement) to have the Company provide access and otherwise assist in permitting the ABL Administrative Agent and its representatives to complete customary field work and appraisals relating to the assets intended to become part of the ABL Facility borrowing base and (g) at any time prior to the later of the Closing Date and the Syndication Date, your ensuring (and, to the extent practical and appropriate and in all instances not in contravention of the Acquisition Agreement, using your commercially reasonable efforts to cause the Company to ensure) that there are no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities by or on behalf of you, the Company or any of your or its subsidiaries being offered, placed or arranged (other than (v) the Equity Investment, (w) indebtedness disclosed to the Initial Lenders prior to the date of this Commitment Letter, including (x) the ABL Facility, (y) the First Lien Term Facility and the Third Lien Notes and (z) any indebtedness of the Company or any of its subsidiaries permitted (whether or not subject to the consent of a party thereto) by the Acquisition Agreement to be incurred, issued or remain outstanding on or prior to the Closing Date) without the consent of the Lead Arrangers (such consent not to be unreasonably withheld, delayed or conditioned), if such issuance, offering, placement or arrangement would materially impair the primary syndication of the ABL Facility (it being understood and agreed that the Company, Holdings and their respective subsidiaries' deferred purchase price obligations, ordinary course working capital facilities and ordinary course capital lease, purchase money, equipment, hydrocarbon inventory and catalyst financing, letter of credit and other indebtedness, and any other indebtedness existing or permitted to be incurred by the Company under the Acquisition Agreement and any amendment, modification or waiver of the documentation governing the Existing AR Facility (as defined below) or extension or renewal thereof in a manner not materially adverse to the interests of the Lead Arrangers, in each case, will not be deemed to materially impair the primary syndication of the ABL Facility). Notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letter or any other letter agreement or undertaking concerning the financing of the Transactions to the contrary, your obligations to assist in syndication efforts as provided herein (including the obtaining of the ratings referenced above and compliance with any of the provisions set forth in clauses (a) through (g) above) shall not constitute a condition to the commitments hereunder or the funding of the ABL Facility on the Closing Date.

The Lead Arrangers, in their capacities as such, will manage, in consultation with you and with your consent (not to be unreasonably withheld or delayed), all aspects of any syndication of the ABL Facility, including decisions as to the selection of institutions reasonably acceptable to you (your consent not to be unreasonably withheld or delayed) to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate (subject to (i) your consent rights set forth in the second preceding paragraph and excluding Disqualified Lenders and (ii) your rights of appointment set forth in Section 2 of this Commitment Letter), the allocation of the commitments among the Initial Lenders under the ABL Facility and

the amount and distribution of fees among the Initial Lenders under the ABL Facility. For the avoidance of doubt, you will not be required to provide any information to the extent that the provision thereof would violate any law, rule or regulation, or any obligation of confidentiality binding upon, or result in the waiver of any attorney-client privilege of, you, the Company or your or its respective affiliates (*provided*, in the event that you do not provide information in reliance on the exclusions in this sentence, you shall use commercially reasonable efforts to provide notice to the Lead Arrangers promptly upon obtaining knowledge that such information is being withheld, and you shall use your commercially reasonable efforts to communicate, to the extent permitted, the applicable information in a way that would not violate such restrictions and to eliminate such restrictions). Notwithstanding anything herein to the contrary, the only financial statements that shall be required to be provided to the Commitment Parties in connection with the syndication of the ABL Facility shall be those required to be delivered pursuant to underline paragraph 5 of underline Exhibit C.

You hereby acknowledge that (i) the Lead Arrangers will make available Information (as defined below), Projections and other offering and marketing materials and presentations, including confidential information memoranda to be used in connection with the syndication of the ABL Facility in a form customarily delivered in connection with senior secured bank financings (the "***Information Memorandum***" and, together with such other customary marketing materials to be used in connection with the syndications (all of which shall be in form and substance consistent with confidential information memoranda and other marketing materials in recent transactions sponsored by the Sponsor), the "***Information Materials***") to the proposed syndicates of Lenders by posting the Information Materials on Intralinks, Debt X, SyndTrak Online or by similar electronic means, in each case, subject to a market standard "click through" or similar confidentiality agreement reasonably approved by you, and (ii) certain of the Lenders in respect of the ABL Facility may be "public side" Lenders (*i.e.*, Lenders that wish to receive only information that (a) is of a type that would be publicly available (or could be derived from publicly available information) if you, Holdings or the Company were a public reporting company (as reasonably determined by you) or (b) is not material with respect to you, Holdings, the Company or your or their respective subsidiaries and securities for purposes of United States federal securities laws or the applicable securities laws of any jurisdiction where the ABL Facility is syndicated (collectively, the "***Public Side Information***"; any information that is not Public Side Information, "***Private Side Information***") and who may be engaged in investment and other market related activities with respect to you, Holdings, the Company or your or its respective subsidiaries or securities) (each, a "***Public Sider***" and each Lender that is not a Public Sider, a "***Private Sider***").

At the reasonable request of the Lead Arrangers, you agree to assist (and to cause the Sponsor to assist and to use commercially reasonable efforts to cause the Company to assist to the extent practical and appropriate and in all instances not in contravention of the Acquisition Agreement) us in preparing an additional version of the Information Memorandum to be used in connection with the syndication of the ABL Facility that consists solely of Public Side Information with respect to you, the Company or any of your or its respective subsidiaries or any of your or their respective securities for the purpose of United States federal and state securities laws to be used by Public Siders. It is understood that in connection with your assistance described above, authorization letters in a form customary for affiliates of the Sponsor will be included in any Information Materials that authorize the distribution thereof to prospective Lenders under the ABL Facility and represent that the additional version of the Information Memorandum contains only

Public Side Information and the Information Materials should contain customary disclaimers that exculpate you, the Sponsor, the other Investors, the Company, and your and their respective affiliates and us and our respective affiliates with respect to any liability related to the use or misuse of the contents of the Information Materials or related offering and marketing materials by the recipients thereof.  Before distribution of any Information Materials, at our reasonable request, you agree to use commercially reasonable efforts to identify that portion of the Information Materials that may be distributed to the Public Siders as "Public Information", which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof.  By marking Information Materials as "PUBLIC", you shall be deemed to have authorized the Commitment Parties and the proposed Lenders under the ABL Facility to treat such Information Materials as containing only Public Side Information (it being understood that you shall not be under any obligation to mark the Information Materials "PUBLIC").

You acknowledge and agree that, subject to the confidentiality and other provisions of this Commitment Letter, the following documents, without limitation, may be distributed to both Private Siders and Public Siders, unless you advise the Lead Arrangers in writing (including by email) within a reasonable time prior to their intended distribution that such materials should only be distributed to Private Siders (*provided* that you and your counsel shall have been given a reasonable opportunity prior to any such distribution to review such documents and comply with the United States Securities and Exchange Commission disclosure obligations or any other applicable disclosure obligations with respect thereto prior to any such distribution): (i) administrative materials prepared by the Lead Arrangers for prospective Lenders under the ABL Facility (such as a lender meeting invitation, bank allocation, if any, and funding and closing memoranda), (ii) term sheets and notifications of changes in the ABL Facility's terms and conditions and (iii) drafts and final versions of the ABL Facility Documentation.  If you advise us in writing (including by email), within a reasonable period of time prior to dissemination, that any of the foregoing should be distributed only to Private Siders, then Public Siders will not receive such materials without your consent.

4.    <u>Information</u>.

You hereby represent and warrant that (with respect to Information and Projections relating to the Company, its subsidiaries and its and their respective businesses, to your knowledge): (i) all written information and written data, other than (x) the Projections, (y) third party reports and/or memoranda and (z) information of a general economic or industry specific nature (the "***Information***"), that has been or will be made available to any Commitment Party by you or, at your direction, by any of your representatives on your behalf in connection with the transactions contemplated hereby, when taken as a whole, is or will be, when furnished, correct in all material respects and does not or will not, when furnished and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto) and (ii) the Projections that have been or will be made available to us by you or, at your direction, by any of your representatives on your behalf in connection with the transactions contemplated hereby have been or will be, when taken as a whole, prepared in good faith based upon assumptions that are believed by you to be reasonable at the time such Projections are so furnished; it being understood that the Projections are predictions as to future events and are not to be viewed as facts or as a guarantee

7

of performance, that the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material.  You agree that if, at any time prior to the later of the Closing Date and the Syndication Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the Information and the Projections contained in the Information Materials were being furnished, and such representations were being made, at such time, then you will (or, prior to the Closing Date, with respect to the Information and such Projections relating to the Company, its subsidiaries or their respective operations or assets, will, in all instances to the extent not in contravention of the Acquisition Agreement, use commercially reasonable efforts to) promptly supplement the Information and such Projections such that (prior to the Closing Date, with respect to Information and Projections relating to the Company, its subsidiaries and their respective businesses, to your knowledge) such representations and warranties are correct in all material respects under those circumstances, it being understood in each case that such supplementation shall cure any breach of such representations and warranties. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the commitments and obligations of the Commitment Parties hereunder or the funding of the ABL Facility on the Closing Date.  In arranging and syndicating the ABL Facility, the Lead Arrangers will be entitled to use and rely on the Information and the Projections contained in the Information Materials without responsibility for independent verification thereof.  The Lead Arrangers do not assume any responsibility for the accuracy or completeness of the Information or the Projections.    Without limiting the foregoing, you hereby agree to provide us with updates and information that are material to any material litigation regarding the Company and any of its subsidiaries and affiliates, including with respect to any informational rights you have for such matters under the Acquisition Agreement promptly after your receipt of knowledge thereof.

5.    <u>Fees</u>.

As consideration for the commitments of the Initial Lenders hereunder and for the agreement of the Lead Arrangers to perform the services described herein, you agree to pay (or cause to be paid) the fees set forth in the Term Sheet and in the Fee Letter, if and to the extent due and payable.  Once paid, such fees shall not be refundable except as otherwise set forth herein or therein or as otherwise agreed in writing by you and us.

6.    <u>Conditions</u>.

The commitments of the Initial Lenders hereunder to fund and establish the ABL Facility on the Closing Date and the agreements of the Lead Arrangers to perform the services described herein are subject solely to the conditions expressly set forth or referred to in the section entitled "Conditions to Initial Borrowing" in <u>Exhibit B</u> hereto, and upon satisfaction (or waiver by all Commitment Parties in writing) of such conditions, the establishment of the ABL Facility shall occur; it being understood and agreed that there are no other conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Fee Letter or the ABL Facility Documentation.

Notwithstanding anything to the contrary in this Commitment Letter (including each of the exhibits attached hereto), the Fee Letter, the ABL Facility Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making or accuracy of which shall be a condition to the availability and funding of the ABL Facility on the Closing Date shall be (A) such of the representations and warranties made with respect to the Company in the Acquisition Agreement as are material to the interests of the Lenders (in their capacities as such), but only to the extent that Sponsor (or its applicable affiliates) has the right (taking into account any applicable cure provisions) to terminate its (or such affiliates') obligations under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) as a result of a breach of any of such representations and warranties without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates), or to decline to consummate the Acquisition (in each case in accordance with the terms of the Acquisition Agreement) as a result of a breach of any of such representations and warranties without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates) under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) (to such extent, the "***Specified Acquisition Agreement Representations***") and (B) the Specified Representations (as defined below) and (ii) the terms of the ABL Facility Documentation and the Closing Deliverables (as defined in Exhibit C) shall be in a form such that they do not impair the availability or funding of the ABL Facility on the Closing Date if the conditions expressly set forth or referred to in the section entitled "Conditions to Initial Borrowing" in Exhibit B are satisfied (or waived by all Commitment Parties in writing) (*provided* that to the extent any security interest in any Collateral (as defined in the Term Sheet) is not or cannot be provided, validated, created, perfected and/or given priority on the Closing Date (other than the pledge and perfection of the security interest in the equity interests of Borrower and each Guarantor (other than Holdings) (provided that (x) any such certificates, other than certificated equity securities of Borrower, will be required to be delivered on the Closing Date only to the extent actually received from the Company after your use of commercially reasonable efforts to obtain such certificates and (y) the delivery of such certificates to the collateral agent under the First Lien Term Facility shall result in the deemed delivery of such certificates to the ABL Administrative Agent) and other assets pursuant to which a lien may be perfected by the filing of a financing statement under the Uniform Commercial Code) after your use of commercially reasonable efforts to do so or without undue burden or expense, then the provision, validity, creation, perfection and/or priority of a security interest in such Collateral shall not constitute a condition to the availability of the ABL Facility on the Closing Date, but instead shall be required to be provided, validated, created, perfected and/or given the applicable priority within (w) with respect to delivery of executed (A) mortgages or mortgage amendments for the Company's real property containing refineries located in Lake Charles, LA, Corpus Christi, TX and Lemont, IL (the "***Refinery Properties***") and (B) customary opinions of local counsel in jurisdictions in which each of the Refinery Properties is located, as to the enforceability of the mortgages or mortgage amendments, 10 business days after the Closing Date (or such later date after the Closing Date as the ABL Administrative Agent shall agree), (x) with respect to mortgagee title policies or date down endorsements to existing mortgagee title policies insuring the enforceability and lien priority of mortgages or existing mortgages as amended by the mortgage amendments, in such amounts as the Lead Arrangers shall reasonably require, as well as customary surveys (or existing surveys together with affidavits of no change), in each case, for the Refinery Properties, 60 days after the

9

Closing Date (or such later date after the Closing Date as the ABL Administrative Agent shall agree), (y) with respect to real property constituting Collateral other than the Refinery Properties (the "***Non-Refinery Properties***"), delivery of executed mortgages, mortgagee title policies and customary surveys with respect to (i) 80% of the aggregate value of the Non-Refinery Properties within 90 days after the Closing Date, and (ii) the remainder of the value of the Non-Refinery Properties within 120 days after the Closing Date, and (z) otherwise, 120 days after the Closing Date (or such later date after the Closing Date as the ABL Administrative Agent shall agree).  For purposes hereof, "***Specified Representations***" means the representations and warranties given by the Borrower and the Guarantors (after giving effect to the Transactions) set forth in the ABL Facility Documentation relating to organizational existence of the Borrower and the Guarantors; power and authority, due authorization, execution and delivery and enforceability, in each case with respect solely to the ABL Facility Documentation and the other Transactions; no conflicts with or consents under charter documents, in each case, related to the entering into and the performance of the ABL Facility Documentation, the incurrence of the extensions of credit thereunder on the Closing Date, and the consummation of the other Transactions; solvency as of the Closing Date (after giving effect to the Transactions and with solvency being determined as expressly set forth in <u>Annex I</u> to <u>Exhibit C</u> hereto and such determination being true and correct in all respects) of Holdings and its subsidiaries on a consolidated basis; Federal Reserve margin regulations; the use of proceeds of the ABL Facility not violating OFAC, FCPA or the PATRIOT Act; the Investment Company Act; and, subject to the proviso in the immediately preceding sentence, creation, validity and perfection of security interests in the Collateral (as defined in <u>Exhibit B</u>) (subject to permitted liens as set forth in the ABL Facility Documentation).  This paragraph, and the provisions herein, shall be referred to as the "***Certain Funds Provisions***".

For the avoidance of doubt, compliance by you and/or your affiliates with the terms and conditions of this Commitment Letter (other than the conditions expressly set forth or referred to in the section entitled "Conditions to Initial Borrowing" in <u>Exhibit B</u> hereto) is not a condition to the Initial Lenders' commitments to establish and fund the ABL Facility hereunder on the terms set forth herein.  The Commitment Parties acknowledge and agree that any failure of the Company and its subsidiaries to comply with the instructions of the Special Master pursuant to Section 6.10 of the Acquisition Agreement shall not be a condition to the establishment or initial borrowing under the ABL Facility or result in a failure to satisfy any condition to the initial borrowing under the ABL Facility, including the Company's failure to cooperate, at the Special Master's request, with any required syndication assistance or required assistance for asset-based loans.

7.     <u>Indemnity, Exculpation, etc.</u>

To induce the Commitment Parties to enter into this Commitment Letter and the Fee Letter and to proceed with the documentation of the ABL Facility, you agree (i) to indemnify and hold harmless each Commitment Party, its affiliates, managed funds and controlling persons (in each case other than any Excluded Affiliate acting in its capacity as such) and the respective officers, directors, employees, agents, advisors, partners and other representatives of each of the foregoing (each, an "***Indemnified Person***"), from and against any and all losses, claims, damages and liabilities of any kind or nature and related reasonable and documented fees and out-of-pocket expenses, joint or several, to which any such Indemnified Person may become subject, in each case to the extent arising out of, resulting from or in connection with, this Commitment Letter (including the Term Sheet), the Fee Letter, the Transactions or any related transaction

contemplated hereby, the ABL Facility or any use of the proceeds thereof or any claim, litigation, investigation or proceeding (including any inquiry or investigation) relating to any of the foregoing (any of the foregoing, a "***Proceeding***"), regardless of whether any such Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other third person, and to reimburse each such Indemnified Person upon written demand for any reasonable and documented fees and out-of-pocket expenses of one counsel for all such Indemnified Persons, taken as a whole and, if necessary, of a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnified Persons, taken as a whole, and, solely in the case of an actual conflict of interest, one additional counsel in each applicable jurisdiction to the affected Indemnified Persons, and other reasonable and documented fees and out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (in each case, excluding allocated costs of in-house counsel and (without your prior written consent) the fees and expenses of any other third-party advisors); *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (a) the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of such Indemnified Person's controlling persons, controlled affiliates or any of its or their respective officers, directors, employees, agents, or partners in each case, who are involved in or aware of the Transactions (as determined by a court of competent jurisdiction in a final and non-appealable decision), (b) a material breach of the obligations of such Indemnified Person or any of such Indemnified Person's controlling persons or controlled affiliates under this Commitment Letter (including its obligation to fund its commitments hereunder), the Term Sheet or the Fee Letter (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (c) disputes solely between or among Indemnified Persons to the extent such disputes do not arise from any act or omission of you, the Sponsor, the other Investors, the Company or any of your or their respective affiliates; *provided* that each Indemnified Person, to the extent acting in its capacity as an agent or arranger or similar role under the ABL Facility, shall remain indemnified in respect of such disputes; and (ii) to the extent that the Closing Date occurs, to reimburse each Commitment Party from time to time, upon presentation of a summary statement, for all reasonable and documented out-of-pocket expenses (including but not limited to expenses of each Commitment Party's consultants (to the extent any such consultant has been retained with your prior written consent (such consent not to be unreasonably withheld or delayed))), syndication expenses, due diligence expenses, field examination and appraisal expenses and reasonable fees, disbursements and other charges of a single counsel to the Commitment Parties identified in the Term Sheet and (if necessary) of a single local counsel to the Commitment Parties in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with your prior written consent, in each case incurred in connection with the ABL Facility and the preparation, negotiation and enforcement of this Commitment Letter, the Fee Letter, the ABL Facility Documentation and any security arrangements in connection therewith (collectively, the "***Expenses***").   The foregoing provisions in this paragraph shall be superseded in each case, to the extent covered thereby, by the applicable provisions contained in the ABL Facility Documentation upon execution thereof and thereafter shall have no further force and effect.   For the avoidance of doubt, the indemnity provided in this paragraph shall not apply to any taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

Notwithstanding any other provision of this Commitment Letter, (i) no Commitment Party, nor its affiliates, managed funds and controlling persons (in each case other than any Excluded Affiliate acting in its capacity as such) and the respective officers, directors, employees, agents, advisors, partners and other representatives of each of the foregoing (it being understood that in no event will this exculpation apply to any Commitment Party or its affiliates or managed funds in their respective capacities as (x) financial advisors to you, the Sponsor, any other Investor or the Company or its subsidiaries in connection with the Acquisition or any other potential acquisition of the Company or (y) co-investors in the Transactions or any potential acquisition of the Company or its subsidiaries (each, a "***Protected Person***")) shall be liable for any damages arising from the use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent that such damages have resulted from (a) the willful misconduct, bad faith or gross negligence of such Protected Person or any of such Protected Person's controlling persons, controlled affiliates or any of its or their respective officers, directors, employees, agents or partners, in each case, who are involved in or aware of the Transactions or (b) any material breach of the obligations of such Protected Person or any of such Protected Person's affiliates under this Commitment Letter, the Term Sheet or the Fee Letter, in the case of clauses (a) and (b), as determined by a court of competent jurisdiction in a final, non-appealable judgment, and (ii) none of us, you (or your affiliates), the Sponsor (or its affiliates), the Company (or its subsidiaries), the other Investors (or their affiliates) or any Protected Person shall be liable for any indirect, special, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) in connection with this Commitment Letter, the Fee Letter, the Transactions (including the ABL Facility and the use of proceeds thereunder), or with respect to any activities related to the ABL Facility, including the preparation of this Commitment Letter, the Fee Letter and the ABL Facility Documentation; *provided* that nothing in this clause (ii) shall limit your indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Protected Person with respect to which the applicable Protected Person is entitled to indemnification as set forth in the immediately preceding paragraph (as qualified by clause (i) immediately above).

In case any Proceeding is instituted involving any Indemnified Person for which indemnification is to be sought hereunder by such Indemnified Person, then such Indemnified Person will promptly notify you of the commencement of such Proceeding; *provided*, *however*, that the failure to so notify you will not relieve you of any liability that you may have to such Indemnified Person pursuant to this Section 7, except to the extent you are materially prejudiced by such failure. In connection with any one Proceeding, you will not be responsible for the fees and expenses of more than one separate law firm for all Indemnified Persons plus additional conflicts and local counsel to the extent provided herein.

You shall not, without the prior written consent of the applicable Indemnified Person (which consent shall not be unreasonably withheld or delayed) (it being understood that withholding consent due to non-satisfaction of any of the conditions described in clause (i) and clause (ii) of this sentence shall be deemed reasonable), effect any settlement of, or consent to the entry of any judgment with respect to, any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (i) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability or claims that are the subject matter of

such Proceeding and (ii) does not include any statement as to or admission of fault, culpability, wrongdoing or failure to act by or on behalf of any Indemnified Person.  In connection with any one Proceeding, you will not be responsible for the fees and expenses of more than one separate law firm for all Indemnified Persons plus additional local counsel and conflicts counsel to the extent provided herein.

You shall not be liable for any settlement of any Proceeding effected without your written consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent or if there is a final and non-appealable judgment by a court of competent jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and reasonable and documented legal or other out-of-pocket expenses by reason of such settlement or judgment in accordance with and to the extent provided in the other provisions of this <u>Section 7</u>.  Each Indemnified Person (by accepting the benefits hereof) agrees to, and shall, refund and return any and all amounts paid by you to such Indemnified Person if a court of competent jurisdiction determines in a final and non-appealable determination that such Indemnified Person was not entitled to indemnification or contribution rights with respect to such payment pursuant to this <u>Section 7</u>.

Each Indemnified Person shall, at your expense, give (subject to confidentiality or legal restrictions, and with no obligation for any such Indemnified Person to waive any legal privilege) such information and assistance to you as you may reasonably request in connection with any Proceeding.

8.    <u>Sharing of Information, Absence of Fiduciary Relationships, Affiliate Activities</u>.

You acknowledge that the Commitment Parties and/or their affiliates or managed funds may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other persons in respect of which you, the Company and your and its respective affiliates may have conflicting interests regarding the transactions described herein and otherwise.  None of the Commitment Parties and their respective affiliates or managed funds will use confidential information obtained from you, the Company, the Investors or any of your or their respective affiliates by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you, the Company, the Investors or your or their respective affiliates in connection with the performance by them or their affiliates of services for other persons, and none of the Commitment Parties and their affiliates or managed funds will furnish any such information to other persons, except to the extent permitted below.  You also acknowledge that none of the Commitment Parties and their affiliates or managed funds has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.  In addition, please note that one or more Commitment Parties and/or their respective affiliates and/or managed funds may be working with competing bidders for the Company in connection with providing or arranging debt or equity financing for the acquisition of the Company.  You agree to such activities and arrangements, and further agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from, on the one hand, such Commitment Party and/or its affiliates' and/or its managed funds' arranging or providing or contemplating arranging

or providing financing for a competing bidder and, on the other hand, our and our affiliates' relationships with you as described and referred to herein.

As you know, certain of the Commitment Parties may be, or may be affiliated with, full service securities firms engaged, either directly or through their affiliates, in various activities, including securities trading, commodities trading, investment management, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, certain of the Commitment Parties and/or their respective affiliates or managed funds may actively engage in commodities trading or trade the debt and equity securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of you, the Company and other companies which may be the subject of the arrangements contemplated by this Commitment Letter for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities. Certain of the Commitment Parties and/or their affiliates or managed funds may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of you, the Company or other companies which may be the subject of the arrangements contemplated by this Commitment Letter or engage in commodities trading with any thereof. You further acknowledge and agree that the Commitment Parties and/or their affiliates or managed funds from time to time may hold investments in, make other loans to or have other relationships with you or the Company or your or the Company's respective subsidiaries and affiliates.

The Commitment Parties and/or their respective affiliates or managed funds may have economic interests that conflict with those of you or the Company and may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and the Commitment Parties have no obligation to disclose any of such interests to you or your affiliates. You agree that the Commitment Parties will act under this Commitment Letter as independent contractors and that nothing in this Commitment Letter or the Fee Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Parties, on the one hand, and you, the Company, your and its respective equity holders or your or their respective affiliates, on the other hand. You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter and the Fee Letter are arm's-length commercial transactions between the Commitment Parties and, if applicable, their affiliates or managed funds, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction each Commitment Party and each of its applicable affiliates or managed funds (as the case may be) is acting solely as a principal and has not been, is not and will not be acting as an advisor, an agent or a fiduciary of you, the Company, your and its management, equity holders, creditors, affiliates or any other person, and (iii) the Commitment Parties and their applicable affiliates or managed funds (as the case may be) have not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether the Commitment Parties or any of their respective affiliates have advised or are currently advising you or the Company on other matters) except the obligations expressly set forth in this Commitment Letter and the Fee Letter. You further acknowledge and agree that (x) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (y) you are capable of evaluating and understand and accept the terms,

14

risks and conditions of the transactions contemplated hereby, and (z) we have provided no legal, accounting, regulatory or tax advice, and you contacted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate. You agree that you will not claim that the Commitment Parties or their applicable affiliates or managed funds, as the case may be, have rendered advisory services of any nature or respect, or owe a fiduciary or similar duty to you or your affiliates, in connection with such transaction or the process leading thereto.

In addition, please note that one or more of the Commitment Parties or its affiliates may be retained as a financial advisor (in such capacity, a "***Financial Advisor***") to the Sponsor in connection with the Acquisition. You agree to such retention (if applicable), and further agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from, on the one hand, the engagement of such Financial Advisor and, on the other hand, our and our affiliates' relationships with you as described and referred to herein. Each of the Commitment Parties hereto acknowledges (i) that one or more of the Commitment Parties or its affiliates may be retained as a Financial Advisor and (ii) that such relationship does not create any fiduciary duties or fiduciary responsibilities to such Commitment Party on the part of such retained Commitment Party or its affiliates.

       9.    <u>Confidentiality</u>.

You agree that you will not disclose, directly or indirectly, the Fee Letter and the contents thereof or this Commitment Letter, the Term Sheet, the other exhibits and attachments hereto and the contents of each thereof, or the activities of any Commitment Party pursuant hereto or thereto, to any person or entity without prior written approval of the relevant Commitment Parties (which may be provided by electronic means) (such approval not to be unreasonably withheld, conditioned or delayed), except (i) to the Sponsor, Investors and prospective equity investors, the Company (and any sellers or other direct or indirect equityholders with respect to the Company or you), the Special Master and Claimholders (each as defined in the Acquisition Agreement) and to your and any of their affiliates and your and their respective Related Parties (as defined below), controlling persons or equity holders and to any other actual and/or potential co-investors, in each case, on a confidential basis (*provided*, that any disclosure of the Fee Letter or its contents (x) until after the Closing Date, to the Company (and any sellers or other direct or indirect equityholders thereof, in each case, other than the Sponsor and its affiliates or respective Related Parties), its affiliates and their respective Related Parties, controlling persons or equity holders (each in its capacity as such), in each case, other than the Sponsor and its affiliates or respective Related Parties, and (y) at all times to the Special Master and Claimholders, shall, in each case, be redacted in a customary manner), (ii) if the relevant Commitment Parties consent in writing (such consent not to be unreasonably withheld or delayed) to such proposed disclosure, (iii) to the extent such information becomes publicly available other than by reason of improper disclosure in violation of any confidentiality obligation owing to us (including those set forth in this paragraph), (iv) in any legal, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation (including this Commitment Letter (but not the Fee Letter, other than the aggregate fee amount, unless required by the Court (as defined in the Acquisition Agreement) or the Special Master, in which case you shall provide only a version redacted in a customary manner, unless an unredacted version is specifically requested or required by the Court or the Special Master, in which case an unredacted version may be provided), including, without limitation, any applicable rules of any national securities exchange and/or applicable federal securities laws in connection with any

Securities and Exchange Commission filings relating to the Acquisition and including to the Court, the Special Master and OFAC, in each case pursuant to the Sale Procedures Order (as defined in the Acquisition Agreement), as may be amended or modified hereafter) or compulsory legal process or as requested by a governmental authority (in which case you agree, to the extent practicable and permitted by law, rule or regulation, to inform us promptly thereof) and/or regulatory authority or (v) to a tax authority, to the extent reasonably necessary in connection with the tax affairs of Holdings and/or its affiliates; *provided* that (A) you may disclose this Commitment Letter (including the Term Sheet and the other exhibits and attachments hereto) and the contents hereof (but not the Fee Letter or the contents thereof) in any proxy, public filing prospectus, offering memorandum, offering circular, syndication materials or other marketing materials in connection with the Acquisition and the ABL Facility (including the Information Materials) or in connection with any public filing relating to the Transactions, (B) you may disclose the Term Sheet (and the other exhibits and attachments hereto) and the contents thereof (together with the results of the exercise of any "market flex" provisions in the Fee Letter and the aggregate amount of fees payable under the Fee Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses), to potential Lenders, potential lenders to the First Lien Term Facility, potential purchasers of the Third Lien Notes, potential hedging counterparties, potential counterparties to commercial agreements that are customary in the refining industry and to rating agencies in connection with obtaining ratings for the Borrower and any term loans or debt securities, (C) you may disclose the aggregate fee amounts contained in the Fee Letter as part of Projections, pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering and marketing materials for the ABL Facility, the First Lien Term Facility, the Third Lien Notes or any other debt securities or in any public or regulatory filing relating to the Transactions, (D) you may disclose this Commitment Letter (including the Term Sheet and the other exhibits and attachments hereto) and the Fee Letter in connection with the enforcement of your rights hereunder and thereunder and (E) you may disclose this Commitment Letter and the Fee Letter and the contents of each thereof (including the Term Sheet and other exhibits and attachments hereto) to any potential additional lead arranger or additional joint bookrunner, in either case to the extent in contemplation of appointing such person pursuant to Section 2 of this Commitment Letter and to any such person's affiliates and its and their respective Related Parties, controlling persons and equity holders, in each case, on a confidential basis. The provisions of this paragraph shall automatically terminate on the second anniversary of the date hereof.

Each Commitment Party and its affiliates or managed funds will use all non-public information provided to it or such affiliates by or on behalf of you hereunder or in connection with the Acquisition and the related Transactions solely for the purpose of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information and shall not publish, disclose or otherwise divulge, such information; *provided* that nothing herein shall prevent such Commitment Party and its affiliates or managed funds from disclosing any such information (i) pursuant to the order of any court (including the Court) or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process based on the reasonable advice of counsel (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (ii) upon the request or demand of

16

any regulatory authority (including any self-regulatory authority) having jurisdiction over such Commitment Party or any of its affiliates or managed funds (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority (including any self-regulatory authority) exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iii) to the extent that such information becomes publicly available other than by reason of improper disclosure by any Commitment Party, any of its affiliates or its managed funds or any of its or their Related Parties in violation of any confidentiality obligations (including those set forth in this paragraph) owing to you, the Company, the Investors or any of your or their respective affiliates or any of your or their Related Parties, (iv) to the extent that such information is received by such Commitment Party or any of its affiliates or managed funds from a third party that is not, to such Commitment Party's knowledge (after due inquiry), subject to any contractual or fiduciary confidentiality obligations owing to you, the Company, the Investors or any of your or their respective affiliates or any of your or their Related Parties, (v) to the extent that such information is independently developed by such Commitment Party or any of its affiliates or managed funds without the use of any confidential information and without violating the terms of this Commitment Letter, (vi) to such Commitment Party's affiliates, limited partners, managed accounts or managed funds (in each case, other than any Excluded Affiliates) and to its and their respective directors, officers, employees, shareholders, financing sources, investors, legal counsel, independent auditors, professionals and other experts or agents (such persons, "***Related Parties***") who need to know such information in connection with the Transactions and who are informed of the confidential nature of such information and who are subject to customary confidentiality obligations of professional practice or who agree in writing to be bound by the terms of this paragraph (or language substantially similar to this paragraph) (with such Commitment Party, to the extent such person's compliance with this paragraph is within its control, being responsible for such compliance), (vii) to bona fide prospective Lenders, participants or assignees and to any direct or indirect contractual counterparty to any swap or derivative transaction relating to you or any of your subsidiaries under any Senior Secured Credit Facility, (viii) for purposes of establishing a due diligence defense in any legal proceedings, (ix) to market data collectors and similar service providers for customary purposes in the lending industry in connection with the any Senior Secured Credit Facility (including in connection with the administration and management of such Senior Secured Credit Facility) and (x) as is necessary or advisable in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter or the Fee Letter; *provided* that no such disclosure shall be made to the members of such Commitment Party's or any of its affiliates' or managed funds' deal teams that are engaged (a) primarily as principals in private equity or venture capital or (b) in the sale of the Company and its subsidiaries, including through the provision of advisory services (any entities described in clause (a) and clause (b), "***Excluded Affiliates***")  other than to a limited number of senior employees who are required, in accordance with industry regulations or such Commitment Party's internal policies and procedures to act in a supervisory capacity and the Commitment Parties' internal legal, compliance, risk management, credit or investment committee members, in each case solely to the extent that any such information that is disclosed to such persons is done on a "need to know" basis solely in connection with the transactions contemplated by this Commitment Letter and any such persons are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of such type confidential; *provided* that the disclosure of any such information

17

pursuant to clause (vii) and clause (viii) above shall be made subject to the acknowledgement and acceptance by such recipient (other than, in respect of clause (viii), a judge in such legal proceeding) that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and each Lead Arranger, including, without limitation, as set forth in the Information Materials) in accordance with the standard syndication process of the Lead Arrangers or market standards for dissemination of such types of information, which may require "click-through" or other affirmative action on the part of the recipient to access such confidential information and acknowledge its confidentiality obligations in respect thereof. The Commitment Parties' and their affiliates' or managed funds', if any, obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation relating to the ABL Facility upon the initial funding thereunder. The provisions of this paragraph shall otherwise automatically terminate on the second anniversary of the date hereof. In no event shall any disclosure of information referred to above be made to any Disqualified Lender. It is understood and agreed that the Commitment Parties may advertise or promote its role in arranging or providing any portion of the ABL Facility (including in any newspaper or other periodical, on any website or similar place for dissemination of information on the internet, as part of a "case study" incorporated into promotional materials, in the form of a "tombstone" advertisement or otherwise).

        10.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in this Commitment Letter or any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution (as defined below) arising under this Commitment Letter, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority (as defined below) and agrees and consents to, and acknowledges and agrees to be bound by:

        (a)    the application of any Write-Down and Conversion Powers (as defined below) by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Commitment Party that is an Affected Financial Institution; and

        (b)    the effects of any Bail-In Action (as defined below) on any such liability, including, if applicable:

        i.    a reduction in full or in part or cancellation of any such liability;

        ii.    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Commitment Letter; or

        iii.    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

        "Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which

19

write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

11.    <u>Miscellaneous</u>.

This Commitment Letter and the commitments hereunder shall not be assignable by any party hereto without the prior written consent of each other party hereto (such consent not to be unreasonably withheld or delayed) and any such attempted assignment without such consent shall be null and void.  This Commitment Letter and the commitments hereunder are intended to be solely for the benefit of the parties hereto (and Protected Persons and Indemnified Persons to the extent expressly set forth herein) and their permitted successors and assigns  and do not and are not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Protected Persons and Indemnified Persons to the extent expressly set forth herein) and their permitted successors and assigns.  Subject to the limitations set forth in <u>Section 3</u> above, the Commitment Parties reserve the right to employ the services of their affiliates or managed funds or branches in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates or branches certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates, managed funds or branches may agree in their sole discretion and, to the extent so employed, such affiliates and branches shall be entitled to the benefits and protections afforded to, and subject to the provisions governing the conduct of, the Commitment Parties hereunder; *provided* that (i) no Commitment Party shall be relieved of any of its obligations hereunder, including in the event that any affiliate or branch through which it performs its obligations fails to perform the same in accordance with the terms hereof, and (ii) the applicable Commitment Party shall be responsible for any breach by any such affiliate, managed fund or branch referred to in the foregoing <u>clause (i)</u> of the obligations hereunder.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the Commitment Parties and you.  This Commitment Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or other electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on the electronic platform DocuSign, digital copies of a signatory's manual signature, and deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  This Commitment Letter (including the exhibits hereto) and the Fee Letter (i) are the only agreements that have been entered into among the parties hereto with respect to the ABL Facility and (ii) supersede all prior

understandings, whether written or oral, among us with respect to the ABL Facility and sets forth the entire understanding of the parties hereto with respect thereto. THIS COMMITMENT LETTER AND THE FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK; *PROVIDED*, *HOWEVER*, THAT (I) THE INTERPRETATION OF THE DEFINITION OF "COMPANY MATERIAL ADVERSE EFFECT" (AS DEFINED IN THE ACQUISITION AGREEMENT) (AND WHETHER OR NOT A COMPANY MATERIAL ADVERSE EFFECT (AS DEFINED IN THE ACQUISITION AGREEMENT) HAS OCCURRED AND/OR IS CONTINUING), (II) THE DETERMINATION OF THE ACCURACY OF ANY SPECIFIED ACQUISITION AGREEMENT REPRESENTATION AND WHETHER AS A RESULT OF ANY INACCURACY THEREOF SPONSOR (OR ITS APPLICABLE AFFILIATES) HAVE THE RIGHT (TAKING INTO ACCOUNT ANY APPLICABLE CURE PROVISIONS) TO TERMINATE ITS (OR SUCH AFFILIATES') OBLIGATIONS UNDER SECTION 8.1 OF THE ACQUISITION AGREEMENT (IN ACCORDANCE WITH THE EXPRESS TERMS THEREOF) AS A RESULT OF A BREACH OF SUCH SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS WITHOUT ANY LIABILITY TO, AND WITHOUT RESULTING IN THE PAYMENT OF ANY FEES, LIQUIDATED DAMAGES OR OTHER AMOUNTS BY, SPONSOR (OR ITS AFFILIATES), OR TO DECLINE TO CONSUMMATE THE ACQUISITION (IN EACH CASE IN ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT) AS A RESULT OF A BREACH OF SUCH SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS WITHOUT ANY LIABILITY TO, AND WITHOUT RESULTING IN THE PAYMENT OF ANY FEES, LIQUIDATED DAMAGES OR OTHER AMOUNTS BY, SPONSOR (OR ITS AFFILIATES) UNDER SECTION 8.1 OF THE ACQUISITION AGREEMENT (IN ACCORDANCE WITH THE EXPRESS TERMS THEREOF) AND (III) THE DETERMINATION OF WHETHER THE ACQUISITION HAS BEEN CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT AND, IN EACH CASE OF THE FOREGOING IN THIS PROVISO, ANY CLAIMS OR DISPUTES ARISING OUT OF ANY SUCH INTERPRETATION OR DETERMINATION OR ANY ASPECT THEREOF SHALL, IN EACH CASE, BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS GOVERNING THE ACQUISITION AGREEMENT AS APPLIED TO THE ACQUISITION AGREEMENT, WITHOUT GIVING EFFECT TO ANY CHOICE-OF-LAW OR CONFLICT-OF-LAW RULES OR PROVISIONS OF ANY JURISDICTION THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

Each of the parties hereto agrees that (i) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including the good faith negotiation of the ABL Facility Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the commitments provided hereunder are subject solely to conditions as expressly provided herein, and (ii) the Fee Letter is a legally valid and binding agreement of the parties thereto with respect to the subject matter set forth therein. Promptly following the execution of this Commitment Letter and the Fee Letter, the parties hereto shall proceed with the negotiation in good faith of the ABL Facility Documentation for purposes of executing and delivering the ABL Facility Documentation substantially simultaneously with the consummation of the Acquisition.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

Each of the parties hereto hereby irrevocably and unconditionally (i) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York County (the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding shall only be heard and determined in such New York State court or, to the extent permitted by law, in such federal court, (ii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby in any New York State or in any such federal court, (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, and (iv) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in any other courts to whose jurisdiction such person is subject, by suit on the judgment or in any other manner provided by law; *provided* that with respect to any suit, action or proceeding arising out of or relating to the Acquisition Agreement or the transactions contemplated thereby and that does not involve claims against us or the Lenders or any Indemnified Person or Protected Person, this sentence shall not override any jurisdiction provision set forth in the Acquisition Agreement.  Each of the parties hereto agrees that service of process, summons, notice or document by registered mail addressed to you or us at the addresses set forth above shall be effective service of process for any suit, action or proceeding brought in any such court.  Nothing in this paragraph shall affect the right of any party hereto to serve process in any manner permitted by law, or limit any right that any party hereto may have to bring proceedings against any other party hereto in the courts of any jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L. 107-56 (signed into law October 26, 2001)) (as amended, the "***PATRIOT Act***") and 31 C.F.R. §1010.230 (as amended, the "***Beneficial Ownership Regulation***"), each of us and each of the Lenders may be required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information may include their names, addresses, tax identification numbers and other information that will allow each of us and the Lenders to identify the Borrower and the Guarantors in accordance with the PATRIOT Act and the Beneficial Ownership Regulation.  This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for each of us and the Lenders.

The indemnification, compensation (if applicable in accordance with the terms hereof and of the Fee Letter), reimbursement (if applicable in accordance with the terms hereof and of the Fee Letter), jurisdiction, governing law, venue, waiver of jury trial, service of process, syndication, survival and confidentiality provisions contained herein and in the Fee Letter and the provisions of Section 8 of this Commitment Letter shall remain in full force and effect regardless of whether

the ABL Facility Documentation shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the Initial Lenders' commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to (a) assistance to be provided in connection with the syndication of the ABL Facility (including supplementing and/or correcting Information and Projections) prior to the Syndication Date, (b) confidentiality of the Fee Letter and the contents thereof (which, notwithstanding the foregoing, shall automatically terminate on the date that is 2 years after the Signing Date) and (c) your understandings and agreements regarding no agency or fiduciary duty) shall automatically terminate and be superseded, to the extent covered thereby, by the provisions of the ABL Facility Documentation upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time. You may terminate this Commitment Letter and/or the Initial Lenders' commitments with respect to the ABL Facility (or portion thereof) hereunder at any time subject to the provisions of the immediately preceding sentence. In addition, in the event that a lesser amount of indebtedness is required to fund the Transactions for any reason, you may reduce the Initial Lenders' commitments with respect to the ABL Facility (on a pro rata basis among the applicable Initial Lenders and across the ABL Facility in your sole discretion).

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and of the Fee Letter by returning to the Commitment Parties (or their legal counsel), executed counterparts hereof and of the Fee Letter not later than 11:59 p.m., New York City time, on September 5, 2025 (such date, or such earlier date on which executed counterparts hereof and of the Fee Letter are returned to the Commitment Parties, the "***Signing Date***"). The Initial Lenders' respective commitments and the obligations of the Commitment Parties hereunder will automatically expire at such time in the event that the Commitment Parties (or their legal counsel) have not received such executed counterparts in accordance with the immediately preceding sentence. If you do so execute and deliver to us this Commitment Letter and the Fee Letter at or prior to such time, we agree to hold our commitment to provide the ABL Facility and our other undertakings in connection therewith available for you until the earliest of (i) the date on which the Acquisition Agreement has been validly terminated in accordance with its terms, (ii) consummation of the Acquisition with or without the funding of the ABL Facility, (iii) 11:59 p.m., New York City time, on the date that is 5 business days after the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof after giving effect to any extensions thereof pursuant to Section 8.1(b) of the Acquisition Agreement as in effect on the date hereof), and (iv) March 5, 2027 (such time, the "***Expiration Date***"). Upon the Expiration Date, this Commitment Letter and the commitments of each of the Commitment Parties hereunder and the agreement of the Lead Arrangers to provide the services described herein shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension in writing.

[Remainder of this page intentionally left blank]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

**BARCLAYS BANK PLC**

By_____
    Name:
    Title:

**CITIGROUP GLOBAL MARKETS INC.**

By_____
    Name:
    Title:

[Signature Page to Project Horizon Commitment Letter]

Accepted and agreed to as of
the date first above written:

**AMBER ENERGY INC.**


By_____
   Name:
   Title:

[Signature Page to Project Horizon Commitment Letter]

<u>Schedule I</u>
<u>Commitments</u>

| Initial Lender | ABL Facility (Percentage) |
|---|---|
| Barclays | 50.0% |
| Citi | 50.0% |
| Total | 100% |

EXHIBIT A

Project Horizon
Transaction Description

Capitalized terms used but not defined in this Exhibit A shall have the meanings set forth in the other Exhibits to the Commitment Letter to which this Exhibit A is attached or in the Commitment Letter. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit A shall be determined by reference to the context in which it is used. It is intended that:

a)  The Sponsor together with certain other investors arranged by and/or designated by the Sponsor (which may include members of the Company's management) (collectively with the Sponsor, the "*Investors*") intend to cause Purchaser, directly or indirectly through one or more transactions to acquire (the "*Acquisition*"), directly or indirectly, equity interests of the Company pursuant to a Stock Purchase Agreement dated as of the date hereof, by and between the Purchaser and Robert B. Pincus, solely in his capacity as special master (the "*Special Master*") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "*Court*") (together with the schedules, exhibits and annexes thereto and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in Exhibit C hereto, the "*Acquisition Agreement*").

b)  The Investors will make, directly or indirectly, equity contributions in an aggregate amount not less than $25.0 million to Amber Energy Topco L.P. ("*Topco*"), the direct parent of Holdings, in exchange for equity of Topco (the "*Equity Investment*"), with all such contributions to Topco to be in the form of common equity or qualified preferred equity (on terms reasonably satisfactory to the Lead Arrangers) and contributed to Holdings, Amber MSub LLC and the Borrower solely in the form of common equity on the Closing Date. On the Closing Date, immediately after the consummation of the Equity Investment and the other Transactions (as defined below), (1) the Sponsor shall own, directly or indirectly, not less than a majority of the voting stock and economic interests of Holdings, (2) Topco shall directly own 100% of voting stock and economic interests of Holdings, (3) Purchaser shall directly own 100% of voting stock and economic interests of PDV Holding, Inc., and, immediately following the Closing, shall merge with and into PDV Holding, Inc. with PDV Holding, Inc. surviving (such that Holdings will directly own 100% of the voting stock and economic interests of PDV Holding, Inc.), (4) PDV Holding, Inc. shall directly own 100% of voting stock and economic interests of Citgo Holding, Inc., and (5)  the Initial Borrower shall merge with and into CITGO Petroleum Corporation with CITGO Petroleum Corporation surviving (such that Citgo Holding, Inc. will directly own 100% of the voting stock and economic interests of the surviving entity).

c)  On or prior to the date hereof, Holdings has entered into (and has delivered to the Commitment Parties duly executed and complete copies of each of the following): (i) that certain Transaction Support Agreement, dated as of August 12, 2025 (together with the schedules, exhibits, and annexes thereto, as in effect on the date hereof and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in Exhibit C hereto, the "*2020 Bonds TSA*") with holders of Petróleos de Venezuela,

S.A.'s 8.50% senior secured notes due in 2020 (the "***2020 Bonds***") representing more than two-thirds of the outstanding principal amount of 2020 Bonds (the "***Consenting 2020 Holders***"), with such 2020 Bonds TSA providing that, effective upon the Closing, each Consenting 2020 Holder shall transfer, convey, and assign to Holdings (or its designee that is a Loan Party) all of the 2020 Bonds held by such Consenting 2020 Holder (such transferred, conveyed, and assigned 2020 Bonds, collectively, the "***Acquired 2020 Bonds***"), in each case, in exchange for cash and/or non-cash consideration, (ii) that certain Commitment Letter, dated as of August 11, 2025 (together with the schedules, exhibits, and annexes thereto, as in effect on the date hereof and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in Exhibit C hereto, the "***Rusoro TSA***"), with Rusoro Mining Ltd., a British Columbia corporation ("***Rusoro***"), pursuant to which, among other things, Rusoro has agreed to, effective upon the Closing, extinguish the Rusoro Claim (as defined in the Rusoro TSA) in exchange for the consideration set forth in the Rusoro TSA, and (iii) that certain Support Agreement, dated as of August 11, 2025 (together with the schedules, exhibits, and annexes thereto, as in effect on the date hereof and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in Exhibit C hereto, the "***Koch TSA***"; the Koch TSA, taken together with the 2020 Bonds TSA and the Rusoro TSA, collectively, the "***TSAs***" and each individually, a "***TSA***"), with Koch Minerals Sàrl ("***Koch Minerals***") and Koch Nitrogen International Sàrl ("***Koch Nitrogen***" and, together with Koch Minerals, collectively, the "***Koch Parties***"), pursuant to which, among other things, the Koch Parties have agreed to, effective upon the Closing, extinguish the Koch Claims (as defined in the Koch TSA) in exchange for the consideration set forth in the Koch TSA.

d) The Borrower will obtain (i) a First Lien Term Facility pursuant to that certain First Lien Commitment Letter, dated as of the date hereof, among Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its affiliates (in such capacity, "***ACM***", and together with Apollo Global Funding, "***Apollo***"), Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, in each case, within its Global Opportunities Fund or Global Private Debt strategies, or one or more entities owned by such funds or accounts ("***OCM***"), Oaktree Opportunities Fund XII Holdings (Delaware), L.P. ("***OOF***"), Oaktree Value Opportunities Fund Holdings, L.P. ("***OVOF***", and together with OCM and OOF, collectively, "***Oaktree***"), Sixth Street Lending Partners, Silver Point Capital, L.P., as agent for and on behalf of certain of its affiliated funds, related funds and investment vehicles, Carronade Capital Master, LP, Crown/Carronade Segregated Portfolio, Jefferies Capital Services, LLC, Diameter Capital Partners LP, Elliott Associates, L.P., Elliott International, L.P. and you (as in effect on the date hereof, the "***First Lien Commitment Letter***") which will be a senior secured first lien term loan facility in an aggregate principal amount of $3,775.0 million (the "***First Lien Term Facility***"; and the loans thereunder, the "***Term Loans***"), (ii) the ABL Facility described in Exhibit B to the Commitment Letter, which is a senior secured asset-based revolving credit facility in an aggregate principal amount equal to $2,000.0 million (the "***ABL Facility***" and, together with the First Lien Term Facility, the "***Senior Secured Credit Facilities***") and (iii) qualified preferred equity (the "***Alternative***

*Preferred Equity*") and/or Third Lien Convertible Notes pursuant to a senior secured third lien convertible notes facility (the "***Third Lien Notes***") to be no less than $3,100.0 million in aggregate principal amount; *provided* that (x) the terms, conditions and documentation of the First Lien Term Facility shall be consistent with those set forth in the First Lien Commitment Letter as of the date hereof and otherwise on terms, conditions and documentation reasonably satisfactory to the Lead Arrangers and (y) the terms, conditions and documentation of the Third Lien Notes shall be consistent with those shared with the Lead Arrangers on August 22, 2025, and pursuant to that certain Convertible Note Commitment Letter, dated as of the date hereof (as in effect on the date hereof, the "***Third Lien Notes Commitment Letter***"), among the commitment parties thereto and, and shall provide for the issuance and funding of an aggregate principal amount of no less than $3,100.0 million (with at least $2,420.5 million thereof to be actually funded in cash of which at least $1,050.0 million thereof will be actually funded in cash by the Sponsor or affiliates or other related funds of the Sponsor) of the Third Lien Notes on the Closing Date (collectively, the "***Acceptable Third Lien Note Terms***"; it being understood and acknowledged that, for purposes of the Acceptable Third Lien Note Terms, any such Alternative Preferred Equity shall also be entirely non-cash pay, funded on the Closing Date in such aggregate minimum amount of $3,100.0 million (with at least $2,420.5 million thereof to be actually funded in cash of which at least $1,050.0 million thereof will be actually funded in cash by the Sponsor or affiliates or other related funds of the Sponsor), and otherwise reasonably satisfactory to the Lead Arrangers) and otherwise on terms, conditions and documentation reasonably satisfactory to the Lead Arrangers.

e)  Subject in all respects to the use of proceeds provisions contained in the term sheet for the First Lien Term Facility, the proceeds of the Senior Secured Credit Facilities borrowed on the Closing Date, together with up to $500 million of borrowings under the ABL Facility (provided, however, that notwithstanding anything to the contrary herein, no borrowings in excess of $50 million may be made under the ABL Facility on the Closing Date unless and until the aggregate principal amount of Alternative Preferred Equity and/or Third Lien Notes that is actually funded in cash on the Closing Date is equal to at least $3,100.0 million), and proceeds from the Alternative Preferred Equity, Third Lien Notes and the Equity Investment, will be applied to (i) pay consideration in connection with the Acquisition and any other payments contemplated by the Acquisition Agreement, (ii) pay the fees and expenses incurred in connection with the Transactions (such fees and expenses, collectively, the "***Transaction Costs***"), (iii) consummate the Refinancing (with the proceeds of the First Lien Term Facility being first applied to pay all such amounts for the Refinancing in full; the amounts set forth in <u>clause (i)</u>, <u>clause (ii)</u> and <u>clause (iii)</u> above, collectively, the "***Acquisition Costs***"), (iv) pay the cash amounts due and owing to the Consenting 2020 Holders in exchange for the Acquired 2020 Bonds held by such holders, in each case, in accordance with the 2020 Bonds TSA and (v) for working capital and general corporate purposes. The transactions described above (including the payment of the Acquisition Costs), are collectively referred to herein as the "***Transactions***".

f)  The Company or the Borrower, as applicable, will, in each case of the following, with the proceeds of the First Lien Term Facility (i) redeem and/or offer to purchase or repurchase in full the Company's (x) 6.375% senior secured notes due 2026 (the "***2026 Notes***") and (y) 8.375% senior secured notes due 2029 (the "***2029 Notes***", and together with the 2026

Notes, collectively, the "***Company Notes***") in each case, that remain outstanding on the Closing Date and (ii) repay all outstanding amounts under that certain Receivables Purchase Agreement dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, Barclays Bank PLC, as program administrator, and the various other parties thereto (as amended, modified or otherwise supplemented, the "***Existing AR Facility***"), and in each case of the foregoing clauses (i)-(ii), all such indebtedness and obligations will be repaid in full and any and all liens and security interests will be released and terminated (the transactions described in clauses (f)(i) and (ii), collectively, the "***Refinancing***").

EXHIBIT B

Project Horizon[1]
$2,000,000,000 ABL Facility
Summary of Principal Terms and Conditions

Borrower:                        Initially, a newly formed wholly-owned indirect subsidiary of Holdings that is a Delaware limited liability company (the "***Initial Borrower***"), and, immediately upon the consummation of the Acquisition, the Initial Borrower will merge with and into CITGO Petroleum Corporation, a Delaware corporation (the "***Successor Borrower***," and together with the Initial Borrower, the "***Borrower***").

Transactions:                   As set forth in Exhibit A to the Commitment Letter.

Administrative Agent and Collateral Agent:                  Citi (as defined in the Commitment Letter) will act as sole administrative agent and sole collateral agent (in such capacities, the "***ABL Administrative Agent***") for the Lenders (as defined below) (and their permitted assigns) and will perform the duties customarily associated with such roles.

Lead Arrangers and Bookrunners:    Citi and Barclays Bank PLC (collectively, in such capacities, the "***Lead Arrangers***") will act as joint lead arrangers and joint bookrunners for the ABL Facility, and will perform the duties customarily associated with such roles; *provided* that Holdings and the Sponsor shall have the right, on the terms set forth in the Commitment Letter and the Fee Letter, to appoint other financial institutions and other institutional lenders and investors as additional joint lead arrangers, joint bookrunners, managers, co-managers, agents or co-agents.

Syndication Agent:              An entity (or entities) (if any) to be determined by the Lead Arrangers in consultation with the Borrower will act as syndication agent(s) for the ABL Facility.

ABL Facility:                    A senior secured asset-based revolving credit facility denominated in United States dollars and any other currency to be mutually agreed subject to customary terms and conditions to be set forth in the ABL Facility Documentation (as defined below) (each of the foregoing currencies, an "***Available Currency***") in an

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Commitment Letter to which this Term Sheet is attached to, including the exhibits thereto.

aggregate principal amount equal to $2,000.0 million. The loans under the ABL Facility, together with (unless the context otherwise requires) the swingline borrowings referred to below, are collectively referred to as "***Loans***".

Purpose:

The letters of credit and proceeds of Loans will be used by the Borrower and its subsidiaries (i) after the Closing Date, for working capital, capital expenditures, other general corporate purposes (including, without limitation, the financing of acquisitions, other investments, working capital and/or purchase price adjustments (including in connection with the Acquisition), prepayments of Specified Indebtedness and related fees and expenses, and dividends and other distributions, in each case, permitted under the ABL Facility Documentation) and any other use not prohibited by the ABL Facility Documentation, and (ii) on the Closing Date as set forth below under "Availability".

Availability:

The ABL Facility will be made available (subject to the Line Cap (as defined below)) on and after the Closing Date; *provided* that on the Closing Date availability (exclusive of letter of credit usage) will be limited to amounts incurred (i) to finance the Acquisition Costs, (ii) for working capital and to refinance outstanding revolver borrowings under the Company's existing credit facilities (including the Existing AR Facility or any permitted replacement thereof), (iii) to finance purchase price adjustments under the Acquisition Agreement (including with respect to the amount of all cash, cash equivalents, marketable securities and working capital to be acquired), (iv) for other general corporate purposes and/or (v) to cash collateralize letters of credit (with respect to clauses (i) and (iv), in an aggregate amount not to exceed $50.0 million). Additionally, letters of credit may be issued on the Closing Date, including, without limitation, to backstop or replace letters of credit outstanding on the Closing Date under facilities no longer available to the Company or its subsidiaries as of the Closing Date, letters of credit issued under such facilities that are no longer available may be "rolled over" into the ABL Facility on the Closing Date and any new letters of credit required under various customary commercial arrangements. Otherwise, letters of credit (in minimum face amounts to

be agreed upon), Loans (in minimum amounts to be agreed upon) and swingline loans (in minimum face amounts to be agreed upon) will be available at any time prior to the final maturity of the ABL Facility. Amounts repaid under the ABL Facility may be reborrowed, subject to the then-applicable Borrowing Base (as defined below).

Borrowing Base:

The borrowing base (the "***Borrowing Base***") at any time shall equal the sum of the following:

(a)     90% of eligible investment grade receivables (to be defined in a manner consistent with the ABL Documentation Principles); ***plus***

(b)     85% of eligible receivables (other than eligible investment grade receivables) (to be defined in a manner consistent with the ABL Documentation Principles); ***plus***

(c)     80% of eligible hydrocarbon inventory (to be defined in a manner consistent with the ABL Documentation Principles) (including eligible in-transit inventory (to be defined in a manner consistent with the ABL Documentation Principles) up to an amount to be agreed); ***plus***

(d)     100% of eligible cash and cash equivalents held at an account with the ABL Administrative Agent or subject to a blocked account control agreement in form and substance reasonably acceptable to the ABL Administrative Agent ("***ABL Eligible Cash***"); ***plus***

(e)     80% of eligible positive exchange agreement balance (to be defined in a manner consistent with the ABL Documentation Principles) up to an amount to be agreed; ***plus***

(f)     70% of eligible renewable identification numbers for renewable fuel (to be defined in a manner consistent with the ABL Documentation Principles) up to an amount to be agreed; ***plus***

(g)     100% of paid but unexpired letters of credit backing crude oil purchases up to an amount to be agreed; ***plus***

(h)     the lesser of (x) 85% of the book value
(measured at cost) of eligible other inventory of lubricant
and other inventory that does not have an observable
market price and (y) 85% of the net orderly liquidation
value (to be defined in a manner consistent with the ABL
Documentation Principles) of eligible other inventory of
lubricant and other inventory that does not have an
observable market price; *plus*

(i)     80% of eligible unbilled accounts up to an
amount to be agreed; *plus*

(j)     90% of eligible credit card receivables; *plus*

(k)     other customary eligible items to be agreed;
*minus*

(l)     customary reserves (which may include mark-to-
market reserves) (subject to Permitted Discretion (as
defined below)).

The eligibility criteria in clauses (a) through (k) above
are to be reasonably and mutually agreed to address
circumstances, conditions, events or contingencies
arising or that changed after the Closing Date and subject
to the ABL Documentation Principles.

The Borrower shall provide weekly reporting of eligible
cash and cash equivalents, showing daily balances.

If the initial field exam or appraisal (and Borrowing Base
Certificate (as defined below) and together with
customary supporting documentation) reflecting the
results thereof) is not completed before the Closing Date,
then the Borrowing Base for purposes of drawings and
letters of credit under the ABL Facility on the Closing
Date (the "*Closing Borrowing Base*") will be equal to
the greater of (x) $1,500 million and (y) the sum of 70%
of accounts receivable plus, 70% of the market value of
hydrocarbon inventory, plus 65% of other inventory,
plus 100% of cash and cash equivalents held at an
account with the ABL Administrative Agent or subject
to a blocked account control agreement in form and
substance reasonably acceptable to the ABL
Administrative Agent, in each case, subject to customary
eligibility criteria to be agreed.  On and after the date that
is 120 days after the Closing Date, the Closing

B-4

Borrowing Base may be reduced by customary reserves (subject to Permitted Discretion), in an aggregate amount not to exceed $250.0 million. If applicable, the Closing Borrowing Base shall be in effect until the earlier of (i) 120 days after the Closing Date and (ii) receipt by the ABL Administrative Agent of (and reasonable opportunity to review) an initial field examination, an initial appraisal and a Borrowing Base Certificate (together with customary supporting documentation) with respect thereto; provided, that (A) in the event that the ABL Administrative Agent has not received such initial field examination and initial appraisal (and a Borrowing Base Certificate (together with customary supporting documentation) with respect thereto) within 120 days after the Closing Date (subject to extension by the Required Lenders in their sole discretion), the Borrowing Base shall be deemed to be $1,250 million until such initial field examination and initial appraisal is delivered; (B) in the event that the ABL Administrative Agent has not received such initial field examination and initial appraisal (and a Borrowing Base Certificate (together with customary supporting documentation) with respect thereto) within 150 days after the Closing Date (subject to extension by the Required Lenders in their sole discretion), the Borrowing Base shall be limited to the greater of (i) the amount of cash and cash equivalents on the Company's balance sheet held at an account with the ABL Administrative Agent or subject to a blocked account control agreement in form and substance reasonably acceptable to the ABL Administrative Agent and (ii) the outstanding letters of credit and (C) in the event that the ABL Administrative Agent has not received such initial field examination and initial appraisal (and a Borrowing Base Certificate (together with customary supporting documentation) with respect thereto) within 180 days after the Closing Date (subject to extension by the Required Lenders in their sole discretion), the Borrowing Base shall be limited to the amount of cash and cash equivalents on the Company's balance sheet held at an account with the ABL Administrative Agent or subject to a blocked account control agreement in form and substance reasonably acceptable to the ABL Administrative Agent until such initial field examination and initial appraisal (and a Borrowing Base Certificate (together with customary supporting documentation)

with respect thereto) is delivered. For the avoidance of doubt, the Closing Borrowing Base shall at all times be subject to customary eligibility criteria to be agreed.

The Borrowing Base will be computed by the Borrower monthly (or more frequently if the Borrower in its sole discretion shall so elect and, if so elected, continued on such basis for at least 30 consecutive days), and a certificate (the "***Borrowing Base Certificate***") presenting the Borrower's computation of the Borrowing Base (together with customary supporting documentation) will be delivered to the ABL Administrative Agent no event later than the 25th calendar day following the end of each calendar month; ***provided***, ***however***, that

(i)      while any Delivery Condition (as defined below) applies, the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate (together with customary supporting documentation) on Friday of each week for so long as such Delivery Condition applies; or

(ii)      during the continuance of a Specified Default (as defined below), until such Specified Default has been cured or waived, the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate (together with customary supporting documentation) as frequently as reasonably requested by the ABL Administrative Agent (but not more frequently than on a weekly basis) and only for so long as such Specified Default is continuing.

"***Delivery Condition***" means the period from

(a)      the date that (i) Specified Availability (as defined below) shall have been less than the greater of (x) $200.0 million and (y) 15% of the Line Cap on any day or (ii) Specified Availability shall have been less than 20% of the Line Cap for five consecutive Business Days; until

(b)      the date that the Specified Availability shall have been greater than 20% of the Line Cap for 30 consecutive calendar days.

"***Permitted Discretion***" means a determination made in the exercise of reasonable (from the perspective of a

secured asset-based lender) credit judgment in accordance with customary business practices for comparable asset-based lending transactions; ***provided*** that, as it relates to the establishment of new reserves (other than reserves that are expressly included in the definition of "reserves" (to be defined in the ABL Facility Documentation)) or the adjustment or imposition of exclusionary criteria, Permitted Discretion will require that:

(a)     such establishment, adjustment or imposition after the Closing Date be based on the analysis of facts or events first occurring or first discovered by the ABL Administrative Agent after the Closing Date or are materially different from facts or events known to the ABL Administrative Agent on the Closing Date; provided, that if the Closing Borrowing Base is utilized, facts or events learned from the initial field examination or initial appraisal shall be deemed to be first discovered after the Closing Date unless relating to any assets that are subject to the Existing AR Facility as long as based on diligence reasonably satisfactory to the ABL Administrative Agent,

(b)     the amount of any such reserve so established or the effect of any adjustment or imposition of exclusionary criteria be a reasonable quantification of changes in the ability of the ABL Administrative Agent to realize upon the Collateral (as defined below) included in the Borrowing Base, in each case, except to the extent such amount is based on the implementation or calculation of any reserve for which the formula or calculation is set forth in the ABL Facility Documentation, or amounts that are based on volume or production of operations of the Loan Parties;

(c)     no reserves or changes will be duplicative of reserves or changes already accounted for through eligibility criteria (including collection/advance rates); and

(d)     unless an Event of Default has occurred and is continuing or would result after giving effect to any extension of credit under the ABL Facility, no reserve will become effective on less than five Business Days

prior written notice to the Borrower (a "***Reserve Notice***").

"***Specified Default***" shall mean any payment or bankruptcy event of default with respect to the Loan Parties under the ABL Facility, any event of default arising from failure to comply with the financial covenant, any event of default arising from a failure to deliver a Borrowing Base Certificate (together with customary supporting documentation) or any material misrepresentation therein or any event of default arising from a failure to comply with the cash management provisions, in each case, when required and after the expiry of any applicable cure period.

"***Line Cap***" means, at any time, the lesser of (i) the aggregate revolving commitments under the ABL Facility at such time and (ii) the Borrowing Base at such time.

Swingline Loans:

In connection with the ABL Facility, Citi (or an affiliate thereof) (in such capacity, the "***Swingline Lender***") will make available to the Borrower swingline facilities under which the Borrower may make short-term borrowings in U.S. dollars upon same-day notice (in minimum amounts to be mutually agreed upon) of up to $200.0 million.  Except for purposes of calculating the commitment fee described below, any such swingline borrowings will reduce availability under the ABL Facility on a dollar-for-dollar basis.

Upon notice from the Swingline Lender, the Lenders will be unconditionally obligated to purchase participations in any swingline loan pro rata based upon their commitments under the ABL Facility.

If any Lender becomes a Defaulting Lender (as defined below), then the swingline exposure of such Defaulting Lender will automatically be reallocated among the non-Defaulting Lenders pro rata in accordance with their commitments under the ABL Facility, up to an amount such that the revolving credit exposure of such non-Defaulting Lender does not exceed its commitments thereunder.  In the event such reallocation does not fully cover the exposure of such Defaulting Lender, the Swingline Lender may require the Borrower to repay such "uncovered" exposure in respect of the swingline

loans and will have no obligation to make new swingline loans to the extent such swingline loans would exceed the available commitments under the ABL Facility of the non-Defaulting Lenders.

Defaulting Lenders:

"**_Defaulting Lender_**" means any Lender whose act or failure to act, directly or indirectly, causes it to meet any part of the definition of "Lender Default".

"**_Lender Default_**" means (x) (i) the refusal (in writing) or failure of (a) any Lender to make available its portion of any incurrence of Loans or participations in letters of credit or (b) any Lender to comply with its obligation to fund any portion of the ABL Facility, any Incremental ABL Facility or any other agreement with affiliates of the Borrower or the Sponsor in which such Lender has committed to extend credit, in each case in <u>clause (a)</u> and <u>clause (b)</u>, which refusal or failure is not cured within one business day after the date of such refusal or failure, unless such Lender notifies the ABL Administrative Agent, the Swingline Lender, the Issuing Banks and the Borrower in writing that such failure is the result of such Lender's reasonable and good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied; (ii) the failure of any Lender to pay over to the ABL Administrative Agent, the Swingline Lender, any Issuing Bank (as defined below) or any other Lender any other amount required to be paid by it under the ABL Facility Documentation or the documentation governing any Incremental ABL Facility within one business day of the date when due, unless such amount is the subject of a good faith dispute; (iii) the notification by a Lender to the Borrower or the ABL Administrative Agent that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under the ABL Facility, any Incremental ABL Facility or any other agreement in which such Lender has committed to extend credit, unless such Lender notifies the ABL Administrative Agent, the Swingline Lender, the Issuing Banks and the Borrower in writing that such failure is the result of such Lender's reasonable and good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any

applicable default, shall be specifically identified in such writing) has not been satisfied; or (iv) the failure by a Lender to confirm in a manner reasonably satisfactory to the ABL Administrative Agent that it will comply with its obligations under the ABL Facility or any Incremental ABL Facility relating to its obligations to fund prospective Loans and participations in then outstanding letters of credit, or (y) a Lender or any person that directly or indirectly controls such Lender (i) admits in writing that it is insolvent or (ii) becomes subject to a Lender-Related Distress Event or a "Bail-In Action".

"*Lender-Related Distress Event*" means, with respect to any Lender, that (i) such Lender or any person that directly or indirectly controls such Lender (each, a "*Distressed Person*"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, (ii) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (iii) such Distressed Person is subject to a forced liquidation or winding up, (iv) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt or no longer viable, or (v) if any governmental authority having regulatory authority over such Distressed Person has taken control of such Distressed Person or has taken steps to do so; *provided* that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Distressed Person by a governmental authority or an instrumentality thereof, unless such ownership interest results in or provides such person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such person (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such person or its parent entity.

The Borrower shall have the right to terminate the commitment of or replace any Defaulting Lender.

Letters of Credit:

Up to an amount to be agreed of the ABL Facility will be available to the Borrower for the purpose of issuing letters of credit denominated in any Available Currency or any other currency to be mutually agreed subject to customary terms and conditions to be set forth in the ABL Facility Documentation to support obligations of Holdings and its subsidiaries. Letters of credit under the ABL Facility will be issued by the Lead Arrangers' lending affiliates pro rata to their commitments to the ABL Facility and/or other Lenders that agree to act as an issuing bank (each, along with any affiliate or designee thereof, an "***Issuing Bank***"); *provided* that no Issuing Bank shall be required to issue letters of credit (other than standby letters of credit) without the consent of such Issuing Bank. Each letter of credit shall expire not later than the earlier of (a) 12 months after its date of issuance or such longer period as may be agreed with the applicable Issuing Bank and (b) the fifth business day prior to the final maturity of the ABL Facility unless cash collateralized or backstopped in a manner reasonably acceptable to the applicable Issuing Bank; *provided* that any letter of credit may provide, at the Borrower's option, for renewal thereof for additional periods of up to 12 months or such longer period as may be agreed with the applicable Issuing Bank (which in no event shall extend beyond the date referred to in clause (b) above, except to the extent cash collateralized, backstopped or rolled into another credit facility, in each case pursuant to arrangements reasonably acceptable to the applicable Issuing Bank). The face amount of any outstanding letter of credit (and, without duplication, any unpaid drawing in respect thereof) will reduce availability under the ABL Facility on a dollar-for-dollar (including, as applicable, dollar equivalent) basis.

Drawings under any letter of credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of loans under the ABL Facility (*provided* that relevant notice requirements with respect thereto shall be waived)) by 12:00 p.m. one business day after notice of such drawing is received by the Borrower from the relevant Issuing Bank (or if such notice is received by the Borrower after 12:00 p.m., two business days following the day that the Borrower receives such

notice). The Lenders will be irrevocably and unconditionally obligated to acquire participations in each letter of credit, pro rata in accordance with their commitments under the ABL Facility, and to fund such participations in the event the Borrower does not reimburse an Issuing Bank for drawings within the time period specified above.

If any Lender becomes a Defaulting Lender, then the letter of credit exposure of such Defaulting Lender will automatically be reallocated among the non-Defaulting Lenders pro rata in accordance with their commitments under the ABL Facility up to an amount such that the revolving credit exposure of such non-Defaulting Lender does not exceed its revolving credit commitments. In the event that such reallocation does not fully cover the exposure of such Defaulting Lender, the applicable Issuing Bank may require the Borrower to cash collateralize such "uncovered" exposure in respect of each outstanding letter of credit and will have no obligation to issue new letters of credit, or to extend or renew existing letters of credit, to the extent letter of credit exposure would exceed the available commitments of the non-Defaulting Lenders under the ABL Facility, unless such "uncovered" exposure is cash collateralized to the Issuing Bank's reasonable satisfaction.

The issuance of each letter of credit shall be subject to the customary procedures of the applicable Issuing Bank.

Incremental ABL Facility:   The ABL Facility Documentation (as defined below) will permit the Borrower to increase commitments under the ABL Facility (any such increase, an "***Incremental ABL Increase***") and/or add one or more incremental FILO asset-based revolving credit facility tranches (each an "***Incremental ABL Facility Tranche***"; the Incremental ABL Increases and the Incremental ABL Facility Tranches are collectively referred to as "***Incremental ABL Facilities***") in an aggregate amount of up to (a) $500.0 million, <u>plus</u> (b) the aggregate amount of all voluntary commitment reductions of the ABL Facility or any Incremental ABL Facility, <u>plus</u> (c) Suppressed Availability (as defined below) to the extent the capacity pursuant to <u>clause (a)</u> has been

completely utilized (<u>clauses (a)</u> <u>plus</u> <u>(b)</u> <u>plus</u> <u>(c)</u>), the
"***Unrestricted Incremental Amount***"); *provided* that:

(i) the Incremental ABL Facilities shall not be
guaranteed by any person other than the Guarantors
under the ABL Facility and, to the extent secured, shall
be secured on a *pari passu* basis with the ABL Facility,

(ii)(A) solely if and to the extent not waived by the
lenders providing such Incremental ABL Facility
(*provided* that only Required Lenders (as defined below)
may waive the condition that no payment or bankruptcy
event of default shall have occurred and be continuing),
no event of default (or, in the case of any Permitted
Acquisition, other investment or any Limited Condition
Transaction (unless otherwise elected by the Borrower),
no payment or bankruptcy event of default) under the
ABL Facility Documentation has occurred and is
continuing or would exist after giving effect thereto,
tested as of the applicable closing date; *provided* that in
the case of any Incremental ABL Facility incurred in
connection with a Limited Condition Transaction,
instead the requirement shall be (unless otherwise
elected by the Borrower) that no payment or bankruptcy
event of default shall have occurred and be continuing
on the LCT Test Date, (B) solely if and to the extent
required by the lenders providing such Incremental ABL
Facility, the representations and warranties in the ABL
Facility Documentation (to be limited in any case to the
Specified Representations, in the case of an Incremental
ABL Facility used to finance a Permitted Acquisition,
other investment not prohibited by the ABL Facility
Documentation or Limited Condition Transaction) shall
be true and correct in all material respects (or in all
respects if already qualified by materiality) on and as of
the date of the incurrence of any Incremental ABL
Facility (or, if such facility is incurred in connection with
a Limited Condition Transaction, the LCT Test Date
rather than such date of incurrence) (although any
representations and warranties that expressly relate to a
given date or period shall be required only to be true and
correct in all material respects (or in all respects if
already qualified by materiality) as of the respective date
or for the respective period, as the case may be), subject
to (1) customary "SunGard" limitations or (2) with
respect to any "certain funds" Limited Condition
Transaction in any non-U.S. jurisdiction, to such

"certain funds" conditionality as is customary or required in such jurisdiction, in each case of clauses (1) and (2), to the extent the proceeds of such Incremental Facility are being used to finance a Limited Condition Transaction and (C) no overadvance then currently exists,

(iii) the maturity date of any Incremental ABL Facility shall be no earlier than the maturity date of the ABL Facility and such Incremental ABL Facility shall require no scheduled amortization or mandatory commitment reduction prior to the final maturity of the ABL Facility,

(iv) any Incremental ABL Increase shall require no scheduled amortization or mandatory commitment reduction prior to the final maturity of the ABL Facility, and such Incremental ABL Increase shall be on the exact same terms and pursuant to the exact same documentation (with, for the avoidance of doubt, no requirement that the ABL Administrative Agent (except to the extent affecting the rights and duties of, or any fees or other amounts payable to, the ABL Administrative Agent) or any other Lender consent to such documentation) applicable to the ABL Facility being increased (it being understood that, if required to consummate an Incremental ABL Increase, the pricing, interest rate margins, rate floors and undrawn fees on the ABL Facility being increased may be increased for all Lenders under the ABL Facility being increased, and additional upfront or similar fees may be payable to the Lenders participating in the Incremental ABL Increase without any requirement to pay such amounts to any Lenders that do not participate in such increase; and any terms of such Incremental ABL Increase may be more favorable to the Lenders thereunder if such terms are also added for the benefit of the ABL Facility being increased),

(v) the pricing, interest rate margins, discounts, premiums, rate floors, fees and (subject to clause (iii) above) maturity and amortization schedule applicable to any Incremental ABL Facility Tranche shall be determined by the Borrower and the lenders thereunder (with, for the avoidance of doubt, no consent to such terms required from the ABL Administrative Agent (except to the extent affecting the rights and duties of, or any fees or other amounts payable to, the ABL

B-14

Administrative Agent) or any other Lender) and will not be subject to any MFN or similar provision,

(vi) for purposes of voluntary and mandatory prepayments, shall share ratably in, less than ratably in or greater than ratably in any voluntary prepayment and ratably or less than ratably in any mandatory prepayments of the ABL Facility; provided that any Incremental ABL Facility Tranche shall not receive the benefit of any voluntary prepayments until the existing ABL Facility has been repaid or the Borrower would be in pro forma compliance with the RP/RDP Payment Conditions,

(vii) [reserved], and

(viii) any Incremental ABL Facility Tranche shall (except as otherwise set forth above) be on terms and pursuant to documentation to be determined by the Borrower and the lenders thereunder (with for the avoidance of doubt, no requirement that the ABL Administrative Agent (except to the extent affecting the rights and duties of, or any fees or other amounts payable to, the ABL Administrative Agent) or any other Lender consent to or acknowledge such documentation); provided that, notwithstanding the foregoing, an ABL Facility Tranche will only be documented in the ABL Facility Documentation pursuant to procedures acceptable to the ABL Administrative Agent acting reasonably.

The Borrower shall provide the ABL Administrative Agent reasonable and prompt written notice of any amendment to effect an Incremental ABL Facility, and the ABL Administrative Agent shall be required to (and shall be directed by each Lender to) acknowledge such amendment as promptly as practicable following such written notice; it being acknowledged and agreed by each Lender that the ABL Administrative Agent, in its capacity as such, shall have no liability with respect to such acknowledgment and each Lender hereby irrevocably waives to the fullest extent permitted by law any claims with respect to such acknowledgment; *provided* that failure to obtain such acknowledgment shall in no way affect the effectiveness of any

amendment entered into to effectuate such Incremental ABL Facility.

Any Incremental ABL Facility may be provided by existing Lenders and/or, subject to the consent (not to be unreasonably withheld, delayed or conditioned) of the ABL Administrative Agent, each Issuing Bank and the Swingline Lender (in each case not to be unreasonably withheld, delayed or conditioned), other persons who become Lenders in connection therewith solely if and to the extent such consent would be required under the heading "Assignments and Participations" below for assignments of Loans or commitments, as applicable, to such person; *provided* that no existing Lender will be obligated to provide any such Incremental ABL Facility, and the Borrower will not be required to offer the opportunity to participate in any Incremental ABL Facility to any existing Lenders.

The proceeds of any Incremental ABL Facility may be used for working capital needs and other general corporate purposes (including capital expenditures, acquisitions and investments, working capital and/or purchase price adjustments, restricted payments, prepayments of Specified Indebtedness and related fees and expenses, in each case, permitted under the ABL Facility Documentation) and for any other purpose not prohibited by the ABL Facility Documentation.

"*Acceptable Intercreditor Agreement*" shall mean the ABL Intercreditor Agreement, the Third Lien Intercreditor Agreement, any other intercreditor agreement or a joinder to either of the foregoing, as applicable, in each case (other than the ABL Intercreditor Agreement or the Third Lien Intercreditor Agreement) (1) in the form attached to the credit agreement (or in the form of joinder attached to the applicable intercreditor agreement), without material changes from such form, or (2) (A) reasonably acceptable to the ABL Administrative Agent or (B) posted to the Lenders and (i) accepted by the Required Lenders and/or (ii) not objected to by the Required Lenders in writing within 3 business days of being posted.

Financial Definitions:                "*First Lien Leverage Ratio*" means the ratio of (a) the First Lien Term Facility and Consolidated Total Funded

Indebtedness secured on a first lien basis by the Collateral (for the avoidance of doubt, including outstanding borrowings under the ABL Facility to the extent constituting Consolidated Total Funded Indebtedness), less Holdings' and its restricted subsidiaries' Applicable Cash and Cash Equivalents as of the applicable date of determination, to (b) Adjusted EBITDA.

"*Total Leverage Ratio*" means the ratio of (a) Consolidated Total Funded Indebtedness, less Holdings' and its restricted subsidiaries' Applicable Cash and Cash Equivalents as of the last day of such test period, to (b) Adjusted EBITDA.

"*Applicable Cash and Cash Equivalents*" means an aggregate amount of up to $500.0 million of (i) unrestricted cash and cash equivalents (including, for the avoidance of doubt, balance sheet cash not contemplated to be used for any purpose) and (ii) cash and cash equivalents that are restricted in favor of the First Lien Term Facility, the ABL Facility (other than ABL Eligible Cash) and/or the Third Lien Notes (subject to, for the avoidance of doubt, the ABL Intercreditor Agreement and the Third Lien Intercreditor Agreement).

"*Consolidated Total Funded Indebtedness*" means, with respect to Holdings and its restricted subsidiaries, the outstanding principal amount of funded indebtedness for borrowed money and letters of credit (to the extent of any amounts thereunder that are drawn but not reimbursed, cash collateralized or backstopped within three business days) of Holdings and its restricted subsidiaries; provided that Consolidated Total Funded Indebtedness shall exclude (i) the Third Lien Notes and (ii) exceptions to be set forth in the ABL Facility Documentation and reasonably acceptable to the Commitment Parties.

"*Interest Coverage Ratio*" means the ratio of (a) Adjusted EBITDA to (b) cash interest expense (net of cash interest income) of Holdings and its restricted subsidiaries on a consolidated basis with respect to Consolidated Total Funded Indebtedness and payable in cash during such test period.

"**_Consolidated EBITDA_**" as used herein shall be defined as set forth in <u>Annex II</u> to this <u>Exhibit B</u>.

"**_Adjusted EBITDA_**" means Consolidated EBITDA for the most recently completed 4 fiscal quarter period for which financial statements have been delivered prior to the applicable date of determination (which, if tested in connection with a Limited Condition Transaction (as defined below) is the LCT Test Date (as defined below)).

<u>ABL Guarantees</u>: All obligations of the Borrower (or, in the case of <u>clause (ii)</u> below, any Guarantor) (the "**_Borrower Obligations_**") under (i) the ABL Facility and (ii) at the election of Holdings, any interest rate protection, commodity trading or hedging, currency exchange or other swap or hedging arrangements (in each case of the foregoing in this sub-clause (ii), entered into in the ordinary course of business, but other than any obligation of any Guarantor (as defined below) to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act (a "**_Swap_**") if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (determined after giving effect to any applicable keepwell, support, or other agreement for the benefit of such Guarantor and any and all applicable guarantees of such Guarantor's swap obligations by the Borrower or other Guarantors) at the time the guarantee of such Guarantor becomes or would become effective with respect to such Swap) or cash management arrangements (which, in the case of such cash management arrangements, must be entered into in the ordinary course of business and not involve any affiliate that is not a Guarantor) entered into by Holdings or any of its restricted subsidiaries, in each case, with a Lender, the ABL Administrative Agent or any affiliate of a Lender or the ABL Administrative Agent ("**_Hedging/Cash Management Arrangements_**"), will be unconditionally guaranteed jointly and severally on a senior basis (the "**_ABL Guarantees_**") by Holdings and each existing and subsequently acquired or organized direct or indirect

restricted subsidiary of Holdings (collectively, the "***Guarantors***", and together with the Borrower, collectively, the "***Loan Parties***"), *provided* that the following subsidiaries ("***Excluded Subsidiaries***") shall not be required to become Guarantors: (a) captive insurance companies (including TRIMARK Insurance Co. Ltd. and Everen Limited), (b) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation existing on the Closing Date or at the time such restricted subsidiary is acquired (so long as not entered into in contemplation thereof and for so long as such prohibition remains in effect), as applicable, from guaranteeing the Borrower Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee (and which consent, approval, license or authorization has not been obtained after the Loan Parties' use of commercially reasonable efforts to obtain such consent, approval, license or authorization); provided that such subsidiary shall be subject to customary "liability management exercise" and/or "liability management transaction" protections, including "Chewy" provisions and prohibitions on incurring contractual prohibitions, restrictions, or obligations with respect to any such Guarantee in contemplation of, for any direct or indirect financing, monetization, or similar transaction, or otherwise with any direct or indirect intent or purpose of avoiding such Guarantee requirement, (c) any restricted subsidiary, the provision of a Guarantee by which would reasonably be expected to result in material adverse tax consequences to Holdings or any of its restricted subsidiaries or direct or indirect parent entities that materially outweigh the impact to the total value of the Collateral (in each case of this underline(clause (c)), as mutually agreed by the ABL Administrative Agent and the Borrower in writing), (d) so long as such subsidiary (i) is not a guarantor of any other funded indebtedness of Holdings, the Borrower, and/or their respective subsidiaries, (ii) holds no material assets, and (iii) is in the process of actively being wound down and liquidated, CITGO Cayman Investment LLC and (e) unrestricted subsidiaries so long as such subsidiary does not guarantee the First Lien Term Facility, the Third Lien Notes or any other indebtedness or claims; underline(provided), underline(however), that (i) any subsidiary that owns all or any portion of the Material

Property (or all or any portion of the Equity Interests of a Person that owns all or any portion of the Material Property) shall be deemed not to be an "Excluded Subsidiary" for purposes of the ABL Facility (and shall be required at all times to be a Guarantor and a subsidiary of the Borrower), and (ii) any subsidiary that guarantees the First Lien Term Facility, the Third Lien Notes or any other indebtedness or claims shall be deemed not to be an "Excluded Subsidiary" for purposes of the ABL Facility (and shall be required at all times to be a Guarantor).

Notwithstanding the foregoing, the Borrower may, in its sole discretion, elect to cause one or more Excluded Subsidiaries to become Guarantors; provided that if the assets held by any such Excluded Subsidiary are proposed to be included in the determination of the Borrowing Base on any date, then (1) if such Excluded Subsidiary is a non-U.S. subsidiary of Holdings, then such non-U.S. subsidiary may only be organized in one of a list of jurisdictions to be agreed in the ABL Facility Documentation, (2) the ABL Administrative Agent shall have conducted an appraisal and field examination of such assets, the results of which shall be satisfactory to the ABL Administrative Agent, and (3) the ABL Administrative Agent shall have received an updated Borrowing Base Certificate that includes such assets (to the extent eligible) in the calculation of the Borrowing Base set forth therein (provided that, for the avoidance of doubt, no assets may be included in the determination of the Borrowing Base unless they are held by a Loan Party at or immediately following the designation of such Excluded Subsidiary as a Guarantor).

Notwithstanding anything to the contrary herein, in no event shall any Guarantor or item of Collateral be released, if such Guarantor is a borrower or guarantor under the First Lien Term Facility, the Third Lien Notes or any other indebtedness or claims, or if such item of Collateral secures the First Lien Facility, the Third Lien Notes or any other indebtedness or claims.

For purposes of clarity, and without limiting the terms above, Amber Energy Inc., as Holdings, will at all times be a Guarantor, and each of its direct and indirect

subsidiaries shall be subject to the guarantor provisions of the ABL Facility.

Security:

Subject to the limitations set forth below in this section and subject to the Certain Funds Provision, the Borrower Obligations and the Guarantees will be secured by: (a) a perfected first priority (in the case of the ABL Facility, the Guarantees in respect thereof and the Hedging/Cash Management Arrangements) pledge, in each case subject to liens not prohibited by the ABL Facility Documentation, of the ABL Priority Collateral (as defined below) and (b) a perfected second-priority pledge in the Term Priority Collateral (as defined below), but excluding the Excluded Assets (as defined below) (collectively, the "*Collateral*"). Without limiting anything to the contrary herein, (x) the Purchaser, the Borrower, and/or its applicable affiliates shall deliver to the ABL Administrative Agent (or the First Lien Administrative Agent acting as agent and bailee for purposes of perfection) a collateral assignment of all their rights and interests under the Acquisition Agreement and (y) the ABL Facility Documentation shall include and reflect customary lender insurance rights.

"*ABL Priority Collateral*" shall mean Collateral comprising:

(i) all accounts receivable and credit card receivables (in each case, except to the extent constituting proceeds of Term Priority Collateral),

(ii) all supporting obligations arising from the purchase of crude oil and other hydrocarbon inventory, including any exchange agreements related thereto,

(iii) all inventory, including all hydrocarbon inventory,

(iv) all renewable energy tax credits, including, without limitation, all renewable identification numbers,

(v) any and all additions, accessions and improvements to, all substitutions and re-placements for and all products of or derived from the foregoing,

(vi) all cash and cash equivalents, deposit accounts, securities accounts and commodities accounts (including

all cash or other funds on deposit therein, except any such accounts which hold solely identifiable proceeds of Term Priority Collateral),

(vii)    all general intangibles (other than intellectual property and capital stock), chattel paper, instruments, documents, commercial tort claims, letter of credit rights, supporting obligations, and other assets, in each case to the extent related to the foregoing clauses (i), (ii), (iii), (iv) or (vi) and that are owned by a Loan Party or in which a Loan Party otherwise has rights, but not, for the avoidance of doubt, including capital stock of the Loan Parties and their subsidiaries,

(viii) all books and records pertaining to any of the foregoing, and

(ix) all proceeds of, and all supporting obligations with respect to, any of the foregoing; provided, however, that, for the avoidance of doubt, any intercompany indebtedness by and among the Loan Parties and/or any of their respective subsidiaries shall not be included in the ABL Priority Collateral.

"*Term Priority Collateral*" shall mean all Collateral of the Loan Parties other than the ABL Priority Collateral (including, to the extent constituting Collateral, refinery assets, real property, intellectual property, equipment, rights and interests under the Acquisition Agreement, the Acquired 2020 Bonds and a pledge of the capital stock of each Loan Party's subsidiaries).

Notwithstanding anything to the contrary, the Collateral shall exclude (including from any applicable security documents) the following: (i) (A) any real property (including its related parcels and assets) (x) with a fair market value of less than $5,000,000, (y) to the extent that the Borrower is prohibited from granting a security interest in, pledge of, or charge, mortgage, or lien upon any such property or assets by reason of any existing and enforceable negative pledge provision that (1) is not prohibited by the ABL Facility, (2) is in existence on the Closing Date, (3) was not entered into with the intent of impairing or excluding the Collateral, and (4) is listed on a schedule attached to the ABL Facility Documentation, and (z) that Citi and Barclays agree shall not constitute Collateral prior to the Closing Date and, for the

avoidance of doubt, it is agreed that Citi and Barclays can elect to exclude any "Buildings" and/or "Manufactured (Mobile) Home" (each as defined in any applicable flood insurance regulations) from the Collateral prior to the Closing Date, (ii) motor vehicles, airplanes and other assets subject to certificates of title to the extent a lien therein cannot be perfected by the filing of a UCC financing statement and letter of credit rights (other than to the extent perfection of the security interest therein is accomplished by the filing of a UCC financing statement) and commercial tort claims reasonably and in good-faith expected to result in a recovery less than an amount to be agreed, (iii) any property of or in which pledges and security interests are prohibited by applicable law, rule or regulation (or would require the consent of any governmental authority or third person to obtain and such consent has not been obtained after the Loan Parties' use of commercially reasonable efforts to obtain such consent) or by any contract binding on such property at the time of its acquisition and not entered into in contemplation thereof, in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable law notwithstanding such prohibition (which such assets cannot be used to pledge or secure any funded debt), (iv) margin stock, (v) any cash and cash equivalents (including securities entitlements and related assets) solely to the extent held in (and only such cash attributable to the following accounts and for such third parties) payroll, healthcare, employee wage and benefits, escrow, fiduciary, trust and other similar accounts (including any securities entitlements or related assets contained therein), including any escrow, fiduciary and trust accounts with respect to taxes of third parties (including sales tax), other than, to the extent constituting or containing identifiable proceeds of other Collateral and, for the avoidance of doubt, any such other cash and cash equivalents (including securities entitlements and related assets) or other deposit, commodities or securities accounts (including any securities entitlements and related assets credited thereto), (vi) any lease, license or other agreement or any

B-23

property subject to a purchase money security interest, capital lease obligation or similar arrangement, in each case, not prohibited by the terms of the ABL Facility Documentation and to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement, purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Guarantor or an affiliate thereof) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable law notwithstanding such prohibition (which such assets cannot be used to pledge or secure other funded debt), (vii) any assets to the extent a security interest in such assets would result in adverse tax consequences to Holdings or any of its restricted subsidiaries or direct or indirect parent entities that materially outweigh the impact to the total value of the Collateral (as mutually agreed in a prior writing by the ABL Administrative Agent and the Borrower), but in any event, may not include the exclusion of any assets for the direct or indirect purpose of creating an alternative senior financing or benefiting creditors other than the Lenders, (viii) those assets as to which the ABL Administrative Agent and the Borrower reasonably and mutually agree that the cost of obtaining such a security interest or perfection thereof (including any adverse tax consequences) are excessive in relation to the benefit to the Lenders of the security to be afforded thereby; provided, that such assets shall not secure any other indebtedness, (ix) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law and (x) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such license, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), for which consent or required approval has

not been obtained after the Loan Parties' use of commercially reasonable efforts to obtain such consent or approval (which such assets cannot be used to pledge or secure other funded debt) (the foregoing described in clauses (i) through (x) are, collectively, the "**Excluded Assets**"). For the avoidance of doubt, the Collateral shall include assets of the type described in clauses (i), (ii), (iii) and (iv) of the definition of ABL Priority Collateral and the ABL Administrative Agent shall have a perfected first priority lien on any assets included in the calculation of the Borrowing Base and the Closing Borrowing Base.

Notwithstanding anything to the contrary, the Company's real property containing refineries located in Lake Charles, LA, Corpus Christi, TX and Lemont, IL (such real property and refineries, together with related inventory, equipment, fixtures, and related personal property, as well as the capital stock in any Loan Party owning any such of the foregoing property, and/or any other assets, rights, agreements, and other interests that are material to the operation of the business of Holdings and its subsidiaries taken as a whole (collectively, the "**Material Property**"), in each case, shall not constitute Excluded Assets at any time and shall, at all times on and after the Closing Date, be directly owned by the Borrower or one of its subsidiaries that is a Guarantor and subject to valid and perfected (x) first-priority liens in favor of the First Lien Term Facility, (y) second-priority liens in favor of the ABL Facility and (z) third-priority liens in favor of the Third Lien Notes. Notwithstanding anything to the contrary herein, in no event shall any of the Material Property be, directly or indirectly, distributed, sold, disposed, contributed, or otherwise transferred to any non-guarantor, affiliate, or other third party without the prior written consent of each Lender.

All the above-described pledges and security interests shall be created on terms to be set forth in the ABL Facility Documentation.

The ABL Facility will be *pari passu* in right of payment with the First Lien Term Facility. The priority of the security interests and related creditor rights between First Lien Term Facility and the ABL Facility will be set forth in an intercreditor agreement consistent with the

Documentation Precedent (the "***ABL Intercreditor Agreement***") and the priority of the security interests and related creditor rights between the First Lien Term Facility and the ABL Facility, on the one hand, and the Third Lien Notes, on the other hand, will be set forth in an intercreditor agreement consistent with the Documentation Principles (the "***Third Lien Intercreditor Agreement***").

<u>Cash Management/Cash Dominion</u>:

The Borrower shall be required to maintain account control agreements on the primary concentration accounts and other material deposit accounts to be set forth in the ABL Facility Documentation (and subject to the exceptions set forth in <u>clause (v)</u> of the definition of "Excluded Assets" above) of the Borrower and the Guarantors within 120 days of the Closing Date (or such longer period as may be agreed by the ABL Administrative Agent).

During a Cash Dominion Period (as defined below) and after delivery of a written notice by the ABL Administrative Agent to the Borrower, all amounts in controlled concentration accounts (or in any other material deposit account which are not swept on a daily basis into a concentration account) will be swept into a collection account maintained with the ABL Administrative Agent and used to repay borrowings under the ABL Facility, subject to customary exceptions and thresholds (which shall include maintenance of funds by the Borrower and Guarantors, subject to customary limitations to be set forth in the ABL Facility Documentation).

"***Cash Dominion Period***" means

(a)    the period from the date that Specified Availability shall have been less than the greater of (i) $100.0 million and (ii) 10% of the Line Cap (such lesser amount, the "***Trigger Amount***") for five consecutive business days to the date that Specified Availability is above the Trigger Amount for 30 consecutive calendar days; or

(b)    upon the occurrence and during the continuance of a Specified Default until such Specified Default has been cured or waived.

B-26

"***Excess Availability***" shall mean, at any time, the remainder of

(a)    the Line Cap, minus

(b)    the sum of (i) aggregate principal amount of all Loans then outstanding and (ii) all amounts outstanding under letters of credit (including issued and undrawn letters of credit) at such time.

"***Specified Availability***" means the sum of (a) Excess Availability at such time plus (b) Suppressed Availability (as defined below) (which shall not be less than zero) at such time.

"***Suppressed Availability***" means an amount, if positive, by which the Borrowing Base exceeds the aggregate amount of the commitments under the ABL Facility; *provided*, for the purposes of calculating Specified Availability, Suppressed Availability shall not exceed 5.0% of the aggregate commitments under the ABL Facility at any time.

Final Maturity and
Amortization:

The ABL Facility will mature, and lending commitments thereunder will terminate, on the date that is 5 years after the Closing Date; *provided* that the ABL Facility Documentation shall provide the right of individual Lenders to agree to extend the maturity of their commitments under the ABL Facility upon the request of the Borrower and without the consent of any other Lender or the ABL Administrative Agent (as further described below).

Notwithstanding anything to the contrary set forth herein, the ABL Facility Documentation shall provide that the Borrower may at any time and from time to time request that all or a portion of any commitments and/or loans of the Borrower be converted to extend any commitments and/or the scheduled maturity date(s) of any payment of principal with respect to all or a portion of such loans (any such commitments or loans which have been so converted, "***Extended Loans***"), and upon such request of the Borrower, any individual Lender shall have the right to agree to extend the maturity date of its commitments under the ABL Facility and its outstanding Loans without the consent of any other Lender or the ABL Administrative Agent; *provided* that

all such requests shall be made pro rata to all Lenders within the applicable class.  The terms of Extended Loans shall be as agreed by the Borrower and the lenders providing such Extended Loans (with, for the avoidance of doubt, no required consent of any other Lender or the ABL Administrative Agent).  Extended Loans shall not be subject to any "default stopper", financial tests, minimum extension conditions or "most favored nation" pricing provisions.

| | |
|---|---|
| <u>Interest Rates and Fees</u>: | As set forth on <u>Annex I</u> hereto. |
| <u>Default Rate</u>: | [REDACTED]. |

<u>Mandatory Prepayments</u>:    If at any time, the aggregate amount of outstanding loans, unreimbursed letter of credit drawings and undrawn letters of credit under the ABL Facility exceeds the Line Cap, then the Borrower will within one Business Day repay outstanding loans and cash collateralize outstanding letters of credit in an aggregate amount equal to such excess, with no reduction of the commitments.

<u>Voluntary Prepayments and Reductions in Commitments</u>:    Voluntary reductions of the unutilized portion of the ABL Facility commitments and voluntary prepayments of borrowings under the ABL Facility will be permitted at any time in minimum principal amounts to be agreed, without premium or penalty other than as set forth below, subject to reimbursement of the Lenders' redeployment costs (other than lost profits) in the case of a prepayment of borrowings (other than ABR Borrowings (as defined in Annex I hereto)) under the ABL Facility other than on the last day of the relevant interest period.

<u>Documentation</u>:    The definitive documentation for the ABL Facility (including, without limitation, the credit agreement, the security and collateral documents with respect thereto, the ABL Intercreditor Agreement and the Third Lien Intercreditor Agreement, the "***ABL Facility Documentation***") will be based on the ABL Documentation Principles (as defined below).

As used in this Term Sheet, "***ABL Documentation Principles***" means documentation based on that certain Credit Agreement, dated as of September 28, 2023, by and among Star Parent, Inc., the guarantors party thereto

from time to time, the lending institutions party thereto from time to time, Goldman Sachs Bank USA, as administrative agent and collateral agent and a lender and the other parties thereto, and, in each case (but subject to the other terms set forth in the Documentation Principles and otherwise in this Term Sheet), the related loan documents (the "***Loan Documents***") executed in connection with such credit agreement (the "***Documentation Precedent***"); such documentation to be initially prepared by counsel to Holdings and its subsidiaries, and shall contain the terms set forth in this Exhibit B and be mutually negotiated in good faith within a reasonable time period to be determined mutually by the parties based on the expected Closing Date.

The ABL Facility Documentation (as defined below) shall contain the payments, conditions to closing and borrowing, mandatory prepayments, representations and warranties, affirmative and negative covenants and events of default expressly set forth in this Term Sheet, in each case, applicable to Holdings, the Borrower, and the subsidiaries of Holdings, and shall contain the standards, qualifications, thresholds, exceptions (including materiality), "baskets" and grace and cure periods expressly set forth in this Term Sheet, with such other modifications to be mutually agreed and reasonably acceptable to the parties thereto; provided that, notwithstanding anything to the contrary herein, the covenants, events of default, financial definitions (including, for the avoidance of doubt, the definition of "Consolidated EBITDA") and other terms of the ABL Facility Documentation shall, in each case, be not less favorable to the Lenders (as reasonably determined by the ABL Administrative Agent in good faith) than the terms of the definitive documentation of the First Lien Term Facility.  The ABL Facility Documentation will (i) include the ABL Administrative Agent's customary agency provisions and certain mechanical provisions not in contravention of anything specifically set forth in this Term Sheet, (ii) cure any mistakes or defects contained in the Documentation Precedent, (iii) include modifications to reflect any relevant changes in law or accounting standards since the date of the Documentation Precedent, (iv) include the material intellectual property anti-"J.Crew" provision from the Documentation Precedent, the "Serta" protection

provision from the Documentation Precedent, the "Chewy" protection provision from the Documentation Precedent, and other customary "liability management exercise" and/or "liability management transaction" protections for the Lenders, (v) remove all "grower" and "builder" basket components contained in the Documentation Precedent, (vi) include (A) letters of credit that are either (1) letters of credit issued under the ABL Facility and drawn but not reimbursed, cash collateralized, or backstopped within three business days or (2) issued and outstanding (regardless of whether drawn) under any other permitted debt basket, and (B) "disqualified preferred stock" and preferred stock of non-guarantor subsidiaries in the definition of "Indebtedness", (vii) clarify that the negative covenants apply to both direct and indirect actions by the applicable Loan Parties or their respective subsidiaries, (viii) remove any prior notice (i.e., only concurrent notice required) for exercise of any equity pledge related remedies (after the occurrence and during the continuation of an event of default) under the ABL Facility, (ix) without limiting any such default or event of default "blockers" set forth in this Term Sheet, add customary default and event of default "blockers" to each of the relevant baskets, and (x) provide that, on and after any default or event of default (and without any action or notice by the ABL Administrative Agent), no continuations or conversions of the Loans to SOFR loans will be permitted, and any expiring SOFR loans shall be automatically converted to ABR Loans. To the extent that any representations and warranties made on, or as of, the Closing Date (or a date prior thereto) are qualified by or subject to "Material Adverse Effect", for purposes of such representations and warranties, the definition thereof shall be "Company Material Adverse Effect" as defined in the Acquisition Agreement.

The ABL Intercreditor Agreement shall be entered into by the ABL Administrative Agent and the agent with respect to the First Lien Term Facility (the "**First Lien Administrative Agent**") and shall be on terms and conditions reasonably acceptable to the ABL Administrative Agent and the Lenders, including, without limitation, the following: (a) a cap in an amount to be agreed with respect to the senior claims of the ABL Facility (but no cap on the amount of the senior claims of the First Lien Term Facility) and (b) a customary par

purchase option in favor of the creditors under the First Lien Term Facility with respect to all ABL Facility claims, subject to customary buy-out trigger events (including, without limitation, any bankruptcy or insolvency event of default).

The Third Lien Intercreditor Agreement shall be entered into by the First Lien Administrative Agent, the ABL Administrative Agent and applicable agent or other representative and holders with respect to the Third Lien Notes as of the Closing Date and shall be on terms and conditions acceptable to the ABL Administrative Agent (acting in its sole discretion), including, without limitation, the following: (a) prior to the irrevocable discharge and payment in full in cash of all obligations under the First Lien Term Facility and the ABL Facility, a permanent standstill of exercise of remedies by the agent and holders of the Third Lien Notes, with the First Lien Administrative Agent and the lenders under the First Lien Term Facility having sole and exclusive authority to pursue enforcement actions and exercise of remedies with respect to the Collateral and the Loan Parties; (b) the obligations of the Third Lien Notes shall be, at all times, both lien subordinated and payment subordinated, in each case, to the obligations under the First Lien Term Facility and the ABL Facility; (c) customary turnover and payover provisions (with inclusion of, without limitation and regardless of whether such amounts are allowed under any applicable law, the Bankruptcy Code, or in any insolvency proceeding, default interest and any Prepayment Premium (as defined in the First Lien Term Loan Term Sheet) owed on account of the First Lien Term Facility and the ABL Facility) with respect to the Third Lien Notes in favor of the First Lien Term Facility and ABL Facility claimholders; (d) no cap on the First Lien Term Facility or ABL Facility obligations or claims; provided that for the avoidance of doubt the ABL Facility will still be subject to any caps on ABL obligations or claims under the ABL Intercreditor Agreement; (e) customary and comprehensive "silent junior" provisions for insolvency and related matters restricting the Third Lien Notes agent and holders, including, without limitation, that (i) the Third Lien Notes agent and holders may not propose any debtor-in-possession financings (or object to (and shall be required to support and consent to) any such debtor-in-possession financings provided by,

consented to, or otherwise not objected to by the First Lien Administrative Agent, the ABL Administrative Agent, the Lenders or the lenders under the First Lien Term Facility), (ii) the Third Lien Notes agent and holders may not request or receive any adequate protection without the prior written consent of the First Lien Administrative Agent and the ABL Administrative Agent, and the Third Lien Notes agent and holders must consent to, and not otherwise object to, any adequate protection requested or provided to the First Lien Administrative Agent, the ABL Administrative Agent, the Lenders and/or any of the lenders under the First Lien Term Facility, (iii) the Third Lien Notes agent and holders must consent to (and agree to the automatic release of the liens securing and guarantees supporting the Third Lien Notes so long as such liens attach to the proceeds thereof in the priority otherwise provided for in the Third Lien Intercreditor Agreement), and not otherwise object to, any credit bid by the First Lien Administrative Agent, the ABL Administrative Agent, the Lenders and/or the lenders under the First Lien Term Facility or any other sale or disposition under Section 363 of the Bankruptcy Code that is supported by, consented to, or otherwise not objected to by the First Lien Administrative Agent, the ABL Administrative Agent, the Lenders and/or the lenders under the First Lien Term Facility, and (iv) the Third Lien Notes agent and holders must consent to, and not otherwise object to, any chapter 11 plan that is supported, consented to, or otherwise not objected to by the First Lien Administrative Agent, the ABL Administrative Agent, the Lenders and/or the lenders under the First Lien Term Facility, and may not otherwise support any chapter 11 plan that does not result in the irrevocable discharge and payment in full in cash of the First Lien Term Facility and the ABL Facility obligations on the effective date thereof; (f) a customary buy-out right in favor of the Third Lien Notes holders on terms to be mutually agreed; provided that (i) such buy-out right must be exercised prior to the earlier of (A) entry of a final order approving any debtor-in-possession financing, and (B) within 30 days following the occurrence of an applicable triggering event of default or the commencement of a bankruptcy or insolvency proceeding, and (ii) the buy-out amount shall consist of 100% of the aggregate principal amount of the First Lien

Term Loans and Loans, plus accrued and unpaid interest (including any default interest), plus the applicable Prepayment Premium with respect to the First Lien Term Loans; (g) all payments to, or otherwise on account of, the Third Lien Notes shall be subordinated to the prior discharge and repayment in full in cash of the First Lien Term Facility and the ABL Facility and expressly prohibited other than permitted payments specifically set forth in this Term Sheet (which shall include interest and other amounts that are solely paid in kind and otherwise capitalized under the Third Lien Notes, with treatment and allowance of any customary and bona fide agency fees and expense reimbursement to be reasonably satisfactory to the ABL Administrative Agent); (h) any and all amendments, supplements, waivers, or other modifications of the Third Lien Notes documentation shall be prohibited without the prior written consent of the First Lien Administrative Agent and the ABL Administrative Agent; (i) the Third Lien Note holders that are the Sponsor or affiliates or other related funds of the Sponsor shall not, and the Borrower shall cause the Sponsor or affiliates or other related funds of the Sponsor not to, directly or indirectly, assign or sell participations or other interests of more than 49.9% of the Third Lien Notes that they own as of the Closing Date, in each case, without the prior written consent of the First Lien Administrative Agent and the Required Lenders in their sole discretion; and (j) the automatic release of liens and guarantees supporting the Third Lien Notes upon a sale, transfer or other disposition of any Collateral or any Loan Party in connection with a sale, transfer, or other disposition permitted by the First Lien Term Facility Documentation and ABL Facility Documentation and the Third Lien Notes documentation (as in effect on the Closing Date) or otherwise in connection with any sale, transfer or other disposition after any event of default under the First Lien Term Facility Documentation or ABL Facility Documentation, exercise of remedies, foreclosure, or pursuant to a sale of Collateral under Section 363 of the Bankruptcy Code agreed to by the First Lien Administrative Agent or ABL Administrative Agent, as applicable.  For purposes of clarity, and notwithstanding anything to the contrary in the foregoing, the priority of the security interests and related creditor rights between

the First Lien Term Facility and the ABL Facility will be governed by the ABL Intercreditor Agreement.

Notwithstanding the foregoing or anything else to the contrary in the ABL Facility Documentation, to the extent applicable, all leases of the restricted subsidiaries of Holdings that are (or would be, if presently in existence) treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update shall be or continue to be accounted for as operating leases regardless of any change in or application of GAAP following such date that would otherwise require such leases to be treated as capital leases.

Any amount set forth herein denominated or to be set forth in the ABL Facility Documentation (including, without limitation, the amount of any Incremental Facility) in U.S. dollars shall be deemed to refer to the Dollar Equivalent (as defined below) of such amount, based on an applicable spot rate of conversion as of the applicable date of determination to be described therein. "***Dollar Equivalent***" means, at any time, (a) with respect to any amount denominated in U.S. dollars, such amount and (b) with respect to any amount denominated in any other currency, the equivalent amount thereof in U.S. dollars as reasonably determined by the ABL Administrative Agent at such time in accordance with currency equivalent provisions to be agreed on the basis of the spot rate as of the applicable date of determination for the purchase of U.S. dollars with such currency.

For purposes of calculating the First Lien Leverage Ratio, Total Leverage Ratio, Interest Coverage Ratio, Fixed Charge Coverage Ratio, Consolidated Total Funded Indebtedness or any financial definition, indebtedness level or ratio including in connection with any covenant test (including on a pro forma basis), the applicable exchange rates shall be selected and determined by the Borrower and shall reflect (i) adjustments to take into account the effect of any interest rate and/or cross currency derivatives Holdings and its restricted subsidiaries have entered into or (ii) with respect to income statement and cash flow items, the interest rate and/or exchange rate calculated by taking the weighted average exchange rates for the

applicable period or any other method otherwise consistent with the exchange rate methodology applied in the financial statements delivered pursuant to the credit agreement, in each case as selected and determined by the Borrower.

Representations and Warranties:    To include the following (to be limited, on the Closing Date, to the Specified Representations, and to be applicable to Holdings and its restricted subsidiaries): organizational status and good standing; power and authority (other than with respect to the ABL Facility Documentation, subject to Material Adverse Effect), qualification (subject to Material Adverse Effect), due authorization, execution, delivery, binding effect and enforceability of the ABL Facility Documentation; with respect to the ABL Facility Documentation and the Transactions, no violation of, or conflict with, law, organizational documents or material agreements; beneficial ownership; compliance with law (subject to Material Adverse Effect); anti-terrorism and sanctions laws, including the PATRIOT Act and OFAC; FCPA and anti-money laundering laws; litigation (subject to Material Adverse Effect); margin regulations; governmental approvals (subject to Material Adverse Effect, except as such approvals pertain to the execution, delivery or performance of the ABL Facility Documentation); Investment Company Act; Federal Power Act; accuracy of disclosure as of the Closing Date; historical financial statements; no Material Adverse Effect since the Closing Date; forward-looking statements in the lender presentation; labor matters (subject to a Material Adverse Effect); taxes (subject to Material Adverse Effect); ERISA (subject to Material Adverse Effect); subsidiaries as of the Closing Date; intellectual property (subject to Material Adverse Effect); environmental laws (subject to Material Adverse Effect); ownership of properties; creation and perfection of liens and other security interests; solvency of Holdings and its subsidiaries (to be defined and determined in a manner consistent with the manner in which solvency is defined and determined in the form of solvency certificate set forth in Annex I to Exhibit C; and the Borrowing Base Certificate being accurate in all material respects when delivered; subject, in the case of each of the foregoing representations and warranties, to customary qualifications and limitations for materiality to be provided in the ABL Facility Documentation

consistent with the ABL Documentation Principles and mutually agreed.

"*Material Adverse Effect*" means (a) on the Closing Date a Company Material Adverse Effect (as defined in the Acquisition Agreement) and (b) after the Closing Date, a material adverse effect on (i) the business or financial condition or results of operations, in each case, of Holdings and its restricted subsidiaries, taken as a whole, (ii) the material rights and remedies (taken as a whole) of the ABL Administrative Agent or the Lenders under the ABL Facility Documentation (taken as a whole) (other than due to the action or inaction of the ABL Administrative Agent or the applicable Lenders), or (iii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under the ABL Facility Documentation.

| | |
|---|---|
| <u>Conditions to Initial Borrowing</u>: | The availability of the initial borrowing and other extensions of credit under the ABL Facility on the Closing Date will be subject solely to the satisfaction (or waiver by the Commitment Parties) of the following: (a) delivery of a customary borrowing notice subject to the Certain Funds Conditions and/or a letter of credit request (as applicable) and (b) the applicable Conditions set forth in <u>Exhibit C</u> to the Commitment Letter. |
| <u>Conditions to All Borrowings After the Closing Date</u>: | The making of each extension of credit under the ABL Facility after the Closing Date shall be conditioned upon (a) delivery of a customary borrowing notice and/or letter of credit request (as applicable), (b) the accuracy of representations and warranties in all material respects as of the date of the applicable extension of credit, except to the extent any such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be required to be accurate in all material respects as of such earlier date (or in all respects if already qualified by materiality), (c) the absence of defaults or events of default at the time of, or after giving effect to the making of, such extension of credit, (d) no over advance, (e) after delivery of a Reserve Notice and prior to the imposition of the applicable reserve, conditions (c) and (f) would not have been satisfied had the applicable reserve been implemented already and (f) the total Borrower Obligations not exceeding the Line Cap, subject to, in the case of <u>clauses (b)</u> and <u>(c)</u>, the limitations set forth in |

the sections hereof entitled "Incremental ABL Facility" and "Limited Condition Transactions", including to the extent the proceeds of any Incremental ABL Facility are being used to finance a Limited Condition Transaction.

Affirmative Covenants:

Limited to the following (to be applicable to Holdings and its restricted subsidiaries only):

(a) quarterly (for each of the first 3 quarters of each fiscal year) unaudited financial statements within 60 days after each such fiscal quarter end (or 90 days for each of the first 3 fiscal quarters ending after the Closing Date for which financial statements are required to be delivered), in each case which period shall be extended by the period of any extension permitted by the Securities and Exchange Commission (the "**SEC**"), and compliance certificates and management discussion and analysis with such financial statements (which shall not include a bring down of any representations or warranties), and (b) beginning with the first fiscal year ending after the Closing Date; provided that in the case of the fiscal quarter in which the Closing Date occurs, such financial statements may be bifurcated into pre- and post-closing periods, annual audited financial statements, accompanied by an audit opinion from a nationally recognized accounting firm or other accounting firm reasonably acceptable to the ABL Administrative Agent without any qualification or exception as to "going concern" or the scope of the audit, except any "going concern" qualification or exception as a result of (i) an impending maturity date of any indebtedness, or (ii) any actual or potential inability to satisfy the Financial Covenant or any other financial covenant under any other indebtedness, and for the avoidance of doubt any explanatory or emphasis of matter paragraphs within 120 days after each fiscal year end (or 150 days in the case of the first such fiscal year end after the Closing Date (*provided* that in the case of the fiscal year in which the Closing Date occurs, such audit may, at the option of the Borrower, be bifurcated into pre and post-closing audits)), in each case which period shall be extended by the period of any extension permitted by the SEC, in each case, for Holdings and its restricted subsidiaries on a consolidated basis; a compliance certificate and management discussion and analysis with such financial statements (which shall not include a bring down of any representations or warranties); other information

B-37

reasonably requested by the ABL Administrative Agent; prior to an IPO, annual budgets  (provided that (i) the Borrower shall not be required to deliver such annual budget if the Borrower's counsel reasonably advises it not to, on account of securities law considerations to the extent the Borrower or any direct or indirect parent thereof has filed a Form S-1 (including a confidential filing) with the Securities and Exchange Commission or certified in writing to the ABL Administrative Agent that it intends to consummate an IPO within one year of any scheduled budget reporting requirement and (ii) on or after an IPO (x) the requirements under clauses (a) and (b) shall be satisfied by the applicable filings with the SEC and (y) no budget shall be required to be delivered); Borrowing Base Certificates and supporting documentation to be mutually agreed upon; notices of default, litigation (subject to Material Adverse Effect) and ERISA (subject to Material Adverse Effect); inspections upon reasonable prior notice (subject to limitations on frequency (so long as there is no ongoing event of default), cost reimbursement and the disclosure of information subject to confidentiality obligations, attorney-client privilege or other customary disclosure limitations and *provided* that inspection rights shall be exercisable solely by the ABL Administrative Agent and solely at the request of either the ABL Administrative Agent or the Required Lenders); maintenance of property (subject to casualty, condemnation and normal wear and tear and subject to Material Adverse Effect) and customary insurance (but not, for the avoidance of doubt, flood insurance except to the extent required by applicable law, and with no requirement that the collateral agent be notified prior to cancellation); maintenance of existence (other than with respect Holdings and the Borrower, subject to Material Adverse Effect); maintenance of books and records; payment of taxes (subject to Material Adverse Effect); compliance with laws (subject to Material Adverse Effect) (with no specific covenants regarding ERISA or environmental law); provision of information required under the Beneficial Ownership Regulation following written request therefor; maintenance of cash management systems consistent with the provisions described under "Cash Management/Cash Dominion"; use of proceeds; quarterly lender calls; and additional guarantors and further assurances on collateral matters.

In addition, the ABL Administrative Agent may conduct up to one field examination and one inventory appraisal (each at the expense of the Borrower) during any calendar year; *provided* that

(i)    at any time after the date on which Specified Availability has been less than 25% of the Line Cap for five consecutive business days, field examinations and inventory appraisals may be conducted (at the expense of the Borrower) two times during the next twelve months, and

(ii)    at any time during the continuation of an Event Default, field examinations and inventory appraisals may be conducted as frequently as determined by the ABL Administrative Agent in its reasonable discretion.

| | |
|---|---|
| <u>Negative Covenants</u>: | Limited to the following (to be applicable to Holdings and the restricted subsidiaries of Holdings) limitations on: |

a)    the incurrence of debt (including "direct or indirect" incurrences thereof), with exceptions to be agreed and reasonably acceptable to the Lenders, including the ability to incur (i) indebtedness under (A) the ABL Facility, (B) the First Lien Term Facility, and (C) the Third Lien Notes, (ii) indebtedness on the terms set forth in the sections hereof entitled "Incremental ABL Facility", (iii) non-speculative hedging arrangements, cash management, banking or treasury obligations and similar arrangements, (iv) purchase money indebtedness and capital leases equal to $300.0 million in the aggregate, (v) unsecured indebtedness of the Borrower or a Guarantor arising from agreements providing for adjustments of purchase price, "earn outs", other contingent consideration obligations and other deferred purchase price obligations entered into in connection with acquisitions, which all such indebtedness shall be subject to an aggregate cap of $100.0 million and may not be incurred or guaranteed by any non-Guarantor subsidiaries, (vi) secured (but not pari or senior secured to the ABL Facility and the First Lien Term Facility on all Collateral and on a senior or pari passu lien priority basis to the Third Lien Notes) and/or unsecured indebtedness pursuant to a general basket equal to $600.0 million in the aggregate, and which such indebtedness may not be guaranteed by any

non-Guarantor Subsidiaries or secured by any non-Collateral, (vii) indebtedness of non-Guarantor subsidiaries subject to a $25 million cap (provided, that, notwithstanding anything to the contrary, all such indebtedness of non-Guarantor subsidiaries may only be incurred under the basket set forth in this clause (vii)), (viii) indebtedness under factoring, receivables and securitization facilities subject to a dollar-for-dollar decrease in the Line Cap, (ix) unlimited unsecured intercompany indebtedness among Loan Parties (subject to subordination arrangements acceptable to the ABL Administrative Agent), (x) [reserved], (xi) [reserved], (xii) [reserved], (xiii) [reserved], (xiv) [reserved], (xv) [reserved], (xvi) indebtedness under other customary exceptions to be agreed and consistent with the ABL Documentation Principles, (xvii) unsecured indebtedness of the Borrower or subsidiary guarantors so long as the Payment Conditions (as defined below) are satisfied, (xviii) non-recourse indebtedness of joint ventures not to exceed $100.0 million on terms and conditions to be agreed, (xix) [reserved], (xx) [reserved], (xxi) [reserved], (xxii) unsecured indebtedness issued in exchange for management equity pursuant to ordinary course compensation agreements subject to terms and conditions to be reasonably agreed and (xxiii) indebtedness on account of industrial revenue bonds not to exceed an aggregate amount equal to $100 million and, if secured, only be secured by the Collateral on a pari passu or junior priority basis (and not a senior basis) to the liens securing the First Lien Term Facility (subject to a customary intercreditor agreement reasonably acceptable to the First Lien Administrative Agent and the Required Lenders under the First Lien Term Facility); *provided,* that for the avoidance of doubt this paragraph (a) shall be subject to the final proviso of paragraph (b) below;

b)    liens (including "direct or indirect" incurrences thereof), with exceptions to be agreed and reasonably acceptable to the Lenders, including permitting liens (i) securing the Borrower Obligations and related Guarantees, (ii) securing the First Lien Term Facility (subject to the ABL Intercreditor Agreement) or Third Lien Notes (subject to the Third Lien Intercreditor Agreement), (iii) [reserved], (iv) pursuant to a general basket securing $200.0 million; provided that any Liens on ABL Priority Collateral are junior to those securing

the ABL Facility pursuant to the ABL Intercreditor Agreement, (v) [reserved], (vi) securing purchase money indebtedness or capital leases permitted by clause (a)(iv) above secured by the assets being leased and/or acquired, (vii) with respect to any foreign subsidiary, arising mandatorily by legal requirements, (viii) [reserved], (ix) securing any factoring, receivables and securitization facilities so long as such liens are not securing Borrowing Base assets, (x) [reserved], (xi) securing indebtedness, without limitation, under the non-guarantor or joint venture indebtedness basket or any other indebtedness of non-guarantors not prohibited by the ABL Facility Documentation (*provided* that such liens extend only to the assets of such non-guarantors and/or joint ventures), (xii) on assets not constituting Collateral, (xiii) securing indebtedness incurred pursuant to clause (a)(vi) (so long as such liens are pari passu or junior to the Third Lien Notes) above; *provided* that any Liens on ABL Priority Collateral are junior to those securing the ABL Facility pursuant to the ABL Intercreditor Agreement, (xiv) securing indebtedness on a junior lien basis to the Senior Secured Credit Facilities so long as, to the extent such liens are on Collateral, such liens to the extent in respect of debt for borrowed money are subject to an Acceptable Intercreditor Agreement, (xv) [reserved], (xvi) [reserved] and (xvii) securing indebtedness incurred pursuant to clauses (a)(i) or (iii) above; *provided*, that permitted liens on Borrowing Base assets securing Indebtedness (other than obligations under the ABL Facility and Permitted Hedging/Cash Management Agreements) shall not be *pari passu* with the ABL Facility except as expressly set forth herein or as is otherwise customary;

c)      fundamental changes (other than, among others to be agreed and reasonably acceptable to the Lenders, (i) intercompany mergers, consolidations, re-domiciliations, liquidations and dissolutions (so long as, if a Borrower or a Guarantor is merging with a subsidiary that is not a Borrower or a Guarantor, such Borrower or Guarantor is the surviving entity (but not in any event, with respect to Holdings or any subsidiary of Holdings that is a direct or indirect parent of the Borrower)), (ii) Permitted Acquisitions and other investments permitted by the ABL Facility Documentation,

(iii) [reserved] and (iv) dispositions permitted by the ABL Facility Documentation);

d)      asset sales (including sales and issuances of capital stock of restricted subsidiaries) and sale leasebacks (and in each case, including "direct or indirect" dispositions), with exceptions to be agreed and reasonably acceptable to the Lenders, including permitting (i) unlimited asset sales, subject solely to the following terms and conditions: (A) all such asset sales are for fair market value as reasonably determined by the Borrower in good faith and (B) the consideration for any such sales in excess of an amount to be agreed is at least 75% cash consideration (the "***75% Cash Consideration Basket***") (but any such permitted non-cash consideration cannot include the assumption of liabilities), with exceptions for asset swaps and exchanges, (ii) sales of obsolete, worn out, uneconomical, negligible or surplus assets or assets no longer used or useful in the business, (iii) asset swaps, (iv) dispositions of noncore assets acquired in connection with a Permitted Acquisition or other investment not prohibited by the ABL Facility Documentation or made to obtain the approval of an anti-trust authority, and any other disposition to comply with any order of an agency, authority or other regulatory body or any applicable law or regulation, (v) intercompany transfers (other than any transfers to Holdings, with transfers of assets from the Borrower or a Guarantor to restricted subsidiaries that are not the Borrower or a Guarantor, in the aggregate with investments by the Borrower and the Guarantors in subsidiaries that are not the Borrower or a Guarantor under clause (e)(ii) below, capped at the greater of $100.0 million (such shared cap amount for all such utilizations or applications thereof, the "***Shared Non-Loan Party Transfers Basket***"), (vi) sale leasebacks (with no dollar cap), (vii) sales of assets in the ordinary course of business and immaterial assets, (viii) unlimited dispositions of non-Collateral assets, (ix) [reserved], (x) unlimited dispositions or discounts made in connection with factoring, receivables and securitization facilities, (xi) licensing arrangements, (xii) scheduled dispositions and dispositions by the Company and its subsidiaries subject to purchase agreements in effect as of the Closing Date, (xiii) dispositions in connection with non-speculative hedging arrangements (and any termination or unwinding thereof), (xiv) dispositions of

equity interests in unrestricted subsidiaries (with no dollar cap) (other than any unrestricted subsidiary the principal assets of which are cash or cash equivalents), (xv) dispositions of assets acquired with or constituting proceeds of equity contributions made to Holdings (or any direct or indirect parent thereof) after the Closing Date (other than Specified Equity Contributions and any disqualified equity), (xvi) [reserved] and (xvii) a general dispositions basket in an amount not less than the greater of an amount to be agreed and a percentage of Adjusted EBITDA; provided that in the event the Borrower consummates an asset sale or series of asset sales that results in a disposition of ABL Priority Collateral valued at more than 10% of the then-effective Borrowing Base collectively since the most recently delivered Borrowing Base Certificate, the Borrower shall promptly deliver an updated Borrowing Base Certificate to the ABL Administrative Agent (together with customary supporting documentation); provided, that, notwithstanding anything herein to the contrary, the Loan Parties shall not be permitted to directly or indirectly sell, transfer or dispose of any Material Property or any capital stock of any subsidiaries that own Material Property without the consent of the Lenders in their sole discretion;

e)     investments (including any direct or indirect transactions and to be defined in a manner consistent with the Documentation Precedent, except that any contract or other agreement that is entered into outside of the ordinary course of business or is not in accordance with prudent industry practices shall constitute an investment), with exceptions to be agreed and reasonably acceptable to the Lenders, including permitting (i) unlimited investments so long as the Payment Conditions are satisfied, (ii) unlimited intercompany investments (with investments by the Borrower and the Guarantors in restricted subsidiaries that are not the Borrower or a Guarantor, in the aggregate, with transfers of assets from the Borrower or a Guarantor to subsidiaries that are not the Borrower or a Guarantor subject to the Shared Non-Loan Party Transfers Basket), (iii) investments pursuant to a general basket in an outstanding amount not to exceed $100.0 million in the aggregate (with investments by the Borrower and the Guarantors in subsidiaries that are not the Borrower or a Guarantor, in the aggregate with

transfers of assets from the Borrower or a Guarantor to subsidiaries that are not the Borrower or a Guarantor subject to the Shared Non-Loan Party Transfers Basket), subject to no event of default, (iv) so long as event of default is existing or continuing (subject to the Limited Condition Transaction provisions), investments in a person (including, to the extent constituting an investment, to acquire assets of a person that represents all or substantially all of its assets or a division, business unit or product line, including research and development and related assets in respect of any product), that is engaged in a permitted business, subject to, among other customary conditions to be agreed, only in persons that become Guarantors and for assets that become Collateral (each such investment, a "*Permitted Acquisition*") and (v) subject to no existing or continuing event of default, investments in joint ventures in an aggregate outstanding amount not to exceed $200.0 million and subject to certain conditions to be agreed, including (A) such joint venture shall be for a bona fide business purpose (and not for liability management transactions, financing, or other capital raises), (B) none of the Material Property is subject, directly or indirectly and in whole or in part, to the joint venture, and (C) no "grower", "builder" or other additive components (whether based on investment returns or otherwise) to the aggregate cap on such basket; *provided*, *however*, that if the assets acquired in connection with any acquisition permitted above are proposed to be included in the determination of the Borrowing Base on any date, then the ABL Administrative Agent shall have (1) conducted an appraisal and field examination of such assets, the results of which shall be satisfactory to the ABL Administrative Agent, and (2) received an updated Borrowing Base Certificate that includes such assets (to the extent eligible) in the calculation of the Borrowing Base set forth therein (*provided* that, for the avoidance of doubt, no assets may be included in the determination of the Borrowing Base unless they are held by a Loan Party at or immediately following completion of such acquisition);

f)        dividends or distributions on, or redemptions of, Holdings' equity interests or subsidiaries' of Holdings' equity interests (including "direct or indirect" dividends, distributions or redemptions), or payments, prepayments, repayments, refinancings, repurchases,

redemptions, or other transfers for value (whether in cash or otherwise) of any junior secured, unsecured, or subordinated indebtedness or any equity interests that are not common equity interests (each of the foregoing, a "***Restricted Junior Payment***"), in each case whether directly or indirectly, with exceptions to be agreed and reasonably acceptable to the Lenders, including (i) subject to no event of default, customary exceptions for distributions necessary to pay the Sponsor (and any other Investor) advisory, refinancing, subsequent transaction and exit fees in an aggregate amount in any fiscal year not to exceed the lesser of 2% of Adjusted EBITDA and $20.0 million, (ii) customary tax distributions to the extent for taxes generated by the operation of the Borrower and its subsidiaries and for which the direct or indirect equity owners of the Borrower are liable (and to the extent such direct or indirect equity owners actually use such distributions to make tax payments in cash to the applicable taxing authority), (iii) [reserved], (iv) [reserved], (v) following an IPO, dividends or distributions in an aggregate amount per annum not to exceed the greater of 7.0% of market capitalization and 7.0% per annum of the gross proceeds from such IPO, (vi) [reserved], (vii) [reserved], (viii) [reserved], (ix) [reserved], (x) [reserved], (xi) [reserved], (xii) unlimited restricted payments so long as the RP/RDP Payment Conditions are satisfied, and (xiii) restricted payments made in connection with or in order to consummate the Transactions including, without limitation, (x) cash payments to holders of equity interests, restricted stock units, options or other equity-linked interests under any management equity plan, stock option plan or any other management or employee benefit or incentive plan or agreement and (y) other payments with respect to working capital adjustments or as otherwise to the extent contemplated by the Acquisition Agreement as in effect on the Closing Date;

g)        (A) prepayments, purchases or redemptions in cash of payment subordinated indebtedness for borrowed money (other than indebtedness owing to Holdings or any of its restricted subsidiaries) in excess of the greater of (x) $375.0 million and (y) 25% of Adjusted EBITDA (the "***Specified Indebtedness***") more than one year prior to the stated maturity thereof (and excluding, for the avoidance of doubt, regularly

scheduled interest payments thereon and the payment of fees, expenses and indemnification obligations thereunder), with exceptions including (i) [reserved], (ii) [reserved], (iii) refinancings or exchanges of Specified Indebtedness for like or other Specified Indebtedness with a maturity not earlier than such refinanced or exchanged Specified Indebtedness and refinancings of Specified Indebtedness acquired in connection with a Permitted Acquisition or similar investment (and not incurred in contemplation thereof), (iv) conversion of Specified Indebtedness to common or "qualified preferred" equity, (v) any "AHYDO catch-up" payments (and any payments thereunder will not be restricted under the ABL Facility), (vi) [reserved], (vii) [reserved], and (viii) unlimited prepayments, purchases or redemptions so long as the RP/RDP Payment Conditions are satisfied, and (B) amendments of any documentation governing Specified Indebtedness in excess of the greater of (x) $375.0 million and (y) 25% of Adjusted EBITDA in violation of an applicable intercreditor or subordination agreement;

h)      amendments of any documentation governing junior secured indebtedness, unsecured indebtedness, subordinated indebtedness, and/or any equity interests other than common equity interests, in each case, (i) in any manner that is materially adverse to the ABL Administrative Agent or the Lenders (it being understood and acknowledged that any amendment of the maturity date thereof in effect on the Closing Date (or other modification to the weighted average life) of any indebtedness shall be deemed to be materially adverse to the ABL Administrative Agent and/or the Lenders), or (ii) that is otherwise in violation of any applicable intercreditor or subordination agreement; provided, further, that in no event shall the definitive documentation governing the Third Lien Notes be amended, supplemented or otherwise modified without the prior written consent of the ABL Administrative Agent;

i)      compliance with the PATRIOT Act, FCPA, OFAC, sanctions laws, anti-money laundering laws or other anti-terrorism laws;

j)      use of proceeds;

k)      passive holding company covenant with respect to Holdings;

l)      lines of business;

m)      changes to organizational documents;

n)      negative pledge clauses; and

o)      limitation on transactions with affiliates (with references to "direct or indirect transactions" and without a dollar or other minimum threshold), with exceptions to be agreed and reasonably acceptable to the Lenders, including (i) subject to no existing or continuing event of default , the payment of financial oversight and similar fees (including refinancing, termination and subsequent transaction fees) under any management agreement in place on the Closing Date (but only if the amount of such fees is substantially consistent with the amounts disclosed to the Lead Arrangers prior to the signing date of the Acquisition Agreement); provided, that, there shall be a per fiscal year cap equal to the lesser of 2% of Adjusted EBITDA and $20.0 million on any such fees, (ii) subject to no existing or continuing event of default, payment of reasonable and documented out-of-pocket expenses and indemnities of the Sponsor (and/or any other Investors) and to directors, (iii) fees payable in connection with the Transactions and (iv) dividends and other restricted payments permitted by the ABL Facility Documentation.

For purposes of determining the possibility of any action, change, transaction or event that requires a calculation of any financial ratio or test (including the Interest Coverage Ratio, the First Lien Leverage Ratio, the Total Leverage Ratio, and the amount of Adjusted EBITDA or consolidated total assets), such financial ratio or test shall be calculated at the time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be, in each case subject to the Limited Condition Transaction provisions set forth herein, and no default or event of default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after the time such action is taken, such change is made, such transaction is consummated or such event

occurs, or the applicable agreement is signed, as the case may be.

"*Payment Conditions*" shall mean

(i)    no event of default has occurred and is continuing or would arise after giving effect to such transaction; and

(ii)    either

(a)    the Borrower would have pro forma Specified Availability of at least 17.5% of the Line Cap (but in no event less than $150.0 million), or

(b)    (x) the Borrower would have pro forma Specified Availability of at least 12.5% of the Line Cap (but in no event less than $150.0 million) and (y) the Borrower shall be in pro forma compliance with the Financial Covenant.

"*RP/RDP Payment Conditions*" shall mean

(i)    no event of default has occurred and is continuing or would arise after giving effect to such transaction;

(ii)    either

(a)    the Borrower would have pro forma Specified Availability of at least 17.5% of the Line Cap (but in no event less than $150.0 million), or

(b)    (x) the Borrower would have pro forma Specified Availability of at least 15.0% of the Line Cap (but in no event less than $150.0 million) and (y) the Borrower shall be in pro forma compliance with the Financial Covenant; and

(iii)    if the amount of such transaction exceeds an amount to be agreed, the Borrower shall have delivered to the ABL Administrative Agent as soon as available, but in any event not less than two (2) business days before such transaction (or such later date as the ABL Administrative Agent may agree in its sole discretion), evidence    reasonably    satisfactory    to    the    ABL

Administrative Agent that the conditions described in clauses (i) and (ii) above are satisfied immediately before and after giving effect to such transaction.

<table>
<tr>
<td>Limited Condition Transactions:</td>
<td>For purposes of (a) determining compliance with any provision of the ABL Facility Documentation that requires the calculation of the First Lien Leverage Ratio, the Total Leverage Ratio, the Interest Coverage Ratio, the Fixed Charge Coverage Ratio, Specified Availability, Adjusted EBITDA, the amount of cash and cash equivalents and/or interest expense, (b) determining compliance with representations, warranties, defaults or events of default or (c) testing availability under baskets set forth in the ABL Facility Documentation (including baskets measured as a percentage of Adjusted EBITDA) for indebtedness (excluding, for the avoidance of doubt, indebtedness under the ABL Facility but including any Incremental ABL Facilities), liens, Permitted Acquisitions or other investments, restricted payments, prepayments of Specified Indebtedness, or asset sales, in each case in connection with a Limited Condition Eligible Transaction (as defined below), at the Borrower's option (the Borrower's election to exercise such option in connection with any Limited Condition Eligible Transaction, an "<strong><em>LCT Election</em></strong>"), such ratios, baskets and other amounts shall be determined, and any representation and warranty or default or event of default blocker shall be tested, as of the date the definitive acquisition agreement, public offer date, date of a letter of intent or announcement date (or, as if and to the extent elected by the Borrower, the date of any notice of redemption, declaration of or other commitment to consummate, as applicable (or, at the Borrower's election, the date on which the financing commitments (including agreements establishing any delayed draw or delayed funding loan) with respect to such Limited Condition Eligible Transaction are entered into)) for such Limited Condition Eligible Transaction are made or entered into (such date, the "<strong><em>LCT Test Date</em></strong>") and calculated as if the acquisition and other pro forma events in connection therewith were consummated on such date. For the avoidance of doubt, if the Borrower makes an LCT Election and any of the ratios, baskets or other amounts for which compliance was determined or tested as of the LCT Test Date are exceeded, or any representation or warranty would be breached or any</td>
</tr>
</table>

default or event of default blocker would apply, as a result of fluctuations in any such ratio or basket (including due to fluctuations of the target of any Limited Condition Eligible Transaction) or as a result of the occurrence of any default or event of default or other event, in each case at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations, such representation or warranty shall not be deemed to have been breached, and (solely for purposes of such default or event of default blocker) such default or event of default shall be deemed not to have occurred. If the Borrower makes an LCT Election, in connection with the calculation of any ratio (other than for purposes of calculating compliance with the Financial Covenant) or basket with respect to the incurrence of any debt (including any Incremental Facilities), liens, Permitted Acquisitions or other investments, restricted payments, prepayments of Specified Indebtedness or asset sales on or following such date and prior to the earlier of the date on which such Limited Condition Eligible Transaction is consummated or the definitive agreement (or letter of intent, declaration or other commitment) for such Limited Condition Eligible Transaction is terminated, any such ratio shall be calculated on a pro forma basis assuming such Limited Condition Eligible Transaction and other pro forma events in connection therewith (including any incurrence of indebtedness) have been consummated. Conditionality for any transaction effected in connection with a Limited Condition Transaction to be completed on a "certain funds" basis in a non-U.S. jurisdiction shall be customary for the jurisdiction whose law governs the applicable acquisition documentation. The provisions of this paragraph are the "***Limited Condition Transaction Provisions***".

As used herein, "***Limited Condition Eligible Transaction***" means (i) any investment or acquisition by Holdings or one or more of its restricted subsidiaries, including, without limitation, by way of merger or amalgamation, of any assets, business or person permitted pursuant to the ABL Facility Documentation, and including, without limitation, any such transaction that is subject to a letter of intent, public offer or purchase agreement, in each case whose consummation is not conditioned on the availability of, or on obtaining,

third party financing, (ii) any redemption, repurchase, defeasance, satisfaction and discharge or repayment of indebtedness requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment or (iii) any dividend declared, any investment or any prepayment of Specified Indebtedness. A "*Limited Condition Transaction*" is a Limited Condition Eligible Transaction with respect to which the Borrower has made an LCT Election.

Financial Maintenance Covenant:

Unless waived by the Required Lenders (as defined below), the ABL Facility Documentation will contain the following financial covenant (the "*Financial Covenant*") with regard to Holdings and its restricted subsidiaries on a consolidated basis, which covenant shall be tested upon the occurrence and during the continuance of a Covenant Trigger Event (as defined below): the ratio (the "*Fixed Charge Coverage Ratio*") of

(a) Adjusted EBITDA minus taxes based upon income paid or required to be paid in cash (including tax distributions paid in cash during such period) minus non-financed cash capital expenditures attributable to maintenance of property, plant or equipment of the Borrower and the restricted subsidiaries to

(b) consolidated interest expense plus scheduled principal amortization payments paid or required to be paid in cash for indebtedness for borrowed money (other than intercompany indebtedness, but including payments in respect of capital lease obligations), plus all cash dividend payments on any series of disqualified stock of the Borrower or preferred stock of any restricted subsidiary, plus, solely for testing compliance with RP/RDP Payment Conditions, restricted payments made in reliance on the RP/RDP Payment Conditions

as of the last day of any fiscal quarter for which financial statements are required to be delivered or, with respect to the date of any Covenant Trigger Event, the last day of the most recently ended fiscal quarter prior to such date for which financial statements have been delivered,

B-51

shall not be less than 1.00:1.00 on a trailing four quarter basis.

A Covenant Trigger Event will occur if Specified Availability shall be less than the greater of

    (a) 10% of the Line Cap and

    (b) $100.0 million,

and shall continue until Specified Availability is equal to or exceeds such amount for 10 consecutive Business Days.

For purposes of determining compliance with the Financial Covenant (to the extent applicable), any cash equity contribution (which shall be common equity or otherwise in a form reasonably acceptable to the ABL Administrative Agent and including equity proceeds) made to the Borrower after the Closing Date and on or prior to the day that is 15 business days after the day on which financial statements are required to be delivered for the applicable fiscal quarter (the "***Cure Period***") will, at the request of Holdings, be included in the calculation of Adjusted EBITDA solely for purposes of determining compliance with the Financial Covenant at the end of such fiscal quarter and applicable subsequent periods which include such fiscal quarter (any such equity contribution so included in the calculation of Adjusted EBITDA, a "***Specified Equity Contribution***"), subject solely to the following terms and conditions: (a) in each 4 consecutive fiscal quarter period, there shall be no more than 2 fiscal quarters in respect of which a Specified Equity Contribution is made, (b) there shall be no more than 5 Specified Equity Contributions in the aggregate during the term of the ABL Facility, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in pro forma compliance with the Financial Covenant, (d) all Specified Equity Contributions shall be counted solely for the purposes of determining compliance with the Financial Covenant and shall not be included for purposes of determining pricing or any baskets and other ratios contained in the ABL Facility Documentation, and (e) there shall be no pro forma reduction in indebtedness (by netting or otherwise) with the proceeds of any Specified Equity Contribution solely for determining compliance with the Financial Covenant for the fiscal quarter for which such Specified Equity

Contribution is deemed applied, *provided* that, to the extent that such proceeds are actually applied to prepay indebtedness, a pro forma reduction in indebtedness is deemed applied with respect to the 3 fiscal quarters thereafter.  Notwithstanding the foregoing, (i)  no event of default shall be deemed to have occurred on the basis of any failure to comply with the Financial Covenant unless such failure is not cured by the making of a Specified Equity Contribution prior to the end of the Cure Period, and (ii) no Lender (including the Swingline Lender) or Issuing Bank shall be obligated to extend Loans or issue or renew letters of credit, until the Specified Equity Contribution has been made.

<u>Unrestricted Subsidiaries</u>:

The  ABL  Facility  Documentation  will  contain provisions  pursuant  to  which,  subject  to  customary limitations  on  loans  and  advances  to  and  other investments in unrestricted subsidiaries, the Borrower will  be  permitted  to  designate  any  existing  or subsequently  acquired  or  organized  subsidiary  (other than  the  Borrower)  as  an  "unrestricted  subsidiary"  and subsequently  re-designate  any  such  unrestricted subsidiary  as  a  restricted  subsidiary,  so  long  as, immediately after giving effect to any such designation or re-designation (including after reclassification of, and investments  in,  debt  of  or  liens  on  assets  of  the applicable  subsidiary),  (a)  no  payment  or  bankruptcy event of default shall be continuing and (b) with respect to any designation of unrestricted subsidiaries, (1) the Required  Lenders  shall  have  consented  to  such designation and (2) the subsidiary being designated shall be  an  "unrestricted  subsidiary"  (or  similar  or  analogous concept) under the First Lien Term Facility and the Third Lien  Notes.   Unrestricted  subsidiaries  (and  the  sale  of any equity interests therein or assets thereof) will not be subject to the mandatory prepayment, representation and warranty,  affirmative  or  negative  covenant  or  event  of default provisions of the ABL Facility Documentation, and  the  results  of  operations  and  indebtedness  of unrestricted subsidiaries will not be taken into account for  purposes  of  determining  Adjusted  EBITDA  or compliance  with  the  Financial  Covenant  or  any  other financial  ratios  or  baskets.   The  designation  of  any restricted subsidiary as an unrestricted subsidiary shall constitute  an  investment  therein  at  the  date  of

designation in an amount equal to the fair market value thereof.

The designation of any unrestricted subsidiary as a restricted subsidiary shall constitute the incurrence at the time of designation of any indebtedness or liens of such subsidiary existing at such time. Additionally, if the aggregate amount of ABL Priority Collateral transferred to unrestricted subsidiaries since the most recently delivered Borrowing Base Certificate exceeds 10% of the then-effective Borrowing Base, then the Borrower shall promptly deliver an updated Borrowing Base Certificate to the ABL Administrative Agent (together with customary supporting documentation).

Events of Default:

Limited to the following (except as otherwise expressly indicated, to be applicable to Holdings, the Borrower and their respective restricted subsidiaries only): nonpayment of principal when due; nonpayment of interest after a 5 business day grace period; nonpayment of fees, premiums and other amounts after a 5 business day grace period; failure to deliver the Borrowing Base Certificate after a 3 business day grace period; violation of covenants, with certain affirmative covenants to have customary grace periods (but in any event not to exceed 30 days after notice or knowledge thereof); incorrectness of representations and warranties, in each case in any material respect; cross default (after expiration of any grace periods) and cross acceleration to the Third Lien Notes; cross default (after expiration of any grace periods) and cross acceleration to indebtedness in excess of $150.0 million; bankruptcy or other insolvency events of Holdings or its restricted subsidiaries (with a customary grace period for involuntary events of no less than 60 days); unsatisfied monetary judgments in excess of $150.0 million (to the extent not fully covered by adequate insurance or indemnity) that have not been paid, vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; actual or asserted (in writing) invalidity of the ABL Facility Documentation, including material Guarantees or security documents or any material security interest purported to be created thereunder; certain material ERISA events; and change of control (to include a pre- and post-IPO provision and with no continuing director prong); *provided* that, a default or event of default with respect to the Financial Covenant shall not constitute a

default or event of default for purposes of the ABL Facility or any Incremental ABL Facility unless and until such failure is not cured with a Specified Equity Contribution on or prior to the expiration of the Cure Period.

The definition of "change of control" will require at least 50% ownership of voting interests by Permitted Holders (defined in accordance with the ABL Documentation Principles and to include, and only to include, the Sponsor and customary sponsor affiliates; provided, that, the scope of such "change of control" definition shall cover the chain of ownership from the Borrower, to Holdings, to PDV Holding, Inc. (or its successor), and ultimately to the Sponsor (or its affiliate)) prior to any IPO and, thereafter, a "change of control" will be triggered if (i) another person or group (other than any employee benefit plan and/or person acting as the trustee, agent or other fiduciary or administrator, any underwriters in connection with an IPO and/or Permitted Holder or group controlled by a Permitted Holder) acquires more than the greater of (a) 35% of the outstanding voting common stock of Holdings and (b) the percentage of then outstanding voting common stock of Holdings held, directly or indirectly, by the Permitted Holders, unless the Permitted Holders have, at such time, the right or ability by voting power or otherwise to elect or designate for election 50% or more of the board of directors of Holdings or a direct or indirect parent thereof or (ii) Holdings shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interests in the economic equity interests of Borrower.

Voting:

Amendments and waivers of the ABL Facility Documentation will require the approval of Lenders holding more than 50% of the aggregate amount of the loans and unused commitments under the ABL Facility (the "**Required Lenders**"), except that (i) the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders or of any other majority or required percentage of the Lenders of any facility, class or tranche, or any other Lenders) shall be required with respect to customary matters including the following: (A) increases in the commitment of such Lender (it being understood that a waiver of any condition precedent, the waiver of any default, event of

default or mandatory prepayment, or any modification, waiver or amendment of financial definitions or ratios or of any covenant shall not constitute an increase of any commitment), (B) reductions in or forgiveness of principal (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment or commitment reduction shall not constitute a reduction in or forgiveness of principal), interest (other than a waiver of default interest), fees, or (if any) prepayment premiums (*provided* that any change in the financial definitions or ratios used in calculating any interest rate or fee (or any component definition thereof) shall not constitute a reduction in any rate of interest or fee for purposes of this <u>clause (B)</u>), (C) extensions of scheduled amortization payments, final maturity (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment or commitment reduction, or any modification, waiver or amendment of financial definitions or ratios or of any covenant shall not constitute an extension of any maturity date), interest, fees, or prepayment premiums (it being understood and agreed that this <u>clause (C)</u> shall not apply to the waiver of default interest), (D) changes to the payment "waterfall" provision (or any substantially similar provision) and express subordination of the obligations under or liens securing the ABL Facility, in each case as set forth in the Documentation Precedent and (E) the pro rata payment provisions, (ii) the consent of 100% of the Lenders will be required with respect to customary matters including the following: (A) decreases to any of the voting percentages and (B) releases of all or substantially all of the value of the Guarantors or releases of all or substantially all of the Collateral (in each case, other than to the extent not prohibited under the ABL Facility Documentation), (iii) the consent of Lenders holding more than 66 2/3% of the aggregate amount of the loans and unused commitments under the ABL Facility will be required to increase the advance rates or otherwise amend or change the definition of "Borrowing Base" (including the component definitions therein) (*provided* that nothing in this <u>clause (iii)</u> shall limit the ability of the ABL Administrative Agent to change, establish, eliminate or reduce any "reserve" in its Permitted Discretion), (iv) customary protections for

the ABL Administrative Agent, the Swingline Lender
and the Issuing Banks will be provided and (v) any
amendment or waiver that by its terms affects the rights
or duties of Lenders holding loans or commitments of a
particular class (but not the Lenders holding loans or
commitments of any other class) will require only the
requisite percentage in interest of the affected class of
Lenders that would be required to consent thereto if such
class of Lenders were the only class of Lenders; it being
understood that, except as expressly provided above,
there shall be no "class" voting requirement for
amendments, modifications or supplements to the ABL
Facility Documentation. Defaulting Lenders shall be
excluded from both the numerator and the denominator
in the calculation of the Required Lenders.

The ABL Facility Documentation shall contain
customary provisions for, on a non pro rata basis,
replacing, or repaying and terminating the commitments
of, (i) Lenders claiming increased costs, tax gross-ups
and similar required indemnity payments, (ii) Defaulting
Lenders, and (iii) non-consenting Lenders in connection
with amendments and waivers requiring the consent of
all relevant Lenders, or of all relevant Lenders directly
affected thereby (and for replacing any Lender that
constitutes a non-extending lender in connection with an
extension of the maturity date of the ABL Facility as
permitted under the section titled "Final Maturity and
Amortization" hereof), so long as Lenders under the
relevant ABL Facility holding more than 50% of the
aggregate amount of the loans and commitments under
the ABL Facility, or more than 50% (by principal
amount) of the directly and adversely affected Lenders
under the ABL Facility, as applicable, shall have
consented thereto or participated, as applicable.

In addition, if the ABL Administrative Agent and the
Borrower (a) shall have jointly identified an error,
omission, mistake or ambiguity or determined to effect
any administrative change of a technical, administrative
or immaterial nature in the ABL Facility Documentation
or (b) desire to amend the ABL Facility Documentation
to add one or more provisions to the ABL Facility
Documentation that are, in the reasonable judgment of
the ABL Administrative Agent, no less favorable to the
Lenders under the ABL Facility in connection with any
Incremental ABL Facility then the ABL Administrative

Agent and the Borrower shall be permitted to amend such provision, or make such amendment, as applicable, without further action or consent of any other person; provided that, in each case of clauses (a) and (b), at the election of the ABL Administrative Agent in its sole discretion, any such amendment, supplement or other modification shall not become effective unless the Lenders have received at least five business days' prior written notice thereof and the ABL Administrative Agent shall not have received within such time period a written notice from the Required Lenders stating that the Required Lenders object to such amendment.  The ABL Facility Documentation will also permit the ABL Administrative Agent and the Borrower to enter into one or more amendments thereto to incorporate the provisions of any Incremental ABL Facility without the consent of any Lender under the ABL Facility, so long as the purpose of such amendment is solely to incorporate the appropriate provisions for such Incremental ABL Facility in the ABL Facility Documentation.   Notwithstanding anything to the contrary herein, the Borrower and the ABL Administrative Agent may, without the consent of any other person, amend, supplement or otherwise modify the ABL Facility Documentation in any manner not materially adverse to the Lenders; provided that, at the election of the ABL Administrative Agent in its sole discretion, any such amendment, supplement or other modification shall not become effective unless the Lenders have received at least five business days' prior written notice thereof and the ABL Administrative Agent shall not have received within such time period a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

The ABL Facility Documentation shall permit guarantees, collateral documents and related documents to be, together with the credit agreement (and any applicable deadlines with respect thereto), amended and waived with the consent of the ABL Administrative Agent without the need for consent by any other Lender if such amendment or waiver is delivered in order to (i) comply with local law or advice of local counsel or (ii) cause such guarantee, collateral document or other document to be consistent with the credit agreement and the other ABL Facility Documentation (including

without limitation the ABL Intercreditor Agreement). The Borrower and the ABL Administrative Agent may, without the consent of any other person, amend the ABL Facility Documentation to permit the accession as Guarantors, of restricted subsidiaries incorporated or organized in jurisdictions outside the United States (at the Borrower's election in its sole discretion).  With respect to any indebtedness expressly permitted to be incurred under the ABL Facility Documentation, the ABL Administrative Agent shall be expressly authorized and instructed by the Lenders to, and shall, in each case to the extent the ABL Administrative Agent's consent or acknowledgement is required therefor under the ABL Facility Documentation, enter into such intercreditor agreement consistent with any terms set forth in, or requirements of, the ABL Facility Documentation; *provided*, that in such event the Borrower shall be required to deliver a certificate certifying that such indebtedness and any related liens are not prohibited from being incurred under the ABL Facility Documentation and the intercreditor terms do not violate the ABL Facility Documentation.

The ABL Administrative Agent shall be entitled to extend any deadline or requirement in connection with compliance with guarantee and security provisions.

Tax Gross-Up; Increased Cost Protection:

The ABL Facility Documentation will include customary tax gross-up and cost protection provisions described below.  Protection for increased costs will be subject to customary exceptions.  The obligation of the Borrower and the Guarantors to gross up for and/or to indemnify Lenders for taxes imposed on payments will be subject to customary exceptions, will include a requirement to provide applicable tax related documentation, and will include customary mitigation provisions; *provided* that the tax gross-up will not apply to any withholding taxes imposed by reason of current Sections 1471 through 1474 of the Code (or any amended or successor version to the extent such version is substantively comparable and not materially more onerous to comply with), any regulations and official interpretations thereof, any agreement entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements (and related legislation, rules or official administrative guidance) and

any "day one" U.S. federal withholding taxes. Protection for increased costs imposed as a result of rules enacted or promulgated under the Dodd-Frank Act or Basel III (regardless of when enacted or adopted) shall be included in the ABL Facility Documentation (but solely for such costs that would have been included if they had been otherwise imposed under the applicable increased cost provisions).

<u>Assignments and Participations</u>:    After the Closing Date, the Lenders will be permitted to assign loans and commitments under the ABL Facility with the consent of the Borrower, the Issuing Banks, the Swingline Lender and the ABL Administrative Agent (the consent of the Issuing Banks, the Swingline Lender and/or the ABL Administrative Agent not to be unreasonably withheld or delayed and the consent of the Borrower not to be unreasonably withheld or delayed (it being understood and agreed that investment objectives and/or history of any prospective assignee or its affiliates shall be a reasonable basis for the Borrower to withhold consent, and the Borrower's refusal to consent (x) to any assignment to a Disqualified Lender or to any prospective assignee whose investment strategies or historical practices (or those of its affiliates) include distressed debt and/or "loan to own" investments or (y) in any situation where such assignment would require consent of, filing with, or registration with any government authority shall be deemed to be reasonable); *provided*, that (A) no assignment may be made to a natural person, a Disqualified Lender (which shall, in the ABL Facility Documentation, for the avoidance of doubt, include Excluded Affiliates) or, a Restricted Affiliated Lender (as defined below), (B) no consent of the Borrower shall be required (other than in the case of a proposed assignment to a Disqualified Lender) after the occurrence and during the continuance of a payment or bankruptcy (with respect to the Borrower) event of default, (C) no consent of the ABL Administrative Agent, the Issuing Banks, the Swingline Lender or the Borrower shall be required with respect to an assignment of any loans or commitments under the ABL Facility if such assignment is an assignment to a Lender, an affiliate of another Lender or an approved fund of a Lender (in each case, other than in the case of a proposed assignment to a Disqualified Lender), (D) the Borrower will be deemed to have consented to any assignment of the loans and commitments under the ABL Facility if it

has failed to respond to a written request for such consent within 10 business days after receipt of such written request, and (E) the request for any such consent of the Borrower in respect of any proposed assignment shall be delivered to the Borrower and to a designated contact at the Sponsor as designated in writing by the Borrower to the ABL Administrative Agent.  For the avoidance of doubt, any Disqualified Lender identified by you in writing to the ABL Administrative Agent after the Closing Date shall not become effective until the fifth business day following receipt thereof by the ABL Administrative Agent.

"*Restricted Affiliated Lender*" means the Sponsor, the other Investors and their respective affiliates (including, without limitation, Holdings and its subsidiaries but excluding Debt Fund Affiliates).

"*Debt Fund Affiliate*" shall mean a debt fund that is an affiliate of the Sponsor or any other Investor and that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, notes, bonds or similar extensions of credit or securities in the ordinary course of its business and whose managers have fiduciary duties to the investors therein independent of or in addition to their duties to the Sponsor or the other Investors, as applicable, or any of their respective affiliates; provided that for any Required Lender vote, Debt Fund Affiliates may not, in the aggregate, account for more than 49.9% of the amounts included in determining whether the Required Lenders have consented to any amendment or waiver.

Each assignment (other than to another Lender, an affiliate of a Lender or an approved fund) will be in an amount of an integral multiple of $5 million in the case of the ABL Facility (or lesser amounts, if agreed between the Borrower and the ABL Administrative Agent) or, if less, all of such Lender's remaining loans and commitments of the applicable class.  Assignments will not be required to be pro rata among the ABL Facility.  The ABL Administrative Agent shall receive a processing and recordation fee of $[REDACTED] for each assignment (except if waived by the ABL

Administrative Agent), except in the case of any such assignment to an affiliate of the assigning Lender.

The Lenders will be permitted to sell participations in loans and commitments without the consent of the ABL Administrative Agent, the Borrower, the Issuing Banks, the Swingline Lender or any other Lender and without any other restriction (other than as set forth below) in accordance with applicable law and subject to limitations consistent with the ABL Documentation Principles; *provided* that participations shall not be permitted to Disqualified Lenders, subject to the last two paragraphs of this Section and with the administration of such prohibition otherwise conducted in a manner and pursuant to documentation consistent with the ABL Documentation Principles.  Voting rights of participants shall be limited to reductions of principal, interest or fees, extensions of final scheduled maturity or times for payment of interest or fees, and releases of Collateral, in each case requiring the unanimous vote of all Lenders (or all directly and adversely affected Lenders).

If any Loans are assigned or participated to a Disqualified Lender or in violation of the ABL Facility Documentation, then: (a) the Borrower may (i) terminate any commitment of such person and repay any applicable outstanding Loans without premium, penalty, prepayment fee or breakage, and/or (ii) require such person to assign its rights and obligations to one or more eligible lenders at the price indicated above (which assignment shall not be subject to the processing and recordation fee specified above), (b) no such person shall receive any information or reporting provided by the Borrower, the ABL Administrative Agent or any other Lender, attend any Lender meetings or have access to any electronic site established for Lenders or confidential communications from counsel to or financial advisors to the ABL Administrative Agent or the Lenders, (c) for purposes of voting, any loans and commitments held by such person shall be deemed not to be outstanding and such person shall have no voting or consent rights with respect to "required lender" or class votes or consents, (d) for purposes of any matter requiring the vote or consent of each Lender affected by any amendment or waiver, such person shall be deemed to have voted or consented to approve such amendment or waiver if a majority of the affected class so approves,

and (e) such person shall not be entitled to any expense reimbursement or indemnification rights and shall be treated in all other respects as a Defaulting Lender.

If any Lender enters into a total return swap, total rate of return swap, credit default swap or other derivative instrument under which any obligation in respect of the ABL Facility is a reference obligation (collectively, "***Derivative Products***") with a counterparty that is a Disqualified Lender without the consent of the Borrower, then, for purposes of voting, such Lender shall be deemed to have voted or consented to approve such amendment or waiver in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Disqualified Lenders and who have not entered into such a Derivative Product.

The ABL Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Restricted Affiliated Lenders, Debt Fund Affiliates or Disqualified Lenders (including with respect to Derivative Products).  Without limiting the generality of the foregoing, the ABL Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Restricted Affiliated Lender, Debt Fund Affiliate or Disqualified Lender, (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Restricted Affiliated Lender, Debt Fund Affiliate or any Disqualified Lender or (z) have any liability with respect to or arising out of the voting in any amendment or waiver to any Loan Document by any Restricted Affiliated Lender or Debt Fund Affiliate.

The ABL Administrative Agent shall be permitted to disclose, verbally or in writing, the list of entities that are Disqualified Lenders upon request by any Lender in connection with any potential assignment or participation (*provided* that such Lender agrees to keep such list confidential).

Successor Administrative Agent:    The ABL Administrative Agent may resign at any time upon no less than 10 business days' written notice to the applicable party, subject to the appointment of a

successor administrative agent (although if no successor administrative agent is appointed within 30 days, such resignation will still be effective). The Borrower may, if the ABL Administrative Agent is a Defaulting Lender or an affiliate of a Defaulting Lender, remove the ABL Administrative Agent upon 10 days' prior notice. In each case, the successor agent shall be a commercial bank or trust company with a combined capital and surplus of at least $1 billion and, unless a payment or bankruptcy (with respect to the Borrower) event of default shall have occurred and be continuing, shall be reasonably acceptable to the Borrower (*provided* that no Disqualified Lender shall be a successor agent).

Expenses and Indemnification:

The Borrower shall pay, if the Closing Date occurs, all reasonable and documented out-of-pocket costs and expenses of the ABL Administrative Agent and the Commitment Parties (without duplication) in connection with the syndication of the ABL Facility and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of the ABL Facility Documentation (limited (i) in the case of legal fees, to the reasonable and documented out-of-pocket fees, disbursements and other charges of the one primary counsel identified herein, of a single local counsel with respect to the ABL Facility in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions), and of one additional counsel due to an actual conflict of interest for all affected parties or otherwise retained (except in the context of enforcement) with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed) and (ii) to advisors or consultants retained (except in the context of enforcement) with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed)), including costs related to appraisals and field examinations.

The Borrower will indemnify the ABL Administrative Agent, the Commitment Parties, the Lenders and their affiliates, managed funds and controlling persons (in each case other than Excluded Affiliates), and the directors, officers, employees, partners, counsel, agents, advisors and other representatives, successors and assigns of the foregoing, and hold them harmless from and against any and all losses, liabilities, damages,

claims and reasonable and documented fees and out-of-pocket expenses (limited, in the case of legal fees, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel for all indemnified parties and, if necessary, one local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all indemnified parties (and, in the case of an actual conflict of interest, one additional counsel in each applicable jurisdiction to the affected indemnified persons)) of any such indemnified person (which, in each case, shall exclude allocated costs of in-house counsel and (without the Borrower's prior written consent (not to be unreasonably withheld or delayed) the fees and expenses of any other third party advisors)) arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such indemnified person is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its affiliates, creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby; *provided* that no indemnified person will be indemnified for any liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from (i)(A) the gross negligence, bad faith or willful misconduct of such person or any of its controlling persons, controlled affiliates or any of the officers, directors, employees, partners or agents, advisors or other representatives, of any of the foregoing, in each case who are involved in or aware of the Transaction (as determined by a court of competent jurisdiction in a final and non-appealable judgment), (B) a material breach of the ABL Facility Documentation by any such person or any of its controlling persons or controlled affiliates (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (C) disputes between and among indemnified persons to the extent such disputes do not arise from any act or omission of the Borrower or any of its affiliates (other than claims against an indemnified person acting in its capacity as ABL Administrative Agent or Lead Arranger or similar role under the ABL Facility); or (ii) any settlement entered into by such person without the Borrower's written consent (for the avoidance of doubt, if settled

with the Borrower's written consent, or if there is a final judgment for the plaintiff against an indemnified person in any proceeding, the Borrower shall indemnify and hold harmless each indemnified person to the extent and in the manner set forth above). Each indemnified person shall refund and return any and all amounts paid by the Borrower to such indemnified person for fees, expenses, damages, indemnification or contribution to the extent such indemnified person is not entitled to payment of such amounts in accordance with the terms described above (as determined by a court of competent jurisdiction in a final and non-appealable determination). None of the indemnified persons and the Borrower and its affiliates and their respective directors, officers, employees, agents, advisors and other representatives shall be liable for any special, indirect, consequential or punitive damages in connection with the ABL Facility (except to the extent of its indemnity or reimbursement obligations hereunder in respect of any losses, claims, damages, liabilities and expenses incurred or paid by an indemnified person to a third party unaffiliated with such indemnified person). For the avoidance of doubt, this paragraph shall not apply to Taxes (as defined in the ABL Facility Documentation), except any Taxes that represent losses, damages, claims, etc. arising from any non-Tax claims.

| | |
|---|---|
| Governing Law and Forum: | New York; *provided, however*, that (i) the interpretation of the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement) (and whether or not a Company Material Adverse Effect (as defined in the Acquisition Agreement) has occurred and/or is continuing), (ii) the determination of the accuracy of any Specified Acquisition Agreement Representation and whether as a result of any inaccuracy thereof Sponsor (or its applicable affiliates) has the right (taking into account any applicable cure provisions) to terminate its (or such affiliates') obligations under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) as a result of a breach of such specified acquisition agreement representations without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates), or to decline to consummate the Acquisition (in each case in accordance with the terms of the Acquisition Agreement) as a result of a breach of such specified acquisition agreement representations |

without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates) under Section 8.1 of the Acquisition Agreement (in accordance with the express terms thereof) and (iii) the determination of whether the Acquisition has been consummated in accordance with the terms of the Acquisition Agreement and, in each case of the foregoing in this proviso, any claims or disputes arising out of any such interpretation or determination or any aspect thereof shall, in each case, be governed by, and construed in accordance with, the laws governing the Acquisition Agreement as applied to the Acquisition Agreement, without giving effect to any choice-of-law or conflict-of-law rules or provisions of any jurisdiction that would cause the application of the law of any other jurisdiction.

<u>Counsel to the ABL Administrative Agent, Initial Lenders, Lead Arrangers and Bookrunners</u>:

Paul Hastings LLP.

ANNEX I to EXHIBIT B

<u>Interest Rates</u>:              [REDACTED]

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans where the applicable rate is determined pursuant to <u>clause (i)</u> of the definition of ABR).

<u>Benchmark Replacement:</u>      [REDACTED]

<u>Letter of Credit Fee</u>:      [REDACTED]

<u>Commitment Fees</u>:      [REDACTED]

ANNEX II to EXHIBIT B

<u>Certain Defined Terms</u>

Certain capitalized terms used in this Annex II are defined as set forth in Exhibit B. Capitalized terms used in this Exhibit B and not otherwise defined herein or in Annex I will be defined in the ABL Facility Documentation consistent with the ABL Documentation Principles.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income[2] for such period, adjusted by (x) *adding thereto*, in each case only to the extent (and in the same proportion) deducted in determining such Consolidated Net Income (other than in respect of <u>clauses (f)</u> and <u>(m)</u> below) and without duplication:

(a)    Consolidated Interest Expense *plus* the amount of any letter of credit fees, Commitment Fees or any other unused line fees;

(b)    Consolidated Amortization Expense;

(c)    Consolidated Depreciation Expense;

(d)    Consolidated Tax Expense;[3]

(e)    Consolidated Transaction Expenses;[4]

(f)    (x) pro forma adjustments of the type identified in the Sponsor Model, and (y) at the Borrower's election in its sole discretion, "run-rate" cost savings (net of actual cash savings), expense reductions, other operating changes, improvements, optimizations, actions, initiatives and synergies (excluding revenue synergies, projected increases in revenues or other revenue enhancements) projected by the Borrower to result from actions either taken or expected to be taken in connection with, and within 12 months following, (i) the Transactions, (ii) any acquisition (including the commencement of activities constituting a business) or disposition (including the termination or discontinuance of activities constituting a business), in each case of business entities or of properties or assets constituting a division or line of business (including, without limitation, a product line), (iii) increased pricing and/or volume, (iv) any other operational change, expanded operations, improvement, optimization, actions or initiative (including, to the extent applicable, in connection with the Transactions or any restructuring), (v) new products, new

---

[2] Definition of "Consolidated Net Income" to be mutually agreed and shall be consistent with the Documentation Principles provided, that such definition of "Consolidated Net Income" shall reflect and incorporate any and all such changes to the definition thereof contained in the Documentation Precedent to correspond and match with those such adjustments and other modifications reflected in the definition of Consolidated EBITDA in this Annex II relative to the definition of Consolidated EBITDA (including, without limitation, clauses (a), (b), (e), and (f) of the definition thereof in this Annex II) included in the Documentation Precedent.

[3] Notwithstanding anything to the contrary in the Documentation Principles, in no event shall any Consolidated Tax Expense include any tariffs, excise, hydrocarbon, gasoline, or any other non-income taxes.

[4] Such expenses referenced in the above clause (e) shall be limited to the Transactions on the Closing Date.

projects or new contracts and/or (vi) creation of, entering into an engagement with or acquisition of new customers (which, in the case of each of <u>sub-clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(v)</u> and <u>(vi)</u> above, will be added to Consolidated EBITDA as so projected until fully realized and calculated on a Pro Forma Basis as though such synergies, cost savings, expense reductions, other operating changes, improvements, optimizations, actions and initiatives, increased pricing and/or volume, new projects and contracts and new customers had been realized (or commenced, acquired or created, as applicable) on the first day of such period), net of the amount of actual benefits realized during such period from such actions; or with respect to actions being taken in connection with acquisitions, dispositions, operational changes, initiatives or such other transactions or occurrences described in this <u>clause (f)</u> which occurred prior to the Closing Date, within 12 months of the Closing Date; *provided*, *further* that, the aggregate amount of adjustments to Consolidated EBITDA permitted to be made for any period pursuant to this <u>clause (f)</u> shall not exceed, together with any adjustments pursuant to the penultimate paragraph of the definition of Pro Forma Basis, 15% of Consolidated EBITDA for such period (calculated after giving effect to such addbacks, exclusions and adjustments).

(g)    any charges, expenses, costs, accruals, reserves, payments, fees or losses of any kind ("**Charges**") (including rationalization, legal, tax, structuring and other Charges) (other than depreciation or amortization expense) related to any consummated, anticipated, unsuccessful or attempted equity offering (including an IPO, whether or not consummated), issuance or repurchase, other Equity Issuance, incurrence by Holdings or any of its Subsidiaries of Indebtedness (including an amendment thereto or a refinancing thereof, whether or not successful, and any costs of surety bonds or similar costs incurred in connection with successful or unsuccessful financing activities), Dividend (including the amount of expenses relating to payments made to option holders of any direct or indirect parent of any Borrower in connection with, or as a result of, any distribution being made to equityholders of such Person, which payments are being made to compensate such option holders as though they were equityholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted under this Agreement), the Acquisition and Transactions (without duplication of <u>clause (e)</u> above), repayment of Indebtedness (including Restricted Debt Payments) or recapitalization or the breakage of any hedging arrangement permitted hereunder or the incurrence of Indebtedness permitted to be incurred hereunder (including a refinancing thereof) (in each case, whether or not successful), including such Charges related to (i) the offering, syndication, assignment and administration of the loans under the Loan Documents and any other credit facilities (including, and together with Charges of S&P, Moody's or any other nationally recognized ratings agency) and (ii) any refinancing, extension, waiver, forbearance, amendment or other modification of the Loan Documents and any other credit facilities or other Indebtedness (in each case, whether consummated, anticipated, unsuccessful, attempted or otherwise);

(h)    (i) any non-cash Charges, impairment Charges (excluding bad debt expense in excess of $10 million in any four fiscal quarter period), write-downs, write-offs,

expenses, losses or items (including, without limitation, purchase accounting adjustments under ASC 805 or similar recapitalization accounting or acquisition accounting under GAAP or similar provisions under GAAP, or any amortization or write-off of any amounts thereof (including, without limitation, with respect to inventory, property and equipment, leases, software, goodwill, intangible assets, in-process research and development, deferred revenue, advanced billings and debt line items)) (including any (x) non-cash expense (A) resulting from non-cash inventory adjustments (in a manner to be agreed) or (B) relating to the vesting of warrants, and (y) non-cash increase in expenses due to recapitalization accounting or to purchase accounting associated with the Transactions) or the amortization or write-off of any amounts thereof, in each case including any such Charges, impairment Charges, write-downs, write-offs, expenses, losses or items pushed down to Holdings and its Restricted Subsidiaries, (ii) net unrealized or realized exchange, translation, performance or other losses relating to foreign currency transactions and foreign exchange adjustments including, without limitation, losses and expenses in connection with, and currency and exchange rate fluctuations and losses or other obligations from, hedging activities or other derivative instruments;

(i)    (i) the amount of management, advisory, monitoring, consulting, refinancing, subsequent transaction and exit fees (including termination fees) and similar fees and expenses and related indemnities and expenses paid or accrued to direct or indirect equity holders of Holdings or any Equity Investor (and each of their Affiliates), and payments for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, to the extent such payments are permitted hereunder, and (ii) directors' fees and expenses paid or accrued by Holdings or its Restricted Subsidiaries or, to the extent paid or accrued with respect to services that relate directly to Holdings or its Restricted Subsidiaries and paid for with amounts distributed by Holdings and its Restricted Subsidiaries, of any direct or indirect parent thereof;

(j)    [reserved];

(k)    Insurance Loss Addbacks; *provided* that if such amount is both (i) added back to Consolidated EBITDA and (ii) not so reimbursed or received by Holdings or its Restricted Subsidiaries within such one year period applicable thereto, then such Insurance Loss Addback shall be subtracted in the subsequent Test Period;

(l)    [reserved];

(m)    any exceptional, extraordinary, unusual, infrequent or non-recurring expenses, losses, lost revenues or Charges incurred; provided that the aggregate amount added back pursuant to this clause (m), when taken in the aggregate with amounts added back with respect to clauses (n), (v), and (y), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

(n)    Charges attributable to or associated with any restructuring (including restructuring

charges related to Permitted Acquisitions and other Investments permitted hereunder and adjustments to existing reserves), carve out, integration, implementation of new initiatives, business optimization activities, cost savings, cost rationalization programs, operating expense reductions, synergies and/or similar initiatives, retention, recruiting, relocation, rebranding, signing bonuses, Charges in connection with a single or one-time event (including without limitation, in connection with facility openings, pre-openings, closings, reconfigurations and/or consolidations and/or terminations, reconfigurations and/or consolidations of existing lines of business), research and development, contract termination Charges, stock option and other equity-based compensation expenses, any Charges associated with any stock subscription or shareholder agreement or any employee benefit trust, severance costs, any Charges associated with modifications to any pension or post-retirement employee benefit plan, indemnities and/or any expenses, accruals or reserves (including restructuring costs related to Permitted Acquisitions and other Investments and adjustments to existing reserves), Charges associated with systems design implementation and/or upgrade, software development, project start-up and new operations (including, without limitation, any Charges in connection with entering into a new market) and corporate development and other executive costs, legal and other professional fees and listing fees, any Charges associated with any modification of any pension or post-retirement employee benefit plan, indemnities and expenses, transaction fees and expenses, management fees and expenses, including, without limitation, any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, for the avoidance of doubt, Public Company Costs); provided that the aggregate amount added back pursuant to this clause (n), when taken in the aggregate with amounts added back with respect to clauses (m), (v), and (y), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

(o)    [reserved];

(p)    non-cash costs and expenses relating to any equity-based compensation or equity-based incentive plan of Holdings (or its direct or indirect parent company) or any of its Restricted Subsidiaries;

(q)    any net losses attributable to the early extinguishment or repayment of Indebtedness (and the termination of any associated Hedging Agreements) including, for the avoidance of doubt, any unamortized fees, costs and expenses paid in connection therewith;

(r)    [reserved];

(s)    [reserved];

(t)    [reserved];

(u)    [reserved];

(v)    any net loss from disposed, abandoned, transferred, closed or discontinued operations (excluding held for sale discontinued operations until actually disposed of); provided that the aggregate amount added back pursuant to this clause (v) when taken in the aggregate with amounts added back with respect to clauses (m), (n), and (y), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

(w)    [reserved];

(x)    [reserved]; and

(y)    all Charges attributable to, and payments of, legal settlements, fines, judgments or orders; provided that the aggregate amount added back pursuant to this clause (y) when taken in the aggregate with amounts added back with respect to clauses (m), (n), and (v), shall not exceed 15% of Consolidated EBITDA for such period (calculated before giving effect to all such addbacks, exclusions and adjustments);

and (y) *subtracting therefrom*, in each case only to the extent (and in the same proportion) added in determining such Consolidated Net Income and without duplication, the aggregate amount of (A) all non cash items increasing Consolidated Net Income for such period (other than the accrual of revenue or recording of receivables in the ordinary course of business); (B) any exceptional, extraordinary, unusual or non recurring gains increasing Consolidated Net Income for such period; (C) any net realized gains from Hedging Agreements, embedded derivatives or other derivatives resulting from actions outside of the ordinary course of trading (provided that, for the avoidance of doubt, gains resulting from ordinary course of trading Hedging Agreements or other derivatives shall not be subtracted pursuant to this clause (C)); (D) any net gain from disposed equity interests or any other assets, or abandoned, transferred, closed or discontinued operations; (E) the amount of any minority interest net income attributable to non-controlling interests in any non-Wholly Owned Subsidiary or any joint venture; and (F) net unrealized or realized exchange, translation or performance income or gains relating to foreign currency transactions and foreign exchange adjustments including, without limitation, income or gains in connection with, and currency and exchange rate fluctuations and income or gains from, hedging activities or other derivative instruments.

Notwithstanding anything herein to the contrary, it is agreed that, for the purpose of calculating the First Lien Leverage Ratio, the Total Leverage Ratio, the Interest Coverage Ratio and the Fixed Charge Coverage Ratio for any period that includes the last four fiscal quarters ended on or prior to the Closing Date, Consolidated EBITDA shall be deemed to be amounts to be agreed for each of foregoing periods, respectively, in each case, as adjusted on a Pro Forma Basis and to give effect to any adjustments in clause (f) above that may become applicable due to actions taken on or after the Closing Date, as applicable; it being agreed that for purposes of calculating any financial ratio or test in connection with a Subject Transaction, Consolidated EBITDA shall be calculated on a Pro Forma Basis in a manner consistent with Consolidated EBITDA for each quarterly period set forth above and the adjustments set forth above in this definition.

EXHIBIT C

<u>Project Horizon</u>
<u>Conditions</u>[5]

Except as otherwise set forth below, the initial borrowing under the ABL Facility shall be subject to the satisfaction or waiver (by the applicable Commitment Parties) of the following conditions:

1.   The Acquisition Agreement (including all schedules, exhibits, and annexes thereto) shall be in form and substance reasonably acceptable to the Initial Lenders (it being understood and agreed that the last draft (including the schedules, exhibits, and annexes thereto) of the Acquisition Agreement delivered to the Commitment Parties on August 22, 2025, is reasonably acceptable to the Commitment Parties). The Acquisition shall have been consummated, or substantially simultaneously with the initial borrowing under the First Lien Term Facility, shall be consummated, in all respects in accordance with the Acquisition Agreement, without giving effect to any amendment, consent or waiver (including, without limitation, any such amendment, consent or waiver to the schedules, exhibits (including, whether as an exhibit to the Acquisition Agreement or otherwise in the form as entered by the Court (as defined in the Acquisition Agreement), the Sale Order), and annexes thereto) by you, thereto that is adverse to the Commitment Parties (in their capacities as such), without the prior consent of each of the Commitment Parties (such consent not to be unreasonably withheld, delayed or conditioned); it being understood and agreed that without otherwise limiting the generality and scope of the foregoing sentence, (a) any reduction (or amendment that has the effect of a reduction) in the purchase price of, or consideration for, the Acquisition shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent; (b) any increase (or amendment that has the effect of an increase) in the purchase price of, or consideration for, the Acquisition shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent, except solely to the extent that any such increase is funded entirely with (i) new cash equity contributions in Holdings and its subsidiaries and/or (ii) the issuance of Alternative Preferred Equity or Third Lien Notes; <u>provided</u> that to the extent any such increase is funded with equity interests other than common equity, such equity interests shall be on terms and conditions reasonably satisfactory to the Commitment Parties; (c) any amendment (or amendment that has the effect of a change) to the definition of "Company Material Adverse Effect" in the Acquisition Agreement shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent, and (d) any amendment or waiver (or any other modification that has the effect of such amendment or waiver) to any conditions precedent to closing of the Acquisition (whether in Sections 7.1(a), (b) or (c) or Sections 7.2(a) or (d), or otherwise contained in the Acquisition

---

[5]   Capitalized terms used in this Exhibit C shall have the meanings set forth in the other Exhibits attached to the Commitment Letter to which this Exhibit C is attached (the "Commitment Letter"). In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit C shall be determined by reference to the context in which it is used.

Agreement) shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent.

2.  The Equity Investment shall have been made, or substantially simultaneously with the initial borrowing under the First Lien Term Facility, shall be made, in at least the amount and consistent with the description thereof, set forth in Exhibit A to the Commitment Letter.

3.  The ABL Administrative Agent and the Lead Arrangers shall have received at least 3 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date (x) all documentation and other information about Borrower and the Guarantors as has been reasonably requested in writing at least 10 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date by the ABL Administrative Agent or the Lead Arrangers that is required by governmental entities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and (y) with respect to each of you and the Borrower, in each case, to the extent that it qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation to the extent requested in writing by the ABL Administrative Agent and/or such Lead Arranger at least 10 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date.

4.  Subject in all respects to the Certain Funds Provisions, the execution and delivery by the Borrower and the Guarantors of (i) the ABL Facility Documentation which shall, in each case, be consistent with the Commitment Letter, the Term Sheet (as modified to reflect any exercise of the "market flex" provisions in the Fee Letter with respect to the ABL Facility) and the ABL Documentation Principles, and shall be valid, enforceable, and effective, and (ii) customary legal opinions, a Borrowing Base Certificate, customary secretary's certificates, customary evidence of authorization, good standing certificates (to the extent applicable) in the jurisdiction of organization of the Borrower and each Guarantor, and a solvency certificate of Holdings' chief financial officer, treasurer, other financial officer or other officer with equivalent duties in substantially the form of Annex I hereto (the items described in this clause (ii), collectively, the "***Closing Deliverables***").

5.  The Commitment Parties shall have received (a) the audited consolidated balance sheet of the Company as of December 31, 2024 and December 31, 2023 and each additional fiscal year ending at least 90 days prior to the Closing Date, and the related audited consolidated statements of income and cash flows for the fiscal years then ended (or, the fiscal year then ending, as applicable), and (b) the unaudited condensed consolidated balance sheet of the Company as of the last date of each subsequent fiscal quarter ending after December 31, 2024, and at least 45 days prior to the Closing Date, and the related unaudited condensed consolidated statements of income and cash flows for the three months then ending and for the portion of the year to date.  It is acknowledged and agreed that the Commitment Parties have received the items required by clause (a) of this paragraph 5.  It is understood and agreed that the condition set forth in this paragraph 5, (x) may be satisfied by furnishing the applicable financial statements of the Company on Form 10-K or Form 10-Q, as applicable, filed with the Securities and Exchange Commission, and (y) shall be deemed to have been delivered on the earliest date on which (i) the Company posts such documents, or provides a

link thereto, on the Company's website on the Internet; or (ii) such documents are posted on the Company's behalf on IntraLinks/IntraAgency or another website to which the Commitment Parties have access.

6.  All fees required to be paid on the Closing Date pursuant to the Fee Letter and reasonable and documented out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, to the extent invoiced at least 3 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date, shall, upon the initial borrowing under the First Lien Term Facility, have been, or will be substantially concurrently, paid (which amounts may be offset against the proceeds of the First Lien Term Facility).

7.  The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects at the Closing Date (as defined in the Acquisition Agreement); provided that to the extent that any Specified Representation is qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, (A) the definition thereof shall be the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement) for purposes of the making or deemed making of such Specified Representation and (B) the same shall be true and correct in all respects.

8.  Since the date of the Acquisition Agreement to the Closing Date (as defined in the Acquisition Agreement), there has not been any Company Material Adverse Effect (as defined in the Acquisition Agreement as in effect on the date hereof),  that would result in the failure of a condition precedent to your obligation to consummate the Acquisition under the Acquisition Agreement or that would give you the right (taking into account any notice and cure provisions) to terminate your obligations pursuant to the terms of the Acquisition Agreement.

9.  The Sale Order (as defined in the Acquisition Agreement) shall be in full force and effect in all respects and not subject to any stay.

10. The Refinancing shall have been, or substantially concurrently with the initial borrowing under the First Lien Term Facility shall be, consummated.

11. The initial funding of the First Lien Term Facility shall have occurred, or substantially concurrently with the effectiveness of the ABL Facility shall occur, on terms, conditions, and documentation as set forth in the First Lien Commitment Letter and otherwise as reasonably acceptable to the Lead Arrangers.

12. The initial issuance of the Third Lien Notes and/or Alternative Preferred Equity shall be, or substantially concurrently with the initial borrowing under the First Lien Term Facility shall be, consummated and made effective on the terms, conditions and documentation as set forth in the Acceptable Third Lien Note Terms and otherwise as reasonably acceptable to the Lead Arrangers.

13. After giving effect to the Transactions on a pro forma basis, the aggregate principal amount of Consolidated Total Funded Indebtedness of Holdings, the Borrower and their respective subsidiaries (less Holdings' and its subsidiaries' Applicable Cash and Cash Equivalents)

shall not be greater than $3,300 million; provided that such amount may increase by up to $500 million in borrowings under the ABL Facility solely to the extent there will be at least $500 million of unrestricted cash and cash equivalents on Holdings' and its subsidiaries' balance sheet.

14.    The 2020 Bonds TSA shall be in full force and effect and shall not have been amended, supplemented, waived, subject to any consent, omission, or failure to enforce, terminated, or otherwise modified (including, without limitation, with respect to any of the schedules, annexes, or exhibits thereto) in a manner adverse to the Commitment Parties (in their capacities as such), in each case, without the prior consent of each of the Commitment Parties (such consent not to be unreasonably withheld, delayed or conditioned); provided that to the extent that the 2020 Bonds TSA is amended, supplemented, waived, subject to any consent, omission or failure to enforce, terminated, or otherwise modified, in each case, whether directly or indirectly, to increase or add additional consideration to be paid or otherwise provided by Holdings or any of its subsidiaries (or increase or expand the direct or indirect monetary or other material obligations or liabilities thereunder), in each case of the foregoing other than such consideration, obligations, or liabilities as expressly in effect in the 2020 Bonds TSA as of the date hereof, any such amendment, supplement, waiver, consent, omission or failure to enforce, termination, or other modification shall be deemed to be adverse to the interests of the Commitment Parties and shall require each of the Commitment Parties' prior written consent.  Substantially concurrently with the initial funding of the First Lien Term Facility, the Consenting 2020 Holders shall transfer, convey, and assign to Holdings (or its designee that is a Loan Party) all of the 2020 Bonds held by such Consenting 2020 Holders that, taken as a whole, constitute the Acquired 2020 Bonds (which, for purposes of clarity, such transferred and acquired 2020 Bonds shall constitute at least two-thirds of the aggregate outstanding principal amount of all the 2020 Bonds), in accordance with the 2020 Bonds TSA.

ANNEX I to
EXHIBIT C

**[HOLDINGS]**

**SOLVENCY CERTIFICATE**

[_____], 20[_]

Pursuant to Section [_] of Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among [_____], the undersigned [chief financial officer] of Holdings hereby certifies as of the date hereof, solely on behalf of Holdings and not in his/her individual capacity and without assuming any personal liability whatsoever, that:

I.      I am familiar with the finances, properties, businesses and assets of Holdings and its Subsidiaries.  I have reviewed the Loan Documents and such other documentation and information and have made such investigation and inquiries as I have deemed necessary and prudent therefor.  I have also reviewed the consolidated financial statements of Holdings and its Subsidiaries, including projected financial statements and forecasts relating to income statements and cash flow statements of Holdings and its Subsidiaries.

II.     On the Closing Date, immediately after giving effect to the Transactions, Holdings and its Subsidiaries (on a consolidated basis) are solvent and (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course and (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital.

All capitalized terms used but not defined in this certificate shall have the meanings set forth in the Credit Agreement.

*[SIGNATURE PAGE TO FOLLOW]*

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**[HOLDINGS]**


By: _____
Name:
Title:

**E-4**

**BID EXECUTION VERSION**

| | |
|---|---|
| **CITIGROUP GLOBAL MARKETS INC.** | **BARCLAYS** |
| 388 Greenwich Street | 745 Seventh Avenue |
| New York, NY 10013 | New York, NY 10019 |

**CONFIDENTIAL**

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attn: Christina Park

Project Horizon
Fee Letter

Ladies and Gentlemen:

Reference is made to the ABL Commitment Letter (including the exhibits and other attachments thereto, the "***ABL Commitment Letter***"), dated as of the date hereof, among Barclays Bank PLC ("***Barclays***") and Citi (as defined below and, together with Barclays, collectively, the "***Commitment Parties***", "***we***" or "***us***") and you, regarding the Transactions described therein.  This letter agreement is the Fee Letter referred to in the ABL Commitment Letter.   Terms used but not defined in this letter agreement shall have the meanings assigned thereto in the ABL Commitment Letter.  "***Citi***" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

**ABL Facility Fees**

As consideration for the Initial Lenders' commitments to provide the ABL Facility under the ABL Commitment Letter, you agree to pay, to the Initial Lenders, each for its own account, an underwriting fee (the "***ABL Facility Underwriting Fee***") equal to ▮▮▮▮ of the aggregate amount of the commitments in respect of the ABL Facility, in each case, to the extent actually provided on the Closing Date, which fees shall be divided among the Commitment Parties based on their pro rata share of the commitment amount of the ABL Facility on the date hereof. The ABL Facility Underwriting Fee will be earned and due and payable in full on the date of the consummation of the Acquisition and the effectiveness of the ABL Facility (the "***Closing Date***").

In connection with the syndication of the ABL Facility, the Commitment Parties may, in their discretion, allocate to their respective affiliates, managed funds or the other Initial Lenders portions

1

of any fees payable to them in connection therewith. In addition, as consideration for the ABL Administrative Agent's agreement to act as administrative agent and collateral agent for the ABL Facility, you agree to pay to the ABL Administrative Agent, solely for its own account, an annual agent fee in an amount equal to ▮▮▮▮, which fee shall be earned by, and payable to, the ABL Administrative Agent, quarterly in advance beginning on the Closing Date and, thereafter, quarterly in advance on the last day of each fiscal quarter of Holdings ending after the Closing Date for so long as the ABL Facility is in effect; *provided* that (x) unless the Closing Date occurs on the last day of a fiscal quarter, any such payment with respect to the fiscal quarter in which the Closing Date occurs shall be prorated for the number of days from the Closing Date until the end of such fiscal quarter, and (y) if the ABL Facility is fully repaid, or the ABL Administrative Agent resigns or is replaced, on a day that is not the last day of a fiscal quarter, a portion of the agent fee will be rebated to the Borrower on the date the ABL Facility is fully repaid, or the ABL Administrative Agent resigns or is replaced, in proportion to (i) the number of days remaining until (but not including) the last day of the fiscal quarter in which such repayment, resignation or replacement occurred, divided by (ii) the number of days in such fiscal quarter. Notwithstanding anything to the contrary set forth herein, if on the Closing Date Barclay's commitments under the ABL Facility are greater than Citi's commitments under the ABL Facility, Barclays shall be a co-collateral agent for the ABL Facility with certain rights to be agreed (but, for the avoidance of doubt, the lien granted in respect of the ABL Facility shall be granted to and held in the name of the ABL Administrative Agent as the secured party of record).

**<u>Other Fees</u>**

Commencing on the 366th day after the date hereof, you shall pay to the Lenders, each for its own account, a ticking fee (the "***ABL Ticking Fee***"), equal to ▮▮▮▮ per annum on the Lenders' commitments to provide the ABL Facility under the ABL Commitment Letter, accruing from such 366th day after the date hereof until the 450th day after the date hereof, and thereafter increasing to ▮▮▮▮ per annum on the Lenders' commitments to provide the ABL Facility under the ABL Commitment Letter and continuing to accrue on and thereafter until the Closing Date. The ABL Ticking Fee shall be conditioned on, and due and payable in full, in cash, immediately upon the occurrence of, the Closing Date and in no event shall accrue on or after the Closing Date.

To the extent that the Closing Date does not occur, and notwithstanding anything to the contrary in the ABL Commitment Letter, you agree to reimburse an aggregate amount of up to ▮▮▮▮ of the Commitment Parties' reasonable and documented or invoiced out-of-pocket expenses related to field examinations and appraisals.

If, in connection with the consummation of the Acquisition, or, in lieu of the Acquisition, any similar transaction occurring during the period from the date hereof to the date that is the twelve month anniversary of the date hereof (which date shall be extended to up to eighteen months in the event the Outside Date is extended under the Acquisition Agreement), in which the Acquisition occurs (any such foregoing transaction, an "***Alternate Transaction***"), an institution or a syndicate of lenders (other than the applicable Initial Lender and/or its affiliates) provides bank or other revolving credit financing to you, the Sponsor or any of your or its respective affiliates in lieu of the ABL Facility (notwithstanding a willingness on the part of such Initial Lender to provide the ABL Facility on the terms set forth in the ABL Commitment Letter

(including the Term Sheet and this Fee Letter), at the time of the Acquisition or such Alternate Transaction), you agree that, with respect to each Initial Lender, unless (i) you have provided such Initial Lender (or an affiliate thereof) a reasonable opportunity to provide such bank financing or other revolving credit financing on substantially the same terms so proposed, acting in such roles and with the compensatory economics applicable to such Initial Lender as specified in the ABL Commitment Letter and this Fee Letter, prior to the consummation of the Acquisition or such Alternate Transaction (the "***Alternate Financing***") and such Initial Lender has breached its obligations thereunder or otherwise declined to provide such financing on such proposed terms, (ii) such Initial Lender otherwise terminated its commitment under the ABL Commitment Letter prior to its stated expiry date or has breached its obligations or otherwise declined to provide the ABL Facility on the terms and conditions of the ABL Commitment Letter (including the Term Sheet) and this Fee Letter, (iii) such Initial Lender has failed to reaffirm in writing its willingness to establish or fund the ABL Facility on the terms and conditions set forth in the ABL Commitment Letter (including the Term Sheet) and this Fee Letter, or (iv)(A) you (or your affiliate) are prepared to consummate the Acquisition or the Alternate Transaction and (B) such Initial Lender refuses to fund its commitment under the ABL Facility (including, without limitation, to the extent on the assertion that a Company Material Adverse Effect (as defined in the Acquisition Agreement) has occurred or on the assertion that a modification to the Acquisition Agreement has occurred that is adverse to the interest of the Initial Lenders), then you will pay to such Initial Lender an amount equal to ▮ of the ABL Facility Underwriting Fee that would have been payable to such Initial Lender as provided above as if the Closing Date and full establishment of the ABL Facility had occurred, which payment or payments shall be made on the date of the later to occur of, and subject to the occurrence of, the closing of the Acquisition or such Alternate Transaction, as applicable, and the initial funding of such Alternate Financing (it being understood and agreed that the amount contemplated in this paragraph constitutes liquidated damages to the applicable Commitment Party relating to the failure to receive the applicable expected payments upon the Closing Date on account of the circumstances described above); *provided* that if any Initial Lender does not accept an offer to provide such Alternate Financing within two business days of such offer being made, such Initial Lender shall be deemed to have declined such offer and the fee contemplated in this paragraph shall not be required to be paid in connection with such Alternate Financing. Such payment or payments, as applicable, will be in lieu of and will discharge you from any obligation in respect of any fee provided for herein with respect to the ABL Facility. For the avoidance of doubt, no fee shall be required to be paid pursuant to this paragraph in connection with the appointment of and/or allocation to any Additional Agents in accordance with Section 2 of the ABL Commitment Letter.

**General**

Except as otherwise set forth herein or separately agreed in writing between us and you, you agree that, once paid, the fees or any part thereof payable hereunder and under the ABL Commitment Letter and the Term Sheet will not be refundable under any circumstances. All fees payable hereunder and under the ABL Commitment Letter and the Term Sheet will be paid in immediately available funds and shall be in addition to any reimbursement of the Commitment Parties' reasonable and documented out-of-pocket expenses to the extent reimbursable pursuant to the ABL Commitment Letter. For the avoidance of doubt, you shall be permitted to cause the Borrower to make any payment otherwise required to be made by you hereunder. All amounts payable under this Fee Letter will be made in U.S. dollars and, in any case, shall not be subject to

counterclaim or set-off for, or be otherwise affected by, any claim or dispute relating to any other matter. In addition, all such payments shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings (a "**Tax Deduction**") imposed by any national, state or local taxing authority, or will otherwise be grossed up by you in respect of such Tax Deduction, except (i) to the extent such Tax Deduction is imposed on, or measured by reference to, net income and such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any connection of the payee with the jurisdiction of such taxing authority (other than a connection arising solely from the execution, delivery and performance of the ABL Commitment Letter or this Fee Letter, any transaction contemplated by or pursuant to the ABL Commitment Letter or this Fee Letter, or the receipt of payments under the ABL Commitment Letter or this Fee Letter), (ii) to the extent such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any failure of the payee to provide any applicable documentation permitting such payments to be made without (or at a reduced rate of) withholding that is reasonably requested by you and that it is legally eligible to provide, (iii) any U.S. federal withholding tax imposed on amounts payable to or for the account of such payee pursuant to applicable law in effect on the date hereof, and (iv) any U.S. federal withholding tax imposed pursuant to Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended, as of the date hereof (or any amended or successor version of such Sections that is substantively comparable and not materially more onerous to comply with) or any Treasury Regulations, other official administrative guidance or intergovernmental agreements implementing such Sections.

## **ABL Facility Market Flex**

Barclays and Citi (the "**Requisite ABL Arrangers**") shall be entitled at any time prior to (A) if a Frustrated Syndication (as defined below) occurs, the earlier of (i) the achievement of a Successful ABL Syndication (as defined below) and (ii) the later of (x) 60 days after the Closing Date (y) 15 Business Days after availability of consolidated financial statements of the Company necessary for the Company's auditors to provide a customary "comfort" letter (the period from the Closing Date to such earlier date, a "**Cooperation Extension Period**") and (B) in all other cases, the earlier of (i) the Closing Date and (ii) the achievement of a Successful ABL Syndication (as defined below) without your consent (but after consultation with you) to make only the following changes to the ABL Facility if the Requisite ABL Arrangers reasonably determine that such changes are reasonably necessary to achieve a Successful ABL Syndication, or if a Successful ABL Syndication has not been achieved on, or cannot be achieved by the Closing Date, to:

(a)     (i) increase the initial interest rate margins with respect to the ABL Facility by no more than ▮ basis points *per annum* which increased interest rate margin with respect to the ABL Facility permitted under this <u>clause (a)</u> of up to ▮ basis points per annum may take the form of upfront fees, with upfront fees being equated to such interest rate margins based on an assumed four-year average life to maturity without any present value discount and the Borrower shall have the option to fund any such upfront fees through a drawing under the ABL Facility; and/or (ii) add a credit spread adjustment equal to 10 basis points *per annum*;

4

(b)        with respect to the definition of Consolidated EBITDA, (i) reduce from 36 months to no less than 24 months the period following the Transactions or any other acquisition, disposition, operational change, improvement, initiative or new contract or new project, *et al.*, within which an action must be either taken or expected to be taken, with respect to which a synergy, operating expense reduction or other operating improvement or cost savings is projected by the Borrower to result, in order for the Borrower to add back the amount of such synergy, operating expense reduction or other operating improvement, *et al.*, in calculating Consolidated EBITDA under the ABL Facility; (ii) impose a cap of not less than 30% of Adjusted EBITDA (calculated after giving effect to adjustments) on Consolidated EBITDA adjustments pursuant to clause (4); (iii) remove "lost revenues" from clause (1)(i); (iv) remove clause (1)(ii); and/or (v) remove addbacks resulting from revenue enhancements and revenue synergies; increased pricing or volume;

(c)        remove clause (b) from the definition of "Specified Availability";

(d)        remove the stepdown on the Commitment Fee;

(e)        add a hard-dollar trigger of $300 million to clause (a)(ii) and/or clause (b) of the definition of "Delivery Condition";

(f)        modify the availability trigger in the definitions of "Payment Conditions" and "RP/RDP Payment Conditions" to provide for a "lookback" for average Specified Availability over the prior 20 days; and/or

(g)        require the Borrower to incur Loans on the Closing Date of up to $300 million.

A "**Successful ABL Syndication**" shall be deemed to have occurred when Citi holds no more than ███████ in the aggregate of commitments and loans under the ABL Facility and Barclays holds no more than ███████ in the aggregate of commitments and loans under the ABL Facility

A "**Frustrated Syndication**" shall be deemed to have occurred with respect to the ABL Facility, if syndication of the ABL Facility has not been completed as a result of the Company's failure to comply with Section 6.10 of the Acquisition Agreement.

It is understood and agreed that, notwithstanding anything to the contrary set forth herein or in the ABL Commitment Letter (but without limiting any additional drawings under the ABL Facility permitted on the Closing Date as set forth in the ABL Commitment Letter), in the event that the Requisite ABL Arrangers elect to implement any upfront fees with respect to the ABL Facility under the "market flex" provisions in this Fee Letter, the Borrower will have the option to fund any such upfront fees through a drawing under the ABL Facility on the Closing Date which shall be deemed to be part of the aggregate committed amount of the ABL Facility committed to be provided by the applicable Initial Lenders pursuant to the ABL Commitment Letter for all purposes of the ABL Commitment Letter and this Fee Letter, in each case, in an amount equal to the entire amount of such upfront fees.

It is understood and agreed that, notwithstanding anything to the contrary set forth herein or in the ABL Commitment Letter, any increase of interest rate margin, or upfront fees pursuant to any exercise of "market flex" described above shall be accompanied by corresponding changes in any incurrence-based tests in the ABL Facility Documentation in order to provide a level of headroom at least equal to that contemplated on the basis of the interest rate margins, upfront fees and facility sizes set forth as indicative terms in <u>Exhibit B</u> to the ABL Commitment Letter.

It is further understood and agreed that prior to utilizing any flex rights under this Fee Letter, the Requisite ABL Arrangers shall notify the Sponsors and allow 2 business days for the Sponsors, the other Investors and their respective affiliates to participate in the syndication (but without reduction in the fees payable pursuant to the sections of this Fee Letter captioned "ABL Facility Fees") which may be before imposition of such flex or after imposition of such flex, as designated by the Sponsors in their sole discretion.

**<u>Miscellaneous</u>**

In consideration of the mutual covenants and agreements contained herein and in the ABL Commitment Letter, and until the ABL Facility is terminated in full in accordance with its terms. you hereby covenant and agree that you shall not enter (or permit any of your affiliates to enter) into any amendment, modification or waiver of the provisions of the documentation related to the reserve account to be entered into on the Closing Date (as disclosed to the Commitment Parties prior to the date hereof) governing release of cash in the reserve account (including the beneficiaries or recipients thereof) without the prior written consent of the ABL Administrative Agent.

The parties hereto hereby agree that the commitments of the Signing Date Lenders (as defined below) in respect of the ABL Facility will be reduced by the amount of the commitments of the Additional Agents (or their relevant affiliates) and the Lenders obtained in accordance with the ABL Commitment Letter as follows (unless the Signing Date Lenders otherwise agree): (i) *first*, on a pro rata basis across the Signing Date Lenders until the commitment of each Signing Date Lender in respect of the ABL Facility is ███████ individually; (ii) *second*, on a ███ to ███ basis across the Signing Date Lenders in favor of Citi (whereby ███ of any commitments so obtained will reduce the commitment of Citi in respect of the ABL Facility and ███ of any commitments so obtained will reduce the commitment of Barclays in respect of the ABL Facility) until the commitment of Citi in respect of the ABL Facility is ███████ individually; and (iii) *third*, on a pro rata basis across the ABL Facility until the Syndication Date. As used herein, the "***Signing Date Lenders***" means Citi and Barclays, collectively.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the ABL Commitment Letter if accepted in accordance with its terms. This Fee Letter may not be amended or waived except by an instrument in writing signed by you and us. This Fee Letter may not be assigned by any party hereto (other than to a permitted assignee of the ABL Commitment Letter in connection with an assignment by you of the ABL Commitment Letter to such permitted assignee) without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld or delayed), and any attempted assignment without such consent

shall be null and void.  This Fee Letter, and any claim, controversy or dispute arising under, or related to, this Fee Letter (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof), shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.  This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.  This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Fee Letter by facsimile transmission or electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the ABL Commitment Letter.

[Remainder of this page intentionally left blank]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement between us.

Very truly yours,

**BARCLAYS BANK PLC**

By _Adam Schnapper_____
    **Name: Adam Schnapper**
    **Title: Managing Director**

[Signature Page to Project Horizon Fee Letter]

**CITIGROUP GLOBAL MARKETS INC.**

By _____
    Name: Christopher Marino
    Title:   Vice President & Director

Accepted and agreed to as of
the date first above written:

**AMBER ENERGY INC.**


By: _____
Name:
Title:

**E-5**

**BID EXECUTION VERSION**

**CITIGROUP GLOBAL MARKETS INC.**                    **BARCLAYS**
388 Greenwich Street                                745 Seventh Avenue
New York, NY 10013                                  New York, NY 10019


<u>**CONFIDENTIAL**</u>

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attention: Christina Park

**Project Horizon**
**$2,000 million Senior Secured Asset-Based Revolving Credit Facility**
<u>**Arranger Fee Letter**</u>

Ladies and Gentlemen:

     Reference is made to the ABL Commitment Letter dated the date hereof (together with all exhibits, schedules and annexes thereto, the "***ABL Commitment Letter***") among Barclays Bank PLC ("***Barclays***"), Citi (as defined below and, together with Barclays, collectively, the "***Initial Arrangers***", "***we***" or "***us***"), you and the other parties thereto.  Unless otherwise defined herein, capitalized terms used herein have the meanings assigned to them in the ABL Commitment Letter. You agree to pay (or cause to be paid) the fee set forth in this Arranger Fee Letter in accordance with the other terms and conditions set forth herein.

     For purposes of this Arranger Fee Letter, "***Citi***" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

**1.**    <u>**Arrangement Fee**</u>

     As consideration for the agreements of the Initial Arrangers under the ABL Commitment Letter, and in addition to any fees or other amounts payable by you to us in connection with the transactions contemplated by the ABL Commitment Letter, you agree to pay (or cause to be paid) to each Initial Arranger, for its own account, (1) a non-refundable arrangement fee (the "***Split Arrangement Fee***") equal to ███████████ of the aggregate principal amount of the commitments under the ABL Facility on the Closing Date, of which ████████████ of such fee shall be payable to Citi and ████████████ of such fee shall be payable to Barclays, and (2) a non-refundable arrangement fee (the "***Pro Rata Arrangement Fee***" and, together with the Split Arrangement Fee, the "***Arrangement Fees***") equal to ████████████ ████ of the aggregate commitments under the ABL Facility on the Closing Date, which fee shall be divided among the Initial Arrangers based on their pro rata share of the commitments under the ABL Facility held by the Initial Arrangers on the Closing Date.  The Arrangement Fees will be earned and due and payable in full on, and subject to the occurrence of, the Closing Date.

1

2.    **Fees Generally**

You agree that, once paid, the fees or any part thereof payable hereunder will not be refundable under any circumstances. All fees payable hereunder will be payable in U.S. dollars in immediately available funds to the applicable Initial Arranger for its own account, or as directed by it, and, in any case, shall not be subject to counterclaim or set-off for, or be otherwise affected by, any claim or dispute relating to any other matter. In addition, all such payments shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings (a "**Tax Deduction**") imposed by any national, state or local taxing authority, or will otherwise be grossed up by you in respect of such Tax Deduction, except (i) to the extent such Tax Deduction is imposed on, or measured by reference to, net income and such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any connection of the payee with the jurisdiction of such taxing authority (other than a connection arising solely from the execution, delivery and performance of the ABL Commitment Letter or this Arranger Fee Letter, any transaction contemplated by or pursuant to the ABL Commitment Letter or this Arranger Fee Letter, or the receipt of payments under the ABL Commitment Letter or this Arranger Fee Letter), (ii) to the extent such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any failure of the payee to provide any applicable documentation permitting such payments to be made without (or at a reduced rate of) withholding that is reasonably requested by you and that it is legally eligible to provide, (iii) any U.S. federal withholding tax imposed on amounts payable to or for the account of such payee pursuant to applicable law in effect on the date hereof, and (iv) any U.S. federal withholding tax imposed pursuant to Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended, as of the date hereof (or any amended or successor version of such Sections that is substantively comparable and not materially more onerous to comply with) or any Treasury Regulations, other official administrative guidance or intergovernmental agreements implementing such Sections. You agree that we may, in our sole discretion, share all or any portion of any fees payable hereunder with any other Lender.

3.    **General**

It is understood and agreed that this Arranger Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the ABL Commitment Letter if accepted in accordance with its terms. This Arranger Fee Letter may not be amended or waived except by an instrument in writing signed by you and us. This Arranger Fee Letter may not be assigned by any party hereto (other than to a permitted assignee of the ABL Commitment Letter in connection with an assignment by you of the ABL Commitment Letter to such permitted assignee) without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld or delayed), and any attempted assignment without such consent shall be null and void. This Arranger Fee Letter, and any claim, controversy or dispute arising under, or related to, this Arranger Fee Letter (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof), shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Arranger Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Arranger Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.

Delivery of an executed signature page of this Arranger Fee Letter by facsimile transmission or electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

You agree that you will not disclose, directly or indirectly, this Arranger Fee Letter and the contents hereof to any person or entity without the prior written approval of the Initial Arrangers (which may be provided by electronic means) (such approval not to be unreasonably withheld, conditioned or delayed), except (i) to the Sponsor, Investors and prospective equity investors, the Company (and any sellers or other direct or indirect equityholders with respect to the Company or you), the Special Master and Claimholders (each as defined in the Acquisition Agreement) and to your and any of their affiliates and your and their respective Related Parties, controlling persons or equity holders and to any other actual and/or potential co-investors, in each case, on a confidential basis (*provided*, that until after the Closing Date, any such disclosure to the Company (and any sellers or other direct or indirect equityholders thereof), its affiliates and their respective Related Parties, controlling persons or equity holders (each in its capacity as such), in each case, other than the Sponsor and its affiliates or respective Related Parties, shall be redacted in a customary manner), (ii) if the Initial Arrangers both consent in writing (such consent not to be unreasonably withheld or delayed) to such proposed disclosure, (iii) to the extent such information becomes publicly available other than by reason of improper disclosure in violation of any confidentiality obligation owing to us (including those set forth in this paragraph), (iv) to the extent such disclosure is required by the Court (as defined in the Acquisition Agreement), in which case you shall provide only a version redacted in a customary manner, unless an unredacted version is specifically requested or required by the Court, in which case an unredacted version may be provided or (v) to a tax authority, to the extent reasonably necessary in connection with the tax affairs of Holdings and/or its affiliates; *provided* that you may disclose (x) the aggregate amount of fees payable under this Arranger Fee Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to potential Lenders, potential lenders to the First Lien Term Facility, potential purchasers of the Third Lien Notes, potential hedging counterparties, potential counterparties to commercial agreements that are customary in the refining industry and to rating agencies in connection with obtaining ratings for the Borrower and any term loans or debt securities, (y) the aggregate fee amount contained in this Arranger Fee Letter as part of Projections, pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering and marketing materials for the ABL Facility, the First Lien Term Facility, the Third Lien Notes or any other debt securities or in any public or regulatory filing relating to the Transactions and (z) this Arranger Fee Letter in connection with the enforcement of your rights hereunder. The provisions of this paragraph shall automatically terminate on the second anniversary of the date hereof.

Your obligations under this Arranger Fee Letter are in addition to all of your obligations under any other agreement between you and us. All fees received by an Initial Arranger hereunder may be shared among it and its affiliates as such Initial Arranger may determine in its sole discretion. In addition, please note that the Initial Arrangers and their respective affiliates do not provide tax, accounting or legal advice. The provisions of this Arranger Fee Letter will survive the expiration or termination of the ABL Commitment Letter (including any extensions thereof) and the funding of the ABL Facility.

*[The remainder of this page is intentionally left blank.]*

3

Very truly yours,

**BARCLAYS BANK PLC**


**By** *Adam Schnapper*

    **Name: Adam Schnapper**
    **Title: Managing Director**

[Signature Page to Project Horizon Fee Letter]

**CITIGROUP GLOBAL MARKETS INC.**

By _____

    Name: Christopher Marino
    Title:  Vice President & Director

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Arranger Fee Letter shall become a binding agreement between us.

Accepted and agreed to as of the date first written above:

**AMBER ENERGY INC.**


By: _____
Name:
Title:

# E-6

**BID EXECUTION VERSION**

**CITIGROUP GLOBAL MARKETS INC.**
**388 Greenwich Street**
**New York, New York 10013**

<u>**CONFIDENTIAL**</u>

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attention: Christina Park

**Project Horizon**
**$2,000 million Senior Secured Asset-Based Revolving Credit Facility**
<u>**Structuring Fee Letter**</u>

Ladies and Gentlemen:

Reference is made to the ABL Commitment Letter dated the date hereof (together with all exhibits, schedules and annexes thereto, the "***ABL Commitment Letter***") among Citi (as defined below), you and the other parties thereto. Unless otherwise defined herein, capitalized terms used herein have the meanings assigned to them in the ABL Commitment Letter. You agree to pay (or cause to be paid) the fee set forth in this Structuring Fee Letter in accordance with the other terms and conditions set forth herein.

For purposes of this Structuring Fee Letter, "***Citi***" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

1.    <u>**Structuring Fee**</u>

As consideration for Citi's services in structuring the ABL Facility, and in addition to any fees or other amounts payable by you to Citi in connection with the transactions contemplated by the ABL Commitment Letter, you agree to pay (or cause to be paid) to Citi, for its own account, a non-refundable structuring fee equal to ▓▓▓▓▓▓, the full amount of which shall be earned and due and payable on, and subject to the occurrence of, the Closing Date.

2.    <u>**Fees Generally**</u>

You agree that, once paid, the fees or any part thereof payable hereunder will not be refundable under any circumstances. All fees payable hereunder will be payable in U.S. dollars in immediately available funds to Citi for its own account, or as directed by it, and, in any case, shall not be subject to counterclaim or set-off for, or be otherwise affected by, any claim or dispute relating to any other matter. In addition, all such payments shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings (a "***Tax Deduction***") imposed by any national, state or local taxing authority, or will otherwise be grossed up by you in respect of such Tax Deduction, except (i) to the extent such Tax Deduction is imposed on, or

1

measured by reference to, net income and such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any connection of the payee with the jurisdiction of such taxing authority (other than a connection arising solely from the execution, delivery and performance of the ABL Commitment Letter or this Structuring Fee Letter, any transaction contemplated by or pursuant to the ABL Commitment Letter or this Structuring Fee Letter, or the receipt of payments under the ABL Commitment Letter or this Structuring Fee Letter), (ii) to the extent such Tax Deduction would not have been imposed (or would have been imposed but at a lower rate) but for any failure of the payee to provide any applicable documentation permitting such payments to be made without (or at a reduced rate of) withholding that is reasonably requested by you and that it is legally eligible to provide, (iii) any U.S. federal withholding tax imposed on amounts payable to or for the account of such payee pursuant to applicable law in effect on the date hereof, and (iv) any U.S. federal withholding tax imposed pursuant to Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended, as of the date hereof (or any amended or successor version of such Sections that is substantively comparable and not materially more onerous to comply with) or any Treasury Regulations, other official administrative guidance or intergovernmental agreements implementing such Sections. You agree that we may, in our sole discretion, share all or any portion of any fees payable hereunder with any other Lender.

**3.    General**

It is understood and agreed that this Structuring Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the ABL Commitment Letter if accepted in accordance with its terms. This Structuring Fee Letter may not be amended or waived except by an instrument in writing signed by you and us. This Structuring Fee Letter may not be assigned by any party hereto (other than to a permitted assignee of the ABL Commitment Letter in connection with an assignment by you of the ABL Commitment Letter to such permitted assignee) without the prior written consent of the other parties hereto (such consent not to be unreasonably withheld or delayed), and any attempted assignment without such consent shall be null and void. This Structuring Fee Letter, and any claim, controversy or dispute arising under, or related to, this Structuring Fee Letter (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof), shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Structuring Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Structuring Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Structuring Fee Letter by facsimile transmission or electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

You agree that you will not disclose, directly or indirectly, this Structuring Fee Letter and the contents hereof to any person or entity without the prior written approval of Citi (which may be provided by electronic means) (such approval not to be unreasonably withheld, conditioned or delayed), except (i) to the Sponsor, Investors and prospective equity investors, the Company (and any sellers or other direct or indirect equityholders with respect to the Company or you), the Special Master and Claimholders (each as defined in the Acquisition Agreement) and to your and

any of their affiliates and your and their respective Related Parties, controlling persons or equity holders and to any other actual and/or potential co-investors, in each case, on a confidential basis (*provided*, that until after the Closing Date, any such disclosure to the Company (and any sellers or other direct or indirect equityholders thereof), its affiliates and their respective Related Parties, controlling persons or equity holders (each in its capacity as such), in each case, other than the Sponsor and its affiliates or respective Related Parties, shall be redacted in a customary manner), (ii) if Citi consents in writing (such consent not to be unreasonably withheld or delayed) to such proposed disclosure, (iii) to the extent such information becomes publicly available other than by reason of improper disclosure in violation of any confidentiality obligation owing to us (including those set forth in this paragraph), (iv) to the extent such disclosure is required by the Court (as defined in the Acquisition Agreement), in which case you shall provide only a version redacted in a customary manner, unless an unredacted version is specifically requested or required by the Court, in which case an unredacted version may be provided or (v) to a tax authority, to the extent reasonably necessary in connection with the tax affairs of Holdings and/or its affiliates; *provided* that you may disclose (x) the aggregate amount of fees payable under this Structuring Fee Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to potential Lenders, potential lenders to the First Lien Term Facility, potential purchasers of the Third Lien Notes, potential hedging counterparties, potential counterparties to commercial agreements that are customary in the refining industry and to rating agencies in connection with obtaining ratings for the Borrower and any term loans or debt securities, (y) the aggregate fee amount contained in this Structuring Fee Letter as part of Projections, pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering and marketing materials for the ABL Facility, the First Lien Term Facility, the Third Lien Notes or any other debt securities or in any public or regulatory filing relating to the Transactions and (z) this Structuring Fee Letter in connection with the enforcement of your rights hereunder.  The provisions of this paragraph shall automatically terminate on the second anniversary of the date hereof.

Your obligations under this Structuring Fee Letter are in addition to all of your obligations under any other agreement between you and us.  All fees received by Citi hereunder may be shared among Citi and its affiliates as Citi may determine in its sole discretion.  In addition, please note that neither Citi nor any of its affiliates provide tax, accounting or legal advice.  The provisions of this Structuring Fee Letter will survive the expiration or termination of the ABL Commitment Letter (including any extensions thereof) and the funding of the ABL Facility.

[*The remainder of this page is intentionally left blank.*]

Very truly yours.

**CITIGROUP GLOBAL MARKETS INC.**

By: _____

Name: Christopher Marino

Title: Vice President & Director

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Structuring Fee Letter shall become a binding agreement between us.

Accepted and agreed to as of the date first written above:

**AMBER ENERGY INC.**


By: _____
Name:
Title:

[SIGNATURE PAGE TO PROJECT HORIZON STRUCTURING FEE LETTER]

# E-7

*Execution Version*

Elliott Associates, L.P.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor
West Palm Beach, FL 33401

Elliott International, L.P.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor
West Palm Beach, FL 33401

Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Floor,
Los Angeles, CA 90071

Carronade Capital Management, LP
17 Old Kings Hwy South, Ste 140
Darien, CT 06820

Rubric Capital Management LP
155 East 44th Street, Suite 1630
New York, NY 10017

Jefferies Capital Services, LLC
520 Madison Avenue
New York, NY 10019

Silver Point Capital, L.P.
Two Greenwich Plaza
Greenwich, CT 06830

**CONFIDENTIAL**

August 22, 2025

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th floor
West Palm Beach, FL 33401
Attn: Christina Park

Project Horizon
Convertible Note Commitment Letter

Ladies and Gentlemen:

You have advised Elliott Associates, L.P., a Delaware limited partnership ("***Elliott
Associates***"), Elliott International, L.P., a Cayman Islands limited partnership ("***Elliott
International***"), Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts
managed by it or an affiliate, or one or more entities owned by such funds or accounts ( "***Oaktree***"),
Carronade Capital Master, LP ("***CCM***") and Crown/Carronade Segregated Portfolio ("***CCSP***" and
together with CCM, "***Carronade***"), Rubric Capital Management LP ("***Rubric***"), Jefferies Capital
Services, LLC ("***Jefferies***"), Silver Point Capital, L.P. acting on behalf of certain funds and
accounts managed by it or an affiliate ("***Silver Point***"), FM Amber Investments LLC ("***FM***")**,**
Manifest Energy Transition Company, LLC ("***Manifest***") and Gregory J. Goff ("***Goff***" and
together with Elliott Associates, Elliott International, Oaktree, Carronade, Rubric, Jefferies, Silver
Point, FM, Manifest and Goff, collectively, the "***Initial Holders***", "***Commitment Parties***", "***we***",
"***our***" or "***us***"), that Amber Energy Inc., a Delaware corporation ("***Holdings***" or "***you***") controlled,
directly or indirectly, by Elliott Investment Management L.P. ("***Elliott***") and its affiliates
(including controlled affiliates and controlled investment funds, including Elliott Associates and
Elliott International) (collectively, the "***Sponsor***"), intends to cause a newly formed direct or
indirect subsidiary of Holdings ("***Purchaser***") to acquire (the "***Acquisition***"), directly or indirectly,
beneficial ownership of the equity interests of a company previously identified by you to us as
"Horizon" (the "***Company***"). You have further advised us that, in connection with the foregoing,

you and the Company intend to consummate the other Transactions described in the Transaction Description attached hereto as <u>Exhibit A</u> (the "***Transaction Description***"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Transaction Description, the Summary of Principal Terms and Conditions attached hereto as <u>Exhibit B</u> (the "***Convertible Note Term Sheet***"), the Conditions to Closing attached hereto as <u>Exhibit C</u> (the "***Conditions***"), or the governance term sheet attached hereto as <u>Exhibit D</u> (the "***Governance Term Sheet***"); this commitment letter, the Transaction Description, the Convertible Note Term Sheet, the Conditions, and the Governance Term Sheet, collectively, this "***Commitment Letter***".

1.    <u>Commitments; Titles and Roles</u>.

In connection with the Transactions, each of the Initial Holders is pleased to advise you of its several and not joint commitment to purchase, directly or through one or more of its affiliates or managed funds, the percentage of the entire aggregate principal amount of the Convertible Notes set forth opposite such Initial Holder's name on <u>Schedule I</u> hereto (as such schedule may be amended or supplemented in accordance with this Commitment Letter, including any modification as a result of Elliott's election in its sole and absolute discretion to increase such aggregate principal amount by the Flex Amount in accordance with the Convertible Notes Term Sheet), subject only to the satisfaction (or waiver by the applicable Commitment Parties) of the conditions set forth or referred to in the section entitled "Conditions to Closing" in <u>Exhibit B</u> hereto (limited on the Closing Date as indicated therein and in <u>Section 4</u> hereof).

Each Initial Holder hereby acknowledges that (a) concurrently with the entry by the United States District Court for the District of Delaware of a sale order approving the Acquisition (the "***Sale Order Entry***"), you will be obligated to make a good faith deposit in an aggregate amount equal to $50 million (the "***Deposit***") in accordance with the Bidding Procedures Order (as defined below) and (b) in addition to the Deposit, following the Sale Order Entry, you may require other cash funding prior to the Closing to pay bona fide operational expenses of Holdings incurred prior to, in anticipation of, and in connection with, the Closing, but not expenses incurred prior to the date of the Sale Order Entry and in no event with respect to professional advisors of the Purchaser or the Sponsor or any of their respective affiliates that are not employees of the Sponsor or any affiliates of the Sponsor, which shall only be paid at Closing (the "***Pre-Closing Expenses***"). Accordingly, from time to time following the date on which you, the Sponsor, or any of your or its respective affiliates enter into any binding agreement to acquire, in whole or in part, directly or indirectly, the assets or any other interest in PDV Holding, Inc., each Initial Holder shall promptly (and in any event within five Business Days (as defined in the Acquisition Agreement) following your written request therefore (a "***Funds Request***")), fund such Initial Holder's pro rata share of the Deposit and Pre-Closing Expenses, in each case, as set forth on <u>Schedule II</u> attached hereto by wire transfer of immediately available funds to an account designated in writing by the Sponsor in such Funds Request. Each Funds Request shall specify the proposed use of the requested funds (either to pay the Deposit, on the one hand, or to pay such Pre-Closing Expenses as set forth in reasonable detail in such Funds Request, on the other hand), and you shall use such amounts so funded in accordance with the uses articulated in the applicable Funds Request; *provided* that in no event shall the Initial Holders have an obligation to fund (x) with respect to the Deposit, an aggregate amount in excess of $50 million and (y) with respect to Pre-Closing Expenses, an aggregate amount during any consecutive 180-day period in excess of $4 million or such other amount as agreed by the Commitment Parties holding at least a majority of all commitments of all

Commitment Parties at such time. At Closing, each Initial Holder's pro rata share of the Deposit and any Pre-Closing Expenses as funded by such Initial Holder pursuant to this paragraph shall be credited against and shall reduce such Initial Holder's aggregate commitment set forth on Schedule I and such funded amounts shall be deemed to have accrued interest at the applicable interest rate set forth in the Convertible Note Term Sheet from the date of such funding. In the event that (x) you are entitled to receive a return of the Deposit in accordance with the terms and conditions of the Acquisition Agreement and elect to waive such entitlement (unless such waiver is otherwise consented to by the Initial Holders, such consent not to be unreasonably withheld, conditioned or delayed) or (y) the Deposit is returned to you in accordance with the terms and conditions of the Acquisition Agreement, then in each case, you shall promptly (and in any event within five Business Days following receipt thereof) return to each Initial Holder their pro rata share of the Deposit as funded by such Initial Holder pursuant to this paragraph. In the event that the Acquisition Agreement has been terminated pursuant to Section 8.1(d) thereof and you, the Sponsor or any of your or its affiliates have received monetary damages in connection with such termination, such proceeds (after payment of fees and expenses in connection with such termination) shall first be used to return to each Initial Holder up to its pro rata share of the Deposit and any Pre-Closing Expenses as funded by such Initial Holder pursuant to this paragraph (together with interest on such amounts as if amounts funded accrued interest at the applicable interest rate set forth in the Convertible Note Term Sheet from the date of such funding), and thereafter the remainder shall be shared pro rata among the Commitment Parties based on each Commitment Party's commitment at such time as increased by such Commitment Party's bona fide and documented out-of-pocket expenses incurred in connection with the transactions contemplated by this Commitment Letter and the Acquisition Agreement as of the date of such termination.

In consideration of the agreement by each Initial Holder to fund its pro rata share of the Deposit and Pre-Closing Expenses pursuant to the preceding paragraph, you agree that you shall not, nor shall you cause the Sponsor or any of its or your affiliates to, without the prior consent of the Initial Holders (not to be unreasonably withheld, conditioned or delayed), affirmatively take any action relating to the Acquisition Agreement or the transactions contemplated thereby that you have knowledge that, if taken, would reasonably be expected to result in a Deposit Forfeiture Event (as such term is defined in the Acquisition Agreement) under the Acquisition Agreement in accordance with the terms thereof (it being understood that the parties hereto agree that any decision by you or the Purchaser (x) not to litigate to obtain any approval of any Governmental Body (as such term is defined in the Acquisition Agreement) necessary to consummate the Transactions as required by the Acquisition Agreement or (y) to take any other action that would reasonably be expected to result in the Special Master having the right to terminate the Acquisition Agreement pursuant to Section 8.1(e) of the Acquisition Agreement is, in each case, an affirmative action which you have knowledge that, if taken, would reasonably be expected to result in a Deposit Forfeiture Event (any such action, a "***Trigger Action***"). In the event that you or the Purchaser take any Trigger Action without the prior consent of the Initial Holders (which consent was not unreasonably withheld, conditioned or delayed), then the Initial Holders shall be entitled to (i) reimbursement by Elliott Associates and Elliott International of the Deposit and Pre-Closing Expenses paid by the Initial Holders pursuant to this Commitment Letter and (ii) reimbursement by Eliott Associates and Elliott International for any reasonable costs of enforcement incurred by the Initial Holders in seeking to enforce such remedies.

It is agreed that a third-party agent will act as administrative agent and collateral agent for the Convertible Notes (in such capacity, the "*CN Agent*"). Except as set forth in this <u>Section 1</u>, you agree that no other agents, co-agents, arrangers or bookrunners will be appointed, no other titles will be awarded and no compensation (other than compensation expressly contemplated by this Commitment Letter) will be paid to any Holder (as defined below) in order to obtain its commitment to participate in the Convertible Notes unless you and we shall so agree.

Except as expressly set forth in <u>Section 9</u>, (a) no Initial Holder shall be relieved, released or novated from its obligations hereunder (including, subject to the satisfaction of the conditions set forth herein, its obligation to purchase its respective portion of Convertible Notes on the date of the consummation of the Acquisition (the "*Closing*" and the date of such purchase, the "*Closing Date*")) in connection with any assignment or participation of the Convertible Notes, including its commitments in respect thereof, until after the Closing Date has occurred, and we will not enter into any transaction that is designed or intended to relieve us of our commitments set forth herein to purchase the Convertible Notes (except as otherwise set forth in <u>Section 9</u>), and (b) unless you otherwise agree in writing, each Initial Holder shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Convertible Notes, including all rights with respect to consents, modifications, supplements, waivers and amendments, until after the Closing Date has occurred.

Rusoro Mining Ltd., a British Columbia corporation ("*Rusoro*"), has obtained and served a writ of attachment fieri facias against Petróleos de Venezuela, S.A.'s equity interest in PDV Holding, Inc. in the following supplemental proceeding: Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela, No. 21 Misc. 481 (D. Del.) (including, for the avoidance of doubt, all accrued interest as of the Closing, the "*Rusoro Claim*"). The Rusoro Claim constitutes an Attached Judgment Claim as defined in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters [D.I. 481]* (as amended, modified, supplemented or superseded, the "*Bidding Procedures Order*"), dated October 4, 2022, in the case of Crystallex International Corporation v. Bolivarian Republic of Venezuela, No. 17 Misc. 151 (D. Del.). Holdings and Rusoro have entered into that certain Commitment Letter, dated as of August 11, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "*Rusoro Commitment Letter*"), pursuant to which, among other things, Rusoro has agreed to extinguish the Rusoro Claim in exchange for consideration consisting in part of Convertible Notes issued to Rusoro on the Closing Date in an aggregate principal amount up to $650,000,000 (the "*Rusoro Notes*") on terms consistent in all respects with the Convertible Note Term Sheet as applicable to the Specified Writholders. The issuance of the Rusoro Notes to Rusoro on the Closing Date shall in no event modify or reduce the commitments of the Commitment Parties to purchase the Convertible Notes as set forth in this Commitment Letter.

Koch Minerals Sàrl ("*Koch Minerals*") and Koch Nitrogen International Sàrl ("*Koch Nitrogen*" and, together with Koch Minerals, the "*Koch Parties*" and each individually, a "*Koch Party*") have each obtained an Attached Judgment Claim (as defined in the Bidding Procedures Order) (each, a "*Koch Claim*" and together, the "*Koch Claims*") and have entered into that certain Support Agreement, dated as of August 11, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "*Koch Support Letter*"), pursuant to which, among other things,

the Koch Parties have agreed to extinguish the Koch Claims in exchange for consideration consisting in part of Convertible Notes issued to the Koch Parties on the Closing Date in an aggregate principal amount up to $150,000,000 (the "***Koch Notes***") on terms consistent in all respects with the Convertible Note Term Sheet as applicable to the Specified Writholders. The issuance of the Koch Notes to the Koch Parties on the Closing Date shall in no event modify or reduce the commitments of the Commitment Parties to purchase the Convertible Notes as set forth in this Commitment Letter.

The Commitment Parties acknowledge and agree that the "Specified Writholders" referred to in the Convertible Notes Term Sheet are, collectively, Rusoro and the Koch Parties.

2.    <u>Holdings' Commitment to Draw; Exclusivity; Expenses</u>.

Each of you and the Sponsor hereby covenant and agree that if (x) you, the Sponsor, or any of your or its respective affiliates enter into any binding agreement to acquire, in whole or in part, directly or indirectly, the assets or any other interest in PDV Holding, Inc. on terms that are substantially consistent in all material respects with the Transaction Description and the Support Agreements (as defined below) and (y) the Sale Order Entry Deadline is satisfied, then you shall issue the Convertible Notes for such acquisition pursuant to the terms of this Commitment Letter and the Convertible Notes Term Sheet (other than any Flex Amounts, which shall be drawn in the Sponsor's sole discretion), which issuance shall be subject to reduction in the event that lesser amounts of cash are required by you to consummate such acquisition as a result of available balance sheet cash of the Company or its subsidiaries (solely with respect to available balance sheet cash of the Company or its subsidiaries or availability under the ABL Facility, in each case, as of the consummation of such acquisition, and not, for the avoidance of doubt, with respect to any available balance sheet cash sourced from an equity, bank, debt securities or other credit or equity financing, including on terms substantially consistent with, or more or less favorable to the Company than, the Convertible Note Term Sheet)), unless (a) any Commitment Party has otherwise terminated its commitment under this Commitment Letter prior to its stated expiry date (other than a termination resulting from your breach of your obligations hereunder), (b) such Commitment Party has breached its obligations or otherwise affirmatively declined in writing to provide its portion of the Convertible Notes on the terms and conditions of this Commitment Letter (including the Convertible Notes Term Sheet), or (c) such Commitment Party has failed to reaffirm in writing (promptly after the Sponsor's request) its willingness to fund its portion of the Convertible Notes on such terms, to the extent such reaffirmation is reasonably necessary in light of the relevant facts and circumstances. "***Support Agreements***" means, collectively, the Rusoro Commitment Letter, the Koch Support Letter, and that certain Transaction Support Agreement dated as of August 12, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "***TSA***") by and among the Company and holders of Petróleos de Venezuela, S.A.'s 8.50% senior secured notes due in 2020 (the "***2020 Bonds***") representing more than two-thirds of the outstanding principal amount of 2020 Bonds. The "***Sale Order Entry Deadline***" shall mean a requirement that the Sale Order Entry shall have occurred on or before December 1, 2025, as such date may be extended pursuant to the TSA.

Upon the issuance of the Convertible Notes in accordance with this Commitment Letter, you agree to reimburse the Initial Holders for their reasonable and documented in reasonable detail out-of-pocket expenses (including expenses of the Initial Holders' due diligence investigation, and

reasonable and documented out-of-pocket fees, disbursements and other charges of Latham & Watkins LLP and Vinson & Elkins LLP, and, if reasonably necessary, of a single local counsel to the Initial Holders in each relevant material jurisdiction, which may be a single local counsel acting in multiple material jurisdictions and in the case of any actual or perceived conflict of interest, one additional counsel in each relevant material jurisdiction), in each case, incurred solely in connection with due diligence and the preparation, negotiation, execution and delivery of the Commitment Letter and the Convertible Notes and the Convertible Note Documentation and subject in all events to an aggregate cap of $5,000,000, with such cap to be apportioned two-thirds and one-third respectively between the Initial Holders represented by Latham & Watkins, on the one hand, and the Initial Holders represented by Vinson & Elkins LLP, on the other hand (collectively, the "***Expenses***"). For the avoidance of doubt, you will not be required to reimburse the Initial Holders for any Expenses in the event the Closing Date does not occur. You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us, including, without limitation, fees paid pursuant hereto.

3. <u>Information</u>.

You hereby represent and warrant that (with respect to Information (as defined below) and all other forecasts, financial estimates and other forward looking information (such forecasts, financial estimates and other forward looking information, collectively, the "***Projections***") relating to the Company, its subsidiaries and its and their respective businesses, to your knowledge): (i) all written information and written data, other than (x) the Projections, (y) third party reports and/or memoranda and (z) information of a general economic or industry specific nature (the "***Information***"), that has been or will be made available to any Commitment Party by you or, at your direction, by any of your representatives on your behalf in connection with the transactions contemplated hereby, when taken as a whole, is or will be, when furnished, correct in all material respects and does not or will not, when furnished and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto) and (ii) the Projections that have been or will be made available to us by you or, at your direction, by any of your representatives on your behalf in connection with the transactions contemplated hereby have been or will be, when taken as a whole, prepared in good faith based upon assumptions that are believed by you to be reasonable at the time such Projections are so furnished; it being understood that the Projections are predictions as to future events and are not to be viewed as facts or as a guarantee of performance, that the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material. You agree that if, at any time prior to the Closing Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if such representations were being made at such time, then you will (or, with respect to the information relating to the Company, its subsidiaries or their respective operations or assets, will, in all instances to the extent not in contravention of the Acquisition Agreement, use commercially reasonable efforts to) promptly supplement the Information and such Projections such that (with respect to Information and Projections relating to the Company, its subsidiaries and their respective

businesses, to your knowledge) such representations and warranties are correct in all material respects under those circumstances, it being understood in each case that such supplementation shall cure any breach of such representations and warranties. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the commitments and obligations of the Commitment Parties hereunder or the purchase of Convertible Notes on the Closing Date. The Commitment Parties do not assume any responsibility for the accuracy or completeness of the Information or the Projections.

4.     Conditions.

        Other than each Initial Holder's obligation to fund their pro rata share of the Deposit and any Pre-Closing Expenses as described in Section 1 above, the commitments of the Initial Holders hereunder to purchase the Convertible Notes on the Closing Date and the agreements of the Commitment Parties to perform the services described herein are subject solely to the conditions set forth in the section entitled "Conditions to Closing" in Exhibit B hereto, and upon satisfaction (or waiver by the applicable Commitment Parties in writing) of such conditions, the initial purchase of the Convertible Notes shall occur; it being understood and agreed that there are no other conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter or the Convertible Notes Documentation.

        Notwithstanding anything to the contrary in this Commitment Letter (including each of the exhibits attached hereto), the Convertible Notes Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making or accuracy of which shall be a condition to the purchase of the Convertible Notes on the Closing Date shall be (A) such of the representations and warranties made with respect to the Company in the Acquisition Agreement as are material to the interests of the applicable Commitment Parties (in their capacities as such), but only to the extent that Sponsor (or its applicable affiliates) has the right (taking into account any applicable cure provisions) to terminate its (or such affiliates') obligations under Section 8.1(d) of the Acquisition Agreement (in accordance with the express terms thereof) as a result of a breach of any of such representations and warranties without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates), or to decline to consummate the Acquisition (in each case in accordance with the terms of the Acquisition Agreement) as a result of a breach of any of such representations and warranties without any liability to, and without resulting in the payment of any fees, liquidated damages or other amounts by, Sponsor (or its affiliates) under Section 8.1(d) of the Acquisition Agreement (in accordance with the express terms thereof) (to such extent, the "***Specified Acquisition Agreement Representations***") and (B) the Specified Representations (as defined below), and (ii) the terms of the Convertible Notes Documentation and the First Lien Facility Closing Deliverables (as defined in Exhibit C) shall be in a form such that they do not impair the availability or purchase of the Convertible Notes on the Closing Date if the conditions expressly set forth or referred to in the section entitled "Conditions to Closing" in Exhibit B are satisfied (or waived by all Initial Holders in writing); *provided* that to the extent any security interest in any Collateral (as defined in the Convertible Note Term Sheet) is not or cannot be provided, validated, created, perfected and/or given priority on the Closing Date (other than the pledge and perfection of the security interest in the equity interests of the Issuer and each Guarantor (other than Holdings) (*provided* that any such certificates, other than certificated equity securities of the Issuer, will be required to be delivered

on the Closing Date only to the extent actually received from the Company after your use of commercially reasonable efforts to obtain such certificates) and other assets pursuant to which a lien may be perfected by the filing of a financing statement under the Uniform Commercial Code) after your use of commercially reasonable efforts to do so or without undue burden or expense, then the provision, validity, creation, perfection and/or priority of a security interest in such Collateral shall not constitute a condition to the availability of the Convertible Notes on the Closing Date, but instead shall be required to be provided, validated, created, perfected and/or given the applicable priority within (x) with respect to delivery of executed (A) mortgages or mortgage amendments for the Company's real property containing refineries located in Lake Charles, LA, Corpus Christi, TX and Lemont, IL (the "***Refinery Properties***") and (B) customary opinions of local counsel in jurisdictions in which each of the Refinery Properties is located, as to the enforceability of the mortgages or mortgage amendments, 10 business days after the Closing Date (or such later date after the Closing Date as the CN Agent shall agree), (y) with respect to mortgagee title policies or date down endorsements to existing mortgagee title policies insuring the enforceability and lien priority of mortgages or existing mortgages as amended by the mortgage amendments, in such amounts as the Holders shall reasonably require, as well as customary surveys (or existing surveys together with affidavits of no change), in each case, for the Refinery Properties, 60 days after the Closing Date (or such later date after the Closing Date as the CN Agent shall agree) and (z) otherwise, 120 days after the Closing Date (or such later date after the Closing Date as the CN Agent shall agree). For purposes hereof, "***Specified Representations***" means the representations and warranties given by the Issuer and the Guarantors (after giving effect to the Transactions) set forth in the Convertible Notes Documentation relating to organizational existence of the Issuer and the Guarantors; power and authority, due authorization, execution and delivery and enforceability, in each case with respect solely to the Convertible Notes Documentation, and the other Transactions; due authorization and reservation of Amber Parent LP Interests (as defined in the Convertible Note Term Sheet); no conflicts with or consents under charter documents, in each case, related to the entering into and the performance of the Convertible Notes Documentation, the incurrence of the extensions of credit thereunder on the Closing Date, and consummation of the other Transactions; solvency as of the Closing Date (after giving effect to the Transactions and with solvency being determined in a manner consistent with <u>Annex I</u> to <u>Exhibit C</u> hereto) of Holdings and its subsidiaries on a consolidated basis; Federal Reserve margin regulations; the use of proceeds of the Convertible Notes not violating OFAC, FCPA or the PATRIOT Act; the Investment Company Act; no registration under the Securities Act of 1933, as amended; and, subject to the proviso in the immediately preceding sentence, creation, validity and perfection of security interests in the applicable Collateral (as defined in <u>Exhibit B</u>) (subject to permitted liens as set forth in the Convertible Notes Documentation). This paragraph, and the provisions herein, shall be referred to as the "***Certain Funds Provisions***".

For the avoidance of doubt, compliance by you and/or your affiliates with the terms and conditions of this Commitment Letter (other than the conditions expressly set forth in the section entitled "Conditions to Closing" in <u>Exhibit B</u> hereto) is not a condition to the Initial Holders' commitments to purchase the Convertible Notes hereunder on the terms set forth herein. The Commitment Parties acknowledge and agree that any failure of the Company and its subsidiaries to comply with the instructions of the Special Master pursuant to Section 6.10 of the Acquisition Agreement shall not be a condition to the initial issuance of the Convertible Notes or result in a failure to satisfy any condition to the initial issuance under the Convertible Notes Documentation.

5.    <u>Indemnity, Exculpation, etc</u>.

To induce the Commitment Parties to enter into this Commitment Letter and to proceed with the documentation of the Convertible Notes, you agree (i) to indemnify and hold harmless each Commitment Party, its affiliates, managed funds and controlling persons (in each case other than any Excluded Affiliate acting in its capacity as such) and the respective officers, directors, employees, agents, advisors, partners and other representatives of each of the foregoing (each, an "***Indemnified Person***"), from and against any and all losses, claims, damages and liabilities of any kind or nature and related reasonable and documented fees and out-of-pocket expenses, joint or several, to which any such Indemnified Person may become subject, in each case to the extent arising out of, resulting from or in connection with, this Commitment Letter (including the Convertible Note Term Sheet), the Transactions or any related transaction contemplated hereby, the Convertible Notes or any use of the proceeds thereof or any claim, litigation, investigation or proceeding (including any inquiry or investigation) relating to any of the foregoing (any of the foregoing, a "***Proceeding***"), regardless of whether any such Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other third person, and to reimburse each such Indemnified Person upon written demand for any reasonable and documented fees and out-of-pocket expenses of one counsel for all such Indemnified Persons taken as a whole and, if necessary, of a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnified Persons taken as a whole, and, solely in the case of an actual conflict of interest, one additional counsel in each applicable jurisdiction to the affected Indemnified Persons, and other reasonable and documented fees and out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (in each case, excluding allocated costs of in-house counsel and (without your prior written consent) the fees and expenses of any other third-party advisors); *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (a) the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of such Indemnified Person's controlling persons, controlled affiliates or any of its or their respective officers, directors, employees, agents or partners, in each case, who are involved in or aware of the Transactions (as determined by a court of competent jurisdiction in a final and non-appealable decision), (b) a material breach of the obligations of such Indemnified Person or any of such Indemnified Person's controlling persons or controlled affiliates under this Commitment Letter (including its obligation to fund its commitments hereunder), the Convertible Note Term Sheet (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (c) disputes solely between or among Indemnified Persons to the extent such disputes do not arise from any act or omission of you, the Sponsor, the other Investors, the Company or any of your or their respective affiliates; *provided* that each Indemnified Person, to the extent acting in its capacity as an agent or similar role under the Convertible Notes, shall remain indemnified in respect of such disputes. The foregoing provisions in this paragraph shall be superseded in each case, to the extent covered thereby, by the applicable provisions contained in the Convertible Notes Documentation upon execution thereof and thereafter shall have no further force and effect. For the avoidance of doubt, the indemnity provided in this paragraph shall not apply to any taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

Notwithstanding any other provision of this Commitment Letter, (i) no Commitment Party, nor its affiliates, managed funds and controlling persons (in each case other than any Excluded Affiliate acting in its capacity as such) and the respective officers, directors, employees, agents, advisors, partners and other representatives of each of the foregoing (it being understood that in no event will this exculpation apply to any Commitment Party or its affiliates or managed funds in their respective capacities as (x) financial advisors to you, the Sponsor, any other Investor or the Company or its subsidiaries in connection with the Acquisition or any other potential acquisition of the Company or (y) co-investors in the Transactions or any potential acquisition of the Company or its subsidiaries (each, a "**_Protected Person_**")) shall be liable for any damages arising from the use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent that such damages have resulted from (a) the willful misconduct, bad faith or gross negligence of such Protected Person or any of such Protected Person's controlling persons, controlled affiliates or any of its or their respective officers, directors, employees, agents or partners, in each case, who are involved in or aware of the Transactions or (b) any material breach of the obligations of such Protected Person or any of such Protected Person's affiliates under this Commitment Letter, the Convertible Note Term Sheet, in the case of <u>clauses (a)</u> and <u>(b)</u>, as determined by a court of competent jurisdiction in a final, non-appealable judgment, and (ii) none of us, you (or your affiliates), the Sponsor (or its affiliates), the Company (or its subsidiaries), the other Investors (or their affiliates) or any Protected Person shall be liable for any indirect, special, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) in connection with this Commitment Letter, the Transactions (including the Convertible Notes and the use of proceeds thereunder), or with respect to any activities related to the Convertible Notes, including the preparation of this Commitment Letter and the Convertible Notes Documentation; *provided* that nothing in this <u>clause (ii)</u> shall limit your indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Protected Person with respect to which the applicable Protected Person is entitled to indemnification as set forth in the immediately preceding paragraph (as qualified by <u>clause (i)</u> immediately above).

In case any Proceeding is instituted involving any Indemnified Person for which indemnification is to be sought hereunder by such Indemnified Person, then such Indemnified Person will promptly notify you of the commencement of such Proceeding; *provided*, *however*, that the failure to so notify you will not relieve you of any liability that you may have to such Indemnified Person pursuant to this <u>Section 5</u>, except to the extent you are materially prejudiced by such failure. In connection with any one Proceeding, you will not be responsible for the fees and expenses of more than one separate law firm for all Indemnified Persons in respect of the Convertible Notes, plus additional conflicts and local counsel to the extent provided herein.

You shall not, without the prior written consent of the applicable Indemnified Person (which consent shall not be unreasonably withheld or delayed) (it being understood that withholding consent due to non-satisfaction of any of the conditions described in <u>clause (i)</u> and <u>clause (ii)</u> of this sentence shall be deemed reasonable), effect any settlement of, or consent to the entry of any judgment with respect to, any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (i) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability or claims that are the subject matter of

such Proceeding and (ii) does not include any statement as to or admission of fault, culpability, wrongdoing or failure to act by or on behalf of any Indemnified Person.

You shall not be liable for any settlement of any Proceeding effected without your written consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent or if there is a final and non-appealable judgment by a court of competent jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and reasonable and documented legal or other out-of-pocket expenses by reason of such settlement or judgment in accordance with and to the extent provided in the other provisions of this <u>Section 5</u>. Each Indemnified Person (by accepting the benefits hereof) agrees to, and shall, refund and return any and all amounts paid by you to such Indemnified Person if a court of competent jurisdiction determines in a final and non-appealable determination that such Indemnified Person was not entitled to indemnification or contribution rights with respect to such payment pursuant to this <u>Section 5</u>.

Each Indemnified Person shall, at your expense, give (subject to confidentiality or legal restrictions, and with no obligation for any such Indemnified Person to waive any legal privilege) such information and assistance to you as you may reasonably request in connection with any Proceeding.

6.    <u>Sharing of Information, Absence of Fiduciary Relationships, Affiliate Activities</u>.

You acknowledge that the Commitment Parties and/or their affiliates or managed funds may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other persons in respect of which you, the Company and your and its respective affiliates may have conflicting interests regarding the transactions described herein and otherwise. None of the Commitment Parties and their respective affiliates or managed funds will use confidential information obtained from you, the Company, the Investors or any of your or their respective affiliates by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you, the Company, the Investors or your or their respective affiliates in connection with the performance by them or their affiliates of services for other persons, and none of the Commitment Parties and their affiliates or managed funds will furnish any such information to other persons, except to the extent permitted below. You also acknowledge that none of the Commitment Parties and their affiliates or managed funds has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons. In addition, please note that one or more Commitment Parties and/or their respective affiliates and/or managed funds may be working with competing bidders for the Company in connection with providing or arranging debt or equity financing for the acquisition of the Company. You agree to such activities and arrangements, and further agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from, on the one hand, such Commitment Party and/or its affiliates' and/or its managed funds' arranging or providing or contemplating arranging or providing financing for a competing bidder and, on the other hand, our and our affiliates' relationships with you as described and referred to herein.

As you know, certain of the Commitment Parties may be, or may be affiliated with, full service securities firms engaged, either directly or through their affiliates, in various activities, including securities trading, commodities trading, investment management, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, certain of the Commitment Parties and/or their respective affiliates or managed funds may actively engage in commodities trading or trade the debt and equity securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of you, the Company and other companies which may be the subject of the arrangements contemplated by this Commitment Letter for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities. Certain of the Commitment Parties and/or their affiliates or managed funds may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of you, the Company or other companies which may be the subject of the arrangements contemplated by this Commitment Letter or engage in commodities trading with any thereof. You further acknowledge and agree that the Commitment Parties and/or their affiliates or managed funds from time to time may hold investments in, make other loans to or have other relationships with you or the Company or your or the Company's respective subsidiaries and affiliates.

The Commitment Parties and/or their respective affiliates or managed funds may have economic interests that conflict with those of you or the Company and may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and the Commitment Parties have no obligation to disclose any of such interests to you or your affiliates. You agree that the Commitment Parties will act under this Commitment Letter as independent contractors and that nothing in this Commitment Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Parties, on the one hand, and you, the Company, your and its respective equity holders or your or their respective affiliates, on the other hand. You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter are arm's-length commercial transactions between the Commitment Parties and, if applicable, their affiliates or managed funds, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction each Commitment Party and each of its applicable affiliates or managed funds (as the case may be) is acting solely as a principal and has not been, is not and will not be acting as an advisor, an agent or a fiduciary of you, the Company, your and its management, equity holders, creditors, affiliates or any other person, and (iii) the Commitment Parties and their applicable affiliates or managed funds (as the case may be) have not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether the Commitment Parties or any of their respective affiliates have advised or are currently advising you or the Company on other matters) except the obligations expressly set forth in this Commitment Letter. You further acknowledge and agree that (i) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (ii) you are capable of evaluating and understand and accept the terms, risks and conditions of the transactions contemplated hereby, and (iii) we have provided no legal, accounting, regulatory or tax advice, and you contacted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate. You agree that you will not claim that the Commitment Parties or

their applicable affiliates or managed funds, as the case may be, have rendered advisory services of any nature or respect, or owe a fiduciary or similar duty to you or your affiliates, in connection with such transaction or the process leading thereto.

7.    <u>Confidentiality</u>.

You agree that you will not disclose, directly or indirectly, this Commitment Letter, the Convertible Note Term Sheet, the Governance Term Sheet, the other exhibits and attachments hereto and the contents of each thereof, or the activities of any Commitment Party pursuant hereto or thereto, to any person or entity without prior written approval of the relevant Commitment Parties (which may be provided by electronic means) (such approval not to be unreasonably withheld, conditioned or delayed), except (i) to the Sponsor, Investors and prospective equity investors, the Company (and any sellers or other direct or indirect equityholders with respect to the Company or you), the Special Master and Claimholders (as defined in the Acquisition Agreement) and to your and any of their affiliates and your and their respective Related Parties (as defined below), controlling persons or equity holders and to any other actual and/or potential co-investors, in each case, on a confidential basis, (ii) if the relevant Commitment Parties consent in writing (such consent not to be unreasonably withheld or delayed) to such proposed disclosure, (iii) to the extent such information becomes publicly available other than by reason of improper disclosure in violation of any confidentiality obligation owing to us (including those set forth in this paragraph), (iv) in any legal, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation (including this Commitment Letter, including, without limitation, any applicable rules of any national securities exchange and/or applicable federal securities laws in connection with any Securities and Exchange Commission filings relating to the Acquisition and including to the Court, the Special Master and OFAC, in each case pursuant to the Sale Procedures Order (as defined in the Acquisition Agreement), as may be amended or modified hereafter) or compulsory legal process or as requested by a governmental authority (in which case you agree, to the extent practicable and permitted by law, rule or regulation, to inform us promptly thereof) and/or regulatory authority or (v) to a tax authority, to the extent reasonably necessary in connection with the tax affairs of Holdings and/or its affiliates; *provided* that (A) you may disclose this Commitment Letter (including the Convertible Note Term Sheet and the other exhibits and attachments hereto) and the contents hereof (i) in any proxy, public filing prospectus, offering memorandum, offering circular, syndication materials or other marketing materials in connection with the Acquisition and the Convertible Notes in connection with their commitments, or in connection with any public filing relating to the Transactions, and (ii) to the lenders under the ABL Facility or First Lien Term Facility, (B) you may disclose the Convertible Note Term Sheet (and the other exhibits and attachments hereto) and the contents thereof, to potential Holders, potential hedging counterparties, potential counterparties to commercial agreements that are customary in the refining industry and to rating agencies in connection with obtaining ratings for the Issuer and the Convertible Notes, and (C) you may disclose this Commitment Letter (including the Convertible Note Term Sheet and the other exhibits and attachments hereto) in connection with the enforcement of your rights hereunder and thereunder. The provisions of this paragraph shall automatically terminate on the second anniversary of the date hereof.

Each Commitment Party and its affiliates or managed funds shall treat confidentially all non-public information provided to it or such affiliates by or on behalf of you hereunder and shall not publish, disclose or otherwise divulge, such information; *provided* that nothing herein shall

prevent such Commitment Party and its affiliates or managed funds from disclosing any such information (i) pursuant to the order of any court (including the Court) or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process based on the reasonable advice of counsel (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (ii) upon the request or demand of any regulatory authority (including any self-regulatory authority) having jurisdiction over such Commitment Party or any of its affiliates or managed funds (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority (including any self-regulatory authority) exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iii) to the extent that such information becomes publicly available other than by reason of improper disclosure by any Commitment Party, any of its affiliates or its managed funds or any of its or their Related Parties in violation of any confidentiality obligations (including those set forth in this paragraph) owing to you, the Company, the Investors or any of your or their respective affiliates or any of your or their Related Parties, (iv) to the extent that such information is received by such Commitment Party or any of its affiliates or managed funds from a third party that is not, to such Commitment Party's knowledge (after due inquiry), subject to any contractual or fiduciary confidentiality obligations owing to you, the Company, the Investors or any of your or their respective affiliates or any of your or their Related Parties, (v) to the extent that such information is independently developed by such Commitment Party or any of its affiliates or managed funds without the use of any confidential information and without violating the terms of this Commitment Letter, (vi) to such Commitment Party's affiliates, limited partners, managed and/or advised accounts or managed funds (in each case, other than any Excluded Affiliates) and to its and their respective members, partners, directors, officers, employees, shareholders, financing sources, investors, prospective investors, legal counsel, independent auditors, professionals, service providers and other experts or agents (such persons, "***Related Parties***") who need to know such information in connection with the Transactions and who are informed of the confidential nature of such information and who are subject to customary confidentiality obligations of professional practice or who agree in writing to be bound by the terms of this paragraph (or language substantially similar to this paragraph) (with such Commitment Party, to the extent such person's compliance with this paragraph is within its control, being responsible for such compliance), (vii) to any direct or indirect contractual counterparty to any swap or derivative transaction relating to you or any of your subsidiaries under the Convertible Notes, (viii) for purposes of establishing a due diligence defense in any legal proceedings, (ix) to market data collectors and similar service providers for customary purposes in the lending industry in connection with the Convertible Notes (including in connection with the administration and management of the Convertible Notes), (x) as is necessary or advisable in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter and (xi) in connection with filings, submissions and any other similar documentation required or customary to comply with Securities and Exchange Commission filing requirements; *provided* that no such disclosure shall be made to the members of Oaktree's or any of their respective affiliates' or managed funds' deal teams that are engaged (a) primarily as principals in private equity or venture capital or (b) in the sale of the Company and its subsidiaries, including through the

provision of advisory services (any entities described in clause (a) and clause (b), "***Excluded Affiliates***") other than to a limited number of senior employees who are required, in accordance with industry regulations or such Commitment Party's internal policies and procedures to act in a supervisory capacity and the Commitment Parties' internal legal, compliance, risk management, credit or investment committee members, in each case solely to the extent that any such information that is disclosed to such persons is done on a "need to know" basis solely in connection with the transactions contemplated by this Commitment Letter and any such persons are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of such type confidential; *provided* that the disclosure of any such information pursuant to clause (vii) and clause (viii) above shall be made subject to the acknowledgement and acceptance by such recipient (other than, in respect of clause (viii), a judge in such legal proceeding) that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and each Commitment Party) in accordance with market standards for dissemination of such types of information, which may require "click-through" or other affirmative action on the part of the recipient to access such confidential information and acknowledge its confidentiality obligations in respect thereof. The Commitment Parties' and their affiliates' or managed funds', if any, obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation relating to the Convertible Notes upon the initial purchase thereof. The provisions of this paragraph shall otherwise automatically terminate on the second anniversary of the date hereof. It is understood and agreed that the Commitment Parties may advertise or promote its role in arranging or providing any portion of the Convertible Notes (including in any newspaper or other periodical, on any website or similar place for dissemination of information on the internet, as part of a "case study" incorporated into promotional materials, in the form of a "tombstone" advertisement or otherwise).

8.  Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in this Commitment Letter or any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution (as defined below) arising under this Commitment Letter, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority (as defined below) and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers (as defined below) by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Commitment Party that is an Affected Financial Institution; and

(b)  the effects of any Bail-In Action (as defined below) on any such liability, including, if applicable:

i.  a reduction in full or in part or cancellation of any such liability;

ii.  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other

instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Commitment Letter; or

       iii.    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

"*Affected Financial Institution*" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**_UK Resolution Authority_**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**_Write-Down and Conversion Powers_**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

9.    Miscellaneous.

This Agreement may only be enforced by (a) the Sponsor at the direction of the Commitment Parties or (b) if the Special Master is entitled to (and is seeking to) cause Purchaser to effect the Closing pursuant to Section 9.13 of the Acquisition Agreement and under no other circumstances, the Special Master, pursuant to and solely in accordance with the terms of Section 9.13 of the Acquisition Agreement and this Commitment Letter, solely for the purpose of seeking specific performance of your right to cause each Commitment Party to fund its commitment to purchase the Convertible Notes in accordance with the terms hereof, and not for any other purpose (including any claim for monetary damages).

This Commitment Letter and the commitments hereunder shall not be assignable by any party hereto without the prior written consent of each other party hereto (such consent not to be unreasonably withheld or delayed) and any such attempted assignment without such consent shall be null and void; *provided* that each Commitment Party may assign its commitments hereunder (subject to the provisions set forth in this Commitment Letter) to its affiliates, managed funds and/or one or more prospective Holders (other than Restricted Parties); *provided*, *further* that such Commitment Party shall only be released from the portion of its commitments hereunder so assigned to the extent such assignee purchases the portion of the commitments assigned to it on the Closing Date on the terms and conditions to such purchase set forth herein. This Commitment Letter and the commitments hereunder are intended to be solely for the benefit of the parties hereto (and Protected Persons and Indemnified Persons to the extent expressly set forth herein) and their permitted successors and assigns and do not and are not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Protected Persons and Indemnified Persons to the extent expressly set forth herein) and their permitted successors and assigns. The Commitment Parties reserve the right to employ the services of their affiliates or managed funds or branches in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates or branches certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates, managed funds or branches may agree in their sole discretion and, to the extent so employed, such affiliates and branches shall be entitled to the benefits and protections afforded to, and subject to the provisions governing the conduct of, the Commitment Parties hereunder; *provided* that (i) no Commitment Party shall be relieved of

17

any of its obligations hereunder, including in the event that any affiliate or branch through which it performs its obligations fails to perform the same in accordance with the terms hereof, and (ii) the applicable Commitment Party shall be responsible for any breach by any such affiliate, managed fund or branch referred to in the foregoing clause (i) of the obligations hereunder. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the Commitment Parties and you; *provided, however*, that: (1) the aggregate principal amount of the Convertible Notes set forth opposite each Initial Holder's respective name on Schedule I hereto may be increased on a pro rata basis among the Commitment Parties without any Commitment Party's consent, so long as the aggregate principal amount of all commitments of all Commitment Parties does not exceed $3,420,000,000 and each individual commitment is not increased by more than the Flex Amount; (2) subject to Section 2, the aggregate principal amount of all commitments of all Commitment Parties may be reduced, on a pro rata basis among the Commitment Parties, without any Commitment Party's consent; and (3) this Commitment Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or other electronic transmission (i.e., a "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on the electronic platform DocuSign, digital copies of a signatory's manual signature, and deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Commitment Letter (including the exhibits hereto), the Koch Support Letter and the Rusoro Commitment Letter (i) are the only agreements that have been entered into among the parties hereto with respect to the Convertible Notes and (ii) supersede all prior understandings, whether written or oral, among us with respect to the Convertible Notes and sets forth the entire understanding of the parties hereto with respect thereto. THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK; *PROVIDED, HOWEVER*, THAT (I) THE INTERPRETATION OF THE DEFINITION OF "COMPANY MATERIAL ADVERSE EFFECT" (AS DEFINED IN THE ACQUISITION AGREEMENT) (AND WHETHER OR NOT A COMPANY MATERIAL ADVERSE EFFECT (AS DEFINED IN THE ACQUISITION AGREEMENT) HAS OCCURRED AND/OR IS CONTINUING), (II) THE DETERMINATION OF THE ACCURACY OF ANY SPECIFIED ACQUISITION AGREEMENT REPRESENTATION AND WHETHER AS A RESULT OF ANY INACCURACY THEREOF SPONSOR (OR ITS APPLICABLE AFFILIATES) HAVE THE RIGHT (TAKING INTO ACCOUNT ANY APPLICABLE CURE PROVISIONS) TO TERMINATE ITS (OR SUCH AFFILIATES') OBLIGATIONS UNDER SECTION 8.1 OF THE ACQUISITION AGREEMENT (IN ACCORDANCE WITH THE EXPRESS TERMS THEREOF) AS A RESULT OF A BREACH OF SUCH SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS WITHOUT ANY LIABILITY TO, AND WITHOUT RESULTING IN THE PAYMENT OF ANY FEES, LIQUIDATED DAMAGES OR OTHER AMOUNTS BY, SPONSOR (OR ITS AFFILIATES), OR TO DECLINE TO CONSUMMATE THE ACQUISITION (IN EACH CASE IN

ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT) AS A RESULT OF A BREACH OF SUCH SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS WITHOUT ANY LIABILITY TO, AND WITHOUT RESULTING IN THE PAYMENT OF ANY FEES, LIQUIDATED DAMAGES OR OTHER AMOUNTS BY, SPONSOR (OR ITS AFFILIATES) UNDER SECTION 8.1 OF THE ACQUISITION AGREEMENT (IN ACCORDANCE WITH THE EXPRESS TERMS THEREOF) AND (III) THE DETERMINATION OF WHETHER THE ACQUISITION HAS BEEN CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT AND, IN EACH CASE OF THE FOREGOING IN THIS PROVISO, ANY CLAIMS OR DISPUTES ARISING OUT OF ANY SUCH INTERPRETATION OR DETERMINATION OR ANY ASPECT THEREOF SHALL, IN EACH CASE, BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS GOVERNING THE ACQUISITION AGREEMENT AS APPLIED TO THE ACQUISITION AGREEMENT, WITHOUT GIVING EFFECT TO ANY CHOICE-OF-LAW OR CONFLICT-OF-LAW RULES OR PROVISIONS OF ANY JURISDICTION THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including the good faith negotiation of the Convertible Notes Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the commitments provided hereunder are subject solely to conditions as expressly provided herein. Promptly following the execution of this Commitment Letter, the parties hereto shall proceed with the negotiation in good faith of the Convertible Notes Documentation for purposes of executing and delivering the Convertible Notes Documentation substantially simultaneously with the consummation of the Acquisition.

EACH OF THE PARTIES HERETO (AND THE SPECIAL MASTER, IN HIS CAPACITY AS AN INTENDED THIRD PARTY BENEFICIARY OF THIS AGREEMENT SOLELY TO THE EXTENT SPECIFIED IN THE FIRST PARAGRAPH OF THIS SECTION 9) IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER.

Each of the parties hereto hereby irrevocably and unconditionally (i) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York County (the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding shall only be heard and determined in such New York State court or, to the extent permitted by law, in such federal court, (ii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby in any New York State or in any such federal court, (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, and (iv) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may

be enforced in any other courts to whose jurisdiction such person is subject, by suit on the judgment or in any other manner provided by law; *provided* that with respect to any suit, action or proceeding arising out of or relating to the Acquisition Agreement or the transactions contemplated thereby and that does not involve claims against us or the Holders or any Indemnified Person or Protected Person, this sentence shall not override any jurisdiction provision set forth in the Acquisition Agreement. Each of the parties hereto agrees that service of process, summons, notice or document by registered mail addressed to you or us at the addresses set forth above shall be effective service of process for any suit, action or proceeding brought in any such court. Nothing in this paragraph shall affect the right of any party hereto to serve process in any manner permitted by law, or limit any right that any party hereto may have to bring proceedings against any other party hereto in the courts of any jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, the "***PATRIOT Act***") and 31 C.F.R. §1010.230 (as amended, the "***Beneficial Ownership Regulation***"), each of us and each of the Holders may be required to obtain, verify and record information that identifies the Issuer and the Guarantors, which information may include their names, addresses, tax identification numbers and other information that will allow each of us and the Holders to identify the Issuer and the Guarantors in accordance with the PATRIOT Act and the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for each of us and the Holders.

The indemnification, compensation (if applicable in accordance with the terms hereof), reimbursement (if applicable in accordance with the terms hereof), jurisdiction, governing law, venue, waiver of jury trial, service of process, survival and confidentiality provisions contained herein and the provisions of <u>Section 7</u> of this Commitment Letter shall remain in full force and effect regardless of whether the Convertible Notes Documentation shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the Commitment Parties' commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to your understandings and agreements regarding no agency or fiduciary duty) shall automatically terminate and be superseded, to the extent covered thereby, by the provisions of the Convertible Notes Documentation upon the initial purchase thereunder, and you shall automatically be released from all liability in connection therewith at such time. You may terminate this Commitment Letter and/or the Commitment Parties' commitments with respect to the Convertible Notes (or portion thereof) hereunder at any time subject to the provisions of the immediately preceding sentence.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to the Commitment Parties (or their legal counsel), executed counterparts hereof not later than 11:59 p.m., New York City time, on September 5, 2025 (such date, or such earlier date on which executed counterparts hereof are returned to the Commitment Parties, the "***Signing Date***"). The Commitment Parties' respective commitments and the obligations of the Commitment Parties hereunder will automatically expire at such time in the

event that the Commitment Parties (or their legal counsel) have not received such executed counterparts in accordance with the immediately preceding sentence. If you do so execute and deliver to us this Commitment Letter at or prior to such time, we agree to hold our commitment to provide the Convertible Notes and our other undertakings in connection therewith available for you until the earliest of (i) the date on which the Acquisition Agreement has been validly terminated in accordance with its terms, (ii) consummation of the Acquisition with or without the purchase of the Convertible Notes, (iii) 11:59 p.m., New York City time, on the date that is 5 business days after the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof, after giving effect to any extensions thereof pursuant to Section 8.1(b) of the Acquisition Agreement as in effect on the date hereof), (iv) the failure of the Sale Order Entry Deadline to be satisfied, (v) March 5, 2027 (such time, the "*Expiration Date*"), and (vi) the date on which the Court declines to specifically enforce the obligations of Purchaser to consummate the transactions contemplated by the Acquisition Agreement pursuant to a claim for specific performance brought against Purchaser pursuant to Section 9.13 of the Acquisition Agreement. Upon the Expiration Date, this Commitment Letter and the commitments of each of the Commitment Parties hereunder and the agreement of the Commitment Parties to provide the services described herein shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension in writing.

Notwithstanding any provision of this Commitment Letter to the contrary, if any Commitment Party fails to fund its commitments in respect of the Convertible Notes as and when required under this Commitment Letter or otherwise breaches this Commitment Letter (such Commitment Party, a "*Failing Commitment Party*"), then (i) Elliott, in its sole discretion, shall have the authority to allocate some or all of the Failing Commitment Party's commitments in respect of the Convertible Notes to itself, another Commitment Party (with the consent of such Commitment Party) or any third party investor (including, for the avoidance of doubt, any Affiliate of Elliott) in any manner Elliott deems appropriate; and (ii) from and after the time a Commitment Party becomes a Failing Commitment Party, the approval, consent, or participation of such Failing Commitment Party shall not be required or taken into account for any voting threshold or any other purpose under this Commitment Letter or in relation to any transaction contemplated hereby.

[Remainder of this page intentionally left blank]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,


**ELLIOTT ASSOCIATES, L.P.**

By: Elliott Investment Management L.P., as attorney-in-fact

By_____
    Name: Elliot Greenberg
    Title:   Vice President


**ELLIOTT INTERNATIONAL, L.P.**

By: Hambledon, Inc., its general partner

By: Elliott Investment Management L.P., as attorney-in-fact

By_____
    Name: Elliot Greenberg
    Title:   Vice President

[Signature Page to Project Horizon Convertible Note Commitment Letter]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

**OAKTREE CAPITAL MANAGEMENT, L.P.,**
Acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts



[Signature Page to Project Horizon Convertible Note  Commitment Letter]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

**CARRONADE CAPITAL MASTER, LP**
By: Carronade Capital GP, LLC its general partner



**CROWN/CARRONADE SEGREGATED PORFOLIO**
By: Carronade Capital Management, LP, its trading advisor



**RUBRIC CAPITAL MANAGEMENT LP,**
as Manager or Sub-Manager of its funds and accounts



[Signature Page to Project Horizon Convertible Note Commitment Letter]

**JEFFERIES CAPITAL SERVICES, LLC**

[Signature Page to Project Horizon Convertible Note Commitment Letter]

**SILVER POINT CAPITAL, L.P.,** on behalf of one or more investment funds, separate accounts and other entities owned (in whole or in part), controlled, managed and/or advised by it or its affiliates

[Signature Page to Project Horizon Convertible Note Commitment Letter]

**FM AMBER INVESTMENTS LLC**



[Signature Page to Project Horizon Convertible Note Commitment Letter]

**MANIFEST ENERGY TRANSITION COMPANY, LLC**



**Gregory J. Goff**

[Signature Page to Project Horizon Convertible Note  Commitment Letter]

Accepted and agreed to as of
the date first above written:

**AMBER ENERGY INC.**

By_____
  Name: Elliot Greenberg
  Title:  Vice President and Secretary

[Signature Page to Project Horizon Convertible Note Commitment Letter]

Schedule I
Commitments

| Committed Convertible Note Holder | Percentage of Aggregate Initial Principal Amount | Initial Principal Amount | Flex Amount |
|---|---|---|---|
| Elliott Associates, L.P. | | | |
| Elliott International, L.P. | | | |
| Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts | | | |
| Carronade Capital Master, LP | | | |
| Crown/Carronade Segregated Portfolio | | | |
| Rubric Capital Management LP | | | |
| Jefferies Capital Services, LLC | | | |
| Silver Point Capital, L.P. acting on behalf of certain funds and accounts managed by it or an affiliate | | | |
| FM Amber Investments LLC | | | |
| Manifest Energy Transition Company, LLC | | | |
| Gregory J. Goff | | | |
| **Total** | **100%** | **$2,850,000,000** | **Up to $570,000,000** |

Schedule II
Pro Rata Shares for Deposit and Pre-Closing Expenses

| Initial Holder | Pro Rata Share (%) |
|---|---|
| Elliott Associates, L.P. | |
| Elliott International, L.P. | |
| Oaktree Capital Management, L.P., acting on behalf of certain funds and accounts managed by it or an affiliate, or one or more entities owned by such funds or accounts | |
| Carronade Capital Master, LP | |
| Crown/Carronade Segregated Portfolio | |
| Rubric Capital Management LP | |
| Jefferies Capital Services, LLC | |
| Silver Point Capital, L.P. acting on behalf of certain funds and accounts managed by it or an affiliate | |
| FM Amber Investments LLC | |
| Manifest Energy Transition Company, LLC | |
| Gregory J. Goff | |
| **TOTAL** | **100%** |

EXHIBIT A

<u>Project Horizon</u>
<u>Transaction Description</u>

Capitalized terms used but not defined in this <u>Exhibit A</u> shall have the meanings set forth in the Commitment Letter.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit A</u> shall be determined by reference to the context in which it is used. It is intended that:

a)  The Sponsor together with certain other investors arranged by and/or designated by the Sponsor (which may include members of the Company's management) (collectively with the Sponsor, the "***Investors***") intend to cause Purchaser, directly or indirectly through one or more transactions to acquire (the "***Acquisition***"), directly or indirectly, equity interests of the Company pursuant to a Stock Purchase Agreement to be entered on or following the date hereof, by and between the Purchaser and Robert B. Pincus, solely in his capacity as special master (the "***Special Master***") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "***Court***") (together with the schedules, exhibits, and annexes thereto and as the same may be further amended, restated, amended and restated, supplemented, modified or waived from time to time in accordance with, and subject to the terms and conditions set forth in <u>Exhibit C</u> to the Commitment Letter, the "***Acquisition Agreement***").

b)  The Investors will make, directly or indirectly, equity contributions in an aggregate amount not less than $25.0 million to Amber Energy Topco L.P. ("***Topco***"), the direct parent of Holdings, in exchange for equity of Topco (the "***Equity Investment***"), with all such contributions to Topco to be in the form of common equity or qualified preferred equity (on terms reasonably satisfactory to the Commitment Parties) and contributed to Holdings, Amber MSub LLC and the Borrower (as defined below) solely in the form of common equity on the Closing Date.  On the Closing Date, immediately after the consummation of the Equity Investment and the other Transactions (as defined below), (1) the Sponsor shall own, directly or indirectly, not less than a majority of the voting stock and economic interests of Holdings, (2) Topco shall directly own 100% of voting stock and economic interests of Holdings, (3) Purchaser shall directly own 100% of voting stock and economic interests of PDV Holding, Inc. and, immediately following the Closing, shall merge with and into PDV Holding, Inc. with PDV Holding, Inc. surviving (such that Holdings will directly own 100% of the voting stock and economic interests of PDV Holding, Inc.), (4) PDV Holding, Inc. shall directly own 100% of voting stock and economic interests of Citgo Holding, Inc., and (5) a to-be-formed wholly owned subsidiary of Amber MSub LLC (the "***Initial Borrower***") shall merge with and into CITGO Petroleum Corporation (the "***Successor Borrower***," and together with the Initial Borrower, the "***Borrower***") with CITGO Petroleum Corporation surviving (such that Citgo Holding, Inc. will directly own 100% of the voting stock and economic interests of the surviving entity).

c)  On or prior to the date hereof, Holdings has entered into a transaction support agreement (as amended, restated, supplemented or otherwise modified from time to time, the "***TSA***") with holders of Petróleos de Venezuela, S.A.'s 8.50% senior secured notes due in 2020 (the "***2020 Bonds***") representing more than two-thirds of the outstanding principal amount of 2020 Bonds (the "***Consenting 2020 Holders***"), with such TSA providing that, effective upon the Closing,

1

each Consenting 2020 Holder shall transfer, convey, and assign to Holdings (or its designee that is a Loan Party) all of the 2020 Bonds held by such Consenting 2020 Holder (such transferred, conveyed, and assigned 2020 Bonds, collectively, the "***Acquired 2020 Bonds***"), in each case, in exchange for cash and/or non-cash consideration.

d)  The Borrower will obtain (i) a senior secured first lien term loan facility in an aggregate principal amount of $3,775.0 million (the "***First Lien Term Facility***"), (ii) a senior secured asset-based revolving credit facility in an aggregate principal amount equal to $2,000.0 million (the "***ABL Facility***" and, together with the First Lien Term Facility, the "***Senior Secured Credit Facilities***"), and (iii) qualified preferred equity (the "***Alternative Preferred Equity***") and/or Third Lien Convertible Notes pursuant to a senior secured third lien convertible notes facility (the "***Third Lien Notes***") to be no less than $3,100.0 million in aggregate principal amount; *provided* that (x) the terms, conditions, and documentation of the ABL Facility shall be consistent with those set forth in the ABL Commitment Letter as of the date hereof (as in effect on the date hereof, the "***ABL Commitment Letter***"), among Barclays Bank PLC, Citi and Holdings and otherwise on terms, conditions, and documentation reasonably satisfactory to the Commitment Parties, and (y) the terms, conditions, and documentation of the Third Lien Notes shall be consistent with this Commitment Letter, and shall provide for the issuance and funding of an aggregate principal amount of no less than $3,100.0 million of the Third Lien Notes on the Closing Date (collectively, the "***Acceptable Third Lien Note Terms***"; it being understood and acknowledged that, for purposes of the Acceptable Third Lien Note Terms, any such Alternative Preferred Equity shall also be entirely non-cash pay, funded on the Closing Date in such aggregate minimum amount of $3,100.0 million, and otherwise reasonably satisfactory to the Commitment Parties), and otherwise on terms, conditions, and documentation reasonably satisfactory to the Commitment Parties.

e)  Subject in all respects to the use of proceeds provisions contained in the First Lien Term Loan Term Sheet, the proceeds of the Senior Secured Credit Facilities borrowed on the Closing Date, together with up to $500 million of borrowings under the ABL Facility (provided, however, that, notwithstanding anything to the contrary herein, no borrowings in excess of $50 million may be made under the ABL Facility on the Closing Date unless and until the aggregate principal amount of Alternative Preferred Equity and/or Third Lien Notes that is actually funded in cash on the Closing Date is equal to at least $3,100 million (the "***Closing ABL Draw Condition***"), proceeds from the Alternative Preferred Equity, Third Lien Notes and the Equity Investment, will be applied to (i) pay consideration in connection with the Acquisition and any other payments contemplated by the Acquisition Agreement, (ii) pay the fees and expenses incurred in connection with the Transactions (such fees and expenses, collectively, the "***Transaction Costs***"), (iii) consummate the Refinancing (with the proceeds of the First Lien Term Facility being first applied to pay all such amounts for the Refinancing in full; the amounts set forth in clause (i), clause (ii) and clause (iii) above, collectively, the "***Acquisition Costs***"), (iv) pay the cash amounts due and owing to the Consenting 2020 Holders in exchange for the Acquired 2020 Bonds held by such holders, in each case, in accordance with the TSA, and (v) for working capital and general corporate purposes. The transactions described above (including the payment of the Acquisition Costs), are collectively referred to herein as the "***Transactions***".

2

f) The Company or the Borrower, as applicable, will, in each case of the following, with the proceeds of the First Lien Term Facility, (i) redeem and/or offer to purchase or repurchase in full the Company's (x) 6.375% senior secured notes due 2026 (the "***2026 Notes***") and (y) 8.375% senior secured notes due 2029 (the "***2029 Notes***", and together with the 2026 Notes, collectively, the "***Company Notes***") in each case, that remain outstanding on the Closing Date and (ii) repay all outstanding amounts under that certain Receivables Purchase Agreement dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, Barclays Bank PLC, as program administrator, and the various other parties thereto (as amended, modified or otherwise supplemented), and in each case of the foregoing clauses (i)-(ii), all such indebtedness and obligations will be repaid in full and any and all liens and security interests will be released and terminated (the transactions described in <u>clauses (f)(i)</u> and <u>(ii)</u>, collectively, the "***Refinancing***").

EXHIBIT B

Project Horizon
Convertible Notes Term Sheet
(Attached.)

Project Horizon[1]
Convertible Note Financing
Summary of Principal Terms and Conditions

| | |
|---|---|
| Issuer: | CITGO Petroleum Corporation, a Delaware corporation (the "***Issuer***"). |
| Transactions: | As set forth in <u>Exhibit A</u> to the Commitment Letter. |
| Administrative Agent and Collateral Agent: | [●] or an affiliate, designee, or sub-agent thereof (in such capacity, the "***CN Agent***").[2] |
| Convertible Notes: | Convertible notes of the Issuer (the "***Convertible Notes***")[3] denominated in U.S. dollars in an initial aggregate principal amount (the "***Initial Principal Amount***") equal to $3,650,000,000, subject to increase by an amount not to exceed $570,000,000 in the aggregate, or decrease as determined by Sponsor (such amount as determined prior to the Closing Date by the Sponsor in its sole and absolute discretion, the "***Flex Amount***") (with all Holders (other than the Specified Writholders) committing to participate in such Flex Amount in accordance with their Pro Rata Shares) |
| | Each Initial Holder shall commit to purchase the percentage of the Initial Principal Amount set forth opposite such Initial Holder's name on Schedule I attached to the Commitment Letter (such percentage being such Initial Holder's "***Pro Rata Share***"). |
| Holders: | On the Closing Date, the Initial Holders and after the funding on the Closing Date, any permitted assignee that becomes a noteholder in accordance with the terms of the Convertible Note Documentation (as defined herein) (collectively, the "***Holders***"). |
| Purpose: | The proceeds of the issuance of the Convertible Notes will be used by the Issuer on the Closing Date, together with any cash on hand at |

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Commitment Letter, including the exhibits thereto, including the Governance Term Sheet (as defined below).

[2] <u>Note to Draft</u>:    To be a third-party agent.

[3] <u>Note to Draft</u>:    The Convertible Notes Documentation will provide for a single class of Convertible Notes, however, Convertible Notes held by the Specified Writholders (i) will have no right or obligation to fund any portion of the Flex Amount and (ii) will not be entitled to voting rights where specified in this term sheet. Mechanism for allocating cash and Convertible Note consideration to maintain the Specified Writholders' pro rata ownership to be addressed in separate agreements with the Specified Writholders. In addition, full voting rights shall be automatically restored to the Convertible Notes held by the Specified Writholders upon any permitted transfer to any third party (including any other Holder).

the Issuer and its subsidiaries or proceeds received from any other debt financing, to pay the Acquisition Costs and to consummate the Refinancing and to finance working capital and for general corporate purposes.

Guarantees:            All obligations of the Issuer (the "***Issuer Obligations***") under the Convertible Notes and the other Convertible Note Documentation will be unconditionally guaranteed (the "***Guarantees***") jointly and severally by Amber Parent and each of its direct or indirect subsidiaries (collectively, the "***Guarantors***"), except for Excluded Subsidiaries, consistent with the First Lien Term Facility (as defined in the Commitment Letter).

Security:              As of the Closing Date, the Issuer Obligations and the Guarantees will be secured by a third priority lien (with intercreditor arrangements to be agreed with the First Lien Term Facility and the ABL Facility (as defined in the Commitment Letter)). In addition, the Holders of the Convertible Notes will agree to payment subordination to all accounts payable and the other types of liabilities included as line items under "Current Liabilities" on the Issuer's most recent balance sheet, in each case as determined in accordance with U.S. GAAP, consistently applied, pursuant to the section titled "Documentation" of Exhibit B to the Commitment Letter. If the Issuer incurs secured Indebtedness after the Closing Date (whether pursuant to the First Lien Term Facility (including any refinancing or replacement thereof), a second lien facility or otherwise), then Holders of the Convertible Notes will agree to subordinate their lien to any such Indebtedness.

Maturity:              The Convertible Notes will mature on the date that is 20 years after the issuance thereof (the "***Maturity Date***").

                       Unless the Convertible Notes are converted before the Maturity Date, an amount equal to the Liquidation Preference (as defined herein) will become due and payable in cash on the Maturity Date.

Liquidity Right:       Beginning on and after the eighth anniversary of the initial issuance of Convertible Notes, the Holders of a majority of the principal amount of Convertible Notes then outstanding held by Holders other than those affiliated with Elliott (other than the Specified Writholders) (the "***Non-Elliott Majority***") will have the right to cause the Issuer or Amber Parent to form a special committee of the Board (the "***Special Committee***") to consider a process to effect a Change of Control, IPO, or other similar or alternative transaction or refinancing. The Special Committee will use commercially

reasonable efforts to inform the Non-Elliott Majority with respect to material updates with respect to such efforts from time to time.

In addition, beginning on and after the eighth anniversary of the initial issuance of the Convertible Notes, one or more Holders (including, for the avoidance of doubt, the Specified Writholders) of at least 10% of the aggregate Liquidation Preference of the Convertible Notes at such time may request that the Issuer and Amber Parent use commercially reasonable efforts to help such Holder market and sell all or a portion of its Convertible Notes to a potential permitted transferee, including making management available for management presentations, the preparation of confidential information memorandums (and similar presentations), permitting the provision of confidential information for potential purchasers pursuant to customary confidentiality agreements, and other customary actions.

Interest Rate:

Interest will accrue in kind and in no event will interest be mandatorily payable in cash (other than at maturity). The Initial Principal Amount of the Convertible Notes will accrete at a rate *per annum* of ████, accruing on a daily basis, and compounding quarterly and on the Maturity Date.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days.

Liquidation Preference:

The Holders will be entitled to a liquidation preference (the "***Liquidation Preference***") on the Convertible Notes equal to the amount required to deliver to the Holders, as of the applicable date of determination, the greater of: (x) a ███ multiple on the Initial Principal Amount and (y) a ███% internal rate of return on the Initial Principal Amount (compounding quarterly).

Other than with respect to certain payments pursuant to the terms of management equity arrangements, any cash dividends or other cash distributions of the Issuer or by Amber Parent shall first be paid to the Holders of the Convertible Notes and shall be applied to reduce the Liquidation Preference thereof on a dollar-for-dollar basis (unless and until the aggregate Liquidation Preference has been reduced to $0) prior to any cash dividends or other cash distributions on any other classes of equity interests of the Issuer.

Following such time as the Liquidation Preference on the Convertible Notes has been reduced to $0, and subject in all events to applicable restricted payment capacity under the Convertible Notes Documentation and the terms of any *pari passu* or senior indebtedness, the Convertible Notes will share in any other cash

3

dividends on an as-converted basis, and no dividend may be made by the Issuer or Amber Parent except in accordance with the foregoing.[4] For the avoidance of doubt, the reduction of the Liquidation Preference on the Convertible Notes to $0 shall not affect the rights and preferences otherwise provided to Holders under the Convertible Note Documentation.

Pro Rata Payments:

All payments to Holders (including on account of purchases, repurchases, exchanges or similar transactions by the Issuer or any of its subsidiaries, or any fees or other economics with respect thereto) will be made on a pro rata basis based on principal amount of Convertible Notes held by each Holder.

Optional Conversion:

The Convertible Notes will not be convertible at the option of any Holder.

Mandatory Conversion:

In the event of a Qualified IPO (as defined herein), Change of Control (as defined herein) or other Liquidation Event (to be customarily defined) (each a "**Conversion Event**"), the Convertible Notes shall automatically convert into limited partnership interests ("**Amber Parent LP Interests**") in Amber Energy Topco, L.P., a Delaware limited partnership and indirect parent entity of the Issuer or any applicable successor or parent entity thereof ("**Amber Parent**"). The Convertible Notes will convert into (and the Convertible Note Documentation will include an acknowledgement by Amber Parent of its obligation to issue in connection therewith):

(a) a percentage of the fully-diluted equity interest in Amber Parent in the aggregate (which amount may be, but shall not be less than, 0%), calculated at the applicable time of conversion, equal to the quotient of (a) the remaining Liquidation Preference (if any) divided by (b) the total equity value of Amber Parent (including the value of any preferential interests) implied in the applicable Conversion Event or by the fair market value at the time of conversion (and all fair market value determinations shall be made by the Board in its reasonable discretion), which percentage will not exceed 100%; *provided*, *however*, that (1) in connection with any Conversion Event and in lieu of the conversion contemplated by this clause (a), the Issuer shall have the option to pay all or a portion of the Liquidation Preference in cash so long as such cash is paid on a pro rata basis among Holders (based on principal amount then outstanding held by

---

[4] Note to Draft: The right to participate in cash dividends on an as-converted basis shall be documented as a right possessed by the ▮▮ warrants in Amber Parent that are issued to holders of the Convertible Notes.

each Holder); and (2) in no event shall the conversion of the Liquidation Preference result in the Holders receiving, in the aggregate, more than 100% of the fully-diluted equity of Amber Parent (and the organizational documents of Amber Parent will provide that upon conversion of the Convertible Notes, the Amber Parent LP Interests issued pursuant to this clause (a) may represent 100% of the fully diluted equity of Amber Parent), and any remaining portion of the Liquidation Preference shall be extinguished; and

(b) ■■■ of the fully-diluted equity interest in Amber Parent in the aggregate, calculated at the Closing Date[5] (subject to dilution with respect to issuances of equity securities by, or securities convertible or exchangeable into securities of, Amber Parent following the Closing Date including, but not limited to, management incentive equity and securities issued upon conversion of the Convertible Notes pursuant to clause (a) above; *provided*, *however*, that the terms of the Convertible Notes shall include customary anti-dilution protection relating to issuances of equity securities in Amber Parent below fair market value at the time of issuance).

The Convertible Notes will require that, upon conversion of the Convertible Notes, each Holder will receive the same type and proportion of consideration as received by the other Holders with respect to the Amber Parent LP Interest received upon conversion in accordance with the foregoing (including the right to elect to "rollover" into non-cash consideration or the right to elect cash consideration).

Notwithstanding the foregoing, in the event that the equity value of Amber Parent implied by the Conversion Event (including the value of any preferential interests) is less than the remaining Liquidation Preference as of immediately prior to such Conversion Event, then upon the election of the holders of Convertible Notes representing at least two-thirds of the then-outstanding principal amount, the Convertible Notes shall not convert upon such Conversion Event but shall instead remain outstanding.[6] The Convertible Note Documentation will provide that each Holder of Convertible Notes

---

[5] Note to Draft:    Note that the right to convert into ■■■ of the equity of Amber Parent will be documented as warrants issued to holders of the Convertible Notes instead of a feature of the Convertible Notes themselves. Final documentation will reflect this, and any equity-like rights set forth in this term sheet that are specific to holders of Convertible Notes will attach to the warrants instead.

[6] Note to Draft: For the avoidance of doubt, this paragraph will cease to have any force or effect upon an exchange of the Convertible Notes into preferred equity as contemplated by the "Exchange" section below.

agrees to refrain from voting against conversion as described in the immediately preceding sentence upon Elliott's determination, in its reasonable discretion, that converting the Convertible Notes into equity of Amber Parent would be likely to improve third party ratings of the Issuer or its affiliates and be in the best economic interest of the Holders of Convertible Notes.

"***Qualified IPO***" means (i) the closing of the first underwritten public offering of common equity interests of Amber Parent (or any newly formed holding company or subsidiary thereof formed pursuant to a Recapitalization Transaction or otherwise) pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, with an aggregate gross offering size of at least $500,000,000 (inclusive of any equity sold by any selling stockholders) and such interests being listed on the New York Stock Exchange or the Nasdaq Global Select Market and, (ii) with respect to any Holder, any other registration of common equity interests of Amber Parent (or any newly formed holding company or subsidiary thereof formed pursuant to a Recapitalization Transaction or otherwise) pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, or pursuant to the Securities Act of 1934, as amended, and following which such interests are listed on the New York Stock Exchange, the Nasdaq Stock Market, or such other national stock exchange (or equivalent non-U.S. securities exchange), that such Holder elects to treat as a Qualified IPO.

"***Change of Control***" will be customarily defined and will include (i) the sale, lease, transfer, conveyance, or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Amber Parent and its subsidiaries, taken as a whole, to any "*person*" or "*group*" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) other than to Elliott or one or more of its direct or indirect affiliates or (ii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that Elliott ceases to possess, directly or indirectly through one or more affiliates, the power to direct the management and policies of Amber Parent and its subsidiaries, whether through the ownership of voting securities, by contract or otherwise (it being understood that neither the grant nor the exercise of customary board designation rights (where Elliott continues to control a majority of the voting power of the board) or other bona fide minority protections will constitute a Change of Control).

| | |
|---|---|
| Redemption: | The Convertible Notes will not be subject to redemption at the option of any Holder or the Issuer. |
| Exchange: | At the election of the Holders of Convertible Notes representing at least a majority of the then-outstanding principal amount (including the affirmative election of at least one other Holder who is not Elliott or its affiliates), which election may be exercised at any time after Closing, each Holder of Convertible Notes will exchange its Convertible Notes for an equal face amount of convertible preferred equity on economic and legal terms that are substantially similar to the applicable terms of the Convertible Notes *mutatis mutandis*, except that the obligations thereunder would not be "indebtedness" and the terms under "Guarantees" and "Security" would be inapplicable.[78] |
| Documentation: | The Convertible Note Documentation (as defined below) shall contain the payments, conditions to closing and issuance, conversion, redemption, representations and warranties, affirmative and negative covenants, and events of default expressly set forth in this Convertible Note Term Sheet and as otherwise mutually agreed and reasonably acceptable to the parties thereto. |
| | The definitive documentation for the Convertible Notes, the (the "***Convertible Note Documentation***") will be based on the Documentation Principles (as defined below). |
| | As used in this Convertible Note Term Sheet, "***Documentation Principles***" means documentation to be initially prepared by counsel to Amber Parent and its subsidiaries and shall contain the terms set forth in this Exhibit B and be mutually negotiated in good faith within a reasonable time period to be determined mutually by the parties based on the expected Closing Date. |
| Conditions to Closing: | The issuance of the Convertible Notes on the Closing Date will be subject solely to the satisfaction (or waiver by each Initial Holder) of the applicable Conditions set forth in Exhibit C to the Commitment Letter. |

---

[7] Note to Draft: Upon the exchange of Convertible Notes into preferred equity, the warrants will be cancelled automatically.

[8] Note to Draft: The economic and legal terms of the convertible preferred equity would, for the avoidance of doubt, include those terms attaching to the ▉ warrants issued by Amber Parent (including the right to participate in cash dividends on an as-converted basis referred to in Footnote 4 above).

<u>Affirmative Covenants</u>:

Information rights to be addressed in the governance term sheet set forth in <u>Exhibit D</u> to the Commitment Letter (the "***Governance Term Sheet***").

For the avoidance of doubt, the information rights in the Governance Term Sheet shall inure to the benefit of each Holder for so long as such Holder continues to hold 50% or more of the initial principal amount of Convertible Notes held by such Holder as of the Closing Date.

<u>Financial Covenants</u>:

None.

<u>Negative Covenants</u>:

The Holders will have only the following negative covenants set forth in the organizational documents of Amber Parent (and which Holders will have all rights and remedies at law and at equity to enforce, including the right to seek specific performance), which may only be amended, modified, waived or terminated by the Non-Elliott Majority:

(a) a restriction on (i) the designation or maintenance of unrestricted subsidiaries or any such similar or analogous concept and (ii) except as a result of issuances with respect to which the Holders are afforded the right to participate in accordance with the terms of the organizational documents of Amber Parent and the Convertible Note Documentation, the creation of any subsidiaries other than direct or indirect wholly owned subsidiaries of Amber Parent (subject to customary exceptions in the case of <u>clause (i)</u> and this <u>clause (ii)</u>, *e.g.*, bona fide investments, operational and similar joint ventures and/or strategic partnerships, director-qualifying shares and other similar foreign-ownership requirements, etc.) (i.e., "anti-short circuit" provisions);

(b) except for certain payments pursuant to the terms of management equity arrangements and other customary exceptions (e.g., tax distributions, management and monitoring fees (subject to a cap on the amount of such management and monitoring fees per annum consistent with the analogous cap set forth in the First Lien Term Facility in effect on the Closing Date), reimbursement of overhead and operating expenses, and repurchases of equity from current or former employees, officers, and directors), a restriction on direct or indirect dividends or other distributions, including repurchases (or other restricted payments), to equityholders of the Issuer, other than cash dividends or cash distributions made in accordance with "Liquidation Preference" above

(with the Liquidation Preference being payable in cash dividends only); and

(c) a prohibition on related party transactions (including with Elliott or any "associate" (as defined in the Securities Exchange Act of 1934, as amended) of Elliott or Amber Parent), subject to customary exceptions (e.g., transactions that are immaterial, on arms'-length terms or bona fide commercial transactions approved by a majority of disinterested director(s)).

|                    |                                                                 |
|--------------------|-----------------------------------------------------------------|
| <u>Amendments:</u> | Amber Parent will not amend its organizational documents in a manner that adversely and disproportionately affects a Holder in its capacity as a Holder of Convertible Notes or in its capacity as a prospective holder of Class A-2 Units in Amber Parent on an as-converted basis, as applicable, relative to the rights of other similarly situated Holders holding Convertible Notes or Class A-2 Units, as applicable, without approval by such affected Holder (including, for the avoidance of doubt, the consent of any Specified Writholder that is so adversely and disproportionately affected). |

The terms of the Convertible Notes may be amended, modified, waived or terminated by the consent of the Holders of Convertible Notes representing a majority of the then-outstanding principal amount (excluding the Specified Writholders), including the consent of at least one other Holder who is not Elliott or its affiliates; <u>provided</u>, <u>however</u>, that any amendment, modification, waiver, or termination (a)(i) that adversely and disproportionately affects a Holder in its capacity as a Holder of Convertible Notes or in its capacity as a prospective holder of Class A-2 Units in Amber Parent on an as-converted basis, as applicable, relative to the rights of other similarly situated Holders holding Convertible Notes or Class A-2 Units, as applicable (it being acknowledged and agreed that any amendment, modification or waiver of the negative covenants may have such an adverse effect), or (ii) the sacred right regarding the release of all or substantially all of the collateral securing the Notes shall require approval by such affected Holder (including in the case of clauses (a)(i) and (a)(ii), for the avoidance of doubt, the consent of the Specified Writholders) or (b) to the preemptive rights shall require the consent of the Holders of Convertible Notes representing a majority of the then-outstanding principal amount (including, for the avoidance of doubt, the Specified Writholders), other than Elliott or its affiliates.

In addition, each Holder (including, for the avoidance of doubt, the Specified Writholders) will have certain sacred rights with respect to any amendment, modification, waiver or termination relating to the

outstanding principal amount or payment currency, the Liquidation Preference, the Maturity, "Mandatory Conversion" rights, any pro rata payment requirements or amendments to the payment waterfall as among the outstanding Convertible Notes, the bankruptcy Events of Default, the interest rate and interest payment dates, the amendment provisions or release of all or substantially all of the collateral securing the Notes or the value of the guarantees except, solely in the case of such releases, as otherwise permitted in the Convertible Note Documentation, and the information rights as set forth in the Governance Term Sheet (it being understood and agreed that the Board's exercise of any right to approve or withhold information, in each case, expressly set forth in the Governance Term Sheet, shall not be deemed to be an amendment, modification, waiver or termination in respect of such information rights).

Events of Default:    Customary events of default for (i) payment default (including at maturity), (ii) failure to comply with conversion provisions of Convertible Notes when required under the Convertible Note Documentation, and (iii) customary bankruptcy and insolvency events. Upon an Event of Default, the Non-Elliott Majority will have customary rights and remedies, including the ability to require the Liquidation Preference then outstanding to be due and payable immediately in cash by the Issuer.

Preemptive Rights:    The Holders of Convertible Notes will be entitled to preemptive rights, as described in the Governance Term Sheet.

Anti-Dilution:    The Convertible Note Documentation will include only customary structural anti-dilution conversion rate and price adjustments with respect to the Convertible Notes and the anti-dilution protections set forth under "Mandatory Conversion".

Voting:    The Convertible Notes will not confer upon the Holders the right to vote or to consent or to receive notice as a limited partners in respect of meetings of partners for the election of managers or any other matters or any rights whatsoever as stockholders except as otherwise expressly provided in the Convertible Note Documentation.

Additional matters related to the governance of Amber Parent and the Issuer are described in the Governance Term Sheet.

Assignments:    After the Closing Date, the Holders will be permitted to directly or indirectly transfer or assign Convertible Notes or any interest therein to any person other than Restricted Parties, provided, that each Holder shall provide the Company with not less than five business days' advance written notice of any such transfer. "***Restricted Parties***" shall mean (a) those persons that are separately identified in

10

writing by Elliott to the Holders prior to the execution of the Commitment Letter, together with any persons identified in writing by Elliott to the Holders at any time and from time to time following the execution of the Commitment Letter (including any affiliate of the foregoing (other than a bona fide debt fund affiliate (as defined below))), underlined provided, that with respect to any additional Restricted Parties identified by Elliott after the execution of the Commitment Letter, upon request by any Holder, Elliott shall provide such Holder with a bona fide, articulable and reasonable rationale for the inclusion of such person as a Restricted Party (it being acknowledged and agreed that the rationale for any Restricted Party's identification as such as of the execution of the Commitment Letter shall be deemed to be reasonable), and to the extent Elliott is not able to provide a bona fide, articulable and reasonable rationale for the inclusion of such person as a Restricted Party, such person shall not be so designated; and (b) operating entities who are engaged in a substantially similar line of business as and are a bona fide competitor to the Issuer and its subsidiaries, and any affiliate thereof (other than a bona fide debt fund affiliate) that is either (i) clearly identifiable solely on the basis of similarity of its name or (ii) identified in writing by Elliott to the Holders at any time and from time to time (each, a "***Competitor***"). For purposes of the foregoing, a "bona fide debt fund affiliate" of a Competitor is a debt fund, investment vehicle, regulated bank entity or unregulated entity primarily engaged in, or that advises funds or other investment vehicles that are primarily engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course of business for financial investment purposes and with respect to which persons involved with the investment in the relevant Competitor, or the management, control or operation thereof, directly or indirectly, possesses the power to direct or cause the investment policies of such fund, vehicle or entity are independent from the Disqualified Lender.

Governing Law:    New York.[9]

---

[9] Note to Draft:  If Preferred Equity is issued, Delaware will be the governing law.

EXHIBIT C

<u>Project Horizon</u>
<u>Conditions to Closing</u>[1]

Except as otherwise set forth below, the initial issuance of the Convertible Notes shall be subject to the satisfaction or waiver (by the Initial Holders) of the conditions set forth below:

1.  The Acquisition shall have been consummated, or substantially simultaneously with the initial issuance under the Convertible Note Documentation, shall be consummated, in all respects in accordance with the Acquisition Agreement, without giving effect to any amendments, consents or waivers by you thereto that are adverse to the Commitment Parties (in their capacities as such), without the prior consent of each of the Commitment Parties (such consent not to be unreasonably withheld, delayed or conditioned); it being understood and agreed that, without otherwise limiting the generality and scope of the foregoing sentence (a) any reduction (or amendment that has the effect of a reduction) in the purchase price of, or consideration for, the Acquisition shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent; (b) any increase (or amendment that has the effect of an increase) in the purchase price of, or consideration for, the Acquisition shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent, except solely to the extent that any such increase is funded entirely with (i) new cash equity contributions in Holdings and its subsidiaries, and/or (ii) the issuance of additional Alternative Preferred Equity or Third Lien Notes; provided that to the extent any such increase is funded with equity interests other than common equity, such equity interests shall be on terms and conditions reasonably satisfactory to the Commitment Parties; (c) any amendment (or amendment that has the effect of a change) to the definition of "Company Material Adverse Effect" in the Acquisition Agreement shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent, and (d) any amendment or waiver (or any other modification that has the effect of such amendment or waiver) to any conditions precedent to closing of the Acquisition (whether in Sections 7.1(a), (b) or (c) or Sections 7.2(a) or (d), or otherwise contained in the Acquisition Agreement) shall be deemed to be adverse to the interests of the Commitment Parties and require each of the Commitment Parties' prior written consent.

2.  The Equity Investment shall have been made, or substantially simultaneously with the initial issuance of the Convertible Notes, shall be made, in at least the amount and consistent with the description thereof set forth in <u>Exhibit A</u> to the Commitment Letter.

3.  The Commitment Parties shall have received at least 3 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date (x) all documentation and other information about Issuer and the Guarantors as has been reasonably requested in writing at least 10 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date by the Commitment Parties that is required by governmental entities under applicable "know

---

[1]  Capitalized terms used in this Exhibit C shall have the meanings set forth in the other Exhibits attached to the Commitment Letter to which this Exhibit C is attached (the "***Commitment Letter***").  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit C shall be determined by reference to the context in which it is used.

your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and (y) with respect to each of you and the Issuer, in each case, to the extent that it qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation to the extent requested in writing by such Commitment Party at least 10 Business Days (as defined in the Acquisition Agreement) prior to the Closing Date.

4.   Subject in all respects to the Certain Funds Provisions, with respect to the Convertible Notes, the execution and delivery by the Issuer and the Guarantors of (i) the Convertible Note Documentation which shall, in each case, be consistent with the Commitment Letter and the Convertible Note Term Sheet and the Documentation Principles, and shall be valid, enforceable, and effective, and (ii) customary legal opinions, customary secretary's certificates, customary evidence of authorization, good standing certificates (to the extent applicable) in the jurisdiction of organization of the Issuer and each Guarantor, and a solvency certificate of Holdings' chief financial officer, treasurer, other financial officer or other officer with equivalent duties in substantially the form of Annex I hereto (the items described in this clause (ii), collectively, the "***Convertible Note Closing Deliverables***").

5.   The Commitment Parties shall have received the audited consolidated balance sheet of the Company as of December 31, 2024 and December 31, 2023 and each additional fiscal year ending at least 90 days prior to the Closing Date, and the related audited consolidated statements of income and cash flows for the fiscal years then ended (or, the fiscal year then ending, as applicable).

6.   All Expenses required to be paid on the Closing Date pursuant to the Commitment Letter, to the extent invoiced at least three (3) Business Days (as defined in the Acquisition Agreement) prior to the Closing Date, shall, upon the initial issuance of the Convertible Notes, have been, or will be substantially concurrently, paid.

7.   The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects at the Closing Date (as defined in the Acquisition Agreement); provided that to the extent that any Specified Representation is qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, (a) the definition thereof shall be the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement) for purposes of the making or deemed making of such Specified Representation and (b) the same shall be true and correct in all respects.

8.   Since the date of the Acquisition Agreement to the Closing Date (as defined in the Acquisition Agreement), there has not been any Company Material Adverse Effect (as defined in the Acquisition Agreement as in effect on the date hereof) that would result in the failure of a condition precedent to your obligation to consummate the Acquisition under the Acquisition Agreement or that would give you the right (taking into account any notice and cure provisions) to terminate your obligations pursuant to the terms of the Acquisition Agreement.

9.   The Sale Order (as defined in the Acquisition Agreement) shall be in full force and effect in all respects and not subject to any stay.

10.  The Refinancing shall have been, or substantially concurrently with the initial issuance under the Convertible Note Documentation shall be, consummated.

11.  The ABL Facility and the First Lien Term Facility shall have become, or substantially concurrently with the initial issuance of the Convertible Notes shall be, effective on terms, conditions, and documentation as set forth in the ABL Commitment Letter or the First Lien Term Facility, as applicable, and otherwise as reasonably acceptable to the Initial Holders.

12.  With respect to the Convertible Notes, the effectiveness of the ABL Facility and the First Lien Term Facility shall occur, on terms, conditions, and documentation as set forth in the Commitment Letter and otherwise as reasonably acceptable to the Initial Holders.

13.  After giving effect to the Transactions on a pro forma basis, the aggregate principal amount of Consolidated Total Funded Indebtedness of Holdings, the Issuer and their respective subsidiaries (less Holdings' and its subsidiaries' Applicable Cash and Cash Equivalents) shall not be greater than $3,275 million; provided that such amount may increase by up to $500 million in borrowings under the ABL Facility solely to the extent there will be at least $500 million of unrestricted cash and cash equivalents on Holdings' and its subsidiaries' balance sheet. For the purposes of this paragraph, "***Applicable Cash and Cash Equivalents***" shall mean an aggregate amount of up to $500.0 million of (i) unrestricted cash and cash equivalents (including, for the avoidance of doubt, balance sheet cash not contemplated to be used for any purpose) and (ii) cash and cash equivalents that are restricted in favor of the First Lien Term Facility, the ABL Facility, and/or the Third Lien Notes (subject to, for the avoidance of doubt, the ABL Intercreditor Agreement and the Third Lien Intercreditor Agreement), and "***Third Lien Intercreditor Agreement***" shall mean that certain intercreditor agreement consistent with the documentation principles applicable to the First Lien Term Facility and ABL Facility, governing the priority of the security interests and related creditor rights between the First Lien Term Facility and the ABL Facility, on the one hand, and the Third Lien Notes.

14.  Substantially concurrently with the initial issuance of the Convertible Notes, the Consenting 2020 Holders shall transfer, convey, and assign to Holdings (or its designee that is a Loan Party) all of the 2020 Bonds held by such Consenting 2020 Holders that, taken as a whole, constitute the Acquired 2020 Bonds, in accordance with the TSA.

15.  In the event the borrowing notice delivered pursuant to the terms of the First Lien Term Facility includes a statement and certification by a responsible officer related to any Liens connected with any Alter Ego Liability of the Acquisition Companies (as defined in the Acquisition Agreement) which requires executed mortgages or mortgage amendments for the Refinery Properties to be delivered on an accelerated basis, the Issuer shall also provide executed mortgages or mortgage amendments for the Refinery Properties to the Holders on the same accelerated basis (it being understood and agreed that provision of such mortgage or mortgage amendments are not themselves a condition to borrowing on the Closing Date).

EXHIBIT D

<u>Project Horizon</u>
<u>Governance Term Sheet</u>

(Attached.)

**PROJECT HORIZON**

**GOVERNANCE TERM SHEET**

**AMBER ENERGY TOPCO L.P.**

*The following is a description of certain post-closing equity arrangements in connection with the proposed acquisition (the "**Acquisition**") of 100% of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (together with its subsidiaries, "**PDVH**") by Amber Energy Inc., a Delaware corporation ("**Amber**" or the "**Buyer**"). This Term Sheet does not constitute a binding commitment to enter into the Acquisition, provide financing for the Acquisition or to enter into any definitive agreement on the terms described herein or otherwise and will have no force or effect until a definitive agreement or agreements, if any, are executed by the parties with respect to the subject matter contained herein. This Term Sheet is not an exhaustive list of all items and drafting issues to be addressed in the definitive documents to be entered into in connection with the Acquisition.*

| | |
|---|---|
| ***Parties***: | "***Elliott***" means certain affiliates of Elliott Investment Management L.P., a Delaware limited partnership. |
| | "***Topco***" means Amber Energy Topco L.P., a newly formed Delaware limited partnership. The "***Company***" refers collectively to Topco and its subsidiaries. |
| | "***General Partner***" means Amber Energy Topco GP LLC, a newly formed Delaware limited liability company controlled by Elliott, which shall serve as the general partner of Topco. |
| | "***Investor***" means each of Elliott and any other holder of Units, and collectively, the "***Investors***". |
| ***Investment Objective***: | Topco's objective will be to, directly or indirectly through one or more intermediate entities (including Amber), acquire, hold and dispose of ownership interests in PDVH and to take actions related thereto. |
| ***Capital Structure***: | Equity interests in Topco will be divided into three classes of common units ("***Units***") referred to as "***Class A-1 Units***," "***Class A-2 Units***" (which, together with the Class A-1 Units, are referred to as "***Class A Units***") and "***Class B Units***." |
| | Upon the closing of the Acquisition (the "***Closing***"), Class A-1 Units will be issued to the Investors in exchange for their respective capital contributions at a fixed price of ▮▮▮▮ per Class A-1 Unit. |
| | At the Closing, CITGO Petroleum Corporation, a Delaware corporation and indirect subsidiary of Topco, will issue to certain investors, including Elliott (the "***Convertible Noteholders***") convertible secured notes (the |

"*Convertible Notes*") that convert into Class A-2 Units.[1,2] Class A-2 Units will be issued exclusively upon the conversion or exercise, as applicable, of such Convertible Notes or warrants in accordance with their terms. No Class A-2 Units will be issued or outstanding at or as of the Closing. In the definitive documentation for the Convertible Notes and warrants, Topco will covenant and agree to issue Class A-2 Units upon conversion or exercise, as applicable, of the Convertible Notes and warrants.

Class B Units will be issued pursuant to a management incentive plan (the "*MIP*") to employees and other natural persons who are Incentive Equity Grantees (as defined below); <u>provided</u>, that no Class B Units shall be issued to Elliott or any of its affiliates or any of their respective employees.[3]

Except for (i) Class A-1 Units, (ii) Class B Units issued pursuant to the MIP, if any, (iii) the Convertible Notes and (iv) any warrants issued to the Convertible Noteholders (the "*warrants*" and the Convertible Noteholders in their capacity as holders of warrants, the "*warrantholders*"), there will be no equity securities or securities convertible into equity securities of Topco issued or outstanding at or as of the Closing and there will be no options, warrants or instruments convertible into or exercisable or exchangeable for equity securities of Topco outstanding at or as of the Closing. The holders of Class B Units (whether vested or unvested) shall have no voting rights for any Class B Units held by such holders.

*Use of Proceeds*:

The proceeds of the subscriptions for the Class A-1 Units shall be used to finance a portion of the purchase price of the Acquisition, to pay transaction expenses and to fund the balance sheet and working capital of the Company (including PDVH).

*Governance*:

Board Composition

The General Partner shall delegate its entire authority to manage the business and affairs of Topco to a board of managers (the "*Board*"). The Board will have six managers (each, a "*Manager*") comprised as follows: (a) four Managers designated by Elliott (the "*Elliott Designees*"); (b) the then-current chief executive officer of the Company (the "*CEO Manager*"); and (c) for so long as it holds any Convertible Notes or any interests in Topco following conversion thereof, one manager designated by Oaktree Capital Management, L.P. ("*Oaktree*," and such manager, the "*Oaktree Manager*"); <u>provided</u>, that notwithstanding the foregoing, Oaktree's right to appoint one manager shall apply (on a proportionate basis) to the board of managers (or equivalent governing body) of Topco,

---

[1] **Note to Draft**: The terms (including conversion terms) applicable to the convertible secured notes are set forth in the Convertible Notes term sheet.

[2] **Note to Draft**: Note that the right to convert into ▮▮▮ of the equity of Topco will be documented as warrants issued to holders of the Convertible Notes instead of a feature of the Convertible Notes themselves. Final documentation will reflect this, and any equity-like rights set forth in this term sheet that are specific to holders of Convertible Notes will attach to the warrants instead.

[3] **Note to Draft**: MIP terms (including allocation methodology and vesting, forfeiture and redemption terms) are set forth in the MIP term sheet.

or any holding company or subsidiary of Topco from time to time that effectively functions as the board of directors (or equivalent governing body) of the Company. Two of the Elliott Designees appointed under clause (a) shall be designated as "*EIM Managers*."

Removal and Replacement of Managers

Elliott will have the right to remove and replace the Elliott Designees at any time and for any reason, and to fill any vacancies otherwise resulting in such manager positions. Oaktree will have the right to remove and replace the Oaktree Manager at any time and for any reason, and fill any vacancy otherwise resulting in such Oaktree Manager position.

Board Action

Each Manager will have one vote; provided, that each EIM Manager shall have three votes. Any EIM Manager may exercise the vote on behalf of any absent or vacant EIM Manager. All actions of the Board will be taken by a majority vote of those present at a meeting at which a quorum is present, and will require the approval of the EIM Managers. Any action of the Board may be taken by the written consent of Managers holding a majority of the voting power and will require the written consent of the EIM Managers; provided, that Topco shall promptly provide notice to all Managers of such written consent.

The Board shall hold regularly scheduled meetings at least once per calendar quarter or as otherwise determined by the chairperson of the Board. Meetings of the Board may also be called by a majority of the Board, by any EIM Manager or by the CEO Manager upon not less than 24 hours' prior notice. Managers will be able to attend such meetings by videoconference or telephone, if necessary, and such attendance shall constitute presence at a meeting.

At every meeting of the Board, a quorum shall require the attendance, whether in person, telephonically, virtually or in any other manner permitted by applicable law, of (a) the number of managers representing a majority of the voting power of the Board and (b) at least one EIM Manager.

Observers

Elliott shall be entitled to designate observers to the Board.

In addition, for so long as a Designated Noteholder (together with its affiliates on an aggregate basis) continues to hold more than 50% of the original principal amount of the Convertible Notes held by such Designated Noteholder (together with its affiliates on an aggregate basis) as of the Closing, such Designated Noteholder shall be entitled to designate two observers to the Board. "*Designated Noteholder*" means Carronade Capital Management, LP.

Duties of Managers and Officers

To the maximum extent permitted by applicable law, Topco and each limited partner will waive any claims against the General Partner, any

3

Manager and any limited partner, in each case, for any breach of any duties (including fiduciary duties), including as may result from a conflict of interest. Officers (other than any officer affiliated with Elliott) will have the duties of officers under Delaware law applicable to officers of corporations organized under the Delaware General Corporation Law.

**Related Party Transactions:**   Without the approval of a majority of the disinterested Managers (which, for the avoidance of doubt, shall exclude the EIM Managers), the Company may not enter into any transaction or contract with Elliott (or its controlled affiliates) with a value or cost to the Company, as the case may be, in excess of $10 million other than (a) transactions entered into in the ordinary course of business on an arms-length basis, (b) in connection with the exercise of an Investor's rights granted under the LPA and other transactions contemplated by the LPA or (c) purchases by Elliott or its affiliates of any indebtedness or debt securities issued by the Company (subject to the Company's compliance with the preemptive rights described below, if applicable). All Related Party Transactions not approved by a majority of the disinterested Managers shall be on arm's length terms no less favorable to the Company than those available from unrelated third parties. For the avoidance of doubt, such approval rights shall be in addition to any approval or consent rights provided to the Convertible Noteholders set forth in the definitive documentation governing the Convertible Notes (the "**Convertible Notes Documentation**").

**Management Delegation:**   Matters to be delegated by the Board to the chief executive officer and his or her reports will be commensurate with those customarily delegated to persons holding such positions at companies of a similar size in a similar industry and shall be pursuant to a written delegation of authority policy. All other matters concerning the business and affairs of the Company will be a decision of the Board.

**Amendments:**   In addition to the consents otherwise expressly provided for hereunder and provided to the Convertible Noteholders in the Convertible Notes Documentation, any amendment, modification, termination or waiver (however effectuated, including by merger, consolidation, division or similar transaction act or adoption of a new agreement, "**Amendment**") to any provision of the LPA or other agreements or organizational documents in which the provisions of this Term Sheet are contained or other agreements to which an Investor is party shall require the consent of (i) Elliott, (ii) each other Investor who holds Class A-1 Units and (iii) each other Investor who holds Class A-2 Units representing more than 5% of the equity interests of Topco on a fully diluted basis at such time if such Amendment (x) adversely affects any tag along right, preemptive right or any other specific right granted to such Investor or (y) adversely and disproportionately affects such Investor in its capacity as a holder of a particular class of Units relative to the rights of other Investors holding the same class of Units (without giving effect to such Investors', specific tax or economic positions, or any other matters that are personal to such Investor). Notwithstanding the foregoing, any Amendment to the LPA that adversely affects the rights of any holder of Class A-2 Units relative

to the other holders of Class A-2 Units shall require the written consent of such adversely affected holder.

Notwithstanding anything to the contrary but subject to the preemptive rights described below and any limitations set forth in the Convertible Notes Documentation, an Amendment made to reflect (a) the terms and conditions of any new class or series of equity securities established in accordance with the terms of the LPA (including any Amendment to reflect the exchange of Convertible Notes into convertible preferred equity as contemplated by the Convertible Notes term sheet) and any restrictions, rights, preferences and privileges associated therewith or (b) the restrictions on or rights of any person who purchases equity securities after the date hereof shall, in each case of clauses (a) and (b), require only the approval of the Board.

The foregoing consent rights will terminate upon consummation of an IPO except to the extent that Topco remains an equityholder of the IPO issuer or is the partnership in an Up-C or similar reorganization in connection with an IPO.

**Preemptive Rights:**

If Topco or any of its wholly owned subsidiaries proposes to issue (x) any new debt securities or indebtedness to Elliott or its affiliates, including in connection with an issuance to a third party in which Elliott or its affiliates participates, or (y) any new equity securities, including any securities convertible into, or exercisable or exchangeable for, equity securities, then in each case of clause (x) and clause (y), each Preemptive Rightsholder (as defined below) will have customary preemptive rights to purchase its *pro rata* share of such debt, equity or equity-like securities of the Company at the same price and on the same terms and conditions that the Company proposes to issue such securities (to maintain its ownership on a fully diluted basis), subject to customary exceptions including: (a) equity or equity-based securities issued to managers, employees, bona fide consultants and other bona fide advisors and service providers ("**Incentive Equity Grantees**") (none of which is to Elliott, any of its affiliates or any of their respective employees, or any Convertible Noteholder solely by virtue of its ownership of Convertible Notes) as compensation for services provided to the Company; (b) issuances or grants of securities in connection with any Unit split or recapitalization of Topco in which the economic and voting rights of the Units are preserved in all material respects and each holder of Units participates on a *pro rata* basis; (c) securities issued upon the exercise of outstanding convertible securities; (d) securities issued to a non-affiliated seller as consideration for the Company's purchase of stock or assets or other property of such seller; (e) securities issued to the public in an initial public offering; (f) securities issued in connection with any debt financing or other bona fide strategic partnership with a third-party commercial entity (excluding Elliott and its affiliates) for purposes related to the business of the Company (and not for the primary purposes of a financing transaction or arrangement unrelated to such business purposes); and (g) securities issued by a wholly owned subsidiary of Topco to Topco or another wholly owned subsidiary of Topco. The preemptive rights will contain a customary mechanism permitting Topco to issue equity or equity-like

securities to any person subject to the obligation to comply with the preemptive rights within a specified time period (not more than 90 days) following the closing of any such transaction. As used herein, the term "***Preemptive Rightsholder***" means each holder of Class A Units and each holder of Convertible Notes, participating pro rata on an as-converted basis (giving effect to the liquidation preference of the Convertible Notes at the time of such determination and at the valuation implied by such proposed issuance) based on the Board's good faith determination of fair market value of Class A Units (including the Convertible Notes on an as-converted basis) at such time (and <u>provided</u>, that so long as such determination is made by the Board acting in good faith, it shall be final and binding on each limited partner and each Convertible Noteholder).

Other than the related party transaction provisions, amendment provisions and the preemptive rights described above, the LPA shall not contain any restrictions or other limitations on the ability of the Company to issue additional indebtedness, debt or equity securities (including convertible and/or preferred debt or equity securities with such terms and other rights and preferences as may be determined by the Board in its sole discretion) following the Closing; <u>provided</u>, that in no event shall the Company issue equity securities for a purchase price less than fair market value as determined in good faith by the Board.

|  |  |
|---|---|
| ***Information Rights*:** | For so long as any limited partner continues to hold 50% or more of the Units of each class of Units held by such limited partner as of the initial issuance date of such Units to such holder (as adjusted for any splits, combinations, equity dividends or similar actions), and subject to certain customary exceptions (e.g., not in violation of any restrictive covenants), the Company shall (a) make available to such holder quarterly and annual financial statements (in each case, together with management's written commentary, discussion and analysis of such financial statements), and (b) conduct (and invite such limited partners to attend) conference calls not less frequently than once per calendar quarter, conference calls to consist of the Company's senior management discussing the Company's financial condition and result of operations for the applicable period; provided, that no foreign investor (for purposes of CFIUS) shall be permitted access to any material non-public technical information, as that term is defined in Section 721 of the U.S. Defense Production Act of 1950, as amended, and CFIUS implementing regulations at 31 C.F.R. Part 800 (together, "***CFIUS Rules***"); nor have any involvement in any substantive decision-making, as those terms are defined in the CFIUS Rules regarding (i) the use, development, acquisition, safekeeping, or release of sensitive personal data of U.S. citizens maintained or collected by any portfolio company or (ii) the use, development, acquisition, or release of critical technologies, as that term is defined in the CFIUS Rules; and provided, further, that the Board may elect to withhold any such information from any Investor if the Board makes a good faith determination that disclosure of such information to such Investor reasonably could be expected to result in public disclosures of such information that are more likely than not to cause material harm to the Company. Without limiting the foregoing, any Investor (including any |

warrantholder) may make public disclosures of Company-related information solely to the extent (x) required by the applicable law or relevant exchange rules for the publicly listed securities of such Investor or (y) approved by the Board in advance; <u>provided</u>, that any disclosure pursuant to the immediately preceding clause (x) that discloses the financial performance of the Company shall in all events be subject to advance approval by the Board, which shall act in good faith and shall cooperate with such Investor to enable such Investor to satisfy its obligations under such applicable law or exchange rules while limiting the extent of such disclosure to the maximum reasonably possible. For the avoidance of doubt, basic tax reporting, such as an Investor's K-1 or similar form, and any reasonable information required for tax reporting and the preparation of tax returns shall be made available to each holder of Units.

The information rights described above shall inure to the benefit of each Convertible Noteholder and warrantholder, and may be satisfied by posting on a private data site accessible to such holder.

***Transfer Restrictions*:** Prior to the occurrence of a Change of Control resulting in any equity interests of the Company becoming publicly traded or a Qualified IPO (as such terms are defined in the Convertible Notes Documentation), without the consent of the Board, no Investor shall (directly or indirectly) sell, assign, pledge, exchange, or transfer its Units in the Company to any third party, in each case other than customary permitted transfers (e.g., transfers to permitted affiliates, transfers for estate planning purposes (including with respect to the Specified Writholder, transfers of equity interests in the Specified Writholder) and transfers by (x) Elliott and its affiliates and the Dragged Investors (as defined below) in each case pursuant to the exercise of the drag-along rights described below and (y) Tag Along Investors (as defined below) pursuant to the exercise of the tag along rights described below (each, a "***Permitted Transfer***" and each such transferee of a Permitted Transfer, a "***Permitted Transferee***"); <u>provided</u>, that notwithstanding anything else to the contrary but subject to the tag-along rights described below, Elliott and its affiliates may freely transfer (directly or indirectly) the Units held by them at any time and from time to time without approval by the Company or the Board. Subject in all events to the Convertible Notes documentation, if a Convertible Noteholder transfers Convertible Notes to a third party, then concurrently with such transfer, the applicable warrantholder shall transfer to such third party a pro rata portion of the warrants held by such warrantholder (and such concurrent transfer of the warrants shall not be subject to approval by the Company or the Board); warrants shall only be transferable in connection with a transfer of the Convertible Notes. Class B Units shall be non-transferable.

Direct and indirect transfers to (a) any existing holding company owned and controlled by a limited partner, or (b) any new company formed by any limited partner for purposes of holding its Units in Topco shall be subject to the same transfer restrictions, tag along rights and other provisions applicable to direct transfers of Units.

Without limiting the foregoing, any acquirer of Units must agree to execute a joinder to the LPA and be bound by the provisions of the LPA, and to make customary representations including as to its status as a "qualified purchaser" and "accredited investor" (as defined in Rule 501 pursuant to the Securities Act of 1933, as amended).

Subject to the restrictions contained herein, no Investor shall be entitled to transfer any Units at any time unless the Board is reasonably satisfied that such transfer would not: (1) violate applicable securities laws; (2) cause Topco to become subject to the registration requirements of the Investment Company Act of 1940; (3) cause Topco to become subject to the registration requirements of Section 12(g) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***") or the reporting obligations under Section 15(d) of the Exchange Act; (4) be a non-exempt "prohibited transaction" under the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder ("***ERISA***") or the U.S. Internal Revenue Code of 1986, as amended (the "***Code***") or cause all or any portion of the assets of Topco or its subsidiaries to constitute "plan assets" under ERISA or Section 4975 of the Code; (5) cause Topco to violate the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or the Clayton Antitrust Act of 1914; (6) violate any CFIUS Rules if any proposed transferee is a "foreign person"; or (7) result in a transfer of Units to any person who is subject to sanctions or included on any Specially Designated Nationals and Blocked Persons list maintained by the United States Office of Foreign Assets Control.

***Competing Entities/Investments:***

Subject to customary restrictions on use of the Company's confidential information, each party will acknowledge that Elliott, Oaktree, the Specified Writholder and each institutional investor holding Class A-1 Units, Convertible Note Interests and/or Convertible Notes may hold or pursue other investments that compete with the business of the Company.

***Tag Along Rights:***

Each holder of Class A Units shall have customary tag along rights solely with respect to proposed transfers of equity securities of Topco by any other holder (other than transfers pursuant to (a) a Drag-Along Transaction, (b) Permitted Transfers or (c) an IPO). In the event a limited partner desires to transfer or sell any of its Units (such selling limited partner, the "***Tag Seller***") and the applicable conditions (if any) in the prior sentence are satisfied (such transfer, a "***Tag Along Sale***"), such Tag Seller must give at least 20 days' written notice to all other holders of Class A Units (the "***Tag Along Investors***"), with such written notice specifying in reasonable detail the identity of the Proposed Transferee(s), the number of Class A Units to be transferred and the material terms and conditions of the transfer ("***Tag Along Sale Notice***").

The Tag Along Investors may irrevocably elect to participate in such Tag Along Sale by giving written notice of such irrevocable election to the Tag Seller within 20 days after receipt of the Tag Along Sale Notice. For each Tag Along Investor, with respect to the Class A Units to be transferred, such participation shall be *pro rata*.

8

Each Tag Along Investor participating in such Tag Along Sale shall transfer its Class A Units on the same terms and conditions (including, to the extent applicable, the same form and type of consideration, and in the same proportions, as is offered to Elliott).

If the Tag Along Investors have not elected to participate in the contemplated transfer before the expiration of the 20-day period after receipt of the Tag Along Sale Notice, then the Tag Seller may transfer the Class A Units specified in the Tag Along Sale Notice at a price and on other material terms no more favorable in the aggregate to the Proposed Transferee(s) thereof than specified in the Tag Along Sale Notice within a 120-day period beginning with the delivery of the Tag Along Sale Notice. If any of the Tag Seller's Class A Units are not transferred during such 120-day period, they shall be subject to the tag along procedures again before the Tag Seller can sell the Class A Units.

Notwithstanding the foregoing, no tag along rights shall apply in connection with any transfers of Class A Units made by Elliott at any time prior to the first (1st) anniversary of the Closing to one or more (x) limited partners in any fund of investment vehicle managed by Elliott funds, or any affiliate of any such limited partner, or (y) Convertible Noteholders or affiliate thereof.

For the avoidance of doubt, if a transaction (x) constitutes a Tag Along Sale and (y) results in the conversion of the Convertible Notes into Class A-2 Units in accordance with their terms, then Convertible Noteholders shall be permitted to exercise the foregoing tag along rights with respect to the Class A-2 Units issued or issuable upon conversion of the Convertible Notes.

***Drag–Along Rights*:**   Elliott shall be entitled to customary drag-along rights and be entitled to drag the other Investors ("***Dragged Investors***") in order to consummate a sale of the Company to an unaffiliated third party ("***Drag-Along Transaction***").

Each Dragged Investor shall take all necessary and desirable actions in connection with the consummation of a sale of the Company (whether in such person's capacity as a limited partner, manager or otherwise) as reasonably requested by Elliott as long as the proceeds of such Drag-Along Transaction are paid proportionally with respect to the Class A-1 Units and Class A-2 Units, on a collective basis, including the right to elect to receive cash or "rollover" securities (including (a) subject to customary limitations with respect to non-competition, non-solicitation and certain other restrictive covenants, in each case, as executed by Elliott, executing and delivering any and all agreements, instruments, consents, waivers, releases and other documents in substantially the same forms and on the same terms (in each case, to the extent applicable) as executed by Elliott (including any applicable purchase agreement, stockholders agreement and/or indemnification and/or contribution agreement, with customary representations and warranties; <u>provided</u>, that other than with respect to indemnification obligations unique to a holder of Units (e.g., with respect to representations and warranties given by such holder with respect to such holder) which shall be borne on a several

9

and not joint and several basis, all such indemnification obligations shall be borne ratably among the applicable holders of Topco equity based on ownership (subject to an overall cap of the proceeds received by such Investor in connection with such sale of the Company)), (b) furnishing information and copies of documents, (c) with respect to management holders only, filing applications, reports, returns, filings and other documents or instruments with governmental entities, participating in management meetings and preparing pitchbooks and confidential information memorandums, and providing assistance with legal, accounting, tax, financial, benefits and other forms of due diligence, (d) cooperating with the Company and Elliott with such sale of the Company, (e) with respect to management holders only, agreeing to any restrictive covenants as necessary, and (f) waiving any dissenters rights, appraisal rights or similar rights in connection with such sale of the Company, and (g) bearing its *pro rata* portion of the expenses incurred pursuant to any sale of the Company; provided, that all such expenses shall be paid by the Company and borne by the Dragged Investors through a *pro rata* reduction on the proceeds they receive from such Drag-Along Transactions and no Dragged Investor shall be required to pay any out-of-pocket amounts (other than de minimis expenses) in connection with any Drag-Along Transactions.

For the avoidance of doubt, no limited partner other than Elliott shall have the right to force a sale of the Company, IPO or similar exit transaction with respect to the Company.

| | |
|---|---|
| ***IPO***: | In the event that the Board approves an IPO, including any related Recapitalization Transaction (as described below), the Investors shall be required to cooperate and take all necessary or desirable actions in connection with the consummation of the IPO as determined by the Board, subject to customary protections, including that each Investor (including, for the avoidance of doubt, each Convertible Noteholder with respect to Class A-2 Units received upon conversion thereof) will participate ratably with Elliott in the IPO and on the same terms and conditions as Elliott and otherwise as set forth in Recapitalization Transaction below. |
| ***Recapitalization Transaction***: | Prior to but subject to consummation of an IPO, if the Board determines to effect a transaction in which one or more classes or series of Units or other equity securities issued by Topco or any of its direct or indirect subsidiaries are, in whole or in part, on a *pro rata* basis among all holders of such securities, converted into, or exchanged for, Interests or other equity securities issued by (a) Topco or any of its direct or indirect subsidiaries, (b) any newly formed holding company or subsidiary of Topco and/or (c) any affiliated person of Topco, in each case in connection with effecting an IPO (a "***Recapitalization Transaction***"), each Investor of Topco will exchange or convert its *pro rata* amount of such Units or other equity securities of Topco held by such Investor, and each such Investor shall receive its *pro rata* amount of the same securities and other consideration in respect of each such equity security exchanged or converted except for immaterial differences, if any, arising from the |

respective rights of the underlying converted or exchanged equity securities and/or the respective rights of each of the Investors set forth in this Term Sheet; <u>provided</u> that for the avoidance of doubt, any securities exchanged in respect of Class A-2 Units, Convertible Note Interests and/or Convertible Notes shall in each case provide the same rights and economic equivalent entitlements as such underlying converted or exchanged security other than in respect of immaterial differences. Such IPO shall occur promptly following the consummation of such Recapitalization Transaction and, if such IPO is not consummated within 120 days (or such longer period as Elliott may agree to, subject in all events to the Board's continued pursuit of such IPO) following such Recapitalization Transaction, then, at Elliott's sole discretion, such Recapitalization Transaction shall immediately be unwound.

| | |
|---|---|
| ***Registration Rights***: | The LPA will provide for (i) customary piggyback registration rights in connection with an IPO for each holder of equity of the IPO entity and (ii) customary post-IPO demand registration rights in favor of the holders of a majority of the Class A-2 Units (or equity of the IPO entity received in exchange therefor) received upon conversion of Convertible Notes held by Convertible Noteholders other than those affiliated with Elliott. |
| ***Corporate Opportunities***: | The organizational documents of Topco will include customary waivers of the corporate opportunities doctrine as it applies to Elliott, Oaktree, the Specified Writholder, each institutional investor holding Class A-1 Units, Convertible Note Interests and/or Convertible Notes and each of their respective affiliates and all of their respective designees and nominees, in each case, subject to customary restrictions on use of the Company's confidential information. |
| ***Indemnification; D&O Insurance***: | The Company will obtain and maintain customary directors' and officers' liability insurance (as approved by the Board) to be in effect at all times. |
| | The organizational documents of the Company will contain exculpation and indemnification rights for managers, directors and officers to the maximum extent allowable under applicable law. |
| ***Confidentiality***: | Customary confidentiality provisions, subject to customary exceptions. |
| | Subject in all events to the prior written consent of the Board, and the execution and delivery by each prospective transferee of a confidentiality agreement in form and substance reasonably acceptable to the Company, a limited partner shall be permitted to disclose certain confidential information to prospective investors in connection with a contemplated sale of some or all of the Units held by such limited partner. |
| ***Documentation***: | The terms of the Units and the governance terms described herein will be documented in a limited partnership agreement of Topco (the "***LPA***") containing the terms described herein. The LPA shall provide that each Convertible Noteholder is a third-party beneficiary of the LPA, entitled to enforce the terms of the LPA directly against Topco and the other parties thereto, with all rights and remedies at law and equity. The initial draft of the LPA will be prepared by Elliott's legal counsel. |

| | |
|---|---|
| ***Governing Law;*** <br> ***Jurisdiction*:** | This Term Sheet shall be governed and construed in accordance with the laws of the State of Delaware applicable to contracts to be made and performed entirely therein without giving effect to the principles of conflicts of law thereof or of any other jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or for recognition or enforcement of any judgment relating thereto, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal court of the United States of America sitting in the State of Delaware), (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and any appellate court from any thereof, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware), and (d) waives, to the fullest extent it may legally and effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware). Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. |

ANNEX I to
EXHIBIT C

**[HOLDINGS]**

**SOLVENCY CERTIFICATE**

[_____], 20[_]

Pursuant to Section [_] of the [Convertible Note Documentation], dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "[***Convertible Note Documentation***]"), among [_____], the undersigned [chief financial officer] of Holdings hereby certifies as of the date hereof, solely on behalf of Holdings and not in his/her individual capacity and without assuming any personal liability whatsoever, that:

I.    I am familiar with the finances, properties, businesses and assets of Holdings and its Subsidiaries. I have reviewed the [Convertible Note Documentation] and such other documentation and information and have made such investigation and inquiries as I have deemed necessary and prudent therefor. I have also reviewed the consolidated financial statements of Holdings and its Subsidiaries, including projected financial statements and forecasts relating to income statements and cash flow statements of Holdings and its Subsidiaries.

II.   On the Closing Date, immediately after giving effect to the Transactions, Holdings and its Subsidiaries (on a consolidated basis) are solvent and (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course and (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital.

All capitalized terms used but not defined in this certificate shall have the meanings set forth in the [Convertible Note Documentation].

[*SIGNATURE PAGE TO FOLLOW*]

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**[HOLDINGS]**


By: _____
Name:
Title:

**E-8**

Elliott Associates, L.P.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor
West Palm Beach, FL 33401

Elliott International, L.P.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor
West Palm Beach, FL 33401

August 22, 2025

Amber MSub LLC
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor
West Palm Beach, FL 33401
Attention: Mike Tomkins, Senior Portfolio Manager

     Re:    Equity Financing Commitment

Ladies and Gentlemen:

This letter agreement (this "Agreement") sets forth the commitments of Elliott Associates, L.P., a Delaware limited partnership ("Elliott Associates"), and Elliott International, L.P., a Cayman Islands limited partnership ("Elliott International" and together with Elliott Associates, collectively, the "Investors" and each, an "Investor"), subject to the terms and conditions contained herein, to purchase or cause to purchase, directly or indirectly, certain interests of Amber MSub LLC, a newly formed Delaware limited liability company ("Buyer"). It is contemplated that, pursuant to the Stock Purchase Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), dated as of the date hereof, between Buyer and Robert B. Pincus, in his capacity as the Special Master ("Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"), Buyer will purchase 100% of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company") on the terms and subject to the conditions of the Purchase Agreement (the "Acquisition"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement, except as otherwise provided.

     1.    Commitments. Each Investor hereby commits, on a several (not joint or joint and several) basis and subject to the terms and conditions set forth herein that, at or immediately prior to the Closing, it shall: (a) purchase, or shall cause the purchase by a Permitted Assignee of, directly or indirectly through one or more intermediate entities, interests of Buyer with an aggregate purchase price not to exceed the amount set forth opposite such Investor's name on Annex A (with respect to each Investor, its "Commitment"), solely for the purposes of (i) enabling Buyer to fund a portion of the Closing Consideration pursuant to Section 3.4 of the Purchase Agreement and (ii) paying fees and expenses payable by Buyer related to the consummation of the Closing under the Purchase Agreement; provided, that no Investor shall, under any circumstances, be obligated to contribute, purchase equity of, or otherwise provide funds to, Buyer in any amount in excess of its Commitment; provided, further, the amount of the Commitments to be funded under this Agreement may be reduced, on a *pro rata* basis in proportion to the respective Commitment of each Investor, to the extent (and only to the extent) that, at the Closing, Buyer does not require the full amount of the Commitments, taken together with the Debt Financing and any other source of funds for Buyer to fund the amounts described in the foregoing clauses (i) and

(ii).  The aggregate proceeds of the Commitments shall constitute the "<u>Aggregate Commitments</u>" for purposes of this Agreement.  Notwithstanding anything to the contrary in this Agreement, in no event shall the cumulative liability of each Investor under this Agreement exceed the amount of its respective Commitment.  All payments hereunder shall be made in lawful money of the United States, in immediately available funds. For the avoidance of doubt, the Commitments are payable only at the Closing upon satisfaction of the conditions set forth in <u>Section 2</u> of this Agreement and only for the uses described above, and the Commitments shall not be payable at any other time, under any other circumstance or for any other purpose. The proceeds from the Aggregate Commitments shall be used by Buyer solely to (i) fund a portion of the amounts payable pursuant to and in accordance with the terms of the Purchase Agreement and (ii) pay fees and expenses payable by Buyer related to the consummation of the Closing under the Purchase Agreement.

2.    <u>Conditions</u>.  Each Investor's obligations under this Agreement, including the obligation of each Investor to fund its respective Commitment shall be subject to (a) the valid execution and delivery of the Purchase Agreement by all parties thereto, (b) all conditions in Section 7.1 and Section 7.2 of the Purchase Agreement (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions; <u>provided</u>, that such conditions are then capable of being satisfied and will be satisfied at the Closing) being satisfied or waived by the Investors, (c) the Debt Financing having been funded in accordance with the terms thereof at the Closing, or the Debt Financing Sources having confirmed in writing that the Debt Financing will be funded at the Closing if the Equity Financing is funded at the Closing, (d) the substantially simultaneous consummation of the Acquisition in accordance with the terms of the Purchase Agreement concurrently with the funding of the Aggregate Commitments, (e) the entry of the Sale Order by the Court and (f) the Purchase Agreement shall not have been terminated.

3.    <u>Parties in Interest; Third Party Beneficiaries; Limited Recourse</u>.

(a)    The parties hereto hereby agree that their respective agreements and obligations set forth herein are solely for the benefit of the other party hereto and its respective successors and permitted assigns, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto and their respective successors and permitted assigns any benefits, rights or remedies under or by reason of, or any rights to enforce or cause Buyer to enforce, the obligations set forth herein; <u>provided</u>, that (i) the Special Master (and, for the avoidance of doubt, not his Affiliates, the Company, the Claimholders or their respective Affiliates, stockholders or any of their other securityholders) is an express third-party beneficiary hereof and shall have the enforcement rights to the extent provided in <u>Section 4(b)</u> of this Agreement and no others and (ii) each of the Non-Recourse Parties is an express third-party beneficiary hereof solely for purposes of <u>Section 3(b)</u> of this Agreement.

(b)    Notwithstanding anything that may be expressed or implied in this Agreement, the Purchase Agreement, or any document or instrument delivered contemporaneously herewith or therewith, and notwithstanding the fact that either of the Investors may be a partnership or other entity, Buyer, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that (i) no Person other than the Investors (and any Permitted Assignee) shall have

2

any obligation (whether of an equitable, contractual, tort, statutory or other nature) hereunder, (ii) it shall have no right of recovery against, and no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against, any Non-Recourse Party, whether by or through attempted piercing of the corporate, partnership or limited liability company veil, by or through a claim by or on behalf of Buyer against any Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law or otherwise, and (iii) no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Non-Recourse Party as such for any obligations of the Investors under this Agreement or any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to have been made in connection herewith or therewith or for any claim (whether at law or equity or in tort, contract or otherwise) based on, in respect of, or by reason of such obligations or their creation.  Buyer hereby covenants and agrees that it shall not institute, and shall cause its Affiliates and Representatives not to institute, any proceeding or bring any other claim arising under, or in connection with, this Agreement, the Purchase Agreement, the Debt Financing Commitments or the transactions contemplated hereby or thereby, against the Investors or any Non-Recourse Party. Nothing set forth in this Agreement shall confer or give, or shall be construed to confer or give, to any Person other than Buyer and the Special Master (including any Person acting in a representative capacity) any rights or remedies against any Person (including any Investor), except as expressly set forth herein.  As used herein, the term "Non-Recourse Parties" means, collectively, any former, current or future equity holders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, stockholders, Affiliates (other than Buyer and its permitted assignees under the Purchase Agreement), Representatives, or assignees of any Investor and any and all former, current or future equity holders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, stockholders, Affiliates, Representatives or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assigns of any of the foregoing; provided, that each Investor shall not be a "Non-Recourse Party"; provided, further, that nothing herein is intended to limit the Special Master's right to assert claims against Buyer for specific performance pursuant to Section 9.13 of the Purchase Agreement.

4.    Enforceability.  This Agreement may only be enforced by (a) Buyer at the direction of the Investors or (b) if the Special Master is entitled to (and is seeking to) cause Buyer to effect the Closing pursuant to Section 9.13 of the Purchase Agreement and under no other circumstances, the Special Master, pursuant to and solely in accordance with the terms of Section 9.13 of the Purchase Agreement and this Agreement, solely for the purpose of seeking specific performance of Buyer's right to cause each Investor to fund its Commitment in accordance with the terms hereof, and not for any other purpose (including any claim for monetary damages).  For the avoidance of doubt, except as set forth in clause (b) of the immediately preceding sentence, creditors of Buyer shall have no right to enforce this Agreement or cause Buyer to enforce this Agreement.  Notwithstanding anything to the contrary contained in this Agreement or any other document, the obligations of the Investors under this Agreement shall be several and not joint or joint and several.  In no event shall this Agreement or any portion of the Commitments hereunder be enforced by the Special Master against either Investor unless the enforcement of all Commitments hereunder is simultaneously enforced against the Investors.  For the avoidance of doubt, each Investor will only fund its respective Commitment to Buyer (pursuant to the terms of, and subject to the

limitations and conditions set forth in, this Agreement) and in no event shall any Investor have any liability or obligation pursuant to this Agreement in excess of such Investor's Commitment.

5.    <u>No Modification; Entire Agreement</u>.  This Agreement may not be amended or otherwise modified without the prior written consent of Buyer and the Investors; <u>provided</u>, that any amendment or modification of this Agreement that is reasonably expected to adversely affect the Special Master shall also require his prior written consent in his capacity as a third party beneficiary.  Together with the Purchase Agreement (including all exhibits and schedules thereto), the Confidentiality Agreement, the Company Disclosure Schedules and the Debt Commitment Letters, this Agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between the Investors or any of their respective Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 10</u> of this Agreement, no transfer or assignment of any rights or obligations hereunder shall be permitted without the prior written consent of Buyer, the Investors and the Special Master.  Any assignment or transfer in violation of the preceding sentence shall be null and void.

6.    <u>Governing Law; Jurisdiction; Venue; Waiver of Jury Trial</u>.

(a)    This Agreement, and any claim, counterclaim, suit, action or proceeding in any way arising out of or relating to this Agreement, the negotiation, execution or performance of this Agreement, or the transactions contemplated hereby (in each case, whether at law or in equity, whether sounding in contract, tort, statute or otherwise) shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction.  In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

(b)    The Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in <u>Section 12</u> of this Agreement.  Nothing in this <u>Section 6(b)</u>, however, shall affect the right of any Person to serve legal process in any other manner permitted by Law.

(c)    EACH PARTY HERETO (AND THE SPECIAL MASTER, IN HIS CAPACITY AS AN INTENDED THIRD PARTY BENEFICIARY OF THIS AGREEMENT SOLELY TO THE EXTENT SPECIFIED IN <u>SECTION 3(A)</u>) OF THIS AGREEMENT ACKNOWLEDGES THAT ANY ACTION, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND

4

THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LITIGATION, ACTION, PROCEEDING OR COUNTERCLAIM.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT:  (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH ACTION OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6(C).

7.    Counterparts and Signature.  This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, scanned pages via electronic mail or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail or via electronic execution method (e.g. DocuSign) (any such delivery, an "Electronic Delivery"), shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered personally by hand.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract and each such party forever waives any defense.

8.    Confidentiality.  This Agreement shall be treated as confidential and is being provided to Buyer solely in connection with the transactions contemplated by the Purchase Agreement.  This Agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the prior written consent of each of the Investors.  Notwithstanding the foregoing, and without prejudice to any other provision of this Agreement, this Agreement may be (a) provided to (i) the Affiliates and Representatives of each Investor and (ii) the Special Master and his Representatives with a bona fide need to review this Agreement; provided, that each such party agrees to treat this Agreement as confidential except to the extent permitted by clauses (b) and (c) of this section; (b) referred to in the Purchase Agreement; and (c) disclosed as may be required by applicable Law, regulation, or any order, of any Governmental Body or national stock exchange (provided, that to the extent reasonably practicable, (i) and to the extent required by the terms of the Purchase Agreement, the Special Master will provide the Investors an opportunity to review such required disclosure in advance of such disclosure being made and (ii) Investors will provide the Buyer an opportunity to review such required disclosure in advance of such disclosure being made) or in connection with the enforcement of the terms of this Agreement.

9.    Termination.  This Agreement and the obligation of each Investor to fund its Commitment in Section 1 of this Agreement will terminate automatically and immediately upon the earliest to occur of (a) the consummation of the Closing, (b) funding of the portion of the Commitment that is required to be funded by such Investor at Closing, (c) the valid termination of the Purchase Agreement in accordance with its terms, (d) the Court declining to specifically

5

enforce the obligations of Buyer to consummate the transactions contemplated by the Purchase Agreement pursuant to a claim for specific performance brought against Buyer pursuant to Section 9.13 of the Purchase Agreement and (e) the Special Master, or any of his Affiliates or Representatives, directly or indirectly, asserting, filing or otherwise commencing a Legal Proceeding or asserting any claim (other than (i) a valid claim against any Non-Recourse Party that is an express party to, and solely pursuant to the terms of, the Confidentiality Agreement, and (ii) a valid claim pursuant to and in accordance with (and solely to the extent permitted by) Section 3(a) and Section 4(b) of this Agreement) against any Investor or any Non-Recourse Party under the Purchase Agreement, this Agreement, the Debt Financing Commitments or any other agreement or document entered into in connection with the transactions contemplated hereby or thereby or otherwise relating hereto or thereto;; provided, that notwithstanding anything to the contrary in this Agreement, Sections 3, 4, 6, 7, 8, 9, 10 and 0 of this Agreement shall survive any termination.

10.    Assignment.    The Commitments evidenced by this Agreement shall not be assignable, in whole or in part, by Buyer without the Special Master and each Investor's prior written consent, and the granting of such consent in a given instance shall be solely in the discretion of the Special Master and the Investors, respectively, and, if granted, shall not constitute a waiver of this requirement as to any subsequent assignment. Each Investor may not allocate and/or assign all or a portion of its rights and obligations under this Agreement, including its obligations to fund its respective Commitment, to one or more of its Affiliates or affiliated investment funds, any of such Affiliates' or affiliated investment funds' limited partners, managed entities and/or co-investors, or any of their respective Affiliates or affiliated investment funds in each case with sufficient funds or undrawn commitments from its investors to allow it to meet the obligations assumed by it pursuant to such assignment and transfer, and which is managed or advised by an Affiliate of an Investor, without the prior written consent of the Special Master (such consent not to be unreasonably withheld, conditioned or delayed) (any such Person, a "Permitted Assignee"); provided, that no such assignment shall relieve such Investor of its obligations hereunder, including its obligation to fund its Commitment, except that such Investor's obligation to fund its Commitment shall be reduced dollar for dollar by any amounts actually funded to Buyer by such Permitted Assignee.    Any purported assignment of this Agreement or the Commitments in contravention of this Section 10 shall be void and of no force or effect.

11.    Representations and Warranties.    Each Investor hereby represents and warrants, on a several (not joint or joint and several) basis and solely as to itself, to Buyer that (a) it is duly organized and validly existing under the Laws of its jurisdiction of organization and has requisite power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby (i) have been duly authorized by all necessary limited partnership action on the part of such Investor and (ii) do not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, any Law, regulation or rule, or any order of, or any restriction imposed by, any Governmental Body applicable to such Investor, (c) this Agreement has been duly and validly executed and delivered by it and assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of such Investor, enforceable against such Investor in accordance with its terms (except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the enforcement of creditors' rights generally or by general principles of

6

equity), (d) such Investor has (and will have, for so long as the Commitment remains in effect) the financial capacity and sufficient unrestricted available funds (which may be in the form of uncalled capital commitments and which are available to be used at the Closing as provided herein) to pay and perform its obligations under this Agreement and (e) except for such consents, approvals, authorizations, permits of, filings with and notifications to, Governmental Bodies contemplated by the Purchase Agreement to be obtained or made after the date hereof, all consents, approvals, authorizations, permits of, filings with and notifications to, any Governmental Body necessary for the due execution, delivery and performance of this Agreement by such Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any Governmental Body is required in connection with the execution, delivery or performance of this Agreement.

12.    <u>Notices</u>.  All notices and other communications hereunder shall be given by the means specified in the Purchase Agreement (and shall be deemed given as specified therein), as follows:

> If to the Buyer or the Investors, to:
>
> Amber MSub LLC
> Elliott Associates, L.P.
> Elliott International, L.P.
> c/o Elliott Investment Management L.P.
> 360 S. Rosemary Ave, 18th Floor
> West Palm Beach, FL 33401
> Attention: Mike Tomkins, Senior Portfolio Manager and Elliot Greenberg
> Email:  mtomkins@elliottmgmt.com,
> egreenberg@elliottmgmt.com
>
> with a copy (which shall not constitute notice) to:
>
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036
> Attention:      Project Horizon
> E-mail:HorizonAkinCore@akingump.com

13.    <u>Miscellaneous</u>.

(a)    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction; <u>provided</u>, however, that this Agreement may not be enforced without giving effect to the limitation of the amount payable by any Investor hereunder to its Commitment provided in <u>Section 1</u> of this Agreement and to the provisions of <u>Sections 3</u> and <u>9</u> of this Agreement and this <u>Section 13(a)</u>.

(b)     When reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement, unless otherwise indicated.  The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party hereto.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.  Any reference to any federal, state, local or foreign statute, law or constitution shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  No summary of this Agreement prepared by any party shall affect the meaning or interpretation of this Agreement.

(c)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(d)     The obligations of the Investors hereunder are several and not joint or joint and several.  In no event shall an Investor have any liability or obligation hereunder for failure of the other Investor to perform its covenants or obligations hereunder, or otherwise be responsible with respect to the other Investor's commitments and guarantees hereunder.

(e)     The Investors agree that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Investors, and the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties.

*[Remainder of the page intentionally left blank]*

8

Sincerely,

**INVESTORS**:

ELLIOTT ASSOCIATES, L.P.

By:  Elliott Investment Management L.P., as attorney-in-fact

By: _____
Name: Elliot Greenberg
Title:   Vice President

ELLIOTT INTERNATIONAL, L.P.

By:  Hambledon, Inc., its general partner

By:  Elliott Investment Management L.P., as attorney-in-fact

By: _____
Name: Elliot Greenberg
Title:   Vice President

*[Signature Page to Equity Commitment Letter]*

Agreed to and accepted:

**<u>BUYER</u>**:

AMBER MSUB LLC

By: _____
      Name:
      Title:

*[Signature Page to Commitment Letter]*

**Annex A**

**Equity Commitments**

| Investor | Commitment |
|---|---|
| Elliott Associates, L.P. | ████████████████████ |
| Elliott International, L.P. | |
| Total | $25,000,000 |

## **Exhibit [F]**

**Transaction Support Agreement with the PDVSA 2020 Bondholders AHG**

*Execution Version*

# TRANSACTION SUPPORT AGREEMENT

This Transaction Support Agreement (this "**Agreement**"), dated as of August 12, 2025, is entered into by and among (a) Amber Energy Inc. ("**Amber**" or the "**Bidder**"); and (b) the undersigned holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, the 2020 Notes (as defined below) (and for the avoidance of doubt, when an investment manager or investment adviser is signing this Agreement on behalf of a Consenting 2020 Noteholder, it is signing solely with respect to those 2020 Notes managed or advised by such investment manager or investment advisor), sufficient to satisfy the Minimum Participation Threshold as if the Successful Bid Date occurred on the Agreement Effective Date (collectively, the "**Initial Consenting 2020 Noteholders**"). Each of Amber and each Consenting 2020 Noteholder (as defined below) is referred to individually as a "**Party**," and such parties are referred to collectively as the "**Parties**."

## RECITALS

WHEREAS, on October 4, 2022, in *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del) (the "**Crystallex Case**"), Judge Leonard P. Stark sitting by designation on the United States District Court for the District of Delaware (the "**Delaware Court**") entered the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 480-1] (as amended, modified, supplemented or superseded, the "**Bidding Procedures Order**"), to govern a future court-ordered auction (the "**Auction**") of PDV Holding, Inc.'s ("**PDVH**") common equity (the "**PDVH Shares**") to satisfy the Attached Judgments of Additional Judgment Creditors (each, as defined in the Bidding Procedures Order);

WHEREAS, Robert B. Pincus acts as special master (the "**Special Master**") in the Crystallex Case;

WHEREAS, on December 31, 2024, the Delaware Court issued a "Memorandum Order Regarding Sales Process and Litigation" (the "**Memorandum Order**");

WHEREAS, pursuant to the Memorandum Order, the Delaware Court directed that a bidding period for the PDVH Shares would commence on or around January 27, 2025 (the "**Bidding Period**");

WHEREAS, the Bidder submitted a bid in the Auction on March 7, 2025;

WHEREAS, the Bidder submitted a bid in the Auction on June 18, 2025, for selection as a Successful Bid pursuant to the Bidding Procedures Order (as it may be updated by Amber, the "**Amber Bid**"), and the Bidder was formed for the purpose of effectuating the Amber Bid;

WHEREAS, on July 2, 2025, the Special Master recommended the bid of Dalinar Energy Corporation as the Successful Bid pursuant to the Bidding Procedures Order [D.I. 1837];

WHEREAS, on October 28, 2019, Petróleos de Venezuela, S.A. ("**PDVSA**") defaulted on the 2020 Notes (as defined below) by failing to make required payments of principal and interest due on the 2020 Notes;

WHEREAS, on October 29, 2019, PDVSA, PDVH and PDVSA Petróleo, S.A. ("**Petróleo**", and collectively with PDVSA and PDVH, the "**PDVSA Parties**") commenced an action (the "**Declaratory Judgment Action**") in the United States District Court for the Southern District of New York (the "**New York Court**") against MUFG Union Bank, N.A., the Trustee under the 2020 Notes Indenture (as defined

below) (the "***Trustee***"), and GLAS Americas LLC, the Collateral Agent under the 2020 Notes Indenture (the "***Collateral Agent***"), seeking a judgment declaring the 2020 Notes invalid, illegal, null and void *ab initio*;

WHEREAS, in the Declaratory Judgment Action, the Trustee and Collateral Agent asserted counterclaims against the PDVSA Parties for breach of contract, declaratory judgment, unjust enrichment, and quantum merit, arguing that (i) the 2020 Notes are governed by New York law, and therefore the Venezuelan Constitution does not apply, and (ii) even if the contracts were in any way governed by Venezuelan law, the 2020 Notes are not "contracts of national interest" such that they would ever require National Assembly approval;

WHEREAS, the Declaratory Judgment Action is pending in the New York Court;

WHEREAS, on June 29, 2023, VR Global Partners, L.P., commenced an action in the New York Court against PDVSA asserting common law fraud, stylized as *VR Global Partners, L.P. v. Petróleos de Venezuela, S.A. et al*, No. 23-cv-05604 (the "***Fraud Action***");

WHEREAS, in support of the Amber Bid, the Parties have, in good faith and at arm's-length, negotiated a consensual transaction in respect of the 2020 Notes (the "***Amber Transaction***"), subject to the terms and conditions set forth in this Agreement and the term sheet attached hereto as **Exhibit A** (the "***Transaction Term Sheet***");

WHEREAS, the Parties intend that all transactions contemplated by this Agreement, taken together, constitute a single integrated transaction; and

WHEREAS, this Agreement sets forth the agreement among the Parties concerning their commitment to support and implement the Amber Transaction, on the terms and subject to the conditions hereof.

NOW, THEREFORE, in consideration of the mutual covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

**Section 1.    Definitions and Interpretation.**

  ***Section 1.1    Defined Terms***. As used in this Agreement, the following terms have the meanings specified below:

"***2020 Noteholder***" means a holder of, or a nominee, investment manager, investment advisor, or subadvisor to funds and/or accounts that hold, or a trustee of trusts that beneficially hold the 2020 Notes.

"***2020 Notes***" means 8½% Senior Notes due 2020, issued by PDVSA under the 2020 Notes Indenture, guaranteed by Petróleo, and secured with a pledge on 50.1% of the equity of CITGO Holding.

"***2020 Notes Indenture***" means that certain Indenture, dated as of October 27, 2016, among PDVSA as Issuer; Petróleo, as Guarantor; the Trustee; the Collateral Agent; Law Debenture Trust

2

Company of New York as Registrar, Transfer Agent, and Principal Paying Agent; and Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Listing Agent and Paying Agent.

"*2020 Notes Pledge Agreement*" means that certain Pledge and Security Agreement, dated as of October 28, 2016, among PDVSA as Issuer; Petróleo, as Guarantor; the Trustee; and the Collateral Agent.

"*2020 Noteholder Joinder*" means a joinder to this Agreement substantially in the form attached as **Exhibit C** hereto.

"*2020 Noteholder Transferee Joinder*" means a joinder to this Agreement substantially in the form attached as **Exhibit B** hereto.

"*Additional Consenting 2020 Noteholder*" has the meaning set forth in Section 6.4.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person.

"*Agreement*" has the meaning set forth in the preamble.

"*Agreement Effective Date*" has the meaning set forth in Section 8.10.

"*Alternative Transaction*" means any refinancing, settlement, exchange, extension, acquisition, tender or other restructuring of the 2020 Notes, in each case, that is ratable (including with respect to any fees or other amounts (other than expense reimbursement) payable in connection therewith) among Consenting 2020 Noteholders and that is an alternative to the Amber Transaction.

"*Amber SPA*" means that certain stock purchase agreement between the Special Master and Amber (as it may be amended, modified, or supplemented in accordance with its terms).

"*Automatic Termination Event*" has the meaning set forth in Section 5.4.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended.

"*Bidder Termination Event*" has the meaning set forth in Section 5.3.

"*Business Day*" means any day other than a Saturday, Sunday, or any other day on which banks in New York, New York are authorized or required by law to close.

"*CITGO*" means CITGO Petroleum Corporation.

"*CITGO Holding*" means CITGO Holding, Inc.

"*CITGO Parties*" means CITGO, CITGO Holding, and their subsidiaries.

"*Collateral Agent D&I Agreement*" has the meaning set forth in Section 2.2(b)(iii).

"*Collateral Release*" means the release of the Collateral (as defined in the 2020 Notes Pledge Agreement).

"*Consent Solicitation*" means the solicitation of consents at or prior to the Sale Transaction Date, in connection with the Proposed Actions and pursuant to the D&I Agreements, pursuant to which

3

(i) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (ii) the Consenting 2020 Noteholders will provide a direction to the Collateral Agent to perform the Proposed Actions, including the Collateral Release, pursuant to a D&I Agreement with the Collateral Agent, (iii) if necessary, the Consenting 2020 Noteholders will provide a direction to the Trustee to perform or permit the Proposed Actions, including the Collateral Release, pursuant to a D&I Agreement with the Trustee and (iv) the Consenting 2020 Noteholders will provide a direction to the Trustee to amend the Register (as defined in the 2020 Notes Indenture) to reflect the transfer of the 2020 Notes by the Consenting 2020 Noteholders to the Bidder or one or more of its designees.

"*Consenting 2020 Noteholders*" means the Initial Consenting 2020 Noteholders, each Additional Consenting 2020 Noteholder and each Notes Permitted Transferee.

"*Consenting 2020 Noteholder Advisor Fees and Expenses*" means all documented fees, expenses, and disbursements (including of the External Advisors) incurred and/or paid (whether before or after the date hereof, including after the Effective Date) (i) by (or at the behest of) the Initial Consenting 2020 Noteholders (or by funds and/or accounts managed and/or advised by any investment manager and/or advisor constituting an Initial Consenting 2020 Noteholder (and irrespective as to whether such funds and/or accounts are 2020 Noteholders as of the Effective Date or Agreement Effective Date)) (a) relating to any litigation concerning the 2020 Notes, including the Fraud Action, the Declaratory Judgment Action, and the Crystallex Case (including all appeals therefrom) or (b) relating to the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement (including all amendments hereto), any prior transaction support agreement between all or some of the Parties hereto, the Amber Transaction, and/or any of the other Definitive Documents and regulatory issues associated with the foregoing; *provided*, *however*, that the fees, expenses and disbursements described above shall not include the fees, expenses, or disbursements incurred by and/or paid to any independent advisors retained by any Consenting 2020 Noteholder outside of the External Advisors without the prior written consent of the Required Consenting 2020 Noteholders and (ii) by the Trustee or Collateral Agent, in each case in their capacities as such and whether in relation to the Declaratory Judgment Action or the Auction.

"*Consenting 2020 Noteholder CA Indemnity*" has the meaning set forth in Section 2.2(b)(iii).

"*Consenting 2020 Noteholder Consent Right*" means the requirement for the Required Consenting 2020 Noteholders to approve the Definitive Documents (or any amendment, modifications, supplements, extensions, terminations, withdrawals, or waivers thereto) in their reasonable discretion.

"*Consenting 2020 Noteholder Termination Event*" has the meaning set forth in Section 5.2.

"*Consenting 2020 Noteholder Trustee Indemnity*" has the meaning set forth in Section 2.2(b)(iv).

"*Control*" means with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement, or otherwise, with the terms "controlling," "controlled by," and "under common control with" having correlative meanings.

"*D&I Agreements*" means, together, the Collateral Agent D&I Agreement and the Trustee D&I Agreement.

"*Definitive Documents*" has the meaning set forth in Section 2.2(b).

"*Documentation Principles*" has the meaning set forth in Section 2.2(a).

"*Effective Date*" means the date on which the Private Exchange is consummated in accordance with the terms of this Agreement and the applicable Definitive Documents.

"*External Advisors*" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("*Paul Weiss*"), Latham & Watkins LLP, Clark Smith Villazor LLP, Sullivan & Cromwell LLP, Clifford Chance LLP, Seward & Kissel LLP, Maslon LLP, Berger McDermott LLP, and Morris James LLP, it being understood that Paul Weiss and Clark Smith Villazor LLP are also counsel to the Trustee and Collateral Agent in the Declaratory Judgment Action.

"*Initial Deadline*" has the meaning set forth in Section 5.4(b).

"*Minimum Participation Threshold*" means the Participation of 2020 Noteholders that collectively hold greater than 66.7% of the aggregate principal amount of 2020 Notes outstanding as of the Successful Bid Date.

"*Notes Permitted Transferee*" has the meaning set forth in Section 6.2.

"*Notes Transfer*" has the meaning set forth in Section 6.2.

"*Offering Materials*" has the meaning set forth in Section 2.2(b)(ii).

"*Outside Date*" has the meaning set forth in Section 5.4(b).

"*Participate*" or "*Participation*" means: (a) with respect to the Private Exchange, a Participating Noteholder's timely execution and delivery of the Purchase Agreements and all other Definitive Documents necessary for such Participating Noteholder to exchange its 2020 Notes in the Private Exchange, and otherwise approve, implement, and effect the Amber Transaction, including the Proposed Actions; and (b) with respect to the Public Exchange, any other 2020 Noteholder's timely tender of its 2020 Notes, pursuant to the terms of the Public Exchange, and non-revocation or withdrawal of such tender, in each case as contemplated by this Agreement and the Definitive Documents.

"*Participating Noteholders*" has the meaning set forth in Section 2.2(b)(i).

"*Party*" has the meaning set forth in the preamble.

"*PDVH Transaction*" means the purchase of the PDVH Shares in the Auction, either by (i) the Bidder pursuant to the Amber Bid or (ii) by any third-party.

"*Person*" means an individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, group, or any other legal entity or association.

"*Private Exchange*" has the meaning set forth in Section 2.2(b)(i).

"*Private Exchange Group Holdings*" means $1,263,572,000.00.

"*Private Exchange Individual Holdings*" has the meaning set forth in Section 6.1.

"***Proposed Actions***" means any amendments, waivers and other actions under the 2020 Notes Indenture, the 2020 Notes Pledge Agreement and related documents that are necessary in order to complete the Amber Transaction, including the Collateral Release.

"***Public Exchange***" means a public exchange of all 2020 Notes not subject to the Private Exchange on the terms set out in the Transaction Term Sheet.

"***Purchase Agreements***" has the meaning set forth in Section 2.2(b)(i).

"***Qualified Marketmaker***" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers 2020 Notes (or enter with customers into long and short positions in 2020 Notes), in its capacity as a dealer or market maker in 2020 Notes and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"***Related Fund***" means, with respect to a Consenting 2020 Noteholder, a fund which is managed or advised by the same investment manager or investment advisor as manages or advises the Consenting 2020 Noteholder, or, if a fund is managed or advised by a different investment manager or investment advisor, a fund whose investment manager or investment advisor is an Affiliate of the investment manager or investment advisor of the Consenting 2020 Noteholder.

"***Required Consenting 2020 Noteholders***" means, as of any date of determination, Consenting 2020 Noteholders that collectively hold greater than 50% of the aggregate outstanding principal amount of the 2020 Notes (taken together as a single class) held by all Consenting 2020 Noteholders as of such date.

"***Sale Order***" means an order of the Delaware Court authorizing and approving, among other things, the purchase of the PDVH Shares pursuant to the Amber Bid by the Bidder in accordance with the Bidding Procedures Order and Memorandum Order.

"***Sale Transaction Date***" means the closing date of the PDVH Transaction.

"***Successful Bid***" shall have the meaning set forth in the Bidding Procedures Order.

"***Successful Bid Date***" means the earlier of the date on which: (i) the Special Master files a motion or other pleading with the Delaware Court pursuant to which it recommends the Amber Bid and seeks approval of the Amber Bid pursuant to the Sale Order; (ii) any bona fide public announcement is made (including by the Special Master) that the Amber SPA has been fully-executed; and (iii) the Bidder provides the notification set out in Section 3.1(b)(i).

"***Termination Date***" has the meaning set forth in Section 5.5.

"***Termination Event***" means any Automatic Termination Event, Bidder Termination Event, or Consenting 2020 Noteholder Termination Event.

"***Transaction Term Sheet***" has the meaning set forth in the Recitals.

"***Transfer***" means to (a) sell, transfer, assign, hypothecate, pledge, or otherwise dispose of, directly or indirectly, right, title, or interest in or with respect to any security, loan, credit commitment, or other obligation, in whole or in part, or (b) deposit any such security, loan, credit commitment, or

other obligation, into a voting trust, or to grant a proxy or enter into a voting agreement with respect to any such security, loan, credit commitment, or other obligation. "**Transferor**" and "**Transferee**" have correlative meanings.

"***Trustee D&I Agreement***" has the meaning set forth in Section 2.2(b)(iv).

    **Section 1.2**  ***Rules of Interpretation***. For purposes of this Agreement:

      (a)  each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include all of the masculine, feminine, and neuter gender;

      (b)  capitalized terms defined only in the singular or the plural shall nonetheless have their defined meanings when used in both the singular and the plural;

      (c)  unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

      (d)  unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided*, that any capitalized terms herein that are defined with reference to another agreement are defined with reference to such other agreement as of the Agreement Effective Date, without giving effect to any termination of such other agreement or any amendments to such capitalized terms in any such other agreement following the Agreement Effective Date;

      (e)  unless otherwise specified, all references herein to "sections" and "exhibits" are references to the sections of and exhibits to this Agreement;

      (f)  the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular provision of this Agreement;

      (g)  the use of "include" or "including" is without limitation, whether stated or not;

      (h)  the definitions of terms in the preamble, the recitals, and this Section 1 shall have the same force and effect as all decretal provisions of this Agreement; and

      (i)  the use of the terms "ratable," "ratably," and "pro rata" shall be referable to the principal amount of the 2020 Notes held by a Consenting 2020 Noteholder and each of those terms and the phrase "disproportionately negative effect" is without prejudice to the ability of each Consenting 2020 Noteholder to recover its actual expenditure in respect of Consenting 2020 Noteholder Advisor Fees and Expenses on a dollar-for-dollar basis.

  **Section 2.**  **Exhibits; Definitive Documentation.**

    **Section 2.1**  ***Exhibits***. The Transaction Term Sheet and each of the other exhibits attached hereto or thereto are incorporated by reference herein and made a part of this Agreement as if fully set forth herein, and all references to this Agreement include and incorporate all such exhibits; *provided*,

7

*however*, (a) to the extent that there is a conflict between this Agreement, on the one hand, and the Transaction Term Sheet, on the other hand, the terms and provisions of the Transaction Term Sheet shall govern, and (b) to the extent that there is a conflict between the Transaction Term Sheet or this Agreement, on the one hand, and the Definitive Documents, on the other hand, the terms and provisions of the Definitive Documents will govern.

### Section 2.2 *Definitive Documents*.

(a)    The Amber Transaction shall consist of the Private Exchange and the Public Exchange, the terms and execution of which shall be consistent with the terms of this Agreement and the Transaction Term Sheet (the "***Documentation Principles***") and, (i) to the extent not addressed therein, shall be on terms reasonably acceptable to the Bidder and the Required Consenting 2020 Noteholders and (ii) to the extent addressed therein but inconsistent with the Documentation Principles, shall be on terms reasonably acceptable to the Bidder and Required Consenting 2020 Noteholders.

(b)    The Amber Transaction will be implemented pursuant to the following agreements and related documentation (collectively, the "***Definitive Documents***"), the agreement and execution of which shall be subject to the Consenting 2020 Noteholder Consent Right:

(i)    (A) agreements between the applicable CITGO Parties and those Consenting 2020 Noteholders (participating ratably in respect of their 2020 Notes) which together satisfy the Minimum Participation Threshold (the "***Participating Noteholders***"), in each case, pursuant to which, on the Sale Transaction Date, such 2020 Noteholders will sell, assign, and transfer to the applicable CITGO Parties their existing 2020 Notes in exchange for cash, as further specified in the Transaction Term Sheet (collectively, the "***Purchase Agreements***" and the sale, assignment and transfer set forth therein, the "***Private Exchange***") and (B) any related procedures, forms, and other documents necessary or desirable to effect such Private Exchange;

(ii)    offering materials for the Public Exchange (collectively, the "***Offering Materials***"), including all forms, securities filings and other documents necessary or desirable to effect the Public Exchange;

(iii)    a direction and indemnity agreement (the "***Collateral Agent D&I Agreement***") by and among the Consenting 2020 Noteholders, the Collateral Agent and (as of the Sale Transaction Date) the CITGO Parties, substantially in the form approved by the Required Consenting 2020 Noteholders, pursuant to which (A) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (B) the Consenting 2020 Noteholders will provide a direction to the Collateral Agent to perform the Proposed Actions, including the Collateral Release, and (C) █████████████████████████████████████

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████

(iv)    to the extent necessary for the Proposed Actions to be completed, a direction and indemnity agreement (the "***Trustee D&I Agreement***") by and among the Consenting 2020 Noteholders, the Trustee and (as of the Sale Transaction Date) the CITGO Parties, substantially in the form approved by the Required Consenting 2020 Noteholders, pursuant to which (A) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (B) the Consenting 2020 Noteholders will provide a direction to the Trustee to perform, direct and/or permit (as applicable) the Proposed Actions, including the Collateral Release, (C) ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████

(v)    the Sale Order; and

(vi)    all other ancillary and related documents and instruments to be entered into in connection with the Amber Transaction, including any amendments to the 2020 Notes Indenture and the 2020 Notes Pledge Agreement reasonably required to consummate the Amber Bid.

(c)    The Definitive Documents remain subject to negotiation and completion and will, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the Documentation Principles, and otherwise in form and substance reasonably satisfactory to the Required Consenting 2020 Noteholders and the Bidder.

(d)    It is expected that the Definitive Documents will provide for the D&I Agreements be effective immediately prior to the Collateral Release, which is expected to occur at or immediately prior to the Sale Transaction Date.

**Section 3.    Commitments of the Parties.**

*Section 3.1    Commitments of the Bidder*.

(a)    As of the date of this Agreement, the Bidder agrees, directly or through its authorized representatives and advisors:

(i)    to cooperate in good faith with the Consenting 2020 Noteholders to negotiate, complete, execute, and deliver, as applicable, the Definitive Documents which, for the avoidance of doubt, shall be subject to the Consenting 2020 Noteholder Consent Right;

(ii)    to use commercially reasonable efforts to take, or cause to be taken, all actions necessary, proper, or advisable to consummate the Amber Transaction;

9

(iii)    without limiting the generality of the foregoing clause (ii), to, with regard to the Public Exchange:

(A)    distribute or cause to be distributed the Offering Materials to 2020 Noteholders;

(B)    solicit or cause to be solicited tenders, consents, and acceptances from the 2020 Noteholders other than the Consenting 2020 Noteholders, in accordance with this Agreement and the Offering Materials;

(C)    use commercially reasonable efforts to timely prepare or cause to be prepared all amendments to the Offering Materials that the Bidder and the Required Consenting 2020 Noteholders reasonably deem necessary or advisable;

(D)    use commercially reasonable efforts to otherwise solicit Participation by 2020 Noteholders in the Public Exchange;

(E)    to promptly share the Amber SPA (and any amendments, modifications, or supplements thereto) to counsel to the Consenting 2020 Noteholders; and

(F)    to the extent no decision has been rendered in respect of the Declaratory Judgment Action by the Successful Bid Date, to use commercially reasonable efforts following the Successful Bid Date to cause the Declaratory Judgment Action to be stayed until the closing date of the Amber Transaction;

(iv)    without limiting the generality of the foregoing clause (ii), to, with regard to the Private Exchange:

(A)    coordinate with counsel to the Initial Consenting 2020 Noteholders to facilitate the distribution of the Purchase Agreements to all of the Consenting 2020 Noteholders on or as soon as reasonably practicable following the Successful Bid Date; and

(B)    subject to the conditions precedent set forth in Section 4 and the performance by the Consenting 2020 Noteholders of their respective obligations hereunder, use commercially reasonable efforts (x) to, or to cause the CITGO Parties to, execute the Purchase Agreements on or prior to the Sale Transaction Date; (y) to cause the Effective Date to occur on or about the Sale Transaction Date; and (z) to cause CITGO to indemnify the Consenting 2020 Noteholders, the Trustee and the Collateral Agent pursuant to the D&I Agreements;

(v)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amber Transaction, to use commercially reasonable efforts to negotiate or to cause to be negotiated with the Required Consenting 2020 Noteholders appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;

(vi)    to pay (or cause the CITGO Parties to pay) all Consenting 2020 Noteholder Advisor Fees and Expenses on the Effective Date;

10

(vii)    that it shall not (i) object to, delay, or impede the Amber Transaction or initiate any legal proceedings, make any filings, arguments, motions, or statements, or otherwise take any positions in any litigation, that are inconsistent with, or that would delay, prevent, frustrate, or impede the approval, solicitation, or consummation of, the Amber Transaction, the Definitive Documents, or any other transactions outlined therein, (ii) amend, modify, supplement, extend, terminate, withdraw, or waive any terms or conditions of the Private Exchange without the prior written consent of the Required Consenting 2020 Noteholders, (iii) take any other action that is barred by this Agreement except as required by applicable law or regulations, or (iv) fail or omit to take any action that is required by this Agreement or the Definitive Documents except as required by applicable law or regulation; *provided*, that the Bidder shall, if legally permitted to do so, notify the Consenting 2020 Noteholders within 48 hours of their determination pursuant to the foregoing clauses (iii) or (iv) that applicable law or regulation requires any act or omission otherwise barred or required by this Agreement; and

(viii)    subject to the terms hereof, to comply with its obligations hereunder and to act in good faith to ensure that this Agreement is not terminated as a result of any order or judgment in the Declaratory Judgment Action that does not (x) stay consummation of the Amber Transaction to a date beyond the Outside Date per Section 5.4(b) hereof or (y) permanently enjoin the Amber Transaction.

(b)    On the terms and subject to the conditions of this Agreement:

(i)    the Bidder agrees to promptly (and in no event later than one calendar day thereafter) notify counsel to the Consenting 2020 Noteholders of the execution of the Amber SPA; and

(ii)    upon the occurrence of the Successful Bid Date and for so long as no Termination Date has occurred, the Bidder agrees, directly or through its authorized representatives and advisors, to prepare or cause the preparation of the Definitive Documents, provide or cause to be provided draft copies of the Definitive Documents to counsel to the Initial Consenting 2020 Noteholders, and provide or cause to be provided to the Consenting 2020 Noteholders (subject to any confidentiality restrictions) a reasonable opportunity to review and comment on the Definitive Documents (which comments the Bidder will consider in good faith, subject to the Documentation Principles and the Consenting 2020 Noteholder Consent Right).

(c)    On the terms and subject to the conditions of this Agreement and for so long as no Termination Date has occurred, the Bidder agrees, directly or through its authorized representatives and advisors, subject to Section 8.19 (*Additional Negotiations*), not to seek, solicit, support, formulate, entertain, encourage, engage in any inquiries or discussions concerning, or enter into any agreements relating to or terminate this Agreement in relation to, any PDVH Transaction that does not (x) provide for financial terms and conditions on par with or more favorable to the 2020 Notes of the Consenting 2020 Noteholders than the financial terms for the Amber Transaction contemplated herein or (y) have the prior written consent of the Required Consenting 2020 Noteholders.

(d)    Nothing herein shall require the consent of the Required Consenting 2020 Noteholders to permit Amber to (i) increase, modify or otherwise amend its capital structure and (ii) modify, amend, supplement or terminate (other than as restricted by Section 3.1(e) of this Agreement) the Amber SPA.

(e)    From and after the Successful Bid Date until the Effective Date, Amber shall not enter into any agreement with the Special Master to terminate the Amber SPA pursuant to a mutual

termination right under the Amber SPA, except for any agreement to terminate the Amber SPA following a determination by Amber and the Special Master that the satisfaction of any of the conditions set forth in Article VII of the Amber SPA is impossible by the Outside Date (*provided,* that such impossibility is not a result of Amber's failure to comply with its obligations under the Amber SPA).

### Section 3.2      *Commitments of the Consenting 2020 Noteholders.*

(a)      *Commitments of the Consenting 2020 Noteholders.* As of the date of this Agreement, each Consenting 2020 Noteholder agrees, severally and not jointly:

(i)      to use commercially reasonable efforts to pursue, support, solicit, implement, confirm, and consummate the Amber Transaction and to act in good faith and use commercially reasonable efforts to negotiate the Definitive Documents with the Bidder, the CITGO Parties and the other Consenting 2020 Noteholders and to take, or cause to be taken, all actions necessary or proper to consummate the Amber Transaction in a manner consistent with this Agreement, subject to the Consenting 2020 Noteholder Consent Right;

(ii)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amber Transaction, to use commercially reasonable efforts to negotiate with the Bidder and the other Consenting 2020 Noteholders in good faith in an effort to agree to appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;

(iii)      to exchange its 2020 Notes held as of the Effective Date in the Private Exchange;

(iv)      to the extent no decision has been rendered in respect of the Declaratory Judgment Action, following the occurrence of the Successful Bid Date, to promptly notify the New York Court of the same and use commercially reasonable efforts to cause the Declaratory Judgment Action to be stayed until the closing date of the Amber Transaction;

(v)      to use commercially reasonable efforts to provide any required direction and pro rata share (among Consenting 2020 Noteholders, but only to the extent that each such Consenting 2020 Noteholder is able to provide such indemnity) of an indemnity to the Trustee and/or the Collateral Agent consistent with Section 2.2(b)(iii) and Section 2.2(b)(iv) hereof;

(vi)      subject to the consent of the Special Master, if the Successful Bid Date occurs, that it will not, directly or indirectly, participate in, support, solicit, finance, or negotiate in respect of an Alternative Transaction except as otherwise provided in Section 3.2(c);

(vii)      subject to the terms hereof, to comply with its obligations hereunder and to act in good faith to ensure that this Agreement is not terminated as a result of any order or judgment in the Declaratory Judgment Action that does not (x) stay consummation of the Amber Transaction to a date beyond the Outside Date per Section 5.4(b) hereof or (y) permanently enjoin the Amber Transaction; and

(viii)      that it shall not:

(1)      (A) object to, delay, or impede the Amber Transaction or initiate any legal proceedings or make any filings, arguments, motions, or statements, or otherwise take any positions in any litigation, that are inconsistent with, or that would

12

delay, prevent, frustrate, or impede the approval, solicitation, or consummation of, the
Amber Transaction, the Definitive Documents, or any other transactions outlined therein,
(B) take any other action that is barred by this Agreement except as required by applicable
law or regulations, or (C) fail or omit to take any action that is required by this Agreement
or the Definitive Documents except as required by applicable law or regulations,
*provided*, that, it (or counsel on its behalf) shall, if legally permitted to do so, notify the
Bidder within 48 hours of their determination pursuant to the
foregoing *clause (B)* or *(C)* that applicable law or regulation requires any act or omission
otherwise barred or required by this Agreement;

(2)    instruct the Trustee to take any action, or to refrain from
taking any action, that would be inconsistent with this Agreement or the Amber
Transaction; or

(3)    solicit, encourage, or direct any Person to undertake any
action set forth in clauses (1) through (2) of this subsection (viii).

(b)    On the terms and subject to the conditions of this Agreement, upon and
following the Successful Bid Date and for so long as no Termination Date has occurred, each Consenting
2020 Noteholder agrees, severally and not jointly to cooperate in good faith and to coordinate activities (to
the extent practicable and subject to the terms hereof) with the Bidder, the CITGO Parties and the other
Consenting 2020 Noteholders to negotiate, complete, execute, and deliver, as applicable, the Definitive
Documents, in each case so long as such Definitive Documents have been approved in accordance with the
terms of this Agreement, subject to the Consenting 2020 Noteholder Consent Right;

(c)    *Equality of Treatment*.  On the terms and subject to the conditions of this
Agreement, upon and following the Successful Bid Date and for so long as no Termination Date has
occurred, each Consenting 2020 Noteholder agrees, severally and not jointly, that it (i) shall not directly or
indirectly, take any action to consummate or pursue or initiate or knowingly encourage, facilitate, solicit,
continue or engage in discussions or negotiations with, or enter into any agreement with, any Person (other
than the Bidder and its Affiliates and representatives) concerning any Alternative Transaction unless such
Alternative Transaction provides for financial terms and conditions on par with or more favorable to the
2020 Notes than the financial terms for the Amber Transaction contemplated herein, and (ii) shall cease
and cause to be terminated any existing discussions, communications or negotiations with any Person (other
than the Bidder and its Affiliates and representatives) conducted heretofore with respect to any Alternative
Transaction unless such Alternative Transaction provides for financial terms and conditions on par with or
more favorable to the 2020 Notes than the financial terms for the Amber Transaction contemplated herein.
For avoidance of doubt, "financial terms" means fair market value of total consideration received by 2020
Noteholders pursuant to Purchase Agreements, including, but not limited to, the form of such consideration
such as cash, securities and financial derivative instruments, if any.

**Section 4.    Conditions Precedent.**

*Section 4.1    Conditions Precedent to Obligations of All Parties*. The occurrence of the
Effective Date and the obligation of each Party to consummate the Amber Transaction are subject to the
satisfaction or waiver by each Party of the following:

(a)    the Agreement shall not have been terminated in accordance with its terms;

(b)      the Successful Bid Date shall have occurred prior to the earlier of (i) any judgment in the Declaratory Judgment Action either in favor of the Trustee, Collateral Agent, and the 2020 Noteholders or in favor of PDVSA, PDVH, and Petroleo and (ii) December 1, 2025;

(c)      the Private Exchange, as described in this Agreement, shall have been consummated or will be consummated on the Effective Date;

(d)      each Definitive Document shall have been prepared in accordance with the Documentation Principles and, if applicable, shall have been duly approved, executed and delivered by each party thereto and be in full force and effect (and all conditions precedent to effectiveness thereunder shall have been satisfied or waived in accordance with the terms thereof) at or substantially concurrently with the Effective Date; *provided*, that a Party's failure to execute and deliver a Definitive Document that has been prepared in accordance with the Documentation Principles or otherwise approved in accordance with the provisions of this Agreement to which it is intended to be a party shall not be a condition precedent to such Party's obligations;

(e)      the Collateral Release shall have occurred or will occur on the Effective Date, or the Parties shall have received evidence reasonably satisfactory to the Parties that the Collateral Agent and Trustee will not enforce their respective remedies under the 2020 Notes Pledge Agreement if the Collateral Agent and the Trustee receive a written direction from the Required Consenting 2020 Noteholders instructing the Collateral Agent and the Trustee not to enforce such remedies;

(f)      no temporary restraining order, preliminary or permanent injunction, judgment, or other order of any court of competent jurisdiction or governmental entity preventing the consummation of any part of the Amber Transaction shall have been entered, issued, rendered, or made by any party other than a Party; nor shall there be any law, rule, or regulation promulgated, enacted, entered, enforced, or deemed applicable to the CITGO Parties, the 2020 Noteholders, the Trustee, the Collateral Agent, or Bidder which makes the consummation of any part of the Amber Transaction illegal, void, or rescinded;

(g)      the PDVH Transaction and the Amber Transaction shall have received the approval of any required regulatory authority or court of competent jurisdiction, and including the Office of Foreign Assets Control; and

(h)      (i) the Delaware Court shall have issued the Sale Order, (ii) the Sale Order shall be entered on or before December 1, 2025, (iii) there is no stay of such Sale Order pending appeal in effect, and (iv) the transaction contemplated by the Amber Bid is consummated substantially concurrently with the Effective Date and the consummation of the Amber Transaction.

**Section 4.2      *Conditions Precedent to the Obligations of the Bidder*.** The occurrence of the Effective Date and the obligation of the Bidder to consummate or cause the consummation of the Amber Transaction are subject to the satisfaction or waiver by the Bidder of the following:

(a)      no Bidder Termination Event shall have occurred;

(b)      the representations and warranties of the Consenting 2020 Noteholders in Section 7 are true and correct in all material respects (or, if any such representation or warranty is qualified by materiality, in all respects) at and as of the date hereof and as of the Effective Date with the same effect as if made at and as of such date and after giving effect to the Amber Transaction (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects or true and correct, as applicable, only as of the specified date); and

(c)    the Consenting 2020 Noteholders (taken as a whole) shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance on or prior to the Effective Date.

**Section 4.3    Conditions Precedent to the Obligations of the Consenting 2020 Noteholders.**

(a)    The occurrence of the Effective Date and the obligation of the Consenting 2020 Noteholders to consummate or cause the consummation of the Amber Transaction are subject to the satisfaction or waiver by the Required Consenting 2020 Noteholders, as applicable, in accordance with Section 4.3(b*)*, of the following:

(i)    no Consenting 2020 Noteholder Termination Event has occurred;

(ii)    the Bidder or the CITGO Parties shall have paid on the Effective Date all Consenting 2020 Noteholder Advisor Fees and Expenses to reimburse each Consenting 2020 Noteholder for any such Consenting 2020 Noteholder Advisor Fees and Expenses paid by such holder, which amounts have been notified (along with relevant payment instructions) in writing to Amber on or before the date that is five Business Days prior to the Effective Date; and

(iii)    the Bidder shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance on or prior to the Effective Date.

(b)    The conditions precedent to the obligation of a Consenting 2020 Noteholder to consummate the Amber Transaction set forth in Section 4.3(a) may only be waived by the Required Consenting 2020 Noteholders.

**Section 5.    Termination.**

**Section 5.1    Mutual Termination Rights.**

(a)    This Agreement may be terminated at any time by mutual written consent of the Bidder and the Required Consenting 2020 Noteholders.

(b)    This Agreement may be terminated by either the Bidder, on the one hand, or the Required Consenting 2020 Noteholders, on the other hand, by written notice to the other Parties, if any condition to the Closing set forth in Section 4.1(b) or Section 4.1(h)is not satisfied within the deadline set forth therein, as applicable; *provided*, that the right to terminate this Agreement pursuant to this Section 5.1(b) (i) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has principally caused or resulted in the failure of the applicable condition to be satisfied by the deadline set forth therein, and (ii) shall expire (solely as to the applicable condition) on the date that is 30 days after the failure of the applicable condition to be satisfied by the deadline set forth therein.

**Section 5.2    Termination by the Consenting 2020 Noteholders.** This Agreement may be terminated by the Required Consenting 2020 Noteholders upon prior written notice thereof to all other Parties (with notice by email solely to each of Paul Weiss and counsel to the Bidder being sufficient) of the occurrence of any of the following events (each a "**Consenting 2020 Noteholder Termination Event**"):

(a)    the Bidder materially breaches any of their representations, warranties, covenants, or obligations under this Agreement and such breach, if susceptible to cure, remains uncured for a period of ten Business Days after the Bidder's receipt of written notice of such breach;

(b)    subject to the Consenting 2020 Noteholder Consent Right, any Definitive Document is, upon its delivery, execution, or amendment or other modification, materially inconsistent with the terms hereof, unless such Definitive Document is reformed so as to be materially consistent with the terms hereof within ten Business Days of receipt by the other Parties of written notice; or

(c)    the Bidder's (i) public announcement of its intention not to support the Amber Transaction, (ii) filing, public announcement, or execution of a definitive written agreement with respect to or in connection with a PDVH Transaction in violation of Section 3.1(c), or (iii) agreement or indication of a material commitment to pursue as evidenced by a term sheet, letter of intent, or similar document (including from or to a CITGO Party), or public announcement of its intent to pursue, a PDVH Transaction in violation of Section 3.1(c);

(d)    PDVH, PDVSA, CITGO Holding or CITGO commences insolvency proceedings (which shall not include the Declaratory Judgment Action), including by (i) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, (ii) consenting to the institution of, or failing to contest in a timely manner, any involuntary proceeding or petition described above, (iii) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the applicable entity or for a substantial part of its assets, or (v) making a general assignment or arrangement for the benefit of creditors;

(e)    the entry of an order, judgment, or decree (other than in respect of the Declaratory Judgment Action) adjudicating PDVH, PDVSA, CITGO Holding or CITGO bankrupt or insolvent, including the entry of any order for relief with respect to any such entity under the Bankruptcy Code;

(f)    the occurrence of the date on which the Delaware Court enters a sale order approving as the purchaser of the PDVH Shares a party other than Amber; or

(g)    the Amber SPA is terminated in accordance with its terms.

**Section 5.3    Termination by the Bidder**. This Agreement may be terminated by the Bidder upon prior written notice thereof to all other Parties of the occurrence of any of the following events (each, a "**Bidder Termination Event**"):

(a)    any Consenting 2020 Noteholder materially breaches any of its representations, warranties, covenants, or obligations under this Agreement, and such breach, if susceptible to cure, remains uncured for a period of ten Business Days after such breaching Party's receipt of written notice of such breach;

(b)    any Definitive Document is, upon its delivery, execution, or amendment or other modification, materially inconsistent with the terms hereof, unless such Definitive Document is reformed so as to be materially consistent with the terms hereof within ten Business Days of receipt by the other Parties of written notice;

16

(c)      PDVH, PDVSA, CITGO Holding or CITGO commences insolvency proceedings, including by (i) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, (ii) consenting to the institution of, or failing to contest in a timely manner, any involuntary proceeding or petition described above, (iii) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the applicable entity or for a substantial part of its assets, or (v) making a general assignment or arrangement for the benefit of creditors;

(d)      the entry of an order, judgment, or decree adjudicating PDVH, PDVSA, CITGO Holding or CITGO bankrupt or insolvent, including the entry of any order for relief with respect to any such entity under the Bankruptcy Code;

(e)      the occurrence of the date on which the Delaware Court enters a sale order approving as the purchaser of the PDVH Shares a party other than Amber; or

(f)      the Amber SPA is terminated in accordance with its terms (subject in all events to Section 3.1).

**Section 5.4      *Automatic Termination***. This Agreement will automatically terminate upon the occurrence of any of the following events (each, an "***Automatic Termination Event***"):

(a)      the Effective Date;

(b)      the outside date, which shall initially be June 30, 2026 (the "***Initial Deadline***"), as such date may be extended by written notice by the Bidder, the Required Consenting 2020 Noteholders, or automatically extended to the extent the "Outside Date" (as defined in the Amber SPA) is automatically extended (such date, as the same may be so extended, the "***Outside Date***"), subject to the accrual of the Ticking Fee (as defined in the Transaction Term Sheet) after the Initial Deadline; *provided*, that the Outside Date may not be extended beyond April 30, 2027, absent the consent of the Bidder and all Consenting 2020 Noteholders, which extension shall be in the sole and absolute discretion, and which discretion may be exercised in any manner whatsoever, of each such Person; or

(c)      execution of definitive documentation relating to any settlement or transaction pursuant to Section 8.19 (*Additional Negotiations*) hereof.

**Section 5.5      *Termination Date and Survival***. The date on which this Agreement is terminated in accordance with this Section 5 is referred to as the "***Termination Date***". The provisions of this Agreement will terminate on the Termination Date; *provided*, that Section 1, Section 5.6, and Section 8 (other than Sections 8.15, 8.18, 8.19, and 8.20) will survive the Termination Date.

**Section 5.6      *Effect of Termination***. Upon the Termination Date, this Agreement shall become null and void and have no further force or effect, each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and, to the extent the Effective Date has not occurred, any of the Definitive Documents, as applicable, and there shall be no liability or obligation on the part of any Party hereto; *provided*, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to such Termination Date, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement that expressly survive any such termination pursuant to Section 5.5.

Upon any Termination Date, any and all consents, tenders, waivers, forbearances, directions and votes delivered by a Consenting 2020 Noteholder in connection with the Amber Transaction automatically shall be deemed, for all purposes, to be null and void *ab initio*. Notwithstanding the foregoing or anything herein to the contrary, no Party may exercise any of its respective termination rights as set forth in this Section 5 if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement unless such failure to perform or comply arises as a result of another Party's actions or inactions or would not otherwise give rise to a Termination Event in favor of the other Party.

### Section 6.    Private Exchange Participation; Transfers of Claims and Interests.

*Section 6.1    Private Exchange Participation.* Each Consenting 2020 Noteholder shall Participate in the Private Exchange with respect to the 2020 Notes held by such Consenting 2020 Noteholder or any of its Affiliates or any of its Related Funds as of August 4, 2025, after accounting for any unsettled trades to purchase or sell 2020 Notes pending as of such date (the "***Private Exchange Individual Holdings***"), in each case by reference to its portion of the Private Exchange Group Holdings, except to the extent the amount of (a) any Consenting 2020 Noteholder's Private Exchange Individual Holdings is increased or decreased in accordance with Section 6.2 or (b) any Consenting 2020 Noteholder's Private Exchange Individual Holdings and the Private Exchange Group Holdings are increased in accordance with Section 6.3.

*Section 6.2    Transfers of 2020 Notes.* Following the Successful Bid Date, so long as no Consenting 2020 Noteholder Termination Event or Automatic Termination Event has occurred, no Consenting 2020 Noteholder shall Transfer any 2020 Notes (a "***Notes Transfer***") unless the Transferee is (a) another Consenting 2020 Noteholder or a Related Fund of a Consenting 2020 Noteholder as of the effective date of such Notes Transfer or (b) any other Person that executes and delivers to counsel to the Bidder and counsel to the Initial Consenting 2020 Noteholders a 2020 Noteholder Transferee Joinder at least one (1) Business Day prior to the effective date of such 2020 Notes Transfer provided that the Required Consenting 2020 Noteholders have provided their prior written approval in respect of the identity of any such Transferee (any Person described in the preceding clause (a) or (b), a "***Notes Permitted Transferee***"). Upon the consummation of a Notes Transfer in accordance with this Section 6.2, (i) the applicable Notes Permitted Transferee will be deemed to make all of the representations, warranties, and covenants of a Consenting 2020 Noteholder set forth in this Agreement, to be bound by all elections made by the applicable transferor under this Agreement, and to be a Party and a Consenting 2020 Noteholder for all purposes under this Agreement, (ii) the amount of the Private Exchange Individual Holdings of the transferor shall decrease by the amount of 2020 Notes subject to the Notes Transfer (*provided*, that Private Exchange Individual Holdings may never be decreased to an amount less than $0.00), (iii) the amount of Private Exchange Individual Holdings of the Notes Permitted Transferee shall be increased by the amount referenced in the immediately foregoing clause (ii), and (iv) the Notes Permitted Transferee or Qualified Marketmaker, if there are two successive Notes Transfers with a Qualified Marketmaker serving as Notes Permitted Transferee in the first Notes Transfer and as the transferor in the second Notes Transfer, shall promptly provide notice to Paul Weiss of the parties to the Notes Transfer(s) and the amount of 2020 Notes included in the Notes Transfer(s). Upon compliance with the foregoing, the applicable transferor will be deemed to relinquish its rights and be released from its obligations under this Agreement, in each case with respect to the 2020 Notes that are the subject of such Notes Transfer. Any purported Notes Transfer made in violation of this Section 6.2 is null and void *ab initio* and is of no force or effect. For the avoidance of doubt, if a Notes Permitted Transferee who is not otherwise a Participating Noteholder beneficially held 2020 Notes prior to its receipt of 2020 Notes via a Notes Transfer, only those 2020 Notes purchased via a Notes Transfer shall Participate in the Private Exchange, absent written agreement of the Bidder and the Required Consenting 2020 Noteholders. For the further avoidance of doubt, prior to the Successful Bid Date, any Consenting 2020 Noteholder may freely Transfer any of its 2020 Notes, and such Transfer shall not be considered a Notes Transfer hereunder unless each of the parties to that transfer, and, if applicable, the

Required Consenting 2020 Noteholders and/or the Bidder expressly agree to treat such Transfer as a Notes Transfer (subject to the terms and conditions of this Section 6.2).

**Section 6.3    Additional Claims**. Except as set forth in Section 6.2, nothing in this Agreement shall be construed as precluding any Consenting 2020 Noteholder or any of its Affiliates or any of its Related Funds from acquiring additional 2020 Notes following the Agreement Effective Date provided that following the Agreement Effective Date, any such additional 2020 Notes acquired by a Consenting 2020 Noteholder or any of its Affiliates or any of its Related Funds may not (a) participate in the Private Exchange, (b) be included in the amount of such Consenting 2020 Noteholder's Private Exchange Individual Holdings, or (c) increase the amount of Private Exchange Group Holdings, in each case absent the express written consent of the Bidder and the Required Consenting 2020 Noteholders; *provided*, that no such consents shall be required in the case of the foregoing clauses (a) and (b) solely by reason of a Consenting 2020 Noteholder acquiring additional 2020 Notes following the Agreement Effective Date pursuant to a Notes Transfer expressly permitted by Section 6.2 in circumstances where the amount of Private Exchange Group Holdings remains unchanged following such Notes Transfer. Each Consenting 2020 Noteholder has provided to Paul Weiss on the Agreement Effective Date the amount of its holdings of the 2020 Notes as of such date. On or around the first business day of each calendar month, each Consenting 2020 Noteholder shall provide Paul Weiss with the current amount of its holdings of the 2020 Notes as of such date.

**Section 6.4    Additional Joinders**. Additional Consenting 2020 Noteholders may accede to this Agreement as Consenting 2020 Noteholders; *provided*, that (i) each Initial Consenting 2020 Noteholder has provided its prior written consent in relation to the identity of each such additional 2020 Noteholder and (ii) each such additional 2020 Noteholder has executed a 2020 Noteholder Joinder, after which such additional 2020 Noteholder shall be deemed a Consenting 2020 Noteholder hereunder in all respects (each such additional 2020 Noteholder being an "***Additional Consenting 2020 Noteholder***"); *provided*, *further*, that any Related Fund that accedes to this agreement shall be deemed an "Initial Consenting 2020 Noteholder".

**Section 7.    Representations and Warranties.**

**Section 7.1    Mutual Representations and Warranties**. Each Party, severally and not jointly, represents to each other Party that:

(a)    such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement, perform its obligations under this Agreement, and carry out the Amber Transaction, and such Party's execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by, as applicable, all necessary corporate, limited liability company, partnership, or other similar actions on its part;

(b)    such Party's execution, delivery, and performance of this Agreement does not and will not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under its organizational documents or any material contractual obligations to which it or any of its subsidiaries is a party;

(c)    such Party's execution, delivery, and performance of this Agreement does not and will not require the consent or approval by any other Person or entity, except for any consent or approval obtained prior to, or contemporaneously with, the Agreement Effective Date; and

(d)      this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles.

###### Section 7.2      *Representations and Warranties of the Consenting 2020 Noteholders*.

Each Consenting 2020 Noteholder, severally and not jointly, represents to the CITGO Parties (solely in respect of its managed and/or advised funds and/or accounts in the case of any investment manager or investment advisor and not in respect of itself), in its capacity, if any, as a holder of 2020 Notes that may participate in the Private Exchange or the Public Exchange:

(a)      (i) it is (A) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, (B) an institutional "accredited investor" within the meaning of Rules 501(a)(1), (a)(2), (a)(3), (a)(7), (a)(8), or (a)(9) under the Securities Act or (C) outside the United States and not a U.S. person (and not purchasing for the account or benefit of a U.S. person) within the meaning of Regulation S under the Securities Act, and (ii) it is tendering its 2020 Notes (and delivering its consents related thereto) for its own account or for one or more separate accounts maintained by such Consenting 2020 Noteholder or for the account of one or more pension or trust funds and not with a view to the distribution thereof; *provided*, that the disposition of such Consenting 2020 Noteholder's property shall at all times be within such Consenting 2020 Noteholder's control;

(b)      it has sufficient experience in business, financial, and investment matters to be able to evaluate the risks involved in, and to make an informed investment decision with respect to, an exchange of its 2020 Notes (and delivery of the related consent), and it acknowledges that: (i) it was given the opportunity to ask questions and receive answers concerning the terms and conditions of the Amber Transaction and to obtain any additional information that the Bidder possesses or can acquire without unreasonable effort or expense; (ii) the Bidder makes no representation regarding the value of the 2020 Notes; and (iii) it has independently and without reliance upon the Bidder made its own analysis and decision to enter into this Agreement and to exchange its 2020 Notes (and deliver consents related thereto) on the terms set forth in this Agreement; and

(c)      it acknowledges that it has made its own decision to execute this Agreement and Participate in the Amber Transaction based upon its own independent assessment of the documents and information available to it, as it has deemed appropriate.

### Section 8.      Miscellaneous.

###### Section 8.1      *Entire Agreement; Prior Negotiations*.

This Agreement, including all of the exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements, representations, warranties, term sheets, proposals, and understandings, whether written, oral, or implied, among the Parties with respect to the subject matter of this Agreement. Each Party acknowledges and agrees that it is not relying on any representation or warranty from any other Party in entering into this Agreement except for those representations and warranties expressly set forth herein.

###### Section 8.2      *Reservation of Rights*.

This Agreement constitutes a confidential communication about a proposed settlement among the Parties. Regardless of whether or not the Amber Transaction is consummated, or whether or not a Termination Date occurs, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights or remedies, and the Parties expressly reserve any and all of their respective rights and remedies. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, the Parties agree

that, to the fullest extent under applicable law, neither this Agreement nor any negotiations relating hereto shall be admitted into evidence in any proceeding other than in a proceeding to enforce this Agreement or as a defense in connection with such a proceeding. This Agreement shall not be construed as or be deemed to be evidence of an admission or concession on the part of any Party for any claim, fault, liability, or damages whatsoever. Each Party denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses that it has asserted or could assert. Except as expressly provided in this Agreement, nothing herein does or is intended to, in any manner, waive, limit, impair, or restrict the ability of each Party to protect and preserve its rights, remedies, and interests. Without limiting the foregoing sentence, each Party reserves any and all of its rights, remedies, and interests in the case of any claim for a breach of this Agreement.

Section 8.3    *Representation by Counsel*. Each Party acknowledges that it has been represented by counsel (or had the opportunity to be represented by counsel and waived its right to do so) in connection with this Agreement and the Amber Transaction. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon the lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties hereto. None of the Parties hereto shall have any term or provision of this Agreement construed against such Party solely by reason of such Party having drafted the same.

Section 8.4    *Counterparts*. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute one and the same instrument, and the counterparts may be delivered by email in portable document format (.pdf) or by electronic signature.

Section 8.5    *Amendments*.

(a)    Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented, and no provision of this Agreement may be waived, without the prior written consent of the Bidder and the Required Consenting 2020 Noteholders; *provided*, that (i) the definitions of "Required Consenting 2020 Noteholders," may not be amended or otherwise modified without the written consent of each Consenting 2020 Noteholder; (ii) Section 5.4(b) and this Section 8.5 may not be amended without the written consent of each of the Bidder and each Consenting 2020 Noteholder, notwithstanding anything to the contrary in this Section 8.5(a); (iii) no modification, amendment or supplement hereunder may have a disproportionately negative effect (including, but not limited to, an economic recovery or any amendment to Section 8.19) to any Consenting 2020 Noteholder relative to another Consenting 2020 Noteholder without the written consent of such negatively affected Consenting 2020 Noteholder; (iv) the parenthetical (A) "only those Consenting 2020 Noteholders able to provide such indemnity" in Section 2.2(b)(iii) and Section 2.2(b)(iv), (B) "among Consenting 2020 Noteholders, but only to the extent that each such Consenting 2020 Noteholder is able to provide such indemnity" in Section 3.2(a)(v), and (C) "and, in the case of the Consenting 2020 Noteholders, only those Consenting 2020 Noteholders able to provide such indemnity" in the Transaction Term Sheet (Consent Solicitation and D&I Agreements section) may not be amended or otherwise modified without the written consent of each Consenting 2020 Noteholder that would be adversely affected by such amendment or modification; and (v) no modification, amendment, or supplement hereunder shall provide for any covenants of any Consenting 2020 Noteholders that apply prior to the Successful Bid Date; *provided*, that any covenants contained in any modification, amendment or supplement hereunder that apply after the Successful Bid Date shall be limited to those covenants necessary and appropriate to consummate the PDVH Transaction and the Amber Transaction, absent the consent of each Consenting 2020 Noteholder.

(b)    No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not such provisions are similar, nor shall any waiver of a provision of this Agreement be deemed a continuing waiver of such provision.

(c)    Notwithstanding anything to the contrary set forth herein, where written consent is required pursuant to or contemplated by this Agreement, such written consent shall be deemed to have occurred if it is conveyed in writing (with email being sufficient) between Paul Weiss (on behalf of the Initial Consenting 2020 Noteholders), counsel to any other Consenting 2020 Noteholders (to the extent applicable), counsel to the Bidder, and counsel to the CITGO Parties (to the extent applicable), and without representations or warranties of any kind on behalf of such counsel.

Section 8.6    **Headings**. The headings of the sections, paragraphs, and subsections of this Agreement are included for convenience only and will not affect the interpretation of the provisions contained herein.

Section 8.7    **Acknowledgments; Obligations Several**. The obligations of the Parties under this Agreement are several and neither joint nor joint and several. A Consenting 2020 Noteholder will not be responsible for the performance of the obligations or any breach by any other Consenting 2020 Noteholder under this Agreement, and no presumption will arise from anything contained herein or any action taken by any Consenting 2020 Noteholder that the Consenting 2020 Noteholders constitute a partnership, an association, or joint venture. No presumption will arise from anything contained herein or any action taken by the Consenting 2020 Noteholders that the Consenting 2020 Noteholders are otherwise acting other than in their individual capacities. The Consenting 2020 Noteholders shall not have any fiduciary duty to any other 2020 Noteholder, the CITGO Parties, or the CITGO Parties' other lenders, noteholders, stockholders, or other stakeholders as a result of this Agreement or the transactions contemplated hereby. Each Consenting 2020 Noteholder acknowledges that no 2020 Noteholder will be acting as agent of any other 2020 Noteholder in connection with monitoring such 2020 Noteholder's investment or enforcing its rights under this Agreement, the Definitive Documents, or any other documents to be entered into in connection with the consummation of the Amber Transaction.

Section 8.8    **Specific Performance; Damages**. The Parties understand, acknowledge, and agree that money damages would be an insufficient remedy for any breach of this Agreement by any Party and, thus, that each non-breaching Party will be entitled to specific performance and injunctive or other equitable relief to remedy any such breach, including an order, of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations in this Agreement. Notwithstanding anything to the contrary in this Agreement, no Party or its representatives will be liable to any other Party for any punitive, incidental, consequential, special, or indirect damages, including the loss of future revenue or income or opportunity, relating to a breach or alleged breach of this Agreement.

Section 8.9    **Governing Law**. This Agreement will be governed by, and construed in accordance with, the laws of the State of New York without regard to any choice of law provision that would require the application of the laws of another jurisdiction. By executing and delivering this Agreement, each Party (a) irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding shall be brought in either a state or federal court of competent jurisdiction in the State and County of New York, Borough of Manhattan; (b) accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit, or proceeding; and (c) submits to the personal jurisdiction of each such court described in this Section 8.9, solely for purposes of any action, suit, or proceeding arising out of or relating to this Agreement or for the recognition or enforcement of any judgment rendered or order entered in any such action, suit, or proceeding. Each Party to this Agreement

irrevocably consents to service of process by personal delivery, certified mail, and email, with the addresses set forth in its signature page. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING REFERRED TO ABOVE.

**Section 8.10     *Agreement Effective Date*.** This Agreement will become effective when executed and delivered by the Bidder and each Initial Consenting 2020 Noteholder.  The date that this Agreement becomes effective in accordance with this Section 8.10 is the "***Agreement Effective Date***."

**Section 8.11     *Notices*.** Any notice, direction, or other communication given regarding the matters contemplated by this Agreement must be in writing, sent by personal delivery, courier, or email, and addressed as follows:

If to the Bidder, to the addresses set forth below

Amber Energy Inc.
c/o Elliott Investment Management L.P.
360 S. Rosemary Ave, 18th Floor
West Palm Beach, FL 33401

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Attention:  Project Horizon (HorizonAkinCore@akingump.com)

If to an Initial Consenting 2020 Noteholder, to the address set forth below

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 6th Ave.
New York NY 10019
Attn:     Andrew N. Rosenberg (arosenberg@paulweiss.com);
          Karen R. Zeituni (kzeituni@paulweiss.com)

If to any other Consenting 2020 Noteholder, to the address set forth in the 2020 Noteholder Transferee Joinder or 2020 Noteholder Joinder to which it is party.

A notice is deemed to be given and received if sent by personal delivery, courier, or email, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt), and otherwise on the next Business Day. A Party may change its address for notice from time to time by providing a notice in accordance with the foregoing. Any subsequent notice must be sent to the Party at its changed address. Any element of a Party's address that is not specifically changed in a notice will be assumed not to be changed.

**Section 8.12     *No Third-Party Beneficiaries*.** Unless expressly stated herein, this Agreement is solely for the benefit of the Parties, and no other Person is a third-party beneficiary hereof.

**Section 8.13     *Successors and Assigns*.** This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators, and representatives.

**Section 8.14    Severability**. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.

**Section 8.15    Good-Faith Cooperation; Further Assurances**. The Parties shall (and shall cause each of their subsidiaries and affiliates to) cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Amber Transaction. Furthermore, each Party shall (and shall cause each of its subsidiaries and affiliates to) take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement. Each Party hereby covenants and agrees to negotiate in good faith the Definitive Documents, each of which will (a) contain the same economic terms (and other terms consistent in all material respects) as the terms set forth in the Transaction Term Sheet (as amended, supplemented, or otherwise modified as provided herein), (b) except as otherwise provided for herein, be in form and substance reasonably acceptable in all respects to the Bidder and the Required Consenting 2020 Noteholders, and (c) be consistent with this Agreement in all material respects.  It is the intent of the Parties to implement and consummate the Amber Transaction regardless of any judgment in the Declaratory Judgment Action either in favor of the Trustee, Collateral Agent, and the 2020 Noteholders or in favor of PDVSA, PDVH, and Petroleo. The Parties understand that such judgment could be rendered prior to the Effective Date and will nonetheless (as described in this Section 8.15 and otherwise in this Agreement) work in good faith to implement and consummate the Amber Transaction.

**Section 8.16    No Solicitation**. Each Party acknowledges that this Agreement is not, and is not intended to be, an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act or the Exchange Act.

**Section 8.17    Confidentiality**. The Parties shall keep both this Agreement and the existence of this Agreement confidential; *provided*, that,

(a)    the Bidder is expressly permitted to (x) include a copy hereof in the Amber Bid (but redacting, and without referencing or otherwise naming, the identities of any of the signatories hereto); *provided*, that to the extent the Amber Bid is publicly filed, the Parties should use commercially reasonable efforts to redact this Agreement, including Section 2.2(b)(iii)–(iv) and Section 8.18  and (y) disclose the existence of this Agreement (without referencing or otherwise naming the identities of any of the signatories hereto) to any third party (i) potentially joining the Amber Bid and (ii) which agrees to maintain the confidentiality of this Agreement in accordance with the provision of this Section 8.17;

(b)    unless the Minimum Participation Threshold shall have already been reached, the Initial Consenting 2020 Noteholders may disclose the existence of this Agreement (without referencing or otherwise naming the identities of any of the signatories hereto) to other 2020 Noteholders (the identities of which have been expressly approved by all of the Initial Consenting 2020 Noteholders) for the express purpose of satisfying the Minimum Participation Threshold;

(c)    Amber may disclose the executed certification of counsel attached hereto as **Exhibit D** for inclusion in any Amber Bid package; and

(d)    the Bidder otherwise may disclose this Agreement with the consent of (and in the form required by (including the need to redact signature pages)) the Initial Consenting 2020 Noteholders, such consent not to be unreasonably withheld.

24

**Section 8.18** 

       **Section 8.19**   **Additional Negotiations**. Nothing herein shall prevent the Initial Consenting 2020 Noteholders (with the agreement of each such Initial Consenting 2020 Noteholder) from negotiating with Venezuela, PDVSA, PDVH or any affiliate of the foregoing regarding a potential settlement of the Declaratory Judgment Action or other transaction concerning the Initial Consenting 2020 Noteholders' holdings of 2020 Notes and any consummation of any such settlement or transaction; *provided*, that any such settlement or transaction (i) shall be offered ratably (including with respect to fees or other amounts (other than expense reimbursement) payable in connection therewith) to all Consenting 2020 Noteholders, and (ii) shall include a Collateral Release. Following the Successful Bid Date, such settlement shall only occur following the Collateral Release and release of all claims by each such Initial Consenting 2020 Noteholders against PDVH and its subsidiaries.

       **Section 8.20**   **Public Exchange Offer Timing**. The Public Exchange shall be structured and launched such that it closes substantially concurrently with the Private Exchange on the Effective Date.

       **Section 8.21**   **Capacity; Actions**. Notwithstanding anything to the contrary in this Agreement, the Transaction Term Sheet or otherwise, each Consenting 2020 Noteholder is executing and agreeing to this Agreement solely in its capacity as a 2020 Noteholder and not in any other capacity.

*[Remainder of Page Intentionally Left Blank]*

AMBER ENERGY INC.


By:  _____
Name:  Elliot Greenberg
Title:    Vice President and Secretary


[CONSENTING 2020 NOTEHOLDERS]


By:  _____
Name:
Title:

AMBER ENERGY INC.

By: _____

Name: Elliot Greenberg

Title:  Vice President and Secretary

*Signature Page to Transaction Support Agreement*

**EXHIBIT A**

**Transaction Term Sheet**

**Execution Version**

# Transaction Term Sheet

THIS TRANSACTION TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE SECURITIES LAWS. THIS TRANSACTION TERM SHEET IS BEING PROVIDED IN FURTHERANCE OF TRANSACTION DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OF EVIDENCE. THE EXCHANGE TRANSACTIONS DESCRIBED IN THIS TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN. UNLESS OTHERWISE SET FORTH HEREIN, ALL CAPITALIZED TERMS HERE SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE TRANSACTION SUPPORT AGREEMENT TO WHICH THIS TRANSACTION TERM SHEET IS ANNEXED.

| TERM | DEFINITION |
|---|---|
| **AcquisitionCo** | Amber, an acquisition vehicle which will be the ultimate parent of PDVH, CITGO Holding and CITGO Petroleum and was formed for the purposes of effectuating the Amber Bid. |
| **Delaware Court** | The United States District Court for the District of Delaware. |
| **Ticking Fee** | A ticking fee (the "Ticking Fee") paid to the Consenting 2020 Noteholders and the Non-Party 2020 Noteholders at the rate of 0.75% per month on $2,125 million (which represents the expected aggregate recovery amount) under the Exchange Transaction, accruing from and including (a) the Initial Deadline until and conditioned upon (b) the closing date of the Sale Transaction (the "Ticking Fee End Date"). The accrued and unpaid portion of the Ticking Fee shall be earned at the Bidder's or the Required Consenting 2020 Noteholders' written notice that the Initial Deadline is to be extended and shall be due and payable in cash at the Ticking Fee End Date. On such date, the Ticking Fee shall be paid to each Consenting 2020 Noteholder and Non-Party 2020 Noteholder on a pro rata basis in immediately available funds without setoff, counterclaim or deduction and shall not be refundable under any circumstances. However, the Ticking Fee shall not be payable if the Effective Date does not occur. |
| **Transaction Support Agreement** | The Bidder and the Initial Consenting 2020 Noteholders shall execute a Transaction Support Agreement, to which this Transaction Term Sheet shall be annexed. |
| **Exchange Transaction** | A transaction consisting of (x) the Private Exchange and (y) Public Exchange Offer. |
| **PDVH BID** | |
| **Bid** | AcquisitionCo shall submit a Bid for a purchase of 100% of the PDVH common shares which Bid shall comply with the Cash Requirements (as defined in the Bidding Procedures Order). |
| **PDVSA Notes Settlement** | The Bid shall include (or otherwise reference in a manner sufficient to evidence the existence thereof) a Transaction Support Agreement executed by the Bidder, on one hand, and the Consenting 2020 Noteholders, on the other, as to the Exchange Transaction, materially on terms set forth herein or as is otherwise agreed by the Consenting 2020 Noteholders. |

## ECONOMIC TERMS[1]

| CLASS | TREATMENT |
|---|---|
| **Private Exchange** | The Consenting 2020 Noteholders shall sell, assign, transfer and exchange their collective aggregate principal amount of 2020 Notes in exchange for their respective pro rata portions of consideration, calculated based on aggregate consideration of $1,611.05 million in cash for 100% of the aggregate principal amount of the 2020 Notes held by the Consenting 2020 Noteholders and eligible to participate in the Private Exchange, plus the Ticking Fee, to the extent applicable. Consummation of the Private Exchange would be conditioned on (a) the Consenting 2020 Noteholders, collectively, agreeing to exchange no less than 2/3 aggregate principal amount of the 2020 Notes and (b) consummation of the PDVH Transaction pursuant to the pending sale process. |
| **Public Exchange Offer** | After or in connection with the consummation of the PDVH Transaction, the 2020 Noteholders, other than Consenting 2020 Noteholders (the "Non-Party 2020 Noteholders") will be offered an opportunity to exchange their respective pro rata portions of consideration, calculated based on aggregate consideration of $453.95 million in cash for 100% of the aggregate principal amount of the 2020 Notes held by the Non-Party 2020 Noteholders, plus the Ticking Fee, to the extent applicable. In order to tender their existing 2020 Notes in the Public Exchange Offer, the tendering Non-Party 2020 Noteholders must agree to a customary waiver and release of claims, plus the Ticking Fee, to the extent applicable. To the extent Consenting 2020 Noteholders hold 2020 Notes that are not entitled to participate in the Private Exchange, such Consenting 2020 Noteholders shall tender such 2020 Notes in the Public Exchange Offer. |
| **Consent Solicitation and D&I Agreements** | At or prior to the Sale Transaction Date, in connection with the Proposed Actions, the Parties will enter into the D&I Agreements, pursuant to which (i) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (ii) the Consenting 2020 Noteholders will provide a direction to the Collateral Agent to perform the Proposed Actions, including the Collateral Release, pursuant to a D&I Agreement with the Collateral Agent, (iii) if necessary, the Consenting 2020 Noteholders will provide a direction to the Trustee to perform or permit the Proposed Actions, including the Collateral Release, pursuant to a D&I Agreement with the Trustee, and (iv) ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ |
| **Consenting 2020 Noteholder Advisor Fees and Expenses** | As defined in and provided for in the Transaction Support Agreement. To the extent Consenting 2020 Noteholder Advisor Fees and Expenses are less than $60 million, the difference between $60 million and such amount shall be reallocated to the Private Exchange. To the extent Consenting 2020 Noteholder Advisor Fees and Expenses are greater than $60 million, the difference between such amount and $60 million shall be subtracted ratably from the Private Exchange and Public Exchange Offer and reallocated to pay Consenting 2020 Noteholder Advisor Fees and Expenses. Notwithstanding anything to the contrary in this Transaction Term Sheet or in the Transaction Support Agreement, in no event shall the aggregate recovery amount of the 2020 Noteholders under the Transaction Support Agreement exceed $2,125 million. |

## IMPLEMENTATION

| | |
|---|---|
| **Implementation Steps** | The Exchange Transaction shall be subject to satisfaction of the conditions precedent set forth in Sections 4.1, 4.2, and 4.3 of the TSA. |

---

[1] The amounts described assume approximately 75.04% of existing 2020 Notes are held by the Consenting 2020 Noteholders and will be adjusted if a higher amount is held by such Consenting 2020 Noteholders.

| Declaratory Judgment Action | Any holder of 2020 Notes that did not Participate in the Private Exchange or Public Exchange Offer on account of all of the 2020 Notes that it holds shall remain subject to the Declaratory Judgment Action. |
|---|---|

**EXHIBIT B**

**Form of 2020 Noteholder Transferee Joinder**

The undersigned (the "***Transferee***") hereby (a) acknowledges that it has read and understands the Transaction Support Agreement (the "***Agreement***"), dated as of August 12, 2025, entered into by and among (x) Amber Energy Inc. and (y) the holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, the 2020 Notes (as defined in the Agreement); and (b) with respect to the 2020 Notes acquired from Transferor, agrees to be bound to the terms and conditions of the Agreement to the extent that Transferor was thereby bound and to make (and be deemed to have made) all of the representations, warranties, covenants, and elections of the Transferor thereunder, in each case without modification, and shall be deemed a Consenting 2020 Noteholder (as defined in the Agreement) under the terms of the Agreement. All 2020 Notes held by the Transferee (now or hereafter) shall, subject to Section 6.2 (*Transfers of 2020 Notes*) and Section 6.3 (*Additional Claims*) of the Agreement, be subject in all respects to the Agreement.

Date Executed: _____, 202_

**[Name of Transferee]**

By: _____
Name: _____
Title: _____
Address: _____
_____
Email: _____

2020 *Notes Acquired*:

$_____

**EXHIBIT C**

**Form of 2020 Noteholder Joinder**

The undersigned (the "***Joining Party***") hereby (a) acknowledges that it has read and understands the Transaction Support Agreement (the "***Agreement***"), dated as of August 12, 2025 entered into by and among (x) Amber Energy Inc. and (y) the holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, the 2020 Notes (as defined in the Agreement); and (b) with respect to the 2020 Notes held by such Joining Party as at the date hereof, agrees to be bound to the terms and conditions of the Agreement and to make (and be deemed to have made) all of the representations, warranties, covenants, and elections of an Initial Consenting 2020 Noteholder (as defined in the Agreement) thereunder, in each case without modification, and shall be deemed a Consenting 2020 Noteholder (as defined in the Agreement) under the terms of the Agreement. All 2020 Notes held by the Joining Party (now or hereafter) shall, subject to Section 6.2 (*Transfers of 2020 Notes*) and Section 6.3 (*Additional Claims*) of the Agreement, be subject in all respects to the Agreement.

Date Executed: _____, 202_

**[Name of Joining Party]**

By:          _____
Name:      _____
Title:       _____
Address:  _____
               _____
Email:      _____

2020 *Notes Acquired*:

$_____

**EXHIBIT D**

**Certification of Counsel**

We hereby certify that, our clients have entered into a transaction support agreement providing for the exchange of their 8½% Senior Notes due 2020, issued by Petróleos de Venezuela, S.A. under the 2020 Notes Indenture, guaranteed by PDVSA Petróleo, S.A., and secured with a pledge on 50.1% of the equity of CITGO Holding, Inc. (the "***2020 Notes***") and a consent solicitation. We further certify that as of the date hereof, the holders of 2020 Notes signature to the transaction support agreement beneficially hold approximately 75.04% of the 2020 Notes (and in any event, not less than two-thirds of the outstanding principal amount).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP


By: *Andrew Rosenberg*
Name:  Andrew Rosenberg
Title:  Partner

**<u>Exhibit [G]</u>**

**Bid Letter Dated August 8, 2025, and Bid Letter Dated August 22, 2025**

# G-1

*Confidential*

August 22, 2025

**VIA EMAIL**

Evercore
909 Fannin, Suite 1800
Houston, Texas 77010
Attention: Ray Strong; William Hiltz
Email:  ray.strong@evercore.com; hiltz@evercore.com


with a copy to:


Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Matt Barr; Eoghan P. Keenan; Chase Bentley
Email: matt.barr@weil.com; eoghan.keenan@weil.com; chase.bentley@weil.com

Dear Messrs. Strong and Hiltz:

On behalf of Elliott Investment Management L.P. (collectively with its affiliates, "***Elliott***," "***we***" or "***us***"), we submit this proposal (this "***Proposal***") for the acquisition of 100% of the outstanding shares (the "***Shares***") of PDV Holding, Inc. ("***PDVH***" and together with its subsidiaries, the "***Company***"), upon the terms and subject to the conditions set forth herein (the "***Proposed Transaction***").[1] Except as supplemented and/or modified by this Proposal, the terms of our prior proposal, submitted on August 8, 2025 (the "***August 8 Proposal***") are incorporated in their entirety herein by reference.

Our Proposal continues to address the Court's priorities by both maximizing value for the Attached Judgment Creditors and Venezuela through negotiated settlements with Rusoro Mining and Koch that would extinguish $5,859,223,200 of Attached Judgments (through Koch) assuming a 12/31/2025 Closing as illustrated on Annex 1 and providing certainty of closing by securing a settlement with holders (the "***2020 Noteholders***") of more than 75% of the outstanding PDVSA 2020 bonds (the "***2020 Notes***"), thereby removing the uncertainty of those claims and ensuring a clear path to completion.

In addition, we are prepared to offer incremental value in the form of $███████ in cash which may be used (x) to extinguish at least $500,000,000 of the Attached Judgment of Gold Reserve Ltd. or, if Gold Reserve Ltd. declines such consideration, then (y) to extinguish some or all of the Attached Judgments of other Claimholders as determined by the Special Master in consultation with the Buyer or as otherwise determined by the Court.

When the $105,000,000 of break fees payable to Attached Judgement Creditors (Red Tree and Gold Reserve Ltd.) is included, our Proposal provides total value of $9,424,200,000.

---

[1] Unless otherwise defined herein, all capitalized terms used shall have the meanings ascribed to them in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "***Sale Procedures Order***") filed in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS.

August 22, 2025
Page 2

**Proposal**

The principal terms of the Proposal are set forth below:

      A.     <u>Proposed Transaction Structure</u>. We affirm our proposed transaction structure from the August 8 Proposal, pursuant to which Amber MSub LLC, a wholly owned subsidiary of Amber Energy Inc., would acquire 100% of the equity interests of PDVH under a mutually acceptable definitive purchase agreement.

      B.     <u>Stock Purchase Agreement</u>.

Attached to this Proposal as <u>Exhibit A-1</u> is a Word version of a draft Stock Purchase Agreement (the "***Proposed SPA***") providing for the acquisition of all of the Shares, with modifications to the draft submitted on June 18, 2025 (the "***June 18 SPA***"). Attached as <u>Exhibit A-2</u> is a PDF redline marked to show our proposed changes to the June 18 SPA, and attached as <u>Exhibit A-3</u> is a PDF redline marked to show our proposed changes against the stock purchase agreement entered into between the Special Master and Dalinar Energy Corporation, dated June 25, 2025 (the "***Dalinar SPA***").

Attached to this Proposal as <u>Exhibit B-1</u> and <u>Exhibit B-2</u> are Word versions of the proposed Company Disclosure Schedules and Buyer Disclosure Schedules, respectively, to accompany the Proposed SPA. Attached as <u>Exhibit B-3</u> is a PDF redline showing our changes to the Company Disclosure Schedules against the draft submitted on June 18, 2025, <u>Exhibit B-4</u> is a PDF redline showing our changes to the Company Disclosure Schedules against the form delivered in connection with the Dalinar SPA, and <u>Exhibit B-5</u> is a PDF redline showing our changes to the Buyer Disclosure Schedules against the draft submitted on June 18, 2025.

Attached to this Proposal as <u>Exhibit C-1</u> is a Word version of the draft Escrow Agreement and attached as <u>Exhibit C-2</u> is a PDF redline showing our changes against the form delivered in connection with the Dalinar SPA. Attached as <u>Exhibit C-3</u> is a Word version of the draft Paying Agent Agreement and attached as <u>Exhibit C-4</u> is a PDF redline showing our changes against the form delivered in connection with the Dalinar SPA. Attached as <u>Exhibit C-5</u> is a Word version of the draft Closing Release and attached as <u>Exhibit C-6</u> is a PDF redline showing our changes against the form delivered in connection with the Dalinar SPA.

      C.     <u>Identity of Purchaser</u>. Amber is controlled by Elliott, which has sufficient financial wherewithal to consummate timely the Proposed Transaction on the terms included herein, and is prepared to move forward on that basis.

      D.     <u>Purchase Price</u>.

We have increased our purchase price for the Shares from $5,959,200,000 as set forth in our August 8 Proposal to $6,459,200,000 (representing an additional $500,000,000 of writ extinguishment), with a portion in cash and a portion in non-cash to Koch and Rusoro, with distributions to Attached Judgment Creditors made in accordance with the Court's priority waterfall. In addition, our Proposal includes a settlement with holders of more than 75% of the outstanding 2020 Notes, which provides meaningful closing certainty. As we noted on the record at the August 12, 2025 status conference, Amber will extinguish all 2020 Notes it receives in connection with the settlement, providing additional extinguishment of claims against PDVSA. Attached to this Proposal as <u>Exhibits D-1</u> through <u>D-3</u> are fully executed settlement agreements with Koch, Rusoro and the 2020 Noteholders, respectively.

August 22, 2025
Page 3

    E.    <u>Sources of Financing</u>.

We affirm, consistent with our August 8 Proposal, that we have fully committed financing commitments from well-known asset managers, including Elliott. The Proposed Transaction and related fees and expenses will be financed by (i) $3,775,000,000 of funded 1L debt from third-party financing sources, (ii) up to $2,850,000,000 of additional capital from Elliott and other third-party financing sources, (iii) negotiated settlements to extinguish the Attached Judgments of Rusoro Mining ($1,553,000,000) and Koch ($468,000,000), (iv) $25,000,000 cash equity investment by Elliott and (v) an assumed $2,046,000,000 of closing balance sheet cash. Such sources of financing are further described in detail below:

- **1L Debt Commitment Letter**. Attached to this Proposal as <u>Exhibit E</u> is a lender-executed debt commitment letter evidencing commitments of up to $3,775,000,000 in funded 1L debt financing. To protect against a potential cash shortfall, we affirm the flexible structure described in our August 8 Proposal, which provides additional availability under its asset-based lending facility and equity and debt financing commitments.

- **ABL Commitment Letter**. Attached to this Proposal as <u>Exhibit F</u> is a lender-executed debt commitment letter providing for a $2,000,000,000 asset-based revolving facility for working capital and liquidity, which is expected to be undrawn but may be drawn up to $500,000,000, if required, at Closing.

- **Financing Commitment Letter**. Attached to this Proposal as <u>Exhibit G</u> is a lender-executed financing commitment letter with Elliott and third-party co-investors for $2,850,000,000, which includes a fully committed accordion feature to fund an incremental $570,000,000, if required, at Closing.

- **Equity Commitment Letter**. Attached to this Proposal as <u>Exhibit H</u> is an Elliott-executed equity commitment letter for $25,000,000.

    F.    <u>Expiration</u>. This Proposal will automatically expire if it has not been confirmed by the Special Master as a "Superior Proposal" under the terms of the sale process by 5:00 p.m., EST on the date that is ten (10) business days from the date hereof, and subject in all events to the Amber and the Special Master reaching mutual agreement on the form of the Sale Order.

    G.    <u>Purchaser Approvals</u>. We have received all approvals required to make this Proposal subject to finalization of the definitive documents, which we expect could be completed in short order given our minimal proposed edits to the Stock Purchase Agreement.

    H.    <u>Contacts</u>. The primary contact on behalf of the Purchaser is Ross Green, who is available by telephone at (212) 478-2672 or by email at rgreen@elliottmgmt.com.

Additionally, please feel free to contact Dan Fisher at Akin by telephone at (212) 872-7450 or by email at dfisher@akingump.com with any questions relating to this Proposal.

    I.    <u>Special Master Consent</u>. We hereby consent for Robert B. Pincus, in his capacity as Special Master for the Court (the "***Special Master***"), in his sole discretion, to share information with U.S. Government regulators, including the U.S. Department of the Treasury's Office of Foreign Assets Control, as well as the Sale Process Parties, subject to the limitations of bidding Sale Process Parties to receive bid information (as outlined in the December Order), pertaining to this Proposal; <u>provided</u>, that the Special

August 22, 2025
Page 4

Master seeks confidential treatment for information pertaining to this Proposal shared with the U.S. Government regulators; provided, further, that the Special Master advises Elliott if the Special Master is notified by a U.S. Government regulator of a request for information pertaining to this Proposal pursuant to the Freedom of Information Act, 5 U.S.C. § 552.

J.      Cooperation. We (i) agree that our advisors will coordinate in good faith with the Special Master's advisors to discuss and explain our regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) agree to cooperate with the Special Master to provide pertinent factual information regarding our ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests, subject to attorney-client privilege and similar rights, in each case subject to the terms of a Purchase Agreement.

K.      No Entitlement to Reimbursement. We acknowledge that submission of this Proposal alone does not entitle us to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

L.      No Liability. We agree that (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to us, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO, and their respective officers, directors and advisors will have no liability or obligation to us or our affiliates, except and only to the extent it is expressly provided for in the Stock Purchase Agreement if, as and when executed.

M.      Representations and Warranties. We hereby represent and warrant as follows:

(i)      We recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO, and their respective representatives make no representations, covenants, or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process, except as otherwise provided in the Stock Purchase Agreement;

(ii)      Other than with respect to our reliance on the representations and warranties provided in the Stock Purchase Agreement if, as, and when executed, we have relied solely upon our own independent review, investigation, and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

(iii)      We have not engaged in any collusion with respect to the submission of our Proposal; and

(iv)      All proof of financial ability to consummate the Proposed Transaction in a timely manner and other information we have submitted to the Special Master as of the date of this Proposal are true and correct in all material respects.

N.      Expenses. Except as may be provided in definitive written agreements, each of the Purchaser, on the one hand, and the judgment creditors of the Company, on the other, will be responsible

August 22, 2025
Page 5

for their own fees and expenses arising out of or in connection with the Proposed Transaction, including those of our and their respective accountants, bankers, counsel, and other advisors.

We respectfully request that this Proposal be considered a "Superior Proposal" under the terms of the sale process and are ready, willing and able to engage immediately to finalize documentation.

This confidential Proposal is not intended to be legally binding and is for discussion purposes only. This Proposal is subject to, among other things, the negotiation and execution of mutually satisfactory definitive agreements containing provisions customary for this type of transaction, regulatory approvals, and satisfactory completion of our due diligence.

This letter shall be governed by the substantive laws (and not the laws of conflict) of the State of Delaware. Any action, suit, litigation, claim, cause of action, arbitration, or other proceeding of any kind whatsoever against any other entity in any way, whether at law or in equity, whether in contract or in tort or otherwise, involving, arising out of, or relating to this letter or this Proposal, will be subject to the exclusive jurisdiction of the Court, or, if the Court does not have subject matter jurisdiction, such other courts of the State of Delaware or of the United States sitting within the State of Delaware and any appellate court from any thereof.

* * * * *

Thank you for the opportunity to present this Proposal. We remain enthusiastic about this opportunity and are prepared to move expeditiously to execute the Stock Purchase Agreement and consummate the Proposed Transaction. If you have any questions concerning this Proposal, please do not hesitate to contact any of the persons listed in Paragraph H above.


Very truly yours,

ELLIOT INVESTMENT MANAGEMENT L.P.


By: _____
Name:  Elliot Greenberg
Title:   Vice President

Annex 1

Sources and Uses

| Transaction Sources: | |
|---|---|
| (+) New 1L Debt | |
| (+) New Money Convertible Notes | |
| (+) Cash on Balance Sheet at Close | |
| (+) Rusoro Mining Commitment | |
| (+) Koch Commitment | |
| (+) Gold Reserve Claim Extinguishment | |
| (+) Funded Equity | |
| (-) Elimination[1] | |
| **Total Sources** | |

| Transaction Uses: | |
|---|---|
| (+) Est. Court Fees, Writ Extinguishment & 2020s Settlement | |
| (+) Existing Debt Paydown | |
| (+) Projected Starting Cash | |
| (+) Transaction Fees and Breakage | |
| (+) Topping Fee | |
| **Total Uses** | |

(1) Reflects double-count due to cash used to partially satisfy writholder claims.

| Sources of Liquidity at Close: | Commit. | Avail. |
|---|---|---|
| (+) Undrawn ABL | $2,000 | $500 |
| (+) New Money Convertible Notes | 3,420 | 570 |
| **Total Sources of Liquidity at Close** | **$5,420** | **$1,070** |

**Illustrative Writ Extinguishment:**

| Writ Holder Summary | Writ | Cumulative Writ | Extinguished Writ $ | % |
|---|---|---|---|---|
| Court Fees & Expenses (Estimated) | $100 | $100 | $100 | 100% |
| Crystallex | 1,015 | 1,115 | 1,015 | 100% |
| Tidewater | 80 | 1,194 | 80 | 100% |
| ConocoPhillips (Petroz. / Hama.) | 1,410 | 2,604 | 1,410 | 100% |
| OIEG & HII (Pari Passu) | 818 | 3,422 | 818 | 100% |
| ACL1 Investments | 119 | 3,541 | 119 | 100% |
| Red Tree Investments | 348 | 3,890 | 348 | 100% |
| Rusoro Mining | 1,553 | 5,443 | 1,553 | 100% |
| ConocoPhillips (Corocoro) | 48 | 5,491 | 48 | 100% |
| Koch | 468 | 5,959 | 468 | 100% |
| Gold Reserve | 1,210 | 7,169 | 500 | 41% |
| Siemens | 236 | 7,405 | 0 | 0% |
| Consorcio Andino | 701 | 8,106 | 0 | 0% |
| Contrarian | 396 | 8,502 | 0 | 0% |
| ConocoPhillips (ICSID) | 11,310 | 19,812 | 0 | 0% |

# G-2

*Confidential*

August 8, 2025

**VIA EMAIL**

Evercore
909 Fannin, Suite 1800
Houston, Texas 77010
Attention: Ray Strong; William Hiltz
Email: ray.strong@evercore.com; hiltz@evercore.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Matt Barr; Eoghan P. Keenan; Chase Bentley
Email: matt.barr@weil.com; eoghan.keenan@weil.com; chase.bentley@weil.com

Dear Messrs. Strong and Hiltz:

On behalf of Elliott Investment Management L.P. (collectively with its affiliates, "***Elliott***," "***we***" or "***us***"), we submit this proposal (this "***Proposal***") for the acquisition of 100% of the outstanding shares (the "***Shares***") of PDV Holding, Inc. ("***PDVH***" and together with its subsidiaries, the "***Company***"), upon the terms and subject to the conditions set forth herein (the "***Proposed Transaction***").[1]

Our Proposal is designed to directly address the Court's stated priorities and resolve the two most critical challenges that have plagued this sale process:

- **Maximizing the value of the PDVH shares for the benefit of the Attached Judgement Creditors and Venezuela**. Our Proposal would extinguish Attached Judgments totaling $5,859,223,200 (through Koch) assuming a 12/31/2025 Closing through negotiated settlements with Rusoro Mining (see attached <u>Exhibit A</u>) and Koch (see attached <u>Exhibit B</u>).

- **Providing certainty of closing by securing a settlement with the PDSVA 2020 bondholders**. Our offer includes a negotiated settlement with holders of more than two-thirds of the outstanding PDVSA 2020 bonds (see attached <u>Exhibit C</u>), removing the uncertainty presented by the PDVSA 2020 bondholder claims and ensuring a clear path to closing.

**Proposal**

The principal terms of the Proposal are set forth below:

A.    <u>Proposed Transaction Structure</u>. Amber Merger Sub LLC, a Delaware limited liability company and a newly formed, wholly owned subsidiary of Amber Energy Inc., a Delaware corporation formed by Elliott in 2024 for the purpose of acquiring the Shares (together, "***Amber***" or the "***Purchaser***")

---

[1] Unless otherwise defined herein, all capitalized terms used shall have the meanings ascribed to them in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "***Sale Procedures Order***") filed in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS.

August 8, 2025
Page 2

would acquire the Company through a purchase of the Shares pursuant to the terms of a negotiated, mutually acceptable definitive written agreement consistent with the terms of this Proposal and the Exhibits attached hereto (the "**Purchase Agreement**"). As this Proposal contemplates an acquisition of 100% of the outstanding equity interests of PDVH, the Proposed Transaction does not contemplate any minority shareholder rights, minority protections, or other terms.

       B.    <u>Stock Purchase Agreement</u>.

We affirm our proposed drafts of the stock purchase agreement (the "**Purchase Agreement**") and related disclosure schedules that were attached to our prior proposal submitted on June 18, 2025.

       C.    <u>Identity of Purchaser</u>. Amber is controlled by Elliott, which has sufficient financial wherewithal to timely consummate the Proposed Transaction on the terms included herein, and is prepared to move forward on that basis.

       D.    <u>Purchase Price</u>.

We are offering $5,959,200,000 in cash for the Shares which, as calculated by Elliott and assuming the Court makes the determination to distribute the cash to the current outstanding writs in accordance with the priority waterfall, will pay the outstanding writs of Crystallex and other holders of Attached Judgments (the "**Claimholders**") through Koch as illustrated on <u>Annex 1</u>. The cash purchase price assumes an aggregate amount equal to $100,000,000 for the Advanced Transaction Expenses Amount, the Closing Transaction Expenses, and the Expense Reserve Holdback Amount (as such terms are defined in the Purchase Agreement).

       E.    <u>Sources of Financing</u>.

As with our prior submissions, we have fully committed financing commitments from well-known asset managers including Elliott. The Proposed Transaction and related fees and expenses will be financed by (i) $3,775,000,000 of funded 1L debt from third-party financing sources, (ii) up to $2,850,000,000 of additional capital from Elliott and other third-party financing sources, (iii) negotiated settlements to extinguish the Attached Judgments of Rusoro Mining ($1,553,000,000) and Koch ($468,000,000), and (iv) an assumed $1,821,000,000 of closing balance sheet cash. Such sources or financing are further described in detail below:

- **1L Debt Commitment Letter**. We are prepared to execute an agreed form of debt commitment letter (see attached <u>Exhibit D</u>) evidencing a total commitment of up to $3,775,000,000 in funded 1L debt financing. To protect against a Cash shortfall risk, Amber has developed a flexible structure that could allow the Purchaser to access additional capital in the form of (1) $500,000,000 of availability under its asset-based lending facility, (2) $570,000,000 in cushion from its equity and debt financing commitments or a combination of some or all of the foregoing.

- **ABL Commitment Letter**. We are prepared to execute an agreed form of debt commitment letter (see attached <u>Exhibit E</u>) providing commitments for a $2,000,000,000 asset-based revolving facility for working capital and liquidity that is expected to be undrawn at the closing of the Proposed Transaction based on current assumptions (but could be drawn up to $500,000,000 at closing).

- **Financing Commitment Letter**. We are prepared to execute a financing commitment letter (see attached <u>Exhibit F</u>) with Elliott and third-party co-investors for $2,850,000,000. These

August 8, 2025
Page 3

commitments include a fully committed accordion feature to fund an incremental $570,000,000 should it be required at closing due to cash flow shortfall or changes in working capital.

F.    <u>Purchaser Approvals</u>. We have received all approvals required to make this Proposal subject to finalization of the definitive documents, which we expect could be completed in short order given our minimal proposed edits to the Purchase Agreement.

G.    <u>Contacts</u>. The primary contact on behalf of the Purchaser is Ross Green, who is available by telephone at (212) 478-2672 or by email at rgreen@elliottmgmt.com.

Additionally, please feel free to contact Dan Fisher at Akin by telephone at (212) 872-7450 or by email at dfisher@akingump.com with any questions relating to this Proposal.

H.    <u>Special Master Consent</u>. We hereby consent for Robert B. Pincus, in his capacity as Special Master for the Court (the "***Special Master***"), in his sole discretion, to share information with U.S. Government regulators, including the U.S. Department of the Treasury's Office of Foreign Assets Control, as well as the Sale Process Parties, subject to the limitations of bidding Sale Process Parties to receive bid information (as outlined in the December Order), pertaining to this Proposal; <u>provided</u>, that the Special Master seeks confidential treatment for information pertaining to this Proposal shared with the U.S. Government regulators; <u>provided</u>, <u>further</u>, that the Special Master advises Elliott if the Special Master is notified by a U.S. Government regulator of a request for information pertaining to this Proposal pursuant to the Freedom of Information Act, 5 U.S.C. § 552.

I.    <u>Cooperation</u>. We (i) agree that our advisors will coordinate in good faith with the Special Master's advisors to discuss and explain our regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) agree to cooperate with the Special Master to provide pertinent factual information regarding our ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests, subject to attorney-client privilege and similar rights, in each case subject to the terms of a Purchase Agreement.

J.    <u>No Entitlement to Reimbursement</u>. We acknowledge that submission of this Proposal alone does not entitle us to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; <u>provided</u>, <u>however</u>, that the Purchase Agreement will include termination fee and expense reimbursement concepts as provided in the January Order.

K.    <u>No Liability</u>. We agree that (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to us, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO, and their respective officers, directors and advisors will have no liability or obligation to us or our affiliates, except and only to the extent it is expressly provided for in the Purchase Agreement if, as and when executed.

L.    <u>Representations and Warranties</u>. We hereby represent and warrant as follows:

(i)    We recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO, and their respective representatives make no representations, covenants, or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room

3

August 8, 2025
Page 4

or otherwise made available by the Special Master and his advisors in connection with the bid process, except as otherwise provided in the Purchase Agreement;

(ii)     Other than with respect to our reliance on the representations and warranties provided in the Purchase Agreement if, as, and when executed, we have relied solely upon our own independent review, investigation, and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

(iii)     We have not engaged in any collusion with respect to the submission of our Proposal; and

(iv)     All proof of financial ability to consummate the Proposed Transaction in a timely manner and other information we have submitted to the Special Master as of the date of this Proposal is true and correct in all material respects.

M.     Expenses. Except as may be provided in definitive written agreements, each of the Purchaser, on the one hand, and the judgment creditors of the Company, on the other, will be responsible for their own fees and expenses arising out of or in connection with the Proposed Transaction, including those of our and their respective accountants, bankers, counsel, and other advisors.

We have demonstrated unwavering commitment throughout the sale process. From the earlier selection of Amber as the winning bidder, we have actively engaged with stakeholders and the Special Master to navigate the complex legal and structural challenges surrounding the sale of PDVH. Our sustained engagement and strategic foresight position us as a uniquely qualified and deeply informed purchaser of the CITGO enterprise. Rather than retreating in the face of uncertainty, we have consistently proposed thoughtful, court-compliant solutions that underscore our readiness to proceed responsibly. We respectfully request that this Proposal be considered a "Superior Proposal" under the terms of the sale process and are ready, willing and able to engage immediately to finalize documentation.

This confidential Proposal is not intended to be legally binding and is for discussion purposes only. This Proposal is subject to, among other things, the negotiation and execution of mutually satisfactory definitive agreements containing provisions customary for this type of transaction, regulatory approvals, and satisfactory completion of our due diligence.

This letter shall be governed by the substantive laws (and not the laws of conflict) of the State of Delaware. Any action, suit, litigation, claim, cause of action, arbitration, or other proceeding of any kind whatsoever against any other entity in any way, whether at law or in equity, whether in contract or in tort or otherwise, involving, arising out of, or relating to this letter or this Proposal, will be subject to the exclusive jurisdiction of the Court, or, if the Court does not have subject matter jurisdiction, such other courts of the State of Delaware or of the United States sitting within the State of Delaware and any appellate court from any thereof.

* * * * *

Thank you for the opportunity to present this Proposal. We remain enthusiastic about this opportunity and are prepared to move expeditiously to execute a Purchase Agreement and consummate the Proposed Transaction. If you have any questions concerning this Proposal, please do not hesitate to contact any of the persons listed in Paragraph G above.


Very truly yours,

ELLIOTT INVESTMENT MANAGEMENT L.P.


By: _____
Name:  Elliot Greenberg
Title:   Vice President

**Annex 1**
**Purchase Price Illustration and Proceeds to Claimholders**

| Transaction Sources: | |
|---|---|
| (+) New 1L Debt | $3,775 |
| (+) New Money Convertible Notes | 2,850 |
| (+) Cash on Balance Sheet at Close | 1,821 |
| (+) Rusoro Mining Commitment | 1,553 |
| (+) Koch Commitment | 468 |
| (+) Funded Equity | 25 |
| (-) Elimination[1] | (200) |
| **Total Sources** | **$10,292** |

| Transaction Uses: | |
|---|---|
| (+) Est. Court Fees, Writ Extinguishment & 2020s Settlement | $8,084 |
| (+) Existing Debt Paydown | 1,205 |
| (+) Projected Starting Cash | 500 |
| (+) Transaction Fees and Breakage | 398 |
| (+) Topping Fee | 105 |
| **Total Uses** | **$10,292** |

(1) Reflects double-count due to cash used to partially satisfy Rusoro or Koch claims.

| Sources of Liquidity at Close: | Commit. | Avail. |
|---|---|---|
| (+) Undrawn ABL | $2,000 | $500 |
| (+) New Money Convertible Notes | 3,420 | 570 |
| **Total Sources of Liquidity at Close** | **$5,420** | **$1,070** |

| Illustrative Writ Extinguishment: | | | | |
|---|---|---|---|---|
| | | Cumulative | Extinguished Writ | |
| Writ Holder Summary | Writ | Writ | $ | % |
| Court Fees & Expenses (Estimated) | $100 | $100 | $100 | 100% |
| Crystallex | 1,015 | 1,115 | 1,015 | 100% |
| Tidewater | 80 | 1,194 | 80 | 100% |
| ConocoPhillips (Petroz. / Hama.) | 1,410 | 2,604 | 1,410 | 100% |
| OIEG & HII (Pari Passu) | 818 | 3,422 | 818 | 100% |
| ACL1 Investments | 119 | 3,541 | 119 | 100% |
| Red Tree Investments | 348 | 3,890 | 348 | 100% |
| Rusoro Mining | 1,553 | 5,443 | 1,553 | 100% |
| ConocoPhillips (Corocoro) | 48 | 5,491 | 48 | 100% |
| Koch | 468 | 5,959 | 468 | 100% |
| Gold Reserve | 1,210 | 7,169 | 0 | 0% |
| Siemens | 236 | 7,405 | 0 | 0% |
| Consorcio Andino | 701 | 8,106 | 0 | 0% |
| Contrarian | 396 | 8,502 | 0 | 0% |
| ConocoPhillips (ICSID) | 11,310 | 19,812 | 0 | 0% |