**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> v.   ) <br> ) <br> BOLIVARIAN REPUBLIC OF ) <br> VENEZUELA, ) <br> ) <br> Defendant. ) | Misc. No. 17-151-LPS |

**DECLARATION OF WILLIAM O. HILTZ
IN SUPPORT OF THE SPECIAL MASTER'S
<u>UPDATED FINAL RECOMMENDATION</u>**

I, William O. Hiltz, declare as follows:

1.     I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), an investment banking advisory and investment management firm. Evercore has extensive experience providing high-quality investment banking services in traditional M&A processes and financially distressed situations. Evercore is the investment banker to the Special Master in the above-captioned action (the "**Action**").[1]

2.     I submit this declaration (this "**Declaration**") in support of the *Special Master's Updated Final Recommendation* (the "**Recommendation**").

3.     I previously submitted the *Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (D.I. 1838), the *Supplemental Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (D.I. 2003), and the *Second Supplemental*

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the Recommendation.

*Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (D.I. 2004). I incorporate by reference all statements contained therein.

4. My background and qualifications are set forth in the *Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (D.I. 1838), ¶¶ 4-7.

5. The statements in this Declaration are, except where specifically noted, based on my personal knowledge and information I received from the Special Master, his Advisors, PDV Holding, Inc. ("**PDVH**"), Citgo Holding, Inc. and Citgo Petroleum Corporation (collectively, "**CITGO**"), employees, advisors, or professionals of Evercore working directly with me or under my supervision, direction, or control, and the books and records of PDVH and CITGO maintained in the ordinary course of their businesses.

## Receipt of Competing Proposals

6. On July 2, 2025, the Special Master submitted the *Notice of Final Recommendation* (D.I. 1837) (the "**Dalinar Recommendation**"), recommending that the PDVH Shares be sold to Dalinar pursuant to the Dalinar SPA (the "**Dalinar June Sale Transaction**").

7. On June 30, 2025, just a couple of days before submitting his recommendation, the Special Master received an unsolicited nonfinal bid letter from a bidder that previously submitted a topping bid during the Topping Period ("**Bidder B**"). Pursuant to the material SPA terms approved by the Court (D.I. 1517), on July 1, 2025, the Special Master informed the Court that he had received an unsolicited competing proposal and requested permission to engage with Bidder B. The Special Master also notified Dalinar that he had received a competing proposal that same day. The Court granted the Special Master authority to engage with Bidder B.

8. On August 8, 2025, the Special Master received another competing proposal from Amber Merger Sub LLC ("**Amber**"), a wholly-owned subsidiary of Amber Energy Inc., an

2

affiliate of Elliott Investment Management L.P. ("**Elliott**"). In an *ex parte* conference on August 11, 2025, the Court granted the Special Master authority to engage with Amber. The Special Master also notified Dalinar on August 11, 2025 that he had received Amber's competing proposal.

9. In light of these unsolicited competing proposals and the limited time remaining before the Sale Hearing, the Special Master considered asking the Court to postpone the Sale Hearing, then scheduled for August 18, 2025, so that he would have sufficient time to consider the competing proposals and engage with the competing bidders. On August 13, 2025, the Special Master raised this issue during another *ex parte* conference with the Court and then met and conferred with the Sale Process Parties, Additional Judgment Creditors, PDVSA 2020 Bondholders, and other interested parties regarding the timing for the Sale Hearing. *See* D.I. 2047. With the exception of Gold Reserve, *see* D.I. 2032, all other parties either supported an adjournment of the Sale Hearing or took no position at that time. *See* D.I. 2047. With that input, the Special Master filed a letter with the Court recommending that it immediately adjourn the Sale Hearing scheduled for August 18, 2025. *Id.* On August 14, 2025, the Court adjourned the Sale Hearing and instead set an expedited briefing schedule and hearing for August 18, 2025 to determine next steps and timing. *See* D.I. 2056.

10. On August 18, 2025, the Court held a hearing and ordered, among other things, that (i) the Sale Hearing be rescheduled to commence on September 15, 2025, (ii) the Special Master be granted authority to engage with any bidder submitting a competing proposal until August 22, 2025, and (ii) the Special Master would be under no obligation to consider unsolicited competing proposals after August 22, 2025 (the "**August 22 Bid Deadline**"), absent further order of the Court, and any bids submitted thereafter must be filed on the docket. *See* August 18, 2025 Hr'g Tr.

3

209:23-210:21, 212:8-16; D.I. 2110 at 3-4.

11. On August 22, 2025, the Special Master received revised competing proposals from Amber and one other bidder ("**Bidder C**"). The Special Master did not receive a proposal from Bidder B.

### Reviewing the Competing Proposals

12. Immediately upon receipt of the competing proposals, the Special Master and his Advisors began a detailed assessment to compare the bids received on August 22 to the Dalinar Sale Transaction, which contemplates a purchase price of $7.380 billion, comprised of cash and non-cash consideration. The Dalinar Sale Transaction does not propose a settlement with the PDVSA 2020 Bondholders. The terms of the Dalinar Sale Transaction are provided in greater detail in the *Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (D.I. 1838), the *Notice of the Special Master's Final Recommendation.* (D.I 1837), and associated filings. During the subsequent days, the Special Master and his Advisors also participated in several calls with the Sale Process Parties to update them on the bids submitted and the Special Master's assessment of their relative merits, and to obtain their input.

13. In evaluating each bid submitted, the Special Master and his Advisors considered the Evaluation Criteria, including (i) the purchase price offered for the PDVH Shares and (ii) the certainty of closing. *See Amended Proposed Evaluation Criteria* (D.I. 1552-1), as approved and modified by the January 27 Order (D.I. 1554). The Special Master and his Advisors also considered the guidance the Court provided in various orders, at hearings, and in *ex parte* conferences with the Special Master, including the Court's April 21, 2025 *Order* (D.I. 1741) (the "**Stalking Horse Approval Order**"). *See* D.I. 1837 at ¶¶ 7-10, 38, 57, 59-62, 76-77, 82-83. The Special Master also assessed each bid's compliance with the Bidding Procedures and the Bid Requirements.

14. In determining the purchase price for each bid, the Special Master and his Advisors assessed the total value of the Attached Judgments expected to be satisfied by both cash and non-cash consideration, as well as whether any proposed non-cash consideration was consented to by the applicable holder of an Attached Judgment that would receive it.

15. In assessing the non-cash consideration, the Special Master and his Advisors applied the Court's rulings that (i) non-cash consideration could be used as currency in the auction only upon consent of the Sale Process Party or Additional Judgment Creditor that would receive it; (ii) non-cash consideration could only be offered according to the priority waterfall and in compliance with the Sale Procedures Order; and (iii) a recipient of non-cash consideration, including contingent cash consideration, could not be paid more than the amount of its claim. *See* Evaluation Criteria at 8; *Order on Open Matters and Joint Status Report* (D.I. 1554). Further, to the extent a bid contained cash consideration sufficient to satisfy all Attached Judgments senior in priority to bidders who hold Attached Judgments, the Special Master considered any credit bid or credit bids by such holders of Attached Judgments to be the equivalent of cash consideration for purposes of determining the purchase price and the amount available for distribution to holders of Attached Judgments. Evaluation Criteria at 8; *Order on Open Matters and Joint Status Report* (D.I. 1554).

16. In assessing certainty of closing, the Special Master, Evercore, and Weil carefully assessed the certainty associated with each bid, its compliance with applicable law, and the likelihood it would be approved by the Court and then successfully proceed to closing. The Special Master and his Advisors specifically took into account the following considerations, among others: (i) likelihood of securing regulatory approval and timing thereof, including requisite approval from OFAC, the Federal Trade Commission, and other government entities; (ii) conditionality related

to pending or future litigation (including with respect to the PDVSA 2020 Bondholders and the alter ego claims); (iii) conditionality related to securing entry of the proposed Sale Order, as well as related to any appeals of the Sale Order; (iv) each bidder's financial wherewithal and certainty of financing sources, including the presence of parent guarantees or other security in the event of a post-Sale Order refusal to close; (v) conditionality related to any other term proposed by the applicable bidder; (vi) certainty of obtaining requisite consents from the holders of Attached Judgments proposed to receive non-cash consideration; and (vii) certainty of financing. Evaluation Criteria at 8; *Order on Open Matters and Joint Status Report* (D.I. 1554).

### Terms of Competing Proposals

*a) Amber Sale Transaction*

17. The Amber Sale Transaction contemplates that Amber will acquire 100% of the PDVH Shares in exchange for (i) distributable cash and non-cash proceeds discharging approximately $5.892 billion[2] of Attached Judgments (the "**Base Consideration**"), plus (ii) additional cash consideration offered to discharge $500 million of Attached Judgments (the "**Additional Consideration**"). Together, the Base Consideration and Additional Consideration account for a total potential purchase price of up to $6.392 billion. The Base Consideration is comprised of (i) cash consideration in the amount of $3.853 billion payable to Attached Judgment Creditors through Red Tree and to ConocoPhillips Gulf of Parai B.V. for its

---

[2] Amounts of Attached Judgments are estimated as of an assumed closing date of June 30, 2026, according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024. *See* D.I. 1136 at 3 (citing D.I. 969-1). Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares. On August 28, 2025, the Special Master received correspondence from ConocoPhillips advising that it had recovered the sum of $869,955 on its Petrozuata/Hamaca Judgment against PDVSA and subsidiaries PDVSA Petróleo, S.A. and Corpoguanipa, S.A., rendered by the United States District Court for the Southern District of New York on August 22, 2018. Claim calculations have been updated accordingly.

Corocoro Judgment; (ii) a package of cash and non-cash and consideration payable to Rusoro Mining Limited ("**Rusoro**") for which it has agreed to discharge the entirety of its Attached Judgment of approximately $1.569 billion; and (iii) non-cash consideration payable to Koch Minerals Sàrl and Koch Nitrogen International Sàrl (collectively, "**Koch**") for which they have agreed to discharge the entirety of their Attached Judgment of approximately $471 million. The Additional Consideration is comprised entirely of cash, which Amber proposes to be offered to extinguish $500 million of Attached Judgments, with such Additional Consideration (i) first made available to Gold Reserve Ltd., f/k/a Gold Reserve Inc. ("**Gold Reserve**"), and (ii) if Gold Reserve declines such consideration, made available to other Additional Judgment Creditors as determined by the Special Master in consultation with Amber, or as otherwise directed by the Court.[3] As of the date of this Declaration, Gold Reserve has not consented to receipt of such consideration. The Additional Consideration will be available for allocation (to Gold Reserve or other Additional Judgment Creditors) until the outside date under the Amber SPA (*i.e.*, at least 12 months and up to 18 months after signing of the Amber SPA). *See* Amber SPA § 8.1(b).

18. The Amber Bid proposes to finance the Proposed Sale Transaction with (i) up to $3.775 billion of committed, funded first lien debt financing from a consortium of lenders (the "**Initial First Lien Lenders**"); (ii) up to $500 million of a $2 billion committed asset-based

---

[3] For the reasons stated in the *Special Master's Determination of Superior Proposal* (D.I. 2113), the amount of the Additional Consideration is not provided in this Recommendation, but will be disclosed prior to the commencement of the Sale Hearing. Further, the Special Master believes it may ultimately be necessary to request the Court's authority to offer the Additional Consideration to Additional Judgment Creditors junior to Gold Reserve, notwithstanding Gold Reserve's rejection of the offer, because of what the Special Master understands has been Gold Reserve's unwillingness to take anything less than full recovery in cash on its $1.2 billion claim, *see Gold Reserve's Response to Notice of Filing of Unsolicited Bid* (D.I. 2014), even though Additional Judgment Creditors both ahead of and behind Gold Reserve have accepted material discounts to the par value of their claims.

7

revolving facility from Barclays Bank PLC and Citigroup Global Markets Inc. (the "**ABL Lenders**"); (iii) $2.850 billion of committed financing convertible notes initially issued to a consortium of convertible note holders (the "**Convertible Noteholders**"), which includes a fully committed accordion feature of up to $570 million; and (iv) $25 million in equity financing from affiliates of Elliott (together with the Initial First Lien Lenders, the Convertible Note Holders, and ABL Lenders, the "**Financing Parties**").

19. Amber has also entered into a transaction support agreement (the "**TSA**"), with an ad hoc group (the "**2020 Bondholders AHG**") compromising over 75% of holders of the 8.5% notes issued by PDVSA due in 2020 (the "**PDVSA 2020 Bonds**" and the holders of the PDSVA 2020 Bonds, the "**PDVSA 2020 Bondholders**"). Pursuant to the TSA, the 2020 Bondholders AHG has agreed to provide the requisite consents to cause the Amber Sale Transaction to be permitted under the indenture governing the PDVSA 2020 Bonds and to cause all of the purported security interests in the equity of CITGO Holding that secure the PDVSA 2020 Bonds to be released and terminated in full. The TSA further provides for Amber to acquire the PDVSA 2020 Bonds for cash consideration totaling approximately $2.125 billion.

20. With respect to the consideration to pay Gold Reserve in exchange for a discharge of $500 million of its claim, the Special Master understands that discount offered to be consistent with the nature of the discounts creditors above Gold Reserve in the priority scheme have taken, taking into account their positions in the waterfall (and, based on Dalinar's subsequent proposal to Contrarian, what creditors below Gold Reserve have been offered as well). On that basis, the Special Master understands that Amber concluded that the recovery it offered to Gold Reserve (reflecting Gold Reserve's place as tenth in priority) was appropriate, in addition to the $30 million expense reimbursement that Dalinar would also receive as being the bidder initially recommended

8

by the Special Master.

### b) Bidder C's Competing Proposal

21. The transaction contemplated by Bidder C proposed a purchase price that would theoretically total approximately $6.117 billion, comprised of cash and non-cash consideration. However, as of the August 22, 2025 deadline, Bidder C had not secured consent from Additional Judgment Creditors for approximately $2.3 billion of the consideration it proposed. Therefore, a large portion of its consideration was not finalized. Subtracting the $2.3 billion of non-consented consideration, the total consideration of Bidder C's transaction was approximately $3.8 billion. Bidder C also delivered a signed settlement with the PDVSA 2020 Bondholders. Accordingly, the Special Master determined that Bidder C's competing proposal was not superior to the Dalinar June Sale Transaction.

## Determination of Receipt of Superior Proposal

22. Although the Amber sale price is lower than that offered by the Dalinar June Sale Transaction, the difference is substantially smaller than the $3.576 billion difference the Special Master faced during the Topping Period when comparing the Dalinar June Sale Transaction and the Stalking Horse Bid. The Amber Sale Transaction also offers a high degree of closing certainty on account of Amber's consensual deal with more than 75% of the PDVSA 2020 Bondholders. The Special Master, in consultation with his Advisors, determined that the certainty of closing associated with the Amber Sale Transaction was much higher than that presented by the Dalinar Sale Transaction since it could close regardless of the outcome of the PDVSA 2020 Bondholder litigation.

23. Further, Amber's settlement with the PDVSA 2020 Bondholders for consideration of $2.125 billion also secures a discount of $895 million on the PDVSA 2020 Bondholders claims,

which they estimate are worth approximately $3.02 billion.[4]  Hypothetically, if the Amber Sale Transaction were not approved and the PDVSA 2020 Bondholders were successful in the SDNY Litigation, this $895 million discount could be lost, and up to the full $3.02 billion might have to be diverted to the PDVSA 2020 Bondholders to satisfy their claims and ensure that they would not block the proposed sale, which would leave considerably less consideration to be distributed to holders of Attached Judgments.

24. For the reasons discussed above, on August 25, 2025, after evaluating the bids received, the Special Master determined that, pursuant to section 6.16(d) of the Dalinar SPA, the Amber Sale Transaction was a Superior Proposal and provided notice of such determination to Dalinar that same day.  *See* D.I. 2113.

## **Matching Period**

25. The notice triggered a three-business-day period ending on August 28, 2025 for Dalinar to submit proposed changes to the Dalinar June Sale Transaction for Dalinar to match or exceed the Amber Sale Transaction.  *See* Dalinar SPA § 6.16(d); D.I. 2110 at 3.

26. Throughout the three-day matching period, the Special Master and his Advisors regularly engaged with Dalinar to discuss Dalinar's efforts to improve its bid to match or exceed the Amber Sale Transaction.  The Special Master communicated to Dalinar that it would need to improve its bid on price, certainty, or both to match or exceed the Amber Sale Transaction.

27. Dalinar submitted a revised bid to the Special Master on August 28, 2025 (the transaction contemplated thereby, the "**Dalinar August Sale Transaction**").

---

[4] $3.02 billion is the PDVSA 2020 Bondholders' estimate of the face value of the PDVSA 2020 Bonds if they are successful in the SDNY Litigation (through all appeals) assuming interest accrues at the contractual default interest rate through a June 30, 2026 closing. The Special Master acknowledges that the applicable interest rate may be subject to dispute in the SDNY Litigation.

**Dalinar's Revised Bid**

28.     The Dalinar August Sale Transaction appears to have an increased purchase price of approximately $518 million, comprised of (i) the addition of approximately $718 million attributable to the extinguishment of the Attached Judgment of Valores, *minus* (ii) $200 million of Gold Reserve's own claim, which it previously agreed to extinguish, but now intends to retain as compensation for fees associated with purchasing the Valores claim. Of note, the Special Master and his Advisors are unaware of the specific terms of the arrangement between Gold Reserve and Valores, other than the fact that Gold Reserve purportedly purchased the Valores claim and intends to include the value of the claim in its credit bid. It is unclear what, if any, consideration Valores is receiving as part of the revised bid. If Dalinar is given full credit for its purchase of the Valores claim, then its purchase price would increase to approximately $7.9 billion.

29.     Dalinar asserts that it has further offered a combination of $10 million of cash plus warrants valued at $10 million, in exchange for the extinguishment of the $396 million Attached Judgment held by Contrarian Capital Management, L.L.C. ("**Contrarian**"); however, that offer expires at 11:59 pm ET today, August 29, 2025. The Special Master was not provided with any evidence that Contrarian either has or intends to accept that offer. Therefore, given its imminent expiration, the Special Master and his Advisors did not take this into account as part of the purchase price associated with the revised bid.

30.     Dalinar contends in its August 28, 2025 bid letter that it has upsized its financing support to fund any required payment to the PDVSA 2020 Bondholders by obtaining an accordion increase of its ABL by $500 million. According to Dalinar, its $1 billion ABL, combined with the $1.8 billion in preferred equity financing covered by its existing Highly Confident Letter, provides $2.8 billion in potential financing to resolve any potential claims asserted by the PDVSA 2020 Bondholders in the event that they succeed in the SDNY Litigation. However, $1.8 billion of the

11

solution (*i.e.*, the preferred equity financing) remains *uncommitted* and does not meet the Bid Requirements for bidders to have committed financing.  Therefore, if the PDVSA 2020 Bondholders were successful, Dalinar has only $1 billion of committed financing available via its ABL to address up to $3.02 billion of claims, a significant shortfall.  Even if the preferred equity financing were committed, the total amount of financing available to Dalinar to address the PDVSA 2020 Bonds issue would be $2.8 billion, which may or may not be sufficient to resolve the asserted $3.02 billion of claims.  Likewise, notwithstanding the existence of ABL commitments generally, the actual availability of a specific amount of ABL proceeds at closing—both for general working capital purposes and to satisfy any obligation to the PDVSA 2020 Bondholders—is yet to be determined.  The ability to draw on asset-based loan facilities, including Dalinar's proposed ABL, is calculated at the time of the requested draw and predicated on the borrower's then-existing liquidity and asset borrowing base.  Neither of those numbers, as they apply to CITGO's business at the time of closing of the proposed Dalinar transaction, can be forecasted today with sufficient specificity for purposes of ensuring Dalinar's ability to satisfy the PDVSA 2020 Bonds in the event the bonds are deemed valid.  *See* D.I. 1837 n.15.

### Determination of Recommendation of Superior Proposal

31. The Special Master and his Advisors carefully reviewed the terms of Dalinar's revised bid to determine if it met or exceeded the terms of the Amber Sale Transaction.  In this assessment, the Special Master was guided by the Evaluation Criteria discussed *supra*, paragraphs 13-16.  The Special Master and his Advisors also held a call with the Sale Process Parties to obtain their input.

32. ***Purchase Price.***  The Special Master determined that the difference between the amount of Attached Judgments satisfied by each of the Amber Sale Transaction and the Dalinar

August Sale Transaction is somewhere between $988 million and $2.006 billion. The lower delta contemplates Amber's purchase price at $6.392 billion, which assumes that Amber's Additional Consideration discharges an additional $500 million of Attached Judgments, and that Dalinar does not receive credit for the approximately $718 million Valores claim discussed above (*i.e.*, $7.380 billion *minus* $6.392 billion *equals* $988 million). The higher delta of $2.006 billion assumes that Amber's Additional Consideration of $500 million is not accepted and Dalinar does receive credit for the Valores claim (*i.e.*, $7.899 billion *minus* $5.892 billion *equals* $2.006 billion).[5]

33. **Certainty.** The Special Master determined that the difference in certainty associated with the Amber Sale Transaction and the revised Dalinar bid is significant. Most notably, the Amber Sale Transaction virtually eliminates any closing risks associated with the PDVSA 2020 Bondholder litigation, by delivering a settlement with the PDVSA 2020 Bondholders. In doing so, the Amber Sale Transaction can close regardless of the outcome of the PDVSA 2020 Bondholder litigation and secures an approximately $895 million discount on the PDVSA 2020 Bondholders' claims. Specifically, Amber's settlement proposes to pay $2.125 billion of cash consideration on account of $3.02 billion of asserted PDVSA 2020 Bondholder claims.

34. Dalinar contends in its August 28, 2025, bid letter that it has increased its own certainty with respect to the PDVSA 2020 Bondholders, by upsizing its financing support to a total of $2.8 billion if needed in potential financing to fund any required payment to the PDVSA 2020 Bondholders should they succeed in the SDNY Litigation. However, $1.8 billion of this remains *uncommitted*, violating the Bid Requirements mandating that bidders have committed financing.

---

[5] No matter the scenario, the difference in "purchase price" reflects the gap between the Attached Judgments satisfied by each bid and does not, for the avoidance of doubt, reflect the difference between actual consideration, or the value of such consideration, provided to creditors.

Therefore, if the PDVSA 2020 Bondholders were successful, Dalinar has only $1 billion of committed financing available via its ABL to address up to $3.02 billion of claims, a significant shortfall. The Special Master raised this issue with Gold Reserve dating back to the early stages of the Topping Period and has continually reiterated it in the months since, but the issue has yet to be addressed. The Special Master also requested changes to Dalinar's financing commitment letters to reflect a requirement that its lenders be required to fund at closing notwithstanding a successful exercise of the CITGO Holding Pledge by the PDVSA 2020 Bondholders resulting in 50.1% of the CITGO Holding equity being owned or controlled by parties other than Dalinar. But that request, too, was not fulfilled. As a result, there are significant issues with the certainty associated with the Dalinar bid when assessing its ability to address the closing risks associated with the PDVSA 2020 Bondholders. *See* D.I. 1837 n. 15.

35. Amber's settlement with the PDVSA 2020 Bondholders also provides the Court with additional flexibility in light of a loss in the PDVSA 2020 Bondholders' litigation. With the PDVSA 2020 Bondholders now committed to their settlement, and the Sale Hearing set for September 15, 2025, with a Sale Order to follow at some point *after* the ruling in the SDNY Litigation, *see* D.I. 2056 ¶ 3; *see also* August 18 2025 Hr'g Tr 203:7-205:20, the Court will have the benefit of 20/20 hindsight in deciding whether the settlement embedded in the Amber Sale Transaction is value accretive to the holders of Attached Judgments or if it instead improperly overpays the PDVSA 2020 Bondholders.

36. Accordingly, the Special Master and his Advisors determined that this Recommendation of the Amber Sale Transaction secures a one-way option for the benefit of the sale process that protects against a significant downside of the PDVSA 2020 Bondholders' potentially frustrating Dalinar's bid if the PDVSA 2020 Bonds were valid, while creating the

14

possibility of a scenario in which additional value could become available to Additional Judgment Creditors in the event the PDVSA 2020 Bonds are found to be invalid.

37. If the Special Master were to recommend the revised Dalinar bid instead of the Amber Sale Transaction, and the PDVSA 2020 Bondholders were then successful in the SDNY Litigation, the $895 million discount secured by the TSA would be lost. In the ensuing re-solicitation of bids, assuming the PDVSA 2020 Bondholders demand something at or near their asserted $3.02 billion of claims, and also assuming the total enterprise value of the CITGO business remains in the same range as the value implied by Amber Sale Transaction, the Additional Judgment Creditors would bear the brunt of the resulting reallocation of value. Specifically, Rusoro and Koch would not likely recover anything of material value for their Attached Judgments, nor would ConocoPhillips for its Corocoro Judgment, which are immediately senior to Gold Reserve.

38. On the other hand, if, at some point between this Recommendation of the Amber Sale Transaction and entry of the Sale Order, the PDVSA 2020 Bonds and the related CITGO Holding Pledge are determined to be invalid,[6] the Court may consider whether it views the $2.125 billion settlement as an over-valuation of the PDVSA 2020 Bondholders' claims and a diversion of value from Attached Judgment Creditors. *See* D.I. 1741 at 7. If this scenario arises, this Court will have the discretion to not approve the Amber Sale Transaction and to order the Special Master to resolicit bids. In that scenario, the universe of the bids for the PDVH Shares could provide materially higher consideration to holders of Attached Judgments, as they could allocate to the

---

[6] Such circumstances may or may not occur. Pursuant to the TSA, the PDVSA 2020 Bondholders have agreed to seek a stay of the SDNY Litigation. If that application is granted, then a decision on the merits of the PDVSA 2020 Bondholders' claims may not be issued prior to closing of the Amber Sale Transaction and the settlement would stand.

15

holders of Attached Judgments a significant portion of the total consideration they are currently willing to pay to address the 2020 Bondholders litigation risk.

39. ***Other Evaluation Criteria***.  In reaching his recommendation, the Special Master also considered the following non-exhaustive considerations, as set forth in the Evaluation Criteria, bearing on certainty of closing:

(a) **Likelihood of Regulatory Approval**: The Special Master is reasonably satisfied that Amber is likely to obtain the requisite regulatory approvals. Amber has represented that it will make, in a timely manner, (i) all filings and disclosures necessary to comply with the regulations of OFAC, (ii) all necessary filings under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and (iii) all other necessary filings and submissions required under any relevant antitrust laws, which include filings in Mexico, Morocco, and the Netherlands. Amber will be ultimately indirectly owned by Elliott. In the SPA, Amber has committed to (and to cause its affiliates to, in certain circumstances) take all actions necessary, proper, or advisable to obtain approval for the Amber Sale Transaction under antitrust laws. The Special Master, upon the advice of his Advisors, determined that the Amber Sale Transaction does not pose a significant risk from a regulatory approval perspective.

(b) **Conditionality Related to Pending or Future Litigation**: The Amber Sale Transaction does not include any additional conditionality relating to pending or future litigation as compared to the Bid Draft SPA.

(c) **Conditionality Related to Appeals of the Sale Order**: The Amber Sale Transaction does not include any additional conditionality relating to an appeal of the Sale Order as compared to the Bid Draft SPA or the Dalinar August Sale Transaction.

(d) **Bidder's Financial Wherewithal and Certainty of Financing**: The Special Master is satisfied with respect to Amber's financial wherewithal and certainty of financing. Amber is an affiliate of Elliott, an established and respected fund manager that manages $76.1 billion in assets.[7] As set forth above, Amber has secured financing from the Financing Parties, all of whom are established and respected participants in the financial system. The financing for the Amber Sale Transaction contains closing conditions that either are customary or otherwise viewed as reasonable under the circumstances.

(e) **Conditionality Related to Other Terms Proposed by the Recommended Bidder**: The SPA has no material additional conditionality with respect to its other

---

[7] *See About Elliott*, Elliott, https://www.elliottmgmt.com/about-elliott/ (last visited Aug. 28, 2025).

terms compared to the Dalinar August Sale Transaction or the Bid Draft SPA. The Amber SPA contains customary conditionality, such as receipt of HSR clearance and OFAC approval, accuracy of certain limited fundamental representations and warranties in all material respects, and compliance with covenants in all material respects, and the absence of an occurrence of a "Company Material Adverse Effect." The financing documents proposed by Amber otherwise contain closing conditions that either are customary or otherwise viewed as reasonable under the circumstances.

40. Ultimately, the Special Master concluded that the Amber Sale Transaction strikes the best balance between price and certainty: It contemplates a price that delivers a slightly lower value than the Dalinar bid, while neutralizing the risks associated with the PDVSA 2020 Bondholders' ability to frustrate the Dalinar bid. As described above, it also potentially offers flexibility that could lead to additional upside for judgment creditors depending on the outcome of the SDNY Litigation. While the price differential between the Amber Sale Transaction and the revised Dalinar bid could be anywhere from under a billion dollars to approximately two billion dollars, because of the substantial outstanding delta on certainty, the Special Master believes that, regardless of where on that spectrum the true difference lies, the Amber Sale Transaction continues to constitute a Superior Proposal and remains the best bid received to date in this sale process

41. Accordingly, the Special Master, in consultation with his Advisors, determined that the Amber Sale Transaction continues to be superior to all of the proposed Dalinar transactions, provides a value-maximizing price for the PDVH Shares, and is the best bid available.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

New York, New York
Dated August 29, 2025

/s/ <u>*William O. Hiltz*</u>
William O. Hiltz
Senior Managing Director
Evercore Group L.L.C.