IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>  Plaintiff,<br><br>  v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | C.A. No. 17-mc-151-LPS |

**CRYSTALLEX INTERNATIONAL CORPORATION'S
RESPONSE TO GOLD RESERVE'S MOTION TO STRIKE
<u>SPECIAL MASTER'S NOTICE OF DETERMINATION OF SUPERIOR PROPOSAL</u>**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Dated:  September 5, 2025

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff*

i

**Preliminary Statement**

Gold Reserve's objection to the Special Master's procedural determinations, styled as a "Motion to Strike," D.I. 2117, is an unnecessary distraction from the Court's goal to sell the PDVH Shares in a value-maximizing sale. Having repeatedly ignored the recommendations of the Special Master, Sales Process Parties Crystallex and ConocoPhillips, and numerous additional creditors as to how to improve the Dalinar bid, Gold Reserve attempts to invoke illusory procedural obstacles in the hope it can avoid defending its (now superseded) bid on the merits. But regardless of whether Amber Energy's bid is considered a "Superior Proposal" under the terms of Dalinar's as-yet nonbinding and unenforceable Stock Purchase Agreement ("Dalinar SPA"), the Court retains discretion to assess all bids before it at the Sale Hearing and select as the winner whichever bid—including potentially Dalinar's—it believes will maximize economic value and certainty of closing. This Court has long "assure[d] all involved in the Sale Process and the Litigation that whatever recommendation the Special Master makes to the Court will be subjected to full and adequate judicial scrutiny – including at and around the multi-day Sale Hearing in [September] and the extensive briefing likely to precede it – regardless of the price associated with any Successful Bid and the Sale Process that produces it." D.I. 1554 at 5. Thus, Gold Reserve will have ample opportunity to object to the Amber Energy bid and attempt to *prove* that its asserted top-line number provides superior value to creditors in this Sale Process despite the obvious risks to closing certainty that its bid presents. *See also* D.I. 1924 (this Court reaffirming the parties' right to present testimony in support of their objections at the Sale Hearing). Gold Reserve's right to do so is not impacted by the Special Master's view that the Amber Energy bid is a Superior Proposal. The competitive process and value-maximizing objective of this sale will not be served by "striking" a serious bid that, by objective economic measures, is superior.

Moreover, since Dalinar has submitted what it believes to be an improved bid to the Special Master, D.I. 2123, ¶¶ 13-15, it is unclear what the Gold Reserve Motion to Strike seeks to accomplish. Gold Reserve does not address the fact that Dalinar submitted a revised bid, and does not explain whether it is asking the Court to order the Special Master to revert to his original Final Recommendation or to accept Dalinar's revised bid as the updated Final Recommendation. *See* D.I. 2117 at 19 (requesting only that the Court "strike the Special Master's Notice of Superior Proposal"). This lack of clarity pervades Gold Reserve's Motion to Strike, leaving Gold Reserve's request for relief ambiguous at best and presumably moot. The motion can, and respectfully should, be denied for this reason alone.

Even setting aside these flaws, Gold Reserve's Motion to Strike still fails, as detailed below. Gold Reserve asserts that the Special Master cannot consider the Amber Energy bid a Superior Proposal because the Amber Energy bid does not meet the overbid minimum required to qualify as an Unsolicited Competing Proposal under the Dalinar SPA. D.I. 2117 at 11. If accepted, that contention would render meaningless the Special Master's "sole discretion" to lower the overbid minimum and his discretion to recommend a Superior Proposal to the Dalinar bid if it "would constitute a higher *or better* bid for the [PDVH] Shares based *upon the Evaluation Criteria*." D.I. 1841-1, Ex. B, § 6.16(f)(i)-(ii) (emphasis added).

Gold Reserve further ignores that the Dalinar SPA is expressly "subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the [PDVH] Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order." *Id.*, § 6.16(a). The Evaluation Criteria require the Special Master to consider both price *and* certainty of closing when making his recommendation to the Court, D.I. 1554 at 24-27, and the Court ordered that the Special Master must retain discretion to

lower the overbid minimum because "the evaluation criteria include criteria other than price," *id.*, at 14.  Each of these facts undercuts Gold Reserve's argument that the Special Master was prohibited from recommending the Amber Energy bid as a Superior Proposal under this Court's binding orders, including the Evaluation Criteria.

Gold Reserve's Motion to Strike ultimately boils down to a dispute over speaking order, and which bidder the Special Master speaks in favor of at the Sale Hearing.  In an enforcement proceeding that has now run for nearly a decade and cost tens of millions of dollars, such a picayune dispute should never have been brought to this Court in the first place.  The motion should be denied.

## Argument

I. **Gold Reserve's Motion To Strike Improperly Seeks To Protect Purported Rights That Are Not Gold Reserve's To Invoke.**

As a threshold matter, the Motion to Strike must fail because Gold Reserve is not a party to the (unenforceable) agreement that it purportedly seeks to enforce.  While Gold Reserve may *object* to the Special Master's recommendations, like any other creditor may, Gold Reserve lacks standing to enforce the provisions of the Dalinar SPA, even were it now binding (which it isn't), whether by "Motion to Strike" or otherwise.  Under Delaware law, "only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions." *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007).  Gold Reserve is neither. *See* D.I. 1841-1, Ex. B, §§ 9.11; 9.15(b) (excluding Gold Reserve from any potential class of third-party beneficiaries except with respect to certain releases of liability).  The fact that Gold

3

Reserve's Motion to Strike was joined only by Siemens, D.I. 2118,[1] whose judgment Gold Reserve added to its bid during the Topping Period, D.I. 2117-2, ¶ 9, and not by Koch or Rusoro, the other members of the bidding consortium, indicates that Gold Reserve speaks only for itself here. And while the unique circumstances of this case mean that it might be appropriate for Gold Reserve or other non-parties to the Dalinar SPA to rely on that document's terms to support objections to the Amber Energy bid and in favor of Dalinar's, that is not what Gold Reserve seeks to do. Gold Reserve seeks to enforce the terms of the Dalinar SPA directly, as if it were a party. *See* D.I. 2117 at 11 (objecting to the Special Master naming the Amber Energy bid a "Superior Proposal," a defined term found only in the Dalinar SPA). Thus, even assuming the Dalinar SPA were currently enforceable, the Motion to Strike should be denied to the extent it is premised on Gold Reserve's supposed rights under that SPA—rights Gold Reserve does not have.

Even if the Special Master and his advisors were bound by the Dalinar SPA, and the agreement were best interpreted in the manner that Gold Reserve urges (neither of which is true), the agreement does not purport to bind *this Court* to approve the Special Master's recommendation of Dalinar, nor could it. The Court's orders make clear that Amber Energy could still submit its bid to this Court, and this Court could still select it as the winning bid. *See* D.I. 1552-1 at 2-3; D.I. 1554. The only difference is that in the latter scenario this Court would lose the benefit of receiving the initial impressions of the Special Master and his advisors, which was one of the primary reasons the Court appointed the Special Master in the first place. *See* D.I. 277 at 3-5. Dalinar's sole protection under the agreement is its potential right to be reimbursed up to $30 million for expenses

---

[1] The Motion to Strike has since been joined by Valores Mundiales and Consorcio Andino, D.I. 2121, out of the money creditors whose judgment Gold Reserve has reportedly purchased to enhance Dalinar's revised bid, D.I. 2123 at 8-9. As a result, their joinder is effectively Gold Reserve agreeing with itself.

4

incurred in connection with its bid. Thus, even assuming Gold Reserve can and does speak for Dalinar, Dalinar is already protected from any cognizable harm in the event Amber Energy is selected as the winning bid.

**II.  The SPA Grants The Special Master Discretion To Select A Superior Proposal That Is "Higher Or Better" Than Dalinar's, And To Lower The Overbid Minimum**

Ignoring the long history of the Sale Process and its well documented twin goals of maximizing both price and certainty, Gold Reserve argues that the Special Master cannot designate the Amber Energy bid a Superior Proposal because, under the Dalinar SPA, a Superior Proposal must first qualify as a Competing Proposal, which, in the case of bids filed during the No-Shop Period (Unsolicited Competing Proposals), must satisfy an overbid minimum comprising two components: (A) a $30 million expense reimbursement and (B) a $50 million additional bidding threshold. *See* D.I. 2117 at 11. Such a simplistic analysis might be persuasive in isolation, but it fails to account (as required in contract interpretation) for the entirety of the SPA and this Court's orders. When the full text of the SPA and this Court's orders are taken into account, Gold Reserve's arguments fail.

*First*, Gold Reserve asserts that the Dalinar SPA must be interpreted in accordance with Delaware contract law. D.I. 2117 at 3-4. But in Delaware, as everywhere, the law is that non-binding contracts are just that—not binding. Apparently recognizing this flaw in its "contract" arguments, Dalinar also claims it is seeking to enforce this Court's orders, which, like contracts, are interpreted according to their unambiguous terms. D.I. 2117 at 3. But the Court's prior orders reflect and implement 8 *Del. C.* § 324—the law governing public execution sales such as this one—and do not use the capitalized terms "Unsolicited Competing Proposal," "Competing Proposal," or "Superior Proposal" with any specificity, let alone the hyper-technical definitions Gold Reserve ascribes to them here. *See* D.I. 1554; *see also* Aug 18, 2025 Hr'g Tr. at 151:3-

5

152:11 (counsel for the Special Master explaining that these capitalized terms do not appear in the Court's orders).

Regardless, it would be nonsensical for the Special Master to be prohibited from doing away with the bidding threshold on which Gold Reserve relies when this Court's orders applying Delaware law explicitly granted the Special Master discretion to select a Superior Proposal based on factors *other than* price. *See, e.g.*, D.I. 1554 at 14 (granting the Special Master discretion to raise or lower the overbid minimum because "the evaluation criteria include criteria other than price"). Those decisions rightly reflected the "common knowledge of all lawyers" and businesspeople "that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two." *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925). Thus, among other things, this Court required the Special Master to consider both the stated value offered and the certainty of closing, D.I. 1554 at 24-27, permitting the Special Master to choose a bid that is "higher *or* better," because an event that is highly improbable obviously has a much lower present economic value than one that is certain to occur, *accord* D.I. 1993-5 (expert report of Dr. J.B. Heaton, providing a framework for analyzing each bid's "expected value"). Based on the language of this Court's orders, it is clear that the Special Master can select bids that do not offer a higher stated headline value than the Dalinar bid provided such bids are "better," which necessarily includes bids that are substantially more certain to close than the Dalinar bid with its financing that is contingent in all but name—because that financing would evaporate if the 2020 Bondholders prevail on the merits and enforce their pledge to block the Dalinar merger. *Accord In re Scimeca Found., Inc.*, 497 B.R. 753, 783 (Bankr. E.D. Pa. 2013) (approving bankruptcy sale where trustee accepted bid that offered all cash, with no present contingencies, over bid that was higher but contingent); *Lawsky*

*v. Condor Cap. Corp.*, 2015 WL 4470332, at *10 (S.D.N.Y. July 21, 2015) (denying motion to enjoin sale to lower bidder that was more certain to close); *In re 388 Route 22 Readington Holdings, LLC*, 2020 WL 4282748, at *5 (D.N.J. July 27, 2020), *aff'd*, 2021 WL 4811409 (3d Cir. Oct. 15, 2021) (rejecting argument that facially higher offers should have been accepted in bankruptcy sale because they were "contingent on the successful resolution" of litigation); *In re Tresha-Mob, LLC*, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) ("In determining whether the highest bid is the best bid, the fiduciary and reviewing court must consider factors such as the risks associated with each bid and the probabilities that the proposed terms will come to fruition as well as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing.") (quotations and citations omitted).

*Second*, the Special Master's decision that the Amber Energy bid merits lowering the overbid minimum for purposes of considering whether it constitutes a Superior Proposal is a procedural determination that, per this Court's orders, is reviewed only for abuse of discretion. D.I. 277 at 7 ("The Court reviews factual issues and legal issues *de novo* and procedural issues for abuse of discretion.") (citing Fed. R. Civ. P. 53(f)(3)-(5)).  Gold Reserve does not even attempt to demonstrate that the Special Master abused his discretion in interpreting the procedures that govern the bidding as permitting him to select the Amber Energy Bid in his Updated Final Recommendation pursuant to this Court's orders.  Nor can it.  Gold Reserve recognizes that this Court approved the overbid minimum in the Dalinar SPA "'subject to the Special Master retaining discretion to lower or raise the overbid minimum throughout the process, as he proposes[.]'"  D.I. 2117 at 8 (quoting D.I. 1554 at 14).  But Gold Reserve ignores the remainder of this Court's order, which explains that the Special Master's discretion to lower the overbid minimum "is helpful for reasons including that the evaluation criteria include criteria other than price."  D.I. 1554 at 14

7

(quotations omitted). The Dalinar SPA cannot undermine these orders, and Gold Reserve's construction of the SPA must therefore be rejected. *Accord, e.g.*, *In re Weinstein Co. LLC*, 2021 WL 3572843, at *4 (Bankr. D. Del. Aug. 12, 2021) (memorandum opinion rejecting a party's interpretation of a purchase agreement because, among other reasons, it was "inconsistent with numerous other terms of the [purchase agreement] … and inconsistent with the Sale Order").

*Third*, contrary to Gold Reserve's assertion, the structure of the Dalinar SPA does not confirm that price alone is a gating factor to the Special Master's naming a competing bid a Superior Proposal. *Cf.* D.I. 2117 at 10 (arguing that the provision of three business days for Dalinar to match a competing proposal "leaves no doubt that price is the central fulcrum on which any Superior Proposal must turn"). The three-day matching period was included in the Special Master's template SPA, D.I. 1557-1, § 6.16(e), and would have applied to any competing proposal, which could have competed with the final recommended bid on price or any other factor. In any event, the issues with Dalinar's bid have been clear for months, and long before the Special Master recommended Dalinar as the Recommended Bidder and signed the SPA. Dalinar's financing requires a post-closing merger of Dalinar with CITGO Petroleum that the 2020 Bondholders could potentially block. *See* D.I. 1949 at 15. Gold Reserve has long been aware of the concern that this risk could prevent the transaction from closing if, for example, Dalinar's financing sources suspect Dalinar will be unable to complete that merger and thus claim Dalinar is in anticipatory breach of that closing condition. *See, e.g.*, D.I. 1741 at 4 (this Court acknowledging the risks to closing inherent in the Dalinar bid); D.I. 2034 (Crystallex explaining this risk in further detail). Faced with a risk that was identified repeatedly by the Court, the Special Master, Crystallex, ConocoPhillips, and other senior judgment creditors that would be forced without compensation to accept the closing risk associated with Dalinar's bid, Dalinar could have addressed these

8

concerns at any time during the Topping Period, and could have been working in parallel to prepare contingency arrangements to match any competing proposal by securing financing that is not contingent on a post-closing merger that could be blocked by the 2020 Bondholders, or otherwise mitigating that obvious closing risk.[2] Intent on minimizing its own costs and risks, Gold Reserve opted to gamble that the headline value of the Dalinar bid would clear the field of competition, did nothing to address those risks during the Topping Period, *e.g.*, D.I. 1840-1 at 32:21-23, and thus left Dalinar exposed to competition from bidders offering nominally less consideration in the form of headline dollars but superior economic value because their proposed transactions are far more certain to close.

Alternatively, Dalinar could have agreed clearly and unambiguously to the termination right proposed by Crystallex and other creditors. That proposal would terminate the Dalinar SPA and permit the Special Master to pivot to the next-highest bid if the 2020 Bondholders were to prevail on their claims or otherwise block the Dalinar transaction and Dalinar did not cure within

---

[2] Gold Reserve argues that its financing is "fully-committed." D.I. 2117 at 3. It is not; nearly $2 billion of Gold Reserve's financing earmarked to cure potential claims by the 2020 Bondholders is supported only by "highly confident" commitment letters, which, of course, is no commitment at all. *See, e.g.*, D.I. 1841-1, Ex. E, at 2 ("[W]e are pleased to inform you that, as of the date hereof, we are highly confident that, in connection with the Acquisition, the structuring, sale and placement of the Preferred Equity Issuance can be accomplished by us (and/or one of our affiliates, as applicable) as your placement agent."); *see also* D.I. 2123 at 11 ("[T]he Special Master has material reservations with Dalinar's plan for addressing this risk and cautions the Court against relying on Dalinar's uncertain financing. First, $1.8 billion of the solution (*i.e.*, the preferred equity financing) remains uncommitted and does not meet the Bid Requirements for bidders to have committed financing. Therefore, if the PDVSA 2020 Bondholders were successful, Dalinar has only $1 billion of committed financing available via its ABL to address up to $3.02 billion of claims, a significant shortfall."). And the remainder of Dalinar's financing requires Adolin Holdings, Inc., a subsidiary of Dalinar, to be merged into Citgo Petroleum, with Citgo Petroleum assuming Dalinar's debt obligations post-closing. D.I. 1841, ¶ 72. If the 2020 Bondholders are able to block that merger through an injunction or otherwise, Dalinar's financing sources would likely claim an anticipatory breach and refuse to fund the transaction, with Gold Reserve's only hope to cure being "highly confident"—i.e., uncertain—financing to strike a deal with the 2020 Bondholders.

a reasonable period, not to exceed 30 to 45 days. *See, e.g.*, D.I. 1949 at 2 (Crystallex); D.I. 1945 at 3 (Conoco); D.I. 1950 at 2 (OIEG joining Crystallex and Conoco's objections). If Dalinar truly believed its repeated claim that the 2020 Bondholders will not prevail in their litigation or otherwise cannot block Dalinar's proposed transaction, it would have readily agreed to to an amendment that clearly reflected that proposal, and certainly could have made preparations to do so if required to match the Amber Energy bid. Again, Dalinar failed to accept such a straightforward solution to improve its bid by planning for this contingency.[3] After sitting on its hands for months, Dalinar cannot now cite the duration of the formal match period in the template SPA as evidence that only the pricing component of its bid could have been improved if a Superior Proposal was identified.

*Fourth*, the Dalinar SPA is subject to this Court's orders, D.I. 1841-1, Ex. B, § 6.16(a), which have always made clear that the best bid will be determined based on a combination of price and certainty of closing. *See, e.g.*, D.I. 1741 at 2 (this Court explaining that the Evaluation Criteria "may be fairly summarized as price and certainty of closing"). Nothing in this Court's prior orders commits the Court to being indifferent to material risk from a bid that cannot close or that may necessitate another round of bidding that further delays creditors' recovery. On the contrary, the Court has repeatedly recognized (as has the Third Circuit) that a delay in closing risks denying

---

[3] While Dalinar purported to address the need for a termination right in its SPA, D.I. 1991 at 19, its proposed solution was far from satisfactory. Instead of clarifying the Special Master's right to terminate the SPA upon the occurrence of certain discrete events in the 2020 Bondholder litigation, Dalinar proposed a byzantine labyrinth of ambiguous language that failed to identify potential outcomes in the 2020 Bondholder litigation as explicit trigger events and included an unreasonably long cure period of 90 days. *See* D.I. 2126-1 at 6 of 271 (Dalinar cover letter describing its revised bid), 103 of 271 (Dalinar revised SPA, § 6.9(f)). The proposal was clearly designed to allow Dalinar to dig in its heels and litigate the issue for months or even years at the expense of this Sale Process and those creditors senior to Gold Reserve, and thus failed to address the need for clarity and finality identified by Crystallex and other creditors objecting to the Dalinar SPA.

10

creditors their rights. D.I. 234 at 33 (recognizing that the sale process must proceed because, among other things, "mak[ing] Crystallex wait for an indefinite additional period" "cannot be justified given the decades and resources that Crystallex has already spent trying to collect on its judgment"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 149 (3d Cir. 2019) ("any outcome where Crystallex is not paid means that Venezuela has avoided its obligations"). The Special Master's directive to select the best bid based on these Evaluation Criteria cannot be supplanted by selective recitation of terms in the Dalinar SPA that is itself subject to the Court's prior orders and is in any event not binding until approved by the Court. Yet that is exactly what Gold Reserve seeks to do: Gold Reserve admits its "entire argument" is that the overbid minimum is "limited exclusively to purchase price" and "to even entertain another Bid at this point in the process, [that bid must be] some amount over" Dalinar's nominal $7 billion figure. Aug. 18, 2025 Hr'g Tr. at 92-93.

### III. Gold Reserve Has Suffered No Cognizable Harm, And It Misunderstands The Purpose Of The Overbid Minimum's Component Parts

As discussed above, the overbid minimum in the Dalinar SPA is composed of two parts: (A) an expense reimbursement subject to a $30 million cap and (B) a $50 million additional bidding threshold. D.I. 1841-1, Ex. B, § 6.16(f)(i). Gold Reserve claims that both components are intended to protect the Recommended Bidder (i.e., Dalinar), but that is wrong. Only the first component—the expense reimbursement—is a protection for the winning bidder, as Gold Reserve well knows. When commenting on the Evaluation Criteria, Gold Reserve did not assert that the additional bidding threshold was intended to protect bidders, but rather that it would "waste time and resources" to consider new bids below a given threshold. D.I. 1539-1 at 3 (addressing the $25 million threshold included in the proposed criteria, which was later amended to $50 million). While the Special Master disagreed that considering lower bids would be a waste of time, and

11

explained that he "should have the discretion to lower the overbid minimum if a competing bid may otherwise be a 'better' bid, among other reasons," he did not suggest that the additional bidding threshold (as opposed to the expense reimbursement) was intended to protect bidders, D.I. 1545-1 at 7, nor did anyone else. The Court adopted the Special Master's proposal. D.I. 1554 at 14.

Gold Reserve's comments on the draft SPA further confirm its understanding that the additional bidding threshold of $50 million—intended to increase the efficiency of the Special Master's process—serves an entirely different purpose than the expense reimbursement component. As the Special Master explained in its submissions to the Court, Gold Reserve and other potential bidders sought to increase the expense reimbursement from $15 million to $50 million because they were "worr[ied] that they may be forced to pay financing commitment fees even if their bid is terminated prior to closing." D.I. 1545-1 at 4. Acknowledging these concerns, the Special Master agreed to a compromise, increasing the expense reimbursement from $15 million to $30 million, which this Court ultimately approved. *Id.*; D.I. 1554 at 9. Again, Gold Reserve's concern as a potential bidder was limited to its need for an expense reimbursement in the event it was outbid, not that it could be outbid by a competitor offering less nominal consideration but more certainty to the Attached Judgment Creditors.

Like Gold Reserve, Red Tree and OIEG confirmed that the expense reimbursement component of the overbid minimum was a protection for bidders that would "encourage bidding *ex ante* and increase the chance that the PDVH shares will sell for the highest price." D.I. 1551 at 4 (citing *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)). Although Gold Reserve wrongly mischaracterizes the record to say Crystallex previously agreed that a break-up fee should be tied to "an increased purchase price," D.I. 2117 at 5, Crystallex's position in fact

12

mirrored Red Tree's and OIEG's. In response to concerns with the 2024 bid submitted by Amber Energy, Crystallex argued that any break-up fee should not be paid to parties who simply get cold feet, but instead only to a bidder whose bid is supplanted by a better bid. *See* D.I. 1507 at 206:4-208:15. While that discussion used higher headline figures as a proxy for improved bids, Crystallex never foreclosed the possibility that a competing bid could be "better" because it is more certain to close, even if it offered a lower headline value than another, more speculative bid. *See id.* Indeed, Crystallex has repeatedly urged the importance of closing certainty, most recently in urging the Court to approve Red Tree as a Stalking Horse bidder, *see* D.I. 1658, 1676, 1692, so its position on the importance of closing certainty is longstanding and well documented. In any event, the Special Master has not exercised discretion to do away with or increase the expense reimbursement component of the overbid minimum to which Dalinar is entitled, and has thus acted consistently with Crystallex's position that bidders should only expect to receive such a break-up fee approved by this Court if they are supplanted by a better bid—nothing more.

In a final attempt to conflate the distinct purposes of the two components of the overbid minimum (the bidding threshold and the expense reimbursement), Gold Reserve says that the Venezuela Parties argued against an increased overbid minimum because "the $25 million overbid minimum was high enough to protect bidding parties." D.I. 2117 at 7 (citing D.I. 1543 at 3). But that is not what the Venezuela Parties said. In fact, the Venezuela Parties argued that an increased overbid minimum "would be unhelpful and deter bidders from topping the Stalking Horse Bid." D.I. 1543 at 3. Thus, like all other commenters, the Venezuela Parties never described the discretionary additional bidding threshold as a protection for bidders like Dalinar—presumably because it would be illogical to do so. To the contrary, the thrust of the Venezuela Parties' position

13

was to foreclose procedural roadblocks to the consideration of additional bids—precisely what Gold Reserve is attempting to do here.

Correcting for its repeated mischaracterizations of the record, Gold Reserve has not pointed to any suggestion from the Court or the dozens of interested parties to this case that a threshold increase in the amount paid to Attached Judgment Creditors is meant to protect the recommended bidder. Nor can it, because the expense reimbursement accomplishes that goal, not the additional bidding threshold component of the overbid minimum. *See In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999) (declining to approve a break-up fee but explaining that the benefit of such a fee can be to "promote[] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited").

The opinions of Gold Reserve's expert, Judge Sontchi, do not change this fact. To start, Judge Sontchi offers an opinion on the proper interpretation of Delaware law and this Court's orders. His report therefore runs afoul of the well-established principle that expert testimony "constru[ing] the contract," interpreting "principles of law," or offering "conclusions as to the legal significance of various facts," is not admissible. *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977); *see also Cantor v. Perelman*, 2006 WL 3462596, at *3 (D. Del. Nov. 30, 2006) ("The Third Circuit has specifically instructed the district courts to 'ensure that an expert does not testify as to the governing law of the case.'") (quoting *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006)); *Halperin v. Richards*, 665 B.R. 626, 643 (E.D. Wis. 2024) (excluding Judge Sontchi's testimony because it consisted of "impermissible legal conclusions" and "encroach[ed] upon the court's authority to instruct the jury on the law to be applied to the facts of the case"). And, even if it were admissible, Judge Sontchi's legal opinion focuses on the way bankruptcy courts oversee Section 363 sales, and is thus irrelevant to this

14

Court's application of 8 *Del. C.* § 324, which governs the judicial execution sale at issue here. *See* D.I. 2117-1 at 5 (testifying that "this is not an instance where a bankruptcy court supervising a section 363 sale would deviate from the existing rules and procedures in the case").[4]

In any case, Judge Sontchi's own prior orders confirm that the expense reimbursement provision, not the additional bidding threshold, is the component of the overbid minimum that protects the interests of a recommended bidder such as Dalinar. In *Art Van Furniture, LLC*, Judge Sontchi established bidding procedures that allowed the trustee to establish bidder protections not to exceed 3% of the overall purchase price to compensate a stalking horse bidder for its expenditure of time, energy, and resources in the event its bid was topped. *See In re Art Van Furniture, LLC*, 20-10553-CTG, ECF 1060-1, at 4-5 (Bankr. D. Del. Oct. 26, 2020). In that case, the bidder protection was separate and distinct from the overbid minimum threshold for bids at the live auction, which were required to beat any prior bid by $50,000, subject to the trustee's discretion to modify that overbid minimum. *Id.* at 6-7. In other words, the break-up fee was meant to protect bidders just as the expense reimbursement component of the overbid minimum does here. But the discretionary additional bidding threshold of $50,000 was a procedural device to increase efficiency in an auction process, not a protection for a Stalking Horse or other bidder. The auction which this Court has long supervised is no different.

Put bluntly, it is unclear what Gold Reserve's complaint is. Gold Reserve negotiated for, and obtained, an increased expense reimbursement for the Recommended Bidder. The Amber Energy bid includes a provision to pay that expense reimbursement to Dalinar in full. *See* D.I. 2123-1 at 25 ("At the Closing, the Buyer shall pay, or cause to be paid, in each case as set forth in

---

[4] Judge Sontchi also accepts that, in a Section 363 sale, "[t]he highest bid may not be the best bid for reasons such as regulatory complications, closing risk, and other non-monetary considerations." D.I. 2117-1 at 5. Just such a situation exists here.

15

the Funds Flow Memorandum, (i) an amount to the Stalking Horse Bidder equal to the Termination Fee, and (ii) an amount to the Topping Bidder equal to the Expense Reimbursement Amount."). Neither Gold Reserve nor Dalinar as the prior Recommended Bidder can expect anything more. And while Gold Reserve as judgment creditor may wish to argue that the Dalinar bid is preferable to Amber Energy's, a Motion to Strike implicitly filed on behalf of Dalinar is not the place to do it.

The Motion to Strike makes clear that Gold Reserve's issue lies not in the Special Master's alleged violation of Dalinar's purported contractual interest as a bidder to acquire the PDVH Shares (which interest is not Gold Reserve's to assert), but in Gold Reserve's status as a junior creditor whose judgment would only be satisfied by its own speculative bid that would leave *all* creditors in the lurch if it fails to close. But, despite claiming that all objectors' concerns can be easily addressed, Dalinar refused to improve the certainty of its bid and took the risk that a Superior Proposal might come along. If Gold Reserve still believes the Dalinar bid is superior to Amber Energy's, it will have a further opportunity to make those arguments in the forthcoming period to object to the Amber Energy bid, but its contrived Motion to Strike is not the appropriate procedural mechanism to do so, and Gold Reserve's arguments under the non-binding Dalinar SPA and this Court's orders fail in any event.

## Conclusion

For the foregoing reasons, Crystallex respectfully submits that the Court should deny Gold Reserve's Motion to Strike.

| | |
|---|---|
| OF COUNSEL:<br><br>Robert L. Weigel<br>Jason W. Myatt<br>Rahim Moloo<br>Zachary Kady<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York  10166<br>(212) 351-4000<br><br>Miguel A. Estrada<br>Lucas C. Townsend<br>Adam M. Smith<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C.  20036<br>Tel:  (202) 955-8500<br>Fax:  (202) 467-0539<br><br>Dated: September 5, 2025 | */s/ Travis S. Hunter*<br>Raymond J. DiCamillo (#3188)<br>Jeffrey L. Moyer (#3309)<br>Travis S. Hunter (#5350)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware  19801<br>(302) 651-7700<br>dicamillo@rlf.com<br>moyer@rlf.com<br>hunter@rlf.com<br><br>*Attorneys for Plaintiff* |