# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No.: 17-mc-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) ) ) |
| Defendant. | ) ) |

## AMBER ENERGY, INC.'S OPPOSITION TO
## GOLD RESERVE'S MOTION TO STRIKE [D.I. 2117]

*Of Counsel:*

Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
Jonathan M. Acevedo
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
susheelkirpalani@quinnemanuel.com
andrewrossman@quinnemanuel.com
matthewscheck@quinnemanuel.com
jonathanacevedo@quinnemanuel.com

*Additional Counsel in Signature Block*

Michael A. Barlow (No. 3928)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Amber Energy, Inc.*

**TABLE OF CONTENTS**

Page

NATURE AND STAGE OF PROCEEDINGS ...............................................................................1

SUMMARY OF ARGUMENT .......................................................................................................1

LEGAL STANDARD......................................................................................................................2

ARGUMENT ...................................................................................................................................3

I. THE COURT IS NOT BOUND BY THE DALINAR SPA.................................................3

II. THE SPECIAL MASTER HAS COMPLETE DISCRETION WITH RESPECT TO THE OVERBID MINIMUM.........................................................................................3

    A. The Dalinar SPA's Plain Language Establishes The Overbid Minimum Is Not Mandatory ...................................................................................................4

    B. The Record Is Clear The Special Master Retained Discretion Not To Impose The Overbid Minimum .............................................................................6

III. THE SALE PROCESS DOES NOT CONTRAVENE DELAWARE LAW ....................10

IV. GOLD RESERVE HAS NOT BEEN PREJUDICED .......................................................11

CONCLUSION..............................................................................................................................12

# **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Atl. Props. Grp., Inc. v. Deibler*,
 1994 WL 45433 (Del. Super. Ct. Jan. 6, 1994), *aff'd*, 652 A.2d 553 (Del. 1995)...................10

*In re Buckhead Am. Corp.*,
 180 B.R. 83 (D. Del. 1995)..........................................................................................................3

*City of Newark v. Donald M. Durkin Contracting, Inc.*,
 305 A.3d 674 (Del. 2023) ......................................................................................................2, 3

*Day v. Loucks*,
 636 F. App'x 830 (3d Cir. 2016) ................................................................................................3

*Ford v. VMware, Inc.*,
 2017 WL 1684089 (Del. Ch. May 2, 2017)................................................................................2

*Gonzalez v. O'Malley*,
 2024 WL 4328774 (W.D. Tex. Aug. 15, 2024)..........................................................................5

*Iron Branch Assocs., LP v. Hartford Fire Ins. Co.*,
 559 F. Supp. 3d 368 (D. Del. 2021).........................................................................................11

*Loda Poultry Co. v. Comm'r of Internal Revenue*,
 88 T.C. 816 (1987).....................................................................................................................5

*Seidensticker v. Gasparilla Inn, Inc.*,
 2007 WL 4054473 (Del. Ch. Nov. 8, 2007) ..............................................................................3

*State Nat'l Ins. Co. v. Cnty. of Camden*,
 824 F.3d 399 (3d Cir. 2016).......................................................................................................3

*Texas Pac. Land Corp. v. Horizon Kinetics LLC*,
 306 A.3d 530 (Del. Ch. 2023), *aff'd*, 314 A.3d 685 (Del. 2024)...............................................6

*Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*,
 2023 WL 2771509 (Del. Ch. Apr. 4, 2023) ...............................................................................5

*United States v. Jaime-Sainz*,
 2025 WL 2210178 (D. Idaho Aug. 4, 2025)..............................................................................5

*Vill. Prac. Mgmt. Co., LLC v. West*,
 2025 WL 1679818 (Del. June 16, 2025)....................................................................................6

**Statutes**

8 *Del. C.* § 324 ........................................................................................................................10, 11

11 U.S.C. § 363(b)(1) .......................................................................................................................11

**Other Authorities**

LOWER, Merriam Webster, https://www.merriam-webster.com/dictionary/lower .......................5

*Reserves of Member Banks Foreign Activities of National Banks*,
    64 Fed.Res.Bull. 756, 1978 WL 36750 (Sept. 1978) ..................................................................5

Reuters, *Gold Reserve's unit raises bid for Citgo parent in court-led auction*
    (Aug. 29, 2025), https://www.reuters.com/business/energy/gold-reserves-unit-
    raises-bid-citgo-parent-court-led-auction-2025-08-28/ .............................................................6

Amber Energy, Inc. ("Amber") respectfully submits this opposition to Gold Reserve's motion to strike the Special Master's August 25, 2025 Notice of Determination of Superior Proposal. D.I. 2117; *see* D.I. 2113 (Special Master's Determination of Superior Proposal); D.I. 2123 (Special Master's Updated Final Recommendation).

## NATURE AND STAGE OF PROCEEDINGS

On August 29, 2025, the Special Master provided an updated final recommendation that the Court approve the sale of all the shares of PDV Holding, Inc. to Amber. D.I. 2123. A sale hearing is set to commence on September 15, 2025. *See* D.I. 2110, at 6.

## SUMMARY OF ARGUMENT

Following a multi-year sale process, the Special Master has concluded that Amber's bid "is the best bid for the PDVH Shares received to date in this sale process" that "places an appropriate emphasis on both price and certainty of closing." D.I. 2123 ¶ 11. Despite having every opportunity to submit its best bid and with no credible basis to attack Amber's proposal, Gold Reserve attempts to hijack this sale process and strike the Special Master's recommendation because Amber's bid did not include an overbid minimum referenced in the non-binding Dalinar Energy Stock Purchase Agreement ("Dalinar SPA"). Gold Reserve's arguments fail at every step, and cannot be reconciled with the Dalinar SPA, this Court's orders, or any other aspect of the sale proceedings to date, all of which consistently reaffirmed the Court's and Special Master's discretion to weigh both of the so-ordered evaluation criteria: price *and* certainty.

1. To begin, the Court is not bound by the Dalinar SPA and Gold Reserve provides no other credible justification for the imposition of an overbid requirement. That alone is enough to deny Gold Reserve's motion.

2. Even were that not the case, the Dalinar SPA leaves no doubt about the Special Master's discretion to consider criteria other than price and to determine whether and in what

1

circumstances an overbid requirement may, or may not, be appropriate. And the overwhelming record evidence establishes that all involved—Gold Reserve included—understood as much.

3. The Court plainly explained why such discretion was necessary: a superior proposal is not simply a bid that offers a higher "headline dollar price," but one that is, in the language of the Dalinar SPA, "higher *or* better," including because it provides greater closing certainty. D.I. 1837-1, Section 6.16(a). And because Amber's bid offers just that—"virtually eliminat[ing] any closing risks associated with the SDNY Litigation, by delivering a settlement with the PDVSA 2020 Bondholders," D.I. 2123 ¶ 16, in addition to a significant aggregate purchase price—the Special Master hardly abused its discretion in selecting Amber's bid over Gold Reserve's bid "that may not be able to close," *id.* ¶ 24. Gold Reserve's argument that price alone dictates which bid is best rewrites history and makes no sense given the importance of certainty here.

At bottom, Gold Reserve cannot now complain that the Special Master faithfully applied the bidding procedures that the Court long ago approved. The Court should reject Gold Reserve's attempt to short circuit the upcoming sale hearing and deny the motion.

## LEGAL STANDARD

It goes without saying that "[o]nly parties to a contract are bound by that contract." *Ford v. VMware, Inc.*, 2017 WL 1684089, at *13 (Del. Ch. May 2, 2017). "Delaware follows the objective theory of contracts, meaning a contract's construction should be that which would be understood by an objective, reasonable third party." *City of Newark v. Donald M. Durkin Contracting, Inc.*, 305 A.3d 674, 679 (Del. 2023) (quotations omitted). Courts "will not torture contractual terms to create ambiguity," *id.*, and "[c]ontract terms are not ambiguous merely because the parties to the contract disagree," *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007).

2

Separately, the Court "is in the best position to interpret its own orders." *In re Buckhead Am. Corp.*, 180 B.R. 83, 88 (D. Del. 1995) (citation omitted); *see also, e.g.*, *Day v. Loucks*, 636 F. App'x 830, 831 (3d Cir. 2016) ("we grant 'great deference . . . to a district court's interpretation of its own order'") (internal citation omitted). However, the Court of course is not bound by proposed orders never actually entered, and, in any case, "has the inherent power to reconsider prior interlocutory orders." *State Nat'l Ins. Co. v. Cnty. of Camden*, 824 F.3d 399, 406 (3d Cir. 2016).

## ARGUMENT

### I. THE COURT IS NOT BOUND BY THE DALINAR SPA

Although Gold Reserve presumes that the Dalinar SPA, including its overbid provision, is binding on this sale process, the Court never adopted and is not bound by that agreement. *See* D.I. 1837. The Dalinar SPA itself is clear that "[t]his Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order." D.I. 1837-1, Section 6.16(a). Gold Reserve's motion accordingly is an unfounded and premature attempt to dictate the sale process—including the determination of which bid is "higher or better"—and should be denied on this basis alone.[1]

### II. THE SPECIAL MASTER HAS COMPLETE DISCRETION WITH RESPECT TO THE OVERBID MINIMUM

In addition to trying to bind the Court to an agreement it neither signed nor approved, Gold Reserve effectively seeks to preclude the Special Master from considering the twin Evaluation

---

[1] Gold Reserve also repeatedly suggests that the Special Master violated the Dalinar SPA by "entertain[ing] Amber Energy's lower-priced bid during the No-Shop Period," Br. at 1–2, although it is unclear why, considering that "the Court granted the Special Master authority to engage with Amber" about its bid, D.I. 2123 ¶ 4.

3

Criteria unless the competing bidder meets a specific price threshold. The overbid minimum argument improperly elevates one Evaluation Criteria over the other, and bars the Special Master from taking certainty into account at all when weighing any competing bid that is even a penny lower. That clearly was not the intent of the Court or Special Master in establishing the sale procedures.

        A.        **The Dalinar SPA's Plain Language Establishes The Overbid Minimum Is Not Mandatory**

The Dalinar SPA is clear that the Special Master's evaluation of any bids is not limited to a single factor like price or the imposition of any overbid minimum, stating: "This Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order." D.I. 1837-1, Section 6.16(a). Those "Evaluation Criteria" are price *and* "certainty of closing," D.I. 1554, at 24–27, both of which must be considered in determining whether any bid is superior—that is, "higher *or* better," D.I. 1837-1, Section 6.16(a); *see also id*. Section 6.16(f)(ii) (defining "Superior Proposal" as a "higher or better" bid). Similarly, the so-ordered sale procedures provide that "the Special Master may take into consideration" a variety of "non-binding factors," including "conditions to, and speed, complexity, timing and certainty of, closing of the Sale Transaction," and "any other factors the Special Master may deem relevant consistent with his duties to the Court and applicable law." D.I. 480-1, at 55. Thus, even if Gold Reserve were correct that the overbid minimum is "mandatory," any such overbid requirement would necessarily conflict with the established Evaluation Criteria that indisputably control here. *See* D.I. 1837-1, Section 6.16(e) ("In the event of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern.").

4

But Gold Reserve, in any case, is wrong that the overbid minimum necessarily applies. Gold Reserve argues the Special Master retained "authority to 'lower or raise' (but not eliminate) this overbid minimum," Br. at 10, but that argument defies the plain language of the provision. *See* D.I. 1837-1, Section 6.16(f)(i) ("<u>provided</u>, further, that the Special Master may, in his sole discretion, lower or raise the Subsequent Overbid Minimum for any Competing Proposal." (original emphasis)). There is nothing ambiguous about the word "lower," which simply means "to let descend" and "to reduce in value, number, or amount," including to zero. LOWER, Merriam Webster, https://www.merriam-webster.com/dictionary/lower; *see also, e.g., Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 2771509, at *17 (Del. Ch. Apr. 4, 2023) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."). After all, one may lower a window shade by just a few inches—or all the way down.[2]

Only a reading that affords the Special Master actual discretion as to the overbid minimum accords with the intent behind the Dalinar SPA and sale process more broadly, and does not render the agreement "illusory." Rather, the agreement contemplates that there may be scenarios where the overbid minimum is warranted—such as in the case of a competing bid with little or no closing certainty—but may not be in the case of other bids, like Amber's here. A nominally lower bid that

---

[2] *See, e.g., United States v. Jaime-Sainz*, 2025 WL 2210178, at *4 (D. Idaho Aug. 4, 2025) (sentencing guidelines amendment provided that "a person who has six criminal history points or fewer is **lowered to zero status points**"); *Gonzalez v. O'Malley*, 2024 WL 4328774, at *1 (W.D. Tex. Aug. 15, 2024) ("[T]he Social Security Administration . . . notified Plaintiff that his monthly SSI benefits were being **lowered beginning March 2019 from $566 to $0**."); *Loda Poultry Co. v. Comm'r of Internal Revenue*, 88 T.C. 816, 820 & n.7 (1987) ("the temperature of each compartment can be raised or lowered" in refrigeration unit and "**could be lowered to zero degrees**"); Board of Governors of the Federal Reserve System, *Reserves of Member Banks Foreign Activities of National Banks*, 64 Fed.Res.Bull. 756, 756, 1978 WL 36750, at *1 (Sept. 1978) ("The Board of Governors has amended its Regulations . . . to **lower to zero per cent** the reserve requirement percentage . . . .") (all emphases added).

5

is likely to close can be more valuable than a higher one that is not. The Court acknowledged as much at the August 18, 2025 hearing, recalling "extensive discussions" with the parties "about whether 3 billion was higher than 7 billion, roughly speaking" including "a whole-day Hearing on a concept that . . . to a lay person might have seemed ridiculous whether 3 is higher than 7, but it was a real live issue in large part because of the evaluation criteria are not limited just to the headline dollar price." Exhibit 1 at 90:18–91:10 (Hearing Transcript from Aug. 18, 2025). By focusing on that "headline dollar price" alone, Gold Reserve reads the Evaluation Criteria out of the contract and the Court's sale procedures.

Gold Reserve's one-sided reading of the Dalinar SPA thus "conflicts with the agreement's overall scheme or plan" and its plain language, and should be rejected. *Vill. Prac. Mgmt. Co., LLC v. West*, 2025 WL 1679818, at *15 (Del. June 16, 2025).[3]

### B. The Record Is Clear The Special Master Retained Discretion Not To Impose The Overbid Minimum

Gold Reserve in any case is wrong that "[t]he record also confirms that the participants understood that the overbid minimum was mandatory and the Special Master's discretion to lower it was narrow" to ensure the sale process "would produce the *maximum sale price* for the benefit

---

[3] Gold Reserve argues that Section 6.16(d) of the Dalinar SPA—which gives Gold Reserve three days to revise its bid after acceptance of any unsolicited Competing Proposal—is "powerful textual evidence that price, not creative deal architecture, is the decisive criterion," because three days "is far too narrow to renegotiate complex, multi-party, non-price components" of a bid. Br. at 10. These "private, subjective feelings" about what might or might not be accomplished in a three-day period "are irrelevant and unhelpful to the Court's consideration of a contract's meaning." *Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 549 (Del. Ch. 2023), *aff'd*, 314 A.3d 685 (Del. 2024). And they are belied in any case by Gold Reserve's own press release following the acceptance of Amber's bid, after which Gold Reserve purportedly "materially increased its proposed purchase price, arranged for additional financial support, and increased the certainty of its bid in non-economic ways" in a matter of days. Reuters, *Gold Reserve's unit raises bid for Citgo parent in court-led auction* (Aug. 29, 2025), https://www.reuters.com/business/energy/gold-reserves-unit-raises-bid-citgo-parent-court-led-auction-2025-08-28/.

6

of Attached Judgment Creditors." Br. at 9 (original emphasis). To the contrary, the record is clear the Special Master retained discretion not to impose the overbid minimum because both the Special Master and the Court consistently acknowledged that factors other than price were important to selecting the superior bid.

In addition to briefing related to the Special Master's model SPA, this Court had several rounds of briefing and argument regarding the bid evaluation criteria. The result of this extensive debate was that the Special Master would take into account the two key qualities of a bid: (1) price and (2) certainty.

At every point since, bidders understood that they were competing on these two fronts. For example, in its proposed markup to the Dalinar SPA, Gold Reserve struck the provision in Section 6.16(f)(i) providing the Special Master with discretion to lower the overbid minimum. D.I. 1539-1, at 3. The Special Master opposed that change, stating (D.I. 1545-1, at 7):

> The Sale Procedures Order already contemplates that, as is customary, the Special Master shall have the discretion to lower the overbid minimum amount for any subsequent bids or any auction. Given that the evaluation criteria include criteria other than price, the Special Master should have the discretion to lower the overbid minimum if a competing bid may otherwise be a "better" bid, among other reasons. In all circumstances, the Special Master will need to justify his use of discretion in connection with submitting his recommendation to the Court.

Although in its January 27, 2025 order the Court adopted Gold Reserve's unopposed request for a higher $50 million overbid threshold, it did so "**IN PART**, subject to the Special Master retaining discretion to lower or raise the overbid minimum throughout the process, as he proposes, *which is helpful for reasons including that 'the evaluation criteria include criteria other than price*.'" D.I. 1554, at 14 (record citations omitted, second emphasis added).

Similarly, at the August 18, 2025 hearing, the Court specifically asked whether there was "anything that Special Master wants to say about Gold Reserve's concerns about this overbid minimum . . . ." Exhibit 1 at 47:8–11. Counsel for the Special Master made clear that it objected

7

to Gold Reserve's characterization of the SPA and the Court's orders (*id*. at 48:19–49:13 (emphasis added)), stating:

> [W]e disagree with their read of both the SPA and the prior Orders. We think that it renders the definition of 'Superior Proposal' completely meaningless, and is contrary to what every other party and . . . we believe also the Court may have intended when setting out the evaluation criteria they would essentially prohibit the Court and the Special Master o[r] the parties from evaluating a Bid based on certainty, and it would be focused literally on only on price [sic], ***which, again, we don't think that's how the evaluation criteria reads or is supposed to read, nor does the SPA***.

At the same hearing, in response to Gold Reserve's argument that "[t]here's no logic if in an unsolicitation [sic] period a lower price Bid can come in," the Court recognized that price was not the only evaluation criteria. *See id*. at 90:18–91:10 ("But I recall extensive discussions with you at the [Stalking Horse] stage about whether 3 billion was higher than 7 billion, roughly speaking. We had a whole-day Hearing on a concept that . . . to a lay person might have seemed ridiculous whether 3 is higher than 7, but it was a real live issue in large part because of the evaluation criteria are not limited just to the headline dollar price."). "They also had always factored in certainty of closing [and] other related concerns," the Court continued, noting that "it's not clear to me that anyone ever said that the only way to exceed a Recommended Bid was to solely look at the headline dollar price, and most of your arguments seemed to be overly simplistic on that ground." *Id*. at 91:11–92:4.[4]

---

[4] Gold Reserve's assertion that the "requirement of an overbid minimum has been included in every version of the Sale Procedures Order" likewise, as demonstrated above, misses the point. Br. at 4. Every proposed order accompanying the bidding procedures—as well as the sixth and final order entered by the Court—left no doubt about the Special Master's discretion to impose an overbid minimum at its "sole discretion" if doing so would further "a value maximizing transaction." *See, e.g.*, D.I. 347, Order ¶ 19 (9/15/21 Proposed Order) ("The Special Master is authorized to offer the Stalking Horse Bid Protections ***at his sole discretion*** if he determines that such Stalking Horse Bid Protections would be in furtherance of a value maximizing transaction . . . ." (emphasis added); *see also* D.I. 391-1 ¶ 20 (11/7/21 Second Revised Proposed Order) (same); D.I. 411-1 ¶ 20 (11/24/21 Third Revised Proposed Order) (same); D.I. 451-1 ¶ 20 (3/31/22 Fourth

8

\* \* \*

On this record, Gold Reserve cannot be heard to claim now after years of established bidding procedures that the Special Master abused its discretion in declining to impose an overbid minimum in a transparent effort to cram down Gold Reserve's own bid. And although the Special Master's recommendation will be fully litigated during the upcoming sale hearing, it is clear the Special Master faithfully applied the Evaluation Criteria established and consistently reaffirmed throughout this litigation when weighing Gold Reserve's and Amber's competing bids. In particular, the Special Master acknowledged the price difference between the two proposals, but ultimately found that "because of the substantial outstanding delta on certainty, the Special Master believes that regardless of where on that spectrum the true difference lies, the Amber Sale Transaction continues to constitute a Superior Proposal, provides adequate value to holders of Attached Judgments under Delaware law, and remains the best bid received in this sale process." D.I. 2123 ¶ 15. "Most significantly," the Special Master found, "the Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation, by delivering a settlement with the PDVSA 2020 Bondholders." *Id.* ¶ 16.

The risks posed by the "$3.02 billion of asserted PDVSA 2020 Bondholder claims" (*id.*) cannot be ignored. The 2020 bondholders have claimed in this litigation that, "[o]f course, any bidder who purchases the PDVH shares would still be subject to the 2020 Bondholders' existing rights, such as their rights to vote 50.1% of PDVH's shares in CITGO Holding and thereby effectively control CITGO Holding." D.I. 1677, at 4. The validity and enforceability of the 2020 bondholders' security interest in 50.1% of PDVH's equity in CITGO Holding is being challenged

---

Revised Proposed Order) (same); D.I. 472-1 ¶ 21 (8/5/22 Fifth Revised Proposed Order) (same); D.I. 481 ¶ 21 (10/11/22 Sixth Order) (same).

9

in long-running litigation in New York and, as this Court has recognized, the "risk posed by the 2020 Bondholders . . . impacts the assessment of certainty of closing." D.I. 1741, at 4. The fact that Amber's bid "virtually eliminates" that risk—while Gold Reserve's does not and indeed "may not be able to close"—is thus powerful evidence that Amber's bid is the better bid here. D.I. 2123 ¶¶ 16, 24.

### III. THE SALE PROCESS DOES NOT CONTRAVENE DELAWARE LAW

As the record establishes, permitting the Special Master discretion to determine whether an overbid minimum is appropriate does not, as Gold Reserve argues, contravene "the Delaware statutory law mandate to sell the PDVH Shares to the 'highest bidder.'" Br. at 14 (quoting 8 *Del. C.* § 324). The "highest" bid, as the Court has acknowledged, may not be the one with the biggest "headline dollar price." Exhibit 1 at 91:3–10. "The bottom line is that the Court should consider the particular nature of the property being sold and the potential market for same in exercising its discretion in determining the adequacy of a bid at a forced sale." *Atl. Props. Grp., Inc. v. Deibler*, 1994 WL 45433, at *6 (Del. Super. Ct. Jan. 6, 1994), *aff'd*, 652 A.2d 553 (Del. 1995). The Evaluation Criteria and the Dalinar SPA's permissive overbid language achieve just that by accounting for the full spectrum of factors that might make one bid "higher or better" in this one-of-a-kind sale. D.I. 1837-1, Section 6.16(f)(ii) (defining "Superior Proposal").

In an effort to sidestep that reality, Gold Reserve submitted a report by U.S. Bankruptcy Judge (Ret.) Christopher Sontchi. D.I. 2117-1. But Judge Sontchi's opinions—all of which are constrained to his experience with sales under section 363(b)(1) of the Bankruptcy Code, not 8 *Del. C.* § 324—are irrelevant and unhelpful. Specifically, Judge Sontchi's opinions about bankruptcy sale processes ignore the realities of—and indeed have nothing to do with—***this*** sale process and the bidding procedures established over years of litigation. Gold Reserve cannot use these opinions to usurp the Special Master's and Court's discretion to determine the superior bid here.

10

## IV. **GOLD RESERVE HAS NOT BEEN PREJUDICED**

Lacking any textual or other basis to upend the sale process, Gold Reserve falls back on the argument that it has been prejudiced by elimination of the overbid minimum. Br. at 13–14. But in reviewing a contract between sophisticated parties, "the court cannot make for the parties a better agreement than that which they bargained for and cannot afford protection to a party which the contract does not provide." *Iron Branch Assocs., LP v. Hartford Fire Ins. Co.*, 559 F. Supp. 3d 368, 387 (D. Del. 2021) (cleaned up). Gold Reserve furthermore was at all times aware that it was competing against bids based on both price *and* certainty, as discussed at length above. The fact that Gold Reserve chose to submit a bid that prioritized the former over the latter is no basis to strike the Special Master's recommendation.

Gold Reserve's claims of prejudice in any case are overstated, at best. In particular, under the Dalinar SPA and Amber's bid, Gold Reserve is entitled to up to $30 million in expense reimbursement. *See* D.I. 1837-1, at 139 (defining "Expense Reimbursement Amount") & Section 8.3(c). Amber, in contrast, was never compensated for its expenditures even though it too has invested significant resources toward its participation in this sale process.

No party has been more committed to providing the best bid—one that accounts for the right balance of price and certainty—than Amber, as the history of this case establishes. And during that time, as the Special Master found, "Amber has proceeded in good faith in all respects," including by "compl[ying] with the provisions of the Sale Procedures Order, Bidding Procedures, December 31 Order, and the Court's other sale process orders" that have governed this process. D.I. 2123 ¶ 23. On this record, where all parties' bids were fully and fairly considered in accordance with the Court's and Special Master's bidding procedures, Gold Reserve's complaints of prejudice ring hollow.

11

## CONCLUSION

For the foregoing reasons, Gold Reserve's motion to strike should be denied.

Dated: September 5, 2025

*Of Counsel:*

Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
Jonathan M. Acevedo
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
susheelkirpalani@quinnemanuel.com
andrewrossman@quinnemanuel.com
matthewscheck@quinnemanuel.com
jonathanacevedo@quinnemanuel.com

-and-

Stephen M. Baldini
Stephanie Lindemuth
Richard J. D'Amato
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036-6745
(212) 872-1000
sbaldini@akingump.com
slindemuth@akingump.com
rdamato@akingump.com

-and-

Julius Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K St NW
Washington, DC 20006-1037
(202) 887-4000
jchen@akingump.com

 /s/ Michael A. Barlow
Michael A. Barlow (No. 3928)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Amber Energy, Inc.*