## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BOLIVARIAN REPUBLIC OF ) <br> VENEZUELA, ) <br> ) <br> Defendant. ) | Misc. No. 17-151-LPS |

### SPECIAL MASTER'S OPPOSITION TO GOLD RESERVE'S MOTION TO STRIKE SPECIAL MASTER'S NOTICE OF DETERMINATION OF SUPERIOR PROPOSAL

Robert B. Pincus, in his capacity as Special Master for the United States District Court for the District of Delaware in the above-captioned case (the "**Special Master**"),[1] submits this opposition to Gold Reserve Ltd. f/k/a Gold Reserve Inc.'s ("**Gold Reserve**") *Motion to Strike Special Master's Notice of Determination of Superior Proposal* (D.I. 2117) (the "**Motion to Strike**" or "**Mot**.") for the reasons set forth below.

### INTRODUCTION

Gold Reserve's Motion to Strike disregards this Court's orders, the plain text of the Dalinar SPA, and the Special Master's authority to recommend a sale of the PDVH Shares that reflects the best combination of price and certainty of closing to maximize value for the judgment creditors. On August 25, 2025, after receiving multiple unsolicited bids during the "No-Shop Period," the

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the *Stock Purchase Agreement*, dated June 25, 2025, by and between Dalinar Energy Corporation and Robert B. Pincus (D.I. 1837-1) (the "**Dalinar SPA**" or "**SPA**").

Special Master filed a *Notice of Special Master's Determination of Superior Proposal* explaining that he received a bid that is superior to the previously recommended Dalinar transaction. D.I. 2113. In response, Gold Reserve filed this Motion to Strike, arguing that the only factor the Special Master may consider in determining whether he has received a Superior Proposal is price, and that because the Amber Energy bid has a lower price than the Dalinar bid, the Special Master is precluded from considering it and must instead recommend the Dalinar transaction. Mot. at 1. But Gold Reserve's position conflicts with the Court's prior orders that instruct the Special Master to consider a combination of *both price and closing certainty* in assessing which bid is most likely to maximize value for the judgment creditors. When reviewing the Special Master's determination in light of those prior orders, the Motion to Strike is meritless.

## ARGUMENT

**A.     The Court's Orders Require The Special Master To Recommend The Bid That Is Most Likely To Maximize Value**

As the Court recently explained at the August 18, 2025 hearing, "the evaluation criteria are not limited just to headline dollar price." August 18, 2025 Hearing Tr. 91:8-10. Instead, the evaluation criteria have "always factored in certainty of closing [and] other related concerns." *Id.* at 91:11–13. On January 27, 2025, before the stalking horse bidding process began, the Court adopted evaluation criteria that require the Special Master to take into account a "non-exhaustive list of considerations" relating to "the certainty associated with a given bidder and the likelihood its applicable bid will successfully proceed to closing," including "[c]onditionality related to pending or future litigation (including with respect to the 2020 Bonds and the Alter Ego Claims)." D.I. 1545-4 at 8–9; *see* D.I. 1554 (adopting the evaluation criteria) (the "**January 27 Order**"). In other words, the evaluation criteria adopted by the Court make clear that the bid with the highest price tag will not necessarily be the best bid. *See also* D.I. 1741 ("All bidders . . . are encouraged

2

to engage with the Special Master to demonstrate that their improved bids reflect the best combination of price and certainty of closing. . . .").

Gold Reserve argues that "the Court ordered bidder protections" require "that any post-Final Recommendation bid must exceed Dalinar Energy's purchase price by at least $80 million," and therefore the Amber Energy bid that the Special Master determined to be a Superior Proposal is "*per se* ineligible for consideration" simply because the purchase price is lower than the purchase price of the Dalinar bid. Mot. at 1, 11. But Gold Reserve's position is at odds with the Court's orders. The Court's January 27 Order directed the Special Master to consider both price *and* closing certainty when evaluating bids. *See* D.I. 1554 (largely adopting the evaluation criteria proposed by the Special Master at D.I. 1545-4).

When ruling on the evaluation criteria, the Court considered objections from the Sale Process Parties and other interested parties, including Gold Reserve. *See* D.I. 1545-1 (summarizing objections). Gold Reserve argued for a $50 million threshold as the "overbid minimum" in the non-solicitation period, and argued that the Special Master should not have the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids. *Id.* at 7. The Court adopted Gold Reserve's proposal of a higher overbid minimum, but also expressly held that the Special Master would "*retain[] discretion* to lower or raise the overbid minimum throughout the process, as he proposes." *See* 1554 at 14 (emphasis added). The Court gave the Special Master this discretion because "the evaluation criteria include criteria other than price." *Id.* (citation omitted). In other words, the Court made clear that although $50 million was the targeted overbid minimum, the Special Master would retain the discretion to change his recommendation if he received a *better* bid after his Final Recommendation of the Dalinar bid (D.I. 1837) (the "**Final Recommendation**"), even if it did not hit that targeted overbid.

3

Moreover, the bidder protections in the Court's January 27 Order did not "*per se*" require that an unsolicited competing proposal submitted during the No-Shop Period include a higher purchase price than the recommended bid. Mot. at 11. Rather, the bidder protections stated that, "in the event the Special Master receives an unsolicited competing proposal after submission of the Final Recommendation and prior to the entry of any Sale Order, he shall inform the Court and the Final Recommended Bidder of the receipt of such proposal and, if so directed by the Court, may engage with the bidder submitting such competing proposal." D.I. 1545-4 at 2; *see also* D.I. 1554 (adopting bidder protections). Likewise, the Court-approved bidder protections stated that "[a]ny initial bid received during the Topping Period" and "[a]ny subsequent bidding increments . . . will need to satisfy an overbid minimum equal to or in excess of $50 million; provided, that the Special Master shall have the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids." D.I. 1545-4 at 3. As for the term "unsolicited competing proposal," this is not defined within the Special Master's proposed bidder protections (as adopted by the Court at D.I. 1554), nor do the references to "unsolicited competing proposal" include any mention of the overbid minimum or the expense reimbursement. *Id.* at 2–3. There is no *requirement* that an unsolicited competing proposal have a purchase price higher than the previously recommended bid. Rather, the bidder protections give the Special Master the flexibility to recommend a bid that he determines to be *better*, whether or not it is also higher than the transaction contemplated in his Final Recommendation.

Despite this clear direction from the Court, Gold Reserve argues that "[t]he requirement of an overbid minimum has been included in every version of the Sale Procedures Order," and asserts that "during the extensive briefing to set the bidder protections for the re-launched Sale Process," there was "no suggestion that the Special Master could entertain a bid" that was "*priced lower* than

4

the final Successful Bid." Mot. at 4–8 (emphasis in original).  But Gold Reserve ignores the fact that every version of the bidder protections the Special Master proposed also gave him discretion to modify the overbid minimum.  D.I. 1528-1 at 3; D.I. 1545-4 at 3; 1552-1 at 3.  Indeed, if the inclusion of an overbid minimum in every version of the Sale Procedures Order meant that once a bid is submitted, the Special Master could only consider price, then the Special Master would have included this language in the proposed bidder protections.  But that clearly was never the intention.  And, in any event, the Court ultimately overruled Gold Reserve's request to limit the Special Master's discretion and instead granted him the ability to lower the overbid minimum because "the evaluation criteria include criteria other than price."  D.I. 1554 at 14.  The record therefore shows that the Special Master has always had the discretion during the No-Shop Period to recommend a better bid with a lower purchase price than the previously recommended bid.

Gold Reserve further argues that the Special Master exercising his discretion with respect to the overbid minimum is "irreconcilable with the clear command of Delaware law."  Mot. at 14.  Yet, to support this argument, Gold Reserve points to a series of cases that merely stand for the proposition that the purpose of setting an overbid minimum is to encourage a competitive bidding process—a sentiment the Special Master shares.  *Id*. at 15 (collecting cases).[2]  Indeed, the Special Master did not object to Gold Reserve's proposal to raise the overbid minimum in the January 27

---

[2] Most of the cases relied upon by Gold Reserve are out-of-circuit, and none address an instance where a party adjusted an overbid minimum in a complex, competitive sale process.  *See In re Mickey Thompson Ent. Grp., Inc.*, 292 B.R. 415, 422 (B.A.P. 9th Cir. 2003) (concerning a $5,000 overbid); *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 505 (Bankr. C.D. Cal. 1999) (finding that an overbid minimum of $25,000 is too high and the appropriate overbid minimum is $500); *In re Greater Miami Neighborhoods, Inc.*, No. 08-10694-BKC-AJC, 2008 WL 4397425, at *2 (Bankr. S.D. Fla. Sept. 26, 2008) (discussing the definition of "Minimum Overbid").  In the only Delaware case cited by Gold Reserve, the court mentions that the parties included a "minimum bid" in an effort to yield the highest price, but such "minimum bid" was actually the only bid made at the open auction.  *See Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 227 (Del. Ch. 2013).

5

Order, but sought to strike a balance between price and closing certainty by affording discretion to change his recommendation if he received a *better* bid. *See* D.I. 1545-1 at 7 ("The Special Master has no objection to this proposal [to raise the overbid minimum to $50 million], so long as the Special Master retains discretion over the overbid minimum for subsequent bids or any auction.").

This approach is not "irreconcilable" with Delaware Law. Rather, it is consistent with standard bidding procedures used in similar contexts. For example, it is common practice for bankruptcy courts to approve bidding procedures that give debtors discretion to lower or adjust the overbid minimum. *See, e.g.*, *In re Brooks Bros. Grp., Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020), D.I. 285-1 at 12 (Sontchi, J.); *In re Bozel S.A.*, No. 10-11802 (AJG), 2010 WL 7786065, at *2 (Bankr. S.D.N.Y. July 26, 2010) (approving bidding procedures that gave debtor discretion to reduce the overbid minimum during the auction period); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 16, 2025), D.I. 446-1 at 14–15 (approving bidding procedures that permitted debtor to increase or reduce minimum overbid in their business judgment); *In re Everstream Sols. LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. June 24, 2025), ECF No. 216, Ex. 1 at 13 (establishing bidding procedures where debtors reserved the right to increase or decrease the minimum overbid amount).

Discretion to lower or adjust the overbid minimum is even more important in this judicial sale, because unlike a chapter 11 proceeding where all assets in a debtor's corporate structure can be sold free and clear, this case concerns the sale of assets that will remain impaired by outside litigation—including the litigation over the PDVSA 2020 Bonds. This is precisely why it is crucial that the Special Master be afforded discretion to lower or eliminate the overbid minimum to

6

appropriately account for aspects other than price in competing bids, such as increased closing certainty.

Moreover, Gold Reserve's interpretation of the Court's orders suggests that, if the Special Master were to receive a bid that is the same exact amount as the Dalinar bid, but included a settlement with the PDVSA 2020 Bondholders, the Special Master could not even consider recommending that bid because the purchase price would not exceed the Dalinar transaction. That is not how the sale process was meant to proceed, and it would put the Special Master in the untenable position of having to continue formally "recommending" a bid that he does not actually believe to be the best available and would in fact be advising the Court *not* to accept.

**B.    Gold Reserve's Interpretation Runs Counter To The SPA's Plain Text**

The express language of the Dalinar SPA further belies Gold Reserve's position. The SPA states that "Superior Proposal" "means a Competing Proposal . . . that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher *or better* bid for the Shares based upon the Evaluation Criteria." SPA § 6.16(f)(ii) (emphasis added); *see also id.* § 6.16(a) (stating that the Dalinar bid is subject to "the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order"). As discussed above, when assessing whether a bid is higher or better bid under the Evaluation Criteria, the Special Master must consider both price and closing certainty. D.I. 1545-4 at 8–9; *see* D.I. 1554 (adopting the evaluation criteria). The Dalinar SPA language unambiguously shows the Special Master retains the discretion throughout the No-Shop Period to recommend an unsolicited bid that is "better" than the previously recommended bid, even if that bid has a lower purchase price than the previously recommended bid, but offers higher certainty of closing. To the extent Gold Reserve believes the

7

Special Master could not consider any bid with a lower purchase price received during the No-Shop Period (Mot. at 11), this contravenes the express language of the Dalinar SPA, and appears to be a naked attempt by Gold Reserve to preclude the Special Master from recommending a different bid.

Gold Reserve's position is also inconsistent with basic tenets of contract construction. If Gold Reserve was correct that an unsolicited Competing Proposal with a lower purchase price than the Dalinar transaction can never be a Superior Proposal, then there would never be a scenario where a Superior Proposal could merely be "better" than the recommended bid. Under Gold Reserve's reading, the Superior Proposal would always need a higher price. But that interpretation improperly reads the language "or better" right out of the SPA's definition of Superior Bid. SPA § 6.16(f)(ii) (defining "Superior Proposal" as a Competing Proposal that the "Special Master determines . . . would constitute a higher *or better* bid for the Shares based upon the Evaluation Criteria") (emphasis added); *see Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F. Supp. 3d 428, 438 (D. Del. 2023) (contracts are to be read "as a whole, giving meaning to each term and avoiding an interpretation rendering any term" "meaningless[,] illusory . . . [or] mere surplusage") (internal quotation marks omitted), *appeal dismissed*, 2024 WL 958377 (3d Cir. Jan. 12, 2024). The inclusion of "better" in that sentence is "not mere surplusage." *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) ("[The] 'highest' bid is not always the 'highest and best' bid."). Rather, it was intended to preserve the Special Master's discretion to recommend a bid that offers greater closing certainty than the Dalinar transaction, even if that bid has a lower purchase price.

As the Third Circuit has explained, it is "common knowledge" that "the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two." *United States v. Chem. Found., Inc.*, 5 F.2d 191,

206 (3d Cir. 1925), *aff'd as modified*, 272 U.S. 1 (1926); *see In re Landscape Props., Inc.,* 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) ("[C]ourts generally consider factors in addition to a higher dollar amount."); *In re Diplomat Const., Inc.*, 481 B.R. 215, 219 (Bankr. N.D. Ga. 2012) ("[T]he highest bid does not always equate to the best bid for the estate."); *In re Bakalis*, 220 B.R. at 532 (finding "no cogent reason to disagree or interfere with the Trustee's judgment" where "[t]he Trustee carefully weighed the competing bids rather than mechanistically recommending the facially higher bid").

Gold Reserve further argues that "[t]he expectation that an Unsolicited Competing Proposal had to be higher in terms of price, and not merely different in some other way, is why the Dalinar SPA at Section 6.16(d) expressly grants Dalinar just three business days to revise its own proposal to remain competitive." Mot. at 10. This argument ignores the fact that at the time the parties negotiated for a three-day period, Gold Reserve had already been on notice for months that the Special Master had concerns that the Dalinar transaction may be unable to close and on notice of the specific actions Gold Reserve needed to take in order to address those concerns. *See, e.g.*, D.I. 1741 (Court Order designating Red Tree as the Stalking Horse). There is nothing in the Dalinar SPA suggesting that the three-business-day matching period is in any way tied to the overbid minimum, and Gold Reserve's contention that it was impractical for Dalinar to "renegotiate complex, multi-party, non-price components of its bid" in three business days (Mot. at 10) is disingenuous at best given how long it had been on notice of the Special Master's concerns regarding its closing certainty.

Gold Reserve also attempts to bolster its arguments by submitting a report with the views of retired Bankruptcy Judge Christopher Sontchi. D.I. 2117-1. Although the Special Master has great respect for Judge Sontchi and recognizes that he has extensive experience overseeing

9

complex bankruptcies, his report consists mostly of impermissible legal conclusions that would not assist the fact-finder.[3]  *See Halperin v. Richards*, 665 B.R. 626, 643 (E.D. Wis. 2024) (excluding Judge Sontchi's opinions on "complex areas of the law" as impermissible legal conclusions because they "encroach upon the court's authority"); *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."); *Haberern v. Kaupp Vascular Surgeons Ltd.*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992) ("While the Federal Rules of Evidence permit helpful expert opinion that embraces an ultimate factual issue to be decided, they do not permit opinion on a question of law.").  Nor is Judge Sontchi's report based on any methodology outside of his own subjective interpretation of bankruptcy case law, along with his experience presiding over cases that involved overbid minimums, and analogizing those cases to the facts of this case.  *See, e.g.*, D.I. 2117 at 31–33 (comparing *In re MTE Holdings LLC*, No. 19-12269 (CTG), 2021 WL 3743201 (Bankr. D. Del. Aug. 17, 2021) to this case).  Such analysis constitutes a legal inquiry that would not further assist the in deciding on the Motion to Strike.  Fed. R. Evid. 702 (expert testimony permissible only when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); *McCrink v. Peoples Benefit Life Ins. Co.*, 2005 WL 730688, at *4 (E.D. Pa. Mar. 29, 2005) (excluding an expert report based upon an expert's "understanding of insurance case law and the application of this case law to the instant dispute").  Therefore, the Court should give no weight to Judge Sontchi's opinions.

---

[3] In his report, Judge Sontchi mistakenly states that the sale procedures include a "fiduciary out" that permits the Special Master to consider "a higher bid from a new bidder after the close of the auction, but only if post-auction meets the overbid minimum increment." D.I. 2117-1 at 37.  Judge Sontchi ignores both the "or better" language as well as the Special Master's discretion to lower the overbid minimum.

Gold Reserve correctly notes that that "the Special Master must obtain 'approval of the Court' before terminating the Dalinar SPA in favor of an Unsolicited Competing Proposal that he considers to be a Superior Proposal." Mot. at 12. And that is precisely what the Special Master has done. The Special Master sought approval to terminate the Dalinar SPA in the *Special Master's Updated Final Recommendation* on August 29, 2025. D.I. 2123. Since filing its Motion to Strike, Gold Reserve submitted a separate letter requesting that the Court stay its decision on the Special Master's request to terminate the Dalinar SPA until the Court rules on the Motion to Strike, or in the alternative, set a briefing schedule for this request. D.I. 2128. But Gold Reserve's arguments in opposition to terminating the Dalinar SPA are the same as those set forth in its Motion to Strike. Accordingly, there is no need for the Court to stay a decision on terminating the Dalinar SPA, and certainly no need for additional briefing to rehash the same arguments. For the reasons the Special Master stated in his Updated Final Recommendation, the Court should grant the Special Master authority to terminate the Dalinar SPA. D.I. 2123 at 16.

C.     **Gold Reserve's Expenses Have No Bearing On Its Motion To Strike**

Gold Reserve also argues it should remain the recommended bidder because it purportedly "expended tens of millions of dollars to participate in this process" based on a belief that "the bidder protections ordered by the Court were supposed to bar the Special Master from even engaging with a lower-priced bid during the No-Sh[o]p Period." Mot. at 1, 14. To be sure, the Special Master maintains that an unsolicited competing proposal must cover Dalinar's expense reimbursement up to $30 million and thereby compensate Dalinar for the reasonable expenses it has incurred to submit an actionable bid and comply with the Dalinar SPA. The Court-approved bidder protections make this clear: "If such unsolicited competing proposal is the winning bid . . . the Termination Fee will be paid to . . . the bidder that the Special Master recommended in his Final Recommendation." D.I. 1545-4 at 3. In fact, when proposing the Evaluation Criteria, the

11

Special Master considered the parties' input, including Gold Reserve's request that the Court establish a $50 million expense reimbursement, and the Special Master ultimately recommended that the Court increase the cap from $15 million to $30 million in an effort to alleviate concerns that bidders "may be forced to pay financing commitment fees even if their bid is terminated prior to closing." D.I. 1545-1 at 4.

But all of the expenses Gold Reserve incurred up until the point where Dalinar was recommended by the Special Master were incurred based on the understanding that there was a significant chance Dalinar would not be selected as the recommended bidder. The fact that Gold Reserve may have expended more than the $30 million expense reimbursement based on an incorrect reading of the Court's orders in this case does not entitle Gold Reserve to halt the sale process and preclude the Special Master from recommending a Superior Proposal. And Gold Reserve's claim that it has been prejudiced by its decision to incur expenses in excess of the expense reimbursement provided in the Court-approved bidder protections has no bearing on whether the Special Master has received a Superior Proposal under the plain terms of the Court's orders and the Dalinar SPA.

Nevertheless, Gold Reserve argues that the Special Master and the Court may only consider unsolicited Competing Proposals if they pay the *full value* of Gold Reserve's attached judgment *in cash*—not simply the expense reimbursement provided by the Court-approved bidder protections. *See* Mot. at 1 (arguing that Gold Reserve "committed the full value of its $1.3 billion judgment precisely because" it believed that "any post-Final Recommendation bid must exceed Dalinar Energy's purchase price by at least $80 million (*i.e.*, the $50 million overbid amount and the $30 million expense reimbursement"); D.I. 2014 ¶¶ 4–5, 8 ("Gold Reserve has confirmed herein that it has not, and will not, agree to accept non-cash consideration from . . . any potential

12

non-solicited topping bidder"). In making these assertions, Gold Reserve conflates its role as a bidder and as a judgment creditor. As the previously recommended bidder, Dalinar is entitled to an expense reimbursement in connection with its bid, but the Special Master's decision to recommend a different bid does not entitle Gold Reserve, an Additional Judgment Creditor, to force competing bidders to pay the full amount of its attached judgment. *See* D.I. 1554 at 9; SPA § 8.3. The expense reimbursement to which Gold Reserve is entitled under Section 8.3 of the SPA as the previously recommended bidder is $30 million—not $1.33 billion.

## CONCLUSION

For these reasons, the Special Master respectfully requests that the Court deny Gold Reserve's Motion.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | By: */s/ Myron T. Steele* |
|  | Myron T. Steele (#0002) |
| Matthew S. Barr (Admitted *pro hac vice*) | Matthew F. Davis (#4696) |
| David Lender (Admitted *pro hac vice*) | Bindu A. Palapura (#5370) |
| Jared R. Friedmann (Admitted *pro hac vice*) | Malisa C. Dang (#7187) |
| Chase A. Bentley (Admitted *pro hac vice*) | Hercules Plaza, 6th Floor |
| WEIL, GOTSHAL & MANGES LLP | 1313 North Market Street |
| 767 Fifth Avenue | P.O. Box 951 |
| New York, New York 10153 | Wilmington, DE 19801 |
| Telephone: (212) 310-8000 | Telephone: (302) 984-6000 |
| Facsimile: (212) 310-8007 | Facsimile: (302) 658-1192 |
| Matt.Barr@weil.com | msteele@potteranderson.com |
| David.Lender@weil.com | mdavis@potteranderson.com |
| Jared.Friedmann@weil.com | bpalapura@potteranderson.com |
| Chase.Bentley@weil.com | mdang@potteranderson.com |
|  |  |
| Dated: September 5, 2025 | *Counsel for Special Master Robert B. Pincus* |
| 12451739 / 21202.00001 |  |