Exhibit 69

Page 343

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
2    -------------------------------------x
     CRYSTALLEX INTERNATIONAL CORP.,
3
4
            Plaintiff,              Case No.
5                                   1:17-mc-00151-LPS
6        vs.                            Vol. 2
7
     BOLIVARIAN REPUBLIC OF VENEZUELA,
8
            Defendant.
9    -------------------------------------x
10
11        VIDEOTAPED DEPOSITION OF WILLIAM O. HILTZ
12              New York, New York
13           Thursday, September 4, 2025
14
15
16
17
18
19
20
21
22
23
24   Reported by:
     Frank J. Bas, RPR, CRR
25   Job No. MW 7572378

Page 344

1

2

3                          September 4, 2025

4                          9:13  a.m. EST

5

6              Continued Videotaped Deposition of WILLIAM O.

7    HILTZ, held at the offices of Weil, Gotshal & Manges,

8    767 Fifth Avenue, New York, New York, before Frank J.

9    Bas, a Registered Professional Reporter, Certified

10   Realtime Reporter, and Notary Public of the State of

11   New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 345
 1    A P P E A R A N C E S:
 2    (Some attendees appearing via videoconference):
 3
 4        GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Plaintiff Crystallex
 5            200 Park Avenue
              New York, New York 10166
 6
          BY: JASON MYATT, ESQ.
 7            jmyatt@gibsondunn.com
              MIGUEL ESTRADA, ESQ. (Via Zoom)
 8
 9        EIMER STAHL LLP
          Attorneys for Citgo and PDVH
10            224 South Michigan Avenue, Suite 1100
              Chicago, Illinois 60604
11
          BY: ALEC SOLOTOROVSKY, ESQ.
12            asolotorovsky@eimerstahl.com
              NATHAN EIMER, ESQ.(Via Zoom)
13            neimer@eimerstahl.com
14
          WEIL, GOTSHAL & MANGES LLP
15        Attorneys for Special Master
              767 Fifth Avenue
16            New York, New York 10153
17        BY: JARED R. FRIEDMANN, ESQ.
              AARON J. CURTIS, ESQ.
18            CHASE BENTLEY, ESQ.
              jared.friedmann@weil.com
19            aaron.curtis@weil.com
20
21
22
23
24
25
```

```
                                                      Page 346

 1   A P P E A R A N C E S:
 2
     FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
 3      Attorneys for Evercore
            7 Times Square
 4          New York, New York 10036
 5      BY: JASON C. RUBINSTEIN, ESQ.
            jrubinstein@fklaw.com
 6
 7   NORTON ROSE FULBRIGHT US LLP
        Attorneys for Gold Reserve, Inc.
 8          799 9th Street NW, Suite 1000
            Washington DC 20001
 9
        BY: MATTHEW H. KIRTLAND, ESQ.
10          matthew.kirtland@nortonrosefulbright.com
            KATHERINE G. CONNOLLY, ESQ. (Via Zoom)
11          katie.connolly@nortonrosefulbright.com
12          -and-
            NORTON ROSE FULBRIGHT US LLP
13          1301 Avenue of the Americas
            New York, New York 10019
14
        BY: MIKKAELA SALAMATIN, ESQ.
15          mikkaela.salamatin@nortonrosefulbright.com
16
        BROWN RUDNICK
17      Attorneys for Gold Reserve
            Seven Times Square, 47th Floor
18          New York, New York 10036
19      BY: MICHAEL J. BOWE, ESQ. (Via Zoom)
            mbowe@brownrudnick.com
20
21      MORGAN LEWIS & BOCKIUS LLP
        Attorneys for OI European Group B.V.
22          One State Street
            Hartford, CT 06103
23
        BY: DAVID SHIM, ESQ. (Via Zoom)
24          david.shim@morganlewis.com
25
```

```
                                                    Page 347

 1
    A  P  P  E  A  R  A  N  C  E  S:
 2
        MOLOLAMKEN LLP
 3      Attorneys for Red Tree Investments LLC
            430 Park Avenue
 4          New York, New York 10022
 5      BY: MARK KELLEY, ESQ. (Via Zoom)
            mkelley@mololamken.com
 6
 7      QUINN EMMANUEL URQUHART & SULLIVAN
        Attorneys for Amber Energy
 8          295 Fifth Avenue, 9th Floor
            New York, New York 10016
 9
        BY: EMMA MCCABE, ESQ.
10          MATTHEW SCHECK, ESQ. (Via Zoom)
            emmamccabe@quinnemanuel.com
11          matthewscheck@quinnemanuel.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 348

1   A P P E A R A N C E S:

2

3       CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
        Attorneys for Petroleos De Venezuela, S.A. (PDVSA)
            101 Park Avenue
4           New York, New York 10178

5       BY: JUAN O. PERLA, ESQ.
            jperla@curtis.com

6

7       MUNGER, TOLLES & OLSON LLP
        Attorneys for Bolivarian Republic of Venezuela
8           350 South Grand Avenue, 50th Floor
            Los Angeles, CA 90071

9

        BY: GEORGE M. GARVEY, ESQ. (Via Zoom)
10          george.garvey@mto.com

11

12  ALSO PRESENT VIA ZOOM:

13      BAILEY FINNESTAD (Concierge Tech)
        ALICE GYAMFI (DLA Piper)

14      JOSHUA BOLIAN (Riley & Jacobson, PLLC)
        MILA RUSAFOVA (Eimer Stahl LLP)

15      ROBERT PROFUSEK (Jones Day)
        ROBERT GROOT

16      SARA LUCIA DANGON (Curtis, Mallet-Prevost,
        Colt & Mosle LLP)

17      DAVID HOLMES (Curtis, Mallet-Prevost,
        Colt & Mosle LLP)

18      ZACH KADY (Gibson Dunn)
        PETE COOPER, Videographer

19

20

21                  - o0o -

22

23

24

25

Page 360

1          Do you see that, sir?

2     A.     Yes.

3     Q.     Is it correct that nothing has

4  changed with respect to the inability of the

5  Special Master to predict whether the PDVSA 2020

6  bondholders are likely to be successful?

7     A.     Nothing has changed with respect to

8  our ability, or the Special Master's ability to

9  predict that as we sit here today.  The one

10 element that has changed is it now appears that

11 there will be a ruling in the Southern District

12 of New York prior to the judge approving any

13 final bid, so that the judge will have perfect

14 knowledge with respect to the outcome of that

15 litigation at the time he approves or chooses to

16 reject whatever bid the Special Master supports.

17    Q.     So sitting here today the Special

18 Master's view, the exercise remains arbitrary at

19 best, as said on page 5 of 7?

20          MR. FRIEDMANN:  Object to form.

21 BY MR. KIRTLAND:

22    Q.     Is that right?

23    A.     It's arbitrary in both directions.

24 It's arbitrary to suggest that the 2020s will

25 prevail.  It's arbitrary to suggest that the

Page 361

1    2020s will not prevail.

2              It works both ways.  There's

3    uncertainty here and we don't believe there's a

4    way, as stated here, to mathematically quantify

5    that by making arbitrary judgments about

6    probabilities.

7         Q.    You said the Court will have perfect

8    knowledge when Judge Failla rules as to the

9    outcome of that litigation.

10             That's not correct, is it?  There's

11   any number of variations of a ruling that

12   wouldn't provide an outcome to that litigation,

13   right?

14             MR. FRIEDMANN:  Object to form.

15        A.    Perhaps "perfect knowledge" is the

16   wrong term.  He will have significantly greater

17   knowledge.  And yes, there are a number of

18   potential permutations as to what could come out

19   of that decision.  But he will clearly have far

20   more information to inform him than we have

21   today as we sit here.

22             KIRTLAND:  You can put that exhibit

23        to the side, sir.  I want to show you the

24        next exhibit which will be 37, which is tab

25        6.

Page 367

1    Dalinar had to get this alternative financing
2    before closing; you're familiar with that?
3                MR. FRIEDMANN:  Object to form.
4         A.    Yes.
5         Q.    Wouldn't you agree with me,
6    Mr. Hiltz, that all three of these items, the
7    increased contingent finance, the antitrust
8    concerns being resolved, and Dalinar proposing
9    the early termination right where it had to get
10   alternative financing before closing were
11   improvements and increased the likelihood of
12   closing of the Dalinar improved bid as compared
13   to the Dalinar stalking horse bid?
14               MR. FRIEDMANN:  Object to form.
15        A.    Not in a material way that would
16   change our judgment about the certainty of
17   closing.
18               I mean, for example, let's take the
19   increased ABL.  If the 2020s prevail and Dalinar
20   is faced with having to either settle or in fact
21   just pay off the 2020s at the 3.02 billion full
22   value of their claim, having the increased
23   500 million of ABL is the equivalent of someone
24   owing a hundred dollars, having $20 in the bank
25   and somebody comes along and says here, I'll

Page 369

1              So the major items that would
2       actually cause a change in our recommendation
3       and have a material impact on certainty are
4       items that you have not addressed.
5              Q.    So I want to make sure I understand
6       your answer.
7              Your answer is yes, they constitute
8       improvements, but you disagree with the
9       materiality of the improvements, is that a fair
10      summary?
11             MR. FRIEDMANN:   Object to form.
12             A.    Yes.
13             Q.    And the difference of judgment on
14      materiality is what you explained in your
15      lengthy prior answer?
16             A.    Yes.
17             Q.    You said that the Special Master
18      instructed Gold Reserve/Dalinar to get committed
19      financing for the $1.8 billion of preferred
20      financing for which it has a highly confident
21      letter, is that right?
22             A.    That's right.
23             Q.    When did the Special Master instruct
24      Gold Reserve to do that between the July 2nd
25      final recommendation of the Dalinar bid and

Page 371

```
 1          A.    I believe so.

 2          Q.    By who?

 3          A.    By Weil, I believe.

 4          Q.    Who at Weil?

 5          A.    I believe Chase.

 6          Q.    And who did you speak with?

 7          A.    I don't know.

 8          Q.    You don't know?

 9          A.    No.

10          Q.    You weren't party to any of these

11    communications?

12          A.    I've been on a number of phone calls

13    but I can't recall specifically what time frame

14    those were or who was speaking.

15          Q.    The contingent finance that

16    Dalinar/Gold Reserve has, the $1.8 billion of

17    pref for which they have the highly confident

18    letter from JPMorgan, you testified at your

19    prior session that JPMorgan doesn't simply issue

20    these highly confident letters as a matter of

21    course, because it represents a reputational

22    risk if in fact the pref for which they're

23    highly confident can't be raised.  Do you stand

24    by that view, Mr. Hiltz?

25          A.    Yes.
```

Page 377

1    litigation?

2             MS. MCCABE:  Object to the form.

3        A.    No, they have not.  But if they're

4    prepared to pay a certain TEV for the company,

5    which includes payments to the 2020s in

6    settlement, and they no longer have to pay that

7    money in the settlement, there's no reason to

8    suppose that they wouldn't redirect a portion,

9    if not a significant portion of those funds to

10   additional judgment creditors absent some

11   gigantic change in market conditions or

12   something that would otherwise impact the value

13   of Citgo.

14       Q.    Did the Special Master ask

15   Amber/Elliott this question?

16       A.    No.  Not that I'm aware of.

17       Q.    Why not?

18       A.    I don't know why.

19       Q.    Why didn't the Special Master or his

20   advisors have Amber build this into their bid,

21   this possibility of an increased price based on

22   a future uncertain litigation event?

23       A.    We -- I suppose you could have.  But

24   we did not.

25       Q.    Would you agree that that would have

Page 378

1    improved the Amber bid if they had actually

2    promised to the Court and the attached judgment

3    creditors that this consequence that you're

4    supposing might happen in the future was real?

5              MS. MCCABE:  Object to form.

6         A.    That would have improved their bid,

7    yes.  But I think the point is that if the Amber

8    bid is rejected you're still here as Gold

9    Reserve able to pursue your transaction that you

10   have on the table.  So whether or not Amber

11   itself is committed, we would expect that there

12   would be a robust bidding process, perhaps

13   including Vitol as well, in the event that the

14   2020s lose and the Amber bid is rejected.

15        Q.    Let me ask you a discreet question,

16   Mr. Hiltz.

17              Take Exhibit 35.  That's your

18   declaration.

19        A.    Yes.

20        Q.    And turn to page 16.  We're under

21   paragraph 39.  Other Evaluation Criteria.  Are

22   you with me?

23        A.    Yes.

24        Q.    And 39(a) is Likelihood of

25   Regulatory Approval, do you see that?  Just read

Page 411

1    cash flows that we were provided with.  But not

2    specifically isolating contingent liabilities,

3    no.  I haven't.

4         Q.    Are you aware, sir, that there are

5    several well established techniques for valuing,

6    putting a monetary value on contingent

7    litigation risk?

8         A.    Not particularly, no.

9         Q.    Do you have any familiarity with the

10   expected monetary value method of valuing

11   contingent litigation risk?

12        A.    I'm familiar with an expected value

13   calculation.  Not specifically as it relates to

14   litigation risk.

15        Q.    In any event the Special Master, nor

16   his advisors, did not conduct any expected

17   monetary value analysis of the 2020 bondholder

18   risk, right?

19        A.    Well, again we did not conduct an

20   analysis where we assigned specific

21   probabilities to individual outcomes to

22   determine, quote, an expected value.  What we

23   did do was to look at a series of scenarios and

24   looked very carefully at what the recoveries to

25   creditors would be under each of those

Page 412

1   scenarios.  So we did do an analysis.  It's just
2   not an expected value analysis.
3          Q.    And you didn't -- you're talking
4   about outcomes in the Delaware proceeding based
5   on potential outcomes in the New York
6   proceeding.  But what you didn't do was conduct
7   any methodological analysis of the 2020
8   litigation.  Because, as stated in the Special
9   Master's filing, it's arbitrary at best, and
10  little if any certainty can be put against it,
11  is that right?
12              MR. FRIEDMANN:  Object to form.
13         A.    We did not conduct an expected value
14  analysis where we assigned probabilities to
15  outcomes.  As I said before, we did do an
16  analysis that looked at the potential recoveries
17  to creditors under a series of different
18  scenarios without assigning probabilities to
19  those particular scenarios.
20         Q.    You are familiar with a Monte Carlo
21  simulation, Mr. Hiltz?
22         A.    It's been a long time since business
23  school, but yeah, I'm somewhat familiar.
24         Q.    The Special Master didn't perform a
25  Monte Carlo simulation to value the 2020

Page 437

1        Q.    But you agree that if OFAC does not

2    change this policy and does not lift this

3    long-running suspension, that this threat to the

4    Gold Reserve/Dalinar financing coming from the

5    exercise of the pledge does not exist?

6               MR. FRIEDMANN:  Object to form.

7        A.    Correct.

8        Q.    Given that even if the 2020s win in

9    New York, they still need to overcome the OFAC

10   suspension of the pledge rights, as you just

11   said, and given that they've represented to the

12   New York court they don't seek to enjoin the

13   Gold Reserve bid, is not the risk that you are

14   referring to with the Dalinar improved bid

15   arising from the 2020s litigation actually lower

16   than the risk presented in the Amber Energy bid

17   from Judge Failla ruling against the 2020s?

18               MR. FRIEDMANN:  Object to form.

19       A.    I don't think you can handicap that

20   risk as being lower.  I mean again, if the 2020s

21   win and the Amber bid -- excuse me.  If the

22   2020s lose and the Amber bid is not approved by

23   the Court, again we don't view that as being a

24   bad thing.  We view that as offering the

25   potential to re-bid the company and obtain

1         A.    Yes.

2         Q.    And the value of that judgment is

3    circa $720 million as of June 30, 2026, is the

4    valuation date, right?

5         A.    718.

6         Q.    So $718 million as of the June 30,

7    2026 valuation date; yes?

8         A.    Reduced by the fact that you then

9    took back 200 of your claim that you were

10   originally going to surrender but are now

11   keeping.

12        Q.    But we'll start with the first 718,

13   or I'll call it -- we'll call it 718.

14              So you were present in the

15   communications with Special Master's counsel

16   where Special Master stated that Dalinar would

17   be given full credit for the $718 million

18   Valores judgment?

19              MR. FRIEDMANN:  Object to form.

20        A.    I don't specifically recall that

21   conversation.  But I don't -- I'm not saying

22   it's untrue.

23        Q.    In any event do you agree that

24   Dalinar should be given full credit when

25   comparing the Amber Energy bid to the Dalinar

Page 448

1    bid?

2                MR. FRIEDMANN:  Object to form.

3          A.    Again, I haven't seen the

4    documentation behind the Valores claim.  But

5    assuming that documentation is in order, yes,

6    you should get full credit for it.

7          Q.    Did the Special Master have any

8    communications -- you're familiar that the

9    Dalinar Energy bid is a consortium, yes?

10         A.    Yes.

11         Q.    It includes Rusoro?

12         A.    (Nodding head affirmatively.)

13         Q.    Okay?  Is that a yes?

14         A.    Yes, I'm sorry.

15         Q.    Koch?

16         A.    Yes.

17         Q.    As well as a creditor behind Gold

18    Reserve, which is Siemens?

19         A.    Siemens.

20         Q.    Yeah.  Did the Special Master, or

21    his advisors, have any communications with

22    Rusoro regarding the Dalinar Energy improved

23    bid?

24         A.    Not that I'm aware of.

25         Q.    You weren't party to any telephone

Page 451

1          A.     Well, I've certainly had

2     communications with Conoco, with Crystallex.  I

3     can't recall that I've had any particular

4     conversations with either Rusoro -- obviously

5     we've had conversations with Gold Reserve.

6          Q.     Do you have any understanding, sir,

7     that there's any uncertainty concerning whether

8     Rusoro needed to consent to the Valores judgment

9     being included in the Dalinar Energy purchase

10    price?

11               MR. FRIEDMANN:  Object to form.

12         A.     I don't believe we have ever seen

13    the detail of your arrangements with either

14    Rusoro or Koch.  It wouldn't have surprised us

15    if that -- you needed their approval.  But I

16    don't know that for a fact.

17         Q.     Did Gold Reserve ever communicate to

18    the Special Master, to your knowledge, that

19    Rusoro or Koch consent was required to add the

20    Valores judgment to its purchase price?

21         A.     I can't recall.

22         Q.     Do you agree that if the Special

23    Master had any questions regarding giving

24    Dalinar full credit for the amount of the

25    Valores judgment, that the Special Master should

Page 452

1    have asked such questions to Gold Reserve and

2    exercised reasonable efforts to clarify any such

3    issues?

4              MR. FRIEDMANN:  Object to form.

5         A.   Yes.

6              MR. KIRTLAND:  We've been going for

7         about another 50 minutes.  I think now is a

8         good time to take a break.  I think what

9         I'll do if it's okay with you guys is I

10        will allow co-counsel, or other counsel to

11        ask some questions and then I'll come back

12        if I have any further questions.

13             MR. FRIEDMANN:  I would rather you

14        just finish up.

15             MR. KIRTLAND:  Let's just take a

16        break then and see what other questions I

17        have.

18             MR. FRIEDMANN:  Okay.

19             THE VIDEOGRAPHER:  The time is 11:42

20        a.m.  This is the end of media one and we

21        are going off the record.

22                  (Recess taken.)

23             THE VIDEOGRAPHER:  We're back on the

24        record.  Go ahead.

25             MR. KIRTLAND:  I have no further

Page 455

MR. SOLOTOROVSKY:

    Q.    Okay.  Good morning Mr. Hiltz.  My
name is Alec Solotorovsky and I represent Citgo
and PDVH.  We were talking earlier, or you were
talking earlier with Mr. Kirtland about highly
confident letters.  Do you recall that?

    A.    Yes.

    Q.    I understand that in part Gold
Reserve's bid is backed by a highly confident
letter from JPMorgan for $1.8 billion in
preferred financing that if needed could be
raised to satisfy part of the 2020s.  Is that
your understanding?

    A.    Yes.

    Q.    For those of us who are new to
investment banking, what is a highly confident
letter?

    A.    It's a letter that says that the
issuer of the letter, in this case JPMorgan, is
highly confident that it will be able to place
those securities.  I don't think it is specific
as to the terms of those securities, and it is
not in fact a binding financial commitment on
the part of JPMorgan.

    Q.    So it's not a legal commitment to

1    raise the money, but there is some reputational

2    risk for the bank if they don't perform after

3    having issued a highly confident letter, is that

4    right?

5               MR. FRIEDMANN:  Object to form.

6          A.    Yes.

7          Q.    You mentioned earlier in discussing

8    highly confident letters with Mr. Kirtland that

9    around the time of the Lehman Brothers

10   bankruptcy there were some situations where

11   investment banks failed to perform under highly

12   confident letters.  Do you recall that?

13         A.    I don't think I specifically said

14   highly confident letters.  I just said there

15   were significant market disruptions.  Actually,

16   I believe there were some committed financings

17   that the banks failed to make good on in that

18   circumstance.  But I don't have knowledge of

19   specific instances where people did not perform

20   on highly confident letters.

21         Q.    So you couldn't identify any

22   specific instance post the Lehman Brothers era

23   where an investment bank failed to perform under

24   a highly confident letter, is that right?

25         A.    I'm not personally aware of any.

Page 458

```
 1        A.    I think that in order to induce
 2   someone to put their best foot forward we are
 3   better off not disclosing that number because
 4   they will, under that set of circumstances, need
 5   to do the best they can.  If, for example, they
 6   were prepared to pay $150 million in additional
 7   consideration but they know that only 75 has
 8   been offered, maybe they'll put in 80 rather
 9   than the 150 that they would be prepared to put
10   in.
11             So I don't agree with the concept
12   that hiding this number reduces competition.  I
13   think it in fact is the reverse; that it is a
14   better incentive to get people to put their best
15   foot forward.
16        Q.    But isn't it possible that there are
17   bidders who might think it was 200 million or
18   300 million and they're going to forgo bidding
19   80 or a hundred because they're discouraged by
20   not knowing the number?
21        A.    No, I don't think that's accurate at
22   all.  I think that they would put in whatever
23   their best number is.
24        Q.    Let's take a look at page 12 of your
25   declaration.  In the big paragraph that carries
```

Page 459

1    over from page 11 you are talking about

2    Dalinar's financing, right?

3                (The witness reviews document.)

4         A.    Yes.

5         Q.    Part of Dalinar's financing is an

6    ABL facility, right?

7         A.    Yes.

8         Q.    And at the bottom of the big

9    paragraph on page 12 you mention that the

10   ability to draw on asset based loan facilities,

11   including Dalinar's proposed ABL, is calculated

12   at the time of the requested draw and predicated

13   on the borrower's then existing liquidity and

14   asset borrowing base.  Do you see that?

15        A.    Yes.

16        Q.    That is also true of the ABL

17   facility that is part of Amber's financing,

18   right?

19        A.    Yes.

20        Q.    Take a look at page 13 of Exhibit

21   35.  In paragraph 33, the second sentence you

22   write:  Most notably, the Amber sale transaction

23   virtually eliminates any closing risks

24   associated with the PDVSA 2020 bondholder

25   litigation.

Page 463

1    value?

2         A.    Well, I believe we've run a process

3    that has allowed the market to speak with

4    respect to value.  That process was thorough.

5    Involved, as we've discussed in the past, any

6    number of parties, some 90 some-odd parties.

7    And I believe it's an accurate market

8    reflection.

9         Q.    Does the Special Master have an

10   opinion of what the fair market value of the

11   PDVH equity is today?

12        A.    Not specifically.

13        Q.    Not generally either, right?

14             MR. FRIEDMANN:  Object to form.

15        A.    I'm sorry.  Repeat your question?

16        Q.    I think when we spoke at your last

17   deposition you testified that you don't have an

18   opinion as to the fair market value of the PDVH

19   equity, is that right?

20        A.    That's correct.

21        Q.    Does that remain true today?

22        A.    Well, again I think we have -- we

23   don't have a specific judgment as to the fair

24   market value, primarily because of the

25   difficulty in evaluating the contingent

Page 466

1    billion number is the higher number that the

2    bondholders are advocating for, right?

3        A.    That's my understanding.

4        Q.    And that is the number that the

5    Special Master has used in evaluating whether

6    Amber or Dalinar is the superior bid in this

7    case, right?

8        A.    That's not the only number that

9    we've used.  Again, we are using that 3.02

10   number to determine the amount of discount that

11   we are obtaining.  But that's not the only

12   factor we're using in distinguishing between the

13   bids.

14       Q.    Why didn't the Special Master ever

15   form its own view of what the proper interest

16   accrual is and calculate the value of the bonds

17   in the event of a win for the bondholders on

18   that basis?

19       A.    Again, we have -- we're not going to

20   make subjective assumptions about how that

21   litigation is going to resolve itself with

22   respect to the appropriate interest rate.  We

23   have no basis to make assumptions about that.

24   So we're conservatively using the higher number.

25           MR. SOLOTOROVSKY:  Give me just a

Page 475

1    Q.    Okay.  So just to clarify the
2  record.  And it may have been Alec and not Matt
3  who asked this question, so I apologize if I
4  gave the wrong lawyer credit for the questions
5  on the fair market value.
6          But you testified earlier that, I
7  thought you testified earlier that Evercore was
8  not aware of what the fair market value was, or
9  hadn't run a fair market value test or something
10  of that nature.
11          Can you clarify what you meant?
12    A.    Yes, what I meant was that Evercore
13  did not conduct the kind of analysis that
14  Dr. Alberro conducted, where we ran a DCF, again
15  looked at comparable company transactions,
16  precedent transactions, et cetera.  Rather we
17  relied on the process that we ran to determine
18  fair market value.
19    Q.    Okay.  So then again just to clarify
20  the record, does Evercore have a view as to what
21  the fair market value is of the PDVH shares as
22  of today?
23    A.    Well, again I think it's reflected
24  by the two bids that we've received from Amber
25  and Gold Reserve, which would imply TEVs

Page 476

1    somewhere around the $8 billion number.

2              MR. FRIEDMANN:  Thank you.  Nothing

3         further.

4              MR. SOLOTOROVSKY:  I just have I

5         think one more in light of that.

6    EXAMINATION (Cont'd)

7    BY MR. SOLOTOROVSKY:

8         Q.    Is the Special Master's sense, as

9    Mr. Friedmann put it, of the fair market value

10   of the PDVH equity based solely on the Dalinar

11   and Amber bids that we've been discussing today

12   or is it based on other things, too?

13        A.    It's based on the result of the

14   entire product.

15        Q.    Meaning the bids that have been

16   received in the process?

17        A.    And -- and the other bids that are

18   nonconforming, for example.  Which would be at

19   slight lower numbers.

20        Q.    So the basis of the Special Master's

21   sense of the fair market value of the PDVH

22   equity is all of the bids that have been

23   received in the process, is that right?

24        A.    Yes, that's correct.

25        Q.    Is there anything else that forms

Exhibit 70

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC.,<br><br>Plaintiffs,<br><br>- v -<br><br>MUFG UNION BANK, N.A., and GLAS AMERICAS LLC,<br><br>Defendants. | 19 Civ. 10023 (KPF) |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

JAY CLAYTON
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2677/2810
samuel.dolinger@usdoj.gov
anthony.sun@usdoj.gov

*Attorney for the United States of America*

SAMUEL DOLINGER
ANTHONY J. SUN
Assistant United States Attorneys
*– Of Counsel –*

The United States of America (the "United States" or the "Government") respectfully submits this Statement of Interest in response to the invitation of the Court, and pursuant to 28 U.S.C. § 517,[1] to provide the views of the Government regarding "its position on the pending cross-motions for summary judgment." Dkt. Nos. 390, 392.

## DISCUSSION

The United States respectfully provides this additional Statement of Interest as a supplement to its previous Statement of Interest filed on September 16, 2020, Dkt. No. 213 ("2020 SOI"), to affirm its recognition of, and firm support for, the 2015 National Assembly of Venezuela as the government of Venezuela. The 2015 National Assembly is the only government of Venezuela duly elected by the Venezuelan people, as detailed in the attached letter from Ambassador Michael G. Kozak, Senior Bureau Official at the Bureau of Western Hemisphere Affairs of the U.S. Department of State to Brenna Jenny, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, annexed hereto as Exhibit A.

As set forth in Ambassador Kozak's letter, "Nicolás Maduro and his coterie of corrupt associates have ravaged Venezuela's economy, inflicted serious human rights abuses upon innocent citizens, and have exploited and squandered the Venezuelan people's assets." *Id.* at 1. Since the United States' 2020 Statement of Interest, the "plight of the Venezuelan people has only worsened due to Maduro's cruelty, corruption, and inhuman indifference to the misery of tens of millions of his countrymen." *Id.* In the Venezuelan presidential election held in July 2024, Maduro "falsely and baselessly declared himself the winner," despite evidence that Venezuelan "citizens

---

[1] Congress has authorized the Attorney General to send "any officer of the Department of Justice . . . to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517; *see Georges v. United Nations*, 834 F.3d 88, 91 & n.10 (2d Cir. 2016).

overwhelmingly cast their ballots for opposition candidate Edmundo González Urrutia." *Id.* Since then, Maduro has "unleashed a campaign of terror and repression that Maduro and his associates mistakenly hope will break the will of the Venezuelan people." *Id.* at 2.

Further, Maduro has continued to cultivate "ties with our nation's most committed adversaries, has destabilized neighboring states through the export of narcotics and violence, and has created a refugee crisis that is now the greatest in the history of the Americas." *Id.* These actions "directly threaten our nation's security, prosperity, and foreign policy interests, and the well-being of millions throughout our hemisphere." *Id.* As a result, the United States has "imposed sanctions on Maduro and those enabling his malign conduct under various executive orders dating back to 2015." *Id.*

"Maduro does not speak for the Venezuelan people," and the United States does not recognize Maduro or his associates as the government of Venezuela. *Id.* The 2015 National Assembly "remains the only democratically elected public institution in Venezuela." *Id.* Although the "2015 National Assembly's leadership has changed" since the United States' 2020 Statement of Interest, "the United States recognizes the 2015 National Assembly as the government of Venezuela." *Id.*

Accordingly, the views presented by the 2015 National Assembly regarding Venezuelan law on behalf of the Republic of Venezuela, *see* Dkt. No. 326-1 at 1 n.1, constitute the views of a foreign government that deserve the same "respectful consideration" from the Court that would be due to any foreign sovereign under *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.*, 585 U.S. 33, 36 (2018). "In the spirit of international comity, a federal court should carefully consider a foreign state's views about the meaning of its own laws." *Id.* at 43 (citation and quotation marks omitted). At the same time, the Court "is not bound to accord

2

conclusive effect to the foreign government's statements." *Id.* at 36; *see id.* at 46 ("a government's expressed view of its own law is ordinarily entitled to substantial but not conclusive weight"); *accord In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 154 (2d Cir. 2021) (a court must "'carefully consider'"—even if it does not "defer conclusively to"—the foreign sovereign's "statement on the meaning of [foreign] law" (quoting *Animal Sci. Prods.*, 585 U.S. at 43)). "[T]he appropriate weight in each case will depend upon the circumstances," and a court should consider the following in assessing a statement from the foreign sovereign: its "clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Animal Sci. Prods.*, 585 U.S. at 43.

Separately, with respect to the merits of the case, the United States respectfully refers the Court to the Government's views on the legal issues as set forth in the 2020 Statement of Interest. That Statement of Interest and accompanying letter from Elliott Abrams, then-Special Representative for Venezuela at the U.S. Department of State, comprehensively described the United States' important foreign policy and national security interests with respect to Venezuela, alongside its legal and policy interests in preserving stability in the sovereign debt markets, as relevant to the matters at issue. *See* 2020 SOI at 1-3, 7-9.

As set forth in the 2020 Statement of Interest, the parties continue to dispute central questions of Venezuelan law and practice. The United States takes no position on the operation of Venezuelan law in this case or the application of the act of state doctrine. *See* 2020 SOI at 4-7. Additionally, the United States reiterates its substantial interest in avoiding uncertainty in lawful contractual relations and an orderly process for restructuring sovereign debts for which creditors can legitimately expect payment. *See* 2020 SOI at 8-9.

## CONCLUSION

For the foregoing reasons, the United States respectfully (1) advises the Court of its recognition of and support for the 2015 National Assembly as the government of Venezuela; (2) urges the Court to accord respectful consideration to the Republic's views as required by *Animal Science Products*; and (3) takes no position on the legal issues in the parties' pending cross-motions for summary judgment.

Dated: August 29, 2025
       New York, New York

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York
*Attorney for the United States of America*

By:    /s/ Samuel Dolinger
       SAMUEL DOLINGER
       ANTHONY J. SUN
       Assistant United States Attorneys
       86 Chambers Street, 3rd Floor
       New York, New York 10007
       Tel.: (212) 637-2677/2810
       samuel.dolinger@usdoj.gov
       anthony.sun@usdoj.gov

4

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c) the undersigned counsel hereby certifies that this memorandum complies with the word-count limitations of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, and excluding the items set forth in the rule, there are 1,023 words in this memorandum.

/s/ Samuel Dolinger
SAMUEL DOLINGER
Assistant United States Attorney

Exhibit A



United States Department of State

*Bureau of Western Hemisphere Affairs*

*Washington, D.C.  20520-6258*

August 29, 2025

Brenna Jenny
Deputy Assistant Attorney General
Civil Division
Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530

Re: *Petróleos de Venezuela, S.A., et al. v. MUFG Union Bank, N.A., et al.*, No. 19 Civ. 10023 (KPF) (S.D.N.Y.)

Dear Ms. Jenny,

I would be grateful for your assistance in presenting this letter to the U.S. District Court for the Southern District of New York.  This letter is submitted in response to the Court's invitation to the United States to express its views in the above-captioned matter, as directed by the Court's orders dated July 17, 2025, and July 28, 2025.

This correspondence follows a September 16, 2020, letter to the Court submitted by Special Representative Elliott Abrams, which comprehensively articulated several policy considerations.  I write to address the U.S. government's recognition posture with respect to Venezuela in light of intervening developments in the country.

As explained in our letter of September 16, 2020, Nicolás Maduro and his coterie of corrupt associates have ravaged Venezuela's economy, inflicted serious human rights abuses upon innocent citizens, and have exploited and squandered the Venezuelan people's assets, including Petróleos de Venezuela, S.A. (PdVSA).  In the years since Special Representative Abrams's letter, the plight of the Venezuelan people has only worsened due to Maduro's cruelty, corruption, and inhuman indifference to the misery of tens of millions of his countrymen.

On July 28, 2024, over twelve million Venezuelans went to the polls to participate in presidential elections that offered hope for a freer, democratic, and more prosperous Venezuela.  Undeterred by disinformation, threats, and violence, these courageous citizens overwhelmingly cast their ballots for opposition candidate Edmundo González Urrutia.  But in open defiance of the people's voice, Nicolás Maduro falsely and baselessly declared himself the winner of the election and

1



United States Department of State

*Bureau of Western Hemisphere Affairs*

*Washington, D.C.  20520-6258*

unleashed a campaign of terror and repression that Maduro and his associates mistakenly hope will break the will of the Venezuelan people.

Nicolás Maduro's corrupt, criminal, and oppressive conduct has not been constrained by Venezuela's borders.  Maduro has cultivated ties with our nation's most committed adversaries, has destabilized neighboring states through the export of narcotics and violence, and has created a refugee crisis that is now the greatest in the history of the Americas.  Over twenty percent of Venezuela's population has fled the country, imposing serious burdens on Colombia, Peru, Ecuador, and the United States, among other nations.  All of these actions directly threaten our nation's security, prosperity, and foreign policy interests, and the well-being of millions throughout our hemisphere.  The United States has accordingly imposed sanctions on Maduro and those enabling his malign conduct under various executive orders dating back to 2015.

Maduro does not speak for the Venezuelan people.  As our prior submission to the Court explained, since January 23, 2019, the United States has not recognized Maduro and his associates as the government of Venezuela.  The 2015 National Assembly was and remains the only democratically elected public institution in Venezuela.  Though the 2015 National Assembly's leadership has changed since we last submitted our views to the Court, the United States recognizes the 2015 National Assembly as the government of Venezuela.  As a result, we believe that the views of the 2015 National Assembly on questions of Venezuelan law are entitled to the same respectful consideration owed to any foreign government's statements regarding its own domestic law.

We trust that these views will be of assistance to the Court in its assessment of the issues before it.

Respectfully,

Ambassador Michael G. Kozak
Senior Bureau Official
Bureau of Western Hemisphere Affairs
U.S. Department of State

2

Exhibit 71

Message

| | |
|---|---|
| **From:** | Josh Weisser [jweisser@contrariancapital.com] |
| **Sent:** | 2/24/2025 8:33:39 AM |
| **To:** | Marco Tramontano [Marco.Tramontano@ashmoregroup.com]; Xin Xu [Xin.Xu@AshmoreGroup.com] |
| **CC:** | Xiao H. Song [xsong@contrariancapital.com] |
| **Subject:** | RE: CITGO - PDVSA 2020's |

That's right.  It should be "Credit Bid" not PDVH Transaction.

From: Marco Tramontano <Marco.Tramontano@ashmoregroup.com>
Sent: Monday, February 24, 2025 8:30 AM
To: Xin Xu <Xin.Xu@AshmoreGroup.com>; Josh Weisser <jweisser@contrariancapital.com>
Cc: Xiao H. Song <xsong@contrariancapital.com>
Subject: RE: CITGO - PDVSA 2020's

I agree. Only point is the way "PDVH Transaction" is drafted it is the Red Tree deal or any other deal
(on no worse terms in effect). So we'd just need to make sure it works.

Marco Tramontano
Ashmore Group plc
61 Aldwych, London WC2B 4AE
Tel: +44 (0)20 3077 6372
marco.tramontano@ashmoregroup.com<mailto:marco.tramontano@ashmoregroup.com>
www.ashmoregroup.com<https://url.us.m.mimecastprotect.com/s/mFX7COYqmOCZDQQBtvhATGiILT?domain=ashmoregrou
p.com/>
[FINAL Ashmore_rgb_50mm_transparent_background_email_resize992_97pct]

From: Xin Xu <Xin.Xu@AshmoreGroup.com<mailto:Xin.Xu@AshmoreGroup.com>>
Sent: 24 February 2025 03:25
To: Josh Weisser <jweisser@contrariancapital.com<mailto:jweisser@contrariancapital.com>>; Marco
Tramontano <Marco.Tramontano@ashmoregroup.com<mailto:Marco.Tramontano@ashmoregroup.com>>
Cc: Xiao H. Song <xsong@contrariancapital.com<mailto:xsong@contrariancapital.com>>
Subject: RE: CITGO - PDVSA 2020's

I like the idea. Marco what do you think? We can discuss later.

Sent with BlackBerry Work
(www.blackberry.com<https://url.us.m.mimecastprotect.com/s/w3OZCQWvoQilnZZwcksnTGiD1i?domain=blackberry.c
om>)

From: Josh Weisser <jweisser@contrariancapital.com<mailto:jweisser@contrariancapital.com>>
Date: Monday 24 Feb 2025 at 3:25am
To: Marco Tramontano <Marco.Tramontano@ashmoregroup.com<mailto:Marco.Tramontano@ashmoregroup.com>>
Cc: Xiao H. Song <xsong@contrariancapital.com<mailto:xsong@contrariancapital.com>>, Xin Xu
<Xin.Xu@AshmoreGroup.com<mailto:Xin.Xu@AshmoreGroup.com>>
Subject: CITGO - PDVSA 2020's

Xiao:

Xiao and I were discussing our collective frustration with potential bidders not seriously engaging with
the 2020s.  Unfortunately, it seems like part of their strategy is to wait briefing out and see if they
can force a "better deal" (from the buyer's perspective) on the committee.  To that end, in the RT TSA,
how do you feel about the following addition?

Subject to the consent of the Special Master, if the Credit Bid is selected as the Successful Bid, the
Initial Consenting 2020 Noteholders agree that they will not, directly or indirectly, participate in,
support, solicit, finance, negotiate in respect of an alternative transaction for the purchase of 100% of
the PDVH Shares in the Auction.

The idea would be to force the current bidders to put best foot forward with the 20's now = and if the RT
transaction is selected, give us some additional ammo to go to Failla to delay any hearing on the 20's.
If we signed the TSA, we could legitimately tell bidders (a) they can't go below the RT number AND (b)
there is a limited timeline for them to get to a deal with us.

JPW

Josh Weisser
Managing Director
Contrarian Capital Management, LLC
411 West Putnam Ave. #425
Greenwich, CT 06830
(m) 917-817-3252

**EXHIBIT**
PENGAD 800-631-6989
Song 13
7/29/25

**SONG DEPOSITION EXHIBIT**

(o)  203-862-8278
jweisser@contrariancapital.com<mailto:jweisser@contrariancapital.com>

_____

This communication (including any attachments) is intended only for the named recipient(s) above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this communication in error, please immediately notify the sender and delete the message and any attachment(s) from your system.

Any business communication, sent by or on behalf of Ashmore Group plc or one or more of its subsidiaries or other entities (together, "Ashmore") is confidential and may be privileged or otherwise protected and is intended for the named individual's, entity's or partnership's use only. If you receive this message in error, please delete it and any copies of it from your system immediately, destroy any hard copies and notify the sender. Telephone calls and other communications may be recorded, for purposes including compliance, training and investment.

Ashmore Group plc is a public limited company registered in England and Wales with registered number 3675683. Ashmore Investment Management Limited (AIML) is a private limited company registered in England and Wales with registered number 3344281 and Ashmore Investment Advisors Limited (AIAL) is a private limited company registered in England and Wales with registered number 8723494. AIML and AIAL are authorised and regulated in the United Kingdom by the Financial Conduct Authority. Ashmore Investment Management (Ireland) Limited (AIMIL) is a private limited company registered in Dublin, Ireland with registration number 634470. AIMIL is regulated by the Central Bank of Ireland. Other subsidiaries may be regulated in the various countries in which they operate. Please refer to www.ashmoregroup.com<https://url.us.m.mimecastprotect.com/s/Rzf2CNkplNSPYyygtmfkTyaMY-?domain=ashmoregroup.com> for more information on Ashmore and its subsidiaries.

_____

This communication (including any attachments) is intended only for the named recipient(s) above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this communication in error, please immediately notify the sender and delete the message and any attachment(s) from your system.