Exhibit 73

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## SIXTH SUPPLEMENTAL DECLARATION OF RANDALL J. WEISENBURGER

I, Randall J. Weisenburger, pursuant to Section 1746 of Title 28 of the United States Code, declare as follows:

1.      I submitted declarations in the above-captioned matter on August 25, 2021 (D.I. 354-1), September 10, 2021 (D.I. 355-1), December 17, 2021 (D.I. 423-1), April 11, 2022 (D.I. 457-1), and May 23, 2023 (D.I. 561-1), in support of the Venezuela Parties'[1] objections to the Special Master's (then) proposed procedures for the sale of shares of stock of PDVH and recommendation to initiate the sale procedures. I also submitted a declaration on July 7, 2025 (D.I. 1951-2, Exhibit 1) in support of the Venezuela Parties' objections to the Special Master's Final Recommendation that the Court approve the bid submitted by Dalinar Energy Corporation ("Dalinar") to acquire the PDVH shares for approximately $7.382 billion (the "Dalinar Bid"). D.I. 1837. My previous opinions remain unchanged.

2.      I have been asked by CITGO and PDVH to consider the Special Master's Updated Final Recommendation that the Court allow him to terminate the Dalinar SPA and instead approve an Unsolicited Competing Proposal by Amber Merger Sub LLC ("Amber") to acquire the PDVH shares for approximately $5.892 billion (the "Amber Bid"). D.I. 2123. In connection with this assignment, I have reviewed additional materials produced in relation to the sale process and in this litigation. *See* Exhibit 1.

3.      In his Updated Final Recommendation, the Special Master states that he decided to recommend the $5.892 billion Amber Bid over the $7.382 billion Dalinar Bid, and even over an improved bid submitted by Dalinar valued at approximately $7.9 billion because the Amber Bid includes a purported settlement with the 2020 Bondholders and thus, in the Special Master's view, has greater closing certainty than the Dalinar Bid. *See* D.I. 2123 ¶¶ 15–16.

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in D.I. 481 and as used in my first declaration (D.I. 354-1).

4.      I continue to believe that the Dalinar Bid is inadequate considering the valuations for the PDVH shares conducted by the Special Master's financial advisor and CITGO and PDVH's valuation expert. D.I. 1951-2, Exhibit 1 ¶¶ 3, 95. (And, given that the Amber Bid is lower than the Dalinar Bid, my opinion that the sale process designed and implemented by the Special Master has failed to maximize value and has resulted in a grossly inadequate Recommended Bid, *id.* ¶¶ 21–89, remains unchanged.) I also continue to believe that value could be better maximized by utilizing an alternative process, such as a leveraged recapitalization combined with a public offering, and that more value could be obtained for the PDVH shares if the Special Master and the Court were to wait to sell the shares until after a decision in the SDNY on the validity of the PDVSA 2020 Bonds, particularly now that, as I understand it, Judge Failla has stated her intent to issue a decision by the end of September 2025. All of that said, it is my opinion that the Special Master has not provided a commercially reasonable justification for recommending the Amber Bid over the Dalinar Bid.

5.      No rational seller, such as a sophisticated private equity firm or the management of a sophisticated public or private corporation, would accept a recommendation from its agent to select a bid that is $2 billion (or even $200 million) below the highest bid submitted by a credible bidder for an asset like the PDVH shares without first conducting a comprehensive analysis of the relative closing risk presented by the bids and finding an extremely compelling reason to sacrifice such a significant amount of value.[2] I have not seen—in the Special Master's Updated Final

---

[2] I understand that Amber also offered a sealed amount of additional consideration to Gold Reserve "to extinguish $500 million of Attached Judgments" held by junior Attached Judgment Creditors. D.I. 2123 ¶ 7; [SEALED] D.I. 2125-1, Exhibit G-1 at 1. Because the Special Master represents that the next creditor in the priority line, Gold Reserve, has refused Amber's settlement offer, I have not included the proposal as part of the consideration. Even if the additional $500 million were included in the Amber Bid, however, it would not alter my opinions, given that the Amber Bid still would be more than one billion dollars below the Dalinar Bid. *See* D.I. 2123 ¶ 15.

Recommendation, in any of his prior recommendations, in any of the declarations submitted by William O. Hiltz, or elsewhere—the Special Master or his Advisors provide such an analysis.

6.        For a rational seller to accept the Amber Bid over the Dalinar Bid, the seller would have to conclude that the risk of the Dalinar transaction not closing is sufficiently high to justify giving up $2 billion in consideration that otherwise would go to stakeholders (here, Attached Judgment Creditors and the Republic and PDVSA in the form of debt reduction). To be clear, this closing risk is not the same as simply the risk that the 2020 Bondholders will succeed on their underlying claims. As I understand it, a decision by the SDNY Court that the PDVSA 2020 Bonds are valid would not necessarily prevent Dalinar from closing. Instead, all of the following also must occur: (1) the 2020 Bondholders would have to be able to block Dalinar's current financing arrangements (by obtaining an injunction or a non-stayed judgment *and* an OFAC license to exercise their rights under the CITGO Holding Pledge); (2) Dalinar would have to be unable to secure alternative financing; and (3) Dalinar would have to be unable to reach and finance an agreement with the 2020 Bondholders to release the CITGO Holding Pledge, notwithstanding that Dalinar has obtained commitments for an asset-based revolving credit facility ("ABL Facility") and support for $1.8 billion in preferred equity financing under a "highly confident letter" from J.P. Morgan, one of the world's leading financial institutions. D.I. 2123 ¶ 17.

7.        A rigorous analysis of the likelihood of all of these events occurring would be required to properly evaluate these multiple factors and justify a recommendation to weigh certainty so much more highly over price. As far as I have seen, however, the Special Master and his Advisors have not provided any analysis of the likelihood of any of these events occurring to justify his recommendation, let alone a rigorous one. Instead, they have offered only the unsubstantiated conclusion that "the Special Master, in consultation with his Advisors, determined

that the certainty of closing associated with the Amber Sale Transaction was much higher than that presented by the Dalinar Sale Transaction since it could close regardless of the outcome of the PDVSA 2020 Bondholder litigation." D.I. 2124 ¶ 22 (Decl. of William O. Hiltz in Support of the Special Master's Updated Final Recommendation). Again, without such an analysis, no rational seller would accept the substantially lower Amber Bid over the Dalinar Bid.[3]

8.    The Special Master also states that he did not afford "any material weight" to Dalinar's ABL Facility and highly confident letter. D.I. 2123 ¶ 17. This decision, however, also is not supported by a commercially reasonable analysis. In my experience, the weight to be given to ABL Facilities and highly confident financing letters depends on multiple factors and must be analyzed on a case-by-case basis. A highly confident letter from J.P. Morgan, for example, generally would be viewed as quite credible given J.P. Morgan's strong track record and the reputational effects that would accompany a failure to secure the proposed financing. In my experience, J.P. Morgan would be unlikely to issue a highly confident letter without having conducted a thorough evaluation of the proposed transaction and the likelihood that it could place the proposed securities in the market. Accordingly, it is unreasonable to afford *no* material weight to Dalinar's proposed solution without first evaluating the credibility of the proposed financing and the factors that might affect the financing sources from delivering and estimating the probability that the financing ultimately could be secured in the amounts needed. The Special Master and his Advisors have not provided any such analysis.

---

[3] Amber's decision to agree to a settlement with the 2020 Bondholders of $2.125 billion, *see* D.I. 2123 ¶ 9, does not necessarily reflect Amber's evaluation of the likelihood that the bonds will be found to be valid. Amber presumably does not care whether the money it is paying goes to Attached Judgment Creditors or to the 2020 Bondholders. And without a settlement, Amber would have to bid at least $7.382 billion (the amount of the Dalinar bid) plus whatever overbid minimum the Special Master might require. As such, the settlement is costing it at most only $600 million more than it otherwise would have paid (i.e., $5.892 plus $2.125, or $8.017).

9.      The Special Master opines in his Updated Final Recommendation that it is possible that "the actual availability of a specific amount of ABL proceeds at closing" could be lower based on CITGO's "liquidity and asset borrowing base" at the time of closing. D.I. 2123 ¶ 17. But he does not provide any analysis of the likelihood that Dalinar might be unable to draw the full amount under the ABL Facility's terms. And his only analysis with respect to the preferred equity financing is to state that it is not committed. *See id.* ¶ 17; *see also* D.I. 1837 at 27 n.15 (Original Final Recommendation) ("The Special Master did not afford the JP Morgan HCL material weight given the Bid Requirement for bidders to have committed financing. However, the Proposed Sale Transaction is not conditioned on Dalinar obtaining the Additional Potential Equity Financing.").

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September 3, 2025, at Greenwich, Connecticut.

Randall J. Weisenburger

# Exhibit 1

### Randall J. Weisenburger Sixth Supplemental Declaration Reliance Materials

| Reference | Document |
|---|---|
| D.I. 1951-2 | Eimer Decl. Exhibit 1 (Supporting Ex. 2 – Randall J. Weisenburger Fifth Supplemental Declaration Reliance Materials) |
| D.I. 2003 | Supplemental Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation |
| D.I. 2003-1 – D.I. 2003-7 | Exhibits A–O in Support of Supplemental Declaration of William O. Hiltz [Sealed] |
| D.I. 2004 | Corrected Second Supplemental Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation |
| D.I. 2004-1 – D.I. 2004-8 | Exhibits A–O in Support of Corrected Second Supplemental Declaration of William O. Hiltz [Sealed] |
| D.I. 2123 | Special Master's Updated Final Recommendation |
| D.I. 2123-1 | Special Master's Annex A and Exhibits A–G |
| D.I. 2124 | Declaration of William O. Hiltz in Support of the Special Master's Updated Final Recommendation |
| D.I. 2125 | Special Master's Updated Final Recommendation [Sealed] |
| D.I. 2125-1 | Special Master's Annex A and Exhibits A–G [Sealed] |
| D.I. 2127 | Notice of Filing of Certain Bid Materials Received by the Special Master [Sealed] |
| D.I. 2127 | Special Master's Exhibits A–B [Sealed] |
| D.I. 2135 | Gold Reserve Notice of Competing Objection and Disclosure of Bid Materials |
| D.I. 2135-1 – D.I. 2135-5 | Gold Reserve Exhibits A–E |

Exhibit 74

# CLARK SMITH VILLAZOR

**Clark Smith Villazor LLP**
666 Third Avenue, 21st Floor
New York, New York 10017
www.csvllp.com

**CHRISTOPHER J. CLARK**
D: 212.377.0853
clark@csvllp.com

September 5, 2025

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007
Failla_NYSDChambers@nysd.uscourts.gov

Re:     *Petróleos de Venezuela, S.A. et al.* v. *MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023

Dear Judge Failla:

We write on behalf of the Trustee and the Collateral Agent to provide an update concerning the possible settlement of the 2020 Noteholders' claims as part of the judicial sale of the stock of plaintiff PDV Holding, Inc. ("PDVH") being overseen by Judge Stark in the United States District Court of Delaware.  At the pre-motion conference held on July 10, 2025, the Court inquired about the possibility of settlement between the parties.  While no settlement has been reached with the PDVSA Parties, as discussed below, the Special Master in the Delaware proceeding is now recommending a transaction that includes a proposed settlement with 2020 Noteholders that may resolve the outstanding issues in this case.

As the Court will recall, at the time of the July 10, 2025 pre-motion conference, the Special Master had recommended that Judge Stark approve a transaction in which the PDVH shares would be sold to Dalinar, an acquisition vehicle created by the Gold Reserve Consortium. Because of the problematic financing structure of the Gold Reserve transaction, which would have encumbered by billions of dollars of debt and fundamentally impaired the value underlying the 50.1% of CITGO Holding pledged to the 2020 Noteholders, the Trustee and Collateral Agent discussed with the Court the possibility that they may need to seek an injunction.

Since the July 10 pre-motion conference, however, the Special Master has pivoted and is now recommending the approval of a subsequent unsolicited bid submitted by Amber Energy, which was deemed by the Special Master a superior proposal to the Gold Reserve transaction. *Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-mc-151 (D. Del.) ("*Crystallex*"), ECF No. 2123.  The proposed Amber Energy transaction, which will be considered for approval by Judge Stark at a hearing commencing on September 15, 2025, includes a $2,125,000,000 cash settlement offer to the 2020 Noteholders as set forth in a Transaction Support Agreement ("TSA") entered into by certain of the 2020 Noteholders.  Under the TSA, over 75% of the 2020 Noteholders have already agreed to sell their 2020 Notes to

The Honorable Katherine Polk Failla
United States District Judge
Page 2

Amber Energy for a share of the settlement proceeds in a private exchange offering, and Amber Energy has agreed to offer to buy all of the remaining 2020 Notes in a public exchange offering in connection with the closing of the Amber Energy transaction.  Amber Energy would then extinguish all the 2020 Notes tendered to it by all of the tendering 2020 Noteholders.  *See Crystallex* Aug. 18, 2025 Hr'g Tr. at 194:5-21 (attached hereto as Exhibit 1).

The 2020 Noteholders who have signed the TSA have agreed, subject to Judge Stark's entry of an order approving the Amber Energy transaction, to direct the Trustee and Collateral Agent in accordance with the Indenture and Pledge Agreement to release the lien under the Pledge Agreement on behalf of all 2020 Noteholders.[1]  For that reason, the remaining 2020 Noteholders should be strongly incentivized to accept the Amber Energy exchange offer for their outstanding 2020 Notes. The upshot of the settlement is that, if the Amber Energy transaction closes and all 2020 Notes are exchanged, the claims in this case would be extinguished.  Judge Stark has scheduled a final sale hearing for September 15–18, 2025 (which may be extended to include October 20–21, 2025).

The Trustee and the Collateral Agent defer to the Court's judgment regarding any impact of the potential settlement on the Court's timing in rendering a decision on the parties' pending motions for summary judgment.

Respectfully submitted,

*/s/ Christopher J. Clark*
Christopher J. Clark

cc:  Counsel of Record (By ECF)

---

[1]    The Trustee and Collateral Agent do not contemplate receiving a formal direction from the requisite 2020 Noteholders under the TSA to release the Collateral or take other actions in furtherance of the Amber Energy transaction unless and until Judge Stark approves the Amber Energy transaction and it proceeds to closing.  The Trustee and Collateral Agent each reserve all rights under the Indenture and related agreements with respect to all such directions, including without limitation, the right to satisfactory indemnity.

CLARK SMITH VILLAZOR

# EXHIBIT 1

Page 1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE STATE OF DELAWARE
2                       -   -   -
3    CRYSTALLEX INTERNATIONAL :   NO. 2023-cv-1074
     CORP.,                    :
4                              :
                    Plaintiff,:
5                              :
         v.                    :
6                              :
     BOLIVARIAN REPUBLIC OF    :
7    VENEZUELA,                :
                               :
8                   Defendant.:
9                       -   -   -
10                  August 18, 2025
11                      -   -   -
12              Hearing in the above captioned
13           matter, held at United States
14           District Court, 844 N. King Street,
15           Unit 18, Wilmington, Delaware
16           19801, beginning at approximately
17           10:00 a.m., before Mary Hammond, a
18           Certified Shorthand Reporter and
19           Notary Public in the state of
20           Pennsylvania.
21
22
23
24

1          THE COURT:  Anybody that
2     absolutely has to be heard briefly?
3          MR. KIRPALANI:  Thank you for
4     the intro, Your Honor.
5          Susheel Kirpalani of Quinn
6     Emanuel, Urquhart & Sullivan, on
7     behalf of Amber Energy.
8          And, actually, the reason we
9     didn't stand up before is because
10     we only wanted to speak if it was
11     absolutely essential, but I don't
12     think it's fair to the participants
13     or to the Court to not confirm on
14     the record what counsel for the
15     2020 Noteholders had said, which is
16     that if Amber Energy is selected as
17     the Superior Bid, we will
18     extinguish all of the 2020 bonds
19     that come into our settlement and
20     that will be on offered to all of
21     them.
22          And to the extent the Special
23     Master wants to work that into a
24     finding SPA or related document,

Exhibit 75

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, <br><br> Defendants. | Case No. 19 Civ. 10023 (KPF) |

**BRIEF OF THE BOLIVARIAN REPUBLIC OF VENEZUELA AS *AMICUS CURIAE***

<u>**TABLE OF CONTENTS**</u>

**Page**

INTEREST OF *AMICUS CURIAE*............................................................................................1

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT...............................................................................................................................3

I.      Legal and Factual Background ...................................................................................3

II.     Procedural Background................................................................................................9

SUMMARY OF ARGUMENT ..............................................................................................10

ARGUMENT ............................................................................................................................11

I.      The Exchange Offer Was Unauthorized and Void *Ab Initio* Under Articles 150 and 187(9) of Venezuela's Constitution. ...............................................................11

      A.     The Exchange Offer Required National Assembly Approval. ............................11

      B.     Venezuelan Law Places the Burden on the Proponent of a National Public Interest Contract to Obtain National Assembly Authorization—Not on Its Opponents to Obtain National Assembly Disapproval........................................13

      C.     The Republic's Explanation of Venezuelan Law Should Be Given Force...........15

II.     The Court Should Recognize the Republic's Acts Under the Act-of-State Doctrine.......................................................................................................................17

      A.     The National Assembly's Declaration of Its Authority to Authorize and Approve the Transaction, and Its Refusal to Do So, Are Acts of State.................17

      B.     The Court Misinterpreted the May and September 2016 Resolutions and the Opinion of the Special Attorney General.........................................................20

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allied Bank International v. Banco Credito Agricola*,
  757 F.2d 516 (2d Cir. 1985)..................................................................................19

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
  585 U.S. 33 (2018)...............................................................................9, 14, 15, 16

*Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*,
  658 F.2d 903 (2d Cir. 1981)..................................................................................17

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964)..............................................................................................17

*Braka v. Bancomer, S.N.C.*,
  762 F.2d 222 (2d Cir. 1985)............................................................................18, 19

*Callejo v. Bancomer, S.A.*,
  764 F.2d 1101 (5th Cir. 1985) .........................................................................18, 19

*D'Augusta v. Am. Petroleum Inst.*,
  117 F.4th 1094 (9th Cir. 2024) .............................................................................18

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  313 F.3d 70 (2d Cir. 2002)....................................................................................16

*Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A.*,
  106 F.4th 263 (2d Cir. 2024) ...........................................................6, 10, 17, 18

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  495 F. Supp. 3d 257 (S.D.N.Y. 2020).......................................................... passim

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  51 F.4th 456 (2d Cir. 2022) ..................................................................................10

*Republic of Philippines v. Marcos*,
  806 F.2d 344 (2d Cir. 1986)..................................................................................21

*Underhill v. Hernandez*,
  168 U.S. 250 (1897)...............................................................................................21

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
  493 U.S. 400 (1990)...............................................................................................18

**STATE CASES**

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.,*
    41 N.Y.3d 462 (2024) ...................................................................................10, 11, 14

**VENEZUELAN CASES**

TSJ, Const. Chamber, No. 953 (Apr. 29, 2003) .......................................................4, 13

TSJ, Const. Chamber, No. 2241 (Sept. 24, 2002)..................................................12, 13

TSJ, Pol.-Admin. Chamber, No. 416 (May 4, 2004) .....................................................4

TSJ, Pol.-Admin. Chamber, No. 847 (Jul. 16, 2013)................................................4, 13

**VENEZUELAN CONSTITUTIONAL PROVISIONS**

Venez. Const. art. 150............................................................................................ passim

Venez. Const. art. 187...................................................................................................10

Venez. Const. art. 187(9) ........................................................................................ passim

Venez. Const. art. 233.....................................................................................................8

Venez. Const. art. 285(3) ...............................................................................................23

Venez. Const. art. 285(7) ...............................................................................................23

Venez. Const. art. 302...........................................................................................4, 6, 23

Venez. Const. art. 303...........................................................................................4, 6, 23

**OTHER VENEZUELAN SOURCES**

Decree No. 2,323, Official Gazette No. 6,227 (May 13, 2016)..................................5, 20

Official Gazette No. 6,154 (Nov. 19, 2014) ...................................................................4

## INTEREST OF *AMICUS CURIAE*[1]

The Republic[2] respectfully submits this brief to address matters of vital importance to the future of the Republic, its legitimate government, and the ultimate restoration of democracy in Venezuela.  In 2016, at the behest of the illegitimate regime of Nicolás Maduro, PDVSA pledged a controlling interest in the parent company of CITGO, the foreign "crown jewel" of the Venezuelan oil industry, as collateral for the 2020 Notes at issue in this case.  That pledge (and the Exchange Offer that depended on the pledge) was invalid under Venezuelan law because it was never authorized by the National Assembly, as required by the Venezuelan Constitution.

The Republic has a sovereign interest in ensuring that this unconstitutional act is not given force and that the separation-of-powers principles enshrined in its Constitution are respected by other states.  It also has an interest in United States courts' deference to its acts of state, including steps taken by the National Assembly to repudiate the pledge on which the proposed Exchange Offer depended.  Finally, the Republic has an interest here because attempts to enforce the invalid 2020 Notes threaten to cripple the Republic's ongoing efforts to restore democracy in Venezuela and to bring humanitarian relief to the Venezuelan people.

## PRELIMINARY STATEMENT

In 2016, the illegitimate Maduro regime directed PDVSA to issue the 2020 Notes, backed by a pledge of the controlling interest in CITGO Holding as collateral, in defiance of the

---

[1]     The Republic's counsel authored this brief in its entirety and no party or its counsel, or any other person or entity other than the *amicus* or its counsel, has made a monetary contribution that was intended to fund the preparation or submission of this brief.  This brief is filed on behalf of the Venezuelan National Assembly that was elected in 2015, speaking for the Republic.  The United States continues to recognize the 2015 National Assembly as the sole legitimate government of Venezuela.  *See* U.S. Dep't of State, U.S. Relations with Venezuela (July 18, 2024), https://www.state.gov/u-s-relations-with-venezuela/.

[2]     Except as otherwise stated, capitalized terms have the definitions set forth in *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257 (S.D.N.Y. 2020) ("*PDVSA I*").

National Assembly's constitutional authority.  Venezuela's Constitution unambiguously prohibits national public interest contracts with foreign entities—a category that encompasses the 2020 Notes transaction—unless the National Assembly authorizes the contract prior to execution.  That authorization never took place.  As a result, that purported pledge (and the Exchange Offer within which it appeared) was invalid, and the 2020 Notes were unauthorized and void *ab initio*.

Defendants' efforts to enforce the Maduro regime's illegal Exchange Offer pose a grave threat to the efforts of the Venezuelan people and their legitimate government to restore democracy in Venezuela.  In the July 2024 election, the Venezuelan people rejected Mr. Maduro's authoritarian rule, instead overwhelmingly electing opposition candidate Edmundo González Urrutia.  Although the United States has recognized Mr. González as president-elect of Venezuela, the Maduro regime has refused to honor the results.[3]  And while the Republic's legitimate government and the international community pressure Mr. Maduro to cede power, his regime has continued to exploit the propaganda value of this proceeding (and others in United States courts) to prop up his regime and discredit the legitimate opposition.  Indeed, as the United States has recognized, attempts to deprive the Venezuelan people and their legitimate government of control over CITGO, if successful, would be "a great political victory for the Maduro regime."  *Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*, No. 17-mc-151, ECF

---

[3]    *See* Antony J. Blinken, *Condemning Nicolás Maduro's Illegitimate Attempt to Seize Power in Venezuela and Announcing New Actions Against Maduro and His Representatives and to Support the Venezuelan People*, U.S. Dep't of State (Jan. 10, 2025), https://www.state.gov/office-of-the-spokesperson/releases/2025/01/condemning-nicolas-maduros-illegitimate-attempt-to-seize-power-in-venezuela-and-announcing-new-actions-against-maduro-and-his-representatives-and-to-support-the-venezuelan-people; Transcript of Background Press Call on Venezuela (Nov. 27, 2024), https://www.whitehouse.gov/briefing-room/pressbriefings/2024/11/27/background-press-call-on-venezuela/.

No. 212-1, at 4 (D. Del. July 16, 2020) (letter from U.S. Special Representative for Venezuela Elliott Abrams); *see also* ECF No. 213-1, at 3 (Mr. Abrams stating that the interim government's legitimacy "would be severely eroded were creditors able to take control of CITGO").

Ensuring the recovery of the Venezuelan oil industry, and in particular CITGO, is indispensable to the ultimate restoration of democracy in Venezuela.  To be sure, and as the legitimate government has long made clear, the Republic fully intends to resolve all legitimate claims of its creditors.  But the Republic cannot recognize the validity of the Exchange Offer because its pledge of vital public assets as collateral violates the Venezuelan Constitution.  The Second Circuit has now made clear that the validity of the Exchange Offer must be determined under the law of Venezuela.  Correctly interpreted and applied, Venezuelan law mandates that this Court reject the Maduro regime's attempt to prop up its unconstitutional dictatorship by alienating a crucial part of Venezuela's national patrimony through an Exchange Offer and pledge that lacked the constitutionally-required authorization of the National Assembly.

## STATEMENT

### I.    Legal and Factual Background

Article 150 of Venezuela's Constitution provides that "[n]o . . . national public interest contract shall be executed . . . with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly."  ECF No. 126-4, at 37.  Article 187(9) reiterates that "[i]t is the role of the National Assembly" to "[a]uthorize contracts of . . . national public interest[] . . . with companies not domiciled in Venezuela." *Id.* at 37-38.[4]  In Venezuela's civil law system, the National Assembly is the first-instance interpreter of the

---

[4]    These absolute provisions stand in contrast to provisions in the same Articles concerning public interest contracts with companies domiciled in Venezuela, as to which National Assembly approval or authorization is required only as "determined by law."  ECF No. 126-4, at 37.

Constitution whenever it enacts laws, adopts Resolutions, or performs other parliamentary acts in accordance with its constitutional authority. *See, e.g.*, ECF No. 119-1, ¶ 53 (citing sources).

PDVSA is a "decentralized entity of the Public Administration" of Venezuela. ECF No. 80 ("Vecchio Letter"), ¶ 10. The close connection of such entities to the State itself subjects them to the mandatory rules of public law in Venezuela, including those governing public contracting. *See* Official Gazette No. 6,154 (Nov. 19, 2014). In addition to the Articles discussed above, the Constitution also contains Articles 302 and 303, which recognize the special importance of the petroleum industry, and of PDVSA in particular. Article 302 reserves to the Republic, "for reasons of national expediency, the control over the petroleum industry and other public interest industries, operations and goods and services of a strategic nature." ECF No. 126-4, at 38. Article 303 provides that the Republic owns PDVSA for "reasons of economic and political sovereignty and national strategy." *Id*. The Republic has long recognized that important contracts of PDVSA—particularly those that impact national public assets—can constitute national public interest contracts. For example, in 2006, the National Assembly invoked its constitutional authority under Article 150 to authorize a joint venture agreement between a PDVSA subsidiary and foreign corporations. Vecchio Letter ¶ 4.

Venezuela's Supreme Tribunal of Justice ("TSJ") has also held that PDVSA is a state-owned enterprise in charge of national public interest activities. Vecchio Letter ¶ 3 (citing TSJ, Pol.-Admin. Chamber, No. 416 (May 4, 2004)). The TSJ has repeatedly held that contracts of state-owned enterprises can be national public interest contracts. *See, e.g.*, TSJ, Const. Chamber, No. 953 (Apr. 29, 2003) (contracts of state-owned enterprise EDELCA were national public interest contracts)); TSJ, Pol.-Admin. Chamber, No. 847 (Jul. 16, 2013) (same with state-owned enterprise DIANCA). Until the pledge and issuance of the 2020 Notes that are at issue in this

litigation, PDVSA had *never* attempted to pledge strategic assets without the prior authorization of the National Assembly.  Vecchio Letter ¶¶ 7, 11.

PDVSA's ownership of CITGO Holding, the owner of the major oil refiner CITGO, is a "vital asset of Venezuela's most vital industry." *Id.* ¶ 8 n.6.  Thus, the purported pledge of a controlling interest in CITGO "impacts *the economic and social life of the Nation*."  ECF No. 164-10 ("Special AG Report"), ¶ 123.  In the considered view of the Republic, discussed *infra*, the indenture and pledge at issue in this litigation and the 2020 Notes issued thereunder are national public interest contracts.  Vecchio Letter ¶ 8; Special AG Report ¶ 106.

Attempted usurpations of power by the Maduro regime in 2016 caused the National Assembly to assert its constitutional authority with respect to public interest contracts twice that year.  On May 13, 2016, Mr. Maduro issued a decree claiming the power to enter into contracts of national public interest without the prior authorization of the National Assembly.  Decree No. 2,323, Official Gazette No. 6,227, May 13, 2016 (cited at ECF No. 119-1, ¶ 68).  Less than two weeks later, on May 26, 2016, the National Assembly enacted a resolution that rejected this authoritarian measure.  That Resolution (a) stated that Article 150 "categorically mandates, *without exception*, the approval of the National Assembly" for contracts of national, state, or municipal public interest with companies not domiciled in Venezuela, including those executed by other than the National Executive; (b) stated that national public interest contracts include "[t]hose contracts that are linked to major procurements that could seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country"; (c) rejected the portions of Mr. Maduro's decree that claimed the authority to enter into such contracts "without the approval of the National Assembly"; (d) "warn[ed] that any activity carried out by an organ that usurps the

constitutional functions of another public authority is null and void and shall be considered non-existent"; and (e) resolved to disseminate the Resolution so that foreign governments and companies would know "about the nullity of the contracts that are concluded in contravention of Article 150." ECF No. 126-13 ("May 2016 Resolution"), at 7-9 (emphasis added).

Mr. Maduro's second attempted usurpation that year, the Exchange Offer at issue in this litigation, was announced in September 2016. PDVSA—whose then-President, Eulogio del Pino, served simultaneously as Mr. Maduro's Minister of Petroleum—announced its offer to issue the 2020 Notes, secured by a first-priority lien on 50.1% of CITGO Holding's stock, in exchange for the unsecured 2017 Notes. ECF No. 126-5, at 17, 133-34. In response, the National Assembly again asserted its authority as first-instance interpreter of the Constitution and as the only branch of government constitutionally charged with authorizing national public interest contracts. Consistent with the understanding that the Exchange Offer, and the pledge therein, were national public interest contracts, the President of the National Assembly's Comptroller's Commission (the organ responsible for monitoring the use of public funds) announced that the Assembly "will not acknowledge any national interest contract that does not come before this National Assembly" and that creditors "will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA." ECF No. 126-14, at 41.

"Immediately after PDVSA announced that its Board had approved the Exchange Offer," *Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 266 (2d Cir. 2024) ("*PDVSA IV*"), the National Assembly enacted a Resolution on September 27, 2016. The National Assembly invoked Article 187(9)—the constitutional provision that gives the National Assembly the exclusive power to "[a]uthorize contracts of . . . national public interest" with foreign companies, ECF No. 126-4, at 38—as well as Articles 302 and 303, the provisions that

emphasize the national importance of the petroleum industry and PDVSA. ECF No. 1-3 ("September 2016 Resolution"), at 8. The September 2016 Resolution "*reject[ed] categorically* that, within the swap transaction, 50.1% of the shares . . . of Citgo Holding . . . are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation." *Id* (emphasis added). It summoned Mr. del Pino "to appear before this National Assembly" to explain himself. *Id.* It demanded a criminal investigation "to determine if the current transaction protects the National Property." *Id.* And because of CITGO's importance as a national asset, it urged PDVSA to develop "a plan for the refinancing of its financial commitments." *Id.*

Mr. Maduro again defied the Resolutions, refused to request authorization for the Exchange Offer from the National Assembly as required by the Constitution, and ignored the National Assembly's invocation of its constitutional authority to refuse to authorize the proposed transaction as structured. Instead, working through Mr. del Pino, Mr. Maduro proceeded with the pledge and the Exchange Offer, issuing the 2020 Notes on October 28, 2016.

By then, it was public knowledge in the financial markets that the Exchange Offer was unconstitutional under Venezuelan law and therefore illegal. Both Resolutions had been widely broadcasted to the public—including because of the National Assembly's instruction that the Resolutions be "publicize[d]," "disseminate[d]," and sent to "all Embassies in [Venezuela] . . . to inform the Governments of the States they represent and the corresponding companies about the nullity of the contracts," September 2016 Resolution at 8; May 2016 Resolution at 9—and resulted in several media and analyst reports in Venezuela and abroad. *See* ECF No. 117, at 13-14 (citing reports). Investors took heed and, as expected, most holders of 2017 Notes—over 60%—recognized the illegal character of the Exchange Offer and declined to exchange their Notes, despite the substantial economic benefits the Exchange Offer seemed to promise and the

significant risk of default for 2017 Notes.  Only 39.43% of the 2017 Notes were tendered by investors willing to take their chances that the Maduro regime would get away with its unlawful and unconstitutional usurpation of authority in issuing the Notes.

In 2019, after Interim President Juan Guaidó became the Republic's legitimate chief executive,[5] he received from Special Attorney General José Ignacio Hernández an analysis of the Exchange Offer.  In a thorough analysis filling 55 single-spaced pages, the Special Attorney General

> concluded that the indenture is a national public interest agreement that, as such, should have been previously authorized by the National Assembly pursuant to article 150 of the Constitution.  Owing to the lack of authorization, [PDVSA] did not have the legal capacity to sign that agreement, which is invalid under Venezuelan Law.

Special AG Report ¶ 2.  He reported that "the defect is the violation of article 150 of the Constitution, since PDVSA signed the issuing contract without prior authorization from the National Assembly."  *Id.* ¶ 164.  He further noted that the National Assembly "questioned . . . the Bond," a fact that bondholders "should have been aware" of.  *Id.* ¶ 161.  Therefore, "a conclu[sion] that the Bond was invalid[]" cannot "surprise those bond-holders in good faith."  *Id*.  And while he noted that the National Assembly "did not declare the unlawfulness of that Bond," *id.* ¶ 160, at the time the National Assembly considered the Exchange Offer and pledge, the 2020 Notes had not yet been issued.  There were, at that point, no Bonds to declare unlawful.  Instead, the National Assembly withheld authorization over the Exchange Offer and pledge to express its *ex ante* disapproval of the Notes' anticipated issuance.

By Resolution dated October 15, 2019 (the "October 2019 Resolution"), the National Assembly "ratif[ied] that the 2020 Bond indenture violated Article 150 of the Constitution . . . ,

---

[5]     Following illegitimate elections administered by Mr. Maduro—who, among other things, banned opposition parties from participating—the National Assembly invoked Article 233 of Constitution in January 2019 and named Mr. Guaidó as Interim President.

since it concerned a national public contract, executed with foreign companies, which was not authorized by the National Assembly." ECF No. 1-4, at 8.

## II. Procedural Background

In June 2020, Carlos Vecchio, then the Republic's Ambassador to the United States, submitted a letter setting forth the Venezuelan constitutional, legislative, and judicial authorities and principles summarized above.[6] The letter also explained that "the absence of the National Assembly's authorization of the CITGO pledge," as well as the enactment of the May 2016, September 2016, and October 2019 Resolutions, meant that no such authorization ever occurred. *Id.* ¶¶ 5, 24. The Letter asked the Court to defer to those "official acts taken wholly within Venezuela by the National Assembly," which render the 2020 Notes and their underlying pledge "invalid, illegal, and null and void *ab initio*." *Id.* ¶ 25.

Both Plaintiffs and Defendants filed for summary judgment. ECF Nos. 81 & 91. On October 16, 2020, this Court denied Plaintiffs' motion and substantially granted Defendants' motion. The Court acknowledged its obligation to "accord respectful consideration" to the Ambassador's Letter as a foreign government's official statement on the interpretation and meaning of its own domestic law. *PDVSA I*, 495 F. Supp. 3d at 279 (quoting *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 36 (2018)). But the Court declined to analyze Venezuelan law and did not rely on any of the materials provided by the Ambassador or the parties' Venezuelan law experts. Instead, the Court opined that Venezuelan law is "ultimately irrelevant to this action." *Id.* at 292.

---

[6] Though Defendants filed a motion to strike the Ambassador's Letter, *see* ECF No. 145, this Court denied that motion, noting that "insofar as the Letter offers views or interpretations of Venezuelan law—an issue that is at the heart of the instant litigation—it is proper for the Court to take into consideration under [Federal Rule of Civil Procedure] 44.1." ECF No. 199, at 2.

On appeal, the Second Circuit certified to the New York Court of Appeals the question of whether New York law requires the validity of the 2020 Notes to be determined under Venezuelan law. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 475 (2d Cir. 2022) ("*PDVSA II*").[7]  The New York court answered affirmatively, holding that a court must apply Venezuelan law in determining "whether the 2020 Notes are invalid due to a defect in the process by which the securities were issued." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 473 (2024) ("*PDVSA III*").  Specifically, the New York court held that "determining whether the securities . . . are valid requires analysis of Article 150 and related provisions of the Venezuelan Constitution" *Id.* at 477 (quotation marks omitted).  Citing both Articles 150 and 187, the court found that those "provisions may address the procedural requirements and approvals necessary for—and present a discrete limitation on—the authority of certain public entities to enter into 'national public interest contracts.'" *Id.* at 479-80.

The Second Circuit remanded this action back to this Court, instructing this Court to "determine whether the 2020 Notes and associated instruments were issued in violation of the Venezuelan Constitution and are thus invalid" and to reconsider its prior holding that the act-of-state doctrine "did not apply." *PDVSA IV*, 106 F.4th at 268-69.[8]

## SUMMARY OF ARGUMENT

"[D]etermining whether the securities issued by the[] Venezuelan entities are valid requires analysis of Article 150 and related provisions of the Venezuelan Constitution." *PDVSA*

---

[7]      The Republic filed *amicus* briefs before both the Second Circuit and the New York Court of Appeals explaining its considered views—consistent with those presented in this brief and Ambassador Vecchio's Letter—on the application of Venezuelan law.

[8]      On remand, this Court endorsed a proposal from the parties that they would submit supplemental briefs to discuss both issues.  ECF No. 320, at 2.  Similarly, the Republic here focuses on these issues and does not address other issues that may be relevant to this litigation. As the parties did in their joint proposal, *see id.*, the Republic reserves the ability to address other issues in a future filing.

*IV*, 106 F.4th at 268 (quoting *PDVSA III*, 41 N.Y.3d at 477). Under Articles 150 and 187(9) of the Constitution, any national public interest contract with a foreign company must be authorized by the National Assembly. The Exchange Offer, including the purported pledge of a controlling interest in CITGO Holding, was a national public interest contract with foreign companies. The National Assembly did not authorize the 2020 Notes. To the contrary, invoking its constitutional authority to authorize national public interest contracts, it categorically rejected a pledge of the CITGO interest or "any other property of the Nation." The Exchange Offer was therefore unauthorized, unconstitutional, and void *ab initio* under Venezuelan law.

The act-of-state doctrine provides a second and independent reason to conclude that the Exchange Offer is invalid and void. The National Assembly's May and September 2016 Resolutions asserted the Assembly's constitutional authority as the branch of government responsible for authorizing national public interest contracts, invoked that authority with respect to the proposed Exchange Offer, and categorically rejected the pledge of strategic national property on which the proposed Exchange Offer depended. The National Assembly thus considered and declined to authorize the proposed Exchange Offer, preventing the 2020 Notes from being validly issued; these decisions should be recognized as sovereign acts of state.

## ARGUMENT

**I.    The Exchange Offer Was Unauthorized and Void *Ab Initio* Under Articles 150 and 187(9) of Venezuela's Constitution.**

### A.    The Exchange Offer Required National Assembly Approval.

Article 150 unambiguously provides that "[n]o municipal, state or national public interest contract shall be executed . . . with companies not domiciled in Venezuela, . . . without the approval of the National Assembly." ECF No. 126-4, at 37. Article 187(9) reiterates that it is the National Assembly's role to authorize such contracts. *Id.* at 38.

In the September 2016 Resolution, the National Assembly concluded that the documents that created the 2020 Notes, including the purported pledge, constituted a national public interest contract. That has been the Republic's considered view throughout this litigation and remains the Republic's view today. PDVSA is "a state-owned enterprise in charge of national public interest economic activities," and CITGO is "PDVSA's greatest strategic asset abroad." Vecchio Letter ¶¶ 3, 7. The National Assembly has consistently treated important contracts of PDVSA as national public interest contracts. *Id.* ¶¶ 3-4, 8-10. The Maduro regime's attempt to pledge 50.1% of PDVSA's interest in CITGO Holding, together with its purported pledge of the remaining 49.9% to the Russian oil company Rosneft, have rightly been described by the National Assembly as an "attempt to conduct a *de facto* privatization of PDVSA." *Id.* ¶ 10.[9] As the Republic's Ambassador put it, the Indenture and Pledge for the 2020 Notes "are national public interest contracts under any possible definition." *Id.* ¶ 8.

The contracts at issue were also with companies not domiciled in Venezuela. The parties to the Indenture were PDVSA; its subsidiary PDVSA Petróleo; MUFG, a U.S. national banking association; GLAS, a New York limited liability company; and other entities formed under New York and Luxembourg law. ECF No. 126-10, at 1. The Pledge and Security Agreement was entered among PDVSA, PDV Holding, Inc., MUFG, and GLAS. ECF No. 126-11, at 5.

Because the Indenture and Pledge were national public interest contracts with companies domiciled outside Venezuela, under Article 150 and Article 187(9), those contracts are void *ab initio* without the authorization of the National Assembly. Defendants have previously argued that the TSJ's decision in *Andrés Velásquez*, TSJ, Const. Chamber, No. 2241 (Sept. 24, 2002),

---

[9]     Unlike the September 2016 Resolution—which disapproved of the Exchange Offer and the associated pledge *before* the relevant Bonds were issued—the National Assembly expressed its *ex post* disapproval of the purported pledge to Rosneft. *See id.*; *infra*, p. 22.

supports the view that *only* contracts to which the Republic is a party can be national public interest contracts. *See* ECF No. 135, at 39-41. It is the Republic's considered view that this interpretation of *Andrés Velásquez* is incorrect. In that decision, the TSJ stated that "contracts concluded by the Republic through the competent organs of the National Executive . . . whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts." ECF No. 128-7, at 17. But that decision states that such contracts "concluded by the Republic" are "*included*" within the category of national public interest contracts, not that national public interest contracts are *exclusively limited* to those entered into by the Republic. Not only is that latter interpretation unsupported by the text of *Andrés Velásquez*, it is also inconsistent with later decisions involving contracts entered into by state-owned enterprises like EDELCA or DIANCA. *See, e.g.*, TSJ, Const. Chamber, No. 953 (Apr. 29, 2003); TSJ, Pol.-Admin. Chamber, No. 847 (Jul. 16, 2013). And, of course, such an interpretation would be inconsistent with the Resolutions of the National Assembly—the first-instance interpreter of the Constitution—regarding PDVSA.

### B. Venezuelan Law Places the Burden on the Proponent of a National Public Interest Contract to Obtain National Assembly Authorization—Not on Its Opponents to Obtain National Assembly Disapproval.

Venezuelan law—which the Second Circuit has held must be applied in analyzing whether the 2020 Notes and pledge are invalid—requires that the proponents of the Exchange Offer obtain National Assembly approval in order for the notes and pledge to be considered valid. Article 150 of the Constitution provides that "[n]o . . . contract shall be executed . . . without the approval of the National Assembly." ECF No. 126-4, at 37. That language is unambiguous. It requires the *proponent* of a national public interest contract to obtain the National Assembly's approval prior to execution of the contract—not the *opponent* of such a

contract to have the National Assembly affirmatively invalidate it. In other words, any national public interest contract executed without the approval of the National Assembly is unlawful and without force. This is why the New York Court of Appeals correctly described the question presented here as whether the Maduro regime's "failure to *receive authorization* from the National Assembly *prior to* issuing the 2020 notes"—and not any purported failure of the National Assembly to overtly disapprove of the transaction after it was announced—"means that the notes were invalid under the law of Venezuela at the time of their issuance." *PDVSA III*, 41 N.Y.3d at 482 (emphasis added).

The National Assembly has repeatedly reaffirmed this understanding of Articles 150 and 187(9). The Assembly's May 2016 Resolution, enacted in direct response to Mr. Maduro's announced intention to enter national public interest contracts without National Assembly authorization, expressly invoked the Assembly's authority under Article 187(9), "rejected" Mr. Maduro's claim to the authority to do so, "remind[ed]" the world of the need for National Assembly approval, and "inform[ed]" foreign governments and companies "about the nullity of the contracts that are concluded in contravention of Article 150." May 2016 Resolution at 8-9. Still, Mr. Maduro purported to go forward with the Exchange Offer, never requesting authorization from the National Assembly as required by Articles 150 and 187(9). In response, the National Assembly issued the September 2016 Resolution, again invoking Article 187(9)— the provision that assigns to the National Assembly the sole authority to authorize national public interest contracts—and "reject[ing] categorically" PDVSA's attempted pledge of the CITGO Holding shares. September 2016 Resolution at 8. The National Assembly reiterated the same understanding in its October 2019 Resolution. ECF No. 1-4, at 6-9.

## C.   The Republic's Explanation of Venezuelan Law Should Be Given Force.

As this Court has previously recognized, *PDVSA I*, 495 F. Supp. 3d at 279, when a foreign government submits a statement interpreting its own laws, a federal court must accord that interpretation "careful[]" and "respectful" (even if not "conclusive") consideration. *Animal Sci. Prods.*, 585 U.S. at 36, 43.  That deferential approach honors "the spirit of 'international comity.'"  *Id.* at 43 (citation omitted).

Here, the Republic confirms that the "2020 Notes were issued as a result of an illegal and unconstitutional transaction aimed to circumvent the political control of the National Assembly over the public national interest contract."  Vecchio Letter ¶ 18.  The Republic also confirms that the "2020 Notes, including the Pledge and Indenture, were therefore void *ab initio*."  *Id.*  Those conclusions follow directly from a plain reading of Venezuela's Constitution as discussed above. The Republic's official interpretation of Venezuelan law, as expressed in the present brief, further supports this reading.  Indeed, each of the considerations the Supreme Court identified in *Animal Science Products*, 585 U.S. at 43, supports accepting the Republic's considered views:

- ***The "statement's clarity, thoroughness, and support."***  Like the Vecchio Letter previously submitted to this Court, this brief clearly sets forth Venezuela's interpretation of its applicable law and discusses the reasoning underlying its interpretation thoroughly. The Republic's interpretation of the relevant issues of Venezuelan law presented here was not manufactured for purposes of this litigation.  Rather, as the Republic's submissions demonstrate, its views are thoroughly supported by provisions of Venezuela's Constitution (including Articles 150 and 187(9)), Resolutions of the National Assembly (including the May and September 2016 Resolutions and others that predate those two), and other authoritative sources.

- ***The "transparency of the foreign legal system."***  The authorities cited by the Republic are readily available for review, as the extensive discussions by the parties' expert witnesses in the original summary judgment briefing demonstrate.  Moreover, the 2015 National Assembly, on whose behalf this brief is being submitted, was democratically elected and is committed to the rule of law.  Its enactments (including the Resolutions in question here) were passed through orderly and transparent legislative processes, including public debate.  And unlike in *Animal Science Products*—where the Chinese government "had not identified any written law or regulation" supporting its views on

what Chinese law required, 585 U.S. at 38—here, the relevant constitutional and legislative provisions are fully available in the record.

- ***The "context and purpose" of the statement.***  The Republic has been transparent about its context and purpose: to vindicate the National Assembly's constitutional role in authorizing contracts in the national public interest, and to explain why the Maduro regime's pledge of a controlling interest in a strategic national asset—in defiance of the Venezuelan Constitution and the Resolutions of the National Assembly—was void under Venezuelan law.  It is difficult to imagine an interest more deserving of comity than a sovereign's desire to enforce its Constitution and to ensure respect for the separation of powers that the Constitution reflects.

  Although this Court has previously opined that the Republic's earlier submission was "offered specifically for the purposes of this litigation," *PDVSA I*, 495 F. Supp. 3d at 280, the relevant question is not whether the Republic's submissions were offered to influence this litigation—that will *always* be the case when a foreign sovereign makes such a submission.  *See, e.g.*, *Animal Sci. Prods.*, 585 U.S. at 37 (noting that the views of the foreign sovereign were submitted to the district court in the form of an *amicus* brief).  What matters is whether the position expressed in such a submission was newly invented in order to influence the litigation.  That is not the case here.  The legal principles set forth in this brief are long-standing.  They are unambiguously enshrined in Venezuela's Constitution; they were articulated and applied in the May and September 2016 Resolutions; and they were ratified in the October 2019 Resolution.  Moreover, the National Assembly has applied the same principles to condemn other usurpations by the Maduro regime, such as the attempt to pledge 49.9% of CITGO to Rosneft and the purported creation of a PDVSA "litigation trust."  Vecchio Letter ¶ 10.  That the Republic and its citizens have an important economic and political interest in this litigation hardly makes the Republic's interpretation of its own laws less worthy of respectful consideration.  *See, e.g.*, *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) (that Indonesia was "a party to the case does not blunt this comity concern").

- ***The "role and authority of the entity or official offering the statement."***  This brief is being offered on behalf of the 2015 National Assembly, which is the legitimate, U.S.-recognized government of the Bolivarian Republic of Venezuela.

- ***The "statement's consistency with the foreign government's past positions."***  The Republic's position stated herein is entirely consistent with the position it has taken previously in this litigation and elsewhere.[10]  In arriving at that position, the Republic relies on long-standing provisions of Venezuela's Constitution, a decision of the TSJ dating from 2003, and numerous Resolutions of the Venezuelan National Assembly from 2006 to 2019.  These include the May 2016 Resolution and the September 2016 Resolution, both of which were issued before the Exchange Offer was consummated and

---

[10]     In addition to the Vecchio Letter submitted to this Court, the Republic has submitted *amicus* briefs to both the Second Circuit and the New York Court of Appeals, and presented oral argument to the Second Circuit as well.

had sharply in focus Mr. Maduro's attempted usurpations of the National Assembly's constitutional authority. Indeed, the Exchange Offer's unlawful character was public knowledge when investors made their decision on whether or not to take up the offer.

## II.      The Court Should Recognize the Republic's Acts Under the Act-of-State Doctrine.

For the reasons stated *supra* in Section I, it is indisputable that the Exchange Offer was unauthorized and void *ab initio* under Venezuelan law.  But in all events, under the act-of-state doctrine, this Court is required to give respect to the definitive action of the National Assembly in refusing to approve the Exchange Offer and therefore rendering it void.  *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964).  The Court previously declined to give effect to the Assembly's refusal to authorize the transaction, which thereby rendered the Exchange Offer void *ab initio*.  As this Court has recognized, those actions, memorialized in the May and September 2016 Resolutions, are sovereign acts of state taken by Venezuela's U.S.-recognized government.  The Court's prior reading of the Resolutions, however, nullified those acts of state.

### A.      The National Assembly's Declaration of Its Authority to Authorize and Approve the Transaction, and Its Refusal to Do So, Are Acts of State.

Under the act-of-state doctrine, U.S. courts must give effect to, and must refrain from declaring invalid, the public acts of a foreign sovereign.  *Sabbatino*, 376 U.S. 401.  The doctrine reflects "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs."  *PDVSA IV*, 106 F.4th at 269 (citation omitted).  The act-of-state doctrine thus requires U.S. courts to give effect to a foreign sovereign's official acts if they occurred within its territory.  *See, e.g.*, *Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 658 F.2d 903, 908 (2d Cir. 1981).

The National Assembly's determination that the Exchange Offer was a national public interest contract requiring authorization, its refusal to authorize that contract, and its rejection of the Exchange Offer, including the pledge therein, as void *ab initio* (all of which were effectuated

by the May and September 2016 Resolutions, and confirmed by the October 2019 Resolution) were all official acts of a foreign sovereign within its territory.  *See PDVSA I*, 495 F. Supp. 3d at 271-73 (concluding that the "May 2016, September 2016, and October 2019 Resolutions all constitute official acts of a foreign sovereign").  By seeking to invalidate each of these sovereign decisions, Defendants here "seek to litigate the . . . policy of [a] foreign nation[]," which is precisely what the act-of-state doctrine prohibits.  *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1103 (9th Cir. 2024).  By contrast, if those acts of state are given effect here as they should be, the 2020 Notes are void and the purported pledge of PDVSA's shares is invalid.

If the Court declines to conclude that "the Exchange Offer is invalid under the Venezuelan Constitution for lack of legislative approval" *PDVSA IV*, 106 F.4th at 270—which, for the reasons stated in Section I, would be incorrect—"the outcome of the case" will then "turn[] upon . . . the effect of official action by a foreign sovereign"; this is precisely the circumstance in which the act-of-state doctrine applies.  *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l,* 493 U.S. 400, 406 (1990).  The entire purpose and effect of the May and September 2016 Resolutions was to assert the National Assembly's constitutional authority to ensure that the Exchange Offer, including the pledge, could not validly be made without the Assembly's prior authorization.  To refuse to give effect to those Resolutions is to "render nugatory the attempts by [Venezuela] to protect" its important national assets.  *Callejo v. Bancomer, S.A*., 764 F.2d 1101, 1116 (5th Cir. 1985).

The National Assembly's exercise of its constitutional power to review and refuse to authorize the Exchange Offer under Articles 150 and 187(9), like the exchange control regulations at issue in *Braka* and *Callejo*, governs the conduct and obligations of a state-owned entity subject to foreign law, which cannot give its contractual counterparties what they seek

without running afoul of that law.  *See Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985); *Callejo*, 764 F.2d at 1116.  Defendants here, like the counterparties in those cases, argue that they seek only an order honoring contractual commitments; but the very point is that honoring those commitments would violate Venezuelan law because the contract at issue is void *ab initio*, a conclusion effectuated by the May and September 2016 Resolutions.

The act-of-state doctrine therefore dictates that the Court find the Exchange Offer to be invalid and void.  "Only by disregarding" the Resolutions could the Court enforce the Exchange Offer; the act-of-state doctrine therefore prohibits that relief.  *See Callejo*, 764 F.2d at 1116.

This case is unlike *Allied Bank International v. Banco Credito Agricola*, 757 F.2d 516, 521 (2d Cir. 1985), because at the time of the National Assembly's acts of state, the 2020 Notes did not yet exist; the National Assembly's refusal to authorize the Exchange Offer, therefore, took place entirely in Venezuela, and not in the United States.[11]  "The test . . . adopted in *Allied* was whether the [act of state] was 'able to come to complete fruition within the dominion of the [foreign] government.'"  *Braka*, 762 F.2d at 224 (citation omitted).  The May and September 2016 Resolutions established, all within Venezuela, that without prior National Assembly authorization, the pledge could not be made and the 2020 Notes could not be issued.  The bondholders who chose to accept the unauthorized Exchange Offer never acquired valid property rights.  In other words, to respect the Resolutions as acts of state does not bless an after-the-fact

---

[11]    As the Court previously acknowledged, this distinction is critical.  *See PDVSA I*, 495 F. Supp. 3d at 276 ("Plaintiffs' strongest argument is that the instant case is distinguishable from *Allied Bank* because the National Assembly's Resolutions, coupled with its omission of authorization for the Exchange Offer, precluded the 2020 Notes and Governing Documents from ever coming into valid legal existence in the first place.").  The Court ultimately found this unpersuasive, but only because in its reading, the "language of the Resolutions" did not support the view that the National Assembly invalidated the Exchange Offer in 2016.  *Id.*  As discussed in Section II.B *infra*, respectfully, the Court's conclusions about the Resolutions are neither supported by their text nor by the context in which they were issued.

expropriation of foreign assets.  To the contrary, it gives effect to the National Assembly's *ex ante* assertion of its constitutional authority to prevent the Maduro regime's usurpation.

### B.     The Court Misinterpreted the May and September 2016 Resolutions and the Opinion of the Special Attorney General.

Respectfully, it is the Republic's considered view that the Court's prior analysis misinterpreted the May and September 2016 Resolutions and gave insufficient weight to the context in which those Resolutions were enacted.

The Court viewed the May 2016 Resolution as "cabin[ed]" to contracts entered into by "the National Executive," and therefore inapplicable to "contracts entered into by PDVSA." *PDVSA I*, 495 F. Supp. 3d at 277.  But this reading does not consider the Resolution's context, responding directly to a Maduro decree issued less than two weeks earlier claiming unilateral authority to enter into national public interest contracts.  *See* Decree No. 2,323, Official Gazette No. 6,227, May 13, 2016 (cited at ECF No. 119-1, ¶ 68).  The Resolution declares that Article 150 "categorically mandates, *without exception*," the Assembly's approval of such contracts with foreign companies, and warns that this constitutional requirement "cannot be relaxed by conventions, decrees or other legal acts."  May 2016 Resolution at 7-8 (emphasis added).

In addition, other provisions of the May 2016 Resolution were not limited to contracts entered by the National Executive.  Provision Two "warn[ed] that *any* activity carried out by *an organ* that usurps the constitutional functions of another public authority is null and void," and Provision Four informed foreign governments and companies "about the nullity of the contracts that are concluded in contravention of Article 150."  *Id.* at 9 (emphasis added).  Neither provision limited itself to contracts signed by the National Executive.  Rather, the Resolution "reiterate[ed] that any national interest contract entered with foreign companies must be previously authorized by the National Assembly."  Vecchio Letter ¶ 5.

Similarly, the Court's prior treatment of the September 2016 Resolution was unduly narrow.  The Court previously dismissed the National Assembly's decision to withhold authorization of the Exchange Offer as irrelevant to the act-of-state analysis on the ground that a "simple failure to act" was unworthy of treatment "as the act of a foreign sovereign."  *PDVSA I*, 495 F. Supp. 3d at 276 n.6.  But the decision to withhold an authorization that the Venezuelan Constitution requires is not a "simple failure to act," especially since it was Mr. Maduro that failed to request authorization as required by the Constitution.  Even without having been asked to consider the issue by Mr. Maduro, the Assembly's September 2016 Resolution "reject[ed] categorically" the pledge of CITGO Holding shares or "any other property of the nation," demanded a criminal investigation be opened about possible abuse of government property, summoned Mr. del Pino to appear before the National Assembly to explain himself, and urged PDVSA to come up with a new plan for refinancing its debt.  September 2016 Resolution at 8. In other words, in enacting the September 2016 Resolution, the National Assembly confirmed and memorialized its refusal to authorize the Exchange Offer.  *Id*.  That was certainly *not* a failure to act on part of the National Assembly.  *See, e.g.*, *Underhill v. Hernandez*, 168 U.S. 250, 251 (1897); *Republic of Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir. 1986).

Equally to the point, the Court's prior conclusions misinterpreted Venezuelan law by declining to treat the Resolutions as acts of state on the ground that they did not expressly reject the Exchange Offer.  *See PDVSA I*, 495 F. Supp. 3d at 276-78.  As an initial matter, that characterization is incorrect: the National Assembly "reject[ed] categorically" the pledge of CITGO Holding shares, as well as a "guarantee . . . over any other property of the Nation." September 2016 Resolution at 8.  Instead, the National Assembly called upon PDVSA to come

up with a new plan for "the refinancing of its financial commitments." *Id.* Thus, even if the National Assembly were required to affirmatively express disapproval, it unmistakably did so.

This Court similarly erred in concluding that the September 2016 Resolution failed to "declare[] the Exchange Offer as null and void." *PDVSA I*, 495 F. Supp. 3d at 279 (noting that "other National Assembly resolutions have expressly declared certain transactions to be null and void" and citing Vecchio Letter ¶ 10). Under Venezuelan law, no talismanic phrases are required for the Assembly's expressed disapproval to have legal force, and certainly the Resolution's declaration that the Assembly "reject[ed] categorically" the Exchange Offer's pledge should satisfy any reasonable standard in that regard. Indeed, in one of the "other National Assembly resolutions" cited at Vecchio Letter ¶ 10 that the Court attempted to distinguish from the September 2016 Resolution, *PDVSA I*, 495 F. Supp. 3d at 279, the National Assembly exercised its constitutional authority to disapprove of the PDVSA "litigation trust agreement" without explicitly declaring the contract "null and void."[12] Moreover, each of the examples cited at Vecchio Letter ¶ 10 involved the Assembly's *ex post* disapproval of a transaction—unlike here, where at the time of the Resolution, the 2020 Notes had not yet issued and there were thus no Bonds to declare "null and void."

More fundamentally, the Court's analysis rested on the assumption that the Exchange Offer should be presumed valid unless the National Assembly expressly repudiated it. *See, e.g.*, *PDVSA I*, 495 F. Supp. 3d. at 278 (concluding that the September 2016 Resolution did not "demonstrate[] an intent to affirmatively invalidate the Exchange Offer"). As discussed above, *see supra*, pp. 13-14, that gets Venezuelan law backwards. Moreover, at the time the National Assembly passed the Resolutions, the transaction itself was not final, but rather a proposal that

---

[12]     *See* ECF No. 126-69, at 9 (declaring the trust to be "unconstitutional").

could be withdrawn or modified.  The National Assembly could scarcely have done more to make clear that the proposed transaction as structured, including the pledge, was unconstitutional, unauthorized, and void as a matter of Venezuelan law.

The Court's analysis also relied on a misreading of the September 2016 Resolution's instruction that an "investigation" be opened by the Venezuelan Public Ministry.[13]  The Resolution "urge[d] the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187, section 9, 302, and 303 of the Constitution."  September 2016 Resolution at 8.  In doing so, the National Assembly "demanded the opening of a *criminal* investigation" to determine whether Maduro regime officials violated their obligations to protect National Property.  Special AG Report ¶ 103 (emphasis added).  Indeed, the Resolution's invocation of Articles 302 and 303 of the Constitution—which recognize the special importance of the petroleum industry and PDVSA— demonstrate that the National Assembly was concerned that officials were abusing National Property by purporting to execute the pledge.  The Court previously read the Resolution's instruction to "open an investigation" as demonstrating the National Assembly's "desire to *investigate the Exchange Offer*," and that the accordingly, the Resolution failed to definitively "invalidate the Exchange Offer."  *PDVSA I*, 495 F. Supp. 3d. at 277-78 (emphasis added).  But the Resolution was clear that the National Assembly "reject[ed] categorically" the pledge; the investigation it sought to open was whether Maduro officials would be subject to liability for the illegal proposed transaction.  *See also* Venez. Const. art. 285(7) (ECF No. 128-5, at 47) (authorizing the Public Ministry to "file any appropriate actions to hold liable public officials

---

[13]    The Public Ministry is a government agency responsible for investigating and prosecuting criminal conduct.  *See* Venez. Const. art. 285(3) (ECF No. 128-5, at 47) (the Public Ministry will "order and direct criminal investigation of the perpetration of punishable acts").

who have incurred civil, labor, military, criminal, administrative or disciplinary liability [in] the course of their official duties.").

Moreover, the National Assembly's explicit invocation in both Resolutions of Article 187(9)—the provision that allocates to the Assembly the role of authorizing national public interest contracts—made clear the determination that the Exchange Offer could not be consummated without prior authorization, a determination plainly qualifies as an act of state.

The financial markets' reaction to the National Assembly's actions further underscores their import as unambiguous acts of state. At the National Assembly's direction, the Resolutions were widely publicized both as a sovereign-to-sovereign matter and in the financial markets more broadly. *See* May 2016 Resolution at 9 (instructing that the Resolution be sent to all embassies in Venezuela to inform foreign governments and companies "about the nullity of the contracts"); September 2016 Resolution at 8 (instructing that the resolution be "publicize[d]"). Investors took heed. Not even 40% of the 2017 Notes were tendered—despite the substantial economic benefits the Exchange Offer seemed to promise and the significant risk of default for the 2017 Notes—doubtless because the noteholders understood that the 2020 Notes had been offered in defiance of law and the National Assembly's sovereign acts. Only opportunistic investors, representing the 39.43% of 2017 Noteholders that are now at issue in this litigation, decided to gamble that a future court would give effect to the illegal scheme in contravention of the sovereign decision by the National Assembly.

Finally, this Court overlooked key portions of the 55-page report issued by the Special Attorney General. The Court previously found that the Republic's views were "undermined" by a single comment in that report stating that "through the September 2016 Resolution, 'the National Assembly did *not* declare the unlawfulness' of the 2020 Notes." *PDVSA I*, 495 F.

Supp. 3d at 279-80 (quoting Special AG Report ¶ 160).  But at the time the National Assembly considered the Exchange Offer and pledge, the 2020 Notes had not yet been issued—there were no Bonds to declare unlawful.  That sentence appeared near the end of the report, in a section addressing whether investors were on notice of the invalidity of the 2020 Notes.  The Special Attorney General concluded in that section that investors "*should have been aware that the Bond was questioned by the National Assembly before being issued*."  *Id.* ¶ 161.  Moreover, earlier in his report, the Special Attorney General analyzed at length the validity of the Exchange Offer and concluded that the absence of National Assembly authorization rendered the indenture and pledge invalid *ab initio*.  *See id.* ¶ 2 ("*conclud[ing] that the indenture is a national public interest agreement that, as such, should have been previously authorized by the National Assembly pursuant to article 150 of the Constitution*" and that because of the "lack of authorization, [PDVSA] did not have the legal capacity to sign that agreement, which is invalid under Venezuelan Law"); *see also id.* ¶ 164 ("[T]he defect is the violation of article 150 of the Constitution, since PDVSA signed the issuing contract without prior authorization from the National Assembly."); *id.* ¶ 170(b) (concluding that the "issuing contract" was a national public interest contract because it entailed the pledge of the CITGO shares and was invalid because it was not authorized by the National Assembly).  A fair reading of the Special Attorney General's report leaves no doubt that his conclusion is consistent with the Republic's understanding: that the National Assembly considered the Exchange Offer, and pledge therein, to be a national public interest contract, and that the September 2016 Resolution rendered the 2020 Notes void *ab initio* because the Offer and pledge were never authorized by the Assembly.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

Dated:   January 15, 2025

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohmmadi@mto.com

*Attorneys for Bolivarian Republic of Venezuela*

Exhibit 76

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

DIRECT DIAL: +1 212 373 3581
EMAIL: PPATERSON@PAULWEISS.COM

BRUSSELS          TOKYO
HONG KONG         TORONTO
LONDON            WASHINGTON, DC
LOS ANGELES       WILMINGTON
SAN FRANCISCO

April 3, 2025

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007
Failla_NYSDChambers@nysd.uscourts.gov

Re:     *Petróleos de Venezuela, S.A. et al.* v. *MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023

Dear Judge Failla:

We write on behalf of the Trustee and the Collateral Agent in response to the PDVSA Parties' March 31, 2025 letter, ECF No. 376 (the "Letter Motion") requesting that the Court expedite oral argument and decision on the parties' cross-motions for summary judgment. As explained below, the PDVSA Parties' expedition request appears to be merely the latest tactic in a campaign by the PDVSA Parties to delay and impede the sale process overseen by Judge Stark in the District of Delaware in *Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-mc-00151 (D. Del.). The request should be denied.

Despite now seeking expedition, since Your Honor granted summary judgment to the Trustee and the Collateral Agent, ECF No. 215, the PDVSA Parties showed no interest in promptly resolving this case. They successfully opposed the Trustee and the Collateral Agent's motion to expedite the PDVSA Parties' appeal, No. 20-3858, ECF No. 91; successfully moved for multiple extensions of time on appeal, *id.* ECF Nos. 103, 190; criticized the Trustee and the Collateral Agent for attempting to move this litigation forward when the appeals ended, ECF No. 311; and proposed a five-month supplemental briefing schedule, ECF No. 320.

The reason for the PDVSA Parties' newfound interest in expedition is plain. Unhappy with developments in the Delaware proceedings before Judge Stark, the PDVSA Parties seek to interrupt that process. On the same day as the PDVSA Parties filed the Letter Motion, they sought from Judge Stark a stay of the Delaware sale process—a fact nowhere mentioned in their letter—while arguing that their expedition request to this Court supported the relief they sought in Delaware. Judge Stark summarily denied the PDVSA Parties' requested stay on April 1.

As background, since we last updated the Court on the Delaware sale process, ECF No. 321, the Delaware proceedings have reached the stage of selecting a stalking horse bid for the judicial sale of the stock of plaintiff PDV Holding, Inc ("PDVH"). On March 21, 2025, the Special Master appointed to oversee the process recommended that a bid by Red Tree Investments, LLC for PDVH be selected as a stalking horse bid. No. 17-mc-00151, ECF No. 1596. Red Tree's bid was accompanied by a Transaction Support Agreement ("TSA") under

The Honorable Katherine Polk Failla
United States District Judge                                              2

which more than two-thirds of the 2020 Noteholders agreed to support the sale.[1] The TSA contemplates that the 2020 Noteholders who are party would provide the requisite consents to direct the release of the Pledge securing the 2020 Notes, in consideration of offers to exchange 2020 Notes for a combination of debt and secured notes issued by CITGO and affiliates. *See* Term Sheet, ECF No. 376-1, Ex. B to Ex. 1. The TSA is not, as the PDVSA Parties claim, "premised on the assumption that the Exchange Offer and the Pledge have been validly issued," nor is it predicated on a "judgment stating that the Pledge and the 2020 Notes are valid." Letter Motion at 2. Rather, the Trustee and the Collateral Agent are informed by the 2020 Noteholders that the TSA would compromise by settlement the 2020 Noteholders' claims at an approximate 30% discount to their current claim amount, which the 2020 Noteholders are accepting in the interests of both finality and near-term liquidity.

Under his order governing the sale process, Judge Stark will now resolve objections to the Special Master's recommendation of Red Tree's bid as the stalking horse bid, a 30-day topping period will commence, a final bid is expected to be recommended by the Special Master by May 16, and a sale hearing will take place from July 22–24, 2025. *See generally* No. 17-mc-00151, ECF No. 1517 (although some deadlines set forth in this order have since been extended).

The PDVSA Parties—acting in concert with the Republic and CITGO (together, the "Venezuela Parties")—have attempted to impede the Delaware sale process at every turn. Judge Stark has described Venezuela as a "highly-recalcitrant judgment debtor" and noted that its repeated delay tactics create an "affront to the United States judicial system." *Crystallex*, 2021 WL 129803, at *18 (D. Del. Jan. 14, 2021), *appeal dismissed*, 24 F.4th 242 (3d Cir. 2022). As part of these attempts, the Venezuela Parties have filed at least five motions to stay the *Crystallex* proceedings, *see* No. 17-mc-00151, ECF Nos. 97, 242, 540, 1272, 1642, in addition to making numerous other attempts to informally pause or slow the proceedings, *see, e.g.*, *Crystallex*, 2021 WL 129803 (D. Del. Jan. 14, 2021); No. 17-mc-00151, ECF Nos. 1144, 1459.[2]

In their latest attempt to delay the sale process, the Venezuela Parties on March 31 filed in Delaware yet another stay motion. *See* No. 17-mc-00151, ECF No. 1645 (attached as Exhibit A). This time, they pointed to the Letter Motion they filed in this Court, and urged Judge Stark to "pause" the sale process for three months because of the proceedings in this Court.[3] They

---

[1] The PDVSA Parties wrongly state that the Trustee and the Collateral Agent are parties to the TSA. *See* Letter Motion at 1; *id.* Ex. 1. The Trustee and the Collateral Agent are not parties to the TSA and have not agreed to its terms, although the TSA contemplates that the 2020 Noteholders would provide a direction to the Trustee and/or the Collateral Agent to give effect to the TSA's terms. *See id.* Ex. 1; *see also* No. 17-mc-00151, ECF No. 1637 (the Trustee and the Collateral Agent's Reservation of Rights regarding any direction).

[2] The Venezuela Parties also have pursued at least nine appeals and mandamus petitions in the Third Circuit, all of which have been rejected. *See* No. 17-mc-00151, ECF No. 1304 at 7. They even moved to disqualify the Special Master, which Judge Stark characterized as another "tactical" delay "designed with at least a partial goal of further delaying these proceedings." *Crystallex*, 2023 WL 2891452, at *4 (D. Del. Apr. 11, 2023); *see also Crystallex*, 2024 WL 2804668, at *1 (D. Del. May 31, 2024) (denying renewed disqualification motion).

[3] The Venezuela Parties' motion was especially meritless because Judge Stark had previously rejected similar arguments. For example, in May 2023, the Venezuela Parties requested the sale process be stayed until "final resolution of the appeal in the 2020 Bondholders Case," No. 17-mc-00151, ECF No. 561. Judge Stark

The Honorable Katherine Polk Failla
United States District Judge                                                    3

emphasized that "PDVH has simultaneously filed a motion to expedite the Southern District of New York Court's decision to reduce as much as possible any delay to the sale proceedings." *Id.* at 1. Judge Stark denied the PDVSA Parties' motion the next day:

> Having reviewed the Venezuela Parties' motion to stay (D.I. [1642]), filed yesterday, and without needing to wait for any responses, IT IS HEREBY ORDERED the motion is DENIED. Among its other failings, the motion is premature; objections to the Special Master's recommendation of a Stalking Horse Bid are being briefed and are, obviously, not resolved. None of the Venezuela Parties' concerns will have any relevance to the next steps in the Sale Process if the Court sustains the objections to that recommendation. As importantly, the motion lacks merit. Even assuming the Court accepts the pending recommendation, the Court is entirely unpersuaded that it should delay its process, to await potential rulings from other courts or for any other reason suggested in the motion. It would be an unwise exercise of the Court's inherent power to manage its docket to now pause the Sale Process for 90 days based on the Venezuela Parties' purported concerns about what even they characterize as a "meritless threat" posed by the 2020 Noteholders.

*See* No. 17-mc-00151, ECF No. 1647. The PDVSA Parties' sole purported ground for expediting this case—that "[t]he requested expedition is warranted in light of recent developments in the sales process in *Crystallex*," Letter Motion at 1—has therefore been rejected by Judge Stark. Indeed, if Red Tree is ultimately selected as the winning bidder in Delaware, the consummation of Red Tree's bid and the TSA would have significant practical impacts on this litigation and may, at the least, materially narrow the issues that this Court needs to decide. As the Letter Motion recognizes, the consummation of Red Tree's bid, including the TSA, would result in the "release of the pledge, the validity of which is at issue in this case." *Id.* at 2. Accordingly, and as the PDVSA Parties' letter references, the TSA contemplates that the participating 2020 Noteholders would seek to stay this litigation if Red Tree's bid is selected.

While the Trustee and the Collateral Agent believe that summary judgment is warranted in their favor for the reasons set forth in their papers, the PDVSA Parties' tactical request to unsettle the Delaware proceedings by expediting this action should be denied. The Trustee and the Collateral Agent of course recognize that the Court will schedule argument, if any, and issue a decision on the schedule it believes appropriate. The Trustee and the Collateral Agent will keep this Court apprised of continuing developments in Delaware that may impact Your Honor's schedule, including the results of the Special Master's expected recommendation of a final bid on May 16.

---

disagreed, holding that while this litigation "could impact the sale process, the Court will not await its outcome before moving forward," because "Potential Bidders will be fully capable of valuing the PDVH Shares" taking into account the 2020 Noteholders' claims. *Crystallex*, 2023 WL 4561155, at *4–5 (D. Del. July 17, 2023). *See also* No. 17-mc-00151, ECF Nos. 1273, 1338 (rejecting argument that "the 2020 Bondholders litigation creates an additional reason [for] a modest pause in the sale process"); *id.*, ECF Nos. 1459, 1517 (rejecting proposed schedule that "would provide sufficient time for Judge Failla to rule on the validity of the [Pledge]").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Katherine Polk Failla
United States District Judge                                                              4

Respectfully submitted,

*/s/ Paul A. Paterson*

Paul A. Paterson

cc:  Counsel of Record (By ECF)

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:17-mc-00151-LPS |
| v. | ) | |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | **PUBLIC** |
| | ) | |
| *Defendant.* | ) | |

# THE VENEZUELA PARTIES'
# MOTION FOR A SHORT STAY OF THE SALE PROCESS

The Venezuela Parties[1] respectfully request that the Court pause the sale process for three months to allow time for the U.S. District Court for the Southern District of New York to issue a decision on the fully briefed issue of the validity of the 2020 Notes and accompanying pledge in *Petróleos de Venezuela S.A. v. MUFG Union Bank N.A.*, No. 19-cv-10023 (the "2020 Notes Litigation"). Recent developments in the sale process—in particular, the Special Master's sacrifice of $3.3 billion in value in the stalking horse round because of his fear of litigation from the 2020 Noteholders—demonstrate the need for a short stay to resolve substantial uncertainty that is impeding the sale process and threatening to divert billions of dollars in value from Attached Judgment Creditors. PDVH has simultaneously filed a motion to expedite the Southern District of New York Court's decision to reduce as much as possible any delay to the sale proceedings.

## NATURE AND STAGE OF THE PROCEEDINGS

In December 2024, the Venezuela Parties proposed a schedule for the current phase of the sale process that would both maintain momentum and provide sufficient time for the Southern District of New York Court to declare the invalidity of the 2020 Notes and accompanying Pledge Agreement under Venezuelan law and thereby preempt any justification for diverting potential sale proceeds to the 2020 Noteholders. *See* D.I. 1459 at 7, 12. That issue, the Venezuela Parties explained, would be fully briefed by March, positioning the parties for a decision that could provide substantially more certainty to bidders. *Id.* at 12. Throughout the entire pendency of this sale process, the Venezuela Parties also have consistently advised the Court that the Special Master's repeated attempts to require or encourage bidders to satisfy the 2020 Noteholders' claims risked chilling bids and/or improperly diverting sale proceeds away from the Attached Judgment

---

[1] As with the Venezuela Parties' other filings, nothing in this filing should be construed to imply the Venezuela Parties' consent to a forced sale under any circumstances. The Venezuela Parties preserve all rights and positions, including on appeal.

Creditors and argued that value would be better maximized by first allowing a resolution of PDVSA and PDVH's ongoing challenge to the validity of the 2020 Notes.[2]

The Special Master opposed the Venezuela Parties' proposed schedule, D.I. 1481, and while the Court ultimately adopted the current schedule in its December 31, 2024 order, D.I. 1517, it did order the Special Master and the bidders not to condition bids on resolution of the 2020 pledge, D.I. 1517 ¶ 28. In the months since that order, the Southern District of New York Court received final supplemental briefs on the application of Venezuelan law on March 18, 2025, as predicted. *MUFG Union Bank*, ECF No. 320 at 10. The issue will likely be set for argument in short order with a decision to follow.

On February 14, 2025, the Special Master nevertheless recommended that the stalking horse bid deadline proceed as scheduled. *See* D.I. 1565. Bidders submitted their proposed stalking horse bids on March 7, 2025. D.I. 1596 ¶ 5. The Special Master subsequently sought, and was granted, three extensions of time to continue negotiating with the bidders, *see* D.I. 1590; D.I. 1591; D.I. 1595, ultimately submitting his recommendation to the Court on March 21, 2025. *See* D.I. 1596.

---

[2] *See, e.g.*, D.I. 561 at 13-15 (arguing that uncertainty posed by the (then-pending) appeal in the 2020 Notes Litigation counseled in favor of not yet launching the sale process); D.I. 561-1 ¶ 25 (R. Weisenburger recommending awaiting resolution of 2020 litigation); D.I. 1144 at ¶ 16 (arguing that the Special Master's then-proposed modifications to the bidding procedures regarding the treatment of the 2020 Noteholders would "discourage bidders and suggest that any bid should be deeply discounted to give great weight to the CITGO Holding Pledge despite its highly questionable validity"); *see also* D.I. 1144 at ¶ 9 (advocating for a pause in the sale process because "uncertainties related to the PDVSA 2020 Notes litigation threatened to impede the sale process"); D.I. 1459 at 11-12 (advocating schedule accounting for the resolution of the 2020 Notes Litigation); D.I. 1459-1 (CITGO's proposed sale process schedule); D.I. 1476 at 4 (same). Following the December 13, 2024 hearing, PDVH and CITGO proposed a compromise schedule that would have provided more time for developments in the 2020 Notes Litigation than advocated for by the Special Master or certain other parties. D.I. 1511-1 (PDVH and CITGO); *see* D.I. 1510 (Special Master).

## LEGAL STANDARD

This Court has "broad inherent power to manage its own affairs so as to achieve the orderly and expeditious disposition of cases." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2024 WL 325133, at *2 (D. Del. Jan. 29, 2024) (cleaned up). "[T]his discretion also allows [the Court] to consider the relative prejudice to the parties who are before [the Court] that might arise from granting or denying the requested relief and also gives [the Court] the authority to consider the impact, if any, of [its] rulings on the ongoing sale process." *Id.* at *3. As relevant here, the Court's broad discretion "includes the authority to modify [its] prior orders," including existing sale process deadlines. *Id.* at *2.

## ARGUMENT

The Venezuela Parties recognize that the Court has denied previous requests to adjust the sale process schedule to accommodate resolution of the 2020 Notes Litigation, *see e.g.*, D.I. 643 at 9; D.I. 1517, but they respectfully urge that the circumstances have changed, and not just because a decision on the 2020 Notes' and accompanying pledge's validity is expected soon. As the Court is aware, the 2020 Noteholders filed a series of pre-emptive objections signaling that they would seek to enjoin any recommended bid that includes financing from or secured by CITGO Holding's or CITGO's assets. *See* D.I. 1553 at 4-5; D.I. 1558 at 3, 4-5; D.I. 1568 at 3. Apparently because of these meritless threats, the Special Master recently rejected a bid for more than $7 billion by Bidder A in favor of a $3.699 billion bid by Red Tree, which purported to have reached an agreement with the 2020 Noteholders (of which its own parent Contrarian is a major holder) to release their claimed lien on over 50.1% of PDVH's shares of stock in CITGO Holding, Inc. The Special Master's decision put a $3.3 billion price tag on potentially eliminating a pledge that the Southern District of New York Court may soon decide is worthless and is at most worth far less than the

$3.3 billion that would otherwise go to Attached Judgment Creditors (while reducing PDVSA's or the Republic's indebtedness by that same amount) under Bidder A's bid.

The Special Master's decision also encourages bidders in the topping period to seek to divert billions of dollars of value to the 2020 Noteholders to satisfy the Special Master's insistence on eliminating the pledge. Red Tree's settlement, for example, would pay more than $2 billion of consideration to the 2020 Noteholders, D.I 1627-1 at 40 (the exact consideration cannot be determined from the available documents, but the Noteholders are receiving $2 billion in notes, a monthly ticking fee, and 7% of the equity of the acquiring company). Moreover, once the Transaction Support Agreement ("TSA")'s exclusivity provisions become operative, the settlement agreement would prohibit the 2020 Noteholders from agreeing to any competing settlement with another bidder unless it is on the same or better financial terms than those to which Red Tree (the subsidiary of a major holder of 2020 Notes) agreed, with the decision as to whether an alternative proposal satisfies this inherently subjective standard presumably being made—or at least significantly influenced—by a conflicted party that is on both sides of the transactions contemplated by the settlement agreement embodied in the TSA, D.I. 1627-1 at 15, § 3.2(c).

This Court previously was assured by the Special Master's and Evercore's representations that "[p]otential bidders will be fully capable of valuing the PDVH [s]hares and CITGO operations agnostic to capital structure, including whether claims held by the PDVSA Noteholders or other judgment creditors will need to be satisfied by the [s]ale [t]ransaction proceeds." D.I. 643 at 10 (cleaned up); *id.* at 11 ("The Court is further persuaded by the Special Master's insistence that the ongoing 2020 Noteholders' litigation will be no impediment to his efforts.").

Recent developments make clear, however, that the Special Master's and Evercore's assurances have not borne out, and the uncertainty surrounding the 2020 Noteholders' claims is

4

directly impeding the Special Master's efforts and threatens to yield a grossly inadequate and unfair result.[3] Indeed, Red Tree's proposed purchase price is a mere fraction of the fair market value of the PDVH Shares and would leave well more than three-quarters of attached judgments unsatisfied, and even Bidder A's $7 billion bid (which is still well below the shares' fair market value) would satisfy only roughly a third of attached judgments. *See* 1140-1 (Final Determination of Attached Judgments); D.I. 1102 (Final Priority Order). Continuing with the current sale process schedule risks ending with the recommendation of a bid that is so grossly inadequate that it cannot possibly be upheld under Delaware law. *See Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994).

Fortunately, there is still time for a course correction. This Court can, and should, "postpone the sale" when "the time selected, or other circumstances, will be likely to produce great sacrifice of the property." *Blossom v. Milwaukee & C.R. Co.*, 70 U.S. 196, 209 (1865). This Court has recognized that if external factors, including the 2020 Notes Litigation, "actually materialize[d]" to "chill[]" bids, it could be appropriate to "adjourn the Auction and/or the Sale Hearing." D.I. 643 at 10 (quoting D.I. 481 ¶ 9) (quotation marks omitted). To that end, the Venezuela Parties propose extending the beginning of the topping period to June 27, 2025. The remainder of the sale process schedule would be similarly extended according to the same 90-day interval. The Venezuela Parties' proposed schedule is attached, in full, as Exhibit A.

This modest extension of the sale process schedule could substantially mitigate the uncertainty upon which the Special Master is fixated by providing time for the Southern District

---

[3] To be clear, the Venezuela Parties maintain that the 2020 Noteholders' claims, as well as their threat to try to block any sale that involves raising financing at the CITGO or CITGO Holding level, lack merit and therefore do not warrant any substantial reduction in the purchase price offered by a rational bidder or any consideration by the Special Master.

of New York Court to rule on the fully briefed question of the validity of the Notes and pledge under Venezuelan law before the topping period concludes.[4] Moreover, ██████████████



and other bidders should be willing to bid far more for the PDVH Shares without the cloud of a potential foreclosure on the 2020 Noteholders' pledge. If the sale process is not stayed at this point, the difference in value would be borne by Attached Judgment Creditors and inure to the benefit of either the 2020 Noteholders including Contrarian/Red Tree (if the Red Tree bid is selected) or another bidder, such as Bidder A, which would receive a windfall from having bought the company at a steep discount and then receiving its full value in the event the pledge is ultimately invalidated. Every dollar taken from Attached Judgment Creditors in this manner also represents a dollar taken from PDVSA and/or the Republic, in the form of indebtedness that should have been satisfied, but was not, due to the failure to maximize value.

The Venezuela Parties understand the Court's desire to bring this action to a close, and they recognize that the Court is not "marketing [the] PDVH [s]hares free and clear of whatever claims, encumbrances, and liabilities, are, have been, or may be attached to any asset or subsidiary of PDVH." D.I. 1515 at 20. But this Court, the Sale Process Parties, and the Special Master have invested years and tens of millions of dollars in attempting to realize the goal of maximizing the

---

[4] The requested stay also would have the added benefit of providing time for Judge Rakoff to rule on pending motions for summary judgment in the PDVH Alter Ego Actions filed by Girard Street and G&A Strategic Investments, further reducing uncertainty.

value of the PDVH shares. Advancing that goal and preventing the loss of more than $3 billion in value should more than make up for adding a mere three months to the schedule.

## CONCLUSION

The Venezuela Parties respectfully request that the Court modify the sale process schedule as proposed in Exhibit A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Hannah Bucher
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com

/s/ Alexandra M. Cumings
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Kirk Andersen (#7156)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
SWaesco@morrisnichols.com
ACumings@morrisnichols.com
KAndersen@morrisnichols.com

*Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
David V. Holmes
CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
101 Park Avenue New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com
dholmes@curtis.com

/s/ Brendan Patrick McDonnell
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (#7086)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hegh.law

*Attorneys for Petróleos de Venezuela, S.A.*

7

ABRAMS & BAYLISS LLP

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

March 31, 2025

*/s/ Christopher Fitzpatrick Cannataro*
A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

Exhibit 77

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

    Plaintiffs and Counterclaim Defendants,

    - against -

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

    Defendants and Counterclaim Plaintiffs.

No. 19 Civ. 10023 (KPF)

---

## DECLARATION OF TIMOTHY MCKENNA IN SUPPORT OF MOTION OF DEFENDANTS AND COUNTERLCLAIM PLAINTIFFS FOR ENTRY OF JUDGMENT DIRECTING PAYMENT OF PRINCIPAL AND INTEREST

Timothy McKenna declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am an Associate Director of NERA Economic Consulting ("NERA"). I hold a B.A. in economics from the University of Chicago, an M.A. in economics from the University of Pennsylvania, and an MBA specializing in accounting and finance from New York University. My curriculum vitae is attached as Exhibit A. I have been retained as an expert in this matter by Paul, Weiss, Rifkind, Wharton & Garrison, LLP, counsel for MUFG Union Bank, N.A. (the "Trustee") and GLAS Americas LLC (the "Collateral Agent"). I submit this Declaration in support of the Trustee and Collateral Agent's motion for entry of judgment pursuant to the Court's Opinion and Order dated October 16, 2020 (ECF No. 215).

2. I was asked to calculate accrued and unpaid contractual interest on outstanding principal on the 2020 Notes and statutory prejudgment interest thereon. I set forth below my calculations. Attached to this Declaration as Exhibit B is a spreadsheet that I prepared

that shows my calculations.  Other professionals employed by NERA assisted me in preparing this Declaration.

3.  In preparing my calculations, I have relied on the following facts provided by counsel, which I understand come from the Indenture for the 2020 Notes and each of the Global 2020 Notes, as well as factual findings by the Court in its Opinion and Order dated October 16, 2020 (ECF No. 215) ("Op.") and undisputed facts set forth in the Trustee and Collateral Agent's Local Rule 56.1 Statement dated June 10, 2020 (ECF No. 100) ("Tr. 56.1").  I have also relied on legal theories for computation of interest as understood by counsel and referenced in the memorandum of law in support of the Trustee and Collateral Agent's motion for entry of judgment ("Tr. MOL").  These facts are as follows:

a.  the principal amount outstanding on the 2020 Notes since October 29, 2018 and as of the date hereof is $1,683,764,500, *see* Op. at 68;

b.  contractual interest accrues at the rate of 8.50% per annum, computed on the basis of a 360 day year of twelve 30-day months (the "Contractual Rate"), *see* Indenture § 2.08(b);

c.  pursuant to the Indenture, contractual interest on outstanding principal is payable semi-annually in arrears on April 27 and October 27 of each year (each an "Interest Payment Date"), or on the date of acceleration of the 2020 Notes if earlier, *see id.* §§ 2.08(b), 5.01(b).  I understand from counsel that contractual interest will cease accruing upon entry of a judgment, Tr. MOL at 7–8;

d.  contractual interest accrues from the most recent Interest Payment Date on which the required interest payment has been made until the principal has been paid or

duly provided for or until the Court enters its final judgment, *see* Indenture § 2.08(b);

e. PDVSA failed to make the required principal and interest payments due on October 27, 2019, and thereafter, Tr. 56.1 ¶¶ 213, 216, 259, 261;

f. on December 18, 2019, a notice of acceleration was sent to PDVSA causing all principal and the interest accruing since October 27, 2019 to become immediately due and payable, *see* Indenture § 5.01(b), Tr. 56.1 ¶ 271;

g. statutory prejudgment interest accrues on unpaid contractual interest payments at a simple interest rate of 9.00% (the "Statutory Rate") from the date on which the interest payment was due until the day on which judgment is entered, *see* Tr. 56.1 ¶ 275; and

h. PDVSA is liable for these amounts as Issuer of the 2020 Notes, and PDVSA Petróleo is jointly and severally liable as Guarantor, *see* Indenture §§ 5.01(f), 7.01.

I have not relied on additional facts provided by counsel in calculating accrued and unpaid contractual interest and statutory prejudgment interest.

4. I have further assumed for purposes of my computations that judgment will be entered sometime between December 1, 2020 and December 31, 2020. As shown below, I have calculated (a) the amounts due on December 1, 2020 (assuming that judgment is entered on that date), and (b) the daily interest accruing after that date through December 31, 2020. I have therefore calculated the amounts of contractual and statutory prejudgment interest due as of December 1, 2020 in addition to a daily amount accruing from December 2, 2020 to December 31, 2020. For these calculations, I have rounded all sums to the nearest dollar; any apparent

discrepancies herein are the result of such rounding. (The rate of accrual changes slightly after December 31, 2020. This is because 2021 will not be a leap year. In addition, the daily accrual will increase on each subsequent Interest Payment Date on which the interest payment then due is not made).

### Calculation of Accrued and Unpaid Contractual Interest on Unpaid Principal Through December 1, 2020

5.      As of December 1, 2020, PDVSA and PDVSA Petróleo owe the Trustee the aggregate amount of accrued and unpaid contractual interest of $228,196,861 on the outstanding principal amount of the 2020 Notes, as set forth in the succeeding four paragraphs.

6.      This aggregate amount includes four due and unpaid contractual interest payments, plus interest accrued since the most recent contractual interest payment date. The four due and unpaid contractual interest payments are as follows: (1) interest of $71,559,991, which accrued from April 27, 2019 until October 27, 2019 and was payable on October 27, 2019; (2) interest of $20,275,331, which accrued from October 27, 2019 until December 18, 2019, the date on which PDVSA received the notice of acceleration, and was payable on December 18, 2019; (3) interest of $51,284,660, which accrued from December 18, 2019 until the next biannual contractual interest payment date of April 27, 2020 and was payable on April 27, 2020; and (4) interest of $71,559,991, which accrued from April 27, 2020 until October 27, 2020 and was payable on October 27, 2020.

7.      I calculated these contractual interest payments by multiplying the outstanding principal ($1,683,764,500) by the Contractual Rate (8.50%), and then multiplying that amount by a fraction representing the part of the year between the previous Interest Payment Date and the current Interest Payment Date, where each month is assumed to have 30 days and the year is assumed to have 360 days, *i.e.*, the 30 / 360 day-count convention. *See* Indenture

4

§ 2.08(b). Thus, for example, I calculated the amount of interest due on October 27, 2019 ($71,559,991) by multiplying the outstanding principal ($1,683,764,500) by the Contractual Rate (8.50%), and then multiplying the result by 0.5, or one-half (representing the half-year period after the prior Interest Payment Date, or April 27, 2019).

8.      In addition to the above overdue and unpaid contractual interest payments, counsel has informed me that PDVSA and PDVSA Petróleo will owe the Trustee contractual interest accruing on the outstanding principal on the 2020 Notes at the Contractual Rate from October 27, 2020 through the date of entry of judgment, again computed on the basis of a 360 day year of twelve 30-day months. *See* Indenture § 2.08(b). As of December 1, 2020, I calculated that such accrued contractual interest on outstanding principal will be $13,516,887, representing the outstanding principal ($1,683,764,500) multiplied by the Contractual Rate (8.50%) and the fraction of a 360 day year between October 27 and December 1, 2020 (34 days, or 9%).

9.      Accordingly, the unpaid contractual interest due as of December 1, 2020 is $228,196,861, the sum of the four unpaid interest amounts due through October 27, 2020, as shown in paragraphs 6 and 7, and the accrued interest as of December 1, 2020, as shown in paragraph 8.

### Statutory Prejudgment Interest on Accrued and Unpaid Contractual Interest Through December 1, 2020

10.      Statutory prejudgment interest on overdue and unpaid contractual interest payments began accruing from the date on which each unpaid contractual interest payment was due, at the Statutory Rate (9.00%) on the basis of the actual number of days elapsed since the payment was due. I calculated the accrued statutory prejudgment interest amount on the four overdue and unpaid contractual interest payments described in paragraph 6 above. Based on my

calculations, the Trustee is owed the following amounts of statutory prejudgment interest through December 1, 2020: (1) $7,059,418 on the contractual interest payment of $71,559,991 due and unpaid since October 27, 2019; (2) $1,740,200 on the contractual interest payment of $20,275,330.85 due and unpaid since December 18, 2019; (3) $2,749,194 on the contractual interest payment of $51,284,660 due and unpaid since April 27, 2020; and (4) $615,885 on the contractual interest payment of $71,559,991 due and unpaid since October 27, 2020.

11.     The aggregate amount of statutory prejudgment interest through December 1, 2020 is the sum of the amounts in the preceding paragraph, or $12,164,697.

12.     Accordingly, through December 1, 2020, the total accrued contractual interest and statutory prejudgment interest due and payable on the 2020 Notes is $240,361,558 (the sum of $228,196,861 in accrued and unpaid contractual interest, ¶ 9, and $12,164,697 in statutory prejudgment interest, ¶ 11).

### Continually Accruing Contractual and Statutory Prejudgment Interest After December 1, 2020

13.     In addition to calculating accrued and unpaid contractual and statutory prejudgment interest owed to the Trustee through December 1, 2020, I have calculated the amount of additional contractual and statutory prejudgment interest that will accrue each day from December 2, 2020, to the date the Court enters judgment.

14.     On the outstanding principal, contractual interest will accrue at the Contractual Rate. Based on my calculations, contractual interest on the outstanding principal will accrue at a daily rate of $397,556 from December 2, 2020, through December 31, 2020 or the date the Court enters judgment, if earlier. (Daily contractual interest will not accrue at the same rate on each day after December 31, 2020. Under the 30 / 360 day-count convention at which the contractual interest accrues, when the prior month has more than 30 days, there is no

accrued interest on the first day of the next month. This means that no contractual interest will accrue on January 1, 2021, because the preceding month of December has 31 days. Similarly, additional contractual interest accrues on March 1, 2021, because February has fewer than 30 days.)

15. On the overdue and unpaid contractual interest, statutory prejudgment interest will accrue at the Statutory Rate. Based on my calculations, there will be $52,790 in statutory prejudgment interest on the overdue and unpaid contractual interest accruing each day from December 2, 2020, through December 31, 2020, or the date the Court enters judgment, if earlier. (As noted in paragraph 4, the daily accrual will increase after December 31, 2020, and again on each Interest Payment Date thereafter, if the payments due on those dates are not made.)

16. Combining these amounts, I calculate that the total amount of additional contractual and statutory prejudgment interest accruing each day from December 2, 2020, to December 31, 2020, or the date of entry of judgment, if earlier, is $450,346.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:    New York, New York
             November 30, 2020

_____
Timothy McKenna

# Exhibit A



**Timothy McKenna**
Associate Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 5503
timothy.mckenna@nera.com
www.nera.com

# TIMOTHY MCKENNA
## ASSOCIATE DIRECTOR

Mr. McKenna is an Associate Director in NERA's Securities Practice and its Product Liability Practice.

In securities, Mr. McKenna's areas of expertise include asset valuation, market structure, and forecasting. He has led investigations of market manipulation and other types of trading related inquiries on behalf of major investment banks and hedge funds. He has consulted on the valuation of fixed income, equity, swaps, options, forwards, futures, and a variety of other derivative positions. His experience also includes forecasting class action and bankruptcy filings for insurance industry clients.

In the Product Liability and Mass Torts Practice, Mr. McKenna has researched malignant and non-malignant forecasting methodologies. He is the author of expert reports on the valuation of future asbestos liabilities for use in company financial and tax filings, an expert report on other tort liabilities filed in US Bankruptcy Court, and he has also prepared forecasts of asbestos and other tort liabilities for use in bankruptcy proceedings.

Mr. McKenna has testified in an International Centre for Settlement of Investment Disputes (ICSID) arbitration hearing, and has authored expert reports and affidavits in a range of matters.

Mr. McKenna is a co-author of "Credit Derivatives and Mortgage-Backed Securities" in *The Handbook of Mortgage-Backed Securities* (Frank J. Fabozzi, ed., 2016).

Prior to joining NERA, Mr. McKenna worked for two years at the Federal Reserve Bank of Chicago as an Associate Economist.

Mr. McKenna received his BA in economics from the University of Chicago, his MA in economics from the University of Pennsylvania, and his MBA from New York University's Stern School of Business, where he specialized in accounting and finance.

Timothy McKenna

## Education

**New York University, Stern School of Business**
M.B.A., Specializations in Accounting and Finance, 2006

**University of Pennsylvania**
M.A., Economics, 2001

**University of Chicago**
B.A., Economics, 1998

## Professional Experience

**NERA Economic Consulting**

| 2015- | Associate Director |
|---|---|
| 2007-2015 | Senior Consultant |
| 2004-2007 | Consultant |
| 2003-2004 | Senior Analyst |
| 2002-2003 | Analyst |

**Federal Reserve Bank of Chicago**

| 1998-2000 | Associate Economist |
|---|---|

## Affidavits, Expert Reports and Testimony

Rebuttal Expert Report of Timothy McKenna in the matter of *MUFG Union Bank, N.A., and GLAS Americas LLC* v. *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc.,* before the US District Court Southern District of New York, to review and respond to the expert report of Mr. David C. Hinman, 2020.

Expert Report on behalf of a US company regarding potential future obligations of a settlement trust. The confidential report was relied upon by the company's auditors in their audit work, 2019.

Two Expert Reports and four Rebuttal Expert Reports on behalf of the US government. Subject matter of the reports is confidential, 2018-2019.

Expert Report on behalf of a large credit union regarding the interest rate risk of their non-maturity deposits and credit card portfolios. The confidential report was relied upon by the company in their discussions with regulators, 2016.

Timothy McKenna

Expert Report on behalf of a US company regarding potential future obligations of a settlement trust. The confidential report was relied upon by the company's auditors in their audit work, 2016.

Expert Report on behalf of a US company regarding potential future obligations of a settlement trust. The confidential report was relied upon by the company's auditors in their audit work, 2014.

Expert Report, In the Eastern District of Washington Bankruptcy Court in *The Catholic Bishop of Spokane a/k/a The Catholic Diocese of Spokane v. Paine Hamblen, LLP, et al.* on topics related to the estimate of future claims against a bankruptcy trust, 2014.

Testimony, *Arbitration Between: The Rompetrol Group NV and The Republic of Romania,* (In Relation to the Arbitration Proceedings Brought Under the Rules of the International Centre for Settlement of Investment Disputes in Accordance with Article 8 of the Agreement on Encouragement and Reciprocal Protection of Investments Between The Government of The Kingdom of the Netherlands and The Republic of Romania) on behalf of The Rompetrol Group NV on causation and damages as a result of a disputed government privatization, 2010.

Expert report on behalf of a large automotive parts manufacturer on the expected surplus value of a fund established for asbestos claimants. The confidential report was utilized in the company's tax filings, 2009.

Expert report on behalf of a large automotive parts manufacturer on expected liability of a subsidiary due future asbestos related litigation. The confidential report was utilized in the company's tax filings, 2008-2009.

Affidavit on behalf of defendant, before the Securities and Exchange Commission, *In the Matter of David Finnerty, et al.* on issues relating to computerized records of specialist trading on the New York Stock Exchange, 2007.

Affidavit (with Faten Sabry) on behalf of plaintiffs in *Barbara Jiggetts et al. v. Michael Dowling, as Commissioner of the New York State Department of Social Services* on a statistical analysis of the present and future adequacy of a housing allowance for low income families in New York City, 2005.

## Selected Project Descriptions

Consulting on an ERISA dispute involving the investment returns of a large pension fund, 2018-2019.

Consulted on the valuation of an emerging markets bond and the impact of disclosures on its price, 2019.

Timothy McKenna

Consulted for an investment bank on issues related to the mismarking of a portfolio of equity index future positions, 2018-2019.

Consulted on credit risk modeling issues for a bank-owned life insurance product, 2018.

Consulted on the valuation of a defaulted sukuk, 2017.

Internal investigation on behalf of a large commercial and investment bank regarding allegations of manipulation of certain benchmark prices used for derivative contracts. Investigated trading by the bank in cash and derivative instruments. Drafted exhibits and documents to assist the client in their interactions with the regulators. 2015-2016.

Valuation of a convertible bond on behalf of the issuer for their financial reporting, 2015.

Internal investigation on behalf of a hedge fund regarding market manipulation charges, 2014-2015.

Valuation of Venezuelan oil warrants, 2014.

Consulted on the preparation and analysis of the termination amount payable to a large commercial and investment bank under the ISDA Master Agreement in connection with a portfolio of more than 30,000 OTC derivatives. The portfolio included credit, interest rate, commodity, equity, and foreign exchange derivatives. Analysis concerns issues related to valuation and portfolio risk measurements, 2008-2014.

Consulted on risk and other characteristics of a series of notes that were issued by a SPV and incorporated CDS and synthetic CDO exposures, 2014.

Consulted on trading in credit default swap indices and index tranches, 2012-2013.

Consulted on trading by a hedge fund in interest rate derivatives, counterparty risk, alleged breaches of investment restrictions and alleged misrepresentations to investors, 2011-2012.

Designed and implemented a forecasting model to predict the probability of a company being sued in a securities class action, 2008 - present.

Advised multiple clients during the criminal and civil phases of litigation resulting from trading on the NYSE, 2006-2007.

## Publications

"The Challenges of Transitioning Away from IBORs," Bylined Article, Law360, June 2019.

With S. Chu, "A Look at Initial Coin Offerings," NERA Working Paper, December 2017.

Timothy McKenna

With R. Starr, "PDVSA's Peculiar Oct. '22 Bond May Carry Elevated Risks," NERA Working Paper, August 2017.

with C. Okongwu, O. Kitaychik, and G. Renzi-Ricci, "Credit Derivatives and Mortgage-Backed Securities," in Frank J. Fabozzi, ed., *The Handbook of Mortgage-Backed Securities*, Seventh Edition (Oxford, 2016).

with C. Okongwu, "Foreclosure Suspensions and Other Mortgage Disputes," NERA Working Paper, December 2010.

## Presentations

Presentation, "Developments in US Securities Litigation," Association of Corporate Counsel's Corporate & Securities CLE Institute, Philadelphia, PA, 2019.

Presentation, "Damage Calculations in the US & New Jurisdictions," DRRT 9th Annual Europe Global Investor Protection Conference, Frankfurt, Germany, February 2017.

Presentation, "Damages ≠ Damages—How Damages Vary From Country to Country," DRRT 10th Annual Europe Global Investor Protection Conference, Frankfurt, Germany, February 2016.

Presentation, "Tips for 'Big Data'," live webcast *Big Data in Litigation: What it is and How it's Used by Economic Experts and Lawyers in Complex Litigation,* hosted by The Knowledge Group, LLC/The Knowledge Congress Live Webcast Series, 2015.

Presentation, "Statistical Developments in US and Non-US Securities Litigation," DRRT 6th Annual Conference on Global Investor Protection, Frankfurt, Germany, 2014.

Presentation, "Argentinian Debt Litigation," as part of *The Best of NERA 2013*, a web-based live audiocast on www.sechistorical.org, Washington, DC, 2013.

November 2020

# Exhibit B

*Petróleos de Venezuela, S.A., et al.* v. *MUFG Union Bank et al.*, No. 1:19-cv-10023
**Contractual and Statutory Interest**
**As of December 1, 2020**

| Description | Interest Start Date | Interest End Date | Interest Rate[1] | Contractual Interest Payments Due and Unpaid | Statutory Prejudgment Interest |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| Overdue Contractual Interest Payment | 4/27/2019 | 10/27/2019 | 8.5% (30/360) | $71,559,991.25 | |
| Statutory Prejudgment Interest (on Overdue 10/27/19 Contractual Interest Payment) | 10/27/2019 | 12/1/2020 | 9% (act/act) | | $7,059,418.05 |
| Overdue Contractual Interest Payment | 10/27/2019 | 12/18/2019 | 8.5% (30/360) | $20,275,330.85 | |
| Statutory Prejudgment Interest (on Overdue 12/18/19 Contractual Interest Payment) | 12/18/2019 | 12/1/2020 | 9% (act/act) | | $1,740,199.82 |
| Overdue Contractual Interest Payment | 12/18/2019 | 4/27/2020 | 8.5% (30/360) | $51,284,660.40 | |
| Statutory Prejudgment Interest (on Overdue 4/27/20 Contractual Interest Payment) | 4/27/2020 | 12/1/2020 | 9% (act/act) | | $2,749,194.09 |
| Overdue Contractual Interest Payment | 4/27/2020 | 10/27/2020 | 8.5% (30/360) | $71,559,991.25 | |
| Statutory Prejudgment Interest (on Overdue 10/27/20 Contractual Interest Payment) | 10/27/2020 | 12/1/2020 | 9% (act/act) | | $615,885.17 |
| Contractual Interest on Outstanding Principal[2] (Accruing Since 10/27/20) | 10/27/2020 | 12/1/2020 | 8.5% (30/360) | $13,516,887.24 | |
| **Total:** | | | | **$228,196,860.99** | **$12,164,697.13** |

**Notes:**

[1] Act/Act interest reflects the actual number of days that have passed as a fraction of the actual number of days in a year (365 in a normal year, 366 in a leap year), multiplied by the corresponding interest rate.

[2] The outstanding principal balance is $1,683,764,500.

***Petróleos de Venezuela, S.A., et al.*** v. ***MUFG Union Bank et al.*** , No. 1:19-cv-10023
**Daily Contractual and Statutory Interest**

| Description | Interest Rate[1] | Daily Amount[2] |
|:---:|:---:|:---:|
| (1) | (2) | (3) |
| Daily Contractual Interest | 8.5% (30/360) | $397,555.51 |
| Daily Statutory Interest | 9% (act/act) | $52,790.16 |
| **Total Daily Interest** | | **$450,345.66** |

**Notes:**

[1] Act/Act interest reflects the actual number of days that have passed as a fraction of the actual number of days in a year (365 in a normal year, 366 in a leap year), multiplied by the corresponding interest rate.

[2] The daily statutory interest is calculated for the days between December 1, 2020, and December 31, 2020. A higher amount of daily statutory interest will accrue starting on January 1, 2021.