**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 1:17-mc-00151-LPS |
| v. | ) | |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | **PUBLIC – REDACTED PURSUANT** |
| | ) | **TO D.I. 1887** |
| *Defendant*. | ) | |

_____

**THE VENEZUELA PARTIES' OBJECTIONS TO THE SPECIAL MASTER'S
<u>UPDATED FINAL RECOMMENDATION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ................................................................... 3

ARGUMENT ...................................................................................................................... 4

    I.      The Amber Bid Defies Delaware Law and the Court's Orders ................................. 4

          A.      Amber Is Not the "Highest Bidder" ................................................................ 4

                1.      Amber's Bid Price Is Not the Highest Received. ............................... 5

                2.      The Special Master has not conducted any analysis to quantify the likelihood that the Dalinar Bid will not close. ................................... 6

                3.      The Special Master has not conducted any analysis to quantify the likelihood that the Amber Bid will not close. ..................................... 9

                4.      The Special Master's defense of the lower bid is flawed and misleading. ...................................................................................... 10

          B.      The Amber Bid Is Grossly Inadequate and Shocks the Conscience ............. 14

          C.      The Amber Bid Is the Product of a Prejudicially Defective Sale Process ..... 15

    II.     The Venezuela Parties Preserve and Incorporate Their Prior Objections ................. 16

    III.    Objections to Terms of Amber's SPA ......................................................... 16

    IV.    Objections to Provisions of the Proposed Sale Order ............................................... 18

    V.    Objection to Timing of Bid Deadline and Sale Hearing ........................................... 20

# TABLE OF AUTHORITIES

## Cases

*Abdulrahman v. Ashcroft*,
  330 F.3d 587 (3d Cir. 2003) ............................................................................... 11

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*,
  461 U.S. 731 (1983) ........................................................................................... 18

*Crystallex v. Bolivarian Republic of Venezuela*,
  24 F.4th 242 (3d Cir. 2022) ......................................................................... 16, 20

*Diaz v. U.S. Dep't of Hous. & Urb. Dev.*,
  657 F. Supp. 3d 372 (S.D.N.Y. 2023) ................................................................ 20

*E. Sav. Bank, FSB v. CACH, LLC*,
  55 A.3d 344 (Del. 2012) .................................................................................... 12

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) .............................................................................. 20

*Gilbert v. El Paso Co.*,
  490 A.2d 1050 (Del. Ch. 1984) ......................................................................... 17

*Greenway v. Buffalo Hilton Hotel*,
  143 F.3d 47 (2d Cir. 1998) ................................................................................ 13

*In re Bakalis*,
  220 B.R. 525 (Bankr. E.D.N.Y. 1998) ................................................................. 5

*In re Cantwell*,
  639 F.2d 1050 (3d Cir. 1981) ............................................................................ 20

*In re Del. & Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991) ................................................................................ 7

*In re Islam*,
  2025 WL 1079081 (B.A.P. 9th Cir. Apr. 10, 2025) ........................................... 13

*In re R.M.L., Inc.*,
  92 F.3d 139 (3d Cir. 1996) .................................................................................. 6

*Johnson v. Craddock*,
  365 P.2d 89 (Or. 1961) ........................................................................................ 5

*King v. Lyons*,
    248 P.3d 878 (N.M. 2011) ...........................................................................5

*Leatherbury v. Greenspun*,
    939 A.2d 1284 (Del. 2007) ..........................................................................5

*Matter of Xonics Photochem., Inc.*,
    841 F.2d 198 (7th Cir. 1988) ........................................................................6

*Miami Ctr. Ltd. P'ship v. Bank of N.Y.*,
    838 F.2d 1547 (11th Cir. 1988) ...................................................................20

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
    73 F.4th 157 (3d Cir. 2023) .................................................................16, 20

*Salzberg v. Sciabacucchi*,
    227 A.3d 102 (Del. 2020) ............................................................................5

**Statutes**

8 Del. C. § 324 ..................................................................................passim

9 Del. C. § 4535 .........................................................................................5

9 Del. C. § 8753 .........................................................................................5

22 Del. C. § 504 .........................................................................................5

25 Del. C. § 6309 .......................................................................................5

28 U.S.C. § 1961 .......................................................................................13

28 U.S.C. § 2004 .......................................................................................19

**Rules**

Fed. R. Civ. P. 53 .....................................................................................19

Fed. R. Evid. 201(b) .................................................................................13

# INTRODUCTION

The Amber Bid ignores the Court's directives, contravenes Delaware law, and is a boon for the 2020 Bondholders at the expense of satisfying attached judgments and discharging the debts of the Republic and PDVSA. The Special Master's decision to recommend it over the already grossly inadequate Dalinar Bid is baffling. In the weeks following his July 2 recommendation, he has—just as the Venezuela Parties ("VPs") predicted—continued his relentless fixation on the Bondholder Litigation, ultimately selecting a bid that, contrary to the Court's *express* directives in the stalking horse round, prioritizes purported closing certainty over a massive price differential and falls short even of the Dalinar stalking horse bid price. D.I. 1741 at 6. The result—over two billion fewer dollars of debt discharged in the new recommendation—is indefensible. The Court should reject the Amber Bid and the Dalinar bids. With Judge Failla's ruling days away, now is the time for the Court to rethink the process, which has consistently produced failed, unconscionable, value-destroying bids.

This Court made clear in April that the final recommendation should have "a price at or exceeding" Dalinar's $6.949 billion March stalking horse bid "while also having a greater likelihood of closing" than that same bid, and that the final recommended bid should place "much greater emphasis" on satisfying judgments and "lesser emphasis" on closing certainty. D.I. 1741 at 3, 6; D.I. 1728 at 2–3. The Special Master instead recommends a bid that fails on both counts. It clearly does not meet or exceed Dalinar's earlier $6.949 billion bid price (or even come close to it) and, therefore, it places *greater* emphasis on closing certainty than price.

Indeed, the Amber Bid the Special Master recommends today is worse even than the Amber Bid he recommended in September 2024, which was roundly castigated by creditors and the VPs alike. Amber's September 2024 bid had a *higher* price ($7.286 billion crediting the 2020s

1

escrow account if the Bondholders lost) than today's $5.892 billion bid and had an escrow arrangement to pay the Bondholders only if they ultimately succeeded on their claims. Months later, after a reset, when the Special Master recommended Red Tree as the stalking horse premised on a Transaction Support Agreement ("TSA") with the Bondholders (like Amber's TSA today) that would pay them whether they won or lost in New York, his counsel admitted that the Red Tree bid was *worse* than Amber's September 2024 bid because at least Amber's escrow structure could prevent the fundamental injustice of paying Bondholders for worthless claims. *See* Hr'g Tr. (Apr. 17, 2025) 97:23–99:5. *Now*, the Special Master recommends a bid that is *lower* than Amber's 2024 bid, offers *more* to the Bondholders than Red Tree's stalking horse bid, and bears the very hallmark—a TSA that pays the Bondholders *win or lose*—that his counsel acknowledged is a step backwards from the failed Amber 2024 bid. The Special Master's undue focus on satisfying the Bondholders has perverted the bidding process at every turn.

At its core, the Amber Bid is not confirmable as a matter of Delaware law. Most fundamentally, Delaware law requires the Court to select the "highest bid[]," not what the Special Master deems the "best" bid. The Amber Bid is significantly lower than both Dalinar bids, and the Special Master has provided no analysis to quantify the value of the Amber Bid's purported closing certainty or justify the $2 billion gap between the bids.[1] Moreover, the Amber Bid fails the 50% test even more obviously than the Dalinar bids, is unconscionable in its own right, and is the product of a defectively designed and prejudicially mismanaged sale process.

Startlingly, the Special Master also has no answer to the Court's concern that approving a bid that pays the Bondholders could give rise to a "fundamental injustice" if their bonds are inva-

---

[1] All references to bid amounts and differences between them are based on the judgment amounts adopted by the Court on April 25, 2024, plus accumulated interest since that date. *See* D.I. 1136; D.I. 969-1. By utilizing these numbers, the VPs do not waive or forfeit any objections or challenges to judgment amounts or bid values.

2

lid. D.I. 1741 at 7–8. Instead, he simply suggests the Court should decline to approve the Amber Bid in that scenario and re-open bidding, which he predicts "would provide materially higher consideration to holders of Attached Judgments" once the cloud of uncertainty cast over the process is lifted. D.I. 2123 ¶¶ 19, 21. That welcome, if erratic, change in position is *precisely* the argument the VPs have made for years. But the Special Master's version of this fix is illusory, as the TSA requires the Bondholders to seek a *stay* of the New York litigation, which, if granted, would deprive this Court (and others) of a determination as to whether the 2020 Bonds are valid, without which the Special Master's proposal to re-solicit bids would never arise. Indeed, the Bondholders sent Judge Failla a letter *yesterday* implying she should slow down because of the TSA and this Court's schedule. And even if the Bondholders win, the TSA at the heart of Amber's bid is only defensible if the Court assumes the Bondholders would prevail on appeal and otherwise be able to both obtain an OFAC license **and** successfully block a different bid— outcomes that are far from certain, that would be heavily litigated, and that the Special Master provides no basis to assume would take place. The TSA provides nothing but an unjustifiable diversion of value away from satisfying judgments.

## NATURE AND STAGE OF PROCEEDINGS[2]

The Dalinar Bid recommended on July 2 would discharge $7.382 billion in judgments. D.I. 1837 ¶ 69, n.12. On August 14, the Court continued the Sale Hearing to allow the Special Master time to evaluate an unsolicited bid from Amber Merger Sub LLC ("Amber"). *See* D.I. 2056 ¶ 2. On August 28, Dalinar submitted a revised bid, which would discharge $7.9 billion in attached judgments. D.I. 2123 ¶¶ 5, 14. Dalinar's revised bid also continues to include the highly confident letter from J.P. Morgan for $1.8 billion of preferred equity financing (which supported

---

[2] The VPs presume familiarity with the history of this case and with regularly used abbreviations.

its July 2 bid) and an additional $500 million to the maximum available borrowings under an as-set-based revolving credit facility ("ABL"), which, when combined, could provide up to $2.8 billion in funds to pay the Bondholders if needed to close its transaction. *Id.* ¶ 17. On August 29, the Special Master filed an updated recommendation, in which he seeks approval of the Amber Bid, which would discharge only $5.892 billion in attached judgments, paired with a TSA that would pay the Bondholders $2.125 billion to release the purported pledge of CITGO Holding stock securing the 2020 Bonds and transfer the bonds to Amber. D.I. 2123 ¶¶ 7, 9.[3]

## ARGUMENT

## I.    The Amber Bid Defies Delaware Law and the Court's Orders.

Shares of corporate stock that have been attached under 8 *Del. C* § 324(a) are to "be sold at public sale to the highest bidder."[4] Even the highest bid, however, cannot be confirmed when it is grossly inadequate and shocks the judicial conscience—a standard presumptively met when the bid is less than 50% of fair market value. D.I. 1951-1 at 12–14. Moreover, apart from the 50% test, the outcome of a forced sale should be rejected where the sale process was prejudicial-ly defective. *Id.* at 12, 20. The Amber Bid fails on all three counts.

### A.    Amber Is Not the "Highest Bidder."

The Amber Bid fails because it is not the "highest bid[]" received by the Special Master. Section 324(a) requires the shares to be sold to the "highest bidder"—a requirement that protects the debtor's interests by maximizing the amount of its debt discharged by a forced sale. The Spe-cial Master and the Court have acknowledged that this standard applies to the final recommenda-

---

[3] The Amber Bid proposes to pay ███████████████████ in "exchange" for the ex-tinguishment of $500 million of Gold Reserve's judgment. D.I. 2123 ¶ 7. Gold Reserve, howev-er, has rejected this "Additional Consideration," *id.* at 7 & n.6, and this Court has been clear that no creditor junior to Gold Reserve could receive that consideration instead. D.I. 1583.

[4] There is no dispute that Delaware law governs. D.I. 83 at 75 n.48 (parties agree); D.I. 481 at 5 (SPO); D.I. 1728 at 3 (Court noting Section 324(a) applies to final recommendation); D.I. 2006 at 38 (Special Master agreeing Section 324 "guide[s]" the sale process).

tion. *See* D.I. 1660 at 6 (Special Master); D.I. 1728 at 3 (Court stating Section 324(a) "requir[es]" that the "attached shares be ***sold*** 'to the highest bidder'"); D.I. 1741 at 4–5 (same).[5]

### 1.    Amber's Bid Price Is Not the Highest Received.

The $5.892 billion Amber Bid, which is over $2 billion lower than the August 28 Dalinar Bid and over $1.5 billion lower than the previously recommended July 2 Dalinar Bid, does not meet the "highest bidder" standard. The Special Master knows it, which is why his recommendation repeatedly refers to the Amber Bid as the "best" bid—never the "highest." D.I. 2123 ¶¶ 6, 11, 15, 24, 26. But "best" and "highest" are distinct concepts; Section 324's "highest bidder" standard is stricter than a "highest and best" standard employed in other contexts, such as bankruptcy sales. *See In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (noting that "best" in "highest and best" standard is "not mere surplusage" and authorizes selecting a lower bid based on unquantified, non-price factors such as certainty and speed of closing).[6] Indeed, the Delaware Code uses "highest" bidder in Section 324, while employing "highest and best" for other sales, including in provisions predating Section 324(a). *See* 9 *Del. C.* § 8753; 22 *Del. C.* § 504(a); 9 *Del. C.* § 4535; 25 *Del. C.* § 6309. That is telling, for when words are "expressly included in one statute but omitted from another," it shows "that the General Assembly intended to make those omissions," even across different titles of the Code. *Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007); *see Salzberg v. Sciabacucchi*, 227 A.3d 102, 118 & n.69 (Del. 2020) (similar & noting statutes are construed to "avoid surplusage").

Identifying the "highest" bid is an objective test. This Court has set the metric for bid

---

[5] During the stalking horse round, the Special Master contended that the Court could approve a bid that was lower than another but purportedly had better "closing certainty" because Section 324(a)'s "highest bidder" requirement applies only to the selection of a final bid. D.I. 1660 at 6.

[6] *See also Johnson v. Craddock*, 365 P.2d 89, 95 (Or. 1961) (en banc) (distinguishing court's discretion when applying "highest" and "highest and best" standards); *King v. Lyons*, 248 P.3d 878, 896 (N.M. 2011) (contrasting "highest bidder" and a "highest and best bidder" standards).

price: the "amount of Attached Judgments expected to be satisfied by the purchase price." D.I. 1552-1 at 8.[7] The Court also instructed that the Special Master's final recommendation should have a bid price "at or exceeding" $6.949 billion and should place "much greater" emphasis on price than closing certainty. D.I. 1741 at 3, 6. Amber's bid does not satisfy either Delaware law's requirement or this Court's instructions and should be rejected on that basis alone.

### 2.    *The Special Master has not conducted any analysis to quantify the likelihood that the Dalinar Bid will not close.*

The Special Master recommends the $5.892 billion Amber Bid solely because it purportedly has greater closing certainty than Dalinar's bids. D.I. 2124 ¶ 33. Even assuming Delaware law might allow the Court to take closing certainty into account in deciding which bid is "highest," the Special Master has not provided any objective analysis quantifying the value provided by the purported difference in closing certainty, and definitely not one that could justify a $2 billion gap between the bids. *E.g.*, Eimer Ex. 69 (Hiltz Dep.) at 360:17–361:6; *id.* at 411:15–412:19 (acknowledging no effort to assess likely outcome of Bondholder Litigation and arguing doing so is impossible).[8] He must. *See In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) (courts should consider likelihood of contingent event "from an objective standpoint"); *Matter of Xonics Photochem., Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) (valuing contingent assets by discounting their face value "by the probability that the contingency will occur"); Eimer Ex. 52 (██████████████

---

[7] The money Amber proposes to pay to the Bondholders under the TSA diverts value that could otherwise go to pay more Attached Judgment Creditors. It should not be credited to the price of Amber's bid. Under Section 324(a) and this Court's orders, the Special Master's mandate is to maximize the value of the PDVH shares to pay off Attached Judgments, not to pay disputed claims of non-attachment holders—much less purport to settle disputed claims by diverting money that would otherwise go to pay down *actual* judgments against PDVSA or the Republic without PDVSA's consent. *See* 8 *Del. C.* § 324(a); D.I. 277 ¶ 2; D.I. 1951-1 at 29–32; D.I. 1639 at 3; Eimer Ex. 12 at 1–3; Eimer Ex. 18 at 1–2; *see also* D.I. 479 (this Court instructing the Special Master not "take any role in disposing of the PDVSA 2020 Bondholders' claim").

[8] "Eimer" exhibits refer to exhibits identified in D.I. 1948-8; D.I. 1951-9, D.I. 1986, D.I. 2043; D.I. 2046-2 and the Third Supplemental Eimer Declaration filed herewith.

████████████████████). Yet the Court warned the Special Master would have to justify any recommendation that relied on closing certainty in this way, advising that, if faced with a choice between $1 billion dollars for creditors or a TSA, "the $1 billion sounds like it might be better." D.I. 1840-1 at 57, 60; *cf. In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175 (D. Del. 1991) (in bankruptcy sales, the trustee bears the burden of demonstrating adequate price). Ignoring that direction, the Special Master presents a bid over $2 billion lower than another because it has a TSA—all based on nothing more than the undefined risk that the Dalinar Bid may not close.

As the VPs and others previously explained (*see* D.I. 1644 at 1, 2–3 and D.I. 1666 at 2–3; D.I. 1636 at 4–5 and D.I. 1667 at 2–3; D.I. 1638 at 5 and D.I. 1665 at 2–3), it is not enough for the Special Master to just ask the Court to trust him that the purported risk to the closing of Dalinar's Bid posed by the Bondholders is so great that the Court should willingly sacrifice billions of dollars in value that should go to Attached Judgment Creditors (with a corresponding reduction in the Republic's and PDVSA's debt) and instead allow that money to be paid to the Bondholders, who do not even hold a judgment, much less an Attached Judgment. To justify such a prejudicial decision, the Special Master at least must show that the Bondholders have a high likelihood of blocking the Dalinar Bid from closing. Eimer Ex. 73 ¶¶ 5–7. He has not done so.

Judge Failla may or may not rule that the 2020 Bonds and the purported CITGO Holding Pledge accompanying it are valid. The Special Master has not assessed the likelihood of such an outcome, without which there is no basis for assigning any value to the risk that Dalinar could not close. Eimer Ex. 69 at 360:17–361:6; *id.* at 411:15–412:19. And even if he had, it would only be the first step in the required analysis, as winning summary judgment would not, by itself, allow the Bondholders to block a Dalinar transaction. The Bondholders also would have to either (1) exercise their voting rights under the indenture and install directors at CITGO Holding and

CITGO who would block Dalinar's financing, which would require both that their judgment is not stayed pending appeal **and** that OFAC lifts its suspension of General License 5 (despite years of renewing the suspension to allow the Bondholder Litigation to conclude); or (2) a non-stayed injunction prohibiting Dalinar or some other party from proceeding to closing under the current financing arrangement, which itself would require OFAC authorization. *See* D.I. 1697 at 4–5; D.I. 1825 at 2–3; Eimer Ex. 69 at 437:1–7 (Mr. Hiltz acknowledging change of OFAC policy required for Bondholders to block closing). And even if the Bondholders could block the current financing arrangement, Dalinar **still** could obtain alternate financing or negotiate a release of the CITGO Holding Pledge with the Bondholders. A rigorous analysis of the likelihood of each of these events is required to conclude that there is *in fact* a high risk that Dalinar cannot close, as it is far from obvious that any of these contingencies will occur, much less all of them.[9]

For example, obtaining an injunction would require the Bondholders to establish, among other things, (1) a likelihood of success on the merits on their argument that Dalinar's proposed financing at the CITGO level breaches a provision of the pledge prohibiting CITGO Holding from paying dividends to PDVH while the bonds are in default, notwithstanding that the transaction does not involve any dividends or other distributions; (2) that the Bondholders would suffer irreparable harm even though they would retain the right to later foreclose on the pledged shares to recover the money PDVSA allegedly owes them and even though those shares clearly are worth more than the amount allegedly owed on the bonds; and (3) that the Bondholders lack an adequate remedy at law even though they can sue for damages for breach of the pledge.

---

[9] Among other things, the Special Master would have to take into account that, just days ago, the United States submitted a statement of interest in the Bondholder Litigation that reaffirms its recognition of the 2015 National Assembly as "the only government of Venezuela," and that therefore "the views presented by" it on the invalidity of the 2020 Bonds under the applicable Venezuelan law "constitute the views of a foreign government" entitled to "respectful consideration" under Supreme Court precedent. Eimer Ex. 70 (*MUFG*, ECF No. 393 at 1–2).

At base, the Special Master has not provided any analysis of the likelihood of these events occurring, much less established that the probability that Dalinar cannot close is so high that it makes up for the more than $2 billion difference between the Dalinar and Amber Bids. This failure is inexplicable given that the Court told him that a recommendation focused on a TSA "rather than (or at the expense of) improving bids to satisfy judgments of the Additional Judgment Creditors" would be unpersuasive (D.I. 1741 at 6); that the winning bid should meet or exceed Dalinar's $6.949 billion stalking horse *bid price* and deemphasize closing certainty (*id.* at 3, 6); and that a sacrifice of even $1 billion in exchange for a TSA would be suspect (D.I. 1840-1 at 57, 60). The Amber Bid contravenes all of those directives, and the Special Master offers no objective analysis to overcome those failures. The Court should hold him to its prior directions.

### 3.    The Special Master has not conducted any analysis to quantify the likelihood that the Amber Bid will not close.

In his haste to champion Amber, the Special Master also has given no serious consideration to the Amber Bid's *own* closing risk if the 2020 Bonds are deemed invalid and it becomes clear that attachment creditors are being deprived of billions of dollars that otherwise should have gone to pay down the Republic's and PDVSA's debts. The Court *expressly* urged him to consider the repercussions of recommending a final bid that "places . . . substantial value on settlement of the 2020 Bondholders' litigation," but "subsequent events" make clear the "2020 Bondholders have no rights to CITGO Holding" such that it would be a "fundamental injustice to close on such a Final Bid, when bids with a much greater purchase price were rejected." D.I. 1741 at 7–8. That is *precisely what the Special Master recommends today*.[10]

---

[10] He also has given no consideration to the risk that the Executive Branch will refuse to license a sale that will transfer billions of dollars of value from Attached Judgment Creditors to the Bondholders without PDVSA's consent, or to do so before a final decision regarding the validity of bonds that were exchanged under the Maduro regime in defiance of the National Assembly, the

#### 4.    The Special Master's defense of the lower bid is flawed and misleading.

The Special Master attempts to defend his recommendation of the bid that is not the "highest bid[]" by characterizing it as a "one-way option for the benefit of the sale process" and (certain) creditors. In his telling, if Judge Failla rules that the Bondholders' claims are valid, then the Court can accept his recommendation, but if she rules that their claims are invalid, then the Court can reject the Amber Bid and order new bidding to capture additional value that will flow from that outcome.[11] D.I. 2123 ¶¶ 19, 21. There are a number of problems with this justification.

*First,* as the Special Master acknowledges (D.I. 2123 n.13), he asks this Court to approve a transaction which Amber and the Bondholders bound themselves under the TSA to seek to immediately stay the Bondholder Litigation (D.I. 2123-1, Ex. F at 10 (Amber TSA § 3.1(a)(iii)(F)); *id.* at 12 (§ 3.2(a)(iv))) to deprive this Court of the benefit of Judge Failla's ruling (and PDVSA of a decision regarding the bonds' validity).[12] If this ploy is successful, it would prevent the Special Master's "option" from ever coming to fruition and would require the Court to assess the bids without the "20/20 hindsight," D.I. 2123 ¶ 18, that the Special Master promises. Indeed, just yesterday, the Bondholders filed a letter encouraging Judge Failla to defer her decision in light of the TSA and this Court's schedule. *See* Eimer Ex. 74 (*MUFG*, ECF No. 394 at 2).

---

only U.S.-recognized government of Venezuela. *See* Eimer Ex. 75 (*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023 (S.D.N.Y.), ECF No. 326-1 ("*MUFG*")).

[11] The VPs welcome the Special Master's belated admission that waiting to solicit bids until after Judge Failla rules could be value-maximizing. The VPs have been saying this for years, *see, e.g.*, D.I. 1951-1 at 29 n.23, and agree that if the Bondholders lose, the Special Master should solicit new bids, though he should do so after fundamentally redesigning the process to capture more value, as Mr. Weisenburger has repeatedly recommended and as Evercore's Mr. Hiltz recently has acknowledged is correct. *See* D.I. 2123 ¶ 21; D.I. 2046-1 at 18 (citing Eimer Ex. 56 at 257:9–24; Eimer Ex. 1 ¶¶ 15–16; D.I. 354-1 ¶ 12).

[12] This provision of the TSA is consistent with the Bondholders' repeated efforts to stop the proceedings in New York until after this Court rules. Eimer Ex. 76 (*MUFG*, ECF No. 377) (Bondholders opposing motion to expedite summary judgment); Eimer Ex. 71 (Contrarian executive describing the Bondholders' desire to have Red Tree as stalking horse so that they would have "additional ammo to go to Failla to delay any hearing on the 20's").

**Second,** the Special Master's characterizations of the competing bids distort the supposed risks and benefits of each in a manner more befitting of an advocate than for a quasi-judicial officer tasked with making a neutral recommendation and maximizing value.[13] Examples abound:

(1)    He calls into question the over $500 million increase in Dalinar's updated bid by refusing to recognize Dalinar's purchase of the Valores Mundiales judgment and decision to credit bid it. D.I. 2123 ¶¶ 14–15. He argues that he must know what Dalinar paid for the Valores judgment and that he has questions about whether Rusoro or Koch may need to consent before that judgment can be acquired (*id.* ¶ 13). However, what Dalinar paid to Valores is irrelevant to whether that bid should be counted in the bid price, and he has no reason to believe that any consents are required or, if they are, that they were not provided. *See also* Eimer Ex. 69 at 451:22–452:5 (Mr. Hiltz acknowledging that if the Special Master had questions about affording Dalinar credit for the Valores claim he "should have asked.").

(2)    He repeatedly suggests that Amber's $5.892 billion bid may ultimately be worth $6.392 billion because of the "Additional Consideration" that was offered to—but rejected by—Gold Reserve. *E.g.*, D.I. 2123 ¶¶ 12, 24. The Special Master suggests this deal may be offered to creditors junior to Gold Reserve, D.I. 2123 ¶ 7 n.6, but the Court has foreclosed such an out-

---

[13] *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) ("due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and such persons "must assiduously refrain from becoming advocates for either party"). The Special Master's advisors apparently advised him to recommend Amber's lower bid and a TSA that potentially gives the Bondholders a huge, unwarranted windfall, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ That is yet another fundamental defect requiring the rejection of the Amber Bid. *See* D.I. 1951-1 at 39.

come. *See* D.I. 1583 (stating that "junior creditors cannot be paid until those with superior liens . . . have been satisfied"). And Delaware law certainly does not allow a bidder ████ to junior creditors just because a senior creditor refused to take ████ discount on its judgment. *See E. Sav. Bank, FSB v. CACH, LLC*, 55 A.3d 344, 350 (Del. 2012) (requiring proceeds of an execution sale to be distributed to creditors "in the order of their entry and priority").

(3)     He argues Gold Reserve is intransigent for refusing to accept ████████ in "exchange" for $500 million of its judgment, D.I. 2123 at 6 n.6 (complaining of "unwillingness to take anything less than full recovery in cash"), despite the Court having ruled that a senior creditor cannot be forced to relinquish its judgment for less than full cash payment, D.I. 1583.

(4)     He gives *no* "material weight" to Dalinar's ability to access $1 billion under its ABL and proposed $1.8 billion preferred equity financing, supported by a highly confident letter ("HCL") from J.P. Morgan, that Dalinar has obtained as backup to finance a resolution with the Bondholders if they are able to block Dalinar from closing. D.I. 2123 ¶ 17. His reason for disregarding the HCL is that the Court's orders require committed financing *to pay for the shares.* But this financing is not to pay for the shares. Moreover, the Court forbade any conditions with respect to the Bondholders, D.I. 1517 ¶ 28, which would include a requirement that bidders have committed backup financing to pay them off. The preferred equity financing and HCL instead should be evaluated on their own merits, which the Special Master has not done, even though J.P. Morgan is a highly regarded financial institution and is extremely unlikely to issue an HCL without having concluded it can raise the required funds. Sixth Suppl. Decl. of Randall J. Weisenburger ¶ 8 (Eimer Ex. 73). Indeed, Mr. Hiltz concedes that failing to honor an HCL would pose reputational risk and that he was aware of *no instance* since the 2008 financial crisis of an investment bank failing to perform under an HCL. Eimer Ex. 69 at 371:15–25; *id.* at 455:25–

456:25. The Special Master also says Dalinar may be unable to access necessary borrowings under its ABL if the CITGO assets supporting the facility decline in value. D.I. 2123. ¶ 17. Yet, he does not analyze how likely this is to occur, *see* Eimer Ex. 73 ¶ 9, and Amber's bid likewise relies in part on an ABL facility with the same limitations, Eimer Ex. 69 at 458:24–459:19.[14]

(5)     He repeatedly uses the Bondholders' calculation that, if the 2020 Bonds are valid, they are owed $3.02 billion and thus contends that the TSA secures an $895 million "discount." *E.g.,* D.I. 2123 ¶ 16 & n.10, ¶ 20. But as the Special Master concedes, the amount of interest on the Bonds is uncertain. *See id.* ¶ 16 & n.10. Namely, the Bondholders contend that the contractual interest rate (8.5% on the remaining principal and 9% on unpaid interest) retroactively applies to the period in which their now-vacated judgment was in effect (December 1, 2020–July 24, 2024). By contrast, if the statutory post-judgment rate (0.11%, per 28 U.S.C. § 1961) is applied during that period,[15] then even using the Bondholders' own methodology, they would be entitled to no more than $2.119 billion—i.e., *less* than the $2.125 billion Amber would pay the Bondholders under the TSA.[16] Thus, if the Bondholders' calculation is wrong, the TSA is an overpay-

---

[14] The Special Master must think the Court has amnesia. Weeks ago, he recommended Dalinar's bid for approval, representing that he was satisfied with its ability to close; today, he denigrates it as unworkable. *Compare, e.g.*, D.I. 1837 ¶¶ 11, 78 (expressing view that Dalinar Bid is "capable of being timely consummated" notwithstanding Bondholder claims)*, with* D.I. 2123 ¶ 12 (questioning Dalinar's ability to close "due to the claims of the PDVSA 2020 Bondholders"), *and* D.I. 1837 at 27 n.15 (explaining that Dalinar's ability to close is not conditioned on being able to secure the additional $1.8 billion in preferred equity financing through J.P. Morgan)*, with* D.I. 2123 ¶17 (criticizing Dalinar because the same "remains uncommitted and does not meet the Bid Requirements for bidders to have committed financing").

[15] *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 55 (2d Cir. 1998) ("post-judgment interest commences from the date a judgment is 'ascertained' in [a] meaningful way'").

[16] The Court may take judicial notice of the interest rate and related calculation. *See, e.g.*, *In re Islam*, 2025 WL 1079081, at *7–8 & n.8 (B.A.P. 9th Cir. Apr. 10, 2025) (taking judicial notice under Fed. R. Evid. 201(b) of 28 U.S.C. § 1961 statutory post-judgment interest rate, explaining method to obtain such interest rate using Federal Reserve website, and conducting calculation using the method provided by statute); *see also* Eimer Ex. 77 (*MUFG*, ECF No. 225) (Bondholders' expert's interest calculation). Using the method described in footnote 8 of *In re Islam*, the

ment, not a discount, under *any* ruling from Judge Failla.[17] (And Dalinar's financing contemplated by the ABL and HCL would then be more than enough to pay the full amount of the Bondholders' claims.) Yet the Special Master has not presented any analysis of the likelihood the higher rate will apply. Eimer Ex. 69 at 466:14–24 (Mr. Hiltz conceding no independent analysis by Special Master). And even if the Bondholders' claim is worth $3.02 billion and the Bonds are held to be valid, there is still no discount here, as there is more than enough equity in PDVH (under Dr. Alberro's or Evercore's valuations) to support payment of the full $3.02 billion without paying Attached Judgment Creditors any less than Amber offers them now.

> **B.    The Amber Bid Is Grossly Inadequate and Shocks the Conscience.**

Even if the Amber Bid were the "highest" bid, it would still need to be rejected as unconscionable. The VPs have explained why the Dalinar Bid price is grossly inadequate and shocks the conscience, and incorporate that analysis here. D.I. 1951-1 at 13–16; D.I. 2046-1 at 8–11. The Amber Bid is even worse.[18] It has a *lower* bid price than the Dalinar Bid and thus falls even further below 50% of the fair market value of PDVH. Even if the Court were to reject Dr. Alberro's $18.6 billion valuation, the Amber Bid is under 50% of Evercore's flawed $13.2 billion valuation.[19] In all events, regardless of the 50% test, approving Amber's bid would shock the ju-

---

[17] applicable statutory interest rate for the week preceding the date of the Bondholders' judgment (*i.e.*, 11/23/2020–11/27/2020) is 0.11%. Underlying calculations are available upon request.

[17] Amber's counsel stated in Court that, upon receipt of the bonds, Amber would extinguish them and that it was prepared to include language to that effect in the SPA or another written document. Aug. 18 H'rg Tr. at 194:16–195:1. The Special Master secured no such written commitment. *See* D.I. 2123 ¶ 9 (relying solely on Amber's representation in court).

[18] For the avoidance of doubt, the VPs continue to object to the July 2 Dalinar Bid and would object to the revised Dalinar Bid. That bid, even assuming the $7.9 billion in value to creditors, would fall below the 50% threshold and is also subject to all of the other objections (substantive and procedural) the VPs previously raised. *See* D.I. 1951-1; D.I. 1984; D.I. 2046-1; D.I. 2038.

[19] Mr. Hiltz testified the Special Master has not conducted a discounted cash flow analysis to ascertain the fair market value of the PDVH shares, but instead relies on the outcome of the sale process itself to estimate an $8 billion fair market value, which he calls a "market test." Eimer

dicial conscience given the magnitude of its shortfall, the procedural defects discussed below and in the VPs' prior briefs, and the unique considerations of selling the crown jewel of a foreign nation in the throes of international crises. D.I. 1951-1 at 15–16; D.I. 2046-1 at 17.

### C.    The Amber Bid Is the Product of a Prejudicially Defective Sale Process.

The VPs also incorporate their arguments that the sale process was beset with a flawed design and implementation, prejudicing the Republic and PDVSA, and that re-running and redesigning the sale without these defects would improve the outcome. *See* D.I. 1951-1 at 12, 20–37 (failure to consider alternatives; prejudicial stalking horse selection; failure to hold public sale; undue emphasis on contingent liabilities; Court statements chilled bidding; Evercore conflict); D.I. 1951-2 (Eimer Ex. 1 (RJW5)); D.I. 2046-1 at 17–25 (same). The Special Master's focus on the Bondholders and overall mishandling of the process since his July 2 recommendation compound the prejudicial defects that warrant rejecting the Amber Bid. *See supra,* Introduction.

The process is not salvageable. But if the Court forges ahead it should allow time after Judge Failla's ruling for unsolicited bids to materialize.[20] *See* D.I. 2089 at 2–5; D.I. 2095. And, in all events, approving the Amber Bid after the Bondholders lose would be a grave injustice, as it would afford them a $2.125 billion windfall at the expense of paying off additional judgments.

---

Ex. 69 at 463:9–12; 475:1–476:1. This sale process cannot approximate a market test. *See* D.I. 2046-1 at 12 & n.15. And, in any event, U.S. Supreme Court and Delaware precedent foreclose calculating fair market value by using the results of a forced sale. D.I. 1951-1 at 17 (citing cases) An independent valuation of the shares is the only logical—and legally permissible—means to assess fair market value and thereafter apply the 50% test. D.I. 2046-1 at 12, n.14.

[20] The Court could set a date by which bidders should submit updated bids that account for Judge Failla's ruling, with enough time to then assess those bids at the October 20–21 hearing. Moreover, in this new round of bidding, with the specter of the Bondholders diminished, the Special Master may finally be able to attract new money, rather than the consideration offered by bids to date: merely leveraging CITGO's own assets to finance their bids. A bidder has already indicated that new money is more likely when risks are resolved. *See* Eimer Ex. 28 ████████████ ████████████████████████████████████████████████████████████ .

## II.    The Venezuela Parties Preserve and Incorporate Their Prior Objections.

To avoid doubt, the VPs incorporate all objections and arguments from their briefs on the Dalinar Bid and waive or forfeit none. D.I. 1859; D.I. 1951-1; D.I. 1984; D.I. 2046-1. A non-exhaustive sample includes objections discussed herein as well as: the attachments held by creditors of the Republic are invalid (D.I. 1951-1 at 37–39), bias infected this proceeding (*id.* at 39), and the Special Master did not act as a willing seller (*id.* at 16–20). The VPs also incorporate their brief in response to Gold Reserve's motion to strike. D.I. 2175. The VPs' arguments are timely (D.I. 2046-1 at 25–27) and their experts are reliable (*id.* at 11–17, 24–25).

## III.    Objections to Terms of Amber's SPA.

The VPs update their objection to Section 6.1(b)(xvi) of the now-Amber SPA, which would still restrict dividends among the CITGO Companies to only those occurring in the "Ordinary Course." *See* D.I. 2123-1 at 58–59; *see also* D I. 1951-1 at 41–42. The term "Ordinary Course" introduces ambiguity in this context that compromises the CITGO Companies' ability to manage their businesses and potentially to pay their operating expenses. D.I. 1951-1 at 41–42. This restriction is not present in other proposed SPAs (*see e.g.*, D.I. 2126-1 at 213 (Bidder C)).

The VPs also request that the CITGO Companies and VPs be added as third-party beneficiaries in SPA Section 9.11 with respect to specific provisions which grant them rights. This is necessary to protect their long-recognized right to appeal,[21] and the right to propose an alternative to the sale process at any time—even after entry of a Sale Order, *see* D.I. 1517 ¶ 22(b). Given that the Proposed Sale Order ("PSO") also does not protect these rights, the CITGO Companies and VPs need an enforcement mechanism for them in the SPA.

The VPs also object to SPA Section 6.19, which allocates up to $50 million for incentive

---

[21] *See e.g., OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 174–76 (3d Cir. 2023); *Crystallex v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 256 (3d Cir. 2022).

bonuses for PDVH and CITGO management and employees at the sole discretion of Amber's post-transaction appointed CEO, but only if the Amber transaction closes. Amber's offer creates an improper incentive by dangling a sizeable carrot in hopes of inducing CITGO personnel to act as Amber's agents and provide support for Amber's bid, which could create conflicts of interest and undermine PDVH and CITGO's opposition to and appeal of any Sale Order. *See Gilbert v. El Paso Co.*, 490 A.2d 1050 (Del. Ch. 1984) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."). Indeed, CITGO management will already be obliged to comply with the SPA's restrictive covenants by court order. That should satisfy any concern that management will continue to operate in the ordinary course subject to the covenants, as evidenced by the fact that no one objected to the Gold Reserve SPA on the basis that it lacked any such provision. This incentive is all the more improper because it is not coming out of Amber's pocket, but diverts value from CITGO and ultimately PDVH that could otherwise be available to facilitate a higher bid.

The VPs object to Sections 6.10(a)(x) and (xi) as off-market and overly intrusive on CITGO's business. The Special Master ignored reasonable revisions to these sections proposed by CITGO.[22] The VPs also object to the prohibition on entering, amending, or renewing any contract with PDVSA, which was added to Section 6.1(b)(xi) but was never in any draft shared with the VPs. This provision impermissibly limits the ability of the CITGO Companies to transact with PDVSA beyond the already restrictive interim operating covenants. The VPs renew their

---

[22] The VPs assume the Special Master's positions on Sections 2.3(a)(i), 2.3(a)(iii), and 7.3(c) of the Dalinar SPA, which the VPs previously indicated were acceptable, apply to the equivalent provisions of the Amber SPA. D.I. 2006 at 40; D.I. 2046-1 at 30, n.41. If the Special Master's position on these sections has changed, the VPs renew their objections. D.I. 1951-1 at 41–42.

objection to SPA Section 6.16(c). D.I. 1951-1 at 39. And the VPs request inclusion of an SPA provision allowing the Special Master to terminate the SPA if PDVSA prevails in the Bondholder Litigation before Judge Failla or on appeal.

**IV.    Objections to Provisions of the Proposed Sale Order**.

On August 25, CITGO and PDVH provided comments and requests to the Special Master regarding a draft Amber PSO, with a follow up on August 26, but never heard back. The VPs present those objections, and ones to further changes to the PSO since the draft they reviewed:[23]

- The VPs objected (as did others) that various provisions of the Dalinar PSO contemplated injunctions beyond the Court's authority and for which the Special Master lacked both standing and any cognizable argument for meeting the standard for issuing an injunction. D.I. 1951-1 at 40–41. The Special Master did not respond to these arguments, and any rebuttal now is waived and forfeited. D.I. 2046-1 at 30. The VPs renew this objection. In particular, Paragraph 13 of the Amber PSO should be stricken in its entirety and language in Paragraphs 6,[24] 10, 19, 20, 24 should be removed. *See* D.I. 1951-1 at 40 n.31 (identifying paragraphs in Dalinar SPA; paragraphs listed here are analogues in Amber SPA).

- Three paragraphs would prohibit the filing of certain legal claims (or requiring preclearance from this Court). PSO ¶¶ 19, 20, 24. In addition to being unsupported by any finding of the elements required to issue an injunction (*see* preceding objection), any such injunction would itself be unconstitutional. *Cf. Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 742–43 (1983) (given "First Amendment right of access to the courts," the "filing and prosecution of a well-founded lawsuit may not be enjoined").

- Language (PSO ¶ R) applying the Transaction Documents to the VPs contravenes this Court's recognition that CITGO and PDVH are nonparties to the SPA. D.I. 1951-1 at 41 (citing D.I. 1552-1 at 4 & D.I. 1554 at 14). Likewise, language in PSO ¶ 6 that the VPs previ-

---

[23] The VPs disagree with many provisions of the PSO, which make findings or statements contrary to the VPs' objections (*e.g.*, re: jurisdictional issues, adequacy of price). In making certain targeted objections, the VPs do not waive or forfeit their other objections. The VPs understand the PSO is drafted on the assumption the Court will overrule those objections and thus the VPs need not identify every disagreement with a PSO they believe should not be entered.

[24] PSO ¶ 6 ("enjoin[ing anyone] from taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order"). On August 24, the Special Master's counsel advised that this language would be deleted. Yet it was restored without explanation. This language is exceedingly broad and would, (among other things) threaten to prohibit protected First Amendment activity.

ously objected to (ordering compliance with *all* obligations and covenants, rather than those the Special Master has identified) should be stricken. D.I. 1951-1 at 41 (VPs objecting to same in Dalinar SPA); D.I. 2006 at 36 n.11 (Special Master disagreeing).

- The Court cannot overrule reservations of rights or deem persons or parties to have *consented* to the sale by not "properly objecting." PSO ¶ 2.

- References to 28 U.S.C. § 2004, Rule 53, the All Writs Act, or the Court's inherent or equitable authority are improper to the extent they are invoked to supplement or supplant the Court's powers under Delaware law. The VPs objected to the Special Master's reliance on federal law (D.I. 1951-1 at 12–13 & nn. 8, 9), which the Special Master disclaimed (D.I. 2006 at 38) and cannot raise now. *Delaware* law governs, and the Court cannot invoke other authority to give it powers it lacks under Delaware law. PSO at 1; *id.* ¶¶ B, L, O, 6.

- The VPs renew and preserve objections (*e.g.*, D.I. 317 at 24; D.I. 469 at 9, n.7 (overruling same)) to the scope of the Special Master and his advisors' judicial immunity. PSO ¶ 20.

- The VPs preserve for appeal the argument that the truncated time to review and respond to the updated Final Recommendation deprived them of due process. D.I. 2109 at 2 (Gold Reserve suggesting the schedule proposed by Special Master and later adopted by the Court was not "consistent with due process"); D.I. 2110 at 1 (finding schedule does not "risk[] infringing any entity's due process or other rights"); *see also* D.I. 2108 at 2; *Contra* PSO ¶ D.

- To avoid any doubt, and consistent with the representations of the Special Master and Amber, the PSO should include a provision stating that (1) all attached judgments paid or credit bid as part of the Amber Bid are discharged *in full* and (2) upon performance of the TSA, all exchanged 2020 Bonds are canceled. Aug. 18 H'rg Tr. at 194:16–195:1; D.I. 2123 ¶ 7 (Rusoro and Koch judgments fully discharged), ¶ 9 (2020 Bonds extinguished).

- To the extent the PSO no longer mentions the VPs' ability to propose alternatives to the sale prior to consummation (or the SPA purports to modify that right), the VPs object. *Compare* Dalinar SPA Section 6.16(h) (D.I. 1837-1 at 113), *with* Amber SPA Section 6.16 (D.I. 2123-1 at 80). The Court has stated that the VPs "shall always" have the right to propose alternatives or pay off judgments until consummation. D.I. 1517 ¶ 22(b). Dalinar SPA Section 6.16(h) should be restored, as well.

Finally, in the weeks since the July 2 recommendation, the Special Master has removed a PSO provision immunizing the sale from appeal absent a stay pending appeal, but the threat remains very much alive. *See* D.I. 1837-1 at 33 (¶ 21) (Dalinar PSO paragraph since removed). A stay pending appeal is necessary to avoid any risk that the VPs will be unable to obtain full appellate relief—*i.e.*, stopping the sale. Courts sometimes decline to unwind a transaction by the

time an appeal resolves because it was not stayed in the interim.[25] That cannot be allowed to happen here.[26] Even without the since-removed provision in the PSO, a bidder and creditors could (wrongly) argue the sale cannot be unwound after a Third Circuit ruling in objectors' favor.[27] Indeed, the PSO now contains a provision stating that closing can start "immediately upon entry of" a sale order (PSO ¶ I). The Third Circuit has repeatedly assured the VPs that, upon entry of a sale order, they can pursue all of their past objections and seek full appellate relief. *E.g., Crystallex*, 24 F.4th at 256; *OIEG*, 73 F.4th at 174–76. The Court should prevent any bidder or creditor from arguing in the future that, because no stay issued, a sale cannot be unwound. The easiest way to do so will be to grant a stay. The VPs thus request that an administrative stay be issued alongside any Sale Order to ensure the opportunity to seek a full stay pending appeal.

## V. Objection to Timing of Bid Deadline and Sale Hearing.

The VPs incorporate their position that the Court erred in setting a bid deadline and Sale Hearing before Judge Failla rules. D.I. 2089; D.I. 2095; Aug. 18 Hr'g Tr. at 69:20–71:2; *see also* Eimer Ex. 1 ¶¶ 39–43. Given that the decision is mere weeks away, doing so was arbitrary and an abuse of discretion, as it needlessly frustrated potential bidding improvements following her ruling. The Court rejected the VPs' position (D.I. 1647; D.I. 2110); the VPs preserve it for appeal.

---

[25] *See, e.g.*, *Diaz v. U.S. Dep't of Hous. & Urb. Dev.*, 657 F. Supp. 3d 372, 379 (S.D.N.Y. 2023) ("courts have routinely rejected requests to rescind complex corporate… transactions once they have closed."); *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1557 (11th Cir. 1988) (courts dismiss appeals as moot if it becomes "legally and practically impossible to unwind" a reorganization plan or "restore the status quo before confirmation"); *see In re Cantwell*, 639 F.2d 1050, 1053 (3d Cir. 1981) (appeal moot when appellate court cannot grant "effective relief"); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352–53 (3d Cir. 2016) ("extraordinarily difficult to 'unscramble the egg'… if no preliminary injunction has issued").

[26] To be clear, courts *cannot and should not* refuse to provide relief in the face of a legal error. But this Court should eliminate any *risk* of any court wrongly doing so in the future.

[27] The VPs asked the Special Master to insert a paragraph into the PSO stating that "[n]othing in this order or SPA in any way limits any party's appellate rights and remedies, including the ability to appeal from a final judgment in this case." The Special Master did not respond and did not include this language. The VPs request that this Court insert it.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Hannah M. Bucher
Alec Solotorovsky
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com
ASolotorovsky@eimerstahl.com

*/s/ Alexandra M. Cumings*
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Phillip Reytan (#7255)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
SWaesco@morrisnichols.com
ACumings@morrisnichols.com
PReytan@morrisnichols.com

*Attorneys for PDV Holding, Inc. and
CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
David V. Holmes
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
101 Park Avenue New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com
dholmes@curtis.com

*/s/ Brendan Patrick McDonnell*
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (#7086)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hehg.law

*Attorneys for Petróleos de Venezuela, S.A.*

ABRAMS & BAYLISS LLP

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001

*/s/ Christopher Fitzpatrick Cannataro*
A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000

(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

September 6, 2025

bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*