IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>                    Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>                    Defendant. | Case No. 17-mc-151-LPS |

**GOLD RESERVE'S OBJECTIONS TO
<u>UPDATED FINAL RECOMMENDATION</u>**

**WOMBLE BOND DICKINSON (US) LLP**
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

**NORTON ROSE FULBRIGHT US LLP**

Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and -

Katherine G. Connolly (*pro hac vice*)
One Embarcadero, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and -

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*

## <u>TABLE OF CONTENTS</u>

I.    Introduction ...................................................................................................................1

II.   Amber Energy's Updated Bid Fails Under Delaware Law And The COURT'S Evaluation Criteria ............................................................................................................................3

   A.   Amber Energy's Bid Is $2 Billion Lower than Dalinar Energy's Improved Bid ............... 3

      i.    The Purchase Price of the Amber Energy Bid Is $5.9 Billion ........................................ 4

      ii.   The Purchase Price of the Dalinar Energy Improved Bid Is $7.9 Billion....................... 4

   B.   The "Certainty of Closing" Attributed to the Amber Energy Bid Is a Mirage ................. 6

      i.    The TSA Cannot Deliver the Release of Collateral and Extinguishment of Claims that It Promises ................................................................................................................... 6

      ii.   Judge Failla's Rejection of the 2020 Bondholders' Claims Would Blow Up the Amber Energy Bid, But the Reverse Is Not True: the Dalinar Energy Bid Survives Either Way.... 10

      iii.  The Amber Energy Bid Hinges on the Highly Uncertain Prospect that Judge Failla Will Stay the SDNY Validity Litigation............................................................................. 12

      iv.   Even If the 2020 Bondholders Prevail, The TSA Will Impede, Not Facilitate, Closing of the Amber Energy Bid ................................................................................ 13

      v.    OFAC's Long-Standing Suspension of the 2020 Bondholders' Purported Pledge Creates Substantial Uncertainty for the Amber Energy Bid.................................................. 14

   C.   The Updated Final Recommendation Excessively Overvalues a Potential Settlement With 2020 Bondholders ...................................................................................................... 15

III.  Amber Energy's Bid Works A Fundamental Injustice At the Expense Of The Attached Judgment Creditors ......................................................................................................16

IV.   Dalinar Energy's Improved Bid Should Be Approved ......................................................18

V.    Conclusion ...................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*,
 846 F.3d 1 (2d Cir. 2017) ..................................................................................................8

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
 19-cv-10023 .........................................................................................................11, 12

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
 19-cv-10023, 106 F.4th 263 (2d Cir. 2024)......................................................................11

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-cv-10023*,
 19-cv-10023, D.I. 1 (S.D.N.Y. Oct. 29, 2019).................................................................14

*Petition of Seaford Hardware Co.*,
 132 A. 737 (Del. Super. 1926).........................................................................................16

*Smith v. Caldera Props.-Nassau Grove, LLC*,
 No. CIV.A.S09C-05-005ESB, 2011 WL 2420842 (Del. Super. Ct. June 9,
 2011) ..................................................................................................................................16

**Rules and Statutes**

Del. Code § 324 .......................................................................................................................3

Trust Indenture Act ..................................................................................................................8

**Other Authorities**

Statement of Interest, Ex. 2 .....................................................................................................11

Treas., Office of Foreign Assets Control, Frequently Asked Questions (Jan. 20,
 2022....................................................................................................................................14

Gold Reserve Ltd. f/k/a Gold Reserve Inc. ("Gold Reserve") respectfully objects to the Updated Final Recommendation (D.I. 2123).

## I.    INTRODUCTION

The Updated Final Recommendation violates the Delaware law requirement that the PDVH Shares be sold to the highest bidder. The Dalinar Energy Improved Bid has a purchase price of ***$7.9 billion***, is supported by fully-committed financing, and complies with all other bidding requirements. In contrast, the Amber Energy Bid has a purchase price of only ***$5.9 billion***. This ***$2 billion*** price decrement compels rejection of the Updated Final Recommendation.

There is no justification in law or fact for this proposed violation of Delaware law. The Special Master insists the Amber Energy bid is "superior" because it includes a supposed settlement with the 2020 Bondholders (the "TSA"). However, on examination, this rationale has no merit. <u>First</u>, this settlement would impermissibly divert $2 billion from the Attached Judgment Creditors to the 2020 Bondholders, a group of non-parties that do not have a final judgment in their own SDNY action, much less in this proceeding.

<u>Second</u>, the stated rationale for the TSA settlement is that it mitigates the ***possibility*** that the 2020 Bondholders ***might*** be able to interfere with the financing of the Dalinar Energy bid. This is illogical to the point of absurdity. For this ***possibility*** to actually materialize—and thus require mitigation—multiple events would need to occur, not one of which is definite, much less probable: (<u>1</u>) OFAC would have to reverse its long-running suspension of the 2020 Bondholders' ability to exercise their purported Pledge—there is no evidence OFAC will ever do this, and all evidence shows the opposite; (<u>2</u>) Judge Failla would have to rule in the 2020 Bondholders' favor in her impending decision—there is no certainty this will happen and, if anything, the opposite is more probable; (<u>3</u>) even if Judge Failla does rule in favor the 2020 Bondholders, they would have to actually request and obtain an injunction against the Dalinar Energy financing—something they

promised Judge Failla they will not do; (4) the Venezuela parties also would have to fail to obtain a stay of enforcement pending their subsequent appeal of any adverse ruling by Judge Failla; (5) in the highly improbable event that all four of these circumstances occur, Gold Reserve would then have to fail to obtain the replacement financing required by the "early termination provision" in the revised SPA in its Improved Bid; and (6) Gold Reserve would also have to be unsuccessful in settling with the 2020 Bondholders (using the $2.8 billion in contingent finance that it arranged for this purpose). The probability of all six (6) of these events occurring in favor of the 2020 Bondholders is miniscule. As such, the purported ***risk*** that is supposedly settled by the TSA, upon which the Updated Final Recommendation is premised, is actually ***no risk at all***. In fact, it is nothing more than a collection of speculations, one piled on another. Such a hypothetical, highly contingent, improbability cannot, under any set of circumstances, justify a $2 billion price decrease.

The Updated Final Recommendation has other, fundamental errors. It ignores that the Amber Energy bid actually has a higher closing risk than the Dalinar Energy bid. Specifically, the Amber Energy bid would blow up if just one event occurs: Judge Failla ruling against the 2020 Bondholders. This substantial risk— in comparison to the six, independent events that all would have to occur in favor of the 2020 Bondholders—is substantially greater than any actual risk to the Dalinar Energy bid.  The Special Master also has ignored that the TSA does not actually ensure any settlement with the 2020 Bondholders. Rather, as shown herein, it has so many loopholes and defects that it is the proverbial "Swiss cheese contract."

Finally, the Amber Energy bid is the product of multiple violations of Court-ordered bidder protections that undermine the integrity of the Sale Process. In contrast, as the Special Master correctly observed in the Final Recommendation, Dalinar Energy "has acted in good faith

throughout the bidding and sale process" by having, among other things, "complied with the provisions of the Sale Procedures Order, Bidding Procedures, and December 31 Order[.]" (D.I. 1837 at ¶¶ 116-18.)118.). These observations remain no less true today. Indeed, Gold Reserve has now submitted a materially Improved Bid in strict conformance with governing procedures, which stands as the highest and best offer for the PDVH Shares.

For these reasons, the Updated Final Recommendation should be rejected. Instead, the Court should approve the Dalinar Energy Improved Bid because it undisputably has the highest price—by a substantial margin—and the greatest certainty of closing.

## II.     AMBER ENERGY'S UPDATED BID FAILS UNDER DELAWARE LAW AND THE COURT'S EVALUATION CRITERIA

Delaware law requires that the PDVH Shares be sold "to the highest bidder[.]" 8 Del. Code § 324. The Court approved two primary evaluation criteria: (1) the price paid for the PDVH Shares, and (2) the certainty that a bid will successfully close. (D.I. 1554 at 24-26.)

### A.  Amber Energy's Bid Is $2 Billion Lower than Dalinar Energy's Improved Bid

The Court has established that a bidder's purchase price is based on one thing: "the amount of Attached Judgments expected to be satisfied by the purchase price." (D.I. 1554 at 26). Recognizing the Amber Energy bid fails under this criterion by a $2 billion margin, Amber Energy and its supporters have tried to advance a series of alternative formulations under which the supposed "value" of a bid can include other unrelated factors. (*See, e.g.*, D.I. 2036 at 1 (Red Tree claiming Amber Energy bid offers more "in total value").) But "value" is not "price." Rather, it is an indefinite and manipulable concept that, in this proceeding, has typically tried to count payment to third parties, particularly the 2020 Bondholders, who are not Attached Judgment Creditors. That is improper. Any claimed "value" of a bid is irrelevant to evaluating ***price***.

### i.    The Purchase Price of the Amber Energy Bid Is $5.9 Billion

The Special Master concedes that the Amber Energy bid price is $5.892 billion. (D.I. 2123 at 1, 8.) This amount, and only this amount, is the ***price*** of the Amber Energy bid. While the Special Master suggests that this price could be pushed higher in light of "additional cash consideration offered to discharge $500 million of Attached Judgments" (*id.* at 4), this is speculation. Amber Energy has not put this additional $500 million amount on the table. Rather, it has offered a paltry fraction of that amount in exchange for Gold Reserve (or other creditors) consenting to extinguish $500 million of its judgment. (*Id.* at 5.) This offer of a contingent cramdown violates Delaware law and the Court's prior orders[1] and, in any event, is not equivalent to purchase price. As such, this "additional" $500 million cannot be included in Amber Energy's price.

### ii.    The Purchase Price of the Dalinar Energy Improved Bid Is $7.9 Billion

Under a reservation of rights, Gold Reserve undertook several actions, at substantial expense, to materially improve the terms of its existing Successful Bid during the three-day "match period." The most significant of these was to agree terms with Valores Mundiales, S.L. and Consorcio Andino, S.L. (collectively, "Valores"), pursuant to which Gold Reserve is able to include the full value of the $720 million Valores Judgment in its credit bid. This is evidenced in the Bidder Equity Commitment Letter included in the Improved Bid (D.I. 2126 at 24-27). In so doing, Gold Reserve presented a conforming, fully-financed bid that satisfies more Attached Judgments and goes further down the Court's priority waterfall than any other bidder has ever done. This brings the total purchase price of Dalinar Energy's Improved Bid to ***$7.902 billion***—a full ***$2 billion higher*** than the Amber Energy bid.

---

[1] D.I. 1583 at 1-2; *see also* D.I. 1554 at 25-26.

Disappointingly, the Special Master, rather than commending Gold Reserve for its extraordinary effort to again deliver to the "highest price" for the PDVH Shares to the Court, seeks to undermine this key component of the Improved Bid. None of these criticisms have merit. <u>First</u>, the Updated Final Recommendation states that the "Special Master is unaware of the specific terms of the arrangement" by which Valores consented to the satisfaction of its judgment and that "it is unclear what if any consideration Valores is actually receiving as part of the Dalinar August Sale Transaction." (D.I. 2123 at 7-8.) However, the "specific terms" that Gold Reserve and Valores agreed upon are confidential and not required to be disclosed. This is the *modus operandi* by which Dalinar Energy included the Attached Judgments of Rusoro, Koch and Siemens Energy Inc. in the Successful Bid that the Special Master previously **approved** and **recommended** to the Court. The Bidding Procedures only require a credit bidder provide proof that an Attached Judgment will be satisfied at closing. (D.I. 480-1; D.I. 481) The above-referenced Bidder Equity Commitment Letter is this proof, and it confirms that the full amount of the Valores Judgment ($720 million) can be included in the purchase price of the Dalinar Energy bid.

<u>Second</u>, the Special Master states he "does not know if the consent of Rusoro and Koch is now required" to add the Valores Judgment to the Dalinar Energy Improved Bid. (*Id.* at 9.) With respect, the Special Master's **lack of knowledge** is irrelevant. Gold Reserve knows such consent is not required, and it represented this to the Special Master when it submitted the Improved Bid.

<u>Third</u>, the Special Master obliquely criticizes Gold Reserve's retention of $200 million of its Attached Judgment in the Improved Bid. (D.I. 2123 at 8 & n.8.). This is unwarranted. This $200 million does not "compensate" Gold Reserve as a bidder; rather, as stated (D.I. 2126-1 at Ex. A-1), it only potentially offsets the substantial expense Gold Reserve agreed to incur to purchase the Valores Judgment so that it can be extinguished at closing and thus maximize the purchase price

5

of the PDVH shares. There is nothing that requires a credit bidder to include the full value of its Attached Judgment and Gold Reserve thus is fully within its rights to reserve this amount from its bid as a reasonable and necessary *quid pro quo* to deliver the highest price for the PDVH shares.

**B. The "Certainty of Closing" Attributed to the Amber Energy Bid Is a Mirage**

The Special Master attempts to justify his extraordinary attempt to violate the statutory requirement to sell the PDVH shares "to the highest bidder" on the basis of the assertion that Amber Energy has executed a TSA with holders of approximately 75% of the 2020 Bonds. Putting aside the fact that the Special Master's key advisor and sole witness at the Sale Hearing – Mr. Will Hiltz of Evercore did not even read the TSA[2] – this assertion is wrong and fundamentally misunderstands the TSA.[3] In fact, a cursory examination of the TSA shows that it cannot bind PDVSA, nor any dissenting bondholder; and it is built on a series of legal, contractual, procedural, and practical infirmities that saddle the Amber Energy bid with substantial closing risks. In short, the TSA *increases* closing risk, directly undermining the entire stated rationale for the Updated Final Recommendation.

**i.   The TSA Cannot Deliver the Release of Collateral and Extinguishment of Claims that It Promises**

The Special Master asserts: "Pursuant to the TSA, the 2020 Bondholders AHG has agreed to provide the requisite consents to cause the Amber Sale Transaction to be permitted under the indenture governing the PDVSA 2020 Bonds and to cause all of the purported security interests in

---

[2] The declaration pages for the TSA have not been produced. It is unknown how this conclusory statement that 75% of the Bonds have been accounted for has been reached, what information the Special Master received to confirm this, or who these bondholders may be.

[3] Ex. 1, Hiltz II Tr. at 479:2-16 ("Q. Did you review the document as a seasoned financial advisor to determine whether it had any holes in it? A. I have not reviewed the TSA, no. Q. If the TSA did have holes in it you would agree that this purported certainty would substantially reduce; yes? MR. FRIEDMANN: Object to form. MS. MCCABE: Object to form. A. Without having read the document I can't make a judgment on that. I don't know whether there are any holes in it or not. Q. I'm sorry. You haven't read the TSA? A. Correct.").

the equity of CITGO Holding that secure the PDVSA 2020 Bonds to be released and terminated in full." (D.I. 2123, ¶ 9.). But the Special Master does not explain *how* the 2020 Bondholders will ever be able to effectuate the release of collateral and extinguishment of claims contemplated by the TSA. A careful examination of the 2020 Indenture and the TSA confirm that the promised release and extinguishment of claims are contingent on events that almost certainly will not occur.

First, Section 9.02(a) of the 2020 Indenture requires "*the written consent*" of PDVSA (as "the Issuer") to amend, supplement or waive it and the related guaranty and security documents. This provision alone puts the lie to the TSA's promise to provide the release of collateral and claims. PDVSA, the Issuer of the bonds, has publicly contested their validity and is not a TSA signatory. Its refusal to give consent is an immediate, non-waivable bar to implementing the release of collateral or entering into any other amendment or supplement that would extinguish the purported rights of the 2020 Bondholders. Without a valid and enforceable amendment signed by the Issuer, the collateral release will be ineffective against non-TSA bondholders. This impediment confirms that the TSA does not deliver any certainty of closing.

Second, Section 9.02(b)(vi) of the 2020 Indenture prohibits the impairment of "the right of each Holder to receive payment of principal of, premium (if any), interest and Additional Amounts, if any, on such Note on or after the due date thereof or to institute suit to enforce such payment," absent such noteholder's consent. The TSA can only bind the parties who signed it; not all bondholders. Any non-consenting bondholder can both challenge the release of collateral and demand better or different treatment than the treatment contemplated by the TSA.[4] *See Marblegate*

---

[4] The Indenture further bars any amendment that would "reduce the percentage of the principal amount of the Notes whose Holders must consent" to core changes. The TSA attempts to do indirectly what the Indenture forbids directly: it tries to quietly sidestep the unanimity requirement through the ad hoc group's majority. That maneuver violates Section 9.02(b)(i) and invites litigation.

*Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 846 F.3d 1 (2d Cir. 2017) (confirming that the Trust Indenture Act prohibits "nonconsensual amendments to an indenture's core payment terms" and permits "creditors to pursue available State and federal law remedies"). This is a substantial risk. Any non-TSA bondholder may seek to extract additional value from the parties to the TSA and thereby frustrate or delay the closing of the Amber Energy transaction. According to the Special Master's advisor, the proposed settlement "secures a discount of $895 million on the PDVSA 2020 Bondholders claims." (D.I. 2124, ¶ 23.) With as many as 25% (or more) of the 2020 Bondholders not consenting to the TSA, they have significant incentive to pursue litigation to extract their portion of this supposed "discount" value, which they did not agree to forgo.

Third, the TSA is riddled with conditions precedent and termination rights that make it highly contingent and easily unwound at the option of Amber Energy or the "Required Consenting 2020 Noteholders" for any reason or no reason at all. For example:

- Section 4.1(d) of the TSA makes it an express condition precedent that "each Definitive Document"—including all ancillary agreements, schedules, and exhibits—must be "approved, executed and delivered by each party thereto and be in full force and effect" at or before closing. This means that any party to any of the numerous required "Definitive Documents" can withhold approval or refuse to execute, for any reason or no reason at all, and thereby prevent the transaction from closing. This flexibility for parties to walk away over any real or pretextual dispute about documentation is virtually unlimited, and it means that there is *zero certainty* that the Amber Energy transaction will ever close.

- Section 4.1(h) of the TSA requires that this Court enter a Sale Order approving the Amber Energy transaction on or before December 1, 2025, *and* that there be no stay of the Sale Order pending appeal. If the Court is unable to enter the order by that date, or if there is a stay pending appeal, either side can terminate the TSA as of right. This gives both Amber Energy and the 2020 Bondholders a clear exit ramp if the judicial process is delayed— hardly a remote possibility in a case of this magnitude and complexity.

- Sections 5.2 and 5.3 of the TSA provide a broad array of termination rights to both the 2020 Bondholders and Amber Energy. For example, either side may terminate for material breach by the other, for failure of conditions precedent, for a host of other reasons, and even perhaps no reason at all. These rights are not limited to clear-cut failures and can be invoked over subjective disputes. This further undermines the Special Master's key assertion that the Amber Energy bid has superior closing certainty.

- Section 5.4(b) establishes an "outside date" of June 30, 2026. If the sale has not closed by that date, either party may walk away from the deal, regardless of the reason for the delay. This nine-month fuse does not mitigate the risk; it simply means that the parties can bide their time, monitor developments, and then exit if circumstances become less favorable.

<u>Fourth</u>, compounding these risks, the TSA is highly vulnerable to regulatory delays. Amber concedes it must obtain an OFAC license, secure CFIUS clearance, Hart-Scott-Rodino ("HSR") termination, and antitrust approvals in three foreign jurisdictions—Mexico, Morocco, and the Netherlands—to close on its proposed purchase of the PDVH shares. However, Elliott has numerous significant equity holdings in the energy and refining industry in multiple jurisdictions.[5] The complexity of these antitrust entanglements is a significant risk. Each of these regulatory approvals for the Amber Energy bid is discretionary and subject to unpredictable timelines. Even if ultimately granted, any delay beyond the TSA's agreed deadlines would give either party the right to walk away from the deal as of right. By contrast, the Dalinar Energy bid has already cleared HSR approval, and no foreign antitrust filings are required. (D.I. 2120).

Taken together, these TSA provisions, the uncertain regulatory landscape, and the pendency of litigation in multiple courts confirm Gold Reserve's position: the TSA is not a binding, unconditional commitment to close. Rather, it is a heavily qualified, opt-out arrangement that allows both Amber Energy and the 2020 Bondholders to withdraw if any number of circumstances occur. The supposed "certainty" of closing of the Amber Energy bid—the *raison d'etre* of the Special Master's changed recommendation—is therefore a mirage.

---

[5] Public filings show that Elliott owns or controls (a) 4.76% of Phillips 66, a major US refiner, and has appointed two board members; (b) 4.34% of Suncor, an integrated energy company with significant US and global refining operations, and has appointed three of its board members; and (c) 5% of BP, an energy major with significant US and global refining operations. *See* Ex. 6.

### ii. Judge Failla's Rejection of the 2020 Bondholders' Claims Would Blow Up the Amber Energy Bid, But the Reverse Is Not True: the Dalinar Energy Bid Survives Either Way

The Special Master contends the proposed TSA would enable the sale of the PDVH Shares to Amber Energy "regardless of the outcome of the 2020 Bondholders litigation[.]" (D.I. 2123 at 10.). This is flat wrong. The Court has already admonished the Special Master and the parties that if Judge Failla rules that "the 2020 Bondholders have no rights to CIT[G]O holding[,]" then "it would be a fundamental injustice" to execute on a lower-priced bid "when bids with a much greater purchase price were rejected." (D.I. 1741 at 7-8.) Indeed, Mr. Hiltz's own testimony recognizes that the sale to Amber Energy would not go through should the Court continue to view a multi-billion dollar settlement "as an over-valuation of the PDVSA 2020 Bondholders' claims and a diversion of value from Attached Judgment Creditors." (D.I. 2124 ¶ 38; *see also* ¶ 35; Ex. 1, Hiltz II Tr. at 428:25-429:14.)

In other words, the proposed transaction with Amber Energy has a single point-of-failure: it will implode should Judge Failla rule against the 2020 Bondholders.[6] The chances of this outcome are high for several reasons. <u>First</u>, the Second Circuit has settled that Venezuelan law governs the validity of the 2020 Notes, and application of that law imperils the claimed validity of the 2020 Bonds and purported Pledge. The Republic has long argued that under Venezuelan law, the 2020 Notes and purported Pledge are invalid and unlawful. The U.S. Government has twice lent support to the Republic in the interpretation of its own laws, including as recently as last week, when it filed a Statement of Interest that supports the 2015 National Assembly (the Opposition) in

---

[6] Mr. Hiltz's testimony indicates that the Special Master's advisors are comfortable with this outcome: "Our judgment is that in that rebidding, we would have interested parties who would be prepared to pay more with that 2020s risk being eliminated by virtue of the fact that they're, in Amber's case, paying 2.25 billion to the bondholders that they would no longer have to pay." (Ex. 1, Hiltz II Tr. at 429:14-20.)

no uncertain terms. *See* Statement of Interest, Ex. 2 at 2. This support—like the U.S. Government's long-standing suspension of the 2020 Bondholders' ability to exercise the purported Pledge—increases the likelihood that Judge Failla will rule against the 2020 Bondholders and that their hypothetical and highly contingent "litigation risk" to the Dalinar Energy financing may finally be wiped clean from the Sale Process.

Conversely, even if Judge Failla rules in favor of the 2020 Bondholders, the risk to Gold Reserve's bid threatened by the 2020 Bondholders remains slight. As noted above, multiple other unlikely events would have to occur for the 2020 Bondholders to present any actual risk to Dalinar Energy's ability to close:  (1) OFAC would have to change its policy and lift the long-running suspension of the 2020 Bondholders' ability to exercise their purported rights under the Pledge; (2) the Venezuela Parties would have to fail to obtain another stay of enforcement pending appeal, as they obtained during their prior appeal; (3) the 2020 Bondholders would have to actually satisfy the stringent requirements for obtaining an injunction; and (4) Dalinar Energy would have to fail to obtain the alternative financing necessary to close on its Sale Transaction that it now is obligated to obtain under the "early termination provision" it has proposed for its SPA; and (5) Gold Reserve would have to be unsuccessful in settling with the 2020 Bondholders (using the additional $2.8 billion in committed and highly confident financing that Gold Reserve has available for this purpose).[7]

---

[7] The de minimis nature of the actual risk presented by the 2020 Bondholders to the Dalinar Energy closing is explained at length in Gold Reserve's prior submissions. *See*, *e.g.*, D.I. 1991 at 1-14.  More recently, the Venezuela Parties' expert identifies in his Sixth Supplemental Expert Report the same hurdles that would need to be overcome before the litigation risks threatened by the 2020 Bondholders could manifest: "however, the Special Master and his Advisors have not provided any analysis of the likelihood of any of these events occurring to justify his recommendation, let alone a rigorous one." Ex. 5 at 3.

None of these events are probable.  Indeed, as to event (3), the 2020 Bondholders have already assured Judge Failla that they would not seek to interfere with Gold Reserve's bid or this Court's Sale Process (*see* (D.I. 1991 at 1-3)):[8]

> [W]e're not seeking an injunction of Judge Stark, we're not seeking an injunction of the special master, we're not seeking an injunction of the process in Delaware. We're not seeking an injunction of the [G]old [R]eserve bid that we've laid out in our letter or even the sale of PDVH pursuant to that process.
>
> . . .
>
> We don't want you to interfere with Judge Stark's process. We don't want you to interfere with Judge Stark. We don't want you to interfere with the [S]pecial [M]aster. We don't want you to interfere with the sale.

Given the remote likelihood of the 2020 Bondholders overcoming all of these hurdles, a ruling in their favor by Judge Failla would not pose a significant risk to the Dalinar Energy transaction.  Conversely, the forthcoming Judge Failla ruling is a single point of failure to Amber Energy's Bid.  As such, contrary to the Special Master's assertions, it is the Dalinar Energy Improved Bid not the Amber Energy Bid that has the highest certainty of closing.

### iii.    The Amber Energy Bid Hinges on the Highly Uncertain Prospect that Judge Failla Will Stay the SDNY Validity Litigation

Recognizing that the Amber Energy Bid thus also fails under the Court's second criteria – closing certainty – the 2020 Bondholders and Amber Energy attempt to game the Sale Process, saying they are going to attempt to prevent Judge Failla from ever ruling on the illegality of the 2020 Bonds. Specifically, Sections 3.1(a)(iii)(F) and 3.2(a)(iv) of the TSA require them to use "commercially reasonable efforts" to stay the SDNY litigation "until the closing date of the Amber Transaction." However, there is no guarantee that any such stay ever will be granted.  Moreover, viewed properly, this attempt to stay Judge Failla's case is a ploy to bury the question of whether

---

[8] *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 19-cv-10023, July 10, 2025 Hr'g Tr. at 9:20-10:12, 11:5-16 (attached as Ex. 4).

the 2020 Bonds and the purported CITGO pledge are invalid. That is precisely why the Venezuela Parties have branded the gambit an "attempted fraud on the Court." They are right.[9] But a stay is, at best, a long shot. PDVSA has already told Judge Failla it will oppose this motion. Moreover, the U.S. Government's recent Statement of Interest backs PDVSA's position and underscores the public-policy imperative of adjudicating the 2020 Bonds' validity. bonds' invalidity.

### iv. Even If the 2020 Bondholders Prevail, The TSA Will Impede, Not Facilitate, Closing of the Amber Energy Bid

Despite provisions of the TSA that the parties will "work in good faith" to close the deal irrespective of Judge Failla's ruling, the TSA does not offer a shred of meaningful closing certainty even if Judge Failla rules in favor of the 2020 Bondholders. The TSA is riddled with discretionary "off-ramps" that make termination a virtual certainty should the 2020 Bondholders win in New York and no longer need to settle their claims. In addition, Sections 5.2 and 5.3 empower either the bondholders or Amber Energy to walk away upon the mere allegation of a "material breach" or if any "Definitive Document" is deemed "materially inconsistent" with the TSA—an assessment left entirely to the terminating party's "reasonable discretion." Section 5.4 also permits automatic termination on the "Outside Date," which Amber Energy can extend or refuse to extend at will, and Section 3.1(c) expressly permits Amber Energy to pursue an alternative transaction that offers "more favorable" financial terms to the 2020 Notes. In practical effect, these provisions ensure that, if Judge Failla rules for the 2020 Bondholders, they will have the opportunity and heavy incentive to abandon the TSA and thus obstruct the Amber Energy closing.

---

[9] It is troubling that the Special Master would lend credence to such tactics by recommending a bid that depends on keeping such a central legal issue—the legality of security instruments issued by the corrupt Maduro regime—from being adjudicated by the U.S. courts.

13

**v.    OFAC's Long-Standing Suspension of the 2020 Bondholders' Purported Pledge Creates Substantial Uncertainty for the Amber Energy Bid**

Another distinct risk to closing that this Court has highlighted is that OFAC "will continue to suspend GL-5 beyond the date of the expected closing" of the PDVH Shares sale. (D.I. 1741 at 7-8.) OFAC expressly warned in connection with General License 5, "transactions related to the sale or transfer of CITGO shares in connection with the PDVSA 2020 8.5 percent bond are prohibited, unless specifically authorized by OFAC."[10] To be sure, even if the 2020 Bondholders prevail before Judge Failla, OFAC would still have to authorize the exercise of their purported voting rights under the Pledge—which OFAC has affirmatively prohibited for nearly 6 years.[11] There is no indication that OFAC will change its policy, regardless of Judge Failla's ruling. Indeed, the proposed TSA can be seen as undermining U.S. Government sanctions and OFAC policy by showering the 2020 Bondholders with over $2 billion for having acquired purported bonds that funded the Maduro regime.

Barring a spontaneous and improbable reversal in OFAC's policy, the settlement contemplated by the TSA cannot close and, by extension, neither can Amber Energy's proposed sale. If OFAC refuses to authorize the 2020 Bondholders to participate in the Amber Energy transaction because the TSA harms U.S. Government policy objectives, the Sale Process will be forced to restart yet again—further delaying recovery by any Attached Judgment Creditor while simultaneously continuing to drive up the crushing expenses of this process.

---

[10] Dep't of Treas., Office of Foreign Assets Control, Frequently Asked Questions (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/595 (summarizing history of GL-5).

[11] *See* Dep't of Treas., Office of Foreign Assets Control, Frequently Asked Questions (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/595 (summarizing history of GL-5); *see Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-cv-10023,* 19-cv-10023, D.I. 1 (S.D.N.Y. Oct. 29, 2019). GL-5 has been suspended since October 2019, during the entire duration of the SDNY litigation, including the Venezuela Parties' successful appeal to the Second Circuit.

## C. The Updated Final Recommendation Excessively Overvalues a Potential Settlement With 2020 Bondholders

The Court has emphasized that any potential advantage attributable to a settlement with the 2020 Bondholders "is **not** a required component of a bid to be recommended[.]" Additionally, the risk of litigation by them is not "materially greater" than any other risk to closing and "must be viewed realistically[.]" (D.I. 1741 at 5 & n.3.) While it "may be [that] a litigation that has to happen," the Court stated that this is "not a deal breaker" to approval of any bid. *See* June 24 Ex Parte Hr'g Tr. at 61:18-25, Ex. 5.

Ignoring these admonishments, the Special Master has now endorsed a bid that is $2 billion lower in price than Dalinar Energy's Improved Bid for the sole reason that it includes an unsigned proposed settlement with the 2020 Bondholders. In so doing, the Special Master has implicitly valued the 2020 Bondholders' litigation **risk** in excess of the **certainty** of the $2 billion price offered by Dalinar Energy's Improved Bid. That is wrong, especially as the 2020 Bondholders lack any realistic avenue to enjoin or interfere with the closing of the Dalinar Energy transaction.

Worse still, the Special Master has openly acknowledged that the inclusion of the proposed settlement in Amber Energy's bid creates a substantial risk that it could fail, thereby requiring this Sale Process to re-start, yet again. Specifically, he suggests that the Court could decide to "order the Special Master to resolicit bids" should Judge Failla rule against the 2020 Bondholders. (*Id.* at 12.) That result would delay the Sale Process for all Attached Judgment Creditors by several more months, at least, while the Special Master's advisors continue to reap millions of dollars in additional fees. (*Id.* at 12-14.) There is no justification for such an outcome.

In the end, the Special Master has greatly overweighted the **hypothetical** and **highly contingent** disruption that the 2020 Bondholders pose to the Dalinar Energy transaction. The proposed settlement to mitigate that risk is not worth anywhere close to the $2 billion decrement

15

that it would cost to the Attached Judgment Creditors. By any realistic measure, that valuation excessively overestimates the potential disruption to closing posed by the 2020 Bondholders. Worse, as the Special Master appears to recognize, the Amber Energy bid actually increases the risks to closing given that the summary judgment motions pending before Judge Failla may be decided against the 2020 Bondholders, thereby undoing the basis for any settlement with them.

## III.    AMBER ENERGY'S BID WORKS A FUNDAMENTAL INJUSTICE AT THE EXPENSE OF THE ATTACHED JUDGMENT CREDITORS

Independent of its role to determine highest and best bid, this Court must also assess fairness, an inquiry that lies distinctly within its judicial province. Specifically, the Court "may, in [its] discretion, set aside a sale where inadequacy of price will result in unfairness or work an injustice on any party having an interest in the outcome of the sale." *Smith v. Caldera Props.- Nassau Grove, LLC*, No. CIV.A.S09C-05-005ESB, 2011 WL 2420842, at *2 (Del. Super. Ct. June 9, 2011). "This equitable power derives from the inherent control of the court over its own process 'for the correction of abuses or the prevention of injury.'" *Id.* (quoting *Petition of Seaford Hardware Co.*, 132 A. 737, 738 (Del. Super. 1926)). Here, the Court has acknowledged that the fairness analysis includes whether "it would be a fundamental injustice to close" on a particular bid "when bids with a much greater purchase price were rejected." (D.I. 1741 at 7-8.)

Amber Energy's bid fails the fairness test in at least four ways. Under First, it proposes to massively shortchange the Attached Judgment Creditors. Amber Energy's lower-priced bid must be seen for what it is: a proposal to grossly underpay for the PDVH Shares by approximately $2 billion so that the 2020 Bondholders can lock in a recovery for potentially unlawful and invalid securities, all the while seeking to prevent Judge Failla from ever ruling on this alleged illegality. This underpayment would work a grave injury to the Attached Judgment Creditors, including in particular the three Attached Judgement Creditors that would have their judgments deemed

satisfied in full by the Dalinar Energy Improved Bid (Gold Reserve, Siemens, and Valores) but *receive nothing* under the Amber Energy Bid. That result would be particularly offensive given that the entire price difference would inure to the benefit of only the 2020 Bondholders, third parties who hold no judgments in this Court and whose interests are diametrically opposed to the requirement of Delaware law that the PDVH Shares be sold for the "highest price." The hijacking of this Sale Process to benefit external third parties, at the expense of actual creditors with final attached judgments, would produce a fundamental injustice and should not be permitted.

Second, the over $2 billion with which Amber Energy proposes to pay off the 2020 Bondholders would be a massive, unjust windfall. As discussed above, the 2020 Bondholders' purported rights are quite possibly on the verge of being extinguished. Despite the precarity of the 2020 Bondholders' situation, the Amber Energy bid would divert some $2.125 billion in cash into their pockets. That cash payment would inarguably represent a massive and unjustified windfall— or, in the Court's words, "a fundamental injustice." (D.I. 1741 at 7-8 ("it would be a fundamental injustice to close on such a Final Bid" if "the 2020 Bondholders have no rights to CIT[G]O Holding").)

Third, the bid of Amber Energy—whose interests are aligned with those of the 2020 Bondholders—seeks to unjustly reward the bellicose threats made by the 2020 Bondholders to disrupt this Sale Process if they do not have their way. The only claimed "value" of Amber Energy's lower-priced bid—the purported settlement—is premised on the 2020 Bondholders' oft-repeated threat to launch litigation to interfere with the sale of the PDVH Shares to any bidder whom they do not favor. To pay off the same third parties that manufactured this risk, Amber Energy's proposal would strip over $2 billion in value from the Attached Judgment Creditors (and

the Venezuela Parties). To approve a lower-priced bid because it compromises unmeritorious threats to derail these proceedings would destroy the integrity of the Sale Process.

Fourth, and not least, Amber Energy's bid seeks to sweep under the rug violations of the bidder protections that the Court ordered to protect the integrity of this Sale Process. As shown in Gold Reserve's Motion to Strike the Special Master's Determination of Superior Proposal (D.I. 2117), Amber Energy's lower-priced bid was submitted during the No-Shop Period after the Special Master originally recommended Dalinar Energy's Successful Bid. The Special Master cast aside the Court-ordered bidder protections requiring him to ignore Amber Energy's invalid bid, which failed by a mile to satisfy the Overbid Minimum applicable during the No-Shop Period. As borne out by the subsequent proceedings, these violations have upset the Sale Process, including by kicking off rounds of extensive briefing and motion practice, pushing back the Sale Hearing date even further, and bringing into a play a bid that would deprive the Attached Judgment Creditors (and the Venezuela Parties) of $2 billion in incremental purchase price.

## IV.    DALINAR ENERGY'S IMPROVED BID SHOULD BE APPROVED

Dalinar Energy's Improved Bid is the highest bid and the best bid. Indeed, it wins for substantially the same reasons that the Special Master recommended that the Court approve Dalinar Energy's Successful Bid in his Final Recommendation. (D.I. 1837 at 29-33).

***Price:*** The Improved Bid offers ***$7.9 billion*** to purchase the PDVH Shares, every dollar of which represents a satisfaction of Attached Judgments. In improving its price by $520 million, Gold Reserve followed the Court's guidance that the "bid it is likely to approve at the conclusion of the [Sale] Process will need a balance that places much greater emphasis on price[.]" (D.I. 1741 at 3). The Improved Bid's price is the highest price of any conforming bid ever submitted.

***Likelihood of Closing***: The Dalinar Energy Improved Bid wins on this metric, as well. Each reason for why the Special Master approved of the closing certainty of Dalinar Energy's original Successful Bid applies equally if not more so to the Improved Bid:

- Dalinar Energy has sufficient "financial wherewithal and certainty of financing as demonstrated by its financial commitment letters[.]" (D.I. 1837 at ¶ 62.) None of this financing is contingent on the outcome of the 2020 Bondholders' litigation in the SDNY.

- The Dalinar Energy Bid "is likely to attain the requisite regulatory approvals[.]" (D.I. 1837 at ¶ 82(a).) Indeed, it has already obtained the first such requisite approval from the FTC confirming that the bid has no antitrust concerns (D.I. 2120).

- The Dalinar Energy SPA does not include any additional conditionality relating to pending or future litigation, an appeal of the Sale Order, or any other terms compared to the model SPA. (D.I. 1837 at ¶ 82(c).) It also contains the requisite consents to non-cash consideration. (D.I. 1837 at ¶ 82(g).)

- Finally, as was true of Dalinar Energy's original Successful Bid, "the risks relating to the PDVSA 2020 Bonds are significantly outweighed by" the Improved Bid's higher price. (D.I. 1837 at ¶ 82(b)). Such is only more true today in light of the Improved Bid.

Dalinar Energy's Improved Bid also minimizes the 2020 Bondholders' litigation threats. The Improved Bid also increased the amount of contingent financing—by $500 million—and continues to be accompanied by a highly confident letter issued by its financing party for $1.8 billion to support a future settlement with the 2020 Bondholders,[12] should it become necessary.[13] This additional financing more than adequately addresses the risk that the 2020 Bondholders may attempt to interfere with closing, which is slight by any realistic measure.

---

[12] As observed by Mr. Weisenburger, the Special Master "is unreasonable to afford *no* material weight" to this Highly Confident Letter, which is the product of J.P. Morgan's "thorough evaluation of the proposed transaction and the likelihood that it could place the proposed securities in the market." Ex. 4, at ¶ 8. Further, Mr. Hiltz testified that he is not aware of any circumstances in which JP Morgan did not produce the financing when it had issued a Highly Confident letter. Ex. 1, Hiltz II Tr. at 455:2-456:25.

[13] Gold Reserve has engaged in good faith negotiations with the 2020 Bondholders regarding a potential settlement, the details of which are subject to a confidentiality agreement. (D.I. 1837-1 at 575-76.) Based on this, Gold Reserve is confident that it can settle any risk presented by the 2020 Bondholder if and when it actually materializes, as Gold Reserve reiterated as part of the Improved Bid. (D.I. 2126-1 at 5; *see also* D.I. 2135-2 at 3.)

Moreover, Dalinar Energy agreed to inclusion of an "early termination right" in its TSA as requested by the senior judgment creditors. Thus, if Dalinar Energy's financing is ever in fact threatened by the 2020 Bondholders, then it is required to obtain alternative financing within a short, 90-day cure period, failing which the Special Master has the right to terminate the Dalinar Energy SPA and pivot to another bid. (D.I. 2126-1 at 6.).

The Special Master previously concluded, correctly, that the litigation threatened by the 2020 Bondholders did not "outweigh the expansive gap in purchase price" offered by Dalinar Energy's Successful Bid of July 2. (D.I. 1837 at ¶ 82.) That conclusion is only more true today in light of Dalinar Energy's Improved Bid. Now with its increased purchase price, it is even less justifiable to pass over Dalinar Energy's superior price based on the greatly exaggerated, and highly speculative, risk posed by the 2020 Bondholders. This is especially true given that the Amber Energy Bid, in contrast, suffers from an absolute risk—it cannot close if the 2020 Bondholders are unsuccessful before Judge Failla.

## V.    CONCLUSION

The Dalinar Energy Improved Bid is the Superior Bid under the Court's evaluation criteria—its price is more than $2 billion higher than that of the Amber Energy Bid and it has the highest certainty of closing. In contrast, the Amber Energy Bid is based on a rationale—settlement of a contingent litigation risk—that is so hypothetical and speculative that it does not justify any price decrement, much less one of $2 billion. Moreover, the essential component of the Amber Energy Bid—the TSA—is a proverbial "Swiss cheese contract" that does not actually ensure that the Amber Energy Bid will ever close. For these reasons, Gold Reserve respectfully requests that the Court reject the Updated Final Recommendation and approve the Dalinar Energy Improved Bid.

Dated: September 6, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
One Embarcadero Center, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*