# EXHIBIT 1

```
                                                          Page 343
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
 2   --------------------------------------x
     CRYSTALLEX INTERNATIONAL CORP.,
 3
 4
             Plaintiff,                   Case No.
 5                                        1:17-mc-00151-LPS
 6        vs.                                  Vol. 2
 7
     BOLIVARIAN REPUBLIC OF VENEZUELA,
 8
             Defendant.
 9   -----------------------------------------x
10
11        VIDEOTAPED DEPOSITION OF WILLIAM O. HILTZ
12                   New York, New York
13              Thursday, September 4, 2025
14
15
16
17
18
19
20
21
22
23
24   Reported by:
     Frank J. Bas, RPR, CRR
25   Job No. MW 7572378
```

Page 344

September 4, 2025

9:13 a.m. EST

Continued Videotaped Deposition of WILLIAM O. HILTZ, held at the offices of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York, before Frank J. Bas, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

```
                                                         Page 345
 1   A P P E A R A N C E S:
 2   (Some attendees appearing via videoconference):
 3
 4      GIBSON, DUNN & CRUTCHER LLP
        Attorneys for Plaintiff Crystallex
 5          200 Park Avenue
            New York, New York 10166
 6
        BY: JASON MYATT, ESQ.
 7          jmyatt@gibsondunn.com
            MIGUEL ESTRADA, ESQ. (Via Zoom)
 8
 9      EIMER STAHL LLP
        Attorneys for Citgo and PDVH
10          224 South Michigan Avenue, Suite 1100
            Chicago, Illinois 60604
11
        BY: ALEC SOLOTOROVSKY, ESQ.
12          asolotorovsky@eimerstahl.com
            NATHAN EIMER, ESQ.(Via Zoom)
13          neimer@eimerstahl.com
14
        WEIL, GOTSHAL & MANGES LLP
15      Attorneys for Special Master
            767 Fifth Avenue
16          New York, New York 10153
17      BY: JARED R. FRIEDMANN, ESQ.
            AARON J. CURTIS, ESQ.
18          CHASE BENTLEY, ESQ.
            jared.friedmann@weil.com
19          aaron.curtis@weil.com
20
21
22
23
24
25
```

```
                                                        Page 346
 1   A P P E A R A N C E S:
 2
     FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
 3      Attorneys for Evercore
            7 Times Square
 4          New York, New York 10036
 5      BY: JASON C. RUBINSTEIN, ESQ.
            jrubinstein@fklaw.com
 6
 7   NORTON ROSE FULBRIGHT US LLP
        Attorneys for Gold Reserve, Inc.
 8          799 9th Street NW, Suite 1000
            Washington DC 20001
 9
        BY: MATTHEW H. KIRTLAND, ESQ.
10          matthew.kirtland@nortonrosefulbright.com
            KATHERINE G. CONNOLLY, ESQ. (Via Zoom)
11          katie.connolly@nortonrosefulbright.com
12          -and-
            NORTON ROSE FULBRIGHT US LLP
13          1301 Avenue of the Americas
            New York, New York 10019
14
        BY: MIKKAELA SALAMATIN, ESQ.
15          mikkaela.salamatin@nortonrosefulbright.com
16
     BROWN RUDNICK
17   Attorneys for Gold Reserve
            Seven Times Square, 47th Floor
18          New York, New York 10036
19      BY: MICHAEL J. BOWE, ESQ. (Via Zoom)
            mbowe@brownrudnick.com
20
21   MORGAN LEWIS & BOCKIUS LLP
        Attorneys for OI European Group B.V.
22          One State Street
            Hartford, CT 06103
23
        BY: DAVID SHIM, ESQ. (Via Zoom)
24          david.shim@morganlewis.com
25
```

1

A P P E A R A N C E S:

2

   MOLOLAMKEN LLP
3  Attorneys for Red Tree Investments LLC
       430 Park Avenue
4      New York, New York 10022
5  BY: MARK KELLEY, ESQ. (Via Zoom)
       mkelley@mololamken.com
6

7  QUINN EMMANUEL URQUHART & SULLIVAN
   Attorneys for Amber Energy
8      295 Fifth Avenue, 9th Floor
       New York, New York 10016
9
   BY: EMMA MCCABE, ESQ.
10     MATTHEW SCHECK, ESQ. (Via Zoom)
       emmamccabe@quinnemanuel.com
11     matthewscheck@quinnemanuel.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 348

```
 1   A P P E A R A N C E S:
 2
       CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 3     Attorneys for Petroleos De Venezuela, S.A. (PDVSA)
           101 Park Avenue
 4         New York, New York 10178
 5     BY: JUAN O. PERLA, ESQ.
           jperla@curtis.com
 6
 7     MUNGER, TOLLES & OLSON LLP
       Attorneys for Bolivarian Republic of Venezuela
 8         350 South Grand Avenue, 50th Floor
           Los Angeles, CA 90071
 9
       BY: GEORGE M. GARVEY, ESQ. (Via Zoom)
10         george.garvey@mto.com
11
12   ALSO PRESENT VIA ZOOM:
13      BAILEY FINNESTAD (Concierge Tech)
        ALICE GYAMFI (DLA Piper)
14      JOSHUA BOLIAN (Riley & Jacobson, PLLC)
        MILA RUSAFOVA (Eimer Stahl LLP)
15      ROBERT PROFUSEK (Jones Day)
        ROBERT GROOT
16      SARA LUCIA DANGON (Curtis, Mallet-Prevost,
        Colt & Mosle LLP)
17      DAVID HOLMES (Curtis, Mallet-Prevost,
        Colt & Mosle LLP)
18      ZACH KADY (Gibson Dunn)
        PETE COOPER, Videographer
19
20
21                       - o0o -
22
23
24
25
```

Page 428

```
 1        A.    No.  But I certainly can't accept
 2   that it's -- that it's going to happen either.
 3        Q.    Would you agree with me, sir, that
 4   given that we've identified this risk to the
 5   Amber Energy bid, meaning if the 2020s lose in
 6   New York, that does present a risk to the Amber
 7   Energy bid, that then the Amber Energy bid does
 8   not neutralize the 2020 bondholders risk?
 9              MR. FRIEDMANN:  Object to form.
10        A.    Well, can you rephrase the question,
11   please?
12        Q.    If the 2020s lose -- let's take a
13   step back.
14              The entire premise of the Amber
15   Energy bid is that it settles this contingent
16   litigation risk from the 2020 bondholders,
17   right?  That's the rationale of the Special
18   Master?
19        A.    That's one element.  Yes.
20        Q.    Yeah.  That's the primary element?
21   It has a settlement with the 2020s?
22              MR. FRIEDMANN:  Object to form.
23        Q.    Right?
24        A.    That's one element, yes.
25        Q.    But if the 2020s lose in New York
```

Page 429

1   and the bonds and the pledge is invalid and
2   unlawful, then this rationale goes away; there
3   would be no reason -- let me put it this way.
4             If the 2020s lose in New York and
5   the 2020 bondholder risk then goes away with the
6   pledge, there would be no reason the Special
7   Master would give really any weight to a
8   settlement with the 2020s, right?
9             MR. FRIEDMANN:  Object to form.
10       A.    That's actually correct.  In which
11  case he would have the ability to terminate the
12  Amber bid and we would be in a situation where
13  we can re-bid without the weight of the 2020
14  settlement.  Our judgment is that in that
15  rebidding, we would have interested parties who
16  would be prepared to pay more with that 2020s
17  risk being eliminated by virtue of the fact that
18  they're, in Amber's case, paying 2.25 billion to
19  the bondholders that they would no longer have
20  to pay.  So ...
21       Q.    This would require, sir, a restart
22  of the bidding process in some way, shape or
23  fashion, that's what you're envisioning would
24  happen in the event the 2020s lose in New York?
25            MR. FRIEDMANN:  Object to form.

Page 430

```
 1        A.    And if the Court -- as a result of
 2   that, if the Court fails to approve the Amber
 3   bid, yes.
 4        Q.    So the current Amber bid in this
 5   scenario would go away, it wouldn't close, and a
 6   new bidding process would start with the Court's
 7   permission?
 8        A.    Correct.
 9        Q.    And so the Amber Energy bid as
10   approved in the updated recommendation doesn't
11   neutralize the risk of the 2020s; it simply
12   allows if that risk materializes against the
13   Amber Energy bid to have a restarted process?
14              MS. MCCABE:   Object to form.
15              MR. FRIEDMANN:   Object to form.
16        A.    That's correct.  Which we expect
17   would produce additional recovery to the
18   judgment creditors.
19        Q.    Do you have any view that the
20   additional recovery would be above the $7.9
21   billion price of the Dalinar approved bid?
22              MR. FRIEDMANN:   Object to form.
23        Q.    One way or another?
24        A.    I think that's difficult to say.
25        Q.    But you can't say -- you're not
```

Page 439

1       Q.   Is it your understanding this number
2 was provided by the 2020s or Amber or did the
3 Special Master independently verify these
4 numbers?
5       A.   I can't --
6       MR. FRIEDMANN:  Object to form.
7       A.   I can't recall the source of the
8 number.
9       Q.   This discount that you are referring
10 to, wherever it comes from, to be clear is at
11 the expense of the $2 billion additional
12 purchase price of the Dalinar improved bid; yes?
13       MR. FRIEDMANN:  Object to form.
14       Q.   That's the trade-off you're making?
15       A.   Yes.
16       Q.   And so I understand it, the Special
17 Master's updated final recommendation sacrifices
18 the $2 billion higher purchase price of the
19 Dalinar Energy improved bid because of the
20 possibility that the 2020 bondholders might be
21 able to interfere with Dalinar Energy's fully
22 committed financing; yes?
23       MR. FRIEDMANN:  Object to form.
24       A.   Well, again I would state it
25 differently.  What we are doing is ensuring that

Page 440

1    if the 2020s do win we have protected our
2    downside and preserved a substantial recovery to
3    Rusoro, Koch and other creditors who if we're
4    forced to pay the full $3 billion would not
5    receive any significant proceeds.
6                 On the other hand if the 2020s lose
7    and Judge Stark elects to not approve the Amber
8    bid, we see a rebidding process which we believe
9    will produce additional value over and above the
10   existing bid and potentially in excess of what
11   Gold Reserve is currently bidding.
12        Q.    Do you think, Mr. Hiltz, it's a
13   valid exercise of the Special Master's
14   discretion to recommend a bid with a $2 billion
15   lower purchase price because of this
16   unquantified, unanalyzed possibility that the
17   2020s may win in New York and may then get
18   relief from the OFAC suspension and may then
19   interfere with Dalinar's financing in a way that
20   Dalinar then is not able to solve at the time
21   needed?  Do you think that's a valid exercise of
22   the Special Master's discretion?
23              MR. FRIEDMANN:  Object to form.
24        A.    Absolutely.
25        Q.    Do you have anything more to add on

Page 441

1  that than what you've already said in your prior
2  answers?
3           MR. FRIEDMANN:  Object to form.
4      A.   Again, we believe that the Amber bid
5  represents the best mix of price and certainty
6  taken as a whole.
7      Q.   Even though the way you've put it,
8  there's an unanalyzed possibility, it's entirely
9  arbitrary, almost 50/50 like a coin flip that
10 they might lose in New York and the current
11 Amber Energy bid goes away?
12          MR. FRIEDMANN:  Objection; misstates
13      prior testimony.
14     A.   Again, if the 2020s lose and Judge
15 Stark determines that the Amber bid unduly
16 enriches the 2020 holders and rejects it on that
17 basis, we believe that there will be a re-bid
18 which will produce additional value to the
19 judgment creditors such that that $2 billion
20 difference is no longer going to be a $2 billion
21 difference.  And I'll repeat what I said
22 earlier.  If you make the assumption, and I'm
23 not sure that this will happen, but if you make
24 the assumption that Elliott is -- Amber is
25 prepared to pay the same TEV for the company

Page 455

1    MR. SOLOTOROVSKY:
2         Q.    Okay.  Good morning Mr. Hiltz.  My
3    name is Alec Solotorovsky and I represent Citgo
4    and PDVH.  We were talking earlier, or you were
5    talking earlier with Mr. Kirtland about highly
6    confident letters.  Do you recall that?
7         A.    Yes.
8         Q.    I understand that in part Gold
9    Reserve's bid is backed by a highly confident
10   letter from JPMorgan for $1.8 billion in
11   preferred financing that if needed could be
12   raised to satisfy part of the 2020s.  Is that
13   your understanding?
14        A.    Yes.
15        Q.    For those of us who are new to
16   investment banking, what is a highly confident
17   letter?
18        A.    It's a letter that says that the
19   issuer of the letter, in this case JPMorgan, is
20   highly confident that it will be able to place
21   those securities.  I don't think it is specific
22   as to the terms of those securities, and it is
23   not in fact a binding financial commitment on
24   the part of JPMorgan.
25        Q.    So it's not a legal commitment to

Page 456

1    raise the money, but there is some reputational
2    risk for the bank if they don't perform after
3    having issued a highly confident letter, is that
4    right?
5              MR. FRIEDMANN:   Object to form.
6         A.   Yes.
7         Q.   You mentioned earlier in discussing
8    highly confident letters with Mr. Kirtland that
9    around the time of the Lehman Brothers
10   bankruptcy there were some situations where
11   investment banks failed to perform under highly
12   confident letters.  Do you recall that?
13        A.   I don't think I specifically said
14   highly confident letters.  I just said there
15   were significant market disruptions.  Actually,
16   I believe there were some committed financings
17   that the banks failed to make good on in that
18   circumstance.  But I don't have knowledge of
19   specific instances where people did not perform
20   on highly confident letters.
21        Q.   So you couldn't identify any
22   specific instance post the Lehman Brothers era
23   where an investment bank failed to perform under
24   a highly confident letter, is that right?
25        A.   I'm not personally aware of any.

Page 479

1    advice from Weil on that topic.
2         Q.    Did you review the document as a
3    seasoned financial advisor to determine whether
4    it had any holes in it?
5         A.    I have not reviewed the TSA, no.
6         Q.    If the TSA did have holes in it you
7    would agree that this purported certainty would
8    substantially reduce; yes?
9              MR. FRIEDMANN:  Object to form.
10             MS. MCCABE:  Object to form.
11        A.    Without having read the document I
12   can't make a judgment on that.  I don't know
13   whether there are any holes in it or not.
14        Q.    I'm sorry.  You haven't read the
15   TSA?
16        A.    Correct.
17             MR. KIRTLAND:  Thank you.
18             THE COURT REPORTER:  Any further
19        questions?
20             THE VIDEOGRAPHER:  Stand by.  We are
21        off the record at 12:42 p.m. and this
22        concludes today's testimony given by
23        William Hiltz.  The total number of media
24        used was two and will be retained by
25        Veritext.