**quinn emanuel** trial lawyers | wilmington

500 Delaware Avenue, Suite 220, Wilmington, Delaware 19801 | TEL (302) 302-4000 FAX (302) 302-4010

WRITER'S DIRECT DIAL NO.
**(302) 302-4030**

WRITER'S EMAIL ADDRESS
**michaelbarlow@quinnemanuel.com**

September 9, 2025

VIA CM/ECF

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, Delaware 19801-3570

Re:   *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
      No. 1:17-mc-00151-LPS

Dear Judge Stark:

We write on behalf of Amber Energy, Inc. ("Amber") regarding Gold Reserve Ltd.'s ("Gold Reserve") efforts to conceal the agreements with other creditors that underlie its supposedly "Superior Bid under the Court's evaluation criteria." D.I. 2183 at 20. Gold Reserve has categorically refused to produce these agreements, which are essential to evaluating both its bid and its objection to terms in Amber's fully disclosed bid. Gold Reserve should not be permitted to attack the Special Master's final recommendation—which is supported by the fully disclosed suite of documents relating to Amber's bid—while preventing access to their own similar documents under self-serving assertions of "confidentiality." Moreover, the lack of disclosure symmetry also violates Section 324, which requires there to be a "*public* sale," not one where bidders hide from the Court the critical side agreements that allegedly make their offer the highest.

On September 3, 2025, Amber served Requests for Production on Gold Reserve that seek, among other things, "any agreements, arrangements, understandings, or offers made to Koch Minerals SÀRL, Koch Nitrogen International SÀRL, Rusoro Mining Ltd., Siemens Energy, Inc., Valores Mundiales, S.L., Consorcio Andino, S.L., Contrarian Capital Management, L.L.C., and/or any other more junior Attached Judgment Creditors." Exhibit A, Request 8; *see also* Requests 6 & 7.

On September 5, Gold Reserve refused to produce the vast majority of documents responsive to the Requests. Exhibit B. In response to Requests 6 and 7, Gold Reserve agreed only to produce materials that had been produced to it by other parties. *Id.* In response to Request 8, Gold Reserve agreed only to "conduct[] a limited search" for "communications with Attached

Judgment Creditors regarding its 'Attempted Match Bid' that post-date August 8, 2025, and [to] produce responsive documents, if any are located and to the extent that such materials relate 'to a change to the Special Master's Final Recommendation[.]'" *Id.*

The parties, including Amber's Delaware counsel, met and conferred twice on September 8. Gold Reserve stood by its refusal to produce all documents other than its agreement with Valores Mundiales, S.L., which Gold Reserve neither refused or agreed to produce. And on September 9, Gold Reserve CEO Paul Rivett refused to testify as to the terms of any deals with judgment creditors. Even after counsel for Amber repeatedly offered to designate (and in fact did designate) portions of the transcript Highly Confidential, Rivett refused to provide any information with respect to the contents of these agreements. To date, none of the documents described above have been produced. Nor has there been any assertion of privilege over these documents. The refusal and non-responsiveness by Gold Reserve regarding its discovery obligations is especially inappropriate and damaging to Amber where the time frame for discovery and the subsequent hearing is so compressed. Gold Reserve appears to think it can simply run the clock to impair Amber's ability to effectively litigate to defend its bid and point out the defects in that of Gold Reserve.

The documents sought by the Requests are part and parcel to Gold Reserve's bid package and indisputably relevant. Among other things, Gold Reserve's Objections to the Special Master's Updated Final Recommendation, D.I. 2183, put them directly at issue.

*First*, the withheld agreements, along with all of their conditions precedent, covenants, consent rights, and other terms, are directly relevant to Gold Reserve's argument that the Court should overrule the Special Master's recommendation because its own bid promises "the greatest certainty of closing." D.I. 2183 at 3. Gold Reserve is party to a never-produced consortium agreement pursuant to which each of Rusoro and Koch "have consent rights in certain circumstances where Dalinar changes the terms of its bid." D.I. 2123 ¶ 13. Gold Reserve did make such changes, in order to add Valores's claims, but whether doing so violated the consortium agreement is simply unknown and unknowable without the underlying documents. "Without knowing the specific terms of that consortium agreement, … the Special Master likewise does not know if the consent of Rusoro and Koch is now required or, if it is required, whether either party would be willing to" provide it. *Id.* Notably, the Special Master observed that "the bid letter accompanying the August Dalinar Sale Transaction does not make reference to support from Rusoro and Koch as the June 25, 2025 topping bid letter does." *Id.* Gold Reserve cannot argue for its own "certainty of closing" without providing agreements that show any conditions on that closing and may explain creditors' conspicuous silence. D.I. 2183 at 3.

The withheld agreements are also relevant to certainty of closing with respect to the various financing contingencies inherent in Gold Reserve's bid. These contracts may prevent or limit the issuance of preferred equity, leaving insufficient value in the resulting company to support the issuance of equity required for Gold Reserve's financing. Gold Reserves points to "a highly confident letter issued by its financing party for $1.8 billion to support a future settlement with the 2020 Bondholders." *Id.* at 19. Even if such financing were available, which is dubious at best,

the missing contracts may require its hypothetical proceeds to first be used to redeem or repay securities issued to judgment creditors, leaving them unavailable for Gold Reserve's attempts to negotiate a future settlement with the 2020 Bondholders. The interlocking obligations that Gold Reserve must satisfy, and thus the actual certainty of Gold Reserve's bid closing, cannot be known without the agreements between Gold Reserve and those creditors.

The withheld agreements also bear on Gold Reserve's attempt to attack the certainty of Amber's bid by arguing that standard contract language in Amber's TSA constitutes "conditions precedent and termination rights that make it highly contingent and easily unwound." D.I. 2183 at 8. The provisions that Gold Reserve attacks, such as a need to enter into "Definitive Documents," rights to terminate for "material breach," and "outside dates," are familiar contract terms that may well be found in the missing contracts. Having elected to attack the specific terms and provisions of Amber's fully-disclosed TSA, Gold Reserve should not be permitted to continue to withhold the same level of detail about the documents that give rise to its bid. Gold Reserve cannot benefit from Amber's transparency yet withhold the same through non-disclosure.

In its objection, Gold Reserve acknowledges the Special Master's repeated requests for the information that Amber seeks here, as well as Gold Reserve's continued refusal to produce it. Rather than resolve the issue by disclosing the missing documents, Gold Reserve tries to shift blame on to the Special Master for pointing out this obvious hole in Gold Reserve's bid. *See* D.I. 2183 at 5. Gold Reserve's circular argument that its refusal to produce these obviously relevant agreements is consistent with its own "*modus operandi*" from earlier in this case is no basis to continue to stiff-arm all interested parties, and is, in any event, inconsistent with the actual requirement that the Special Master "file a report under seal (and serve a copy to the Sale Process Parties) that provides a summary of the Bids, including their cash and non-cash consideration components." D.I. 481 ¶ 13. It is not possible to accurately and fully summarize the cash and non-cash consideration components of Gold Reserve's proposed bid without the agreements that Gold Reserve has failed to produce.

*Second*, Gold Reserve claims that it has operated "in strict conformance with governing procedures" for this bidding process, in contrast to (false, unsupported) allegations of violations by Amber. D.I. 2183 at 3. This proposition puts the withheld agreements further at issue. There can be no assurance that Gold Reserve has abided by the bidding procedures without transparency into the agreements with other judgment creditors. Based on the little information Gold Reserve has revealed, it appears the consortium agreement governs the parties' conduct during this sale process, presumably describes the anticipated consideration each member will receive if Gold Reserve's bid is accepted, and almost certainly restricts members from taking certain actions. A collusive agreement that binds judgment creditors, acts as a gag order, or otherwise bars them from fully participating undermines the integrity of this sale proceeding. While Gold Reserve maintains its proposal is "superior," it is, in reality, widely opposed—and for good reasons as the Special Master identified. As Crystallex recently noted, "[t]he fact that Gold Reserve's Motion to Strike was joined only by Siemens, whose judgment Gold Reserve added to its bid during the Topping Period, and not by Koch or Rusoro, the other members of the bidding consortium, indicates that

Gold Reserve speaks only for itself here." D.I. 2169 at 3–4. The withheld agreements provide context for Gold Reserve's attacks on Amber's integrity and may reveal whether Gold Reserve is purporting to speak for judgment holders who are in fact constrained by unseen contracts.

*Finally*, by asserting that there is a "fundamental injustice" being imposed on Attached Judgment Creditors by Amber's bid, D.I. 2183 at 16, Gold Reserve opens the door to the question of what, exactly, those same creditors will receive from Gold Reserve's alternative. Gold Reserve seeks to focus this dispute solely on "the amount of Attached Judgments expected to be satisfied by the purchase price." *Id.* at 3 (quoting D.I. 1554 at 26). But its challenge to "fairness," *id.* at 16, raises broader considerations and comparisons between what each creditor will actually receive in the event that one bid is selected or the other. By invoking a purported "grave injury" to "the three Attached Judgement Creditors that would have their judgments ***deemed*** satisfied in full by the Dalinar Energy Improved Bid," and claiming that Amber's bid "would strip over $2 billion in value ***from*** the Attached Judgment Creditors (and the Venezuela Parties)," *id.* at 17-18 (emphasis added), Gold Reserve puts at issue what amount those creditors actually stand to receive from its own plan. Gold Reserve has strenuously avoided disclosing those facts, but can no longer do so.

It is not credible or proper for Gold Reserve to fault—and ask this Court to override—the Special Master's recommendation of Amber's bid based on arguments about the purported strength of a bid that Gold Reserve has kept, in important respects, shrouded in darkness. The Court years ago established the sale procedures to ensure a "full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the PDVH Shares." D.I. 481 at 6. That is why Amber has disclosed its own agreements with judgment creditors. In contrast, Gold Reserve's preference for backroom deals defies the letter and purpose of the Court's orders. If Gold Reserve insists on pressing its objection, full disclosure of Gold Reserve's agreements with other participants to this sale process is necessary to level the playing field and permit a true assessment of the strengths and weaknesses of all bids.

\*    \*    \*

For the reasons above, Amber respectfully requests that the Court compel Gold Reserve to produce the remaining documents responsive to Requests 6–9 no later than 5 p.m. on September 10, 2025.

Respectfully submitted,

 /s/ Michael A. Barlow

Michael A. Barlow (#3928)

cc:     All Counsel of Record (via CM/ECF)