**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | |
| Plaintiff, | Misc. No. 17-151-LPS |
| v. | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |

**RESPONSE OF ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS
LTD., AND LDO (CAYMAN) XVIII LTD. TO OBJECTIONS TO
THE SPECIAL MASTER'S UPDATED FINAL RECOMMENDATION**

*Of counsel*:

Joshua S. Bolian (*pro hac vice*)
Jared A. Hagler (*pro hac vice*)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rjfirm.com
jhagler@rjfirm.com

Dated: September 12, 2025

ASHBY & GEDDES
Marie M. Degnan (#5602)
Randall J. Teti (#6334)
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
mdegnan@ashbygeddes.com
rteti@ashbygeddes.com

*Attorneys for ACL1 Investments Ltd., ACL2
Investments Ltd., and LDO (Cayman) XVIII Ltd.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ..........................................................................................................1

STATEMENT .................................................................................................................1

    A.    The Dalinar Bid..............................................................................................1

    B.    The 2020 Bondholders' Litigation ...............................................................2

    C.    OFAC General License 5 ...............................................................................4

ARGUMENT ..................................................................................................................5

I.    A Reasonable Estimate of the Expected Value of the Dalinar Bid Is Less Than $5 Billion ......................................................................................................................5

    A.    Expected Value .............................................................................................5

    B.    Events Analyzed............................................................................................6

        1.    Bondholders Prevail on Merits of Validity Question: 60%.......................6

        2.    Stay Pending Appeal of Summary Judgment Ruling for Bondholders Is Denied: 60% .........................................................................9

        3.    Adolin Merger Enjoined Pending Appeal: 35% .......................................11

        4.    Second Circuit Rules Before OFAC Authorizes Dalinar Transaction: 50% ........................................................................................13

        5.    OFAC Allows GL 5 To Become Effective When Authorizing Dalinar Transaction: 80% ....................................................................................14

        6.    Dalinar Transaction Terminated If Temporarily but Not Permanently Impossible: 50% ....................................................................16

    C.    Events Not Analyzed.....................................................................................17

    D.    Decision Tree ................................................................................................18

    E.    Calculation of Expected Value......................................................................19

II.    Joinder........................................................................................................................20

CONCLUSION...............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Agudath Israel of Am. v. Cuomo*,
   980 F.3d 222 (2d Cir. 2020) ........................................................................ 11, 12

*Am. Cap. Fin. Servs., Inc. v. Berry-Hill Galleries, Inc.*,
   2010 WL 11882042 (S.D.N.Y. Mar. 30, 2010) ........................................ 13

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
   585 U.S. 33 (2018) ........................................................................................ 8

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999) ........................................................................ 13

*Centauri Shipping Ltd. v. W. Bulk Carriers KS*,
   528 F. Supp. 2d 186 (S.D.N.Y. 2007) ........................................................ 11

*Citibank, N.A. v. Brigade Cap. Mgmt., LP*,
   49 F.4th 42 (2d Cir. 2022) .......................................................................... 17

*In re Citibank Aug. 11, 2020 Wire Transfers*,
   2021 WL 1905002 (S.D.N.Y. May 12, 2021) ............................................ 13

*In re Grand Jury Subpoena*,
   912 F.3d 623 (D.C. Cir. 2019) .................................................................... 8

*In re Nassau County Strip Search Cases*,
   783 F.3d 414 (2d Cir. 2015) ................................................................ 10, 11

*In re Pet Food Prods. Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010) ........................................................................ 5

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) .......................................................................... 5

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
   663 F. Supp. 3d 406 (D. Del. 2023) ............................................................ 8

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   106 F.4th 263 (2d Cir. 2024) ...................................................................... 3

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   495 F. Supp. 3d 257 (S.D.N.Y. 2020) ............................................ 3, 4, 5, 7, 9

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   51 F.4th 456 (2d Cir. 2022) ...................................................................... 6, 9

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002)..................................................................6

*Werner v. Werner*,
   267 F.3d 288 (3d Cir. 2001) .................................................................2

**Statutes**

28 U.S.C. § 1292(a)(1)..............................................................................12

**Rules, Regulations, and Executive Materials**

31 C.F.R. § 501.803 ...................................................................................5

31 C.F.R. § 591.310 .................................................................................15

Executive Order 13835, 83 Fed. Reg. 24,001 (May 21, 2018)....................4

Fed. R. App. P. 8(a)(2) .......................................................................10, 12

OFAC General License 3I, 88 Fed. Reg. 76,991 (Nov. 8, 2023)................15

OFAC General License 5, 85 Fed. Reg. 14,572 (Mar. 13, 2020) ................4

OFAC General License 5S, https://ofac.treasury.gov/media/934391/download ...........................5

Sup. Ct. R. 10.........................................................................................18

**Other Authorities**

21B Charles Alan Wright et al., *Federal Practice and Procedure* § 5106.4,
   Westlaw (updated May 2025) ..............................................................2

Merriam-Webster.com Dictionary (Sept. 2025)........................................6

OFAC FAQ No. 1123, https://ofac.treasury.gov/faqs/1123 .....................15

OFAC FAQ No. 1124, https://ofac.treasury.gov/faqs/1124 .....................15

Sheldon Ross, *A First Course in Probability* (7th ed. 2005) ............6, 13, 20

Supreme Tribunal of Justice of Venezuela, No. 2241, *Andrés Velásquez*, Sept. 24, 2002..............7

Supreme Tribunal of Justice of Venezuela, No. 618, *Brigitte Acosta Isasis*, July 8, 2016 ............7

Supreme Tribunal of Justice of Venezuela, No. 953, *Electrificación del Caroní S.A.*, Apr. 29,
   2003 ...................................................................................................7

## INTRODUCTION

On August 18, the Court stated that it would "have to deal with the impact of the 2020s under all of their possibilities." 8/18/25 Tr. (D.I. 2171-1) at 206. This is ACL's[1] effort to assist the Court with that task. ACL here identifies six events that, in some combination, appear likely to determine whether the 2020 Bondholders can prevent the Dalinar bid from closing. For each event, ACL provides a reasoned, illustrative probability that the event would occur. ACL then provides a litigation decision tree to show how the six events relate to each other and prevent (or don't prevent) the Dalinar bid's closing. Employing the illustrative probabilities and decision tree, a reasonable estimate of the likelihood that Dalinar's bid can close is about 60%. This means that a reasonable estimate of the expected value (a metric widely used in law to account for risk) of Dalinar's bid is less than $5 billion.

## STATEMENT

### A.    The Dalinar Bid

Gold Reserve Ltd. requests that the Court approve the "Dalinar Energy Improved Bid" submitted on August 28 by Dalinar Energy Corporation. *See* Bid Materials (D.I. 2135). The nominal purchase price for that bid is $7.899 billion. Updated Final Recommendation (D.I. 2123) at 10 n.9. (This is measured by the amount of judgments expected to be satisfied, *see* D.I. 1545-4 at 8, assumes a June 30, 2026, closing, D.I. 2123 at 10 n.9, and gives Dalinar the benefit of the doubt about Rusoro's and Koch's consent to the acquisition of the Valores claim, *see id.* at 8-9.)

Dalinar's previous bids have been subject to "contingencies relating to the 2020 Bondholders," such as the "risk[]" that the Bondholders "enjoin material aspects of [Dalinar's] bid or

---

[1] "ACL" means ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. Neither ACL nor its affiliates own PDVSA 2020 bonds. Any financial interest ACL has in the 2020 bond litigation derives from its Attached Judgment in this case.

its financing." Stalking Horse Approval Order (D.I. 1741) at 5; *see* Updated Final Recommendation (D.I. 2123) at 7 (same issue with Dalinar bid submitted during topping period).

The operative Dalinar bid is subject to the same contingencies. The 2020 Bondholders claim to have rights under a Pledge and Security Agreement. D.I. 1441-2 (the "Pledge Agreement"). One right that creates a contingency for the Dalinar bid is the right to vote 50.1% of the stock of CITGO Holding, Inc. *Id.* § 2.05(d). Were the Bondholders to exercise this right, Dalinar's lenders would be unable to fund at closing. Updated Final Recommendation (D.I. 2123) at 11 n.12. A second right that creates a contingency for the Dalinar bid is the "anti-upstreaming" right that "profits and other distributions on the" Bondholders' collateral, including 50.1% of the CITGO Holding stock, shall be paid to the Bondholders. Pledge Agreement § 2.05(c); *see id.* § 2.05(f). The Bondholders have signaled that they would invoke this right to seek an injunction. 7/7/25 Letter (SDNY D.I. 384) at 3-4.[2] The injunction could block a merger of Dalinar's subsidiary into CITGO Petroleum Corporation, or block the grant of a security interest to Dalinar's lenders, either of which would prevent funding of the Dalinar bid. ACL Reply Br. (D.I. 2037) at 3; Red Tree Reply Br. (D.I. 2036) at 2-3. *See* 8/28/25 Dalinar Bid Letter (D.I. 2126-1), ECF PageID 53105 (incorporating by reference the financing documents described in the reply briefs just cited).

**B.    The 2020 Bondholders' Litigation**

The 2020 Bondholders' ability to exercise their asserted rights, and thus the risk that Dalinar's bid could not close, are subject to litigation in the Southern District of New York ("SDNY").

Currently before the SDNY are cross-motions for summary judgment. On one side, the

---

[2] "SDNY D.I." refers to entries on the docket of *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023 (S.D.N.Y.). This Court may take judicial notice of documents filed in that case. *Werner v. Werner*, 267 F.3d 288, 295-96 (3d Cir. 2001); *accord* 21B Charles Alan Wright et al., *Federal Practice and Procedure* § 5106.4, Westlaw (updated May 2025) ("[F]ederal courts notice the records of any court, state or federal.").

Bondholders seek declarations that their bonds and related documents are valid and that events of default have occurred. Summ. J. Mot. (SDNY D.I. 81).[3] The Bondholders also seek an award of damages for principal and interest. *Id.* On the other side, Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and another PDVSA subsidiary seek a declaration that the 2020 bonds and related documents are invalid, void, and unenforceable. Summ. J. Mot. (SDNY D.I. 91). In addition, those parties seek an injunction against the Bondholders' "attempting to enforce the 2020 Notes, the Indenture, or the Pledge or . . . attempting to exercise any rights, remedies, or privileges purportedly arising from a default." *Id.* at 2.

The SDNY previously denied PDVSA's summary-judgment motion and largely granted the Bondholders' summary-judgment motion. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257 (S.D.N.Y. 2020) ("*PDVSA I*"). On appeal, the Second Circuit certified questions to the New York Court of Appeals. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 267 (2d Cir. 2024) ("*PDVSA III*"). That court held that the validity *vel non* of the 2020 bonds was determined not by New York law, as the SDNY had held, but by Venezuelan law. *Id.* Accordingly, the Second Circuit vacated the SDNY's judgment and remanded. *Id.* at 270.

On remand, the parties have filed supplemental briefs and evidentiary materials applying Venezuelan law to their respective motions for summary judgment. The SDNY has taken the matter under advisement and informed the parties to its case, as well as this Court, that it expects to render a decision by September 30. *See* 8/14/25 Order (D.I. 2056) at 2 n.1.

The SDNY's decision on the summary-judgment motions would not end the litigation. If the Bondholders prevail, PDVH could seek a stay, and PDVH's counsel has indicated that it would

---

[3] The parties to the SDNY case are not the 2020 Bondholders themselves but the Bondholders' Trustee and Collateral Agent acting at the Bondholders' direction. The distinction does not matter for present purposes, so, for simplicity, this brief will refer only to the Bondholders.

do so. 4/17/25 Tr. (D.I. 1854-2) at 84-85. At the same time, the Bondholders could seek an injunction of the kind described above (p. 2), and their counsel has indicated that they would do so. 7/10/25 SDNY Tr. (D.I. 1991-2) at 23. If the Bondholders do not prevail, they could nonetheless seek an injunction. *Infra* pp. 11-12. And, regardless of any stay or injunction, at least one side would appeal to the Second Circuit.

### C.    OFAC General License 5

The 2020 Bondholders' ability to exercise their asserted rights, and thus the risk that Dalinar's bid could not close, are separately affected by the sanctions regime of the Office of Foreign Assets Control ("OFAC").

In May 2018, the President issued Executive Order 13835. 83 Fed. Reg. 24,001 (May 21, 2018). That Order prohibited "[a]ll transactions related to" any "sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest." *Id.* § 1(a)(iii). The Order thus prevented the 2020 Bondholders from foreclosing on their collateral, 50.1% of the stock of CITGO Holding, because Venezuela indirectly owns CITGO Holding. (The Order arguably prevented exercise of the Bondholders' other claimed rights as well. *See infra* p. 15 n.6.)

In July 2019, OFAC issued General License 5 ("GL 5"). 85 Fed. Reg. 14,572, 14,573 (Mar. 13, 2020). GL 5 carved out an exception to Executive Order 13835 for the 2020 bonds. Specifically, it provided that "all transactions related to" the 2020 bonds "that would be prohibited by Subsection 1(a)(iii) of Executive Order 13835 . . . are authorized." *Id.*

On October 24, 2019, OFAC suspended the operation of GL 5. It replaced GL 5 with General License 5A, which provided that GL 5's exception to Executive Order 13835 would not take effect until early 2020. *Id.* Three days later, on October 27, PDVSA defaulted on the 2020 bonds. *PDVSA I*, 495 F. Supp. 3d at 267. Two days after that, on October 29, PDVSA initiated the SDNY

4

litigation, seeking a declaration that the 2020 bonds were invalid and void. *Id.*

Since October 2019, OFAC has periodically renewed its suspension of GL 5. *See* 6/25/25 Red Tree Ltr. (D.I. 1824) at 1-2 (describing history). Currently, GL 5 is suspended through December 20, 2025. General License 5S, https://ofac.treasury.gov/media/934391/download. However, OFAC is free to change its suspension of GL 5 "at any time." 31 C.F.R. § 501.803.

## ARGUMENT

### I.    A Reasonable Estimate of the Expected Value of the Dalinar Bid Is Less Than $5 Billion

#### A.    Expected Value

The problem with Dalinar's bid is that its nominal purchase price overstates the amount of judgments that the bid is likely to satisfy. The nominal purchase price of $7.9 billion reaches creditors only if the 2020 Bondholders fail in their long-threatened litigation to prevent Dalinar's financing from closing. Hence, the $7.9 billion is not so much a purchase price as it is the potential winnings on a wager. If the Bondholders prevail, the wager is lost, and creditors get nothing.

To measure the value of something contingent on future events, as Dalinar's purchase price is, courts use expected value. For instance, whether a company is solvent may depend on the value of assets that are contingent on a future event. Courts value such assets by determining "the likelihood of that event occurring." *In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996). Likewise, in evaluating class-action settlements, courts "discount[]" the "damages plaintiffs would likely recover" by "the risk of not prevailing." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 354 (3d Cir. 2010) (quotation marks omitted). The same idea—using probability to put a single value on what could be either of two values, depending on what happens—animates the "Learned Hand formula."

Determining an expected value is conceptually straightforward. It is just "the sum of the values of" a number "with each value multiplied by its probability of occurrence." Expected Value,

Merriam-Webster.com Dictionary (Sept. 2025); *accord* Sheldon Ross, *A First Course in Probability* 140-43 (7th ed. 2005). Thus, the expected value of a coin flip, if you get $10 for heads and $0 for tails, is $10 × 50% + $0 × 50% = $5.

Determining the expected value of Dalinar's bid in particular warrants some humility. The probability that the bid closes depends on the 2020 Bondholders' litigation, and "[a] high degree of precision cannot be expected in valuing a litigation." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002) (Posner, J.). Nonetheless, the effort is worthwhile here, for at least two reasons. First, expected value is one established way to weigh the quantitative criterion of price with the qualitative criterion of certainty. Second, the Dalinar bid's payout depends not on a single litigation event but on multiple events. It is easier to understand how multiple, interacting events work together to affect the result when their probabilities are measured quantitatively.

### B.    Events Analyzed

Whether the Dalinar bid can close is contingent on what the Court termed "permutations" of multiple events. 8/18/25 Tr. (D.I. 2171-1) at 206. Here, ACL identifies six such events and provides a reasoned, illustrative probability that each would occur.

#### 1.    Bondholders Prevail on Merits of Validity Question: 60%

The first event is that the Bondholders prevail on the question, posed in the cross-motions for summary judgment pending in the SDNY, whether the 2020 bonds are valid. In ACL's view, the probability that the Bondholders prevail is approximately 60%.

To prevail, the Bondholders must prevail on both of two separate questions: whether the 2020 bonds are valid under the Venezuelan Constitution, and whether the bonds are valid despite certain resolutions of Venezuela's legislature given force by the act-of-state doctrine. *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 464 (2d Cir. 2022) ("*PDVSA II*").

a.    The constitutional question concerns Article 150 of the Venezuelan Constitution.

6

Article 150 provides, in relevant part: "No municipal, state[,] or national public interest contract shall be executed . . . with companies not domiciled in Venezuela . . . without the approval of the National Assembly." *PDVSA I*, 495 F. Supp. 3d at 263. It is undisputed that the 2020 bonds and related documents are contracts "with companies not domiciled in Venezuela" and that they lacked "approval of the National Assembly." The question, therefore, is whether those contracts are "public interest contract[s]." PDVSA argues that they are; the Bondholders argue that they are not.

The "concept of *public interest contract*" had, according to the Constitutional Chamber of Venezuela's Supreme Tribunal, been subject to "many interpretations" over the years. No. 2241, *Andrés Velásquez*, Sept. 24, 2002 (SDNY D.I. 128-7) at 15. One professor (cited by one of PDVSA's experts, SDNY D.I. 342-1 ¶¶ 65-66) had contended that it was "necessary, but not sufficient, that one of the parties in the contract was the Republic." *Andrés Velásquez* (SDNY D.I. 128-7) at 15. Others had commented, to the contrary, that a contract could be a public interest contract even if the Republic itself was not party. *See* Brewer-Carías Decl. (SDNY D.I. 340) ¶ 11.

Against this backdrop, the Constitutional Chamber, "as maximum and ultimate interpreter of the Constitution," held that "the meaning that must be given to the concept of *national public interest contracts* contained in article[] 150" is: "contracts entered into by the Republic . . . where the national . . . public interest is involved." *Andrés Velásquez* (SDNY D.I. 128-7) at 16-17.

What to make of this language from *Andrés Velásquez* is at the core of the dispute between PDVSA and the Bondholders, as the Republic is not party to the 2020 bonds. PDVSA contends, relying on its experts, that *Andrés Velásquez* is not binding. SDNY D.I. 343 at 10-11. That argument is not persuasive; the Constitutional Chamber itself has extensively relied on *Andrés Velásquez* as a rule for decision. *E.g.*, No. 618, *Brigitte Acosta Isasis*, July 8, 2016 (SDNY D.I. 128-8) at 19-21; No. 953, *Electrificación del Caroní S.A.*, Apr. 29, 2003 (SDNY D.I. 349-17) at 12-13.

7

PDVSA separately maintains that, because *Andrés Velásquez* involved contracts to which the Republic *was* party, it did not decide whether contracts to which the Republic *was not* party could be public interest contracts. SDNY D.I. 343 at 11-12. While this argument has more force, ACL believes that it, too, is ultimately unpersuasive. For one thing, *Andrés Velásquez* self-consciously stepped into a long debate about public interest contracts. This makes less likely that its language was unconsidered dicta. More important are the statements of PDVSA's own experts. In their academic writing, prior to their retention as expert witnesses for litigation, the experts repeatedly agreed with the Bondholders that, under *Andrés Velásquez*, "contracts concluded by . . . enterprises such as PDVSA" *cannot* qualify as public interest contracts. SDNY D.I. 347 at 19; *see id.* at 18-20, 27. The SDNY appears unimpressed with PDVSA's explanation for these extra-litigation statements. ACL Reply Br. (D.I. 2037) at 5 & n.3.

Gold Reserve skips all this analysis to point out that the Republic has sided with PDVSA's interpretation of Venezuelan law. D.I. 2183 at 10-11. But the Republic does little more than echo PDVSA's arguments. *See* SDNY D.I. 326-1 at 12-14. Moreover, the "weight" due the Republic's view "depend[s] upon the circumstances." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 43 (2018). Here, the Republic offers its view "in the context of litigation" (*see id.*)— and not just any litigation. The Republic is trying to save CITGO, its "'crown jewel' and most economically and strategically important foreign asset" (*see OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 424 (D. Del. 2023)), from seizure. Such a "response to th[e] litigation" in which the sovereign has "a direct stake" has merited little deference from courts. *E.g.*, *In re Grand Jury Subpoena*, 912 F.3d 623, 634 (D.C. Cir. 2019) (per curiam).[4]

---

[4] The United States does not, as Gold Reserve claims (D.I. 2183 at 10-11), "support" the Republic "in no uncertain terms." After the SDNY solicited its position, the United States "t[ook] no position on the operation of Venezuelan law in this case." SDNY D.I. 393 at 3.

b.      For the foregoing reasons, ACL expects courts to agree with the Bondholders that the Venezuelan Constitution does not render the 2020 bonds invalid. That is not the only issue, though: PDVSA could prevail under its alternative argument invoking the act-of-state doctrine.

"The act-of-state doctrine is a rule of decision requiring that . . . courts accept as valid the acts of foreign sovereigns taken within their own jurisdictions." *PDVSA II*, 51 F.4th at 466. In 2016, Venezuela's legislature passed resolutions criticizing the Maduro government's claim that it could "sign contracts of public interest[] without the approval of the National Assembly" and "reject[ing] categorically" the security interest purportedly granted to the 2020 Bondholders. SDNY D.I. 126-13 ¶ 1; SDNY D.I. 1-3 ¶ 2. PDVSA argues that these resolutions are acts of a sovereign that "render[] the" 2020 bonds "null and void." SDNY D.I. 343 at 30.

PDVSA's act-of-state argument is not substantial. The SDNY rejected it at length. *PDVSA I*, 495 F. Supp. 3d at 271-83. The Second Circuit vacated that decision so that the SDNY could consider whether the applicability of Venezuelan law changed the result. *PDVSA III*, 106 F.4th at 269-70. But PDVSA does not argue that Venezuelan law changes anything. D.I. 343 at 27-34. What is more, the legislature acting alone was not a sovereign in 2016, when the legislature itself recognized President Maduro as the legitimate head of state. *See* SDNY D.I. 347 at 32-35.

## 2.      Stay Pending Appeal of Summary Judgment Ruling for Bondholders Is Denied: 60%

The second event is that, were the Bondholders to prevail on summary judgment, PDVSA or PDVH fails to obtain a stay of that judgment pending appeal. In ACL's view, the probability that a stay would be denied is approximately 60%.

Preliminarily, ACL agrees with Gold Reserve that a stay would (while in effect) render the Bondholders unable to stop Dalinar's transaction. The order being stayed would be a declaration in the Bondholders' favor. *Supra* p. 3. A corollary thereof would be a declaration, as was included

9

in the SDNY's prior judgment, that the Bondholders may "exercise the remedies for default" in "the Pledge Agreement." SDNY D.I. 229 at 3. Were such a declaration's effect stayed, PDVSA and PDVH would be free to contest any attempted exercise of the Bondholders' rights.

The main argument that PDVSA or PDVH would obtain a stay is that they did so last time the SDNY entered summary judgment for the Bondholders. Gold Reserve Obj. (D.I. 2183) at 11. The expressed view of the SDNY district judge matters because the same judge would be making the decision this time around. That judge's grant of a stay would be dispositive because grants of stays pending appeal generally cannot be appealed as of right. *See* Fed. R. App. P. 8(a)(2).

The better argument, ACL maintains, is that the circumstances now so differ from the circumstances before that a future stay request would be denied. A review of the SDNY's prior stay order (SDNY D.I. 241) shows that things have changed in ways that discourage another stay.

The main reason the SDNY previously granted a stay was that the Bondholders' collateral, 50.1% of CITGO Holding, qualified as security tantamount to a supersedeas bond under Federal Rule of Civil Procedure 62(b). SDNY D.I. 241 at 3-4. The SDNY concluded that "no additional security is necessary" (*id.*) under *In re Nassau County Strip Search Cases*, 783 F.3d 414 (2d Cir. 2015) (per curiam). *Nassau County* requires courts to consider factors including "the degree of confidence . . . in the availability of funds to pay the judgment" and "whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste." *Id.* at 417.

The analysis under Rule 62(b) and *Nassau County* would look quite different now than it did before. This time, it is assumed, this Court would have approved Dalinar's bid. As a result, the Bondholders' collateral would face the imminent loss of $4.5 billion in value, because Dalinar's lenders would (were the transaction consummated) get a structurally senior security interest in that amount. Term Sheet (D.I. 1837-1), ECF PageID 41364-65. That security interest would signifi-

cantly reduce the "availability of funds" and "ability to pay." *See Nassau Cnty.*, 783 F.3d at 417. And PDVH would be unable to make up that difference by posting an additional bond, as PDVH previously argued. SDNY D.I. 234 at 9-10.

In the alternative, the SDNY previously granted a stay using its "equitable powers." SDNY D.I. 241 at 4. It reasoned that PDVH would be irreparably harmed by the Bondholders' seizing their collateral. *Id.* at 5 n.5. Now, though, the Bondholders do not want to seize the collateral, which could come encumbered by the security interests of Dalinar's lenders. First, they would want to block the Dalinar transaction, by exercising their right to vote the CITGO Holding stock. *Supra* p. 2. Permitting the Bondholders to do that would not irreparably harm PDVH. To the contrary, it would *help* PDVH maintain its value by preventing Dalinar's lenders from taking a security interest in CITGO Petroleum's assets. Thus, the SDNY's previous basis for granting an equitable stay—like its previous basis for granting a Rule 62(b) stay—no longer applies.[5]

### 3.    Adolin Merger Enjoined Pending Appeal: 35%

The third event is that the merger of Dalinar's subsidiary, Adolin Holdings Inc., into CITGO Petroleum is enjoined pending an appeal of the SDNY's summary judgment decision. *See* Final Recommendation (D.I. 1837) ¶ 72 (describing role of Adolin); ACL Reply Br. (D.I. 2037) at 3. In ACL's view, the probability that an injunction would be granted is approximately 35%.

Preliminarily, Gold Reserve makes three incorrect claims about such an injunction. *First*, Gold Reserve claims that the Bondholders could not obtain an injunction after the SDNY enters summary judgment against them. D.I. 2183 at 10-11. But they could; indeed, the SDNY previously

---

[5] The SDNY previously rejected the argument that its stay was injunctive in nature, so that Federal Rule of Civil Procedure 62(d) would apply. SDNY D.I. 241 at 4 n.4; *see Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 186, 188-89 (S.D.N.Y. 2007). That argument is colorable. Were it accepted this time, the SDNY would apply factors much the same as those that govern its equitable powers. *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 225-26 (2d Cir. 2020).

awarded injunction-like relief pending appeal to PDVH after ruling against it. SDNY D.I. 241 at 7 (Bondholders "shall not attempt to enforce the Pledge Agreement"). And they could appeal any denial of an injunction. 28 U.S.C. § 1292(a)(1); Fed. R. App. P. 8(a)(2). *Second*, Gold Reserve claims that no injunction can issue without OFAC authorization. D.I. 2183 at 11. That is not so, as Red Tree has explained (D.I. 1942 at 5-7) and as Gold Reserve largely conceded in response (D.I. 1991 at 10-11). *Third*, Gold Reserve reiterates its claim that the Bondholders have committed not to pursue an injunction. D.I. 2183 at 12. That claim has been refuted by ACL (D.I. 2037 at 2-4) and others (*e.g.*, ConocoPhillips, D.I. 2035 at 4).

To obtain an injunction pending appeal, the Bondholders would need to show (a) likelihood of success on the merits; (b) likelihood that they would suffer irreparable harm; (c) that the balance of equities favors them; and (d) public interest. *Agudath Israel*, 980 F.3d at 256. In ACL's view, there is reason to doubt that the Bondholders could prevail on the first two factors. Accordingly, even assuming the Bondholders could prevail on the last two factors, the Bondholders are unlikely to obtain an injunction.

Success on the merits would concern not only the 2020 bonds' validity (on which the Bondholders are likely to prevail, *supra* pp. 6-9) but also the Pledge Agreement's "anti-upstreaming" provision (*supra* p. 2). Read literally, that provision does not protect the Bondholders. It covers only "profits and other distributions on the" CITGO Holding stock and certain property "received by" PDVH. Pledge Agreement § 2.05(c), (f). It is not literally applicable because, in Dalinar's transaction, CITGO Holding would not distribute anything, and PDVH would receive no property. Transaction Description, D.I. 1837-1, ECF PageID 41333. The Bondholders could respond that such a literal approach elevates form over substance. In substance, value would flow from CITGO Petroleum (which assumes $4.5 billion in new debt) to PDVSA (debt of which would correspond-

12

ingly be discharged). The entities between PDVSA and CITGO Petroleum—PDVH and CITGO Holding—are bypassed, apparently to evade the anti-upstreaming provision. Despite the substance of the transaction, the Pledge Agreement's literal terms pose a risk to success on the merits.

The Bondholders' irreparable-harm argument would be that the Adolin merger would reduce the value of their collateral by billions of dollars. The Bondholders would be right that "threat of the dissipation of collateral" is recognized as irreparable harm. *Am. Cap. Fin. Servs., Inc. v. Berry-Hill Galleries, Inc.*, 2010 WL 11882042, at *13 (S.D.N.Y. Mar. 30, 2010). They would also be right, more generally, that they would be irreparably harmed if "there is a substantial chance that," but for an injunction, they "cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). But here, as with likelihood of success, the Bondholders would face formalistic objections. The collateral would be the same (50.1% of CITGO Holding) before and after the merger. And the "positions they previously occupied" principle can be limited to insolvency, which is not threatened here. *In re Citibank Aug. 11, 2020 Wire Transfers*, 2021 WL 1905002, at *5 (S.D.N.Y. May 12, 2021).

### 4.    Second Circuit Rules Before OFAC Authorizes Dalinar Transaction: 50%

The fourth event is that the Second Circuit decides the appeal of the SDNY's summary-judgment decision before OFAC authorizes the Dalinar transaction. Whether this occurs depends on how quickly the Second Circuit decides the appeal and on the speed of an OFAC process that could require input from the State and Treasury Departments. These matters of timing are discretionary. In the absence of legal standards or facts that would make one inference more likely than another, ACL assumes that the probability that the Second Circuit rules before OFAC acts is 50%. *See* Ross, *supra*, at 215 (expected value of a uniform distribution is the midpoint).

**5.    OFAC Allows GL 5 To Become Effective When Authorizing Dalinar Transaction: 80%**

The fifth event is that, when OFAC authorizes the Dalinar transaction, it also ends its suspension of GL 5, thus enabling the Bondholders to exercise their claimed rights (subject to non-OFAC limitations). In ACL's view, the probability that OFAC would authorize the Bondholders to act when it authorizes the Dalinar transaction is approximately 80%.

Gold Reserve contends that OFAC will not end its suspension of GL 5 because that suspension has been in place for nearly six years. D.I. 2183 at 14. That contention, that history will repeat itself indefinitely, is unpersuasive here for at least three reasons.

First, context suggests that GL 5 is suspended to enable the courts to determine whether the 2020 bonds are valid, not to take claimed rights away from the Bondholders. GL 5 was first suspended just days before PDVSA defaulted on, and challenged the validity of, the bonds. *Supra* pp. 4-5. This timing suggests that OFAC was made aware of the impending default and litigation, then acted to keep the Bondholders' collateral in place while the litigation played out. Indeed, in this case, OFAC indicated that it awaited certain decisions of this Court before taking a licensing action. 7/16/20 Gacki Ltr. (D.I. 212-2) at 2. Relatedly, a former OFAC director has opined that, "[o]ften, when any party to litigation" seeks a license, "OFAC will require evidence of [the court's] final decision or order before authorizing the transaction(s)." Smith Decl., *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 19 Misc. 290, D.I. 97 ¶ 25 (D. Del. May 25, 2021). All of this indicates that GL 5 is being suspended only to enable resolution of the Bondholders' litigation.

Second, OFAC has suspended GL 5 for a few months at a time, rather than indefinitely. *Supra* p. 5. This established pattern suggests that OFAC is actively monitoring events to decide when it should end the suspension. Had OFAC instead intended to suspend GL 5 until further notice, as Gold Reserve claims, OFAC could simply have done so. That is OFAC's usual practice.

For example, when OFAC amended a general license to allow U.S. investors to trade most Venezuelan bonds, it set no expiration date for its change in policy. General License 3I, 88 Fed. Reg. 76,991 (Nov. 8, 2023).

Third, authorizing Dalinar while continuing to suspend GL 5 would effectively prefer one creditor to another—a result OFAC has indicated it seeks to avoid. This case again furnishes a good example. Crystallex International Corp. told OFAC that Crystallex should get an OFAC license because the 2020 Bondholders had GL 5. OFAC "disagree[d]" that there was any "preferential treatment," because GL 5 was suspended. 9/10/21 Gacki Ltr. (D.I. 346-1) at 2. This response accepts Crystallex's premise that preferential treatment is to be avoided. When OFAC later did license steps toward this case's sale, it did not pick winners (as it could have). License, D.I. 555. Instead, it "committed to fair and equivalent treatment of potential creditors." OFAC FAQ No. 1123, https://ofac.treasury.gov/faqs/1123. Nor should the 2020 bonds be disfavored, as Gold Reserve asserts, because they "funded the Maduro regime." D.I. 2183 at 14. The judgments in this case, too, arise from transfers of value to (i.e., property taken or debts unpaid by) the Maduro and predecessor Chávez regimes.[6]

---

[6] It is unclear whether the 2020 Bondholders would need an OFAC license to vote 50.1% of the stock of CITGO Holding, at least if the vote merely preserves the status quo. GL 5 lifts the prohibition against any "sale, transfer, [or] assignment" of the CITGO Holding stock so long as the Republic indirectly owns it. *Supra* p. 4. A vote like the one contemplated (*supra* p. 2) would not effect a "sale" or "assignment." "Transfer" is broadly defined, but even that definition extends only to acts that "create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property." 31 C.F.R. § 591.310. The contemplated vote would prevent, rather than effectuate, such a change in property rights. Perhaps the vote qualifies as "the exercise of any power." *See id.* If so, it might be subject to OFAC's "non-enforcement policy" that protects "any person . . . taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PdVSA 2020 8.5 percent bond." OFAC FAQ No. 1124, https://ofac.treasury.gov/faqs/1124.

### 6.    Dalinar Transaction Terminated If Temporarily but Not Permanently Impossible: 50%

The sixth event is that, were the Bondholders able to block Dalinar's transaction for some limited period of time, Dalinar's stock purchase agreement would be terminated. In ACL's view, the probability of termination in such a scenario is approximately 50%.

The parties agree that situations could arise in which the Dalinar transaction becomes temporarily but not permanently impossible to consummate. For example, the Bondholders could obtain "an injunction by the S.D.N.Y.," yet PDVSA could "ultimately prevail" in the Second Circuit. Special Master Resp. (D.I. 2006) at 22.

The parties further agree that Dalinar's agreement should provide for termination in such situations. But the parties differ on the specifics. Crystallex and ACL call for automatic termination within thirty days. *E.g.*, D.I. 1949 at 14. The Special Master believes he has the discretion to terminate after forty-five days. D.I. 2006 at 22-23. Gold Reserve agrees to discretionary termination after ninety days. D.I. 2135-3 at 2.

Gold Reserve claims that it could avert termination by "arrang[ing] for alternative financing" that the 2020 Bondholders would be unable to block. D.I. 2148 at 6. But that prospect is too speculative to assign it any weight. The risks to Dalinar's financing have been criticized since at least early April (*e.g.*, D.I. 1658 at 3-4), and the Special Master has requested that Gold Reserve eliminate those risks (D.I. 2123 at 11 n.12). Despite more than five months, and ample incentive, Gold Reserve has failed. There is no reason to believe that it could find alternative financing within ninety days or less. Indeed, finding such financing would be more difficult in the future than it has been before, as Gold Reserve would be seeking it in a scenario where the Bondholders have gained an upper hand in litigation.

A more realistic way for Gold Reserve to avoid termination would be to end the condition,

16

before the termination period expires, that enabled the Bondholders to block Dalinar's transaction. For example, if the Bondholders have an injunction pending appeal, Gold Reserve could seek expedition in the Second Circuit. But that court (like any other) is not always able to render decision in time to avoid "dire repercussions" for affected parties. *See Citibank, N.A. v. Brigade Cap. Mgmt., LP*, 49 F.4th 42, 94 (2d Cir. 2022) (Park, J., concurring in the judgment). Even if it could do so, the Bondholders' injunction could remain in place through disposition of a petition for certiorari, a process likely to outlast even the ninety days that Gold Reserve requests for a termination period.

### C.    Events Not Analyzed

To avoid undue complexity, ACL has not provided an illustrative probability for every event that could affect whether the Dalinar transaction can close. The events not analyzed include:

- *Settlement*. Gold Reserve has failed to settle with the 2020 Bondholders despite motive and opportunity. There is no reason to believe that it could do so *after* the Bondholders have prevailed at one or more key points in their litigation, putting Gold Reserve over a barrel.

- *Outcomes other than summary judgment*. While the SDNY or Second Circuit could deny summary judgment for both sides in the Bondholders' litigation, the dispute appears amenable to summary judgment for one side or the other.

- *Bondholders' other causes of action*. The Bondholders have raised, but not yet pursued, causes of action including unjust enrichment and breach of warranty. SDNY D.I. 40 at 45-48. ACL does not attempt to determine how or when these causes of action could play out.

- *Effect of decisionmaker on merits*. There is no reason to believe that the SDNY would view the merits of the Bondholders' case any differently than the Second Circuit would. Thus, ACL assumes the same probability for the merits event (*supra* pp. 6-9) in both courts.

- *Certiorari*. The application of Venezuelan law at issue in the Bondholders' litigation does not implicate the considerations that typically warrant granting certiorari. *See* Sup. Ct. R. 10. ACL assumes that certiorari would be denied.

- *Next round of bids*. ACL does not attempt to speculate on how much value creditors might ultimately receive were the Dalinar bid to fail and the Special Master to solicit another round of bids.

### D.    Decision Tree

ACL posits that the events analyzed in Section I.B relate to one another, and to the overall probability that the Dalinar bid could close, as shown in a decision tree attached as **Exhibit A**. A framework like the decision tree is necessary to determine the expected value of the Dalinar bid. The expected value depends on the probability that the Dalinar transaction could close. That probability is not provided by any single event analyzed in Section I.B. Instead, combinations of those events taken together would determine how likely the transaction is to close. The decision tree identifies which combinations of events should be considered.

The decision tree is a set of reasonable narratives for the future of the 2020 Bondholder litigation. It begins with the SDNY's decision, expected by September 30, on the pending cross-motions for summary judgment. *Supra* p. 3. Regardless who prevails, it appears that the Bondholders would move for an injunction pending appeal. *Supra* p. 4. And PDVH has stated that, if summary judgment is granted to the Bondholders, it would seek a stay pending appeal. *Supra* pp. 3-4. The decision tree assumes that, at or near the time the stay and injunction motions are resolved, this Court would approve the Dalinar bid without any stay pending appeal in this case.

Two branches (one for each possible summary-judgment outcome) of the decision tree assume that the Bondholders obtain an injunction. If that occurs (and absent alternative financing),

18

then the Dalinar stock purchase agreement could be terminated. *Supra* pp. 16-17. If it is not terminated, then the decision tree contemplates a merits decision by the Second Circuit and (if the Bondholders prevail there) a decision by OFAC on whether to continue its suspension of GL 5.

One branch of the decision tree assumes that PDVH obtains a stay pending appeal of a summary-judgment decision in the Bondholders' favor. If that occurs, and if OFAC authorizes the Dalinar transaction while the stay is in place, Dalinar's transaction could close. If, instead, the Second Circuit decides the merits before OFAC acts, then the result would depend on its decision and (if the Bondholders prevail) on OFAC's subsequent decision about GL 5.

It is also possible that the SDNY would grant neither an injunction nor a stay. If that happens after summary judgment is entered against the Bondholders, then Dalinar's transaction could close. If it happens after summary judgment is entered for the Bondholders, things are more complex. The Second Circuit could rule before OFAC authorizes the Dalinar transaction. In that event, the outcome would again depend on the Second Circuit's decision and on OFAC's subsequent decision about GL 5. Or OFAC could authorize the Dalinar transaction before the Second Circuit rules. Were OFAC to do so and also end its suspension of GL 5, then the Bondholders could exercise their right to vote the CITGO Holding stock and potentially terminate the Dalinar transaction. If there is no termination, or if the Second Circuit ruled before OFAC authorized the Dalinar transaction, then the outcome would depend on the decisions of the Second Circuit and of OFAC.

### E.    Calculation of Expected Value

To repeat (*see supra* p. 5), Dalinar's nominal purchase price of $7.899 billion overstates the amount of judgments that the bid is likely to satisfy, due to the risk posed by the 2020 Bondholders. An accepted way to adjust for this risk is to calculate expected value.

The expected value is the sum of possible payouts to creditors, with each possible payout multiplied by the probability that it would occur. Here, there are two possible payouts: $7.899

billion, if the Dalinar transaction closes, and $0, if the transaction does not close.

Whether the Dalinar transaction can close is determined by combinations of events. For example, it could close if (a) the SDNY enters summary judgment for the Bondholders, then (b) the SDNY grants a stay pending appeal, then (c) OFAC authorizes the Dalinar transaction before the Second Circuit rules. The probability that multiple events all occur is the product of the events' probabilities. (If you flip two coins, the probability that each comes up heads is 50% × 50% = 25%. *See* Ross, *supra*, at 87.) Thus, the probability of the example scenario just given is (a) 60% (*supra* pp. 6-9) times (b) 40% (*supra* pp. 9-11) times (c) 50% (*supra* p. 13) = 12%.

The probability that the Dalinar transaction can close is the sum of the probabilities of all the scenarios in which the transaction can close. Each such scenario is marked in the decision tree attached as Exhibit A with a green box that says "Dalinar bid succeeds." Each green box includes the probability, calculated as in the preceding paragraph, that the scenario occurs. The sum of those probabilities, and therefore the probability that the Dalinar transaction can close, is **59.9%**.

To get from the probability that the Dalinar transaction can close to the expected value of the Dalinar bid, the probability of closing is multiplied by the value if it closes. With a probability of 59.9% and a value of $7.899 billion, the expected value is 59.9% × $7.899 billion = **$4.732 billion**. ACL accordingly submits that a reasonable estimate of the expected value of the Dalinar bid is less than $5 billion.

## II.    Joinder

ACL hereby joins in the response brief of Crystallex (insofar as it addresses 8 Del. C. § 324(a)) filed contemporaneously herewith.

**CONCLUSION**

A reasonable estimate of the expected value of the Dalinar bid is less than $5 billion.

20

Dated: September 12, 2025

*Of counsel*:

Joshua S. Bolian (*pro hac vice*)
Jared A. Hagler (*pro hac vice*)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rjfirm.com
jhagler@rjfirm.com

Respectfully submitted.

ASHBY & GEDDES

*/s/ Marie M. Degnan*
_____
Marie M. Degnan (#5602)
Randall J. Teti (#6334)
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
mdegnan@ashbygeddes.com
rteti@ashbygeddes.com

*Attorneys for ACL1 Investments Ltd., ACL2
Investments Ltd., and LDO (Cayman) XVIII Ltd.*

21