**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendants. | Misc. No. 17-151-LPS |

**2020 BONDHOLDERS' RESPONSE TO GOLD RESERVE'S OBJECTIONS TO
SPECIAL MASTER'S UPDATED FINAL RECOMMENDATION**

**TABLE OF CONTENTS**

I. Gold Reserve Misrepresents the Amber Energy Bid's Certainty of Closing ..................... 3

    A. The 2020 Bondholders May Direct the Release of the Lien .................................. 3

    B. Gold Reserve Mischaracterizes the SDNY Litigation ............................................ 7

II. Gold Reserve's Bid Cannot Close Without an Unlawful Court Order ............................. 11

    A. Gold Reserve Could Not Control CITGO Holding or CITGO Petroleum After Closing ................................................................................................................ 12

    B. Gold Reserve's Bid Therefore Relies on an Unlawful Sale Order ...................... 13

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

                                                                                                                        Page(s)

**Cases**

*In re Chrysler LLC*,
  576 F.3d 108 (2d Cir. 2009) ......................................................................................... 4

*Marblegate Asset Management LLC* v. *Education Management Corp.*,
  846 F.3d 1 (2d Cir. 2017) ............................................................................................. 5

*In re Metaldyne Corp.*,
  409 B.R. 671 (Bankr. S.D.N.Y. 2009) ......................................................................... 4

*Ocean Trails CLO VII* v. *MLN Topco Ltd.*,
  233 A.D.3d 614 (N.Y. App. Div. 2024) ....................................................................... 3

*PDVSA* v. *MUFG Union Bank, N.A.*,
  235 N.E.3d 949 (N.Y. 2024) ....................................................................................... 11

*Weinstein Enters., Inc.* v. *Orloff*,
  870 A.2d 499 (Del. 2005) ....................................................................................... 12, 13

**Statutes**

8 Del. C. § 141(k) ............................................................................................................ 12

8 Del. C. § 324(c) ............................................................................................................ 13

Trust Indenture Act ........................................................................................................... 5

**Other Authorities**

OFAC, Venezuela Sanctions FAQ 1123, https://ofac.treasury.gov/faqs/1123 .................. 8

OFAC, Venezuela Sanctions FAQ 1124, https://ofac.treasury.gov/faqs/1124 .................. 8

An ad hoc group of holders of a majority of PDVSA 2020 Bonds (the "2020 Bondholders") submits this Response to Gold Reserve's Objection to the Special Master's Updated Final Recommendation (D.I. 2183, the "Objection").[1] Gold Reserve's Objection mischaracterizes the certainty of closing associated with the Amber Energy Bid selected by the Special Master as his updated Final Recommendation. It also misrepresents the substantial impediments to the closing of its own bid, which relies on non-consensual financing by entities that are not part of the sale process, disregard of the 2020 Bondholders' pledge, and an unlawful sale order.

*First*, in an attempt to attack the Amber Energy Bid, Gold Reserve mischaracterizes provisions in the Transaction Support Agreement between Amber and the 2020 Bondholders (the "TSA," D.I. 2123-1 at 800) and the Indenture and Pledge Agreement underlying the 2020 Bonds, suggesting that they require the consent of PDVSA and every 2020 bondholder to release the pledged Collateral. In fact, the Indenture and the Pledge Agreement expressly state that holders of two-thirds of the 2020 Bonds can direct the release of the Collateral.[2] And contrary to Gold Reserve's misleading rhetoric, the fact that definitive documents remain to be negotiated and executed—a standard contractual term—does not allow the 2020 Bondholders to refuse to close "for no reason at all."

*Second*, Gold Reserve attempts to downplay the challenges to its own highly-risky bid by misrepresenting recent developments in the litigation over the 2020 Bonds in the Southern District of New York (the "SDNY Litigation") and the 2020 Bondholders' ability to protect their rights.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection and the 2020 Bondholders' Memorandum in Support of Objection to the Special Master's Final Recommendation, D.I. 1943.

[2] As the 2020 Bondholders have repeatedly made clear, the rights and duties of parties under the Indenture and the Pledge Agreement are not before this Court and are being resolved in the Southern District of New York. *See, e.g.*, D.I. 1820, 1943. The 2020 Bondholders respond on these points solely to correct Gold Reserve's mischaracterizations of those documents.

1

Most egregiously, Gold Reserve claims that a Statement of Interest filed by the government "supports the 2015 National Assembly (the Opposition) in no uncertain terms," "increases the likelihood that Judge Failla will rule against the 2020 Bondholders," and "backs PDVSA's position." In fact, the government's Statement of Interest reiterates *precisely* the same positions the government took in 2020, after which Judge Failla ruled in *favor* of the 2020 Bondholders. Gold Reserve's uninformed claims about the SDNY Litigation therefore illustrate—at best—its own basic ignorance of that litigation and the risks the 2020 Bonds pose to Gold Reserve's bid. Gold Reserve also attempts to suggest that OFAC will allow Gold Reserve to close on a purchase of the PDVH Shares but will simultaneously deny the 2020 Bondholders the ability to protect their own rights, ignoring that OFAC has repeatedly made clear that it is committed to the equal treatment of all creditors.

*Third*, Gold Reserve also ignores that its bid is contingent on a financing structure that requires a merger involving CITGO Petroleum, an entity which it does not and cannot control (even if it is the successful bidder), given that the 2020 Bondholders have a pledge over 50.1% of the shares of CITGO Holding (its parent). Gold Reserve's only solution is an unlawful sale order that would purport to require CITGO Petroleum and CITGO Holding to take actions to consummate Gold Reserve's financing under threat of contempt, even though this Court has previously recognized that PDVH's assets—which include these entities—are not "in the possession or control of this Court." D.I. 1515 at 9. Indeed, as the 2020 Bondholders have previously explained, Gold Reserve's proposed sale order is also unlawful in numerous other respects, and despite submitting a revised order, Gold Reserve has made no serious attempt to resolve those issues.

The Court should thus overrule Gold Reserve's Objection.

I. **Gold Reserve Misrepresents the Amber Energy Bid's Certainty of Closing**

A. **The 2020 Bondholders May Direct the Release of the Lien**

The TSA provides that, by the date the Amber Transaction is consummated, the 2020 Bondholders will effectuate a release of their lien over the Collateral through one or more direction and indemnity ("D&I") agreements, which will provide a direction to the Trustee and the Collateral Agent "to perform the Proposed Actions, including the Collateral Release" TSA § 2.2(b)(iii); *see also id.* §§ 2.2(b)(ii)-(iv), 2.2(d), 4.1(e). Section 7.03(b) of the Pledge Agreement provides that "in connection with any [] proposed release of the Collateral, the consent of the Holders of at least 66 2/3% aggregate in principal amount of the outstanding Notes shall be required." As of the signing of the TSA, the 2020 Bondholders held 75% of the outstanding Notes, well above this threshold. D.I. 2123-1 at 833. And the 2020 Bondholders party to the TSA may not sell or transfer their 2020 Bonds except to other such 2020 Bondholders or to parties that agree to be bound by the TSA. *See* TSA § 6.2. Moreover, Section 5.01(o) of the Indenture empowers the same supermajority of 2020 Bondholders to direct the Trustee to instruct the Collateral Agent to release the Collateral, subject to customary boilerplate indenture conditions.

Gold Reserve nevertheless argues that the release of the Collateral "almost certainly will not occur," Objection at 7, for two reasons, both of which are wrong.

*First*, Gold Reserve argues that PDVSA's consent is required for the 2020 Bondholders to release the Collateral, citing Section 9.02(a) of the Indenture, which applies to "amend[ments] or supplement[s to] this Indenture, the Guaranty or the Security Documents." But the TSA does not contemplate amending or supplementing any of these documents because such an amendment or supplement is not required to effectuate the transactions contemplated by the TSA. The TSA simply contemplates one or more D&I agreements directing the Trustee and the Collateral Agent to effect the Collateral Release. *See, e.g.*, *Ocean Trails CLO VII* v. *MLN Topco Ltd.*, 233 A.D.3d

3

614, 615 (N.Y. App. Div. 2024) (rejecting argument that party's consent to amendment was required because the provision "used terms suggesting an actual, textual amendment" and there was "no 'agreement' to 'waive[], amend[], or modif[y]' the terms of any loans") (alterations in original); *accord In re Chrysler LLC*, 576 F.3d 108, 120 (2d Cir.), *vacated as moot on other grounds sub nom. Ind. State Police Pension Tr.* v. *Chrysler LLC*, 558 U.S. 1087 (2009); *In re Metaldyne Corp.*, 409 B.R. 671, 678 (Bankr. S.D.N.Y. 2009). There is nothing in any document that requires PDVSA's consent for the Collateral Release. Nor would such a requirement make any sense, since no reasonable issuer or guarantor would have any logical reason to object to another party's release of a security interest over its collateral.

*Second*, Gold Reserve claims that Section 9.02(b)(vi) of the Indenture—which prohibits amendments or waivers to the Indenture or the Notes "impair[ing] the right of each Holder to receive payment of principal" and interest on their notes—requires every single 2020 noteholder to agree to the release of the Collateral. That argument is hardly colorable given that, just three paragraphs later, the Indenture expressly provides a two-thirds threshold for the release of collateral: "Without the consent of the holders of at least 66 2/3% aggregate in principal amount of the outstanding Notes, no amendment, supplement or waiver may release any Lien on Collateral granted for the benefit of the Secured Parties." Section 9.02(b)(vi) therefore cannot possibly have the meaning that Gold Reserve claims. While Section 9.02 does not apply at all because releasing the Collateral is not an amendment or waiver to the Indenture or Notes, even if it was, it certainly would not require unanimity. Releasing the Collateral does not impair the right of any 2020 Bondholder to receive payment on their notes, as PDVSA remains bound to make principal and interest payments on the notes irrespective of the existence of the lien.

4

The Second Circuit's decision in *Marblegate Asset Management LLC* v. *Education Management Corp.*, 846 F.3d 1 (2d Cir. 2017), relied upon by Gold Reserve, confirms the error in its argument. In *Marblegate*, the Second Circuit held that the Trust Indenture Act prohibits "only nonconsensual amendments to an indenture's core payment terms." The Second Circuit made clear that "core payment terms" are limited to "the amount of principal and interest owed, and the date of maturity," *id.* at 7, and the Trust Indenture Act does not protect against other amendments, including the release of valuable guarantors or pledges, even if they "influence the value of a note or a bondholder's practical ability to collect payment," *id*.

Gold Reserve also suggests a nonconsenting bondholder could frustrate or delay the closing of the Amber transaction and would be incentivized to try and "extract their portion of this supposed 'discount' value." Objection at 8. As explained above, the Collateral may be released by the Trustee and the Collateral Agent at the direction of holders of two-thirds of the 2020 Bonds irrespective of actions taken by a hypothetical "nonconsenting bondholder." Gold Reserve also ignores that the TSA permits bondholders who have not signed on to the TSA to exchange their bonds for cash consideration at a price greater than par through a public exchange offer, provided they agree to a customary release of claims. TSA § 2.2(a) and Ex. A (Term Sheet) at 2. Any bondholder that does not participate in this public exchange would be left owning unsecured bonds against PDVSA, whose current trading price is approximately one-tenth of what they would receive under the public exchange offer. Gold Reserve's unfounded arguments ring particularly hollow because it points to no holder of 2020 Bonds who has complained about the terms of the publicly-available TSA or the transaction support agreement previously signed by certain 2020 Bondholders and Red Tree, and the 2020 Bondholders are not aware of any either.

5

*Third*, Gold Reserve wrongly argues that the TSA can be "easily unwound" by Amber Energy or the 2020 Bondholders "for any reason or no reason at all." Objection at 8. But the provisions Gold Reserve takes issue with are standard terms in commercial contracts, and even a basic review of the TSA shows that they do not provide any party with license to unilaterally walk away from the TSA without justification.

For instance, Gold Reserve cites Section 4.1(d) of the TSA, which states that each Definitive Document must be executed and in full force and effect at or before closing, for the proposition that parties can unilaterally "prevent the transaction from closing" for "no reason at all." *Id*. As an initial matter, Gold Reserve ignores the subsequent text of that provision, which states that the failure to provide a Definitive Document "shall *not* be a condition precedent" if it "has been prepared in accordance with the Documentation Principles." TSA § 4.1(d).[3] Moreover, neither party holds a flat consent right, but a standard and customary reasonable consent right—the 2020 Bondholders' consent right requires the Required Consenting 2020 Noteholders (i.e., a controlling majority of the 2020 Bondholders) to act "reasonably" in approving the Definitive Documents. *Id.* § 1.1; § 2.2(a).

Gold Reserve also ignores (among other things) the contractual commitments the 2020 Bondholders have made "to act in good faith and use commercially reasonable efforts to negotiate the Definitive Documents . . . and to take, or cause to be taken, all actions necessary or proper to consummate the Amber Transaction in a manner consistent with this Agreement." TSA § 3.2(a)(i); *see id.* §§ 3.2(b), 4.1(d).

---

[3] The TSA defines Documentation Principles to mean that the execution of the Amber Transaction "shall be consistent with the terms of this Agreement and the Transaction Term Sheet." TSA § 2.2(a).

6

Gold Reserve further cites provisions—some of which are included in its own SPA with the Special Master, D.I. 1837-1 at 118, §8.1(e-f)—allowing the parties to terminate the TSA in certain limited circumstances, such as for material breaches by the other parties thereto or the commencement of insolvency proceedings by the CITGO entities. These are ubiquitous contractual terms, and to state the obvious, they do not simply allow the parties to walk away whenever convenient.

### B. Gold Reserve Mischaracterizes the SDNY Litigation

Gold Reserve's Objection also mischaracterizes the current status of the SDNY Litigation, including the U.S. government's recent Statement of Interest and the 2020 Bondholders' ability to protect their rights under the Indenture and Pledge Agreement.

*First*, Gold Reserve claims that the government's latest Statement of Interest "backs PDVSA's position." Objection at 13. This is blatantly false, and particularly outrageous given the government expressly took "no position on the operation of Venezuelan law in this case or the application of the act of state doctrine"—the only two issues that are the subject of summary judgment briefing. SDNY Litigation, D.I. 393 at 3. Nor does the government's statement that it "supports the 2015 National Assembly (the Opposition)" in any way "increase[] the likelihood that Judge Failla will rule against the 2020 Bondholders." Objection at 10–11. The government expressed exactly the same position in 2020 when Judge Failla last solicited its views, SDNY Litigation, D.I. 213, after which she rejected PDVSA's argument on the act of state doctrine and ruled that the 2020 Bonds were valid. Gold Reserve also ignores that the government reiterated "its substantial interest in avoiding uncertainty in lawful contractual relations and an orderly process for restructuring sovereign debts for which creditors can legitimately expect payment," which weighs strongly in favor of the 2020 Bondholders. SDNY Litigation, D.I. 393 at 3. There

7

is therefore absolutely no legitimate basis for arguing that the government's Statement of Interest increases the likelihood that Judge Failla will rule against the 2020 Bondholders.

*Second*, Gold Reserve's contention that OFAC will license its proposed transaction, while simultaneously preventing the 2020 Bondholders from taking any action to protect themselves against a financing transaction that would upend their rights, has no merit. Gold Reserve provides no basis for this claim, and it is contrary to OFAC's guidance and longstanding policies. Indeed, OFAC has expressly represented that it is "committed to fair and equivalent treatment of potential creditors." OFAC, Venezuela Sanctions FAQ 1123, https://ofac.treasury.gov/faqs/1123.[4] Separately, OFAC has also declared that it "will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PdVSA 2020 8.5 percent bonds." OFAC, Venezuela Sanctions FAQ 1124, https://ofac.treasury.gov/faqs/1124. There is thus no credible argument that OFAC sanctions are likely to operate to prevent the 2020 Bondholders from enforcing their rights while simultaneously allowing Gold Reserve's bid to close. The very fact that Gold Reserve's argument turns on the unsupported assertion that it could close its transaction *because* the United States government will supposedly restrain an exercise of the 2020 Bondholders' rights—even while such an outcome would run contrary to the government's stated interest in non-discrimination among creditors and where it would serve no policy interest in supporting the Venezuelan opposition (given the sale of

---

[4] This is reinforced by the fact that OFAC issued FAQ 1123 (authorizing creditors to participate in the judicially-directed sale of PDVH, subject to the winner obtaining an OFAC license) and FAQ 1124 (making clear that the 2020 Bondholders may take actions to protect their collateral and that any final settlement of the 2020 claims would require an OFAC license) on the same day, illustrating that OFAC does not intend to disadvantage PDVSA 2020 bondholders relative to other creditors, but rather to let U.S. courts determine the priority of creditor claims, while ensuring that OFAC has the power to approve any ultimate transfer of CITGO.

8

PDVH)—only underscores the legal and practical infirmities of Gold Reserve's proposed transaction.

*Third*, Gold Reserve argues that the Venezuela Parties could obtain a stay of enforcement pending appeal if Judge Failla rules in favor of the 2020 Bondholders, based solely on the fact that they obtained a stay during their prior appeal—another implicit concession that its transaction would violate the 2020 Bondholders' rights and requires third-party intervention to even attempt to accomplish. But neither of the bases on which Judge Failla granted a stay in 2020 are now applicable. Specifically, given the state of these sale proceedings and the looming transfer of the PDVH Shares, a stay would neither (1) ensure "that the Pledged Shares will be maintained in their current form for the duration of the appeal," nor (2) "protect the status quo during the pendency of PDVH's appeal." SDNY Litigation, D.I. 241 at 2, 4.

*Fourth*, Gold Reserve misleadingly claims that the 2020 Bondholders have promised Judge Failla they would not seek an injunction against the financing of its transaction. Objection at 1. As the 2020 Bondholders have previously explained, this is a blatant mischaracterization of the Trustee and Collateral Agent's counsel's statements that they have not sought to disrupt the Sale Process or enjoin the Court or Special Master in any way. D.I. 2033 at 15.[5] The 2020 Bondholders have made abundantly clear that they would seek to enjoin PDVH and potentially other parties from taking actions in connection with the financing of Gold Reserve's transaction that would violate their rights under the Pledge Agreement, and as the 2020 Bondholders have repeatedly made clear, they would seek to do so before Judge Failla. SDNY Litigation, D.I. 384.

---

[5] Other judgment creditors have likewise explained how Gold Reserve has similarly mischaracterized these statements. *See, e.g.*, D.I. 2034 at 3–4; D.I. 2037 at 2–3.

9

*Fifth*, Gold Reserve wrongly argues that the Amber Energy Bid somehow "hinges" on Judge Failla staying her decision on the validity of the 2020 Bonds in the SDNY Litigation. Objection at 12. Gold Reserve points to nothing making the Amber Energy Bid contingent on such a stay, and it is not so contingent. Indeed, after the 2020 Bondholders wrote to Judge Failla to update her on recent developments (*without* requesting a stay), she again repeated her intention to issue a decision this month. SDNY Litigation, D.I. 394; D.I. 396 at 4. Yet the Amber Energy Bid is still proceeding, putting the lie to Gold Reserve's claim that it "hinges" on a stay.[6]

*Finally*, Gold Reserve incorrectly contends that if Judge Failla rules against the 2020 Bondholders on the currently-pending summary judgment motions, the 2020 Bondholders' claims would be "wiped clean" and the Amber Energy Bid will "implode." Objection at 10, 11. Unlike Gold Reserve and Venezuela, the 2020 Bondholders have not seen the need to talk up in this litigation their prospects of prevailing before Judge Failla—that is a matter for Judge Failla, and the 2020 Bondholders look forward to receiving her decision soon. They do feel the need, however, to correct Gold Reserve's misimpression that a decision holding against them on summary judgment would somehow eliminate their claims. If the 2020 Bondholders prevail on the narrow issue before Judge Failla—whether the Indenture and Pledge Agreement were validly issued under Venezuelan law—then they prevail entirely (assuming Judge Failla adheres to her prior decision on the act-of-state doctrine). If they do not, then they have a host of other claims

---

[6] Gold Reserve also claims that a provision in the TSA contemplating the parties requesting a stay of the SDNY Litigation pending the consummation of their settlement was an "attempted fraud on the Court." Objection at 13. That is a completely unfounded accusation that only demonstrates Gold Reserve's willingness to make outrageous and baseless claims to advance its bid. It is particularly unjustified given the 2020 Bondholders publicly disclosed the terms of the TSA and, as Gold Reserve was well aware when it filed its Objection, the 2020 Bondholders' letter did not affirmatively request a stay or any other relief (not that doing so could possibly be an "attempted fraud" in any event).

10

against PDVH that remain, including claims that the Indenture and Pledge Agreement are enforceable notwithstanding any invalidity under Venezuelan law. *See, e.g.*, *PDVSA* v. *MUFG Union Bank, N.A.*, 235 N.E.3d 949, 961 (N.Y. 2024) ("[E]ven if it is determined that the securities were 'issued with a defect going to their validity' under Venezuelan law, New York law nonetheless governs the consequences of that defect."); SDNY Litigation, D.I. 320 at 2 (postponing consideration of "the effect under New York law of any alleged invalidity of the Governing Documents under Venezuelan law," as well as the equitable defenses and counterclaims asserted by the Trustee and the Collateral Agent, because those issues never need to be reached if the 2020 Bondholders are correct about Venezuelan law). Accordingly, the notion that an adverse summary judgment decision by Judge Failla would somehow end the 2020 Bondholders' claims or their security interest is demonstrably false.

**II.    Gold Reserve's Bid Cannot Close Without an Unlawful Court Order**

Even while Gold Reserve makes unjustified claims about the certainty of the Amber Energy Bid closing, it continues to ignore the obvious impediments to its own bid. As the 2020 Bondholders have previously explained, Gold Reserve is not paying for the PDVH Shares with cash on its balance sheet—a transaction to which the 2020 Bondholders would have no inherent objection—but has instead chosen a transaction structure that would raise debt against the assets of CITGO Petroleum and thereby deplete the value of the Collateral. A key problem with this structure is that, given the pledge of 50.1% of the shares of CITGO Holding to the 2020 Bondholders, Gold Reserve cannot control either CITGO Holding or CITGO Petroleum directly, even after any closing. Gold Reserve therefore seeks to effectuate its transaction through an unlawful sale order that purportedly requires CITGO Petroleum to take on this financing, even though this Court has previously held that it does not control either CITGO entity.

11

### A. Gold Reserve Could Not Control CITGO Holding or CITGO Petroleum After Closing

The Gold Reserve transaction and its underlying financing relies on Adolin, a wholly owned subsidiary of Gold Reserve's acquisition vehicle Dalinar, incurring billions of dollars of new debt in order to fund Dalinar's purchase of PDVH, and then merging with CITGO Petroleum to encumber CITGO Petroleum with all of that debt. D.I. 1837 at 27. But effectuating such a transaction would require either the willingness of the CITGO Petroleum board or a direction by the CITGO Holding board. Neither is likely absent a court order, given the current directors' fiduciary duties to CITGO Holding and CITGO Petroleum (whose assets would be taking on billions in debt without any consideration whatsoever), the likelihood of fraudulent conveyance and other claims later being pursued based on the distributions of these vast amounts for the benefit of CITGO Holding's parent entities, and the affiliation of the current directors with the Venezuela parties (who have advanced every possible objection to any sale of PDVH).

Gold Reserve would therefore need to appoint a new CITGO Holding board in order to effectuate its transaction—assuming it could even find directors willing to take on these liabilities—but it cannot do that, or otherwise exercise control over CITGO Holding, so long as the 2020 Bondholders maintain their lien on the Collateral. It is well established that "control exists when a stockholder owns, directly or indirectly, more than half of a corporation's voting power." *Weinstein Enters., Inc.* v. *Orloff*, 870 A.2d 499, 507 (Del. 2005). Indeed, "the election of directors" and other "fundamental corporate changes," including mergers, "require approval by a majority vote of the stockholders." *Id.*; *see also* 8 *Del. C.* § 141(k) ("Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.").

12

Gold Reserve is bidding for PDVSA's shares in PDVH, which would be its sole source of corporate authority over the CITGO entities. A majority of the CITGO Holding Shares (the Collateral) are currently held by the Collateral Agent, and the Collateral Agent is authorized under the Pledge Agreement to direct PDVH on how to vote them and act in all other respects as their outright owner—an obligation that would be binding on PDVH even after any acquisition by Dalinar.[7] Without the ability to vote a majority of the CITGO Holding shares, Gold Reserve will simply not be able to control CITGO Holding, or by extension, CITGO Petroleum. *See Weinstein Enters., Inc.*, 870 A.2d at 507 ("The parent, once having elected directors, does not have a right thereafter to interfere."). Indeed, the 2020 Bonds and the Pledge Agreement, and the Collateral Agent's control over the Collateral, are not contingent on a judicial order as Gold Reserve implies, but are self-effectuating and remain valid and binding unless and until there is a court order saying otherwise.

Accordingly, Gold Reserve would be unable to appoint a new board of CITGO Holding (or otherwise control CITGO Holding) as necessary to effectuate its proposed financing.

### B.  Gold Reserve's Bid Therefore Relies on an Unlawful Sale Order

Gold Reserve's bid attempts to solve its inability to control the CITGO entities directly by having the Court compel PDVH's subsidiaries to comply with its financing transaction. But as the 2020 Bondholders previously explained (and incorporate again here), D.I. 1943 at 21–22; D.I. 2033 at 11–12, such a sale order provision is beyond this Court's authority. Section 324 empowers courts to oversee a public sale of shares "as fully as if" the defendant "had transferred the same to

---

[7]  The Pledge Agreement authorizes the Collateral Agent and Trustee, following an Event of Default (which has indisputably occurred), to direct PDVH "to vote the Securities representing the Pledged Shares [i.e., 50.1% of the shares of CITGO Holding]" and obligates PDVH to vote the securities as directed, and otherwise authorized the Collateral Agent "to act with respect to the Collateral as outright owner thereof." Pledge Agreement § 2.05(d).

13

such purchaser." 8 Del. C. § 324(c). It does *not* provide the Court any authority with respect to the assets of the entity whose shares are being sold. Indeed, as the Court has previously recognized, it does ***not*** have jurisdiction over PDVH's subsidiaries, as "the subject of the litigation here is the PDVH Shares." D.I. 1515 at 9. The Court "exercises control over those shares, which evidence ultimate ownership of the assets owned or controlled by PDVH, but ***this Court does not exercise control over those assets themselves***." *Id.* (emphasis added).

The revised proposed sale order that Gold Reserve included in its improved bid, D.I. 2135-5, does nothing to address this lack of jurisdiction. As relevant here, the revised proposed sale order still purports to unlawfully compel performance by PDVH's subsidiaries. Specifically, it provides that "PDVH, CITGO, and CITGO Related Parties are directed and hereby ordered to comply with all obligations and covenants contained in the Stock Purchase Agreement and Transaction Documents," under threat of contempt and sanctions. *Id.* ¶ 6.[8]

Gold Reserve's revisions to the proposed sale order also do not sufficiently address the improper provisions limiting and extinguishing the rights of third parties, including the 2020 Bondholders, without any consideration whatsoever, as the 2020 Bondholders have raised and as no party has been able to legitimately defend. D.I. 1943, 2033. The revised proposed sale order now purports to preserve the 2020 Bondholders' rights, D.I. 2135-5 ¶ 26, but that language only affirms the obvious proposition that the sale order does not constitute a ruling on the "validity or

---

[8] The redlined version of the revised proposed sale order Gold Reserve submitted includes a comment indicating Gold Reserve moved language (suggested by the Special Master) stating that the order does not require PDVH's subsidiaries, directors, and officers "to take any steps to consummate the sale transaction to the extent that doing so violates the PDVSA 2020 Bondholder Parties' rights," including under the Indenture or Pledge Agreement. D.I. 2135-5 at 24. However, that language was in fact deleted in the location it was purportedly moved to. *Id.* at 37. In any event, that language does not solve the basic problem that the Court has no jurisdiction to issue orders to PDVH's subsidiaries. It is also a recipe for uncertainty by inviting litigation over whether any such order violates the 2020 Bondholders' rights.

14

scope" of the Indenture or Pledge Agreement or the 2020 Bondholders' rights thereunder.  That language does not clearly preserve the 2020 Bondholders' ability to challenge the financing structure that Gold Reserve has injected into its transaction, or address other provisions in the sale order that could enjoin the 2020 Bondholders from challenging that structure.  *See, e.g.*, *id.* Recital M, ¶¶ 13, 19, 24.  This lack of clarity is deliberate:  Gold Reserve *rejected* plain language in the 2020 Bondholders' markup of the proposed sale order that would preserve their right to bring that challenge, D.I. 1943-2 Recital V, ¶¶ 11, 19, 26—a right which this Court has recognized, D.I. 1840-1 at 48–49, 61.  Similarly, Gold Reserve's language does not clearly preserve the full extent of the claims asserted by the 2020 Bondholders in the SDNY Litigation, which as noted above, extend far beyond breach of contract claims based on the "validity or scope" of the Indenture and Pledge Agreement.  And Gold Reserve's revised proposed sale order does not sufficiently or appropriately limit the provisions of the proposed sale order that would immunize Gold Reserve and the transaction.  D.I. 2135-5 ¶¶ 11, 18.  Gold Reserve's revised proposed sale order thus does not cure significant deficiencies previously identified by the 2020 Bondholders.

## CONCLUSION

For the reasons discussed above, the 2020 Bondholders respectfully submit that the Objection of Gold Reserve should be overruled, and that in any event, the Court should not approve Gold Reserve's proposed sale order.

Dated: Wilmington, Delaware
September 12, 2025

Respectfully submitted,

| | |
|---|---|
| /s/ Daniel A. Mason | OF COUNSEL: |
| Daniel A. Mason (#5206) | Andrew N. Rosenberg |
| PAUL, WEISS, RIFKIND, | Jeffrey J. Recher |
|    WHARTON & GARRISON LLP | Paul A. Paterson |
| 1313 North Market St., Suite 806 | Tyler B. Myers |
| Wilmington, DE 19801 | PAUL, WEISS, RIFKIND, |
| Telephone: 302-655-4410 |    WHARTON & GARRISON LLP |
| Facsimile: 302-655-4420 | 1285 Avenue of the Americas |
| Email: dmason@paulweiss.com | New York, New York 10019-6064 |
| | Telephone: 212-373-3000 |
| *Counsel for the 2020 Bondholders* | Facsimile: 212-757-3990 |
| | Email: arosenberg@paulweiss.com |
| | Email: jrecher@paulweiss.com |
| | Email: ppaterson@paulweiss.com |
| | Email: tmyers@paulweiss.com |