**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 1:17-mc-00151-LPS |

## CONOCOPHILLIPS' RESPONSE TO OBJECTIONS TO FINAL RECOMMENDATION

*Of Counsel*:

Michael S. Kim
Marcus J. Green
Josef M. Klazen
Lydia L. Halpern
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
michael.kim@kobrekim.com
marcus.green@kobrekim.com
jef.klazen@kobrekim.com
lydia.halpern@kobrekim.com

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
 & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
RGMason@wlrk.com
ARWolf@wlrk.com
MHCassel@wlrk.com

Dated: September 12, 2025

ROSS ARONSTAM & MORITZ LLP

Garrett B. Moritz (Bar No. 5646)
Elizabeth M. Taylor (Bar No. 6468)
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
gmoritz@ramllp.com
etaylor@ramllp.com

*Attorneys for Phillips Petroleum Company*
*Venezuela Limited, ConocoPhillips*
*Petrozuata B.V., ConocoPhillips Gulf of*
*Paria B.V., and ConocoPhillips Hamaca B.V.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

RESPONSE..............................................................................................................................2

I.    Gold Reserve Seeks to Impose the Risk of Adverse Results in the 2020 Bondholder Litigation on the Other Creditors. ...............................................................2

II.   Gold Reserve's Modified Termination Provision Only Confirms That Its Bid Is Objectionable. ...............................................................................................................5

III.  The Amber Energy Bid Can Realistically Close and Does Not Work a Fundamental Injustice. ...................................................................................................8

IV.  Responses to Other Issues Raised in the Objections. .........................................................11

      A.    Delaware Law Does Not Require the Court to Accept the Highest Price Based on a Non-Actionable Bid. ...............................................................11

      B.    ConocoPhillips Incorporates Its Previous Response to the Venezuela Parties on Other Delaware Law Matters. ...............................................................13

      C.    ConocoPhillips Incorporates Its Previous Response to Gramercy. ......................13

CONCLUSION......................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Marblegate Asset Mgmt., LLC* v. *Educ. Mgmt. Corp.*,
 846 F.3d 1 (2d Cir. 2017) ..........................................................................................9

*Nken* v. *Holder*,
 556 U.S. 418 (2009)......................................................................................................4

**Statutes and Rules**

8 *Del. C.* § 324 ......................................................................................................11, 12

9 *Del. C.* § 4535 ..........................................................................................................11

9 *Del. C.* § 8753 ..........................................................................................................11

22 *Del. C.* § 504(a)......................................................................................................11

25 *Del. C.* § 6309 ........................................................................................................11

7 Del. Laws, Corporations, "*An Act for expediting suits against Corporations*" § 5
 (1829)........................................................................................................................12

Sale Process Parties Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V. (Plaintiffs in Cases No. 19-mc-00342-LPS, No. 22-mc-00264-LPS, and No. 22-mc-00464-LPS) ("ConocoPhillips") respectfully submit this response to the objections to the Special Master's Updated Final Recommendation (D.I. 2123) filed by Gold Reserve (D.I. 2183), the Venezuela Parties (D.I. 2180), and the Gramercy Parties (D.I. 2178):

## PRELIMINARY STATEMENT

ConocoPhillips supports the Special Master's Updated Final Recommendation of the Amber Energy bid.  ConocoPhillips submits this brief to respond to certain specific matters in the objections to the Final Recommendation.

Gold Reserve, formerly the Recommended Bidder, is now in the position of objecting to the Special Master's recommendation of another bidder, for several reasons.  While Gold Reserve's facially higher bid initially led the Special Master to designate it as the Final Recommended Bidder, the Special Master's subsequent receipt of an unsolicited bid from Amber Energy that, while lower than Gold Reserve's bid, is significantly higher than prior competing bids, and pays additional Attached Judgment Creditors, changed the calculus.  At that point, the far greater certainty that Amber Energy would in fact be able to close was viewed as outweighing the higher headline price of Gold Reserve's bid.

An additional factor relates to the ability of the Special Master to terminate the Dalinar SPA.  ConocoPhillips and other senior creditors had objected to the recommendation of Gold Reserve because of their concern that the termination provision of the Dalinar SPA was insufficiently clear, and created the potential for them to be trapped in a non-actionable bid for a year or more if the 2020 Bondholders prevailed in their litigation in the Southern District of New

York.  Despite countless opportunities, Gold Reserve has continued to insist on a bid structure in which, even if the 2020 Bondholders win their litigation, Gold Reserve will claim to have complete exclusivity over the Sale Process for a year or more even without an executable financing structure necessary to close its transaction.

While imperfect, the Amber Energy bid is clearly more likely to close in the event that the 2020 Bondholders are held to have a valid pledge.  It also captures meaningful upside for the Attached Judgment Creditors in the event that the 2020 Bondholders win, in the form of a significant reduction in the amount to be paid on account of potentially accrued interest.  On the other hand, as the Special Master has previewed, a ruling invalidating the 2020 Bondholders' purported pledge might lead this Court to deny approval of the Amber Energy bid.  While that may technically constitute an inability to close, unlike with Gold Reserve's bid, it should not result in significant delay or litigation; rather, new bids could be solicited by the Special Master promptly, and the amount paid to Attached Judgment Creditors could significantly increase.  Moreover, the creditor most directly affected by the lesser purchase price being offered in the Amber Energy bid is Gold Reserve itself — a creditor which has had every opportunity to mitigate the risks of its own credit bid and has failed to do so.

Accordingly, based on the information available to date, ConocoPhillips continues to support the Special Master's Updated Final Determination.

## RESPONSE

### I.  Gold Reserve Seeks to Impose the Risk of Adverse Results in the 2020 Bondholder Litigation on the Other Creditors.

Gold Reserve, joined in substantial part by the Venezuela Parties, has repeatedly claimed that the closing risk created by the 2020 Bondholders' purported pledge is minimal.  But Gold Reserve's words are one thing, and its actions are another.  If Gold Reserve actually believed the

risk was minimal, it would find a way to either assume that risk itself, or agree to move aside if the risk occurs, rather than transferring the risk to the senior creditors by delaying the process indefinitely should the 2020 Bondholder litigation not result in invalidation of the pledge.

Gold Reserve insists that, *even if* Judge Failla rules that the 2020 Bondholders have a valid pledge, there are other reasons why Gold Reserve's financing could still proceed following such a decision. But those reasons do not survive close inspection.

Gold Reserve's purported reasons why its proposed financing can proceed in the face of an adverse decision in the 2020 Bondholder litigation can be summarized as follows: (1) OFAC is likely to continue to stay the 2020 Bondholders from exercising their rights; (2) the 2020 Bondholders would need to obtain an injunction against Dalinar's financing; (3) Judge Failla might stay enforcement of the pledge pending the Venezuela Parties' appeal; (4) Gold Reserve might be able to obtain alternative financing; and (5) Gold Reserve could settle with the 2020 Bondholders.

Those reasons are unconvincing.

*First*, OFAC has not only stayed the 2020 Bondholders from exercising their purported rights, but it has also stayed the ultimate closing of any transaction resulting from *this* proceeding. Therefore, the relevant question is whether OFAC would lift the sanctions regime to permit the sale transaction in this case to close — thereby divesting PDVH and the entire CITGO refining enterprise from Venezuelan ownership — yet continue to block the 2020 Bondholders from exercising their (in this scenario, adjudicated to be valid) rights with respect to an enterprise that will no longer be owned by Venezuela or PDVSA. While OFAC of course will make its own decisions, the foreign policy rationale for imposing a selective stay of *only* the 2020 Bondholders' exercise of their rights while permitting ownership of the entire CITGO enterprise to be transferred out of Venezuelan hands is not immediately apparent.

*Second*, Gold Reserve assumes, without explanation, that the 2020 Bondholders would need to obtain an injunction to block Dalinar's bid.  D.I. 2183 at 11.  But if the 2020 Bondholders are found to have a valid pledge, the pledge agreement on its face grants them the contractual right to take actions that would block Gold Reserve's current financing — specifically by voting the CITGO Holding shares to block the merger of CITGO Holding's subsidiaries with the Dalinar acquisition vehicle.[1]

*Third*, with respect to a potential stay of enforcement of the pledge pending appeal, stays pending appeal are ordinarily meant to preserve the status quo while the losing litigant seeks relief from a higher court.  *See Nken* v. *Holder*, 556 U.S. 418, 429 (2009) ("A stay simply suspends judicial alteration of the status quo." (internal quotation marks omitted)).  Here, however, Gold Reserve is positing a situation where enforcement of the pledge is stayed pending appeal, but the sale of the PDVH shares in the manner proposed by Gold Reserve is permitted to go forward in this Court, thereby altering the status quo.  If the Gold Reserve bid is allowed to close with its current structure, the 2020 Bondholders' rights associated with their then-validated pledge potentially would be impaired during the pendency of an appeal.  While perhaps not inconceivable, Judge Failla staying the exercise of the rights of the pledge after holding it valid to permit that result seems unlikely.

*Fourth*, Gold Reserve asserts that it is highly unlikely that it would be unable to obtain alternative financing, again without providing any explanation.  Indeed, if it were possible for Gold

---

[1] As discussed in the next section, Gold Reserve effectively acknowledges that the exercise of the pledge would block the financing because its own modified termination provision provides that the 2020 Bondholders gaining the right to exercise their pledge is a triggering event requiring Gold Reserve to obtain new financing.  *See infra* at 7.

4

Reserve to obtain financing that did not require it to be able to grant liens on CITGO's assets, it is reasonable to assume that it would have done so already, given the extensive focus on this issue.

*Fifth*, Gold Reserve treats its ability to settle with the 2020 Bondholders, if it becomes necessary, as a non-issue. Once again, the basis for this confidence is far from clear. In addition to its Highly Confident Letter, which is not committed financing, Gold Reserve would require at least hundreds of millions of dollars in additional financing were the bonds to prevail both on validity and the rate at which interest has accrued. At best, the contingent financing is far from sufficiently described to provide an adequate degree of closing certainty.

In sum, Gold Reserve's objection provides no basis to conclude that the concerns about the risks of its inability to close are unwarranted. Instead, Gold Reserve makes numerous unsupported proclamations that only generate greater skepticism about its credibility. Most notably, on page 19 of its objection, Gold Reserve declares that: "None of [its] financing is contingent on the outcome of the 2020 Bondholders' litigation in the SDNY." Of course it is. If it were not, Gold Reserve could have produced a written assurance from its financing sources that they would fund even if the 2020 Bondholders prevail, and even if Gold Reserve's proposed merger into CITGO subsidiaries cannot take place. Despite repeated statements from counsel that this is the case, no such confirmation has ever been provided.

## II.    Gold Reserve's Modified Termination Provision Only Confirms That Its Bid Is Objectionable.

ConocoPhillips, joined by multiple other creditors, objected to the Special Master's previous recommendation of the Dalinar bid due to their concern that, in the event an order in favor of the 2020 Bondholders was issued in the Southern District, the Special Master's ability to terminate the Dalinar SPA was unclear and would likely lead to protracted litigation. *See* D.I. 1945, 2035. ConocoPhillips' view was that it needed to be clear that if the 2020

Bondholders prevail in their litigation, Dalinar need to quickly obtain workable financing, or else the Special Master should be permitted to terminate the Dalinar SPA and select another bidder.

*That should have been an easy fix*.  Instead, Gold Reserve filed a brief in which it took the position that it was entitled to a year (or perhaps longer) to find alternative financing in the event the 2020 Bondholders prevailed, and that the cure period requiring it to obtain new financing would not begin until a ruling that the 2020 Bondholders' pledge was valid became final and *non-appealable* (through denial of certiorari), and that every other creditor would just have to wait while that process played out.  *See* D.I. 1991.

No doubt recognizing that this position was (for good reason) unacceptable to almost all of the creditors and was unlikely to do any better with the Court, days before the Special Master was to submit his revised final recommendation, Gold Reserve began proposing modifications to the termination provision.  Gold Reserve's counsel proposed modifications to counsel to the Sale Process Parties, then represented to the Special Master that the Sale Process Parties had agreed to those modifications (they had not), and filed a brief claiming that the revised termination provision had actually resolved the Sale Process Parties' concerns (it does not).  *See* D.I. 2148 at 5-6.

Gold Reserve's revised termination provision, filed with its competing bid materials, permits the Special Master to terminate after a 90-day cure period running from a "Triggering Event."  A Triggering Event is defined as "the coming into effect of any Law or Order by a Governmental Body of competent jurisdiction, that (i) enjoins the Transaction or (ii) permits the 2020 Bondholders to immediately exercise the Purported Pledge."  Dkt. 2135-3 at 4.  This modified termination provision does not address the senior creditors' concerns to any significant degree, because the manner in which a Triggering Event is defined is so narrow as to make it highly unlikely to be satisfied, thereby leaving Gold Reserve able to run out the clock, just as it contended

6

the previous provision would.  The second prong 2 of the term Triggering Event would require that the 2020 Bondholders be able to "immediately" exercise their alleged pledge.  But Gold Reserve will inevitably take the position that, so long as OFAC sanctions remain in place, the 2020 Bondholders cannot "immediately" exercise the purported pledge, so the Triggering Event will not have occurred.  As to the first prong, the requirement that Judge Failla have issued an order that actually "enjoins the Transaction" is also unduly specific, as there are many forms of relief that the 2020 Bondholders could obtain that would stymie the closing of Gold Reserve's proposed financing, but would not meet this limited definition of Triggering Event.  The upshot is that the Sale Process could be left in a situation where the 2020 Bondholders have prevailed, and have effectively prevented Gold Reserve's financing, yet the Special Master could be unable to terminate and Gold Reserve would not be required to obtain new financing.  The modified termination provision is therefore yet another illusory "solution" from Gold Reserve, just the latest in a long series of "solutions" that have failed to materialize.

Despite having every opportunity (and then some) to chart a different course, Gold Reserve continues not to accept any meaningful risk associated with the 2020 Bondholders' litigation, and instead is trying to transfer that risk to the other participants in the process.  Not only would the risk be transferred, but Gold Reserve seeks to compound the risk by attempting to block the process indefinitely by forcing the Special Master to remain bound to Gold Reserve even if its bid proves to be non-actionable as a result of an adverse decision in the 2020 Bondholder litigation.  In the final analysis, the major issues before the Court are not limited to closing certainty and price.  They also include how to evaluate a bid from a bidder that appears to be entirely committed to either getting its way or preventing any other creditor from getting paid through this process if it does not.  Of course, no creditor can be faulted for attempting to receive a recovery, and senior creditors

may be expected to take some degree of risk to permit junior creditors to be paid — but it is not appropriate for creditors to be bound indefinitely to a non-actionable bid.

For those reasons, ConocoPhillips believes that Gold Reserve's higher headline "price" should be heavily discounted.  If Gold Reserve had simply accepted the point that ConocoPhillips and other parties have been asking it to accept — that if the 2020 Bondholders win, Gold Reserve needs to quickly obtain new, workable financing or the process moves on – the outcome might have been different.

## III.    The Amber Energy Bid Can Realistically Close and Does Not Work a Fundamental Injustice.

Gold Reserve and the Venezuela Parties attack the Amber Energy bid on three grounds — (i) because it is also subject to significant closing risk, (ii) because it is $2 billion lower than Gold Reserve's bid, and (iii) because more than $2 billion is going to the 2020 Bondholders on account of a pledge that may be determined to be invalid.  Those objections appear to be significantly overstated.

With respect to closing risk, Gold Reserve's principal argument is that the TSA does not ensure that the Amber Energy bid can close, because the 2020 Bondholders' purported pledge of 50.1% of the CITGO Holding stock cannot be released without PDVSA's consent.  That does not appear to be correct.  Gold Reserve bases that assertion on a provision governing amendments to the terms of the pledge agreement, which would require PDVSA's consent.  D.I. 2183 at 7.  Release of the collateral, however, does not require amending the terms of the document.  Rather, following an Event of Default, the pledge agreement provides that the Collateral Agent may exercise any rights and remedies of a secured party, subject to the limitation that, "[i]n connection with any other proposed release of the Collateral [other than releases occurring through payment in full or

through credit bidding], the consent of the Holders of at least 66 2/3% aggregate in principal amount of the outstanding Notes shall be required." Pledge Agreement[2] §§ 5.01(a), 7.03(b).[3]

With respect to the argument that approving Amber Energy's bid would work an injustice because of its lower price and the amount of consideration flowing to the 2020 Bondholders, whose pledge may be invalidated, as the Special Master has explained, such an injustice is unlikely to materialize. Given the proximity in time of the sale hearing to the end of September, when Judge Failla intends to issue her ruling, the Court has indicated that it will not issue a ruling before Judge Failla rules on the validity of the pledge. Moreover, the Special Master has acknowledged that if Judge Failla rules that the pledge is invalid, the Court may conclude that the Amber Energy bid diverts value from Attached Judgment Creditors and therefore should not be approved. In that event, the Court could order the Special Master to resolicit bids, which would hopefully reallocate that value to the Attached Judgment Creditors next in line. Such a resolicitation in close proximity to the last round of bidding should not cause substantial delay. By contrast, if the 2020 Bondholders' pledge is determined to be valid, the Special Master will have captured a beneficial settlement of the interest accrual dispute, a resolution that would likely not have been available following Judge Failla's decision, and otherwise cleared the way to a successful closing. No injustice would occur in that scenario.

---

[2] The Pledge Agreement has been publicly filed in *Petroleos de Venezuela S.A.* v. *MUFG Union Bank N.A.*, Case No. 20-3858, Dkts. 132 and 133, JA-3476 *et seq.* (2d Cir. Mar. 22, 2021).

[3] Gold Reserve's argument that *Marblegate Asset Management, LLC* v. *Education Management Corp.*, 846 F.3d 1 (2d Cir. 2017) prevents a two-thirds majority from releasing collateral misstates the holding of the case. The entire holding of *Marblegate* is that the Trust Indenture Act only prohibits "formal amendments to payment terms that eliminate the right to sue for payment" – and in particular, does not prohibit transactions that would release guarantees that secure the notes, or transactions that eliminate the practical ability to actually receive payment. *Id.* at 6, 17.

Even if that were not the case, Gold Reserve's complaint that value that could otherwise flow to Additional Judgment Creditors is being unjustly diverted to the 2020 Bondholders is unavailing.  The affected creditors are Gold Reserve, Siemens, and Valores.  These creditors have had every opportunity to credit bid their judgments and preserve their ability to receive a recovery.  But fundamental to a credit bid is the obligation to pay off senior creditors in cash.  Those creditors, however, do not propose to pay off the senior creditors in cash until they are allowed to acquire the collateral and then place liens on it to raise the cash needed to pay the senior creditors.  Nothing entitles these credit bidders to place the risk on the senior creditors that they will ultimately be unable to perform their obligations, and certainly nothing should force the senior creditors to sit idly by for a year or more while the credit bidders "search" for financing that does not depend on invalidating the 2020 Bondholders' pledge.  The possibility that the Court might discount bids with those attributes in the face of repeated, substantial objections and the continued refusal of those bidders to make basic modifications that would ameliorate those objections should have been apparent.  There is no injustice here.

As to any purported injustice to the Venezuela Parties, regardless of whether the 2020 Bondholders have a valid pledge, the 2020 Bondholders may have valid claims against PDVSA, either on the underlying note or in restitution for the amounts that were lent to PDVSA under the original notes that were ultimately exchanged into the 2020 Bonds.  Therefore, the Venezuela Parties' contention that payments on account of amounts owed on the 2020 Bonds would not reduce the Venezuela Parties' overall debt burden appears doubtful.

To the extent Gold Reserve and the Venezuela Parties argue that the Amber Energy bid will amount to an "attempted fraud on the court" because the existence of the Amber Energy bid will cause Judge Failla to stay her decision, D.I. 2183 at 16, that scheme has already failed – Judge

Failla reaffirmed just days ago that she intends to issue her decision by the end of September. *See Petroleos de Venezuela, S.A.* v. *MUFG Union Bank, N.A.*, No. 19-cv-10023-KPF, D.I. 396 at 4 (S.D.N.Y. Sep. 9, 2025) ("The Court intends to issue its decision on the pending cross-motions for summary judgment by the end of September 2025.").

## IV. Responses to Other Issues Raised in the Objections.

### A. Delaware Law Does Not Require the Court to Accept the Highest Price Based on a Non-Actionable Bid.

The Venezuela Parties argue for the first time that the text of 8 *Del. C.* § 324 does not provide the Court any discretion to accept any bid other than the facially highest bid, regardless of whether that bid is executable, and suggest that comparison with other statutes in scattered sections of unrelated portions of the Delaware Code shows that the Delaware legislature intended that only the "highest bid," rather than the "highest and best," be considered.

The Venezuela Parties' citations to other statutes are neither relevant nor helpful. For example, 9 *Del C.* § 8753 and 9 *Del. C.* § 4535 authorize New Castle County and Kent County, respectively, to designate agents to bid at sheriff's sales for real estate to satisfy tax liens. One of the other cited statutes, 22 *Del. C.* § 504(a), deals with the powers of Delaware municipal parking authorities, and 25 *Del. C.* § 6309 deals with the rights of commercial landlords exercising rights under liens of distress for rent. These statutes are too far afield to be instructive here. By contrast, 8 *Del. C.* § 324(a) is a 1967 recodification, essentially unchanged in relevant part, of its ultimate predecessor, which dates back to *1829*.[4] Thus, although it is sometimes appropriate to construe

---

[4] *Compare* 8 *Del. C.* § 324(a) ("The shares of any person in any corporation with all the rights thereto belonging, or any person's option to acquire the shares, or such person's right or interest in the shares, may be attached under this section for debt, or other demands, if such person appears on the books of the corporation to hold or own such shares, option, right or interest. So many of the shares, or so much of the option, right or interest therein may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt, or other demand, interest and costs, upon

the meaning of one statute by looking to the language of other statutes on similar topics, interpreting what is fundamentally an 1829 statute by reference to statutes that address entirely unrelated subjects or that were enacted more than 100 years later is not.

Of course, the reality is that, in 1829, an auction in which bids would be based on financing the asset being purchased to the tune of billions of dollars could not remotely have been contemplated. In that era, any auction for shares of stock would have required the bidder to show up with immediately available funds. The Court has correctly held, through its adoption of the Evaluation Criteria, that it is entitled to decide whether a facially higher bid is realistically capable of delivering what it promises in view of the fact that, rather than showing up with cash, bidders are proposing exceedingly complex structures to purchase this multi-billion-dollar enterprise by leveraging the value of the acquired asset. Were the Venezuela Parties' position to be accepted, even bids submitted by unknown, unrepresented parties for amounts that facially are in the tens of billions of dollars would have to be accepted despite those bids having no realistic ability to close. While price is obviously the most important consideration in an auction, it has to be a price that is realistically capable of being delivered to the judgment creditors. Section 324(a) cannot be read

---

an order issued therefor by the court from which the attachment process issued, and after such notice as is required for sales upon execution process.") *with* 7 Del. Laws, Corporations, "*An Act for expediting suits against Corporations*" § 5 (1829), *available at* https://archivesfiles.delaware.gov/laws-of-de/vol_07_pt_1_revised_edition.pdf, p. 99 ("[T]he shares of any person in any company, which has been or hereafter may be incorporated by the Legislature of this State, with all the rights and privileges appertaining to such shares, have been and are liable to be attached and may be attached for debt or other demands; and if any such shares have been or shall be attached upon process of attachment issued before or after judgment, so many of such shares may be sold at public vendue to the highest bidder, as shall be sufficient to satisfy the debt or other demand, interest and costs, upon an order issued therefor, by order of the court, out of which such process issued and after notice given of the time and place of sale as hereafter provided; that is to say, the officer ordered to sell as aforesaid, shall give the same notice, as is required by law, for the sale of personal property under execution").

to require the Court to accept a bid that is subject to an obvious and potentially crippling financing contingency, especially where that bid appears designed to transfer risk to more senior creditors to preserve the option value of the junior creditors' right to credit bid.

**B.    ConocoPhillips Incorporates Its Previous Response to the Venezuela Parties on Other Delaware Law Matters.**

The Venezuela Parties largely repeat their arguments that the bids received through this Sale Process are so low as to shock the conscience.  ConocoPhillips incorporates its previous response to the Venezuela Parties on those matters.  *See* D.I. 1988 at 1-5.

**C.    ConocoPhillips Incorporates Its Previous Response to Gramercy.**

The Gramercy Parties, who are out-of-the-money creditors whose alter ego claims against PDVH were dismissed by Judge Rakoff in the SDNY, continue to object to the form of sale order to preserve their claims in the highly unlikely event they prevail in reversing Judge Rakoff's grant of summary judgment on appeal.  ConocoPhillips incorporates its previous response to the Gramercy Parties.  *See* D.I. 1988 at 9.

## <u>CONCLUSION</u>

The Objections to the Final Recommendation should be overruled.

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Michael S. Kim
Marcus J. Green
Josef M. Klazen
Lydia L. Halpern
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
michael.kim@kobrekim.com
marcus.green@kobrekim.com
jef.klazen@kobrekim.com
lydia.halpern@kobrekim.com

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
  & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
RGMason@wlrk.com
ARWolf@wlrk.com
MHCassel@wlrk.com

Dated: September 12, 2025

/s/ Garrett B. Moritz
Garrett B. Moritz (Bar No. 5646)
Elizabeth M. Taylor (Bar No. 6468)
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
gmoritz@ramllp.com
etaylor@ramllp.com

*Attorneys for Phillips Petroleum Company*
*Venezuela Limited, ConocoPhillips*
*Petrozuata B.V., ConocoPhillips Gulf of*
*Paria B.V., and ConocoPhillips Hamaca B.V.*