IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | C.A. No. 17-mc-151-LPS |

**CRYSTALLEX INTERNATIONAL CORPORATION'S RESPONSE TO OBJECTIONS TO SPECIAL MASTER'S UPDATED FINAL RECOMMENDATION**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: September 12, 2025

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

**Preliminary Statement**

The sale of the PDVH Shares is undoubtedly the most widely publicized and extensively marketed judicial sale ever conducted. It has generated interest from many sophisticated parties and resulted in multiple, multi-billion-dollar bids. To help evaluate those bids, this Court appointed a Special Master to oversee the sale, to analyze each bid received for the PDVH Shares, and to recommend to the Court the highest and best bid—i.e., the one that is expected to satisfy the most Attached Judgments based on a combination of headline price and closing certainty. Given the complexity of the asset being sold, each bidder submitted a bespoke proposal to acquire the PDVH Shares, tweaking the Court-approved template SPA to account differently for the risks and opportunities inherent in such a sale. Applying his unique experience and the advice received from his financial and legal advisors, the Special Master now recommends that the Court approve a sale of the PDVH Shares to Amber Energy for nearly $6 billion, a transaction that proposes meaningfully to address the most significant risk to the certainty of closing. Crystallex respectfully urges the Court to adopt the Special Master's recommendation.

There comes a time when the sale must be conducted and creditors paid. Every day this process drags out is a day of prejudice to creditors, some of whom (like Crystallex) have waited a decade for justice. Inherent in Delaware's sale statute is the recognition that the winning bid in a public sale is one that can close on time, without undue danger that the sale will fail and the process will need to be restarted. In a simple sale where all bidders offer cash on the barrelhead, the numerically highest offer is likely the best. But no bidder here (especially Gold Reserve)[1] has offered such straightforward consideration, which is why the Special Master must apply his

---

[1] Because Gold Reserve controls the bidding consortium behind Dalinar Energy Corporation ("Dalinar"), Crystallex refers to that bid as the Dalinar bid and the Gold Reserve bid interchangeably.

1

expertise to make a qualitative judgment about the relative value of competing bids—not simply compare topline numbers in a mechanical exercise without regard to the risk of a failed sale and the resulting harm to creditors and the Venezuela Parties. The Special Master has appropriately done that here.

The objections to the Special Master's recommendation lack merit. The Venezuela Parties once again offer sweeping objections designed to prevent any sale whatsoever, ignoring that they have received far more process than they are due under Delaware law, and that the significant value to be achieved in a sale of the PDVH Shares is the direct result of this Court's, the Special Master's, and the Sale Process Parties' efforts to market the shares effectively. Gold Reserve, which submitted a structurally complicated and materially opaque credit bid, objects to a sale to any bidder but itself and creditors it controls, demanding that every senior creditor accept uncertainty in the hope that Gold Reserve can obtain the funds needed to pay them (while reaping an outsized return relative to its own judgment if all goes according to plan). But Gold Reserve has no right to credit bid by shifting all the risks of its proposed transaction to senior creditors. Those senior creditors, including Crystallex, are entitled to be paid *in cash* by Gold Reserve *before* Gold Reserve is entitled to have its credit bid accepted, not to an IOU that Gold Reserve hopes it can pay after it gets its hands on the assets and it can borrow against them—which fairly describes what Gold Reserve is attempting to do here. For all of Gold Reserve's bluster about the committed financing behind its bid, the reality is that no money will be paid to senior creditors if the 2020 Bondholders exercise the Citgo Pledge and block the merger on which Dalinar's financing depends. Once these closing risks are acknowledged, the holes in the Dalinar bid make plain that it would be fantasy to consider it the highest bid—i.e., the one expected to satisfy the most Attached Judgments.

The Dalinar bid is not the "highest" bid under Delaware law, but a questionable credit bid by a junior creditor seeking improperly to cram down its IOUs on senior creditors, rather than paying them cash on the barrelhead. Yet Gold Reserve insists once again that the Court is required to impose these risks on senior creditors because it believes the Dalinar bid is highly likely to close, despite the near-universal disagreement of all the affected senior creditors. Gold Reserve's assertions are backed only by the ceaseless repetition of the same hopeful speculations that have pervaded its arguments since the Stalking Horse hearing—that the 2020 Bondholders may lose, that even if they win OFAC will keep them from exercising their rights for the benefit of Dalinar, and that if all else fails Dalinar will figure out some unspecified way to raise additional billions to settle with them. In Gold Reserve's view, all of its assertions must be taken on faith. While demanding trust, Gold Reserve shields its arrangements with its consortium partners in absolute secrecy, even though how much of Citgo's potential future earnings has been allocated to them by contract presumably would be pertinent to assessing the plausibility of Gold Reserve's claim that it will be able to raise billions more to meet adverse future developments.

The Special Master (recommended by the Venezuela Parties for his unique experience overseeing sales like this one) recommends Amber Energy as the highest bidder because its proposed transaction offers the best combination of price and closing certainty and is thus expected to satisfy the greatest amount of Attached Judgments. Any other option risks miring this Court, the Sale Process Parties, and all other interested creditors in months or years of litigation, including a morass of tangential disputes with the 2020 Bondholders, just to land back in front of this Court auctioning the PDVH Shares for a potentially far lower price than is available today. The Amber Energy bid satisfies nearly $6 billion worth of Attached Judgments and offers far more closing

3

certainty than Dalinar's, making Amber Energy the highest bidder under Delaware law. This Court should adopt the Special Master's recommendation to approve the Amber Energy bid.

## Argument

### I. The Amber Energy Bid Is The Highest Bid

The Venezuela Parties and Gold Reserve wrongly assert that the Amber Energy bid is not the highest bid because its stated headline price is lower than Dalinar's. By that logic, the Court would be required to approve a bid submitted by a consortium of Vladimir Putin, the Ayatollah Ali Khamenei and Kim Jong Un if they appeared at the Sale Hearing offering the $18 billion that the Venezuela Parties (but no one else) claim PDVH is worth, in a transaction that obviously would never secure required regulatory approvals. That is not the law, as confirmed by this Court's prior orders interpreting Delaware law to require that the highest bidder be selected based on a combination of both price and certainty of closing. As set out below, the Venezuela Parties' and Gold Reserve's overlapping arguments that Amber Energy cannot be considered the "highest bidder" fail.

8 *Del. C.* § 324's requirement that the PDVH Shares be sold to the "highest bidder" does not mean, as the Venezuela Parties contend, that the shares can only be sold to the bidder that claims to offer the highest headline *price* for the shares. D.I. 2180 at 5. The Venezuela Parties emphasize that 8 *Del. C.* § 324 only mentions the words "highest bidder," not "highest and best," as is sometimes seen in other statutes, *see* D.I. 2180 at 5. And both the Venezuela Parties and Gold Reserve assume without authority that the term "highest" refers to price, rather than value. *See* D.I. 2180 at 4-6; D.I. 2183 at 3. But Section 324 does not limit itself to "price," and even Gold Reserve accepts that the concepts are distinct. D.I. 2183 at 3 ("[V]alue is not price") (quotations omitted). Of course, the statute also contemplates one public sale that will "satisfy the debt," 8 *Del. C.* § 324, not a succession of attempts with risky and speculative bids. And, as relevant

4

here and as this Court has previously recognized, a junior creditor who wants to credit bid must pay all senior creditors in cash, and cannot force those creditors to accept non-cash consideration without their consent. D.I. 1583 at 2. That necessarily forecloses a junior creditor's bid that merely *promises* cash to senior creditors in the future, once the junior creditor removes the senior liens, acquires the assets, and is able to borrow against those assets.[2]

The Venezuela Parties seek to impose limitations on Section 324 by relying on out-of-state bankruptcy decisions to support their favored interpretation of the law. But in so doing they ignore Delaware precedent confirming that a bid with a lower headline amount can constitute the highest bid, even in an auction designed to focus on price. In *Huff Fund Inv. P'ship v. CKx, Inc.*, shareholders exercised their statutory right to obtain a court appraisal of the "fair value" of the stock of a corporation after a merger. 2013 WL 5878807, at *11 (Del. Ch. Nov. 1, 2013). To analyze that question, the court observed that the merger was the result of a process "in which bidders raise each other's bids until only one bidder remains" and "[t]he highest-value bidder then ends up winning the good." *Id.* Although the winning bid was 10 cents per share lower than an alternative bid with a higher headline value, this "d[id] not change the analysis of the auction process [because] [t]he certainty of financing and favorable deal terms were legitimate factors for the Board to consider when choosing the winning bidder." *Id.* n.135. Although the auction was

---

[2] To the extent that Delaware law can be viewed as limited to the highest price, it must be remembered that sheriff sales in Delaware generally require a 20% deposit with the balance due by the third Monday of the following month. *See* New Castle County Sheriff Sales-Real Estate, *available at* https://nccde.org/DocumentCenter/View/193/Sheriff-Auction-Rules-and-Bidder-Registration?bidId= ("20% Deposit or $10,000 in Certified Funds, whichever is greater, due at Time of Sale. Balance of bid (certified funds) is due on or before the third Monday of the month following the sale."); Del. Super. Ct. Civ. R. 69 ("Return of sheriff's sales of real estate shall be made on the third Monday of the month succeeding the date of the sale."). Under that structure there is no material risk to close and the difference between value and price largely becomes one of semantics. The bids at issue here present a very different scenario.

5

designed to elicit the highest price, "the various bidders were competing along more dimensions than just price" and a bid with a higher headline price but significant financing risk was thus not the best indicator of the company's value. *Id.* at *15. Indeed, the outdated bankruptcy decisions the Venezuela Parties cite in support of their position confirm that, even where it is "'legally essential' to approve the highest offer," comparing bids based only on headline price "assumes that the offers and offerors are in all other respects comparable." *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (quoting *In re Landscape Props., Inc.*, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988)). That is not the case here.

Even if nominal "price" were the only relevant consideration, this Court's prior orders correctly acknowledge that price depends on certainty of closing. As Gold Reserve concedes, the price obtained for the PDVH Shares must be judged by "the amount of Attached Judgments expected to be satisfied by the purchase price." D.I. 1528-3 at 2 of 3 (Special Master's proposed Evaluation Criteria); D.I. 1554 at 26 (adopting the Special Master's proposed Evaluation Criteria). Gold Reserve's reliance on this order, D.I. 2183 at 3, wrongly ignores the importance of the word "expected" in the Court's analysis. To continue the analogy, a bid submitted by Vladimir Putin, even if it approached the Venezuela Parties' fanciful valuation of PDVH, would not be "expected" to satisfy *any* Attached Judgments because it could not secure regulatory approval. It therefore could not be selected as the highest bid.

Lest there be any doubt, even Gold Reserve correctly notes that the Court retains the "equitable power" to control "its own process for the correction of abuses or the prevention of injury." D.I. 2183 at 16 (quoting *Smith v. Caldera Props. Nassau Grove, LLC*, 2011 WL 2420842, at *2 (Del. Super. Ct. June 9, 2011). While Gold Reserve interprets this power as allowing the Court to consider the fairness of closing on one transaction when another purports to offer a higher

6

headline price, *id.* at 16, the reverse is also true. That is, even apart from whether Gold Reserve can legally credit bid without putting cash on the barrelhead now sufficient to pay senior lienholders today (as opposed to IOUs it hopes to pay once it acquires PDVH and borrows against PDVH's indirect assets), the Court must consider the fundamental injustice it would work to Crystallex, the Attached Judgment Creditors, and the Venezuela Parties if the Dalinar bid were selected but failed to close due to the financing risks in the Dalinar bid, which Dalinar and Gold Reserve have obstinately refused to address despite months of warnings. In the scenario where the Court selects the Amber Energy bid, there is a risk that *some* creditors (most notably Gold Reserve) would not see their judgments satisfied when they otherwise might have. But the risk is far greater in the scenario where the Dalinar bid is chosen. If the Dalinar bid fails to close, then *all creditors and the Venezuela Parties* would be left in the lurch and forced to once again come back to this Court seeking to sell the PDVH Shares for potentially far less than either of the current bids once the 2020 Bondholders have taken their 50.1% cut of Citgo Holding. There is risk both ways, and the Court must exercise its equitable power to avoid injustice by selecting the option likely to do the most good and the least harm based on currently-available information. Properly framed, the Amber Energy bid is undoubtedly the right choice.

In any case, the Venezuela Parties' position is founded on a supposed distinction between what constitutes the "highest" bid under Section 324 and factors that contribute to a bid being the "best" and "highest" under the Bankruptcy Code. Gold Reserve presumably rejects this submission, having asserted in its Motion to Strike that this case should be analyzed like a bankruptcy proceeding. *See* D.I. 2117 at 18. And while Crystallex agrees with the Venezuela Parties that decisions of the bankruptcy courts are not controlling in the way Gold Reserve's Motion to Strike suggests, those decisions nevertheless may be informative to the extent they offer

7

persuasive insights into the factors relevant to selecting the highest bid in a non-cash sale of a debtor's assets. As relevant here, the bankruptcy courts confirm it is not unusual to select as the winner a more certain bid that offers a nominally lower headline price than a competitor's bid if that nominally lower bid is more certain to close and thus offers greater expected value for the assets being sold. *See, e.g.*, *In re Scimeca Found., Inc.*, 497 B.R. 753, 783 (Bankr. E.D. Pa. 2013) (approving bankruptcy sale where trustee accepted bid that offered all cash, with no present contingencies, over bid that was higher but contingent); *Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332, at *10 (S.D.N.Y. July 21, 2015) (denying motion to enjoin sale to lower bidder that was more certain to close); *In re 388 Route 22 Readington Holdings, LLC*, 2020 WL 4282748, at *5 (D.N.J. July 27, 2020), *aff'd*, 2021 WL 4811409 (3d Cir. Oct. 15, 2021) (rejecting argument that facially higher offers should have been accepted in bankruptcy sale because they were "contingent on the successful resolution" of litigation); *In re Tresha-Mob, LLC*, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) ("In determining whether the highest bid is the best bid, the fiduciary and reviewing court must consider factors such as the risks associated with each bid and the probabilities that the proposed terms will come to fruition as well as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing.") (quotations and citations omitted).

      Taking these facts into account, it is not surprising that the Venezuela Parties fail to apply their claimed principles even within this case. As the Court is aware, on June 17, 2025 Black Lion submitted a purported bid to acquire the PDVH Shares for $8 billion. D.I. 1822. And on September 4, 2025 the Special Master informed the Sale Process Parties that it received an unsolicited letter from an entity called Deep River Petro, which claimed it is prepared to "submit a bid which will CLEARLY exceed both pending bids under review by the Special Master," and

8

attaching a purported confirmation from Apex Capital Bank that it holds $11 billion in cash to purchase the PDVH Shares. Ex. 1 (capitalization in original).[3] Yet the Venezuela Parties are not advocating that the Court should name Black Lion or Deep River Petro the "highest bidder" for the PDVH Shares under Delaware law. It is surely not because they are shy about criticizing the Court's Sale Procedures Order or its restrictions on what constitutes a qualifying bid. Rather, the Venezuela Parties presumably recognize that factors other than a bid's claimed headline value must be taken into account when determining who is the highest bidder.[4] That implicit admission reflects the "common knowledge of all lawyers" and businesspeople "that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two." *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925).

---

[3] Citations in the form of "Ex. __" refer to exhibits attached to the September 12, 2025 Declaration of Jason W. Myatt in support of this brief.

[4] Black Lion has not done anything to advance its unsolicited "bid" to acquire PDVH. Deep River Petro, whom counsel for the Special Master directed to the Court's requirement that it file its bid on the docket, appears to be a hoax backed by a sanctioned, unregistered bank with a history of making last-minute, fanciful bids in headline-grabbing public sales. *See, e.g.*, Georgia Department of Banking and Finance, *Order to Cease and Desist Issued to Apex Capital Bank*, Sept. 12, 2024, *available at* https://dbf.georgia.gov/press-releases/2024-09-12/order-cease-and-desist-issued-apex-capital-bank (last accessed Sept. 11, 2025) ("The Department has no record of Apex Capital Bank and has not approved this entity to organize a bank and/or conduct a banking business in or from Georgia."); Reuters, *Mystery bidder for Paramount Global raises questions*, July 31, 2024, *available at* https://www.reuters.com/markets/deals/mystery-bidder-paramount-global-raises-questions-2024-08-01/ (last accessed Sept. 11, 2025) ("The person familiar with negotiations told Reuters that Apex Capital Trust had expressed interest in making a bid for Paramount several months ago, though the parties involved in evaluating such offers for Paramount could not establish the legitimacy of the parties involved or verify they had the financial resources to complete the transaction."); NY Post, *Paramount Global gets bizarre all-cash bid from 'Apex Capital'*, July 31, 2024, *available at* https://nypost.com/2024/07/31/media/paramount-global-receives-competing-bid-of-up-to-43b-from-apex-capital/ (last accessed Sept. 11, 2025) ("A new player in the Paramount Global hunt reportedly offered an all-cash $43 billion offer for the media giant—but the money seems too good to be true. … The only problem is that A[p]ex Trust seems to be a bogus company, according to FT.").

      **a.**      **The Amber Energy bid is substantially more certain to close than the "improved" Dalinar bid**

The Special Master determined that the Amber Energy bid is far more likely to close than the Dalinar bid. As the Special Master explains, the Amber Energy bid "virtually eliminates any closing risks associated with the SDNY Litigation." D.I. 2123 at 10. On the other hand, the Special Master "has material reservations with Dalinar's plan for addressing the [2020 Bondholder] risk" and thus "caution[ed] the Court against relying on Dalinar's uncertain financing" to settle claims the Bondholders might bring. *Id.* at 11. The Special Master also concludes that the Amber Energy bid is not subject to significant regulatory risk. As addressed below, the Special Master's recommendation is compelling, and none of the objections merits a different conclusion.

      **i.**      **Risk posed by the 2020 Bondholders**

Gold Reserve's disagreement with the Special Master's view that the Amber Energy bid reduces risk posed by the 2020 Bondholders hinges on an obvious mischaracterization of the Special Master's statements. The Special Master, echoed by Will Hiltz of Evercore, suggested that the Amber Energy bid creates a supposed "one-way option" to protect against the downside risk of the 2020 Bondholders prevailing while preserving optionality if they win. *See* D.I. 2123, ¶ 19 (Special Masters Updated Final Recommendation); D.I. 2183 at 10-11 (Gold Reserve's objections). With respect, the Special Master's description of this possibility lacks precision. Crystallex does not understand the Special Master to say a Court order confirming the sale of PDVH to Amber Energy could be derailed if the 2020 Bondholders lose, as Gold Reserve suggests. Rather, because the Court will not decide which bid to select until after Judge Failla rules on the 2020 Bondholders' claims in the Southern District of New York, *this Court* will have the opportunity to consider the potential consequences of Judge Failla's ruling when making its

10

decision. *See* D.I. 2123, ¶ 18 (Special Master explaining that "*the Court* will have the benefit of 20/20 hindsight in deciding whether the settlement embedded in the Amber Sale Transaction is value accretive to the holders of Attached Judgments or if it instead unnecessarily overpays the PDVSA 2020 Bondholders") (emphasis added).

Gold Reserve's mischaracterization of the Special Master's and his advisors' statements is not only transparently wrong, it is illogical. A ruling against the 2020 Bondholders is *not* a "single point of failure" that would imperil the Amber Energy bid. D.I. 2183 at 10, 12. Such a ruling would pose no threat whatsoever to the Amber Energy bid's ability to close. Rather than threatening to derail this process, the 2020 Bondholders' leverage would have been substantially diminished—first by the TSA and then by an adverse ruling in the SDNY litigation. That is why settlements happen at points of maximum leverage and uncertainty. Gold Reserve is wrong to say that "the sale to Amber Energy would not go through" if the 2020 Bondholders lose in their separate litigation. D.I. 2183 at 10 (characterizing Mr. Hiltz's testimony about the Court's likely decisions as a self-destruct mechanism in the Amber Energy bid itself). It would, if the Court approves it. Put differently, the Amber Energy bid would be unaffected by such a ruling, except perhaps that the Court might determine that the bid pays too much to the 2020 Bondholders and thus decline to select Amber Energy as the winning bidder. But that is the risk Amber Energy and the 2020 Bondholders chose to take. And doing so puts them in contrast with Dalinar and Gold Reserve, who, if the 2020 Bondholders win, would have the Court shift the closing risk entirely onto senior Attached Judgment Creditors whose judgments would *all* remain unsatisfied, with equally devastating consequences for the Venezuela Parties whose outstanding judgment debts would only continue to grow.

In any event, any potential (albeit minimal) risks in the Amber Energy bid are outweighed by the risk of selecting the Dalinar bid. The Special Master confirms that, even after alleged improvements, the Dalinar bid remains highly uncertain to close. As part of its financing commitments, Dalinar agreed to perform a post-closing merger of Adolin Holdings—its acquisition vehicle—with Citgo Petroleum, with Citgo Petroleum assuming Adolin's debt obligations entirely. *See* D.I. 1841, ¶ 72; D.I. 1949 at 4. Because the 2020 Bondholders purport to have a lien on 50.1% of the shares of Citgo Holding, which sits between PDVH and Citgo Petroleum in the corporate structure, as well as the right to vote the shares of Citgo Holding in the event of an uncured default such as PDVSA's years long non-payment of its bond obligations—they could exercise their rights and block the Adolin merger into Citgo Petroleum or obtain an injunction preventing it. *See, e.g.*, D.I. 1741 at 4 (this Court acknowledging the risks to closing inherent in the Dalinar bid). In that scenario, Dalinar's financing sources would almost certainly claim an anticipatory breach and refuse to fund. *See* D.I. 2034 at 3-6 (Crystallex explaining this risk in detail).

Rather than address this structural risk in Dalinar's bid with guaranteed funds or agree to a clear right to terminate the Dalinar SPA if the 2020 Bondholders win, Gold Reserve made clear it will litigate for months or years—with the Special Master, the 2020 Bondholders, and presumably anyone else that seeks to right the harm caused by Dalinar's intransigence. *See* D.I. 1991 at 19 (asserting that the original Dalinar SPA could not be terminated until an injunction in favor of the 2020 Bondholders is "final and non-appealable"). Dalinar's revised bid is no better. As Crystallex has already explained, *see* D.I. 2169 at 10 n.3, Dalinar's proposed amendment to its SPA fails to explicitly create a termination right based on specific outcomes in the 2020 Bondholders' dispute, and thus all but guarantees protracted litigation about whether and when the Special Master can

12

terminate the SPA based on the results of the 2020 Bondholders' litigation in New York. *See* D.I. 2126-1 at 6 of 271 (Dalinar cover letter describing its revised bid), 103 of 271 (Dalinar revised SPA, § 6.9(f)). The new termination right also provides Dalinar an unreasonably long 90-day cure period, meaning that litigation concerning the Special Master's right to terminate the Dalinar SPA would not even begin until at least January of 2026, an unacceptable delay and risk to force on the Attached Judgment Creditors who have already waited more than a decade to be paid.

In its objections to the Special Master's Updated Final Recommendation, Gold Reserve insists that the 2020 Bondholders are unlikely to prevail in their litigation or to take the actions necessary to block the Dalinar transaction if they do, and thus concludes that the risks "remain slight." D.I. 2183 at 11. A near-universal chorus of objectors disagrees, and has done for months. D.I. 1942 (Red Tree); D.I. 1945 (Conoco); D.I. 1946 (ACL); D.I. 1949 (Crystallex); D.I. 1950 (OIEG). If Gold Reserve were so confident that it is right and that everyone else is wrong, it would have committed to a clear and unequivocal termination right if the 2020 Bondholders prevail and/or obtain an injunction blocking the Dalinar transaction. That it refused to take on that risk and instead shifted it to senior creditors speaks volumes.

      ii.      **Regulatory risk**

Gold Reserve also claims it obtained the first "requisite approval from the FTC confirming that the [Dalinar] bid has no antitrust concerns." D.I. 2183 at 19 (citing D.I. 2120). But early termination of Hart-Scott-Rodino review is *not* a confirmation that the Dalinar bid "has no antitrust concerns" as Gold Reserve claims. *Id.* Although unlikely, the transaction can still be blocked or unwound. 15 U.S.C. § 18a(i)(1) (a decision to terminate the waiting period "shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of [the Clayton] Act or any other provision of law").

13

More concerningly, it is not clear what Dalinar disclosed to the FTC. The "early termination letter" filed on this Court's docket lists only "Gold Reserve Ltd." as the entity acquiring voting securities of PDVH. D.I. 2120-1 at 2. But the primary antitrust concern posed by the Dalinar bid stems from the fact that Koch entities have the right to appoint two of Dalinar's board members. D.I. 1949 at 16-17; D.I. 1841-1, Ex. H, at 2. The potential absence of any discussion of Koch—or even Dalinar and Adolin Holdings, the actual entities that would be acquiring PDVH—in Gold Reserve's filing with the FTC casts doubt on the completeness and/or candor of the submission that was made, and thus on what this Court might infer from the FTC's early termination decision.

In any event, it would be unlikely for Amber Energy's investments in the energy sector to create greater antitrust concerns than Koch's, as the Special Master confirms based on the advice of his sophisticated legal and transactional advisors. D.I. 2123, ¶ 22(a). Gold Reserve's speculation to the contrary should be rejected.[5]

### iii. Risks posed by the overbroad proposed Sale Order

Both the Dalinar bid and the Amber Energy bid come, in Crystallex's view, with unnecessarily broad proposed Sale Orders that threaten to create more risks to the finality of this Court's Sale Process than they resolve. The objections filed by the 2020 Bondholders, the 2020 Bondholders' Trustee and Collateral Agent, and the Gramercy Parties confirm as much. *See* D.I. 2178 (Gramercy Parties objecting to proposed Sale Order in Amber Energy bid); D.I. 1968 (Gramercy Parties objecting to proposed Sale Order in Dalinar bid); D.I. 1943 at 11-20 (2020 Bondholders objecting to proposed Sale Order in Dalinar bid); D.I. 1947 at 3-4 (2020

---

[5] Crystallex reserves the right to amend its position upon viewing the responses submitted by Amber Energy and others, including to join in their response to Gold Reserve's objections.

Bondholders' Trustee and Collateral Agent objecting to proposed Sale Order in Dalinar bid); D.I. 2178 (reservation of rights by the 2020 Bondholders' Trustee and Collateral Agent concerning the Amber Energy bid). Crystallex therefore reiterates its view that the Court should direct the Special Master to amend the Sale Order to mitigate the unnecessary risk of appeal created by the overbroad releases and other objectionable terms in the Proposed Sale Order. *See* D.I. 1949 at 19.

However, the Court need not countenance the objections submitted by the Venezuela Parties, which, like the objections filed by the 2020 Bondholders, their representatives, and the Gramercy Parties, seek to overcorrect and create new risks to the finality of the sale. In particular, the Court need not remove references to its inherent powers, or its powers under the All Writs Act, 28 U.S.C. § 2004, or any other applicable federal law. The auction has been deemed a judicial sale, and it therefore "differs from an execution sale in that the former is conducted pursuant to directions of the court and the federal statutes." *United States v. Branch Coal Corp.*, 390 F.2d 7, 9 (3d Cir. 1968). Venezuela's objections to the contrary should be rejected. *See* D.I. 2180 at 19.

Similarly, the Court should reject the Venezuela Parties' attempt to secure a stay pending appeal before this Court even issues an order than can be appealed. *See id.* If the Venezuela Parties wish to secure such an extraordinary stay, they should be required—like all appellants—to move this Court for a stay after filing a notice of appeal. *See* Fed. R. App. P. 8(a)(2)(A)(ii); *T.C. v. Kyes*, 2025 WL 2430425, at *1 (D. Mass. Aug. 22, 2025) ("Before seeking a stay pending appeal from the court of appeals, a party 'must ordinarily move first in the district court.'") (quoting Fed. R. App. P. 8(a)(1)). Moreover, especially after losing at every turn and demonstrating Olympic levels of recalcitrance in their efforts not to pay their debts and to defy the lawful judgments of federal courts, the Venezuela Parties should be required to post a bond in order to pursue such an appeal—or at the very least to demonstrate why they should be treated differently than other

appellants—and cannot skirt the requirement to do so through an objection to the Special Master's recommendation rather than by properly moving the Court to issue a stay at the proper time.

        **b.**        **The Amber Energy bid offers significant expected value to the Attached Judgment Creditors and the Venezuela Parties**

Given the Special Master's view that the Amber Energy bid is virtually certain to close and his concern that the Dalinar bid remains unacceptably uncertain, it is perfectly rational to conclude that the Amber Energy bid offers the "highest" expected value to the Attached Judgment Creditors. *See* D.I. 1993-5, ¶¶ 12-16 (Dr. Heaton explaining that a bid with material closing risk has a much lower "expected value" than a bid that is nearly certain to close, even if the headline value of the latter bid is lower). The Venezuela Parties assert that the Special Master has not sufficiently analyzed the Dalinar and Amber Energy bids to decide which is best. *See* D.I. 2180, at 6-9. And Gold Reserve complains that the Special Master's selection of Amber Energy violates the Bidder Protections in the Court-ordered Sale Process. *See* D.I. 2183 at 2-3. But even if they were correct (they are not), neither criticism is relevant to this Court's analysis of which bid is highest. The Special Master's recommendation is a *procedural* mechanism to assist the Court only, and remains subject to *de novo* review by the Court after considering all interested parties' objections to the *substance* of the bids in question both in writing and at the upcoming Sale Hearing. D.I. 1554 at 5 (this Court "assur[ing] all involved in the Sale Process and the Litigation that whatever recommendation the Special Master makes to the Court will be subjected to full and adequate judicial scrutiny—including at and around the multi-day Sale Hearing in [September] and the extensive briefing likely to precede it—regardless of the price associated with any Successful Bid and the Sale Process that produces it").

In the end, the Court must weigh the value of Amber Energy's bid against the far less certain bid offered by Dalinar, and determine which is expected to satisfy the greatest amount of

16

Attached Judgments and thus be selected as the highest bid under Delaware law. Unfounded objections to the Special Master's level of analysis are irrelevant and not a basis to reject the sale of PDVH to either Amber Energy or to Dalinar.

## II. The Venezuela Parties' Remaining Arguments Fail for the Same Reasons Crystallex Previously Presented

The Venezuela Parties purport to incorporate by reference their prior objections, D.I. 2180 at 16. That violates the Court's instruction that objections should address only issues relevant to the Special Master's changed recommendation, D.I. 2110, ¶ 6, and it violates Local Rule 7.1.3(a)(4) as this Court has already admonished the Venezuela Parties, D.I. 1180 at 5-6 ("It is improper for the Venezuela Parties to expect the Court to track down the earlier filings, figure out for itself the supposedly relevant pages in four earlier briefs—which were written at an earlier time, based on a different record, with no awareness of or accounting for the Court's subsequent rulings—and somehow divine what the Venezuela Parties might now be arguing.").

To the extent the Court considers the Venezuela Parties' "incorporated" arguments, Crystallex stands on its prior responses to the Venezuela Parties' objections, which are based on unfounded claims of bias, allegations of deficiencies in the Sale Process that have already been rejected, and a supposed "50% rule" that does not exist under Delaware law. For the avoidance of doubt, the Venezuela Parties' objection to the timing of the Court's bid deadline, though styled as a new objection, D.I. 2180 at 20, is in fact a restatement of their prior objections and fails for the reasons set out in Crystallex's response. D.I. 1992 at 16-17 (Crystallex's response to this objection); D.I. 1948 at 24 (Venezuela Parties acknowledging that they have "asked the Court for more time to allow for favorable developments in the Bondholder Litigation—and the PDVH Alter Ego Litigation" and that "the Court refused").

17

The Venezuela Parties seek to avoid this Court naming any entity the winner in this sale. But the heated competition among sophisticated bidders—each offering billions of dollars to discharge Venezuela's and PDVSA's debts—proves there is no merit to the Venezuela Parties' position, regardless of which bid is selected at the end of the day. If Venezuela is dissatisfied with the bids, it has the money and the means to top them—and to pay fully affirmed judgments that it has been subverting for years. Its willful refusal to do so is the only conduct here that shocks the conscience.

## Conclusion

For the foregoing reasons, Crystallex respectfully submits that the Court should reject the objections to the Special Master's Updated Final Recommendation and confirm Amber Energy as the winning bidder of this Court's long-running and successful Sale Process.

|  |  |
|---|---|
| OF COUNSEL:<br><br>Robert L. Weigel<br>Jason W. Myatt<br>Rahim Moloo<br>Zachary Kady<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York  10166<br>(212) 351-4000<br><br>Miguel A. Estrada<br>Lucas C. Townsend<br>Adam M. Smith<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C.  20036<br>Tel:  (202) 955-8500<br>Fax:  (202) 467-0539<br><br>Dated: September 12, 2025 | */s/ Travis S. Hunter*<br>Raymond J. DiCamillo (#3188)<br>Jeffrey L. Moyer (#3309)<br>Travis S. Hunter (#5350)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware  19801<br>(302) 651-7700<br>dicamillo@rlf.com<br>moyer@rlf.com<br>hunter@rlf.com<br><br>*Attorneys for Plaintiff* |