## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>        Defendant. | Case No. 17-mc-151-LPS |

## GOLD RESERVE'S CONSOLIDATED REPLY IN SUPPORT OF
## OBJECTIONS TO SPECIAL MASTER'S UPDATED FINAL RECOMMENDATION

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

**NORTON ROSE FULBRIGHT US LLP**

Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and -

Katherine G. Connolly (*pro hac vice*)
One Embarcadero, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and -

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*

## TABLE OF CONTENTS

I.    Introduction ........................................................................................................................1

II.   The Responding Parties' "Expected Value" Constructs Are Contrary to Delaware Law and Methodologically Unsound ...................................................................................................2

   A.   Delaware Law and the Court's Orders Require Selecting a Conforming Bid With the Highest Price, Not the Highest "Expected Value" ..................................................... 2

   B.   No Responding Party or Expert Performs a Rigorous "Expected Value" Assessment of Either Bid, and None Perform Any Assessment at All of Amber Energy's Bid ...................... 3

III.  The Special Master's Final Recommendation of Dalinar Energy's Bid Two Months Ago Refutes What He Says Now ...................................................................................................5

   A.   The Special Master's Conflict of Interest .......................................................... 9

IV.   The Risks Associated with the 2020 Bondholders' Claims Are Greater to Amber Energy's Bid Than Dalinar Energy's Bid ...........................................................................................10

   A.   Amber Energy's Bid Will Implode If the 2020 Bondholders Lose Before Judge Failla— Tellingly, Amber Energy Never Suggests Amending Its Bid If That Happens........................ 11

   B.   Whether They Win or Lose Before Judge Failla, the 2020 Bondholders Still Have No Viable Path for Interfering with Dalinar Energy's Financing ................................................. 13

   C.   The Flexibility to Address Risks Posed by the 2020 Bondholders Depending on Future Events Is a Distinct and Significant Advantage of the Dalinar Energy Bid ............................ 17

V.    The TSA Puts Amber Energy's Bid at High Risk of Imploding ...........................................19

   A.   TSA's Numerous "Commercially Reasonable Efforts" Clauses Create Discretionary Off-Ramps From Closing ................................................................................................ 19

   B.   The "Consenting 2020 Noteholder Consent Right" Adds Even More Uncertainty ......... 22

VI.   The Venezuela Parties' Rehashed Arguments Against Dalinar Energy's Improved Bid Remain As Flawed As Ever ...................................................................................................24

VII.  Conclusion .........................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Deibler v. Atlantic Properties Group, Inc.*,
    652 A.2d 553 (Del. 1995) ................................................................................2

*Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. et al.*,
    No. 1:19-cv-10023 (S.D.N.Y.), D.I. 396 ......................................................11

*Serdarevic v. Centex Homes, LLC*,
    No. 08 CV 5563 VB, 2012 WL 4054161 (S.D.N.Y. Sept. 5, 2012) .............19

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
    441 F. Supp. 3d 1 (S.D.N.Y. 2020) ...............................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) .....................................15

**Rules and Statutes**

8 *Del. C.* § 324(a) ..................................................................................................2

Gold Reserve Ltd. f/k/a Gold Reserve Inc. ("Gold Reserve") submits this Consolidated Reply to the Responses to its Objections to Special Master's Updated Final Recommendation addressing filings by the Special Master, Amber Energy, the 2020 Bondholders, Crystallex, ConocoPhillips, OIEG, Red Tree, ACL, and the Venezuela Parties ("Responding Parties").[1]

## I.    INTRODUCTION

Gold Reserve submits this Reply to urge the Court to reject the Updated Final Recommendation and approve Dalinar Energy's Improved Bid. Delaware law and this Court's orders require that attached shares be sold to the highest conforming bidder, not discounted by speculative "expected value" calculations. Dalinar Energy's bid is more than $2 billion higher than Amber Energy's and is fully financed—meeting the Court's paramount concern for price and certainty. No party has identified any Delaware authority allowing the Court to depart from the "highest bidder" standard or to apply risk discounts selectively.

The Responding Parties rely on an "expected value" framework that is both legally unsupported and methodologically unsound. No rigorous analysis was performed for discounting Amber Energy's bid, and the Special Master never quantified any discount on Dalinar Energy's price. The result is an unjustified sacrifice of billions in value for judgment creditors.

The Special Master's recent reversal—now favoring Amber Energy's lower bid based on a TSA that diverts $2.125 billion from the Attached Judgment Creditors to the 2020 Bondholders regardless of outcome—cannot be reconciled with the Special Master's prior findings or the Court's own warning against such a "fundamental injustice." The Updated Final Recommendation also ignores that Amber Energy's bid is fraught with execution risk, including discretionary

---

[1] The Special Master, Amber Energy, the 2020 Bondholders, Crystallex, ConocoPhillips, ACL, and the Venezuela Parties filed responses to Gold Reserve's objections (D.I. 2262-2266, 2273-2274) while Red Tree (D.I. 2267) and OIEG (D.I. 2270) have filed joinders to Crystallex's response.

"commercially reasonable efforts" clauses and broad consent rights that undermine certainty.

For these reasons, selecting Amber Energy's bid would contravene Delaware law, the record, and the Court's guidance, while exposing creditors to unnecessary risk and forfeiting substantial value. In contrast, Dalinar Energy's Improved Bid maximizes recovery for judgment creditors, provides flexibility to address the 2020 Bondholders' claims as events unfold, and offers the highest, most certain path to closing. The Court should approve Dalinar's Improved Bid.

## II.    THE RESPONDING PARTIES' "EXPECTED VALUE" CONSTRUCTS ARE CONTRARY TO DELAWARE LAW AND METHODOLOGICALLY UNSOUND

### A.    Delaware Law and the Court's Orders Require Selecting a Conforming Bid With the Highest Price, Not the Highest "Expected Value"

Delaware law is clear: attached shares must be sold "to the highest bidder." 8 *Del. C.* § 324(a). None of the Responding Parties cite a single Delaware case authorizing a court to discount a bid's purchase price by speculative "expected value" calculations or to select a lower-priced bid based on hypothetical litigation or regulatory risks. The absence of any such authority is fatal to the Responding Parties' attempt to guide the Court into a legally untenable framework for evaluating the bids submitted in this proceeding.

In arguing otherwise, Red Tree and ACL misplace reliance on *Deibler v. Atlantic Properties Group, Inc.*, 652 A.2d 553 (Del. 1995), which merely recognized that paying or releasing a valid debt can constitute value to the debtor. It did not authorize discounting bids by hypothesized litigation outcomes, much less at the expense of judgment creditors in a judicial sale. This Court has recognized price and certainty as the Evaluation Criteria, but no Delaware authority permits replacing the "highest bidder" standard with an idiosyncratic expected value calculus.

The Court has also made clear that, at the conclusion of this Sale Process, price will be of paramount importance: "the Court expects that any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser

emphasis on certainty." (D.I. 1741 at 3.) The Court further observed that, when faced with a choice between higher price and a 2020s settlement, "the $1 billion [increase] sounds like it might be better," and the 2020s risk "is not worth anywhere near $4 billion." (D.I. 1840-1 at 57, 60; D.I. 2183-5 at 4-5.) The Court also cautioned that it would be a "fundamental injustice" to approve a lower-priced bid premised on 2020s settlement if subsequent events[2] reveal the 2020s lack rights. (D.I. 1741 at 7-8.) Dalinar Energy's Improved Bid undoubtedly delivers the highest price, by a $2 billion margin, and is fully financed. Under the Court's guidance and Delaware law, that price advantage—not speculative and slanted "expected value" overlays—must drive the final selection.

## B.  No Responding Party or Expert Performs a Rigorous "Expected Value" Assessment of Either Bid, And None Perform Any Assessment at All of Amber Energy's Bid

The Responding Parties' "expected value" arguments are undermined by their utter failure to rigorously assess any actual risk to Dalinar Energy's Improved Bid. And, no one performs any expected value analysis *whatsoever* for Amber Energy's Bid, thereby allowing them to argue for a discount to the purchase price of Dalinar Energy's Improved Bid while leaving Amber Energy's Bid untouched by any such haircut.

Red Tree's expert, Dr. Heaton, does not do what Red Tree claims. Dr. Heaton admits he offers no opinions on the required inputs—no probabilities, no outcomes, no timing, and no discount rate beyond an illustrative example. *See* (D.I. 2267-1, Heaton Rpt. ¶¶ 11, 16-17, 27); Ex. 7, Heaton Dep. Tr. at 32:24-25 ("I'm not offering any opinions on what the right outcomes are."). His "binary" tree assumes, at Red Tree's instruction, a $7.38 billion success outcome and a $0 failure outcome for Gold Reserve alone, while acknowledging that if the transaction were blocked

---

[2] The Court's examples of subsequent events were (a) an adverse decision in the summary judgment phase in the SDNY Litigation, (b) a stay against any 2020 Bondholders judgment in the SDNY Litigation, or (c) an indication that OFAC would continue its long-running suspension of GL-5 (D.I. 1741 at 7-8); all of which are the exact same risks that Gold Reserve argues.

"a sale may nevertheless take place at some point in the future." (D.I. 2267-1, Heaton Rpt. ¶¶ 13-14 & n.6; D.I. 2267-1 at ¶ 12.) However, using $0 as the "failure" outcome predetermines Red Tree's narrative. Replace $0 with the next-highest conforming bid (Amber's own number) and the "expected value" arithmetic materially changes. Neither Red Tree nor ACL offers a principled reason to value a failure scenario at $0 rather than at the alternative bid sitting in the market.

ACL's "expected value" assessment, which lacks the imprimatur of any expert, is no better. It concedes it did not analyze myriad material events and assigns "illustrative" probabilities to a subset affecting only Dalinar Energy, yielding a "60%" chance to close and an "expected value" under $5 billion. (D.I. 2263 at 1-2, 17, 20.) Yet, it does not apply this same "analysis" to the numerous contingencies and termination risks in the Amber Energy Bid, *e.g.*, the risks of Judge Failla invalidating the 2020 Bonds and purported Pledge, OFAC never lifting the suspension of GL-5, non-consenting bondholders litigating the TSA, the TSA failing on its terms due to its many loopholes, or Amber Energy failing to obtain regulatory approvals, including approvals in three foreign jurisdictions that do not apply to the Dalinar Energy Bid. (*Id.* at 17-18 (listing "events not analyzed").) Like Red Tree, ACL computes no expected value for Amber Energy at all. Such an obviously one-sided and biased exercise cannot justify any discount on Gold Reserve's price.

The Special Master and his Advisors did not perform a risk-adjusted analysis of competing bids, did not quantify the "discount" applied to Gold Reserve's price, and admit they did not afford "any material weight" to alternative financing available to address 2020s risk. (D.I. 1660 at 4; D.I. 2123 ¶ 17; D.I. 2183-4 ¶¶ 5-9.) That is the opposite of the rigorous valuation Red Tree and ACL now demand. In short, the "expected value" banner conceals an analysis not performed for Amber Energy or grounded in quantified, bilateral risk assessments. It is not a basis to apply any price decrement to the Dalinar Energy Bid, much less one of $2 billion.

III.    **THE SPECIAL MASTER'S FINAL RECOMMENDATION OF DALINAR ENERGY'S BID TWO MONTHS AGO REFUTES WHAT HE SAYS NOW**

Barely two months ago, the Special Master made his Final Recommendation that the Court approve Dalinar Energy's Successful Bid, which at the time had a purchase price of $7.382 billion. (D.I. 1837.) Dalinar Energy had the same committed, fully-executed financing that it still has today for its $7.9 billion Improved Bid: Adolin will merge with CITGO Petroleum Corporation, which will in turn assume the debt for the acquisition financing, and Adolin will then distribute the cash portion of the purchase price to an escrow agent for distribution to senior Attached Judgment Creditors that did not opt to accept non-cash consideration. (*Id.* at 29.) The Special Master expressed "confidence with respect to Dalinar Energy's financial wherewithal and certainty of financing to recommend approval of the Proposed Sale Transaction," which he confirmed was "capable of being timely consummated." (*Id.* ¶ 78 (citing Hiltz Decl. ¶ 63).) He further praised Dalinar Energy's financing parties as "highly reputable global financial institutions." In short, there is no hint of criticism about the financial or legal structure of Dalinar Energy's proposed transaction or the reliability of the first-rate financial commitments that Gold Reserve procured (at great expense to itself) to execute on Dalinar Energy's Proposed Sale Transaction.

As to certainty, the Special Master confirmed he had "carefully assessed the certainty associated" with Dalinar Energy's bid and "the likelihood it would be approved by the Court and then successfully proceed to closing," (*id.* at 21), and that he was "reasonably satisfied that Dalinar is likely to attain the requisite regulatory approvals." (*Id.* at ¶ 82(a).) "The Special Master, upon the advice of his Advisors, determined that the Proposed Sale Transaction does not pose a significant risk from a regulatory approval perspective." (*Id.*) He also assessed the "chance the PDVSA 2020 Bondholders could be successful in their efforts to enjoin a sale of the PDVH Shares similar to the [Dalinar Energy] Proposed Sale Transaction[.]" (*Id.* at 33.) But "after evaluation of

5

the attendant risks with his Advisors," he "conclude[d] that the risks relating to the PDVSA 2020 Bonds are ***significantly outweighed*** by the difference in purchase price between the Proposed Sale Transaction and the Revised Stalking Horse Bid," even though only the latter featured a "proposed settlement with the PDVSA 2020 Bondholders via a transaction support agreement[.]" (*Id.* at 26, 33 (emphasis added).) The Special Master noted that even if Red Tree had succeeded in lowering the purchase price delta to $2 billion, he remained "skeptical" that the Red Tree TSA would outweigh that vast difference in price. (*Id.* ¶ 81.)

Recognizing the manifest risk that the TSA would overpay on the 2020 Bondholders' claims, the Special Master asked that Red Tree "negotiate a mechanism in a transaction support agreement with the PDVSA 2020 Bondholder which contemplated lower economics for the PDVSA 2020 Bondholders in the event they were unsuccessful in the SDNY Litigation." (*Id.* at 35.) Red Tree, however, could not reach agreement with the 2020 Bondholders. (*Id.*) The Special Master decided that Red Tree's failure to obtain this mechanism meant that it did "not address the matters the Court expected topping bidders to address, including . . . taking into account in its [TSA] the possibility the PDVSA 2020 Bondholders are unsuccessful in the SDNY Litigation." (*Id.* at ¶ 85.) Yet, the Special Master and objecting parties ignore that Elliott also failed to obtain this mechanism in the Amber Energy TSA with the 2020 Bondholders. This is a critical defect in the Amber Energy Bid, because it means that if the 2020 Bondholders lose in the SDNY litigation, the "fundamental injustice" previously recognized by the Court (D.I. 1741 at 7-8) will manifest.

Conspicuously, the Special Master makes no mention of this point in the Updated Final Recommendation. Instead, appearing to think the Court has amnesia and has forgotten all he said on July 2, 2025, the Special Master would have the Court ignore the expressions of confidence in his original Final Recommendation to the Court about the financial and legal solidity of Dalinar

Energy's proposed transaction and financing structure. Now, the Special Master claims that "at that time, the Special Master was faced with a much different choice and felt that taking the risk and hoping Dalinar would ***sneak through*** to a closing was worth the alternative." (D.I. 2273 at 10 n.10 (emphasis added).) That is an absurd, and frankly offensive, explanation. The Special Master's original Final Recommendation did not pin its hopes on Dalinar Energy's bid "sneaking through." If that were true, Dalinar Energy's Successful Bid surely would not have earned his expressions of confidence that it would close in his original Final Recommendation, and certainly he would not have represented to the Court that the Dalinar Energy Bid was "capable of being timely consummated." (*Id.* ¶ 78 (citing Hiltz Decl. ¶ 63).)

More troubling, the Special Master denigrates Gold Reserve as a dull rube for supposedly not understanding the purported 2020 Bondholders' risk—despite these risks not changing one iota between when the Special Master lauded Gold Reserve in the Final Recommendation and now—throwing Gold Reserve under the bus in the Updated Final Recommendation:

> [T]hat just reveals the nescience of Gold Reserve—if PDVH cannot direct its subsidiaries to pledge their assets as collateral to the Dalinar financing parties in the second step of Dalinar's transaction, then those lenders can walk away from the deal, and the Dalinar transaction will not close. This is the exact risk the Special Master warned of in the stalking horse phase. Yet Gold Reserve still has not caught on.

(*Id.* at 8.) It is impossible to square the Special Master's dismissive, even insulting, treatment of Gold Reserve's finance structure today with the confidence he heaped on it but two months ago.

In Updated Final Recommendation, the Special Master argues that Amber Energy's bid, which has a price gap of $2 billion *vis-à-vis* the Dalinar Energy Improved Bid, is a change of circumstance because of the TSA. But, that argument cannot be squared with his prior representations to the Court which rejected the Revised Stalking Horse bid despite it potentially having ***exactly the same*** delta in purchase price. When he compared the Dalinar Successful Bid to

the Revised Stalking Horse Bid, the Special Master discussed Red Tree's failed efforts to get Rusoro to agree to non-cash consideration. (D.I. 1837 ¶ 68.) Critically, the Special Master noted that even if Red Tree had succeeded, he was "skeptical that the revised purchase price . . . and any value attributable to the Revised Stalking Horse Bid on account of closing certainty, as compared to the Dalinar Topping Bid, would be sufficient to make up for the over **$2.076 billion** purchase price difference." (*Id.* ¶ 81 (emphasis added).) This is the same difference between Dalinar Energy's $7.9 billion bid and Amber Energy's $5.9 billion bid. There is no rational explanation for why the Special Master treats the Amber Energy TSA as some sort of gamechanger.

Moreover, the Special Master reverses himself on his prior criticism of the Red Tree-proposed settlement (which is *virtually identical* to the TSA here) for not considering the possibility of PDVSA prevailing before Judge Failla. (D.I. 1837 at 35.) In an Orwellian turn, he now attempts to spin Elliott's failure to obtain this termination right into a positive feature: "Rather than being a negative aspect of the Special Master's recommendation, this is a *positive*[.]" (D.I. 2273 at 11 (emphasis in original).) But of course it is not a positive for Amber Energy's proposed transaction to divert $2 billion away from the judgment creditors to the 2020 Bondholders on claims that could be invalid at the time of closing, particularly when the over $2 billion in cash payments could satisfy Attached Judgments.

The Special Master's original Final Recommendation had it right: "Dalinar's Proposed Sale Transaction is the highest bid" and is "capable of being timely consummated after taking into account the factors in the Court's guidance," including the (small) risk to closing posed by the 2020 Bondholders. (D.I. 1837 at 7.) The Special Master had a chance to explain his 180-degree change of position in his response brief, but he failed to do so. Instead, he showed only one thing: neither his word nor his judgment are reliable. That makes it all the more important that the Court

fulfill its promise to subject "whatever recommendation the Special Master makes to the Court" to "full and adequate judicial scrutiny[.]" (D.I. 1554 at 5.)

### A.  The Special Master's Conflict of Interest

Gold Reserve notes that the Special Master's about-face on the merits of the Dalinar Energy Bid occurred against the backdrop of a long-standing, previously undisclosed, and now admitted conflict on the part of both his legal and financial Advisors. At the Court's status conference this week, Weil admitted these previously undisclosed conflicts but asserted without elaboration that they were "immaterial." But materiality is not the relevant standard. ███

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

Although Gold Reserve will wait to present its full position on this issue until after full disclosure, for the purpose of this Reply it does ask the Court to consider: (a) the taint and prejudice of these previously undisclosed conflicts on the Updated Recommendation; (b) that the scope of this relationship was previously misrepresented to the parties; (c) that these same Advisors previously recommended an Elliott bid that the Court rejected and essentially described as unworkable; (d) that once again these Advisors have put forth a recommendation in Elliott's favor that dramatically deviates from the Court's ordered process and direction; and (e) the fundamental rationale underlying this recommendation relies on demonstrably inaccurate information, as will become clear during the course of the Sale Hearing. Under these circumstances, it is essential that the Court scrupulously examine the Special Master's Updated Final Recommendation and measure it against the Delaware law requirement that the PDVH Shares be sold to the "highest bidder."

## IV.    THE RISKS ASSOCIATED WITH THE 2020 BONDHOLDERS' CLAIMS ARE GREATER TO AMBER ENERGY'S BID THAN DALINAR ENERGY'S BID

There can be no dispute that the SDNY Litigation and need for OFAC approval are substantial risks to the closing of the Amber Energy Bid for which the Special Master has failed to account. This Court has stated in no uncertain terms that, if a bid with a materially lower price– like Amber Energy's Bid–is chosen because of a proposed settlement with the 2020 Bondholders– as Amber Energy's Bid was–that such a bid risks being deemed a "fundamental injustice."[3] The risks outlined by the Court are exactly the risks Gold Reserve has repeatedly raised. *First*, the Amber Energy Bid will work a "fundamental injustice" if the SDNY "grant[s] Venezuela's pending motion for summary judgment and conclude[s] the 2020 Bondholders have no rights to CITGO Holding."[4] Judge Failla has twice indicated she will issue a decision by end of September, thus creating a substantial risk to the Amber bid's closing. *Second*, the Amber Energy Bid will work a "fundamental injustice" if "the same court indicate[s] it will stay enforcement of any judgment entered in favor of the 2020 Bondholders." The Venezuela Parties have indicated that they will seek mandatory and discretionary stays from the SDNY and the Second Circuit and if needed, will post a bond, thus creating a substantial risk to the Amber bid's closing. *Third*, the Amber Energy Bid will work a "fundamental injustice" if "OFAC indicat[es] it will continue to suspend GL-5 beyond the date of the expected closing of sale of the PDVH Shares." OFAC's renewed suspension of GL-5 in June 2025 and its recent letter to the SDNY provide just such an

---

[3] All quotes herein are to the Court's Stalking Horse Recommendation Order. (D.I. 1741 at 7-8).

[4] The 2020 Bondholders' ploy here is obvious: avoid a decision on the validity of their bonds and instead obtain a $2 billion windfall for potentially worthless bonds at the expense of Attached Judgment Creditors in a judicial sale in which the 2020 Bondholders chose not to participate. The alleged "certainty" of the PDVSA 2020 Bondholders decision does indeed "hinge" on the TSA's stay provision: unless a decision in SDNY is prevented through a stay, the Amber Energy Bid is at risk of not closing because of the SDNY Litigation.

indication that OFAC has not changed its long-held position that any exercise of the Pledge should be blocked, thus creating a substantial risk to the closing of Amber's Bid. These are substantial, indisputable risks to the closing certainty of the Amber Bid for which, in spite of clear direction from the Court, the Special Master has failed to account.

### A. Amber Energy's Bid Will Implode If the 2020 Bondholders Lose Before Judge Failla—Tellingly, Amber Energy Never Suggests Amending Its Bid If That Happens

Judge Failla just reconfirmed she will rule by the end of this month. (*Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023 (S.D.N.Y.), D.I. 396 at 4.) If she invalidates the 2020 Bonds or purported Pledge, the $3 billion claim based on those instruments will disappear, and Amber Energy's proposed diversion of $2.125 billion to "settle" this risk will, to borrow the words of the Court, be "a fundamental injustice." (D.I. 1741 at 7-8.)

In the dozens of pages of responses to Gold Reserve's Objections, the Responding Parties do not dispute this essential fact. At most, Amber Energy notes that "regardless of a ruling on the validity of the 2020 Bondholders' claims[,]" it will have "a continuing obligation [under the TSA] to try to seek consummation of the TSA and sale until December 1, 2025[.]" (D.I. 2274 at 11.) That is the equivalent of saying, "Even though it would be unjust for me to pay $2.125 billion to the 2020 Bondholders if they are determined to have no valid rights, the TSA will make me do that anyway." But that is precisely why the Amber Energy TSA is a *vice*, not a virtue.

Searching for a reason why a loss before Judge Failla should not be fatal to its bid, Amber Energy now suggests that "if the bonds were held to be invalid, there are still several live issues in that litigation[,] . . . including the effect under New York law of invalidity, and equitable defenses and counterclaims asserted by the Trustee and Collateral Agent[.]" (D.I. 2274 at 4.) Similarly, the 2020 Bondholders claim "they have a host of other claims against PDVH that remain, including claims that the Indenture and Pledge Agreement are enforceable notwithstanding any invalidity

under Venezuelan law." (D.I. 2264 at 13-14.) Yet neither of them spells out for the Court the merits of the claims and issues which might survive an adverse ruling from Judge Failla—which is probably for the best, since Judge Failla is seized of that litigation.

Regardless, the possibility that the 2020 Bondholders may appeal an adverse summary judgment ruling would not present any closing risks to the Dalinar Energy bid. The Special Master's Updated Final Recommendation does not claim otherwise, and his only analysis regarding the probability of Judge Failla ruling against the 2020 Bondholders is that "[s]uch circumstances may or may not occur." (D.I. 2123 at 13 n.13.) Likewise, Mr. Hiltz testified that the Special Master and his Advisors have not estimated the probabilities of the 2020 Bondholders winning. *See, e.g.,* Ex. 8, Hiltz II Dep. Tr. 360:23-361:6, 411:15-415:4. It is arbitrary and capricious for the Special Master to recommend a $2 billion lower proposal based on a risk he has not attempted to value.

Worse, discovery has confirmed that the Special Master has no support for his "belie[f] that the universe of bids for the PDVH Shares would provide materially higher consideration to holders of Attached Judgments" should the Court "order the Special Master to resolicit bids." (D.I. 2123 at 14 (citing Hiltz Decl. ¶ 38).) In his deposition, Mr. Hiltz speculated that if a third round of bidding is ordered, it would be *logical* for Amber Energy to reallocate the cash it diverts to the 2020 Bondholders to the Attached Judgment Creditors. Ex. 8, Hiltz II Dep. Tr. 417:18-418:11, 430:9-18, 437:19-438:14, 441:14-442:4. Yet he confirmed that he has no basis for this speculation. Specifically, Amber Energy has *never represented* this to the Special Master nor his Advisors. *See* Ex. 8, Hiltz II Dep. Tr. 376:22-377:3 ("Q. So has Amber or Elliott represented to the Special Master or to his advisors that they will in fact put in a higher priced bid in the event the 2020s lose in the New York litigation? [] A. No, they have not."); *see also id.* 470:22-471:8. Thus, the key

rationale for the Updated Final Recommendation—that the Amber Bid provides a "one-way option" that will *likely* lead to higher bids in another round—has zero evidentiary support.

It would have been simple for Amber Energy to fill this gap by assuring the Court in its response that it would, in fact, amend its bid so as to re-divert the $2.125 billion to the Attached Judgment Creditors, but it says no such thing. Its silence on this point is deafening, especially given that several other Responding Parties—including the Special Master—advocate for restarting the Sale Process for a third time if the Amber Energy Bid blows up because of Judge Failla's ruling.[5] By all appearances, Elliott/Amber Energy is determined not to pay the Attached Judgment Creditors a dollar more than it now offers, regardless of what happens in Judge Failla's court. And Amber Energy has made no representations to the Special Master to indicate otherwise. *See* Ex. 8, Hiltz II Dep. Tr. 376:22-377:3. In sum, there is no basis to conclude that if the Sale Process is restarted for a third time, Amber Energy (or another bidder, for that matter) will come forward with a conforming bid that has a higher price than Dalinar Energy's $7.9 billion bid.

**B. Whether They Win or Lose Before Judge Failla, the 2020 Bondholders Still Have No Viable Path for Interfering with Dalinar Energy's Financing**

As Gold Reserve's Objections spell out, there are multiple distinct events that would need to occur for the 2020 Bondholders to obtain an injunction preventing Dalinar Energy from closing.

---

[5] D.I. 2273 at 11 (Special Master: "If the PDVSA 2020 Bondholders lose, the Court . . . would have the option to assess the proposed Amber Sale Transaction with 20/20 hindsight, and may conclude that, in light of changed circumstances, the proposed transaction is no longer value-maximizing."); D.I. 2266 at 12 (Crystallex: "[T]he Court might determine that the bid pays too much to the 2020 Bondholders and thus decline to select Amber Energy as the winning bidder."); D.I. 2262 at 5-6 (VZ Parties: "Even if the Court does not order a redesign of the sale process [after resolution of the 2020 Bondholders litigation], it should at least allow for further bidding rather than default to Dalinar's revised bid."); D.I. 2265 at 12 (ConocoPhillips: "In that event, the Court could order the Special Master to resolicit bids, which would hopefully reallocate that value to the Attached Judgment Creditors next in line. Such a resolicitation in close proximity to the last round of bidding should not cause substantial delay."); D.I. 2267 (Red Tree: "Red Tree reserves its right to submit its own bid or change which bidder it supports in any future round of bidding, should one take place.").

(D.I. 2183 at 4-5, 14.) In response, Amber Energy overstates the risk that the 2020 Bondholders would "seek an injunction of the sale process" in a way that would not "unfold quickly." (D.I. 2274 at 5.) The 2020 Bondholders similarly threaten to "seek to enjoin PDVH and potentially other parties from taking actions in connection with the financing of Gold Reserve's transaction" based on their hotly disputed "rights under the Pledge Agreement[.]" (D.I. 2264 at 12.)

But neither Amber Energy nor the 2020 Bondholders manage to overcome even the first obstacle to an injunction: a change in the years-long OFAC policy prohibiting the 2020 Bondholders' ability to exercise their purported rights under the Pledge. In response to this obstacle, they both point to "FAQ" guidance issued in May 2023 by OFAC that it "will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PDVSA 2020 8.5 percent bond." (D.I. 2274 at 5 (citing OFAC "FAQ" 1124 (May 1, 2023)[6]); D.I. 2264 at 11 (same).) Their reading is, at best, careless. OFAC issued that guidance in connection with General License 5 ("GL-5"), which in May 2018 initially removed Executive Order prohibitions "as an obstacle to holders of the PDVSA 2020 8.5 percent bond gaining access to their collateral."[7] GL-5, however, "was replaced and superseded" by a series of amendments that has suspended it since October 2019. (*Id.*) Even the Special Master recognizes that for the 2020 Bondholders to "exercise their remedies under the CITGO Holding Pledge to block the transaction[,]" OFAC would have to "***lift[] the suspension of General License 5[.]***" (D.I. 2273 at 7 (emphasis added).) There is absolutely no indication that OFAC will spontaneously reverse its six-year-long suspension of GL-5. That being so, the threats of the 2020 Bondholders to pursue enforcement of their purported rights under the Indenture and

---

[6] Available at: https://ofac.treasury.gov/faqs/1124.

[7] OFAC "FAQ" 595 (Updated November 7, 2024), *available at* https://ofac.treasury.gov/faqs/595.

Pledge to block Dalinar Energy's transaction are hollow.

Moreover, even should OFAC somehow remarkably change its policy to favor the 2020 Bondholders—which is highly unlikely given that the 2020 Bonds financed the same Maduro regime that is public enemy #1 of the present Administration[8]—neither they nor Amber Energy show that the 2020 Bondholders could satisfy the four-factor test for such an injunction.[9]

First, the 2020 Bondholders will not be able to establish that they are likely to succeed on the merits if their claims are poured out on summary judgment by Judge Failla—and that event should spell the end of any effort to obtain a preliminary injunction. But even if they survive summary judgment, the 2020 Bondholders would be unable to obtain an injunction because the Dalinar Bid's debt financing structure ***does not*** violate the Pledge. The Pledge purports to attach to 50.1% of the capital stock of CITGO Holding, but the Dalinar Energy Improved Bid involves pledging to the transaction lenders the assets of *CITGO Petroleum*, which is a CITGO Holding subsidiary, as opposed to the shares or assets of CITGO Holding itself. The transaction will not alter CITGO Holding's ownership and interest in CITGO Petroleum, and the 2020 Bondholders will still have a claim to their 50.1% interest in CITGO Holding. Therefore, nothing about the transaction violates the Pledge, and the 2020 Bondholders will not be able to show a likelihood (or even a possibility) of success on the merits.

Second, the 2020 Bondholders cannot show that they would suffer irreparable harm that

---

[8] *See, e.g.,* "Rubio leads charge in Trump's new war in Latin America," WLRN (Sept. 12, 2025), https://www.wlrn.org/americas/2025-09-12/rubio-leads-charge-in-trumps-new-war-in-latin-america; *see also* Narcotics Rewards Program: Nicolas Maduro Moros, U.S. DEP'T OF STATE (Aug. 7, 2025), https://www.state.gov/nicolas-maduro-moros (increasing the award for information leading to arrest and conviction of Maduro up to $50 million).

[9] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ((1) likelihood of success on the merits; (2) irreparable harm to the moving party in the event the injunction is not granted; (3) the balance of equities between the parties favors granting the injunction; and (4) the public interest favors granting the injunction.).

could not be compensated by an adequate remedy at law, specifically, a lawsuit seeking monetary damages. Unlike litigants who claim a shareholding interest in a company, the 2020 Bondholders do not claim to have a permanent right to 50.1% of the capital stock of CITGO Holding, as their interest in that stock is extinguished upon payment of the Notes and accrued interest. Rather, the harm they have alleged is that the value of their purported collateral (*i.e.*, 50.1% of the capital stock of CITGO Holding) would be reduced by the amount of additional debt secured by the assets of CITGO Petroleum after closing. (D.I. 1943 at 7.) By definition, this is a pecuniary harm. If the 2020 Bondholders prove a valid legal claim for breach of the Indenture, the reduction in value of the CITGO Holding shares could be quantified and awarded as monetary damages.

Third, the balance of equities does not favor granting a preliminary injunction against the Dalinar Energy transaction. An injunction would frustrate the ability of Attached Judgment creditors—both senior and junior to Gold Reserve—to receive satisfaction on their judgments after years of waiting. Conversely, declining an injunction would not prevent the 2020 Bondholders from pursuing whatever rights they believe they have, and (as shown above) seeking award of adequate monetary damages to fully compensate any proven harm (which is entirely pecuniary).

Fourth, there is no public interest in the 2020 Bondholders preserving their alleged contractual rights under the Indenture and related Pledge. Conversely, the public's interest in a functioning judiciary that satisfies judgments would be greatly impaired if an injunction prevented the Dalinar Energy transaction. In summary, because the 2020 Bondholders are unlikely to succeed on any injunctive relief they seek before Judge Failla, the Dalinar Energy Improved Bid does not face substantial risk to closing from the 2020 Bondholders.

As a fallback argument, Amber Energy suggests that no "injunction would be necessary to hinder Gold Reserve's closing" because the 2020 Bondholders' collateral agent holds in a vault a

physical stock certificate of 50.1% of the certificated shares of CITGO Holding. (D.I. 2274 at 5.) But not even the 2020 Bondholders argue that this alleged circumstance gives them any greater rights in the collateral shares, much less any practical ability to block the transaction outside of a preliminary injunction. Simply put, the 2020 Bondholders would have to establish before a court of competent jurisdiction each of the stringent elements for a preliminary injunction. But they cannot show those elements even if they prevail before Judge Failla, much less if they lose.

## C. The Flexibility to Address Risks Posed by the 2020 Bondholders Depending on Future Events Is a Distinct and Significant Advantage of the Dalinar Energy Bid

Amber Energy and other parties wrongly attempt to fault the Dalinar Energy Improved Bid for its flexibility in addressing the alleged risks posed by the 2020 Bondholders. That flexibility, far from being a fault, is a significant advantage over the Amber Energy Bid. It allows for the resolution of the supposed risks of the 2020 Bondholders to be adapted to the nature and magnitude of those risks if and when they actually materialize, depending on how future events unfold.

*If Judge Failla rules in favor of PDVSA and against the 2020 Bondholders*, that ruling, as Crystallex acknowledges, "substantially diminishe[s]" the 2020 Bondholders' "leverage" to continue threatening a sale of the PDVH Shares to Dalinar Energy. (D.I. 2266 at 12.) Dalinar Energy can then move forward with the purchase of the PDVH Shares without even the potential for interference. As such, Dalinar Energy, unlike Amber Energy, is not "locked in" to paying billions of dollars to the 2020 Bondholders on their potentially worthless claims. This is a material advantage to the Dalinar Energy Improved Bid.

*If Judge Failla rules in favor of the 2020 Bondholders and against PDVSA,* Dalinar Energy can still move forward with the purchase of the PDVH Shares. For the reasons shown in Gold Reserve's Objections and elsewhere in this Reply, it remains highly unlikely that all five (5) of the other conditions required for Amber Energy to actually interfere with Dalinar Energy's

closing will all occur.[10] Indeed, even if OFAC remarkably changes its six-year running policy and the PDVH parties to not obtain another stay of enforcement pending appeal—factors (2) and (3)—Dalinar Energy will have financial resources of up to $2.8 billion to settle the 2020 Bondholders' claims—nearly the full amount of their approximately $3 billion nominal value. Dalinar Energy's $2.8 billion settlement reserve is much more secure than certain parties have argued. And, as importantly, the actual value of the 2020 Bondholders' claims might actually only be $2.119 billion, if the PDVH parties prevail on the pending dispute concerning the correct calculation of post-judgment interest. *See* (D.I. 2182-1 at 13-14).

*If a Law or Regulation actually creates interference with Dalinar Energy's financing*—however improbable that result—then Dalinar Energy has materially improved its bid (in the view of the objecting parties) by providing for an "early termination right" that gives it a 90-day period to obtain alternative financing. This is not nearly as improbable as some parties have portrayed.

Thus, Dalinar Energy's Improved Bid allows it to pursue an optimal resolution based on the circumstances, which may or may not entail an appropriate realities-based settlement with the 2020 Bondholders. As the Special Master noted in his Final Recommendation of the Dalinar Energy bid, this flexibility gives effect to the Court's criteria for the Topping Period set out in the Stalking Horse order. (D.I. 1837 at 35.) In contrast, Amber Energy's bid would lock it into pursuing only one resolution: to divert $2.125 billion to the 2020 Bondholders regardless of future events, even should Judge Failla invalidate the 2020 Bonds. This offers no flexibility and risks a massive windfall payment of over $2 billion that is owed to the Attached Judgment Creditors. This

---

[10] The factors include (1) OFAC changing its long-running suspension of the 2020 Bondholders' ability to exercise their purported Pledge; (2) the 2020 Bondholders requesting and actually obtaining an injunction against the Dalinar financing; (3) the Venezuela Parties failing to obtain a stay of enforcement pending their subsequent appeal; (4) Gold Reserve failing to obtain replacement financing required by the revised SPA in the Improved Dalinar Bid; and (5) Gold Reserve failing to settle with 2020 Bondholders. *See* (D.I. 2183 at 1-2).

is another fundamental disadvantage of the Amber Energy Bid.

**V.    THE TSA PUTS AMBER ENERGY'S BID AT HIGH RISK OF IMPLODING**

Gold Reserve demonstrated in its Objections how the TSA does not provide the simple, straightforward path to closing. Neither the Special Master, Amber Energy, nor any other Responding Party has any real answer to these points.

**A.  TSA's Numerous "Commercially Reasonable Efforts" Clauses Create Discretionary Off-Ramps From Closing**

When Amber Energy and the 2020 Bondholders were negotiating the TSA, they had the opportunity to create a simple contract with binding obligations which would present the Court with a strong certainty of closing. That is not what happened. Instead, they created a Swiss-cheese TSA, riddled with holes, any one of which would permit either party to walk away.[11] One of the most prominent of these is the inclusion of "commercially reasonable efforts" modifiers to a number of the TSA's stated obligations.

Per Section 8.9, the TSA is governed by New York law. Although New York courts have varied in how "efforts clauses" have been applied, it is generally accepted that "commercially reasonable efforts" is a "fairly lenient" standard. *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). This is a far lower bar than "best efforts," which "imposes an obligation to act with good faith in light of one's own capabilities." *Serdarevic v. Centex Homes, LLC*, No. 08 CV 5563 VB, 2012 WL 4054161, at *15 (S.D.N.Y. Sept. 5, 2012).

The "commercially reasonable efforts" modifier appears in no fewer than 10 provisions in

---

[11] Elliott's witness Mr. Michael Turkel affirmed these negotiations took place between Elliott and the 2020 Bondholders. *See* Ex. 9, Turkel Dep. Tr. 81:11-20 ("So without discussing internal discussions, with respect to, you know, the back-and-forth with the third party [the 2020 Bondholders], I believe that reasonableness qualifiers at certain points in the negotiations were, you know, added by one party or suggested by one party, which would have been us, with respect to a term like this, and were struck by the other party. You know, that -- that would have been in some back-and-forth.").

the TSA. For example, it applies to Amber Energy's agreement to do the following "directly or through authorized representatives and advisors" (emphasis added):

- "*use commercially reasonable efforts to* take, or cause to be taken, all actions necessary, proper, or advisable to consummate the Amber Transaction;" (D.I. 2123-1 at 808 (Section 3.1(a)(ii)));

- "*use commercially reasonable efforts to* timely prepare or cause to be prepared all amendments to the Offering Materials that the Bidder and the Required Consenting 2020 Noteholders reasonably deem necessary or advisable;" (D.I. 2123-1 at 809 (Section 3.1(a)(iii)(C)));

- "*use commercially reasonable efforts to* otherwise solicit Participation by 2020 Noteholders in the Public Exchange;" (D.I. 2123-1 at 809 (Section 3.1(a)(iii)(D)));

- "to the extent no decision has been rendered in respect of the Declaratory Judgment Action by the Successful Bid Date, *to use commercially reasonable efforts* following the Successful Bid Date to cause the Declaratory Judgment Action to be stayed until the closing date of the Amber Transaction;" (D.I. 2123-1 at 809 (Section 3.1(a)(iii)(F)));

- "subject to the conditions precedent set forth in Section 4 and the performance by the Consenting 2020 Noteholders of their respective obligations hereunder, *use commercially reasonable efforts* (x) to, or to cause the CITGO Parties to, execute the Purchase Agreements on or prior to the Sale Transaction Date; (y) to cause the Effective Date to occur on or about the Sale Transaction Date; and (z) to cause CITGO to indemnify the Consenting 2020 Noteholders, the Trustee and the Collateral Agent pursuant to the D&I Agreements;" (D.I. 2123-1 at 809 (Section 3.1(a)(iv)(B))); and

- "to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amber Transaction, *to use commercially reasonable efforts to* negotiate or to cause to be negotiated with the Required Consenting 2020 Noteholders appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment[.]" (D.I. 2123-1 at 809 (Section 3.1(a)(v)).)

For the 2020 Bondholders, this leniency modifier applies to their obligations to do the following (emphasis added):

- "to use commercially reasonable efforts to pursue, support, solicit, implement, confirm, and consummate the Amber Transaction and to act in good faith *and use commercially reasonable efforts to* negotiate the Definitive Documents with the Bidder, the CITGO Parties and the other Consenting 2020 Noteholders and to take, or cause to be taken, all actions necessary or proper to consummate the Amber Transaction in a manner consistent with this Agreement, subject to the Consenting 2020 Noteholder Consent Right;" (D.I. 2123-1 at 811 (Section 3.2(a)(i)));

20

- "to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amber Transaction, *to use commercially reasonable efforts to* negotiate with the Bidder and the other Consenting 2020 Noteholders in good faith in an effort to agree to appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;" (D.I. 2123-1 at 811 (Section 3.2(a)(ii)));

- "to the extent no decision has been rendered in respect of the Declaratory Judgment Action, following the occurrence of the Successful Bid Date, to promptly notify the New York Court of the same *and use commercially reasonable efforts to* cause the Declaratory Judgment Action to be stayed until the closing date of the Amber Transaction;" (D.I. 2123-1 at 811 (Section 3.2(a)(iv)); and

- "*to use commercially reasonable efforts to* provide any required direction and pro rata share (among Consenting 2020 Noteholders, but only to the extent that each such Consenting 2020 Noteholder is able to provide such indemnity) of an indemnity to the Trustee and/or the Collateral Agent consistent with Section 2.2(b)(iii) and Section 2.2(b)(iv) hereof[.]" (D.I. 2123-1 at 811 (Section 3.2(a)(v)).)

The inclusion of the "commercially reasonable efforts" modifier thus converts this document into, *at best*, a framework for settlement—not an actual settlement. This modifier gives Amber Energy or any of the 2020 Consenting Noteholders flexibility to walk away from the TSA at any time. As Gold Reserve only recently learned, there are ▮ distinct 2020 Bondholders who have signed the TSA. (Ex. 11, Xu Depo. Tr. 33:11-34:2 (confirming that the ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮); Ex. 11, List of ▮▮▮▮▮ Consenting 2020 Noteholders.) Each of these financial institutions has fiduciary duties, bound to make its own decisions for its own clients. This all injects substantial uncertainty into the TSA and the entire Amber Energy bid.[12]

---

[12] The Special Master and the 2020 Bondholders claims that the discretionary "off-ramps" in the TSA are "standard deal terms" that do not provide any part a "loophole" to performance, (D.I. 2273 at 9-10; *see also* D.I. 2264 at 9), but the TSA is not a standard financial document. It is a bespoke settlement between multiple parties—Amber Energy on one hand and ▮▮▮▮▮▮ individual 2020 Bondholders on the other, each of whose commercial interests may vary at any time between now and closing such that ceasing to close the TSA may be legally required. The TSA thus is fundamentally different from the standard-form debt commitment letters that support the Dalinar Energy Bid.

**B.  The "Consenting 2020 Noteholder Consent Right" Adds Even More Uncertainty**

The Amber Energy TSA introduces another material uncertainty: The "Definitive Documents" [13] necessary to implement its "proposed" terms have not yet been agreed or executed between Amber Energy and each of the Consenting 2020 Noteholders. (D.I. 2274 at 9.) Not only that, each of these key documents is subject to the "reasonable discretion" of each of the Consenting 2020 Noteholders.

The TSA defines "Consenting 2020 Noteholder Consent Right" as "the requirement for the Required Consenting 2020 Noteholders to approve the Definitive Documents (or any amendment, modifications, supplements, extensions, terminations, withdrawals, or waivers thereto) ***in their reasonable discretion***." (D.I. 2123-1 at 803 (emphasis added).)  As Elliott's Assistant General Counsel testified, "the consent right is their ability -- their -- exactly what it says on the page. It's a requirement for the required consenting 2020 noteholders to approve the definitive documents in their reasonable discretion." Ex. 9, Turkel Dep. Tr. 101:2-7. Although Elliott negotiated qualifiers for these consent rights,[14] these consent rights weaken both parties' ability to compel the

---

[13] The "Definitive Documents" as defined include such foundational documents as (1) any agreements between applicable CITGO Parties and Consenting 2020 Noteholders, and any related procedures or other documents necessary to effect the surrender of the 2020 Bonds; (2) offering materials, including all forms, securities filings and other documents necessary or desirable to effect the public offering; (3) a direction and indemnity agreement between the 2020 Bondholders, the Collateral Agent, and the CITGO Parties, to provide consent for the collateral release and the 2020 Bondholders will provide a direction to the Collateral Agent to perform the collateral release; (4) a direction and indemnity agreement between the 2020 Bondholders, the Trustee, and the CITGO Parties to provide consent for the collateral release and provide a direction to the Trustee to perform, direct and/or permit the collateral release; (5) the Sale Order; and (6) all other ancillary and related documents entered into in connection with the Amber Energy proposed transaction, including any amendments to the 2020 Indenture and the 2020 Pledge that are "reasonably required" to consummate the transaction. (D.I. 2123-1 at 807-08 (Section 2.2(a)).)

[14] *See* Ex. 9, Turkel Dep. Tr. 98:4-17 ("Q. What do you recall about the back-and-forth on the reasonable efforts or reasonably accepted clauses of the TSA generally? I generally recall that -- and it's a little bit clearer with respect to the prior one, which would have only qualified the – the noteholders' consent right, i.e. from the Amber perspective we would want to have been able to compel them to be reasonable. But I generally recall that we did want a reasonableness qualifier for most of those consent rights and ultimately achieved such a qualifier.").

other to take actions to close. These consent rights are baked into the provisions for the Definitive Documents[15] and are cross-referenced throughout the TSA, thereby undermining every purported commitment that they touch. The inclusion of this leniency modifier means that as each of the "Definitive Documents" is drafted and negotiated in the future, each of the ███████ 2020 Noteholders can, in the exercise of their "reasonable discretion" refuse to agree or execute such document. This is a gaping hole in the certainty of the TSA ever closing and it confirms that the settlement of the 2020 Bondholders' litigation risk that it supposedly provides is nothing more than an "agreement to agree"—not a binding agreement.

This is particularly true given that a condition precedent of the TSA is that "[t]he occurrence of the Effective Date and the obligation of each Party to consummate the Amber Transaction are *subject to the satisfaction or waiver by each Party*" of several details, including that each of the Definitive Documents must be "*duly approved, executed, and delivered by each party*" (D.I. 2123-1 at 813 (Section 4.1(d)) (emphasis added)).[16] As Gold Reserve only recently learned, there are ██ distinct parties who have each signed the TSA. (Ex. 10, Xu Depo. Tr. 33:11-34:2 (confirming that the █████████████████████████████████████████████████ ████████████████████████████████████); Ex. 11, List of Consenting 2020 Noteholders.) Each financial institution or firm holding PDVSA 2020 bonds has fiduciary duties to their clients,

---

[15] The TSA also includes termination provisions, Sections 5.2 and 5.3, which outline broad reasons for which the parties can walk away. Relevant to the Definitive Documents, Section 5.2(b) provides that "subject to the Consenting 2020 Noteholder Consent Right, any Definitive Document is, upon its delivery, execution, or amendment or other modification, materially inconsistent with the terms hereof, unless such Definitive Document is reformed so as to be materially consistent with the terms hereof within ten Business Days of receipt by the other Parties of written notice[.]" Amber Energy's attempt to wave away concerns about Section 5.2 are belied by its statement that such conditions are also subject to the "commercially reasonable efforts" standard discussed *supra*. (D.I. 2274 at 13.)

[16] These are similar to the terms which lay out the Definitive Documents, which require that such documents "*shall be on terms reasonably acceptable to* the Bidder and the Required Consenting 2020 Noteholders." (D.I. 2123-1 at 807 (Section2.2(a)).)

and each of those institutions is dutybound to make its own decisions for its own clients, which makes it highly uncertain if all can agree on the Definitive Documents necessary for closing.

The Amber Energy TSA attempts to protect these discretionary off-ramps by reinforcing them through other provisions. The examples below are illustrative but not exhaustive.

- The TSA includes other provisions which do not explicitly reference the enumerated consent right, but functionally provide cover for additional ones. For example, Section 4.1(h) provides as a condition precedent that "***subject to the satisfaction or waiver by each Party of the following***: (h) (i) the Delaware Court shall have issued the Sale Order, (ii) the Sale Order shall be entered on or before December 1, 2025, (iii) there is no stay of such Sale Order pending appeal in effect, and (iv) the transaction contemplated by the Amber Bid is consummated substantially concurrently with the Effective Date and the consummation of the Amber Transaction." (D.I. 2123-1 at 813 (emphasis added).)

The TSA also lacks a mechanism to foster collective decision-making among the 2020 Bondholders. As explained by Mr. Xu in his testimony, the *ad hoc* group ████████████ ██████ Ex. 10, Xu Dep. Tr. 35:25-36:24. The inability to bind any one *ad hoc* bondholder to the others underscores the uncertainty of the TSA ever actually closing, as closing is subject to the individual decision-making process of each of those ████████ signatories, any of which can exercise its individual "reasonable discretion" as to whether or not to take the as-yet uncompleted steps necessary for closing, including negotiating, agreeing and executing each of the "Definitive Documents" necessary to close.[17]

## VI.    THE VENEZUELA PARTIES' REHASHED ARGUMENTS AGAINST DALINAR ENERGY'S IMPROVED BID REMAIN AS FLAWED AS EVER

In responding to Dalinar Energy's Objections, the Venezuela Parties effectively rehash criticisms they previously made to Dalinar Energy's Successful Bid originally recommended by the Special Master. (D.I. 2262 at 1-6). Gold Reserve has already rebutted those criticisms in its

---

[17] These are similar to the terms which lay out the Definitive Documents, which require that such documents "*shall be on terms reasonably acceptable to* the Bidder and the Required Consenting 2020 Noteholders." (D.I. 2123-1 at 807 (Section 2.2(a)).)

Response and Sur-Reply in support of the Special Master's Final Recommendation (D.I. 1991, D.I. 2148), as well as the Response briefing submitted by Dalinar Energy consortium members Rusoro Mining Ltd. (D.I. 1987) and Koch Minerals Sàrl and Koch Nitrogen International Sàrl (D.I. 1983). Gold Reserve incorporates those same arguments here again.

The Venezuela Parties dedicate most of their pages to re-hashing their valuation arguments (which are even less applicable to the higher-priced Dalinar Energy Improved Bid than the Amber Energy Bid). The price of the Dalinar Energy Improved Bid is, as Gold Reserve has already laid out, not grossly inadequate and does not shock the conscience. (D.I. 1991 at 21-28.) The Venezuela Parties' strict reading of the so-called "50% test" has already been rejected by Delaware courts. (*Id.* at 22.) The Dalinar Energy Improved Bid's price should not shock the Court's conscience, as it is the highest-priced conforming bid submitted so far in the Sale Process and provides more satisfaction to judgment creditors than any other bid—and $2 billion more than the Amber Energy Bid. (*Id.* at 26-27.) In fact, the price of the Dalinar Energy Improved Bid may exceed the fair market value of the PDVH Shares, given the prices of the bids it beat out, particularly in the context of a forced judicial sale of closely held shares. (*Id.* at 27.)

## VII.    CONCLUSION

The Dalinar Energy Improved Bid's price is more than $2 billion higher than that of the Amber Energy Bid and it has the highest certainty of closing. In contrast, the Amber Energy Bid is not a meaningful improvement on the Red Tree Stalking Horse bid that the Special Master declined to recommend a little over two months ago. To be sure, any closing risks associated with the 2020 Bondholders are not greater now than when the Special Master originally recommended Dalinar Energy's Successful Bid. Gold Reserve respectfully requests that the Court reject the Updated Final Recommendation and approve the Dalinar Energy Improved Bid.

Dated: September 14, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
One Embarcadero Center, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*