**EXHIBIT 7**

**In the Matter Of:**

Crystallex Int. vs Bolivarian Republic of Venezuela

17-151-LPS

**JAMES B. HEATON, J.D., M.B.A., PH.D.**

*August 01, 2025*



800.211.DEPO (3376)
EsquireSolutions.com

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3              MISC. NO. 17-151-LPS

4      CRYSTALLEX INTERNATIONAL        )

5      CORP.,                          )

6              Plaintiff,              )

7              -vs-                    )

8      BOLIVARIAN REPUBLIC OF          )

9      VENEZUELA,                      )

10              Defendant.             )

11

12              VIDEO DEPOSITION OF

13      JAMES B. HEATON, J.D., M.B.A., PH.D.

14                August 1, 2025

15                  9:00 a.m.

16

17

18

19

20

21

22

23
        TAKEN BY:
24      AMY DOMAN, RDR, CRR, CCR (MO), CSR (CA/IL/TX/WA)
        PAGES: 1 - 72
25      JOB NUMBER: J13254794



JAMES B. HEATON, J.D., M.B.A., PH.D.                                    August 01, 2025
Crystallex Int. vs Bolivarian Republic of Venezuela                              2

```
 1          The deposition upon oral examination of

 2   JAMES B. HEATON, J.D., M.B.A., PH.D., a witness

 3   produced and sworn before me, Amy Doman, Registered

 4   Diplomate Reporter, Certified Realtime Reporter,

 5   California CSR 14465, Missouri CCR 1529, Illinois CSR

 6   084004926, Texas CSR 6203, Washington CSR 22031067,

 7   Notary Public in and for the County of Hamilton,

 8   State of Indiana, taken on behalf of Gold Reserve, at

 9   the offices of MoloLamken LLP, 300 N. LaSalle Street,

10   Chicago, Illinois, scheduled to begin at 9:00 a.m.,

11   on Friday, August 1, 2025, pursuant to the Federal

12   Rules of Civil Procedure.

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    A P P E A R A N C E S

 2    ATTORNEYS REPRESENTING CRYSTALLEX INTERNATIONAL
      CORP.:
 3
      Zachary A. Kady, Esq. (Remote)
 4    Jason Myatt, Esq. (Remote)
      GIBSON DUNN & CRUTCHER LLP
 5    200 Park Avenue
      New York, NY 10166-0193
 6    zkady@gibsondunn.com
      jmyatt@gibsondunn.com
 7
      ATTORNEYS REPRESENTING GOLD RESERVE INC.:
 8
      Katherine G. Connolly, Esq. (Remote)
 9    NORTON ROSE FULBRIGHT US LLP
      One Embarcadero Center
10    San Francisco, CA 94111
      katie.connolly@nortonrosefulbright.com
11
      Matthew H. Kirtland, Esq. (Remote)
12    NORTON ROSE FULBRIGHT US LLP
      799 9th Street NW
13    Washington, DC 20001
      matthew.kirtland@nortonrosefulbright.com
14
      Taylor LeMay, Esq. (Remote)
15    NORTON ROSE FULBRIGHT US LLP
      1550 Lamar Street
16    Houston, TX 77010
      taylor.lemay@nortonrosefulbright.com
17
      ATTORNEYS REPRESENTING OI EUROPEAN GROUP B.V.:
18
      Christopher L. Carter, Esq. (Remote)
19    MORGAN LEWIS & BOCKIUS LLP
      One Federal Street
20    Boston, MA 02110-1726
      christopher.carter@morganlewis.com
21

22

23

24

25
```



```
 1  ATTORNEYS REPRESENTING PDV HOLDING, INC., INTERVENOR
    CITGO PETROLEUM CORPORATION, AND PETROLEOS DE
 2  VENEZUELA, S.A.:

 3  Alice Adu Gyamfi, Esq. (Remote)
    Daniel Lynch, Esq. (Remote)
 4  DLA PIPER
    1251 Avenue of the Americas
 5  New York, NY 10020-1104
    alice.gyamfi@us.dlapiper.com
 6  dan.lynch@dlapiper.com

 7  ATTORNEYS REPRESENTING PDV HOLDING, INC., INTERVENOR
    CITGO PETROLEUM CORPORATION, AND PETROLEOS DE
 8  VENEZUELA, S.A.: (Continued)

 9  Daniel D. Birk, Esq.
    Hannah Bucher, Esq.
10  Nathan P. Eimer, Esq. (Remote)
    Mila Rusafova, Esq.
11  EIMER STAHL LLP
    224 South Michigan Avenue, Suite 1100
12  Chicago, IL 60604
    dbirk@eimerstahl.com
13  hbucher@eimerstahl.com
    neimer@eimerstahl.com
14  mrusafova@eimerstahl.com

15  ATTORNEYS REPRESENTING PETROLEOS DE VENEZUELA, S.A.:

16  Sara Lucia Dangon, Esq. (Remote)
    David Holmes, Esq. (Remote)
17  Juan O. Perla, Esq. (Remote)
    CURTIS MALLET-PREVOST COLT & MOSLE LLP
18  101 Park Avenue, New York, NY 10178
    sdangon@curtis.com
19  dholmes@curtis.com
    jperla@curtis.com
20
    ATTORNEY REPRESENTING PHILLIPS PETROLEUM COMPANY
21  VENEZUELA LIMITED CONOCOPHILLIPS PETROZUATA B.V.:

22  Amy R. Wolf, Esq. (Remote)
    WACHTELL LIPTON ROSEL & KATZ
23  51 West 52nd Street
    New York, NY 10019
24  ARWolf@wlrk.com

25
```



Case 1:17-mc-00151-LPS    Document 2300-2    Filed 09/14/25    Page 7 of 44 PageID #:
57638
JAMES B. HEATON, J.D., M.B.A., PH.D.                              August 01, 2025
Crystallex Int. vs Bolivarian Republic of Venezuela                              5

```
 1 │  ATTORNEYS REPRESENTING RED TREE INVESTMENTS LLC:
   │
 2 │  Lois S. Ahn, Esq. (Remote)
   │  Lauren F. Dayton, Esq.
 3 │  MOLOLAMKEN LLP
   │  300 N. LaSalle Street
 4 │  Chicago IL 60654
   │  lahn@mololamken.com
 5 │  ldayton@mololamken.com
   │
 6 │  ATTORNEYS REPRESENTING THE SPECIAL MASTER:
   │
 7 │  Chase Bentley, Esq. (Remote)
   │  Andrew Clarke, Esq. (Remote)
 8 │  Aaron J. Curtis, Esq. (Remote)
   │  Jared R. Friedman, Esq. (Remote)
 9 │  Charles Gehnrich, Esq. (Remote)
   │  WEIL GOTSHAL & MANGES LLP
10 │  767 Fifth Avenue
   │  New York, NY 10153-0119
11 │  chase.bentley@weil.com
   │  andrew.clarke@weil.com
12 │  aaron.curtis@weil.com
   │  jared.friedman@weil.com
13 │  charles.gehnrich@weil.com
   │
14 │  VIDEOGRAPHER:
   │
15 │  Gabriel Foster
   │
16 │  EXHIBIT TECHNICIAN:
   │
17 │  Bailey Diaz
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```



JAMES B. HEATON, J.D., M.B.A., PH.D.                          August 01, 2025
Crystallex Int. vs Bolivarian Republic of Venezuela                        6

1                    INDEX OF EXAMINATION

                                                        Page
2   JAMES B. HEATON, J.D., M.B.A., PH.D............    7

3   EXAMINATION.....................................    7

4     Questions by Ms. Katie G. Connolly

5   EXAMINATION.....................................   37

6     Questions by Ms. Hannah Bucher

7   EXAMINATION.....................................   55

8     Questions by Mr. Charles Gehnrich

9   EXAMINATION.....................................   65

10    Questions by Ms. Lauren F. Dayton

11

12                    EXHIBIT INDEX

13  Deposition Exhibit:                             Page

14  Exhibit 1    -  Expert Report of J.B. ........   37
                    Heaton, J.D., M.B.A., Ph.D.
15

16

17       STENOGRAPHER'S NOTE:  Please be advised that an
    UNCERTIFIED ROUGH DRAFT version of this transcript
18  exists.  If you are in possession of said rough
    draft, please replace it immediately with this
19  CERTIFIED FINAL TRANSCRIPT.
         Please note that due to the quality of a Zoom
20  videoconference and transmission of data,
    overspeaking can cause audio distortion which
21  disrupts the process of preparing a videoconference
    transcript.
22       All quotations from exhibits are reflected in
    the manner in which they were read into the record
23  and do not necessarily denote an exact quote from the
    document.
24       Quotation marks are used for clarity and do not
    necessarily reflect a direct quote.

25



```
 1              So right before the break, I was attempting
 2    to ask, at Footnote 6 of your report -- which I think
 3    if we scroll down to the next page, page 5, Bailey,
 4    and it should be at the bottom -- it says:
 5                   "If the Gold Reserve transaction does not
 6              close, it is" -- or "is blocked," excuse me --
 7              "it is possible a sale may nevertheless take
 8              place at some point in the future."
 9              Do you see that?
10    A.    I do.
11    Q.    Given that, if the Gold Reserve transaction
12    does not close, it is possible that the value at that
13    point would not be zero, correct?  There could be
14    another bid?
15              MS. DAYTON:  Objection, compound.
16    A.    Yeah.  I mean, I don't -- I haven't offered
17    any opinions on that.  But I think just as a matter
18    of logic, that follows, yes.
19    BY MS. CONNOLLY:
20    Q.    You have offered an opinion in that your
21    model assumes if the Gold Reserve bid does not close,
22    the value is zero, correct?
23              MS. DAYTON:  Objection.
24    A.    Again, no, because I'm not offering any
25    opinions on what the right outcomes are.  I'm simply
```



**EXHIBIT 8**

Page 343

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
2    -------------------------------------x
     CRYSTALLEX INTERNATIONAL CORP.,
3
4
              Plaintiff,              Case No.
5                                     1:17-mc-00151-LPS
6         vs.                              Vol. 2
7
     BOLIVARIAN REPUBLIC OF VENEZUELA,
8
              Defendant.
9    -------------------------------------x
10
11          VIDEOTAPED DEPOSITION OF WILLIAM O. HILTZ
12                   New York, New York
13               Thursday, September 4, 2025
14
15
16
17
18
19
20
21
22
23
24   Reported by:
     Frank J. Bas, RPR, CRR
25   Job No. MW 7572378

Page 344

1

2

3                    September 4, 2025

4                    9:13  a.m. EST

5

6          Continued Videotaped Deposition of WILLIAM O.

7    HILTZ, held at the offices of Weil, Gotshal & Manges,

8    767 Fifth Avenue, New York, New York, before Frank J.

9    Bas, a Registered Professional Reporter, Certified

10   Realtime Reporter, and Notary Public of the State of

11   New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 345
 1    A P P E A R A N C E S:
 2    (Some attendees appearing via videoconference):
 3
 4        GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Plaintiff Crystallex
 5            200 Park Avenue
              New York, New York 10166
 6
          BY: JASON MYATT, ESQ.
 7            jmyatt@gibsondunn.com
              MIGUEL ESTRADA, ESQ. (Via Zoom)
 8
 9        EIMER STAHL LLP
          Attorneys for Citgo and PDVH
10            224 South Michigan Avenue, Suite 1100
              Chicago, Illinois 60604
11
          BY: ALEC SOLOTOROVSKY, ESQ.
12            asolotorovsky@eimerstahl.com
              NATHAN EIMER, ESQ.(Via Zoom)
13            neimer@eimerstahl.com
14
          WEIL, GOTSHAL & MANGES LLP
15        Attorneys for Special Master
              767 Fifth Avenue
16            New York, New York 10153
17        BY: JARED R. FRIEDMANN, ESQ.
              AARON J. CURTIS, ESQ.
18            CHASE BENTLEY, ESQ.
              jared.friedmann@weil.com
19            aaron.curtis@weil.com
20
21
22
23
24
25
```

```
                                                    Page 346

 1    A P P E A R A N C E S:
 2
      FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
 3       Attorneys for Evercore
             7 Times Square
 4           New York, New York 10036
 5       BY: JASON C. RUBINSTEIN, ESQ.
             jrubinstein@fklaw.com
 6
 7    NORTON ROSE FULBRIGHT US LLP
         Attorneys for Gold Reserve, Inc.
 8           799 9th Street NW, Suite 1000
             Washington DC 20001
 9
         BY: MATTHEW H. KIRTLAND, ESQ.
10           matthew.kirtland@nortonrosefulbright.com
             KATHERINE G. CONNOLLY, ESQ. (Via Zoom)
11           katie.connolly@nortonrosefulbright.com
12           -and-
             NORTON ROSE FULBRIGHT US LLP
13           1301 Avenue of the Americas
             New York, New York 10019
14
         BY: MIKKAELA SALAMATIN, ESQ.
15           mikkaela.salamatin@nortonrosefulbright.com
16
         BROWN RUDNICK
17       Attorneys for Gold Reserve
             Seven Times Square, 47th Floor
18           New York, New York 10036
19       BY: MICHAEL J. BOWE, ESQ. (Via Zoom)
             mbowe@brownrudnick.com
20
21    MORGAN LEWIS & BOCKIUS LLP
         Attorneys for OI European Group B.V.
22           One State Street
             Hartford, CT 06103
23
         BY: DAVID SHIM, ESQ. (Via Zoom)
24           david.shim@morganlewis.com
25
```

Page 347

1    A P P E A R A N C E S:

2

3        MOLOLAMKEN LLP
         Attorneys for Red Tree Investments LLC
             430 Park Avenue
4            New York, New York 10022
5        BY: MARK KELLEY, ESQ. (Via Zoom)
             mkelley@mololamken.com

6

7        QUINN EMMANUEL URQUHART & SULLIVAN
         Attorneys for Amber Energy
8            295 Fifth Avenue, 9th Floor
             New York, New York 10016

9

         BY: EMMA MCCABE, ESQ.
10           MATTHEW SCHECK, ESQ. (Via Zoom)
             emmamccabe@quinnemanuel.com
11           matthewscheck@quinnemanuel.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 348

1   A P P E A R A N C E S:
2
        CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
3       Attorneys for Petroleos De Venezuela, S.A. (PDVSA)
            101 Park Avenue
4           New York, New York 10178
5       BY: JUAN O. PERLA, ESQ.
            jperla@curtis.com
6
7       MUNGER, TOLLES & OLSON LLP
        Attorneys for Bolivarian Republic of Venezuela
8           350 South Grand Avenue, 50th Floor
            Los Angeles, CA 90071
9
        BY: GEORGE M. GARVEY, ESQ. (Via Zoom)
10          george.garvey@mto.com
11
12  ALSO PRESENT VIA ZOOM:
13      BAILEY FINNESTAD (Concierge Tech)
        ALICE GYAMFI (DLA Piper)
14      JOSHUA BOLIAN (Riley & Jacobson, PLLC)
        MILA RUSAFOVA (Eimer Stahl LLP)
15      ROBERT PROFUSEK (Jones Day)
        ROBERT GROOT
16      SARA LUCIA DANGON (Curtis, Mallet-Prevost,
        Colt & Mosle LLP)
17      DAVID HOLMES (Curtis, Mallet-Prevost,
        Colt & Mosle LLP)
18      ZACH KADY (Gibson Dunn)
        PETE COOPER, Videographer
19
20
21                      - o0o -
22
23
24
25

Page 360

1              Do you see that, sir?

2        A.    Yes.

3        Q.    Is it correct that nothing has

4    changed with respect to the inability of the

5    Special Master to predict whether the PDVSA 2020

6    bondholders are likely to be successful?

7        A.    Nothing has changed with respect to

8    our ability, or the Special Master's ability to

9    predict that as we sit here today.  The one

10   element that has changed is it now appears that

11   there will be a ruling in the Southern District

12   of New York prior to the judge approving any

13   final bid, so that the judge will have perfect

14   knowledge with respect to the outcome of that

15   litigation at the time he approves or chooses to

16   reject whatever bid the Special Master supports.

17       Q.    So sitting here today the Special

18   Master's view, the exercise remains arbitrary at

19   best, as said on page 5 of 7?

20            MR. FRIEDMANN:  Object to form.

21   BY MR. KIRTLAND:

22       Q.    Is that right?

23       A.    It's arbitrary in both directions.

24   It's arbitrary to suggest that the 2020s will

25   prevail.  It's arbitrary to suggest that the

Page 361

1    2020s will not prevail.

2            It works both ways.  There's

3    uncertainty here and we don't believe there's a

4    way, as stated here, to mathematically quantify

5    that by making arbitrary judgments about

6    probabilities.

7        Q.    You said the Court will have perfect

8    knowledge when Judge Failla rules as to the

9    outcome of that litigation.

10           That's not correct, is it?  There's

11   any number of variations of a ruling that

12   wouldn't provide an outcome to that litigation,

13   right?

14           MR. FRIEDMANN:  Object to form.

15       A.    Perhaps "perfect knowledge" is the

16   wrong term.  He will have significantly greater

17   knowledge.  And yes, there are a number of

18   potential permutations as to what could come out

19   of that decision.  But he will clearly have far

20   more information to inform him than we have

21   today as we sit here.

22           KIRTLAND:  You can put that exhibit

23       to the side, sir.  I want to show you the

24       next exhibit which will be 37, which is tab

25       6.

Page 376

1    that stay.  They've said so publicly.  So it

2    creates the possibility of a one-way option in

3    our favor that captures the best of both worlds.

4    Protects us on the downside in the event the

5    2020s win, and potentially allows for increased

6    payments to creditors if the 2020s lose.

7         Q.    And this is all based on the

8    potential outcome of the 2020 SDNY litigation;

9    yes?

10        A.    Yes.

11        Q.    Which again in the Special Master's

12   view predicting it is arbitrary at best and it

13   cannot be predicted with any certainty, correct?

14        A.    That's correct.

15        Q.    Has Amber represented to the Special

16   Master, or has Elliot -- sorry, let me just take

17   a step back.

18             Amber Energy is a company created by

19   Elliott for the purpose of buying the PDVH

20   shares; yes?

21        A.    That's my understanding.

22        Q.    So has Amber or Elliott represented

23   to the Special Master or to his advisors that

24   they will in fact put in a higher priced bid in

25   the event the 2020s lose in the New York

Page 377

1    litigation?

2              MS. MCCABE:    Object to the form.

3         A.    No, they have not.    But if they're

4    prepared to pay a certain TEV for the company,

5    which includes payments to the 2020s in

6    settlement, and they no longer have to pay that

7    money in the settlement, there's no reason to

8    suppose that they wouldn't redirect a portion,

9    if not a significant portion of those funds to

10   additional judgment creditors absent some

11   gigantic change in market conditions or

12   something that would otherwise impact the value

13   of Citgo.

14        Q.    Did the Special Master ask

15   Amber/Elliott this question?

16        A.    No.  Not that I'm aware of.

17        Q.    Why not?

18        A.    I don't know why.

19        Q.    Why didn't the Special Master or his

20   advisors have Amber build this into their bid,

21   this possibility of an increased price based on

22   a future uncertain litigation event?

23        A.    We -- I suppose you could have.  But

24   we did not.

25        Q.    Would you agree that that would have

Page 411

1    cash flows that we were provided with.  But not

2    specifically isolating contingent liabilities,

3    no.  I haven't.

4         Q.    Are you aware, sir, that there are

5    several well established techniques for valuing,

6    putting a monetary value on contingent

7    litigation risk?

8         A.    Not particularly, no.

9         Q.    Do you have any familiarity with the

10   expected monetary value method of valuing

11   contingent litigation risk?

12        A.    I'm familiar with an expected value

13   calculation.  Not specifically as it relates to

14   litigation risk.

15        Q.    In any event the Special Master, nor

16   his advisors, did not conduct any expected

17   monetary value analysis of the 2020 bondholder

18   risk, right?

19        A.    Well, again we did not conduct an

20   analysis where we assigned specific

21   probabilities to individual outcomes to

22   determine, quote, an expected value.  What we

23   did do was to look at a series of scenarios and

24   looked very carefully at what the recoveries to

25   creditors would be under each of those

Page 412

1    scenarios.   So we did do an analysis.   It's just

2    not an expected value analysis.

3         Q.    And you didn't -- you're talking

4    about outcomes in the Delaware proceeding based

5    on potential outcomes in the New York

6    proceeding.   But what you didn't do was conduct

7    any methodological analysis of the 2020

8    litigation.   Because, as stated in the Special

9    Master's filing, it's arbitrary at best, and

10   little if any certainty can be put against it,

11   is that right?

12              MR. FRIEDMANN:   Object to form.

13        A.    We did not conduct an expected value

14   analysis where we assigned probabilities to

15   outcomes.   As I said before, we did do an

16   analysis that looked at the potential recoveries

17   to creditors under a series of different

18   scenarios without assigning probabilities to

19   those particular scenarios.

20        Q.    You are familiar with a Monte Carlo

21   simulation, Mr. Hiltz?

22        A.    It's been a long time since business

23   school, but yeah, I'm somewhat familiar.

24        Q.    The Special Master didn't perform a

25   Monte Carlo simulation to value the 2020

Page 413

1    litigation risk; correct?

2         A.    No.

3         Q.    Didn't conduct a sensitivity

4    analysis to value the 2020 litigation risk, is

5    that right?

6         A.    Well, I'm not sure what you mean by

7    sensitivity analysis.  As I said before, we

8    conducted an analysis where we looked at

9    recoveries to creditors under a series of

10   different potential outcomes.  That to me would

11   constitute a sensitivity analysis.

12        Q.    But you did not assign probabilities

13   to those outcomes?

14        A.    That's correct.

15        Q.    He just said well, if the 2020

16   litigation goes one way, then this might happen;

17   if the 2020 litigation goes this way, then that

18   might happen?

19             MR. FRIEDMANN:   Object to form.

20        A.    Correct.

21        Q.    You're familiar with U.S. GAAP

22   principles, Mr. Hiltz?

23        A.    I am not a certified public

24   accountant, but I have a general familiarity

25   with GAAP principles.

Page 414

1          Q.    You're familiar that under GAAP
2     contingent liabilities, litigation liabilities
3     can be assessed as probable, reasonably possible
4     or remote; are you familiar with that?
5          A.    Not in that degree of specificity,
6     no.
7          Q.    In any event, the Special Master
8     didn't itself or any of its advisors conduct a
9     GAAP analysis to determine whether the 2020
10    litigation risk was probable, reasonably
11    probable or remote, correct?
12               MR. FRIEDMANN:  Object to form.
13         A.    No, but I believe under GAAP it has
14    to be the -- the outcome has to be reasonably
15    estimatable as well.  So no.
16         Q.    In your view this outcome is not
17    reasonably estimatable, this is what we went
18    through before with Exhibit 36; yes?
19               MR. FRIEDMANN:  Object to form.
20         A.    I'm not sure what you are referring
21    to on Exhibit 36.
22         Q.    Where the Special Master says this
23    assessment would be arbitrary at best and little
24    if any certainty could be put against it?
25         A.    We --

Page 415

1              MR. FRIEDMANN:   Object to form.

2         A.    We think the assignment of

3    probabilities is subjective and not instructive

4    in this circumstance.

5         Q.    Let me take you to paragraph 35 of

6    your new declaration, which is Exhibit 34.

7         A.    I'm sorry, what paragraph?

8         Q.    Paragraph 35.

9         A.    Paragraph 35 of Exhibit 34.

10             MR. KIRTLAND:  Yes.

11             MR. FRIEDMANN:  I'm not sure there's

12        a paragraph 35.

13             MR. KIRTLAND:  I've got the wrong

14        exhibit number, sorry.  It is 35 of -- 35.

15        It's your new declaration, which is -- yeah

16        35.  Sorry.

17   BY MR. KIRTLAND:

18        Q.    Exhibit 35, your declaration in

19   supported of the updated final recommendation

20   and then para 35.  It starts with Amber

21   settlement.

22        A.    Yes, I'm reading it.

23        Q.    Yes, just read that.

24             (The witness complied.)

25             THE WITNESS:  Yes.

Page 417

1          Q.    The bid that's not approved by the
2    Court can't close; correct?
3          A.    I understand your point.  I'm trying
4    to draw a distinction between a risk inherent in
5    closing assuming bids are approved versus the
6    risk of approval.
7          Q.    So we're in agreement here on this
8    point so we can move on.  This is an
9    acknowledgment, at the end of 35, that if Judge
10   Failla rules against the 2020 bondholders, that
11   the Amber Energy bid may not be approved and
12   therefore by definition couldn't close?
13               MS. MCCABE:  Object to form.
14         A.    Well, if it's -- again, we're
15   distinguishing between approval versus closing.
16   If Amber Energy is approved, it will close.  If
17   it's not approved then closing isn't an issue.
18               I guess the other thing I would
19   point out is that in this set of circumstances,
20   where the 2020s lose for reasons that I
21   discussed before, we have the ability to re-bid
22   and we would expect that that rebidding will
23   produce higher recoveries to judgment creditors
24   as people like Amber who had directed 2.125
25   billion to the settlement of the 2020

Page 418

1    bondholders we believe are likely to redirect a

2    significant portion of those monies to

3    additional judgment creditors, which is why

4    again we believe that choosing the Amber bid

5    creates a very interesting option dynamic for

6    the judgment creditors, where their downside is

7    protected, and we preserve $895 million worth of

8    discount, if the 2020s prevail, and yet still

9    have the ability to get upside in the event that

10   the 2020s lose and the Court refuses to approve

11   the bid.

12           Q.    A bid that's not approved will not

13   close; yes?  Court approval is required as a

14   prerequisite to a closing in this transaction;

15   yes?

16           A.    Correct.

17           Q.    As well as there's other conditions,

18   like OFAC approval; yes?

19           A.    Yes.

20           Q.    Other regulatory approvals such as

21   we talked about earlier?

22           A.    Yes.

23           Q.    Okay.  So this possibility of the

24   2020s losing in New York is a risk to the Amber

25   Energy bid; correct?

Page 430

1          A.    And if the Court -- as a result of

2     that, if the Court fails to approve the Amber

3     bid, yes.

4          Q.    So the current Amber bid in this

5     scenario would go away, it wouldn't close, and a

6     new bidding process would start with the Court's

7     permission?

8          A.    Correct.

9          Q.    And so the Amber Energy bid as

10     approved in the updated recommendation doesn't

11     neutralize the risk of the 2020s; it simply

12     allows if that risk materializes against the

13     Amber Energy bid to have a restarted process?

14               MS. MCCABE:    Object to form.

15               MR. FRIEDMANN:    Object to form.

16          A.    That's correct.    Which we expect

17     would produce additional recovery to the

18     judgment creditors.

19          Q.    Do you have any view that the

20     additional recovery would be above the $7.9

21     billion price of the Dalinar approved bid?

22               MR. FRIEDMANN:    Object to form.

23          Q.    One way or another?

24          A.    I think that's difficult to say.

25          Q.    But you can't say -- you're not

Page 437

1          Q.    But you agree that if OFAC does not

2    change this policy and does not lift this

3    long-running suspension, that this threat to the

4    Gold Reserve/Dalinar financing coming from the

5    exercise of the pledge does not exist?

6                    MR. FRIEDMANN:   Object to form.

7          A.    Correct.

8          Q.    Given that even if the 2020s win in

9    New York, they still need to overcome the OFAC

10   suspension of the pledge rights, as you just

11   said, and given that they've represented to the

12   New York court they don't seek to enjoin the

13   Gold Reserve bid, is not the risk that you are

14   referring to with the Dalinar improved bid

15   arising from the 2020s litigation actually lower

16   than the risk presented in the Amber Energy bid

17   from Judge Failla ruling against the 2020s?

18                   MR. FRIEDMANN:   Object to form.

19         A.    I don't think you can handicap that

20   risk as being lower.   I mean again, if the 2020s

21   win and the Amber bid -- excuse me.   If the

22   2020s lose and the Amber bid is not approved by

23   the Court, again we don't view that as being a

24   bad thing.   We view that as offering the

25   potential to re-bid the company and obtain

Page 438

1    additional monies for the judgment creditors.
2    What we like about the Amber bid is that in the
3    event that the 2020s do win we've captured $895
4    million worth of discount.
5              So again in our view it's a one-way
6    option that is in our favor.  We protect our
7    downside in the event that the 2020s win by
8    capturing that discount and locking it in
9    instead of facing a $3 billion claim.  And in
10   the event that the 2020s lose, the Court may
11   decide not to approve the Amber bid which would
12   put us in a position to re-bid and we believe
13   get more money for the judgment creditors than
14   the base Amber bid.
15        Q.    Just to be clear this discount you
16   are referring to, this 800 million discount --
17        A.    895.
18        Q.    Did you do an independent analysis
19   of the Amber Energy -- sorry -- of the 2020
20   bondholder claims to verify these numbers?
21        A.    Yes.  I think we have -- I don't
22   know whether we did it or it was provided to us.
23   But my understanding is that the Amber Energy --
24   excuse me -- the 2020s claim, and I can't recall
25   which date this is as of, is $3.02 billion.

Page 441

1    that than what you've already said in your prior

2    answers?

3              MR. FRIEDMANN:  Object to form.

4        A.    Again, we believe that the Amber bid

5    represents the best mix of price and certainty

6    taken as a whole.

7        Q.    Even though the way you've put it,

8    there's an unanalyzed possibility, it's entirely

9    arbitrary, almost 50/50 like a coin flip that

10   they might lose in New York and the current

11   Amber Energy bid goes away?

12             MR. FRIEDMANN:  Objection; misstates

13        prior testimony.

14        A.    Again, if the 2020s lose and Judge

15   Stark determines that the Amber bid unduly

16   enriches the 2020 holders and rejects it on that

17   basis, we believe that there will be a re-bid

18   which will produce additional value to the

19   judgment creditors such that that $2 billion

20   difference is no longer going to be a $2 billion

21   difference.  And I'll repeat what I said

22   earlier.  If you make the assumption, and I'm

23   not sure that this will happen, but if you make

24   the assumption that Elliott is -- Amber is

25   prepared to pay the same TEV for the company

Page 442

1   that they are paying today and allocate all of

2   the amounts that they are currently paying to

3   the 2020s to the additional judgment creditors,

4   their bid will exceed the Dalinar bid.

5          Q.    Were you involved in the prior

6   Amber/Elliott bid from 2024?  Were you

7   performing the same function, Mr. Hiltz?

8          A.    Yes.

9          Q.    Were you in support of that bid that

10  was recommended by the Special Master in

11  September of 2024?

12         A.    Is that the bid with the escrow

13  arrangements?

14         Q.    Yes, sir.

15               MR. FRIEDMANN:  Object to form.

16         A.    Again, we thought it was the best

17  available bid at that time.  But obviously there

18  were sales process parties that did not like

19  that structure.

20         Q.    Would you agree with my

21  characterization that almost every attached

22  judgment creditor including the lead sales

23  process parties, Crystallex and Conoco, objected

24  to the Special Master's recommendation?

25               MS. MCCABE:  Object to form.

**EXHIBIT 9**

CONFIDENTIAL

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3      -----------------------------------x

4      CRYSTALLEX INTERNATIONAL CORP.,

5                Plaintiff,              Case No.

6            vs.                        1:17-mc-00151-LPS

7      BOLIVARIAN REPUBLIC OF VENEZUELA,

8                Defendant.

9      -----------------------------------x

10

11                  *** CONFIDENTIAL ***

12

13            VIDEOTAPED 30(b)(1) and 30(b)(6)

14              DEPOSITION OF MICHAEL TURKEL

15      Individually and as Corporate Representative of

16              ELLIOTT INVESTMENT MANAGEMENT L.P.

17                  New York, New York

18              Tuesday, September 9, 2025

19

20

21      Reported by:

22      Frank J. Bas, RPR, CRR

23      Job No. 7586641

24

25      PAGES 1 - 328

                                          Page 1

CONFIDENTIAL

```
 1
 2                    September 9, 2025
 3                    11:43 a.m. EDT
 4
 5          Videotaped Deposition of MICHAEL TURKEL,
 6    held at the offices of Quinn Emanuel Urquhart &
 7    Sullivan LLP, 295 Fifth Avenue, New York, New York,
 8    before Frank J. Bas, a Registered Professional
 9    Reporter, Certified Realtime Reporter, and Notary
10    Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                                              Page  2

CONFIDENTIAL

```
 1    A P P E A R A N C E S:
 2    (Some attendees appearing via videoconference):
 3
 4       GIBSON, DUNN & CRUTCHER LLP
         Attorneys for Plaintiff Crystallex
 5            1700 M Street, N.W.
              Washington, DC 20036-4504
 6       BY:  MIGUEL ESTRADA, ESQ. (Via Zoom)
 7            mestrada@gibsondunn.com
 8               -and-
 9       GIBSON DUNN & CRUTCHER LLP
              200 Park Avenue
10            New York, New York 10166
11       BY:  JASON MYATT, ESQ.  (Via Zoom)
              ZACHARY A. KADY, ESQ.  (Via Zoom)
12            jmyatt@gibsondunn.com
              zkady@gibsondunn.com
13
14       EIMER STAHL LLP
15       Attorneys for Citgo and PDVH
              224 South Michigan Avenue, Suite 1100
16            Chicago, Illinois 60604
17       BY:  NATHAN EIMER, ESQ.(Via Zoom)
              neimer@eimerstahl.com
18
19       WEIL, GOTSHAL & MANGES LLP
20       Attorneys for Special Master
              767 Fifth Avenue
21            New York, New York 10153
22       BY:  JARED R. FRIEDMANN, ESQ.
              CHASE BENTLEY, ESQ.  (Via Zoom)
23            MOLLY NEWCOMB, ESQ.  (Via Zoom)
              jared.friedmann@weil.com
24            chase.bentley@weil.com
25            molly.newcomb@weil.com
```

Page  3

CONFIDENTIAL

```
 1     A P P E A R A N C E S (Continued):

 2

 3        NORTON ROSE FULBRIGHT US LLP
 4        Attorneys for Gold Reserve, Inc.
               799 9th Street NW, Suite 1000
 5             Washington DC 20001
 6        BY:  MATTHEW H. KIRTLAND, ESQ.
               matthew.kirtland@nortonrosefulbright.com

 7
               -and-

 8

          NORTON ROSE FULBRIGHT US LLP
 9             1301 Avenue of the Americas
               New York, New York 10019

10

          BY:  MIKKAELA SALAMATIN, ESQ.
11             mikkaela.salamatin@nortonrosefulbright.com

12

13        BROWN RUDNICK
14        Attorneys for Gold Reserve
               Seven Times Square, 47th Floor
15             New York, New York 10036
16        BY:  MICHAEL J. BOWE, ESQ. (Via Zoom)
17             mbowe@brownrudnick.com

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

```
 1     A P P E A R A N C E S (Continued):
 2
 3        MORGAN LEWIS & BOCKIUS LLP
          Attorneys for OI European Group B.V.
 4            One State Street
              Hartford, CT 06103
 5
          BY:  DAVID SHIM, ESQ. (Via Zoom)
 6             CELINE DESANTIS, ESQ.  (Via Zoom)
               david.shim@morganlewis.com
 7             celine.desantis@morganlewis.com
 8
 9        MOLOLAMKEN LLP
          Attorneys for Red Tree Investments LLC
10            430 Park Avenue
              New York, New York 10022
11
          BY:  PRATIK RAJ GHOSH, ESQ. (Via Zoom)
12             prajghosh@mololamken.com
13
14        QUINN EMMANUEL URQUHART & SULLIVAN
          Attorneys for Amber Energy, Elliott Management
15        and the Witness
              295 Fifth Avenue, 9th Floor
16            New York, New York 10016
17        BY:  ANDREW ROSSMAN, ESQ.
               EMMA MCCABE, ESQ.
18             andrewrossman@quinnemanuel.com
               emmamccabe@quinnnemanuel.com
19
20
21        CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
          Attorneys for Petroleos de Venezuela, S.A. (PDVSA)
22            101 Park Avenue
              New York, New York 10178
23
          BY:  JUAN O. PERLA, ESQ.
24             jperla@curtis.com
               SARA LUCÍA DANGÓN-NOVOA, ESQ.
25             sdangon@curtis.com
```

Page 5

CONFIDENTIAL

```
 1    A P P E A R A N C E S (Continued):

 2

 3       MUNGER, TOLLES & OLSON LLP
         Attorneys for Bolivarian Republic of Venezuela
 4            350 South Grand Avenue, 50th Floor
              Los Angeles, CA 90071

 5

         BY:  GEORGE M. GARVEY, ESQ. (Via Zoom)
 6            george.garvey@mto.com

 7

 8       WACHTELL, LIPTON, ROSEN & KATZ
         Attorneys for ConocoPhillips
 9            51 West 52nd Street
              New York, New York 10019

10

         BY:  AMY R. WOLF, ESQ.  (Via Zoom)
11            ARwolf@wlrk.com

12

13    ALSO PRESENT VIA ZOOM:

14       MIGUEL LOPEZ

15       ALICE GYAMFI (DLA Piper)

16       JARED HAGLER (Riley & Jacobson, PLLC)

17       NATE EIMER (Eimer Stahl LLP)

18       MILA RUSAFOVA (Eimer Stahl LLP)

19       ROBERT PROFUSEK (Jones Day)

20       MIRANDA SWIFT (Stinson)

21       NICK HOUPT  (Akin Gump)

22       JEFFREY RECHER (Paul Weiss)

23       RICHARD ZABEL  (Elliott Management)

24       MATTHEW RIESDORPH (Concierge Tech)

25       PHIL GLAUBERSON, Videographer
```

                                              Page 6

CONFIDENTIAL

1    something that was discussed during the

2    negotiations on which there was back-and-forth

3    with one party requesting it and perhaps one

4    party opposing it and then consensus as to the

5    standard for this consent, or was it simply

6    accepted by one of the -- proposed and accepted?

7               MR. ROSSMAN:  You can testify

8          regarding the negotiations.  Just remove

9          from your answer any internal discussion.

10         If you're aware.

11         A.    So without discussing internal

12    discussions, with respect to, you know, the

13    back-and-forth with the third party, I believe

14    that reasonableness qualifiers at certain points

15    in the negotiations were, you know, added by one

16    party or suggested by one party, which would

17    have been us, with respect to a term like this,

18    and were struck by the other party.  You know,

19    that -- that would have been in some

20    back-and-forth.

21              I cannot recall whether this

22    particular reasonableness qualifier was the

23    subject of what I just described.

24         Q.    Do you agree with me that "in their

25    reasonable discretion" is a relatively lenient

Page 81

1          Other than that, you know, I -- that

2     is my recollection with respect to "reasonably

3     acceptable."

4          Q.    What do you recall about the

5     back-and-forth on the reasonable efforts or

6     reasonably accepted clauses of the TSA

7     generally?

8          A.    I generally recall that -- and it's

9     a little bit clearer with respect to the prior

10    one, which would have only qualified the -- the

11    noteholders' consent right, i.e. from the Amber

12    perspective we would want to have been able to

13    compel them to be reasonable.

14          But I generally recall that we did

15    want a reasonableness qualifier for most of

16    those consent rights and ultimately achieved

17    such a qualifier.

18          Q.    Skipping down to the definitive

19    documents 2.2(b) where there's the caveat that

20    the execution of the definitive documents is

21    subject to the consenting 2020 noteholder

22    consent right.

23          A.    Mm-hmm.

24          Q.    Right?  And we talked about that

25    earlier, and we looked at it.  That's the one

                                          Page 98

CONFIDENTIAL

```
 1    discretion."
 2              So the consent right is their
 3    ability -- their -- exactly what it says on the
 4    page.  It's a requirement for the required
 5    consenting 2020 noteholders to approve the
 6    definitive documents in their reasonable
 7    discretion.
 8         Q.   Right.  And so my question, with
 9    that background, is:  Did Elliott want a
10    stricter limit on the 2020 -- the consenting
11    2020 noteholders' consent right, a higher
12    threshold than reasonable discretion?
13              MR. ROSSMAN:  Objection to the
14         extent the question seeks internal
15         conversations.
16              But you can answer based on
17         conversations with the 2020s or their
18         counsel.
19         A.   Would you mind repeating the
20    question?  I'm just trying to make sure I'm
21    following exactly, especially with respect to
22    how it's used in this clause here.
23         Q.   Sure.  In the back-and-forth on the
24    TSA when it was being negotiated between Elliott
25    on one hand and the as yet unidentified initial
```

Page 101

**EXHIBIT 10**

# FILED UNDER SEAL

**<u>EXHIBIT 11</u>**


# FILED UNDER SEAL