IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Misc. No. 17-151-LPS |
| ) | |
| BOLIVARIAN REPUBLIC OF ) | |
| VENEZUELA, ) | |
| ) | |
| Defendant. ) | |

**SPECIAL MASTER'S RESPONSE
TO EMERGENCY REQUEST TO POSTPONE THE SALE HEARING**

Robert B. Pincus, in his capacity as Special Master in this case (the "**Special Master**"),[1] respectfully submits this response to the "emergency request by Gold Reserve to postpone the Sale Hearing." D.I. 2286 at 1.[2] While the Special Master takes any attack on his (or, as here, his Advisors') impartiality extremely seriously, Gold Reserve's concerns are entirely without merit and appear to be nothing more than a pretextual effort to postpone a hearing to consider approval of a recommended bid other than its own. The Court rightly ruled that the hearing should proceed as scheduled. D.I. 2289. There is no reason to allow Gold Reserve's baseless accusations to frustrate the culmination of a sale process that has been undertaken with great care, participation by judgment creditors, the Venezuela Parties, and their respective advisors, and complete impartiality to arrive at a recommendation to the Court that provides the maximum benefit to the holders of Attached Judgments.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in D.I. 481 (the "**Sale Procedures Order**") or D.I. 2123 (the "**Updated Final Recommendation**").

[2] The Venezuela Parties joined in Gold Reserve's request. D.I. 2287.

1

There is no merit to Gold Reserve's contentions about the alleged impartiality of the Special Master's Advisors. To be clear: Weil, Gotshal, & Manges LLP's ("**Weil**") work for Elliott Investment Management L.P. ("**Elliott**") amounts to less than $200,000 in billings during the requested period (January 1, 2021 to the present) in matters entirely unrelated to this one. The total amount paid by Elliott across the two relevant matters amounts to less than one hundredth of one percent of Weil's annual revenue. The remainder of the amounts cited by Gold Reserve reflect work performed by attorneys in Europe for different affiliates of Elliott that, to Weil's knowledge, are not directly related to Amber. But even including those relatively modest fees, the amount paid by Elliott and its affiliates during the requested period (approximately five years) in *aggregate* across all such matters is about two-tenths of one percent of Weil's *annual* revenue. These small amounts fall far below any reasonable threshold to suggest that the Special Master's Advisors have any "interest that could be substantially affected by the outcome of th[is] proceeding." 28 U.S.C. 455(b)(5)(iii).[3] And with respect to Evercore, Gold Reserve concedes that Evercore did not work directly for Elliott at all.[4] These engagements are nothing more than a reflection of the nature of modern law practice and the complexity and scale of this judicial sale that do nothing to call the Special Master's impartiality into question.

The Special Master and his Advisors, moreover, have treated Amber and Elliott like any

---

[3] Gold Reserve's suggestion that Weil "only took on these new engagements for Elliott while the Sale Process was ongoing and Elliott was an active bidder," D.I. 2286 at 1, mischaracterizes the relevant timeline, as Weil's work with Elliott began within this window as early as 2023, before Elliott became an active bidder in this process in 2024. Further, Weil was engaged by Elliott and its affiliates on various matters dating back to 1990, long prior to Weil's engagement by the Special Master in connection with this sale process. Despite a decades-long history of engagements from Elliott and its affiliates, Weil only received a total of $7.665 million in fees before January 1, 2021– an amount as immaterial as the amounts collected since 2021.

[4] Gold Reserve notes only that Evercore acted as investment banker for ad hoc groups that included Elliott and one PDVSA 2020 Bondholder, without alleging anything about those parties' roles in those ad hoc groups or their direct relationships with Evercore.

other bidder in this sale process. As the Court is aware, the Special Master has, at times, recommended bids by Elliott and has, at times, rejected them (for example, at the Stalking Horse and Topping Period stages). Indeed, the Special Master previously recommended a bid supported by Gold Reserve, who now complains that the Special Master's Advisors' impartiality somehow tainted the entire process. That the Special Master ultimately recommended a bid by Elliott seems to be the genuine basis for Gold Reserve's newfound concern. That is no basis for recusal. *See In re Coulter*, 773 Fed. App'x. 110, 111 (3d Cir. 2019) ("[W]e have repeatedly held that mere dissatisfaction with rulings does not warrant recusal.").

The timing of Gold Reserve's request only confirms that it is meritless and, apparently, pretextual. As it acknowledges in its letter, Gold Reserve has had actual knowledge for nearly six months that Weil represented Elliott in another matter. *See* D.I. 2286 at 2 (acknowledging that "[o]n March 24, 2025," Weil provided a disclosure identifying an "engagement by Weil for Elliott"). To the extent that Gold Reserve believes that any work by Weil for Elliott tainted the sale process—and, according to Gold Reserve, "materiality is not the relevant standard" and any work by the Special Master's Advisors for Elliott taints the process, *id.* at 3—it should have raised its concerns when it first learned of Weil's other representation of Elliott six months ago, rather than waiting until the eve of the Sale Hearing.

This timing alone is reason to reject Gold Reserve's "emergency" request out of hand. As one of the cases Gold Reserve cites makes clear, "parties seeking disqualification under § 455(a) should do so in a timely manner." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3d Cir. 2004). This is because "[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Id.*

3

(quoting *Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1978)). This describes Gold Reserve's behavior exactly. Gold Reserve's newfound, alleged concern for partiality should not be rewarded.

Gold Reserve tries to mask its change-of-heart by arguing that it was the "New Information" disclosed in the past week that raised this issue and that these recent disclosures contradict the Special Master's Advisors' prior disclosures. D.I. 2286 at 2–3. Not so. *First*, the prior disclosures made on March 24, 2025, responded to a narrower discovery request, which sought only work performed for any "bidder" in the sale process. *Id.* at 2. The recent disclosures were made in response to the Court's order at the September 10, 2025 status conference after the Special Master volunteered to produce a broader set of information, including work performed for any *affiliate* of any bidder in the sale process over a longer period of time.[5] In short, the disclosures provided information responsive to overlapping, but substantively different, requests. *Second*, and relatedly, the "New Information"—which primarily involves work performed in Europe for affiliates of Elliott that are not directly related to Amber—does not create any appearance of impropriety at all.

In any event, Gold Reserve's accusations are one step removed from any potential impartiality or appearance thereof in this Court's sale process. Gold Reserve challenges the partiality only of the Special Master's *Advisors*, not the Special Master himself. D.I. 2286 at 2. The Special Master's Advisors *advise* the Special Master; they do not control his decision-making. Gold Reserve fails to articulate any reasonable basis by which an alleged conflict affecting only

---

[5] As counsel to the Special Master indicated at the September 10 status conference, it could not overturn every stone to come up with an exhaustive list of every affiliate of every bidder, but would ensure that its subsequent disclosure included any entities tagged as such affiliates within Weil's own engagements database—and the September 12 disclosure did just that. While collecting information responsive to the Court's September 10, 2025 order, Weil discovered that, when responding to the prior discovery request, it inadvertently omitted a small (*i.e.*, less than $35,000) two-month engagement that it handled for Elliott in 2023.

4

the Special Master's Advisors should be imputed to the Special Master himself, and there is no reason to think that the Special Master himself stands to gain anything from his Advisors' alleged conflicts, which (as explained above) are not real and motivated by self-interest of the complaining parties.

Further mitigating any potential concerns, there is reason to question whether the requirements governing impartiality for members of the judiciary should even apply to the Special Master himself in this proceeding, as the Special Master's role is to assist the Court in implementing a judicial sale by *recommending* a potential transaction that the Court may itself approve or reject. *See* D.I. 443 at 7 ("While the Special Master is subject to 28 U.S.C. § 455, the parties have not directed the Court to any cases applying the statute to a special master who has been tasked with implementing a judicial sale to satisfy a judgment. Nor has the Court found any such case."). Gold Reserve nowhere suggests that the Court's partiality is impacted by this alleged conflict affecting the Court's advisor's advisors.

Moreover, as the Court has previously recognized, "[t]he Court's procedures provide additional protections against purported conflicts or misguided incentives tainting the sale process." D.I. 443 at 8–9; *see id.* ("Those procedures include both those that the Court has followed to date, such as extensive briefing and argument on the Sale Process Parties' objection to the Proposed [Sale Procedures] Order, and those the Court will follow during a similar period of objections and argument after the bidding process has concluded and the Special Master has made whatever recommendation he will make regarding which bid (if any) the Court should accept."). The Sale Hearing represents the culmination of this process. It is a week-long hearing in open court during which the Court will hear all relevant evidence to ensure that the transaction the Special Master has recommended is the best available transaction for the benefit of the holders of Attached

5

Judgments. Parties (including Gold Reserve) will have ample opportunity to present evidence and argument to facilitate the Court's decision—including argument about any alleged conflicts of interest that it claims may have impacted the sale process, *see* D.I. 2289. In light of the fair and transparent process the Court has conducted to date and will continue to conduct through the Sale Hearing—perhaps the most robust process ever undertaken in a judicial sale—there can be no basis for "a reasonable person, with knowledge of all the facts, [to] conclude that the [Court's or Special Master's] impartiality might reasonably be questioned" due to an alleged conflict-of-interest impacting the Special Master's Advisors. *In re Kensington Int'l*, 368 F.3d at 301. Further, the Special Master consulted extensively with interested parties—including both judgment creditors and the Venezuela Parties—in implementing the sale process and marketing the PDVH Shares, holding weekly meetings with the Sale Process Parties for years and seeking their input on virtually all material decisions in the sale process, including (among other subjects) the structure of the sale process, the choice of potential bidders to reach out to, the deliberation of received bids, and the choice of what bid to ultimately select.

For these reasons, there is no reasonable basis to question the impartiality of the Special Master's Advisors in this process, much less that of the Special Master himself, still less that of the Court.[6] Respectfully, the objections of Gold Reserve and the Venezuela Parties appear to be nothing more than an effort to delay and obstruct the conclusion of an impartial sale process because they are dissatisfied with its outcome.

---

[6] The Special Master acknowledges Gold Reserve's "Requests for Additional Information," D.I. 2286, but believes no additional information is needed for the Court to resolve this issue and that efforts to produce additional information at this late date (which could potentially involve securing consent from third-party clients of the Special Master's Advisors) would distract from the more critical work of preparing for the Sale Hearing. The Special Master, however, stands ready to provide any additional information that the Court believes would be useful.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

| OF COUNSEL: | By: */s/ Myron T. Steele* |
|---|---|
| | Myron T. Steele (#0002) |
| Matthew S. Barr (Admitted *pro hac vice*) | Matthew F. Davis (#4696) |
| David Lender (Admitted *pro hac vice*) | Bindu A. Palapura (#5370) |
| Jared R. Friedmann (Admitted *pro hac vice*) | Malisa C. Dang (#7187) |
| Chase A. Bentley (Admitted *pro hac vice*) | Hercules Plaza, 6th Floor |
| WEIL, GOTSHAL & MANGES LLP | 1313 North Market Street |
| 767 Fifth Avenue | P.O. Box 951 |
| New York, New York 10153 | Wilmington, DE 19801 |
| Telephone: (212) 310-8000 | Telephone: (302) 984-6000 |
| Facsimile: (212) 310-8007 | Facsimile: (302) 658-1192 |
| Matt.Barr@weil.com | msteele@potteranderson.com |
| David.Lender@weil.com | mdavis@potteranderson.com |
| Jared.Friedmann@weil.com | bpalapura@potteranderson.com |
| Chase.Bentley@weil.com | mdang@potteranderson.com |
| | |
| Dated: September 14, 2025 | *Counsel for Special Master Robert B. Pincus* |
| 12461245/21202.00001 | |