UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP.,<br><br>    Plaintiff,<br><br>    v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>    Defendants. | Misc. No. 17-151-LPS |

**2020 BONDHOLDERS' POST-SALE HEARING OPENING BRIEF**

An ad hoc group of holders of a majority of PDVSA 2020 Bonds (the "2020 Bondholders") submits this Opening Brief following the September 15–18, 2025 Sale Hearing.

The Southern District of New York has now affirmed that the 2020 Bondholders are secured creditors of PDVSA and PDVH. *Petróleos de Venezuela, S.A.* v. *MUFG Union Bank, N.A.* ("*MUFG*"), 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025). They have a structurally senior (and pre-existing) security interest over 50.1% of the shares of CITGO Holding—the entity which bidders in this case are effectively seeking to purchase and control. *Id.* at *1. Those 50.1% of CITGO Holding's shares are held in a vault in New York by the Collateral Agent for the 2020 Bonds. *Id.* at *3. Given PDVSA's default, the Collateral Agent is entitled to act as the outright owner of the shares and direct how they are voted.[1] RT-63 (Pledge Agreement) § 2.05(d).

As Mr. Hiltz testified at the Sale Hearing, bidders could have proposed transactions that could close notwithstanding the 2020 Bondholders' security interest, including paying cash for the PDVH shares, financing a purchase against the PDVH shares (rather than shares of CITGO Holding or CITGO Petroleum), or settling with the 2020 Bondholders. Sale Hearing Tr. at 592:22–593:9, 609:23–610:8. Amber Energy chose the latter. Its bid can close because of its settlement with the 2020 Bondholders, who have agreed to a nearly $900 million discount on their roughly $3 billion secured claim—a discount that benefits unsecured creditors in this sale process by providing recoveries they would not otherwise receive. AM-DX-001.

Gold Reserve, in contrast, deliberately chose a transaction structure that would raise secured financing against the assets of CITGO Holding and CITGO Petroleum—which form the basis of the 2020 Bondholders' collateral. Gold Reserve effectively proposed that its acquisition

---

[1] The Collateral Agent's rights, duties, and protections with respect to the exercise of remedies at the direction or instruction of the 2020 Bondholders and the Trustee are subject to the terms of the Indenture and Pledge Agreement.

1

vehicle (Adolin) raise secured debt, and then merge with CITGO Petroleum to burden CITGO Petroleum with that debt. That transaction faces the basic problem (among others) that even if it purchases the PDVH Shares, Gold Reserve still cannot control CITGO Holding (or, therefore, CITGO Petroleum), given the 2020 Bondholders' security interest in and control over CITGO Holding. Gold Reserve therefore cannot merge CITGO Petroleum with Adolin any more than it could force any other corporation that it does not control to merge with Adolin and become liable for Adolin's debt.[2]

Indeed, Section 251 of Delaware's General Corporation Law (the "DGCL") requires mergers to be approved by both a company's board of directors and a majority of its outstanding voting stock. 8 *Del. C.* § 251(b)-(c). Thus, a merger between Adolin and CITGO Petroleum would require the approval of both CITGO Petroleum's board of directors and its sole shareholder, CITGO Holding. And Gold Reserve cannot assume control over CITGO Holding—even if it owned the PDVH Shares—because the 2020 Bondholders control 50.1% of CITGO Holding's shares. Despite numerous parties identifying this basic problem in their pre-trial briefs,[3] Gold Reserve failed to present any evidence to the contrary. Remarkably, Gold Reserve's principal,

---

[2] Contrary to Gold Reserve's claims, OFAC sanctions do not prohibit the 2020 Bondholders from exercising their voting rights under the Pledge Agreement. RT-51 (OFAC FAQ 1124, stating OFAC "will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PdVSA 2020 8.5 percent bond"). Moreover, as Mr. Hiltz rightly testified, there is no legitimate basis to believe that OFAC would license a change in control of PDVH to Gold Reserve while restricting the 2020 Bondholders from preserving their own rights. Sale Hearing Tr. at 696:24– 697:9; *see also* RT-50 (OFAC FAQ 1123, stating "OFAC is committed to fair and equivalent treatment of potential creditors").

[3] ACL's Response to Objections to Special Master's Updated Final Recommendation, D.I. 2263 at 2; 2020 Bondholders' Response to Gold Reserve's Objections to Special Master's Updated Final Recommendation, D.I. 2264 at 12–13; ConocoPhillips' Response to Objections to Final Recommendation, D.I. 2265 at 4; Crystallex International Corporation's Response to Objections to Special Master's Updated Final Recommendation, D.I. 2266 at 2, 12; Special Master's Response to Objections to Updated Final Recommendation, D.I. 2273 at 4–5.

2

Paul Rivett, testified that he was not even aware that a merger of CITGO Petroleum required the consent of its shareholder. Sale Hearing Tr. at 1088:19–1089:2. Even beyond Gold Reserve's basic inability to vote the PDVH Shares, no reasonable director could approve the type of transaction proposed by Gold Reserve—a transaction in which billions of dollars of debt would be incurred by CITGO Petroleum for no corporate benefit whatsoever, as the proceeds would be siphoned to the creditors of other entities. Approving such a transaction would impose significant risk of liability for fraudulent transfers, illegal dividends, and similar causes of action.

Instead, the path Gold Reserve identified to try to force the CITGO entities that it does not control to finance its bid is to have the Court order them to do so. It should surprise nobody that the Court lacks that authority. Section 324 of the DGCL, under which this sale is being conducted, empowers courts to oversee a public sale of shares of a corporation "as fully as if" the defendant "had transferred the same to such purchaser." 8 *Del. C.* § 324(c). It does not give the Court special powers over the assets of the corporation being sold, much less empower the Court to order parties not before the Court to finance such a sale. And this Court has previously recognized that it does not control the CITGO entities: because "the subject of the litigation here is the PDVH Shares," the Court only "exercises control over those shares, which evidence ultimate ownership of the assets owned or controlled by PDVH, but this Court does not exercise control over those assets themselves." D.I. 1515 at 9. Accordingly, Gold Reserve's proposal that the Court enter a sale order directing CITGO Holding and CITGO Petroleum to cooperate with the financing of Gold Reserve's bid is a non-starter. Gold Reserve's proposed sale order also contains numerous other lawless provisions that Gold Reserve cannot defend, such as provisions Gold Reserve apparently

3

intended to use to try to prevent the 2020 Bondholders from even challenging a violation of their rights. *See, e.g.*, D.I. 2135-5 Recital M, ¶¶ 6, 13, 19, 24.[4]

The Amber Energy Bid avoids these basic problems given it delivers a settlement under which the 2020 Bondholders would release their collateral, and provides substantial recoveries to the Attached Judgment Creditors. The Court should approve that bid.

---

[4] The 2020 Bondholders understand that Gold Reserve's proposed sale order is not presently at issue, given that the parties are briefing whether the Amber Energy Bid should be approved. D.I. 2333; D.I. 2348 ¶ 5. Indeed, the Special Master has made clear that, if the Amber Energy Bid is not approved, he would recommend soliciting additional offers rather than proceeding with Gold Reserve's bid (even assuming Gold Reserve's bid still exists). Sale Hearing Tr. at 587:6-10. Gold Reserve has not yet presented any evidence, following the termination of its SPA, that its bid is even still viable at all, nor has it presented any evidence about the status of its arrangements with its financing partners and consortium partners. However, the 2020 Bondholders have previously discussed Gold Reserve's problematic sale order in detail. *See, e.g.*, D.I. 1943 at 11–22; D.I. 2033 at 3–14; D.I. 2264 at 13–15.

Dated: Wilmington, Delaware
October 8, 2025

Respectfully submitted,

| | |
|---|---|
| /s/ Daniel A. Mason | OF COUNSEL: |
| Daniel A. Mason (#5206) | |
| PAUL, WEISS, RIFKIND, | Andrew N. Rosenberg |
|    WHARTON & GARRISON LLP | Jeffrey J. Recher |
| 1313 North Market St., Suite 806 | Paul A. Paterson |
| Wilmington, DE 19801 | Tyler B. Myers |
| Telephone: 302-655-4410 | PAUL, WEISS, RIFKIND, |
| Facsimile: 302-655-4420 |    WHARTON & GARRISON LLP |
| Email: dmason@paulweiss.com | 1285 Avenue of the Americas |
| | New York, New York 10019-6064 |
| *Counsel for the 2020 Bondholders* | Telephone: 212-373-3000 |
| | Facsimile: 212-757-3990 |
| | Email: arosenberg@paulweiss.com |
| | Email: jrecher@paulweiss.com |
| | Email: ppaterson@paulweiss.com |
| | Email: tmyers@paulweiss.com |