IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

               Plaintiff,

     v.

BOLIVARIAN REPUBLIC
OF VENEZUELA,

               Defendant.

C.A. No. 17-mc-151-LPS

## CRYSTALLEX INTERNATIONAL CORPORATION'S
## POST-HEARING OPENING BRIEF

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Dated:  October 8, 2025

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL FRAMEWORK ...................................................................................................... 4

ARGUMENT ............................................................................................................................ 7

    I.    The Court's Robust and Competitive Sale Process Complied With Delaware Law ...................................................................................................... 7

        A.    The Venezuela Parties Were On Notice Of And Participated In The Sale Process ................................................................................................ 7

        B.    The Sale Process Was Widely Publicized And Well-Noticed .................. 8

        C.    The Sale Process Created Competition To Maximize Value For The PDVH Shares, Given The Circumstances Of This Forced Sale ....... 10

        D.    There Is No Merit To The Venezuela Parties' Critiques Of This Court's Sale Process ..................................................................................... 16

    II.    The Amber Bid Will Extinguish $5.892 Billion Of Attached Judgments And Is The Best Bid For The PDVH Shares ........................................................ 24

        A.    The Amber Bid Is the Highest And Best Bid ......................................... 25

        B.    The Dalinar Bid Is Not A Viable Alternative To The Amber Bid ........... 26

CONCLUSION ...................................................................................................................... 30

i

# TABLE OF AUTHORITIES

## Cases

*Burge v. Fidelity Bond & Mortg. Co.*,
  648 A.2d 414 (Del. 1994) ...................................................................................21

*Cent. Tr. & Sav. Co. v. Chester Cnty. Elec. Co.*,
  77 A. 771 (Del. Ch. 1910) ....................................................................................5

*Deibler v. Atl. Props. Grp., Inc.*,
  652 A.2d 553 (Del. 1995) ................................................................4, 10, 18, 26

*Dell v. Magnetar Glob. Master Fund*,
  177 A.3d 1 (Del. 2017) .......................................................................................19

*DFC Glob. Corp. v. Muirfield Value Partners*,
  172 A.3d 346 (Del. 2017) .............................................................................19, 20

*In re Family Christian, LLC*,
  533 B.R. 600 (Bankr. W.D. Mich. 2015)..............................................................6

*Girard Tr. Bank v. Castle Apartments, Inc.*,
  379 A.2d 1144 (Del. Super. Ct. 1977) .................................................................5

*Greenpoint Mortg. Funding, Inc. v. McCabe*,
  2006 WL 3604784 (Del. Super. Ct. Nov. 27, 2006)............................................4

*In re Halpern*,
  229 B.R. 67 (Bankr. E.D.N.Y. 1999)...................................................................6

*HBK Master Fund L.P. v. Pivotal Software, Inc.*,
  2023 WL 10405169 (Del. Ch. Mar. 12, 2024).....................................................19

*Lawsky v. Condor Cap. Corp.*,
  2015 WL 4470332 (S.D.N.Y. July 21, 2015) ......................................................6

*Maryland Nat'l Bank v. Porter-Way Harvester Mfg. Co.*,
  300 A.2d 8 (Del. 1972) ........................................................................................18

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025).................................................3, 25

*Pewabic Min. Co. v. Mason*,
  145 U.S. 349 (1892).........................................................................................5, 6

*In re Pursuit Cap. Mgmt., LLC*,
  874 F.3d 124 (3d Cir. 2017).................................................................................16

*Smith v. Caldera Props.-Nassau Grove, LLC*,
  2011 WL 2420842 (Del. Super. Ct. June 9, 2011) ..............................................6

*United States v. Chem. Found.*,
    5 F.2d 191 (3d Cir. 1925) ...........................................................................6

**Statutes**

8 *Del. C.* § 324 ..................................................................................4, 16, 17, 18

8 *Del. C.* § 324(a) ........................................................................................4, 7

**Rules**

Fed. R. Civ. P. 69(a)(1) .................................................................................4

**Other Authorities**

Francisco Rodríguez, *How Venezuela Lost Citgo*, Financial Times
    (Sept. 26, 2023), https://tinyurl.com/38yebtyn ..........................................10

Jef Feeley, Nicolle Yapur, & Andreina Itriago, *US Judge Resets Bidding for Oil
Refiner Citgo, Creating Competition for Elliott*, Bloomberg (Dec. 31, 2024),
    https://tinyurl.com/447ksdc8 ....................................................................10

U.S. Dep't of the Treasury, Office of Foreign Assets Control, Venezuela General
License 5S - Authorizing Certain Transactions Related to the Petróleos de
Venezuela, S.A. 2020 8.5 Percent Bond on or After December 20, 2025 (June
20, 2025) ...................................................................................................28

## PRELIMINARY STATEMENT

The Sale Hearing confirmed that this Court's Sale Process achieved its purpose of ensuring a robust, well-noticed, public sale that generated competition to maximize the value obtained for the PDVH Shares. The Sale Hearing also confirmed that Amber Energy's bid to purchase the PDVH Shares in exchange for the satisfaction of $5.892 billion worth of Attached Judgments is the best bid resulting from the Sale Process and should thus be confirmed.

The Court must answer two questions to confirm the sale of the PDVH Shares in satisfaction—at last—of Crystallex's and other Attached Judgment Creditors' judgments: (1) did the Court's Sale Process comply with Delaware law and (2) which bidder in the Court's Sale Process offered the highest bid to acquire PDVH and confer value to the Attached Judgment Creditors and the debtors? The answer to both questions is clear.

*First*, the Court's Sale Process unquestionably complied with Delaware law, which requires only notice to the debtor and the public, and that the sale of attached stock by either a court, sheriff, or U.S. Marshal be conducted openly and fairly. This Court's Sale Process more than satisfies these modest requirements. There is no question that this sale was extensively marketed and is perhaps the most well-noticed sale in judicial history. The Sale Hearing confirmed there is no dispute on this front, with the Venezuela Parties' witness agreeing that the Special Master contacted every potential bidder for the PDVH Shares, including all bidders suggested by the Venezuela Parties and anyone who might even conceivably consider paying a premium for the shares at auction. Indeed, no one contends that there is a single potential buyer who was unaware of the Sale Process.

There is also no doubt the sale was run openly and fairly. The Special Master solicited bids from more than a hundred potential bidders and provided any potential bidder that signed a

1

non-disclosure agreement equal access to tens of thousands of documents detailing PDVH and its subsidiaries' operations. Interested entities were then permitted to submit initial bids and were advised by the Special Master to improve their bids through the Sale Process. At the conclusion of the Topping Period ordered by this Court in January 2025, the Special Master filed all bids on the public docket, with limited redactions for confidential information. He made similar public filings after making his Final Recommendation and his further Updated Final Recommendation to the Court. The Special Master and all interested entities also engaged in discovery—including voluminous document productions and depositions—and briefing on the merits of the bids, followed by a four-day Sale Hearing that was open to the public and any interested parties wishing to join and/or listen via publicly available teleconference.[1] The Court's selection of the highest and best bidder will be the result of this well-noticed, fair, and public process.

*Second*, there is no longer any serious dispute that Elliott Management's ("Elliot") investment vehicle, Amber Energy, Inc. ("Amber"), submitted the highest bid capable of closing and that a sale of the PDVH Shares to Amber should be confirmed. Amber offers to extinguish $5.892 billion of attached judgments—more than $2 billion more than Red Tree's Stalking Horse bid. Both remaining bids—Amber's and Dalinar Energy Corp.'s ("Dalinar")—are backed by financing that ultimately requires debt to be secured by the assets of CITGO Petroleum, which is the operating entity owned by CITGO Holding, PDVH's direct subsidiary. Such a financing structure cannot work, however, without some plan to account for a lien on 50.1% of CITGO Holding held by the 2020 Bondholders, the validity of which was confirmed by the Southern

---

[1] The Court closed the courtroom twice for extremely brief, limited and unobjected-to periods, each lasting minutes, to enable questioning about certain confidential and proprietary information, following a finding that such a sealing was justified and that a transcript would remain available to any party that later might seek, and justify, access to the sealed material. Tr. 1131-42, 1481-1527.

District of New York during this Court's Sale Hearing.  And as confirmed at the Sale Hearing, the pledged CITGO Holding shares are currently in the possession of the 2020 Bondholders' Collateral Agent authorized to vote the shares according to the interests of the 2020 Bondholders.  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2675871, at *3 (S.D.N.Y. Sept. 18, 2025) ("The collateral is held as a physical stock certificate by [the Collateral Agent] in a vault in New York."); Tr. 1579:20-1580:9 (same); RT-63 (Pledge and Security Agreement); RT-64 (Indenture). The 2020 Bondholders can be expected to oppose any attempt to saddle CITGO Petroleum with new debt and thus impair the value of their pledge.  D.I. 2264, at 9 (2020 Bondholders representing to this Court that they will "seek to enjoin PDVH and potentially other parties from taking actions in connection with the financing of [Dalinar's] transaction").

Faced with this risk, Amber negotiated a Transaction Support Agreement ("TSA") under which the 2020 Bondholders agreed to release their pledge against 50.1% of the CITGO Holding shares, thus paving the way for a sale of PDVH to Amber that is highly likely to close and offers the most realizable value to the Attached Judgment Creditors.  On top of that, Amber represented to this Court that it intends to extinguish the bonds it acquires under the TSA, thus creating as much as $3 billion in additional value—debt relief—to PDVSA and its alter ego, Venezuela. Dalinar, on the other hand, asks this Court and each and every creditor in front of it to have faith in Dalinar's ability to close over objections—without committed financing to deal with the obvious risks to its bid or any other actual evidence that Dalinar can and will perform on its promises. Thus, no other bid creates as much total value and certainty for both the Attached Judgment Creditors and for the debtor as the Amber bid, and there is not a shred of evidence that the PDVH Shares could be sold for more.

As set out below, the Sale Hearing confirmed that which Crystallex has long contended: (1) the Court's Sale Process complied with Delaware law and (2) Amber submitted the highest and best bid that creates the most value for both the Attached Judgment Creditors and the debtors in this case.  The sale of PDVH to Amber should thus be confirmed.

## LEGAL FRAMEWORK

This court has broad discretion to confirm the sale of the PDVH Shares, but it "may not" "refuse to confirm a sale[] where there are no irregularities in the sale proceedings and no fraud, unfairness, or other extraneous matter demonstrating unfairness to one of the interested parties is shown."  *Greenpoint Mortg. Funding, Inc. v. McCabe*, 2006 WL 3604784, at *1 (Del. Super. Ct. Nov. 27, 2006), *aff'd sub nom*. *Pac. W. Grp., Inc. v. Greenpoint Mortg. Funding, Inc.*, 933 A.2d 1250 (Del. 2007) (denying motion to set aside sale and objection to confirmation of same).

This Court's process to execute on Crystallex's judgment—and those held by the additional Attached Judgment Creditors—"must accord with the procedure of the state where the court is located."  Fed. R. Civ. P. 69(a)(1).  Here, Delaware law requires only that the Court sell "[s]o many of the shares … as shall be sufficient to satisfy the debt" at a noticed, "public sale to the highest bidder."  8 *Del. C.* § 324(a); *see also* D.I. 71, at 8 (PDVSA agreeing that "Section 324 contemplates execution only by a 'public sale.'  8 *Del. C.* § 324(a).  It does not identify any other form of execution on shares.").  Though sales of complex refining companies are rare, execution sales are not.  Delaware law is clear that an execution sale is public and complies with the law where (1) reasonable efforts were made to notify the property owner of the sale; (2) "a reasonable process [is] employed to give notice to the public of the sale so that a reasonable price, considering the forced sale nature of the transaction, might be obtained;" and (3) "perhaps" an inquiry is conducted to confirm "that the process employed in fact operated reasonably."  *Deibler v. Atl. Props. Grp.,*

*Inc.*, 652 A.2d 553, 557 (Del. 1995).  Thus, where the debtor and public receive notice of the sale, a judicial sale is almost always confirmed.  Though debtors often seek to set aside judicial sales on the grounds of inadequate price, allegations of inadequate price alone are insufficient to refuse confirmation of a properly-run sale.  *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977) ("[W]here the standard has been applied, there usually has been evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale or confusion at the sale, neither of which has been shown here."); *Cent. Tr. & Sav. Co. v. Chester Cnty. Elec. Co.*, 77 A. 771, 772 (Del. Ch. 1910) ("[M]ere inadequacy of price will not be sufficient [to set aside a sale], in the absence of fraud or irregularity in the manner of conducting a sale.").

Whether the Sale Process was reasonably designed and accorded just treatment to the debtor is not determined by asking whether the sale obtained the maximum price that the asset could attract if all of that asset's imperfections were first resolved and it were sold at the ideal time under perfect market conditions.  This Court has already confirmed as much, finding that "Delaware law does not guarantee that the maximum [possible] price be the result" of a Sale Process "with the aim of maximizing the value of the asset being sold."  D.I. 257, at 6.  Indeed, an execution sale should not be delayed in hopes the value of the attached asset improves.  Rather, "[t]here comes a time in the history of a litigation like this when, though the times may be depressed, there must be a sale."  *Pewabic Min. Co. v. Mason*, 145 U.S. 349, 358 (1892).  And "it does not always lie in the mouth of one who, by strenuous and protracted resistance, has delayed for years a sale, to claim still further delay on account of the then depressed financial condition" of the asset to be sold.  *Id.*  Rather, "[a] speedy end of litigation, as speedy as is consistent with the rights of each party, is to be desired."  *Id.*  A "highly-recalcitrant judgment debtor," D.I. 234, at

37, "who prolong[s] litigation by appeal from court to court must not complain if sometimes they find themselves, at the end, under burdens which would not have rested upon them but for such delay." *Pewabic Min. Co.*, 145 U.S. at 358; *accord In re Halpern*, 229 B.R. 67, 76-77 (Bankr. E.D.N.Y. 1999) (it is unjust to allow a debtor to delay the sale and "bet[]" on the possible future appreciation of his asset at the creditors' expense).

Moreover, the process must be run to obtain the best price available in the circumstances from a bidder able to close the deal. The Court has discretion to control "its own process for the correction of abuses or the prevention of injury." *Smith v. Caldera Props.-Nassau Grove, LLC*, 2011 WL 2420842, at *2 (Del. Super. Ct. June 9, 2011). That discretion requires that the Court select as the winning bidder the party that offers the best combination of headline price and closing certainty. *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925) (it is "common knowledge of all lawyers" and businesspeople "that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two"); *Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (court-appointed receivers "are not duty-bound to 'mechanically accept a bid with the highest dollar amount'" because they "owe[] a duty to consider more factors than just the price of the bid, such as the risks associated with each bid and the probabilities that the proposed terms will come to fruition"); *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) (debtors conducting sale process "have a fiduciary duty to maximize the value of their estates" and "are permitted, and in fact are encouraged, to evaluate other factors [than price] such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing").

## ARGUMENT

**I.    The Court's Robust and Competitive Sale Process Complied With Delaware Law**

**A.    The Venezuela Parties Were On Notice Of And Participated In The Sale Process**

To ensure debtors not resident in Delaware receive due process prior to a sale, Delaware law requires that a copy of the order "be sent by registered or certified mail, return receipt requested, to such debtor's last known address" "and published at least twice for 2 successive weeks, the last publication to be at least 10 days before the sale, in a newspaper published in the county where the attachment process issued." 8 *Del. C.* § 324(a).  The Venezuela Parties agreed to receive a copy of the Court's order by email only, D.I. 481, at 7-8 & n.3, ¶ E, and there is no dispute that the Special Master complied with Delaware law's requirement to publish notice of the sale in newspapers in Delaware and in Venezuela.[2]  FOF, ¶ 47.[3]

All of the Venezuela Parties had appeared before this Court by the time Crystallex filed its opening brief in support of its Motion for an Order of Sale on June 17, 2020.  D.I. 181, 182.[4]  In

---

[2] In any case, the Venezuela Parties waived any requirement "under the Delaware General Corporations Law *or otherwise* regarding publication of notice in Venezuela."  D.I. 481, at 8 n.3 (emphasis added).

[3] References to "FOF" refer to the Proposed Findings of Fact filed by the Special Master in connection with his Opening Post-Trial Brief dated October 8, 2025, which Crystallex joins.

[4] Venezuela, PDVSA, PDVH, and CITGO were all aware of this Court's sale of the PDVH Shares to satisfy Crystallex's unpaid judgment, and eventually the unpaid judgments of several other creditors who moved for and obtained writs of attachment against the PDVH Shares.  After registering its judgment with this Court, Crystallex filed a motion on August 14, 2017 for an order authorizing the issuance of a writ of attachment against the shares of PDVH, a Delaware corporation nominally owned by PDVSA.  D.I. 3-1.  Although Venezuela did not initially appear to contest the attachment (it later intervened in the court of appeals, Order, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 18-2797 (3d Cir. Mar. 20, 2019)), PDVSA did, moving to intervene on August 22, 2017.  D.I. 14.  Crystallex did not oppose PDVSA's motion, D.I. 16, and the Court granted PDVSA permission to intervene just six days later, D.I. 17.  After multiple rounds of briefing and oral argument, the Court ruled that PDVSA was an alter ego of Venezuela and ordered that a writ of attachment be served on PDVH.  D.I. 78, 79.  The United States Marshals

fact, the Court ordered that the Venezuela Parties would have significant input into the Sale Process, *see* D.I. 234, at 1-2, which was overseen by the Special Master whom the Venezuela Parties recommended for his "unique[]" qualifications and "expertise necessary to … oversee[] a value-maximizing sale," D.I. 643, at 6.

There can be no dispute that each of the Venezuela Parties received more than adequate notice of the sale. Indeed, each has been an active participant in this Court's Sale Process for years.

**B.    The Sale Process Was Widely Publicized And Well-Noticed**

The Sale Hearing confirmed what any observer of this Sale Process already knew: the Venezuela Parties received far more process than they were due, as this was perhaps the most widely marketed and well-noticed public sale in history. Even the Venezuela Parties' witness, Mr. Weisenburger, admitted that the Special Master "extensively marketed" the PDVH Shares to potential bidders, and that the sale was "extensively publicized" and the marketing was "comprehensive and complete." FOF, ¶ 48. Rightly so. The Special Master reached out to every potential bidder that CITGO suggested, contacting approximately 136 potential bidders to notify them of the Court's Sale Process. FOF, ¶¶ 44, 46. This included every potential strategic bidder likely to be interested in acquiring PDVH and/or paying a premium for the shares, such as private investment funds, sovereign wealth funds, and companies across several industries, including refining, majors, upstream, fuel distribution, midstream, chemicals, integrated, international,

---

Service served the writ on PDVH on August 24, 2017, D.I. 96, at which point CITGO Petroleum moved to intervene, D.I. 101, and PDVH eventually answered the writ on June 5, 2020, after a stay pending appeal was lifted, D.I. 109, 110, 177. Counsel for the Republic filed a notice of appearance in this Court on October 11, 2019, taking an active role in this litigation and the Sale Process after the Third Circuit Court of Appeals confirmed this Court's order directing the issuance of a writ of attachment on the grounds that PDVSA is the alter ego of Venezuela. D.I. 138.

trading and financing, and creditor counterparties, as well as related industries.  FOF, ¶ 22.  Thus, Mr. Weisenburger was right to concede that he could not think of any potential bidder that the Special Master failed to contact.  Tr. 312:14-313:9.

The Special Master's notice to the public and potential bidders was designed to entice bidders to participate in the Sale Process and it provided the information necessary to do so.  In October 2023, the Special Master sent a "teaser letter" to all potentially interested bidders, which provided information about the sale and instructions concerning the deadline to submit initial indications of interest and what information those indications of interest should include.  FOF, ¶ 23.  The teaser accomplished its goal, attracting approximately 27 potential bidders to sign nondisclosure agreements.  FOF, ¶ 26.  These potential bidders were granted access to a virtual data room containing tens of thousands of documents detailing CITGO's business, so that they could formulate reasonable and competitive bids for the PDVH Shares.  FOF, ¶ 27.  Thus, no one can seriously complain about a lack of information for potential bidders.

After an initial attempt to sell the PDVH Shares resulted in a bid that appeared unlikely to pay cash to any Attached Judgment Creditor and was unacceptable to the Attached Judgment Creditors and the Venezuela Parties, FOF, ¶¶ 30-33, the Court ordered the Special Master to re-launch the process.  The Special Master once again contacted every bidder potentially interested in acquiring the PDVH Shares—approximately 136 potential bidders in total—including those who had not signed a non-disclosure agreement during the earlier bidding round.  FOF, ¶¶ 37-46.  Once again, the list of entities contacted included all potential bidders suggested by CITGO.  *Id.*  Of the contacted bidders, 26 signed non-disclosure agreements and were granted access to the virtual data room, which at that point contained "more than fifty-nine thousand detailed, confidential documents regarding PDVH, the PDVH Shares, and CITGO."  FOF, ¶ 50; SM-028,

¶ 33.  Those potential bidders also asked, and CITGO answered, "more than 1,400 questions from the potential bidders" concerning CITGO's business and the PDVH Shares.  FOF, ¶ 58.  CITGO also participated in extensive management presentations and hosted site visits for potential bidders.  *Id.*[5]

In short, the Special Master contacted approximately 136 potential purchasers of the PDVH Shares directly, and undoubtedly reached more through his advertisements.  In addition, the Venezuela Parties were at all times free to supplement the Special Master's notice as they felt appropriate, D.I. 234, at 35, and the sale received substantial coverage in the U.S. and international press.  *See, e.g.*, Jef Feeley, Nicolle Yapur, & Andreina Itriago, *US Judge Resets Bidding for Oil Refiner Citgo, Creating Competition for Elliott*, Bloomberg (Dec. 31, 2024), https://tinyurl.com/447ksdc8; Francisco Rodríguez, *How Venezuela Lost Citgo*, Financial Times (Sept. 26, 2023), https://tinyurl.com/38yebtyn.  The Special Master further ensured that all potentially qualified bidders had access to all information necessary to participate in the sale and to assess the value of the PDVH Shares being sold.  The comprehensively marketed and publicized sale thus not only satisfies, but vastly exceeds, all procedural requirements of fairness and Delaware law.

C.    **The Sale Process Created Competition To Maximize Value For The PDVH Shares, Given The Circumstances Of This Forced Sale**

When the Court adopted the Sale Procedures Order, it explained that the process was "designed to promote a competitive and robust bidding process to generate the greatest level of

---

[5] "[E]fficiency and fairness in procedure would require the complaining party to raise all arguable defects with the notice" prior to the sale, or else "be held to waive them."  *Deibler*, 652 A.2d at 557.  Not only did the Venezuela Parties not object to the notice provided to potential bidders, they actively assisted in providing that notice by recommending potential bidders for the Special Master to reach out to and hosting site visits for potential bidders.  The Venezuela Parties have thus waived any such argument here.

interest in the PDVH Shares and result in the highest offer in connection with any Sale Transaction." D.I. 481, at 6. And the Court has since "endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH." D.I. 1554, at 4. The Sale Hearing confirmed that the Sale Process succeeded in establishing a competitive process to sell the PDVH Shares to the highest bidder.

Following the two initial rounds of bidding in 2024, the Special Master engaged in comprehensive negotiations with the bidder offering the highest nominal price for the PDVH Shares. Tr. 543:13-544:24. After those negotiations did not result in an actionable deal—because, among other things (1) the bidder insisted on delaying payment to the Attached Judgment Creditors until alter-ego claims against PDVH were resolved and all appeals exhausted and (2) the bidder's financing was only committed for 12 months and the bidder was unable or unwilling to extend those commitments, *id.*—the Special Master turned to the then-second-highest bidder, Elliot Management, and its acquisition vehicle, Amber. FOF, ¶ 30. Like the initial bidder, however, Amber insisted on an escrow arrangement that would delay payment to the Attached Judgment Creditors pending the resolution of the alter-ego claims against PDVH and the 2020 Bondholders' litigation, meaning that its bid would have delivered minimal value to the creditors at closing. *Id.* The Sale Process Parties and certain Attached Judgment Creditors objected to the proposal and Amber was unable or unwilling at the time to amend its bid and deliver cash or non-cash consideration acceptable to the creditors at closing in exchange for the PDVH Shares. FOF, ¶¶ 31-33. The Court accordingly directed the Special Master to re-launch the Sale Process in January 2025. FOF, ¶¶ 34-36.

The re-launched Sale Process consisted of two rounds of bidding—a Stalking Horse round and a Topping Period.  The Special Master received four Stalking Horse bids, but Red Tree and Dalinar submitted the only two qualifying bids, with Red Tree offering a purchase price of $3.732 billion and Dalinar offering a purchase price of $7.081 billion.  FOF, ¶ 60; Tr. 550:14-22; VP-110.002.  Although the Dalinar bid offered a higher headline price, Dalinar's financing ultimately depended on its ability to merge its acquisition vehicle, Adolin, with CITGO Petroleum.  FOF, ¶¶ 62, 226-27.  This created a material risk that the Dalinar bid would not close because the merger could be blocked.  The 2020 Bondholders hold a lien on 50.1% of the shares of CITGO Holding, CITGO Petroleum's parent company, and they have made clear that they would seek to block the proposed merger to preserve the value of their CITGO Holding pledge.  FOF, ¶ 216; SM-017.  On the other hand, Red Tree secured an agreement from the 2020 Bondholders pursuant to which their lien on the CITGO Holding shares would be discharged, thereby allowing closing on the PDVH sale without objection, and thus Red Tree's bid offered "a much higher degree of certainty" than Dalinar's bid.  FOF, ¶ 63.

Because the purpose of the Stalking Horse round was to generate increased interest in, and competition for, the PDVH Shares, the Special Master recommended Red Tree as the Stalking Horse bidder.  FOF, ¶ 66.  At the Sale Hearing, Mr. Hiltz testified that the Special Master did so because he was concerned no bidder would match Dalinar's price if Dalinar were selected as the Stalking Horse, and potential bidders would thus refrain from participating in the Topping Period, depriving the process of the opportunity to consider bids with a greater likelihood of closing than Dalinar's.  FOF, ¶ 67; Tr. 556:1-557:4.  In that scenario, the success of the entire Sale Process could turn on the veracity of Gold Reserve's repeated claims that the 2020 Bondholders' lien on the CITGO Holding shares would be invalidated or that Dalinar could likely obtain sufficient

resources to secure a settlement if the 2020 Bondholders' pledge was declared valid (neither would turn out to be the case). Still, in accepting the Special Master's recommendation, the Court warned bidders that they would likely need to offer more consideration than Red Tree to be selected as the winning bidder following the Topping Period. FOF, ¶ 70.

The Special Master then notified potential bidders of the deadline to submit bids during the Topping Period, and advised bidders that anyone hoping to be selected as the winning bidder must improve their offer in terms of both price and certainty of closing. FOF, ¶¶ 75-76. The Topping Period was then extended to allow bidders more time to submit potentially improved bids after Judge Rakoff granted summary judgment to PDVH in the Southern District of New York in the *Gramercy* litigation, dismissing alter-ego claims that had threatened to allow some junior creditors in this Court's Sale Process to leapfrog ahead of all senior creditors by attaching the shares of CITGO Holding—one company farther down the corporate structure and closer to the valuable assets held by CITGO Petroleum—and disrupt the Sale Process. *See* Dkt. 241, *Girard St. Inv. Holdings LLC v. PDV Holding, Inc.*, No. 1:24-cv-04448-JSR (S.D.N.Y. June 25, 2025).

At the end of the Topping Period, Dalinar submitted an improved bid that increased the headline bid price from $7 billion to $7.382 billion. FOF, ¶ 93. Red Tree's bid was unchanged. FOF, ¶ 92. Although he remained concerned that the 2020 Bondholders could prevent the Dalinar bid from closing, the Special Master selected Dalinar as the Final Recommended Bidder on July 2, 2025 because he felt the $3.756 billion price difference between the Dalinar bid and Red Tree's revised Stalking Horse bid "outweighed concerns about the certainty of the Dalinar Bid." FOF, ¶ 96; D.I. 1837.

A Sale Hearing to consider objections and arguments in support of that recommendation was scheduled for August 18, but the Special Master continued to receive unsolicited bids for the

PDVH Shares, confirming the public's interest in the sale. FOF, ¶¶ 98-100. Two of those unsolicited bids failed to satisfy the Court's criteria to be considered as qualifying bids, but a third, submitted by Amber, appeared to the Special Master and his advisors—upon their initial review—to meet those criteria and to have the potential to maximize value for the PDVH Shares by offering a much higher headline price than Red Tree's bid and, because of an agreement with the 2020 Bondholders that would remove the potential block from their lien, far greater certainty than Dalinar's bid. FOF, ¶¶ 98-99; Tr. 570:1-571:1.

The Court therefore ordered a brief adjournment of the Sale Hearing so the Special Master could consider the Amber bid. When comparing the Dalinar bid to the Amber bid, the Special Master considered four possible scenarios: (1) if the 2020 Bondholders' pledge were to be held invalid, the Dalinar bid would likely close and result in $7.4 billion of recovery to judgment creditors; (2) if the 2020 Bondholders' pledge were held valid, the Dalinar bid may not have been able to close and the 2020 Bondholders' claim could be worth as much as $3.02 billion as of the presumed closing date of June 30, 2026 (and potentially continue to grow, if the sale were delayed beyond that date, as interest continued to accrue), rather than the $2.125 billion amount negotiated by Amber, resulting in a greatly reduced recovery, if any, for the Attached Judgment Creditors; (3) if the 2020 Bondholders' pledge were held valid and the Court selected the Amber bid, the sale of the PDVH Shares could close and the 2020 Bondholders' lien would be discharged for the discounted price of $2.125 billion and the Attached Judgment Creditors would receive $5.892 billion; and (4) if the Special Master recommended the Amber bid and the 2020 Bondholders' pledge were held invalid, the Court would have the option to either allow the Amber bid to close or to reject it if it believed that the TSA with the 2020 Bondholders overvalued the risk of the pledge litigation when the TSA was agreed to and, if so, order a prompt round of rebidding. FOF,

¶¶ 123-26.  Given the significant risks posed by the 2020 Bondholder litigation, which remained unaddressed by the Dalinar bid, the increased certainty provided by the Amber bid in this respect, and the narrowed gap in headline price between the Amber bid and the Dalinar bid, the Special Master determined that the Amber bid was a Superior Proposal to Dalinar's.  FOF, ¶¶ 128-31.

During the resulting "match period" triggered by the Special Master's determination that the Amber bid constituted a Superior Proposal, FOF, ¶¶ 132-35, Dalinar responded with only unsubstantiated assurances that all legal contingencies would eventually break its way, and should they not, that Dalinar would find a way to close.  Faced with the undeniable fact that Dalinar was unable or unwilling to improve the closing certainty of its bid, the Special Master submitted an Updated Final Recommendation on August 29, 2025, recommending that the Court approve the Amber bid, which offered to extinguish $5.892 billion in Attached Judgments and offered far greater closing certainty than Dalinar's bid because it could not be blocked by the 2020 Bondholders, who had agreed to relinquish their lien on CITGO Holding under a separate agreement with Amber—the TSA.  In addition, PDVSA and its alter ego Venezuela would obtain additional debt relief by reason of the 2020 Bondholder TSA (as much as $3 billion in debt relief including interest accrued to date), since Amber had undertaken to cancel the bonds that have now been found to be enforceable.

A Sale Hearing was held from September 15 to 18, 2025.  The Sale Hearing confirmed that the Court's multi-year effort to sell the PDVH Shares in a value-maximizing manner has been successful.  The process resulted in a robust debate between two sophisticated bidders, with the primary dispute centering on assessing the fair value of each bid in light of the risk posed by the 2020 Bondholders (which remained the subject of unresolved litigation at the start of the Sale Hearing).  On the one hand, Dalinar claimed to offer a higher nominal price for the PDVH Shares,

15

but outside of Gold Reserve's bidding consortium, creditors were virtually unanimous in emphasizing that this higher price was subject to significant (and likely fatal) closing risks if the 2020 Bondholders' pledge were held to be valid.  On the other hand, Amber offered a substantial but lower headline price with the promise of significantly higher closing certainty, having obtained the consent of 75% of the 2020 Bondholders—more than the required percentage under the Pledge Agreement, RT-63.024—to release their lien on the CITGO Holding shares (at a discount of nearly 33% if their pledge was deemed to be valid).  Such competitive tension is the hallmark of a well-designed and effectively-run Sale Process intended to maximize value for the PDVH Shares.  *See, e.g.*, *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 137 (3d Cir. 2017) (a "competitive auction strongly indicates that a purchaser has paid appropriate value for estate assets").  Thus, the evidence confirms the Special Master and his advisors' long-held belief that an extensive marketing process and the ability of bidders to access voluminous information about CITGO in the virtual data room would create a Sale Process whose final price would be the best evidence of what a buyer would be willing to pay for the PDVH Shares.  Tr. 566:14-567:9.

Crystallex respectfully submits that the Court should reach the same conclusion.

### D.     There Is No Merit To The Venezuela Parties' Critiques Of This Court's Sale Process

This Court already concluded in the Sale Procedures Order that the process contemplated, "including the Marketing Process, Bidding Procedures, and Notice Procedures, shall constitute a 'public sale to the highest bidder' within the meaning of" 8 *Del. C.* § 324.  D.I. 481, at 8.  Yet the Venezuela Parties continued to insist at the Sale Hearing that the Court should have chosen a different process entirely, such as an initial public offering ("IPO") or leveraged recapitalization. FOF, ¶ 389.  But anything other than a public sale to the highest bidder able to close the transaction

is inconsistent with Delaware law, and the evidence elicited at the Sale Hearing confirmed there is no merit whatsoever to the Venezuela Parties' alternative proposals.

The Venezuela Parties called Mr. Weisenburger in an attempt to establish that the Special Master should have engaged in a number of alternative corporate transactions not contemplated by Section 324, such as an IPO, leveraged recapitalization, or private placement. FOF, ¶¶ 389-91. These alternative musings assume that PDVSA would retain—at least for a period of time—some portion of PDVH and that anyone who purchased the PDVH Shares would become a joint shareholder with a sanctioned state entity incapable of operating freely in the marketplace due to its longstanding ties to Venezuela. As Mr. Weisenburger explained, a hypothetical IPO would require "taking the Company public [and] using those proceeds again to payoff [*sic*] some of the remaining creditors." Tr. 276:19-21. "[Y]ou would then over time either distribute those shares in [PDVH] to the remaining creditors or sell th[em] and distribute that cash to the remaining creditors." Tr. 277:1-4. But even assuming this scenario could be squared with the "public sale" required by Section 324, "[n]o bidder that [the Special Master] contacted expressed any interest in owning less than 100 percent [of PDVH]. … That's just not an alternative that's attractive to anyone." Tr. 533:12-18. Indeed, Mr. Weisenburger acknowledged the "fair" criticism that he lacks "any concrete evidence that if the court were to rerun a sale process right now, that a bidder would necessarily come forward with a higher price than what is on the table right now." Tr. 329:2-8.

More fundamentally, Mr. Weisenburger's proposals do not comply with Delaware law because (apart from whether they meet the statutory definition of a "public sale," which seems doubtful) creditors cannot be compelled to accept shares—even temporarily—in lieu of cash. The PDVH Shares have been "in *custodia legis* since the levy by the [Marshals]" on August 24, 2018,

17

*see Deibler*, 1994 WL 45433, at *9, and must be sold in accordance with Delaware law for the satisfaction of Crystallex's and the Attached Judgment Creditors' liens.  That means the Attached Judgment Creditors must be paid in order of seniority, in cash, unless they agree to receive noncash consideration or to release their attachments.  D.I. 1583, at 1-2 (citing *Maryland Nat'l Bank v. Porter-Way Harvester Mfg. Co.*, 300 A.2d 8, 11 (Del. 1972)).  Mr. Weisenburger's IPO proposal requiring creditors to accept a combination of shares and cash and relinquish parts of their attachments (which apply to the whole of PDVH regardless of seniority) without compensation fails as a matter of law.  This disconnect between what Mr. Weisenburger calls for and what is actually possible is explained by his admission that he is unfamiliar with 8 *Del C.* § 324 and cannot opine on whether his alternative proposals "would be consistent with the provisions of section 324 of the Delaware Code"—*i.e.*, the provision of Delaware law that governs this Court's Sale Process. Tr. 331:14-332:3.  Crystallex therefore respectfully submits that the opinions offered by Mr. Weisenburger are unhelpful to the resolution of any issue before the Court and the Court should accord them no weight.

As for the Venezuela Parties' valuation expert, Dr. Alberro, his "valuation" selectively hopscotched across methodologies and data sets to arrive precisely at the number that counsel for CITGO had previously announced as the value for the shares before Dr. Alberro was even engaged. *See* D.I. 1357, at 52:19-22 (counsel for PDVH stating at an October 1, 2024 hearing that "we will present evidence ultimately that the value of [the PDVH] stock is closer to 17 billion dollars"); Tr. 760:8-15 (Dr. Alberro confirming he began working on his valuation "in the first quarter of [2025]"); FOF, ¶ 262; Tr. 749:25-751:7 (Dr. Alberro explaining that his valuation gave no weight to his market multiples or enterprise value analyses—both of which resulted in valuations billions

of dollars lower than his DCF calculation—because they "seem[ed] … not very precise" and he questioned "how trustworthy those numbers are").

Dr. Alberro's valuation should not be accorded any weight given the far more authoritative indications of PDVH's value provided by this Court's open and robust Sale Process. Delaware courts considering a company's fair value in appraisal actions have "long endorsed" the view that "the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client." *Dell v. Magnetar Glob. Master Fund*, 177 A.3d 1, 24 (Del. 2017). While Delaware law does not require that courts blindly adopt the market price without considering other factors relevant to the sale at issue, "the trial judge must give particular and serious consideration to transaction price as evidence of fair value" and accord "considerable weight" to such pricing evidence "absent deficiencies in the deal process." *HBK Master Fund L.P. v. Pivotal Software, Inc.*, 2023 WL 10405169, at *22 (Del. Ch. Mar. 12, 2024). For example, where "i) the transaction resulted from a robust market search that lasted approximately two years in which financial and strategic buyers had an open opportunity to buy without inhibition of deal protections; ii) the company was purchased by a third party in an arm's length sale; and iii) there was no hint of self-interest that compromised the market check," the transaction price is entitled to considerable weight. *DFC Glob. Corp. v. Muirfield Value Partners*, 172 A.3d 346, 349 (Del. 2017) (finding in such cases that "economic principles suggest that the best evidence of fair value was the deal price, as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid"). Here, the Court's Sale Process was open and competitive, spanning more than two years and multiple rounds of bidding that were preceded by outreach to every entity

19

likely to be interested in bidding to acquire the PDVH Shares. The Court therefore must give considerable weight to the market's valuation of PDVH, reflected in the bids received by the Special Master.

This is particularly true where, as here, a transaction involves risk that may be difficult to quantify. The Delaware Supreme Court explained in 2017 that "the collective judgment of the many is more likely to be accurate than any individual's guess" and when a transaction price is informed by the views of "potential buyers of the entire company and those of the company's debtholders with a self-interest in evaluating the regulatory risks facing the company, there is more, not less, reason to give weight to the market's view of an important factor." *DFC Glob. Corp.*, 172 A.3d at 349. Again, there is no dispute that bidders had access to all relevant information concerning the risks facing PDVH and each bidder accounted for those risks in its bid to acquire the PDVH Shares. The Court cannot discard the market's valuation of these risks without good reason to do so (which does not exist here) and should therefore be skeptical of expert opinions that reach conclusions that are at odds with the market's views.

Dr. Alberro's "valuation" is a textbook example of an expert opinion that should be discounted in favor of the evidence produced by the market of bidders participating in this Sale process. Dr. Alberro himself does not believe his "valuation" reflects what anyone in the real world would be willing to pay for the shares—in a forced judicial sale or otherwise—and has no opinion on the question of whether there is "anyone, anywhere in the world who would actually pay $18 billion dollars for the PDVH shares"—the amount the Venezuela Parties (but no one else)

claim they are worth.  Tr. 762:15-23.  Indeed, Dr. Alberro could not say that any legitimate bidder exists that would pay even "$10 billion" for PDVH.  *Id.*[6]

Dr. Alberro also confirmed his valuation has no basis in reality.  He has "never been asked to assess the market value of the Company … I was asked to establish the fair market value."  Tr. 764:21-23.  In other words, Dr. Alberro's assessment is theoretical—it does not reflect the price anyone is willing to pay in the real world.  Tr. 767:4-10.  Indeed, Dr. Alberro did not even conduct a valuation of PDVH.  Instead, he confirmed at the Sale Hearing that his discounted cash flow analysis "reflects CITGO's intrinsic value."  Tr. 750:9-10.  Thus, Dr. Alberro estimated the value of CITGO Petroleum and rolled that value up into PDVH with only minor adjustments for operating expenses.  VP-186.004 ("The projections rely on CITGO Petroleum Corporation's ('CPC') latest operating forecasts" and "CPC's projected free cash flows."); *id.* at VP-186.060-61 (Dr. Alberro confirming that he deducted $27.52 million per year from CITGO's value to account for "standalone expenses specific to PDVH and its subsidiaries other than CITGO Holding, Inc.").

Even if Dr. Alberro had valued the correct asset, he admits his valuation ignores the risk—now substantially realized by the 2020 Bondholders' victory in the Southern District of New York—that PDVH could lose half its value, and control of CITGO Holding.  Tr. 751:24-752:8, 825:1-6; VP-186.104 ("I do not subtract any value associated with the 2020 bonds when calculating PDVH's equity value").  Dr. Alberro explained that he made this decision because the debt to the 2020 Bondholders is owed by PDVSA, not PDVH, and therefore is "not [a] liabilit[y]

---

[6] As a matter of law, Delaware courts have never applied the so-called "50% test" as a categorical rule to reject a forced sale, as the Venezuela Parties have previously argued and will no doubt argue again.  At most, Delaware courts have held that "special judicial scrutiny" may be applied when an asset is sold at a forced sale for less than 50% of its market value.  *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994).  But in any event, the Venezuela Parties have not established the necessary factual predicate for any such rule: *i.e.*, that the proposed sale of the PDVH Shares to Amber Energy would be for less than 50% of their market value.

of the entity whose equity is being valued." VP-186.104.  That misses the point.  While PDVSA issued the debt, PDVH's assets are at risk following PDVSA's default.  RT-18.029-30.  Yet Dr. Alberro completely ignores this risk to half of the value of PDVH's sole asset.  FOF, ¶¶ 280-85. This is true despite his admission that a sophisticated bidder leveraging the assistance of counsel and accountants would discount its offer to purchase the PDVH Shares based on these risks.  Tr. 918:24-919:7.

Regardless, Dr. Alberro's valuation of CITGO Petroleum is unreliable.  Where it served to increase his valuation, Dr. Alberro relied on CITGO's own projections, for example with respect to forecasts of CITGO's output and operations.  *See* VP-186.057.  On the other hand, Dr. Alberro discarded CITGO's price forecasts in exchange for his own more favorable projection based on reports provided by third-party analysts, despite confirming that he had "no basis to conclude that CITGO's forecasts were systematically inaccurate."  FOF, ¶¶ 258-60; Tr. 902:20-903:2.  Dr. Alberro's inability to explain why he found CITGO's own forecasts unreliable casts doubt on his decision to discard them, particularly given his admission that CITGO consults the same analysts Dr. Alberro consulted to create price forecasts and Dr. Alberro never spoke with anyone at CITGO to understand how they came up with their price estimates.  FOF, ¶ 261.

Red Tree's expert, Mr. Gary Kleinrichert, testified at the Sale Hearing that Dr. Alberro's valuation overstates CITGO's EBITDA by nearly every metric.  *See* FOF, ¶¶ 326-29.  Rather than adjusting CITGO's forecasts upwards, as Dr. Alberro did, Mr. Kleinrichert explained that CITGO's management forecasts have been consistently over-optimistic, and should be adjusted downward in a proper DCF analysis.  FOF, ¶¶ 326-29.  Indeed, Dr. Alberro acknowledged that his EBITDA projections were in aggregate over $2 billion higher than CITGO's own projections. FOF, ¶ 258.  The Special Master's advisor, Mr. Hiltz, explained that Dr. Alberro's calculations

relied on an inflated weighted average cost of capital ("WACC") typically used in academic analyses, and Dr. Alberro admitted that his valuation would have been much lower if he used lower, size-based equity risk premiums typically used in business settings. FOF, ¶¶ 272-75. The faults in Dr. Alberro's analysis are legion, as explained in greater detail by the Special Master and Red Tree, whose analyses make clear that Dr. Alberro put his thumb (and often much more) on the scale in favor of a higher valuation at nearly every opportunity.

In sum, the Venezuela Parties' valuation of the PDVH Shares is divorced from the way market participants would value PDVH when submitting a bid, the circumstances of this Sale Process, and reality in general. Dr. Alberro's theoretical opinions on what PDVH might be worth under different circumstances, at a different time, and under financial assumptions that differ wildly from CITGO's own projections and past results are thus unhelpful and irrelevant to this Court's decision. The Court therefore should not accord Dr. Alberro's opinions any weight in concluding that the robust and competitive Sale Process resulted in multiple offers for the PDVH Shares that offer the best evidence of their true value.

The lack of evidence to support the Venezuela Parties and their witnesses' proposals dooms their case. The Venezuela Parties have long been on notice of the need to collect such evidence if they intended to object to the sale on the grounds of an inadequate price. In January 2025, this Court admonished the Venezuela Parties that if they "attempt to object to the recommended sale transaction on the ground that a higher bid was likely, it is worth noting that there is nothing preventing them from identifying such a bidder now and encouraging it to participate in this Court's sale process." D.I. 1554, at 5. If the Venezuela Parties made no effort to find such a bidder, they have only themselves to blame. But the more obvious answer is that no such bidder exists: given the comprehensive nature of the search process and the open bidding conducted by

the Special Master under this Court's direction, the Venezuela Parties' suggestion that the shares are worth in the range of $18 billion, but that rational market participants somehow are allowing those shares to be snapped up for a fraction of that price in a public sale, is preposterous.[7]

The Venezuela Parties' attacks on the design of the Sale Process fail.

## II.    The Amber Bid Will Extinguish $5.892 Billion Of Attached Judgments And Is The Best Bid For The PDVH Shares

If approved, Amber's bid will extinguish approximately $5.892 billion in Attached Judgments through a combination of distributable cash and non-cash proceeds.  FOF, ¶ 107. Amber's purchase price is billions of dollars higher than any other bid that is likely to close.  *See, e.g.*, VP-110 (confirming that, other than Dalinar's uncertain proposal, the highest Stalking Horse bid offered $3.7 billion).

The Amber bid is also far more certain to close than Dalinar's, the only other bid that purports to offer a comparably high headline value for the PDVH Shares.  Unlike the Dalinar bid, however, the Amber bid's financing structure cannot be blocked by the 2020 Bondholders because Amber has entered into a TSA with an ad hoc group of 2020 Bondholders that provides for "all of the purported security interests in the equity of CITGO Holding that secure the PDVSA 2020 Bonds to be released and terminated in full."  FOF, ¶ 114.  The risk of the 2020 Bondholder litigation is no longer theoretical: having won their motion for summary judgment in the Southern

---

[7] Indeed, it seems the Venezuela Parties have not even convinced themselves that PDVH is worth more than the bids on offer in this Sale Process.  The Venezuela Parties reserved their right to bid on the PDVH Shares during the Sale Process.  FOF, ¶ 78.  The Venezuela Parties surely would have submitted a bid for $8 billion—or would have identified a bidder or bidding partner willing to do so—if they truly believed the PDVH Shares were worth anything close to the $18 billion valuation Dr. Alberro claims.  But they did not.  It is therefore reasonable to assume that the Venezuela Parties do not believe the fantasy valuation their own experts are selling.  Thus, even if Delaware's 50% standard were as rigid as the Venezuela Parties posit (it is not), they have failed to establish that the PDVH Shares are actually worth more than twice the amount Amber is willing to pay for them, a necessary factual predicate for the standard's application.

District of New York, the 2020 Bondholders now hold an enforceable lien on 50.1% of the shares of CITGO Holding. *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025). The Amber bid appropriately anticipated this risk and is now positioned to neutralize the threat that the 2020 Bondholders' success would pose to the sale of the PDVH Shares if the Dalinar bid were adopted.

### A.    The Amber Bid Is the Highest And Best Bid

Comparing the Amber bid to Dalinar's confirms Amber is the only reasonable choice and the reason is simple: Amber's bid can close, and in a reasonable timeframe at that. The Southern District of New York has confirmed that the 2020 Bondholders' pledge against 50.1% of the CITGO Holding shares is valid and enforceable. *Petróleos de Venezuela, S.A.*, 2025 WL 2675871. As a result, Amber's deal to secure a release of the 2020 Bondholders' pledge for just $2.1 billion represents a discount on the full value of what the 2020 Bondholders could demand, which they estimate to be around $3 billion. FOF, ¶ 117. And Amber's bid will satisfy nearly $6 billion of Attached Judgments on closing, while conferring an additional $2 to $3 billion on the Venezuela Parties in the form of extinguished 2020 Bonds. Amber offers far and away the most value and there is no longer any serious dispute to the contrary. FOF, ¶¶ 107, 117-20.

The value of Amber's agreement with the 2020 Bondholders must also be taken into account when assessing the Venezuela Parties' sure-to-be-repeated claim that the sale resulted in an inadequate price. To be clear, while the monetary value of Amber's settlement with the 2020 Bondholders remains an inappropriate criterion to determine which of several bids for the PDVH Shares is the highest, that does not mean its value *to the Venezuela Parties* is irrelevant, especially now that the 2020 Bonds have been found to be valid despite the Venezuela Parties' repeated protestations to the contrary. Rather, the Delaware Supreme Court instructs that there is "no reason not to take" a "financial benefit to the debtor" into account when determining whether a sale price

is adequate, even when that benefit does not come in the form of "direct sale proceeds." *Deibler*, 652 A.2d at 559-60.

Here, Amber represented that it intends to extinguish any PDVSA 2020 Bonds acquired pursuant to the TSA. FOF, ¶ 119. Thus, up to $3 billion of PDVSA's debt may be forgiven as a result of the exchange agreed to as a condition of the Amber bid. *Id.* At minimum, with 75% of 2020 Bondholders already signed up to the TSA, FOF, ¶¶ 114-15, at least $2.25 billion of PDVSA's estimated debt will be forgiven. Thus, any evaluation of the Venezuela Parties' (meritless) claim that the sale should not be confirmed on the basis of price must account for the additional $2.25 to $3 billion that PDVSA—Venezuela's alter ego—will receive in debt relief as a result of the sale.

### B.      The Dalinar Bid Is Not A Viable Alternative To The Amber Bid

Unlike the Amber bid, "Dalinar doesn't currently have a settlement with the 2020 bondholders." Tr. 1080:17-20. Given the recent victory of the 2020 Bondholders confirming the validity of their pledge against 50.1% of CITGO Holding, the absence of an agreement with the 2020 Bondholders renders Dalinar's bid dead in the water—and certainly less viable than Amber's.

At the sale hearing, Gold Reserve, the primary member backing Dalinar's bid and leader of the Dalinar Consortium, claimed that Dalinar was "perfectly situated to … absorb [the] risk" posed by the 2020 Bondholders either by "negotiat[ing] with the funds available to us through pref[erred equity] investors or … on the other side of closing." Tr. 946:5-23. To support this claim, Gold Reserve maintains that Dalinar's financing contemplates $2.8 billion in additional cash which it can use to "settle" with the 2020 Bondholders. Tr. 972:17-973:9. That financing comprises three "buckets": (1) a $4.5 billion bridge loan secured by the assets of CITGO Petroleum following the proposed merger of Dalinar's subsidiary, Adolin Holdings Inc., into CITGO; (2) a $1.8 billion highly confident letter with J.P. Morgan to raise preferred equity financing; and (3) a

$2 billion asset-backed loan ("ABL") with an accordion feature worth up to an additional $1 billion.  GR-63, ¶ 72, PDF p. 596; GR-93, PDF p. 7; FOF, ¶ 225.  Together, Gold Reserve argues, this financing leaves nearly $2.8 billion remaining after the distribution of cash and non-cash consideration to the judgment creditors to satisfy the 2020 Bondholders pursuant to their pledge, should they prevail in the Southern District of New York.  Tr. 208:24-209:5, 972:17-973:9.  The documents and facts proven at the Sale Hearing tell a different story.

*First*, the Southern District of New York has now confirmed that the 2020 Bondholders hold a valid lien on 50.1% of CITGO Holding.  They will therefore demand satisfaction of their entire claim against PDVSA, which, with interest accrued to date, could total as much as $3 billion and will continue to grow until paid.  If the 2020 Bondholders are correct about the interest rate that governs (a matter that Venezuela disputes), the interest could grow by as much as hundreds of millions of dollars in the coming year alone before a transaction in this case can close.  Gold Reserve's hypothetical $2.8 billion to satisfy the 2020 Bondholders is therefore insufficient even if it could be used for this purpose (which it cannot, as discussed below).

*Second*, Gold Reserve cannot raise additional funds to settle with the 2020 Bondholders by issuing preferred equity, as its witness Mr. Paul Rivett suggested it might attempt to do.  Dalinar's bridge loan provides that any financing obtained through the issuance of preferred equity of CITGO before or at closing would reduce the amount of the bridge loan on a dollar-for-dollar basis.  FOF, ¶¶ 205-206.  Even if the highly confident letter were committed financing—and it is not, *see, e.g.*, Tr. 973:19-979:8—any of the $1.8 billion in preferred equity financing that is raised post-closing must therefore be used to pay down the balance of the bridge loan.  GR-63, PDF pp. 537-39.

*Third*, Dalinar's ABL facility likewise cannot be used as a source of *additional* funds.  The terms of the ABL expressly prohibit Dalinar from using it to pay the 2020 Bondholders within the first year of closing or while the bridge loan remains outstanding.  *See* FOF, ¶¶ 210-14; Tr. 995:18-999:9.  But as Gold Reserve itself acknowledged at the Sale Hearing, there is *no* guarantee that the bridge loan will be converted to a term loan.  Tr. 1004:14-21.  As a result, if and until the bridge loan is converted to a term loan at some unspecified point post-closing, Gold Reserve and Dalinar can rely neither on the issuance of preferred equity nor on the ABL or bridge loan to settle with the 2020 Bondholders.

Given that its financing does *not* allow Dalinar to absorb the 2020 Bondholders' possession of 50.1% of CITGO Holdings' equity—and despite the recent victory of the 2020 Bondholders in the Southern District of New York—Gold Reserve tries to bolster the viability of the Dalinar bid by minimizing the likelihood that the 2020 Bondholders will be able to block their proposed deal.  Here, too, Gold Reserve's assertions are unavailing.

*First*, Gold Reserve asserts that the 2020 Bondholders will be unable to take control of CITGO Holding's stock because of OFAC's ongoing suspension of General License 5 ("GL-5"), which previously allowed transactions relating to blocked property including the CITGO Holding Shares.  *See* Tr. 1400:6-1401:4, 1604:2-6.  But, by its terms, OFAC's suspension of GL-5 expires on December 20, 2025.  *See* U.S. Dep't of the Treasury, Office of Foreign Assets Control, Venezuela General License 5S – Authorizing Certain Transactions Related to the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After December 20, 2025 (June 20, 2025), *available at* https://ofac.treasury.gov/media/934391/download?inline.  For all its bluster, Gold Reserve has offered no reasoned basis for any expectation that OFAC would permit the transfer of attached PDVH Shares to Gold Reserve, but prohibit the 2020 Bondholders' exercise of their rights under

28

the pledge to seize 50.1% of the equity in CITGO Holding—particularly now that the Southern District of New York has found the pledge valid.  OFAC has made no such indication that it would take sides by allowing one transaction but prohibiting the other.  Indeed, Gold Reserve's CEO, Mr. Paul Rivett, acknowledged at the Sale Hearing that he was "not … aware of" OFAC's "plans with respect to the GL-5."  Tr. 1059:19-22.  Nothing therefore supports Gold Reserve's speculation that OFAC will prohibit the 2020 Bondholders' acquisition of 50.1% of the CITGO Holding shares while permitting Dalinar's acquisition of the PDVH Shares for the benefit of the Additional Judgment Creditors.

*Second*, Gold Reserve argues that the 2020 Bondholders must obtain an injunction in the Southern District of New York to prevent the sale transaction from moving forward, and that the 2020 Bondholders indicated to Judge Failla that they would not seek such an injunction.  Tr. 221:6-14, 1616:3-13.  This distorts the 2020 Bondholders' assertions.  The 2020 Bondholders have made clear—including before this Court—that they do not require an injunction to prevent Dalinar from executing a merger at the CITGO Petroleum level.  Tr. 1579:11-14.  Under the pledge agreement, the collateral agent is entitled to act as the outright owner of the CITGO Holding shares and to direct how they were voted.  Tr. 1579:24-1580:9.  Thus, even if Dalinar were to acquire 100% of the PDVH Shares, "it cannot control the boards or the majority of the voting stock of the CITGO entities.  That control lies with the 2020 bondholders."  Tr. 1580:3-9.

*Third*, Gold Reserve argues that the Venezuela Parties will obtain a stay pending appeal of Judge Failla's decision, allowing the Gold Reserve transaction to close in the interim.  Tr. 1605:6-12.  But there is no basis whatsoever to believe that Judge Failla—who just weeks ago upheld the validity of the 2020 Bondholders' rights under the pledge—would now allow the value of those same bonds to be eviscerated by staying the 2020 Bondholders' exercise of their rights while

allowing the sale transaction to close. Nor does this argument take account of the fact that the Bondholders already control the CITGO Holding shares. And it is far more likely that Judge Failla will allow the 2020 Bondholders to exercise their rights to maintain the status quo, even if a sale of the CITGO Holding shares is eventually stayed.

In sum, the 2020 Bondholders' success is Gold Reserve's and Dalinar's demise. Despite knowing of the obvious risk posed by the 2020 Bondholders for years, Gold Reserve did nothing to eliminate it. It is now clear that Gold Reserve and Dalinar simply do not have the cash necessary to take out the 2020 Bondholders so that the merger of Adolin and CITGO Petroleum can proceed. Nor can they credibly claim that the 2020 Bondholders pose no threat to that proposed merger—they control CITGO Holding, the direct parent company of CITGO Petroleum, the company Dalinar needs to control in order to make its financing structure work. As a result, Dalinar's bid is not viable at all, and it is certainly not a realistic alternative to Amber's.

## CONCLUSION

For the reasons above and in the opening briefs submitted by the Additional Attached Judgment Creditors supporting the Amber bid, Crystallex respectfully submits that the Court should confirm Amber Energy as the winning bidder and direct the Special Master to complete the sale of the PDVH Shares to Amber Energy.

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539


Dated: October 8, 2025

/s/ Travis S. Hunter
Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*

31