# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br>        Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br>        Defendant. | Case No. 17-mc-151-LPS |

## GOLD RESERVE'S POST-TRIAL OPENING BRIEF

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

- and -

**BRITHEM LLP**

Michael J. Bowe (*pro hac vice*)
Lauren Tabaksblat (*pro hac vice*)
Andrew T. Sutton (*pro hac vice*)
Kate E. Fisch (*pro hac vice*)
565 5th Avenue
New York, New York 10017
Telephone: (646) 653-9378
mbowe@brithem.com
ltabaksblat@brithem.com
asutton@brithem.com
kfisch@brithem.com

**NORTON ROSE FULBRIGHT US LLP**

Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

Katherine G. Connolly (*pro hac vice*)
One Embarcadero Center, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................1

II.    THE GOLD RESERVE/DALINAR ENERGY IMPROVED BID REMAINS THE HIGHEST AND BEST BID ...........................................................................4

III.    APPROVING THE UPDATED FINAL RECOMMENDATION WOULD VIOLATE THE DELAWARE LAW REQUIREMENT THAT THE PDVH SHARES BE SOLD "TO THE HIGHEST BIDDER"...........................................................................................8

IV.    RECORD EVIDENCE DOES NOT SUPPORT THE EXISTENCE OF THE "CONTINGENT RISK" UPON WHICH THE UPDATED FINAL RECOMMENDATION IS BASED ......................................................................................................12

V.    THE UPDATED FINAL RECOMMENDATION WOULD CREATE A "FUNDAMENTAL INJUSTICE"..................................................................15

VI.    ALTERNATIVELY, A RISK THAT IS AS CONTINGENT AND SPECULATIVE AS THE 2020 BONDHOLDERS RISK CANNOT, UNDER ANY CIRCUMSTANCES, JUSTIFY A MULTI-BILLION PRICE DECREMENT ..............................................18

    A.    There Is No Record Evidence Showing that OFAC Will Ever Change its Long-Standing Policy of Suspending the 2020 Bondholders' Purported Pledge .................................19

    B.    There Is No Record Evidence Showing that the 2020 Bondholders Will or Can Obtain an Injunction That Interferes with the Gold Reserve/Dalinar Energy Closing ............................ 20

    C.    If a Law or Regulation Actually Creates Interference with Dalinar Energy's Financing— then Dalinar Energy Must Obtain Replacement Financing ....................................... 23

    D.    The Record Evidence Shows that Gold Reserve/Dalinar Energy have Arranged Contingent Financing Sufficient to Mitigate the 2020 Bondholders Risk, Should That Ever Actually Become Necessary ...................................................................... 23

    E.    The Elliott/Amber Energy Bid is Vulnerable to Appeal and to a Stay Pending Appeal .. 25

VII.    THE ELLIOTT/AMBER ENERGY BID HAS EQUAL, IF NOT MORE, CLOSING UNCERTAINTY THAN THE SUCCESSFUL BID OR THE IMPROVED BID ......................27

    A.    The Amber Energy TSA Has Multiple Conditions Precedent and Termination Rights... 27

    B.    The Amber Energy TSA's Multiple "Commercially Reasonable Efforts" Clauses Create Substantial Closing Uncertainty ............................................................... 28

    C.    The Amber Energy TSA's "Consenting 2020 Noteholder Consent Right" Adds More Uncertainty to the Elliott/Amber Energy Bid .............................................. 31

    D.    The Amber Energy TSA Does Not Deliver the Release of Collateral and Extinguishment of Claims by the 2020 Bondholders that It Promises .............................................. 32

    E.    The Elliott/Amber Energy Bid Faces Substantial Regulatory Risks ............................... 34

VIII.    CONCLUSION..................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Girard Tr. Bank v. Castle Apartments, Inc.*,
   379 A.2d 1144 (Del. Super. Ct. 1977) ..................................................................17

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*,
   846 F.3d 1 (2d Cir. 2017) .................................................................................33

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   19-cv-10023 (S.D.N.Y.)...............................................................................19, 20

*Petition of Seaford Hardware Co.*,
   132 A. 737 (Del. Super. 1926) ..........................................................................15

*Serdarevic v. Centex Homes, LLC*,
   No. 08 CV 5563 VB, 2012 WL 4054161 (S.D.N.Y. Sept. 5, 2012).......................29

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
   441 F. Supp. 3d 1 (S.D.N.Y. 2020)....................................................................29

*Smith v. Caldera Props.-Nassau Grove, LLC*,
   No. CIV.A.S09C-05-005ESB, 2011 WL 2420842 (Del. Super. Ct. June 9,
   2011) .............................................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)............................................21

**Rules and Statutes**

8 Del. C. § 324(a) (2024) ...............................................................1, 8, 9, 10, 12

**Other Authorities**

Narcotics Rewards Program: Nicolas Maduro Moros, U.S. DEP'T OF STATE (Aug.
   7, 2025), https://www.state.gov/nicolas-maduro-moros.......................................21

Dep't of Treas., Office of Foreign Assets Control, Frequently Asked Questions
   (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-
   sanctions/faqs/595..........................................................................................19

WLRN (Sept. 12, 2025), https://www.wlrn.org/americas/2025-09-12/rubio-leads-
   charge-in-trumps-new-war-in-latin-america;.......................................................21

Pursuant to the schedule set by the Court (D.I. 2348), Gold Reserve Ltd. f/k/a Gold Reserve Inc. ("Gold Reserve") respectfully submits this Post-Hearing Opening Brief.

## I.    INTRODUCTION

The Updated Final Recommendation should be rejected. It asks the Court to approve a bid that has a $2 billion lower purchase price than the Gold Reserve/Dalinar Energy Improved Bid on the basis of speculation and conjecture. The sole rationale for the Updated Final Recommendation is that the Elliott/Amber Energy Bid includes a settlement with the 2020 Bondholders, but the risk that this settlement purportedly mitigates is merely the ***possibility*** that the 2020 Bondholders ***might*** be able to interfere with Gold Reserve/Dalinar Energy's financing and thus ***might*** be able to prevent Gold Reserve/Dalinar Energy from closing on the purchase of the PDVH Shares. None of this is certain or proven. The "2020 Bondholders Risk" is a contingent risk, nothing more, and its mitigation cannot justify the Court accepting the Updated Final Recommendation. There are at least <u>five</u> reasons why this is so.

<u>First</u>, such an outcome is prohibited by Delaware law, which requires that the Court sell the PDVH Shares to the "highest bidder." This statutory requirement is absolute. As between two conforming bids submitted by qualified bidders, no discretion is afforded to a court under Section 324 to reject a higher bidder in favor of a lower bidder. No party has identified any Delaware authority that permits such a result, nor does any exist. Nothing at the Sale Hearing changed this reality. To the contrary, the undisputed record evidence confirmed that Elliott/Amber Energy is not the highest bidder, given that its bid has a purchase price of ***$5.9 billion***, whereas the Dalinar Energy Improved Bid is ***$2 billion higher***, at ***$7.9 billion***. This alone compels rejection of the Updated Final Recommendation as a matter of law.

<u>Second</u>, even if Delaware law did afford the Court discretion to consider a factor other than purchase price when evaluating two qualifying, conforming bids (which is not the case), no

1

evidentiary support for the contingent 2020 Bondholders Risk was presented at the Sale Hearing. Specifically, no witness testified that the 2020 Bondholders would actually attempt to interfere or enjoin the Gold Reserve/Dalinar Energy financing or closing. Likewise, no witness testified that the Gold Reserve/Dalinar Energy financing violates the purported Pledge Agreement or Indenture. Indeed, no witness from the 2020 Bondholders testified at the Sale Hearing at all. This absence of evidence is a critical flaw in the case of those parties that support the Updated Final Recommendation, as without such record evidence there is no evidentiary basis upon which the Court can make the requisite finding that the 2020 Bondholders Risk is of such magnitude and certainty that its mitigation would justify the $2 billion purchase price decrement that would result from the Elliott/Amber Energy Bid.

Third, approval of the Updated Final Recommendation would run afoul of the separate Delaware law requirement that the price of the sale of the PDVH Shares should not create a "fundamental injustice." Here, such an injustice would be created because the Elliott/Amber Energy Bid is predicated on an improper diversion of $2 billion from the Attached Judgment Creditors to the 2020 Bondholders, a group of non-parties that do not have a final, non-appealable judgment in their own SDNY action, much less any judgment in these Delaware proceedings. Gold Reserve/Dalinar Energy, as the Special Master correctly observed in the Final Recommendation, "has acted in good faith throughout the bidding and sale process" by having, among other things, "complied with the provisions of the Sale Procedures Order, Bidding Procedures, and December 31 Order[.]" (GR-063, D.I. 1837 at ¶¶ 116-18). In these circumstances, and given that Gold Reserve, Siemens Energy Inc. ("SEI"), and Valores Mundiales, S.L. and Consorcio Andino, S.L. (collectively, the "Valores Parties"), like any other Attached Judgment Creditors, have a right to collect on their judgments if a qualified, conforming bid has a price that would achieve this result,

2

and Venezuela and PDVSA have an equivalent right to have as much of their attached debt cleared through the Sale Process, it would be fundamentally unjust to accept the lower-priced Elliott/Amber Energy Bid in the face of the conforming, qualified Gold Reserve/Dalinar Energy bid with its $2 billion higher purchase price.

Fourth, in addition to these first three reasons, the record evidence confirms that the 2020 Bondholders Risk does not justify a $2 billion purchase price decrement, particularly given the measures put in place by Gold Reserve to mitigate this risk, should that ever actually become necessary. As noted, the entire rationale for the materially lower-priced Elliott/Amber Energy Bid is that it purports to mitigate the *possibility* that the 2020 Bondholders *might* be able to interfere with the financing of the Dalinar Energy bid. However, for this *possibility* to actually materialize— and thus justify the proposed $2 billion price decrement such mitigation—multiple events would need to occur, not one of which has been established as probable on the evidence. These events include: (1) OFAC would have to reverse its long-running suspension of the 2020 Bondholders' ability to exercise their purported Pledge; (2) the 2020 Bondholders would have to actually request and be able to obtain an injunction that interferes with the Gold Reserve/Dalinar Energy financing—something that the 2020 Bondholders represented to Judge Failla they will not do and that, in any event, the evidence does not support; (3) in the improbable event that these two events occur, Gold Reserve would have to fail to obtain the replacement financing required by the "early termination provision" it agreed to include in the revised SPA that accompanied its Improved Bid; (4) Gold Reserve would also have to be unsuccessful in settling with the 2020 Bondholders (using the $2.8 billion in contingent finance that it arranged for this purpose); and (5) in the interim, the 2020 Bondholders would have to prevail in the impending appeal of Judge Failla's summary judgment and not have Judge Failla (or the Second Circuit) stay enforcement of their judgment

pending appeal. The probability of all five (5) of these events occurring in favor of the 2020 Bondholders remains extremely low. And, as such, the hypothetical, highly contingent risk that the 2020 Bondholders *might* be able to interfere with the Gold Reserve/Dalinar Energy financing cannot, on the evidence, justify the definite $2 billion purchase price decrement that would result from the Court accepting the Updated Final Recommendation.

Fifth, relatedly, the evidence has confirmed that the Elliott/Amber Energy Bid has substantial closing uncertainty, and that this uncertainty is at least equal to that of the Gold Reserve/Dalinar Energy Improved Bid. Specifically, the Amber Energy TSA does not actually ensure a settlement with the 2020 Bondholders. Rather, on its face, and as confirmed by witness testimony, it is merely an "agreement to agree" that has so many loopholes and potentially off-ramps that it provides no real certainty that the Elliott/Amber Energy Bid will ever close.

For these reasons, and as more fully set out below and in the accompanying proposed findings of fact, Gold Reserve respectfully requests that the Court reject the Updated Final Recommendation and approved the Gold Reserve/Dalinar Energy Improved Bid.

## II.    THE GOLD RESERVE/DALINAR ENERGY IMPROVED BID REMAINS THE HIGHEST AND BEST BID

Before exploring the reasons why the Updated Final Recommendation should be rejected, it bears reiterating that the record evidence has confirmed that the Gold Reserve/Dalinar Energy Improved Bid remains the highest bid and the best bid. The reasons supporting this conclusion are substantially the same as those that the Special Master identified in the Final Recommendation when he represented to the Court that the Gold Reserve/Dalinar Energy Successful Bid should be approved. (FOF § I(G); GR-063, D.I. 1837 at 29-33).

*Price:* There is no dispute that the Final Recommended Bid and the Improved Bid both have a purchase price that is materially higher than the Elliott/Amber Energy Bid. The Improved

Bid offers *$7.9 billion* to purchase the PDVH Shares, every dollar of which represents satisfaction of Attached Judgments. (FOF § II(B); GR-092; GR-093). In improving its purchase price of its already Successful Bid by $520 million, Gold Reserve followed the Court's guidance that the "bid it is likely to approve at the conclusion of the [Sale] Process will need a balance that places much greater emphasis on price[.]" (FOF § I(E); D.I. 1741 at 3). The Improved Bid's price remains the highest price of any conforming bid ever submitted. (FOF § II(B)(ii); D.I. 2183).

The $7.9 billion purchase price of the Improved Bid was made paid possible by Gold Reserve undertaking several actions to materially improve the terms of its existing Successful, Final Recommended Bid during the three-day "match period." The most significant of these was Gold Reserve agreeing terms with the Valores Parties, pursuant to which Gold Reserve is able to include the full value of the $720 million Valores Parties' Judgment in its credit bid. This is evidenced in the Bidder Equity Commitment Letter included in the Improved Bid (GR-092, D.I. 2126 at 24-27). In so doing, Gold Reserve presented a conforming, fully-financed bid that satisfies more Attached Judgments and goes further down the Court's priority waterfall than any other bidder has ever done. This improvement brought the total purchase price of Dalinar Energy's Improved Bid to $7.9 billion—a full $2 billion higher than the $5.9 billion purchase price of the Elliott/Amber Energy Bid.

***Certainty of Closing***: The Gold Reserve/Dalinar Energy Improved Bid is at least equal to the Elliott/Amber Energy Bid on closing certainty. Again, the evidentiary support for this conclusion is set out by the Special Master in the Final Recommendation:

- The Special Master expressed "confidence with respect to Dalinar Energy's financial wherewithal and certainty of financing to recommend approval of the Proposed Sale Transaction," which he confirmed was "capable of being timely

5

consummated." (FOF § II(B)(iii); *id.* ¶ 78 (citing Hiltz Decl. ¶ 63)). The Special Master further praised Dalinar Energy's financing parties as "highly reputable global financial institutions." (SM-028, D.I. 1838 ¶ 65).

- The Special Master also confirmed he had "carefully assessed the certainty associated" with the Gold Reserve/Dalinar Energy Bid and "the likelihood it would be approved by the Court and then successfully proceed to closing," (*id.* at 21), and that he was "reasonably satisfied that Dalinar is likely to attain the requisite regulatory approvals." (FOF § I(G); *id.* at ¶ 82(a)). This has proven true, with Gold Reserve/Dalinar Energy having already obtained the first such requisite approval from the FTC confirming that there are no antitrust concerns with its bid (D.I. 2120).

- The Improved Bid was supported by sufficient "financial wherewithal and certainty of financing as demonstrated by its financial commitment letters[.]" (FOF §§ I(G), II(B)(iii); GR-063, D.I. 1837 at ¶ 62). None of this financing was contingent on the outcome of the 2020 Bondholders' litigation in the SDNY (FOF § II(B)(iii); D.I. 2183 at 19), and, as subsequently confirmed by the record evidence, none of this financing was disturbed by Judge Failla's September 18, 2025 ruling. (FOF § II(B)(iii); Day 4, 954:24-955:3; 1094:17-1095:4) (P. Rivett) (testimony that SDNY decision in favor of 2020 Bondholders does not alter financing and that there are more factors at play than just the SDNY decision).

- The Dalinar Energy SPA does not include any additional conditionality relating to pending or future litigation, an appeal of the Sale Order, or any other terms compared to the model SPA. (FOF § II(B)(iii); GR-063, D.I. 1837 at ¶ 82(c)). It

also contains the requisite consents to non-cash consideration for its bidding consortium members and partners—Koch, Rusoro, SEI and the Valores Parties. (FOF § I(G); GR-063, D.I. 1837 at ¶ 82(g)).

- Critically, the Special Master also assessed the "chance the PDVSA 2020 Bondholders could be successful in their efforts to enjoin a sale of the PDVH Shares similar to the [Dalinar Energy] Proposed Sale Transaction[.]" (FOF § I(G); *id.* at 33). But "after evaluation of the attendant risks with his Advisors," the Special Master "conclude[d] that the risks relating to the PDVSA 2020 Bonds are ***significantly outweighed*** by the difference in purchase price between the Proposed Sale Transaction and the Revised Stalking Horse Bid," even though the latter, like the Elliott/Amber Energy Bid, also featured a "proposed settlement with the PDVSA 2020 Bondholders via a transaction support agreement[.]" (FOF § I(G); *id.* at 26, 33 (emphasis added)).  Indeed, in this respect, the Special Master noted that even if Red Tree had succeeded in lowering the purchase price delta to $2 billion, he remained "skeptical" that its TSA and associated settlement with the 2020 Bondholders would outweigh that $2 billion price difference. (FOF § I(G); *id.* ¶ 81).

The Improved Bid also further minimized any actual risk to the Gold Reserve/Dalinar Energy Bid closing presented by the 2020 Bondholders' litigation threats by increasing the amount of contingent financing available to settle with the 2020 Bondholders to a total of $2.8 billion. Mr. Rivett testified at the Sale Hearing as to the nature and availability of this financing. (*See, e.g.*, FOF § II(B)(iii); Day 4, 973:3-979:8; 993:8-21; 996:20-23). This additional financing more than adequately addressed the risk that the 2020 Bondholders may attempt to interfere with closing. For

example, it is circa $600 million more than what the 2020 Bondholders are purportedly receiving under the Amber Energy TSA. Further, Mr. Rivett testified that he had full confidence that—if additional funds beyond the $2.8 billion were needed—the financing could be obtained. (FOF § II(B)(iii); Day 4, 1123:8-1126:7) (P. Rivett).

And, finally, Gold Reserve/Dalinar Energy agreed in its Improved Bid to include the "early termination right" in its SPA as requested by the senior judgment creditors. (FOF § II(B)(iii); GR-092, D.I. 2126-1 at 6). Thus, if the Gold Reserve/Dalinar Energy financing is ever in fact threatened by the 2020 Bondholders, then Dalinar Energy is contractually obligated to obtain alternative financing within a reasonable, 90-day cure period, failing which the Special Master has the right to terminate the Dalinar Energy SPA and pivot to another bid. (FOF § II(B)(iii); GR-092, D.I. 2126-1 at 6). This was a material concession by Gold Reserve and it removes any legitimate justification for the materially lower-priced Elliott/Amber Energy Bid.

In sum, the Special Master's original Final Recommendation had it right: "Dalinar's Proposed Sale Transaction is the highest bid" and is "capable of being timely consummated after taking into account the factors in the Court's guidance," including the relatively small risk to closing posed by the 2020 Bondholders. (FOF § I(G); GR-063, D.I. 1837 at 7).

## III.    APPROVING THE UPDATED FINAL RECOMMENDATION WOULD VIOLATE THE DELAWARE LAW REQUIREMENT THAT THE PDVH SHARES BE SOLD "TO THE HIGHEST BIDDER"

Delaware law requires that, once attached, corporate shares must be sold "at public sale to the highest bidder." 8 Del. C. § 324(a). This statutory requirement is absolute and dispositive of the issue before the Court. Given that the Elliott/Amber Energy Bid is $1.5 billion lower in purchase price than the Gold Reserve/Dalinar Energy Final Bid and $2.0 billion lower in purchase price than the Improved Bid, *see* (Day 2, 587:11-588:3 (W. Hiltz)), Delaware law does not permit approval of the Updated Final Recommendation.

8

All of the evidence and argument at the Sale Hearing ignored this fundamental point of law. However, no matter what the Special Master or senior creditors may speculate or think or believe about contingent risks to the Gold Reserve/Dalinar Energy bid, the undisputed fact is that Elliott/Amber Energy is not the highest bidder for the PDVH Shares. Accordingly, and putting aside everything else, the Updated Final Recommendation must be rejected as a matter of law and the highest bid—the Improved Bid submitted by Gold Reserve/Dalinar Energy—matter be approved.

Confirming that this conclusion is correct, neither the Special Master nor any other party supporting the Updated Final Recommendation has been able to cite a single case where, in a Section 324 sale, corporate shares have been sold to any person other than the highest bidder.[1] This is because no such authority exists. In the absence of such authority, it simply is irrelevant that the Special Master and his advisors *believe* the Elliott/Amber Energy Bid is "***better***" because it diverts $2 billion from the Attached Judgment Creditors to try to settle the 2020 Bondholders Risk. This is not a private M&A transaction where the Special Master and his advisors get to pick-and-choose to whom they want to sell PDVH Shares. This Sale Process is governed by the strictures of Delaware law. And under that law, there is no room for the exercise of discretion when the Court is evaluating two conforming bids from two qualified bidders.  Instead, in that scenario, Section 324 commands that the shares must be sold to the "highest bidder."

This all makes sense given that, under Section 324, the objective of the statutory "highest bidder" requirement is to extinguish as many attached judgments as possible, both for the benefit of the maximum number of attached judgment holders ***and*** for the benefit of the judgment debtor.

---

[1] In *Deibler v. Atlantic Properties Group, Inc.,* 652 A.2d 553 (Del. 1995), the case previously relied on by the supporters of the Updated Final Recommendation, the bid in question was the only bid, and therefore the highest bid, submitted for the shares being sold by the court.

The plain language of Section 324 confirms this:

> *§ 324. Attachment of shares of stock or any option, right or interest therein; procedure; sale; title upon sale; proceeds.*
>
> *(a)* ***The shares of any person in any corporation*** *with all the rights thereto belonging, or any person's option to acquire the shares, or such person's right or interest in the shares,* ***may be attached under this section for debt****, or other demands, if such person appears on the books of the corporation to hold or own such shares, option, right or interest.* ***So many of the shares, or so much of the option, right or interest therein may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt****, or other demand, interest and costs, upon an order issued therefor by the court from which the attachment process issued, and after such notice as is required for sales upon execution process.*

8 Del. C. § 324 (2024) (emphasis added). Yet, this fundamental principle has somehow been lost by the Special Master during the long, winding road of these Sale Proceedings. Now that the process is in its final stages, it must be enforced.

Section 324's "highest bidder" requirement does not mean, of course, that the Court cannot set criteria for defining what bidders are "qualified" and what bids are "conforming." That can be done, and has been done in this case. And, through such mechanisms, the Court and the Special Master are perfectly within the boundaries of the law to refuse to consider bids that purport to have a higher purchase price but, in fact, are non-actionable. Indeed, this principle has been applied in these proceedings by the Court and the Special Master to disregard multiple, non-actionable bids, certain of which purported to have a higher purchase price than either the Final Bid or the Improved Bid. (*See, e.g.*, GR-063, D.I. 1837 at 22 ("Non-Conforming Bids")). However, this principle ***has no application whatsoever*** to either of the Gold Reserve/Dalinar Energy bids. To the contrary, the record evidence confirms both that Gold Reserve/Dalinar Energy is a qualified bidder and that both its Successful Bid and its Improved Bid are fully conforming and actionable. (GR-063 at 25 ¶ 67; AM-045 at 1 ¶ 2). The Successful Bid was confirmed to be actionable when the Special Master recommended it to the Court on July 2, 2025. (GR-063). Likewise, there is no defect in the

Improved Bid that renders it non-actionable, and neither the Special Master nor any other party has ever contended the opposite.

The principle that the PDVH Shares must be sold to the highest bidder is embedded in the SPO. *See*, *e.g.*, (D.I. 481, ¶¶ D, H, 33, 36) (Sale Procedures Order) (the goal of the Sale Process is to "ensure a value maximizing sale process" that "result[s] in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments"); *see also* (D.I. 1554 at 4) (Jan. 27, 2025 Order) ("Second, the Court has endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH."). And, the Court has made clear that, at the conclusion of this Sale Process, price will be of paramount importance: "the Court expects that any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." (D.I. 1741 at 3).

Applying these rules to the undisputed record evidence, the Elliott/Amber Energy Bid violates the requirements of Delaware law because its purchase price is ***$1.5 billion*** lower than the purchase price of the Successful Bid and ***$2 billion*** lower than the purchase price of the Improved Bid.[2] The Court has established that a bidder's purchase price is based on one thing: "the amount of Attached Judgments expected to be satisfied by the purchase price." (D.I. 1554 at 26). The Special Master concedes that the Elliott/Amber Energy Bid price is $5.9 billion. (AM-45, D.I.

---

[2] Recognizing the Elliott/Amber Energy Bid fails under this criterion by a $2 billion margin, Amber Energy and its supporters have tried to advance a series of alternative formulations under which the supposed "value" of a bid can include other unrelated factors. (*See, e.g.*, D.I. 2036 at 1). But "value" is not "price."

2123 at 1, 8). This amount, and only this amount, is the **price** of the Elliott/Amber Energy Bid.[3] Likewise, there is no dispute that the purchase price of the Successful Bid is $7.382 billion, and that the purchase price of the Improved Bid is $7.9 billion. Given this, under Section 324, the Updated Final Recommendation must be rejected as a matter of law and the PDVH Shares must be sold to the qualified bidder with the highest, conforming bid—Gold Reserve/Dalinar Energy.

be sold to the qualified bidder that has the highest, conforming bid—Gold Reserve/Dalinar Energy.

## IV.    RECORD EVIDENCE DOES NOT SUPPORT THE EXISTENCE OF THE "CONTINGENT RISK" UPON WHICH THE UPDATED FINAL RECOMMENDATION IS BASED

There is another fatal flaw in the Updated Final Recommendation. As noted, its entire premise is that the materially lower-priced Elliott/Amber Energy Bid purports to settle the contingent risk that the 2020 Bondholders **might** attempt to interfere with the Gold Reserve/Dalinar Energy financing and therefore **might** be able to prevent the closing of the Gold Reserve/Dalinar Energy purchase of the PDVH Shares. Gold Reserve addresses in other sections of this brief why this purported settlement cannot, under any circumstances, justify either a $1.5 billion or $2 billion decrement in purchase price. However, the Court need not reach those issues given the other fatal flaw in the Updated Final Recommendation: the lack of record evidence providing the existence and particulars of the 2020 Bondholders Risk.

To understand the significance of this lack of record evidence, it is again necessary to return to first principles. On the undisputed record evidence, the purchase price of the Successful Bid and

---

[3] While the Special Master suggests that this price could be pushed higher in light of "additional cash consideration offered to discharge $500 million of Attached Judgments" (*id.* at 4), this is speculation. Amber Energy has not put this additional $500 million amount on the table. Rather, it has offered a fraction of that amount in exchange for Gold Reserve (or other creditors) consenting to extinguish $500 million of its judgment. (*Id.* at 5). This offer of a contingent cramdown violates Delaware law and the Court's prior orders and, in any event, is not equivalent to purchase price. As such, this "additional" $500 million is not included in Amber Energy's price.

the Improved Bid are, respectively, $1.5 billion and $2 billion higher than that of the Elliott/Amber Energy Bid. Even were it permissible under Delaware law to rely upon a contingent risk like the 2020 Bondholders Risk to justify selling the PDVH Shares to anyone other than the "highest bidder" (which it is not), the nature and extent of this risk still would need to be proven in order for its mitigation to properly be considered by the Court. Here, the Special Master, Elliott/Amber Energy, and all other parties that support the Updated Final Recommendation failed to satisfy this evidentiary burden at the Sale Hearing:

- No witness representing the 2020 Bondholders testified. The absence of such testimony was conspicuous, particularly given that the 2020 Bondholders have long been participating in these proceedings as an "interested party," and counsel for the 2020 Bondholders make oral remarks on the final day of the Sale Hearing. (Day 4, 1566:25-1581:14).

- No witness testified regarding the terms of the Pledge Agreement, the Indenture, or the 2020 Bonds, despite these documents being the entire basis for the purported 2020 Bondholders Risk.

- No witness testified that the 2020 Bondholders would, in fact, seek any injunctive relief against the Gold Reserve/Dalinar Energy Improved Bid or would otherwise attempt to interfere with the Sale Process or the closing of the Gold Reserve/Dalinar Energy Improved Bid.

- No witness was proffered by the Special Master, Elliott/Amber Energy or any other party regarding any analysis of the 2020 Bondholders Risk.

- No witness testified that the Gold Reserve/Dalinar Energy financing would terminate in the event the 2020 Bondholders prevailed in the SDNY litigation.

13

- No witness testified that the terms of the Gold Reserve/Dalinar Energy financing violated any provision of the Pledge Agreement or the Indenture. The absence of such evidence was particularly conspicuous given that Gold Reserve and the other members of its bidding consortium have long maintained that no such violation exists.[4]

In short, neither the Special Master nor any other party put forward any evidence at the Sale Hearing to attempt to substantiate the contingent risk at the heart of the Updated Final Recommendation.[5]  This is a fatal flaw. If the Special Master and other parties are going to base their legal position entirely on the assertion that the 2020 Bondholders might be able to leverage their Pledge Agreement and Indenture to interfere with the Gold Reserve/Dalinar Energy financing such that it is necessary to mitigate this risk by diverting more than $2 billion from the Attached Judgment Creditors to the 2020 Bondholders, then the burden is on the Special Master to actually put forward record evidence, in the form of witness testimony and documents, to substantiate the existence and particulars of this risk and to prove that this risk in fact creates the actual possibility of interference with Gold Reserve/Dalinar Energy's ability to close on its transaction. None of this occurred at the Sale Hearing.

---

[4] *See*, *e.g.*, D.I. 1696 at 4:  "C. Gold Reserve's Financing Structure Does Not Violate the Pledge. The entire premise of Red Tree's position is the incorrect assertion that Gold Reserve's financing structure violates the purported Pledge held by the 2020 Bondholders. While Gold Reserve's structure does use CITGO assets post-Closing, the Court has already determined that this is permitted, over the same objections and litigation threats now made again by the 2020 Bondholders. (D.I. 1553 at 2). As such, the fact that the 2020 Bondholders may, despite this clear ruling, try to object to the debt-financing structure of Gold Reserve's bid, or may attempt to interfere with consummation of the Sale Transaction, the possibility of that un-test objections does not justify any decrement to the Consortium's purchase price, much less $3.382 billion."

[5] *See* (VP-192 at 2-3) (Mr. Randall Weisenburger stating that "I have not seen—in the Special Master's Updated Final Recommendation, in any of his prior recommendations, in any of the declarations submitted by William O. Hiltz, or elsewhere—the Special Master or his Advisors provide such an analysis" of closing risk); (Day 1, 289:12-21, 290:19-291:6 (R. Weisenburger)) ("I haven't seen any analysis that shows . . . the Dalinar bid is $2 billion less likely to close if the 2020s win[.]").

Instead, the Special Master and other parties are simply asking the Court to accept on faith that this risk exists and that it justifies a $2 billion price decrement. That is improper. The purpose of the Sale Hearing was to establish and test the evidentiary foundation necessary to support the Special Master's recommendation. Here, for the Updated Final Recommendation, this was not done because nowhere did the Special Master (or any other party) actually prove, with evidence, the particulars of the 2020 Bondholders Risk and that it actually has the real possibility of interfering with the Gold Reserve/Dalinar Energy financing. As a result, there is no proper evidentiary basis upon which the Court can make the requisite findings of fact to attempt to justify the $2 billion price decrease if the Updated Final Recommendation were accepted.

In contrast, the particulars of the Gold Reserve/Dalinar Energy bids are fully supported by the record evidence, all of which confirmed that the Gold Reserve/Dalinar Energy Improved Bid is conforming, actionable and meets the Delaware law requirement of being the highest bid. This all provides an independent reason to reject the Updated Final Recommendation and approve the Improved Bid.

## V.    THE UPDATED FINAL RECOMMENDATION WOULD CREATE A "FUNDAMENTAL INJUSTICE"

Independent of its obligation to sell the PDVH shares to the highest bidder, the Court also "may, in [its] discretion, set aside a sale where inadequacy of price will result in unfairness or work an injustice on any party having an interest in the outcome of the sale." *Smith v. Caldera Props.-Nassau Grove, LLC*, No. CIV.A.S09C-05-005ESB, 2011 WL 2420842, at *2 (Del. Super. Ct. June 9, 2011). "This equitable power derives from the inherent control of the court over its own process 'for the correction of abuses or the prevention of injury.'" *Id.* (quoting *Petition of Seaford Hardware Co.*, 132 A. 737, 738 (Del. Super. 1926)). Here, the Court has acknowledged that this fairness analysis includes whether "it would be a fundamental injustice to close" on a particular

15

bid "when bids with a much greater purchase price were rejected." (D.I. 1741 at 7-8).

The Court has confirmed that the "price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH Shares taking into account the benefits and risks associated with this unique asset[.]" (D.I. 1554, quoting D.I. 1522 at 5).

Applying these principles to the record evidence, the Updated Final Recommendation fails the "fundamental injustice" test in at least three ways. <u>First</u>, it would materially shortchange the Attached Judgment Creditors by diverting $2 billion to the 2020 Bondholders, so that they can lock in a recovery on their disputed securities. This underpayment would work a grave injustice to the Attached Judgment Creditors, including in particular the three Attached Judgement Creditors that would have their judgments satisfied in full by the Dalinar Energy Improved Bid—Gold Reserve, SEI, and the Valores Parties—but ***receive nothing*** under the Elliott/Amber Energy Bid. Such a result would be particularly unjust given that the entire price difference would inure to the benefit of the 2020 Bondholders, third parties who hold no judgments in this Court and whose interests are diametrically opposed to the requirement of Delaware law that the PDVH Shares be sold to the highest bidder.

<u>Second</u>, the over $2 billion with which Amber Energy proposes to pay off the 2020 Bondholders could be a massive, unjust windfall. As discussed herein, the 2020 Bondholders' purported rights are still the subject of active litigation. Despite this, the Elliott/Amber Energy Bid would irrevocably lock in a $2.125 billion payment in cash to the 2020 Bondholders. That cash payment could still represent a massive and unjustified windfall—in the Court's words, "a fundamental injustice"—in the event that the 2020 Bondholders again lose on appeal. (D.I. 1741 at 7-8 ("it would be a fundamental injustice to close on such a Final Bid" if "the 2020 Bondholders have no rights to CIT[G]O Holding")).

Third, the $5.9 billion purchase price of the Elliott/Amber Energy Bid is so grossly inadequate as compared to the market price established by the Gold Reserve/Dalinar Energy Improved Bid that it "shocks the conscience." *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1145 (Del. Super. Ct. 1977) ("It is recognized that decisions of this Court have held that gross inadequacy of price which shocks the conscience of the Court may serve as the basis for setting aside a sheriff's sale.").

In this respect, Gold Reserve notes that the Special Master asserted in the Updated Final Recommendation that Elliott/Amber Energy's Bid, which has a price gap of $2 billion *vis-à-vis* the Gold Reserve/Dalinar Energy Improved Bid, is a change of circumstance because of the Amber Energy TSA. (FOF § I(J); AM-45, D.I. 2123 at ¶¶ 12-14, 24). But, that argument cannot be squared with the Special Master's prior representations to the Court in the Final Recommendation which rejected the Revised Stalking Horse Bid despite it potentially having ***exactly the same*** delta in purchase price. (FOF § I(G); D.I. 1837 ¶ 81). When he compared the Gold Reserve/Dalinar Energy Successful Bid to the Revised Stalking Horse Bid, the Special Master discussed Red Tree's failed efforts to get Rusoro to agree to non-cash consideration. (FOF § I(G); GR-063, D.I. 1837 ¶ 68). Critically, the Special Master noted then that even if Red Tree had succeeded, he was "skeptical that the revised purchase price . . . and any value attributable to the Revised Stalking Horse Bid on account of closing certainty, as compared to the Dalinar Topping Bid, would be sufficient to make up for the over ***$2.076 billion*** purchase price difference." (FOF § I(G); GR-063, D.I. 1837 ¶ 81 (emphasis added)). This is the same amount of the price difference between Gold Reserve/Dalinar Energy's Improved $7.9 billion bid and Elliott/Amber Energy's $5.9 billion bid, and this too shocks the conscience and renders the price of the Elliott/Amber Energy Bid grossly inadequate.

## VI.  ALTERNATIVELY, A RISK THAT IS AS CONTINGENT AND SPECULATIVE AS THE 2020 BONDHOLDERS RISK CANNOT, UNDER ANY CIRCUMSTANCES, JUSTIFY A MULTI-BILLION PRICE DECREMENT

Even if the Special Master and other parties supporting the Updated Final Recommendation had proffered evidence proving the existence and particulars of the 2020 Bondholders Risk (which they did not), the evidence that is in the record shows that this risk is so contingent and speculative that its mitigation cannot justify the multi-billion price decrement of the Elliott/Amber Energy Bid. Specifically, even though Judge Failla has ruled in favor of the 2020 Bondholders, multiple other events would still have to occur for the 2020 Bondholders to present any actual risk to the Gold Reserve/Dalinar Energy financing, and therefore its ability to close.

These events include: (1) OFAC would have to change its policy and lift the long-running suspension of the 2020 Bondholders' ability to exercise their purported rights under the Pledge; (2) the 2020 Bondholders would have to actually satisfy the stringent requirements for obtaining an injunction; (3) Dalinar Energy would have to fail to obtain the alternative financing necessary to close on its Sale Transaction that it now is obligated to obtain under the "early termination provision" it has proposed for its SPA; (4) Gold Reserve would have to be unsuccessful in settling with the 2020 Bondholders (using the additional $2.8 billion in contingent financing that Gold Reserve arranged to meet this contingent risk); and (5) the Venezuela Parties would have to fail to obtain another stay of enforcement pending appeal, as they obtained during their prior appeal, and the 2020 Bondholders would have to prevail on appeal.[6] No record evidence was proffered to establish that any of these events is probable. As such, for this independent reason, the Updated

---

[6] The *de minimis* nature of the actual risk presented by the 2020 Bondholders to the Dalinar Energy closing is explained at length in Gold Reserve's prior submissions. *See*, *e.g.*, D.I. 1991 at 1-14. More recently, the Venezuela Parties' expert identifies in his Sixth Supplemental Expert Report the same hurdles that would need to be overcome before the litigation risks threatened by the 2020 Bondholders could manifest: "however, the Special Master and his Advisors have not provided any analysis of the likelihood of any of these events occurring to justify his recommendation, let alone a rigorous one." (VP-192 at 3).

Final Recommendation should be rejected.

### A. There Is No Record Evidence Showing that OFAC Will Ever Change its Long-Standing Policy of Suspending the 2020 Bondholders' Purported Pledge

With respect to the first event, the record evidence has confirmed that if OFAC does not change its long-standing policy that prevents them from exercising any remedies that they have under their purported Pledge, then there is no risk to the Gold Reserve/Dalinar Energy bid and thus the entire rationale for selecting the lower-priced Elliott/Amber Energy Bid falls apart.[7] As previously highlighted by the Court, there is a distinct possibility that OFAC "will continue to suspend GL-5 beyond the date of the expected closing" of the PDVH Shares sale. (D.I. 1741 at 7-8). And, OFAC has expressly warned in connection with General License 5 that, "transactions related to the sale or transfer of CITGO shares in connection with the PDVSA 2020 8.5 percent bond are prohibited, unless specifically authorized by OFAC."[8] As such, even though the 2020 Bondholders prevailed in obtaining a summary judgment ruling in their favor before Judge Failla, OFAC would still have to authorize the exercise of their purported voting rights under the Pledge—which OFAC has affirmatively prohibited for nearly 6 years – in order for there to be any actual risk to the Gold Reserve/Dalinar Energy financing.[9]

---

[7] Day 2 - Recorded Portion, 12:19-13:6) ("Mr. Kirtland: Now, you're aware, Mr. Hiltz, that for the last six years, OFAC has suspended the ability of the 2020 bondholders to exercise their rights under the alleged pledge, yes? Mr. Hiltz: Yes. Q: And you would agree with me that if OFAC does not change this policy and does not lift this long-running suspension, that this potential threat to the -- to the Gold Reserve Dalinar financing, coming from the exercise of this pledge, does not exist, correct? A: I'm not a lawyer, but as a layman, I think you're probably correct."). This testimony confirmed the position long-recognized by the Special Master that for the 2020 Bondholders to "exercise their remedies under the CITGO Holding Pledge to block the transaction[,]" OFAC would have to "*lift[] the suspension of General License 5[.]*" (D.I. 2273 at 7 (emphasis added)).

[8] Dep't of Treas., Office of Foreign Assets Control, Frequently Asked Questions (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/595 (summarizing history of GL-5).

[9] *See* Dep't of Treas., Office of Foreign Assets Control, Frequently Asked Questions (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/595 (summarizing history of GL-5); *see Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-cv-10023,* 19-cv-10023, D.I. 1 (S.D.N.Y. Oct.

Despite this, neither the Special Master nor any other party introduced any evidence that suggests, much less proves, that there is a possibility that OFAC will ever change its long-standing policy. As such, there is no evidentiary basis upon which the Court can find that the purported risk presented by the 2020 Bondholder will ever actually materialize and therefore justify either the $1.5 billion or $2.0 billion price decrement of the Elliott/Amber Energy Bid.[10] This is a critical flaw in the position advocated by the Special Master and others, and it alone justifies rejecting the Updated Final Recommendation.

**B. There Is No Record Evidence Showing that the 2020 Bondholders Will or Can Obtain an Injunction That Interferes with the Gold Reserve/Dalinar Energy Closing**

With respect to the <u>second event</u>, the 2020 Bondholders have already expressly represented to Judge Failla that they would not seek to interfere with Gold Reserve's bid or this Court's Sale Process (*see* (D.I. 1991 at 1-3)):[11]

> [W]e're not seeking an injunction of Judge Stark, we're not seeking an injunction of the special master, we're not seeking an injunction of the process in Delaware. We're not seeking an injunction of the [G]old [R]eserve bid that we've laid out in our letter or even the sale of PDVH pursuant to that process.
> . . .
> We don't want you to interfere with Judge Stark's process. We don't want you to interfere with Judge Stark. We don't want you to interfere with the [S]pecial [M]aster. We don't want you to interfere with the sale.

---

29, 2019). GL-5 has been suspended since October 2019, during the entire duration of the SDNY litigation, including the Venezuela Parties' successful appeal to the Second Circuit.

[10] The "FAQ" guidance issued in May 2023 by OFAC that it "will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PDVSA 2020 8.5 percent bond" does not assist the parties supporting the Updated Final Recommendation. (D.I. 2274 at 5 (citing OFAC "FAQ" 1124 (May 1, 2023)); D.I. 2264 at 11 (same)). OFAC issued that guidance in connection with General License 5 ("GL-5"), which in May 2018 initially removed Executive Order prohibitions "as an obstacle to holders of the PDVSA 2020 8.5 percent bond gaining access to their collateral." GL-5, however, "was replaced and superseded" by a series of amendments that has suspended it since October 2019. *Id.*

[11] (D.I. 2183-3, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 19-cv-10023, July 10, 2025 Hr'g Tr. at 9:20-10:12, 11:5-16).

Even had the 2020 Bondholders not made this representation, and even if there were evidence to support the conclusion that OFAC might change its policy to favor the 2020 Bondholders—which there is not, and which is highly unlikely given that the 2020 Bonds financed the same Maduro regime that is public enemy #1 of the present Administration[12]—neither the 2020 Bondholders nor any other party have shown that the 2020 Bondholders could satisfy the four-factor test for such an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ((1) likelihood of success on the merits; (2) irreparable harm to the moving party in the event the injunction is not granted; (3) the balance of equities between the parties favors granting the injunction; and (4) the public interest favors granting the injunction).

As to the first factor—likelihood of success on the merits—the 2020 Bondholders have not shown that they are likely to succeed given that they introduced no evidence at the Sale Hearing on this point.    As importantly, the Gold Reserve/Dalinar Energy Improved Bid debt financing structure ***does not*** violate the Pledge. (*supra* at 14) The Pledge purports to attach to 50.1% of the capital stock of CITGO Holding, but the Dalinar Energy Improved Bid involves pledging to the transaction lenders the assets of *CITGO Petroleum*, which is a CITGO Holding subsidiary, as opposed to the shares or assets of CITGO Holding itself. The transaction will not alter CITGO Holding's ownership and interest in CITGO Petroleum, and the 2020 Bondholders will still have a claim to their 50.1% interest in CITGO Holding. Therefore, nothing about the transaction violates the Pledge. This will preclude the 2020 Bondholders from being able to show a likelihood (or even a possibility) of success on the merits.

---

[12] *See, e.g.,* "Rubio leads charge in Trump's new war in Latin America," WLRN (Sept. 12, 2025), https://www.wlrn.org/americas/2025-09-12/rubio-leads-charge-in-trumps-new-war-in-latin-america;    *see also* Narcotics Rewards Program: Nicolas Maduro Moros, U.S. DEP'T OF STATE (Aug. 7, 2025), https://www.state.gov/nicolas-maduro-moros (increasing the award for information leading to arrest and conviction of Maduro up to $50 million).

The 2020 Bondholders also cannot satisfy the second factor—irreparable harm—given that any harm that they allegedly would suffer could be compensated by an adequate remedy at law, specifically, monetary damages. Unlike litigants who claim a shareholding interest in a company, the 2020 Bondholders do not claim to have a permanent right to 50.1% of the capital stock of CITGO Holding, as their interest in that stock is extinguished upon payment of the Notes and accrued interest. Rather, the harm they have alleged is that the value of their purported collateral (*i.e.*, 50.1% of the capital stock of CITGO Holding) would be reduced by the amount of additional debt secured by the assets of CITGO Petroleum after closing on the Gold Reserve/Dalinar Energy Bid. (D.I. 1943 at 7). By definition, this is a pecuniary harm. Stated differently, if the 2020 Bondholders prove a valid legal claim for breach of the Indenture, the reduction in value of the CITGO Holding shares could be quantified and awarded as monetary damages. The availability of such monetary relief would also preclude entry of an injunction.

The balance of equities—the third factor—also does not favor granting a preliminary injunction against the Dalinar Energy transaction. An injunction would frustrate the ability of Attached Judgment creditors—both senior and junior to Gold Reserve—to receive satisfaction on their judgments after years of waiting. Conversely, declining an injunction would not prevent the 2020 Bondholders from pursuing whatever rights they believe they have, and (as shown above) seeking award of monetary damages to fully compensate for any proven harm (which is entirely pecuniary).

With respect to the fourth factor, there also is no public interest in the 2020 Bondholders preserving their alleged contractual rights under the Indenture and related Pledge. Conversely, the public's interest in a functioning judiciary that satisfies judgments would be greatly impaired if an injunction prevented the Dalinar Energy transaction.

In summary, because the Special Master and other parties proffered no evidence showing that the 2020 Bondholders will even seek an injunction against the Gold Reserve/Dalinar Energy Bid and certainly proffered no evidence showing that any such injunction is likely to succeed, the Special Master and other parties cannot rely upon mitigation of the risk of any such injunction to justify the Court accepting a materially reduced purchase price for the PDVH Shares.

**C.  If a Law or Regulation Actually Creates Interference with Dalinar Energy's Financing—then Dalinar Energy Must Obtain Replacement Financing**

With respect to the <u>third event</u>, Dalinar Energy materially improved its bid (in the view of the objecting parties) by providing for an "early termination right" that gives it a 90-day period to obtain alternative financing. (FOF § II(B)(iii); GR-092, D.I. 2126-1 at 6); *see* (Day 3, 950:7-13 (P. Rivett)). Thus, if the Gold Reserve/Dalinar Energy financing is ever in fact threatened by the 2020 Bondholders, then Dalinar Energy is contractually obligated to obtain alternative financing within a reasonable, 90-day cure period, failing which the Special Master has the right to terminate the Dalinar Energy SPA and pivot to another bid. (FOF § II(B)(iii); GR-092, D.I. 2126-1 at 6).  As set forth below, the evidence shows that this replacement financing will be available, and this material concession by Gold Reserve and thus removes any legitimate justification for the materially lower-priced Elliott/Amber Energy Bid.

**D.  The Record Evidence Shows that Gold Reserve/Dalinar Energy have Arranged Contingent Financing Sufficient to Mitigate the 2020 Bondholders Risk, Should That Ever Actually Become Necessary**

With respect to <u>fourth event</u>, even if there were evidence showing that OFAC might change its six-year running policy, the 2020 Bondholders might actually be able to interfere with the Dalinar Energy closing by seeking an injunction, and Gold Reserve is unlikely to be able to obtain replacement financing—all of which there is not—Dalinar Energy will still be able to proceed to closing if it can settle with the 2020 Bondholders. For this task, the record evidence confirmed that

Gold Reserve/Dalinar Energy has arranged for contingent financing of up to $2.8 billion—nearly the full amount of the approximately $3 billion nominal value of the 2020 Bonds. (Day 3, 1123:8-12 (P. Rivett)) ("Judge Stark: And you think you have or could raise up to $2.8 billion in financing to settle with them. Right? Mr. Rivett: Correct. Yes.").

Mr. Rivett confirmed that the $1.8 billion highly confident letter could be converted to committed preferred equity ("pref") financing, and that once selected as the winning bid, Gold Reserve would be able to obtain better terms by "actually hav[ing] a transaction to transact on[.]" *Id.* at 1108:15-1110:1. Mr. Rivett testified that this "pref financing is readily available at any time," and could be obtained within "three to six weeks," if necessary. *Id.* at 1111:24-25; 1115:8. When asked if Gold Reserve had ever asked for "committed financing on the pref," Mr. Rivett confirmed that it had not—primarily because the pre-closing terms were "not great"—but that that exercise of soliciting interest revealed that JP Morgan saw "that there was that demand" for the pref from investors. *Id.* at 1115:19-1116:14.

Mr. Rivett also confirmed that JP Morgan's enthusiasm for the Dalinar Energy transaction resulted in them increasing the ABL by $500 million. *Id.* at 1116:11. When asked by the Special Master's counsel if the "$1 billion accordion ABL facility" would be "available at the time of closing of the sale of the PDVH Shares" to pay the 2020 Bondholders, Mr. Rivett confirmed that it "is definitely available," and that it could be used to settle with the 2020 Bondholders "depending on the collateral that supports it," including CITGO's actual "collateral, working capital, inventory, [and] receivables" which Gold Reserve would then be able to borrow on. *Id.* at 1086:13-22. Further, Mr. Rivett testified that once the Dalinar Energy transaction has "closed and were in the company [a possible settlement] doesn't have to be paid right away," but could "be paid on terms, paid over time, paid with interest." *Id.* at 1085:24-1086:3. As Mr. Rivett pointed out, such

24

options would be more available to Gold Reserve once it is named the winning bidder—thereby giving it increased leverage with the 2020 Bondholders.  *Id.* at 1086:5-9.

Mr. Rivett also testified that Gold Reserve would be willing to offer 2020 Bondholders "shares in CITGO, which is what they would be able to get through [a valid] pledge in any event." *Id.* at 1084:21-23. And, when asked ifs he "had conversations with any other financial institutions about possible back up financing," Mr. Rivett confirmed that Gold Reserve has been fielding calls from "numerous parties that want to finance this transaction," that "love the CITGO Petroleum assets," and that "will get behind this financing" once Dalinar Energy is named as the winning bid. *Id.* at 1076:10-19. Mr. Rivett also testified that Gold Reserve could raise more money from its shareholders, including beyond the preferred equity financing in the highly confident letter—and that Gold Reserve "will do whatever it takes to make this happen." *Id.* at 1085:5-11.

In sum, the record evidence thus shows that this financing does exist and it would be more than sufficient to settle the 2020 Bondholders' claims should they ever actually be able to threaten the Gold Reserve/Dalinar Energy closing.[13]

### E.    The Elliott/Amber Energy Bid is Vulnerable to Appeal and to a Stay Pending Appeal

As to the fifth event, the Venezuela Parties would have to fail to obtain another stay of enforcement pending appeal, as they obtained during their prior appeal, and the 2020 Bondholders would have to prevail on appeal.

The Special Master contends the proposed TSA would enable the sale of the PDVH Shares to Amber Energy "regardless of the outcome of the 2020 Bondholders litigation[.]" (AM-045, D.I. 2123 at 10). This is flat wrong. The Court has already admonished the Special Master and the

---

[13] As importantly, the actual value of the 2020 Bondholders' claims might actually only be $2.119 billion, if the PDVH parties prevail on the pending dispute concerning the correct calculation of post-judgment interest. *See* (D.I. 2182-1 at 13-14).

parties that if Judge Failla rules that "the 2020 Bondholders have no rights to CIT[G]O holding[,]" then "it would be a fundamental injustice" to execute on a lower-priced bid "when bids with a much greater purchase price were rejected." (D.I. 1741 at 7-8).

In other words, the proposed transaction with Amber Energy still has a single point-of-failure: it will fail if the 2020 Bondholders lose on appeal. The chances of this outcome remain substantial for several reasons. <u>First</u>, the Second Circuit has settled that Venezuelan law governs the validity of the 2020 Notes, and the Republic has long argued that under Venezuelan law, the 2020 Notes and purported Pledge are invalid and unlawful. The U.S. Government has twice lent support to the Republic in the interpretation of its own laws, including in its recent filing in the SDNY of a Statement of Interest that supports the 2015 National Assembly (the Opposition) in no uncertain terms. (*See* D.I. 2183-2 at 2, Statement of Interest). This support—like the U.S. Government's long-standing suspension of the 2020 Bondholders' ability to exercise the purported Pledge—increases the likelihood that Judge Failla's ruling in favor of the 2020 Bondholders will again be reversed on appeal and that their hypothetical and highly contingent "litigation risk" to the Dalinar Energy financing would disappear.

* * * * * *

The Court has emphasized that any potential advantage attributable to a settlement with the 2020 Bondholders "is ***not*** a required component of a bid to be recommended[.]" Additionally, as observed by the Court, the risk of litigation presented by the 2020 Bondholders is not "materially greater" than any other risk to closing and "must be viewed realistically[.]" (D.I. 1741 at 5 & n.3). While it "may be [that] a litigation that has to happen," as the Court stated, this is "not a deal breaker" to approval of any bid. (*See* D.I. 2183-5, June 24 *Ex Parte* Hr'g Tr., at 61:18-25).

Ignoring these admonishments, the Special Master has now recommended a bid that is $2 billion lower in price than Dalinar Energy's Improved Bid for the sole reason that it includes a

26

proposed settlement with the 2020 Bondholders. In so doing, the Special Master has implicitly valued the 2020 Bondholders' litigation *risk* in excess of the ***certainty*** of the $2 billion price offered by Dalinar Energy's Improved Bid. That is wrong, especially given that, as set forth above, the 2020 Bondholders Risk is highly contingent and speculative, and the 2020 Bondholders lack any realistic avenue to enjoin or interfere with the closing of the Dalinar Energy transaction. Given such circumstances, as supported by the record evidence, the 2020 Bondholders Risk does not justify the $2 billion purchase decrement recommended by the Special Master. This too provides an independent reason to reject the Updated Final Recommendation.

## VII.    THE ELLIOTT/AMBER ENERGY BID HAS EQUAL, IF NOT MORE, CLOSING UNCERTAINTY THAN THE SUCCESSFUL BID OR THE IMPROVED BID

The sole basis for the Updated Final Recommendation is the Amber Energy TSA and its promise to settle the 2020 Bondholders Risk. A cursory examination of the TSA's terms shows that it cannot bind PDVSA, nor any dissenting bondholder; and it is built on a series of legal, contractual, procedural, and practical infirmities that create substantial closing uncertainty for the Elliott/Amber Energy Bid. All of this was confirmed by the record evidence at the Sale Hearing.[14]

### A.  The Amber Energy TSA Has Multiple Conditions Precedent and Termination Rights

The Amber Energy TSA has multiple conditions precedent and termination rights that make it highly contingent and easily unwound at the option of Amber Energy or the "Required Consenting 2020 Noteholders" for any reason or no reason at all. For example:

- Section 4.1(d) of the TSA makes it an express condition precedent that "each Definitive

---

[14] *See* (Day 1, 433:10-435:2, 438:25-18 (M. Turkel)); (Day 2, 459:17-469:1 (M. Turkel)) ("Mr. Kirtland: And that's the requirement for the required consenting 2020 Noteholders to approve the Definitive Documents. Those are all the documents we just talked about; yes? Mr. Turkel: Yes. Q. As well as any amendment, modifications, supplement, extension, termination, withdrawal or waiver thereto; yes? A. Yes. And that requirement gives the consenting 2020 Noteholders reasonable discretion in exercising this approval; yes? Mr. Turkel: That is correct."); (Day 2, 480:22-487:4 (M. Turkel)) ("Mr. Kirtland: So if the sale order is stayed pending appeal, then the Amber TSA will not close because it's a condition precedent; right? Mr. Turkel: That -- that's correct.").

Document"—including all ancillary agreements, schedules, and exhibits—must be "approved, executed and delivered by each party thereto and be in full force and effect" at or before closing. This means that any party to any of the numerous required "Definitive Documents" can withhold approval or refuse to execute, for any reason or no reason at all, and thereby prevent the transaction from closing. This flexibility for parties to walk away over any real or pretextual dispute about documentation is virtually unlimited, and it means that there is ***no certainty*** that the Amber Energy transaction will ever close.

- Sections 5.2 and 5.3 of the TSA provide a broad array of termination rights to both the 2020 Bondholders and Amber Energy. For example, either side may terminate for material breach by the other, for failure of conditions precedent, for a host of other reasons, and even perhaps no reason at all.

- Sections 5.2 and 5.3 also empower either the ***bondholders*** or Amber Energy to walk away upon the mere allegation of a "material breach" or if any "Definitive Document" is deemed "materially inconsistent" with the TSA—an assessment left entirely to the terminating party's "reasonable discretion."

- Section 5.4 also ***permits*** automatic termination on the "Outside Date," which Amber Energy can extend or refuse to extend at will, and Section 3.1(c) expressly permits Amber Energy to pursue an alternative transaction that offers "more favorable" financial terms to the 2020 Notes. In practical effect, these provisions ensure that, if Judge Failla rules for the 2020 Bondholders, they will have the opportunity and heavy incentive to abandon the TSA and thus obstruct the Amber Energy closing.

**B. The Amber Energy TSA's Multiple "Commercially Reasonable Efforts" Clauses Create Substantial Closing Uncertainty**

When Amber Energy and the 2020 Bondholders were negotiating the TSA, they had the opportunity to create a fully formed contract with binding obligations which would deliver a strong certainty of closing. That is not what happened. Instead, they created a document with multiple holes, any one of which creates substantial closing uncertainty.[15] Some of the most prominent of these holes are the multiple "commercially reasonable efforts" modifiers that feature throughout the document.

Per Section 8.9, the Amber Energy TSA is governed by New York law. Although New York courts have varied in how "efforts clauses" have been applied, it is generally accepted that

---

[15] Elliott's witness Mr. Michael Turkel affirmed these points at the Sale Hearing. *See* (Day 1, 433:10-435:2, 438:25-18 (M. Turkel)); (Day 2, 459:17-469:1, 480:22-487:4 (M. Turkel)).

"commercially reasonable efforts" is a "fairly lenient" standard. *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). This is a far lower bar than "best efforts," which "imposes an obligation to act with good faith in light of one's own capabilities." *Serdarevic v. Centex Homes, LLC*, No. 08 CV 5563 VB, 2012 WL 4054161, at *15 (S.D.N.Y. Sept. 5, 2012); *see* (Day 2, 464:24-466:9 (M. Turkel)).[16]

The "commercially reasonable efforts" modifier appears in no fewer than ten (10) provisions in the TSA. For example, it applies to Amber Energy's agreement to take the following steps "directly or through authorized representatives and advisors" (emphasis added):

- "***use commercially reasonable efforts to*** take, or cause to be taken, all actions necessary, proper, or advisable to consummate the Amber Transaction;" (GR-001, D.I. 2123-1 at 808 (Section 3.1(a)(ii)));

- "***use commercially reasonable efforts to*** timely prepare or cause to be prepared all amendments to the Offering Materials that the Bidder and the Required Consenting 2020 Noteholders reasonably deem necessary or advisable;" (GR-001, D.I. 2123-1 at 809 (Section 3.1(a)(iii)(C)));

- "***use commercially reasonable efforts to*** otherwise solicit Participation by 2020 Noteholders in the Public Exchange;" (GR-001, D.I. 2123-1 at 809 (Section 3.1(a)(iii)(D)));

- "to the extent no decision has been rendered in respect of the Declaratory Judgment Action by the Successful Bid Date, ***to use commercially reasonable efforts*** following the Successful Bid Date to cause the Declaratory Judgment Action to be stayed until the closing date of the Amber Transaction;" (GR-001, D.I. 2123-1 at 809 (Section 3.1(a)(iii)(F)));

- "subject to the conditions precedent set forth in Section 4 and the performance by the Consenting 2020 Noteholders of their respective obligations hereunder, ***use commercially reasonable efforts*** (x) to, or to cause the CITGO Parties to, execute the Purchase

[16] "Mr. Kirtland: And are you aware that the term 'commercially reasonable efforts' is what's known as an efforts clause in commercial agreements governed by New York law? Mr. Turkel: I am aware of that. Q: And you're aware that [an] efforts clause only requires a party to take some level of effort to achieve the desired result, but it does not -- it's not an absolute obligation? A. I am generally aware of that. Q. You are also aware that the three-most common efforts clauses are best efforts, reasonable efforts and commercially reasonable efforts? . . . A. I am aware of that, yes. Q. And are you aware that . . . commercially reasonable efforts is the most lenient or the least demanding of the efforts clauses? A. If you're ranking the efforts clauses, that sounds accurate."

29

Agreements on or prior to the Sale Transaction Date; (y) to cause the Effective Date to occur on or about the Sale Transaction Date; and (z) to cause CITGO to indemnify the Consenting 2020 Noteholders, the Trustee and the Collateral Agent pursuant to the D&I Agreements;" (GR-001, D.I. 2123-1 at 809 (Section 3.1(a)(iv)(B))); and

- "to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amber Transaction, ***to use commercially reasonable efforts to*** negotiate or to cause to be negotiated with the Required Consenting 2020 Noteholders appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment[.]" (GR-001, D.I. 2123-1 at 809 (Section 3.1(a)(v))).

This leniency modifier also applies to what the 2020 Bondholders are supposed to do under

the TSA; specifically, to their obligation to do the following (emphasis added):

- "to use commercially reasonable efforts to pursue, support, solicit, implement, confirm, and consummate the Amber Transaction and to act in good faith ***and use commercially reasonable efforts to*** negotiate the Definitive Documents with the Bidder, the CITGO Parties and the other Consenting 2020 Noteholders and to take, or cause to be taken, all actions necessary or proper to consummate the Amber Transaction in a manner consistent with this Agreement, subject to the Consenting 2020 Noteholder Consent Right;" (GR-001, D.I. 2123-1 at 811 (Section 3.2(a)(i)));

- "to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amber Transaction, ***to use commercially reasonable efforts to*** negotiate with the Bidder and the other Consenting 2020 Noteholders in good faith in an effort to agree to appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;" (GR-001, D.I. 2123-1 at 811 (Section 3.2(a)(ii)));

- "to the extent no decision has been rendered in respect of the Declaratory Judgment Action, following the occurrence of the Successful Bid Date, to promptly notify the New York Court of the same ***and use commercially reasonable efforts to*** cause the Declaratory Judgment Action to be stayed until the closing date of the Amber Transaction;" (GR-001, D.I. 2123-1 at 811 (Section 3.2(a)(iv))); and

- "***to use commercially reasonable efforts to*** provide any required direction and pro rata share (among Consenting 2020 Noteholders, but only to the extent that each such Consenting 2020 Noteholder is able to provide such indemnity) of an indemnity to the Trustee and/or the Collateral Agent consistent with Section 2.2(b)(iii) and Section 2.2(b)(iv) hereof[.]" (GR-001, D.I. 2123-1 at 811 (Section 3.2(a)(v))).

The inclusion of these "commercially reasonable efforts" modifiers converts the Amber

Energy TSA into, *at best*, a framework for settlement—not an actual settlement. These modifiers

give Amber Energy and any of the 2020 Consenting Noteholders flexibility to walk away from the

TSA at any time, without fault, based on their independent commercial judgment. As the record evidence shows, there are 11 distinct 2020 Bondholders who have signed the TSA. (GR-112, signature pages of eleven (11) Consenting 2020 Noteholders). Each of these financial institutions has fiduciary duties, bound to make their own decisions for its own clients. This injects substantial uncertainty into the TSA and therefore the closing of the entire Elliott/Amber Energy Bid.

### C. The Amber Energy TSA's "Consenting 2020 Noteholder Consent Right" Adds More Uncertainty to the Elliott/Amber Energy Bid

The Amber Energy TSA introduces another material uncertainty: The "Definitive Documents"[17] necessary to implement its "proposed" terms have not yet been agreed or executed between Amber Energy and each of the Consenting 2020 Noteholders, (D.I. 2274 at 9), and doing so for each of these key documents is subject to the "reasonable discretion" of each of the Consenting 2020 Noteholders.

The TSA defines "Consenting 2020 Noteholder Consent Right" as "the requirement for the Required Consenting 2020 Noteholders to approve the Definitive Documents (or any amendment, modifications, supplements, extensions, terminations, withdrawals, or waivers thereto) *in their reasonable discretion*." (GR-001, D.I. 2123-1 at 803 (emphasis added)). As Elliott's Assistant General Counsel testified, "the consent right is their ability -- their -- exactly what it says on the

---

[17] The "Definitive Documents" as defined include such foundational documents as (1) any agreements between applicable CITGO Parties and Consenting 2020 Noteholders, and any related procedures or other documents necessary to effect the surrender of the 2020 Bonds; (2) offering materials, including all forms, securities filings and other documents necessary or desirable to effect the public offering; (3) a direction and indemnity agreement between the 2020 Bondholders, the Collateral Agent, and the CITGO Parties, to provide consent for the collateral release and the 2020 Bondholders will provide a direction to the Collateral Agent to perform the collateral release; (4) a direction and indemnity agreement between the 2020 Bondholders, the Trustee, and the CITGO Parties to provide consent for the collateral release and provide a direction to the Trustee to perform, direct and/or permit the collateral release; (5) the Sale Order; and (6) all other ancillary and related documents entered into in connection with the Amber Energy proposed transaction, including any amendments to the 2020 Indenture and the 2020 Pledge that are "reasonably required" to consummate the transaction. (GR-001, D.I. 2123-1 at 807-08 (Section 2.2(a))).

page. It's a requirement for the required consenting 2020 noteholders to approve the definitive documents in their reasonable discretion." (D.I. 2300-2 at 33-42, Turkel Dep. Tr., 101:2-7). This consent right is baked into the provisions for the Definitive Documents and are cross-referenced throughout the TSA, thereby undermining every purported commitment that they touch. The inclusion of this leniency modifier means that as each of the "Definitive Documents" is drafted and negotiated in the future, each of the eleven (11) 2020 Noteholders can, in the exercise of their "reasonable discretion" refuse to agree or execute such document. This is a material hole in the certainty of the TSA and therefore the Elliott/Amber Energy Bid, and it confirms that the settlement of the 2020 Bondholders' litigation risk that it supposedly provides is an "agreement to agree"—not a binding agreement.

### D. The Amber Energy TSA Does Not Deliver the Release of Collateral and Extinguishment of Claims by the 2020 Bondholders that It Promises

The Special Master asserts: "Pursuant to the TSA, the 2020 Bondholders AHG has agreed to provide the requisite consents to cause the Amber Sale Transaction to be permitted under the indenture governing the PDVSA 2020 Bonds and to cause all of the purported security interests in the equity of CITGO Holding that secure the PDVSA 2020 Bonds to be released and terminated in full." (AM-045, D.I. 2123, ¶ 9). But the Special Master does not explain, and there is no record evidence showing, *how* the 2020 Bondholders will ever be able to effectuate the release of collateral and extinguishment of claims contemplated by the Amber Energy TSA.

<u>First</u>, Section 9.02(a) of the 2020 Indenture requires "*the written consent*" of PDVSA (as "the Issuer") to amend, supplement or waive it and the related guaranty and security documents. PDVSA, the Issuer of the bonds, has publicly contested their validity and is not a TSA signatory. Its refusal to give consent is an immediate, non-waivable bar to implementing the release of collateral or entering into any other amendment or supplement that would extinguish the purported

rights of the 2020 Bondholders. Without a valid and enforceable amendment signed by the Issuer, the collateral release will be ineffective against non-TSA bondholders. This impediment confirms that the TSA does not deliver any certainty of closing. Neither the Special Master nor any other party introduced any record evidence to dispute this point.

Second, Section 9.02(b)(vi) of the 2020 Indenture prohibits the impairment of "the right of each Holder to receive payment of principal of, premium (if any), interest and Additional Amounts, if any, on such Note on or after the due date thereof or to institute suit to enforce such payment," absent such noteholder's consent. The TSA can only bind the parties who signed it; not all bondholders. Any non-consenting bondholder can both challenge the release of collateral and demand better or different treatment than the treatment contemplated by the TSA.[18] *See Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 846 F.3d 1 (2d Cir. 2017) (confirming that the Trust Indenture Act prohibits "nonconsensual amendments to an indenture's core payment terms" and permits "creditors to pursue available State and federal law remedies"). This is a substantial risk. Any non-TSA bondholder may seek to extract additional value from the parties to the Amber Energy TSA and thereby frustrate or delay the closing of the Amber Energy transaction. According to the Special Master's advisor, the proposed settlement "secures a discount of $895 million on the PDVSA 2020 Bondholders claims." (D.I. 2124, ¶ 23). With the evidence showing that 25% of the 2020 Bondholders did not consent to the TSA (FOF III(B)(i); AM-045 at 6), they have significant incentive to pursue litigation to extract their portion of this supposed "discount" value, which they did not agree to forgo.

---

[18] The Indenture also bars any amendment that would "reduce the percentage of the principal amount of the Notes whose Holders must consent" to core changes. The Amber Energy TSA attempts to do indirectly what the Indenture forbids directly: it tries to quietly sidestep the unanimity requirement through the ad hoc group's majority. That maneuver violates Section 9.02(b)(i) and invites litigation.

### E. The Elliott/Amber Energy Bid Faces Substantial Regulatory Risks

In addition to the closing uncertainty created by the TSA, the Elliott/Amber Energy Bid is subject to unique regulatory risks. Amber concedes it must obtain an OFAC license, Hart-Scott-Rodino ("HSR") antitrust approval, and antitrust approvals in three foreign jurisdictions—Mexico, Morocco, and the Netherlands—to close on its proposed purchase of the PDVH shares. However, Elliott has numerous significant equity holdings in the energy and refining industry in multiple jurisdictions.[19] The complexity of these antitrust entanglements is a significant risk. Each of these regulatory approvals for the Elliott/Amber Energy Bid is discretionary and subject to unpredictable timelines. Even if ultimately granted, any delay beyond the TSA's agreed deadlines would give either party the right to walk away from the deal as of right. By contrast, the Dalinar Energy bid has already cleared HSR approval, and no foreign antitrust filings are required. (D.I. 2120). The record evidence at the Sale Hearing confirmed the existence of these risks.[20]

## VIII. CONCLUSION

On the undisputed record evidence introduced at the Sale Hearing, the Gold Reserve/Dalinar Energy Improved Bid remains the highest and best bid under the Court's evaluation criteria—with its purchase price being more than $2 billion higher than that of the Elliott/Amber Energy Bid and with its closing certainty being at least equivalent to that of the

---

[19] Elliott confirmed at the Sale Hearing that it owns or controls (a) 4.76% of Phillips 66, a major US refiner, and has appointed two board members; (b) 4.34% of Suncor, an integrated energy company with significant US and global refining operations, and has appointed three of its board members; and (c) 5% of BP, an energy major with significant US and global refining operations. *See* (Day 2, 471:10-472:18 (M. Turkel); *see also* D.I. 2183-6).

[20] (Day 2, 470:24-477:12 (M. Turkel) ("Mr. Kirtland: And you can't tell us what happens to the Amber Energy bid if antitrust approval is not given in the Netherlands, Morocco and Mexico; is that right? Mr. Turkel: As I'm not an antitrust expert, I can't speculate on the impact of antitrust results in those -- in those jurisdictions."); Day 2, 676:17-678:10 (W. Hiltz) ("Mr. Kirtland: Well, just tell us, what is the consequence then if the Netherlands antitrust filing is rejected? Mr. Hiltz: I -- I don't know, Matt. Q. You don't know. Or in Morocco? A. No.")).

Elliott/Amber Energy Bid. In contrast, the Elliott/Amber Energy Bid is based on a rationale—settlement of a contingent litigation risk—that both would violate the Delaware law requirement that the PDVH Shares be sold to the "highest bidder" and that is unevidenced, hypothetical and so speculative that it does not justify any price decrement, much less one of $2 billion. For these reasons, Gold Reserve respectfully requests that the Court reject the Updated Final Recommendation and approve the Gold Reserve/Dalinar Energy Improved Bid.

Dated: October 8, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

- and -

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

Katherine G. Connolly (*pro hac vice*)
One Embarcadero Center, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

- and -

**BRITHEM LLP**

Michael J. Bowe (*pro hac vice*)
Lauren Tabaksblat (*pro hac vice*)
Andrew T. Sutton (*pro hac vice*)
Kate E. Fisch (*pro hac vice*)
565 5th Avenue
New York, New York 10017
Telephone: (646) 653-9378
mbowe@brithem.com
ltabaksblat@brithem.com
asutton@brithem.com
kfisch@brithem.com

*Attorneys for Gold Reserve Ltd.*