# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Misc. No. 17-151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF | ) | |
| VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |

## SPECIAL MASTER'S POST-SALE HEARING BRIEF

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Myron T. Steele  (#00002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Malisa C. Dang (#7187)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Dated:  October 8, 2025                    *Counsel for Special Master Robert B. Pincus*
12504254 / 21202.00001

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.    THE AMBER SALE TRANSACTION HAS THE BEST COMBINATION OF PRICE AND CERTAINTY ................................................................... 2

    A.    The Amber Sale Transaction Is Substantially Certain To Close ........................... 5

        1.    The TSA is a binding contract that provides certainty to the Amber Sale Transaction ................................................................... 5

        2.    The PDVSA 2020 Bondholders pose no real closing risk ......................... 7

        3.    The Amber Sale Transaction does not face other hurdles to closing .......... 8

    B.    Gold Reserve Meaningfully Discounts The Risks The PDVSA 2020 Bondholders Pose To The Dalinar August Sale Transaction .................................. 9

        1.    The PDVSA 2020 Bondholders may block or enjoin the Dalinar August Sale Transaction ................................................................... 9

        2.    Dalinar failed to adequately address the PDVSA 2020 Bondholders risk .................................................................................. 10

    C.    The Amber Sale Transaction Offers The Best Combination Of Price And Certainty ................................................................................. 14

II.    THE SPECIAL MASTER RAN AN EFFECTIVE SALE PROCESS ..................... 17

    A.    The Special Master Designed An Appropriate Sale Process And Properly Considered Transaction Alternatives ................................................ 19

    B.    The Special Master Appropriately Selected Red Tree As The Stalking Horse And Fostered Competition Throughout The Topping Period (And After) ............................................................................................ 20

    C.    The Special Master Communicated With Bidders To Improve Bids And Encourage Competition ................................................................... 23

    D.    The Court Should Give No Weight To Randall Weisenburger's Testimony ......... 25

III.    THE SALE PROCESS FAIRLY DETERMINED THE VALUE FOR THE PDVH SHARES ......................................................................................... 28

    A.    The Price Achieved For The PDVH Shares During The Sale Process is the Best Evidence of its Fair Market Value ............................................... 28

    B.    Delaware Law Support Confirmation of the Amber Sale Transaction ................ 32

    C.    Even if the 50% Rule Were Applicable, The Amber Bid Satisfies That Test ....... 35

CONCLUSION ................................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Barton v. Borit*,
  316 F.2d 550 (3d Cir. 1963) ................................................................................39

*BFP v. Resol. Tr. Corp.*,
  511 U.S. 531 (1994) ............................................................................................30

*Burge v. Fid. Bond & Mortg. Co.*,
  648 A.2d 414 (Del. 1994) ...................................................................................32

*Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*,
  51 A.2d 854 (Del. Super. Ct. 1947) ...................................................................32

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
  24 F.4th 242 (3d Cir. 2022) ...............................................................................32

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  Misc. No. 17-151-LPS, 2023 WL 4561155 (D. Del. July 17, 2023) ..................27

*Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*,
  177 A.3d 1 (Del. 2017) .......................................................................................39

*DFC Glob. Corp. v. Muirfield Value Partners, L.P.*,
  172 A.3d 346 (Del. 2017) ...................................................................................30

*Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*,
  68 A.3d 197 (Del. Ch. 2013) ..............................................................................23

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................................26

*Girard Tr. Bank v. Castle Apartments, Inc.*,
  379 A.2d 1144 (Del. Super. Ct. 1977) ...............................................................32

*Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*,
  379 A.2d 1147 (Del. Super. Ct. 1977) ...............................................................32

*Metlyn Realty Corp. v. Esmark, Inc.*,
  763 F.2d 826 (7th Cir.1985) ..............................................................................38

*Oldham v. Hossenger*,
  10 Del. 434 (Del. Super. Ct. 1878) ....................................................................32

*Petroleos De Venezuela, S.A. v. MUFG Union Bank, N.A.*,
  No. 19 CIV. 10023 (KPF), 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025) ...........4

*Poole v. N. V. Deli Maatschappij,*
    243 A.2d 67 (Del. 1968) ................................................................................29

*Reger v. A.I. duPont Hosp. for Children of Nemours Found.,*
    259 F. App'x 499 (3d Cir. 2008) ...............................................................26

*Sec. Tr. & Safe Deposit Co. v. Gallagher,*
    84 A. 806 (Del. Super. Ct. 1911) ...............................................................32

*In re Trans World Airlines, Inc.,*
    134 F.3d 188 (3d Cir. 1998)........................................................................38

*VFB LLC v. Campbell Soup Co.,*
    482 F.3d 624 (3d Cir. 2007)..............................................................28, 39

*Whyte v. Stanley Black & Decker, Inc.,*
    514 F. Supp. 3d 684 (W.D. Pa. 2021) ........................................................26

**Statutes**

8 Del. Code § 324(a) ................................................................................................23

10 Del. Code §§ 4771-4987 ....................................................................................33

**Other Authorities**

*Market Value*, Black's Law Dictionary 971 (6th ed. 1990).........................................30

Robert B. Pincus, as special master in this case (the "**Special Master**"), respectfully submits this post-sale hearing brief in support of the Special Master's Updated Final Recommendation (D.I. 2123) (the "**Updated Final Recommendation**"). [1]

## INTRODUCTION

The Special Master's recommendation of a sale of the PDVH Shares to Amber is the result of the tireless efforts of the Special Master, the Sale Process Parties, the Additional Judgment Creditors, and the Court over the course of many years. The Amber Sale Transaction represents the best combination of price and closing certainty for the benefit of holders of Attached Judgments. The two parties most obviously conflicted, Gold Reserve and the Venezuela Parties, continue to oppose the Special Master's updated recommendation for their own self-serving reasons, which plainly do not align with the goal of maximizing the value of the PDVH Shares for the benefit of the judgment creditors.

The Venezuela Parties—the only parties to consistently dispute the sale process itself—have attempted to halt a value-maximizing sale that would extinguish at least $5.892 billion of Attached Judgments (with the possibility of increasing to $6.392 billion). The Venezuela Parties dispute the way the Special Master conducted the sale process, but this is the same sale process that has been heavily litigated by the parties and approved by the Court every step of the way. The Venezuela Parties also maintain that the purchase price is inadequate, despite conceding that it was extensively marketed to every conceivable bidder and that there is no concrete evidence that re-running the sale process would yield a higher bid. In short, the Venezuela Parties continue their efforts to block any sale from taking place, regardless of the bid's bona fides.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in D.I. 481 (the "**Sale Procedures Order**") or the Updated Final Recommendation (D.I. 2123).

Gold Reserve, for its part, has made clear that it views the success of its credit bid as "existential" and is therefore willing to gamble the recoveries of more senior creditors to try to "shoot the moon" and obtain an outsized recovery for itself.  But its actions, including its failure to obtain committed financing despite the repeated urging by the Special Master to do so, undermines the credibility of Gold Reserve's assertion that it is willing and able to do anything to have its bid succeed.  And its effort to mischaracterize the certainty offered by the Amber Sale Transaction and the risks associated with the Dalinar August Sale Transaction were further exposed by Judge Failla's recent ruling in favor of the PDVSA 2020 Bondholders.

Both the Venezuela Parties' and Gold Reserve's disputes with the Amber Sale Transaction fail for the same reasons.  Their complaints about price and process ignore the fact that the Special Master carried out a robust, open-market sale process in accordance with the Court's orders and Delaware law, and recommended the bid with the best combination of price and certainty.

## ARGUMENT

## I.    The Amber Sale Transaction Has The Best Combination Of Price And Certainty

The Court's Stalking Horse Order directed all bidders to "demonstrate that their improved bids reflect the best combination of price and certainty of closing," and emphasized that "the Special Master on behalf of the Court[] must factor into [his] assessment of [bids] the risk to closing posed by the [PDVSA 2020] Bondholders being able to assert their rights (assuming they exist) in a manner that would interfere with closing."  D.I. 1741 at 6, 8 (emphasis added); *see also* Sale Hearing Tr.  557:16-558:15 (Hiltz).  Judge Failla has now ruled that the PDVSA 2020 Bondholders' rights do in fact exist, resolving much of the uncertainty around whether the PDVSA 2020 Bondholders will be an impediment to a proposed transaction such as the Dalinar August Sale Transaction that fails to adequately address them.

In the end, the Special Master was tasked with deciding between two competitive, but very

different, bids. The Amber Sale Transaction offered a substantial price of $5.892 billion (with the possibility of increasing that price to $6.392 billion), while virtually eliminating any closing risks associated with the SDNY Litigation through an agreement with a supermajority of the PDVSA 2020 Bondholders. Sale Hearing Tr. 574:16-21, 580:17-23 (Hiltz); GR-003 (Declaration of William O. Hiltz in Support of the Special Master's Updated Recommendation, dated August 29, 2025 (D.I. 2124), the "**Hiltz Updated Rec. Decl.**") ¶¶ 22, 33. It also captured a discount to the PDVSA 2020 Bondholders' claims to the benefit of the holders of Attached Judgments. Sale Hearing Tr. 574:16-21, 580:17-23 (Hiltz). The Dalinar August Sale Transaction offered a purchase price of up to $7.9 billion, but failed to address (in any real way) the risk posed by the PDVSA 2020 Bondholders. Sale Hearing Tr. 579:14-23, 585:23-586:6 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶¶ 28, 34. Had the Special Master received a bid that combined the purchase price of the Dalinar August Sale Transaction with materially improved certainty in line with his guidance to Gold Reserve, *see* AM-045 (Special Master's Updated Final Recommendation (D.I. 2123) the "**Updated Final Recommendation**")) ¶ 17 & n.12, the Special Master may very well have recommended that bid. But that bid does not exist—despite the Special Master's months' long efforts to encourage Dalinar to address the risks related to the PDVSA 2020 Bondholders. *See e.g.*, Sale Hearing Tr. 551:17-24, 554:10-21 (Hiltz); 1092:13-1097:15 1098:16-1101:24 (Rivett); SM-017 (Chase Bentley Email to Dalinar, dated March 19, 2025); SM-050 (Andrew Clarke Email to Dalinar, dated May 16, 2025). Accordingly, the Special Master and his Advisors, in consultation with the Sale Process Parties, determined that the Amber Sale Transaction offers the best combination of price and certainty after carefully weighing the differences between the bids in accordance with the Court's guidance and the Evaluation Criteria.

The Special Master's decision to recommend a bid that directly addresses the risks

3

associated with the PDVSA 2020 Bondholders proved to be the right one.  Indeed, Judge Failla has now ruled that the PDVSA 2020 Bonds are valid under Venezuelan law.  *See Petroleos De Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 19 CIV. 10023 (KPF), 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025).  That ruling significantly increases the likelihood that the PDVSA 2020 Bondholders will be able to block or interfere with any transaction that does not offer a concrete solution for dealing with the PDVSA 2020 Bondholders or otherwise does not implicate their rights.  The Amber Sale Transaction does precisely that.  It includes an agreement with the PDVSA 2020 Bondholders that will resolve their claims at a discount of up to $895 million and ensures that they will not attempt to prevent the transaction from closing by exercising their rights under the CITGO Holding Pledge or seeking an injunction. AM-045 (Updated Recommendation).

Moreover, it is unclear whether the Dalinar August Sale Transaction is even still available. Gold Reserve indicated at the Sale Hearing that terminating the Dalinar SPA would "irreparably harm" Dalinar by likewise terminating its commitment letters, and that, if the Dalinar SPA was terminated, "there's no guarantee that any bidder could reacquire that level of debt finance."  Sale Hearing Tr. 1396:20-1397:6.  Gold Reserve further stated that, if the Special Master were to terminate the Dalinar SPA and Dalinar were to lose its financing commitments, "the Dalinar bid might not ever come back."  Sale Hearing Tr. 1397:16-17.  The Court, however, granted the Special Master's request to terminate the Dalinar SPA and execute the Amber SPA, noting that this was largely "ministerial" and aligned with the "paperwork" of the Special Master's Updated Recommendation.  Sale Hearing Tr. 1535:12-22.  Following the Court's approval, the Special Master now has terminated the Dalinar SPA.  *See* Sale Hearing Tr. 1535:15-17; D.I. 2319.  Even if Dalinar's former bid were still on the table, Gold Reserve's own words reveal the fundamental weaknesses in its purported financing commitments.  Gold Reserve's efforts to minimize the risks

4

associated with Dalinar's financing and proposed transaction structure are unavailing and fall far short of the risk-mitigation measures the Special Master encouraged Gold Reserve to pursue throughout the sale process.

### A.    The Amber Sale Transaction Is Substantially Certain To Close

#### 1.    *The TSA is a binding contract that provides certainty to the Amber Sale Transaction*

Amber's TSA with the PDVSA 2020 Bondholders effectively eliminates the risk that the PDVSA 2020 Bondholders might try to block or interfere with the closing in this sale process. The Amber TSA consensually binds Amber and an ad hoc group of holders of PDVSA 2020 Bonds (the "**PDVSA 2020 Bondholders AHG**") which holds in the aggregate over 75% of the principal amount of the 2020 PDVSA Bonds at a price of up to $2.125 billion. Sale Hearing Tr. 575:17-21 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 19; *see also* AM-45 at ¶ 9; AM-DX-2; Tr. 355:18-25, 379:1-10, 434:23-435:2 (Turkel); AM-46 (Annex and Exhibits A-G to the Notice of Special Master's Updated Final Recommendation (D.I. 2123-1), the "**Exhibits to the Updated Final Recommendation**") at 829 (private exchange accounting for $1.6 billion; public exchange accounting for $453.95 million; fees and expenses accounting for $60 million, subject to adjustment). The Special Master thoroughly evaluated the Amber TSA and determined that it is an appropriately binding contract and contains only customary closing conditions. Sale Hearing Tr. 676:10-16 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 39.

Gold Reserve argued that the TSA has numerous loopholes and defects, even giving the contract a cringeworthy moniker: "Swiss cheese contract." D.I. 2183 at 2, 20. But Gold Reserve's tacky taglines and contorted interpretations of the TSA's terms do not reveal any actual flaws in the agreement. To the contrary, the purported defects identified by Gold Reserve are merely standard deal terms that would be present in any similar agreement, and indeed can be found in

the former Dalinar bid itself.  GR-062 (Final Rec).  For instance, Gold Reserve takes issue with the provision providing a party the ability to walk away in the event of a material breach, and the TSA's requirement of the delivery and execution of "Definitive Documents" as a condition precedent to closing.  *Id.* §§ 2.2(b), 3.2(b).  But, as would be expected, Gold Reserve's own commitment papers include similar terms.[2]  Gold Reserve also identifies a number of "discretionary 'off-ramps'" that it says "make termination a virtual certainty should the 2020 Bondholders win in New York."  D.I. 2183 at 13.  But the TSA is clear that it will bind the parties "*regardless* of any judgment" in the SDNY Litigation.  *See* AM-046 (Exhibits to the Updated Final Recommendation), at 823 (TSA, § 8.15) (emphasis added).  The "discretionary 'off-ramps'" Gold Reserve identifies are standard deal terms. Other aspects of the TSA that Gold Reserve challenges are likewise customary, such as the inclusion of other (limited) termination rights and an outside date, and leaving certain aspects of performance up to a party's "reasonable discretion."  *Id.* § 5. The Special Master considered these terms and does not believe they provide either party with a "loophole" to avoid performance.

Gold Reserve takes particular issue with certain portions of the TSA that it asserts prevent the TSA from providing for the release of the collateral and claims.  One such defect alleged by Gold Reserve is that "Section 9.02(a) of the 2020 Indenture requires '*the written consent*' of PDVSA (as 'the Issuer')" to implement the release of the CITGO Holding Pledge collateral, which, according to Gold Reserve, PDVSA will refuse to give.  D.I. 2183 at 7; *see also* Sale Hearing Tr. 1616:24-1617-3.  Gold Reserve is incorrectly relying on language in the 2020 Indenture that is

---

[2] *See, e.g.*, GR-63 (Final Recommendation) at 501-03, Conditions Annex (ABL Facility) ¶ 2 (giving lenders the right to not fund if certain aspects of Dalinar SPA are materially changed); ¶ 3 (giving lenders the right not to fund if a "Company Material Adverse Effect" occurs); ¶¶ 1, 6, 7, 9, 10 (requiring delivery of certain documentation).

inapplicable. Section 9.02(a) requires the "written consent of" the issuer, PDVSA, to amendments and waivers to the CITGO Holding Pledge or "modifying in any manner the rights" of the 2020 PDVSA Bondholders with respect to the pledge. VP-219 (Indenture) § 9.02(a). But the PDVSA Bondholders' rights already include the right to release liens under Section 7.03 of the CITGO Holding Pledge, which clearly states that only 66.66 percent of the PDVSA 2020 Bondholders are required to release the pledge collateral. *Id.* § 7.03. Further, no amendment or waiver is necessary to implement the transactions contemplated by the TSA. TSA § 4.1(e); D.I. 2274 at 7. Thus, Section 9.02(a) is not implicated. For the same reason, Section 9.02(b)(vi) of the 2020 Indenture does not create a substantial risk that non-consenting noteholders could block the deal. The 2020 Indenture is clear that *only* 66.66 percent of the 2020 Bondholders are required to release the collateral. If any minority bondholders take issue with the Collateral Agent's actions to release collateral, they are free to seek enforcement of those rights, but the Special Master is satisfied that this poses a tail risk at most.

### 2. *The PDVSA 2020 Bondholders pose no real closing risk*

The Venezuela Parties and Gold Reserve previously asserted that Judge Failla's rejection of the PDVSA 2020 Bondholders' claims would "blow up" the Amber Sale Transaction. D.I. 2183 at 2, 10-11; D.I. 2180 at 9. The Special Master explained why this was incorrect (Sale Hearing Tr. 580:24-582:19 (Hiltz)), including because Amber's TSA is clear that it "is the intent of the Parties to implement and consummate the Amber [Sale] Transaction regardless of any judgment in the Declaratory Judgment Action either in favor of the Trustee, Collateral Agent, and the 2020 Noteholders or in favor of PDVSA, PDVH, and Petroleo." AM-046 (Exhibits to the Updated Final Recommendation), at 823 (TSA, § 8.15). In any event, now that Judge Failla has ruled that the PDVSA 2020 Bonds are valid, the concerns expressed by the Venezuela Parties and Gold Reserve are largely moot. Although there may be an appeal of Judge Failla's decision, the Amber Sale

Transaction is able to close regardless of the outcome of the PDVSA 2020 Bondholder litigation.

### 3. The Amber Sale Transaction does not face other hurdles to closing

Gold Reserve has raised other concerns with the Amber Sale Transaction, including the risk presented by OFAC, antitrust, or other regulatory approvals. D.I. 2183 at 9. The Special Master has thoroughly assessed all components of closing certainty associated with the Amber Sale Transaction, including the risks identified. Sale Hearing Tr. 677:24-678:4 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 39; *see also* Sale Hearing Tr. 514:18-515:4 (Turkel) (explaining that the Amber SPA contains a "hell or high water obligation" to obtain antitrust approval). The Special Master satisfied himself that the risk associated with OFAC approval is not significant—and certainly no greater than any OFAC-related risks that the Dalinar August Sale Transaction entails. GR-003 (Hiltz Updated Rec. Decl.) ¶ 39; RT-51 (OFAC FAQ No. 1124) at 1-2; s*ee also* Sale Hearing Tr. 1062:8-1063:20 (Rivett) (reviewing OFAC guidance indicating that it will not take enforcement action against any person for taking steps to preserve the ability to enforce the PDVSA 2020 Bondholders' rights). As the Special Master has stated, it is impossible to fully predict OFAC's decision-making, and he has no ability to secure pre-approval or otherwise attain certainty about OFAC's position in advance. *See* D.I 2006 at 23-24; D.I. 1821 at 1. Likewise, the Special Master determined that the risks presented by antitrust approvals and other regulatory requirements are not significant. Sale Hearing Tr. 514:18-515:4 (Turkel); AM-045 (Updated Recommendation) ¶ 22. The Special Master is satisfied that Amber is likely to attain the requisite regulatory approvals. Sale Hearing Tr. 677:24-678:4 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 39.

**B.** **Gold Reserve Meaningfully Discounts The Risks The PDVSA 2020 Bondholders Pose To The Dalinar August Sale Transaction**

**1.** ***The PDVSA 2020 Bondholders may block or enjoin the Dalinar August Sale Transaction***

The Court has recognized that the PDVSA 2020 Bondholders pose a risk to a potential sale. D.I. 1741 at 8 n.6. The PDVSA 2020 Bondholders may be able to (a) exercise their rights under the CITGO Holding Pledge and block the debt-shifting mechanism necessary to consummate the Dalinar August Sale Transaction (Sale Hearing Tr. 584:4-15 (Hiltz)) or (b) enjoin the transaction from being consummated (Sale Hearing Tr. 1090:11-16 (Rivett)). Gold Reserve acknowledges that the PDVSA 2020 Bondholders pose a risk to the closing of the Dalinar August Sale Transaction, but has argued that the risk is "slight." D.I. 2183 at 11.

But the path for the PDVSA 2020 Bondholders to disrupt the Dalinar August Sale Transaction is far more straightforward than Gold Reserve is willing to admit. The Dalinar August Sale Transaction is a two-step transaction, with the second step being the merger of Adolin Holdings Inc. ("**Adolin**") and CITGO Petroleum Corporation ("**CPC**"). *See* Sale Hearing Tr. 1088:2-18 (Rivett). The PDVSA 2020 Bondholders could exercise their rights under their Pledge Agreement and vote to block the merger from occurring. *See* Sale Hearing Tr. 584:4-15 (Hiltz). In fact, 50.1% of the shares of CITGO Holding sit in New York in a vault of the collateral agent for the PDVSA 2020 Bondholders. Sale Hearing Tr. 1579:20-1580:9. "Gold Reserve does not have them, it can't control them, and it can't vote them." Sale Hearing Tr. 1580:1-2. This alone could prevent Dalinar from executing its proposed merger and stop its financing and proposed transaction in its tracks. Yet, Dalinar did not obtain any written commitments from its lenders requiring them to fund the contemplated acquisition of the PDVH Shares in the event the PDVSA 2020 Bondholders foreclosed on the CITGO Holding Equity Pledge. Sale Hearing Tr. 1095:5-1096:15 (Rivett); *see also* Sale Hearing Tr. 552:5-553:13 (Hiltz).

The PDVSA 2020 Bondholders could also obtain an injunction that prevents the proposed merger. Dalinar recognizes these risks: Mr. Rivett of Gold Reserve concedes that the PDVSA 2020 Bondholders will "most likely will try to block [the merger]." Sale Hearing Tr. 1090:11-16 (Rivett). Dalinar did not obtain a commitment from its lenders that the transaction will close over the PDVSA 2020 Bondholders attempting to block the transaction from closing. *See* Sale Hearing Tr. 1100:17-1101:4 (Rivett). Instead, Dalinar proposes that stakeholders in this sale process should wait and see whether it can capitalize on its bet that it will be able to affect its proposed merger despite the PDVSA 2020 Bondholders' efforts to prevent it from happening.

Moreover, in the event OFAC lifts the suspension of General License 5 ("**GL-5**"), the PDVSA 2020 Bondholders could immediately exercise their remedies under the CITGO Holding Pledge to block the transaction. Gold Reserve points to the PDVSA 2020 Bondholders' statements at the July 10, 2025 conference in the SDNY Litigation, as if a prohibition on PDVH's participation in the Dalinar August Sale Transaction would not cause the same harm as an injunction on Dalinar itself or on this Court's sale process. D.I. 2183 at 12. But if PDVH cannot direct its subsidiaries to pledge their assets as collateral to the Dalinar financing parties in the second step of Dalinar's transaction, then those lenders can walk away from the deal, and the Dalinar August Sale Transaction will not close. This is the exact risk the Special Master warned of in the Stalking Horse Period. Sale Hearing Tr. 552:5-553:13 (Hiltz).

### 2. *Dalinar failed to adequately address the PDVSA 2020 Bondholders risk*

The Dalinar August Sale Transaction continued to carry a significant risk that the PDVSA 2020 Bondholders would prevent the transaction from closing. Sale Hearing Tr. 579:14-23, 585:23-586:6 (Hiltz). Gold Reserve contends that Dalinar's $2.8 billion in contingent financing "more than adequately addresses the risk that the [PDVSA] 2020 Bondholders may attempt to interfere with closing." D.I. 2183 at 19. Gold Reserve asserts it can address the claims of the

PDVSA 2020 Bondholders, through the "highly confident" J.P. Morgan preferred equity financing and through its proposed ABL facility. Sale Hearing Tr. 937:17-938:1 (Rivett). But there are three gating issues associated with this purported solution: (i) the "highly confident" financing is not committed (Sale Hearing Tr. 584:16-585:4 (Hiltz)); (ii) the ABL facility may not even be available to resolve the claims of the PDVSA 2020 Bondholders (Sale Hearing Tr. 1089:6-1091:2 (Rivett)); and (iii) even if Dalinar secures its proposed "highly confident" financing and can access the ABL facility for this purpose, Dalinar would only have $2.8 billion to resolve claims the PDVSA 2020 Bondholders assert are worth $3.02 billion (Sale Hearing Tr. 971:17-973:9 (Rivett)). Ultimately, the Special Master "did not believe [the certainty of the Dalinar August Sale Transaction] improved in a material way." Sale Hearing Tr. 585:23-586:6 (Hiltz).

> a.   The "highly confident" J.P. Morgan preferred equity letter is not certain to address the PDVSA 2020 Bondholder risk

The "highly confident" J.P. Morgan preferred equity financing is not committed and thus should not be given material weight, particularly in light of the bid requirements in this sale process. *See* Sale Hearing Tr. 976:1-9 (Rivett) (agreeing that the J.P. Morgan Highly Confident Letter is not a contract and does not obligate J.P. Morgan to provide funding); Sale Hearing Tr. 584:16-22 (Hiltz); *see also* GR-63 (Special Master's Final Recommendation (D.I. 1837), the "**Final Rec**.") at 27 n.15. Notwithstanding the Special Master's consistently communicated reservations that the "highly confident" financing was not committed, Gold Reserve did not take any steps to turn it into committed financing. Sale Hearing Tr. 1115:9-1116:8 (Rivett). Instead, Mr. Rivett suggests one can take comfort in unwritten "assurances" from a "number of investors . . . that they would be there." Sale Hearing Tr. 991:22-992:4 (Rivett). But a "trust us" approach is not enough where the Special Master also has a viable (and superior) competing bid.

After Mr. Rivett testified that Gold Reserve would "do whatever it takes" to raise

committed financing, the Court aptly noted that Gold Reserve has not "to this point, done whatever it would take," which includes paying "the $50 to $70 million to get committed financing to potentially pay the [PDVSA] 2020 [Bondholders]." Sale Hearing Tr. 1114:10-16 (Rivett). Dalinar had more than enough time to raise committed financing, but decided not to. Mr. Rivett testified that it would take three to six weeks to raise committed preferred equity financing. *See* Sale Hearing Tr. 1115:5-8 (Rivett). Dalinar had over two months between the entry of the Stalking Horse Order and the conclusion of the Topping Period to obtain this committed financing. But Dalinar chose not to obtain committed financing to address the risks posed by the PDVSA 2020 Bondholders. Dalinar instead chose to roll the dice based on its belief that it could "get that pref financing" and "the price we would have had to pay didn't make sense at that point." Sale Hearing Tr. 1113:11-12, 1116:6-8 (Rivett). In doing so, Dalinar gambles with the recoveries that the Amber bid secures for Koch Nitrogen International Sàrl ("**Koch**"), Rusoro Mining Limited ("**Rusoro**"), and ConocoPhillips Petrozuata B.V. ("**ConocoPhillips**").

Moreover, Dalinar repurposes the same preferred equity financing three times over, which raises doubt on whether preferred equity securities or the proceeds therefrom would even be available to address the PDVSA 2020 Bondholders. First, the terms of Dalinar's debt commitment letter requires the proceeds of any preferred equity issuances to pay down the bridge loan. *See* GR-063 at 488 (Dalinar's debt commitment letter). Second, Gold Reserve has earmarked "preferred and common equity" as non-cash consideration payable to Rusoro and Koch. *Id* at 555 (Equity Commitment Letter, dated June 25, 2025 (Gold Reserve, Rusoro, and Koch agree "that they will accept specified non-cash consideration, including in the form of preferred and common equity of Dalinar")); *see also* Sale Hearing Tr. 1034:3-11 ("these materials . . . are . . . agreements between Gold Reserve and its consortium partners under which they have structured their

12

economics") and AM-014 (Dalinar Consortium Agreement). And, third, Dalinar proposes to raise its "highly confident" J.P. Morgan preferred equity financing and promises the proceeds as a solve for the PDVSA 2020 Bondholders risk. GR-063 at 547 (J.P. Morgan Highly Confident Letter), 576 (Dalinar Bid Letter); Sale Hearing Tr. 973:3-9 (Rivett).

If the Dalinar August Sale Transaction were to fall through and the PDVSA 2020 Bondholders were to demand full payment for their claims, there might be no consideration left to satisfy the Attached Judgments of Rusoro, ConocoPhillips, and Koch.

    b.    *Dalinar's ABL may not be available to address 2020 Bondholders*

Dalinar asserts that it will have up to $1 billion available via its ABL facility to address the risks associated with the PDVSA 2020 Bondholders. The first and critical flaw of this proposal is that by definition, the ABL facility will not be available until after closing. The merger of Adolin and CPC—step two of Dalinar's two-step transaction—must occur before the full amount of the ABL facility will be available. Sale Hearing Tr. 1090:6-10 (Rivett). Thus, if the PDVSA 2020 Bondholders enjoin or block the merger from occurring, these funds simply will not be available. Further, the proposed ABL funding to address the claims of the PDVSA 2020 Bondholders is the result of an "accordion feature" of the ABL facility that allows Dalinar to "request" up to an additional $1 billion of funding from its lenders. GR-63 (Final Rec.) at 458; GR-093 (Gold Reserve's Notice of Competing Objection and Disclosure of Bid Materials (D.I. 2135-1), the "**Gold Reserve Disclosure of Bid Materials**") at 3. Dalinar's lenders have not agreed to provide this funding and have only agreed to allow Dalinar to *request* the funding. *See* GR-63 at 458.

Even if Dalinar could overcome these hurdles, the current terms of the ABL facility limit its use to pay the PDVSA 2020 Bondholders. The terms of Dalinar's debt commitment letter provide that use of the ABL to pay the PDVSA 2020 Bondholders is a "Restricted Payment" that is subject to the following "Payment Conditions": (i) it is not available until the first anniversary

of closing; and (ii) it is not available until Dalinar's Bridge Loan is paid off in full. GR-63 (Final Rec.) at 469. Mr. Rivett remarkably testified that the ABL would still be available to pay the PDVSA 2020 Bondholders, notwithstanding the reference to the SDNY Litigation as a Restricted Payment, acknowledging "that's what it says here, but that's not the understanding with the banks." Sale Hearing Tr. 997:7-14, 998:20-999:1 (Rivett); *see also* GR-63 (Final Rec.) at 469. The plain terms of Dalinar's ABL term sheet indicate otherwise. The term sheet states that the ABL accordion feature is not available until these two conditions have been met. Therefore, at best, the ABL facility can be used to pay the PDVSA 2020 Bondholders one year after closing and after the Bridge Loan is paid off. Perhaps a permanent term loan and ABL facility would address this gaping hole in Dalinar's financing. But Dalinar has given the Court and the Special Master no indication as to the terms of any permanent financing, let alone an actual commitment from a financing source. Gold Reserve is once again asking the Special Master to "trust us," while these conditions undermine Dalinar's ability to use the ABL facility to pay the PDVSA 2020 Bondholders and prevent their interference with closing. Sale Hearing Tr. 998:20-999:9 (Rivett).

> c.    *Even if the financing is available, the PDVSA 2020 Bondholders may demand more than $2.8 billion*

Even if Dalinar could count on $1 billion from the ABL facility and the $1.8 billion of "highly confident" preferred equity financing from J.P. Morgan to pay the PDVSA 2020 Bondholders, Dalinar would still only have $2.8 billion to settle with the PDVSA 2020 Bondholders. *See* Sale Hearing Tr. 1083:18-21 (Rivett). The PDVSA 2020 Bondholders assert their claims are worth $3.02 billion, and there is no assurance they would settle their claims for less than that, especially now that Judge Failla has ruled that the PDVSA 2020 Bonds are valid.

## C.    The Amber Sale Transaction Offers The Best Combination Of Price And Certainty

In light of the significantly greater certainty provided by the Amber Sale Transaction and

the risks posed by the PDVSA 2020 Bondholders to the Dalinar August Sale Transaction, the Amber Sale Transaction presents the best combination of price and certainty of any bid received by the Special Master to date.  Sale Hearing Tr. 586:17-587:10 (Hiltz).  In the end, the Special Master's task was to weigh the benefits of two bids with very different features and decide which bid offered the best balance of price and certainty, considering that, in the Special Master's view, both bids were satisfactory reflections of fair market value under Delaware law.  *See Memorandum Order Regarding Sale Process and Litigation* (D.I. 1517).

The Venezuela Parties and Gold Reserve have taken issue with the Special Master's assessment of the risk posed by the PDVSA 2020 Bondholders to the proposed transactions.  D.I. 2180 at 6-9; D.I. 2183 at 11 n.7.  The Venezuela Parties argue that the Special Master failed to provide an "objective analysis quantifying the value" of the risk.  D.I. 2180 at 6.  Attempting to precisely quantify the risk posed by the PDVSA 2020 Bondholders would have been arbitrary at best, as there was no reliable way for the Special Master to predict to the percentage point the outcome of the SDNY Litigation or whether the 2020 Bondholders will be able to prevent the Dalinar sale from closing.  D.I. 1660 at 5.

Instead, the Special Master carefully scrutinized the PDVSA 2020 Bondholder risk, including by reviewing competing risk analyses shared by the PDVSA 2020 Bondholders and Gold Reserve, and working through four potential scenarios stemming from the PDVSA 2020 Bondholder risk, "looked at the outcome to creditors under each of those four scenarios."  Sale Hearing Tr. 578:10-12 (Hiltz).  Under the first scenario, where the Special Master recommends a Dalinar bid and the PDVSA 2020 Bondholders lose their litigation, the Special Master believed a Dalinar bid would likely go forward and result in approximately $7.4 billion of recovery to creditors.  Sale Hearing Tr. 579:5-13 (Hiltz).  Under the second scenario, where the Special Master

15

recommends a Dalinar bid and the PDVSA 2020 Bondholders win their litigation, the Special Master believed there would be a material risk that Dalinar could not close, which would likely result in a significant loss of value that could have been paid to judgment creditors. Sale Hearing Tr. 579:14-580:11 (Hiltz).  Under the third scenario, where the Special Master recommends the Amber Sale Transaction and the PDVSA 2020 Bondholders win their litigation, the Special Master believed that the Amber bid could go forward with the benefit of capturing up to an $895 million discount. Sale Hearing Tr. 580:12-23 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 23.  Under the fourth scenario, where the Special Master recommends the Amber Sale Transaction and the PDVSA 2020 Bondholders lose their litigation, the Special Master believed the Court would be in a position to either (i) let the Amber bid proceed, or alternatively, (ii) armed with the knowledge of Judge Failla's decision, reject the Amber bid on account of the bid overvaluing a agreement with the PDVSA 2020 Bondholders. Sale Hearing Tr. 580:24-581:9 (Hiltz).

When assessing these scenarios, the Special Master considered that because the Court did not expect to rule until after Judge Failla ruled on the summary judgment motions, the Court would have the benefit of 20/20 hindsight in deciding whether the agreement embedded in the Amber Sale Transaction is value-accretive to the holders of Attached Judgments or if it instead improperly overpays the PDVSA 2020 Bondholders. GR-003 (Hiltz Updated Rec. Decl.) ¶ 35.  The Special Master, in consultation with his Advisors, thus determined that recommending the Amber Sale Transaction would secure a one-way option for the benefit of the sale process that protects against a significant downside of the PDVSA 2020 Bondholders' potentially frustrating Dalinar's bid if the PDVSA 2020 Bonds were valid, while creating the possibility of a scenario in which additional value could become available to Additional Judgment Creditors in the event the PDVSA 2020 Bonds were found to be invalid. Sale Hearing Tr. 581:3-582:19, 586:20-587:10, 598:13-599:1,

612:23-613:10 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 35.  The risks to judgment creditors under the second scenario were too great to continue recommending the Dalinar bid considering that substantial value would be distributed to judgment creditors under both the third and fourth scenarios.  *See* Sale Hearing Tr. 579:14-580:9, 580:12-23, 582:2-8, 696:7-16 (Hiltz).

The Special Master's Updated Final Recommendation, moreover, is fully consistent with his prior recommendation of the Dalinar June Sale Transaction in light of the alternatives available at the time.  With respect to the Special Master's prior Final Recommendation, he appropriately balanced the unaddressed risk to the closing certainty of the Dalinar June Sale Transaction with the substantial delta in price between the Dalinar June Sale Transaction and the next highest bid from Red Tree ($7.382 billion versus $3.806 billion).[3]  Sale Hearing Tr. 575:22-576:6 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 22.  On August 29, 2025, when deciding between the revised Dalinar and Amber bids, the delta in price was much smaller (at the most, $7.9 billion versus $5.9 billion).   Sale Hearing Tr. 1145:19-1146:4 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 22.  Accordingly, under the changed circumstances and in light of the information available to the Special Master, the Special Master maintains that the Amber Sale Transaction offers the best combination of price and certainty.  A conclusion that was further affirmed after receiving Judge Failla's September 18, 2025 ruling that the PDVSA 2020 Bonds are valid.

## II.    The Special Master Ran an Effective Sale Process

To arrive at his recommendation of the Amber Sale Transaction, the Special Master carried out a carefully designed, open-market sale process that obtained a value-maximizing price for the PDVH Shares.  The Special Master acted pursuant to his mandate, *see* D.I. 277, with the assistance

---

[3] These figures reflect the purchase price calculations that the Special Master was considering at the time of making the Final Recommendation before ConocoPhillips advised it had recovered a certain amount on its Petrozuata/Hamaca Judgment.

of well-qualified Advisors, diligently followed the Court's directives, consulted with the Sale Process Parties and other parties extensively, and exercised his business judgment throughout the process. The procedures the Court approved were the result of consistent input from numerous stakeholders, including the Venezuela Parties, the other Sale Process Parties, and the Additional Judgment Creditors, and were designed specifically to protect the interests of the Venezuela Parties while maximizing value to be distributed to holders of Attached Judgments. *See* D.I. 1180 at 12.

The Special Master and his Advisors contacted over 130 potential bidders, coordinated extensive diligence (with over 59,000 documents provided, dozens of calls coordinated, and over 1,400 bidder questions answered by CITGO management), and engaged in multiple rounds of extensive, robust back-and-forth negotiations with bidders. Sale Hearing Tr. 528:6-14, 543:8-11, 20-22, 544:3-24, 545:2-3, 548:2-5 (Hiltz); *see also* SM-028 (Declaration of William O. Hiltz, dated July 2, 2025, the "**Hiltz Declaration**" or "**Hiltz Decl.**"); GR-63 (Final Recommendation); SM-030 (Corrected Second Supplemental Declaration of William O. Hiltz, dated August 4, 2025, the "**Hiltz Second Supp. Decl.**"); GR-003 (Hiltz Updated Rec. Decl.). Ultimately, the Special Master and his Advisors "came to the conclusion that the Amber bid represented the best combination of price and certainty." Sale Hearing Tr. 586:17-587:10 (Hiltz).

The Venezuela Parties have previously questioned the Court's judgment in adopting the sale procedures. *See* D.I. 481; D.I. 1517. But the Court entertained numerous rounds of briefing and duly considered the arguments and input from all interested parties, including the Venezuela Parties, before adopting procedures for the sale process, including those memorialized in the Sale Procedures Order and the December 31 Order. *See* SM-028 (Hiltz Decl.) ¶¶ 15-18; D.I. 481 (*sixth* draft of the Sale Procedures Order); D.I. 1517 (the December 31 Order); *see also* D.I. 1433; D.I. 1493; D.I. 1507; D.I. 1554. The Venezuela Parties themselves had a front row seat to strategy

sessions and countless updates provided by the Special Master to the Sale Process Parties—a level of access for a debtor whose assets are subject to a judicial sale that, to the Special Master's knowledge, is unprecedented.  The Special Master has indisputably adhered to the procedures outlined in the Court's orders. Sale Hearing Tr. 314:8-12 (Weisenburger).

> ### A.  The Special Master Designed An Appropriate Sale Process And Properly Considered Transaction Alternatives

The Special Master engaged in a lengthy and collaborative process with the Sale Process Parties, including the Venezuela Parties, to design and recommend to the Court a set of sale procedures that would best maximize the value obtained for the PDVH Shares and to carry out the sale in a manner that is fair to all parties, including the Venezuela Parties.  Sale Hearing Tr. 526:11-22, 534:2-9 (Hiltz); *see also*, D.I. 481; D.I. 1433; D.I. 1493; D.I. 1517; SM-030 (Hiltz Second Supp. Decl.) ¶ 9.  In doing so, the Special Master considered alternatives to the sale process, including an initial public offering ("**IPO**"), equitization of claims, equity or debt financing solutions, a partial sale of the PDVH Shares, the creation of a trust for paying claimants over time, a sale of CITGO assets in parts to multiple buyers, a reorganization through an aggregated credit bid, and combinations of the foregoing. *See* Sale Hearing Tr. 526:11-22, 528:22-529:12, 534:2-9 (Hiltz); SM-030 (Hiltz Second Supp. Decl.) ¶ 9.

The Special Master, assisted by his Advisors, recommended the existing process—over the alternative transaction structures previously suggested by the Venezuela Parties and now repeated by their hired gun, Randall Weisenburger—for valid and strategic reasons.  For example, the Special Master and his Advisors rejected an IPO for several reasons, including that conditions in the IPO market generally were quite negative.  Sale Hearing Tr. 529:10-20 (Hiltz).  Furthermore, pursuing an IPO would leave open questions surrounding what the governance of the company would look like at the time of the IPO.  Sale Hearing Tr. 530:21-23 (Hiltz).  The Special Master

and his Advisors believed that institutional investors would have little interest in becoming minority partners in a company still owned by PDVSA, and that reaching a governance arrangement with PDVSA to neuter its control was a remote possibility.  Sale Hearing Tr. 530:23-531:11 (Hiltz).  Moreover, the disclosure process involved with an IPO would have required even more cooperation from CITGO than the auction sale process.  SM-030 (Hiltz Second Supp. Decl.) ¶ 11.  The Special Master rejected other alternative processes as they would almost certainly provide less distributable consideration to judgment creditors, require complex disclosures, or require debt incurrence that would result in unrealistic leverage for CITGO to operate in the ordinary course going forward.  *See* SM-030 (Hiltz Second Supp. Decl.) ¶¶ 9–12.  The sale process ultimately recommended by the Special Master and approved by the Court was typical of a divestiture sale.  Sale Hearing Tr. 526:11-528:21 (Hiltz) (describing the initial sale process).

> ### B.    The Special Master Appropriately Selected Red Tree As The Stalking Horse And Fostered Competition Throughout The Topping Period (And After)

The Venezuela Parties criticized the Special Master's recommendation of Red Tree as the Stalking Horse, maintaining that this led to a deficient Topping Period with no competition on price.  *See* D.I. 1948 at 16–21.  The Court has already determined that Red Tree's bid was the best choice for a stalking horse, after considering objections and conducting a hearing.  D.I. 1741.  There is no need to relitigate that issue.  The Special Master and his Advisors conducted assessments of the strengths and weaknesses of each bid and compared the bids side-by-side in a systematic manner. SM-028 (Hiltz Decl.) ¶¶ 35-36.  Moreover, the Court and the Special Master were correct that the selection of Red Tree would create competition among the bidders and ultimately lead to a higher purchase price.  Dalinar increased its own Stalking Horse bid by $433 million (*see* SM-028 (Hiltz Decl.) ¶ 62) and several other bidders, including Amber, increased their bids following the selection of the Stalking Horse (Sale Hearing Tr. 563:12-15 (Hiltz)).

The Venezuela Parties have also argued that the Special Master failed to foster competition during the Topping Period, cherry-picking a handful of emails—out of the thousands of emails relating to the Topping Period from the Special Master and his Advisors—to paint a distorted picture of the Special Master's activity and his efforts to negotiate improved bids. *See* D.I. 1948 at 19–21. To the contrary, the Special Master, with the assistance of his Advisors, actively encouraged bidders during the Topping Period to improve their bids and was able to foster competitive tension among multiple suitors, which ultimately led to receiving a bid that provided the best combination of price and certainty for the benefit of the judgment creditors.

The Special Master reached out to 136 potential bidders at the start of the Topping Period to provide them with an opportunity to bid and gave potential bidders detailed information about the sale process, the assets being sold, and bid requirements. SM-019 (Letter from Evercore to Potential Bidders, dated April 28, 2025); Sale Hearing Tr. 558:19-560:4 (Hiltz); SM-028 (Hiltz Decl.) ¶ 39. Throughout the subsequent weeks, the Special Master and his Advisors held numerous calls with several potential bidders to discuss their topping proposals and provide them the information needed to formulate competitive topping proposals. SM-028 (Hiltz Decl.) ¶ 40. After receiving initial bids on June 18, 2025, the Special Master and his Advisors negotiated open issues and tried to assist the topping bidders in making their bids as competitive as possible. *Id.* The Special Master rejected unfavorable terms with multiple bidders and pushed Dalinar to increase its bid by an additional $433 million in consideration even though Gold Reserve already had the highest bid. *See* GR-63 (Final Recommendation) at ¶ 80.

At the conclusion of the Topping Period, and after assessing the bids received and consulting with the Sale Process Parties, the Special Master sought further guidance from the Court during a June 24, 2025 *ex parte* meeting—an appropriate and reasonable time to do so, and an

action he has often taken throughout the process.  *See* D.I. 1840-1.  The Court reiterated that both price and closing certainty are important considerations but noted that it may be inclined to approve a bid that does not address the PDVSA 2020 Bondholders' risk over a bid that does, depending on the size of the gap in purchase price. *Id.* at 57:5-18.

The Special Master continued to foster competition and a fair sale process following the Topping Period and recommendation of the Dalinar bid, upon receiving a series of unsolicited competing proposals, including from Amber.  Sale Hearing Tr. 570:15-571:24 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶¶ 7-8.  In each instance, the Special Master informed the Court he had received an unsolicited competing proposal, informed Gold Reserve of the same, and requested the Court's permission to engage.  Sale Hearing Tr. 569:7-11, 570:15-571:24 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶¶ 7, 8.  And after the Court granted the Special Master the authority to engage with any bidder submitting a competing proposal until August 22, 2025, the Special Master actively engaged with bidders, encouraging them to "put together [bids reflecting] their best combination of price and certainty."  Sale Hearing Tr. 572:21-573:13 (Hiltz).

At one point, it appeared there could be three bids with identical purchase prices and agreements with the PDVSA 2020 Bondholders.  Sale Hearing Tr. 576:17-23 (Hiltz).  The Special Master and his Advisors therefore encouraged those bidders to reach further down the waterfall and attempt to strike a deal with Gold Reserve and more junior creditors as part of their bids to provide as much value to judgment creditors as possible.  Sale Hearing Tr. 576:24-577:3 (Hiltz). The Special Master also ensured an open process by participating in several calls with the Sale Process Parties to update them on the bids submitted and the Special Master's assessment of their relative merits, and to obtain their input.  GR-003 (Hiltz Updated Rec. Decl.) ¶ 12.

The Special Master and his Advisors determined that the Amber Sale Transaction was a

Superior Proposal (pursuant to the Dalinar SPA) and provided notice of such determination to Dalinar the same day.  Sale Hearing Tr. 582:20-583:1 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 24 (citing D.I. 2113).  During the three-business-day matching period provided for in the Dalinar SPA, the Special Master and his Advisors regularly engaged with Dalinar to discuss Dalinar's efforts to improve its bid to match or exceed the Amber Sale Transaction.  Sale Hearing Tr. 583:16-584:3 (Hiltz); GR-003 (Hiltz Updated Rec. Decl.) ¶ 26.  Notably, the Special Master and his Advisors emphasized that Dalinar needed to improve its financing, a point the Special Master had consistently stressed throughout the sale process.  Sale Hearing Tr. 583:16-585:22 (Hiltz)

The Special Master ultimately determined that the Dalinar August Sale Transaction did not address the risk that the PDVSA 2020 Bondholders would prevent the transaction from closing, and therefore did not materially improve its closing certainty. Sale Hearing Tr. 579:14-23, 585:23-586:6 (Hiltz); *see also supra* I.B.2.  The Special Master further determined that the Amber Sale Transaction did not entail significant closing risk and "came to the conclusion that the Amber bid represented the best combination of price and certainty."  Sale Hearing Tr. 586:17-587:10 (Hiltz).

## C.    The Special Master Communicated With Bidders To Improve Bids And Encourage Competition

Throughout the sale process, the Special Master and his Advisors provided guidance to bidders to foster competition and yield the best possible bids.  During the Stalking Horse Period and throughout the sale process, the Special Master and his Advisors communicated with the bidders to share the Special Master's concerns regarding the bids and to assist them in putting forth their highest or best possible bids.  Sale Hearing Tr. 560:6-18 (Hiltz).  In particular, Weil repeatedly advised Dalinar of the Special Master's concerns regarding whether "Dalinar and its financing sources [would be] required to close the contemplated acquisition of the PDVH Shares (and associated financing) in the event the 2020s foreclose on the CITGO Holding equity pledge."  SM-

017 (Chase Bentley Email to Dalinar, dated March 19, 2025); *see also* Sale Hearing Tr. 552:7-553:13 (Hiltz); *see also* Sale Hearing Tr. 1095:5-1097:15 (Rivett).

And during the Topping Period, the Special Master and his Advisors continued to communicate to Dalinar specific concerns regarding its bid.  SM-050 (Andrew Clarke Email to Dalinar, dated May 16, 2025).  For example, Weil sent an email to Dalinar's counsel outlining the Special Master's continued concerns about the Dalinar bid, which included questions about "how Gold Reserve proposes to shift the 2020s risk away from the Special Master and the holders of Attached Judgments (as is the case in Gold Reserve's Stalking Horse bid), to itself and its financing sources." *Id.*  The email specifically noted that, due the bid's conditionality, the bid "create[d] additional complexity and conditionality risk" making "the risk of a failure for the financing to be available on the Closing Date . . . higher under the Gold Reserve bid." *Id.*  And in that same email, the Special Master's Advisors, frustrated with the lack of progress, also did the legwork for Gold Reserve and provided proposed edits to Dalinar's commitment letters to show exactly how Gold Reserve could "increase the certainty of closing" for the Dalinar bid. *Id.*  By providing bidders, including Dalinar, with specific guidance about the weaknesses in their bids and making suggestions on how to improve their bids, the Special Master fostered competition and gave each bidder the opportunity to craft the best possible bid.

The Venezuela Parties contend that the Special Master exaggerated the risk of contingent liabilities in a way that depressed the sale price attained for the PDVH Shares. *See, e.g.*, D.I. 1948 at 22–27.  In their effort to stop the sale at all costs, they astonishingly even blame the Court, arguing that the Court's own statements providing guidance to stakeholders and potential bidders also chilled bidding. *Id.* at 27–28.  Neither is true.  The Venezuela Parties likewise accuse the Special Master of treating CITGO like a "distressed asset."  Sale Hearing Tr. 277:5-15

(Weisenburger).  "Distress" in the financial context implies the expectation that a company would be "trading below par" whether in a court process involving the trading of securities or the sale of a company.  Sale Hearing Tr. 456:2-17 (Turkel).  On the contrary, the transaction recommended by the Special Master is delivering over $8 billion of value to parties with interests in the equity of CITGO's ultimate and intermediate parent entities, while also refinancing or leaving in place the $1.115 billion of existing debt of CITGO's operating subsidiaries that has a maturity date after the assumed closing date of June 30, 2026.  Hardly a characteristic of a distressed asset.

The Special Master clearly stated *multiple* times that bidders need *not* eliminate the closing risks posed by the PDVSA 2020 Bondholders.  Repeatedly, he offered ways that bidders could structure their bids to avoid the issue entirely.[4]  Ultimately, bidders were sophisticated entities, with expert advisors, fully able to assess for themselves the risks posed by the PDVSA 2020 Bondholders and structure their bids or adjust their proposed purchase prices accordingly.  How they did so was up to them.  And Judge Failla's decision in the PDVSA 2020 Bondholder litigation makes clear that the Special Master was correct to communicate concerns with respect to closing a transaction that did not address the PDVSA 2020 Bondholder litigation in some way.

### D.    The Court Should Give No Weight To Randall Weisenburger's Testimony

The Venezuela Parties channel their criticisms of the sale process through the testimony and declarations of Randall Weisenburger.  *See, e.g.*, VP-187 (Fifth Supplemental Declaration of

---

[4] *See, e.g.*, D.I. 1660 at 3 ("The Red Tree Bid presents one way, but not the only way, to minimize those risks."); *see also* D.I. 1679 at 4 ("One option is for bidders to engage with the Ad Hoc Group of the PDVSA 2020 Bondholders . . . to attempt to settle the PDVSA 2020 Bondholders' claims . . . . Bidders could also propose financing structures that do not present closing risks on account of the PDVSA 2020 Bondholders, or explain to the Special Master's satisfaction how their proposed transactions and accompanying financing will close regardless of the outcome of the litigation."); D.I. 1702 at 1 ("The Special Master suggested other ways bidders can address the closing risks associated with the PDVSA 2020 Bondholder litigation . . . .").

Randall J. Weisenburger, dated July 7, 2025, the "**Weisenburger Fifth Supp. Decl.**"); VP-192 (Sixth Supplemental Declaration of Randall J. Weisenburger, dated September 3, 2025). Although the Venezuela Parties tout Mr. Weisenburger's "decades of experience in corporate finance" (VP-187 (Weisenburger Fifth Supp. Decl.) ¶ 4), Mr. Weisenburger admitted during the Sale Hearing that he has no direct experience or expertise relevant here. Sale Hearing Tr. 300:5-9 (Weisenburger). Mr. Weisenburger has never served as a Special Master (*id.* at 297:13-16), has never been qualified by a court as an expert in any proceeding (*id.* at 297:9-10), has never served in any capacity to assist a court in selling an asset (*id.* at 297:17-20), has never been retained to evaluate a judicial sale (*id.* at 297:21-24), has never sold an asset through a judicial sale (*id.* at 297:25-298:3), has never participated in a judicial sale (*id.* at 298:8-11), has no experience with forced judicial sales (*id.* at 336:25-337:1), has never published articles on judicial sales or any type of sales (*id.* at 298:18-25), has never conducted any type of research on judicial sales or any type of sales (*id.* at 299:1-5), and has never purchased a company in the refining industry (*id.* at 299:6-10).

Mr. Weisenburger's "experience" is the sole basis for his "personal opinions." Sale Hearing Tr. 300:5-301:18, 302:10–13 (Weisenburger). He did not cite any other source to support his opinions. And when asked whether he was "really just speculating now based on [his] own personal opinions," Mr. Weisenburger responded, "[t]hat is what I was asked to do." Sale Hearing Tr. 328:17-20 (Weisenburger). Courts regularly strike expert testimony that is based on the *ipse dixit* of the expert and nothing more. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Reger v. A.I. duPont Hosp. for Child. of Nemours Found.*, 259 F. App'x 499, 500 (3d Cir. 2008); *Whyte v. Stanley Black & Decker, Inc.*, 514 F. Supp. 3d 684, 694 (W.D. Pa. 2021).

Based on his purported experience, and ignoring the actual record, Mr. Weisenburger

claims that the Special Master did not seriously consider other options to sell or monetize the PDVH Shares (Sale Hearing Tr. 276:2-7 (Weisenburger)), that the sale process resulted in a sale that does not reflect the fair market value of the PDVH Shares (*id.* 304:9-18), that the Special Master undermined the sale process in selecting a Stalking Horse (*id.* 315: 13-23), and that in light of all these purported issues, the Court should re-run the sale process (*id.* 327:9-16).  But Mr. Weisenburger did not directly participate in the sale process.  *Id.* 300:5-9.  He did not review documents in the VDR (*id.* at 300:18-20), he did not review the bidders' due diligence questions (*id.* at 300:21-25), and he did not speak to any bidders about their bid materials (*id.* at 301:8-11).  His declarations were solely his "personal opinions" and "personal beliefs" based on his review of bids, court filings, and various emails.  Sale Hearing Tr. 301:12-301:18 (Weisenburger).

Despite insisting that an IPO of the PDVH Shares would have generated a higher value for CITGO, Mr. Weisenburger likewise did not speak to industry participants to get an assessment as to what CITGO might trade for in the public markets.  Sale Hearing Tr. 305:2-5 (Weisenburger).  Rather, he determined the valuation was off by "billions" through the arithmetic exercise of taking Dr. Alberro's comparable company analysis valuation of $14.4 billion, subtracting the Dalinar purchase price, and thereafter the Amber purchase price. Sale Hearing Tr. 306:14-25 (Weisenburger).  Yet, Mr. Weisenburger admitted that he did not know that Dr. Alberro had previously stated that his comparable company analysis, which yielded the $14.4 billion valuation that Mr. Weisenburger relied on, was not trustworthy. Sale Hearing Tr. 307:1-4 (Weisenburger); *see also* Sale Hearing Tr. 815:9-816:8 (Alberro).  Sale Hearing Tr. 307:1-4 (Weisenburger); *see also* Sale Hearing Tr. 815:9-816:8 (Alberro).  Furthermore, after stating that the Court should re-run the sale process, Mr. Weisenburger conceded that he was merely speculating and had no evidence that a bidder would come forward with a higher bid than what was offered to the Special

Master if the Court were to re-run the sale process. Sale Hearing Tr. 328:5-20, 329:2-8 (Weisenburger).

The Court has previously expressed doubts about Mr. Weisenburger's credibility as the "expert for a long-time recalcitrant judgment debtor," noting that the Special Master's input "comes with greater credibility." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, Misc. No. 17-151-LPS, 2023 WL 4561155, at *3 (D. Del. July 17, 2023). The same is true today. Mr. Weisenburger's declaration and testimony offer nothing more than "personal opinions" about a sale process that was approved by this Court long ago. Sale Hearing Tr. 300:5-17 (Weisenburger).

III.    **The Sale Process Fairly Determined the Value for the PDVH Shares**

The sale process resulted in the appropriate value for the PDVH Shares. Notwithstanding the theoretical desktop valuation offered by the Venezuela Parties' witness, Dr. Alberro, the price offered by the Amber Sale Transaction was the result of a robust public sale process that successfully maximized the value for the judgment creditors, represents the "real-world" value of the PDVH Shares, is appropriate under Delaware law, and does not "shock the conscience."

A.    **The Price Achieved For The PDVH Shares During The Sale Process is the Best Evidence of its Fair Market Value**

The Amber Sale Transaction is fair, reasonable, and reflective of the fair market value of the PDVH Shares. The best evidence of the value of the PDVH Shares is the prices that bidders were willing to pay during the public sale process, not the valuation manufactured by the Venezuela Parties' hired witness. As the Third Circuit has explained, "the market price 'is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'" *VFB LLC v. Campbell Soup Co*., 482 F.3d 624, 633 (3d Cir. 2007) (citation omitted).

The Venezuela Parties have maintained in these proceedings that "forced sales do not approximate fair market value." D.I. 1948 at 10. But this sale process could not be further from

a typical sheriff's sale of foreclosed property. The multi-year sale process has involved sophisticated features, including a Stalking Horse Period and a Topping Period, offers of both cash and complex non-cash securities consideration, and a competitive and expansive open-market process aimed at maximizing the sale price attained for the PDVH Shares. Sale Hearing Tr. 566:18-567:9 (Hiltz); *see also* SM-028 (Hiltz Decl.) ¶¶ 19–53; SM-030 (Second Supplemental Hiltz Decl.) ¶¶ 25–26.

As the Court has already explained, the Court "has endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH." D.I. 1554 at 4. And "the Court anticipate[d] [t]he price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH Shares taking into account the benefits and risks associated with this unique asset." *See id.*

The Delaware Supreme Court defines the fair market value of corporate stock as "the price which would be agreed upon by a willing seller and a willing buyer . . . without any compulsion upon the seller to sell or upon the buyer to buy." *Poole v. N. V. Deli Maatschappij*, 243 A.2d 67, 70 n.1. While the Venezuela Parties may not be a "willing seller," having relinquished that entitlement after decades of ignoring their debts, the Special Master and the Court have effectively stepped into this role. The Court granted the Special Master discretion to reject "inadequate or insufficient" bids as well as bids that do not "provid[e] for a value maximizing sale transaction." D.I. 481 ¶ 9. The Special Master was also authorized to "adjourn the Auction and/or Sale Hearing" should the above circumstances occur. *Id.* The Special Master also had "no obligation to accept the highest bid (or any bid) and does not intend to recommend any bid if he believes the price is

too low or a superior bid would be forthcoming." *See* D.I. 1554 at 4–5 (quoting D.I. 1530 at 2); *see also* SM-030 (Second Supplemental Hiltz Decl.) ¶ 29). Unlike a typical foreclosure sale, the entire sale process has been carefully overseen by the Court. And unlike property sold within the "strictures of the foreclosure process," the conditions of this sale closely replicate the "price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property." *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537-38 (1994) (quoting Market Value, Black's Law Dictionary 971 (6th ed. 1990)).

"[E]conomic principles suggest that *the best evidence of fair value [i]s the deal price*, as it result[s] from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit ha[ve] a chance to bid[.]" *DFC Glob. Corp. v. Muirfield Value Partners*, L.P., 172 A.3d 346, 349 (Del. 2017) (emphasis added). It is undisputed that the PDVH Shares were extensively marketed, such that any interested investor who wished to know about the sale had access to the information, based on the Special Master's direct outreach to potential bidders, notices placed by the Special Master, and other widespread publicity. Sale Hearing Tr. 311:6-312:9 (Weisenburger); 566:18-567:9 (Hiltz). The Special Master knows of no other judicial sale (ever) that has received the same amount of widespread publicity and extensive marketing as the sale of the PDVH Shares, further showcasing that the sale process itself was the best evidence of the fair market value. Sale Hearing Tr. 566:18-567:9 (Hiltz). Beyond the notices placed by the Special Master himself, news of this sale was widespread in major newspapers for the last several years.[5] None of the 136 potential bidders the

---

[5] *See, e.g.*, Marianna Parraga, *US Court Launches 30-day Competition for Citgo Parent's Shares*, REUTERS NEWS (Apr. 25, 2025), https://www.reuters.com/business/energy/us-court-launch-30-day-competition-citgo-parents-shares-2025-04-25/; Alicia McElhaney, *Contrarian Capital Unit*

Special Master reached out to submitted a bid anywhere close to the valuation that Dr. Alberro claims is the fair market value.  Sale Hearing Tr. 1146:13-18 (Hiltz).  And the Venezuela Parties were unable to identify—either through documents or through witness testimony—a potential bidder who would submit a bid anywhere close to the valuation offered by Dr. Alberro.  Sale Hearing Tr. 304:23-305:1 (Weisenburger).    In fact, the Venezuela Parties' witness, Mr. Weisenburger, admitted that it would have been a "great deal" to purchase the PDVH Shares for $8 billion if they were actually worth $18.2 billion.  Sale Hearing Tr. 326:3-5 (Weisenburger).  But the Venezuela Parties never submitted a bid for $8 billion or any other amount, even though they had ample opportunity to do so.  Sale Hearing Tr. 564:3-13 (Hiltz); 325:12-326:14 (Weisenburger).

The Venezuela Parties have also argued that the Special Master is not fulfilling the role of a "willing seller" because he has no economic stake in the PDVH Shares and instead has been charged to sell the shares for the benefit of holders of Attached Judgments—who are "clamoring to be paid as soon as possible."  D.I. 1948 at 10–11.  It is true (and self-evident) that the Special Master has no economic stake in the PDVH Shares—the Special Master is an arm of the Court with a mandate to run a sale process aimed at securing a value-maximizing sale of the PDVH Shares in compliance with all governing law.  But the Special Master ultimately answers to the Court.  He does not work for any judgment creditor, and the sale process he designed is for the benefit of PDVSA and the Republic just as much as it is for the judgment creditors.  His lack of economic stake in the outcome does not interfere with his ability to fulfill his mandate and does not change the fact that he would not have recommended any bid if he believed the price was too

---

*Named Top Bidder in Citgo Auction*, WSJ (Mar. 21, 2025); Nicolle Yapur, *Elliott's Bid for Citgo Tops Gold Reserve's, Adviser Says*, BLOOMBERG (Aug. 25, 2025), https://www.bloomberg.com/news/articles/2025-08-26/citgo-auction-elliott-tops-gold-reserve-grz-cn-bid-court-adviser-says; Sale Hearing Tr. 540:13-16 (Hiltz); Sale Hearing Tr. 566:18-567:9 (Hiltz); *see also* Sale Hearing Tr. 311:6-312:9 (Weisenburger).

low or a superior bid would be forthcoming, as he had the discretion to do. Sale Hearing Tr. 704:6-705:4 (Hiltz). Further, the Venezuela Parties paint the judgment creditors with too broad a brush.

### B.    Delaware Law Support Confirmation Of The Amber Sale Transaction

The Venezuela Parties have maintained throughout these proceedings that the Court must apply the so-called "50% test." *See, e.g.*, D.I. 1524, 1529, 1531, 1948, 2042. In support of this contention, the Venezuela Parties rely on a series of Delaware cases that apply "special judicial scrutiny" if property is sold for less than 50% of its fair market value at a judicial sale. *See, e.g.*, *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994); *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977). But a close read of these cases makes obvious the difference between this sale process—a lengthy and complex judicial sale overseen by the Court—and a typical forced execution sale under Delaware law where the 50% test has been applied. Virtually all of the cases relied upon by the Venezuela Parties involve *a sheriff's sale at an auction*, the typical way in which sales to satisfy unpaid judgments occur in Delaware.[6] This sale process, on the other hand, is a judicial sale that has been overseen by a federal district court and run by a court-appointed special master with decades of experience in large company mergers and acquisitions, with the aid of advisors with similar expertise. It hardly resembles a single-day execution sale on the courthouse steps that is typically contemplated by Delaware law. *See* 10 Del. C. §§ 4771-4987; *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 24 F.4th 242, 255 (3d Cir. 2022) ("The District Court is proceeding through a judicial sale,

---

[6] *See, e.g.*, *Burge*, 648 A.2d 414 (sheriff's sale at an auction for a foreclosed piece of real property); *Girard Tr.*, 379 A.2d at 1146 (same); *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854, 858 (Del. Super. Ct. 1947) (same); *Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*, 379 A.2d 1147 (Del. Super. Ct. 1977) (same); *Sec. Tr. & Safe Deposit Co. v. Gallagher*, 84 A. 806, 806 (Del. Super. Ct. 1911) (same); *Oldham v. Hossenger*, 10 Del. 434, 434 (Del. Super. Ct. 1878) (same).

not an execution sale. . . .").

Moreover, although a judicial sale "may be set aside . . . when the sales price is so grossly inadequate that it shocks the conscience of the court," "it is a well-established rule in Delaware that mere inadequacy of price, standing alone, is an insufficient ground for setting aside a judicial sale." *Burge*, 648 A.2d at 419. Therefore, even where the 50% test is relevant, Delaware courts simply apply "special judicial scrutiny" if property is sold for less than 50% of its fair market value at a judicial sale. *Id.*; *see also Girard Tr.*, 379 A.2d at 1145–46. But "this standard is not absolute and does not contemplate that the Court will inflexibly apply this standard in every instance." *Girard Tr.*, 379 A.2d at 1146; *see also Home Beneficial Life*, 379 A.2d at 1149–50 (sales "remove[d] from the category of ordinary real estate transactions" "may lead to a departure from the traditional 50% test").

Rather, this standard typically only applies where there "has been evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale or confusion at the sale." *Girard Tr.*, 379 A.2d at 1146; *see also Burge*, 648 A.2d at 419 (setting aside sale due to an "avoidable, unilateral mistake by the mortgagee's agent"). Neither of these factors are applicable here. In fact, the Venezuela Parties' own witness, Mr. Weisenburger, testified that he does not have any evidence that re-running the sale process would result in higher bids, and acknowledged that he was merely "speculating." Sale Hearing Tr. 328:5-20, 329:2-8 (Weisenburger). Mr. Weisenburger also testified that the PDVH Shares were extensively marketed such that any interested investor who would want to know about the sale knew about it, including those investors provided to the Special Master by CITGO. Sale Hearing Tr. 311:6-312:9 (Weisenburger).

The Venezuela Parties have nevertheless maintained that the sale price of the Amber Sale

33

Transaction is unconscionable regardless of whether it is less than 50% of fair market value, implying that the fact that the overall value of the PDVH Shares is supposedly greater than a typical asset sold at judicial auction should somehow subject this sale to a higher standard for approval. D.I. 1948 at 8–9; D.I. 2180 at 14-15. Delaware law does not support this conclusion. It is true that whether the price was less than 50% of fair market value is not "the sole touchstone of acceptability"; courts also assesses whether there was "some defect or irregularity in the process or mode of conducting the sale, or . . . neglect of duty, or misconduct on the part of the Sheriff or some other sufficient matter . . . whereby the rights of parties to, or interested in the sale are, or may have been, prejudiced." *Burge*, 648 A.2d at 419.

But courts in Delaware have not indicated that higher-value property must garner a sale price that is proportionately closer to fair market value than a property with lesser value in order for the sale to be approved. If anything, courts in Delaware have held the opposite. For instance, in *Home Beneficial Life*, which the Venezuela Parties have previously cited, a Delaware court determined that "the nature and size of the building and the magnitude of its value may be such as to remove it from the category of ordinary real estate transactions because the customary buyers at auction sales would not be in a position to buy this property." *Home Beneficial Life*, 379 A.2d at 1149. The court then confirmed the sale, concluding that it did "not appear that anyone other than the mortgagee was prepared to bid on the property nor has it been shown that a higher bidder is likely to bid at a new auction sale." *Id.* at 1149–50; *accord Girard Tr.*, 379 A.2d at 1145–47 (noting that there may be unique considerations that may render the 50% test "unrealistic" such as "property whose price is great or usefulness is limited" and finding that a sale price of 6% of fair market value was not "unconscionable").

The Venezuela Parties have pointed out that this sale is "unprecedented in Delaware

history." D.I. 1948 at 8.  This is undoubtedly true.  But the fact that a sale is unprecedented does not render it shocking to the conscience.  Despite the unique characteristics of the asset being sold, the PDVH Shares are not being sold at a "fire sale price," but at the best price the Special Master obtained in the open market after an extensive, multi-step, years-long sale process, involving extensive publicity, outreach, diligence, and arms-length negotiation—all oriented towards obtaining the highest value attainable for the PDVH Shares.  There has been no defect, irregularity, or misconduct in the sale process, nor is there any evidence to support that additional bidders would come forward or that a higher sale price is likely at a subsequent sale.  Ultimately, the Amber purchase price of $5.892 billion (or up to $6.392 billion) distributable to holders of Attached Judgments, combined with closing certainty that Amber obtained by paying another $2.125 billion to address the PDVSA 2020 Bondholders' claims, renders the Amber Sale Transaction a fair, reasonable price, and reflective of the PDVH Shares' fair market value.

## C.    Even if the 50% Rule Were Applicable, The Amber Bid Satisfies That Test

To the extent Delaware's 50% decisional standard applies at all, the Amber Sale Transaction, like the Dalinar transaction, is well within 50% of the fair market value of the PDVH Shares.  The Venezuela Parties make the remarkable assertion that the fair market value of the PDVH Shares is $18.6 billion—based on Dr. Alberro's theoretical, desktop valuation—and therefore conclude that the Amber bid price is less than 50% of the PDVH Shares' fair market value.  Sale Hearing Tr. 731:11-15 (Alberro); VP-186 (Expert Report of Jose Alberro, dated July 7, 2025); *see also* D.I. 1948 at 7; D.I. 2180 at 14-15.  It is curious that Dr. Alberro's number is so close to the number, $17 billion, the Venezuela Parties claimed in open court the PDVH Shares were purportedly worth before Dr. Alberro even started his work.  Oct. 1, 2024 Hearing Tr. at 52:19–53:20 (D.I. 1357).  PDVH has also previously asserted even higher pie-in-the-sky valuations of $32 billion to $40 billion in 2023.  *See* PDVH Opening Brief at 14, *Petróleos de Venezuela, S.A.*

*v. PDV Holding, Inc.*, 306 A.3d 572 (Del. Ch. 2023).  The theme here is clear: The Venezuela Parties will endeavor to put extraordinary valuations before the Court so they can argue that the bids received through the public sale process must be rejected.

But the Venezuela Parties and their witness have been unable to identify any bidder willing to pay anything close to the amount of their valuations or put forth any other evidence to suggest that their theoretical or wishful claims as to the value of the PDVH Shares are at all tied to reality. Sale Hearing Tr. 326:19-327:8 (Weisenburger).  In fact, earlier this year, the Venezuela Parties supplied the Special Master with names of potential bidders they believed might be interested in purchasing the PDVH Shares, and the Special Master's Advisors contacted each of those potential bidders.  Sale Hearing Tr. 548:6-9 (Hiltz); SM-028 (Hiltz Decl.) ¶ 25; *see also* Sale Hearing Tr. 311:24-312:9 (Weisenburger).  Yet not one of those potential bidders even signed an NDA—let alone offered to pay $18.6 billion for the PDVH Shares.  SM-028 (Hiltz Decl.) ¶ 28; *see also* Sale Hearing Tr. 548:6-13 (Hiltz).  It is likewise telling that the Venezuela Parties failed to make a bid after opting out of receiving confidential bid information.  *See supra* III.A; Sale Hearing Tr. 564:3-13 (Hiltz), 325:12-326:14 (Weisenburger).

The Venezuela Parties' assertion that the PDVH Shares are worth $18.6 billion is based on a discounted cash flow ("**DCF**") analysis from their witness, Dr. José Alberro, PhD.  VP-186 (Expert Report of JoséAlberro, dated July 7, 2025).  But a DCF analysis is just math and only as good as the inputs you use.  Sale Hearing Tr. 771:14-772:1 (Alberro).  Dr. Alberro's report contains numerous flaws, and he used assumptions that materially diverge from CITGO's own projections and historical financial performance without proper justification.  Rather than relying on CITGO management's EBITDA projections, carefully tailored to their own business, Dr. Alberro prepared his own inflated EBITDA projections for 2026 through 2030 by using information from third-party

36

analysts.  Sale Hearing Tr. 739:10-18 (Alberro).  Dr. Alberro acknowledged that his EBITDA projections were in aggregate over $2 billion higher than CITGO's own projections.  Sale Hearing Tr. 803:15-21 (Alberro).  In some places, his EBITDA projections were over 40% higher than CITGO management's own projections.  Sale Hearing Tr. 901:4-902:3 (Alberro).

Dr. Alberro applied these inflated projections that he himself created, despite admitting that he found "no basis to conclude that CITGO's forecasts were systematically inaccurate."  Sale Hearing Tr. 902:20-903:2 (Alberro).  Instead, Dr. Alberro reasoned that the four analysts whose forecasts he based his projections on "provide . . . more reasonable forecasts than the forecasts provided by only one company, which is CITGO."  Sale Hearing Tr. 796:9-20 (Alberro).  In doing so, Dr. Alberro acknowledged that he never spoke with anyone at CITGO about how they came up with their prices or whether CITGO already consults with third-party analysts when preparing its own projections.  Sale Hearing Tr. 797:16-798:2 (Alberro).  If Alberro had consulted CITGO, he would have learned that CITGO consulted with the *same group of analysts* in developing its own forecast and then adjusted that pricing information based on its own understanding of its operations, refineries, and markets.  Sale Hearing Tr. 1147:11-17 (Hiltz).

Similarly, the weighted average cost of capital ("**WACC**") discount rate and perpetuity growth rate in Dr. Alberro's DCF analysis rely on assumptions that make little sense.  Sale Hearing Tr. 1150:7-1151:15 (Hiltz).  As Mr. Hiltz explains, a WACC between 10.08% to 10.84% and a 1.00% perpetuity growth rate are more appropriate.  Sale Hearing Tr. 1150:7-1151:15 (Hiltz).  Using CITGO's own EBITDA projections from 2026 to 2030, a 10.46% WACC, and a 1.00% perpetuity growth rate, while keeping all other assumptions the same, the PDVH enterprise value in Dr. Alberro's DCF analysis decreases by approximately 50% from $18.6 billion to $9.4 billion.  Sale Hearing Tr. 1152:16-20 (Hiltz); Hiltz-DX-001 (Evercore Adjustments to Alberro Valuation).

Further, Dr. Alberro's analysis ignores important factors that substantially impact the prices buyers are willing to pay in a competitive transaction. Notably, Dr. Alberro's DCF analysis fails to account for contingent liabilities such as the PDVSA 2020 Bondholders' claim that they have a lien on 50.1% of the CITGO Holding shares, even though it was clearly important to bidders' assessments of value. Sale Hearing Tr. 1153:13-1154:2 (Hiltz); *id.* at 822:3-822:11 (Alberro). Dr. Alberro stated that assessing this liability in any way was beyond the scope of his expertise, but acknowledged that he never asked the Venezuela Parties' counsel to explain the liability to him. *Id.* at 855:8-22 (Alberro). In similar scenarios, courts have cast considerable doubt on the accuracy of simplistic valuations that fail to account for contingent liabilities and other important factors bearing on the value of assets. *See In re Trans World Airlines, Inc.*, 134 F.3d 188, 197 (3d Cir. 1998) ("[I]t is proper to consider contingent liabilities when evaluating the insolvency of a corporation."); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835–36 (7th Cir.1985) (noting that "[DCF] valuations are highly sensitive to assumptions about the firm's costs and rate of growth," and that DCF may not be "the best way" to value a business). The Venezuela Parties also point to Evercore's 2023 preliminary draft valuation of the PDVH Shares, which suggested an implied enterprise value range of $10.0 billion to $13.0 billion. *See* VP-074 (September 2023 Evercore Presentation). But Evercore prepared this preliminary draft valuation nearly two years ago, before the sale process had even commenced. Sale Hearing Tr. 537:15-538:3 (Hiltz); SM-04 (Preliminary Draft Valuation Email from Evercore to CITGO, dated September 15, 2023); see also SM-030 (Hiltz Second Supp. Decl.) ¶ 13. The analysis was a rough, draft valuation, based on extremely limited information, done without any adjustments (including for contingent liabilities) or sensitivities. Sale Hearing Tr. 537:15-538:3 (Hiltz). Over the past two years, CITGO's actual financial performance has been significantly weaker than the EBITDA projections that formed the

basis of the 2023 Evercore preliminary draft valuation, and as a result, among other reasons, the preliminary draft valuation proved to be overstated. 537:15-538:7 (Hiltz); 827:24-829:9 (Alberro). While CITGO performed better than anticipated in 2023 and achieved adjusted EBITDA of approximately $3.3 billion that year, CITGO's adjusted EBITDA dropped to approximately $1.2 billion in 2024 and is projected to be only $1.05 billion in 2025. SM-031 (Hiltz Supp. Decl.) ¶ 12.

If the PDVH Shares' fair market value was truly $18.6 billion, offers to purchase the PDVH Shares should have been at least within the ballpark of that number. Yet at no point in the process did the Special Master receive a bid, or even an indication of interest, anywhere close to $18.6 billion. Sale Hearing Tr. 548:6-9 (Hiltz); SM-028 (Hiltz Decl.) ¶ 25; *see also* Sale Hearing Tr. 311:24-312:9 (Weisenburger). In fact, as Dr. Alberro admitted at the Sale Hearing, his $18.6 billion valuation was roughly *thirty-five times* the amount of CITGO's last-twelve-months EBITDA as of the date of his valuation, March 31, 2025. Sale Hearing Tr. 912:21-913:5, 914:1-5 (Alberro). As compared to CITGO's most recent 2025 forecast, Dr. Alberro's valuation is over two times the high end of the EBITDA-to-enterprise value multiple for any of the five comparable companies Dr. Alberro analyzed. Sale Hearing Tr. 796:9-20  (Alberro), 1154:14-1156:25 (Hiltz). There is absolutely no evidence that a willing buyer would pay such a massive amount for the PDVH Shares. Rather, "the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (citation omitted); *see also Barton v. Borit*, 316 F.2d 550, 552 (3d Cir. 1963) ("[T]he best evidence of fair market value is the price at which comparable property changes hands at about the time of loss in arm's length transactions between willing buyers and willing sellers."); *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 35-37 (Del. 2017) (finding that far more weight should have been placed on the deal price than the petitioner's

expert's DCF analysis and cautioning against attempts to "outguess . . . interested economic players with an actual stake in a company's future" and rely on "widely divergent partisan expert testimony").

Moreover, while the purchase price measured by value of Attached Judgments satisfied is $5.892 billion (and potentially up to $6.392 billion), Amber is also paying an additional approximately $2.125 billion in cash for the PDVSA 2020 Bonds as additional consideration for the PDVH Shares, significantly boosting the overall value it is offering in exchange for the shares. GR-003 (Hiltz Updated Rec. Decl.) ¶¶ 17–9.  The Amber Sale Transaction price, which was the result of an extensive sale process, is the best measure of the value of the PDVH Shares.  Sale Hearing Tr. 1145:19-1146:4 (Hiltz).

## CONCLUSION

For the foregoing reasons, the Court should adopt the Updated Final Recommendation.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Dated: October 8, 2025
12504254 / 21202.00001

By:  */s/ Myron T. Steele*
    Myron T. Steele (#00002)
    Matthew F. Davis (#4696)
    Bindu A. Palapura (#5370)
    Malisa C. Dang (#7187)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19801
    Telephone: (302) 984-6000
    Facsimile: (302) 658-1192
    msteele@potteranderson.com
    mdavis@potteranderson.com
    bpalapura@potteranderson.com
    mdang@potteranderson.com

*Counsel for Special Master Robert B. Pincus*