## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:17-mc-00151-LPS |
| v. | ) | |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | **PUBLIC - REDACTED** |
| | ) | |
| *Defendant.* | ) | |

_____

## THE VENEZUELA PARTIES' POST-HEARING OPENING BRIEF OBJECTING TO THE SPECIAL MASTER'S UPDATED FINAL RECOMMENDATION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................. 1

ARGUMENT ............................................................................................................. 2

    I.      Elliott's Bid Is Grossly Inadequate and Shocks the Conscience. ............................ 2

           A.     The Special Master Has Failed to Show by a Preponderance of the Evidence that Elliott's Bid Exceeds 50% of the Fair Market Value of the PDVH Shares. ....................................................................... 3

                  1.    *Dr. Alberro Presented the Only Credible Valuation of the Shares.* ................................................................................. 3

                  2.    *Evercore's 2023 Valuation Supports Dr. Alberro's Conclusions.* ..... 6

                  3.    *Mr. Kleinrichert's Cash Flow Adjustments Are Flawed and Unreliable.* ............................................................................ 8

           B.     Elliott's Bid Is Below 50% of the PDVH Shares' Fair Market Value. ...... 12

           C.     Elliott's Bid Also Shocks the Judicial Conscience Because It Is Billions of Dollars Below Any Reasonable Estimate of Fair Market Value. .................................................................................... 14

    II.     Elliott's Bid Is the Product of a Prejudicially Defective Process. .......................... 15

           A.     The Special Master Failed to Seriously Consider Alternative Transactions Even as His Sale Process Was Clearly Failing. .................. 16

           B.     The Evidence Shows that the Special Master Deliberately Failed to Generate Competitive Tension Throughout the Sale Process. ................. 17

           C.     The Special Master Did Not Run a "Public Sale." ................................. 21

           D.     The Special Master Placed Undue Emphasis on Contingent Liabilities and Then Failed to Mitigate the Bid-Chilling Uncertainties He Fostered. .................................................................................... 23

                  1.    *The Special Master's Approach to the Bondholders Destroyed Value.* .................................................................................. 23

                   2.    *The Special Master's Approach to the PDVH Alter Ego Litigation Destroyed Value.* ................................................... 25

           E.     The Court's Public Statements Chilled Bidding. ................................... 27

F.    The Special Master's Advisors' Conflicts of Interest Are a Prejudicial Defect. ...................................................................................... 28

G.    A Higher Bid Likely Could Be Obtained if the Process Were Run Again. .......................................................................................... 31

III.    Elliott's Bid Is Not the Highest Bid. ................................................. 32

IV.    Additional Objections ...................................................................... 38

A.    The Sale Should Be Set Aside Because of Defects in the Attachments. .... 38

B.    The Sale Should Be Set Aside Because of Bias and Conflicts of Interest. ....................................................................................... 39

C.    The Venezuela Parties' Appellate Rights Must Be Protected. ................. 39

D.    Objections to the Proposed Sale Order and Stock Purchase Agreement. .................................................................................. 40

ADDENDUM A ........................................................................... Addendum-1

# TABLE OF AUTHORITIES

**Cases**

*Abdulrahman v. Ashcroft,*
    330 F.3d 587 (3d Cir. 2003) ................................................................ 29

*Aetna Cas. & Sur. Co. v. Markarian,*
    114 F.3d 346 (1st Cir. 1997) ................................................ Addendum-1

*Akorn, Inc. v. Fresenius Kabi AG,*
    2018 WL 4719347 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) ........................ 27

*BFP v. Resol. Tr. Corp.,*
    511 U.S. 531 (1994) ................................................................ 2, 13

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.,*
    461 U.S. 731 (1983) ................................................ Addendum-3

*Blossom v. Milwaukee & C.R. Co.,*
    70 U.S. 196 (1865) ................................................................ 13

*Boatmen's Nat'l Bank v. Eidson,*
    796 S.W.2d 920 (Mo. Ct. App. 1990) ................................................ 22

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft,*
    154 A.2d 684 (Del. 1959) ................................................................ 38

*Burge v. Fid. Bond & Mortg. Co.,*
    648 A.2d 414 (Del. 1994) ................................................ passim

*Carlisle v. United States,*
    517 U.S. 416 (1966) ................................................ Addendum-1

*Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.,*
    51 A.2d 854 (Del. Super. Ct. 1947) ................................................ 12, 31

*Citibank Fed. Sav. Bank v. New Plan Realty Tr.,*
    748 A.2d 24 (Md. Ct. Spec. App. 2000) ................................................ 28

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
    24 F.4th 242 (3d Cir. 2022) ................................................ 38, 39

*Deibler v. Atl. Props. Grp., Inc.,*
    652 A.2d 553 (Del. 1995) ................................................ 3, Addendum-3

*Deng v. HK Xu Ding Co.,*
    2023 WL 3318322 (Del. Super. Ct. May 8, 2023) ................................................ 15

*DFC Glob. Corp. v. Muirfield Value Partners, L.P.*,
   172 A.3d 346 (Del. 2017) ............................................................... 4

*Diaz v. U.S. Dep't of HUD*,
   657 F. Supp. 3d 372 (S.D.N.Y. 2023) ....................................... 40

*E. Sav. Bank, FSB v. CACH, LLC*,
   55 A.3d 344 (Del. 2012) ............................................................. 29

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983) .................................................................... 38

*Friendly Fin. Corp. v. Hector*,
   1999 WL 1847444 (Del. Com. Pl. Mar. 15, 1999) ..................... 2

*FTC v. Penn State Hershey Med. Ctr.*,
   838 F.3d 327 (3d Cir. 2016) ...................................................... 40

*Gallen v. New Castle Cnty.*,
   839 A.2d 665 (Del. 2003) ............................................................. 3

*Gilbert v. El Paso Co.*,
   490 A.2d 1050 (Del. Ch. 1984) ................................... Addendum-7

*Girard Tr. Bank v. Castle Apartments, Inc.*,
   379 A.2d 1144 (Del. Super. Ct. 1977) ........................ 2, 3, 13, 31

*Grider v. Keystone Health Plan Cent., Inc.*,
   500 F.3d 322 (3d Cir. 2007) ................... Addendum-1, Addendum-2

*Hicklin v. Onyx Acceptance Corp.*,
   970 A.2d 244 (Del. 2009) ............................................................. 2

*Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*,
   379 A.2d 1147 (Del. Super. Ct. 1977) ......................................... 2

*In re Alexander Jones*,
   Case No. 22-33553 (Bankr. S.D. Tex., Dec. 10, 2024) ......... 21, 22

*In re Bakalis*,
   220 B.R. 525 (Bankr. E.D.N.Y. 1998) ...................................... 33

*In re Cantwell*,
   639 F.2d 1050 (3d Cir. 1981) ................................................... 40

*In re Kempthorne*,
   449 F.3d 1265 (D.C. Cir. 2006) ................................................ 39

*In re Kensington Int'l, Ltd.*,
   368 F.3d 289 (3d Cir. 2004) ......................................................................... 39

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) ........................................................................... 35

*In re Time Sales Fin. Corp.*,
   445 F.2d 385 (3d Cir. 1971) ......................................................................... 22

*In re Watertech Holdings, LLC*,
   619 B.R. 324 (Bankr. D.S.C. 2020) ............................................................. 19

*In re WestPoint Stevens, Inc.*,
   600 F.3d 231 (2d Cir. 2010) ......................................................................... 19

*In re Winthrop Mills*,
   106 F. Supp. 464 (D. Me. 1952) ................................................................... 22

*Ivey v. Harney*,
   47 F.3d 181 (7th Cir. 1995) .............................................................. Addendum-1

*Johnson v. Craddock*,
   365 P.2d 89 (Or. 1961) ................................................................................. 34

*King v. Lyons*,
   248 P.3d 878 (N.M. 2011) ............................................................................ 21

*Kool, Mann, Coffee & Co. v. Coffey*,
   300 F.3d 340 (3d Cir. 2002) ........................................................................... 4

*Leatherbury v. Greenspun*,
   939 A.2d 1284 (Del. 2007) ........................................................................... 34

*Matter of Xonics Photochem., Inc.*,
   841 F.2d 198 (7th Cir. 1988) ........................................................................ 35

*Miami Ctr. Ltd. P'ship v. Bank of N.Y.*,
   838 F.2d 1547 (11th Cir. 1988) .................................................................... 40

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................ Addendum-2

*Offredi v. Huhla*,
   60 A.2d 779 (Conn. 1948) ............................................................................ 22

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
   73 F.4th 157 (3d Cir. 2023) ..................................................................... 38, 39

*Peacock v. Thomas,*
516 U.S. 349 (1996) ............................................................................................ 39

*Peterson v. Bank Markazi,*
121 F.4th 983 (2d Cir. 2024) .............................................................................. 39

*Poole v. N. V. Deli Maatschappij,*
243 A.2d 67 (Del. 1968) ........................................................................ 3, 13, 14

*Salzberg v. Sciabacucchi,*
227 A.3d 102 (Del. 2020) .................................................................................. 34

*Shields v. Bobby Murray Chevrolet, Inc.,*
261 S.E.2d 238 (N.C. Ct. App. 1980) ............................................................... 21

*Sibbach v. Wilson & Co.,*
312 U.S. 1 (1941) .................................................................................. Addendum-1

*Spence v. ESAB Grp., Inc.,*
623 F.3d 212 (3d Cir. 2010) .............................................................................. 14

*United States v. Denedo,*
556 U.S. 904 (2009) ............................................................................ Addendum-1

*United States v. Chem. Found.,*
5 F.2d 191 (3d Cir. 1925) .................................................................................. 34

*Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.,*
821 A.2d 296 (Del. Ch. 2002), *aff'd* 822 A.2d 397 (Del. 2003) ...................... 33

*Walston v. Deutsche Bank Nat'l Trust Co.,*
67 A.3d 1023 (Del. 2013) ................................................................................... 3

**Statutes**

28 U.S.C. § 455 ............................................................................................................ 39

8 *Del. C.* § 324 ................................................................................................... passim

9 *Del. C.* § 4535 .......................................................................................................... 34

9 *Del. C.* § 8753 .......................................................................................................... 34

22 *Del. C.* § 504(a) ..................................................................................................... 34

25 *Del. C.* § 6309 ........................................................................................................ 34

Ala. Code § 9-15-80 ................................................................................................... 22

Ind. Code Ann. § 5-22-22-5 ........................................................................................... 22

**Regulations**

31 C.F.R. § 591.309 ...................................................................................................... 37

31 C.F.R. § 591.310 ...................................................................................................... 37

**Rules**

Del. Super. Ct. Civ. R. 41 ............................................................................................. 14

Fed. R. Civ. P. 53 .......................................................................................................... 39

Fed. R. Civ. P. 69 ................................................................................... 1, Addendum-1

**Other Authorities**

2 Woolley, *Practice in Civil Actions* § 1121 (1985) .................................................... 3

Executive Order 13,835 ................................................................................................ 37

Executive Order 13,850 ................................................................................................ 37

## INTRODUCTION

After years of running an erratic and mismanaged sale process that focused on the wrong issues and departed from industry norms—and after a Sale Hearing that confirmed the same—the Special Master ("SM") recommends a $5.892 billion bid for the United States' fifth largest refining company from Elliott, a hedge fund. The Court should reject Elliott's bid. It fails under Delaware law because: it is grossly inadequate in price, well under 50% of the fair market value of the PDVH shares and, staggeringly, $3 billion dollars below CITGO's earnings over just the last three years; its multibillion dollar shortfall should shock the judicial conscience under any standard; it is the product of a prejudicially defective sale process marred by repeated failures and baffling decisions by the SM and his advisors; and it is not the highest bid received, given that Dalinar's bid satisfies $2 billion worth of additional judgments.[1] Moreover, it is indefensible and incurable to approve a bid sponsored by advisors to the SM who count the bidder and the Bondholders among their multimillion-dollar clients. Neither Judge Failla's ruling nor process fatigue justifies approving a bid that would be a miscarriage of justice and defy Delaware law.

## LEGAL STANDARD

Execution proceedings "must accord with the procedure of the state where the court is located" unless a federal statute governs. Fed. R. Civ. P. 69(a)(1). Here, Delaware law requires attached shares of stock to be "sold at public sale to the highest bidder."[2] 8 *Del. C.* § 324(a). Delaware courts reject the outcome of a forced sale where the "price is so grossly inadequate as

---

[1] The VPs have objected to acceptance of any Dalinar bid submitted to date and maintain that those objections are meritorious. As it is not clear whether, post-hearing and post-termination of its SPA, Dalinar intends to submit a new bid for consideration or argue that its earlier bid(s) should be accepted, the VPs reserve the right to oppose acceptance of any bid advocated for by Dalinar in its opening brief or otherwise.

[2] There is no dispute that Delaware law governs. D.I. 83 at 75 n.48 (parties agree); D.I. 481 at 5–6 (SPO); D.I. 1660 at 6 (SM); D.I. 1728 at 3 (Court); D.I. 2006 at 38 (SM).

to shock the conscience of the Court," *Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*, 379 A.2d 1147, 1149 (Del. Super. Ct. 1977); *accord Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994), or where "there was 'some defect or irregularity in the process or mode of conducting the sale . . . or some other sufficient matter . . . whereby the rights of parties to, or interested in the sale are, or may have been, prejudiced,'" *Burge*, 648 A.2d at 419.

### ARGUMENT[3]

## I.    Elliott's Bid Is Grossly Inadequate and Shocks the Conscience.

Delaware courts do not confirm forced sales where the price is "grossly inadequate, shocking the conscience of the court." *Id.* The default standard is that if the fair market value ("FMV") of the property "is more than twice the sale price, there is such gross inadequacy as will shock the conscience." *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1145 (Del. Super. Ct. 1977); *accord Burge*, 648 A.2d at 419. It is the burden of the bid's proponents to prove the sale price exceeds 50% of FMV.[4] The outcome of a forced sale itself is the "antithesis" of FMV. *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537–38 (1994). Instead, Elliott's $5.892 billion bid is significantly below 50% of the FMV of the PDVH shares established by the evidence and thus is grossly inadequate and should be rejected. Even if the Elliott bid managed to surpass the 50% threshold, it should still shock the judicial conscience because the shortfall from any reasonable valuation is billions of dollars and the property is a foreign nation's strategic asset.

---

[3] The VPs object to the Court's prohibition on cross referencing the extensive prior briefing in these proceedings. D.I. 2348 ¶ 8. The VPs fully and carefully presented 6 briefs in the 10.5 weeks leading up to the Sale Hearing addressing the SM's recommendations and sale process. Compressing those arguments—plus those arising from the four-day Sale Hearing—into 40 pages under threat of waiver and forfeiture is unreasonable and prejudicial.

[4] *See Friendly Fin. Corp. v. Hector*, 1999 WL 1847044, at *1 (Del. Com. Pl. Mar. 15, 1999) (applying 50% rule in UCC case and requiring creditor to demonstrate by preponderance of evidence that price exceeded 50% of FMV), *overruled on other grounds by Hicklin v. Onyx Acceptance Corp.*, 970 A.2d 244 (Del. 2009) (creditor must go beyond 50% rule under UCC).

**A.    The Special Master has Failed to Show by a Preponderance of the Evidence that Elliott's Bid Exceeds 50% of the Fair Market Value of the PDVH Shares.**

The Delaware Supreme Court defines the FMV of corporate stock as "the price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances." *Poole v. N. V. Deli Maatschappij*, 243 A.2d 67, 70 n.1 (Del. 1968). Delaware courts, including its Supreme Court, consistently look to expert testimony and other extrinsic evidence *outside* of the forced sale itself to ascertain FMV for use in the 50% test.[5] The 50% test applies to forced sales of corporate stock. *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 558–60 (Del. 1995). And a court need not find any impropriety beyond gross inadequacy of price to reject a forced sale. *Girard Tr.*, 379 A.2d at 1146; *Burge*, 648 A.2d at 419.

PDVH's primary asset is its indirect ownership of CITGO, a thriving refiner and marketer of refined petroleum products and the fifth largest refining company in the United States. VPs' Proposed Findings of Fact ("PFF") ¶4. The Court has heard from two experts offering a valuation of CITGO and the PDVH shares, Dr. Alberro, who has decades of experience both in the refining industry and as a valuation expert, and Mr. Kleinrichert, who has no experience in the refining industry. PFF ¶¶1–3, 50. Mr. Hiltz of Evercore critiqued Dr. Alberro but offered no expert opinion of his own. PFF ¶25. Taken together, the evidence establishes that Dr. Alberro's **$18.6 billion** valuation is correct. PFF ¶6.

### 1.    Dr. Alberro Presented the Only Credible Valuation of the Shares.

Both experts present discounted cash flow ("DCF") valuations, PFF ¶¶6, 52, which is the

---

[5] *See, e.g.*, *Walston v. Deutsche Bank Nat'l Trust Co.*, 67 A.3d 1023 at *2 (Del. 2013) (Steele, C.J.) (affirming determination of FMV from competing evidence, including an expert valuation); *Gallen v. New Castle Cnty.*, 839 A.2d 665 (Del. 2003) (affirming determination of FMV by review of competing appraiser testimony); *Deibler*, 652 A.2d at 558–60 (affirming application of 50% test that included evaluating competing expert valuations to determine FMV of corporate stock); *accord Burge*, 648 A.2d at 419 (using "appraised fair market value"); 2 Woolley, *Practice in Civil Actions* § 1121 (1985) ("when property sells for less than one-half of its value, as determined by evidence on the hearing, there is . . . gross inadequacy of price").

favored methodology of the Third Circuit and Delaware courts for valuing privately held corporations.[6] The DCF method has three key inputs—(1) the cash flow forecast over a defined period (here, five years), (2) the weighted average cost of capital ("WACC"), and (3) the perpetuity growth rate, which is an estimate of the rate at which the business will grow after the cash flow forecast period, *i.e.*, in perpetuity. PFF¶5(a). Mr. Kleinrichert agrees with Dr. Alberro as to CITGO's WACC (8.27%) and perpetuity growth rate (2.0%). PFF¶52. Thus, the only real dispute between them is over the cash flow forecast.

Dr. Alberro forecasted CITGO's cash flow between 2025 and 2030 using CITGO management's volume forecast (*i.e.*, the number of inputs (*e.g.*, crude oil) and outputs (*e.g.*, gasoline) the refineries are forecasted to consume and produce). Mr. Kleinrichert had no specific criticisms of those forecasts. Dr. Alberro then multiplied those forecasts by the prices of inputs and outputs derived from an average of four professional forecasting organizations widely relied upon in the energy industry, carefully adjusted to match the specific mix of products CITGO sells and the locations in which it operates to calculate CITGO's future cash flows. PFF¶¶17–19. Mr. Kleinrichert had no criticisms of those professional price forecasts. PFF¶¶20–22.

Dr. Alberro relied on management's volume forecasts because volumes are driven by operational factors (*e.g.*, equipment capacity, maintenance schedules) that, as both he and Mr. Weisenburger testified, management is best positioned to predict and control. PFF¶16. Although CITGO management also created forecasts of input and output prices, Dr. Alberro decided to rely on published price forecasts because refining is a commodity industry, and Dr. Alberro's and Mr. Weisenburger's unrebutted testimony is that, in such an industry, CITGO is a market price taker

---

[6] *Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340, 362–63 (3d Cir. 2002) (favoring DCF for "the extremely difficult task of valuing the stock of a company which is privately owned"); *DFC Glob. Corp. v. Muirfield Value Partners, L.P.,* 172 A.3d 346, 369 n.118 (Del. 2017) (viewing DCF as particularly appropriate for valuing large, privately held company).

both for the purchase of inputs like crude oil and for the sale of outputs like gasoline. PFF¶17. Accordingly, CITGO management is no better positioned to predict what crude oil or gasoline prices will be next year or in 2030 than any other industry participant or analyst. PFF¶17. And as Dr. Alberro explained, each of the forecasting organizations he relied on takes a different approach to forecasting, such that an average of the four produces a robust composite forecast, accounting for more information than any single forecast. PFF¶18.

No witness or other participant has identified any flaws in Dr. Alberro's cash flow forecasting methodology. Specifically, no one has presented evidence showing that (1) management's volume or non-input cost forecasts are inaccurate; (2) the consultants whose market input and output price forecasts Dr. Alberro utilized are unqualified or unreliable or that some other forecaster is better at predicting future input and output prices; (3) Dr. Alberro's method for adjusting input and output prices to CITGO's specific products and locations was flawed or unreliable; and (4) Dr. Alberro did anything unreasonable in applying the consultant price forecasts to the CITGO volume forecasts to predict PDVH's cash flow. PFF¶¶20–22.

The industry outlook also supports Dr. Alberro's use of composite third-party price forecasts. As Dr. Alberro, the only valuation expert who is also an expert in the refining industry to testify, explained, refining margins are likely to be stable in the medium- and long-term based on a combination of (1) persistent demand for refined products that drops only gradually over the long term as the energy transition takes hold; and (2) no significant supply growth because there are no significant refinery projects planned in markets where CITGO competes. PFF¶¶9–12. This opinion is supported by Evercore's Confidential Information Memorandum prepared for bidders, which stated that "[g]lobal demand for refined products is expected to grow throughout the medium term" while only "limited new capacity has been planned post-2025." PFF¶12. And a

recent *Evercore* report finds that the values of publicly traded refiners have been stable and risen over the last two years, even during the current cyclical downturn in industry earnings and margins, a strong indication of investor optimism regarding medium- and long-term performance. PFF¶11. Therefore, in the foreseeable future, the evidence supports a stable margin outlook. PFF¶¶9–10 (Dr. Alberro); PFF¶11 (Evercore Report).

### 2.    *Evercore's 2023 Valuation Supports Dr. Alberro's Conclusions.*

The valuation of the PDVH shares calculated by Evercore and shared with the SM in September 2023 also supports the reliability of Dr. Alberro's valuation. PFF¶¶44–49. As Mr. Weisenburger explained, preparing a valuation at the beginning of a sell-side engagement is standard because the seller wants to understand what the asset is worth before going to market and for use as a baseline in evaluating offers. PFF¶44. The midpoint of the DCF range calculated by Evercore in 2023 was $13.2 billion—more than $7 billion higher than Elliott's bid. PFF¶44. Crucially though, Evercore made three mistakes, and as Dr. Alberro explained at the hearing, correcting these mistakes in Evercore's valuation (one of which reduces Evercore's valuation) results in a **$16.9 billion** valuation: *First*, reversing a tax advantage that Evercore erroneously assumed (minus $1.0 billion). PFF¶45. *Second*, using the WACC that Evercore actually calculated (8.6–9.0%) instead of the arbitrary 9.25% WACC inexplicably applied in the calculation,[7] minus a small company risk premium that Evercore erroneously applied (plus $1.3 billion). PFF¶¶46–47. *Third*, using a 2.0% perpetuity growth rate instead of the zero percent perpetuity growth rate Evercore applied in 2023, when market expectations for long-term demand were more pessimistic given then-prevailing views about the transition to electric vehicles and renewables (plus $3.4 billion). PFF¶¶48–49. The 2.0% growth rate merely keeps pace with basic inflation and is consistent with Evercore's recent equity research report

---

[7] Mr. Hiltz could not explain this discrepancy, even after Dr. Alberro identified it.

expressing a more positive view on future refining margins and with Mr. Kleinrichert, who adopted Dr. Alberro's 2.0% perpetuity growth rate in his own valuation. PFF¶48. These changes increase the valuation from $13.2 billion to $16.9 billion, quite in line with Dr. Alberro's valuation. PFF¶49.

At the Sale Hearing, Mr. Hiltz attempted to undermine his own firm's valuation by arguing that PDVH's earnings have declined in the two years since the Evercore valuation was prepared. That critique is baseless. The *value* of a business does not automatically decline during a period of declining earnings, especially in cyclical industries where investors are accustomed to periods of rising and falling profits. That was shown through an Evercore equity research report on the refining industry discussed in Mr. Hiltz's cross examination. As Mr. Hiltz admitted, the value of three publicly traded refiners (Marathon, Valero, Phillips 66) all held steady or increased between 2023–2025 even though their earnings declined significantly in that period. PFF¶11.

Again, Mr. Hiltz has not identified any flaws in the price forecasts utilized by Dr. Alberro. He nevertheless speculated that Dr. Alberro should have utilized the price forecasts developed by CITGO management. PFF¶¶31. While, as explained, the unrebutted testimony of Dr. Alberro and Mr. Weisenburger establishes that relying on a composite of pricing forecasts prepared by third-party analysts is more reliable for forecasting medium- and long-term input and output prices in the refining industry, Dr. Alberro also presented an illustrative valuation using CITGO's pricing (and volume) forecasts, as Hiltz suggested, together with the 8.27% WACC and 2.0% perpetuity growth rate Dr. Alberro and Mr. Kleinrichert both used. PFF¶¶31, 68. The resulting DCF value is **$15.6 billion** using Evercore's own September 2023 valuation DCF methodology, which is the same methodology that Mr. Kleinrichert adopts.[8] PFF¶¶31.

---

[8] Both used the final year of the cash flow forecast (2030) as the terminal cash flow. PFF¶31.

### 3.    *Mr. Kleinrichert's Cash Flow Adjustments Are Flawed and Unreliable.*

By contrast to Dr. Alberro's well-grounded methodology, Mr. Kleinrichert's cash flow "forecast" is methodologically indefensible. Mr. Kleinrichert does not attempt to predict volumes, input or output prices, or costs, nor does he adopt CITGO management's forecasts of those variables. PFF¶¶54–66. Instead, he simply takes the 2025–2030 forecasted EBITDA from CITGO's most recent Medium Term Plan and lowers it substantially through mathematical tricks to match what he incorrectly claims is the historical relationship between CITGO's earnings and those of publicly traded refiners. PFF¶¶54–66. Both the purported necessity and the amount of Mr. Kleinrichert's fabricated adjustment—which tellingly was not part of the DCF analysis conducted by Evercore in 2023—are driven by three justifications, each of which is flawed.

*First,* Mr. Kleinrichert claims that a downward adjustment is warranted because CITGO historically has failed to meet its EBITDA forecasts. PFF¶54. To reach this conclusion, he begins by comparing PDVH's actual results to its forecasted results for the period 2019 through Q1 2025 to demonstrate a supposed need to "correct" CITGO's forecasts, and he then calculates the median of the miss percentages as negative 63.9%. PFF¶54. He does not identify any purported bias or systematic inaccuracy in CITGO's forecasting methods that would require a downward correction, any explanation for why CITGO supposedly underperformed (by, for instance, attempting to discern whether CITGO overestimated output prices or production volumes or underestimated input prices or production costs), or any reason to think that any historical underperformance would reasonably be expected to recur. *See* PFF¶¶54–57. But most of the variance between forecasted and actual earnings is attributable to (1) 2020 and 2021, when earnings were wiped out by the COVID-19 pandemic; and (2) Q1 2025, a single anomalous

8

quarter that Mr. Kleinrichert overweights by including in the calculation as if it were a full year.[9] PFF¶55. Excluding those periods produces a median miss percentage of just negative 8.1%, with an even distribution of annual periods in which the miss was high (actual earnings exceeded forecast) and low (actual earnings fell short of forecast). PFF¶57. That eviscerates any justification for applying a systematic downward adjustment to CITGO's forecasts.

**Second,** as further support for his downward adjustment—and as the first of two bases to calculate the amount of the adjustment—Mr. Kleinrichert calculates CITGO's supposed historical EBITDA margins (EBITDA divided by revenue) relative to peers and concludes that from 2019 through LTM (last twelve months) March 31, 2025,[10] CITGO purportedly achieved only 58.4% of the peer group's median EBITDA margins. PFF¶58. On that basis, he reduces CITGO's forecasted EBITDA such that in each future period CITGO has an EBITDA margin (compared to its forecasted revenues) equal to 58.4% of the median margin forecasted for the peer group members. PFF¶58. Again, Mr. Kleinrichert does not attempt to identify the reason for the purported variance, and he does not present any valid reason why any historical variance would justify a downward adjustment to CITGO's future margin forecasts at all, much less to a fixed ratio of 58.4% of forecasted peer group margins. PFF¶58. He does not, for example, attempt to demonstrate that CITGO management's own forecasts do not already assume lower output prices or higher input prices or costs than those forecasted for the peer group or that any variance is the result of factors that inevitably will result in underperformance relative to peers. *See* PFF¶¶58–59. Indeed, Mr. Kleinrichert ignores the fact that CITGO management's forecasts already assume lower EBITDA margins than peers, which his own demonstrative illustrates. *See*

---

[9] The Q1 2025 miss percentage (1,225%), the highest by far of any period reported by Mr. Kleinrichert, is exceedingly unlikely to be the miss percentage for full year 2025 given improved results in Q2 2025, and he does not assert that Q1 2025 is representative of the full year. PFF¶55.

[10] For clarity, LTM March 31, 2025, would mean Q2 2024, Q3 2024, Q4 2024 and Q1 2025.

PFF¶¶58–59. But his analysis also is flawed and misleading even on its own terms.

To begin, the period for the calculation is arbitrary and designed to produce a lower EBITDA margin relative to peers. PFF¶¶59–60. Whereas in assessing CITGO's historical forecasting accuracy Mr. Kleinrichert begins in 2019, here Mr. Kleinrichert inexplicably begins in 2020. PFF¶62. On the other end, Mr. Kleinrichert includes the 12-month period LTM March 31, 2025. PFF¶60. This results in double-counting Q2, Q3, and Q4 of 2024 since Mr. Kleinrichert also includes full-year 2024 in his average. PFF¶60. Because those quarters had a higher-than-average variance between CITGO and peer group EBITDA margin, this double counting produces a more extreme average variance. PFF¶60. Moreover, there is no basis to conclude that, because CITGO's EBITDA margin averaged 58.4% of the peer group median from 2020 through LTM March 31, 2025, that relationship will persist. Even within the given period, Mr. Kleinrichert could not explain the variance between CITGO and the peer group. PFF¶59. He could not, for example, rule out that 2020 and 2021 had higher variances than 2022, 2023, and 2024 because of the one-time impact of U.S. sanctions that forced CITGO's refineries to switch from a steady supply of Venezuelan heavy crude oil to alternative crudes. PFF¶59.[11]

*Third,* as his final support for his downward adjustment—and as the second of two bases to calculate the amount of the adjustment—Mr. Kleinrichert claims that CITGO's management forecasts a faster rate of "EBITDA recovery" from an LTM March 31, 2025, baseline than is forecasted for its peer group. PFF¶63. "EBITDA recovery" means the factor by which forecasted EBITDA in each future period exceeds EBITDA for LTM March 31, 2025. PFF¶63. He purports

---

[11] Moreover, Mr. Kleinrichert's analysis uses the *ratio* of CITGO's EBITDA margins to the peer group median, which produces a more extreme discount to CITGO's forecasted future cash flow than simply subtracting the *nominal* difference between CITGO and the peer group. PFF¶61. Mr. Kleinrichert offers no reason for selecting the ratio method. *See* PFF¶61.

to find that CITGO is forecasting a higher rate of "recovery" from this arbitrarily chosen period than the peer group is forecasting and therefore adjusts CITGO's forecasts down to equal 90% of the peer group maximum recovery. PFF¶63.

The premise of this adjustment is that CITGO could not have faster EBITDA recovery than the peer group, but Mr. Kleinrichert has no support for such an assumption. PFF¶64. In fact, as Mr. Kleinrichert and others point out, CITGO had an unusually poor first quarter of 2025, so CITGO can reasonably expect a faster rate of increase from the LTM March 31, 2025, baseline because it had unusually lower earnings than the peer group in that baseline period. *See* PFF¶¶55, 65. Dr. Alberro confirms this explanation by showing that shifting the baseline by just one quarter to full year 2024 produces a CITGO EBITDA recovery forecast well within the peer group range. PFF¶65. On that basis, one could not justify any discount to CITGO's forecast. Mr. Kleinrichert also does not consider that CITGO has made substantial capital investments in recent years that are expected to generate additional EBITDA in the coming years, something that Evercore itself has touted to investors. PFF¶64 (CIM, Mgmt Presentation).

In short, Mr. Kleinrichert's "EBITDA recovery" analysis, like his margins analysis, is an arbitrary basis for adjusting CITGO's forecasted cash flow. Both methods are highly sensitive to the baseline and assume—without basis—that CITGO's performance relative to peers will match its historical performance over an arbitrarily chosen (and mis-counted) period. Even if Mr. Kleinrichert's observations about CITGO's historical performance relative to peers were valid (which they are not), they ***are not inconsistent*** with Dr. Alberro's cash flow forecast. Dr. Alberro's projection is not based on any forecasted improvement in CITGO's business relative to peers; indeed, his projections are agnostic to CITGO's performance relative to peers. *See* PFF¶¶14–19. Instead, Dr. Alberro's projections are driven by third-party analysts' forecasted

improvement in **industrywide** crack spreads—the difference between input and output prices—which if borne out would positively affect the performance CITGO **and** its peers. PFF¶¶14–19.

The unreliability of Mr. Kleinrichert's arbitrary adjustments is underscored by the fact that his $8.4 billion DCF valuation is lower than PDVH's cumulative EBITDA of $8.8 billion over just the last three years. PFF¶66. There is no basis to value a major refining business so low unless it is failing. *See* PFF¶66. That is not the case here, as CITGO is emerging from a cyclical downturn in pricing and is poised to generate higher cash flow. PFF¶¶19, 66. And a substantial portion of these earnings have been invested in CITGO to fund value-increasing capital investments and strategic improvements. PFF¶64.

**B.    Elliott's Bid Is Below 50% of the PDVH Shares' Fair Market Value.**

Compared to Dr. Alberro's $18.6 billion valuation, Elliott's bid spectacularly fails the 50% test. PFF¶70. Even if one deducts the value Elliott and the Bondholders have assigned to releasing the Bondholders' contested pledge against the CITGO Holding shares—the $2.125 billion TSA[12]—Elliott's bid is only 35.7% of the shares' FMV. PFF¶70.[13] Elliott's bid also would fail the 50% test if Evercore's corrected valuation ($16.9 billion, $14.775 billion with TSA deduction) or a valuation using the independent experts' agreed WACC and perpetuity growth rate, along with CITGO's price forecasts ($15.6 billion, $13.475 billion with TSA deduction) were used to establish FMV. PFF¶¶31, 49, 69. In short, the bid is grossly inadequate by any measure, warranting rejection and an "infer[ence] that a resale would correct the situation." *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854, 858 (Del. Super. Ct. 1947).

Hoping to avoid the 50% test altogether, the SM contends that the outcome of the sale

---

[12] To be clear, the VPs do not agree that the Bondholders' claims are worth this amount. Judge Failla's decision could—and, given its fundamental flaws, should—be reversed on appeal (and is subject to de novo review). The VPs just use the $2.125 billion figure here to be conservative.

[13] This percentage is calculated as: $5.892 billion / ($18.6 billion - $2.125 billion).

itself should be considered the best evidence of FMV. PFF¶72 (Mr. Hiltz). This Court has expressed its inclination to agree. D.I. 1554 at 4. But this approach would nullify the 50% test, defy U.S. Supreme Court and Delaware precedent, and ignore the SM's and his advisors' conduct.[14] The SM has argued that the Court can treat the outcome of the sale process as FMV because the SM—a court-appointed officer whose duty is to forcibly sell an asset against its owner's wishes, at the behest of creditors who want to be satisfied as soon as possible, and on a deadline set by the Court—purportedly stood in the shoes of a willing seller (*see Poole*, 243 A.2d at 70 n.1), citing his ability to recommend no winning bidder in the event the bidding failed. *E.g.*, D.I. 1527 at 3; D.I. 2006 at 17–19. But *every* sheriff sale can be postponed if "circumstances[] will be likely to produce great sacrifice of the property." *Blossom v. Milwaukee & C.R. Co.*, 70 U.S. 196, 209 (1865). The SM actually has less power than the sheriff in this regard, as the SPO allows the Court to overrule the SM's recommendation that no winner be selected. D.I. 481 ¶ 13. And, at the Sale Hearing, counsel for the SM made clear that the SM ***did not view*** recommending no winner as a realistic option,[15] and Elliott's witness testified that the sale process is *not* "a simple sale by . . . a willing buyer and a willing seller," PFF¶72 (Mr. Turkel).

Moreover, the evidence is indisputable that the SM did not *conduct* the process like a willing seller. *See* PFF¶¶72–83. The entire premise of a *willing* seller is one who would walk away rather than forge ahead with a process that was failing to maximize value. Unlike a willing seller, however, the SM "forced" the process "to try to go through the steps to get it done as fast

---

[14] *BFP*, 511 U.S. at 537–38 (outcome of forced sale is "the very antithesis" of FMV); *Poole*, 243 A.2d at 70 n.1 (defining FMV as price agreed between willing buyer & seller); *Girard Tr. Bank*, 379 A.2d at 1146 (applying 50% test & explaining that a forced sale "involves conditions of compulsion" that are "foreign to the concept of fair market value").

[15] PFF¶83 (counsel for the SM repeatedly stating that someone "in the shoes of the Special Master" would be "forced to choose between" the bids available, despite Mr. Weisenburger stating that he "wouldn't have selected either one").

as possible." PFF¶72 (Mr. Weisenburger). Among other things, he granted exclusivity to Elliott in 2024, which no willing seller would have done given the poor state of Elliott's bid at the time, *see id.*, and then recommended Elliott's bid even though it "proposed to put all of the proceeds from the sale into escrow for years while [Elliott] got to operate the company and take the profits," *id.*. Nor would a willing seller have selected a stalking horse bid that was half the price of the highest bid submitted because the lower bid had diverted billions of dollars away from the beneficiaries of the sale to pay a claim that the seller was actively disputing. PFF¶82. The list could go on, but as Mr. Weisenburger succinctly made the point: "I don't think a willing seller would have accepted any of these bids." PFF¶72.

To the extent the Court is inclined to ignore the 50% test or find that the sale's outcome equals FMV (or that a judicial officer can be considered a "willing seller"), either conclusion would contravene Delaware Supreme Court precedent in *Burge* and *Poole*, respectively. The Court should not do so unless it certifies such questions to the Delaware Supreme Court and receives its blessing. *See* Del. Super. Ct. Civ. R. 41; *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (federal courts "may not impose our own view of what state law should be, nor expand state law in ways not foreshadowed by state precedent") (cleaned up).

### C. Elliott's Bid Also Shocks the Judicial Conscience Because It Is Billions of Dollars Below Any Reasonable Estimate of Fair Market Value.

This case is unprecedented in Delaware history, and so too is the magnitude of the shortfall of the Elliott Bid as compared to FMV under any reasonable valuation. As a multibillion-dollar company, PDVH dwarfs any property previously sold in a Section 324 sale. The scale of value that would be lost (and corresponding debt unpaid) in approving Elliott's bid—*billions* of dollars—is immense. No court has ever overseen, much less confirmed, a sale of stock under Section 324 anywhere close to this magnitude. *See* D.I. 102-1 at 13 (collecting

14

Section 324 cases, with largest involving $567,000 judgment); *Deng v. HK Xu Ding Co.*, 2023 WL 3318322, at *6 (Del. Super. Ct. May 8, 2023) (vacating $2.4 million attachment intended to be satisfied using Section 324). Moreover, PDVH and its subsidiaries are the "crown jewel" and lifeline of a foreign nation in the throes of humanitarian, political, and economic crises. Approving the transfer of that unique, thriving asset at a fire sale price should shock the conscience of any court, rendering Elliott's bid unconfirmable regardless of the 50% test.

The judicial conscience should be all the more shocked by the recommendation of a bid by a SM whose primary advisors were reaping millions in fees from the winning bidder and its affiliates *and* from major 2020 Bondholders. Selling a thriving company to a client of the SM's advisors for a monumental discount and diverting money from non-client creditors to client Bondholders—while insisting PDVSA be grateful for a "settlement" that purportedly discharges debts that PDVSA still believes to be null and void—is galling. It is all the more shocking when one considers Evercore and Weil's institutional interests in providing a windfall to their clients.

## II.    Elliott's Bid Is the Product of a Prejudicially Defective Process.

Even where the price obtained in a forced sale is "not grossly inadequate," a sale should be rejected where "there was 'some defect or irregularity in the process or mode of conducting the sale, . . . or some other sufficient matter . . . whereby the rights of parties to, or interested in the sale are, or may have been, prejudiced.'" *Burge*, 648 A.2d at 419; *see id.* (courts should "consider factors other than price" to avoid "unfairness or work an injustice on [parties] having an interest in the outcome"). Here, the SM committed indefensible errors when designing and implementing the sale process—many of which the VPs urged both the SM and the Court to avoid in real time. These errors resulted in an inadequate bid that is billions of dollars short of FMV. This outcome prejudices the Republic and PDVSA by depriving them of the discharge of

billions of dollars' worth of debts. While the full catalogue of errors is provided in more detail in the VPs' Proposed Findings of Fact, the following section describes some of the most significant errors and other process defects and explains how they contributed to the deficient outcome.

### A. The Special Master Failed to Seriously Consider Alternative Transactions Even as His Sale Process Was Clearly Failing.

It is clear that the process the SM designed was not well suited to maximize value. As Mr. Weisenburger testified, when conducting an auction of corporate shares, the goal is to attract multiple bidders willing and able to pay a "strategic premium" for the company, for instance because of synergies with the buyer's own operations or assets, and pit those buyers against each other to drive up the price. PFF¶111. That did not happen here. Of the over 90 potential bidders to whom Evercore sent teasers, only 12 potential bidders submitted non-binding indications of interest in January 2024, and of those, the highest bid submitted was over $6 billion below the valuation Evercore had conducted just months earlier. PFF¶¶112–13. At this point, the SM and his advisors should have reached out to potential strategic bidders who did not participate to understand what had kept them from bidding and what he could do to incentivize stronger participation. PFF¶¶75, 114. They never did this. *See* PFF¶114 (Mr. Hiltz admitting the SM "never reached out to strategic bidders who didn't participate to ask them what might make the process more appealing").

The second round of bids submitted in June 2024 was no improvement. Only six bidders submitted bids and the highest was (again) over $6 billion below Evercore's own valuation. PFF¶¶121–22. At this point, as Mr. Weisenburger testified, the SM should have considered switching to an alternative process or at least prepared for such an alternative as a backstop to the inadequate bids that had been submitted to date. PFF¶¶124–26. As Mr. Weisenburger has long explained, where a seller is not obtaining a strategic premium in an auction process, he should

16

instead consider whether to sell the shares in the public markets. PFF¶¶76, 161–62. The public markets are likely to yield more than what can be obtained in a fire sale auction to buyers specializing in the purchase of distressed assets, which is all the SM has managed to attract here. PFF¶162. In fact, the VPs reached out to the SM and his team in July 2024, pointing out the gross inadequacy of the second-round bids and urging the SM to correct course and consider alternative processes. PFF¶126; VP_Ex_025 (July 11, 2024 letter from N. Eimer to R. Pincus). Instead, the SM pushed stubbornly forward, with ever-worsening results.

### B.    The Evidence Shows that the Special Master Deliberately Failed to Generate Competitive Tension Throughout the Sale Process.

As explained above, the June 2024 bidding round was a disaster under any standard. PFF¶¶121–26. However, rather than walk away from the unacceptable bids he received or pivoting to an alternative process capable of generating more value, the SM granted two bidders—first ███, and then when those negotiations fell apart, Elliott—competition-destroying exclusive negotiation rights that no rational seller would have granted. PFF¶¶127–30. At the time the SM entered into these exclusive negotiations, neither ███ nor Elliott had submitted a bid that even approached the value of the PDVH shares, and what is worse, neither was bound on price, both bids were subject to continued diligence, and neither had committed financing. PFF¶¶130–31. The VPs repeatedly warned the SM that exclusivity would be detrimental to the sale process. PFF¶¶128–31; VP_Ex_173 (July 25, 2024 letter); VP_Ex_190 (August 7, 2024 letter); VP_Ex_028 (August 19, 2024 letter). The SM's decision to nevertheless grant exclusivity, which cannot be squared with the actions of a willing, rational, unbiased seller (*see supra* at 14), destroyed competition as the SM was no longer able to pit bidders against each other. PFF¶77. The decision also resulted in the SM's indefensible recommendation of Elliott's September 2024 bid as the "winning bid." That actual value of that bid was billions of dollars below its headline

17

price and proposed to hold even these meager sale proceeds in escrow potentially for years until the PDVH Alter Ego litigation was resolved, while allowing Elliott to operate the business and retain all profits in the interim even if it later chose to walk away. PFF¶¶139–40. Elliott's bid was so bad that the Attached Judgment Creditors and the Sale Process Parties unanimously opposed it (as well Elliott's November 2024 revised proposal), requiring the SM to "pivot" to another round of bidding. PFF¶¶143–49; VP_Ex_038 (November 2, 2024 letter from N. Eimer to R. Pincus noting "the financial and legal non-viability of Elliott's bid and the near-unanimous opposition from attachment holders"). As Mr. Weisenburger explained, the SM's willingness to grant exclusivity and recommend such a flawed bid could not be cured by another round of bidding because bidders now understood that the SM would accept any bid, no matter how inadequate. PFF¶147.

The SM's missteps continued into the new rounds of bidding. ***First,*** he recommended Red Tree's $3.699 billion bid as the stalking horse, even though it was more than $3 billion below the highest bid (Dalinar's $6.949 billion bid).[16] The SM's justification to the Court at that time for this decision was that Red Tree's TSA with the 2020 Bondholders supposedly gave its bid more closing certainty. D.I. 1596 ¶¶ 33–34. Strikingly, however, this justification was not based on a reasoned determination that Red Tree's bid represented a "higher" bid after factoring in the risk posed by the Bondholders. Indeed, the SM admitted that he did not even attempt to analyze the various purported risks he claimed existed in Dalinar's bid.[17] PFF¶182 (Mr. Hiltz

---

[16] *All* the stalking horse bids were below 50% of PDVH's FMV and thus should have been rejected. *See* VP_Ex_187.035–.036. Any willing and rational seller would have stopped the sale process and deemed it a failure or, at most, would have selected the highest bid as a nonbinding base bidder, so as to set a higher floor for the topping period. *See* VP_Ex_187.055, .036.

[17] In fact, discovery reveals the SM was not convinced that Red Tree's purported agreement with the 2020 Bondholders was itself free from conditionality given the risk that the Bondholders could terminate the TSA. D.I. 1948-6 (Ex. 40).

admitting that the SM did not analyze the likelihood that the Bondholders could block the closing of a deal without a TSA, or the risk that they would be successful in doing so). This decision—devoid of quantified analysis as it was—thus gave default approval to a bid that was a mere fraction of the shares' value and led bidders in the topping period to compete to increase the price paid to the 2020 Bondholders rather than the price paid to Attached Judgment Creditors. VP_Ex_187.033–.036, .041–.043; *see also* D.I. 1644 at 2–5.

The new justification offered by the SM is even less persuasive. Mr. Hiltz has now testified that Red Tree was selected as the stalking horse bidder by the SM not because of the pretextual rationale provided during the Stalking Horse Period, but because he and his advisors were concerned that if they selected Gold Reserve "many people who felt they might not be able to get fully to Gold Reserve's price would throw up their hands and give up because [the SM] would have signaled that price, rather than certainty was the primary criteria." PFF¶181.

Naming Red Tree as the stalking horse created effectively no competition on price during the topping period because no bidder—not even Gold Reserve—was incentivized to improve the price of its bid beyond the low mark set by Red Tree. *See* PFF¶¶189, 197–99; VP_Ex_187.033–.034. This is unsurprising, as the SM's decision was contrary to the very purpose of a stalking horse bid—to "indicate to others that the assets being sold have value" and thus to "attract other buyers to a competitive bidding process." *In re Watertech Holdings, LLC*, 619 B.R. 324, 337 (Bankr. D.S.C. 2020); *see also In re WestPoint Stevens, Inc.*, 600 F.3d 231, 239 n.3 (2d Cir. 2010) (stalking horse is "strategically solicited" to "prevent low-ball offers"); VP_Ex_187.033–.043. Choosing Red Tree as the stalking horse had the opposite effect.

By apparently prioritizing closing certainty in the stalking horse round, the SM predictably led bidders in the topping period to focus on that issue—diverting funds to the

Bondholders at the expense of improving bid prices.[18] PFF¶197; *see also* VP_Ex_187.021–.024, .033–.034, .041–.043. ▮▮▮▮ topping bid, for example, merely inched above Red Tree's (inadequate) purchase price but emphasized its "expect[ation]" to settle with the Bondholders. *See* VP_Ex_187.280–.287. The SM's public filings during the stalking horse round reinforced his emphasis on the Bondholders. *See* D.I. 1679 at 3 (directing topping bidders to explain how their bid could close if the Bondholders won in New York, confirm the bidder bears the risk of the Bondholder Litigation, or structure bids to not implicate that litigation "*at all*").

*Second*, the SM failed to actively foster competition during the topping period. He had little idea how to get the bidders to improve on their bids. *See* PFF¶189 (ten days into the topping period, SM asking, "how are we going to get some movement during this SH [sic] period?"); *id.* (Mr. Hiltz admitting "the Special Master's team was concerned about not having any movement in the Topping Period"). To make matters worse, he inexplicably denied bidders information to compete head-to-head. PFF¶202 (Mr. Hiltz admitting that no one told bidders the price of the bid they had to beat). Even when asked directly by bidders how they could prevail, he simply pointed them to the Court's April 21 Order and told them to "put [their] best foot forward based on the court's guidance." D.I. 1840-1 Ex. A at 59:14–24; *see also* VP_Ex_017 (counsel for Gold Reserve asking how "to maximize [its] chances of success"); VP_Ex_077.001 ("the [SM] does not intend to give Gold Reserve guidance on" whether to settle with the Bondholders or pay additional AJCs); PFF¶¶189, 198. What little guidance the SM *did* give demonstrated no effort to encourage bidders to beat Dalinar's stalking horse bid price (as the Court stated it expected of the SM), but instead asked Red Tree and Elliott to increase their bid price only through Rusoro (and

---

[18] The VPs warned that selecting Red Tree would depress the topping period, divert money away from AJCs, and result in a competition to pay the Bondholders—not maximize value. D.I. 1654 at 2, 4, 5; D.I. 1666 at 3; D.I. 1697 at 2–3. The VPs were right.

to do so by cannibalizing the joint Dalinar bid instead of fully satisfying those claims), while encouraging Gold Reserve to resolve the Bondholder uncertainty without urging it to increase its bid price. PFF¶189. The VPs again raised their concerns to the SM. PFF¶198; VP_Ex_042 (June 23, 2025 letter).

The SM's approach has echoes of the failed stock sale in the *InfoWars* bankruptcy, where the court rejected a trustee's recommendation because, despite a "well-intended" process, it "did not maximize value in any way." *In re Alexander Jones*, Case No. 22-33553 (Bankr. S.D. Tex., Dec. 10, 2024), ECF No. 992 at 363:9–11 ("*Jones* Tr."). The court observed that a party charged with selling assets "has a duty to try to go out there and scratch and claw and get every dollar possible." *Id.* at 369:14–16. The SM did the opposite. *See id.* at 366–67 (process "left a lot of money on the table" and "the potential for a lot of negotiations on the table").

This Court conceived of a very different topping period, in which the SM would conduct what amounted to a "longer auction" by "generating as much 'competitive tension' among bidders as possible," D.I. 1554 at 12–13, and ultimately produce "a Final Bid with a price at or exceeding that associated with [Gold Reserve's stalking horse] bid," D.I. 1741 at 6. Even the SM now admits that the topping period failed to generate any competitive tension on price. *See* PFF¶202 (Mr. Hiltz admitting that no "competitive tension" "play[ed] out during the Topping Period"). This was "an objective failure under any metric." VP_Ex_187.034.

## C.    The Special Master Did Not Run a "Public Sale."

By refusing to apprise bidders of the highest price on the table—in the topping period and every round before that—the SM also departed from Section 324's requirement to sell the shares at a "public sale." 8 *Del. C.* §324(a); PFF¶¶202–03. After all, "[t]he key element . . . in a public sale is the opportunity for competitive bidding." *Shields v. Bobby Murray Chevrolet, Inc.*, 261 S.E.2d 238, 240 (N.C. Ct. App. 1980); *see King v. Lyons*, 248 P.3d 878, 895 (N.M. 2011). The

SM's approach instead amounted to relying on sealed bids, which are incompatible with a "public sale."[19] Indeed, Section 324 refers to a "public sale," *not* to a "public sale or sealed bid" like some other states' statutes. *E.g.*, Ala. Code § 9-15-80; Ind. Code Ann. § 5-22-22-5.

It was not apparent at the outset that the SM intended to conduct a secret process. Instead, he assured the Court the topping period would function like a "longer auction," with competitive tension building *during* bidding; the Court directed him to "*continuously* . . . engage with bidders" to achieve that end. D.I. 1554 at 12. That approach might have met the "public sale" requirement. But, as described above, that is not what happened. *See* VP_Ex_187.042–.043.

The SM and Evercore's response is that bidders were aware of the bid prices at moments in time when the SM publicly filed his various recommendations. PFF¶202. This is no answer. Having bidders make proposals in the dark, only to learn after a public recommendation how far off they were from the highest bid is decidedly not the kind of "long auction" the SM promised. *See Jones* Tr. at 363:13–18 (*Infowars* court stating that the sale was "almost doomed from the minute they decided to go to a sealed bid" because "[n]o one knows what everybody else is bidding" such that "[p]eople don't know if they're actually bidding against themselves"); *id.* at 355:18–20 ("no one knew what the other bids were going into the best and finals"). And the SM's erratic approach to selecting bids during and after the Topping Period did not allow bidders to compete on price, since no one ever knew what price the SM subjectively viewed as the price to beat on any particular day. For example, the SM initially favored Dalinar's bid price and

---

[19] *See, e.g.*, *Offredi v. Huhla*, 60 A.2d 779, 781 (Conn. 1948) ("sale by sealed bids is not a public sale," because a bidder lacks "full opportunity to know what the competition is and to increase his bid."); *Boatmen's Nat'l Bank v. Eidson*, 796 S.W.2d 920, 922–23 (Mo. Ct. App. 1990) (sealed bidding is not a "public sale" because it forecloses competitive bidding); *In re Winthrop Mills*, 106 F. Supp. 464, 464 (D. Me. 1952) (similar); *cf. In re Time Sales Fin. Corp.*, 445 F.2d 385, 386 (3d Cir. 1971) (suggesting forced sales be set aside where bidder was not told about auction date because bidder "had a vital interest" in being able to either "meet" or "top" "a higher bid").

closing certainty in his July 2 recommendation and stated that a $2 billion difference in favor of a lower bid with a TSA would be hard to justify. D.I. 1837 ¶ 81; PFF¶¶210–13. He then whipsawed to favor certainty *only* and recommended Elliott's bid though its bid came in at the very $2 billion gap he expressed skepticism over just weeks earlier. PFF¶¶215.

### D.    The Special Master Placed Undue Emphasis on Contingent Liabilities and Then Failed to Mitigate the Bid-Chilling Uncertainties He Fostered.

#### 1.    The Special Master's Approach to the Bondholders Destroyed Value.

As the VPs have long predicted, the SM severely damaged the ability of the sale process to maximize value by repeatedly, consistently, and publicly elevating the risk profile of the Bondholders' pledge and then improperly making the resolution of that pledge effectively a requirement for bidders.[20] Judge Failla's recent summary judgment decision does not alter that conclusion. Indeed, any effort to use her decision as a post-hoc justification for the SM's myopic focus on resolving the Bondholder Litigation at the expense of maximizing bid prices ignores that (1) her decision is subject to appeal; (2) the Second Circuit rejected her prior determination about the validity of the Bonds and related pledge; (3) in all events, absent an OFAC license (or any favorable indication from OFAC[21]) the Bondholders still have no mechanism to enforce their purported rights under the pledge; and (4) it remains unclear whether a financing mechanism such as the one proposed by Dalinar would violate any enforceable rights held by the 2020s.

The Court therefore should not lose sight of the fact that the SM's approach to the Bondholders throughout the sale process chilled bidding, shifted competition from price to paying the Bondholders to release the pledge, and ultimately resulted in a $2.125 billion TSA

---

[20] VP_Ex_187.015–.027; *see also* D.I. 348 ¶ 55 (stating resolution of Bondholders' claims likely necessary for actionable bid); D.I. 1513 at 19:5–20:4 (stating Bondholders' claims should be "resolved" in sale process); D.I. 1144 at 2, 9–10 (describing SM instructing bidders to assume the SM will secure release of the pledge or to propose an alternative resolution).

[21] *See* PFF¶182 (Mr. Hiltz conceding that the SM has no evidentiary basis to contend that OFAC will change its longstanding policy); *see also* PFF¶¶259, 260, 262.

that was much higher than could have been obtained without the SM's missteps. VP_Ex_187.015–.016. To begin, the SM's entry into settlement negotiations coupled with his public statements that the pledge would have to be resolved as part of the sale effectively assured the Bondholders—and the market—that the pledge would be paid off, regardless of its merit.[22]

The SM's selection of Red Tree as the stalking horse only exacerbated the problem. During that period, the SM's advisors pressed unrelentingly until the SM changed from his initial inclination to select Gold Reserve's bid to instead select Red Tree's bid because it included a TSA. It is not clear why the SM's advisors were so adamant that resolving the Bondholders' disputed pledge should be a de facto condition of a winning bid (other than their clear conflict of interest, *see infra* at §§ II.F, IV.B). If the SM believed a settlement was so crucial to the process, he could have submitted a better settlement proposal for Court approval in the prior year (assuming it could be done without OFAC authorization and PDVSA's consent). Specifically, in September 2024, the SM rejected a $1.6 billion settlement proposal from the Bondholders that would have been available to any bidder that wanted to take it, PFF¶136, apparently at the behest of Crystallex and ConocoPhillips and without informing the VPs or the Court of the proposal. PFF¶¶135–38. Setting aside the inappropriateness of trying to settle a case against PDVSA's will, submitting that offer for Court approval notwithstanding Crystallex and ConocoPhillips' objection would have been half a billion dollars cheaper than what the SM and his advisors are now recommending—a $2.125 billion TSA. PFF¶136 (Mr. Hiltz conceding same).

Worse, as the SM and his advisors were well aware (given that Red Tree is fully controlled by Contrarian—a major 2020 Bondholder), PFF¶¶169–70, Red Tree's $2.0 billion "settlement" was in fact simply a collusive agreement among the Bondholders on both sides of

---

[22] D.I. 561-1 ¶ 25; *see also* VP_Ex_187.024–.025 (history of the VPs' efforts to mitigate the risk of Bondholders' impact); VP_Ex_187.025–.026 (history of the SM resisting); PFF¶119.

the negotiating table to release the pledge while retaining the ability to enforce their bonds against PDVSA, with the goal being to either overpay themselves or set an inflated floor for settlements with other bidders. PFF¶¶169–73. Although the SM's advisors knew that selecting Red Tree's bid would give the Bondholders a blocking position and set the floor for any other settlements, they worked with Red Tree to hide that fact from the Court and objectors, in contravention of their supposed role as a neutral. PFF¶¶172–73 (Weil admitting that while "[p]ractically speaking, the 2020s [would] not . . . support an Alternative Transaction unless it provide[d] a better recovery than the [Red Tree] TSA," any explicit term to that effect in the TSA would "put a target on the TSA for anyone objecting to the Special Master's recommendation" and thus asking Red Tree to omit such language from the TSA). For their part, the Bondholders were all too eager to leverage this position with the other bidders who approached them for settlement negotiations. *See* AM-018.0002 (2020 Bondholder representing to Elliott that "receiving headline consideration[] less than in the Red Tree deal is not acceptable for us"); VP_Ex_146.001 (SM's advisor relaying that the Bondholders had been making a "$2.2 [billion] ask" from bidders); PFF¶197 (Mr. Turkel and Mr. Rivett).

### 2.    *The Special Master's Approach to the PDVH Alter Ego Litigation Destroyed Value.*

The SM exaggerated the importance of the PDVH Alter Ego Litigation and then failed to mitigate the chilling effect his reaction caused, by pausing the process or giving bidders some means of protecting against the risk he exaggerated. As a result, bidders understandably backed away from the sale process until these claims were resolved, resulting in a vacuum of bidder participation and loss of potential value. *See* PFF¶¶80, 191.

The Alter Ego Litigation began in June 2024, VP_Ex_187.028, and the SM moved to enjoin it three months later. D.I. 1248; D.I. 1249. He publicly argued that the mere pendency of

those cases "created a cloud of uncertainty around the PDVH [s]hares" and warned that, if successful, the plaintiffs' claims would "harm the value" of CITGO Holding (and CITGO) for the winning bidder. D.I. 1249 at 19; *see also* D.I. 1250 ¶ 6. At the same time, however, the VPs and the senior creditors were all of the view that the claims were meritless. *G&A Strategic Invs. I LLC v. PDVSA*, 1:23-cv-10766 ("*G&A*") (S.D.N.Y. Feb. 27, 2025), ECF No. 207 (Crystallex and ConocoPhillips amicus brief). The Court later denied the injunction motion, D.I. 1493; D.I. 1515, but despite the SM's own amplification of the risk, he did nothing to attempt to mitigate it. Instead, he, as well as the Court, chose to push forward rather than pause until the litigation was resolved. *See* VP_Ex_187.028–.029; D.I. 1511; D.I. 1511-1; D.I. 1517. This decision is difficult, if not impossible, to square with (1) the SM's own warnings about the harm these cases could cause, VP_Ex_187.030–.031; *see also* D.I. 1249 at 9, 19; D.I. 1250 ¶ 6, and (2) the fact that the leading case in the Alter Ego Litigation was moving quickly and likely to reach a decision on the merits in the first half of 2025. *See G&A*, Feb. 27, 2025 Minute Entry.

Thus, when the new round of bidding began at the end of 2024, the specter of the Alter Ego Litigation was still haunting bidders (and their bankers, *see* D.I. 1760 ¶ 3) who were seeking protection from the perceived risk of these cases before participating. *See* PFF¶80; VP_Ex_004.002 (███ telling the SM that an adverse decision in the alter ego cases must constitute a Material Adverse Effect ("MAE") allowing it to back out of the purchase). The VPs urged the SM and the Court to adopt such protections, D.I. 1549 at 5, but the SM disagreed—even though he was aware of the bidders' concerns. D.I. 1545-2 at 5–6; VP_Ex_004.002.

Because these risks were not mitigated, some bidders chose to stay largely on the sidelines when bidding restarted. *See, e.g.*, PFF¶191. But unsurprisingly, after Judge Rakoff issued his summary judgment decision in favor of PDVH and PDVSA, *G&A*, ECF No. 245,

bidders began to consider more seriously engaging. PFF¶¶190–93. But yet again, the SM failed to capitalize on the opportunity. He resisted extending the topping period on the erroneous basis that bidders had not asked him to do it, D.I. 1763 at 2, when—in fact—he was aware two potential bidders were purportedly "scrambling to have conversations and talk with lawyers to see if their position is going to change on making a bid," with one even asking whether the SM was "going to push the bid deadline," PFF¶194. The SM relented after a bidder ███████████ █████████████████████████████ made a public filing to the same effect (D.I. 1760 ¶ 3), and the Court granted a modest three-week extension of the topping period. D.I. 1779. But such a brief window left no time for existing bidders and their lenders to potentially increase the price of their bids, for the SM to use Judge Rakoff's decision to drive up bids, or for bidders who may have sat out of the topping period to meaningfully prepare a bid. Elliott's lowball ██████████ bid after re-entering the sale process is proof positive of that (HC VP_Ex_153.002). PFF¶¶190–92.

### E.    The Court's Public Statements Chilled Bidding.

The Court also made statements that chilled bidding. *First*, it expressed its inclination that the outcome of the sale process would reflect FMV. D.I. 1554 at 4. This erroneous statement of the law (*see supra* at 13) removed any incentive for bidders to meaningfully compete on price. If bidders are told in advance that their low bids will be accorded FMV status, they will not feel pressure to increase their offers to actually *reflect* FMV. VP_Ex_187.034–.035 ¶ 56.

*Second*, the Court found "compelling" the legally erroneous position that if PDVH lost the Alter Ego Cases, that would not constitute an MAE because the risk would be known. D.I. 1554 at 20–21 & n.8; *see Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *60 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (known risks can qualify as an MAE). For the reasons described above, bidders' concern about such an MAE limitation dampened participation

and depressed bidding. The Court's statement only worsened that problem. VP_Ex_187.032.

### F.    The Special Master's Advisors' Conflicts of Interest Are a Prejudicial Defect.

Conflicts of interest plaguing the SM's advisors also are prejudicial defects warranting rejection of Elliott's bid. *See Burge*, 648 A.2d at 419; *see also Citibank Fed. Sav. Bank v. New Plan Realty Tr.*, 748 A.2d 24, 30–32 (Md. Ct. Spec. App. 2000) (sheriff must conduct sale impartially). Indeed, the conflicts appear to be the only rational explanation for many of the defects described above.

First, as outlined in the VPs' separate motion to disqualify the SM, his advisors' material, contemporaneous client relationship with Elliott affiliates and 2020 Bondholders tainted the entire sale process and the SM's ability to make an impartial recommendation.[23] The SM and his advisors did not disclose this information themselves, and when asked about it, his advisors provided incomplete and misleading information about the scope, time, and scale of the representations. *Compare* VP_Ex_216.001, *with* VP_Ex_217.001–.009. Selecting Elliott over Dalinar as the recommended winner was, to say the least, an unusual decision; the fact that the SM's advisors were being paid large sums by Elliott, its affiliates, and 2020 Bondholders, who stood to benefit from the TSA (executed well *before* Judge Failla ruled) at the same time they recommended Elliott's lower-priced bid is clearly (and at least creates the appearance of) a conflict of interest undermining the integrity of the process and the SM's recommendation.

The SM's skewed and misleading descriptions of the Elliott and Dalinar bids in his Updated Final Recommendation may be explicable only by this conflict of interest. He repeatedly characterizes the bids in a manner more befitting an advocate for Elliott and the

---

[23] Because this briefing is proceeding in parallel with the post-hearing briefing, the VPs do not repeat in full the arguments presented in the disqualification motion. Doing so would be contrary to the Court's request for streamlined briefing. The VPs trust the Court will consider the disqualification motion on its merits and that its analysis will inform its decision regarding the allegations of bias in the sale process that warrant rejecting the SM's recommendation.

Bondholders than for a quasi-judicial officer tasked with making a neutral recommendation and maximizing value. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) ("due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and such persons "must assiduously refrain from becoming advocates for either party").

In Elliott's favor, the SM suggests its $5.892 billion bid may be worth $6.392 billion because of the "Additional Consideration" purportedly offered by Elliott to Gold Reserve that has been *rejected by Gold Reserve.* D.I. 2123 ¶¶ 12, 24. His suggestion that this Additional Consideration may leapfrog Gold Reserve and go to another creditor (D.I. 2123 ¶ 7 n.6) ignores this Court's ruling foreclosing such an outcome. *See* D.I. 1583 at 1 (stating that "junior creditors cannot be paid until those with superior liens . . . have been satisfied").[24]

In contrast to the rosy picture he paints for Elliott's bid, the SM baselessly calls into doubt the $500 million increase in Dalinar's bid price to cover the Valores Mundiales judgment. D.I. 2123 ¶¶ 14–15. He frames Gold Reserve's decision not to accept $75 million in cash in exchange for $500 million of its judgment as intransigence. D.I. 2123 at 6 n.6 (complaining of "unwillingness to take anything less than full recovery in cash"). That is unbecoming of a neutral officer, not least because this Court has ruled that a senior creditor cannot be forced to relinquish its judgment for less than full cash payment. D.I. 1583 at 1. And he affords *no* "material weight" to Dalinar's ability to access $1 billion under its ABL and proposed $1.8 billion preferred equity financing, supported by a highly confident letter ("HCL") from J.P. Morgan, which Dalinar obtained as backup to finance a resolution with the Bondholders if they are able to block a Dalinar closing, D.I. 2123 ¶ 17, even though Mr. Hiltz acknowledges that J.P. Morgan "is a

---

[24] Nor may a bidder pay cash to junior creditors just because a senior creditor refused to take a discount on its judgment. *See E. Sav. Bank, FSB v. CACH, LLC*, 55 A.3d 344, 350 (Del. 2012) (requiring distribution of proceeds to creditors "in the order of their entry and priority").

reputable bank" and "they don't issue those highly confident letters lightly." PFF¶218. His reason for disregarding the HCL is that the Court's orders require committed financing *to pay for the shares.* But this financing is not to pay for the shares, and the Court forbade any conditions regarding the Bondholders, D.I. 1517 ¶ 28, which would include requiring bidders to have committed backup financing to pay them off.

Second, because Evercore's compensation structure entitled it to a contingency fee only if it recommended a winning bidder, Evercore was biased in favor of recommending any bid— even an inadequate and prejudicial one—over advising the SM (as it should have here) that the bidding process had failed.[25] PFF¶¶89–91. This incentive infected its advice to the SM and his recommendation to the Court.[26] Evercore (and by extension, the SM) was also incentivized to pursue a settlement with the 2020 Bondholders—despite their claims not being part of this sale process. PFF¶¶86–89; *see also* VP_Ex_187.052–.053 (describing effects of Evercore's entitlement to a "restructuring fee" that could be paid if a settlement with the Bondholders was included in this process). This opportunity improperly "incentivized Evercore to divert time and attention away from securing the best outcome for the [AJCs] and to amplify and pursue" the Bondholders. VP_Ex_187.052–.053. And because Evercore's engagement letter was public, its conflicted incentives increased bidders' leverage, empowering them to propose outlandish terms and extract commercially unreasonable concessions. VP_Ex_187.047–.048; 052–.053.

Notably, Mr. Hiltz effectively admits Evercore's conflict by declining to contest that it stands to earn more money if a deal—any deal—closes rather than if the SM recommends no winner. D.I. 2010 ¶¶ 6–8. He urges instead that Evercore was merely a bystander, and that the

---

[25] The Court overruled the VPs' previous objections to the terms of Evercore's engagement. *See, e.g.,* D.I. 317 at 21–25; D.I. 354-1 ¶ 5(a), (c), ¶¶ 9–10, ¶¶ 45–49; D.I. 457-1 ¶¶ 13–21.

[26] This is fixable. Had Evercore's fee been tied to the highest bid received—regardless of whether it was consummated—it would have been incentivized to maximize value.

SM was unaffected by its advice or pecuniary interests. *Id.* ¶¶ 8, 29. This is not credible. The SM clearly relied heavily on Evercore, selected Red Tree as the Stalking Horse Bidder against his better judgment because of Evercore's advice, *see* PFF¶¶179–81, and indeed has relied exclusively on Mr. Hiltz to defend the *SM's* process and proposed winning bid.

### G.    A Higher Bid Likely Could Be Obtained if the Process Were Run Again.

As explained above, where a bid is grossly inadequate, Delaware courts automatically infer greater value could be obtained if the process were run again. In addition, the VPs presented abundant evidence, including testimony from Mr. Weisenburger, showing that "a higher bid [is] likely to be made at a subsequent sale." *Girard*, 379 A.2d at 1146; *see also Cent. Nat'l Bank*, 51 A.2d at 858 (testimony "produced to show that a much higher price could be obtained on resale"); *see e.g.*, PFF¶¶158–62. As explained above, the sale process has been plagued by a multitude of errors, willful missteps, inexplicable failures to attempt to generate competitive tension, and conflicts of interest by the SM and his advisors. A new process run by non-conflicted personnel and without repeating the same mistakes is likely to yield more competition and better bids.

Mr. Weisenburger also testified that more value could be obtained through a "leveraged recapitalization and equitization," *i.e.* a combination of borrowing cash to pay to senior creditors, using an IPO to generate additional cash (perhaps 15-20% of the company's equity) and set an initial value for the shares, and distribute the remaining equity to junior creditors or in private placements (generating more cash). PFF¶¶161–62. Evercore twice recommended this alternative to the SM, in 2021 and 2023. VP_Ex_072.002; VP_Ex_074.002 (proposing that an IPO could be used as a "[s]econdary listing to establish enterprise value[,] distribute cash and remaining PDVH equity to claimholders"). More recently, a financial analyst for a 2020 Bondholder told the SM's advisors that the sale process was incapable of achieving anything more than

"opportunistic bids [that] will only ever get you approx. half way to any fair value," and floated—much like Mr. Weisenburger—that a leveraged recapitalization to pay senior creditors followed by distribution of stock to junior creditors with an anticipated IPO once ownership has changed hands was the better way to obtain a fair result. VP_Ex_073.002. An Evercore advisor recognized this as a "good idea," VP_Ex_073.001, as did Weil, *id.* at .002 ("it isn't a bad idea for getting more judgment holders paid"). And Mr. Hiltz testified that if the Court rejects Elliott's bid, the SM could and should conduct a leveraged recapitalization. PFF¶160.

A new process could also occur at a more opportune time that would be more conducive to maximizing value, as the VPs have repeatedly argued, because it would allow for contingencies such as the Bondholder Litigation to be resolved and for U.S. foreign policy favoring a democratic transition in Venezuela to a U.S.-recognized government to advance, after which time CITGO would be well-positioned to receive heavy crude shipped from Venezuela, which has one of the largest oil reserves in the world and which continues to draw interest from major international oil companies. *See* PFF¶¶271–73; 274–78.

### III.    Elliott's Bid Is Not the Highest Bid.

Elliott's bid also cannot be confirmed because it is not the highest bid received in the process, as required by 8 *Del. C.* § 324(a). To protect the debtor by maximizing the amount of debt discharged by a forced sale, Section 324 provides that the shares of corporate stock that have been attached must be "sold at public sale to the highest bidder." This Court and the SM have acknowledged that this standard applies to the SM's final recommendation. D.I. 1660 at 6; D.I. 1728 at 3; D.I. 1741 at 4–5. Ascertaining which bid is the "highest" is an objective test, requiring a quantifiable basis for comparing bids. The Court-approved evaluation criteria make clear that bid "price" is defined as the "amount of *Attached Judgments* expected to be satisfied."

D.I. 1552-1 at 8 (emphasis added). Elliott's bid discharges only $5.982 billion of attached judgments—over $2 billion less than Dalinar's revised bid (which itself is unconfirmable for myriad reasons, as the VPs have argued and will argue if Dalinar continues assert that its bid should be confirmed over Elliott's bid); PFF¶¶217–18.

       To be sure, a court can determine that a bid that would otherwise be the highest can be disregarded as incapable of closing. *See Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.*, 821 A.2d 296, 309–10, 316 (Del. Ch. 2002) (concluding under New York law that objecting competing bidder had been "properly disqualified from bidding" because its purported financing did not exist and the remaining bidder was thus the "highest"), *aff'd* 822 A.2d 397 (Del. 2003).[27] The SPO directs this precise approach, requiring selection of "the highest bid that the Special Master believes to be capable of being timely consummated." *E.g.*, D.I. 480-1 at 41. Here, the SM determined Dalinar's bid is "capable of being timely consummated" (D.I. 1837 ¶ 11), even if Judge Failla ruled for the Bondholders.

       The SM has not changed his determination. Nevertheless, he now recommends Elliott's bid even over Dalinar's improved bid, despite the $2 billion price difference (and the prejudice to three judgment creditors, the Republic and PDVSA). He has done so supposedly because, in his view, Elliott's bid has the greatest closing certainty and thus is the "best" bid submitted. *See, e.g.*, D.I. 2123 ¶¶ 6, 11, 15, 24, 26. But "best" and "highest" are distinct concepts. Section 324's "highest bidder" standard is stricter and more objective than a "highest and best" standard employed in other contexts, such as bankruptcy sales, which permit unquantified, non-price terms to be considered in selecting a winning bid. *See In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (noting that "best" in "highest and best" standard is "not mere surplusage" and

---

[27] *Accord* D.I. 2265 at 15 (Conoco: "price is obviously the most important consideration in an auction" so long as it "is realistically capable of being delivered to the judgment creditors").

authorizes selecting a lower bid based on unquantified, non-price factors such as certainty and speed of closing).[28] Indeed, the Delaware Code uses "highest" bidder in Section 324(a), while employing "highest and best" for other sales, including in provisions predating Section 324. 9 *Del. C.* § 8753; 22 *Del. C.* § 504(a); 9 *Del. C.* § 4535; 25 *Del. C.* § 6309. When words are "expressly included in one statute but omitted from another," it shows "that the General Assembly intended to make those omissions," even across different titles of the Code. *Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007); *Salzberg v. Sciabacucchi*, 227 A.3d 102, 118 & n.69 (Del. 2020) (similar and noting statutes are read to "avoid surplusage").[29] At a minimum, given the clear textual command, this is another issue that the Court should certify to the Delaware Supreme Court to the extent it is inclined to approve Elliot's bid. *See supra* at 14.

Accordingly, the Court cannot approve a lower bid over a higher bid under Section 324 based on the SM's subjective opinion that the lower bid is "better" or "more certain" to close than the higher one.[30] While the SM and Elliott focused single-mindedly (and in direct coordination) on proving that Dalinar's bid is not certain to close because there is a *possibility* that the 2020 Bondholders could block its financing, neither presented any objective, quantifiable

---

[28] *See also Johnson v. Craddock*, 365 P.2d 89, 95 (Or. 1961) (en banc) (distinguishing court's discretion when applying "highest" and "highest and best" standards). Crystallex agrees that bankruptcy standards are "irrelevant to this Court's application of 8 *Del. C.* § 324." D.I. 2169 at 15–16 (Crystallex); *accord* D.I. 2172 at 7 (ConocoPhillips).

[29] A 100-year-old Third Circuit decision cited by Elliott proponents (D.I. 2274 at 5; D.I. 2169 at 7; D.I. 2266 at 10; D.I. 2273 at 13 n.17; D.I. 2176 at 8–9) is inapposite, as it applied a statute with a "highest bidder" standard that had a carveout for selecting a lower bid in the public interest. *United States v. Chem. Found.*, 5 F.2d 191, 206–07 (3d Cir. 1925). Section 324 has no such carveout.

[30] Specifically, when recommending a stalking horse with a lower bid price than a competitor, the SM leaned on purported (subjective) closing certainty to justify selecting Red Tree, arguing that it was premature to apply the "highest bidder" standard, as that only applies to the final recommendation. D.I. 1660 at 6 ("Section 324(a) only applies to the ultimate 'public sale' of shares of stock."); D.I. 1741 at 4–5 (Court acknowledging the "highest bidder" standard applies to the final recommendation, even if not the stalking horse round).

evidence or analysis as to the *likelihood* of such a possibility so as to prove that the risk of Dalinar's bid not closing is so great that selecting a bid that is $2 billion lower is justified.[31] *See, e.g.*, PFF¶219 (Mr. Hiltz admitting that the SM "ha[s] not assigned probabilities" to calculate the likelihood of Elliott's bid closing). Many things are possible; indeed, there are reasons why Elliott's bid may not close, such as regulatory risk or the risk that the 2020 Bondholders refuse to approve the still-to-be-negotiated final documents in support of their TSA. The question, however, is how likely such possibilities are to come to pass, and whether that likelihood is sufficient to overcome the price differential.

Mr. Hiltz contends that quantifying the likelihood of future contingencies or ascribing value to contingencies is not a task that the Special Master or his advisors could carry out, PFF¶218 (Mr. Hiltz); *see also* D.I. 1660 at 4–5, but courts and litigants do it all the time. *See In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) (courts should consider likelihood of contingent event "from an objective standpoint"); *Matter of Xonics Photochem., Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) (valuing contingent assets by discounting their face value "by the probability that the contingency will occur"); D.I. 1948-7 (HC Ex. 52) (███████████████████████).[32]

Moreover, multiple parties—and the Court—have repeatedly discussed the questions relevant to this inquiry, yet the SM has not undertaken any effort to analyze them. He has not, for example, assessed the likelihood (1) that OFAC will lift its years-long suspension of GL-5 while the Bondholder Litigation remains subject to appellate review (a step it *expressly did not take* last

---

[31] The Court's comments at the Sale Hearing are not to the contrary. Clearly a bid that is illusory is not the highest bid, and to determine whether a closing risk is "too great," one must undertake some quantitative analysis to demonstrate as much. *See* Sale H'rg Tr. at 1533:3–6 (Court stating highest bid cannot be one that is "not . . . even real if it can't actually be paid at closing" and contemplating assessing level of risk to closing). The Special Master has undertaken no objective analysis to justify selecting the lower-priced Elliott bid here.

[32] ACL1's quantification effort is flawed and not real evidence. D.I. 2263. It is nothing more than the guesswork of ACL1's counsel, including an opinion on Venezuelan law by U.S. lawyers.

time PDVSA (successfully) appealed a ruling in favor of the Bondholders) and that the Bondholders will be able to exercise rights to control CITGO Holding and block a Dalinar Bid, or (2) that the Bondholders would be able to *enjoin* a Dalinar Bid based on their convoluted argument that the Dalinar Bid's mechanics would violate the pledge[33] and obtain an OFAC license authorizing the same. *See* PFF¶¶218 (Mr. Hiltz acknowledging change of OFAC policy required for Bondholders to block closing); *id.* at ¶265.[34] This Court previously has acknowledged the series of hurdles the Bondholders would have to surmount beyond winning summary judgment in front of Judge Failla to pose a threat to Dalinar's closing. D.I. 1741 at 6–7.

The SM also has undertaken no analysis to determine whether, even *if* the Bondholders could block the Dalinar Bid, Dalinar would be unable to obtain alternative financing or negotiate a release of the CITGO Holding Pledge. PFF¶218. Instead, the SM just sought to prove that Dalinar's HCL from J.P. Morgan is not a binding commitment, even though J.P. Morgan is a highly regarded financial institution and is extremely unlikely to issue an HCL without having concluded it can raise the required funds. PFF¶218. The SM also says Dalinar may be unable to access necessary borrowings under its ABL if the CITGO assets supporting the facility decline in value. D.I. 2123 ¶ 17. Yet, he does not analyze how likely this is to occur, *see* VP_Ex_192.006,

---

[33] Obtaining such an injunction is no easy task because the Bondholders would have to overcome several hurdles, not the least of which is to show that they would suffer irreparable harm even though their only harm would be monetary and they would retain the right to later foreclose on the pledged shares that are worth much more than the money PDVSA allegedly owes them.

[34] The Executive Branch has made clear that the National Assembly's view that the 2020 bonds and pledge are invalid under Venezuelan law should be accorded respect; Judge Failla unduly disregarded them. VP_Ex_023 (*MUFG* ECF No. 393). Yet the purported closing uncertainty inherent in the Dalinar Bid is premised on OFAC authorizing the Bondholders to exercise rights or remedies to block it, which would defy the National Assembly's conception of Venezuelan law. That is unlikely to occur any time soon. On the other side of the ledger, approving Elliott's bid is premised on the United States approving a transaction that includes a TSA that, again, defies the National Assembly's view of Venezuelan law. There is great reason to suspect that OFAC will not authorize Elliott's bid in advance of the June 2026 target closing date embedded in the Elliott Transaction Documents if at all. The SM accounts for none of this.

and Elliott's bid likewise relies in part on an ABL facility with the same limitations, PFF¶218 (Mr. Hiltz noting drawbacks "in any ABL").[35]

Moreover, the SM has not conducted an analysis of the likelihood that Elliott's bid *will* close. PFF¶219. For example, Judge Failla's ruling could be reversed, vitiating the benefits of the TSA and implicating this Court's warning against a bid that would amount to a "fundamental injustice." D.I. 1741 at 7–8. In addition, absent a (non-suspended) license from OFAC that Elliott and the Bondholders have not sought, much less obtained (PFF¶259 (Mr. Turkel); VP_Ex_227 at 161:1–9, 161:22–162:1), the TSA itself violates OFAC regulations.[36] *See* PFF¶260.[37]

At base, the SM has not provided *any* analysis of the purported closing certainty he relies

---

[35] The SM must think the Court has amnesia. Months ago, he recommended Dalinar's bid for approval, representing that he was satisfied with its ability to close regardless of Judge Failla's ruling; today, he denigrates it as unworkable. *Compare, e.g.*, D.I. 1837 ¶¶ 11, 78, *with* D.I. 2123 ¶ 12, *and* D.I. 1837 at 29 n.15, *with* D.I. 2123 ¶17.

[36] The TSA is a "transaction related to" or "other dealings in" blocked property (the CITGO Holding shares), the purpose or intent of which is to "surrender" or "release" the CITGO Holding pledge in exchange for a payment—a prohibited "transfer" under Executive Orders 13,835 § 1(a)(iii), and 13,850. 31 C.F.R. §§ 591.309, 591.310; OFAC FAQ No. 595. What is more, the TSA falls outside (1) the non-enforcement policy related to the *Crystallex* sale process because it is not "ordinarily incident and necessary" to completing the prefatory steps under the SPO, OFAC FAQ No. 1123; and (2) the non-enforcement policy related to the 2020 Bondholders, which applies only to efforts to "preserve the ability to enforce" bondholder rights, not actual enforcement of those purported rights such as by contracting for payment in exchange for releasing the pledge. OFAC FAQ No. 1124. Indeed, if the 2020 Bondholders were currently authorized to enforce or contract out their purported rights OFAC's years' long suspension of General License 5 would be entirely meaningless. *See* OFAC FAQ No. 595. Finally, there is no suggestion from OFAC that it would view favorably a request to license the TSA as a purported settlement of the 2020s Litigation. PFF¶218. The only guidance OFAC has offered as to licensing for settlement agreements on the 2020 Bonds is that it would view such requests favorably if they were negotiated with the National Assembly or its appointed entities, such as the PDVSA ad hoc Board, and that parties that have negotiated a settlement of the 2020 Bonds "will still need to seek a specific license for entry into that agreement." OFAC FAQ No. 1124; OFAC FAQ Nos. 595, 1125. The TSA does not fit that description.

[37] And regardless of what happens to Judge Failla's ruling on appeal, OFAC may (and should) look with disfavor on licensing a sale that privileges the minority of eligible bondholders who elected to accept the 2020 Bonds in an exchange offer carried out by the Maduro Regime in open defiance of the Republic's National Assembly. *See* VP_Ex_024.

on to ignore Delaware's "highest bidder" requirement—much less make up for the over \$2 billion differential at issue. Apart from glaring conflicts of interest, this failure is inexplicable given that the Court told him that a recommendation focused on a TSA "rather than (or at the expense of) improving bids to satisfy judgments of the" AJCs would be unpersuasive (D.I. 1741 at 6); that the winning bid should meet or exceed Dalinar's \$6.949 billion stalking horse *bid price* and deemphasize closing certainty (*id.* at 3, 6); and that a sacrifice of even \$1 billion in exchange for a TSA would be suspect (D.I. 1840-1 at 60:5–22). Elliott's bid contravenes all of those directives. The Court should hold him to its prior directions.

## IV.    Additional Objections

### A.    The Sale Should Be Set Aside Because of Defects in the Attachments.

The VPs continue to preserve for appeal that the sale should not be confirmed because the attachments held by creditors of the Republic on the theory that PDVSA is the Republic's alter ego are *ultra vires* and invalid under the Foreign Sovereign Immunities Act (FSIA) and Delaware law. First, under Delaware law, applicable by Rule 69 and Section 1606 of the FSIA (*e.g.*, D.I. 179), a judgment creditor may attach shares of a corporation owned by an alleged alter ego of a debtor only if the creditor shows that the corporate form was abused to commit a fraud or similar injustice. *E.g.*, *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959). No creditor of the Republic has done so, nor could they. *E.g.*, D.I. 83 at 26, 30, 34–35.[38]

Second, the VPs preserve for appeal that PDVSA is immune from the Court's jurisdiction with respect to those same attachments under the FSIA, 28 U.S.C. §§ 1330, 1604. The Supreme Court has yet to address this Court's and the Third Circuit's views on *First National City Bank v.*

---

[38] The Third Circuit has not yet ruled on that issue or this Court's rulings that the argument was collaterally estopped and untimely. *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 174–76 (3d Cir. 2023) (declining to review until final sale order); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 249, 258 (3d Cir. 2022) (same).

*Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983), and *Peacock v. Thomas*, 516 U.S. 349 (1996). D.I. 83 at 11–18, *aff'd*, 932 F.3d 126 (3d. Cir. 2019). The Second Circuit has disagreed with the Third Circuit, creating a circuit split on the threshold issue of jurisdictional immunity under the FSIA. *Peterson v. Bank Markazi*, 121 F.4th 983, 1000 n.6 (2d Cir. 2024).[39]

### B.    The Sale Should Be Set Aside Because of Bias and Conflicts of Interest.

As explained above, the VPs have moved to disqualify the SM based on his advisors' conflicts of interest with Elliott and large 2020 Bondholders under 28 U.S.C. § 455 and Fed. R. Civ. P. 53. The SM's recommendation and all proceedings based on it should be set aside for the reasons explained in that motion. *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 303–04, 306–07 (3d Cir. 2004); *In re Kempthorne*, 449 F.3d 1265, 1270 (D.C. Cir. 2006).

Separately, the VPs also preserve for appeal their objection that the SM must be disqualified for engaging in improper advocacy on behalf of creditors in his interactions with OFAC.[40] And the VPs preserve the argument that Evercore's conflicted interests, as discussed above, further infected the partiality of the SM because his advisors had a pecuniary interest in recommending a sale even if grossly inadequate. D.I. 317 at 22–23; D.I. 443 (overruling same).

### C.    The Venezuela Parties' Appellate Rights Must Be Protected.

The Third Circuit has repeatedly assured the VPs that, upon entry of a sale order, they can pursue all of their past objections and seek full appellate relief—including stopping a sale. *E.g., Crystallex*, 24 F.4th at 256; *OIEG*, 73 F.4th at 174–76. The VPs request that, to ensure this right is protected, the Court enter an administrative stay in conjunction with entry of any sale order to

---

[39] These defects have enormous implications. Attachments held by creditors of the Republic (including Crystallex's) account for about $19 billion of the $21 billion in attached debt. Such attachments could have been satisfied without selling 100% or any of the PDVH shares.

[40] The VPs moved for the SM's disqualification on this ground. D.I. 509; D.I. 515; D.I. 1138; D.I. 1175. The Court denied this request, and the Third Circuit has not yet ruled on it. D.I. 544; D.I. 1180; Order, No. 23-1687 (3d Cir. May 4, 2023) (denying writ of mandamus).

enable them to move for a full stay pending appeal.[41] *See* PFF¶¶278.

Under the Elliott SPA, if all conditions are satisfied or waived (one of which is entry of a sale order), closing can take place immediately—and must take place within 10 business days. D.I. 2123-1 at 22 (Section 2.2 (Closing)); *id.* at 82 (Section 7.1(b) (conditions precedent)). And the Elliott PSO provides that closing can start "immediately upon entry of" a sale order (D.I. 2125-1 at 373 (PSO ¶ I)). If the sale closes, the new owner would immediately be able to gain access to PDVH and CITGO's confidential/privileged information, replace management, sell equity, and dispose of assets. These effects would be irreversible even after appeal. Moreover, courts sometimes decline to unwind a transaction altogether by the time an appeal resolves because it was not stayed in the interim.[42] That cannot be allowed to happen here.[43] The easiest way to prevent any party from later arguing that a sale cannot be unwound is to grant a stay.

### D.    Objections to the Proposed Sale Order and Stock Purchase Agreement.

Consistent with the VPs' request to present their arguments against certain provisions of the Elliott Proposed Sale Order and Stock Purchase Agreement separate from their brief (D.I. 2342 at 2), and this Court's granting of the same (D.I. 2348 ¶ 9), the VPs direct the Court to Addendum A for a full description of their objections to those documents.[44]

---

[41] Elliott's witness testified that a stay pending appeal would not provide a basis to terminate the TSA. PFF¶222 (Mr. Turkel). Should anyone later oppose staying the sale order by arguing otherwise, the VPs reserve the right to argue that it is inappropriate to pressure the Court against issuing a stay by threatening to blow up the Elliott deal. D.I. 2269-1 at 8–10.

[42] *E.g.*, *Diaz v. U.S. Dep't of HUD*, 657 F. Supp. 3d 372, 379 (S.D.N.Y. 2023); *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1557 (11th Cir. 1988); *In re Cantwell*, 639 F.2d 1050, 1053–54 (3d Cir. 1981); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352–53 (3d Cir. 2016). To be clear, courts *cannot and should not* refuse to provide relief in the face of legal error.

[43] The VPs asked the SM to insert a paragraph into the Proposed Sale Order stating that "[n]othing in this order or SPA in any way limits any party's appellate rights and remedies, including the ability to appeal from a final judgment in this case." The SM did not respond and did not include this language. The VPs request that this Court insert it.

[44] If Dalinar advocates for its prior bid(s), the VPs will file a similar chart regarding the same.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Hannah M. Bucher
Alec Solotorovsky
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com
ASolotorovsky@eimerstahl.com

*Attorneys for PDV Holding, Inc. and
CITGO Petroleum Corporation*

*/s/ Alexandra M. Cumings*
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Phillip Reytan (#7255)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
SWaesco@morrisnichols.com
ACumings@morrisnichols.com
PReytan@morrisnichols.com

*Attorneys for PDV Holding, Inc. and
CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
Robert Groot
David V. Holmes
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
101 Park Avenue New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com
rgroot@curtis.com
dholmes@curtis.com

*Attorneys for Petróleos de Venezuela, S.A.*

*/s/ Brendan Patrick McDonnell*
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (#7086)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hegh.law

*Attorneys for Petróleos de Venezuela, S.A.
and the Bolivarian Republic of Venezuela*

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

*Attorneys for the Bolivarian Republic of Venezuela*

October 8, 2025

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Proposed Sale Order ("PSO") Provision(s)[45] | Elliott PSO |
|---|---|---|
| 1. | *Injunctions (general).* The VPs object to myriad provisions of the Elliot PSO that purport to enjoin conduct deemed contrary to the interests of the recommended winner, the Special Master, or his advisors. These injunctive provisions are overbroad and the Court lacks authority to enter them.[46]<br><br>The Court's jurisdiction to conduct an execution sale under Rule 69 and Section 324 does not grant it authority to impose such injunctions, even in reliance on the All Writs Act ("AWA"). *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (AWA authority "is contingent on that court's subject-matter jurisdiction"); *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 328–29 (3d Cir. 2007) (the "extraordinary powers" under AWA are "firmly circumscribed"). Nor does any provision of federal or Delaware law authorize such injunctions here. Because Rule 69 has "the force of a federal statute," *see Sibbach v. Wilson & Co.*, 312 U.S. 1, 13 (1941), the AWA is inoperative because Rule 69 governs, *see Carlisle v. United States*, 517 U.S. 416, 429 (1966). Courts consistently recognize that the AWA does not enhance or circumvent state procedures for judgment enforcement. *See, e.g., Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 350 (1st Cir. 1997); *Ivey v. Harney*, 47 F.3d 181, 184 (7th Cir. 1995).<br><br>Moreover, neither the Special Master nor Elliott have attempted to prove that they have suffered or are "likely | PSO[47] ¶¶ 6, 10, 13, 19, 20, 24 |

---

[45] The VPs' objections to the PSO are also memorialized at PFF ¶¶ 220, 222–23, 225, 228, 231–33.

[46] Paragraph 6 of the Elliott PSO is a prime example of an overbroad injunction. Elliott PSO ¶ 6 ("enjoin[ing anyone] from taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order"). The Special Master has not and cannot assert that Delaware (or federal) law grants him, a bidder, or the Court the right to prevent others from taking actions that "adversely affect[], interfere[] with, is likely to frustrate or is in any way inconsistent with" a sale. This language is exceedingly broad and would, (among other things) threaten to prohibit protected First Amendment activity. Indeed, on August 24, the Special Master's counsel advised that this language would be deleted from the PSO. Yet it was restored to the Elliott PSO thereafter without notice or explanation. The Special Master's belated characterization of this language as "narrowly tailored to authorize the Special Master to transfer the PDVH Shares" is not serious. D.I. 2273 at 22. The language broadly prohibits an undefined and limitless category of conduct that would clearly purport to imperil the ability of objectors to the sale process from, for example, lobbying OFAC about whether to license the transaction.

[47] The Elliott PSO is available at D.I. 2123-1 at 360–395 (Exhibit C).

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Proposed Sale Order ("PSO") Provision(s)[45] | Elliott PSO |
|---|---|---|
| | to suffer" an imminent injury necessary to afford them Article III standing to obtain the broad prospective relief they seek or that the requirements to obtain a permanent injunction are satisfied. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153, 156–57 (2010). For example, they do not explain why their ability to raise legal arguments, rights, or defenses (such as judicial immunity) in any proceedings against them would not afford an adequate remedy at law. *See Grider*, 500 F.3d at 332 (stating that the "opportunity to raise" claims in a separate proceeding, is generally an adequate remedy at law).<br><br>In a previous round of briefing, the Special Master did not respond to the above legal arguments. His ability to respond is thus waived and forfeited. *See* D.I. 2046-1 at 30. He later argued that he has authority to "implement the sale" by requesting the Court to issue injunctions because he is a "court-appointed official," and thus need not establish the elements for injunctive relief. D.I. 2273 at 22. There is no basis for this open defiance of the law. | |
| 2. | *Appellate rights.* The VPs object that Paragraph I of the Elliott PSO, which allows closing to begin "immediately upon entry of" a Sale Order should not be interpreted to prevent issuance of a stay pending appeal. Moreover, for the reasons described in their briefing, the VPs maintain their request for an administrative stay of any Sale Order to allow time to file a motion for a stay pending appeal.<br><br>Presently moot, but preserved, objections: The VPs previously objected to a provision in the July 2 Dalinar PSO that limited their appellate rights in the absence of a stay pending appeal. D.I. 1951-1 at 39-40; D.I. 2046-1 at 30-31; D.I. 2269-1 at 6. The Elliott PSO removed this provision. If the provision returns, the VPs reserve their rights and remain opposed to it. | PSO ¶ I |
| 3. | *Scope of compliance.* The VPs object to language requiring their compliance with "all obligations and covenants" in the SPA and Transaction Documents. CITGO and PDVH do not object to that requirement *with respect to the SPA* so long as it is limited *only* obligations and covenants the Special Master has told CITGO and PDVH are ones with which he will cause them to comply. Requiring compliance with a broadly defined—arguably unlimited—universe of "all obligations and covenants" in the SPA and Transaction Documents, many of which do not implicate CITGO and PDVH, would be inconsistent with their court-approved status as non-parties to the SPA. D.I. 1552-1 at 4; D.I. 1554 at 14. | PSO ¶ R (applying Transaction Documents to VPs), ¶ 6 (requiring compliance with all obligations and covenants) |
| 4. | *Injunctions (First Amendment activity).* In addition to the reasons described in Objection No. 1, *supra*, certain | PSO ¶¶ 6, 19, 20, |

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Proposed Sale Order ("PSO") Provision(s)[45] | Elliott PSO |
|---|---|---|
| | proposed injunctions are doubly problematic because they prohibit First Amendment protected activity. In particular, provisions that seek to restrict the ability of entities to file future legal claims, or to seek preclearance from this Court before doing so, are blatant violations of the First Amendment. PSO ¶¶ 19, 20, 24. *Cf. Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 742–43 (1983) (given "First Amendment right of access to the courts," the "filing and prosecution of a well-founded lawsuit may not be enjoined"). Likewise, injunctions that prohibit or restrict the ability to petition the Executive Branch in opposition to the sale are unlawful. *E.g.*, Elliott PSO ¶ 6. | 24 |
| 5. | *Reservation of rights.* The Court lacks authority to overrule reservations of rights or deem persons or parties to have *consented* to the sale by not "properly objecting." | PSO ¶ 2 |
| | The Special Master is wrong that *Deibler* justifies PSO ¶ 2. D.I. 2273 at 22–23. *Deibler* discusses waiver of objections—not the entirely distinct concept of "presumed consent" to a sale or the inability to present objections later that may over-come a waiver defense. *See* 652 A.2d at 556. | |
| 6. | *Applicable law.* References to 28 U.S.C. § 2004, Rule 53, the All Writs Act, or the Court's inherent or equitable authority are improper to the extent they are invoked to supplement or supplant the Court's powers under Delaware law. The VPs objected to the Special Master's reliance on federal law (D.I. 1951-1 at 12–13 & nn. 8, 9), which the Special Master disclaimed (D.I. 2006 at 38) and cannot raise now. *Delaware* law governs, and the Court cannot invoke other authority to give it powers it lacks under Delaware law. | PSO at 1; *id.* ¶¶ B, L, O, 6 |
| 7. | *Judicial immunity.* The VPs renew and preserve previously overruled objections (*e.g.*, D.I. 317 at 24; D.I. 469 at 9, n.7 (overruling same)) to the scope of the Special Master and his advisors' judicial immunity. | PSO ¶ 20 |
| 8. | *Time to respond to updated recommendation.* The VPs preserve for appeal the argument that the truncated time to review and respond to the updated Final Recommendation deprived them of due process. D.I. 2109 at 2 (Gold Re-serve suggesting the schedule proposed by Special Master and later adopted by the Court was not "consistent with due process"); D.I. 2110 at 1 (finding schedule does not "risk[] in-fringing any entity's due process or other rights"). | PSO ¶ D |
| 9. | *Judgment Discharge for Credit Bids.* The VPs request insertion of a provision that memorializes the Special Master's (and Elliott's) representation that all attached judgments paid or credit bid as part of the Elliott Bid are | ***Requested insertion*** |

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Proposed Sale Order ("PSO") Provision(s)[45] | Elliott PSO |
|---|---|---|
| | discharged *in full*. Aug. 18 H'rg Tr. at 194:16–195:1; D.I. 2123 ¶ 7 & Annex A. | |
| 10 | *Bond Extinguishment*. The VPs request insertion of a provision stating that, consistent with Elliott's and the Special Master's representations to this Court, upon performance of the TSA, all exchanged 2020 Bonds are canceled. Aug. 18 H'rg Tr. at 194:16–195:1; D.I. 2123 ¶ 9. Elliott has testified that this representation was made with its consent and authorization. PFF¶251 (Mr. Turkel). Elliott/Amber has entered an appearance in these proceedings (*e.g.*, D.I. 1367) and made a material representation to the Court about the proposed sale transaction; it should be held to it. | ***Requested insertion*** |
| 11 | *Alternatives to the Sale.* To the extent the Elliott PSO no longer refers to the VPs' ability to propose alternatives to the sale prior to consummation (or the SPA purports to modify that right), the VPs object. *Compare* original Dalinar SPA Section 6.16(h) (D.I. 1837-1 at 113), *with* Elliott SPA Section 6.16 (D.I. 2123-1 at 80). The Court has repeatedly stated that the VPs "shall always" have the right to propose alternatives or pay off judgments until consummation. *E.g.*, D.I. 1517 ¶ 22(b). | ***Requested clarification*** |
| 12 | *Gramercy's proposals*. At present, the Elliot PSO does not include proposals presented by Gramercy. D.I. 1943-2 ¶¶ J, M, V, 6, 13, 17, 18, 19, 26; D.I. 1968-2 at same & ¶¶ 11, 28. D.I. 2178-1 ¶¶ 6, 25(a). The Special Master does not support Gramercy's substantive changes. D.I. 2273 at 23. In the event the Court is inclined to adopt Gramercy's proposals, the VPs object to the insertion of language that would purport to unreservedly preserve claims against PDVH, its subsidiaries, and potentially its personnel arising from purported violations of the "rights of the PDVSA 2020 Bondholder Parties, the PDVSA Indenture, or the CITGO Holding Shares Pledge Agreement" and/or from "any fraudulent conveyance, illegal dividend, breach of fiduciary duty, or other similar legal or equitable doctrine arising from the structure or financing of the sale of the PDVH Shares." It would be the height of unfairness for PDVH, its subsidiaries, and its personnel to be potentially found liable for any actions taken pursuant to a court-ordered sale process (or actions associated with contesting—on appeal or otherwise—confirmation of a bid). The Court should not adopt any provision in the sale order that exposes PDVH, its subsidiaries, its management, or its personnel to potential liability for any conduct undertaken by virtue of an order from this Court regarding implementation of the sale process. | N/A |

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Stock Purchase Agreement ("SPA") Provision(s)[48] | Elliott SPA Section |
|---|---|---|
| 13. | *Superior Proposal.* The SPA must permit submission of a superior proposal until entry of a Sale Order, not only up until the Sale Hearing. The Court-adopted Bidder Protections provide that such proposal is presentable to the Court and potentially actionable until "entry of any Sale Order." D.I. 1552-1 at 2–3. SPA provisions to the contrary cannot supersede the Court's orders. The VPs were satisfied with Special Master's representation regarding this objection (D.I. 2046-1 at 30 n.41) and rely on Court's prior decision (D.I. 1552-1 at 2-3) that a superior proposal may be submitted at any time until entry of a Sale Order. If the Special Master or Court take a different view in the future, the VPs maintain and preserve this objection. | SPA Section 6.16(c)[49]<br><br>***No action currently required based on Special Master's assurances.*** |
| 14. | *Dividends.* The Elliott SPA places restrictions on dividends among PDVH and its subsidiaries, contrary to Special Master's statement that he would permit "dividends or similar distributions between PDVH and its subsidiaries." D.I. 1552-1 at 5. Restrictions on dividends could compromise the ability of CITGO Holding and PDVH to pay operating expenses. The Special Master's purported concern that the dividends at issue could "divert" the "value of PDVH's business" prior to closing (D.I. 2006 at 39) misses the point; PDVH is subject to a number of other interim operating restrictions, so PDVH would only be able to use such dividended funds in accordance with the other restrictions to which PDVH is subject.<br><br>Insertion in the Elliott SPA of a qualifier that such dividends may only take place in the "Ordinary Course" does not solve the problem as it introduces ambiguity in this context that compromises the CITGO Companies' ability to manage their businesses and potentially to pay their operating expenses. This "Ordinary Course" qualifier is not present in other proposed SPAs. *E.g.*, D.I. 2126-1 at 231 (Bidder C). | SPA Section 6.1(b)(xvi)<br><br>***Proposal***: strike entirety of 6.1(b)(xvi)(ii) |
| 15. | *FIRPTA Certificate.* CITGO and PDVH previously objected to any guarantee for a FIRPTA certificate by a date certain. D.I. 1951-1 at 42; D.I. 2269-1 at 6. The VPs were satisfied with Special Master's representation regarding this objection. D.I. 2046-1 at 30 n.41; D.I. 2182-1 at 21 n.22. If the Special Master takes a different view in the future, the VPs maintain and preserve this objection. | SPA Section 2.3(a)(iii) and 7.1(f)<br><br>***No action current-*** |

---

[48] The VPs' objections to the SPA are also memorialized at PFF¶¶224–25, 227, 230, 232–33, 236–37, 238, 240.

[49] The Elliott SPA and accompanying documents are available at D.I. 2123-1 at 6–359. (Exhibit B)

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Stock Purchase Agreement ("SPA") Provision(s)[48] | Elliott SPA Section |
|---|---|---|
| | | *ly required based on Special Master's assurances.* |
| 16. | *Representations and Warranties Affirmation.* CITGO and PDVH previously objected to CITGO's CFO confirming the accuracy of representations and warranties made by the Special Master. D.I. 1951-1 at 42; D.I. 2269-1 at 6. The VPs were satisfied with Special Master's representation regarding this objection. D.I. 2046-1 at 30 n.41; D.I. 2182-1 at 21 n.22. If the Special Master takes a different view in the future, the VPs maintain and preserve this objection. | SPA Section 2.3(a)(i) *No action currently required based on Special Master's assurances.* |
| 17. | *Third Party Beneficiary.* PDVSA, CITGO and PDVH request that they be included as third-party beneficiaries in Section 9.11 of the SPA with respect to certain provisions of the SPA. Specifically, PDVSA, CITGO and PDVH request third-party beneficiary rights to protect their long-recognized right to object to the approval and execution of the SPA, including the right to appeal, and the right to propose an alternative to the sale process at any time—even after entry of a Sale Order. Because PDVSA, CITGO and PDVH are not parties to the SPA, they would have no option to enforce any provision of the SPA without enumerated third-party beneficiary rights. | SPA Section 9.11 *Proposal*: Add two subsections: (f) the Acquired Companies and PDVSA as set forth in Section 6.1(f); (g) the Venezuela Parties as set forth in Section 6.1(g) and Section 6.16(e)[50] |

---

[50] The VPs have requested that Section 6.16(h) from the Dalinar SPA to be added to the Elliott SPA as Section 6.16(e). *See* Objection No. 23, *infra.*

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Stock Purchase Agreement ("SPA") Provision(s)[48] | Elliott SPA Section |
|---|---|---|
| 18. | *Incentive bonuses.* The VPs object to Section 6.19 of the Elliott SPA, which allocates up to $50 million for incentive bonuses for PDVH and CITGO management and employees at the sole discretion of Elliott's post-transaction appointed CEO, but only if the Elliott transaction closes and, in the case of half of the bonus pool, only if CITGO management and employees agree to operating restrictions more onerous than those with which they are otherwise obligated to comply. Elliott's offer creates an improper incentive by dangling a sizeable carrot in hopes of inducing CITGO personnel to act as Elliott's agents and provide support for Elliott's bid, which could create conflicts of interest and undermine PDVH and CITGO's opposition to and appeal of any Sale Order. *See Gilbert v. El Paso Co.*, 490 A.2d 1050 (Del. Ch. 1984) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."). Indeed, CITGO management will already be obliged to comply with the SPA's restrictive covenants by court order. D.I. 2123-1 at 382-83. That should satisfy any concern that management will continue to operate in the ordinary course subject to the covenants, as evidenced by the fact that no one objected to the Gold Reserve SPA on the basis that it lacked any such provision. This incentive is all the more improper because it is not coming out of Elliott's pocket, but diverts value from CITGO and ultimately PDVH that could otherwise be available to facilitate a higher bid. Section 6.19 should be stricken as contrary to Delaware law. <br><br> Note: Elliott admitted that the purpose of this section is to incentivize and induce CITGO personnel to prefer Elliott's interest in closing a sale over their ultimate shareholders' interest in pursuing their objections and potential appeal. In its brief in support of the Special Master's updated recommendation, Elliott stated that it was "willing to pay [these] bonuses" precisely because it wanted to hinder the Venezuela Parties' ability to prevent "the sale [to Elliott] from closing." D.I. 2274 at 20. Elliott's witness, Mr. Turkel, confirmed the accuracy of that statement and admitted that "the bonuses were included to incentivize [] the CITGO executives effectively to cooperate with the Court-ordered sale." PFF¶233. | SPA Section 6.19 <br><br> *Proposal*: delete section in its entirety |
| 19. | *Off Market Financing Cooperation Provisions.* Certain provisions in Section 6.10 of the Elliott SPA are off-market and overly intrusive. CITGO proposed reasonable revisions reflected in footnote 51 and requests their adoption. These limited revisions are consistent with general market practice and appropriate to clarify CIT- | SPA Section 6.10(a)(x) and (xi) <br><br> *Proposed* |

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Stock Purchase Agreement ("SPA") Provision(s)[48] | Elliott SPA Section |
|---|---|---|
| | GO's obligations to cooperate with the Debt Financing Sources for the purpose of establishing collateral arrangements that the Debt Financing require be in place at Closing pursuant to the Financings. To be clear, CITGO will reasonably cooperate with the Debt Financing Sources for these purposes. CITGO is concerned, however, that the provisions currently included in the Elliott SPA go beyond what is reasonably required and have the potential to be unnecessarily intrusive and disruptive to the CITGO business. In particular, those provisions have the potential to require inappropriate pre-closing actions and could be utilized to attempt to justify due diligence reviews and evaluations that go well beyond what is reasonably necessary to establish required collateral arrangements. In addition, those provisions could be interpreted to require modifications to CITGO's cash management function prior to closing of the transaction and prior to Elliott having the right to dictate the operations of the CITGO business. CITGO further believes its reasonable and limited proposed revisions to Section 6.10(a) would not negatively impact the Financings in any respect. | *revisions reflected in footnote*[51] |
| 20. | *Contract interference.* The VPs also object to the prohibition on entering, amending, or renewing any contract with PDVSA, which was added to Section 6.1(b)(xi) but was never in any draft shared with the VPs. This provision impermissibly limits the ability of the CITGO Companies to transact with PDVSA beyond the already | SPA Section 6.1(b)(xi) |

---

[51] <u>Section 6.10(a)(x)</u>: "subject to an executed confidentiality agreement containing confidentiality provisions that are not less favorable in any material respect to the Special Master than those contained in the Confidentiality Agreement (an "<u>Acceptable Confidentiality Agreement</u>"), taking all actions reasonably requested in writing and reasonably necessary and customary to ~~(A)~~ permit the Debt Financing Sources and their respective Representatives to evaluate the Acquired Companies' current assets, properties, rights, inventory, cash management and accounting systems, and policies and procedures relating thereto, solely for the purpose of establishing collateral arrangements to the extent required by the Debt Financing Sources to fund the Debt Financing upon the Closing and otherwise customary and reasonable ~~and (B) establish bank and other accounts and blocked account agreements and lock box arrangements in connection with the foregoing, provided that such agreements and arrangements will only be effective upon Closing~~;"
<u>Section 6.10(a)(xi)</u>: "subject to an Acceptable Confidentiality Agreement, granting the Debt Financing Sources on reasonable terms and upon reasonable written request, at reasonable and limited times and on reasonable notice (and at times and locations to be mutually agreed), access to the Acquired Companies' properties, ~~rights, assets and cash management and accounting systems~~ (including cooperating in a limited and reasonable amount ~~and facilitating the completion~~ of field examinations, collateral audits, asset appraisals and surveys) for the purpose of establishing collateral arrangements required to be in place at Closing pursuant to the Financings;"

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Stock Purchase Agreement ("SPA") Provision(s)[48] | Elliott SPA Section |
|---|---|---|
| | restrictive interim operating covenants. Moreover, as the Special Master has acknowledged, any such contracting is subject to OFAC authorization. The Special Master should not be permitted to use the SPA—a contract with a private party—to tie OFAC's hands in exercising its discretion to permit specific interactions between CITGO and PDVSA. | ***Proposal***: delete the following language from 6.1(b)(xi): "and; provided, further, that no Acquired Company shall enter into, amend or renew any Contract with PDVSA" |
| 21. | *Termination.* To avoid the fundamental injustice of the 2020 Bondholders receiving a $2.125 billion payment for legally invalid bonds, the VPs request insertion of a provision allowing the Special Master to terminate the SPA if PDVSA prevails in the Bondholder Litigation on appeal. | ***Requested insertion*** |
| 22. | *Stay pending appeal.* As described in their post-trial brief, the VPs previously objected that, to the extent Elliott's SPA and TSA can be interpreted to pressure the Court not to enter a stay pending appeal, the Venezuela Parties object. Elliott's representative has insisted that the TSA does not function in this manner. PFF¶222 (Mr. Turkel). In the event a Sale Order issues and any entity argues that entry of a stay pending appeal would give rise to a means to terminate the TSA (and, in turn, the SPA), the VPs preserve the right to object to the Court approving an SPA that puts pressure on it to deny a stay pending appeal. | Section 8.1(h) [as it interacts with TSA Sections 4.1(h)(iii) and 5.1(b)] ***No action currently required based on Elliott's assurances.*** |
| 23. | *Alternatives to the Sale.* The Court has stated that the VPs "shall always" have the right to propose alternatives or pay off judgments until consummation. D.I. 1517 ¶ 22(b). The Dalinar SPA accounts for this requirement; the Elliott SPA omits similar language. The following language from Dalinar SPA Section 6.16(h) should be | ***Requested insertion*** as Section 6.16(e) (see |

**ADDENDUM A**
**Venezuela Parties' Objections to the Elliott**
**Proposed Sale Order and Stock Purchase Agreement**
**(as authorized by D.I. 2348 ¶ 9)**

| No. | Objection to Stock Purchase Agreement ("SPA") Provision(s)[48] | Elliott SPA Section |
|---|---|---|
|  | inserted into the Elliott SPA: "The Buyer acknowledges that nothing hereunder limits any Venezuela Party from proposing or negotiating any alternative transaction or series of transactions, and the Venezuela Parties (as defined in the Sale Procedures Order) will not at any time be prevented from making a Competing Proposal)." D.I. 2182-1 at 23. | language in parenthetical in adjacent cell) |