# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:17-mc-00151-LPS |
| v. | ) | |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | **PUBLIC – REDACTED** |
| | ) | |
| *Defendant.* | ) | |

_____

## THE VENEZUELA PARTIES' PROPOSED FINDINGS OF FACT

# TABLE OF CONTENTS

I.  **The Fair Market Value of the PDVH Shares Is $18.6 Billion. ........................................ 1**

    A.  Dr. Alberro Is an Expert in Valuation and Has Extensive Experience in the Refining Industry. ...................................................................................... 1

    B.  The Industry Outlook for Refining Companies Is Strong Due to Stable to Shrinking Supply and Growing Demand Into the 2030s and Slightly Declining Demand After That. ...................................................................... 3

    C.  Dr. Alberro Correctly Concluded that, Under the DCF Method, the Enterprise Value of CITGO Is $18.6 Billion. ...................................................... 5

        1.  Future Cash Flows ........................................................................................ 5

        2.  WACC ........................................................................................................... 8

        3.  Perpetuity Growth Rate .............................................................................. 10

        4.  Final Enterprise Value Calculation ............................................................ 10

    D.  A Market Multiples Approach Values the PDVH Shares at $14.2 Billion, Which Corroborates Dr. Alberro's DCF Analysis ................................................ 11

    E.  A Comparable Transactions Approach Values the PDVH Shares at $16.2 Billion, Which Corroborates Dr. Alberro's DCF Analysis. ........................ 13

    F.  Dr. Alberro Correctly Calculated the Equity Value of the PDVH Shares as $18.6 Billion. ...................................................................................... 14

    G.  Dr. Alberro's $18.6 Billion Valuation for the PDVH Shares Is Consistent With a Corrected Version of Evercore's September 2023 Valuation. ................... 15

    H.  Mr. Kleinrichert Adopts Several of Dr. Alberro's Key Inputs but Erroneously Believes That CITGO's EBITDA Forecasts Need To Be Reduced. ..................... 18

        1.  Mr. Kleinrichert Agrees With Dr. Alberro on Two of Three Inputs for a DCF Valuation. ................................................................................. 18

        2.  Mr. Kleinrichert Erroneously Introduces, But Does Not Rely On, the Conclusion That CITGO Has Missed Prior Annual EBITDA Forecasts by 63.9%. ...................................................................................................... 18

        3.  Mr. Kleinrichert Wrongly Applies a "EBITDA Margins" Method to Reduce CITGO's Cash Flow Forecasts. ................................................... 19

        4.  Mr. Kleinrichert Wrongly Adopts the "EBITDA Recovery" Method to Reduce CITGO's Cash Flow Forecasts. ................................................ 21

    I.  Elliott's Bid Is Grossly Inadequate. ...................................................................... 23

    J.  The Special Master Did Not Function as a Willing Seller in this Forced Sale ..... 23

i

II.     Elliott's Bid Is the Product of a Prejudicially Defective Sale Process ......................... 28

    A.     The Special Master and His Advisors Design the Sale Process and Prepare for Its Implementation......................................................................................... 28

    B.     The Special Master Launches the Sale Process and Receives Initial Bids Priced Far Below the Value of the PDVH Shares.................................................. 34

    C.     The Special Master Receives Second Round Bids Priced Far Below the Value of the PDVH Shares................................................................................... 36

    D.     The Special Master Engages in Failed Negotiations with Bidders and the 2020 Bondholders Following the Second Round of Bidding. ............................... 38

    E.     The Special Master Recommends Elliott as the Initial Winning Bidder, Provoking Unanimous Opposition from the Attached Judgment Creditors and Sale Process Parties............................................................................................. 42

    F.     The Special Master Recommends a "Pivot" in the Sale Process After the Failure of the Elliott Bids............................................................................... 44

    G.     The Special Master's Stalking Horse Recommendation Resulted in Bid Prices that Were Grossly Inadequate and Improperly Diverted Bidder Attention Towards the Resolution of the 2020 Bondholders' Claims................................... 45

    H.     The Special Master Failed to Generate Competition During the Topping Period and Contravened Delaware Law Which Requires Public Sales. ............... 53

III.    Elliott Is Not the Highest Bidder......................................................................... 62

IV.     The Venezuela Parties' Objections to the PSO and SPA ............................................ 64

V.      OFAC Is Unlikely to Authorize the Elliott Transaction and TSA ............................. 70

    A.     Executive Order 13835 Has Prevented the 2020 Bondholders From Enforcing Their Purported Rights........................................................................ 70

    B.     The TSA Purports to Provide $2.125 Billion to Release the CITGO Holding Pledge and Settle the 2020 Bondholders Claims, Without PDVSA's Consent..... 73

    C.     OFAC Has Provided No Guidance Supporting the Elliott Transaction or the TSA....................................................................................................... 74

    D.     OFAC Maintains a Favorable Licensing Policy Only for Settlement Agreements with the U.S.-Recognized Legitimate Government of Venezuela.... 75

    E.     OFAC Has Maintained a Non-Enforcement Policy Permitting the S.D.N.Y. Litigation to Proceed to Conclusion .................................................................... 76

VI.     Calculating the Elliott Bid's "Discount" of 2020 Bondholder Claims ....................... 76

**VII.**    **The Value of PDVH/CITGO's Strategic Links to PDVSA and Venezuela** ................ **77**

**VIII.**    **The Wrong Time to Maximize Value** ......................................................................... **78**

    A.    2020 Bondholder Litigation in S.D.N.Y. ............................................................. 78

**IX.**    **Efforts to Undermine the Venezuela Parties' Appellate Rights** .................................. **79**

    A.    Proceeding Expeditiously in S.D.N.Y. and the Second Circuit ............................ 79

I.      **The Fair Market Value of the PDVH Shares Is $18.6 Billion.**

      A.      **Dr. Alberro Is an Expert in Valuation and Has Extensive Experience in the Refining Industry.**

      1.      The Court finds that Dr. José Alberro is a qualified valuation expert. He received a Bachelor of Arts in Economics at the Instituto Tecnológico Autónomo de México, and a Master of Arts and Ph.D. in Economics from the University of Chicago. Sept. 15–18, 2025 Sale Hearing Transcript ("JTX") at 728:11–16; VP_Ex_186.006. Dr. Alberro was a tenure-track assistant professor in Economics at the University of Illinois for four years before becoming a tenured full professor in Mexico at El Colegio de México for ten years. JTX at 728:19–22; VP_Ex_186.005, .109.

      2.      The Court further finds that Dr. Alberro is also an expert in the petrochemical and refining industries having served as the chief representative of PEMEX, the state oil company of Mexico, during the 1990–1992 NAFTA negotiations. VP_Ex_186.006, .109. In 1992, the President of Mexico appointed Dr. Alberro as the founding CEO of PEMEX Gas and Basic Petrochemicals. JTX at 729:1–13; VP_Ex_186.005–.006, .109. He was also on the Board of Directors of PEMEX Refining. JTX at 729:14–15. After leaving PEMEX, Dr. Alberro embarked on a successful consulting career, working with several of the most prestigious U.S. consulting firms, the last two years of which have been at FTI Consulting. JTX at 730:4–9.

      3.      Dr. Alberro has served as a valuation expert in dozens of arbitrations over the past twenty years. JTX at 730:15–21; VP_Ex_186.107–.108. In fact, Dr. Alberro's credentials are so well-respected that he was hired by ConocoPhillips as a valuation expert in an arbitration that produced one of the judgments ConocoPhillips seeks to recover in this case. JTX at 730:22–731:8.

      4.      Dr. Alberro was engaged to establish the fair market value of the shares of PDVH. JTX at 731:11–12; VP_Ex_186.006. PDVH's primary asset is its indirect ownership of CITGO,

the fifth largest refining company in the United States and a marketer of refined petroleum products. VP_Ex_186.008–.010.

5.      Dr. Alberro conducted three standard valuation methodologies: the discounted cash flow ("DCF") method; the market multiples method; and the comparable transactions method. JTX at 749:25–751:7; CIT-2.23; VP_Ex_186.065, .089, .093.

   a.   <u>DCF Method</u>: Valuing a business based on the principle that a firm's enterprise value is equal to the net present value of its future cash flows. JTX at 261:21–262:5, 734:11–16; VP_Ex_186.066. The future economic benefits are adjusted to the valuation date using a discount rate that incorporates the time value of money and the risks of those future cash flows. VP_Ex_186.066. The three key inputs for a DCF valuation are (1) future cash flows, (2) the discount rate (the Weighted Average Cost of Capital ("WACC")), and (3) the perpetuity growth rate. JTX at 734:11–19; VP_Ex_186.065.

   b.   <u>Market Multiples Method</u>: Valuing a business by reference to the value of other companies traded in the market and for which you can calculate relevant multiples, such as enterprise value to EBITDA, and then using that multiple to value the subject company. JTX at 745:23–746:4.

   c.   <u>Comparable Transaction Method</u>: Valuing a business by analyzing similar past transactions in the industry, typically using multiples of enterprise value in those transactions to value the subject business. JTX at 747:21–748:8; VP_Ex_186.093.

6.      Dr. Alberro credibly concluded that the DCF method is the best and most reliable method to establish the fair market value of the PDVH shares because it reflects CITGO's intrinsic

value and minimizes, significantly, the market noise (that is, fluctuations in the market unrelated to the value of the business); accordingly, the method should be assigned complete weight. JTX at 750:4–10; VP_Ex_186.065. The Venezuela Parties' expert Mr. Randall Weisenburger also testified that the DCF method is targeted at estimating the value of a business when it is sold as a whole, rather than in parts or the public markets. JTX at 255:24–256:1. Dr. Alberro also credibly concluded that the fair market value of the PDVH shares is $18.6 billion based on the DCF method. JTX at 731:14–15; VP_Ex_186.079–.082.

7.      The market multiples valuation can only serve as a corroborative check; it is not an independently reliable method for valuing the PDVH shares in this case. JTX at 745:17–20; JTX at 750:11–20; VP_Ex_186.089. The characteristics of the refining industry limit the use of comparable companies because there are only eight publicly traded companies, each of which differs meaningfully from CITGO. VP_Ex_185.038; VP_Ex_186.103. Moreover, the wide dispersion of resulting values underscores the method's unreliability. JTX at 750:11–20; CIT-2.23; VP_Ex_185.038. Finally, unlike the DCF method, the market multiples method is subject to substantial market noise unrelated to the value of the subject business. JTX at 750:7–16.

8.      While the comparable transactions method can also serve only as a corroborative check, it is less reliable than the DCF method because there have been no significant transactions in the refining industry in the last several years, and the last truly comparable transaction on a scale comparable to CITGO was in October 2018. JTX at 750:21–751:7; VP_Ex_186.103.

**B.      The Industry Outlook for Refining Companies Is Strong Due to Stable to Shrinking Supply and Growing Demand Into the 2030s and Slightly Declining Demand After That.**

9.      Refining margins are likely to remain healthy for a long time. JTX at 732:6–10. The supply of refined products is stable globally and shrinking slightly in North America as old or inefficient refineries cease production. *See* JTX at 731:20–24; VP_Ex_186.024. There are also no

new greenfield refinery capacity additions planned in the markets where CITGO competes. *See* VP_Ex_186.021–.031; VP_Ex_071.017. In North America, the shutdown of LyondellBasell Houston refinery and the conversion of the Phillips 66 Rodeo refinery to renewable fuel production are expected to further tighten supply in the Gulf Coast region where most of CITGO's refining capacity is located. VP_Ex_186.024.

10.     Dr. Alberro credibly determined that petroleum demand is likely to be stable in the near term and declining only slowly thereafter based on forecasts published by three organizations: the Organization of the Petroleum Exporting Countries ("OPEC"), RBN Energy, and the International Energy Association ("IEA"). JTX at 732:17–25; VP_Ex_186.031–.032. OPEC represents the interests of oil-producing countries; the IEA represents the interests of oil-consuming countries; and RBN Energy is a consulting firm that publishes forecasts of energy demand and pricing. JTX at 732:17–25; VP_Ex_186.033. Taken together, these three organizations give a balanced view of long-term demand. JTX at 733:7–16. There is a consensus amongst all three forecasters that demand for refined products will continue to grow until the 2030s. JTX at 732:1–3, 733:1–6; VP_Ex_186.032. There is more variation in the analysis of long-term oil demand from 2030 through 2050, with two entities—OPEC and RBN Energy—predicting that there will be continued oil demand growth. JTX at 733:7–16; VP_Ex_186.034. The IEA predicts a small drop off from about 105 million barrels a day in 2030 to 97 million barrels a day in 2050. JTX at 733:17–734:2; VP_Ex_186.034. Thus, even the organization most inclined to predict falling demand predicts only a slow decline in demand over a long period. JTX at 733:17–734:2.

11.     The positive outlook for the refining industry is supported by Evercore's own analysis in a June 2025 equity research report authored by Stephen Richardson, covering the refining industry and three companies in particular: Phillips 66, Marathon Petroleum, and Valero.

JTX at 1160:12–1161:1; VP_Ex_099.001. The report outlines that, for each of the three companies, while earnings declined markedly from about 2023 to mid-2025 (when the report was published), the stock prices for the companies remained stable or rose slightly. JTX at 1161:6–1164:2. Furthermore, the report opined that Evercore "expect[ed] global refined product demand to keep growing," and there are no "material risks from falling product demand trends for US refiners well into the 2030s." VP_Ex_099.003; JTX at 1168:16–1169:7. The report also opined that "[t]he US refining industry can maintain high utilization rate to address resilient (if low growth) domestic demand and serve export markets (primarily Mexico & Latin America)." VP_Ex_099.003; JTX at 1169:14–21. Richardson gave "in line" ratings to Marathon and Valero, indicating he expected their value to hold steady, and an "outperform" rating to Phillips 66, indicating he expected its value to increase. VP_Ex_099.001.

12.     Additionally, Evercore's Confidential Information Memorandum prepared for bidders in this proceeding stated that "[g]lobal demand for refined products is expected to grow throughout the medium term" while only "limited new capacity has been planned post-2025." VP_Ex_071.017.

### C.     Dr. Alberro Correctly Concluded that, Under the DCF Method, the Enterprise Value of CITGO Is $18.6 Billion.

13.     As established, the DCF method has three key inputs: (1) future cash flow; (2) the discount rate; and (3) the perpetuity growth rate. JTX at 734:11–19; VP_Ex_186.065.

#### 1.     Future Cash Flows

14.     CITGO released a Medium-Term Plan ("MTP") in January 2025 that forecasted EBITDA for 2025 through 2030. VP_Ex_186.053; CIT-2.20. In 2025, projected EBITDA was expected to be ███████; in 2026, projected EBITDA is expected to be ███████; in 2027, projected EBITDA is expected to be ███████; in 2028, projected EBITDA is expected

to be ██████████; in 2029, projected EBITDA is expected to be ██████████; and in 2030, projected EBITDA is expected to be ████████. JTX at 738:24–739:14; CIT-2.15, 2.19; VP_Ex_186.053–.055.

15.     Dr. Alberro developed his own forecast of cash flows that incorporated CITGO's volume forecasts but used different forecasts of input and output prices. *See infra* PFF ¶ 19. CITGO is a processing entity. JTX at 736:10–14. CITGO buys crude oil and other related products, then produces a variety of goods, such as gasoline, jet fuel, and diesel. JTX at 736:15–21. The cash flow that CITGO generates is a function of the volumes for the products that are taken in, the volumes for products that are produced, and the price at which these two streams of goods are bought and sold. JTX at 736:21–25. The equation for determining CITGO's projected cash flows then has two pieces: volume forecasts and price forecasts. JTX at 736:10–25.

16.     CITGO's volume forecasts are reliable. *See* JTX at 262:6–21 (Mr. Weisenburger), 737:1–11 (Dr. Alberro). CITGO's volume forecasts include both input purchases and output sales and are grounded in technical and operational factors. VP_Ex_186.057. Such technical and operational factors include what kind of crude (and other inputs) to buy and how to transform that crude into which product; those factors are engineering decisions that are made by CITGO engineers and management, who possess unique expertise. *See* JTX at 262:17–21 (Mr. Weisenburger), 737:1–11 (Dr. Alberro).

17.     In contrast, CITGO is no more reliable than any other professional organization at forecasting input and output prices. JTX at 737:12–15. CITGO is a price taker and participates in a competitive input and output market, i.e., a market where a participant accepts the market prices at which it buys inputs and sells its own goods. *See* JTX at 262:6–21, 263:3–8 (Mr. Weisenburger), 737:16–18 (Dr. Alberro). Therefore, the best method to determine the applicable price forecasts

for CITGO's inputs and outputs is to use a composite forecast drawn from four well-known consulting firms that are experts in the area of price forecasting. JTX at 737:18–25. The third-party forecasts include publications from S&P Global Platts, RBN Energy, Turner Mason, and Wood Mackenzie. JTX at 738:1–14, 798:10–15; VP_Ex_186.057.

18.     The third-party price forecasts include projections for crude oil, refined products, and other relevant inputs and outputs across CITGO's three refineries. VP_Ex_186.059. In many cases, the products in the forecasts matched CITGO's products. VP_Ex_186.059–.060. In the few instances where these prices are industry benchmarks for different locations that do not exactly match the locations where CITGO buys and sells products, Dr. Alberro appropriately adjusted the consultant forecasts to match CITGO's locations. VP_Ex_186.059–.060. The resulting composite forecasts use the average of the prices from the relevant forecasted prices for each CITGO product from each third-party analyst. VP_Ex_186.060. This composite forecast is more reliable because the approach reflects the views of the leading market analysts and does not rely on any single methodology. VP_Ex_186.060.

19.     Based on the volume forecasts from CITGO's 2025 MTP and the price forecasts drawn from the four-party composite forecast, the best and most reliable CITGO EBITDA forecasts are $1,433 million for 2025; $1,872 million for 2026; $2,291 million for 2027; $2,808 million for 2028; $3,090 million for 2029; and $2,947 million for 2030. JTX at 739:4–18; CIT-2.15, 2.19; VP_Ex_186.060–.062.

20.     No evidence was introduced that was critical of the reliability or accuracy of the four forecasts or forecasting companies used by Dr. Alberro.

21.     No evidence was introduced to contradict CITGO's forecasts of its volumes of products refined or produced.

22.    No evidence was introduced that was critical of the way Dr. Alberro applied the consultant price forecasts to CITGO's volume forecasts to develop his cash flow forecast.

### 2.    *WACC*

23.    The Court finds that the appropriate WACC is 8.27%. VP_Ex_186.075; JTX at 741:5–6. The WACC is the weighted average of the cost of equity and the after-tax cost of debt, with the weights proportionate to the industry peer group's ratio of equity and debt into total capital. JTX at 740:17–171:4; VP_Ex_186.065–.066. The premise of WACC is that a company has two sources of financing, equity and debt, and the ability to obtain funds is a function of how much it costs to raise equity and how much it costs to raise debt. JTX at 740:17–741:1. The key inputs then for WACC are the cost of equity, the cost of debt, and how much to weigh the debt and equity. VP_Ex_186.075.

24.    The cost of equity is calculated using the Capital Asset Pricing Model, which adds the risk-free rate—the rate of a risk-free asset, such as a 20-year Treasury bond—and the product of an equity premium (to reflect the additional risk of the asset) and the equity beta—which measures the correlation between a firm's stock with the overall market return. VP_Ex_186.067. The risk-free rate is 4.87%, the daily average on a 20-year treasury security from April 4, 2025 to July 3, 2025. VP_Ex_186.071. The most reliable equity-risk premium comes from Professor Aswath Damodaran of NYU, a well-known expert in valuation, because his methodology is economically consistent and publicly available, which allowed Dr. Alberro to verify the calculations; Professor Damodaran's estimate is 4.21%. VP_Ex_186.071. The most reliable equity beta is the median equity beta of the five most comparable companies: Marathon Petroleum Corporation, Phillips 66, Valero Energy Corporation, HF Sinclair Corporation, and PBF Energy Inc; that median is 1.009. VP_Ex_186.071.

25.     In speculating that a higher WACC of 10.46% (which is significantly higher than the WACC that Evercore calculated when valuing the PDVH shares in 2023) would be appropriate, Mr. Hiltz, who is not a valuation expert and does not conduct his own DCF analysis, JTX at 1164:18–1165:15, relies on Kroll to determine the equity-risk premium. VP_Ex_184.011. But Kroll is not the exclusive source for determining the equity-risk premium. VP_Ex_184.011. In fact, Kroll recently conducted a survey of participants in a webinar (including Kroll employees) and found that 23.7% use Professor Damodaran's equity-risk premium. VP_Ex_045.006. Moreover, Kroll's equity-risk premium is less reliable than Professor Damodaran's because, unlike Professor Damodaran, Kroll's methodology is not publicly available, is not explained, and cannot be tested to determine its reliability. VP_Ex_184.011. Significantly, Mr. Kleinrichert, a valuation expert who was in one respect critical of Dr. Alberro (the development of cash flow forecasts), found Dr. Alberro's WACC to be "reasonably developed" and used the same WACC in his own analysis. JTX at 1228:8–14. The Court thus finds that Mr. Hiltz's proposed WACC calculation is unsupported and unreliable.

26.     The cost of debt is also derived from the cost of debt of the five most comparable companies. VP_Ex_186.072. Their reported interest rates determine the pre-tax cost of debt; the median pre-tax cost of debt for those companies is 8.13%. VP_Ex_186.072, .074. Professor Damodaran's data yields a marginal tax rate of 25.77%. VP_Ex_186.072. Based on those two numbers, the median value of the after-tax cost of debt is 6.03%. VP_Ex_186.073.

27.     In short, the cost of equity is 9.12%; the cost of debt is 6.03%. To calculate the WACC, the cost of equity and the cost of debt must be weighted in line with the costs for comparable companies. VP_Ex_186.074. The five most comparable companies' median value of the equity weight is 72.47% and the debt weight is 27.53%. VP_Ex_186.074–.075.

Mathematically, the cost of equity (9.12%) multiplied by the equity weight (72.47%) is added together with the cost of debt (6.03%) multiplied by the debt weight (27.53%) to reach the appropriate WACC of 8.27%. VP_Ex_186.075; JTX at 741:5–6.

### 3.    *Perpetuity Growth Rate*

28.    The Court finds that the appropriate perpetuity growth rate is 2%, which assumes that the prices of CITGO's products will grow at the same pace of inflation and that the volume of CITGO's sales will shrink slightly over time. JTX at 741:18–24; VP_Ex_186.076. Mathematically, the perpetuity growth rate is calculated using the average inflation rate in the United States from 2000 to 2024—2.58%—and the global oil demand rate—which the most conservative source, the IEA, projects to be -0.44%. VP_Ex_186.076. That yields an implied perpetuity growth rate of 2.14% for the oil sector, which rounds down conservatively to 2.0%. VP_Ex_186.076.

29.    Mr. Kleinrichert again agrees with Dr. Alberro and uses the same 2.0% perpetuity growth rate, without criticism, as Dr. Alberro. JTX at 1228:15–18; *see also infra* PFF¶52. Evercore's 2023 valuation erroneously and without support assumed a 0% growth rate, which is inconsistent with Evercore's own 2025 report of industry growth and current industry expectations. VP_Ex_076.009; VP_Ex_184.007; JTX at 1169:14–20; VP_Ex_099.003; *see also supra* PFF¶¶9–12.

### 4.    *Final Enterprise Value Calculation*

30.    Under the DCF method, using the three inputs, the enterprise value of the PDVH shares is $18.6 billion, which adds the net present value of the cash flow forecasts for 2025 through 2030 ($5.4 billion) to the net present value of the cash flow forecasts into perpetuity ($13.2 billion). JTX at 742:16–743:10; VP_Ex_186.082. Mechanically, the net present value of the cash flow forecasts for 2025 through 2030 takes each forecasted year and discounts the value of that sum to the date of the valuation. JTX at 742:16–25. The net present value into perpetuity uses the average

10

of the cash flow forecast for the years 2026 through 2030 and applies the perpetuity growth rate. VP_Ex_186.082; JTX at 743:1–10. The use of an average of the forecast period cash flows as the assumed terminal period cash flow is conservative because it would also be reasonable to use the last year of the forecast period (which is higher than the average) as the assumed terminal period cash flow. VP_Ex_184.007; VP_Ex_186.082.

31.     Although the composite price forecasts are more reliable than CITGO's MTP price forecasts, using CITGO's own cash flow forecast (as Mr. Hiltz recommends) results in an enterprise value of $15.6 billion. JTX at 744:22–745:3; CIT-2.20; VP_Ex_184.006, .023–.024. The value of $15.6 billion results when using 2030 as the terminal cash flow value, as Evercore did in its September 2023 valuation. JTX at 745:4–8; CIT-2.20; VP_Ex_184.023–.024. This calculation further supports the reliability of Dr. Alberro's DCF valuation.

**D.     A Market Multiples Approach Values the PDVH Shares at $14.2 Billion, Which Corroborates Dr. Alberro's DCF Analysis.**

32.     Again, the market multiples approach estimates CITGO's value by examining the market value of similar companies and using a relevant multiple, such as enterprise value to EBITDA. VP_Ex_186.089. The first step in the market multiples analysis is to determine the comparable peer companies. JTX at 746:7–8; VP_Ex_186.089. For CITGO, the five most comparable peer companies (the same ones used for the WACC) are: Marathon, Phillips 66, Valero, HF Sinclair, and PBF. JTX at 746:13–15; VP_Ex_185.011; VP_Ex_186.090. For the five companies, it is necessary to determine multiples of the enterprise value divided by the EBITDA (EV-to-EBITDA), specifically the median multiple and the distribution of multiples (the lower and upper end of the range). JTX at 746:14–20; VP_Ex_186.090.

33.     Dr. Alberro correctly calculated the peer group multiple based on the last quarter enterprise value divided by the last twelve months' EBITDA for 13 quarterly periods going back

to the end of the COVID pandemic (2022), instead of limiting the analysis only to the latest quarter. VP_Ex_185.011–12. The purpose of a 13-quarter lookback is to capture the cyclical nature of the refining industry and smooth out variation unrelated to the value of the subject business. JTX at 637:13–20 (Mr. Hiltz agreeing that "refining is a cyclical business"), 746:20–22; VP_Ex_185.011–.012; VP_Ex_186.090. From there, Dr. Alberro correctly multiplied CITGO's reported Last Twelve Month ("LTM") EBITDA by the peer-group median, lower end of the range, and upper end of the range. VP_Ex_185.012; VP_Ex_186.090–.091. CITGO's enterprise value, which is calculated each quarter for the past thirteen quarters, is then averaged across all thirteen quarters, resulting in an upper end value, a lower end value, and a median value. VP_Ex_185.012; VP_Ex_186.091. The value ranges between $10 to $14.8 billion, with a median of $12.2 billion. JTX at 746:23–747:2; VP_Ex_185.012.

34.    After calculating the range and median value, it is necessary and appropriate to apply a 21% premium. JTX at 747:3–11; VP_Ex_185.013. Acquisitions of public companies commonly have a premium to trading price that reflects the value of control, the value of synergies, or other elements of value the buyer perceives. JTX at 1171:14–1172:14; VP_Ex_185.013. Mr. Hiltz testified that, in his experience, buyers of public companies typically pay a 15% to 25% premium. JTX at 1170:20–1171:21; VPX226.012–.013. The median premium paid in the seven most recent relevant transactions is 21%. JTX at 747:3–15; VP_Ex_186.092; VP_Ex_185.013. Because the market multiples valuation of PDVH is based on public company stock valuations, a premium is necessary to put the valuation on the same basis as typical public company acquisitions. VP_Ex_186.091–.092.

35.    After applying the 21% premium to the $10 to $14.8 billion range, the market multiple range is between $12.1 billion and $17.9 billion, with a median value of $14.2 billion.

JTX at 747:13–15; VP_Ex_185.012. These calculations further support the reliability of Dr. Alberro's DCF valuation.

### E.    A Comparable Transactions Approach Values the PDVH Shares at $16.2 Billion, Which Corroborates Dr. Alberro's DCF Analysis.

36.    A comparable transactions analysis begins by identifying a set of comparable transactions. JTX at 747:21–748:8; VP_Ex_186.093–.094. Here, the comparable transactions should include acquisitions of full companies in the refining industry—excluding bankruptcy proceedings—where the transaction was at arm's length and involved refineries located within the United States. VP_Ex_186.094. Based on those criteria, there are four possibly comparable transactions: Marathon's acquisition of Andeavor in October 2018; Andeavor's acquisition of Western Refining in June 2017; HollyFrontier's acquisition of Sinclair Oil in March 2022; and Cenovus Energy's acquisition of Husky Energy in January 2021. JTX at 747:21–748:8; VP_Ex_186.094–.095.

37.    A comparable transactions analysis for refineries can use an industry-specific metric: enterprise value per unit of equivalent distillation capacity ("EDC"). JTX at 748:9–14. The EDC multiple is similar to an enterprise value to EBITDA multiple because it derives a multiple from comparable transactions used to value the subject business. VP_Ex_186.093–.094, .100. Refinery values increase with their complexity, defined to be their capacity to process lower-cost crude into higher-value products. *See* VP_Ex_186.041, .044, .068, .096. EDC equals the capacity of a refinery—measured in the maximum throughput of crude per day—multiplied by the complexity—the capability of the refinery, as measured by a widely accepted metric, the Nelson Complexity Index. JTX at 748:24–749:4; VP_Ex_186.095–.096.

38.    The EDC multiple method is an accepted valuation method in the refining industry; Evercore, itself, employed the EDC method to value the seller in a December 21, 2025 fairness

opinion prepared for the Board of Directors of Northern Tier Energy GP LLC. JTX at 1173:12–16, 1175:12–19; VP_Ex_097.001, .034, .039.

39.     The first step in applying the EDC method is to calculate the EDC units of the companies sold in the comparable transactions, then divide the enterprise value of the transactions by the EDC units to arrive at the multiple. VP_Ex_186.100–.102. The median EDC multiple for the four comparable transactions listed above is $1,239 per EDC unit. JTX at 748:12–14; VP_Ex_186.101.

40.     CITGO has $10.2 million EDC units. VP_Ex_186.101. The value of CITGO's refineries is CITGO's EDC (10.2 million) multiplied by the EDC multiple ($1,239) for a total of $12.6 billion. JTX at 749:15–18; VP_Ex_186.101. CITGO's refinery share is 78% (refinery share is the net present value of CITGO's forecasted EBITDA from refining relative to CITGO's total forecasted EBITDA); to calculate the enterprise value using this method, the value of CITGO's refineries is divided by 78% for a valuation of $16.2 billion. JTX at 749:18–24; VP_Ex_186.101. This calculation further supports the reliability of Dr. Alberro's DCF valuation.

**F.      Dr. Alberro Correctly Calculated the Equity Value of the PDVH Shares as $18.6 Billion.**

41.     The equity value of the PDVH shares starts with the enterprise value of $18.6 billion, then adds PDVH's cash and subtracts any long-term debt. JTX at 751:8–13; VP_Ex_186.104–.105. PDVH's cash on balance sheet is $1.8 billion; PDVH's long-term debt on balance sheet is $1.8 billion. VP_Ex_186.104–.105. The equity value of the PDVH shares is $18.6 billion. VP_Ex_186.105; JTX at 751:14–17.

42.     Dr. Alberro was correct to not subtract anything on account of the contingency posed by the PDVSA 2020 bondholder litigation from his calculation of fair market value. JTX at 751:24–752:1; VP_Ex_186.104. The 2020 bonds are a debt of PDVSA, not PDVH. JTX at 752:3–

8; VP_Ex_186.104. Additionally, the purported lien that the 2020 bondholders have asserted on the equity of CITGO Holding, Inc. is the subject of ongoing litigation, including an appeal of the recent summary judgment ruling, and cannot be reasonably ascertained by a valuation expert. VP_Ex_186.104.

43.     The date of the valuation is March 31, 2025. JTX at 734:20–22; VP_Ex_185.018. If July 7, 2025 or September 15, 2025 were selected as the valuation date, the inputs and valuation would be the same because there were no meaningful changes in the relevant inputs. JTX at 735:19–736:9; VP_Ex_185.018.

### G.     Dr. Alberro's $18.6 Billion Valuation for the PDVH Shares Is Consistent With a Corrected Version of Evercore's September 2023 Valuation.

44.     In September 2023, Evercore created a deck of preliminary valuation materials at the outset of the sale process. VP_Ex_076.003; VP_Ex_186.083; JTX at 640:12–15. That deck was created by a team of at least three people at Evercore. JTX at 645:23–646:1. A senior team at Evercore, composed of Mr. Hiltz, Mr. Ying, and Mr. Strong, reviewed the deck and discussed it. JTX at 646:2–646:6. It was then presented to the Special Master himself for review. VP_Ex_076.001; JTX at 646:7–9. Mr. Weisenburger explained that preparing a valuation at the beginning of a sell-side engagement is standard because the seller wants to understand what the asset is worth before going to market and for use as a baseline in evaluating offers. JTX at 257:11–258:7. In the deck of preliminary valuation materials, Evercore developed a DCF valuation, based on CITGO's MTP for 2023 through 2028, and calculated the value of the company to be $13.2 billion. VP_Ex_076.010; VP_Ex_186.084; JTX at 755:24–756:9. This calculation, however, contained three mistakes. JTX at 753:2–756:9; CIT-2.30–35.

45.     *First*, Evercore assumed that the sale process was an asset sale with a step-up in basis instead of an equity share purchase. JTX at 753:6–11; VP_Ex_186.085, .087 n.237. As a

result, certain tax benefits that Evercore assumed would not be available to the buyer, reducing the value. VP_Ex_186.085. Correcting that mistake lowers Evercore's valuation by approximately $1.0 billion, from $13.2 billion to $12.2 billion. JTX at 753:13–15; VP_Ex_186.085.

46.     *Second*, Evercore calculated a WACC range from 8.6% to 9.0% but, for some unexplained reason, used WACC values between 9.0% and 9.5%, with a midpoint of 9.25%, to calculate its September 2023 valuation. JTX at 753:21–754:12; VP_Ex_186.086. There is no good reason to apply a different discount rate than the rate actually calculated for the valuation, and no reasonable valuation expert would do the same. JTX at 754:14–20.

47.     Evercore also applied a small company risk premium for 0.6% to the cost of equity. JTX at 754:21–24; VP_Ex_186.086. But the notion of a fair market valuation is agnostic as to the size of the company that would be acquiring the asset under consideration. JTX at 754:25–755:7. Well-established principles of valuation require that the value of an asset be assessed from the perspective of a typical market participant, and the market is not composed exclusively of small companies. VP_Ex_186.086–.087. Therefore, there is no good reason to assume that an acquiring company in the framework of a fair market valuation would be paying 0.6% as a cost of equity more than others. VP_Ex_186.087; JTX at 755:3–7. Correcting these WACC errors increases the valuation by $1.3 billion. VP_Ex_186.086–.088.

48.     *Third*, Evercore used the unrealistically low perpetuity growth rate of 0.0%. JTX at 755:8–14; VP_Ex_186.086. Assuming 2% annual inflation, that growth rate implies a significantly decreasing real growth rate of negative 2% every year indefinitely into the future, an assumption that is contradicted by the available evidence and by Evercore itself. JTX at 755:15–20, 1169:14–20; VP_Ex_099.003; VP_Ex_186.086; *see also supra* PFF¶¶9–12. As explained above, the

appropriate perpetuity growth rate is 2%. *See supra* PFF¶¶28–29. Mr. Kleinrichert agrees and used the same 2% growth rate in his DCF analysis. JTX at 1228:15–18.

49.    The September 2023 Evercore valuation then must be corrected by decreasing the $13.2 billion valuation by about $1.0 billion to account for the appropriate taxation scheme; then increasing the valuation by $1.3 billion to use the smaller WACC that Evercore actually calculated, without the small company risk premium; and finally, applying the appropriate perpetuity growth rate to increase the valuation by $3.4 billion. JTX at 755:24–756:8; VP_Ex_186.088. These changes result in a corrected September 2023 valuation of $16.9 billion. JTX at 756:8–9; VP_Ex_186.088. This valuation lends further support to the conclusion that the fair market value of the shares of PDVH is $18.6 billion. JTX at 756:10–19. Although the valuation was conducted approximately two years ago, Evercore's equity research report on the refining industry reflects that values of refining companies have changed very little over the last two years, even though earnings for all studied industry participants declined in that period. JTX at 1161:6–1164:2. Evercore's valuation further supports the reliability of Dr. Alberro's valuation.

50.    For the foregoing reasons, the Court finds that Dr. Alberro's DCF analysis is reliable, well-supported, and credible and correctly results in a valuation of $18.6 billion for the PDVH shares.

### H.    Mr. Kleinrichert Adopts Several of Dr. Alberro's Key Inputs but Erroneously Believes That CITGO's EBITDA Forecasts Need to be Reduced.

51.    The Court finds that Mr. Kleinrichert is not an expert in the refining industry. JTX at 1227:2–5. He has never been employed by a refiner nor conducted a valuation of a refining business before. JTX at 1227:6–8, 11–15.

#### 1.    Mr. Kleinrichert Agrees With Dr. Alberro on Two of Three Inputs for a DCF Valuation.

52.    For his DCF analysis, Mr. Kleinrichert used the same WACC of 8.27% and 2% perpetuity growth rate as Dr. Alberro. JTX at 1228:8–18.

53.    Mr. Kleinrichert also reviewed certain important case documents, namely, the confidential information memorandum, CITGO's MTP, and the Evercore management presentation. JTX at 1228:19–24. Those documents present information about CITGO's planned strategic capital investments in the future and offer estimates of what CITGO expects those investments will produce for EBITDA gains. JTX at 1228:25–1229:7. Mr. Kleinrichert agrees that CITGO plans to make all those planned capital expenditures. JTX at 1229:11–16. Those investments project increasing EBITDA in future years for CITGO. JTX at 1300:8–1303:23; VP_Ex_185.004–.005.

#### 2.    Mr. Kleinrichert Erroneously Introduces, But Does Not Rely On, the Conclusion That CITGO Has Missed Prior Annual EBITDA Forecasts by 63.9%.

54.    Mr. Kleinrichert suggests he compared CITGO's annual forecasts relative to its actual annual EBITDA from 2019 through 2025 and observed that CITGO had a median "miss percentage" of 63.9%. JTX at 1229:24–1230:4; 1233:24–1232:1. This finding, in part, informed his decision to reduce CITGO management's cash flow forecasts. JTX at 1230:5–20.

55.    Mr. Kleinrichert's analysis had several flaws that undermine the validity of his observation. (At the same time, Mr. Kleinrichert never concluded whether CITGO was good or

bad at forecasting. JTX at 1231:20–25.) First, he wrongly included the first quarter of 2025 in his calculation of the median miss percentage even though Q1:2025 is only one quarter and Mr. Kleinrichert attempted to calculate a median *annual* miss percentage, thus overweighting the Q1:2025 result as though it were a full year. JTX at 1231:7–14. The Q1:2025 miss percentage of 1,225% was the highest of any period reported by Mr. Kleinrichert. VP_Ex_185.026; RT-DX-6.001. Additionally, two of the biggest miss percentages are for 2020 and 2021. JTX at 1232:7–9. The years 2020 and 2021 were the height of the COVID-19 pandemic, which essentially wiped-out earnings for those two years at CITGO. JTX at 1232:15–20. No refiner predicted—nor could have predicted—the massive global pandemic. JTX at 1232:21–23. Mr. Kleinrichert did not deny that every refiner underperformed its budgets in 2020 and 2021. JTX at 1232:24–1233:13.

56.    If the years 2020 and 2021 were excluded from Mr. Kleinrichert's analysis, the median miss percentage would be significantly lower. JTX at 1234:2–6. Similarly, if Mr. Kleinrichert had excluded Q1:2025 because it is only a quarter and not a year, the median miss percentage would be still lower. JTX at 1234:7–9.

57.    An analysis of CITGO's historical forecasting accuracy based on 2019, 2022, 2023, and 2024 reveals that CITGO has historically not missed its projections significantly. VP_Ex_185.026. The average annual miss percentage was -6.5%, and the median annual miss percentage was -8.1%. VP_Ex_185.026–27. Over the four relevant years, CITGO exceeded its forecast in two and missed its forecast in two. VP_Ex_185.026–.027.

### 3.    *Mr. Kleinrichert Wrongly Applies a "EBITDA Margins" Method to Reduce CITGO's Cash Flow Forecasts.*

58.    Supposedly having satisfied himself that CITGO's forecasting needed adjusting, Mr. Kleinrichert used his EBITDA margins method to take the average variance between CITGO's EBITDA margins and the median EBITDA margins of the five selected peer companies as a basis

for reducing PDVH's cash flow forecast. JTX at 1235:6–1236:4. Using this method, Mr. Kleinrichert calculated that on average CITGO's EBITDA margins were 58.4% of the peer group from 2020 to March 31, 2025, and based on that conclusion, Mr. Kleinrichert incorrectly reduced CITGO's management forecasts in each future period from 2025 through 2030 such that in each period CITGO would have an EBITDA margin equal to 58.4% of the forecasted peer group's EBITDA margin. JTX at 1236:5–9. This method also has several flaws. VP_Ex_185.032–.033.

59.     Mr. Kleinrichert's calculation of 58.4% again includes 2020 and 2021 in the analysis, years in which PDVH was at a disadvantage relative to peers because it was switching crude inputs from heavy Venezuelan crude that its refineries were designed for to lighter U.S. crude due to sanctions recently imposed on Venezuela. JTX at 1102:19–1103:7, 1236:17–22. Mr. Kleinrichert could not rule out that this was the cause of the variance between CITGO and the peer group in 2020 and 2021. JTX at 1237:13–1238:4. The variance between CITGO and the peer group median was larger in 2020 and 2021 than in 2022, 2023, and 2024. JTX at 1237:4–9. Mr. Kleinrichert did not have an explanation as to why the variances between CITGO's EBITDA margins and the median EBITDA margins of the peer group are different in each of the different periods. JTX at 1241:5–15. If the years 2020 and 2021 were removed, the percentage used by Mr. Kleinrichert to adjust CITGO's EBITDA margins variance method would be significantly higher. JTX at 1236:23–1237:2. Moreover, Mr. Kleinrichert's own demonstrative shows that CITGO's management forecasts already assume lower EBITDA margins than its peers. RT-DX-10.001.

60.     Additionally, Mr. Kleinrichert's 58.4% calculation included both full year 2024 and LTM March 31, 2025, which includes both Q1:2025 and repeats the last three quarters of 2024. JTX at 1241:25–1242:10. By including both full year 2024 and LTM March 31, 2025, the final three quarters of 2024 were counted twice in the average. JTX at 1242:7–10; 1243:6–9. Full year

2024 and LTM March 31, 2025, had a higher variance between CITGO's EBITDA margins and that of the peer group median than in prior periods. JTX at 1242:11–23. If the final three quarters of 2024 were not counted twice, CITGO's EBITDA margins relative to the peer median would have been still higher. JTX at 1244:1–13. Specifically, if Mr. Kleinrichert's own EBITDA margins method had included only years 2022, 2023, and 2024, the ratio of PDVH's EBITDA margin to the median of comparators would be 88.8%, substantially higher than the 58.4% figure Mr. Kleinrichert used. VP_Ex._185.033.

61.    Mr. Kleinrichert also erred by using ratios of PDVH's EBITDA margin relative to the peer group median instead of subtracting the nominal differences between the two. VP_Ex_185.034–.035. The use of ratios cannot be properly done when there is negative value, and the margin numbers are so small that even a slight difference causes an outsized variation. VP_Ex._185.033–.034.

62.    Finally, Mr. Kleinrichert applies different start years for his EBITDA margins analysis compared to his assessment of CITGO's historical forecasting accuracy. JTX at 1245:22–24, 1246:7–10. The first year in the EBITDA margins method begins in 2020, whereas, without explanation, the first year in the assessment of CITGO's historical forecasting accuracy starts with 2019. JTX at 1245:22–1246:2.

### 4.    *Mr. Kleinrichert Wrongly Adopts the "EBITDA Recovery" Method to Reduce CITGO's Cash Flow Forecasts.*

63.    Mr. Kleinrichert creates the term "EBITDA recovery" to mean the rate at which a refiner's earnings are forecasted to grow in the future relative to the last twelve months of EBITDA. JTX at 1246:11–25; VP_Ex_185.028. Mr. Kleinrichert uses the "EBITDA recovery" of the five companies in the peer group as a benchmark to compare against CITGO's EBITDA recovery. VP_Ex_185.028. Mr. Kleinrichert claims that CITGO is forecasting a higher rate of

"recovery" from this chosen period (LTM March 31, 2025) than the peer group is forecasting, and on that basis, he adjusts CITGO's forecasts down to 90% of the peer group maximum recovery. VP_Ex_185.028–.029. This method is not an accepted approach for a DCF analysis because the cash flow adjustments are made based on peer companies, which resembles a market multiples method. VP_Ex_185.028–.029. Moreover, the EBITDA recovery method also suffers from two fatal flaws.

64.     *First*, Mr. Kleinrichert's calculation assumes that CITGO's EBITDA must grow roughly in line with the peer group. VP_Ex_185.029. But a company's earnings do not always grow uniformly with its peers. JTX at 1248:1–4. CITGO might grow faster in some periods and slower in others relative to peers. JTX at 1248:5–8. Here, there is good reason to believe that CITGO will have an accelerated growth trajectory relative to its peers because the company is increasing strategic capital investments substantially relative to peers. JTX at 1300:8–1303:2; VP_Ex_185.029; *see also* VP_Ex_071.014, .060 (Confidential Information Memorandum); VP_Ex_200.093–.102 (Management Presentation).

65.     *Second*, the "EBITDA recovery" method is extremely sensitive to the chosen baseline; choosing a different baseline leads to a significantly different result. JTX at 1248:12–16. For example, applying Mr. Kleinrichert's EBITDA recovery method to full year 2024 instead of LTM March 31, 2025 moves CITGO to well within the peer group range. JTX at 1250:6–22; VP_Ex_185.031. In other words, CITGO could have a higher EBITDA recovery rate than the peer group not by growing faster but simply by having lower relative earnings in the baseline period. VP_Ex_185.029–.031.

66.     As further evidence of the unreliability of Mr. Kleinrichert's methods, his final DCF valuation of $8.4 billion is less than the sum of the past three years of CITGO's EBITDA ($8.8

billion). VP_Ex_185.006; VP_Ex_186.048 (CITGO), .051 (PDVH). There is no reasonable way to value a company at less than the past three years of EBITDA; that valuation "is basically [a] steal." JTX at 757:9–14.

67.    For the foregoing reasons, the Court rejects the valuation prepared by Mr. Kleinrichert as unreliable, unsupported, and not credible.

**I.    Elliott's Bid Is Grossly Inadequate.**

68.    The Court finds that the fair market value of the PDVH shares is $18.6 billion. JTX at 731:14–15.

69.    Even after subtracting $2.125 billion for the settlement with the 2020 Bondholders, the fair market value of the PDVH shares is at least $16.475 billion.

70.    The Court finds that Elliott's bid of $5.89 billion is less than 50% of fair market value of the PDVH shares. AM-046.0799–.0833 (TSA); AM-045.0001 (Elliott bid). Thus, the Court finds that Elliott's bid is grossly inadequate. Regardless, the Court finds that Elliott's bid is billions of dollars below fair market value, such that it would shock the Court's conscience to approve it.

71.    The Court further finds that both of the bids submitted by Dalinar (for $7.3 billion and $7.9 billion) are less than 50% of the fair market value of the PDVH shares. GR-63 at 134; GR-92 at 7 (D.I. 2126-1 at 4). Accordingly, the Court finds that Dalinar's bids are grossly inadequate. Regardless, the Court finds that Dalinar's bids are billions of dollars below fair market value such that it would shock the Court's conscience to accept either of them.

**J.    The Special Master Did Not Function as a Willing Seller in this Forced Sale.**

72.    The Special Master takes the incorrect position that the outcome of the sale should be considered the best evidence of fair market value. JTX at 1145:19–1146:4, 1164:18–1165:2. However, the forced execution sale of the PDVH shares was not and is not a sale between a willing

buyer and a willing seller. JTX at 344:24–25 (Mr. Turkel) ("[T]he acquisition of the PDVH shares . . . is not a simple sale by two --- by a willing buyer and a willing [seller]."); JTX at 294:11–21 (Mr. Weisenburger) ("[T]here has been a number of steps throughout the process that it looks to me . . . that . . . the process has been forced to try to go through the steps to get it done as fast as possible."); JTX at 295:1–6 (Mr. Weisenburger) ("I don't think a willing seller would have accepted any of these bids."); JTX at 294:22–25 (Mr. Weisenburger) (testifying that a willing seller would not "have granted exclusivity to Elliott"); VP_Ex_187.047 (Mr. Weisenburger discussing how the Special Master was "unable or unwilling to walk away" from Elliott's 2024 bid); VP_Ex_187.054–.056 (Mr. Weisenburger describing how the Special Master failed to act like a willing seller throughout the sale process).

73.    In an open-market, non-forced sale, a seller is one who has "the free will to sell and not sell. If he doesn't like the price" offered by the buyer, "he can elect to not sell" and "wait for better." JTX at 293:22–24 (Mr. Weisenburger).

74.    The Special Master and his advisors also did not conduct the sale process like willing sellers. First, the Special Master accepted bids that were priced far below the valuation prepared by his own advisors, which no willing seller would have done. *See* JTX at 265:10–19 (Mr. Weisenburger) (stating that the first round bids would have been a "problem" in light of Evercore's "valuation [with a] midpoint valuation is 13.2 billion" where the bid prices were "coming back at five or six billion" and that this would have suggested "something is wrong in the [sale] process"); JTX at 270:6–14 (Mr. Weisenburger) (stating that the results of the first round bids indicated that the Special Master and his team were "not making progress with respect to narrowing the value gap"); *see also* VP_Ex_225.001–.002 (Evercore Round 1 Bid Summary dated February 4, 2024).

75.     Evercore prepared a valuation in September 2023 and, using the DCF method, determined that the midpoint valuation of the PDVH shares was $13.2 billion. VP_Ex_076.009 (Evercore September 2023 Valuation); *see also* JTX at 265:10–19; 253:23–25 (Mr. Weisenburger). However, the highest "first-round" bids (i.e., those submitted in February 2024) submitted by bidders who continued to the second round, were priced between only $5 and $6 billion. *See* VP_Ex_225.001–.002; JTX at 265:10–19 (Mr. Weisenburger). Thus, the first-round bids were less than half the price of the Special Master's own valuation. VP_Ex_076.009; VP_Ex_225.001–.002.

76.     The results of the "second-round" bids (i.e., those submitted in June 2024) indicated a similar gap between the Special Master's own valuation and the purchase price offered by bidders. Highly Confidential VP_Ex_109.001–.002 (Evercore Round 2 Bid Summary); JTX at 269:5–12 (Mr. Weisenburger) (explaining that the price of the second-round bids indicated that no bidder was paying a "strategic premium" for the shares).

77.     Even though the bids that the Special Master received in the second round were again almost half the price of Evercore's own valuation, he elected to continue with the sale process. *See* JTX at 275:21–25 (Mr. Weisenburger) (stating that the Special Master "should have implemented a different process" after the submission of second round bids in June 2024). A willing seller would not have made this decision. *See* VP_Ex_025.003–.004 (correspondence from N. Eimer to R. Pincus dated July 11, 2024, stating that the second-round bids fall short of Evercore's valuation and reminding the Special Master that he is not obligated to accept bids, make a recommendation, or even consummate a transaction).

78.     Second, faced with these results, a willing seller also would have reached out to both the bidders who submitted bids and those who chose not to bid to determine what could account for the difference between their bid price and the seller's advisors' valuation. JTX at

259:7–260:13; 266:5–267:4 (Mr. Weisenburger) (explaining how a seller would have reached out

to survey the bidders). The Special Master presented no evidence that he ever engaged in such

discussions. JTX at 275:12–20; *id.* at 596:20–24 (Mr. Hiltz) (admitting that the Special Master

"never reached out to the strategic bidders who didn't participate to ask them what might make the

process more appealing").

79.    Third, unlike the Special Master, a willing seller also would have paused the sale

process to await the resolution of contingent liabilities that were affecting the sale process and

driving down the price of bids. JTX at 597:18 – 21 (Mr. Hiltz) (admitting that the Special Master

never considered postponing the sale process until material contingencies like the 2020

Bondholder litigation and the PDVH Alter Ego litigation were resolved). Specifically, a willing

seller would not have publicly tied the resolution of the 2020 Bondholder Litigation to the sale

process, JTX at 284:7–285:24 (Mr. Weisenburger); VP_Ex_187.024–.027, or instructed bidders to

include a built-in assumption about the value of the 2020s claim in their bid materials, VP_Ex_043

(correspondence from N. Eimer to R. Pincus detailing the issues with instructing the bidders to

assume the release of the CITGO Holding Pledge); VP_Ex_187.017–.018.

80.    Relatedly, a willing seller would not have publicly stated that the PDVH alter ego

cases were chilling bidding and then continued with the sale process after his efforts to enjoin that

litigation failed. *See* JTX at 285:7–286:10 (Mr. Weisenburger) ("[T]he process needed to be halted

when the alter ego case was going on"); VP_Ex_187.027–.032 (Mr. Weisenburger explaining the

rationale for pausing the sale process while the alter ego cases are pending). Moreover, a willing

seller would have taken bidder concerns seriously when they expressed concerns about

participating in the sale process while the alter ego cases were pending and without any measure

of protection for the bidders including, for example, a provision in the bidder draft stock purchase

agreement ("SPA") that an adverse decision in the alter ego cases would constitute a material adverse event. *See* VP_Ex_004.002 (email correspondence from N. Bhakta to R. Strong and W. Hiltz dated January 24, 2025); *see also* JTX at 373:6–374:4 (Mr. Turkel) (describing how Elliott was not engaged in the Topping Period until Judge Rakoff issued his decision affirming summary judgment for PDVH).

81. Fourth, no willing seller would have granted exclusivity to ███ and Elliott when their bids were so far below their own advisor's valuation, the bidders had not completed diligence, and the terms of the bids were subject to further negotiations. JTX at 286:19–288:6 (Mr. Weisenburger) (describing the reasons why it was inappropriate to grant exclusivity to ███ and Elliott); VP_Ex_187.043–.050 (same); VP_Ex_173 (letter from N. Eimer to R. Pincus dated July 25, 2024, objecting to exclusive bidder negotiations); VP_Ex_190 (letter from N. Eimer to R. Pincus dated August 7, 2024, objecting to exclusive bidder negotiations); VP_Ex_038.003 (letter from N. Eimer to R. Pincus dated November 2, 2024, describing the extensive post-bid and post-signing diligence conducted by Elliott, including "nearly 70 expert calls and meetings totaling almost 110 hours and almost 1,000 questions" after Elliott submitted its bid, and "over 35 hours of in-meeting employee and counsel time," the submission of "over 40 questions through Evercore" which "resulted in the production of over 740 additional documents" after Elliott and the Special Master signed the SPA).

82. Fifth, no willing seller would have selected Red Tree as the stalking horse bidder. *See* JTX at 289:23–25 (Mr. Weisenburger) ("[P]utting that higher bid out there for people to shoot at would seem like a more logical component."); VP_Ex_187.033, .039–.040, .048–.050. Additionally, unlike the Special Master, no willing seller would have purposefully selected a lower stalking horse bid out of concern that choosing the highest bidder as the stalking horse would not

create competition on price. *See* JTX at 556:24–557:4; 659:11–24 (Mr. Hiltz) ("We chose the Stalking Horse bid [i.e., Red Tree's bid] to emphasize certainty rather than price in order to maximize competition during the Topping Period.").

83.    Even though each of the topping bids was well below the fair market value of the PDVH shares as calculated by the Special Master's own advisors, the Special Master proceeded as if he was "forced" to choose a winning bid from among those submitted and did not realistically consider exercising his option to recommend no winning bidder following the topping period. JTX at 320:18–321:8 (Mr. Friedmann questioning Mr. Weisenburger) (Q: [Attorney Friedmann] And if you were in the shoes of the Special Master and you were forced to choose between those two bids you also would have selected the Dalinar bid between those two. Correct? A: [Mr. Weisenburger] I wouldn't have selected either one. Q: But if you were --- going back to the question I asked, which is that if you were in the shoes of the Special Master and you were forced to choose between Dalinar on one hand and the stalking horse bid on the other you would have also picked the Dalinar bid. Correct? A: Well it was my understanding that the Special Master actually had the ability to not select anyone because I thought he was supposed to be able to not be forced to select the bidder.") (*emphases added*).

## II.    Elliott's Bid Is the Product of a Prejudicially Defective Sale Process.

### A.    The Special Master and His Advisors Design the Sale Process and Prepare for Its Implementation.

84.    On May 27, 2021, the Court appointed Robert M. Pincus as Special Master to "devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the Sale by the Court and/or

devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold." D.I. 277 at 3.[1]

85.　　The Court's order appointing the Special Master authorized him to retain Weil, Gotshal & Manges LLP as "transaction counsel" to "represent him in his role as Special Master and to assist him in the performance of his duties as Special Master" and also "to retain one or more additional . . . consultants or advisors, including financial advisors." *Id.* at 7–8.

86.　　In June 2021, the Special Master retained Evercore as his financial advisor. *See* D.I. 285 at 2.

87.　　On June 14, 2021, the Special Master, Weil, and Evercore delivered a presentation to the Court stating that, "[i]n addition to a cash sale of 100% of equity in PDVH, value maximization could also potentially be achieved through a combination of (i) initial public offering, (ii) equitization of claims, and (iii) equity or debt financing solutions." VP_Ex_072.002; JTX at 638:3–9 (admitting that, as of June 2021, the Special Master's team "thought this idea, an IPO and equitization of claims and equity and debt financing solutions, was good enough and workable enough to present it to the Honorable Court").

88.　　On August 9, 2021, the Special Master filed a Proposed Sale Procedures Order and an accompanying Report and Recommendation. D.I. 302; D.I. 303.

89.　　Pursuant to the terms of Evercore's engagement letter, Evercore is compensated for its services as an advisor to the Special Master through a monthly fee of $200,000. VP_Ex_140.003. Evercore is further entitled to a "Sale Fee" on top of its monthly fees in an

---

[1] For ease of review, all references to a "D.I." number refer to the ECF file-stamp page number, not a document's internal page number.

amount equal to the aggregate consideration provided by the winning bidder multiplied by 0.35%. *Id.* at .004.

90.     Evercore is entitled to the sale fee only if a transaction is consummated. VP_Ex_140.004.

91.     Evercore was further eligible to receive a "Restructuring Fee" in the event that it negotiated a settlement of the 2020 Bondholders' claims to the CITGO Holding stock. VP_Ex_140.005 (describing the terms of the "Restructuring Fee"); VP_Ex_140.006–.007 (defining "Restructuring").

92.     Thus, Evercore was incentivized, through the structure of its sale fee, to ensure that some transaction would close regardless of the price for the PDVH shares. Evercore was further incentivized, through the availability of the Restructuring Fee, to pursue a settlement with the 2020 Bondholders through the sale process.

93.     The Special Master filed an initial proposed Sale Procedures Order ("SPO") on August 9, 2021 (D.I. 302), after which the Venezuela Parties and others engaged in multiple rounds of objections briefing regarding the substance of its terms. *See, e.g.*, D.I. 354; D.I. 355; D.I. 423; D.I. 457; D.I. 561.

94.     In support of their objections briefing on the SPO (as well as numerous other process decisions in the course of this proceeding), the Venezuela Parties presented the testimony of Mr. Randall J. Weisenberger, an expert on capital market transactions, who discussed how to best structure and implement a value-maximizing sale of a complex commercial asset like the PDVH shares. *See, e.g.*, D.I. 354-1; D.I. 355-1; D.I. 423-1; D.I. 457-1; D.I 561-1; D.I. 1948-1 (Exhibit 1); D.I. 2181-2 (Exhibit 73); *see also* JTX at 247:17–252:25 (summarizing the history of Mr. Weisenburger's declarations and involvement in this litigation).

95.     Mr. Weisenburger is an accomplished corporate executive who has held executive level positions at sophisticated financial institutions that specialize in private equity investing and leveraged acquisitions. *See* VP_Ex_188.002. Since 2015 he has served as the Managing Member of Mile 26 Capital LLC, a private investment firm. *Id.* He previously served as the Executive Vice President and Chief Financial Officer of Omnicom Group Inc. from 1998 to 2014. *Id.* Before joining Omnicom, Mr. Weisenburger was a founding member of Wasserstein Perella, where he specialized in private equity investing and leveraged acquisitions. *Id.* Throughout the course of his career, he has participated in or led hundreds of strategic acquisitions worth billions of dollars. *Id.* In his time at Omnicom alone, the firm completed more than 400 strategic acquisitions. *Id.* Mr. Weisenburger has also served on the board of numerous multi-national companies, including four public companies. *See id.* His work as a corporate board member has involved significant strategic M&A transactions and numerous capital market transactions. *See id.* Mr. Weisenburger currently serves on the board of directors of Valero Energy Corporation—one of the leading independent refiners in the United States. *Id.*; *see also* JTX at 245:21–24 (Mr. Weisenburger). Mr. Weisenburger thus is an expert based on his practical experience in both the refining industry and in large complex corporate transactions.

96.     After several iterations and extensive briefing related to objections by the Venezuela Parties and others, the Court entered the Special Master's Sixth Proposed Sale Procedures Order on October 11, 2022. D.I. 481.

97.     The SPO provided the Special Master with a period of up to six months during which he and his advisors were authorized to solicit guidance from the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") about its position on the marketing process as well as any additional guidance that OFAC would be willing to share so that the Special Master

could implement a value maximizing transaction. D.I. 481 at 12 ¶ 3. Before the conclusion of this six-month period, the Special Master was directed to make a recommendation to the Court as to whether it was appropriate to launch the marketing process. *Id.*

98.    Rather than simply soliciting guidance from OFAC, however, the Special Master stated that he intended to advocate for OFAC to support the launch of the Sale Process. *See* D.I. 509 at 5.

99.    The Venezuela Parties requested permission to attend the Special Master's meeting with OFAC, but the Court denied that request. D.I. 506 at 1.

100.    Shortly thereafter, on January 20, 2023, the Venezuela Parties moved to disqualify the Special Master on the basis of his improper advocacy before OFAC, pointing to the fact that the Special Master stated the purpose of the meeting was to lobby OFAC, rather than to solicit neutral guidance from the executive branch. *See* D.I. 509 at 10–13.

101.    The Court denied the Venezuela Parties' motion to disqualify the Special Master on April 4, 2023. D.I. 538 at 1.

102.    On April 26, 2024, the Venezuela Parties filed a renewed motion to disqualify the Special Master, having obtained evidence through a Freedom of Information Act request demonstrating that the Special Master did—in fact—engage in improper advocacy before OFAC. *See* D.I. 1138 at 2 (citing a presentation made to OFAC where the Special Master requests that OFAC "provide authorization of the Special Master sale process in the form of a General License or broad specific license") (emphasis omitted).

103.    The Court denied the Venezuela Parties' renewed motion to disqualify on May 31, 2024. D.I. 1180 at 1.

104. The Special Master launched the marketing process for the PDVH shares on July 24, 2023. SM-028 ¶ 8.

105. On July 17, 2023, the Court ordered the Special Master to begin preparing for the launch of the initial marketing process for the PDVH shares. SM-028 ¶ 8.

106. As part of its preparations for the sale process, in September 2023, Evercore prepared a valuation of the PDVH shares which calculated that the midpoint valuation of the PDVH shares under a discounted cash flow (DCF) analysis was $13.2 billion. VP_Ex_076.009 (Evercore September 2023 Valuation); *see also* JTX at 1157:15–1158:1 (Mr. Hiltz) (recalling "that the midpoint was about 13.6"). That valuation was shared with the Special Master by his senior advisors at Evercore. VP_Ex_076.001.

107. In a September 2023 presentation, Weil and Evercore again noted that an alternative to a sale to a single bidder would be conducting a "[s]econdary [IPO] listing to establish enterprise value" and distributing "cash and remaining PDVH equity to claimholders." VP_Ex_074.002.

108. As Mr. Weisenburger testified at the sale hearing, performing an initial valuation is a critical step in any complex sale transaction. Once hired, an advisor would likely conduct an initial valuation to serve as the benchmark for evaluating any bids received. *See* JTX at 257:11–22 (explaining that a valuation is a "tool that you're going to start almost every divestiture process with" and that it serves as a "benchmark" to "help[] guide the beginning of the process" which could ultimately "prove[] out that you want to do public markets transactions as opposed to a divestiture"); JTX at 273:9–274:4 (Mr. Weisenburger) (explaining that Mr. Hiltz's suggestion that Evercore never intended for the Special Master to rely on their valuation was "just not credible" because any advisor in a sale process would understand that they performed the valuation "as part

of this process" and that as "a professional firm doing that work" Evercore would "know that it is being used for a purpose").

109.    It is also likely that, once hired, the advisor's valuation would slightly undervalue the asset being sold so that they had realistic target for what could be achieved in the sale. JTX at 272:4–273:3 (Mr. Weisenburger). Evercore had been working for the Special Master for two years by the time they prepared the September 2023 valuation. *See id*. at 273:4–8 (Mr. Weisenburger).

### B.    The Special Master Launches the Sale Process and Receives Initial Bids Priced Far Below the Value of the PDVH Shares.

110.    The Special Master formally launched the sale process on October 23, 2023. SM-028 ¶ 10.

111.    When preparing for the sale of a complex commercial asset like the PDVH shares, the seller should be looking to maximize opportunities for participation by strategic buyers, meaning a buyer who would be willing to pay the "highest price" for the asset because they "have synergies with the company" that is being sold. JTX at 256:2–11 (Mr. Weisenburger). If the seller cannot find a buyer with these kinds of synergies, it should then look for those who have a "low cost of capital, an ability to fund the overall business, maybe somebody that has a vision different than [the seller] to grow the business or do something with it." JTX at 256:12–22 (Mr. Weisenburger). These are the kinds of buyers who would be willing to pay a "strategic premium" for the asset. JTX at 256:23–257:2 (Mr. Weisenburger). Ultimately, the seller would be looking to pit the buyers capable of paying a strategic premium against each other in order to generate more competition during the sale. JTX at 257:4–10 (Mr. Weisenburger).

112.    In January 2024, despite sending marketing materials to ninety-three potential bidders, the Special Master received only twelve non-binding indications of interest ("IOIs") (only

nine of which were deemed sufficiently credible by the Special Master's advisors to advance to the second bidding round). SM-028 ¶¶ 10–11.

113.    The highest amount of consideration offered to creditors by any of the potential bidders in the IOIs was between $5.9 billion and $6.6 billion. VP_Ex_225.002. All of the bids were billions of dollars below the valuation conducted by Evercore just a few months before.

114.    The Special Master did not contact any potential bidders that did not submit IOIs to ask them why they elected not to participate or whether anything could be done to induce them to participate. JTX at 274:5–20; *id.* at 596:20–24 (Mr. Hiltz) (admitting that the Special Master "never reached out to the strategic bidders who didn't participate to ask them what might make the process more appealing").

115.    Evercore opened the virtual data room to potential bidders on February 12, 2024. SM-028 ¶ 12.

116.    Two of the nine potential bidders selected by the Special Master "decided not to proceed to the next round." SM-028 ¶ 13.

117.    There is no evidence that the Special Master ever reached out to these two bidders to determine why they dropped out. *Cf.* JTX at 596:20–24 (Mr. Hiltz) (admitting that the Special Master "never reached out to strategic bidders who didn't participate to ask them what might make the process more appealing").

C.      **The Special Master Receives Second Round Bids Priced Far Below the Value of the PDVH Shares.**

118.    In April and May 2024, the Special Master instructed second-round bidders to propose a purchase price that would assume the release of the 2020 Bondholders' lien on the CITGO Holding stock or propose an alternative method by which they planned to resolve the 2020 Bondholders' claims. *See* VP_Ex_043.002–.004 (letter from N. Eimer to R. Pincus dated April 16, 2024 detailing the issues with instructing the bidders to assume the release of the CITGO Holding Pledge in the price of their bids); VP_Ex_027.003 (letter from J. Pizzurro to R. Pincus dated August 9, 2024 noting that the Special Master "previously instructed bidders to set aside $1.95 billion to settle the Bondholders' claims"); SM-010 at 2 (same); *see also* VP_Ex_187.017–.018 (¶¶ 23–25) (summarizing the Venezuela Parties' opposition to the Special Master's instruction to bidders regarding the resolution of the 2020 Bondholders' claims); SM-028 ¶ 13 (describing the bid instruction letters sent to the bidders between April and May 2024).

119.    The Special Master's instruction to the bidders about their assumptions regarding the 2020 Bondholders followed years of his repeated emphasis on the need to resolve their claims, as well as years of the Venezuela Parties repeated warnings that attempting to do so would chill bidding and depress value for the PDVH shares. *See*. D.I. 561-1 ¶ 25; *see also* VP_Ex_187.024–.025 (history of the Venezuela Parties' efforts to mitigate the risk of the Bondholders' impact on the sale process); *id.* VP_Ex_187.025–.025 (history of the Special Master resisting those efforts); *see also* VP_Exs_27, 30, 39, 40, 42, 43, 47–49; D.I. 1679 at 3 (directing topping bidders to explain how their bid can close if the Bondholders win in New York, confirm the bidder bears the risk of the 2020 Bondholder Litigation, or structure bids to not implicate that litigation "at all").

120.    Separately from the PDVH sale process, three creditors of the Republic and PDVSA—Girard Street Investment Holdings LLC ("Girard Street"), G&A Strategic Investments

I LLC ("G&A"), and Gramercy Distressed Opportunity Fund LLC ("Gramercy") (together the "PDVH Alter Ego Creditors")—filed a series of complaints against PDVH in the Southern District of New York and in Texas state court between June 10, 2024 and July 29, 2024. *See* D.I. 1249 at 12–14. The PDVH Alter Ego Creditors were attempting to collect on default judgments that they held against PDVSA and the Republic by alleging that PDVH is the alter ego of PDVSA. *Id.* at 14.

121.    Only six potential bidders submitted second-round bids on June 11, 2024. SM-028 ¶ 13.

122.    The highest amount of consideration to be paid to creditors under any of the second-round bids was $6.865 billion (submitted by Gold Reserve). Highly Confidential VP_Ex_109.002. The next highest bid was for ████ billion, by ████████. ████ bid was for ████ billion. *Id.*

123.    The Special Master, for reasons that he has not explained, "directed Gold Reserve to abandon its bid and, by July 10, 2024, join with the bid submitted by either CVR Energy or Elliott Investment Management LP ('Elliot')." D.I. 1359-1 at 3.

124.    Even the highest bids that the Special Master received in the initial rounds of bidding were over six billion dollars below Evercore's own valuation. Despite the differential between the bids he received and the value of the shares that his advisors prepared, there is no evidence that the Special Master ever reached out to bidders to understand why their bids were priced so low. JTX at 275:12–20 (Mr. Weisenburger).

125.    Nevertheless, the Special Master did not reject those bids but instead elected to continue with the sale process even after being advised to implement a different process. *See* JTX at 275:21–25 (Mr. Weisenburger) (agreeing that "the Special Master should have implemented a different process" after the submission of second round bids in June 2024); VP_Ex_25.002–.004

(correspondence from N. Eimer to R. Pincus dated July 11, 2024 stating that the second round bids fall short of Evercore's valuation and reminding the Special Master that he is not obligated to accept bids, make a recommendation, or even consummate a transaction).

126.    On July 11, 2024, after review of the second-round bids, counsel for PDVH and CITGO sent a letter to the Special Master explaining that it appeared "the sale process will not succeed in maximizing value and that if the process is carried out to conclusion, the ultimate result will be the equivalent of a fire sale of one of the country's largest independent refiners for a deeply discounted and grossly inadequate price." VP_Ex_025.004. The letter went on to "again implore [the Special Master] to consider … alternatives," including "an initial public offering, private placements of equity and debt securities, or other capital markets transactions." *Id.*

### D.    The Special Master Engages in Failed Negotiations with Bidders and the 2020 Bondholders Following the Second Round of Bidding.

127.    On July 24, 2024, the Special Master entered into an exclusivity arrangement with ██, terminating discussions with all other bidders. *See* VP_Ex_173.002–.003. The Special Master granted ██ exclusivity even though its financing was not committed. *See* VP_Ex_173.003.

128.    On July 25, 2024, counsel for PDVH and CITGO sent a letter to the Special Master objecting to his decision to grant exclusivity to ██ and predicting that "it would be a serious mistake to effectively grant exclusivity to one bidder . . . due to an artificial deadline" and threats by the bidder to withdraw if exclusivity were not granted. VP_Ex_173.002.

129.    On July 30, 2024, the Special Master declared an "impasse" with ██, supposedly due to new financing and closing conditions imposed by ██. VP_Ex_174.002; JTX at 544:3–24 (Mr. Hiltz) (explaining that the Special Master failed to reach agreement with ██ because ██ insisted on a final non-appealable resolution of the alter ego issue and its financing commitments

only had a 12-month tenure); VP_Ex_178.002. The Special Master then turned to the bidders with whom he had previously terminated discussions and asked them to re-engage. *See* JTX at 545:1–3 (Mr. Hiltz) (stating that after negotiations fell apart with ███, the Special Master turned to the second-highest bidder, Elliott).

130.    On August 7, 2024, counsel for PDVH and CITGO sent a letter to the Special Master urging him not to engage in exclusive negotiations with Elliott and reminding him that PDVH and CITGO had "correctly predicted that it would be unwise not to continue to engage with other bidders given ███ uncertainty around financing and closing" and observing that, "[i]n fact, a mere four days after you granted exclusivity to ███, and so advised the other bidders, you reached an impasse with ███—in large part because it had been emboldened by exclusivity to insist upon unreasonable terms and conditions, after already reducing its bid by $300 million— and you were forced to go back and try to re-engage the other bidders." VP_Ex_190.002.

131.    PDVH and CITGO also warned that, because Elliott had not completed due diligence or agreed to final price or other terms, "there is a serious risk that Elliott (whose bid is already lower than other bids) intends to use the additional diligence to negotiate a reduced purchase price." *Id*. The letter further warned that granting exclusivity to Elliott "would only give Elliott greater leverage without the threat of continued competition and make the problem of the inadequate bids even worse than it already is." *Id.*

132.    On August 8, 2024, the Special Master nevertheless entered into an exclusivity arrangement with Elliott. SM-028 ¶ 14.

133.    On August 19, 2024, counsel for PDVH and CITGO sent a letter to the Special Master warning that "[t]he exclusivity granted to [Elliott] will lead to a bid that would not pass the bar set in the Delaware distress sale cases and that could not, in good conscience, be recommended

to the Court for approval" given the low price offered by Elliott and the fact that its bid price was not final. VP_Ex_028.002. The letter further warned that "no one can know what [Elliott] will ultimately bid" and that, "[p]articularly with no competition, [Elliott] will surely use this exclusivity period to back off from its already grossly inadequate price," but at that point the Special Master "will then have no alternative to the lowered bid because the exclusivity period will [extend] . . . beyond the latest extension of [the] deadline to make a recommendation to the Court." *Id*.

134.    On September 9, 2024, the Special Master moved to enjoin the PDVH Alter Ego Litigation because he stated it was having a chilling effect on bidder participation. *See* JTX at 596:11–13 (Mr. Hiltz) (describing how the Special Master "asked Judge Stark for a channeling motion to try to deal with the alter ego claims"); VP_Ex_187.028 (describing the Special Master's "previous statements that the PDVH Alter Ego Litigation would chill bidding").

135.    As the evidence at the hearing confirms, "early on in th[e] process, the Special Master tried to negotiate a deal with the" 2020 Bondholders. JTX at 595:20–23 (Mr. Hiltz). The Special Master's settlement would have then "been available to bidders if they wished to avail themselves of it," but they would not have been required to use it. *Id.* at 595:23–596:2. As the Special Master's advisor, Mr. Hiltz confirmed, such a settlement agreement "would have provided a level playing field" for the bidders, who could have locked in the 2020 Bondholders to a settlement amount "at numbers below where we currently are with respect to settlement with the 2020s." *Id.* at 596:2–596:17.

136.    On September 13, 2024, the 2020 Bondholders sent a draft transaction support agreement to counsel for the Special Master proposing to release the CITGO Holding Pledge in exchange for $1.684 billion in cash at the closing of the stock sale. VP_Ex_001.002 (Sept. 13,

2024 email from J. Esses of Paul Weiss to R. Schrock of Weil transmitting "draft transaction support agreement" on behalf of the "ad hoc group[]"); VP_Ex_002.009 (defining "Transaction Consideration" to "mean[] $1,684,213,374 in cash which shall be paid at the close of PDVH Transaction by the Successful Bidder . . . in connection with the release of the Pledge"); JTX at 615:21–616:7 (Mr. Hiltz) (agreeing that in September 2024 the 2020 Bondholders sent a draft TSA with a settlement value of between $1.6 and $1.8 billion); *see also* Apr. 17, 2025 Hr'g Tr. at 127:19–128:15 (Counsel for the Special Master explaining that "[t]he Special Master negotiated a deal with the 2020s" and "had a deal in principle").

137.    The Special Master rejected the 2020 Bondholders' proposal because Crystallex and ConocoPhillips opposed it. VP_Ex_003.002 (Sept. 15, 2024 email exchange between D. Ying and D. Lakhdir of Evercore reporting that "Wachtel does not want a 2020 settlement" and that while the proposal "seems to work in concept," "Crystallex is not supportive of it"); JTX at 614:20–615:5 (Mr. Hiltz) (explaining that the Special Master could not complete a settlement with the 2020s in 2024 because "the sales process parties were violently objecting to it"); *id.* at 617:12–16 (Mr. Hiltz) (agreeing that "ConocoPhillips and Crystallex opposed" the proposed settlement); *see also* Apr. 17, 2025 Hr'g Tr. at 128:1–5 (explaining that it became "clear that [the Special Master was] not going to get any support from the sale process parties with respect to a settlement" and "[s]o it was the Special Master that walked away").

138.    There is no evidence that the Special Master ever disclosed this settlement offer from the 2020s to the Court, the Venezuela Parties, the AJCs, or potential bidders.

E.    **The Special Master Recommends Elliott as the Initial Winning Bidder, Provoking Unanimous Opposition from the Attached Judgment Creditors and Sale Process Parties.**

139.    On September 27, 2024, the Special Master recommended that Elliott's bid (submitted through affiliated entity Amber Energy, Inc.) "be selected as the Successful Bidder" and that "the Court approve a transaction for the purchase of the PDVH Shares by Amber Energy" (the "2024 Elliott Recommendation"). SM-028 ¶¶ 14–15.

140.    The Special Master recommended Elliott's bid even though, during the exclusivity negotiations period, Elliott (1) reduced the consideration to be paid to creditors by billions of dollars below its $7.286 billion headline price through a variety of holdbacks and deductions and (2) inserted an escrow structure which would hold all of the sale proceeds before they could be distributed to any Attached Judgment Creditors until all asserted and unasserted alter ego claims had been finally resolved, while allowing Elliott to take possession and control of the PDVH shares and CITGO in the interim and keep all profits earned during the escrow period even if it ultimately rescinded the sale. *Compare* Highly Confidential VP_Ex_109.002 (showing ███ proposed second round bid price at ███ billion), *with* D.I. 1325 at 2 (describing the "material assumptions and adjustments" that affected Elliott's headline purchase price of $7.286 billion) *and* SEALED D.I. 1377 at 2–4 (CITGO Parties describing the extent of the holdbacks and deductions in the Elliott bid and explaining that "there could be as little as $3 billion (or less) left for attachment holders" which itself would "be placed in another proposed escrow to resolve 'asserted and unasserted' alter ego claims against PDVH"). *See also* VP_Ex_187.019 (¶ 27) (describing Elliott's "two-pronged" escrow structure for the sale proceeds to resolve the PDVH Alter Ego Litigation and the 2020 Bondholder Litigation); VP_Ex_038.001 (describing Elliott's "last-minute insertion of a trust structure, various conditions to closing and payout, deductions and holdbacks from its

already grossly inadequate headline price, and other deficiencies"); D.I. 1446-1 at 139 (entitling Elliott to "retain all Net Operating Profits" after closing).

141.    The Special Master also recommended Elliott's bid despite objections of senior creditors who strongly opposed Elliott's escrow construct, because he and his Advisors were "determined to get to signing an[] SPA on [September] 26th." VP_Ex_106.002; *see also* VP_Ex_106.001 (Counsel for ConocoPhillips telling Evercore that Elliott's term sheet is a "huge step backward" and that the "agreement to close on a sale order gives them the company and gives us no money until the Supreme Court denies cert in several matters. That is good for them, bad for us."); VP_Ex_106.002 (Counsel for ConocoPhillips stating that the Elliott bid "got worse not better" and that "[t]he escrow term sheet seems to have gone backwards").

142.    The Special Master also recommended Elliott's bid even though it was contingent on the Court enjoining the PDVH Alter Ego claims. VP_Ex_187.020 (¶ 29).

143.    The Special Master's 2024 Elliott Recommendation faced near-universal opposition from the Attached Judgment Creditors and the Venezuela Parties alike. *See* SM-028 ¶ 15; *see also* VP_Ex_038.002 (describing Elliott's bid as facing "overwhelming opposition from creditors and the Sale Process Parties, including . . . Crystallex and ConocoPhillips"); VP_Ex_187.019 (¶ 27) (cataloging the opposition from Attached Judgment Creditors and Sale Process Parties to the 2024 Elliott Recommendation).

144.    Even though the Special Master's 2024 Elliott Recommendation was all but unactionable, the Special Master nevertheless allowed Elliott to maintain its exclusive position as the sole bidder allowed in the data room and to continue to engage in extensive and invasive due diligence. *See generally* VP_Ex_038 (correspondence from N. Eimer to R. Pincus dated November 2, 2024).

145.    After the Attached Judgment Creditors, as well as the Venezuela Parties, raised their concerns regarding the Special Master's 2024 Elliott Recommendation, Elliott submitted an "alternative term sheet" on November 6, 2024, setting out revised terms for the purchase of the PDVH shares. SM-028 ¶ 15; VP_Ex_187.020; *see also* D.I. 1414-1.

146.    Elliott's revised bid "removed the escrow structure for the sale proceeds that was dedicated to the PDVH Alter Ego Claims, but . . . continued to escrow the funds dedicated to resolving the 2020 Bondholder Litigation." VP_Ex_187.020. This "alternative transaction also included a $2 billion reduction in the proposed purchase price and remained conditioned on the Court enjoining the PDVH Alter Ego Litigation." *Id.*

147.    The revised Elliott bid faced near-universal opposition from the Attached Judgment Creditors and Sale Process Parties. VP_Ex_187.020. Moreover, the Special Master's recommendation tainted the subsequent rounds of bidding as it effectively "set a ceiling on the value" of the PDVH shares and served as a signal to bidders about the Special Master's willingness to accept bids at or below that price point. *See* JTX at 287:10 – 20 (Mr. Weisenburger); *see also* VP_Ex_187.029 (¶ 47).

148.    The Court ultimately denied the Special Master's injunction motion in December 2024. *See* VP_Ex_187.028 (citing D.I. 1493; D.I. 1515).

**F.    The Special Master Recommends a "Pivot" in the Sale Process After the Failure of the Elliott Bids.**

149.    After the failure of the Elliott bids, and in response to a set of inclinations issued by the Court, the Special Master stated that it would be necessary for a "pivot" to conducting additional bidding rounds. *See* D.I. 1455 at 2; *see also* SM-028 at 6. The parties then engaged in "extensive briefing on how the sale process should proceed" which included a "full-day hearing [held] on December 13, 2024." SM-028 at 6.

150.    On December 18, 2024, the Special Master re-opened the virtual data room to bidders. SM-028 at 6. On December 31, 2024, the Court issued a Memorandum Order Regarding Sale Process and Litigation, D.I. 1517, in which it set out the steps to reset the sale process which would include the solicitation of new bidders, re-engaging previous bidders, and conducting additional marketing. SM-028 at 6–7. After the close of the new marketing process, the Special Master was to solicit and select a stalking horse bid. *Id.* at 6–8. The stalking horse period would then be followed by a topping period in which the Special Master was directed to generate "as much 'competitive tension' among bidders as possible." D.I. 1554 at 12; D.I. 1517 at 8. At the conclusion of the topping period, the Special Master would select a final recommended bidder, and the parties would then proceed to brief any objections and participate in a sale hearing about whether the final recommendation should be confirmed. D.I. 1517 at 9. In the alternative, if the Special Master did not receive any bids worthy of stalking horse protections at the conclusion of the stalking horse period, the Special Master would be permitted to designate a bid as the "Base Bid" (i.e., the leading bid, but one not entitled to traditional bidder protections) and proceed to an auction for the PDVH shares. D.I. 1517 at 8; *see also* VP_Ex_187.021.

### G.    The Special Master's Stalking Horse Recommendation Resulted in Bid Prices that Were Grossly Inadequate and Improperly Diverted Bidder Attention Towards the Resolution of the 2020 Bondholders' Claims.

151.    Between December 18, 2024 and January 16, 2025, the Special Master attempted to engage bidders and re-market the PDVH shares. SM-028 at 6–8.

152.    During this period, he and his advisors reached out to 41 bidders who had previously signed NDAs to participate in the sale process—only 28 of those bidders requested and were granted access to the virtual data room. SM-028 at 7.

153.    The Special Master also reached out to 65 potential bidders who had previously been contacted, but had not yet executed an NDA, to solicit their interest in participating in a new

round of bidding. *Id.* Of these 65 bidders, five responded to the Special Master and only three executed NDAs to access the virtual data room. *Id.*

154.    Finally, the Special Master, in consultation with CITGO management, reached out to an additional 30 new potential bidders who had never been contacted to participate in the sale process. *Id.* at 8.

155.    None of these newly contacted bidders expressed an interest in participating in the sale process. *Id.*

156.    Despite this paucity of participation, the Special Master did not ask the bidders what issues had kept them from participating in the sale process previously or what could be corrected in order to induce their participation in the new round of bidding. *See, e.g.*, JTX at 596:20–24 (Mr. Hiltz); JTX at 265:20–267:13 (Mr. Weisenburger); JTX at 270:6–266:6 (Mr. Weisenburger). The Special Master simply sent bidders emails asking "whether they were interested in participating in the bidding process and would like to receive VDR access." SM-028 at 7.

157.    As set forth in the Court's Memorandum Order Regarding Sale Process and Litigation, D.I. 1517, the Special Master developed a draft stock purchase agreement for potential bidders, bidder protections, and evaluation criteria for the Special Master. SM-028 at 9–10. Certain Sale Process Parties and Attached Judgment Creditors filed objections to or briefs in support of various aspects of each of these documents. *Id.* The Court then issued a series of orders granting and/or overruling the objections between January 27, 2025 and March 4, 2025. SM-028 at 9–10; *see also* D.I. 1554; D.I. 1571; D.I. 1583.

158.    On February 3, 2025, a representative of One Fin Capital Management LP, a holder of 2020 Bonds, sent an email to Chase Bentley warning that bids based on leveraging CITGO's assets and balance sheet "will only ever get you approx. half way to any fair value" and that outside

cash was unlikely to be offered given the nature of the process. VP_Ex_073.002. The process, the One Fin representative said, thus would provide "a value transfer windfall to the buyer or some junior creditors at the expense of others." *Id.* Instead, the One Fin representative proposed leveraging CITGO to raise cash to pay senior creditors, then distributing equity to more junior creditors, in tandem with an IPO. *Id.*

159.    David Ying of Evercore called this "a good idea." VP_Ex_073.001; JTX at 633:11–634:9 (Mr. Hiltz) (admitting that "we have always thought that that was a good idea as a fallback plan if the auction failed to produce reasonable results"). Chase Bentley of Weil stated that "it isn't a bad idea for getting more judgment holders paid." VP_Ex_073.002.

160.    The Special Master's advisor has admitted that a leveraged recapitalization combined with an IPO or equitization of shares would be a viable structure if the current sale process "failed to produce reasonable results." JTX at 532:2–9, 628:5–12, 633:11–634:9 (Mr. Hiltz).

161.    This proposal, i.e., a leveraged recapitalization combined with an IPO or equitization of shares, also is consistent with the kinds of value-maximizing alternatives that Mr. Weisenburger has proposed to the Special Master and to the Court. *See, e.g.*, VP_Ex_187.009– .010 (cataloging Mr. Weisenburger's recommendations for alternatives to the sale process designed by the Special Master); VP_Ex_187.011–.012 (Mr. Weisenburger stating that "the Special Master could have attracted a larger, more serious, and strategic pool of potential investors by designing a different sale process, such as by facilitating an IPO" or by "explor[ing] a leveraged recapitalization, under which more senior creditors would be paid in cash and more junior creditors would be paid with securities in a trust funded by a portion of the company's cash flow over a defined period of time"); VP_Ex_192.003 (Mr. Weisenburger stating that he "continue[s] to

47

believe that value could be better maximized by utilizing an alternative process, such as a leveraged recapitalization combined with a public offering").

162.    As Mr. Weisenburger further testified, public market transactions, like a leveraged IPO paired with an equitization of shares, are likely to generate greater value than the kinds of transactions that have been proposed by bidders in this process to date. JTX at 278:10–280:2.

163.    On February 10, 2025, the Special Master sent 26 bidders a stalking horse bid instruction letter which "provided potential bidders with information about the sale process" the PDVH shares, and "set forth the required contents for a bid to qualify" as a stalking horse bidder. SM-028 at 10. The stalking horse bid letter also informed bidders that the deadline to submit a stalking horse bid would be March 7, 2025 at 5:00 PM (CT). *Id.* A stalking horse bid is typically the highest bid submitted so that bidders in future rounds are competing to improve upon that price in the topping period. VP_Ex_187.033. For similar reasons, the stalking horse bid should be considered an acceptable winning bid in the event the topping period fails to produce a higher bid. *Id.*

164.    While it may be appropriate to consider other factors when deciding whether a bid is worthy of stalking horse protections, like the certainty that a bid will close, the most critical feature of a stalking horse bid is its price. VP_Ex_187.033; JTX at 289:23–25 (Mr. Weisenburger) (stating that "putting that higher bid out there for people to shoot at would seem like a more logical component" for the stalking horse bid).

165.    On February 21, 2025, PDVH's motion to dismiss the Girard Street action was denied and the presiding judge, Judge Rakoff, ordered the parties to proceed to discovery and summary judgment. Opinion and Order, *G&A Strategic Invs. I LLC, et al. v. Petróleos de*

*Venezuela, S.A., et al.*, 1:23-cv-10766 (JSR), (S.D.N.Y. Feb. 21, 2025), ECF No. 126; *see id.* Minute Entry (Feb. 26, 2025).

166.    On March 7, 2025, the Special Master received stalking horse bids from only four bidders: Gold Reserve, Red Tree, ███, and ███ SM-028 at 11; VP_Ex_110.002 (Evercore Discussion Materials dated March 11, 2025).

167.    Gold Reserve submitted the highest stalking horse bid, offering to purchase the PDVH shares for $6.949 billion. D.I. 1837 at 31, n.17 (calculating the value of Dalinar's bid based on an assumed closing date of June 30, 2026); *see also* VP_Ex_110.002. Gold Reserve proposed to finance this bid by ultimately merging its financing vehicle into CITGO and then "leverag[ing] CITGO's balance sheet" to pay the Attached Judgment Creditors. VP_Ex_187.035 (describing Gold Reserve's financing structure); VP_Ex_187.227 (Gold Reserve stalking horse bid letter dated March 12, 2025 describing Gold Reserve's sources and uses for financing its bid); VP_Ex_110.002 (Evercore March 2025 Stalking Horse Bid Summary describing the same).

168.    Red Tree submitted the next highest stalking horse bid, offering to purchase the PDVH shares for $3.732 billion and diverting approximately $2 billion to pay the 2020 Bondholders under a Transaction Support Agreement. VP_Ex_110.002, .006; *see also* VP_Ex_118.038–.039 (Transaction Support Agreement between Red Tree and the 2020 Bondholders dated March 7, 2025).

169.    The Court finds that the TSA between Red Tree and the 2020 Bondholders was a collusive agreement negotiated by the 2020 Bondholders with themselves—Red Tree is entirely controlled and operated by its parent, Contrarian. D.I. 1596 at 1 (Special Master stating that Red Tree is "an indirect subsidiary of Contrarian Funds, LLC, an affiliate of Contrarian Capital Management, LLC").

170.    Contrarian is a major holder of 2020 Bonds in addition to being an Attached Judgment Creditor. *See* Highly Confidential VP_Ex_227.017 (Dep. X. Xu Tr. at 61:15–21).

171.    The "negotiations" over the Red Tree TSA consisted of Contrarian working collusively with other 2020 Bondholders to negotiate an inflated settlement amount to serve as the floor for negotiations with other bidders. VP_Ex_066.001 (Feb. 24, 2025 email from Josh Weisser of Contrarian to Xin Xu of Ashmore stating that "if we signed the TSA, we could legitimately tell bidders (a) they can't go below the RT number AND (b) there is a limited timeline for them to get to a deal with us"); *id.* (response email from Xin Xu stating, "I like the idea.").

172.    The Special Master's advisors made clear to Contrarian and the other 2020 Bondholders that they understood Red Tree's TSA would set the floor for negotiations with other bidders and that, in fact, the 2020 Bondholders would not in the future even accept a settlement on the same terms as they had agreed to with Red Tree. VP_Ex_096.001 (March 20, 2025 email from Chase Bentley to Andrew Rosenberg of Paul Weiss and others acknowledging that "practically speaking, the 2020s are not going to support an Alternative Transaction unless it provides a better recovery than this TSA").

173.    The Special Master's advisors asked for a change to the TSA, however, to hide this reality from objectors. *Id.* (stating that an explicit provision prohibiting settlement on lower terms "will put a target on the TSA for anyone objecting to the Special Master's recommendation"); AM-018.0002 (June 18, 2025 email from Xin Xu of Ashmore, representative of the 2020 Bondholders, to ▮▮▮▮▮▮▮▮▮ regarding settlement negotiations and stating that "receiving headline consideration[] less than in the Red Tree deal is not acceptable for us").

174.    In fact, the 2020 Bondholders were demanding $2.2 billion from other bidders. VP_Ex_146.001.

175. ███████ stalking horse bid offered ██████ billion for the PDVH shares. VP_Ex_110.002.

176. The Special Master negotiated with each of the stalking horse bidders and consulted with the Sale Process Parties about the bids between March 7, 2025 and March 21, 2025. SM-028 at 11; *see also* VP_Ex_187.233–.240 (email correspondence between counsel for the Special Master and Evercore reflecting the status of negotiations with the bidders during the stalking horse period).

177. The Special Master received multiple extensions of his deadline to recommend a stalking horse bidder from the Court. SM-028 at 11.

178. During his consultations with the Sale Process Parties, the Special Master stated that he was inclined to select Gold Reserve as a base bidder rather than naming them as the stalking horse bidder. VP_Ex_187.242 (email correspondence between counsel for the Special Master and Evercore dated March 16, 2025 explaining that they need to inform Red Tree, Gold Reserve, and the Attached Judgment Creditors that they "anticipate going with [Gold Reserve] . . . and give everyone the reason for" selecting a "[b]ase instead of [stalking horse bid]").

179. The Special Master represented that he was inclined to select Gold Reserve as the base bidder for an auction because of the significant differential in price between Gold Reserve and Red Tree (over $3 billion), but had reservations about the closing certainty in Gold Reserve's bid because it could draw a challenge from the 2020 Bondholders due to the bid's proposed financing structure. *See* VP_Ex_187.246 (email correspondence between counsel for the Special Master and counsel for Gold Reserve dated March 19, 2025 explaining that while the Special Master did not view Gold Reserve's proposed financing structure as a "fatal flaw" in its bid, and that it would not "preclude[e] the Special Master from selecting [Gold Reserve's] bid as a Base

Bid", the Special Master viewed the financing as "containing conditionality with respect to the PDVSA 2020 Bonds"); VP_Ex_010.002–.003 (email correspondence among the Special Master and his advisors dated March 16, 2025 discussing scheduling calls with Red Tree and Gold Reserve "to let them know we anticipate going with GR"); JTX at 655:7–20 (Mr. Hiltz) (stating that, during the stalking horse phase, Mr. Pincus "was leaning" towards picking Gold Reserve).

180.    Despite these representations, the Special Master did not select Gold Reserve as the base bidder. Instead, on March 21, 2025, he recommended Red Tree as the stalking horse bidder, stating that he selected Red Tree's bid even though it was $3 billion below Gold Reserve's because Red Tree's bid offered a higher degree of closing certainty due to its inclusion of the TSA with the 2020 Bondholders. JTX at 555:17–20 (Mr. Hiltz) (Evercore stating that "our objectives, in choosing a stalking horse bidder, were best served by choosing the bidder with a higher degree of certainty").

181.    The Special Master later admitted that Red Tree in fact was selected as the stalking horse bidder because he and his advisors were concerned that if they selected Gold Reserve "many people who felt they might not be able to get fully to Gold Reserve's price would throw up their hands and give up because [the Special Master] would have signaled that price, rather than certainty was the primary criteria." JTX at 556:1–7 (Mr. Hiltz); JTX at 656:11–16 (Mr. Hiltz) (admitting that the Special Master's advisors "were afraid" that if the Dalinar bid was picked as the stalking horse, "other purchasers might not come over the top of their price").

182.    Although the Special Master and his advisors initially claimed that they were focused on the closing certainty that Red Tree's bid provided through the TSA with the 2020 Bondholders, the Special Master admitted that he never analyzed the risk that the 2020s would interfere with the closing of the transaction if the Special Master selected Gold Reserve's bid, JTX

at 618:6–17 (Mr. Hiltz) (admitting that the Special Master did not analyze the likelihood that the 2020s could block the closing of a deal without a TSA), or the risk that they would be successful in doing so, JTX at 697:24–698:3 (Mr. Hiltz) (conceding that the Special Master has no evidentiary basis to contend that OFAC will change its longstanding policy).

183.    After parties briefed objections to and responses in support of the Special Master's stalking horse recommendation, the Court heard argument on the recommendation on April 17, 2025. SM-028 at 11. The Court issued an order approving the Special Master's stalking horse recommendation on April 21, 2025. SM-028 at 11–12.

184.    In approving the Special Master's stalking horse recommendation, the Court emphasized that it had "serious reservations about the price of the Red Tree bid and the implicit overvaluation placed on the TSA (i.e., Red Tree's settlement with the 2020 Bondholders) in the Special Master's evaluation of that bid." SM-028 at 12 (quoting D.I. 1741 at 5).

185.    The Court also made clear that it expected the Special Master to recommend "a Final Bid with a price at or exceeding that associated with [Gold Reserve's] bid while also having [a] greater likelihood of closing than the current [Gold Reserve] bid." SM-028 at 12 (quoting D.I. 1741 at 6).

186.    Finally, the Court stated that it "d[id] not view the risk that the 2020 Bondholders, or other litigants (*e.g.*, plaintiffs pressing any Alter Ego Claims that are ongoing or may yet be filed), will seek to enjoin the Sale Process or transactions (*e.g.*, financing, necessary corporate transactions) as anywhere close to dispositive on the question of whether the Court should accept a Final Bid." SM-028 at 12 (quoting D.I. 1741 at 7).

### H.    The Special Master Failed to Generate Competition During the Topping Period and Contravened Delaware Law Which Requires Public Sales.

187.    The topping period began on April 28, 2025. SM-028 at 12.

188.    Instead of working to generate competitive tension during the topping period as directed by the Court, the Special Master attempted to allow the only two non-credit bidders who were participating in the process, █████ and ████, to stop competing against one another and instead submit a joint bid. VP_Ex_129.001. The Special Master ceased these efforts because the Sale Process Parties objected that a joint bid between █████ and █████ would lead to the potential loss of competition between the two bidders. *See* VP_Ex_129.001 (counsel for ConocoPhillips stating, "[i]t seems awfully unfortunate to eliminate competition between these 2").

189.    During the Topping Period, the Special Master had few ideas for how to improve the prices of the stalking horse bids and gave the bidders little guidance for how to prevail during the topping period. *See, e.g.*, VP_Ex_075.001 (ten days into the topping period, Special Master asking, "how are we going to get some movement during this SH [sic] period?"); JTX at 622:18–21 (Mr. Hiltz) (admitting that "the Special Master's team was concerned about not having any movement in the Topping Period"); D.I. 1840-1 at 60:14–24 (Special Master's counsel representing to the Court that they have pointed the bidders to the Court's April 21 Order and told them to "put [their] best foot forward based on the court's guidance."). Crucially, the Special Master did not tell bidders to meet or exceed Dalinar's stalking horse bid price; instead he just encouraged bidders to provide enough consideration (through negotiated agreements involving discounted non-cash consideration) to satisfy the Attached Judgment Creditors only through Rusoro. VP_Ex_145.001 (June 23, 2025 email from David Ying of Evercore to Chase Bentley stating that "[t]he only guidance we plan giving RT" to beat Dalinar's topping bid "is that Rusoro is willing to extinguish $1.4B of their claim, and they should listen carefully to the parameters of Rusoro's ask"); JTX at 625:4–23 (Mr. Hiltz) (confirming the same); VP_Ex_018.002 (May 16, 2025 email from Andrew Clarke of Weil to Lawrence Wee of Milbank and others providing

"suggestions and requests" as to how Red Tree could "improve its bid during the Topping Round" as to "both economic and non-economic terms" and asking only for information about Red Tree's discussions with Rusoro and referencing discussions with more junior creditors only "in the event Rusoro does not consent to receipt of any offered non-cash consideration"); VP_Ex_075.001 (May 8, 2025 email from Eoghan Keenan in response to a request from the Special Master for ideas on how to get "some movement during this SH period … [m]ore certainty for GR more value for RT" and stating that "[o]n the Red Tree side, I know Evercore has been checking in to see how discussions are going with Rusoro"); VP_Ex_020.002 (Apr. 15, 2025 email from Ray Strong of Evercore to the Special Master's advisors stating, "David Ying and I were just discussing whether there is anything to do now to pressure Red Tree to up their bid (i.e., reach resolution with Rusoro)").

190.    On May 20, 2025, Judge Rakoff issued a decision in the PDVH Alter Ego Litigation in the Southern District New York, ruling in favor of PDVH on summary judgment and dismissing the alter ego claims against PDVH. SM-028 at 13.

191.    Michael Turkel, Assistant General Counsel for Elliott, described Judge Rakoff's decision as "fairly monumental", JTX at 374:4 (Mr. Turkel), and admitted that it was the catalyst that spurred Elliott's renewed participation in the sale process, *id.* at 506:2–10.

192.    Other bidders had also previously represented that the pendency of the PDVH Alter Ego Litigation and the lack of protection for bidders around that risk was chilling participation by bidders seeking to bring "new money" into the sale process. VP_Ex_004.002 (email correspondence from ███████████████ to Ray Strong of Evercore dated January 25, 2025 stating that "it is clear from [████] analysis that 'new money' will not be inclined to bear [the alter ego] risk before closing").

193.    The Venezuela Parties moved for an extension of the topping period so that bidders could factor the impact of this "fairly monumental," JTX at 374:4 (Mr. Turkel), decision into their bids or new bidders could be incentivized to join. SM-028 at 13.

194.    The Special Master initially resisted the Venezuela Parties request for an extension. He did so knowing that other bidders were "scrambling to have conversations and talk with lawyers to see if their position is going to change on making a bid," with one even asking whether the Special Master was "going to push the bid deadline." D.I. 1948 at 34; D.I. 1948-7 at 2 (Eimer Ex. 49).

195.    The Special Master eventually relented after new bidders emerged and expressed their interest in bidding. VP_Ex_187.029–.030 (describing how the Special Master initially resisted the Venezuela Parties' request for an extension but "changed course after new groups of bidders expressed an interest in bidding"); *see also* SM-028 at 13.

196.    On May 30, 2025, the Court granted the Venezuela Parties request to extend the topping period to June 18, 2025. SM-028 at 13.

197.    Given the Special Master's emphasis on closing certainty with respect to the 2020 Bondholders, as demonstrated by his selection of Red Tree as the stalking horse bidder, *see* JTX at 555:17–20 (Mr. Hiltz), bidders were focused on securing a settlement with the Bondholders, though they remained intransigent and unwilling to negotiate a deal for anything less than what Red Tree offered in its stalking horse bid. *See* JTX at 954:8–11 (Mr. Rivett) (describing Gold Reserve's attempted negotiations with the 2020 Bondholders as "very unsuccessful"); JTX at 375:17–376:8 (Mr. Turkel) (describing how the 2020 Bondholders "iced" Elliott while negotiating a settlement and made clear that they "would not be accepting any amount or any consideration that provided, in their view, less than the consideration that they would be receiving under" the

Red Tree TSA); VP_Ex_148.001 (email correspondence from Ray Strong dated June 24, 2025 describing Elliott as feeling "frustrated with the 2020s").

198.    On June 23, 2025, Matt Kirtland, counsel for Gold Reserve, asked the Special Master's advisors "whether the Special Master would give the Gold Reserve consortium guidance on whether it should pursue securing a TSA with the 2020 [B]ondholders or, instead, increase the amount of its existing bid by providing consideration to Siemens and/or Valores." VP_Ex_077.001; *see also* VP_Ex_017.002 (counsel for Gold Reserve asking how "to maximize [its] chances of success"). That same day, the Venezuela Parties raised their concerns about the progress in the topping period with the Special Master and the disappointing bids received to date. *See* VP_Ex_042.

199.    The next day, Chase Bentley, counsel for the Special Master, stated that "the Special Master does not intend to give Gold Reserve guidance on which of the two options are better" and that instead "Gold Reserve should submit the best bid it can." VP_Ex_077.001; *see also* JTX at 602:23–603:24 (Mr. Hiltz) (affirming the same); *see also* JTX at 1093:20–1094:3 (Mr. Rivett) (explaining that Gold Reserve "never really got clarity from the Special Master or its Counsel, unfortunately, with respect to what [they] should do" about the 2020 Bondholders, so Gold Reserve "just kept going deeper and deeper building partnerships with the agencies to get [them] to come on board so that we could all benefit.").

200.    Two days later, on June 24, 2025, the Special Master and his advisors reversed course, deciding that it was necessary to seek guidance during an ex parte conference with the Court to "get to the central issue" for bidders, meaning the "trade off between a deal with the 2020's with no ratchet down if they lose in SDNY versus a substantial increase in compensation

to the waterfall coupled with certainty." VP_Ex_148.001. An ex parte conference between the Court, the Special Master, and his advisors was held the same day. *See* SM-028 at 16.

201.    Before the June 24 ex parte conference, the Special Master did not ask Gold Reserve to increase the amount of consideration in its bid—*that changed after the Special Master received guidance from the Court. Compare* SM-050 (May 16, 2025 email from Andrew Clarke of Weil to Matt Kirtland and others providing "suggestions and requests" as to how Dalinar could "improve its bid during the Topping Round" as to "both economic and non-economic terms," but not including any suggestion or request that Dalinar increase its bid price or satisfy the judgments of additional creditors), *and* VP_Ex_022.002 (pre-conference June 24, 2025 email from Avi Rubin of Weil to Matt Kirtland and others providing "guidance on" the "timing . . . necessary for the Special Master to make a decision" with respect to outstanding issues, including a deal with the 2020s, but not including increasing the price of Dalinar's bid), *with* VP_Ex_021.002 (post-conference June 25, 2025 email from Chase Bentley to David Ying of Evercore stating, "we should talk about how we get GR consortium up a bit").

202.    Contrary to the Court's expectation that the Special Master would generate competitive tension among the bidders, at no point in the topping period were the bidders aware of what the current highest bid was or even the price point they were expected to beat in order to prevail. JTX at 589:16–590:5 (Mr. Hiltz) (admitting that neither the Special Master nor his advisors told bidders the price of the bid they had to beat during active bidding rounds); JTX at 591:5–592:2 (Mr. Hiltz) (conceding that bidders did not know who the leading bidder was in the bidding intervals between the Special Master's public final recommendations); JTX at 562:12–563:1 (Mr. Hiltz) (admitting that no "competitive tension" "play[ed] out during the Topping Period").

203.    Without this critical information, the Special Master failed to conduct a public sale as required by law and no bidder was in a position to compete effectively for the PDVH shares.

204.    The Special Master received only two Qualified Topping Bids during the topping period. SM-028 at 14, 18.

205.    First, Gold Reserve's bidding subsidiary, Dalinar, submitted a bid offering $7.382 billion of proposed consideration to the Attached Judgment Creditors. Highly Confidential VP_Ex_153.003.

206.    Red Tree's bid offered $5.306 billion of consideration to the Attached Judgment Creditors and again included a TSA with the 2020 Bondholders that diverted $2 billion to satisfy their claims. Highly Confidential VP_Ex_153.003.

207.    The Special Master also received a topping bid from ███, offering ███ billion of proposed consideration to the Attached Judgment Creditors, but ███ bid was deemed non-conforming by the Special Maser because it was conditional on reaching a settlement with the 2020 Bondholders in the future. Highly Confidential VP_Ex_153.003.

208.    ███ also submitted a topping bid offering ███ billion to the Attached Judgment Creditors, Highly Confidential VP_Ex_153.003, but ███ bid was deemed non-conforming because it did not have a settlement with the 2020 Bondholders, though the bid was conditional on reaching a settlement, and the Attached Judgment Creditors in the waterfall had not consented to the receipt of the consideration offered to them. *Id.*; SM-028 at 19–20.

209.    Finally, an entity called Black Lion Capital Advisors, LLC ("Black Lion") submitted a topping bid offering $8 billion in cash to the Attached Judgment Creditors, Highly Confidential VP_Ex_153.003, but Black Lion's bid, too, was deemed non-conforming by the

Special Master because it, among other things, was subject to outstanding due diligence and financing contingencies. *Id.*; *see also* SM-028 at 20–21.

210.    On July 2, 2025, the Special Master submitted a Final Recommendation recommending Dalinar as the Successful Bidder and asking the Court to enter a Proposed Sale Order confirming Dalinar's $7.382 billion bid for the shares and an accompanying Stock Purchase Agreement. GR-63.

211.    At the time he recommended Dalinar's bid, the Special Master stated that, even if Red Tree had reached an agreement with Rusoro, thereby bringing its bid price up to $5.3 billion, the price still would likely have been insufficient to make up for the approximately $2 billion price difference with the Dalinar bid. JTX at 663:20–664:13 (Mr. Hiltz); GR-63 (Special Master's July 2 Recommendation) ¶ 81.

212.    At the time he recommended Dalinar's bid, the Special Master represented that a bid "d[id] not need to eliminate all risk related to the PDVSA 2020 Bonds" in order to be named the winning bidder. GR-63 ¶ 82(b).

213.    At the time he recommended Dalinar's bid, the Special Master represented that while there was "at least some chance" that the 2020 Bondholders could successfully enjoin Dalinar's transaction closing, he "d[id] not believe the combination of the likelihood of such risk and the consequences of it coming to fruition outweigh the expansive gap in purchase price between" Dalinar's bid and Red Tree's revised stalking horse bid. GR-63 ¶ 82(b).

214.    Ultimately, the Special Master admitted that at the conclusion of the topping period, he found himself in essentially the same position as where he started with the stalking horse round. JTX at 622:18–21 (Mr. Hiltz (admitting that "the Special Master's team was concerned about not

having any movement in the Topping Period"); *see also* JTX at 623:19–624:3 (Mr. Hiltz) (admitting that "essentially nothing changed from the Stalking Horse recommendation").

215.    After recommending Dalinar as the winning bidder on July 2, 2025, the Special Master received an unsolicited topping bid from Elliott offering $5.982 billion for the PDVH shares and diverting $2.125 billion for the 2020 Bondholders on August 8, 2025. AM-045.0002, .0004, .0006. The Special Master determined on August 25, 2025 that Elliott's bid constituted a superior bid to Dalinar's. AM-045.0003. Dalinar submitted a revised final bid on August 28, 2025 offering approximately $7.9 billion for the PDVH shares including additional financing to settle with the 2020 Bondholder if necessary. AM-045.0003, .0008 –.0009, .0010–.0012. On August 29, 2025, the Special Master submitted an updated recommendation naming Elliott as the winning bidder and stating that Dalinar's August 29 bid did not match or exceed Elliott's bid, despite the fact that Elliott's proposed purchase price was $2 billion lower than Dalinar's. AM-045.0003– .0004. The Special Master's advisor admitted that the Special Master never told Elliott to bid an amount over Dalinar's July 2 bid price in order to constitute a superior bid. JTX at 669:19–670:5.

216.    For the foregoing reasons, the Court finds that the sale process was defective. The Court further finds that the process's many defects resulted in depressed participation by bidders, depressed competition, and bids that are billions of dollars below fair market value, to the prejudice of Attached Judgment Creditors, the Republic, and PDVSA.

## III.    Elliott Is Not the Highest Bidder.

217.    The proposed purchase price of the Elliott bid ($5.89 billion) is $2 billion lower than the proposed purchase price Dalinar's August 2025 bid ($7.9 billion). AM-045.0001, .0009; JTX at 587:11–15 (Mr. Hiltz) ("1.5 to $2 billion"). In spite of this price differential, the Special Master contends that Elliott's bid is superior to Gold Reserve's bid because it includes a $2.125 billion settlement with the 2020 Bondholders in the form of a Transaction Support Agreement. *See* AM-045.0010 ("[T]he Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation by delivering a settlement with the PDVSA 2020 Bondholders."); AM-046.0799–.0833 (Elliott and 2020 Bondholder TSA dated August 12, 2025). The Court rejects the Special Master's contention.

218.    The Special Master has put forth no evidence to support his contention that the closing certainty provided by the 2020 Bondholder TSA in Amber's bid makes up for the $2 billion price differential between the Elliott bid and the Dalinar August 2025 bid. More specifically, the Special Master has provided no evidence that the 2020 Bondholders would be able to successfully interfere with the closing of the Dalinar transaction. *See, e.g.*, JTX at 618:6–17 (Mr. Hiltz) (admitting that the Special Master did not analyze the likelihood that the 2020s could block the closing of a deal without a TSA); Sale Hearing Day 2 (Audio-Recorded Portion) Tr. 12:19–13:6 (Mr. Hiltz) (acknowledging that a change of OFAC policy is required for the 2020 Bondholders to block the closing); JTX at 697:24–698:3 (Mr. Hiltz) (conceding that the Special Master has no evidentiary basis to contend that OFAC will change its longstanding policy); JTX at 678:20–23 (Mr. Hiltz) ("We think it's completely subjective and have been advised by Weil that they wouldn't know what probabilities to assign to these various things."). He also has not undertaken any analysis to determine whether, in the event, the 2020 Bondholders could block the Dalinar Bid, that Dalinar would be unable to obtain alternative financing or negotiate a release of the CITGO

Holding Pledge. *See* VP_Ex_192.004, .005. The Special Master's advisors simply attempted to undermine the force of a highly confident letter, explaining that it does not constitute a binding commitment, but acknowledged that J.P. Morgan "is a reputable bank" and "they don't issue those highly confident letters lightly." JTX at 584:23–585:1 (Mr. Hiltz). The Special Master also suggested that Dalinar may access needed funding under its ABL if the CITGO assets supporting the facility decline in value. *See* D.I. 2123. ¶ 17. But again, the Special Master has not provided any analysis for how likely this is to occur, *see* VP_Ex_192.006, and Elliott's bid likewise relies in part on an ABL facility with the same limitations, AM-042.004, .008, .1310–.1336; JTX at 585:10–17 Mr. Hiltz (noting drawbacks "in any ABL").

219.    Nor has the Special Master ever analyzed the extent of the closing risk inherent in the Elliott bid, including that the Second Circuit may reverse Judge Failla's decision on appeal or that the Bondholders back out of or do not ultimately agree to definitive documentation implementing the TSA. JTX at 627:2–12 (Mr. Hiltz) (admitting that the Special Master did not analyze the percentage likelihood of Amber's bid closing); JTX at 699:18–25 (Mr. Hiltz) (admitting that Judge Failla's decision does not remove all uncertainty in the Elliott bid because it could be reversed on appeal); JTX at 627:11–12 (Mr. Hiltz) ("As I've stated repeatedly, we have not assigned probabilities to these outcomes."); JTX at 428:14–461:8 (Mr. Turkel) (testifying that the "Definitive Documents" in support of Elliott's TSA with the 2020 Bondholders, including the "documents necessary for the sale and assignment in the private exchange" with the 2020 Bondholders are not final and are subject to further negotiation); JTX at 461:21–463:11 (Mr. Turkel) (admitting that the 2020 Bondholders have consent rights over the approval of the Definitive Documents).

220.    Absent an evidentiary record quantifying this risk, the Special Master cannot demonstrate that the Elliott bid is the "highest bid[]" as required under Delaware law.

221.    Moreover, the TSA may be subject to termination by either party if this Court does not enter a Final Sale Order by December 1, 2025. JTX at 368:22–369:10, 437:25–439:1 (Mr. Turkel).

222.    Elliott's representative, Mr. Turkel, took the position that the TSA does not provide termination rights to either party in the event that the Final Sale Order is and remains stayed on or after December 1, 2025. JTX at 439:2–441:10 (Mr. Turkel). Rather, the parties' mutual termination rights under TSA § 5.1(b) arise only if a condition precedent to closing set forth in § 4.1(b) or 4.1(h) is not satisfied within an applicable deadline. JTX at 439:17–441:10 (Mr. Turkel); TSA § 5.1(b). Although it is a condition precedent to closing under TSA § 4.1(h)(iii) that there be no stay of the sale order pending appeal in effect, a stay pending appeal would not give rise to any termination rights under the TSA because there is no applicable deadline to this condition precedent. JTX at 439:17–441:10 (Mr. Turkel); JTX at 480:22–482:5 (Mr. Turkel).

223.    For the foregoing reasons, the Court finds that Elliott's bid is the not the highest bid and thus cannot be approved.

## IV.    The Venezuela Parties' Objections to the PSO and SPA

224.    The Venezuela Parties have objected to provisions of the Special Master's drafts of bidder SPAs in real time. In September 2024, the Venezuela Parties raised "fundamental problems with the current draft of the [SPA]," urging the Special Master to "submit the SPA to the Court for approval, and to OFAC for requisite licensing." VP_Ex_035 (letter from N. Eimer to R. Pincus dated September 13, 2024). The Venezuela Parties also specifically objected to Sections 6.22 and 6.25 of the draft SPA, which purported to impermissibly impose obligations or covenants on the CITGO parties without their consent. *Id.*

225.    Also in September 2024, the Venezuela Parties objected to the Special Master's intent to file an executed, purportedly binding SPA, renewing their position that he could not do so without Court and OFAC approval and furthermore that the SPA cannot impose any obligations or restrictions on the Venezuela Parties, as they were not parties to the agreement. VP_Ex_036 (letter from N. Eimer to R. Pincus dated September 22, 2024); VP_Ex_037 (letter from J. Perla to R. Pincus dated September 22, 2024).

226.    Once the Special Master recommended the Dalinar Bid on July 2, 2024, the Venezuela Parties filed objections to provisions of the Dalinar Proposed Sale Order ("PSO") and SPA. On July 24, 2025, the Venezuela Parties objected to the following sections of the Dalinar PSO purporting to enjoin conduct deemed contrary to the interests of Dalinar, the Special Master, or his advisors: ¶¶ 6, 10, 13, 19, 20, and 25. D.I. 1948 at 40–41. The Venezuela Parties also objected to ¶ 21 of the PSO, which purported to immunize the Dalinar Bid from meaningful appellate review. *Id.* at 39–40. To ensure protection of their appellate rights, the Venezuela Parties requested an administrative stay to give them time to seek a stay pending appeal. *Id.* at 40.

227.    On July 24, 2025, the Venezuela Parties objected to the following sections of the July 2 Dalinar SPA: §§ 2.3(a)(i), 2.3(a)(iii), 6.1(b)(xvi)(C), 6.16(c), and 7.3(c). D.I. 1948 at 39–42. SPA § 6.16(c) suggests that the Special Master may provide an unsolicited competing proposal to the Court only up until the Sale Hearing, but the Court-adopted Bidder Protections provide that such proposal is presentable to the Court and potentially actionable until "entry of any Sale Order." D.I. 1948 at 39 (citing D.I. 1552-1 at 2–3). SPA § 6.1(b)(xvi)(C) would restrict dividends from CITGO to CITGO Holding, which is contrary to the Special Master's statement that he would permit "dividends or similar distributions between PDVH and its subsidiaries." D.I. 1948 at 41– 42 (citing D.I. 1552-1 at 5). Sections 2.3(a)(iii) and 7.3(c) require a FIRPTA Certificate, which

CITGO cannot guarantee will be available by any particular date, as it relies on third-party analyses. D.I. 1948 at 42. The Venezuela Parties also objected to Section 2.3(a)(i), as it would not be appropriate for CITGO's CFO to confirm the accuracy of representations and warranties made by the Special Master. *Id.*

228.    On August 7, 2025, the Venezuela Parties objected to the 2020 Bondholders' and Gramercy's proposed revisions to the July 2 Dalinar PSO that purported to unreservedly preserve claims against PDVH, its subsidiaries, and potentially its personnel arising from purported violations of the "'rights of the PDVSA 2020 Bondholder Parties, the PDVSA Indenture, or the CITGO Holding Shares Pledge Agreement' and/or from 'any fraudulent conveyance, illegal dividend, breach of fiduciary duty, or other similar legal or equitable doctrine arising from the structure or financing of the sale of the PDVH Shares.'" D.I. 1984 at 5 (quoting D.I. 1943-2; D.I. 1968-2). The Venezuela Parties also objected to the 2020 Bondholders' proposal limiting the PSO such that it exclude "requir[ing] or authoriz[ing] PDVH's subsidiaries, their directors or officers, or other persons to take any steps to consummate the Sale Transactions to the extent that doing so violates the PDVSA 2020 Bondholder Parties' rights," arguing that it would be unfair for PDVH, its subsidiaries, and its personnel to be potentially found liable for any actions taken pursuant to a court-ordered sale process and/or to put the responsibility on PDVH, its subsidiaries, and personnel to determine whether a given court-ordered directive violates the heavily disputed "2020 Bondholder Parties' rights." D.I. 1984 at 5 (quoting D.I. 1943-2).

229.    On August 13, 2025, the Venezuela Parties renewed their objections to the Dalinar PSO regarding injunctions and appellate review. D.I. 2042 at 30. The Venezuela Parties pointed out that the Special Master and members of the Dalinar Consortium did not respond to the Venezuela Parties' arguments that they lack standing to seek the injunction provisions of the PSO,

that those provisions exceed this Court's authority, and that the Special Master and Dalinar have not proven the elements required to obtain a permanent injunction, and thus that any arguments in support of those provisions are therefore forfeited and waived. *Id.* The Venezuela Parties also renewed their objections to the provisions of the PSO limiting appellate review and renewed their request for an administrative stay. *Id.* at 30–31.

230.    On August 13, 2025, the Venezuela Parties renewed their objection to Section 6.1(b) of the July 2 Dalinar SPA. D.I. 2042 at 29–30. The Venezuela Parties agreed to Sections 2.3(a)(i), 2.3(a)(iii), 6.16(c), and 7.3(c), as clarified by the Special Master. *Id.* at 29 n.41 (referring to the Special Master's August 7, 2025 Response to Objections to Final Recommendation, D.I. 2002 at 39–40). The Venezuela Parties also reaffirmed their position that the Court-approved bidder protections ensure that a superior proposal may be submitted at any time until "entry of any Sale Order." D.I. 2042 at 29 n.41 (quoting D.I. 1552-1 at 2–3).

231.    On September 6, 2025, the Venezuela Parties objected to the following sections of the August 29 Elliott PSO: ¶¶ 2, 6, 10, 13, 19, 20, 24, and R. D.I. 2180 at 22–23. Paragraphs 19, 20, and 24 unconstitutionally prohibit the filing of certain legal claims (or require preclearance from the Court). *Id.* at 22. Paragraph R, applying the Transaction Documents to the Venezuela Parties, contravenes the Court's recognition that CITGO and PDVH are not parties to the SPA. *Id.* Likewise, the Venezuela Parties objected to Paragraph 2 on the ground that the Court cannot overrule reservations of rights or deem persons or parties to have consented to the sale by not "properly objecting"; Paragraph 6 ordering compliance with all obligations and covenants; and Paragraphs 6, 10, 13, 19, 20, and 24, which contemplate injunctions beyond the Court's authority and for which the Special Master lacks both standing and any cognizable argument for meeting the standard for issuing an injunction. *Id.* at 22–23.

232.    On September 6, 2025, the Venezuela Parties objected to the following sections of the August 29 Elliott SPA: §§ 2.3(a)(i), 2.3(a)(iii), 7.3(c), 6.1(b)(xi), 6.1(b)(xvi); 6.10(a)(x) and (xi), 6.16(c), 6.19, and 9.11. D.I. 2180 at 20–22 & n.22. They renewed their objections to Sections 2.3(a)(i), 2.3(a)(iii), 7.3(c), and 6.16(c), *id.* at 21–22 & n.22, and asserted new objections to Section 6.1(b)(xvi) for introducing ambiguity by restricting dividends among the CITGO Companies to only those occurring in the "Ordinary Course," *id.* at 20; Sections 6.10(a)(x) and (xi) as off-market and overly intrusive on CITGO's business; and Section 6.1(b)(xi)'s prohibition on entering, amending, or renewing any contract with PDVSA. *Id.* at 21. The Venezuela Parties also requested that they be added as third-party beneficiaries in SPA § 9.11 with respect to specific provisions which grant them rights in order to protect their right to appeal and the right to propose an alternative to the sale process at any time, *id.* at 20, and requested inclusion of a new SPA provision allowing the Special Master to terminate the SPA if PDVSA prevails in the Bondholder Litigation before Judge Failla or on appeal, *id.* at 22.

233.    The Venezuela Parties also objected to Section 6.19 of the August 29 Elliott SPA, which allocates up to $50 million for incentive bonuses for PDVH and CITGO management and employees at the sole discretion of Amber's post-transaction appointed CEO, but only if the transaction closes. D.I. 2180 at 20–21; *see also* AM-046 at 81–82 (Elliott SPA). Elliott first proposed the addition of this provision to its SPA during the Stalking Horse negotiations with the Special Master. JTX at 404:6–9 (Mr. Turkel). Elliott asserted through counsel that it was "willing to pay [these] bonuses" to hinder the Venezuela Parties' ability to stop "the sale from closing." D.I. 2274 at 23 (Elliott Response to Objections to the Special Master's Updated Final Recommendation); *see also* JTX at 404:10–23 (Mr. Turkel). At the hearing, Mr. Turkel admitted that "[t]he bonuses were included to incentivize the [] CITGO executives effectively to cooperate

with the Court-ordered sale." JTX at 404:10–23 (Mr. Turkel). The Venezuela Parties have objected that this offer creates an improper incentive by dangling a sizeable carrot in hopes of inducing CITGO personnel to act as Elliott's agents and provide support for Elliott's bid, which could create conflicts of interest and undermine PDVH and CITGO's opposition to and appeal of any Sale Order and is also improper because it is unnecessary and diverts value from CITGO and PDVH that could otherwise be available to facilitate a higher bid. D.I. 2180 at 21.

234.    On September 12, 2025, the Venezuela Parties objected to the provisions of the August 28 Dalinar PSO (D.I. 2135-5) consistent with their objections to the July 2 Dalinar PSO and the August 29 Elliott PSO, but supported Dalinar's removal of the overbroad and unjustified injunctive language from Paragraph 6, the language that limited appellate rights absent a stay pending appeal, and the language imposing on PDVH and its personnel the obligation to ascertain which actions it may take under court order that could potentially affect the 2020 Bondholders' rights. D.I. 2262 at 7–8. The Venezuela Parties renewed their objections to all injunctive language remaining in the revised PSO and also renewed their request for an administrative stay to protect their appellate rights. *Id.* at 7 & n.5.

235.    On September 12, 2025, the Venezuela Parties objected to the provisions of the August 28 Dalinar SPA (D.I. 2135-3) consistent with their objections to the July 2 Dalinar SPA. D.I. 2262 at 7. The Venezuela Parties also requested that they be added as third-party beneficiaries in Dalinar SPA § 9.11(e). *Id.*

236.    On September 12, 2025, the Venezuela Parties objected to provisions in the Elliott TSA and SPA to the extent they prejudice any party's ability to obtain a stay pending appeal and protect their appellate rights. D.I. 2262 at 8–10. Specifically, the Venezuela Parties objected to TSA §§ 4.1(h) and 5.1(b) and SPA § 8.1(h). D.I. 2262 at 8.

237.    On September 12, 2025, the Venezuela Parties objected to Gramercy's proposed amendments to the August 29 Elliott PSO, reiterating that none of the proposed changes should be understood to provide an avenue to hold PDVH, its subsidiaries, their management, or their personnel liable for any conduct undertaken by virtue of a court order regarding implementation of the sale process. D.I. 2262 at 10–11.

238.    On September 14, 2025, the Venezuela Parties renewed their objections to PSO and SPA provisions made in their July 24, August 7, August 13, September 6, and September 12 briefs. D.I. 2290 at 19 & n.23.

239.    On September 14, 2025, the Venezuela Parties renewed their objections to the broad injunctive provisions in Elliott's August 29 PSO, including Paragraph 6. D.I. 2290 at 20.

240.    On September 14, 2025, the Venezuela Parties renewed their objections to Elliott SPA §§ 6.1(b)(xvi) and 6.19 in light of the Special Master's and Elliott's response briefs. D.I. 2290 at 19 (citing D.I. 2273; D.I. 2274).

## V.    OFAC Is Unlikely to Authorize the Elliott Transaction and TSA.

### A.    Executive Order 13835 Has Prevented the 2020 Bondholders From Enforcing Their Purported Rights.

241.    In response to the Maduro regime's actions including "attempts to undermine Venezuela's democratic order," President Donald Trump issued Executive Order 13835 on May 21, 2018, later amended by Executive Order 13857 of January 25, 2019, prohibiting "all transactions related to, the provision of financing for, and other dealings in . . . the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest." Prohibiting Certain Additional Transactions With Respect to Venezuela, 83 Fed. Reg. 24001, 24001; *see also* Taking Additional Steps To Address the National Emergency With Respect to

Venezuela, 84 Fed. Reg. 509, 509–10.

242.    On July 19, 2018, OFAC issued General License 5, authorizing "all transactions related to, the provision of financing for, and other dealings in" the purported CITGO Holding pledge that would otherwise be prohibited under Section 1(a)(iii) of Executive Order 13835. OFAC General License No. 5 Authorizing Certain Transactions Related to the Petroleos de Venezuela SA 2020 8.5 Percent Bond (available at General Licenses Issued Pursuant to Venezuela-Related Executive Order 13835, 85 Fed. Reg. 14572-01, 2020 WL 1185120); U.S. Dep't of the Treasury, OFAC FAQ No. 595 (2024).

243.    On October 24, 2019, OFAC issued General License 5A, which suspended the effectiveness of General License 5. OFAC General License No. 5A Authorizing Certain Transactions Related to the Petroleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020 (available at General Licenses Issued Pursuant to Venezuela-Related Executive Order 13835, 85 Fed. Reg. 14572-01, 2020 WL 1185120); U.S. Dep't of the Treasury, OFAC FAQ No. 595 (2024).

244.    On October 29, 2019, PDVSA, PDVSA Petróleo, and PDVH filed a complaint in the United States District Court for the Southern District of New York against MUFG Union Bank N.A. and GLAS Americas LLC, seeking a judgment declaring the 2020 Bonds and related pledge invalid, illegal, null, and void *ab initio* (the "2020s Litigation"). *See* Complaint ¶ 1, *Petróleos de Venezuela S.A. v. MUFG Union Bank*, No. 1:19-cv-10023 (S.D.N.Y. Oct. 29, 2025) ("*MUFG*"), ECF 1.

245.    For nearly six years, OFAC has consistently extended the suspension of General License 5, doing so for a total of 18 times so far, from General License 5A through 5S. *See* U.S. Dep't of the Treasury, OFAC FAQ No. 595; *see also* U.S. Dep't of the Treasury, *General License*

*5S* (June 20, 2025), https://ofac.treasury.gov/media/934391/download?inline (replacing the 17th iteration of the license, 5R, to extend license to December 20, 2025); JTX at 219:7-16 (Attorney Kirtland noting that "OFAC has renewed this [license] 18 times over this [six year] period with the last such extension being for six months until December 20th of this year.").

246.    OFAC maintained the suspension of General License 5 after the Southern District of New York's October 16, 2020 decision and judgment in the 2020s Litigation declaring the 2020 Bonds valid and enforceable under New York law. *See* U.S. DEP'T OF THE TREASURY, OFAC FAQ NO. 595 (2024). The Southern District of New York's decision was later overturned and the judgment vacated by the Second Circuit. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 270 (2d Cir. 2024).

247.    Most recently, on June 20, 2025, OFAC issued General License 5S, further suspending General License 5 until December 20, 2025. OFAC General License 5S Authorizing Certain Transactions Related to the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After December 20, 2025, https://ofac.treasury.gov/media/934391/download?inline.

248.    Executive Order 13835, Section 1(a)(iii), along with the suspension of General License 5, has prevented the 2020 Bondholders from enforcing their purported rights in the CITGO Holding shares pledged as collateral for the 2020 Bonds. Sale Hearing Day 2 (Audio-Recorded Portion) Tr. 12:19–13:6 (Mr. Hiltz); *see* U.S. DEP'T OF THE TREASURY, OFAC FAQ NO. 595 (2024).

249.    The Special Master's advisor, Mr. Hiltz, stated that he has no "evidentiary basis to contend that OFAC will change the policy that it's had in place for the last six years," a policy that has prevented the 2020 Bondholders from accessing the purported CITGO Holding pledge. JTX (Recorded Portion) at 12:19–13:6 (Mr. Hiltz); JTX at 697:24–698:3 (Mr. Hiltz).

**B.    The TSA Purports to Provide $2.125 Billion to Release the CITGO Holding Pledge and Settle the 2020 Bondholders Claims, Without PDVSA's Consent.**

250.    Under the TSA, Elliott agreed to pay up to $2.125 billion in exchange for the consenting noteholders (i) transferring their 2020 Bonds to Elliott and (ii) releasing their asserted collateral in the CITGO Holding shares. JTX at 355:22–24 (Mr. Turkel); JTX at 492:18–493:19 (Mr. Turkel); AM-046, Annex F §§ 3.1, 3.2, and 6.

251.    Elliott represented that the 2020 Bonds tendered to them under the TSA would be "extinguish[ed]." JTX at 351:3–11, 365:10–21, 393:12–394:11, 398:4–20 (Mr. Turkel). Any bonds not tendered as part of the exchanges under the TSA would not be extinguished. JTX at 393:12–394:11 (Mr. Turkel).

252.    Counsel for Elliott represented to this Court during the August 18, 2025 hearing that Elliott will "extinguish" any 2020 Bonds tendered to them under the TSA, which will affect a "settlement" of the claims in the 2020 Bondholder Litigation. JTX at 398:4–402:9 (Mr. Turkel); JTX at 487:17–488:2 (Mr. Turkel).

253.    The 2020s Trustee and Collateral Agent, with Elliott's consent, represented to Judge Failla in the 2020s Litigation that the TSA constitutes a settlement that would "extinguish" the "claims in [the S.D.N.Y.] case." JTX at 399:4–401:21 (Mr. Turkel); *MUFG* ECF 394.

254.    Relying on the Special Master's valuation of the 2020 Bondholders' claims, Elliott treated PDVSA's total obligations under the 2020 Bonds as amounting to roughly $3.020 billion including interest. JTX at 355:11–356:4; 396:18–397:24 (Mr. Turkel); JTX at 493:20–494:11 (Mr. Turkel); AM-DX-002. Elliott's internal valuation of the 2020 Bondholders' claims is lower, at $2.8 billion including interest. JTX at 356:20–357:7; 397:11–397:24; 407:13–408:18 (Mr. Turkel).

255.    The decision to cancel the roughly $2.8–$3 billion in 2020 Bonds, as estimated by the Special Master and Elliott, was made by Elliott employees Michael Turkel, Michael Tompkins, and Ross Green. JTX at 488:3–13 (Mr. Turkel).

256.    Elliott has an "investment committee" that is responsible for approving important investment decisions. JTX at 488:23–489:22 (Mr. Turkel). To date, no one has requested that this committee grant authority to cancel the supposedly $2.8–$3 billion in 2020 Bonds that would be tendered under the TSA. JTX at 496:7–10 (Mr. Turkel).

257.    Elliott's commitment to cancel/extinguish the bonds was not memorialized in writing in any legally binding document. JTX at 400:4–14 (Mr. Turkel); JTX at 494:13–495:1 (Mr. Turkel); 496:22–497:3 (Mr. Turkel).

258.    The Venezuela Parties have consistently advised the Special Master that PDVSA does not consent to any purported settlement or resolution of the 2020s Litigation without its involvement. JTX at 717:23–718:21 (Mr. Hiltz); SM-010.

C.    **OFAC Has Provided No Guidance Supporting the Elliott Transaction or the TSA.**

259.    As of the time of the sale hearing, Elliott has not submitted their proposed transaction or the TSA to OFAC for approval. JTX at 402:12–403:4 (Mr. Turkel).

260.    The 2020 Bondholders have not obtained OFAC's authorization to enter into the TSA, nor sought any guidance from OFAC regarding the TSA. VP_Ex_227.020–.021 (Dep. X. Xu Tr. 161:1–9, 161:22–162:1). The 2020 Bondholders have not otherwise consulted with OFAC regarding General License 5. VP_Ex_227.021 (Dep. X. Xu Tr. at 162:14–18).

261.    The Special Master has not requested from Elliott any information concerning OFAC guidance related to the proposed transaction or the TSA. JTX at 403:5–21 (Mr. Turkel).

262.    The Special Master has not engaged in any communications with OFAC concerning

OFAC's policy toward the 2020 Bonds. JTX at 696:17–698:3 (Mr. Hiltz) (acknowledging change of OFAC policy required for Bondholders to block closing).

### D.     OFAC Maintains a Favorable Licensing Policy Only for Settlement Agreements with the U.S.-Recognized Legitimate Government of Venezuela.

263.     OFAC has issued General License No. 42 authorizing the "negotiation of settlement agreements" only with the U.S.-recognized Government of Venezuela relating to "any debt of the Government of Venezuela, [PDVSA], or any entity in which [PDVSA] owns, directly or indirectly, a 50 percent or greater interest." OFAC General License No. 42; U.S. DEP'T OF THE TREASURY, OFAC FAQ No. 1125 (2023).

264.     The United States Government has recognized as the legitimate Government of Venezuela the "IV Venezuelan National Assembly seated on January 5, 2016 ('IV National Assembly'), its Delegated Commission, any entity established by, or under the direction of, the IV National Assembly to exercise its mandate ('IV National Assembly Entity'), or any person appointed or designated by, or whose appointment or designation is retained by, an IV National Assembly Entity." OFAC General License No. 42; VP_Ex_23.009–.010 (U.S. Statement of Interest, Exhibit A).

265.     OFAC stated that a specific license is required for "entry into settlement agreements, contingent or otherwise," that are negotiated with the recognized Government of Venezuela under General License No. 42. U.S. DEP'T OF THE TREASURY, OFAC FAQ No. 1125 (2023); OFAC General License No. 42. OFAC has stated that it intends to implement a "favorable licensing policy" towards settlement agreements negotiated under General License No. 42, *i.e.*, settlement agreements with the U.S.-recognized Government of Venezuela or ad hoc entities appointed by the U.S.-recognized Government of Venezuela, such as the PDVSA ad hoc Board. OFAC General License No. 42; U.S. DEP'T OF THE TREASURY, OFAC FAQ No. 1125 (2023).

266.    OFAC has also stated that it maintains a "favorable licensing policy" with respect to "proposals to restructure or refinance payments due" to the 2020 Bondholders. U.S. DEP'T OF THE TREASURY, OFAC FAQ NO. 595 (2024).

### E.    OFAC Has Maintained a Non-Enforcement Policy Permitting the S.D.N.Y. Litigation to Proceed to Conclusion.

267.    OFAC adopted a non-enforcement policy towards the 2020 Bondholders specifically with respect to "taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral," but not with respect to actual enforcement of any purported rights in that collateral. Any actions beyond "preserv[ing] the ability to enforce" including in connection with "any sale" would require a specific license. U.S. DEP'T OF THE TREASURY, OFAC FAQ NO. 1124 (2023).

268.    OFAC's non-enforcement policy regarding the 2020s Litigation further provides that settlement agreements, negotiated under General License No. 42, require a specific license in order to be executed. U.S. DEP'T OF THE TREASURY, OFAC FAQ NO. 1124 (2023).

## VI.    Calculating the Elliott Bid's "Discount" of 2020 Bondholder Claims

269.    Elliott calculates that its bid settles the 2020 Bondholder claims at a 30% discount, netting savings of about $895 million. JTX at 395:11–17 (Mr. Turkel). For this calculation, Elliott relies on the Special Master's valuation of the 2020 Bondholders' claims at $3.02 billion including interest. JTX at 396:18–397:24 (Mr. Turkel); AM-DX-002.

270.    Using Elliott's own internal calculation of the 2020 Bondholders' claims ($2.8 billion including interest) would reduce any purported discount by approximately $200 million. JTX at 356:20–357:7 (Mr. Turkel); JTX at 397:11–397:24 (Mr. Turkel); 407:13–408:18 (Mr. Turkel).

## VII.    The Value of PDVH/CITGO's Strategic Links to PDVSA and Venezuela

271.    The Special Master's witness, Mr. Hiltz, acknowledged that Venezuela has one of the largest oil reserves in the world. JTX at 701:9–11 (Mr. Hiltz). And major oil companies such as Chevron continue to do business in Venezuela even though they experienced the same legal and regulatory changes that other major oil companies such as Conoco and Exxon experienced. JTX at 701:12–17 (Mr. Hiltz). CITGO's refineries were built with high-complexity configurations specifically designed to process large volumes of heavy sour crude into high-value products, making them particularly well-suited for Venezuela's predominantly heavy crude oil. Highly Confidential VP_Ex_186.045 (¶ 93). Following the 2019 sanctions against the Maduro regime, CITGO replaced Venezuelan supply with heavy streams from Canada and Latin America, while maintaining the technical capability and capacity to process Venezuela's heavy feedstock. *Id.* CITGO refineries, such as the Lemont refinery, have greater capacity to handle heavy crude than most regional competitors, providing CITGO with a distinct operational advantage. Highly Confidential VP_Ex_186.012–.013 (¶ 27). CITGO's refining system is strategically and geographically positioned to resume processing Venezuelan heavy crude once conditions allow renewed shipments from one of the world's largest oil reserves." Highly Confidential VP_Ex_186.044–.045 (¶¶ 91–92).

272.    The United States has expressed that Venezuela's forced dispossession of PDVH would be a "great political victory for the Maduro regime" and would be "greatly damaging and perhaps beyond recuperation" to both the legitimate U.S. recognized government and to U.S. foreign policy goals in Venezuela. D.I. 212 at 8 (quoting Special Representative Abrams); *accord* D.I. 220 at 13 ("[P]roceeding toward a forced sale of Venezuela's largest and most important foreign asset at this time could render significant foreign policy harm to the United States."); *see also* Statement of Interest of the United States at 5–6, *MUFG* ECF 213; VP_Ex_023 (Statement

of Interest of the United States at 2–5, *MUFG* ECF 393).

273.    The Special Master did not consider the impact the sale process might have on Venezuela's ability to transition to a U.S. recognized, legitimate government. JTX at 702:13–18 (Mr. Hiltz).

## VIII.    The Wrong Time to Maximize Value

### A.    2020 Bondholder Litigation in S.D.N.Y.

274.    The 2020 Bonds and the purported CITGO Holding pledge may still be invalid if Judge Failla's decision in the 2020 Bondholder Litigation is reversed on appeal. JTX at 698:20–699:25 (Mr. Hiltz).

275.    If Judge Failla's decision is reversed, then the Elliott transaction would divert billions of dollars in sale proceeds from the AJCs to the 2020 Bondholders for bonds that are not valid. D.I. 1741 at 7–8; JTX at 426:21–427:23; 430:6–21 (Mr. Turkel); JTX at 698:20–699:25 (Mr. Hiltz).

276.    In an attempt to mitigate this potential downside, the Special Master requested that Elliott negotiate a "safety valve" in the TSA that would reduce or eliminate the 2020 Bondholders' recovery if the bonds and pledge are ultimately held invalid. JTX at 425:20–429:19 (Mr. Turkel). The 2020 Bondholders rejected this proposed "safety valve" and therefore none was included in the TSA. JTX at 429:20–430:21 (Mr. Turkel); JTX at 700:1–701:1 (Mr. Hiltz).

277.    Similarly, the Dalinar transaction holds significant funds in reserve for a potential settlement to account for perceived closing risks posed by the 2020 Bondholders. JTX at 580:24–582:19 (Mr. Hiltz); JTX at 967:9–12; 1081:3–1082:7; 1083:14–21. These reserves include: $1.8 billion in funding from JP Morgan that is currently the subject of a highly confident letter and up to an additional $1 billion through an ABL accordion. JTX at 937:17–938:1; 939:16–941:8; 970:4–971:6; 972:17–973:9; 992:13–993:21; 1080:3–13 (Mr. Rivett). These reserves indicate that there

is value in the PDVH shares that is being lost because funds are being held back to pay out Bondholders that may have invalid bonds secured by an invalid pledge. These reserves could be used to increase the bid price if the 2020 Bonds and related pledge are held to be invalid on appeal and therefore the 2020 Bondholders' lack any legal right to interfere with the sale process. JTX at 580:24–582:19 (Mr. Hiltz).

278.    The Court can mitigate the risk of unnecessarily diverting funds to the 2020 Bondholders (or reserving funds as a contingency) by waiting for a final decision by the Second Circuit before approving a sale or by staying any Final Sale Order, thereby retaining the ability to later reject the Elliott and Dalinar bids if the 2020 Bondholders lose on appeal. JTX at 698:20–699:25; 700:23–701:1 (Mr. Hiltz).

## IX.    Efforts to Undermine the Venezuela Parties' Appellate Rights

### A.    Proceeding Expeditiously in S.D.N.Y. and the Second Circuit

279.    PDVSA has consistently attempted to expedite the 2020s Litigation to eliminate any uncertainty as to the validity of the bonds. *MUFG*, ECF 15, 16, 376. The 2020 Bondholders have so far resisted these attempts. *MUFG*, D.I. 20, 377.

280.    The 2020 Bondholders and Elliott agreed under the TSA to seek a stay of the 2020s Litigation prior to any decision on the validity of the 2020 Bonds. JTX at 483:9–487:4 (Mr. Turkel); JTX at 711:12–712:21 (Mr. Hiltz); AM-046.0811 (TSA § 3.2(a)(iv)).

281.    On September 5, 2025, the 2020 Bondholders asked Judge Failla to consider the timing of any decision on the validity of the bonds in deference to the proposed Elliott transaction. *MUFG*, ECF 394. PDVSA wrote to Judge Failla on September 8, 2025, to request that she issue her decision per her previously stated timeline. *MUFG*, ECF 395.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Hannah M. Bucher
Alec Solotorovsky
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com
ASolotorovsky@eimerstahl.com

*Attorneys for PDV Holding, Inc. and
CITGO Petroleum Corporation*

*/s/ Alexandra M. Cumings*
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Phillip Reytan (#7255)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
SWaesco@morrisnichols.com
ACumings@morrisnichols.com
PReytan@morrisnichols.com

*Attorneys for PDV Holding, Inc. and
CITGO Petroleum Corporation*


HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
Robert Groot
David V. Holmes
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
101 Park Avenue New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com
rgroot@curtis.com
dholmes@curtis.com

*Attorneys for Petróleos de Venezuela, S.A.*

*/s/ Brendan Patrick McDonnell*
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (#7086)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hegh.law

*Attorneys for Petróleos de Venezuela, S.A.
and the Bolivarian Republic of Venezuela*

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

*Attorneys for the Bolivarian Republic of Venezuela*

October 8, 2025