# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

        Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

        Defendant.

Case No. 1:17-mc-00151-LPS

## CONOCOPHILLIPS' POST-TRIAL OPENING BRIEF IN SUPPORT OF SPECIAL MASTER'S FINAL RECOMMENDATION

*Of Counsel*:

Michael S. Kim
Marcus J. Green
Josef M. Klazen
Lydia L. Halpern
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
michael.kim@kobrekim.com
marcus.green@kobrekim.com
jef.klazen@kobrekim.com
lydia.halpern@kobrekim.com

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
  & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
RGMason@wlrk.com
ARWolf@wlrk.com
MHCassel@wlrk.com

Dated:  October 8, 2025

ROSS ARONSTAM & MORITZ LLP

Garrett B. Moritz (Bar No. 5646)
Elizabeth M. Taylor (Bar No. 6468)
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
gmoritz@ramllp.com
etaylor@ramllp.com

*Attorneys for Phillips Petroleum Company
Venezuela Limited, ConocoPhillips
Petrozuata B.V., ConocoPhillips Gulf of
Paria B.V., and ConocoPhillips Hamaca B.V.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .......................................................................................................4

    A    Gold Reserve's Transaction Structure ....................................................4

    B    Gold Reserve's Financing............................................................................5

        1.    The Bridge Loan ...........................................................................6

        2.    The ABL .........................................................................................8

        3.    The Preferred Equity Raise ......................................................12

ARGUMENT ..........................................................................................................13

I.    GOLD RESERVE FAILED TO ESTABLISH THAT THE DALINAR BID WAS CAPABLE OF CLOSING IF THE 2020 BONDHOLDERS PREVAILED. ..................15

II.    GOLD RESERVE FAILED TO ESTABLISH THAT IT HAS SUFFICIENT INCREMENTAL FINANCING TO RESOLVE THE 2020 BONDHOLDER CLAIMS. ...................................................................................................18

III.    GOLD RESERVE'S BID COULD NOT HAVE BEEN APPROVED...........................25

    A.    Gold Reserve's Termination Provision.................................................25

    B.    Gold Reserve's Objective Was to Attempt to Force Payment of its Claim in Cash if the 2020 Bondholders Won.................................................27

CONCLUSION.......................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Petroleos De Venezuela, S.A.* v. *MUFG Union Bank, N.A.*,
    2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025)..........................................................................15

**Statutes and Rules**

8 *Del. C.* § 324(a)...........................................................................................................25, 28

**Other Authorities**

"Payment Conditions."  GR-63 at 518.............................................................................10, 11, 12

Practical Law, Asset-Based Lending:  Overview .....................................................................8, 9

Practical Law, What's Market:  Bridge Loans .............................................................................6

Sale Process Parties Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V. (Plaintiffs in Cases No. 19-mc-00342-LPS, No. 22-mc-00264-LPS, and No. 22-mc-00464-LPS) ("ConocoPhillips") respectfully submit this opening post-trial brief in support of approval of the Sale to Amber Energy as requested by the Special Master:

## PRELIMINARY STATEMENT

The Special Master recommended the bid submitted by Amber Energy to acquire the PDVH shares based on his conclusion that it best achieved his dual mandate of price and certainty of closing. The Court conducted a four-day evidentiary hearing in which the evidence bore out the correctness of the Special Master's decision, not the least of which was the real-time issuance of a decision from the Southern District of New York validating the 2020 Bondholders' claims on the final day of the hearing.

The Amber bid was supported by all creditors with claims senior to Gold Reserve (Crystallex, Tidewater, ConocoPhillips, OIEG, Huntington Ingalls, ACL1 and Red Tree) other than Gold Reserve's consortium members (Koch and Rusoro), who took no position as between the two bids. The Amber bid faced objections only from the Venezuela Parties, who have steadfastly opposed any sale, and Gold Reserve/Valores. The Venezuela Parties' objections were essentially that (i) the price is unconscionably low and (ii) the inadequate price resulted from a defective sale process. Gold Reserve objected to the Amber bid on the basis that the Dalinar bid made by its consortium was facially higher than the Amber bid, and was capable of closing.

The Venezuela Parties' principal argument is that the Amber bid should not be approved because it is purportedly less than 50% of the fair market value of the PDVH shares and thus fails to meet the requirements of Delaware law. This argument fails for reasons both factual and legal. On the facts, the evidence established that the $18.6 billion valuation prepared by the Venezuela

Parties' expert, Dr. Alberro, was not a reliable indicator of the fair market value of the PDVH shares. Indeed, Dr. Alberro himself candidly conceded that the valuation he prepared was theoretical, and he has no opinion on whether any actual buyer would pay $18.6 billion for the PDVH Shares. Beyond the uncontested fact that the Alberro valuation does not even purport to reflect "fair market value" in its commonly understood sense of what a willing buyer would pay a willing seller, Dr. Alberro's valuation analysis relies on questionable assumptions and makes methodological errors, including not taking into account any potential liability related to the 2020 Bonds, which have now been ruled valid. These issues are discussed in the brief filed by Red Tree, with which ConocoPhillips generally concurs.

The Venezuela Parties' objection also fails as a matter of law, because Delaware law does not impose the bright line test that the Venezuela Parties espouse, which is that the price achieved in a forced sale must be at least 50% of fair market value. To the contrary, the Delaware cases reveal a strong judicial preference for valuations based on actual results achieved in the market as determinants of value, rather than expert-driven discounted cash flow or similar valuation techniques. Crystallex's brief, with which ConocoPhillips concurs, addresses this issue. Crystallex also addresses the testimony that established that the marketing of the PDVH shares was unprecedented in scope, involving an exceptionally large search for potential buyers. Tr. at 534:11-535:6 (Hiltz). Crystallex further demonstrates that the criticisms of the sale process from the Venezuela Parties' witness, Mr. Weisenburger, should be accorded no weight given his complete lack of experience with or even knowledge of forced judicial sales under Delaware law.

Gold Reserve's principal objection is that the credit bid made by the Gold Reserve consortium through its acquisition vehicles, Dalinar and Adolin, has a facially higher price than the Amber bid and therefore was superior to it. ConocoPhillips will address the question of which

is the superior bid below.  As will be shown, the evidence conclusively established that the Special Master's decision to terminate the Dalinar bid in favor of the Amber bid was entirely appropriate given Gold Reserve's failure to provide any meaningful explanation of how its bid could close if, as has now occurred, the 2020 Bondholders prevailed in their litigation.  While Gold Reserve has asserted that its lenders would finance the bid even if the 2020 Bondholders win, the evidence shows that the loan proceeds could be not used to pay for the PDVH Shares (and become available for distribution to creditors) unless Gold Reserve is able to cause its acquisition vehicle, Adolin, to merge with CITGO Petroleum Corporation.  Nor did the evidence bear out Gold Reserve's assertion that it had the financial wherewithal to "settle" with the 2020 Bondholders if necessary because Dalinar had access to an additional $2.8 billion in financing capable of being used to pay the 2020 Bondholders.  To the contrary, that financing is either illusory, unavailable to pay the 2020 Bondholders, or both.  As events have now played out, the certainty that the Amber bid provides in the form of a binding transaction support agreement with the 2020 Bondholders has been proven critical.

In ConocoPhillips' view, the evidence that the Amber bid is worthy of this Court's approval, and that the objections should be overruled, is overwhelming.  ConocoPhillips respectfully urges the Court to authorize the Special Master to proceed with the sale of the PDVH shares to Amber.

## BACKGROUND

The general factual underpinnings of this brief are contained in the Special Master's proposed findings of fact (the "**FOF**").[1]  This brief focuses on two core aspects of Gold Reserve's Bid:  the transaction structure through which Gold Reserve intends to acquire the PDVH Shares, and the manner in which Gold Reserve intends to finance the transaction.  Below, we summarize the key facts underlying both.

### A.      Gold Reserve's Transaction Structure

Gold Reserve proposes to carry out its acquisition of the PDVH Shares through two acquisition vehicles.  Gold Reserve's acquisition vehicles are Dalinar Energy Company, a wholly owned subsidiary of Gold Reserve, which is the entity that would purchase the PDVH Shares, and Dalinar's subsidiary, Adolin Holdings, Inc.  *See* Tr. 1043:22-23, GR-63 at 618; FOF ¶¶ 227, 229.  Gold Reserve does not have assets of its own sufficient to fund its proposed transaction, nor would Gold Reserve's acquisition vehicles (Dalinar and Adolin) be funded with any material assets.  *See* AM-40; Tr. 960:21-961:19, 1043:17-1044:1 (Rivett); FOF ¶¶ 222, 224, 227.  Instead, Gold Reserve proposes to finance its acquisition by taking out loans that are intended to be secured by the assets of CITGO Petroleum Corporation.  *See* Tr. 1041:2-1043:10 (Rivett); FOF ¶ 229.

Because, before closing, Gold Reserve has no ability to cause CITGO Petroleum Corporation or its subsidiaries to grant liens, Gold Reserve proposes to carry out the transaction through a two-step process.  *See* Tr. 1043:11-1044:14 (Rivett); FOF ¶ 229.  In the first step, Gold Reserve's acquisition vehicle, Adolin, would borrow $4.5 billion in the form of a bridge loan (or

---

[1] Capitalized terms not otherwise defined have the same meanings as in the Proposed Findings of Fact.  References to "Tr." indicate citations to the transcript of the Sale Hearing.  References to an exhibit are noted by Exhibit Number.

replacement financing for the bridge), and a $350 million asset-based pre-fund facility. Tr. 1044:2-1044:6; GR-63 at 29, 482; FOF ¶ 227.

After those loans are funded, and Adolin transfers those funds to the Special Master for payment to the judgment creditors, Dalinar would take possession of the shares. *See* GR-63 at 504 ¶ 1. At that point, Dalinar, as the new parent of PDVH and, indirectly, the CITGO enterprise, would direct CITGO Petroleum Corporation to merge with Adolin. GR-63 at 504 ¶ 2. The newly merged Adolin/CITGO Petroleum Corporation would then grant liens on all of its assets and cause CITGO Petroleum Corporation's subsidiaries to grant liens on all of their assets in favor of the lenders. GR-63 at 504-506 ¶¶ 2, 4; FOF ¶¶ 232-233.

Thus, following the transaction, the corporate structure of the resulting enterprise would be as follows: Dalinar Energy Corporation would be the 100% owner of PDVH. PDVH would be the 100% owner of CITGO Holding, Inc., but subject to the 2020 Bondholders' pledge of 50.1% of the CITGO Holding shares (unless that pledge is resolved). CITGO Holding, Inc. would be the 100% owner of CITGO Petroleum Corporation. CITGO Petroleum Corporation/Adolin would be the entity that owns, through itself and its subsidiaries, the operating assets that make up the CITGO refining enterprise. CITGO Petroleum Corporation/Adolin would become the borrower on all of the acquisition debt and the entity in which Gold Reserve's preferred equity investors would invest. *See* GR-63 at 596 (defining "Preferred Equity Issuance" to mean "up to $1,800,000,000 of gross cash proceeds from the issuance of preferred equity securities *of CPC* in private offering(s)") (emphasis added); *id.* at 504 (defining "Ultimate Borrower" to mean CITGO Petroleum Corporation); FOF ¶ 211.

### B.    Gold Reserve's Financing

Gold Reserve proposes to finance its bid through three different facilities: (1) a Bridge Loan from a syndicate led by J.P. Morgan for $4.5 billion (the "**Bridge Loan**"), unless that

financing can be replaced by (as yet uncommitted and undescribed) permanent financing (*see* GR-63 at 505 ¶¶ 3.f-3.g); (2) an Asset-Backed Loan, or "ABL," with a committed portion of up to $2 billion and an "accordion" feature permitting it to be expanded up to $3 billion, all of which is subject to the existence of adequate collateral (the "**ABL Facility**"); and (3) if needed, a preferred equity financing supported by a "Highly Confident" letter from J.P. Morgan (the "**Preferred Equity Financing**"). *See generally* GR-63 at 29 & n.15. The core details of each of these proposed financings are discussed below.

### 1. The Bridge Loan

"Bridge loans" are a commonly used mechanism to help finance an acquisition. By obtaining a bridge loan commitment, the purchaser has a commitment from a bank that financing will be available to close the acquisition, thus assuring the seller that the transaction will close; but the intent is never to actually draw on the bridge. Instead, the intent is to attempt to obtain other financing, from a broader syndicate of lenders, that would take the place of the bridge before the transaction actually closes – as Mr. Rivett testified, "That's the way a bridge works. That's why it's called a bridge." Tr. 1004:2-3 (Rivett); *accord* GR-63 at 29, FOF ¶ 213.

Because a bridge facility is generally not intended to actually be funded, the terms of bridge loans are often unfavorable for the borrower and are designed to incentivize repayment of the facility as soon as practicable. *See* Practical Law, What's Market: Bridge Loans. As Mr. Rivett explained, "They [the banks] don't want to be in the bridge. Nobody wants to stay in the bridge." Tr. 1004:19-21 (Rivett). Accordingly, Mr. Rivett hopes that more permanent financing would be in place before the transaction closes. Tr. 1003:5-8 (Rivett); *accord id.* 1004:4-11. However, Gold Reserve does not have any committed financing to replace the bridge, and therefore the actual terms of that permanent financing are not yet determined (assuming that permanent financing is even available when it comes time to close the transaction). Tr. 1004:17-19 (Rivett); FOF ¶ 213.

6

Among the terms of the Bridge Loan that incentivize repayment as soon as possible is that any money raised from equity financings (including the proposed Preferred Equity Financing discussed below) must be used to repay the Bridge Facility immediately.  To the extent that the Bridge Loan has not yet been funded, the committed amount of the Bridge Loan is reduced dollar-for-dollar by the amount of any equity raise.  Mr. Rivett acknowledged as much in his testimony: In response to a question "[i]f you close relying on the bridge and the bridge is not repaid, anything that you raise from an equity financing has to first go to pay the bridge; right?," he responded "If we weren't able to transition from a bridge to a term ABL," indicating that while he believed that permanent financing would be in place such that the Bridge Loan would not be outstanding, if the Bridge Loan *were* still outstanding, any proceeds from an equity financing would be required to be used to pay down the Bridge Facility.  Tr. 1005:14-19 (Rivett).

Mr. Rivett's testimony is fully supported by the text of Gold Reserve's Bridge Loan Commitment Letter.  Under the terms of the Bridge Loan Commitment Letter, to the extent Gold Reserve is able to raise "[o]n or prior to the Closing Date," "aggregate net cash proceeds from the issuance of any equity securities or equity-linked securities," then the Bridge Commitment "will be automatically and permanently reduced on a dollar-for-dollar basis."  GR-63 at 537; FOF ¶¶ 210-212.  The same economic effect remains "[a]fter the Closing Date" – instead of reducing the commitment, which is not possible because the loans will have been funded, the Borrower is required to "repay the Bridge Loans … within one (1) business day following the receipt of net cash proceeds … from the issuance of any equity securities or equity linked-securities … in an amount equal to 100% of such net cash proceeds."  GR-63 at 538-539; FOF ¶¶ 210-212.

The Bridge Loan contains other material restrictions as well.  One of the key restrictions is that "no dividends or other distributions to Borrower's equity holders shall be permitted while the

Bridge Facility is outstanding." GR-63 at 543. That would appear to include any dividend from CITGO Petroleum Corporation to resolve the CITGO Holding Pledge, as the 2020 Bondholders are the equity holders of 50.1% of CITGO Petroleum Corporation's parent company, CITGO Holding. In particular, to the extent that any cash proceeds are obtained at CITGO Petroleum Corporation (such as proceeds of the ABL Facility or the Preferred Equity Financing), those monies cannot be dividended to CITGO Holding to pay the 2020 Bondholders.

The availability of the Bridge Loan is also dependent on being able to consummate the merger of Adolin with CITGO Petroleum Corporation. Among other things, the Bridge Loan is specifically to be made in contemplation of the "Transactions," which includes the Adolin/CITGO Petroleum Corporation merger, the Bridge Loan defines CITGO Petroleum Corporation as the "Ultimate Borrower," and requires that all of the Transactions (including the Adolin/CITGO Petroleum Corporation merger that permits CITGO Petroleum Corporation to pledge its assets) take place on the Closing Date, with the failure to do so being an immediate Event of Default and mandatory repayment event. GR-63 at 534, 539, 543; FOF ¶¶ 230-231.

## 2. The ABL

The second type of financing that Gold Reserve proposes to use is an Asset-Based Loan or "ABL." Unlike a more typical all-assets secured loan (such as the Bridge Loan), an Asset-Based Loan is secured by specified assets of the borrower. "Like all loan agreements, asset-based loans are subject to a maximum commitment, which is the absolute limit on the amount of money the borrower can borrow under the loan agreement. However, in an asset-based loan, the borrower will only be able to utilize the full amount of the commitment if it has enough assets to support its outstanding loans." Practical Law, Asset-Based Lending: Overview. As Mr. Rivett testified, an "ABL works based on what collateral is available." Tr. 994:4-5 (Rivett); *accord* Tr. 1086:20-29

(Rivett) ("The ABL is all about the collateral, working capital, inventory, about receivables if they are certified you will be able to borrow on them."); FOF ¶ 214.

The specific means through which the banks determine how much they are willing to lend based on the availability of the specific collateral is the "Borrowing Base," which is "a formula that is used to determine the maximum amount of money the borrower can borrow at any given point in time, based on the value of its assets."  Practical Law, Asset-Based Lending: Overview; *accord* GR-63 at 507 ("the Borrower intends to … obtain a senior-secured asset-based revolving credit facility …. with initial aggregate commitments of $2,000,000,000, which are subject to the Borrowing Base … then in effect"); *see id.* at 508 (defining "**Availability**" as "an amount equal to (i) *the lesser of the ABL Commitments and the Borrowing Base*" (the "**Line Cap**"), subject to reduction for amounts already drawn and increases for certain letters of credit) (italics added); *accord* FOF ¶ 214.  In other words, regardless of the face amount nominally committed under the ABL Facility, the amount that is *actually* available at any given time is a function of the Borrowing Base; the committed size of the facility merely sets the *maximum* possible amount that can be drawn, assuming the presence of sufficient collateral.

Under Gold Reserve's proposed ABL Facility, the initial Borrowing Base is calculated as 65% of CITGO's accounts receivable plus 50% of CITGO's hydrocarbon inventory.  *See* GR-63 at 510.  After certain post-closing steps and the delivery of certain certificates, the Borrowing Base takes into consideration other assets such as CITGO's retail gasoline inventory.  GR-63 at 509-510.  No evidence was presented as to what amount the Borrowing Base would be expected to be upon the closing of the transaction or thereafter, and therefore whether it would be sufficient to support an ABL borrowing to repay the 2020 Bondholders.  *See* FOF ¶ 214.  Moreover, because the ABL Facility depends on the presence of sufficient collateral, the ABL Facility must be repaid

to the extent that the amounts outstanding ever exceed the Line Cap; for instance, as retail gasoline is sold and amounts are converted to cash, the resulting cash generally must repay the loan unless new gasoline is generated.  GR-63 at 509-510.

At the Sale Hearing, reference was also made to the "accordion" feature of the ABL.  The "accordion" refers to the feature of Gold Reserve's ABL Facility that states "the Borrower will be able to, at its option, and subject to customary conditions, request an increase in the ABL Commitments by up to $500,000,000 (with the aggregate principal amount of the ABL Commitments not to exceed a total of $2,500,000,000) by obtaining additional commitments from one or more Lenders, or, with the consent of the ABL Administrative Agent and Issuing Lenders … from other entities."  GR-63 at 507; FOF ¶ 228.  That amount was subsequently increased from $500,000,000 to $1 billion, thus making the theoretical maximum amount available under the ABL Facility $3 billion.  *See* Tr. 993:8-21 (Rivett); *accord* GR-93 at 7; FOF ¶ 214.  However, none of the banks in Gold Reserve's syndicate have actually committed to lend the incremental $1 billion under the ABL Facility, nor does the existence of the accordion feature alter the Borrowing Base formula which independently limits the borrowing available under the ABL Facility; FOF ¶ 228.

Finally, the ABL also has limitations on its ability to be used to fund payments on account of any resolution of the 2020 Bond Litigation.  Specifically, payments on account of the 2020 Bondholder Litigation are specifically described as "Restricted Payments."  *See* GR-63 at 518 (definition of "Restricted Payment"); FOF ¶ 215.  Under the terms of the ABL Facility, Restricted Payments can be made in an unlimited amount, but are subject to satisfaction of the "Payment Conditions."  GR-63 at 518.

The relevant Payment Conditions include, among others, that no Restricted Payment can be made until one year after the transaction closes; therefore the ABL cannot be used to fund *any* payments on account of the 2020 Bondholders for at least one year. *See id.* (Payment Condition (a)); FOF ¶ 215. A second condition is that no Bridge Loans can be outstanding and the Bridge Facility has to have been repaid in full. *Id.* (Payment Condition (c)); FOF ¶ 215. And a third restriction is that there are financial ratio limitations on using the ABL Facility to fund Restricted Payments. *Id.* (Payment Condition (d)); FOF ¶ 216. While the precise details of those calculations vary depending on the performance of the company, in the most plausible scenarios, Restricted Payments can only be made so long as, after giving effect to the transaction, there would still be between $300 and $400 million in Availability remaining under the ABL Facility – meaning that amounts actually available to fund a settlement with the 2020 Bondholder Litigation would be significantly less than even the Borrowing Base amount.[2] GR-63 at 518-519.

The ABL Facility and the Bridge Loan Facility (or its replacement) are interconnected with each other in that each facility has a second lien on the collateral that primarily supports the other facility – known as a "crossing lien" structure. *See* GR-63 at 514; FOF ¶ 229 n.7. As described

---

[2] The Payment Conditions financial ratio test permits distributions only "(i) so long as the Total Leverage Ratio (calculated on a pro forma basis after giving effect to such transaction) as of such date is at least 2.00 to 1.00, (A) (1) Availability (calculated on a pro forma basis after giving effect to such transaction) is greater than the greater of (x) 17.5% of the Line Cap and (y) $300,000,000 and (2) the Fixed Charge Coverage Ratio (calculated on a pro forma basis after giving effect to such transaction) as of such date is at least 1.00 to 1.00 or (B) Availability (calculated on a pro forma basis after giving effect to such transaction) is greater than the greater of (x) 22.5% of the Line Cap and (y) $400,000,000." GR-63 at 518-519. Even under Dr. Alberro's most optimistic projections, CITGO Petroleum Corporations' EBITDA is not projected to materially exceed $2 billion, meaning that the leverage ratio is exceedingly likely to be at least 2.00 to 1.00 at the closing of the transaction. As a result, and after giving effect to the transactions, there would have to be at least $300 million of Availability remaining under the ABL Facility in any scenario to permit Restricted Payments.

in the ABL Facility Term Sheet: "[t]he ABL Facility will be secured by a perfected first priority lien on the ABL Priority Collateral and a perfected second priority lien on the Bridge Priority Collateral. The Bridge Facility will be secured by a perfected first priority lien on the Bridge Priority Collateral and a perfected second priority lien on the ABL Priority Collateral." *Id.*; *accord* GR-63 at 536 (describing same arrangement for the Bridge Loans); FOF ¶ 229 n.7. Thus, although the ABL Facility has first call on the assets that support it, to the extent that there is additional value in the ABL Facility's collateral beyond the outstanding amount drawn under the ABL Facility, the Bridge Loan is next in line; and vice versa for the collateral that principally supports the Bridge Loans.

### 3.    The Preferred Equity Raise

The third source of funds that Gold Reserve proposes to use, if needed, is a preferred equity raise. Unlike the Bridge Loan and the non-accordion portion of the ABL, the preferred equity raise is not committed financing. Instead, Gold Reserve has obtained a letter from J.P. Morgan indicating that it is "Highly Confident" that it could raise $1.8 Billion of preferred equity from third-party investors in the future. GR-63 at 596-597; FOF ¶ 201.

Setting aside that the Highly Confident letter is not a binding commitment, the letter comes with a number of conditions to J.P. Morgan's degree of confidence.

One of those conditions is that Gold Reserve represented that the Debt Financing for the transaction would consist of only "up to $350,000,000 of borrowings under the ABL." GR-63 at 596; FOF ¶ 203. The use of the ABL Facility to fund an additional $1 billion in payments to the 2020 Bondholders, as suggested by Gold Reserve at the Sale Hearing, is not contemplated by the Highly Confident letter. Another is that the transaction must be financed in a manner that is consistent with the terms of the existing financing. *Id.* But under the existing financing, the proceeds of any cash equity raises go to pay down the secured debt that is being placed on CITGO

Petroleum.  J.P. Morgan does not state that it is highly confident that potential preferred equity investors would be willing to invest while leaving the entirety of the secured debt needed to fund the transaction in place ahead of their investments.  And, moreover, J.P. Morgan "consent[ed] to the delivery of a copy of this letter to **(but, for the avoidance of doubt, for informational purposes only in connection with consideration of your bid on a non-reliance basis)** the Special Master."  GR-63 at 599 (emphasis added), FOF ¶ 203.  No evidence has been presented that J.P. Morgan has waived its express statement that the letter is not to be relied upon.

## ARGUMENT

Gold Reserve has made two core arguments why its bid is capable of closing despite the fact that the 2020 Bondholders prevailed in their litigation in the Southern District of New York.  The first set of arguments is meant to support the proposition that even though the 2020 Bondholders have prevailed, the 2020 Bondholders cannot stop the Adolin/CITGO Petroleum Corporation merger that is at the center of Gold Reserve's financing package.  Gold Reserve contends that the 2020 Bondholders might be stayed by OFAC, or might need an injunction from the Southern District, so that even though the 2020 Bondholders have been determined to have a valid pledge of the stock of CITGO Holding Corporation, the proposed transaction can still close.  The second set of arguments is financial:  In the event that the 2020 Bondholders can block the merger, Gold Reserve claims that it has sufficient additional financing to settle with or pay off the 2020 Bonds.

Neither set of arguments is persuasive.

The first set of arguments ultimately boils down to Gold Reserve's hope that OFAC will lift the sanctions preventing the closing of *this* transaction to allow the sale of the PDVH Shares to Gold Reserve, but simultaneously maintain the stay on the 2020 Bondholders enforcing their pledge rights.  Absent compelling evidence that OFAC actually intends to selectively stay certain

creditors but not others, relying only on that hope poses far too great a risk to closing certainty – and in any event, the evidence presented at the Sale Hearing was that there is no reason to believe that OFAC will selectively stay only the 2020 Bondholders.

The second set of arguments collapses upon close inspection, because Gold Reserve's ability to raise enough incremental financing to pay off the 2020 Bondholders before closing is dependent on numerous contingencies occurring – including, among others, obtaining permanent committed financing to replace the Bridge Loan on materially different terms, sufficient ABL Facility collateral being available to support up to $1 billion in payments to the 2020 Bondholders, the ABL Facility lenders being willing to waive material conditions to their financing that prohibit distribution of those funds to the 2020 Bondholders, and that there would still be preferred equity investors willing to invest despite having billions more secured debt on the company than was apparently proposed to them.  And for each of those contingences, there is simply no evidence, beyond Mr. Rivett's unsupported hopes that those contingencies are capable of being satisfied. The rest of the judgment creditors in the waterfall should not be forced to wait on the sidelines while Gold Reserve attempts to satisfy those contingencies without any reasonable assurance of success and with essentially no risk to Gold Reserve if those contingencies ultimately are not met.

For all the reasons set out below, ConocoPhillips believes that the Court should not only approve the Amber Bid, but also make clear that Gold Reserve's bid could not have been approved in its current form regardless of the status of the Amber Bid.  That would be an independent and sufficient ground on which Gold Reserve's challenges based on the Overbid Minimum and its previous status as the recommended bidder could be resolved.

## I.    GOLD RESERVE FAILED TO ESTABLISH THAT THE DALINAR BID WAS CAPABLE OF CLOSING IF THE 2020 BONDHOLDERS PREVAILED.

Gold Reserve's position that it would be able to close the transaction notwithstanding the fact that the 2020 Bondholders have prevailed in the litigation defies reality.

Were there no OFAC sanctions at issue, there would be no legitimate question that the Dalinar Bid could not proceed as currently structured, because the 2020 Bondholders could and would block the Adolin/Citgo Petroleum Corporation merger that is at the center of Gold Reserve's financing.

The trustee for the 2020 Bonds has physical possession of 50.1% of the shares of CITGO Holding in a vault in New York. *See Petroleos De Venezuela, S.A.* v. *MUFG Union Bank, N.A.*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025); FOF ¶ 400. Under the terms of the pledge agreement governing the 2020 Bonds, the 2020 Bondholders have the right to vote the 50.1% of the shares that they possess, which gives them the right to change the composition of the Holdings board. *See* RT-63 at 12, § 2.05(d). Absent an agreement to resolve the 2020 Bondholder dispute, the 2020 Bondholders would undoubtedly attempt to exercise those voting rights – as Mr. Rivett admitted, the 2020 Bondholders "most likely will try to block" the merger assuming they have prevailed in their litigation and not settled. Tr. 1090:16 (Rivett). Alternatively, or in addition, the 2020 Bondholders could seek an injunction to prevent the Holdings board from acting in a manner contrary to their interests. In light of the Southern District's ruling that the bonds and the associated pledge are valid, there is every reason to believe that the 2020 Bondholders would not be forced to stand idly by while structurally senior debt is incurred to pay creditors whose claims are structurally junior to the 2020 Bonds.

If the 2020 Bondholders obtain control of the Holdings board or otherwise prevent approval of the merger, the contemplated merger obviously would not occur. And the consequence of the

merger being blocked is that Gold Reserve's financing is unavailable to pay for the PDVH Shares. Instead, the only permitted use of the funds would be to repay Adolin's lenders. *See supra* at 8. That, of course, makes perfect sense – Adolin has no assets of its own, and the loans are intended to be secured by the assets of CITGO Petroleum. Tr. 1044:15-20 (Rivett); FOF ¶ 229. If Adolin is unable to merge with CITGO Petroleum, CITGO Petroleum would never be able to grant liens on its assets, so the banks would not have access to the collateral against which they are intending to lend. *See* FOF ¶ 226. No economically rational bank would lend $4.5 billion, allow that money to be used to pay other creditors, and then have recourse only to Adolin (which, absent the merger, is an empty shell).

This potential risk to Dalinar's financing was repeatedly raised with Gold Reserve, but Gold Reserve did not provide a satisfactory explanation for its position that it did not pose a serious risk to the transaction. Instead, Gold Reserve's continual answer has been that OFAC will block the 2020 Bondholders from exercising their pledge rights, repeatedly arguing that there is no reason to assume that OFAC, which "has consistently suspended their rights to exercise their pledge," will "allow[] this pledge to be exercised." Tr. 1604-1605 (Gold Reserve Closing); *accord* Tr. 1604:2-6 ("We have always said, Your Honor, in our prehearing briefing, both in the stalking horse period and here today before this hearing, that the 800 pound gorilla in this room is not Judge Failla's ruling but OFAC."); Tr. 1605:3-4 ("Clearly if OFAC were to change its position then the position would change."); *see also* GR-92 at 3 ("This risk has … been substantially reduced, if not eliminated entirely, by [OFAC's extension of GL-5S] on June 20, 2025.")

The evidence, however, told an entirely different story. In fact, it seems highly unlikely that OFAC would allow control of CITGO Petroleum to be transferred by reason of a sale of the PDVH shares for the benefit of the creditors in this proceeding, financed with billions of dollars

16

of secured debt to be placed on CITGO Petroleum, but leave the 2020 Bondholders powerless to protect the value of their pledge of a majority ownership interest in CITGO Holding. Indeed, it is directly refuted by the position expressed by OFAC in FAQ 1123, which states that "in making these licensing determinations OFAC is committed to fair and equivalent treatment of potential creditors." RT-50. Similarly, it is contrary to FAQ 1124: "OFAC will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the [PDVSA] 2020 8.5 percent bond." RT-51 at 1-2; *see* FOF ¶ 237. It is far more realistic to assume, as the Special Master did in making his recommendation, and as Mr. Hiltz did in his testimony, that if OFAC were to lift the sanctions to permit the transaction at issue here to close, it would also lift the sanctions on the 2020 Bondholders, rather than effectively predetermining the outcome of what is fundamentally an intercreditor dispute. As Mr. Hiltz explained:

> Now, with respect to OFAC I make the following observation. I understand your argument that OFAC has had this in place for six years, and I believe there were foreign policy concerns that caused OFAC to have that in place. Namely because of the issues surrounding the U.S. relationship with Venezuela government, they didn't want to have a change of control at CITGO take place.
>
> Why in the world would it make sense to allow the sale to Gold Reserve […] which results in a change of control and at the same time maintain a stay against the 2020s to prevent, which it was designed to prevent, a change of control.
>
> I mean, if they're going to permit a change of control they would permit a change of control and they would allow that, whether that be with respect to the sale of the Gold Reserve or with respect to the 2020s exercising their lien. So all I'm saying is that it's not clear to me that just because OFAC has had this stay in effect for six years it's going to continue to stay.

Tr. 696:17-697:12 (Hiltz).

By contrast, Mr. Rivett, despite numerous opportunities, provided no evidence whatsoever demonstrating that it was likely that OFAC would selectively stay only the 2020 Bondholders. *See* Tr. at 1056:10-1066:18 (Rivett).

Because there is no persuasive reason to conclude based on the evidentiary record that OFAC would stay only the 2020 Bondholders while permitting the transaction here to close, the possibility of a selective stay should not be given material weight in the analysis of closing certainty. Therefore, for all the reasons stated above, Gold Reserve's bid as currently structured is unworkable, unless Gold Reserve demonstrated that it had the ability to raise sufficient incremental financing to pay the 2020 Bondholders. For the reasons discussed in the next section, the record is abundantly clear that it has not.

The Special Master therefore appropriately determined that the Dalinar bid created significant closing uncertainty, and that, despite its higher headline price, was not superior to the Amber bid, which had addressed this risk by entering into the TSA.

## II.    GOLD RESERVE FAILED TO ESTABLISH THAT IT HAS SUFFICIENT INCREMENTAL FINANCING TO RESOLVE THE 2020 BONDHOLDER CLAIMS.

Beyond arguing that OFAC would block the 2020 Bondholders from ever exercising their rights even as it permits Gold Reserve's proposed transaction to close, Gold Reserve has also told the Court that it has sufficient financing to pay the 2020 Bondholders from a $1.8 billion Preferred Equity raise and an incremental $1 billion from the ABL Facility.

The obvious problems with those proposed sources of financing have been pointed out by multiple parties. For example, even if the *entirety* of Dalinar's reserve financing was treated as money-good in its full face value, $2.8 billion is not the $3 billion or more that the 2020 Bondholders claim to be owed. FOF ¶¶ 199-200. And neither the $1.8 billion in the Preferred

18

Equity Financing or the incremental $1 billion from the ABL Facility is actually committed from any investor or lender.

But Gold Reserve's financing is worse than merely uncommitted and insufficient. Based on the terms of the financing documents themselves, the evidentiary record demonstrates that Dalinar has *zero dollars* in reserve financing that can be used to pay the 2020 Bondholders for at least the entire first year following the closing of the transaction. Whether Dalinar will ever have *any* money after that year that can be used to pay the 2020 Bondholders is also, on this record, utterly speculative. It depends on Gold Reserve being able to obtain permanent financing on terms substantially different from those of the Bridge Loan, the ABL Lenders being willing to waive the Payment Conditions in the ABL Facility, sufficient collateral being available to support making distributions under the ABL Facility, and the preferred equity investors being willing to invest despite being layered behind additional billions of dollars of secured debt, among others. Gold Reserve has effectively asked the rest of the judgment creditors in the waterfall to simply take Mr. Rivett's word for it that those contingencies can be worked through. The rest of the creditors ahead of Gold Reserve in the waterfall (other than those contractually bound to silence) have rightly insisted on contractual commitments, not hope and speculation.

*The Bridge Loan Paydown Requirements.* There is no dispute that, so long as the Bridge Loan is outstanding, any amounts raised through a preferred equity financing would need to be used to repay the Bridge Loan or reduce the amount committed under the Bridge Loan. Mr. Rivett testified as much, and the documents clearly so provide. *See supra* at 7. The result is that, under the present financing structure, the incremental additional financing that can be raised through the proposed $1.8 billion Preferred Equity Financing or any other preferred equity financing is *$0* –

each dollar raised in preferred equity simply reduces the amount of Bridge Loan dollar-for-dollar, and the entire amount of the Bridge Loan is needed to fund the transaction.

Again, and for the avoidance of doubt: Gold Reserve does not dispute any of this.  Instead, Gold Reserve's response has been that it will obtain permanent financing to replace the Bridge Loan.  But there are two major problems with that proposed solution.  *First*, Gold Reserve has no commitment for that permanent financing, and has not presented any evidence that it will actually be available in the future.  One of the inherent risks in this transaction is the possibility or even likelihood that there will be an extended period between the Court's approval of this transaction and when the transaction ultimately closes; the ability to obtain permanent financing could be hindered for reasons having nothing to do with Gold Reserve, such as a downturn in the financing markets, poor performance from CITGO, or myriad other reasons.

And *second*, it is not enough for Gold Reserve to be able to obtain replacement financing instead of the Bridge Loan.  Gold Reserve needs to obtain new financing *that does not have the same paydown requirements and other restrictions and limitations as the Bridge Loan*.  Merely replacing the Bridge Loan with a more permanent facility but otherwise with terms similar to the Bridge Loan does not help.  If any preferred equity financing is able to generate proceeds that are *incremental* to the amounts contemplated to be raised by the Bridge Loan or its replacement, that new financing would need to permit the raising of Preferred Equity at CITGO Petroleum and simultaneously permit those proceeds to be used for a dividend to CITGO Holding and then be used to pay the 2020 Bondholders.  No evidence has been provided as to whether new financing would be available with that material change in terms as compared with the Bridge Loan.

The Bridge Loan also contains restrictions on the use of proceeds of the ABL Facility to pay the 2020 Bondholders.  Separate and apart from any restrictions contained within the ABL

Facility itself, the Bridge Loan *independently* prohibits CITGO Petroleum Corporation from making any restricted payments, which would include payments on account of resolving the 2020 Bondholder Litigation. *See supra* at 7-8. Any replacement for the Bridge Loan would also have to permit the use of proceeds from the ABL Facility to make payments on account of the 2020 Bondholder Litigation. Notably, the Bridge Loan (and presumptively its replacement) have a second lien on the ABL Collateral, and there is no evidence that the Bridge Loan Lenders (or their hypothetical permanent replacements) would be willing to let material proceeds of the ABL Facility be used to pay the 2020 Bondholders, as opposed to paying themselves down or repaying the ABL Facility (which would improve the position of the Bridge Lenders, because their second lien on the ABL Collateral would be behind less indebtedness under the ABL Facility).

Gold Reserve has little beyond speculation to demonstrate that it will not only be able to find new permanent financing, but also that it will be able to find new permanent financing that would permit Dalinar to use proceeds of the Preferred Equity Financing and the ABL Facility to make payments on account of the 2020 Bondholder Litigation, which the current financing prohibits. As matters stand today, the evidence is that Dalinar only has the Bridge Loan committed, not its intended permanent replacement, and that the Bridge Loan indisputably precludes any use of the Preferred Equity raise or the ABL Facility to make payments on account of the 2020 Bondholders.

*The Conditions to ABL Availability.* The terms of the ABL Facility also are clear that proceeds of the ABL cannot be used to make payments on account of the 2020 Bondholder Litigation for at least one year following the closing of transaction, nor while any amounts under the Bridge Facility remain outstanding.

Again, Gold Reserve does not dispute that this is exactly what the documents say. Mr. Rivett agreed that the Payment Conditions in the ABL Facility do not permit use of the ABL to pay the 2020 Bondholders, but stated: "That's what it says here, but that is not the understanding with the banks." Tr. 998:24-99:1 (Rivett). Of course, *unwritten understandings* with banks do not translate into committed funding, particularly if the unexpected occurs.

Even assuming, however, that the ABL Facility Lenders would generously be willing to waive the Payment Conditions so as to permit payments to be made to the 2020 Bondholders immediately, rather than, for example, repaying the Bridge Loan or its permanent replacement (even though permitting payments to the 2020 Bondholders would effectively impair their own position, because the ABL Facility Lenders benefit from a second-lien behind the Bridge Loan (or its replacement), and so payments to the Bridge Loan improve their own position), it is obvious that the ABL Facility Lenders would never lend, or permit their loan proceeds to be used, unless there is sufficient collateral available to support the Borrowing Base.

No evidence was presented regarding what the Borrowing Base is expected to be at the closing of the transaction. And, even setting aside the other Payment Conditions that independently restrict the use of ABL Facility proceeds to pay the 2020 Bondholders, the ABL Facility Lenders have negotiated for financial covenant ratio tests that limit the amount of the ABL Facility that can be used for payments to the 2020 Bondholders – essentially capping the amount that could be used for payments to the 2020 Bondholders at hundreds of millions of dollars *below* the Borrowing Base.

Lastly, there is a basic circularity problem with Gold Reserve's transaction. All but $350 million of the ABL Facility cannot be funded until the CITGO Petroleum Corporation/Adolin merger closes. Access to the remainder depends on that transaction having closed. And there is

22

no reason to think (let alone evidence supporting) that the 2020 Bondholders, having vigorously opposed the Gold Reserve transaction at every turn, would ever let the merger close in the first place. Therefore, even if all the other contingencies are somehow dealt with – the Bridge Loan is replaced with permanent financing, that new permanent financing permits the ABL Facility to be used to pay the 2020 Bondholders, the ABL Facility Lenders agree to waive the restriction prohibiting the use of the ABL Facility for this type of payment for a year, and there is enough available collateral that all the financial ratio tests are actually met – Gold Reserve will never even have access to the ABL Facility because the merger cannot close. The 2020 Bondholders represent an *immediate* risk to closing; it is not an issue that can potentially be addressed a year down the road after the transaction has already occurred.

For all these reasons, the availability of the ABL Facility to fund a settlement or payment to the 2020 Bondholders is entirely speculative. The documents do not permit its use in that manner, and the ability to obtain required modifications to the terms of both the ABL Facility and the Bridge Loan or its permanent replacement, plus the financial and other restrictions contained in the documentation, create far too much uncertainty to accord this source of reserve financing any material weight in the analysis.

*The Preferred Equity "Highly Confident" Letter*. Lastly, Gold Reserve has touted its Highly Confident letter from J.P. Morgan as a means of obtaining $1.8 billion to pay the 2020 Bondholders. Of course, the Highly Confident letter is not a commitment by J.P. Morgan to advance funds to Dalinar; it merely states that J.P. Morgan is highly confident it can sell equity securities to third-party investors to raise those funds. GR-63 at 597. Indeed, the letter on its face says that it is to be used for informational purposes only, and it is not to actually be relied upon.

GR-63 at 599.  If J.P. Morgan was not willing to let Gold Reserve rely on the letter, it is not clear why the other judgment creditors and the Court should now be asked to rely upon it.

Beyond the lack of a binding commitment or even real indicia of reliability, it also appears that the letter does not contemplate a situation where the Preferred Equity Financing, together with the ABL Facility, would be used to make payments to the 2020 Bondholders rather than reducing debt or being used to operate the business of CITGO Petroleum Corporation.  On its face, the letter states that there would only be $350,000,000 of indebtedness outstanding under the ABL at the Closing of the transaction, not an additional $1 billion along the lines suggested by Gold Reserve to pay the 2020 Bondholders.  And, under the terms of the financing documents, the proceeds of any preferred equity raises must be used to pay down the secured debt at CITGO Petroleum Corporation, not dividended to CITGO Holding and then used to pay the 2020 Bondholders.

The difference between investing in preferred equity to pay down secured debt of the issuer, and investing in preferred equity to fund a dividend to the issuer's parent company, is highly material.  If the proceeds of an equity raise are used to repay senior debt, then, so long as the enterprise is solvent, the value of the preferred equity position is increased dollar-for-dollar by the reduction in debt; by contrast, if the proceeds are used to fund a dividend while leaving the secured debt in place, the preferred equity remains behind that debt.  There is no evidence that there would be a market for these preferred equity securities if the terms of the financing documents were changed to permit the proceeds of preferred equity raises to be used, not to operate CITGO Petroleum or to pay down the secured debt, but instead to fund a dividend for the benefit of CITGO Petroleum's equity holders.

For all those reasons, the only tenable conclusion to draw based on the evidence presented at the Sale Hearing is that the amount of reserve financing that Gold Reserve currently has

available to either pay or settle with the 2020 Bondholders before closing is *zero dollars*.  The unrealized and highly uncertain potential for Gold Reserve to obtain reserve financing in some greater amount is inadequate to justify consideration of its bid.

## III.    GOLD RESERVE'S BID COULD NOT HAVE BEEN APPROVED.

As has been amply demonstrated, Gold Reserve did not and does not have the means to address the risk that the 2020 Bondholders would prevail in their litigation, as they now have.  To the contrary, it is clear that Dalinar needs to be able to effectuate the merger and grant liens on all of CITGO Petroleum's assets, which it simply would be unable to do now that the pledge has been upheld.  Had the 2020 Bondholders lost, the bid could have worked, but there was no workable strategy to close the transaction otherwise.

The Court should find that, in view of the outcome in the 2020 Bondholder Litigation, Gold Reserve's bid is not actionable.  While ConocoPhillips believes that the Court's interpretation of the Overbid Minimum provisions was entirely correct, a holding that Gold Reserve's proposal is unworkable and not approvable is an independent and dispositive basis for resolving both Gold Reserve's Bid Protection objections and its claim that 8 *Del. C.* § 324(a) prohibits any consideration other than price.

### A.    Gold Reserve's Termination Provision

Throughout the Sale Hearing, Gold Reserve portrayed its having become the Final Recommended Bidder as a moment of "elation," that it had done all it needed to do, and its bid was effectively on a glide-path to approval.  Gold Reserve's framing of its status ignores the fact that the Special Master's recommendation of Gold Reserve as the Final Recommended Bidder was *opposed* by Crystallex, ConocoPhillips, and others.

The opposition from those senior creditors focused on a limited, but important, issue. ConocoPhillips and Crystallex recognized that in view of the bids that were then on the table, the facially higher amount proposed by Gold Reserve as compared to the then-existing other bidder entitled that price to significant weight.  But there was a major potential ambiguity in the Dalinar SPA:  while ConocoPhillips, Crystallex, and the Special Master understood the SPA to permit termination of the SPA if the 2020 Bondholders won, because that would effectively impair Gold Reserve's debt financing, the senior creditors had significant concerns that the terms were not nearly as clear as they needed to be for such an important issue.  In other words, ConocoPhillips and Crystallex were reluctantly willing to let the Special Master roll the dice on the 2020 Bondholder Litigation and thereby obtain greater value for the rest of the Additional Judgment Creditors, but not at the cost of being held up indefinitely by a non-actionable bid if the 2020 Bondholder Litigation went in the 2020 Bondholders' favor.

It soon became clear that Gold Reserve took a very different view of the Special Master's ability to terminate.  Gold Reserve took the position that it was entitled to a year (or perhaps longer) to find alternative financing in the event the 2020 Bondholders prevailed, and that the cure period requiring it to obtain new financing would not even begin until a ruling that the 2020 Bondholders' pledge was valid became final and *non-appealable* (*i.e.*, through denial of certiorari).  In the meantime every other judgment creditor would just have to wait while that process played out. *See* D.I. 1991.

Shortly before the Sale Hearing, no doubt recognizing that this position was (for good reason) unacceptable to almost all of the creditors, Gold Reserve began proposing modifications to the termination provision.

But the new provision Gold Reserve offered was just as problematic. That provision would permit termination after a cure period based on the occurrence of a "Triggering Event." A Triggering Event was defined as "the coming into effect of any Law or Order by a Governmental Body of competent jurisdiction, that (i) enjoins the Transaction or (ii) permits the 2020 Bondholders to immediately exercise the Purported Pledge." GR-93 at 34. However, Gold Reserve would inevitably take the position that the 2020 Bondholders could not exercise their pledge "immediately" unless OFAC lifted the sanctions, thereby creating the prospect of an approved bid dependent on financing that was unworkable, because once it actually came time to close the transaction, the 2020 Bondholders could block the merger. In the meantime, and until the Outside Date giving the Special Master a separate termination right (which could be a year or more under the Dalinar SPA), the entire process would be in Gold Reserve's hands.

Why would Gold Reserve insist so vigorously on making it all but impossible to displace its bid, even if its financing was moribund? The answer became clear at the Sale Hearing.

### B. Gold Reserve's Objective Was to Attempt to Force Payment of its Claim in Cash if the 2020 Bondholders Won.

The evidence and arguments at the Sale Hearing confirmed that Gold Reserve's principal objective was to become the Final Recommended Bidder so that it could have blocking rights preventing this process from moving forward unless it was either topped in price (thereby requiring its judgment to be paid in full in cash) or until the Outside Date.

The Court may recall the colloquy that it had with Mr. Rivett regarding why Gold Reserve had not paid J.P. Morgan the commitment fee needed to convert the Highly Confident Letter into a commitment:

> Judge Stark: I think you testified today . . . we will do whatever it takes, but that is not true, because you haven't, to this point, done whatever it would take. You haven't paid the $50 to $70 million to get the committed financing to potentially pay the 2020s, if need be.

27

The Witness:  But Your Honor, in fairness, like we were named the final recommended bid.  We thought we had done what it would take.

* * *

The Witness:  We didn't ask for that preferred share committed financing, but only because in the end we didn't need it.  We got the final recommendation, so again like we did everything, . . . and we got that final recommendation.

Tr. 1114:10-20, 1117:8-14 (Rivett).

The clear disconnect between the Court and the witness is this:  The Court wanted to know why Gold Reserve did not do everything to ensure that there would not be closing risk, and Gold Reserve wanted to do everything to ensure that it had done enough to be the Final Recommended Bidder.  *See also* Tr. 1006-1007 (responding to question from Amber's counsel regarding his response to Elliott's offer of $75 million that Gold Reserve wanted all of its claim to be paid in full, Mr. Rivett said: "My understanding was we had bidder protections that I thought provided us with the ability to be paid in cash.").  Once Gold Reserve became the Final Recommended Bidder, it believed that any bid either had to top it in price (which meant that it could insist on payment in full in cash), or else it would win and then even if the 2020 Bondholders prevailed, it would have enormous leverage because it thought that its SPA was effectively non-terminable, and therefore Gold Reserve could prevent a pivot to another transaction prior to the Outside Date, giving it leverage to insist on payment to move the process forward.

The effect of a ruling that Gold Reserve's bid was incapable of approval is that it would render moot Gold Reserve's arguments about the Overbid Minimum and 8 *Del. C.* § 324(a).  Even if Gold Reserve was right about the Overbid Minimum (it was not), and even if Delaware law requires the Court blindly to accept the numerically highest price no matter what (it obviously does

not), the Court was certainly never required to accept a bid based on a financing structure that has no credible path to being executed in view of the result in the 2020 Bondholder Litigation.

## **CONCLUSION**

The Special Master's Updated Final Recommendation should be adopted, and the Amber Energy transaction approved.

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*/s/ Garrett B. Moritz*

Garrett B. Moritz (Bar No. 5646)
Elizabeth M. Taylor (Bar No. 6468)
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
gmoritz@ramllp.com
etaylor@ramllp.com

*Of Counsel*:

Michael S. Kim
Marcus J. Green
Josef M. Klazen
Lydia L. Halpern
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
michael.kim@kobrekim.com
marcus.green@kobrekim.com
jef.klazen@kobrekim.com
lydia.halpern@kobrekim.com

*Attorneys for Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.*

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
 & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
RGMason@wlrk.com
ARWolf@wlrk.com
MHCassel@wlrk.com

Dated:  October 8, 2025