# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,    )
                                   )
                    Plaintiff,     )
                                   )
             v.                    )     Case No.:  17-mc-151-LPS
                                   )
BOLIVARIAN REPUBLIC OF             )
VENEZUELA,                         )
                                   )
                    Defendant.     )

## AMBER ENERGY INC.'S POST-TRIAL BRIEF

*Of Counsel:*

Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
susheelkirpalani@quinnemanuel.com
andrewrossman@quinnemanuel.com
matthewscheck@quinnemanuel.com

*Additional Counsel in Signature Block*

Michael A. Barlow (No. 3928)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Amber Energy Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................2

I.     The Attachment And Sale Of PDVH Shares To Satisfy Venezuela's Judgments ..............2

II.    Amber's History Of Good-Faith Bidding ..........................................................................3

III.   The Special Master's Recommendation Of The Amber Bid ..............................................5

IV.   The Sale Hearing ...............................................................................................................6

ARGUMENT ....................................................................................................................7

I.     Amber Has Submitted The Highest And Best Bid .............................................................7

      A.    Amber's Bid Extinguishes At Least $5.859 Billion In Writs In Exchange For Significant Value To Writholders ....................................................................7

      B.    Amber's Bid Rests On A Foundation Of Committed Financing ..........................10

      C.    Amber's Bid Reflects the PDVH Shares' Fair Market Value ..............................11

II.    Amber's Bid Is Certain To Close ....................................................................................15

      A.    Amber's Settlement With The 2020 Bondholders Solves A Gating Risk To Closing .................................................................................................................15

      B.    Amber Faces No Other Obstacles To Closing ....................................................17

III.   Amber's Bid Also Offers The Opportunity For Significant Additional Writ Extinguishment ...............................................................................................................19

IV.   Amber's Bid Enjoys The Support Of Senior Writholders ................................................21

CONCLUSION ...............................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### <u>Cases</u>

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   932 F.3d 126 (3d Cir. 2019), *cert. den.*, 140 S. Ct. 2762 (2020)................................................2

*G&A Strategic Invs. I LLC v. Petroleos de Venezuela, S.A.*,
   2025 WL 1752342 (S.D.N.Y. June 25, 2025) ...........................................................................4

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*,
   2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025) ..................................................................7, 15

*United States v. Chem. Found.*,
   5 F.2d 191 (3d Cir. 1925)..........................................................................................................15

### <u>Other Authorities</u>

Office of Foreign Assets Control, FAQ 595, https://ofac.treasury.gov/faqs/595 .........................19

Amber Energy Inc. ("Amber") respectfully submits this Post-Hearing Brief pursuant to the Court's September 29, 2025 Scheduling Order.  D.I. 2348.

## INTRODUCTION

The September sale hearing established that Amber's bid is the highest and best available bid for the attached shares of PDVH, the only bid certain to close, and the bid that achieves the purposes of this attachment and sale process.  After years of overseeing the sale proceedings, the Special Master concluded that Amber's bid "is the best bid for the PDVH Shares received to date in this sale process," and that it "places an appropriate emphasis on both price and certainty of closing" considering, among other features, its fully committed financing and settlement that "virtually eliminates" the now-crystallized risks posed by the 2020 Bondholders.  AM-45 ¶¶ 11, 16.  The evidence and argument presented at the sale hearing only reinforced these conclusions.

Amber's bid stands alone in terms of its overall value and certainty.  It has the support of every senior creditor above Gold Reserve, as most of those creditors explicitly stated over the course of four days of proceedings.  It extinguishes more of Venezuela's debt than any other alternative, and does so through a purchase that accurately values the shares being sold—particularly now that the 2020 Bondholders' structurally-senior claims on key assets have been vindicated.  While other bidders may have been prepared to gamble senior writholders' recovery on Judge Failla's ruling, now that the coin has been tossed and that bet against the 2020 Bondholders has been lost, there is no viable path to closing on any other proposed bid, and no good reason whatsoever to discard the $895 million discount on those claims that Amber negotiated.

Amber's bid delivers the most value to writholders, has the support of senior creditors and the Special Master, and is certain to close.  The Court should approve it and bring this sale process to an end.

## **BACKGROUND**

I.    **THE ATTACHMENT AND SALE OF PDVH SHARES TO SATISFY VENEZUELA'S JUDGMENTS**

On June 19, 2017, Crystallex registered a judgment against Venezuela for $1.202 billion. D.I. 1.  Crystallex immediately moved for a writ of attachment *fieri facias* against the shares of PDV Holding, Inc. ("PDVH"), which at that time were wholly owned by Venezuela's alter ego, Petróleos de Venezuela, S.A. ("PDVSA").  D.I. 2.  On August 9, 2018, the Court issued a writ of attachment on PDVSA's shares of PDVH (the "PDVH Shares") to satisfy Crystallex's judgment. D.I. 82.  The Third Circuit affirmed that decision in a published opinion, and the U.S. Supreme Court denied certiorari.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019), *cert. den.*, 140 S. Ct. 2762 (2020).  On May 22, 2020, the Court lifted its stay of the proceedings and solicited briefing on "the mechanics by which the sale of PDVH is to occur."  D.I. 174 at 1.

On January 14, 2021, the Court announced its plan to "set up the sale procedures and then follow them to the maximum extent that can be accomplished without a specific license from OFAC."  D.I. 234 at 32-33.  A Special Master would "oversee the day-to-day and detailed implementation of the sales procedures" and assist the Court to "set minimum requirements—for example, for advertising and other notices to reach potential bidders" and "the materials that will be deposited in a data room to be accessed by potential bidders."  *Id*. at 34-35.  The Court's order contemplated that other writholders' judgments "may be added to the sale," and ordered the parties to "work with the special master to consider implementing procedures to permit any other judgment creditor of Venezuela to request to participate in the Court's process."  *Id*. at 36.  The Court subsequently appointed Robert Pincus as the Special Master.  D.I. 258.

2

On October 11, 2022, after further, significant proceedings, the Court established sale and bidding procedures to govern the sale process.  D.I. 480-1, 481.  On July 27, 2023, the Court entered an order outlining how additional judgment creditors could participate in the sale by registering their judgments and obtaining a writ of attachment.  D.I. 646.  On March 1, 2024, the Court established the priority of each judgment "based on the date the applicable judgment holder moved for a writ of attachment that was eventually granted."  D.I. 996; *see also* D.I. 1102 (April 3, 2024 Final Priority Order).  And on January 27, 2025, the Court entered an order that adopted two key evaluation criteria for any bid: price and certainty of closing.  D.I. 1554 at 24-25.

## II.    AMBER'S HISTORY OF GOOD-FAITH BIDDING

Amber submitted its first bid for the PDVH Shares in 2024, culminating in Amber's September 2024 SPA with the Special Master.  That bid included an escrow feature to address the risks associated with purchasing those shares, including alter ego claims and the structurally senior claims by the holders of PDVSA bonds that are secured by a pledge of 50.1% of the equity in CITGO Holding (the "2020 Bondholders").  *See* D.I. 1325, 1325-1.  Amber's bid, while initially supported by the Special Master, did not receive wide support from the judgment creditors.  *See, e.g.*, D.I. 1414 at 1-2 (Special Master noting "the dissatisfaction among certain stakeholders, including Crystallex and ConocoPhillips," with this bid).

Amber continued to participate in the sale process and in early 2025 submitted another bid as part of the Stalking Horse phase that likewise was not selected.  September 15-18, 2025 Sale Hearing Transcript ("Tr.") 371:17-372:3 (Turkel).  Instead, the Special Master selected Red Tree as the Stalking Horse.  D.I. 1596.  One of the notable features of the Red Tree bid was that it included a settlement with the 2020 Bondholders, eliminating that risk to closing.  *Id*. ¶ 25; *see* Tr. 404:24-405:9 (Turkel).  In recommending the Red Tree bid, the Special Master stated that the settlement was "[a]n important factor in assessing the closing certainty of the Proposed

Transaction," considering that "[t]he existence of a dispute, and the virtual certainty of litigation by the PDVSA 2020 Bondholders, is by definition a risk that weighs on closing certainty, regardless of the Special Master's or a bidder's assessment of the likelihood of success in that litigation." D.I. 1596 ¶ 34. The sale process then proceeded to a Topping Period that was extended through June 18, 2025 (*see* D.I. 1779), with the deadline for the Special Master to submit his recommendation scheduled for July 2, 2025 (*see* D.I. 1809).

On May 20, 2025, Judge Rakoff issued a summary judgment ruling in the Southern District of New York alter ego litigation dismissing the alter ego claims brought by G&A Strategic Investments and its affiliates. *G&A Strategic Invs. I LLC v. Petroleos de Venezuela, S.A.*, 2025 WL 1752342, *1 (S.D.N.Y. June 25, 2025). Following that decision, Amber re-engaged in the sale process, but was unable to submit a viable bid during the Topping Period. Tr. 373:2-374:9 (Turkel).

Nevertheless, Amber continued to refine its bid and negotiate with key counterparties—most notably the 2020 Bondholders—in an effort to arrive at a superior proposal, and submitted yet another bid on August 8, 2025. Tr. 374:10-25 (Turkel); AM-46 at 844 (Amber's August 8 bid letter). Such bids were anticipated by the Court's procedures. *See* D.I. 1554 (authorizing Special Master to consider unsolicited bids after Topping Period).

The Special Master obtained permission to engage with Amber on its August 8, 2025 bid. *See* Tr. 570:15-573:13 (Hiltz). On August 22, 2025, following those discussions, Amber submitted an updated bid that offered Gold Reserve $75 million in cash in exchange for extinguishing $500 million of its judgment, increasing the headline price of Amber's bid to "$6,459,200,000 (representing an additional $500,000,000 of writ extinguishment)." AM-42 at 2-3. Amber's

August 22, 2025 updated bid letter further noted that its proposal "provides total value of $9,424,200,000." AM-42 at 2.[1]

Amber's bid has the following key features. *See* AM-45; AM-46. *First,* writholders' consent to extinguish $5.859 billion of their judgments, the full amount claimed by Koch and every creditor senior to it, for a total of $5.038 billion in cash and equivalents. *Second*, a settlement that resolves the $3.02 billion claim of the 2020 Bondholders, 75% of whom (by aggregate principal) have committed to participate for approximately $1.611 billion in cash (plus expense reimbursement), with the remaining 25% able to participate in a public exchange offer for as much as an additional $453.95 million in cash. *Third*, fully committed financing. *Fourth*, additional consideration including $105 million in expense reimbursements to Red Tree and Gold Reserve, and the aforementioned $75 million offer to Gold Reserve.

## III.    THE SPECIAL MASTER'S RECOMMENDATION OF THE AMBER BID

Amber's persistent efforts to deliver the best bid ultimately proved effective. On August 29, 2025, the Special Master issued his Updated Final Recommendation recommending Amber's bid as the Superior Proposal. *See* AM-45; AM-46. The Special Master's recommendation noted that, "[m]ost significantly, the Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation, by delivering a settlement with the PDVSA 2020 Bondholders," and would capture an $895 million discount on the 2020 Bondholders' asserted $3.02 billion claim. AM-45 at 10. In a similar vein, the Special Master also found significant that Amber's bid is supported by fully committed financing. *Id*. at 11.

---

[1]  This $9,424,200,000 is comprised of: (i) writ extinguishment of $5,859,223,200; (ii) additional consideration offered to extinguish $500,000,000 of Gold Reserve's writ; (iii) extinguishment of 2020 Bondholders' claims, valued here at approximately $2.86 billion; (iv) $105,000,000 in break fees payable to Red Tree and Gold Reserve; and (v) $100,000,000 in court fees payable for the costs associated with the sale process.

The Special Master noted that the Dalinar bid, in contrast, "does not meet the Bid Requirements for bidders to have committed financing." *Id*. The Special Master further highlighted that the Dalinar bid does not include a settlement with the 2020 Bondholders or even an adequate means for settling those claims in the future. *Id*. at 11-12 (noting Dalinar's $1 billion of committed financing presents a "significant shortfall" for dealing with the 2020 Bondholders, and that its $1.8 billion of uncommitted financing, even if it came to fruition, "may not be sufficient to resolve the asserted $3.02 billion of claims"). The Special Master accordingly had "material reservations with Dalinar's plan for addressing [the 2020 Bondholders] risk and caution[ed] the Court against relying on Dalinar's uncertain financing." *Id*. at 11.

"In summary, . . . faced with a Dalinar bid that may not be able to close and may require re-solicitation of bids at a significantly depressed level, or an Amber bid that discharges $5.892 billion (and potentially up to $6.392 billion) of Attached Judgments,[2] has a high degree of closing certainty, and secures an $895 million discount on the PDVSA 2020 Bondholders' claims," the Special Master concluded that the Amber bid "is the best bid for the PDVH Shares." *Id*. at 16.

## IV.    THE SALE HEARING

The Court held a sale hearing from September 15 to 18, 2025, during which Michael Turkel, Assistant General Counsel at Elliott, testified on behalf of Amber. The risks posed by the 2020 Bondholders were the topic of significant testimony and debate at the sale hearing, in large part because the parties and Court were awaiting a decision from Judge Failla in the Southern District of New York regarding whether the notes held by the 2020 Bondholders were valid. On the morning of September 18, 2025, the last day of the hearing before this Court, Judge Failla

---

[2]  The difference between the Special Master's estimate of the writs extinguished ($5.892 billion) and Amber's estimate ($5.859 billion) is based on minor differences in calculating the expected value of the writs at closing based on interest accumulation. Amber uses its estimate herein.

issued an opinion and order on summary judgment in favor of the 2020 Bondholders. *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2675871, *1 (S.D.N.Y. Sept. 18, 2025) (holding "the 2020 Notes . . . were and are valid").

At the conclusion of the hearing, the Court granted the Special Master's request, authorizing the Special Master to terminate the Dalinar SPA and enter into the Amber SPA. Tr. 1535:15-17. The following day, the Special Master filed a notice of his termination of the Dalinar SPA and execution of the Amber SPA. D.I. 2319; *see also* D.I. 2319-1 (executed Amber SPA).

## ARGUMENT

Amber stands ready, willing, and able to close its bid, which is the best and highest one submitted in this sale process under the Court's twin evaluation criteria of price and certainty. *See* D.I. 1554 at 24-27. Amber's proposal delivers the most value to writholders, extinguishes an enormous volume of writs to Venezuela's benefit, is supported by fully committed financing, and reflects the fair market value of the PDVH Shares and CITGO assets. Amber's bid is also certain to close, having secured a settlement with enough of the 2020 Bondholders to ensure that group will not seek to enjoin or otherwise block the transaction, as they would if faced with a sale order to which they did not consent. Finally, Amber's bid enjoys wide support from virtually all of the senior creditors above Gold Reserve.

Any one of these factors supports the conclusion that Amber's bid should be selected as the superior proposal. Together they compel that result. Amber's bid should be adopted.

## I.    AMBER HAS SUBMITTED THE HIGHEST AND BEST BID

### A.    Amber's Bid Extinguishes At Least $5.859 Billion In Writs In Exchange For Significant Value To Writholders

Amber's bid extinguishes $5.859 billion in judgments—and potentially far more—all to Venezuela's benefit. *Id*.; *see infra* Section III (discussing potential writ extinguishment in

exchange for an additional $75 million in consideration). In exchange, Amber's bid offers $5.218 billion in cash and cash equivalents to writholders, plus an estimated $100 million in court fees. AM-DX-2.

Amber's bid delivers judgment creditors $4.243 billion in cash and $800 million in convertible notes that have been valued at par by independent investors in the market. D.I. 2124 ¶ 17; D.I. 2123-1 at 436, 442; Tr. 353:8-16; 367:2-11 (Turkel); Tr. 574:16-575:1 (Hiltz). Writholders are paid in cash, in full, from Crystallex through Red Tree (and ConocoPhillips Gulf of Parai B.V. for its Corocoro Judgment), which accounts for $3.838 billion of the cash consideration offered. AM-DX-2; Tr. 352:5-24; 353:17-20 (Turkel).[3] Amber also provides $1.050 billion in cash and cash equivalents to Rusoro, comprised of a mix of $400 million in cash and $650 million in convertible notes (AM-46 at 400), and another $150 million in convertible notes to Koch (AM-46 at 442). *See also* AM-DX-2; AM-45 at ¶ 7; AM-42 at 2; Tr. 353:1-23 (Turkel). Both writholders have agreed to accept this consideration in exchange for extinguishing their writs entirely. In addition, Amber offers expense reimbursement fees to Red Tree (for the Stalking Horse Bid) and Gold Reserve (for the July 2 Final Recommended Bid) that total $105 million. AM-42 at 2.

Amber has also endeavored to provide Gold Reserve—or, if Gold Reserve declines, another consenting writholder—compensation in exchange for partial writ extinguishment. Specifically, Amber has offered an additional $75 million in cash to extinguish up to $500 million of Gold Reserve's writ. AM-DX-2; AM-42 at 2; Tr. 353:24-25 (Turkel). That offer remains outstanding. *See, e.g.*, Tr. 575:9-16 (Hiltz). "[I]f Gold Reserve [] declines such consideration,"

---

[3]  That includes Crystallex, Tidewater, ConocoPhillips, OIEG, HII, ACL1, and Red Tree, along with ConocoPhillips's Corocoro Judgment, being paid in cash, in full at closing. AM-DX-2.

Amber's bid anticipates that, with the permission of the Court, this consideration can be offered this consideration to "extinguish some or all of the Attached Judgments of other Claimholders." AM-42 at 2; AM-45 at 5; Tr. 575:2-16 (Hiltz).  This additional $75 million in cash brings the total available cash to writholders in Amber's bid to $4.418 billion.

In contrast, the Gold Reserve Dalinar bid offers out-of-the-money writholders Dalinar or ████████████████ with no ascertainable market value to increase the perceived headline price of its credit bid.  *See* GR-63 at 615 (Dalinar Energy bid letter noting that it will "also satisfy, through the exchange of equity securities of Dalinar Energy, a further $3.605 billion in Attached Judgments"); AM-14 (Consortium Agreement); Tr. 935: 8-11 (Rivett) (identifying this as the "credit bid component" of the Gold Reserve bid).  In exchange for agreements to extinguish their writs, Gold Reserve's bid ███████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████ AM-14 (Consortium Agreement); AM-24 (Siemens Agreement); AM-44 (Valores Agreement). ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ *See* AM-14 at 10-16. ████████████████████████
████████████████████████████████████████████████████████
███████████████████████ *See, e.g.*, AM-14 at 12 ███████████████████
████████████████████████████████████████████████████████
████████████████ ; AM-14 at 14 ████████████████████████████████
████████████████████████████████████████████████ Amber's cash bid, on the other hand, provides a clear measure of value on which writholders can safely rely.

### B.    Amber's Bid Rests On A Foundation Of Committed Financing

Amber's bid is strengthened by its fully committed financing, the importance of which the Court has acknowledged.  D.I. 1554 at 14-15 (adopting "Non-Negotiable" committed financing SPA provision and agreeing "that 'the inclusion of committed financing is critical to a determination by the Special Master that a bid is viable'").

Amber's proposal includes four sources of committed financing:  (i) $3.775 billion in first lien debt (AM-46 at 481); (ii) $2 billion in an ABL revolver (AM-46 at 587); (iii) $2.85 billion in committed financing in the form of convertible notes (with an accordion feature for an incremental $570 million at closing, if required) (AM-46 at 721); and (iv) $25 million in equity contribution (AM-46 at 788).  AM-42 at 4; Tr. 366:6-20 (Turkel).  Elliott is participating in the financing both by purchasing approximately $1.25 billion-$1.5 billion of the convertible notes (where exactly in that range will depend on whether the accordion is fully drawn at closing), and by funding the $25 million equity investment.  Tr: 366:19-367:1 (Turkel); AM-42 a 3; AM-46 at 721, 753, 748, 798.  The financing parties have each executed commitment letters that were submitted with Amber's bid, and which were locked into place with the signing of the SPA after the sale hearing.  AM-42 at 4.

The Special Master noted that the Dalinar bid, in contrast, "does not meet the Bid Requirements for bidders to have committed financing."  AM-45 at 11.  Gold Reserve instead relies on $1.8 billion in uncommitted financing in the form of a "highly confident" letter from J.P. Morgan.  GR-63 at 596; Tr. 1108:6-13 (Rivett).  But J.P. Morgan has not committed any of the bank's own capital to support the $1.8 billion preferred equity financing raise, or indeed made any commitment at all.  Tr. 978:5-12 (Rivett).  The letter makes plain that it "does not constitute a commitment by J.P. Morgan or any of its affiliates to underwrite, place or purchase the Preferred Equity Issuance or to arrange or provide any other financing and there can be no assurance that

the sale or placement of the Preferred Equity Issuance will in fact be accomplished."  GR-63 at 598; *see also* Tr. 977:10-22 (Rivett).  In fact, Gold Reserve met with over a dozen potential investors—including Elliott—before obtaining the highly confident letter from J.P. Morgan, not one of which committed to providing Gold Reserve with any equity financing.  Tr. 939:16-940:4; 984:7-985:2; 988:17-989:16 (Rivett); AM-16.

Notwithstanding these glaring deficiencies, Gold Reserve has still not asked J.P. Morgan to commit to raising the $1.8 billion, and still has no other written assurance from any other third party to raise any preferred equity.  Tr. 983:8-12; 991:11-992:4; 1091:8-12; 1115:9-24 (Rivett).  Gold Reserve claimed it could have obtained $1.8 billion in committed financing for approximately $50 to $75 million in commitment fees, but simply chose not to.  Tr. 1108:19-1113:12 (Rivett) ("But the pref financing is readily available at anytime, but we just didn't want to incur those fees in advance knowing if it needed to be paid or not.  So that's why we didn't do it.").  That testimony is difficult to square with the fact that the company has no material assets and the serious doubts about whether it can even make the $50 million good faith deposit required in connection with its bid.  *See* GR-92 at 18; Tr. 958:13-17; 959:9-960:4 (Rivett); AM-64 (account statement showing proof of funds).  And even if credited, Gold Reserve's deliberate choice not to secure committed financing is fatal to its speculative bid, and establishes that Amber's bid is the only serious proposal here.

### C.    Amber's Bid Reflects the PDVH Shares' Fair Market Value

The evidence at the sale hearing further established that Amber's purchase price is fully consistent with, and indeed defines, the fair market value of the PDVH Shares.

William Hiltz of Evercore testified at the sale hearing to the extensive effort he and his team put into advertising the sale to obtain the greatest value for the PDVH Shares.  During the initial sale process prior to the 2025 reset, Hiltz and his team designed a comprehensive marketing

11

process in which they contacted an "extraordinar[il]y large number of potential buyers," taking a "quite expansive" approach to ensure that they reached all potentially interested parties. Tr. 534:10-535:3 (Hiltz). These groups spanned strategic buyers in the oil and gas industry, private equity investors with and without experience in the sector, and sovereign wealth funds. In total, this initial solicitation reached around 95 potential bidders. Tr. 536:2-6 (Hiltz). When the sale process restarted, the Special Master and his advisors expanded the audience of potential acquirers ever further. Combining outreach to the existing pool of interested parties and additional parties Evercore identified, the Special Master and his advisors contacted approximately 135 parties in January 2025. Tr. 547:13-548:5 (Hiltz). There can be no question that the sale process was designed to locate the most serious bidders the market had to offer and to maximize the competitive tension among participants.

The Venezuela Parties' attempts to cast doubt on this robust process, including by putting forth an untenable valuation of the CITGO assets, lack merit. Dr. Alberro's inflated, made-for-litigation $18.62 billion valuation does nothing to undermine the market-tested bids in this proceeding, Amber's included. Dr. Alberro projects cash flows that are at times **40% higher** than CITGO management's own forecasts, which themselves have a history of over-optimism. *Compare* VP-186 (Expert Report of José Alberro), Tbl. 5, *with id.* Tbl. 7. His valuation implies that, relative to its prior-year EBITDA, CITGO is more than twice as valuable as other blue-chip refiners in the United States, with no explanation for this divergence. *Id.* at 90-91. Correcting for these (and other) errors in Dr. Alberro's analysis gives an enterprise value for CITGO of approximately $8.4-8.6 billion, a figure actually comparable with other publicly traded refiners in

the United States.  *See generally* RT-65 (Expert Report of Gary Kleinrichert).[4]

Indeed, Dr. Alberro admitted at the sale hearing that his valuation did not reflect what a real, market-tested buyer would pay.  When pressed to confirm whether he could identify any actual buyer that valued the PDVH Shares at his stated valuation, Dr. Alberro admitted that "[t]he only person willing to pay the fair market value [he] calculated is a theoretical willing buyer ... [n]ot an actual buyer."  Tr. 767:4-10 (Alberro).  That is not surprising.  As Hiltz observed, one would expect that "one of the 135 investors that [Evercore] reached out to" would bid something close to $18.9 billion if that were the asset's true value.  Tr. 1146:8-18 (Hiltz).

The total value of $9.4 billion provided by the Amber bid is also a fair and reasonable outcome of the Special Master's auction process, given the recent financial performance of CITGO and the state of the refinery market in the United States.   Indeed, by some measures, the value provided by the Amber bid to Venezuela actually ***exceeds*** the fair market value of CITGO.  *See* Tr. 1187:13-18 (Kleinrichert).  Gary Kleinrichert, an expert with over thirty years of valuation experience, testified at trial that the fair market value of PDVH equity as of July 2025 was between $8.4 to $8.6 billion.  *Id.*  Critically, Mr. Kleinrichert testified this was the fair market value of the PDVH's shares, *before* taking into account the billions of dollars of contingent liabilities associated with the PDVSA 2020 Notes litigation. RT 65 (Kleinrichert Rep.) ¶9; *see also* Tr. 1187:13-18 (Kleinrichert).  Therefore, the amount of value provided to Venezuela by the Amber bid—over $9 billion—substantially exceeds the fair market value of the assets.

The $8.4 billion valuation figure that Mr. Kleinrichert testified to is also consistent with

---

[4]  The Venezuela parties also point to a 2023 valuation performed by Evercore, but it is stale and unrepresentative.  At the time, "crack spreads"—the difference in price between crude oil and petroleum products extracted from it—were substantially higher, and CITGO was making billions more of annual profit that it does today.  *See e.g.*, RT-65 (Exp. Rpt. of Gary Kleinrichert), Tbl. 8.

Dr. Alberro's market analysis.   Although Dr. Alberro inflated CITGO's projected financial performance to arrive at an estimated "intrinsic" value of PDVH Shares of over $18 billion, Dr. Alberro conceded at trial that ***objective*** market data implies that the PDVH Shares have less than half that value.  Tr. 910:4-22 (Alberro).  For example, Dr. Alberro testified that the five refiners in the United States that are "most comparable" to CITGO traded at approximately 6.8 to 15.1 times their last twelve-month EBITDA numbers as of March 31, 2025, which was Dr. Alberro's valuation date.  Tr. 909:1-6 (Alberro); VP-186 at 90.  Applying Dr. Alberro's multiples to CITGO's Q1 2025 last twelve month EBITDA figure results in an approximate value of $3.62 to $8 billion for PDVH Shares, even before making any adjustments for contingent liabilities associated with the 2020 Bondholder litigation.  AM-DX-4.  This figure is consistent with Mr. Kleinrichert's testimony, as well as the Amber bid.  In addition, Mr. Hiltz found that correcting Dr. Alberro's discounted cash flow valuation for his errors in his EBITDA projections, WACC,  and perpetuity growth rate, while keeping the rest of Dr. Alberro's assumptions the same, results in a valuation of $9.4 billion, which is also in line with Amber's bid.  Tr. 1152:16-20 (Hiltz); Hiltz-DX-001 (Evercore Adjustments to Alberro Valuation).

The Amber bid represents the most reliable, market-tested representation of the actual fair market value of the PDVH Shares.  *See* Tr. 566:14-567:9 (Hiltz) (testifying that the offers for CITGO during the sale process indicated what a willing buyer would pay for 100% of PDVH equity).  Months ago, the Court "anticipate[d] that, while not dispositive, '[t]he price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH shares taking into account the benefits and risks associated with this unique asset.'"  D.I. 1554 at 4.  That has proven true.  Amber's bid—the highest and best one achieved from this in-depth process—***is*** the fair market value of the PDVH Shares.

14

## II.    AMBER'S BID IS CERTAIN TO CLOSE

This Court has consistently indicated that the touchstone in determining which bid is best is the balance of price and certainty, not merely the highest headline price.  *See, e.g.*, Tr. 49:23-50:12 (Court noting that the "evaluation criteria have always been there"); Tr. 526:2-10 (Hiltz) (testifying that Hiltz understood the "goal of the sale process" was "to achieve the best possible outcome for judgment creditors" which meant "to get the best possible combination of price and certainty for the judgment creditors"); *see also* D.I. 1554 at 24-27.  Indeed, "[i]t is common knowledge of all lawyers and many businessmen that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two."  *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925).  Here, Amber's bid is both the highest and the best bid, because it maximizes value for writholders in a transaction that is certain to close.

### A.    Amber's Settlement With The 2020 Bondholders Solves A Gating Risk To Closing

No other bid can provide the certainty that Amber's offers given its settlement with the 2020 Bondholders—particularly in light of Judge Failla's ruling that "the 2020 Notes . . . were and are valid." *Petróleos de Venezuela*, 2025 WL 2675871 at *1.  Amber's bid secures an $895 million discount on the 2020 Bondholders' $3.02 billion claim and associated pledge of 50.1% of the CITGO Holding shares, which were dramatically vindicated on the last day of the sale hearing. Without such a settlement, the Bondholders have pledged to wield their seniority and equity pledge to delay or block a sale of the PDVH Shares all together.  That could come via an injunction, which the 2020 Bondholders represented they would seek to "protect [their] rights" if it became necessary.  Tr. 1579:3-10 (2020 Bondholders closing statement).  And it could also come from the simple fact that the pledged shares are sitting in a vault, held by a collateral agent that will not vote

them without direction from the 2020 Bondholders.  Tr. 1579:24-1580:9 (counsel for the 2020 Bondholders noting that the bonds remain in the collateral agent's vault and their voting rights remain under the collateral agent's control under the pledge agreement).  Absent a settlement, no bidder can "control CITGO Petroleum or CITGO Petroleum['s] sole shareholders CITGO Holding" given the 50.1% pledge held by the Bondholders, so the 2020 Bondholders can block an unapproved transaction by simply refusing to vote in favor of any necessary merger or to provide a security interest in CITGO's assets.  Tr. 1579:20-24 (2020 Bondholders closing statement).  Any bid without a settlement with the 2020 Bondholders, the Dalinar bid included, faces significant and potentially insurmountable obstacles to closing.

Amber's Transaction Support Agreement ("TSA") with a supermajority of 2020 Bondholders eliminates that risk altogether.  *See* AM-45 at 10 (Special Master's Updated Final Recommendation noting that, "[m]ost significantly, the Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation, by delivering a settlement with the PDVSA 2020 Bondholders").  Specifically, Amber's TSA includes a commitment from holders of 75% of the 2020 Bonds to exchange their bonds for cash.  *See* AM-46 at 811 (TSA § 3.2(iii): each 2020 Bondholder signatory agrees to "exchange its 2020 Notes held as of the Effective Date in the Private Exchange"); AM-42 at 2; AM-46 at 833 (certification attesting to the Ad Hoc Group of 2020 Bondholders holding 75.04% of 2020 Notes).  After that exchange, any remaining 2020 Bondholders will not "have any ability to control or direct the pledge of [the] CITGO Holding[] shares."  Tr. 515:12-516:2 (Turkel).  As such, Amber anticipates that the non-signatories will participate in the TSA's "Public Exchange," pursuant to which they may exchange their bonds for aggregate consideration of up to $453.95 million in cash.  *See* AM-46 at 829; Tr. 511:10-513:8, 516:4-9 (Turkel) ("It is my expectation that they will participate in the exchange

and exchange their notes.").  In any event, the solidified Private Exchange is enough to remove the threat that the 2020 Bondholders would otherwise pose to closing.

As Mr. Rivett admitted at the hearing, negotiating a new settlement with the 2020 Bondholders now, after Judge Failla's decision, would doubtless prove more costly than Amber's TSA, and could even exceed the $2.8 billion in financing that Gold Reserve purportedly established to support a settlement.  Tr. 1123:13-18 (Rivett).  As discussed at the hearing, that "financing" is uncommitted, *see* D.I. 2123 at 11, would depend on Gold Reserve ***also*** replacing its $4.5 billion bridge facility, *see* GR-63 at 534; Tr. 999:2-9; 1003:23-1004:21; 1000:8-14 (Rivett), and is subject to other restrictions, like the passage of a full year from closing in the case of the unfunded ABL that Gold Reserve touts, *see* GR-63 at 518, Tr. 993:8-994:13 (Rivett).  At the sale hearing, Gold Reserve had no response to the fact that the plain terms of its materials leave them unable to fund a settlement with the 2020 Bondholders, should Gold Reserve even be able to negotiate one.  *See* Tr. 998:19-999:9 (Rivett) ("That's what it says here, but that's not the understanding with the banks.").

After Amber acquires the 2020 Bonds, it will extinguish them.  Tr. 398:4-399-3 (Turkel); AM-42 at 3.  All told, Amber's bid provides for the satisfaction and extinguishment of up to $3.02 billion of 2020 Bondholder liabilities, on top of the $5.859 billion in judgments—and potentially much more—that Amber will extinguish.  Thus, not only do writholders accordingly benefit from the TSA's $895 million discount to settle with the 2020 Bondholders, the Venezuela Parties do too given the multi-billion-dollar judgment risk that Amber's settlement eliminates and that forms part of the $9.379 billion in overall debt extinguishment in Amber's bid.  AM-DX-2.

### B.    Amber Faces No Other Obstacles To Closing

Amber faces no other material obstacles to closing, whether from the 2020 Bondholders or any other source.  Like any other bidder, Amber will have to obtain the regulatory approvals

17

required to close, and has begun the regulatory approval process since obtaining the signed SPA following the sale hearing. *See* D.I. 2319 (Special Master's notice of the termination of the Dalinar SPA and signing of the Amber SPA). That SPA commits Amber to a "hell or high water" obligation to obtain regulatory approvals. AM-46 at 63 (SPA § 6.3(e)). Among other things, Section 6.3(e) of the SPA requires Amber to "take . . . all action necessary . . . to consummate the Transactions prior to the outside date," including "(i) . . . the sale, license, divestiture, disposition or hold[ing] separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer" and "(iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures, or contractual rights." *Id.* This provision makes clear that, "come hell or high water, you have to do what you need to in order to get antitrust approvals." Tr. 514:18-515:4 (Turkel). Consistently, Mr. Hiltz also testified that he had "been advised by Weil's antitrust teams that they do not have concerns about regulatory approvals, given the hell or high water nature of the contract." Tr. 677:18-678:4 (Hiltz).

Gold Reserve's efforts during the sale hearing to point to additional regulatory hurdles that Amber must overcome fall flat. It is true that Amber must file for regulatory approvals in certain foreign jurisdiction, but nothing about that is unusual—whether for Amber or any other bidder. *See* Tr. 473:4-18 (Turkel) (testifying to his understanding that the Mexico filing is not "Elliott's specific requirement" but "would be a requirement [for] anyone looking to purchase CITGO"). Moreover, unlike Dalinar (*see* GR-63 at 100), Amber is a U.S.-based entity that does not require CFIUS approval. D.I. 2275-1 at 14 ("Amber's bid is not by a foreign person and faces no such risk" with respect to CFIUS).

OFAC has acknowledged the sale process and has made clear that, although a specific license is required for any sale of PDVH, an application for such a license will be reviewed under

a favorable licensing policy.[5]  OFAC has publicly reaffirmed this position.  *See, e.g.*, RT-50 (OFAC FAQ 1123:  "OFAC will not take enforcement action against any individuals or entities for participating in, facilitating, or complying with the prefatory steps set out in the court's Sale Procedures Order [in this litigation], or for engaging in transactions that are ordinarily incident and necessary to participating in, facilitating, or complying with such steps (such as serving as potential or actual credit counterparties).").  In FAQ 595, OFAC extended this favorable licensing policy to payment agreements with the 2020 Bondholders, which means that the TSA resolution with the 2020 Bondholders is also likely to be reviewed under a favorable licensing policy.  *See* Office of Foreign Assets Control, FAQ 595, https://ofac.treasury.gov/faqs/595.  Amber, a well-capitalized American company with experienced operators, therefore has every expectation of receiving the necessary authorization.

There was no evidence adduced at the sale hearing that created any reason to doubt the above or Amber's ability to obtain the necessary approvals, particularly given its "hell or high water" obligation to do so.

## III.    AMBER'S BID ALSO OFFERS THE OPPORTUNITY FOR SIGNIFICANT ADDITIONAL WRIT EXTINGUISHMENT

Amber submits that its proposal to extinguish $5.859 billion in writs is the highest and best bid, even excluding any writ extinguishment from the $75 million of additional consideration previously offered to Gold Reserve.  That additional consideration, however, may achieve

---

[5] Letter from Joseph E. Borson at 2 (Apr. 7, 2023), D.I. 553-1, Exhibit A:  "The United States Government nevertheless wishes to convey that OFAC intends to implement a favorable licensing policy for license applications in connection with the execution of a sale as contemplated in the Sales Order or, as applicable, the negotiation of a settlement agreement among the relevant parties."

19

significant writ extinguishment for the benefit of the Venezuela Parties subject to agreement with a consenting writholder and Court approval.

After Gold Reserve did not accept the offer of $75 million for the extinguishment of $500 million of Gold Reserve's writ, *see* Tr. 388:10-14 (Turkel), Amber engaged with writholders down the writ stack, one-by-one, offering a discounted rate of recovery commensurate with their position in the priority order relative to the rate of recovery to more senior writholders who are accepting a discount.[6]  First, Amber offered Siemens a rate of recovery on their approximately $236 million judgment no greater than the rate of recovery offered to Gold Reserve; Siemens declined.[7]  Next, Amber engaged with  Valores, proposing $75 million to extinguish their $701 million claim. Valores likewise declined—citing their agreement with Gold Reserve as prohibiting Valores from accepting (or even engaging).  Third, Contrarian also declined an offer on its $396 million claim that would provide a rate of recovery similar to the rate offered to Valores.

Finally, after discussions with each of the foregoing writholders proved fruitless, Amber has proposed providing ConocoPhillips with the $75 million in exchange for extinguishing a portion of its ICSID writ, commensurate with the offers extended to other, more senior creditors. That proposal remains under active consideration by ConocoPhillips.

Given that Gold Reserve and the next-in-line writholders have not accepted Amber's offer, Amber intends to continue pursuing an alternative path to utilize the $75 million in a manner that

---

[6]   Rusoro is recovering $1.050 billion in cash and cash equivalents on their $1.553 billion judgment, equating to a 67.6% rate of recovery.  Koch is recovering $150 million in cash equivalents on their approximately $468 million claim, indicating a 32% rate of recovery.  *See* AM-DX-2; AM-46.

[7]   Siemens stated that it would not be open to accepting a rate of recovery implied by the 15% recovery offered to Gold Reserve.  Given that Amber would not be in a position to offer Siemens a *greater* rate of recovery (as the Siemens claim is junior to Gold Reserve's claim), Amber did not have additional negotiations with Siemens.

will extinguish the maximum amount of liabilities for the benefit of the Venezuela Parties, while also complying with this Court's orders.  Unless or until Gold Reserve or one of the other next-in-line writholders decide to accept Amber's offer, Amber will continue to engage with ConocoPhillips and the Special Master in pursuit of an agreement that will utilize the $75 million of additional consideration offered by Amber.

To be clear, Amber submits that its current bid is the highest and best bid, regardless of *any* writ extinguishment received in exchange for the $75 million of additional consideration. Rather, it is an added feature of Amber's bid that the $75 million of additional consideration may provide even further (and significant) debt relief for the Venezuela Parties.  Moreover, neither the Amber SPA, nor the closing, are conditioned upon any outcome regarding the $75 million of additional consideration.

## IV.     AMBER'S BID ENJOYS THE SUPPORT OF SENIOR WRITHOLDERS

The strength of Amber's bid is evident in the support it commands from the most senior writholders.  At the sale hearing, every single senior creditor above Gold Reserve that expressed a view supported Amber's proposal.[8]  Tellingly, the only parties supportive of the Gold Reserve bid

---

[8]

were Gold Reserve itself and two even more junior out-of-the-money judgment holders who stand even a prospect of sharing in the consideration from this process only if Gold Reserve's bid is accepted. A handful of junior creditors willing to take a leap of faith that the 2020 Bondholders will not make good on their promise to do everything possible to block the Gold Reserve deal cannot outweigh the massive outpouring of support from senior creditors in favor of Amber's bid.

Holding otherwise would allow obviously self-interested parties to drive the selection of a bid that could spell disaster for this sale process. As Crystallex stated at the sale hearing, Gold Reserve "seeks to constrict all the senior creditors as involuntary participants in their credit bid. They get all the upside of buying the company if the company ever makes any money. We get all of the risk[.]" Tr. 139:2-6. And while Gold Reserve's bid "really is an I.O.U." to senior creditors "based on [Gold Reserve] ultimately getting the assets" and securing financing, Amber's proposal provides committed financing and cash that is certain to be paid at closing. Tr. 139:13-14 (Crystallex opening statement). The choice is clear: Amber's bid overwhelmingly delivers the most value and certainty across the board.

## CONCLUSION

For the foregoing reasons, Amber respectfully requests that this Court enter the Amber sale order and permit Amber to consummate the acquisition of the PDVH Shares.

Dated:  October 8, 2025

*Of Counsel:*

Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
QUINN EMANUEL URQUHART  & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
susheelkirpalani@quinnemanuel.com
andrewrossman@quinnemanuel.com
matthewscheck@quinnemanuel.com

-and-

Stephen M. Baldini
Stephanie Lindemuth
Richard J. D'Amato
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036-6745
(212) 872-1000
sbaldini@akingump.com
slindemuth@akingump.com
rdamato@akingump.com

-and-

Julius Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K St NW
Washington, DC 20006-1037
(202) 887-4000
jchen@akingump.com

  */s/ Michael A. Barlow*
Michael A. Barlow (No. 3928)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Amber Energy Inc.*