**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  17-mc-151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF | ) | **PUBLIC VERSION** |
| VENEZUELA, | ) | **DATED:  October 10, 2025** |
| | ) | |
| Defendant. | ) | |

## AMBER ENERGY INC.'S RESPONSE TO
## <u>OBJECTIONS TO SPECIAL MASTER'S UPDATED FINAL RECOMMENDED BID</u>

*Of Counsel:*

Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
susheelkirpalani@quinnemanuel.com
andrewrossman@quinnemanuel.com
matthewscheck@quinnemanuel.com

*Additional Counsel in Signature Block*

Michael A. Barlow (No. 3928)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Amber Energy Inc.*

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.    AMBER HAS MADE THE HIGHEST AND BEST BID FOR THE PDVH SHARES ........................................................................................................................2

    A.    The Combination Of Price And Certainty Determine The Best Bid .......................2

    B.    Amber's Bid Is More Certain Than Gold Reserve's Because It Addresses The Gating Risk Posed By The 2020 Bondholders ................................................3

        1.    *The Risk From The 2020 Bondholders Is Real And Significant* ................3

        2.    *Amber's Bid Resolves The Risk From The 2020 Bondholders* ...................6

        3.    *Gold Reserve's Hope For A "Future Settlement" With The 2020 Bondholders Highlights The Fundamental Uncertainty Of Its Bid Actually Closing* ................................................................................12

    C.    Amber's Bid Is More Certain Than Gold Reserve's Because It Is Transparent And Supported By Committed Financing .........................................14

    D.    Amber's Bid Strikes A Better Price Than Gold Reserve's Because It Delivers Rusoro And Koch $400 Million More In Cash And $800 Million More In Notes With Market-Tested Value ...........................................................14

    E.    Gold Reserve's Bid Improperly Shifts Risk To Senior Writholders And Cannot Be Imposed Against Their Will................................................................15

    F.    Amber's Bid Strikes A Better Price Than Gold Reserve's Because It Also Delivers $2.125 Billion In Cash To Address The 2020 Bondholder Risk............17

    G.    The Only Risk Of A Fundamental Injustice Is Discarding Amber's Transparent, Committed, Highest And Best Bid ..................................................18

II.    THE VENEZUELA PARTIES' ATTACKS ARE MERITLESS ATTEMPTS TO DERAIL THE SALE OF THE PDVH SHARES ALTOGETHER...................................19

    A.    Amber's Bid Easily Satisfies The "50% Test" ....................................................19

    B.    The Venezuela Parties' Make-Weight Procedural Objections Also Fail..............20

CONCLUSION...........................................................................................................................20

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Acad. Hills Phase IV Maint. Corp. v. Rogers*,
  2023 WL 3749357 (Del. Super. Ct. May 25, 2023) ................................................19

*Canavarel Port Authority v. M/V Surfside Princess*,
  2010 WL 11651212 (M.D. Fla. May 3, 2010).........................................................16

*Economy Stone Midstream Fuel, LLC v. M/V A.M. Thompson*,
  2009 WL 103536 (N.D. Miss. Jan. 14, 2009)..........................................................16

*Fed. Deposit Ins. Corp. v. Meyer*,
  781 F.2d 1260 (7th Cir. 1986) .................................................................................16

*Holland Loader Co. v. FLSmidth A/S*,
  313 F. Supp. 447 (S.D.N.Y. 2018), *aff'd*, 769 Fed. App'x 40 (2d Cir. 2019) ..........8

*In re Homestead Partners, Ltd.*,
  197 B.R. 706 (N.D. Ga. 1996) .................................................................................14

*Jackson v. Halls*,
  314 P.3d 1065 (Ct. App. Utah 2013) .......................................................................16

*Key Bank of Puget Sound v. Alaskan Harvester*,
  738 F.Supp. 398 (W.D. Wash. 1989).......................................................................16

*M & I Bank, FSB v. Coughlin*,
  805 F. Supp. 2d 858 (D. Ariz. 2011) .......................................................................16

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*,
  846 F.3d 1 (2d Cir. 2017)...........................................................................................8

*Neptune Orient Lines, Ltd. v. Halla Merchant Marine Co., Ltd.*,
  1998 WL 128993 (E.D. La. Mar. 20, 1998) ............................................................16

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  495 F. Supp. 3d 257 (S.D.N.Y. 2020), *vacated and remanded on other
  grounds*, 106 F.4th 263 (2d Cir. 2024) ......................................................................5

*Transmontaigne Product Services, Inc. v. M/V Wilbur R. Clark*,
  2010 WL 1267302 (S.D. Ala. Mar. 29, 2010) ...........................................................6

*United States v. Chem. Found.*,
  5 F.2d 191 (3d Cir. 1925)...........................................................................................2

## <u>INTRODUCTION</u>

Nearly 2,000 docket entries ago, it was already true that "[m]uch has happened in this long-running litigation." D.I. 443 at 3. A variety of interested parties have endeavored to navigate the thicket of legal issues surrounding this proceeding to construct and deliver a bid that addresses the key risks while providing the highest expected value to writholders. Ultimately, the Special Master has confirmed "that the Amber Sale Transaction places an appropriate emphasis on both price and certainty of closing" and "is the best bid for the PDVH Shares." D.I. 2123 ¶ 11.

The Special Master was correct to conclude that Amber's bid is the highest and best one available. Amber's bid, the highest one made by a committed and financed third-party with both the means of closing and the prospect of successfully running the resulting company, squarely addresses every risk to closing. It is built on the foundation of a $2.125 billion settlement with the 2020 Bondholders, who otherwise pose a gating risk to closing. That settlement provides an $895 million discount on structurally senior claims for the benefit of judgment creditors. Every writholder senior to Gold Reserve supports Amber's bid.

Gold Reserve rolls the dice on the 2020 Bondholder risk. Its proposed solution of raising equity to settle that risk in the future is an illusion supported by a "highly confident" letter that imposes no obligations or rights. If Gold Reserve cannot secure an equity commitment today, how will it get one in the future, following a ruling that the 2020 Bonds are valid? If Gold Reserve is wrong, the cost of resolving that risk will be higher and will set this process back to square one.

Amber's bid provides more cash, and more valuable securities, to the judgment creditors. Even assuming it is capable of closing at all, Gold Reserve's bid relies on an unprecedented credit bid while forcing senior, non-consenting writholders to accept contingent payment. Gold Reserve also violates the rules of priority by preserving $200 million of its own judgment while inflating its nominal "price" with the judgments of even further out of the money writholders. Amber's bid

1

is superior on all relevant criteria, the Special Master's recommendation was correct, and the objections raised against it do not support selecting another bid.

## ARGUMENT

### I.    AMBER HAS MADE THE HIGHEST AND BEST BID FOR THE PDVH SHARES

#### A.    The Combination Of Price And Certainty Determine The Best Bid

The Court and Special Master have consistently ruled that an appropriate balance of price and certainty, not merely the highest "headline dollar price," is the touchstone in determining which bid is best. D.I. 2171-1 at 90:18-91:10; *see* D.I. 1554 at 26-27. Indeed, "[i]t is common knowledge of all lawyers and many business men that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two." *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925). Here, Amber's bid is both the highest and the best.

From the beginning, the Court has recognized "the reality that a successful bid in the Sale Process must, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts the assessment of certainty of closing." D.I. 1741 at 4. "Conditionality related to pending or future litigation … including with respect to the 2020 Bonds," is expressly part of the Evaluation Criteria. D.I. 1528-3 at 2. Amber has endeavored to account for all identified risks, and has revised its proposal multiple times in response to developments in the case and guidance from the Court, the Special Master, and the creditors.

On September 27, 2024, after the Special Master's negotiations with the 2020 Bondholders failed, Amber's former bid was recommended. D.I. 1325; *see* D.I. 1379-1 at 1, 8. It addressed the then-undecided alter ego issue and the still-undecided 2020 Bondholder risks with a trust structure that "reserve[d] a portion of the sale proceeds in escrow for the benefit of the" 2020 Bondholders, subject to conditions including that they obtain a final, non-appealable order in their favor and a

release of their equity pledge. D.I. 1379-1 at 8-9. Amber's proposal faced criticism from the sale process parties and other judgment creditors who preferred certainty and being paid more quickly than a trust structure would allow. *See* D.I. 1444 at 4-5.

On April 21, 2025, the Court accepted Red Tree's bid, which embodied a settlement with the 2020 Bondholders, as the Stalking Horse. *See* D.I. 1741 at 8 (encouraging all bidders "to engage with the Special Master to demonstrate that their improved bids reflect the best combination of price and certainty of closing in light of the guidance provided here"). The Special Master then recommended the Gold Reserve bid, primarily on the basis that it offered a substantially higher nominal price. D.I. 1837. With the benefit of the guidance provided by the consideration of these bids, Amber constructed, negotiated and delivered an unsolicited competing proposal that embodied the certainty of a settlement with the 2020 Bondholders while achieving the best price. D.I. 2011. On August 25, 2025, weighing both price and certainty, the Special Master changed his recommendation and designated Amber's bid the Superior Proposal. D.I. 2113. And while the certainty of Amber's bid, compared with the fundamental uncertainty of Gold Reserve's alternative, is reason enough to support the Special Master's conclusion, as detailed below, Amber's bid actually prevails on both metrics.

### B.    Amber's Bid Is More Certain Than Gold Reserve's Because It Addresses The Gating Risk Posed By The 2020 Bondholders

#### 1.    The Risk From The 2020 Bondholders Is Real And Significant

The 2020 Bondholders represent an "up to $3 billion structurally senior claim to the PDVH shares being sold" in this sale process. Ex. A (Turkel Dep. Tr.) 233:1-5. This is a glaring, gating issue for any prospective buyer of the PDVH Shares, which the Court has recognized poses a risk to closing. Indeed, the Court authorized the Special Master to attempt to settle with the 2020 Bondholders. D.I. 479. Self-serving attempts to minimize the seriousness and extent of this risk—

a risk that Gold Reserve itself tried but failed to settle, *see* D.I. 2135 ¶ 4; D.I. 2135-2, and now baldly asserts it has a plan to resolve in the future, D.I. 2126-1 at 5—should be rejected.

Gold Reserve's purported analysis of the merits of the 2020 Bondholders' claims is both directed to the wrong forum and incorrect, as the 2020 Bondholders have repeatedly explained both here and in the Southern District of New York. *E.g.*, D.I. 1375-1; D.I. 1441. And, contrary to Gold Reserve's explanation, even if the bonds were held to be invalid, there are still several live issues in that litigation that could nonetheless potentially interfere with the proposed Dalinar transaction and impose risk on anyone receiving proceeds therefrom, including the effect under New York law of invalidity, and equitable defenses and counterclaims asserted by the Trustee and Collateral Agent. Thus, a trial court decision of invalidity would not put the matter to bed, not only due to the inevitability of an appeal, but also because even an invalid bond may still be enforceable—an issue expressly reserved for further litigation before Judge Failla after the validity decision.[1] But rather than dive into contested issues properly before another court, this Court need only look to the market value of the 2020 Bonds to reject Gold Reserve's supposition that they have little chance of prevailing. "PDVSA 2020s, which benefit from a pledge of collateral, are priced significantly higher than other [PDVSA] bonds," reflecting market consensus that their claim to that collateral has serious merit. Mark Weidemaier & Mitu Gulati, *The Puzzling Price of Venezuelan Sovereign Bonds*, Am. Bankruptcy Institute, https://www.abi.org/feed-item/the-puzzling-pricing-of-venezuelan-sovereign-bonds.

Gold Reserve is also incorrect when it argues that the 2020 Bondholders are powerless to interfere with a closing here. The 2020 Bondholders' recent statement that they were not, *at that*

---

[1] Endorsed Joint Letter at 2, *Petroleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023 (S.D.N.Y. Aug. 16, 2024), D.I. 320 (endorsing parties' agreement to defer these issues to "a later stage of this proceeding").

*time*, seeking an injunction of the sale process (*see* D.I. 2183 at 15) is no bar to doing so in the future.  That was made plain in the portion of the transcript that Gold Reserve omits, in which the 2020 Bondholders advised Judge Failla:  "After Judge Stark issues his order, we would seek a preliminary injunction prohibiting plaintiff PDVH in this case and those acting in concert with it, pursuant to Rule 65(d)(2)(C), from [vi]olating the pledge agreement."  D.I. 1991-2 at 10:7-11.

Nor is OFAC approval required for such an injunction.  *See* Off. of Foreign Assets Control, Frequently Asked Questions 1124 (May 1, 2023) ("OFAC will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PDVSA 2020 8.5 percent bond").  There is little reason to believe that injunctive proceedings would unfold quickly.  And it is not even clear that any injunction would be necessary to hinder Gold Reserve's closing; after all, the collateral agent holds physical possession of 50.1% of the certificated shares of CITGO Holding, and Gold Reserve's bid offers no plan to actually acquire those shares while the 2020 Bondholders have any legal or appellate claims to them, a problem that could endure for years and that could result in additional legal disputes affecting Gold Reserve's closing at any time.  *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 265 (S.D.N.Y. 2020) (stating "the collateral was, and is, held as a physical stock certificate by GLAS [the collateral agent] in a vault in New York"), *vacated and remanded on other grounds*, 106 F.4th 263 (2d Cir. 2024).  Moreover, injunction or not, any holder of a more senior attached judgment faces the specter of litigation by the 2020 Bondholders seeking to claw back any payments made from assets to which they enjoy structural seniority.  Gold Reserve glosses over this risk entirely and assumes it can impose it on senior writholders against their will in lieu of paying its own cash to satisfy them.

The obstacles that Gold Reserve claims all must occur for the 2020 Bondholders to pose a

threat to closing are not independent contingencies that each need to randomly occur. They are instead a sequence of interlocking events that follow from one another and pose a fundamental, gating risk to any sale in this process. Gold Reserve's attempts to eliminate a risk by erecting a wall of dominoes before it has no merit.

### 2. *Amber's Bid Resolves The Risk From The 2020 Bondholders*

Amber's bid resolves the significant risk from the 2020 Bondholders' claims, at an $895 million discount to the writholders' benefit. The TSA requires the 2020 Bondholders to release their lien on the CITGO Holding shares at closing, and further provides that even if the lien release is not completed, the 2020 Bondholders will take no action to stop the sale here from closing. Gold Reserve's arguments that the TSA does not resolve the 2020 Bondholder risk are all wrong.

> (a) The TSA And Pledge And Security Agreement Permit Release Of The Collateral

The TSA provides for the 2020 Bondholders to release their collateral under the Pledge and Security Agreement to the 2020 Bonds. D.I. 2123-1 Ex. F ("TSA") § 4.1(e). The Pledge and Security Agreement provides: "In connection with any other proposed release of the Collateral, the consent of the Holders of at least 66 2/3% aggregate in principal amount of the outstanding Notes shall be required." Ex. B, Pledge and Security Agreement § 7.03(b). Thus, two-thirds of the 2020 Bondholders can release the collateral (*i.e.*, the CITGO Holding shares). Over 75% of the 2020 Bondholders signed the TSA. TSA Ex. D.

Gold Reserve's contrary argument, D.I. 2183 at 10, ignores Section 7.03(b) of the Pledge and Security Agreement, focusing exclusively on Section 9.02(a) of the Indenture to argue that PDVSA's written consent must be secured to release the collateral. This argument fails for multiple reasons. *First*, it contradicts the plain text of Section 9.02(a) of the Indenture, which Gold Reserve tellingly does not quote:

> Section 9.02 **With Consent of the Holders.** (a) Subject to Section 10.06, ***and only with the written consent of the Required Holders,*** the Issuer, the Guarantor, the Trustee, the Principal Paying Agent and the Collateral Agent may, from time to time and at any time, amend or supplement this Indenture, the Guaranty or the Security Documents …

Ex. C, Pledge and Security Agreement § 9.02 (emphasis added).  The only "written consent" required by this section is that "of the Required Holders."  The other parties mentioned are not ones whose consent is required; they are ones whose action is constrained without the Required Holders' consent.  *Second*, the TSA provides for a release of the collateral, which is explicitly provided for under the Pledge and Security Agreement, and as such the TSA does not contemplate any amendment or supplement to the Indenture or any other operative document.  *See* TSA § 4.1(e).  *Third*, Gold Reserve omits the relevant language in section 9.02 of the Indenture, which, consistent with the Pledge and Security Agreement, also provides that 66 2/3% of the holders can release liens.  *Fourth*, the benefit of the TSA does not hinge on the pledge being released.  Amber can close without releasing the pledge if the 2020 Bondholders agree to forbear any remedies.  *Id.* Forbearance only requires a majority of those bondholders, and 75% support the TSA.

Gold Reserve next argues that Section 9.02(b)(vi) the 2020 Indenture prohibits impairment of the right to receive payment.  D.I. 2183 at 10-11.  But the TSA simply provides terms of an exchange by which 2020 Bondholders may exchange their notes for cash from Amber.  *See* TSA § 3.2(a).  That in no way impairs any 2020 Bondholders' right to receive payment from the issuer PDVSA, it simply offers a mechanism by which 2020 Bondholders may elect to release the equity pledge and give Amber their 2020 Bonds rather than pursue recovery against the long-defaulted

recalcitrant judgment debtor PDVSA.  Section 9.02(b)(vi) of the Indenture does not apply.[2]

In arguing otherwise, Gold Reserve cites cases that establish that the TSA may do precisely what it does.  D.I. 2183 at 10-11 (citing *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1 (2d Cir. 2017)).  *Marblegate* rejected the argument that "the right to receive payment is impaired 'when the source of assets for that payment is deliberately placed beyond the reach of non-consenting noteholders.'"  846 F.3d at 16 (no violation where transaction removed all collateral from debtor and left only an "empty shell").  Here, *Marblegate* raises no concern where the governing documents expressly allow the release of collateral by the requisite bondholders.  Nothing in the TSA changes a legal right to payment from the issuer or prevents any 2020 Bondholders who choose to retain their bonds from attempting to collect against PDVSA, and as a result *Marblegate* confirms there is no issue under the Trust Indenture Act.

### (b)     Gold Reserve's Scattershot Arguments Miss The Mark

The TSA requires both Amber and the 2020 Bondholders to do what they can to close the sale, which in this case would include the 2020 Bondholders simply doing nothing and letting the sale close.  Both parties entered into the TSA "in support of the Amber Bid," and thereby agreed to "a consensual transaction in respect of the 2020 Notes (the 'Amber Transaction')."  TSA at 801. In light of the twin goals of consummating the Amber Transaction and supporting the Amber Bid, both Amber and the 2020 Bondholders agreed to use commercially reasonable efforts to achieve many objectives, chief among them the consummation of the Amber Transaction and resolution of any legal or structural issues that may arise.  TSA §§ 3.1(a)(ii), 3.1(a)(v), 3.2(a)(i)-(ii).  The

---

[2]   Gold Reserve also argues (D.I. 2183 at 10 n.4) that the TSA violates the Indenture's supposed "unanimity requirement" embodied in Section 9.02(b)(i).  But Section 9.02(b)(i)—which references the voting thresholds for amendment, supplement, or waiver of "the Indenture or the Notes"—has no bearing on the voting threshold for waiving the collateral lien, which is two-thirds of the 2020 Bondholders.  Ex. C (2020 Indenture) §§ 9.02(b), 9.02(b)(i).  The TSA has that support.

2020 Bondholders also specifically agreed **not** to "object to, delay, or impede the Amber Transaction," and **not** to take any litigation positions that would "delay, prevent, frustrate, or impede" the Amber Transaction.  *Id.* § 3.1(a)(vii)(i).  Indeed, the very standard that the parties selected—commercially reasonable efforts—requires "conscious exertion to accomplish the agreed goal."  *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 447, 473 (S.D.N.Y. May 2, 2018), *aff'd*, 769 Fed. App'x 40 (2d Cir. 2019).

Gold Reserve argues the TSA is a "Swiss cheese contract" because the parties do not have real obligations to close the deal.  D.I. 2183 at 5.  This has no merit.  The TSA enumerates the affirmative duties owed by each party and the real commitment embodied in the explicit, familiar, and binding covenant to use commercially reasonable efforts (*i.e.*, a commitment to problem solve). In the context of these commitments, Gold Reserve's "Swiss cheese" objections to the TSA, *see* D.I. 2183 at 11-12, all melt.

First, Section 4.1(d) of the TSA makes it a condition precedent that Amber and the Bondholders enter into the Definitive Documents.  The claim that this means "zero certainty that the Amber Energy transaction will ever close," D.I. 2183 at 11, is risible.  Drafting definitive documentation after the material terms are reached is standard and already well underway.[3] Beyond the general duty to problem solve to consummate the TSA, the parties also specifically agreed to cooperate on finalizing the Definitive Documentation.  TSA §§ 3.1(a)(i), 3.2(a)(i).

Second, Section 4.1(h) requires that this Court enter the Sale Order approving the transaction contemplated by Amber's Bid by December 1, 2025.  Gold Reserve contends that this

---

[3]  If Gold Reserve is concerned about Amber obtaining definitive documentation associated with the TSA, it should be even more preoccupied with its own definitive documentation that will need drafting.  *See* D.I. 1837-1 at 438 (lender commitment letter referencing non-existent "definitive documentation for the Bridge Facility" and "the ABL Facility").

injects considerable uncertainty into the process.  D.I. 2183 at 11.  Again, Gold Reserve is mistaken.  The December 1 deadline was informed by the Special Master's advisors' expectations for the timeline of the sale process.  Moreover, this deadline was fully disclosed to the Court, which accordingly set a schedule that will complete proceedings well within that timeframe.  Should the Court need additional time to render a decision, the parties can simply agree to extend the deadline.  *See* TSA § 4.1 (all conditions "are subject to the satisfaction or waiver by each Party").

Third, Sections 5.2 and 5.3 of the TSA provide certain termination rights, for example in the event of a material breach, of the sort that are present in every deal, and even imposed by the common law of contracts.  Based on these terms, a party could not terminate "for no reason at all," as Gold Reserve puzzlingly offers.  D.I. 2183 at 11.  Rather, a party can only terminate under the circumstances where an *enumerated* event occurs, such as a "material breach."  TSA §§ 5.2(a), 5.3(a).  These conditions are subject as well to commercially reasonable efforts obligations, which prohibit the sort of pretextual termination that Gold Reserve seems to be intimating.  *See* TSA §§ 3.1(a)(ii), 3.2(a)(i).  In any event, Gold Reserve again ignores that its own contracts contain similar conditions and rights, or even the much broader walk-away right inherent in a "highly confident" letter that imposes no obligations at all.

Fourth, Section 5.4(b) provides an outside date of June 30, 2026.  However, once again Gold Reserve misinterprets this provision of the TSA as a "walk away" right.  D.I. 2183 at 12.  Neither party to the TSA will have the opportunity to walk if the sale has not closed by June 30 because the Outside Date *automatically extends* with the SPA through April 30, 2027, as provided in the very provision that Gold Reserve cites.  TSA § 5.4(b).

Contrary to Gold Reserve's supposition that the 2020 Bondholders could "abandon the TSA" and "obstruct Amber's closing" based on these TSA provisions, D.I. 2183 at 16, in fact the

provisions simply acknowledge that the TSA is not an exclusive deal. The 2020 Bondholders have a meaningful incentive to pursue a closing with Amber regardless of any lower court ruling, as the TSA provides certainty that is unavailable even after initial favorable rulings that remain subject to appeals. Gold Reserve's hypothetical arguments otherwise are baseless.

        (c)     Amber's Bid And The TSA Face Lesser Regulatory Hurdles Than Gold Reserve

Gold Reserve also attacks the Amber bid and TSA as facing greater regulatory risk, citing OFAC, CFIUS, and antitrust risk. D.I. 2183 at 12. This attack fails. First, with respect to OFAC, every bidder faces the same risk; Gold Reserve, like Amber, would have to obtain OFAC approval before closing. Second, with respect to CFIUS, Amber's bid is not by a foreign person and faces no such risk, whereas Gold Reserve's bid (*i.e.*, a bid by a Bahamas-incorporated company) does. *See* D.I. 1837-1 at 114-15 (Dalinar SPA Section 6.19 detailing CFIUS requirements). Third, with respect to antitrust risk, Gold Reserve's objection has no meritorious basis. Antitrust requirements will be cleared in every applicable country (and, on that note, based on CITGO's revenues alone, any buyer would have to file for antitrust approval in Mexico; that Gold Reserve's bid does not have such an antitrust requirement for Mexico is a flaw in, rather than a feature of, that bid). Notably, Amber has committed to a "hell or high water" obligation to clear regulatory issues, all of which Amber is confident in its ability to resolve. D.I. 2123-1 at 63 § 6.3(e).

        (d)     Rejection Of The 2020 Bondholders' Claims Would Not "Blow Up" Amber's Bid

Finally, Gold Reserve's argument that Judge Failla rejecting the 2020 Bondholders' claims would "blow up" Amber's bid, D.I. 2183 at 13-15, is inaccurate. Under the TSA, at the 2020 Bondholders' insistence, Amber has a continuing obligation to try to seek consummation of the TSA and sale until December 1, 2025, regardless of a ruling on the validity of the 2020 Bondholders' claims. TSA § 4.1(b).

### 3.    Gold Reserve's Hope For A "Future Settlement" With The 2020 Bondholders Highlights The Fundamental Uncertainty Of Its Bid Actually Closing

Gold Reserve's "confiden[ce] that it can settle any risk presented by the 2020 Bondholder[s] if and when it actually materializes," D.I. 2183 at 22 n.13, underscores the uncertainty inherent in its bid at the relevant time, which is as of the hearing, not some date in the distant future.  First, Gold Reserve has already tried, and failed, to settle.  *See* D.I. 2135 ¶ 4; D.I. 2135-2.  Gold Reserve's plan "to work[] with the 2020 Bondholders in good faith regarding a potential settlement of their claims <u>after</u> being named the final recommended bidder and the Sales Order is entered," provides no certainty today.  D.I. 2135-2 at 3.

Second, the funding that Gold Reserve proposes to deploy to resolve this gating risk is illusory.  Gold Reserve touts its access to "$1.8 billion in preferred equity," D.I. 2126-1 at 5, but that financing cannot be credited as of the time the Court must evaluate bids.  JP Morgan's "highly confident" letter does not obligate the bank to raise any funds at all, and provides that if it does so, "[t]he terms of the transaction, including the ultimate structure, offering price, . . . will be determined by J.P. Morgan" and "will be based on market conditions at the time of the sale or placement of the Preferred Equity Issuance . . . as well as on the structure and documentation of the Acquisition."  D.I. 1837-1 at 547-48.  A letter expressing "confidence" that funds could be raised, on unknown terms, from unknown parties, at an unknown time, under unknown market conditions, if JP Morgan elects to do so, cannot provide the needed certainty.  Such evidence is insufficient under the bidding procedures here, which required committed financing.  D.I. 1554 at 14 (Court agreeing with Special Master that "the inclusion of committed financing is critical to a determination by the Special Master that a bid is viable").  Even if the amount were large enough to cover the contingency of the 2020 Bonds—it is not—it provides no certainty of anything.

Moreover, even if Gold Reserve could raise the $1.8 billion in preferred equity

contemplated by the JP Morgan letter, doing so would not make cash available to pay off the 2020 Bondholders. A significant portion of Gold Reserve's financing derives from a $4.5 billion bridge loan. D.I. 1837-1 at 485 (Bridge Loan Facility). But that bridge loan is "***automatically and permanently reduced on a dollar-for-dollar basis*** by . . . the aggregate net cash proceeds from the issuance of any equity securities or equity-linked securities" of Dalinar, Adolin Holdings, "or any of their respective subsidiaries" before closing, *id.* at 488, and after closing it must be repaid "***within one (1) business day*** following the receipt of net cash proceeds by" Dalinar, CITGO Petroleum Corporation, "or any of its subsidiaries from the issuance of any equity securities or equity-linked securities" of any of them "to third parties . . . in an amount equal to 100% of such net cash proceeds." *Id.* at 489–90 (emphasis added). If JP Morgan were to actually raise the funds in its letter, the bridge loan would swallow those proceeds, leaving nothing additional available to pay the 2020 Bondholders in a hypothetical settlement.

Gold Reserve's only other stated source of funding to resolve the 2020 Bondholders' claims, "an accordion increase of its ABL by $500 million to $1 billion," D.I. 2126-1 at 5, is also not up to the task. No lender has agreed to lend that $1 billion, only $350 million of the ABL is available as a pre-closing funding, and any other proceeds are not available to pay the 2020 Bondholders (a) "prior to the first anniversary of the Ultimate Closing Date," and (b) until "no Bridge Loans are outstanding and the Bridge Facility has been paid in full." D.I. 1837-1 at 469. Those dual conditions cannot come to pass for at least a year after closing, and may never happen at all. In addition, the availability of any incremental ABL proceeds requires (i) that a financing source be willing to fund it, which Gold Reserve has not indicated (only that the facility size has increased, *see* D.I. 2135-1) and (ii) that the borrowing base of the company be sufficient to support the draw, which has no guarantees, D.I. 2124 ¶ 24. The ABL, like the JP Morgan letter and like

Gold Reserve's failed settlement efforts, provides no deal certainty.

### C.    Amber's Bid Is More Certain Than Gold Reserve's Because It Is Transparent And Supported By Committed Financing

Even putting aside the gating risk of the 2020 Bondholders, Ambers bid is significantly more certain to close than Gold Reserve's competing proposal.  Amber has provided complete transparency regarding its deal terms, including its arrangements with Rusoro, Koch, and the 2020 Bondholders, and the consideration each judgment creditor will receive.  D.I. 2123-1 (Amber's bid materials).  And unlike Gold Reserve's financing, Amber's is fully committed and thus available at closing.  *See* D.I. 2123 ¶ 8.  In contrast, the secrecy around Gold Reserve's bid only began to lift when this Court compelled Gold Reserve to produce the underlying contracts.  Pursuant to that order, this brief does not discuss their contents.

### D.    Amber's Bid Strikes A Better Price Than Gold Reserve's Because It Delivers Rusoro And Koch $400 Million More In Cash And $800 Million More In Notes With Market-Tested Value

In addition to being more certain, Amber's bid is also, when properly weighed, the bid with the highest price.  Amber's bid delivers judgment creditors $4.253 billion in cash and $800 million in convertible notes that have been valued at par in the market, as evidenced by third parties committing to fund new money for such convertible notes.  D.I. 2124 ¶ 17, D.I. 2123-1 at 436, 442.  In comparison, Gold Reserve's bid delivers creditors just $3.925 billion in cash and not one dollar of market-valued notes.  D.I. 2126-1 at 9.  The remainder of its purported "price" is not based on any consideration that Gold Reserve contributes, but instead is based on promising creditors securities of a reorganized company in exchange for their judgments.

Gold Reserve's attempts to use credit bidding (an improper form of it, as discussed below) to buy writs for pennies on the dollar and then insist that they be counted dollar-for-dollar when measuring "price" contravenes the purposes and commands of a competitive bidding process under

14

Section 324(a). As another court has recognized in a similar auction context, "[a]llowing [Gold Reserve] to credit bid would countermand this value-assessing function, since [one party] would bid with cash money while their main competitor spent a currency of no consequence." *In re Homestead Partners, Ltd.*, 197 B.R. 706, 719 n.15 (Bankr. N.D. Ga. 1996). Gold Reserve seeks to freely "spend" the currency of nominal judgments in its credit bid, asking that they be priced as dollars even as they are bought for a fraction, and only by doing so can it purport to top the far more concrete price of Amber's bid.[4] But when it comes to anyone else's bid, Gold Reserve has insisted on getting cashed out at 100 cents on the dollar, Ex. D (Rivett Dep. Tr.) 57:8-18, which chills bidding and artificially inflates the headline price of its own bid in relation to Amber's.

### E.    Gold Reserve's Bid Improperly Shifts Risk To Senior Writholders And Cannot Be Imposed Against Their Will

Gold Reserve's insistence that it would be a "violation of Delaware law," D.I. 2183 at 1, to weigh the actual consideration that each bid offers could not be further from the truth. Section 324(a) calls for a "public sale to the highest bidder," and Section 324(d) explains what to do with "[t]he money arising from the sale." Both provisions anticipate a bid grounded in actual "money" that can be distributed to creditors. Amber's bid satisfies that statutory command. In contrast, Gold Reserve has weaponized the Special Master's statement that price "will be evaluated based on the amount of Attached Judgments expected to be satisfied," D.I. 1528-3 at 2, to advance the novel argument that a party may credit bid even without satisfying non-consenting senior writs

---

[4]   Gold Reserve's bid is further undermined by Gold Reserve's retention of $200 million of its judgment, a benefit provided to neither the creditors more senior to Gold Reserve nor those more junior. D.I. 2123 ¶ 13. Gold Reserve inflates the "price" of its bid by pocketing much of its own claim while skipping ahead on the waterfall to aggregate more, even-further-out-of-the-money writs. Gold Reserve's behavior establishes that it is far more valuable to have an open judgment than to accept the consideration Gold Reserve is using to retire writs in its proposal, which speaks louder than words about the disconnect between "price" and value in Gold Reserve's bid.

until *after* it has acquired the asset, relying on money borrowed against that asset. That construct looks nothing like any case discussing credit bids, let alone any case interpreting Section 324.

Credit bidding has been permitted as "merely a convenience to avoid the useless ceremony of payment to the sheriff by the very party which is entitled to receive the proceeds of the sale." *Jackson v. Halls,* 314 P.3d 1065, 1067 (Ct. App. Utah 2013); *M & I Bank, FSB v. Coughlin*, 805 F. Supp. 2d 858, 865 (D. Ariz. 2011) ("[T]o avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it, the lender is allowed to make a credit bid up to the amount of the outstanding indebtedness."). But absent a license to gamble with senior writs that have not consented, Gold Reserve's attached judgment, and the more junior writs it seeks to aggregate, are out of the money, and entitled to receive nothing at all. The absence of cash for, or consent from, senior writholders makes Gold Reserve's "credit bid" unlike those approved in other contexts. "Even in districts where the ability of a mortgagee to credit bid is an established or recognized practice, courts have imposed a requirement that the mortgagee bid cash or post a bond for any claims which may have priority." *Canaravel Port Authority v. M/V Surfside Princess*, 2010 WL 11651212, *2 (M.D. Fla. May 3, 2010) (denying right to credit bid in absence of bond to pay senior interest holders) (citing *Transmontaigne Product Services, Inc. v. M/V Wilbur R. Clark*, 2010 WL 1267302, *4 (S.D. Ala. Mar. 29, 2010) (requiring lender to post a surety bond to secure the claims of the other claimants); *Neptune Orient Lines, Ltd. v. Halla Merchant Marine Co., Ltd.*, 1998 WL 128993, *5 (E.D. La. Mar. 20, 1998) (citing cases); *Economy Stone Midstream Fuel, LLC v. M/V A.M. Thompson*, 2009 WL 103536, *3 (N.D. Miss. Jan. 14, 2009) (allowing credit bid only on the condition that mortgagee agrees to pay any and all claims senior in priority to its preferred ship mortgage); *Key Bank of Puget Sound v. Alaskan Harvester*, 738 F.Supp. 398 (W.D. Wash. 1989) (same)); *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1265 (7th Cir. 1986) ("The

foreclosing lender is allowed to credit bid because if the lender is the highest bidder and is required to bid with cash, the lender would pay itself with the same cash it bid.  A junior lienor, however, must bid in cash.").

Far from posting a bond or cash to satisfy senior writs in order to ripen the right of a junior creditor to credit bid, Gold Reserve demands its right to credit bid must be recognized *prior to* satisfaction of senior writs.  Because no case supports that upside-down proposition, Gold Reserve's arguments about what Delaware law requires hangs on the Court's willingness to be the first to permit a speculative credit bid without requiring the junior creditor to post cash or a bond to guarantee payment to senior writs.  That dubious proposition is made all the more shaky by Gold Reserve's inability to establish that it can clear the structurally senior encumbrance of the 2020 Bondholders, which it must do to close the proposed transaction.  There is no case law anywhere that recognizes the cart-before-horse credit bid construct that Gold Reserve is urging.

### F.    Amber's Bid Strikes A Better Price Than Gold Reserve's Because It Also Delivers $2.125 Billion In Cash To Address The 2020 Bondholder Risk

While the argument above establishes that Amber's bid is higher than Gold Reserve's credit bid even without taking its resolution of the 2020 Bondholder risk into consideration, in fact the Court should also consider the $2.125 billion that Amber's bid introduces to address this issue—an amount that is entirely unmatched in Gold Reserve's bid.  As a result, the $4.004 billion in non-cash/note consideration in Gold Reserve's bid is all encumbered by that risk.

All else being equal, the price of a bid that includes $2 billion in cash to retire a gating risk is $2 billion higher than an equivalent bid that ignores the same risk.  Amber's bid puts up $5.143 billion in real money (cash or market-value notes) to retire approximately $5.964 billion of writs, plus $2.125 billion in real money (cash) to resolve the existential 2020 Bondholders' claim, while Gold Reserve's bid puts up $3.913 billion in cash and retires the remainder of writs using

speculative securities encumbered by doubts about their majority ownership due to the risk from the 2020 Bondholders.  Amber's bid is both more valuable and a higher price.

### G. The Only Risk Of A Fundamental Injustice Is Discarding Amber's Transparent, Committed, Highest And Best Bid

Gold Reserve's rhetoric about the "fundamental injustice" of selecting Amber's higher and more certain bid, *see* D.I. 2183 at 19-21, drives home the manipulation inherent in Gold Reserve's form of credit bidding, and the superiority of Amber's bid.  Gold Reserve points to itself,[5] Siemens, and Valores as victims, but ignores the ways that Amber's bid provides more recovery for more-senior creditors Rusoro and Koch.  Moreover, after extensively arguing that the $2.125 billion in cash that Amber's bid commits to resolving the 2020 Bondholders risk must be ignored, *see, e.g.*, D.I. 2183 at 23, Gold Reserve flips its position and claims that this payment must be counted as somehow "strip[ping] over $2 billion in value from the Attached Judgment Creditors (and the Venezuela Parties)," *id.* at 20-21.  Gold Reserve is right to concede that the $2.125 billion must be counted when comparing bids, but wrong to criticize its use, which is not a gratuitous donation to third-parties but instead the means and cost of removing a risk to more than half of the value of the PDVH shares.  That $2 billion in value is added to Amber's winning outlay to the creditors, not stripped from it, and the only fundamental injustice would be selecting a less-valuable and less-certain bid by prioritizing junior, out-of-the-money creditors over senior creditors.

---

[5]  Contrary to Gold Reserve's claim that it would "receive nothing under the Amber Energy Bid," D.I. 2183 at 17, in fact it has been offered a substantial amount of cash.  D.I. 2124 ¶ 17.

## II.   THE VENEZUELA PARTIES' ATTACKS ARE MERITLESS ATTEMPTS TO DERAIL THE SALE OF THE PDVH SHARES ALTOGETHER

### A.   Amber's Bid Easily Satisfies The "50% Test"

Contrary to the VPs' objections, see D.I. 2182-1 at 14, Amber's more than $8 billion bid[6] easily satisfies the "50% Test" and does not pay too little for the PDVH shares.

Dr. Alberro's litigation opinion that PDVH was valued at $18.62 billion as of March 2025 is the result of manipulation and inflation.  He projects cash flows that are at times 40% higher than CITGO management's forecasts, which themselves have a history of over-optimism. *Compare* Ex. E (Exp. Rpt. of José Alberro) Tbl. 5, *with id.* Tbl. 7.  His valuation implies that, relative to its prior-year EBITDA, CITGO is more than twice as valuable as other blue-chip refiners in the United States, with no explanation for this divergence.  *Id.* at 90-91.  Correcting for these (and other) errors in Dr. Alberro's analysis gives an enterprise value for CITGO of approximately $8.4-8.6 billion, a figure actually comparable with other publicly traded refiners in the United States.  *See generally* Ex. F (Exp. Rpt. of Gary Kleinrichert).[7]

Most critically, the results of this auction demonstrate that the fair market value of CITGO

---

[6]   While the VPs attempt to critique "[t]he $5.892 billion Amber Bid," D.I. 2182-1 at 9, there is no basis for the VPs to ignore the fact that Amber's bid includes $2.125 billion to the 2020 Bondholders.  Gold Reserve's arguments for ignoring that cash in measuring the bid's "price" have no application to the 50% Test, which concerns the fair market value of the asset—a concept that does not permit ignoring liabilities that burden that asset.  *See Acad. Hills Phase IV Maint. Corp. v. Rogers*, 2023 WL 3749357, *4 (Del. Super. Ct. May 25, 2023) ("[I]n following the reasoning for fair market value, we must consider the mortgage and federal tax lien which remains in place.").

[7]   The VPs also point to a 2023 valuation performed by Evercore, but it is stale and unrepresentative.  At the time, "crack spreads"—the difference in price between crude oil and petroleum products extracted from it—were substantially higher, and CITGO was making billions more of annual profit that it does today.  *See e.g.,* Ex. F (Exp. Rpt. of Gary Kleinrichert), Tbl. 8.  As Evercore's senior M&A banker testified, "[CITGO's] performance has been dramatically lower than the projections that were utilized in [the September 2023 valuation], which is one of the reasons why I believe this valuation is, frankly, irrelevant to the question of what is the company worth today".  Ex. G (Hiltz Dep. Tr.) 42:21-43:1.

is nowhere near the VPs' unsupported assertions.  This Court has indicated that, "while not dispositive, '[t]he price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH Shares taking into account the benefits and risks associated with this unique asset,'" and invited the VPs to either identify a higher bidder or "simply pay what they owe and avoid the sale process altogether."  D.I. 1554 at 4-5.  Amber's bid, the highest and best one achieved from this in-depth process, *is* the fair market value.

### B.    The Venezuela Parties' Make-Weight Procedural Objections Also Fail

The VPs also object to the terms of Amber's SPA and proposed Sale Order, and a request for a stay, transparent attempts to thwart the sale process altogether. *See, e.g.,* D.I. 2182-1 at 23. The VPs object to granting bonuses for CITGO executives, but Amber is willing to pay those bonuses to protect its investment precisely *because* the VPs will use every effort to prevent the sale from closing.  The ill-taken objections show why the bonuses are necessary.

VPs' other make-weight objections, including unsupported assertions of a need for PDVSA's "consent" in a proceeding that is inherently about selling assets without PDVSA's consent, objections to SPA, the Sale Order, and timing of Sale Hearing, and misguided argument that Amber is not the highest bid, provide no basis to disrupt the Special Master's recommendation.

### <u>CONCLUSION</u>

For the foregoing reasons, the Objections should be overruled.

Dated:  September 12, 2025

<div style="display:flex">

<div>

*Of Counsel:*

Andrew J. Rossman
Susheel Kirpalani
Matthew R. Scheck
QUINN EMANUEL URQUHART  & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
susheelkirpalani@quinnemanuel.com
andrewrossman@quinnemanuel.com
matthewscheck@quinnemanuel.com

-and-

Stephen M. Baldini
Stephanie Lindemuth
Richard J. D'Amato
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036-6745
(212) 872-1000
sbaldini@akingump.com
slindemuth@akingump.com
rdamato@akingump.com

-and-

Julius Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K St NW
Washington, DC 20006-1037
(202) 887-4000
jchen@akingump.com

</div>

<div>

  */s/  Michael A. Barlow*
Michael A. Barlow (No. 3928)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Amber Energy Inc.*

</div>

</div>