**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 17-mc-151-LPS |

**GOLD RESERVE'S MOTION TO DISQUALIFY THE DISTRICT JUDGE,
THE SPECIAL MASTER, AND THE SPECIAL MASTER'S ADVISORS
<u>UNDER 28 U.S.C. § 455</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 4

    I.    New and Ongoing Discovery Reveals the Advisors' Material Conflicts of Interest. .. 4

    II.    The Special Master's Management of the Sale Process Exacerbates the Appearance of Bias. ................................................................................................................ 8

ARGUMENT ...................................................................................................................... 13

    I.    The Advisors' Conflicts of Interest Create an Appearance of Bias that Only Disqualification Can Cure. ..................................................................................... 14

    II.    This Court Must Stay All Other Proceedings Until This Motion Is Resolved. ......... 19

REQUEST FOR RELIEF .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Primerica Holdings, Inc.*,
    10 F.3d 155 (3d Cir. 1993) ............................................................... 14, 17, 19

*In re Kensington Int'l Ltd.*,
    353 F.3d 211 (3d Cir. 2003) ................................................................... 19

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004) ............................................................. passim

*In re Sch. Asbestos Litig.*,
    977 F.2d 764 (3d Cir. 1992) ................................................. 2, 14, 17, 19

*Jenkins v. Sterlacci*,
    849 F.2d 627 (D.C. Cir. 1988) ............................................................... 14

*Liljeberg v. Health Servs. Acq. Corp.*,
    486 U.S. 847 (1988) .............................................................................. 14

**Statutes**

28 U.S.C. § 455 ........................................................................... 1, 13, 14

8 Del. C. § 324(a) .................................................................................... 8

**Rules**

Fed. R. Civ. P. 53(a)(2) ...................................................................... 1, 14

An appearance of bias has compromised the integrity and fairness of these proceedings. Under Fed. R. Civ. P. 53(a)(2) and 28 U.S.C. § 455(a)-(b), Gold Reserve Ltd. f/k/a Gold Reserve Inc. ("Gold Reserve") respectfully requests an order disqualifying the Honorable Leonard P. Stark (sitting as district judge), Special Master Robert B. Pincus, Esq. (the "Special Master"), and the Special Master's advisors at Weil, Gotshal & Manges LLP ("Weil") and Evercore, Inc. ("Evercore," together with Weil, the "Advisors").  Gold Reserve further requests a temporary stay of all decisions concerning any bids submitted in the Sale Process pending resolution of this Motion, including any period of discovery needed to resolve the Motion.

## INTRODUCTION

The Special Master has recommended a bid that has been proposed by, and that will directly benefit, non-judgment creditors that have paid his Advisors nearly ███████ for work in various matters during the course of just the last five (5) years of this proceeding.  Some of these matters are continuing, additional matters have been undertaken, more matters are almost certain in the future.  This is a whopping, newly disclosed, highly material, and disqualifying conflict of interest that has irredeemably contaminated the current proceeding.  Under 28 U.S.C. § 455(a)-(b) and the Third Circuit's directly on-point decision *In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004), this conflict unquestionably disqualifies the Special Master, his Advisors, and the presiding Judge from further involvement in this proceeding.

There is no evidence or contention that this Court (*i.e.*, Judge Stark) has any actual bias against Gold Reserve or toward the non-judgment creditors who have paid the Special Master's Advisors nearly ███████ in fees during this proceeding.  But that is irrelevant.  In *Kensington*, the Third Circuit repeatedly emphasized that the district judge—who had consulted with advisors who themselves had conflicts of interest—had not "done anything wrong or unethical or biased." 368 F.3d at 294.  Nevertheless, the advisors' conflict was imputed to the judge and required his

1

disqualification.  Section 455(a) "reflects Congress's view that the adjudication of a case by a judge with an actual *or* apparent bias is an abuse of judicial power because it is a threat to the integrity of the judicial system."  *In re Sch. Asbestos Litig.*, 977 F.2d 764, 778 (3d Cir. 1992) (cleaned up).  When a "reasonable person"—that is, the "average layperson"—"would conclude that the judge's impartiality might reasonably be questioned" if that person knew "all the facts," then disqualification is mandatory.  *Kensington*, 368 F.3d at 296, 302-03.  Here, under *Kensington*, a reasonable person would necessarily reach that conclusion based on the Advisors' clear conflicts of interest, which must be imputed to both the Special Master and this Court irrespective of any actual bias or lack thereof.

Nothing more is required to prove the appearance of bias that mandates disqualification under these controlling standards.  But the appearance of bias is particularly unavoidable in this case.  This Court tasked the Special Master, in one of the largest forced judicial sales in history outside bankruptcy, to impartially oversee a fair sale process that maximizes the price paid for the PDVH Shares for the greatest possible benefit of Attached Judgment Creditors.  (D.I. 277 at 3.) The Special Master has been assisted throughout that process by conflicted Advisors from Weil and Evercore.  And not just assisted.  Throughout this proceeding, these Advisors have dominated communications with the parties—and, as the Court is aware, with the Court—while the Special Master often offers little input himself.  Under their influence, the Special Master has made a series of decisions over the past fourteen months that have favored Elliott Investment Management L.P. ("Elliott"), a major client of both his Advisors, and that other participants and observers have found inexplicable.  Last year, for example, the Special Master recommended that the Court adopt an Elliott bid to which virtually every other participant virulently objected yet which the Special Master continued to push.  Today, the Special Master is again (improperly) recommending an

Elliott bid that is far from the highest bid (Gold Reserve's) and that now also benefits not only Elliott but also certain bondholders (the "2020 Bondholders") involved in entirely separate litigation who have paid, and who continue to pay, his Weil Advisors orders of magnitude more in fees than even Elliott has paid them.

These facts not only reflect, but exacerbate, the appearance of bias, suggesting that the Special Master's apparent bias in favor of Elliott is actual bias. At the same time, the Advisors have not only failed to disclose their conflicts of interest, they have materially misrepresented the scope of their conflicts in prior disclosures to the parties. And when these conflicts were first raised with the Court last month, Weil (speaking on behalf of the Special Master) misleadingly minimized them as "not material." (Ex. 1, 9/10/25 Status Conf. Tr. 83:11-14.) There is simply no world where ▮▮▮▮▮ in business with active clients, who have more such business to give, would seem "not material" to anyone, let alone to a reasonable person.

Individually and collectively, these facts require disqualification so that a new, untainted sale proceeding may occur. The simple fact is that the Special Master's Advisors should have declined either this representation or the business that has created an undisclosed conflict for this Court. They unilaterally decided to do both without disclosure or permission. This was reckless and irresponsible. It has fatally contaminated this proceeding. And it is a great disservice to this Court, the parties, and all the time, effort, and substantial resources they have put into this case.

At a minimum, the Court cannot proceed on the merits of a sale until all outstanding discovery on Weil's and Evercore's conflicts of interest is completed, a full record can be presented and considered, and a hearing can be conducted. To do otherwise would be fundamentally unfair to the parties and the judicial process and would only compound the perception of illegitimacy that the Advisors have injected into this proceeding. All other proceedings must therefore be stayed

pending the resolution of this Motion and, in the event the Court disagrees that the current record suffices to mandate disqualification, pending further discovery.

## FACTUAL BACKGROUND

On August 29, 2025, the Special Master issued his Updated Final Recommendation urging the Court to adopt Elliott's new bid.  (D.I. 2123.)  Since then, discovery has revealed deep-rooted ties between the Special Master's Advisors, on the one hand, and Elliott and the 2020 Bondholders, on the other, which has injected an overwhelming appearance of impartiality and unfairness that requires immediate dismissal under controlling Third Circuit law.

### I.    New and Ongoing Discovery Reveals the Advisors' Material Conflicts of Interest.

The Special Master retained Weil and Evercore as Advisors in 2021.  (D.I. 277 at 7 ¶ 13; D.I. 560-1 at 2.)[1]  Not until years later would the parties and Court learn—through the deposition of Elliott's Assistant General Counsel on September 9, 2025—that both Weil and Evercore have ongoing, material professional relationships with Elliott.   As Elliott revealed through this designated witness, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

███  (Ex. 2, Turkel 9/9/25 Dep. Tr. 242:12-243:9, 243:18-24.)  This attorney-client relationship has persisted for at least the past █████████████.  (*Id.* 244:19-25, 16:17-23.)  Evercore, for its part, has acted as ███████████████████████████████████████████, including a recent engagement where Elliott facilitated Evercore's selection and Evercore stands to receive ████████ in fees.  (*Id.* 248:4-18, 249:4-9, 257:6-14, 260:24-262:3, 262:19-263:2.)

The Special Master, Weil, and Evercore withheld these ongoing relationships with Elliott from prior disclosures.  Indeed, in response to a request from the Venezuela Parties that the Special

---

[1] All docket citations herein are to the ECF page number unless specified otherwise.

Master produce "[d]ocuments sufficient to identify any professional engagements in which You or Your advisors performed work for any bidder participating in the sale process" (D.I. 1663-5 at 19), Weil disclosed ████████████████████████████████████████████████████ ███████████████████████████████████████████. (Ex. 3, Hiltz Deposition Ex. 33.) And they have only begun to reveal the full extent of these relationships under compulsion by Gold Reserve and the Venezuela Parties, as reflected (and ordered) at the September 10 hearing.

This new evidence shows that Weil alone has collected over ████████ in fees from Elliott and its affiliates from ████████████████████████████, which is all in addition to the millions that it has already collected and will collect through this sale process. (Ex. 4 at SM0266173-74; Ex. 5 at SM0266172.) Weil's eleventh-hour disclosures ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████ (Ex. 6, 9/12/25 Ltr. from C. Bentley, Ex. A, at 1-2; Ex. 7 at SM0265963 & n.1.) Indeed, Elliott is one of the most prominent restructuring and distressed asset firms in the world, which is the very core of Weil's business.[2] All of this needs to be explored in depositions and document discovery. For its part, Evercore has earned over █████ █████ in fees from ad hoc groups involving Elliott and will obtain another ██████████ in fees for its collaborations with Elliott on other matters. (Ex. 6, Ex. A, at 5 n.2; Ex. 2, Turkel 9/9/25 Dep. Tr. 261:18-262:3, 262:19-263:2.)

These late-breaking disclosures have continued, and they show that the ties run deeper still. Documents produced just days ago reveal ████████████████████████████████████

---

[2] Weil, "Restructuring," available at https://www.weil.com/experience/practices/restructuring ("Weil is one of the leading restructuring firms in the world . . . .").

█████████████████████████████████████████████████ (Ex. 8 at

EVERCORE_CITGO-0000003.)  Evercore personnel acknowledged internally ████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ Although Evercore

███████████████  ██████████████████████████████████████████

███████████████  ██████████████████████████████████ to

advise the Special Master to recommend Elliott's significant underbid in this matter just weeks

later.  (D.I. 2123.)

These obvious conflicts are just the tip of the iceberg.  Just days ago, Weil disclosed that,

since the Special Master's appointment (and retention of Weil as an Advisor) in 2021, Weil has

earned more than ██████████ in fees from the 2020 Bondholders and their known affiliates, plus

██████████ from ad hoc groups that include one or more Bondholders.  (Ex. 9 at SM0265978 &

n.1.)  That disclosure is particularly significant because a putative agreement between the 2020

Bondholders and Elliott—another Weil client—was the Special Master's sole basis for selecting

Elliott's low bid here.  (D.I. 2123 at 10-14 ¶¶ 15-21.)  These Bondholders are involved in separate

litigation in the Southern District of New York regarding the validity of their PDVSA bonds.  That

litigation poses no real risk to closing Gold Reserve's much higher bid here, and, in any event, this

Court has ordered that certainty of closure is secondary to price as bid criteria.  (*Infra* at 9-10 &

n.4.)  Nevertheless, the Special Master's Final Recommendation places significant weight on a

purported "transaction support agreement" ("TSA") between Elliott and a group of 2020

Bondholders whereby Elliott agreed to buy the bonds and the Bondholders agreed to provide any

"consents" needed for Elliott's bid to close.  (D.I. 2123 at 6 ¶ 9; *see also id.* at 10-14 ¶¶ 15-21.)

These conflicts of interest are material. Elliott and the 2020 Bondholders have a direct interest in the selection of Elliott's bid. Weil and Evercore have longstanding and highly lucrative relationships with both of those entities, and they have been involved in this sale process since the beginning. Indeed, they have dominated it. Over just the past fourteen months, when the Special Master took all the dubious actions discussed herein, the Special Master has claimed a total of just $713,191.83 in fees and expenses. (D.I. 1360 at 4; 1404 at 4; 1430 at 5; 1584 at 6; 1742 at 5; 1800 at 5; 1965 at 7; 2355 at 7.) That amount is less than one average month's bill from Weil and Evercore, who have collectively claimed $39,335,923.14 in fees and expenses over the same period. (*Id.*)

Meanwhile, this Court has largely deferred to the Special Master and his Advisors throughout the sale process, explaining at a recent *ex parte* conference with the Special Master's team that the Court has been "dealing with other things" and has had "no insight into what [the Special Master is] doing day-to-day, and what the status of the bids are." (D.I. 1840-1 at 19:7-20:8.) The significant trust, responsibility, and reliance this Court has placed in the Special Master and his Advisors in running this process and advising the Court, and Weil's domineering role in doing so, created virtually unlimited and nontransparent opportunities for Weil to skew this process in favor of its current clients. The mere appearance of this possibility is sufficient to compel disqualification and certainly all the more so given Weil's actual track record of decisions favoring its clients.

The conflicts at the heart of this proceeding would lead any reasonable, objective person to doubt the impartiality of the Special Master, his Advisors, and this Court, whether or not there is any actual bias. But as seen below, this concern is especially acute given that the Special Master, on the advice of Weil and Evercore, has repeatedly favored their clients throughout the sale

process, including in his most recent recommendation that the Court select Elliott's lower-priced bid and displace Gold Reserve's superior recommended bid.[3]

## II.    The Special Master's Management of the Sale Process Exacerbates the Appearance of Bias.

The initial bidding process took place in June 2024, at which point (as today) Gold Reserve and its bidding partners submitted the highest-priced bid. (D.I. 1359-1 at 3.) Under Delaware law, the Special Master should have selected that bid as the winning bid. *See* 8 Del. C. § 324(a). He did not. Instead, the Special Master pressured Gold Reserve to join its bid with either ███████ or Elliott. (D.I. 1359-1 at 3.) After Gold Reserve acquiesced and joined with ███████ however, the Special Master declared an "impasse"—there was none—and on August 7, 2024 immediately ceased all negotiations with ███████ and Gold Reserve. (*Id.*) That same day, the Special Master informed Gold Reserve that he had entered an exclusivity agreement with another bidder, later revealed to be Elliott. (*Id.*; D.I. 1373-5 at 4; D.I. 1404-1 at 33, 36.)

The Special Master proceeded to negotiate exclusively with Elliott for the next several months, preventing all potential bidders except Elliott from even accessing the data room. (D.I. 1359-1 at 4; D.I. 1373-5 at 4; D.I. 1419 at 1; D.I. 1517 at 5 ¶ 2.) As the Venezuela Parties noted at the time, "[e]very aspect of the Special Master's proposal [wa]s aimed at protecting Amber and at inhibiting the generation of a purchase price that adequately reflects the true value of the PDVH shares." (D.I. 1373-6 at 4.) But he still charged Gold Reserve and the other potential bidders millions in fees. In September 2024 alone, with other bidders locked out of the data room, Weil racked up fees of over $3.6 million—a total of 2,483.90 hours of work—for purportedly

---

[3] Gold Reserve's acquisition vehicle is Dalinar Energy, while Elliott's wholly owned bidding entity is Amber Energy. For simplicity's sake, this Motion will refer to the respective bids as Gold Reserve's and Elliott's bids.

reviewing and analyzing Elliott's bid and preparing the Special Master's recommendation. (*See* D.I. 1430-1 at 3, 8.)

On September 27, 2024, the Special Master recommended Elliott to purchase the PDVH shares. (D.I. 1325.) This initial Recommendation was so egregious that the parties near-unanimously protested. (D.I. 1373-5 at 2-5.) Crystallex, the first creditor in the priority order, went so far as to call Elliott's bid "evil." (D.I. 1357 at 29:19-30:2, 36:21-24.) It was only through such repeated objection, in the face of the Special Master's then-inexplicable support for Elliott, that the bidding process was effectively re-opened and the entire sale process began again. (D.I. 1517.)

The Court ordered the Special Master and potential bidders to propose new Bidder Protections, which the Court adopted. (D.I. 1517 at 6 ¶ 3; D.I. 1554 at 7-14.) These included (i) a "No-Shop/Non-Solicitation" period following the Special Master's final recommendation, and (ii) a "Subsequent Overbid Minimum" requiring any unsolicited bid in that period to exceed the recommended purchase price by at least $80 million, subject to the Special Master's discretion to raise or lower (but not eliminate) the minimum. (*See* D.I. 1552; D.I. 1552-1; D.I. 1554 at 11-14.) The Court also adopted certain Evaluation Criteria regarding bid price and closing certainty. (D.I. 1554 at 24-27.) As to certainty, the Court made clear that the Criteria "shall NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holdings, Inc., which is disputed by the Venezuela Parties and is subject to active litigation." (D.I. 1517 at 7-8 ¶ 28.)[4] The Court incorporated these Protections and Criteria verbatim into the

---

[4] The risk that the 2020 Bondholder litigation might impact closing Gold Reserve's bid—the sole justification the Special Master articulated for selecting Elliott's bid—is in fact *de minimis*. The 2020 Bondholders themselves made clear to Judge Failla, who oversees that litigation, that "we're

Court-approved model Sales and Purchase Agreement ("SPA").  (D.I. 1557-1 at 68-71 (§ 6.16), 94 ("Expense Reimbursement Amount" def.), 97 ("No-Shop Period" def.).)

After several rounds of competitive bidding,[5] the Special Master recognized Gold Reserve's $7.382 billion bid as the "best bid" and entered an SPA—including the above Bidder Protections and Evaluation Criteria—with Gold Reserve's bidding entity, Dalinar Energy. (D.I. 1837 at 30-31 ¶¶ 75-76, 78; D.I. 1837-1 at 111-113 (§ 6.16).)  In July 2025, the Special Master recommended that the Court accept Gold Reserve's bid, concluding, among other things, that the risk arising from the 2020 Bondholders litigation did not "outweigh the expansive gap in purchase price."  (D.I. 1837 at 33 ¶ 82(b).)  However, over a month later, well into the No-Shop period after the Special Master had recommended Gold Reserve's bid, Elliott submitted a new proposal, offering $5.859 billion—$1.523 billion less than Gold Reserve.  (D.I. 2025 at 1.)  The Special Master's first move was to ask the Court for permission to negotiate with Elliott. (D.I. 2155-1 at 19:6-20:5.)  Under the SPA's Bidder Protections, the Special Master lacked

---

not seeking an injunction of Judge Stark, we're not seeking an injunction of the special master, we're not seeking an injunction of the process in Delaware.  We're not seeking an injunction of the [G]old [R]eserve bid that we've laid out in our letters or even the sale of PDVH pursuant to that process."  (D.I. 2183-3 at 6-8.)  The Special Master's team's obsession with the Bondholder litigation also defied this Court's direction that the final bid "will need a balance that places much greater emphasis on price and lesser emphasis on certainty" given the Court's "serious reservations about the price of the [then-benchmark] bid and the implicit overvaluation placed on the [prospective settlement with the 2020 Bondholders]" by the Special Master.  (D.I. 1741 at 3, 5.)

[5] The Special Master and his Advisors also exhibited prejudice toward Gold Reserve during the "Stalking Horse" phase.  Initially the Special Master was "leaning towards" Gold Reserve's $7.2 billion bid because it was "substantially higher" than other bids and carried "lower risk."  However, the Special Master ultimately rejected Gold Reserve's offer as the "base bid" in favor of ███████ ████████████████████████████ materially lower $3.7 billion bid after Red Tree complained to the Special Master's team on a call.  (Ex. 6, Ex. A, at 1 n.1 (████████ ██████████████████████████████████████), 5 (██████████████████████████████████).)  Publicly, the Special Master's team claimed ██████████ bid would create a more robust bidding process because Gold Reserve's bid was too high to beat.  This makes no sense, particularly given that Gold Reserve's bid remains the highest today, and in any event, completely defies the purpose of a value-maximizing sale process.

independent discretion to consider a bid below the Overbid Minimum. (D.I. 1837-1 at 112 (§ 6.16(c)), 113 (§ 6.16(f)(i)).) Yet the Special Master failed to inform the Court that Elliott's bid was short ($1.523 billion short) of that mark. (D.I. 2155-1 at 4:7-22:9.) In the ensuing negotiations, the Special Master failed even to attempt to force Elliott to raise its bid, effectively relieving Elliott of any obligation to match Gold Reserve's bid, let alone to better it by $80 million. An Evercore witness confirmed as much in a deposition on behalf of the Special Master. (Ex. 11, Hiltz 9/4/25 Dep. Tr. 397:17-398:2.)[6]

In late August, the Special Master issued a Notice of Superior Proposal in Elliott's favor. (D.I. 2113.) Gold Reserve then had three days to match or beat Elliott's proposal. With enormous effort, Gold Reserve submitted an Improved Bid priced at $7.902 billion, which is now more than $2 billion higher than Elliott's bid and which would satisfy more judgments than any conforming bid submitted in this process. (D.I. 2123 ¶¶ 5, 13-15.) To no avail. The next day, the Special Master filed an Updated Final Recommendation requesting to terminate Gold Reserve's existing SPA and recommending Elliott's underbid. (D.I. 2123.)

To defend the Special Master's recommendation, his Advisors portrayed Elliott's bid in the Updated Final Recommendation as "virtually eliminat[ing] any closing risks associated with the PDVSA 2020 Bondholder litigation." (D.I. 2124 at 13 ¶ 33.) In fact, the Advisors later admitted at their depositions that they had never assessed whether the 2020 Bondholders' claims

---

[6] In stark contrast, the Weil Advisors had previously—and falsely—told Gold Reserve that the Special Master would recommend Gold Reserve's (already highest) bid if Gold Reserve increased it or sought a settlement with the 2020 Bondholders, when in fact this decision had already been made *before* Gold Reserve went to great lengths to increase its bid by $500 million. (*See* D.I. 1840-1 at 57:19-59:24; D.I. 1991-1 at 3 ¶ 6; *see also* D.I. 1840-1 at 53:18-54:13, 56:12-16 (Weil indicating to the Court in an *ex parte* conference that the Special Master would accept Gold Reserve's bid regardless).)

were likely to succeed, much less whether they would block closing on Gold Reserve's bid. (*See* Ex. 11, Hiltz 9/4/25 Dep. Tr. 411:15-412:15 ("[W]e did not conduct an analysis where we assigned specific probabilities to individual outcomes to determine, quote, an expected value.").)[7] Mr. Hiltz of Evercore further admitted that he had not even read Elliott's putative TSA with the 2020 Bondholders.[8] Nor did he have "any evidence" that OFAC would change its longstanding policy of preventing the 2020 Bondholders from exercising their purported pledge. (*Id.* 435:18-436:10.)[9]

The upshot of all of this is that the painstaking, multi-year sale process culminated in a final three-week period where the Special Master's Advisors advocated for their non-judgment creditor clients at the expense of the highest bidder in this judgment enforcement proceeding. Only two days after securing the Court's permission to engage with Elliott and its deeply discounted bid, Weil told the Court *ex parte* that the goal in considering Elliott's bid was to incentivize Gold Reserve to take a discount on its judgment to secure additional money for the 2020 Bondholders. Specifically, Weil informed the Court that it had "encouraged" Elliott (a non-judgment creditor client) to "reach out" to Gold Reserve and other Attached Judgment Creditors "to discuss potentially folding them into the Amber Energy bid," whereby Gold Reserve would "tak[e] non-cash consideration or tak[e] some kind of a discount to the face value of their claim" and the group

---

[7] Again in contrast, Gold Reserve did evaluate the risks of the 2020 Bondholder litigation's potential outcomes and determined that its Improved Bid would be unaffected by such eventualities. (D.I. 2183 at 13-15.)

[8] Ex. 11, Hiltz 9/4/25 Dep. Tr. 479:2-16 (Q: "Did you review the document as a seasoned financial advisor to determine whether it had any holes in it?" A: "I have not reviewed the TSA, no." Q: "If the TSA did have holes in it you would agree that this purported certainty would substantially reduce; yes?" [Objection] A: "Without having read the document I can't make a judgment on that. I don't know whether there are any holes in it or not." Q: "I'm sorry. You haven't read the TSA?" A: "Correct.").

[9] Indeed, Maarten Petermann, who the *New York Times* has described as an "Elliott Advisor," traveled with Boris Johnson to the Dominican Republic to meet with Nicolas Maduro, who was then subject to U.S. sanctions, in February 2024. This will no doubt raise further OFAC scrutiny and exacerbates the appearance of impropriety here.

would pay the 2020 Bondholders (other non-judgment creditor clients) "$2.1 billion or so." (D.I. 2155-1 at 40-41 (Tr. 7:24-8:3), 47 (Tr. 14:9-11), 52-53 (Tr. 19:23-20:1); *see also id.* at 45 (Tr. 12:18-22).)  After Gold Reserve declined to give up its rights, the Special Master and Weil asked the Court to adjourn the then-scheduled August sale hearing so that it could use Elliott's bid to "pressure" and "leverage" Gold Reserve to "tak[e] [this] new deal." (*Id.* at 74-75 (Tr. 41:12-19, 42:13-20).)  In other words, rather than pursue a value-maximizing sale for the benefit of all Attached Judgment Creditors, the Special Master's team leveraged their role to try to force the high bidder to give up its rights and agree to a deal giving billions to the Advisors' non-judgment creditor clients.[10]  And, after Gold Reserve again declined and raised its bid an additional $500 million, the Special Master and his Advisors decided to pick Elliott anyway.

Regardless of whether some explanation could be offered that sanitizes these facts, at a minimum, any regular person would equally view them as painting a picture of two self-interested advisors leveraging their role to deliver for their other clients benefits that would never be available under commercial realities or any typical judgment enforcement proceeding.

## ARGUMENT

Section 455(a) requires disqualification wherever a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  Section 455(b)(1) also requires disqualification where a judge has "a personal bias or prejudice concerning a party." *Id.* § 455(b).  These standards apply equally to special masters.  *See* Fed. R. Civ. P. 53(a)(2); *see also, e.g.*, *Jenkins v. Sterlacci*, 849 F.2d 627,

---

[10] Indeed, Gold Reserve, through its significantly higher bids, has been the only party in this process to actually facilitate the statutory requirement of price maximization.  Without Gold Reserve's bids, the highest bid would have been Red Tree's more than $4 billion lower priced bid after the Stalking Horse phase.  In fact, notwithstanding that Gold Reserve has been the highest bidder all along, and has been the only party willing to increase its bid, the Special Master's team actively discouraged Gold Reserve's proposals to further increase the amounts paid to Attached Judgment Creditors, including Weil dismissing as "ridiculous" Gold Reserve's offer to Red Tree of the last leg of the waterfall before Conoco's claim.

630-32 (D.C. Cir. 1988) (special masters are held to the same impartiality standards as judges). And these standards are distinct. As the Third Circuit has made clear, the appearance of bias alone is sufficient to require disqualification under Section 455(a) absent evidence of actual bias under Section 455(b)(1). *See Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir. 1993); *Kensington*, 368 F.3d at 317-18. The question under Section 455(a) is simply whether an average layperson, fully informed of the facts, would find the judge or special master's objectivity to be reasonably questionable. *See Alexander*, 10 F.3d at 162; *Kensington*, 368 F.3d at 301-03.

Whenever circumstances create an appearance of bias under that standard, disqualification is mandatory. *See* 28 U.S.C. § 455(a); *see also Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 859-61 (1988). In such circumstances, a court has "no statutory power to hear" the case. *Sch. Asbestos Litig.*, 977 F.2d at 778. Under controlling caselaw, namely *Kensington*, one such circumstance is where the adjudicator consults with advisors who themselves have conflicts of interest. The advisors' apparent bias imputes to and mandates disqualification of the adjudicator himself. *See Kensington*, 368 F.3d at 306-09.

The Weil and Evercore Advisors' manifest conflicts of interest taint the Special Master and this Court with an appearance of bias. The only remedy is disqualification.

## I.    The Advisors' Conflicts of Interest Create an Appearance of Bias that Only Disqualification Can Cure.

Weil's attorney-client relationship with Elliott, Evercore's commercial relationship with Elliott, and Weil's attorney-client relationship with the 2020 Bondholders create material conflicts of interest that are fundamentally incompatible with the role of an independent, unbiased Advisor and with the neutrality obligations of Section 455. As agents of the Special Master and, consequently, this Court, Weil and Evercore are bound by those same obligations. By the same

token, their conflicts of interest impute to the Special Master and this Court, thus mandating that the Advisors, Special Master, and this Court be disqualified from these proceedings.

The facts of this case parallel those of *Kensington*.  If anything, the facts here are worse. In *Kensington*, the Third Circuit held that a district judge's attorney advisors in an asbestos case were conflicted because they also represented plaintiffs in an "unrelated asbestos-driven bankruptcy," where they "espoused views therein on the same disputed issues."  368 F.3d at 302. Here, Weil and Evercore represent parties with a direct financial interest in *this* proceeding: Elliott, whose bid the Special Master has recommended, and the 2020 Bondholders, would-be beneficiaries of that bid.  In *Kensington*, the Third Circuit emphasized "the importance of the Advisors' role" and their "unique level of influence" over the district judge, which, given the advisors' conflict, created an impermissible appearance of bias.  *Id*. at 304.  That was so even though the judge had "met with the Advisors as a group on only four occasions for a total of eighteen hours," after which they "became functionally obsolete."  *Id*. at 306.  Here, by contrast, Weil and Evercore have dominated the sale process from the beginning, effectively serving as the Special Master themselves, and incurring thousands of hours in so doing.  (*Supra* at 7.)  And in *Kensington*, the advisors' conflict required the district judge's disqualification even though that conflict had long been open and notorious; after all, the advisors' participation in the bankruptcy case could have been discovered from that case's public docket.  *See* 368 F.3d at 312-13.  Here, Weil and Evercore concealed their conflict until one of their designated witnesses let it slip in a deposition just a week before the Sale Hearing, and they have continued to try to downplay the conflict in open court since it came to light.  (*Supra* at 3-4.)

If the advisors' conflicts required the district judge's disqualification in *Kensington*, Weil and Evercore's conflicts of interest necessarily require disqualification here.  It is "immaterial"

under Section 455(a) whether an advisor has "actually affected the judge's decision." *Kensington*, 368 F.3d at 307 (cleaned up). What matters is the appearance of partiality that the advisor's conflict of interest creates. Like a law clerk, the Advisors are bound to provide competent and impartial advice to enable the Special Master to fulfill his mandate. *See id*. Unlike a law clerk, they have earned ███████████ for purportedly doing so. (*Supra* at 4-7.) Retained pursuant to authority that the Court vested in the Special Master, who himself serves at the behest of the Court, these Advisors operate under, and as an arm of, the Court. (D.I. 277 at 7 ¶ 13; D.I. 560-1 at 2.) They thus are bound by the same rules. Under those rules, they categorically cannot provide impartial advice in these proceedings when they simultaneously have direct and highly lucrative relationships with parties who in turn have direct interests in these proceedings. This remains the case—only more so—because these Advisors undertook these significant matters without disclosing their conflicts to the parties or the Court. Indeed, the Advisors' inadequate disclosures and affirmative misrepresentations about these conflicts only intensifies the perceived bias.

In any event, the Advisors' conflicts of interest have "actually affected the [Special Master's] decision[s]" here. *Kensington*, 368 F.3d at 307. As detailed above, (i) the Special Master, guided by his Advisors, first declared an impasse with CVR/Gold Reserve (without any basis) in order to negotiate exclusively with Elliott while shielding Elliott from price competition for its initial underbid, which the Special Master recommended and which was so egregiously defective that the Court ordered the bidding to be redone; (ii) the Special Master, guided by his Advisors, then unilaterally and impermissibly eliminated Court-ordered Bidder Protections so that he could entertain a bid from Elliott that was $1.5 billion (now $2.0 billion) lower than the Gold Reserve bid he had already recommended; and (iii) the Special Master, guided by his Advisors, ultimately recommended Elliott's lower-priced bid because it purportedly had a higher certainty

16

of closing in light of the 2020 Bondholders litigation, even though the Special Master and his Advisors had never read Elliott's putative TSA with the 2020 Bondholders or performed any analysis whatsoever of the risk that the Bondholders' claims might succeed. And those are just the highlights. (*Supra* at 8-14.) Through it all, Weil and Evercore have concealed their true relationships with Elliott and the 2020 Bondholders, whose interests the Special Master has consistently favored for no other apparent reason.

These are not merely isolated errors, but a sustained course of conduct that has, with the benefit of the newly discovered evidence, destroyed the appearance of impartiality and fairness in this proceeding. If disqualification were not already necessary under Section 455(a), this pattern of apparent favoritism—and the resulting procedural contortions—would require disqualification for actual bias under Section 455(b)(1). But if nothing else, this pattern exacerbates the appearance of bias that arises from Weil and Evercore's conflicts of interest and that requires disqualification under Section 455(a) and Third Circuit law. *See Kensington*, 368 F.3d at 309-12 (appearance of bias evidenced by judge's *ex parte* meetings with advisors, including one where an advisor "disparaged a possible expert witness and criticized a defense"); *Sch. Asbestos Litig.*, 977 F.2d at 781-82 (judge's attendance at informational conference where plaintiffs' experts presented on merits-related issues warranted disqualification); *Alexander*, 10 F.3d at 164-66 (judge's criticism of plaintiffs and their witnesses created disqualifying appearance of bias).

Under *Kensington*, these Advisors' conflicts of interest impute to both the Special Master and this Court. To be sure, *Kensington* did not involve a special master; the conflicted advisors interacted directly with the district judge. In the circumstances of this case, however, that is a distinction without a difference. The Special Master's Advisors have also interacted directly with this Court, both in public proceedings, where the Advisors speak for the Special Master, and in at

least eleven *ex parte* meetings and communications, which the Third Circuit has "described . . . as anathema in our system of justice" and where (according to the few available transcripts) the Advisors appear to be just as involved. *Kensington*, 368 F.3d at 309 (quotation marks omitted). It was at one of these *ex parte* meetings where the Court acknowledged that it had "no insight into what [the Special Master is] doing day-to-day" and has accordingly relied on the Special Master's team. (D.I. 1840-1 at 19:7-20:8 (noting that the Court has pursued a status-quo were it "just remain[s] curious, but [does] not have [the Special Master] fill me in on anything").) Simply put, the Special Master's conflicted Advisors have driven the highly irregular and apparently biased process that has put Elliott's bid in the driver's seat for the Court's approval. And the Court has interacted with these Advisors more than enough throughout this process to create an appearance of bias under *Kensington*, where just four *ex parte* meetings with more tangentially conflicted advisors was deemed "extensive." 368 F.3d at 306, 309. These facts alone are disqualifying regardless of any actual bias. Any reasonable observer would question the fairness and neutrality of a sale proceeding where the Advisors who have guided that proceeding have been paid ██ ███ in other matters by the proponent and beneficiaries of the bid that the Special Master and his Advisors have recommended for the Court to select.

This Motion is timely. Whereas the *Kensington* advisors' conflict of interest concededly could have been discovered well before the disqualification motion was filed, the Advisors here have actively concealed their conflict of interest. Even today, there is no certainty that the Advisors have yet disclosed the conflict's full scope. Given that they failed to disclose the underlying relationships for years, and each round of newly ordered disclosures reveals further depth to those relationships, it is far likelier that they have not. Again, then, if the *Kensington* disqualification motion was timely, this Motion must be, too. *See id.* at 312-15. And only disqualification can

cure the appearance of bias here. Indeed, where an adjudicator's neutrality is reasonably in doubt, the *only* adequate remedy is disqualification and reassignment. *See, e.g.*, *Alexander*, 10 F.3d at 167-68 (disqualifying judge and directing reassignment); *Kensington*, 368 F.3d at 318-19 (same). Here, the only way to restore the integrity of the sale process and to ensure compliance with applicable law is for a judge to independently evaluate Elliott's bid and to issue a new Final Recommendation. Under Section 455, however, the Special Master, the Advisors, and this Court cannot be involved in that process. The Advisors' conflict of interest leaves this Court, unfortunately, with "no statutory power to hear" this case further.

## II.    This Court Must Stay All Other Proceedings Until This Motion Is Resolved.

The Court must stay all proceedings, including any further merits proceedings on Elliott's and other bids, until this Motion is resolved. And to the extent that the Court does not deem the current record sufficient to require disqualification (which it is), the stay must include an adequate period for Weil and Evercore to fully satisfy the discovery requests of Gold Reserve and the other moving parties. Given that a court with an appearance of bias in a case lacks any power over that case, the Third Circuit has made clear that disqualification is a threshold issue and that further proceedings should be stayed until the district court can rule on a disqualification motion based on "a developed evidentiary record." *In re Kensington Int'l Ltd.*, 353 F.3d 211, 223 (3d Cir. 2003). Thus, the first time the *Kensington* dispute reached the Third Circuit—on a petition for mandamus after the district court had refused to allow disqualification-related discovery—the Third Circuit stayed "all proceedings affected by [the] petition (with the exception of the recusal motion)," granted mandamus to vacate the district court's discovery stay, and remanded for expedited discovery and decision. *Id*. at 216, 225.

Upon discovering Weil and Evercore's conflicts of interest, Gold Reserve promptly sought full disclosures regarding the relationship between those firms, Elliott, and the 2020 Bondholders.

(D.I. 2223.)  Weil and Evercore have since made some responsive productions, partly revealing the web of conflicts as discussed above.  Given the expedited disqualification briefing schedule (D.I. 2347) and scope of relevant information, however, Gold Reserve does not yet have full discovery into the nature of these disqualifying conflicts.  Among several other still-unsatisfied discovery requests, Gold Reserve has received few internal communications and no text messages, where discussions revealing Weil, Evercore, Elliott, and the 2020 Bondholders' relationships are likely to be.  And Gold Reserve has not yet taken depositions, where Weil and Evercore's efforts to minimize those relationships can be tested.  (*See* D.I. 2345 at 5-6; D.I. 2341 at 2.)

Billions of dollars are at stake in the choice whether to accept Elliott's recommended bid. The appearance of impermissible bias in Elliott's favor is clear enough on its own to require the requested disqualifications.  But if the Court disagrees, this appearance of bias is at a minimum serious enough to warrant further discovery.  Only a full record could ensure that this monumental choice is not made by a court without the statutory authority to make it.

## REQUEST FOR RELIEF

For the foregoing reasons, Gold Reserve respectfully asks the Court to:

1.  Stay all sale-related deadlines and determinations pending resolution of this Motion;

2.  Disqualify itself, the Special Master, and Advisors Weil and Evercore from any further role in designing, administering, or recommending bids in the sale of the PDVH Shares, or, to the extent the Court declines to recuse itself, appoint neutral successors, unaffiliated with any bidder, to independently evaluate Elliott's bid and issue an independent Final Recommendation; and

3.  Grant such other and further relief as the Court deems just and proper.

For the avoidance of doubt, Gold Reserve reserves the right to request any relief requested by any other party moving for disqualification, and to supplement its argument and evidence in support of its requests for relief upon completion of full discovery.

Dated: October 9, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: _/s/ Matthew P. Ward_
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
555 California Street, Suite 3300
San Francisco, CA 94101
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

- and –

**BRITHEM LLP**
Michael J. Bowe (*pro hac vice*)
565 Fifth Avenue

New York, NY 10017
Telephone: (332) 296-8300
mbowe@brithem.com

*Attorneys for Gold Reserve Ltd.*