**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Misc. No. 17-151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF | ) | **PUBLIC VERSION** |
| VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |

**SPECIAL MASTER'S OPPOSITION TO GOLD RESERVE'S & THE VENEZUELA**
**PARTIES' DISQUALIFICATION MOTIONS**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

ARGUMENT ................................................................................................................ 8

I.      THE DISQUALIFICATION MOTIONS ARE UNTIMELY AND WAIVED. ................... 8

II.     THERE IS NO REASONABLE BASIS TO QUESTION THE IMPARTIALITY
        OF THE COURT, THE SPECIAL MASTER, OR HIS ADVISORS. ..............................11

III.    THERE IS NO BASIS FOR DISQUALIFICATION UNDER SECTION
        455(B)(4)............................................................................................................ 19

CONCLUSION ........................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Coulter*,
773 F. App'x 110 (3d Cir. 2019) ........................................................... 16

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ................................................................... 4

*In re Digital Music Antitrust Litig.*,
2007 WL 632762 (S.D.N.Y. Feb. 27, 2007) ......................................... 19

*Diversifoods, Inc. v. Diversifoods, Inc.*,
595 F. Supp. 133 (N.D. Ill. 1984) ......................................................... 20

*In re Kempthorne*,
449 F.3d 1265 (D.C. Cir. 2006) ............................................................ 18

*In re Kensington*,
353 F.3d 211 (3d Cir. 2003) .................................................................. 11

*In re Kensington*,
368 F.3d 289 (3d Cir. 2004) .................................................................. 18

*Liteky v. United States*,
510 U.S. 540 (1994) ............................................................................... 16

*Martin v. Monumental Life Ins. Co.*,
240 F.3d 223 (3d Cir. 2001) .................................................................. 11

*Pashaian v. Eccelston Props., Ltd.*,
88 F.3d 77 (2d Cir. 1996) ...................................................................... 20

*Sullivan v. Chesapeake & Ohio Ry. Co.*,
947 F.2d 946 (6th Cir. 1991) (unpublished decision) ........................... 19

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ................................................................ 10

*Withrow v. Larkin*,
421 U.S. 35 (1975) ................................................................................. 11

**Statutes**

28 U.S.C. § 455 ............................................................................ *passim*

28 U.S.C. § 455(a) ................................................................................................2, 11, 19

28 U.S.C. § 455(b)(1) .............................................................................................2, 16, 20

28 U.S.C. § 455(b)(4) .............................................................................................3, 19, 20

28 U.S.C. § 455(e) ...............................................................................................................11

**Other Authorities**

Del. R. Prof. C. 1.7.............................................................................................................4

Jessica Seah, Weil, Paul Hastings Engaged on $22.8B CK Hutchison Ports Sale to
    BlackRock Consortium, Law.com (Mar. 10, 2025),
    https://www.law.com/international-edition/2025/03/10/weil-paul-hastings-
    engaged-on-228-ck-hutchison-ports-sale-to-blackrock-consortium/.......................................9

Robert B. Pincus, as special master in this case (the "**Special Master**"), respectfully submits this brief in response to Gold Reserve's & The Venezuela Parties' Motions to Disqualify, D.I. 2381 ("**GR Motion**"); D.I. 2385 ("**VZ Motion**") (together, the "**Motions**").[1]

## INTRODUCTION

This is the fourth attempt to disqualify the Special Master or his advisors. One party, Gold Reserve, now also moves to disqualify this Court. Like previous failed disqualification efforts, these motions were "filed at a moment of particular sensitivity in the sale process." D.I. 1180 ("**3d DQ Order**") at 6. The Court just heard extensive evidence showing that the sale of PDVH Shares to Amber will provide the best combination of price and certainty for the benefit of Attached Judgment creditors. The evidentiary hearing caps a robust, open-market sale process that was designed to—and did—obtain the value-maximizing price for the PDVH Shares. The Special Master's "entire *raison d'être* … is to assist the Court in enforcing Crystallex's judgment." *Id.* at 10. Now, thanks to the tireless efforts of the Court, the Special Master, his advisors, and the judgment creditors, enforcement is imminent.

At any other point in this long process, Gold Reserve and the Venezuela Parties would have been the unlikeliest of bedfellows. But it is no coincidence that, at this juncture, the only parties seeking disqualification are the ones who oppose any enforcement of the judgment and the losing bidder now facing an "existential" crisis. The Special Master takes seriously any attack on his or his advisors' impartiality. But the Court should look skeptically at both the motives and the timing of these Motions. The Court has already found that the Venezuela Parties' prior disqualification motions were "tactical and designed with at least a partial goal of further delaying these proceedings." *Id.* at 8. This time around is no different.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in D.I. 481 (the "**Sale Procedures Order**") or the Updated Final Recommendation (D.I. 2123).

As a threshold matter, the Court should deny the Motions because they are untimely. The Court denied two prior disqualification attempts in this case for this reason. *See* 3d DQ Order; D.I. 544 ("**2d DQ Order**"). The Court has made clear that, if a party believes there are "meritorious grounds for disqualif[ication] … that's an emergency that requires contacting the Court … within a day, two days maybe, three days at most." 2d DQ Order at 6. Yet Gold Reserve and the Venezuela Parties waited *almost six months* after Weil and Evercore disclosed working for bidders and 2020 Bondholders in unrelated matters—until the eve of the sale hearing—to bring their motions. And the moving parties knew or should have known since 2021, when Weil and Evercore were retained, that their industry-standard engagements allow for representation of bidders and other parties in matters unrelated to this one. If Movants believed something else was required, the time to say so was when the advisors were retained—or, at the latest, six months ago when they knew for certain the Special Master's advisors did unrelated work for bidders and bondholders. Gold Reserve had no qualms about any of this when the Special Master supported Gold Reserve's bid. It was only after a superior bid emerged that Gold Reserve claimed there was an ethical conflict.

Delay aside, there is no basis for disqualification. No reasonable person, aware of all the relevant facts, would question the impartiality of the Court, the Special Master, or his professional advisors. 28 U.S.C. §§ 455(a), (b)(1). This is the closing act of what is surely among the most thorough and participatory judicial sale processes ever held. Every move by the Special Master was scrutinized. Every party had ample opportunity to object. The Special Master's recommendation to accept the Amber bid is supported by Crystallex and ConocoPhillips (and many other judgment creditors, including Red Tree), who, unlike the Venezuela Parties, want the judgment to be enforced. D.I. 2376. And the Special Master's recommendation does not determine which bid will be accepted. That question is reserved for the Court, based on evidence presented

in extensive proceedings in which Movants have fully and actively participated. No reasonable person could view this process and conclude the actual decision-maker lacks impartiality.

The gist of the Motions is that Weil and Evercore do unrelated work for bidders and 2020 Bondholders. Of course they do. This exceedingly complex sale process could not have been completed without the experience and expertise of sophisticated professionals. Any advisor up to the task works regularly with complex transactions and court-supervised sales. That means they also work with parties who participate in those transactions, like the bidders and 2020 Bondholders. That Weil and Evercore have unrelated engagements in this space does not make them biased. It is the hallmark of the experience and sophistication that enables them to advise the Special Master.

The moving parties also fail to show that the Special Master's advisors have a vested interest, financial or otherwise, in any particular bid. 28 U.S.C. § 455(b)(4). The advisors have no financial stake in the underlying property or in any of the bidders, bondholders, or their affiliates. Any contention that the outcome here might have some distant follow-on effect on the advisors' future workflow is implausible and far too speculative to support disqualification.

The Special Master and his advisors have, at every step of this process, provided impartial and conflict-free recommendations to the Court to facilitate a value-maximizing sale of the PDVH Shares for the benefit of Attached Judgment creditors, which is the sole purpose of this post-judgment proceeding. As the Court knows, this has been a complex and painstaking endeavor, and one that the Court, the Special Master, and his advisors have undertaken with professionalism, care, and—critically—impartiality. The evidence presented by all sides at the evidentiary hearing establishes that the Special Master's recommendation, reached with the heavy involvement of the Sale Process Parties and supported by many creditors, is the value-maximizing transaction.

Whatever bid the Court selects, the end is near. Yet now, inches from the finish line, Movants urge the Court to start all over again with a new set of rules that would likely exclude any advisors capable of doing the job and disqualify the Court itself. The Court should reject this tactical, eleventh-hour attempt to derail the value-maximizing sale of the PDVH Shares. As the Third Circuit said six years ago: "Any outcome where Crystallex is not paid means that Venezuela has avoided its obligations." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 149 (3d Cir. 2019). After nearly a decade and after a robust sale process, it is time for Venezuela to "liv[e] up to its obligations to pay its debts." 2d DQ Order at 13.

## BACKGROUND

On April 13, 2021, with the support of the Venezuela Parties, the Court appointed Robert B. Pincus as Special Master "to assist with the sale of PDVSA's shares of PDVH." D.I. 277 at 1. In accepting his charge, the Special Master submitted to the Court a declaration stating that he did "not believe that there are any grounds for [his] disqualification as a Special Master under 28 U.S.C. § 455." D.I. 278, ¶ 3. The "Sale Procedures Order" was subsequently approved by the Court and the Special Master was approved to retain advisors including Weil, Gotshal & Manges LLP and Evercore Group L.L.C. D.I. 277; D.I 481. As is standard in the industry, the terms of the Special Master's engagement permitted Weil and Evercore to concurrently represent clients who might be involved in this proceeding in unrelated matters. *See* Del. R. Prof. C. 1.7 (permitting concurrent representation when there is no "significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client").

Contrary to Movants' unsubstantiated accusations of bias,[2] the Special Master has

---

[2] Movants make numerous misrepresentations in their opening briefs, including about the sale process and the bids. The Special Master does not attempt to correct the record or respond to every misstatement or mischaracterization of the record, as the justification for the Special Master's recommendations are well aired in prior filings. *See e.g.*, D.I. 481; D.I. 1554; D.I. 1554; D.I. 1552-

presented the Court with the best available bid at every relevant juncture. First, on September 27, 2024, the Special Master recommended a bid submitted by Amber Energy, Inc., an affiliate of Elliott Investment Management L.P. ("**Elliott**"). D.I. 1325. This was the best available bid at the time[3] but it was far from perfect—mostly due to an escrow designed to manage contingent liabilities relating to 2020 Bondholders and alter-ego claims. After widespread opposition, the Court directed the Special Master to reopen the bidding process. D.I. 1505.

On March 21, 2025, consistent with the Court's Evaluation Criteria, Sale Hearing Tr. 551:10–14 (Hiltz), the Special Master recommended a stalking-horse bid submitted by Red Tree. D.I. 1596. Amber had also submitted a bid at that time, but the Special Master recommended Red Tree's because it was the best available option—though, again, far from perfect. Sale Hearing Tr. 550:17-22 (Hiltz). The Court noted "serious reservations about the price of the Red Tree bid," but found that "[i]t seems sensible to set as the minimum bid for beginning the Topping Period the bid that appears to have the greatest likelihood of closing." D.I. 1741 at 3, 5. On July 2, 2025, following the topping periods, the Special Master recommended an imperfect bid by a Gold Reserve affiliate, Dalinar Energy Corporation. D.I. 1837. However, as permitted by the Court and the Dalinar SPA, D.I. 1517, Amber submitted an unsolicited competing proposal on August 8, which it revised on August 22. Sale Hearing Tr. 570:15-574:1 (Hiltz). Because Amber's revised bid was superior to Dalinar's, the Special Master, on August 29, 2025, recommended approval of the revised Amber

---

1; D.I. 1741; D.I. 2376; D.I. 2425; D.I. 2373; D.I. 2432; D.I. 2123; D.I. 2273; D.I. 1837; D.I. 2006; D.I. 1596; D.I. 1660; D.I. 1840; D.I. 2155; April 17, 2025 Hr'g Tr.; and Sale Hr'g Tr.). The decision not to respond to any particular statements by the Movants should not be construed as an admission.

[3] The Special Master first considered a bid from ███████ joined by Gold Reserve, but turned to the Amber bid due to the mismatch between ██████ closing conditions (which required a final, non-appealable order) and the timing of its financing (which was committed for only twelve months, not long enough for appeals to fully run their course). Sale Hearing Tr. 544:3-24 (Hiltz).

bid. D.I. 2133. Unlike Dalinar's bid, Amber's bid mitigated the risk from a potential ruling that the 2020 bonds were valid (as Judge Failla later, in fact, found). This Court held a week-long evidentiary hearing to assess the Amber bid, in which Movants actively participated.

Over the course of the sale process, the Special Master has provided information relating to his advisors. On March 24, 2025, the Special Master produced to Gold Reserve and certain of the Venezuela Parties—in response to a discovery request seeking information about representations of "bidders"—a chart detailing Weil's and Evercore's engagements with bidders.[4] The March 24 disclosure reflected that Weil represented Elliott and other bidders (one of whom is also a 2020 Bondholder) in matters unrelated to the sale process, and that Evercore had other, unrelated engagements with other, non-Elliott bidders. *See* GR Mot., Ex. 3; VZ Mot. Ex. 5. Although Movants thus had actual knowledge no later than March 24 of the advisors' representations during the sale process of Elliott and other bidders, including a 2020 Bondholder, Movants did not ask for additional discovery, object, or raise any issue with the Court at that time.

The Special Master has since provided additional, expanded disclosures. Following the September 9 deposition of Michael Turkel, Elliott's Assistant General Counsel, counsel for Gold Reserve wrote to the Court and—for the first time—requested information pertaining to Weil's and Evercore's representation of not just bidders but also "corporate parents, subsidiaries, or affiliates" of "Elliott or any other bidding party," including the "fees and expenses" for such matters, dating back to January 1, 2021. D.I. 2223. On September 12, Weil and Evercore produced charts detailing relevant engagements. VZ Mot., Ex. 8. Then, on September 16, Gold Reserve and the Venezuela Parties served significantly expanded discovery requests, seeking—again for the first time—

---

[4] Evercore's March disclosure was overinclusive: It listed bidders that were not Evercore clients, but otherwise significant to an Evercore engagement, *e.g.*, an investor in Evercore's client. *See* VZ Mot., Ex. 23 (Evercore's Oct. 1, 2025 chart).

information relating to engagements with 2020 Bondholders (and affiliates) and ad hoc groups that counted as members any affiliate of any bidder or 2020 Bondholder. D.I. 2312 at 1.

Weil and Evercore again produced responsive information, including email communications. *See* Ex. A, Discovery Process Letter. They have now disclosed every single representation (and the fees collected) for any bidder, any known affiliate of any bidder, any 2020 Bondholder, and any ad hoc creditor group involving any of the above. GR Mot., Exs. 5-7; VZ Mot., Exs. 8-13. The total collections from 2021 – 2025 are as follows:

| | Weil | Evercore Investment Banking |
|---|---|---|
| Amber Energy | $0 | $0 |
| Elliott Inv. Mgmt. LP | $191,584 | $0 |
| Other Elliott affiliates | $4.43 million | $0 |
| Other bidders and their affiliates | $2.16 million | $16.5 million |
| 2020 Bondholder Group | $0 | $0 |
| Individual 2020 Bondholders | $62.61 million | $24.4 million |
| Ad hoc groups involving any of the above | $30.91 million | $25 million |

Several undisputed aspects of these disclosures merit particular mention. *First*, and critically, the disclosures show that none of Weil's or Evercore's other engagements is related to this sale process. Nor does any engagement violate the industry-standard terms of either firm's engagement with the Special Master.[5] *Second*, Weil collected a total of just $191,584 from Elliott (Amber's direct affiliate named in its bid materials). VZ Mot., Ex. 8. *Third*, including other Elliott affiliates, Weil collected just over $4.5 million in the *past five years*—less than 0.05% of Weil's *annual* revenue

---

[5] Despite their extensive discovery requests related to this motion, Movants never sought the Special Master's engagement letter with Weil, which, with its industry-standard conflict-of-interest provisions, confirms the appropriateness of Weil's representation and undermines the Movants' allegations. For the Court's convenience, the Special Master attaches the letter as Ex. B hereto.

over that period. Evercore, for its part, has not collected any investment banking fees from Elliott or its affiliates, which reflects Evercore's commitment to representing clients defending against activist investors like Elliott. *Finally*, the overwhelming bulk of the fees come from unrelated engagements with individual 2020 Bondholders or ad hoc groups, who are not parties here.

## ARGUMENT

### I.    The Disqualification Motions Are Untimely and Waived.

"Motions for disqualification 'must be brought at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim.'" 3d DQ Order at 1 (citation omitted). This Court held that waiting even weeks to assert a potential ground for disqualification of the Special Master renders a motion untimely: "[I]f you're sitting on an issue that could mandatorily require me to disqualify the special master, I don't think you can wait from December 28th until January 9th"—a period of less than two weeks—"without even contacting the Court and giving it a hint that there is this kind of emergency." *See* 2d DQ Order at 6. "I think that's an emergency that requires contacting the Court or doing your level best to contact the Court within a day, two days maybe, three days at most." *Id.*

The delay here is measured in months or years, not days. Movants indisputably knew of the circumstances underlying their alleged basis for disqualification for nearly *six months* before they first raised this issue on September 13, 2025. *See* D.I. 2286. On March 24, 2025, Weil and Evercore disclosed to Gold Reserve, CITGO, and PDVH that they represented various bidders (including, for Weil, Elliott). *See, e.g.*, VZ Mot. 4-5.[6] Weil also disclosed that it represented

---

[6] While PDVSA and the Republic elected not to receive discovery produced at this time, they were able to access it and had constructive knowledge of this information by dint of their common interest with the other Venezuela Parties no later than July, when they signed on to the confidentiality agreement permitting them to see this discovery. At the very latest, they admit they became aware of this information at the deposition of Mr. Hiltz on August 6, 2025, more than a month before they raised their purported concerns with the Court. VZ Mot. 5.

██████████████████, a known 2020 Bondholder listed as a bidding party in connection with ████████████, and Evercore disclosed that ███████████ was an investor in an Evercore client.

Despite knowing all these facts, Movants did not breathe a word about disqualification. Nor did they seek disqualification when, months later in July 2025, the Special Master recommended Dalinar's (*i.e.*, Gold Reserve's) then-superior bid. It was only after a better bid from Amber emerged—and even then, on the eve of the sale hearing—that Movants suddenly concluded that representing bidders or 2020 Bondholders in unrelated matters "is fundamentally incompatible with the role of an independent, unbiased Advisor." GR Mot. 14.

And looking back six months substantially understates Movants' delay. They have been on notice since 2021—when the Court first approved the Special Master's engagement of Weil and Evercore, with the industry standard (and ethical) terms that permit them to represent entities involved in this process in unrelated matters. No party objected then. Nor did Movants seek disqualification after numerous public disclosures of Weil's and Evercore's representation of bidders and 2020 Bondholders during the sale process, including on other court dockets and in news articles.[7] Movants had both actual and constructive knowledge of the purported conflict for years but waited until the eve of the sale hearing to sound the alarm.

Movants try to paper over their delay by pointing to additional disclosures after March 24, 2025. GR Mot. 18; *see also* VZ Mot. 18-19 (asserting violation of disclosure obligations). But one

---

[7] For example, Weil's representations of known 2020 Bondholders were matters of public knowledge during the sale process. *See* D.I 103; *see, e.g.*, Jessica Seah, Weil, Paul Hastings Engaged on $22.8B CK Hutchison Ports Sale to BlackRock Consortium, Law.com (Mar. 10, 2025), https://www.law.com/international-edition/2025/03/10/weil-paul-hastings-engaged-on-228-ck-hutchison-ports-sale-to-blackrock-consortium/; ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

reason for these additional disclosures is that Movants kept changing their minds about what they think is a conflict. They first inquired about representations of *bidders*. Months later, Movants inquired about *affiliates* of bidders and fees. The ensuing September 12, 2025 disclosure showed that Evercore collected *nothing* from Elliott or their affiliates, and that Weil received *less than $200,000* from Elliott over 4+ years (compared with Weil's *annual* 2024 revenues of over $2 billion). VZ Mot., Ex. 8. It also showed Weil collected *less than $4.5 million* from Elliott affiliates in that time, almost entirely outside the United States. *Id.* Unsatisfied with those figures, Movants zoomed out again and sought information about 2020 Bondholders and their affiliates (most of whom are not parties here), which revealed $62 million in Weil fees and $24.4 million in Evercore fees over 4+ years.[8] After padding that amount with another $31 million from Weil and $25 million for Evercore from representations of ad hoc groups that included any of the above parties, Movants came up with their "conscience-shocking" headline of over $100 million in fees and their repeated assertion that Weil and Evercore stood to receive "tens of millions" more. VZ Mot. 1, 6. All told, after the March disclosure revealed the purported basis for disqualification, Movants waited six months to declare an emergency. *Cf.* D.I. 2286 at 2 (Gold Reserve: "materiality is not the relevant standard").

The timing of these Motions, first brought at the start of the sale hearing, plainly evidences strategic delay. *See United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) ("In the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings."). Brought of desperation given the strength of and overwhelming support for the Amber bid, their Motions are proof that Movants will do whatever it takes to try and stop the sale

---

[8] To put these fees (received over 4+ years) in context, Evercore's annual net revenues in just 2024 were over $2.97 billion. *See* Evercore Inc. Form 10-K (Feb. 21, 2025).

of the PDVH shares. Now, like before, Movants waited to seek disqualification until they believed it would bring them a strategic advantage. 3d DQ Order at 6 (Movants "undoubtedly kn[ew] this would be a most inopportune time for the Court, and the sale process, to lose the individual overseeing the entire, complex sale process"). The Venezuela Parties seek to prevent any recovery, and Gold Reserve seeks to undermine a bid superior to its own because winning this auction is "existential" to Gold Reserve's survival. Sale Hearing Tr. 957:4-7 (Rivett).

For the same reasons the Motions are untimely, Movants also waived their primary basis for seeking disqualification.[9] "[T]he same analysis as to the timeliness" applies to waiver. 2d DQ Order at 8 (finding waiver); 3d DQ Order at 3 (same). Movants' "long-time acquiescence" in the Special Master's advisors' representations of bidders and 2020 Bondholders in unrelated matters "constitutes a waiver of their right to seek disqualification." *Id.*

## II. There Is No Reasonable Basis to Question the Impartiality of the Court, the Special Master, or His Advisors.

On the merits, the Motions do not present any ground for disqualification of the advisors— let alone the Special Master and the Court—under Section 455(a). "Disqualification … is required when 'a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned.'" 3d DQ Order at 8 (quoting *In re Kensington*, 353 F.3d 211, 220 (3d Cir. 2003)). "[D]isqualification is not easy to obtain: a movant must overcome 'a presumption of honesty and integrity in those serving as adjudicators.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). "Because a judge is presumed to be impartial, a party seeking recusal bears the substantial burden of proving otherwise." *Id.* at 8-9 (quotation omitted). Especially now, "[a]fter a massive proceeding such as this, when the court has invested substantial

---

[9] "[D]isqualification under 28 U.S.C. § 455(a) 'may be waived …' although 'the grounds for disqualification under § 455(b)[] generally cannot be waived." 2d DQ Order at 8 n.13 (quoting *Kensington*, 353 F.3d at 220-21); *see generally* 28 U.S.C. § 455(e).

judicial resources," "there must be a more compelling standard ... for recusal under 455(a)." *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001).

At the outset, the claim of a disabling conflict by the Special Master's advisors is "simply implausible." D.I. 443 at 7. This is "a post-judgment enforcement proceeding; the Special Master and his advisors—like the Court itself—have no occasion to adjudicate the merits of [any] claims." *Id.* at 8. As this Court has recognized, it is unclear how Section 455 should even apply to a special master—much less to his advisors—"tasked with implementing a judicial sale to satisfy a judgment," and Movants do not cite a single case arising in this context. *Id.* at 7.

The Court's robust and transparent "procedures provide additional protections against purported conflicts." *Id.* at 8-9. Gold Reserve, the Venezuela Parties, and many others "have had innumerable opportunities to litigate every conceivable challenge to this Court's approach—and they have often done so." 3d DQ Order at 13. This includes opportunities to object to the selection of the Special Master, the appointment of his advisors, the procedures governing the sale process, and each of the various interim steps and transactions the Special Master recommended. And, of course, the Special Master's recommendation does not determine the sale process' outcome. That decision is for the Court alone, based on the evidence presented in an adversarial proceeding. The Court's limited interactions with the Special Master and his advisors through *ex parte* conferences are not evidence of bias that should disqualify this Court, *see* GR Mot. 18, but evidence that the Court, the Special Master, and his advisors carefully vetted each step of the process.[10]

Against this backdrop, Movants contend it is a "shocking conflict[] of interest" that Weil and Evercore work with bidders, 2020 Bondholders, and their affiliates in unrelated matters. VZ Mot. 6. What would be shocking is if they didn't. As this Court found (and the Venezuela Parties

---

[10] The Special Master will make all *ex parte* transcripts available, at the Court's direction.

conceded), "the Special Master's task is a monumental and challenging one." D.I. 443 at 10. It can be completed only with the aid of advisors who have deep experience and expertise in complex transactions and judicial sales. "[R]etaining skilled counsel and advisors that have the resources, experience, and expertise in the sale of complex and large assets" is "critical to maximizing the value of the PDVH shares." D.I. 348 at 5; *see also* 3d DQ Order at 12-13 ("The Court has needed, and will continue to need, the experience and efforts of the Special Master (and his advisors) to carry out the elaborate process it has adopted."). Managing the sale process has involved expertise across the advisors' firms, including M&A, restructuring, tax, securities, regulatory, and more. These advisors are qualified for this role *because* of their sophistication and experience.[11]

Movants analogize the advisors to law clerks. *See* VZ Mot. 15, 20; GR Mot. 16. But a law clerk would not have the experience or the resources to advise the Special Master in this sale process. The advisors are professional firms with deep benches who are in the business of advising on complex transactions. Financial institutions who participate in these transactions, like the bidders and 2020 Bondholders and their affiliates, are repeat players. Major law firms and financial advisors routinely represent these institutions in one transaction while sitting across the table from them in other, unrelated transactions. *See* GR Mot., Ex. 2 (Turkel Dep.) Tr. at 248:21-22 ("I certainly can recall situations where [Elliott] had been on the other side of [Evercore]."). Those are the industry-standard terms under which firms provide unbiased professional advice to clients. The advisors' representations of bidders and 2020 Bondholders in unrelated deals do not taint their advice in this matter or in those.

---

[11] Movants' request for additional discovery should be denied. GR Mot. 3-4. Weil and Evercore have already produced significant discovery on, as this brief explains, unrelated entities and confidential, non-public engagements that have absolutely no bearing on the alleged issue here. Movants had the opportunity to pursue depositions prior to this hearing but chose not to.

Weil's and Evercore's representations of the Special Master are fully consistent with their ethical obligations and industry standards and provided the Special Master with conflict-free recommendations. *See* D.I. 443 at 10 ("It is notable, as well, that everything Evercore has done is consistent with industry standards."). All the representations Movants rely on indisputably involve matters completely unrelated to the Special Master's work in this proceeding. No one would assume the advisors are biased in those representations or in this one.

The fees the advisors received for the unrelated matters are not grounds for disqualification either. To exaggerate the alleged conflict, Movants rely overwhelmingly on fees from representations of individual 2020 Bondholders or their affiliates and ad hoc groups. *E.g.*, VZ Mot. 14. Not only are those matters entirely unrelated to this one, but most of the 2020 Bondholders are not even parties here. Movants' argument with respect to ad hoc groups (*i.e.*, independent coalitions) is more attenuated still. Movants' position is essentially that the advisors are biased because clients in unrelated matters who are not parties here—large institutional investors with broad portfolios—owned 2020 bonds. That allegation does not pass the smell test, but it accounts for the vast majority of the supposedly disqualifying financial incentive.

As for fees from representations of Elliott and affiliates, no reasonable observer could conclude that they rendered the Special Master's advisors biased. Representation of Elliott netted Weil a total of $191,584 in nearly five years. *See* VZ Mot., Ex. 8. Even including representations of Elliott affiliates (mainly U.K.-based affiliates in matters run by U.K.-based attorneys), Weil's collections add up to slightly more than $4.5 million over approximately five years, representing a miniscule fraction of Weil's revenues, which in 2024 alone exceeded $2 billion. Evercore, for its part, did not represent Elliott at all. Instead, Evercore frequently represented clients adverse to Elliott's interests (and the interests of other activist investors) as part of Evercore's anti-activism

practice. Evercore's work for ad hoc groups that include Elliott (where the group, not Elliott, is the client) is also "paid by the company, not the noteholders," and Elliot had no input into Evercore's selection in one of the two ad hoc engagements that Movants cite. VZ Mot., Ex. 7 (Turkel Dep.) at Tr. 258:15-16; 259:25-260:8. In the other, the ███████ group engaged Evercore based on the vote of its steering committee ███████████████████████.

Movants' allegations of actual bias in the Special Master's decisions also fail. Movants claim that by recommending the Amber bid, the Special Master "favored Elliott … and diverted billions of dollars to the 2020 Bondholders." VZ Mot. 1.[12] In recommending a superior bid, which addressed the "litigation risk posed by the 2020 Bondholders," the Special Master followed the Court's directive to advance the best interests of Attached Judgment creditors. D.I. 1741 at 4. Time has borne out the wisdom of this approach, as the 2020 Bondholder risk has materialized. Dalinar's bid, which did not adequately address that risk, is now a dead letter. The parties who want the sale process to succeed, Crystallex and ConocoPhillips and others—who are not accused of any conflict—support the Special Master's recommendation of Amber's bid. Achieving the best result is not evidence of bias. As this Court has explained, "the Special Master is not required to be neutral between the options of effectuating the task given to him—enforcing an affirmed judgment of the federal courts—and failing in those duties." 3d DQ Order at 11.

There are other reasons to reject Movants' claim that the open and transparent sale process was a cloak-and-dagger scheme to benefit Elliott and 2020 Bondholders. As recounted above, no bid in these proceedings has been ideal but at all junctures the Special Master has selected the best

---

[12] The suggestion that the Special Master recommended the Amber Bid to benefit the 2020 Bondholders is belied by the "one-way option" driving that recommendation by capturing up to an $895 million discount on the 2020 Bondholders claims if they won their litigation, while giving the Court the opportunity to reject the Amber recommendation, and therefore the 2020 Bondholders agreement embedded therein, if the 2020 Bondholders lost. *See* D.I. 2123 ¶¶ 18-21.

one available. Sometimes those bids have come from Amber and sometimes from other parties.

For example, as recently as July 2025—months after Movants knew of the purported conflicts—

the Special Master recommended approval of Dalinar's bid because, at the time, no other bid was

better. The Special Master likewise recommended the stalking-horse bid by Red Tree, and selected

it over Amber's bid, because, all things considered, Red Tree's was the best stalking horse bid. At

other points, the Special Master has supported proposals by Amber, when they were the best

options available. That was true in 2024, when the Special Master first supported an early Amber

bid. *See supra* n.2. And now, the Special Master recommends a value-maximizing sale to Amber—

a recommendation supported by Crystallex, ConocoPhillips, and many others, and validated by

Judge Failla's recent ruling. The integrity of the successful sale process cannot reasonably be

questioned. The only parties who do question it are the ones who want it to fail.[13]

The out-of-context emails that Movants rely on (and mischaracterize) also present no

evidence of bias. *E.g.*, VZ Mot. 6-7, 8-9. Movants point to an Evercore email chain—completely

unrelated to this sale process—which states that representing an ad hoc group that included Elliot

would present a "high bar." *Id.* at 9. Movants cast this as an admission that advising a group that

included Elliott would be problematic *because* of Evercore's work here. That is not what the emails

say. As the emails show, the "high bar" was because Evercore routinely advises clients *opposing*

campaigns by Elliott and other activist investors, and maintaining this positional adversity to, and

---

[13] Without the backing of the Venezuela Parties, Gold Reserve contends that disclosures of affiliate and ad hoc representations have "destroyed the appearance of impartiality" under Section 455(b)(1). GR Mot. 17. But Gold Reserve sidesteps "the subjective limitation of (b)(1)" entirely. *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994). Gold Reserve offers no arguments, let alone evidence, that any of the parties they seek to disqualify harbored "personal bias or prejudice." 28 U.S.C. § 455(b)(1). Gold Reserve approved of the Special Master's recommendation to support its own bid but now disapproves of the recommendation to support Amber's superior bid. Gold Reserve's sour grapes are not personal bias by the advisors. "[M]ere dissatisfaction with rulings does not warrant recusal." *In re Coulter*, 773 F. App'x 110, 111 (3d Cir. 2019).

independence from, Elliott and other activists is a critical part of the Evercore Strategic, Defense & Shareholder Advisory Group's marketing and business strategy. Evercore's *reluctance* to work even for an ad hoc group that included Elliott (where Elliott would not be Evercore's client) because of Evercore's positional adversity to activists (like Elliott) is the opposite of bias *in favor* of Elliott. Movants' attempt to portray this as a conflict is detached from reality.

Movants also contend that Weil restructuring partner Jeffrey Saferstein was an "active conduit" between Elliott and Weil. *Id.* at 12 ("back-channel advocacy"). But the emails Movants rely on do not show any lack of impartiality. Consistent with the terms of Weil's engagement and standard industry practice, Mr. Saferstein represented Elliott on the small, unrelated matters discussed above and had a personal and business relationship with individuals at Elliott, including Mr. Turkel. As the emails illustrate, Mr. Turkel *expressed his frustration with the Special Master's advisors* to Mr. Saferstein, in June 2025, because he "want[ed] to do the deal and he says his offer is higher but it's impossible to get it all done by tomorrow." VZ Mot. Ex. 2. In a responding email, Weil partner Chase Bentley says "[w]e told [Mr. Turkel] that his bid needs to be done by tomorrow (because that's what the court requires)." *Id.* That is hardly evidence of favoritism toward Elliott.

Movants emphasize Mr. Saferstein's statement that "I hate for them to not want to work with us," but in context it is clear this refers only to Mr. Saferstein asking his colleagues to treat Elliott and Mr. Turkel with the responsiveness and respect expected of sophisticated counsel to all parties involved in a transaction. VZ Mot. 2, 7. The very next sentence in Mr. Saferstein's email confirms that Mr. Turkel is "just looking for someone to have a conversation with," not any preferred treatment. VZ Mot. Ex. 2. There is no express or implied conflict or quid pro quo suggested by these communications. And Elliott did not receive any preferred treatment. The Special Master held Elliott to the same standard and deadline as other bidders and, twenty-four

17

hours later, executed an SPA with Dalinar and recommended Dalinar's bid because it was the best one submitted. All the other communications the moving parties cite are similar—they include nothing that calls into question Weil's or Evercore's impartiality with respect to any other party.[14]

As in prior disqualification efforts, the Movants again liken this case to *Kensington* and again come up short, as there is no structural conflict of interest here. *See* D.I. 443 at 7-8. The problem in *Kensington* was that a judge's advisors had fiduciary duties to clients to "espous[e] views … on the *same disputed issues* that [were] at the core" of the asbestos cases before the judge. 368 F.3d 289, 302 (3d Cir. 2004) (emphasis added). "The structural conflict arose primarily out of the close relationship between the future asbestos claimants," to whom the advisors owed a fiduciary duty, and overlapping "issues in the Five Asbestos Cases," in which the advisors were advising the court. *Id.* at 304. "[M]any of the *same legal issues* … either have arisen or will arise in both," and the advisors had conflicting duties with respect to these issues—owing a duty of impartiality to the court on the one hand and a duty of zealous advocacy to clients on the other. *Id.* (emphasis added). There is no allegation of any analogous conflict here. The Special Master and his advisors' "sole job is to maximize the value of the assets being sold (the PDVH Shares)," which has nothing to do with the subject matter of the other unrelated representations.[15] D.I. 443 at 7.

Movants' allegations of conflict boil down to this: At the same time Weil and Evercore

---

[14] The Venezuela Parties also reference a "CITGO discussion" involving Mr. Saferstein that occurred on November 21, 2024. This was the day it was announced that Ray Schrock—the senior partner who previously led the matter—was leaving the firm and would need a successor. It is entirely unsurprising and unproblematic that leaders of the practice would all be included in a conversation about these matters following Mr. Schrock's departure.

[15] This case is entirely unlike *Kempthorne*, where a special master's advisor "'stood to gain financially from' the special master reaching a particular result" in litigation involving the Department of the Interior's management of trust accounts because the advisor "worked for one of the players in the underlying dispute against the Department." D.I. 443 at 8 (quoting *In re Kempthorne*, 449 F.3d 1265, 1270 (D.C. Cir. 2006)). There is no allegation that Weil or Evercore stand to reap a direct financial benefit from recommending any particular bidder. They do not.

were advising the Special Master in this proceeding, they were providing services in completely unrelated matters to bidders, 2020 Bondholders, and their affiliates. A reasonable layperson would correctly see these facts as the unremarkable, industry-standard circumstances in which professional firms routinely provide unbiased advice to their clients.

## III.    There Is No Basis for Disqualification Under Section 455(b)(4).

Having found no ground for disqualification under Section 455(a), the Venezuela Parties turn to disqualification under Section 455(b)(4). Notably, Gold Reserve does not join the Venezuela Parties in moving on this ground. Subsection (b)(4) requires recusal where a judicial officer "knows he has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). There is no evidence whatsoever that that the Court, the Special Master, or his advisors have a direct financial interest in the proceeding or in any party to it.[16] So the Venezuela Parties are left to rely on the statute's narrow exception for "other interest[s] that could be substantially affected by the outcome of the proceeding." *Id.*

The Venezuela Parties argue that because the Special Master's advisors represented Elliott (and other bidders, and 2020 Bondholders, and their affiliates) in other, unrelated matters, the advisors' interests will be substantially affected by the outcome of this proceeding. That argument fails for all the reasons explained above about the attenuated ties between those engagements and this proceeding, and the immaterial nature of Weil's (and nonexistence of Evercore's)

---

[16] The Venezuela Parties' brief argument that Weil and Evercore have a "financial interest" because they have a "relationship as … advisor … in the affairs of a party" by virtue of providing legal advice, VZ Mot. 16, has been roundly rejected. "[L]egal representation does not qualify as a 'financial interest in the subject matter of the controversy.'" *In re Digital Music Antitrust Litig.*, 2007 WL 632762, at *13 n.18 (S.D.N.Y. Feb. 27, 2007). "The term 'adviser' is not a synonym for 'lawyer,' which appears throughout Section 455 and is noticeably absent from the definition of 'financial interest.'" *Id.*; *see Sullivan v. Chesapeake & Ohio Ry. Co.,* 947 F.2d 946 at *5 (6th Cir. 1991) (unpublished decision) (similar).

representations of Elliott and its affiliates. *See generally* 12D Fed. Practice & Procedure 3547 (Wright & Miller) (Courts typically consider "the remoteness of the interest and its extent or degree" in deciding whether an interest is "substantially affected" under Subsection (b)(1).).

As the Venezuela Parties see it, the advisors had an interest in supporting Amber's bid because doing so would lead to more work down the road. Courts have repeatedly rejected this argument: A movant must do more than allege that "law firms are interested in as many clients as they can get, that [they] would like to keep the defendant as a client, and that if the defendant loses this lawsuit, it will take its legal business elsewhere." *Diversifoods, Inc. v. Diversifoods, Inc.*, 595 F. Supp. 133, 139 (N.D. Ill. 1984). Only if there is a "substantial pecuniary or nonpecuniary interest of the firm [that] was affected" is there any basis for concern. *Id.* The remote possibility that the advisors might garner more work (or lose work) by dint of their actions in this proceeding is not plausibly an interest that would be "substantially affected" by the outcome here. *See id.* ("Many clients have come and gone in the history of all the major firms in Chicago and the reputation and good will of those firms has not been affected substantially."). As the Second Circuit has explained, "[i]t would simply be unrealistic to assume… that partners in today's law firms invariably 'have an interest that could be substantially affected by the outcome of' any case in which any other partner is involved." *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83 (2d Cir. 1996). There is no reasonable basis to conclude that the results of this proceeding will substantially affect either Weil or Evercore and thus no reason for disqualification under Section 455(b)(4).

## CONCLUSION

For the foregoing reasons, the Court should deny the Motions.

Dated: October 16, 2025
Public Version Dated: October 17, 2025

CHRISTENSEN LAW LLC

By: */s/ Joseph L. Christensen*
Joseph L. Christensen (#5146)
1201 North Market Street, Suite 1404
Wilmington, DE 19801
(302) 212-4330
joe@christensenlawde.com

-and-

FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP

By: */s/ Jason C. Rubinstein*
Jason C. Rubinstein (Admitted *pro hac vice*)
Geoffrey Cajigas (Admitted *pro hac vice*)
7 Times Square
New York, New York 10036
(212) 833-1100
jrubinstein@fklaw.com
gcajigas@fklaw.com

*Attorneys for Evercore Group, L.L.C.*

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

*/s/ Myron T. Steele*
Myron T. Steele (#00002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com

- and -

WEIL, GOTSHAL & MANGES LLP

*/s/ Jared R. Friedmann*
Jared R. Friedmann (Admitted *pro hac vice*)
Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
Gregory Silbert (*pro hac* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jared.Friedmann@weil.com
Matt.Barr@weil.com
David.Lender@weil.com
Chase.Bentley@weil.com
Greg.Silbert@weil.com

*Counsel for Special Master Robert B. Pincus*