pavel@vistanetsky.com
pavlovistanetsky@legacysolutions.net
Emek HaZeytim 12, Haifa, Israel

**Pavel Vistanetsky**

DD: + 972 (53) 527-30-21
+ 1 (585) 3-161-911



OCT 14 2025

The Honorable Leonard P. Stark
United States District Court District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, Delaware 19801

**Re: Crystallex International Corporation v. Bolivarian Republic of Venezuela (No. 17-mc-151-LPS)**

Dear Judge Stark,

    In light of the Motions to Disqualify Special Master Robert Pincus and his advisors (D.I. 2346; D.I. 2384), I respectfully submit this Letter to raise my serious concerns to the Court regarding their impartiality.

    a. **Interest and Personal Background**

My name is Pavel Vistanetsky. Since early 2021, I have been invested in companies holding judgments against Venezuela, I have closely followed this proceeding, reviewed every relevant filing, and attended (virtually) most of the hearings. I am knowledgeable about both the legal aspects of this case and the economic realities of the underlying refinery assets. For the avoidance of doubt, my documented involvement long predates Amber's participation in the bidding process, and throughout nearly all relevant periods, my entire net worth has been tied to companies that were, or became later, Additional Judgment Creditors in this proceeding

    b. **Conflicts Undermining the Integrity of the Sale Process**

While Venezuela Parties and Gold Reserve have raised a number of conflicts in their briefs (D.I. 2346; D.I. 2384) supplemented by the evidentiary testimony in Sale Hearing, there are notable conflicts and issues of fact, which have been left unsaid in this Court and more critically in the public record, which I would respectfully call to the Court's attention as it evaluates the pending motions to disqualify:

    1) **Elliott/Amber's engagement of Latham & Watkins as its legal advisor for the first Amber Bid, and Latham immediate subsequent hiring Special Master counsel Ray Schrock in November 2024 was improper and should have been disqualifying of Weil, Gotshal & Manges**

Elliott/Amber's engagement of Latham & Watkins ("Latham") as its legal advisor for the first Amber Bid, followed by Latham's subsequent hiring of Special Master's counsel Mr. Schrock in November 2024, raises serious concerns of impropriety that should have

disqualified Weil, Gotshal & Manges ("Weil") from continuing to advise the Special Master.

1) According to Latham's own press release[1], Amber employed 28 Latham attorneys in connection with its first bid. On October 2, 2024, Mr. Schrock appeared before this Court as counsel to the Special Master, arguing—against universal opposition—that the first Amber Bid should be preserved as "a bird in hand."

2) Less than fifty days later, on November 21, 2024, Latham announced Mr. Schrock's lateral move to the firm. It is implausible that a senior partner would make such a transition, accompanied by several colleagues who were also involved in this Sale Process, without negotiations having begun well before his October 2 appearance. If Mr. Schrock received a sign-on bonus or other compensation linked to Latham's ongoing Amber engagement—reportedly exceeding $50 million in legal and advisory fees—then the conflict deepens further.

3) Mr. Schrock's former subordinate, Mr. Bentley, was promoted to Partner position in Weil five days later, on November 26, 2024, and continues to lead Weil's advisory role to the Special Master.

To any reasonable person, these facts explain Weil's persistent advocacy for the first Amber Bid in 2024 and raise grave doubts about its independence thereafter. More importantly, they compromise Weil's ability to function as a neutral legal advisor to the Special Master and have caused substantial and continuing harm to the integrity of the Sale Process.

Revolving-door movements between major firms are common in New York and Delaware bankruptcy practice, but in what credible judicial process could a bidder directly hire the Special Master's counsel *while the sale is still ongoing*? The precedent this sets is corrosive: it signals to other participants—including Mr. Bentley, Evercore, and even the Special Master's office—that loyalty to Elliott/Amber's position could yield tangible professional rewards, whether through promotions, hiring opportunities, or financial incentives.

2) <u>Paul Singer, Elliott's Founder and co-CEO, is a Serial Donor to Charitable Organizations on which the Special Master serves as a Director</u>

Conflicts do not only implicate Weil, but also the Special Master himself.

Public records show the Special Master, Mr. Robert Pincus, served and continues to serve almost exclusively on the National Boards of U.S. organizations focused on promoting the Israeli cause, including the American Israel Public Affairs Committee ("AIPAC"), Maccabi USA/Sports for Israel, Jewish National Fund in Delaware, Lawyers for Israel, The Jewish Fund for the Future.[2] Since at least 2014, Mr. Pincus has served on AIPAC's National Board,

---

[1] https://www.lw.com/en/news/2024/10/latham-watkins-advises-amber-energy-in-acquisition-of-citgo

[2] https://americansforbgu.org/wp-content/uploads/2024/09/Robert_Pincus_bio.pdf, "Bob Pincus is a proud Zionist who has been involved in the pro-Israel and Delaware Jewish communities for over 35 years", https://maccabiusa.com "Maccabi USA builds Jewish pride

devoting approximately eight unpaid hours per week to advancing pro-Israel initiatives — a level of engagement comparable to his involvement[3] in this Sale Process.

Mr. Paul Singer, the ultimate controlling person of Amber Energy (through Elliott Management) is one of the largest donors to those same organizations. Mr. Singer's philanthropic efforts are also heavily concentrated around promoting the Israeli cause. AIPAC is a prominent political advocacy organization that actively lobbies for pro-Israel policies in the United States by engaging with lawmakers and shaping public discourse. It is registered as a 501(c)(4) nonprofit organization, which permits substantial lobbying and issue-based political activity while exempting it from publicly disclosing its donors. According to AIPAC's Form 990 filings, its controlled entities include the American Israel Education Foundation ("AIEF") and the United Democracy Project ("UDP")[4].

UDP is a federally registered Super PAC, authorized to independently raise and spend unlimited funds in connection with federal elections. As a Super PAC, UDP is required by law to disclose its donors through filings with the Federal Election Commission (FEC). During Mr. Pincus's tenure on the board of AIPAC—the organization controlling UDP—Paul Singer personally made three separate donations to UDP: the first in early 2022, the second on September 29, 2023, shortly after the Marketing Process began, and the third on June 17, 2024, when Amber was actively participating in the PDVH sale auction. Each donation was $1 million. These $3 million in cumulative donations placed Mr. Singer among UDP's most significant private donors.

AIEF is a 501(c)(3) nonprofit organization controlled by AIPAC primarily dedicated to sponsoring educational trips to Israel for lawmakers and influential American figures. It is not legally required to publicly disclose its donors. In 2019, according to publicly disclosed IRS Form 990[5], Paul Singer, through his charitable entity—the Paul E. Singer Foundation—donated $1.25 million to AIEF. This contribution was the largest donation made by the foundation in that year.

---

through sports and promotes support for Israel, Zionism...", https://www.jnf.org/jnf-in-your-area/board-of-directors/delaware-leaders, motto: "Your Voice for Israel", https://shalomdelaware.org/ways-to-give/legacies/jewish-fund-for-the-future.html, "JFF is the endowment arm of the Jewish Federation of Delaware", "No matter how successful, the Federation's Annual Campaign will NEVER raise enough to provide for the growing needs of our Jewish homeland in Israel..."

[3] D.I 2355-1 at 2; 216-217. Special Master billed 37 hours in July and 91 hours in August

[4] https://projects.propublica.org/nonprofits/organizations/530217164/202442219349301469/full, page 2. "POLITICAL: TO SUPPORT PRO-ISRAEL POLITICS BY MAKING DIRECT POLITICAL CONTRIBUTIONS TO PRO-ISRAEL MEMBERS OF CONGRESS (MOCS) AND CANDIDATES THROUGH A CONNECTED POLITICAL ACTION COMMITTEE, THE AIPAC PAC, AND THROUGH UNITED DEMOCRACY PROJECT, AN "INDEPENDENT EXPENDITURE ONLY" COMMITTEE, MORE COMMONLY REFERRED TO AS A SUPER PAC.". According to the this AIPAC Form 990 filing, the CEO of the United Democracy Project is listed explicitly as an AIPAC employee, with his position described precisely as "CEO of United Democracy Project"

[5] https://projects.propublica.org/nonprofits/organizations/272009342/202142799349100514/full

Neither the Special Master nor Elliott/Amber disclosed these overlapping affiliations or contributions to the Court. To an informed and reasonable observer, these undisclosed financial links between a bidder's controlling person and organizations on whose boards the Special Master serves create a clear *appearance of partiality*.

Given the limited public reporting obligations of these nonprofit entities, it is highly likely that additional contributions remain undisclosed. The true extent of these overlapping relationships may therefore be significantly greater than what is presently before this Court. The notion that a bidder could make multi-million-dollar donations to organizations concurrently led by the Special Master—during the midst of a judicially supervised sale—without any disclosure to the Court, is profoundly inconsistent with the standards of transparency and impartiality expected of an Arm-of-the-Court.

3) <u>Elliott/Amber Publicly Boasted to Leading Refining Executives at the Wolfe Refining Conference That They Were "favored to win (again)" Just Before the Stalking Horse Round in March 2025</u>

On March 6, 2025, the day before Stalking Horse Bids were due, Elliott principals—including Equity Partner John Pike , Amber President Jeff Stevens and Amber CEO Gregg Goff —hosted a fireside chat, 1-on-1 meetings, and a dinner at the Wolfe Research Refining Conference. Following the conference, Wolfe Research published a recap specifically noting (see Annex A):

"[CITGO] bids due by March 7 – puts the fate of CITGO's three refineries and related assets in play, although with Elliott Management's Amber Energy seemingly favored to win (again)."

This statement echoed Elliott's own remarks during the conference, attended by senior executives from CITGO's direct refining peers—Valero, PBF Energy, Phillips 66, Calumet, and others—precisely the class of strategic bidders the Sale Process was designed to attract.

The phrase "favored to win (again)" was not an incidental boast. It implicitly referred to Amber's prior, legally defective 2024 bid—a bid that should have been rejected outright for multiple independent reasons, including violations of priority rules, an untenable injunction request under the All Writs Act, and grossly inadequate consideration. By suggesting they would nevertheless be "favored" again, Elliott conveyed to industry participants that, regardless of those deficiencies, the Special Master's process was expected to produce the same result.

The Court had already expressed concern during the December 13, 2024 hearing that even a misleading press release describing Amber's earlier submission as a "winning bid" might discourage potential bidders or distort market perception of the process (D.I 1507 at 52). What occurred at the Wolfe Conference went far beyond that concern. It was, in effect, a signal to the industry that, regardless of how unviable or low its bid might be, Elliott expected to "win again."

Such a message—delivered publicly to the very class of potential strategic bidders whose participation was critical to maximizing value—could only undermine confidence in the fairness of the Sale Process, chill bidding, and reinforce the perception that the outcome was predetermined.

Indeed, no other qualified bidder made comparable public statements about the Sale Process, and no other conforming bidder appeared to share Elliott's confidence. Only Elliott publicly implied that its selection was effectively assured—an implication fundamentally at odds with the transparency and impartiality required in a court-supervised auction.

### c. Actions taken by the Special Master and his Advisors
1. Failure to Address the 2020s Litigation, Followed by Imposition of Excessive Financing Requirements to Address That Same Litigation Risk

The Court has devoted substantial time and resources to resolving the 2020 Bonds issue, which has dominated significant portions of the Sale Process since March 2025, including the full-day hearing on April 17, 2025, and extensive objections arising after the Stalking Horse round[6].

Throughout 2024, Weil billed approximately 1,800 hours (at rates exceeding $1,500 per hour) on efforts to evaluate and settle the 2020 Bonds litigation—efforts that, I believe, were largely ingenuine. (D.I 1192-1; D.I 1220-1; D.I 1237-1; D.I 1246-1; D.I 1360-2; D.I 1404-1; D.I 1430-1). Those efforts unsurprisingly failed. (D.I 1323)

As disclosed during the Sale Hearing by Mr. Eimer (CITGO), a TSA could have been executed at ~$1.6 billion between the Special Master and 2020s Bondholders in September 2024.

Likewise, during the Sale Hearing we learned from Mr. Hiltz's testimony that this TSA was abandoned at Elliott's behest — following an unprecedented months-long exclusivity period — in its place was the universally derided escrow structure.[7]

Special Master team has never explained why a TSA was not executed in mid-2024. The only justification offered — at the April 17 Stalking Horse hearing [8]— was that they walked away

---

[6] Indeed, Mr. Hiltz of Evercore testified before this Court that the two core issues confronting the Sale Process were the 2020 Bonds and the Alter-Ego Claims, the latter of which have largely faded from relevance following Judge Rakoff's ruling in May 2025

[7] For the record, Mr. Hiltz's testimony conflicts with many of Mr. Bentley's representations to the Court on April 17 and on the Sale Hearing in which he stated that Sale Process Parties and VZ Parties had both opposed the 2020s settlement. It is unclear which of the reasons were dispositive, but it is essential for the Court to have an established evidentiary record.

[8] The exact transcript page cannot be cited because Veritext, the court reporting firm brought by the Special Master team, has repeatedly explicitly refused to sell transcripts to me as an unrepresented non-party. On the one occasion when they did offer access, they demanded the "Original" rate. When I asked them to explain why they imposed this rate, they chose to ignore my message. In all my previous encounters with court reporters employed by this Court, I was billed according to the "First Copy" rate.
Likewise, I believe they are improperly charging this full "Original" rate to each of the 15+

due to the involuntary disclosure (by the Venezuela Parties) of a bidder questionnaire. That excuse cannot reasonably justify the forfeiting of a deal of this magnitude.

As a result, the opportunity for a TSA between the Special Master and 2020s was irretrievably lost—entirely behind closed doors, without public scrutiny or any input from the affected AJCs, in private negotiations between Elliott, the Special Master, his Advisors, and the Sale Process Parties.

As we now know, the gamble did not pay off with Judge Failla's recent ruling in the Southern District of New York:

1. This failure, which is the original sin of the Sale Process in 2025, has now already cost Junior AJCs more than $500M when compared to the Amber $2.125B TSA
2. More troublingly and despite Mr. Barr's (Weil) stated commitment to "reform the Sale Process" — it is now clear from the evidentiary record that Weil leveraged the unresolved 2020s litigation as a pretext to further complicate an already highly-complex Sale Process for its own benefit prolonging this Sale Process. Weil imposed unreasonable financing terms on Bidders to address this very risk and kept all parties including Bidders uncertain as to the actual, plain requirements for prevailing in this auction[9][10]
3. Weil spent millions analyzing the 2020s litigation yet never made a remote attempt to quantify those risks — including the risks to closing or the requisite OFAC licenses required — in the Special Master's Stalking Horse and Updated Final Recommendation. To make matters worse, the Special Master, Weil & Evercore made

---

represented AJCs and Interested Parties in this case, despite the fact that only the party procuring the service should be charged the "Original" rate. To date, Veritext has not released this or other transcripts to the public, despite more than 90 days having passed since the hearings and their clear legal obligation to do so. More recent transcripts, including from the last Sale Hearing, remain unavailable even on the public access terminals at the courthouse. On April 30, I contacted Mr. Rebeck, Chief Deputy Clerk, regarding Veritext's overbilling practice, which undermines public access to this case.

[9] At December 13 status conference, Weil counsel explained that bids conditioned upon a settlement with the 2020s would be viewed less favorably than "clean" bids without closing contingencies (D.I. 1507 at 65-66). He emphasized that such settlement-conditioned offers must be evaluated "under a finer microscope," compared to bids that "simply take subject to the 2020 litigation ... no closing contingencies". Chase Bentley cautioned that a bidder reliant on a 2020s settlement "is running the risk that their bid is not looked at as favorably" With this unambiguous guidance, out of four bidders, only one (affiliated with 2020s Ad Hoc Group) proceeded to execute a settlement (TSA) with the 2020s during the Stalking Horse stage.

[10] It remains unclear, however, why Special Master recommended and then the Court agreed to give away nearly $100M to support an inherently unviable bid while indicating that during the Topping Period, it might prioritize higher-value, less certain offers. A more logical strategy would have been to designate the Consortium Bid as the Base Bid and explicitly state that lower-value but more certain bids would still be considered in the Topping Period. It's especially true in light of Special Master position on non-binding nature of Overbid Minimum Requirements.

no attempt to quantify what interest rate accrual Judge Failla might ultimately apply. Instead, Weil has adopted the 2020s' calculations *prima facie*, without any independent validation. Now, citing these unquantified "risks to closing," the Special Master recommends a bid that would deliver approximately $2 billion less in satisfied judgments

Finally, as a justification for the Special Master's Updated Final Recommendation, Special Master's counsel repeatedly represented to the Court that they were surprised to learn that a decision in the 2020s litigation would be issued prior to entry of the Sale Order. (D.I. 2155-1 at 80: "And obviously, when Bob signed the Dalinar SPA on June 25th and submitted his recommendation on July 2nd, we had no idea that the 2020s decision from Judge Failla was imminent by September."). Weil even invoked this argument in their Opening Statement, but that assertion is implausible. Any individual with an average IQ, access to the SDNY docket in the 2020s litigation, and a basic understanding of civil procedure — or even access to a search engine — could have reasonably anticipated that a decision was imminent.[11]

2. Special Master Selects Unviable Amber Bid for the First Time Granting Nearly Half-Year Exclusivity for a Dead-on-Arrival Bid

At the conclusion of the initial solicitation period in 2024, the Special Master was left with two bidders. The first was a consortium comprising Gold Reserve and refining company CVR Energy, which submitted a joint bid at the Special Master's request, rather than submitting two separate bids. By virtue of being a Credit Bid, this proposal was structured to satisfy all senior obligations in the waterfall (D.I 1419 at 4) . According to previous Gold Reserve statements on this court docket, they were informed that they were the leading bidder. While specific details are not publicly available, it appears the Special Master subsequently rejected their bid based on some unimportant technicality — the financing commitment was for 12-months instead of 18. It remains unclear whether this purported deficiency was ever properly communicated to the bidder. A 12-month commitment would have been sufficient in any case, and had the Special Master executed the TSA with the 2020s earlier, the demand for an 18-month term would have been even more unnecessary. This was the first, but not the last, instance in which he imposed unnecessary and unreasonable financing requirements to address risks of his own making.

---

[11] The underlying summary judgment motion was fully briefed as of March 21, 2025. By the time the Final Recommendation was submitted in July, a ruling could reasonably have been expected at any moment. Indeed, by that time, it was common knowledge among market participants that a decision was likely in the near term. Some anticipated it within weeks, while others speculated that Judge Failla might hold a hearing or request updated input from the Department of Justice, potentially delaying the ruling by a few additional months. But virtually everyone anticipated that the decision would be issued no later than Q3 or early Q4 of 2025, and in any event prior to entry of the Sale Order. This is especially true given Judge Failla's track-record for efficiency and the fact that she was already deeply familiar with the case, having presided over it for years and previously issued substantive rulings on the merits. Likewise, under the Judicial Conference's «six-month rule» federal judges are expected to resolve fully briefed motions within roughly six months. As in 2020, the case was expected to be disposed of at the summary judgment stage without proceeding to trial.

The Amber Bid in 2024 was dead-on-arrival and could never have survived for any of several independent reasons:

1. **Priority violation.** It proposed to pay a junior creditor participating as a credit bidder before satisfying senior creditors — in direct contravention of Delaware law.
2. **Defective injunction request.** It relied on an Injunction Motion grounded in the rarely used All Writs Act. Even in the highly unlikely event it were granted to the extent of halting the Gramercy Parties litigation, the Motion would not have prevented other parties from pursuing alter-ego actions against PDVH.
3. **Grossly inadequate consideration.** After adjustments, the consideration was insufficient, with the CITGO Parties acknowledging that it could result in a zero distribution to Additional Judgment Creditors (D.I. 1373 at 4).
4. **Indefinite creditor lock-up.** The proposed consideration could be trapped in trust for an indefinite period. So long as any party brought an alter-ego action against PDVH or of its subsidiaries, the funds would remain unreleased to creditors.

The Special Master could have rejected Amber' deficient bid and promptly invited Gold Reserve to rebid—a process that could have been completed within a month. Instead, he deliberately delayed the proceedings by accepting Amber bid and granting four months of exclusivity to Amber. Following this exclusivity period, he and his advisors undertook the costly and unnecessary exercise of drafting a Master SPA, addressing problems entirely of their own creation. Had the Special Master instead engaged with a good-faith bidder like Gold Reserve, no sophisticated SPA would likely have been necessary, as Gold Reserve consistently agreed to pay all creditors prior to waterfall distributions and explicitly assumed all risks associated with alter-ego claims and 2020s Bonds.

### d. Relief Requested

Respectfully, the Court should:

1) Establish a clear evidentiary record of the conflicts and issues of fact set out in this Letter and in the briefs before it, prior to ruling on the Motions to Disqualify; and
2) To order Veritext to docket all transcripts of proceedings as required by law.

Sincerely,
Pavel Vistanetsky

OCT 14, 2025