IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>       Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>       Defendant. | Case No. 17-mc-151-LPS |

**GOLD RESERVE'S POST-TRIAL REPLY BRIEF**

**WOMBLE BOND DICKINSON (US) LLP**

Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

- and -

**BRITHEM LLP**

Michael J. Bowe (*pro hac vice*)
Lauren Tabaksblat (*pro hac vice*)
Andrew T. Sutton (*pro hac vice*)
Kate E. Fisch (*pro hac vice*)
565 5th Avenue
New York, New York 10017
Telephone: (646) 653-9378
mbowe@brithem.com
ltabaksblat@brithem.com
asutton@brithem.com
kfisch@brithem.com

**NORTON ROSE FULBRIGHT US LLP**

Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

Katherine G. Connolly (*pro hac vice*)
One Embarcadero Center, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................................1

I.  THE COURT SHOULD IMPLEMENT A MECHANISM TO PREVENT A DOUBLE RECOVERY ON THE ATTACHED JUDGMENTS ..................................................................1

II. THE OFAC SANCTIONS REGIME BARS THE 2020 BONDHOLDERS FROM ATTEMPTING TO INTERFERE WITH GOLD RESERVE/DALINAR ENERGY'S CLOSING BY VOTING THE CITGO HOLDING SHARES ...................................................................2

   A.  OFAC FAQ 1123 does not allow the 2020 Bondholders to exercise their rights under the Pledge........................................................................................................................... 4

   B.  OFAC FAQ 1124 does not permit the 2020 Bondholders to exercise their rights under the Pledge........................................................................................................................... 5

   C.  The 2020 Bondholders know that E.O. 13835 prohibits them from exercising their rights under the Pledge............................................................................................................. 7

III. THERE IS NO PROPER BASIS UPON WHICH THE COURT CAN VIOLATE SECTION 324'S REQUIREMENT THAT THE PDVH SHARES BE SOLD TO THE HIGHEST BIDDER: GOLD RESERVE/DALINAR ENERGY ..................................................10

IV. THE GOLD RESERVE/DALINAR ENERGY FINANCING.............................................12

V.  THE SPECIAL MASTER DID NOT GENERATE COMPETITIVE TENSION IN THE SALE PROCESS .........................................................................................................14

CONCLUSION..............................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)...................................................................9

**Other Authorities**

E.O. 13835 ..........................................................................................................2, 3, 4, 6, 7

Pursuant to the schedule set by the Court (D.I. 2348), Gold Reserve Ltd. f/k/a Gold Reserve Inc. ("Gold Reserve") respectfully submits this Post-Hearing Reply Brief.[1]

## ARGUMENT

### I. THE COURT SHOULD IMPLEMENT A MECHANISM TO PREVENT A DOUBLE RECOVERY ON THE ATTACHED JUDGMENTS

In its Post-Hearing Answering Brief, Gold Reserve proposed that the Court revise the Sale Order to include a mechanism that serves two purposes: <u>one</u>, to prevent any creditor from obtaining a double-recovery on any Attached Judgment (similar to provisions in the SPO applicable to credit bidders), and, <u>two</u>, to provide that in the event any creditor recovers from an alternate source in advance of Closing on any Attached Judgment that otherwise would be satisfied at Closing, that the amount of consideration to be paid to such creditor under the term of the final approved bid instead be paid to the waterfall creditors per the priority order set by the Court. (D.I. 2433).

Gold Reserve explained the need for such a mechanism in its Post-Hearing Answering Brief (*id.*) and at the October 21, 2025 Sale Hearing. (Oct. 21, 2025 Hr'g Tr. ("Hr'g Tr.") 192:4-194:11 (M. Kirtland)). The Special Master's counsel confirmed they had no conceptual objection to introducing such a mechanism. (Hr'g Tr. 272:22-273:8 (C. Bentley)). On October 24, 2025, Gold Reserve proposed language to the Special Master based on the referenced SPO provisions (D.I. 481 at 24). *See* Proposed Sale Order Redline, attached hereto as Exhibit A. Earlier this afternoon, the Special Master proposed revisions to Gold Reserve's proposed language along with other proposed changes to the Sale Order, which it is filing with its own reply brief. Gold Reserve is now considering these counter-proposals and will respond as soon as is practicable.

---

[1] In making this submission, Gold Reserve does not waive any of its prior objections, including those made in its Motion to Strike (D.I. 2113), and those arising in connection with its Motion to Stay filed on September 13, 2025 (D.I. 2286), renewed at the October 21, 2025 Sale Hearing (Hr'g Tr. 427:6-10 (M. Bowe)), and renewed again on October 23, 2025 (D.I. 2485), as well as those arising in its Petition for Writ of Mandamus filed with the United States Court of Appeals for the Third Circuit on today's date.

II. **THE OFAC SANCTIONS REGIME BARS THE 2020 BONDHOLDERS FROM ATTEMPTING TO INTERFERE WITH GOLD RESERVE/DALINAR ENERGY'S CLOSING BY VOTING THE CITGO HOLDING SHARES**

The 2020 Bondholders argue that they can currently exercise their rights under the Pledge to vote the CITGO Holding shares to block the merger between Adolin and CITGO Petroleum that is part of the second step of the Gold Reserve/Dalinar Energy Closing. In their Post-Hearing Answering Brief, the 2020 Bondholders argue OFAC FAQ 1124 is "[e]xisting OFAC guidance [which] makes clear that the 2020 Bondholders do not require OFAC's approval to either" vote the CITGO Holding shares "or to seek an injunction." (D.I. 2420 at 3). They also argue that OFAC FAQ 1123's statement that "[i]n making these licensing determinations, OFAC is committed to fair and equivalent treatment of potential creditors" supports this conclusion. *Id.* Counsel for the 2020 Bondholders repeated these arguments at the October 21 Sale Hearing, arguing that Executive Order ("E.O.") 13835 "does not restrict the 2020 Bondholders from directing the Collateral Agent as to how to vote shares already pledged under a valid pledge agreement." (Hr'g Tr. 376:16-20) (J. Recher)). Their counsel again relied on FAQ 1124, arguing that "OFAC has affirmatively made clear that we can preserve our ability to enforce our rights," "[a]nd that's exactly the circumstance we would be in if we were to exercise the right to vote those shares." *Id.* at 377:24-378:5.

All of these arguments are wrong. Section 1(a)(iii) of E.O 13835 prohibits all "dealings in" the 2020 Bonds. *See* E.O. 13835, attached hereto as Exhibit B. Exercising their purported rights under the Pledge is a "dealing[] in" the 2020 Bonds, and it is a right the 2020 Bondholders would not have but for the 2020 Bonds. It is a right that they only purport to have because they agreed to (or are dealing in the 2020 Bonds that did) fund the Maduro regime—which E.O. 13835 explicitly targets. *See id.* (describing the Maduro regime's "endemic economic mismanagement and public corruption at the expense of the Venezuelan people and their prosperity," "ongoing repression of

2

the political opposition," "attempts to undermine democratic order by holding snap elections that are neither free nor fair," and "the regime's responsibility for the deepening humanitarian and public health crisis in Venezuela," all of which was effectively funded in part by 2020 Bonds).

If the plain language of E.O. 13835 is not explicit enough, OFAC FAQ 595 makes clear that E.O. 13835 prohibits exercise of the 2020 Bondholders' purported rights under the Pledge. It states: "Subsequent to the issuance of E.O. 13835, OFAC received inquiries about how and whether subsection 1(a)(iii) of E.O. 13835 could affect **the ability to enforce bondholder rights** to the CITGO shares serving as collateral for the" 2020 Bonds. OFAC FAQ 595, attached hereto as Exhibit C (emphasis added). Because of these inquiries, "OFAC issued General License (GL) 5 [("GL-5")] on July 19, 2018, which removed E.O. 13835 as an obstacle to holders of the [2020 Bonds] gaining access to their collateral." *Id.* That is, the entire point of OFAC issuing GL-5 was to permit the 2020 Bondholders to access their collateral, *i.e.*, by voting the pledged CITGO Holding shares, which is not permitted under E.O. 13835.

However, as the Court is well aware, GL-5 "was replaced and superseded by General License 5A on October 24, 2019 with a delay in the effectiveness of the authorization in the general license." *Id.* Thereafter, OFAC has continued the suspension of GL-5 19 times—most recently through GL-5S, which extends the suspension (and thus the 2020 Bondholders' ability to vote the pledged CITGO Holding shares) through December 20, 2025. OFAC FAQ 595, attached hereto as Exhibit D. The purpose of this long-standing policy is to prohibit "all transactions related to, the provision of financing for, and other dealings in the [2020 Notes]." *Id.* The existing U.S. sanctions regime thus blocks the 2020 Bondholders' ability to vote the pledged CITGO Holding shares. Until OFAC changes the status quo that has been in effect for the past six (6) years and lifts the suspension of GL-5—and there is no evidence that this will ever occur, whether introduced by the

3

Special Master or otherwise—the 2020 Bondholders "are prohibited" from exercising their rights under the Pledge.

### A. OFAC FAQ 1123 does not allow the 2020 Bondholders to exercise their rights under the Pledge.

The 2020 Bondholders rely on OFAC FAQ 1123 for their misguided conclusion, but it provides no support. FAQ 1123 merely expresses that OFAC, in making licensing decisions, "is committed to fair and equivalent treatment of potential creditors." (RT-050). This does not mean that OFAC will not give effect to E.O. 13835 or the ongoing suspension of GL-5 to further the policies of the U.S. government. While the 2020 Bondholders claim that OFAC permitting the Gold Reserve/Dalinar Energy transaction to proceed while also prohibiting them from exercising their purported rights under the Pledge would constitute OFAC "put[ting] its thumb on the scale to help Gold Reserve," (Hr'g Tr. 375:19-376:2 (J. Recher)), it would in fact only constitute OFAC continuing to give effect to E.O. 13835 as they have for the past six (6) years.

While the 2020 Bondholders and other parties supporting the Special Master's Updated Final Recommendation have argued that OFAC would not treat Gold Reserve differently from the 2020 Bondholders, OFAC's guidance says otherwise. In May 2023, OFAC changed its policy and issued guidance that made clear it would permit this Sale Process to go forward. (RT-050). When OFAC took this action, it had already been blocking the 2020 Bondholders from exercising their rights under the Pledge for over three (3) years—since October 2019—and this stay has remained in place since then. At no point, whether in its guidance permitting this Sale Process to move forward or otherwise, including in FAQ 1123, has OFAC ever stated (or even suggested) that there was any connection between its favorable licensing policy with respect to this Sale Process, and equal treatment of creditors in connection therewith, and its long-standing policy of blocking the 2020 Bondholders from exercising the Pledge.

4

To the contrary, OFAC has long made clear that it is treating "bonds and other securities" like the 2020 Bonds differently, because the Maduro regime was selling these assets "for much less than they are worth at the expense of the Venezuelan people and using proceeds from these sales to enrich supporters of the regime." OFAC FAQ 512, attached hereto as Exhibit E ("The prohibitions and related general licenses are meant to prevent U.S. persons from contributing to the [Maduro regime]'s corrupt and shortsighted financing schemes while mitigating market disruptions and harm to investors."). The U.S. government, and particularly the current Administration, have made their hostility towards the Maduro regime, and those that funded it, crystal clear. *See* (D.I. 2433 at 15). There is, therefore, a stark difference between the creditors in this Sale Proceeding, who have valid judgments against Venezuela that they have been trying to collect on for decades, almost all arising from the Chavez/Maduro regime's expropriation of their investments, and the 2020 Bondholders, who stand to be enriched from security instruments that financed the corrupt, illegal Maduro regime.

While this explicit statement from OFAC evidences that its policy is to take a more restrictive approach to the 2020 Bondholders than it has to this Sale Process (and the creditors involved here, like Gold Reserve), it is further evidenced by OFAC continuing to suspend GL-5 while also permitting the Sale Process to proceed. In the absence of any evidence from the 2020 Bondholders or any party to the contrary, it is therefore logical to assume that OFAC will continue its course of action that has now persisted through multiple Administrations and continue to prohibit the 2020 Bondholders from exercising any rights under the Pledge.

**B. OFAC FAQ 1124 does not permit the 2020 Bondholders to exercise their rights under the Pledge.**

The 2020 Bondholders also rely on OFAC FAQ 1124, which they argue was issued "to provide guidance to the 2020 Bondholders that they could 'preserve the ability to enforce

5

bondholder rights[.]'" (D.I. 2420 at n. 3) (citing RT-051, FAQ 1124). However—FAQ 1124 permits only *preservation* of the ability to enforce those rights. It does not permit *enforcement* of those rights by voting the pledged CITGO Holding shares, whether to stop the Adolin/CITGO Petroleum merger or otherwise. The text of FAQ 1124 is clear. The question posed is:

> 1124. I am a party seeking to enforce bondholder rights to the shares of CITGO Holding serving as collateral for the Petróleos de Venezuela, S.A. (PdVSA) 2020 8.5 percent bond, pending the outcome of ongoing litigation. How can I preserve or enforce my bondholder rights consistent with the Venezuela Sanctions Regulations, 31 CFR part 591 (VSR)?

(RT-051). In response to this question of whether a 2020 Bondholder could preserve *or* enforce those rights, OFAC responded that it "will not take enforcement action against any person for taking steps to *preserve* the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PdVSA 2020 8.5 percent bond[.]" *Id.* (emphasis added). This answer is clear: a 2020 Bondholder can preserve its rights, *e.g.*, continue the litigation in the SDNY to obtain summary judgment regarding the validity of the 2020 Bonds, but it cannot enforce those rights, *i.e.*, by voting the pledged shares. No other conclusion is possible given that the express purpose of the ongoing suspension of GL-5 is to prohibit the 2020 Bondholders from exercising the Pledge.

Nonetheless, the 2020 Bondholders argue that voting the CITGO Holding shares would be an act of preservation. Even if this were true (which it is not), it undeniably also would be an act of *enforcing* those rights, which OFAC did not endorse in FAQ 1124 when this exact question was asked. The 2020 Bondholders' twisted reading of FAQ 1124 would mean that they can effectively do what they want with the CITGO Holding shares (their 'collateral')—as if E.O. 13835 and six-year suspension of GL-5 never existed. That would clearly violate the OFAC sanctions regime.[2]

---

[2] Further, in FAQ 1124, OFAC has only said it "will not take enforcement action" against 2020 Bondholders that take steps to preserve their rights under the Pledge. (RT-051). That does not mean voting the CITGO

6

**C. The 2020 Bondholders know that E.O. 13835 prohibits them from exercising their rights under the Pledge.**

The 2020 Bondholders know that their arguments on this issue have no merit. If E.O. 13835 and the suspension of GL-5 did not prohibit them from exercising their voting rights for the CITGO Holding shares, then they would have exercised these rights and taken control of CITGO Petroleum. Using these rights, the 2020 Bondholders would have long ago changed out the Board of CITGO Holding and then used that control to operate CITGO Petroleum, including directing it to pay the 2020 Bondholders, structure a settlement of their claims, or initiate a foreclosure sale. Indeed, if the 2020 Bondholders could in fact vote the CITGO Holding shares, there would be no need for the injunction that they long have threatened to "protect" the value of their collateral, *i.e.*, the value of the equity in CITGO Holding. *See, e.g.*, (D.I. 1677 at 6) ("Unless Gold Reserve (or another bidder using a similarly objectionable financing structure) is willing to reach an agreement with the 2020 Bondholders on terms that would protect their interests, the 2020 Bondholders would be forced to object vigorously to any such bid[.]"). But none of these things have happened—and that is precisely because they could not have happened, either before or after Judge Failla's most recent ruling,³ and they cannot happen until, at the earliest, OFAC lifts its long-standing suspension of GL-5. For the 2020 Bondholders to now argue otherwise—and to argue that they have had the right to be in control of CITGO Petroleum the entire time—would take the Court for a fool.

---

shares is a lawful action. FAQ 1124 certainly provides no basis for the 2020 Bondholders to request an injunction of the Gold Reserve/Dalinar Energy transaction, much less receive one.

³ Judge Failla's ruling does not change what risk the 2020 Bondholders pose to the Gold Reserve/Dalinar Energy bid. They have repeatedly argued as much. *See, e.g.*, (D.I. 1661 at 4) ("Under the Pledge Agreement, the 2020 Bondholders do not need a final judgment in order to exercise their rights (or even foreclose upon their Collateral) . . . [t]he 2020 Bondholders are entitled to enforce their rights now[.]"); (D.I. 1693 at 3).

7

The Special Master has recognized this legal reality, stating that the 2020 Bondholders "could immediately exercise their rights under the CITGO Holding Pledge" *only* "[i]n the event OFAC lifts the suspension of" GL-5. (D.I. 2273 at 4). Counsel to the Special Master also recognized this at the April 17, 2025 Stalking Horse Hearing, agreeing with the Court that "the OFAC suspension or stay of the GL-5 license is something the 2020s have to overcome in order to pose any risk at all" to the Gold Reserve/Dalinar Energy bid. Apr. 17 Hr'g Tr. 118:7-14 (C. Bentley) (D.I. 1854-2). This admission was made in response to extensive briefing from Gold Reserve, the Dalinar Consortium, and other parties on this point. *See, e.g.*, (D.I. 1636, D.I. 1667). The Court also recognized this in its Stalking Horse Order, where it instructed bidders to view the 2020 Bondholders "risk . . . realistically," as it depends on the 2020 Bondholders "obtaining injunctive relief from some court" *and* "persuading OFAC to change" its position regarding GL-5. (D.I. 1741 at 6-7) (noting that the 2020 Bondholders risk is not "materially greater or more important than other risks" to the Sale Process). Mr. Hiltz reiterated this same point at the Sale Hearing. *See* (Sale Hr'g Day 2 Tr. - Recorded Portion, 12:19-13:6).

Even if the 2020 Bondholders could exercise their rights under the Pledge and access the CITGO Holding shares serving as collateral (which they cannot), their Collateral Agent's alleged physical possession of the CITGO Holding share certificates in a vault in New York City (which was not put into evidence at the Sale Hearing) does nothing to enhance any right the 2020 Bondholders would have to block the Gold Reserve/Dalinar Energy transaction. It does not mean that the 2020 Bondholders now possess the 50.1% of the shares listed in the share certificates. Those share certificates are issued in the name of the shareholder (PDVH); the entity that controls PDVH (PDVSA) possesses the shares evidenced by those share certificates—and exercises control over CITGO Holding to vote those shares, and therefore controls CITGO Petroleum. This is true

regardless of where the physical share certificates—which name PDVH (not the bondholders or the Collateral Agent) as the holder of the shares—are located.

The 2020 Bondholders' behavior when Gold Reserve was the Final Recommended Bidder is telling. They did not argue they could exercise their rights under the Pledge to block the transaction, but rather suggested that they would seek an injunction to protect their rights. *See* (D.I. 2033 at 14-15); *see generally* (D.I. 1943). Indeed, they requested (and obtained) a status conference with Judge Failla to, in their own words, "discuss an injunction to prevent a potential financing transaction that would violate the Pledge Agreement, and counsel made clear that the 2020 Bondholders would move for such an injunction if necessary." (D.I. 2033 at 15). At that hearing, they told the Court that, if the Gold Reserve/Dalinar Energy transaction is selected, "they would seek to enjoin PDVH and potentially other parties from taking actions in connection with the financing of Gold Reserve's transaction that would violate their rights under the Pledge Agreement." *Id.* Again, if the 2020 Bondholders can simply vote the CITGO Holding shares at present, then there would have been no need for such injunctive relief. While they now deny it, the reason the 2020 Bondholders have been hinting at an injunction for the past year is because they well know that while OFAC FAQ 1124 permits them to seek such an injunction, it prohibits them from voting the CITGO Holding shares until the suspension of GL-5 is lifted.[4]

---

[4] Even if the 2020 Bondholders did in fact seek an injunction, they are unlikely to receive one. While multiple parties argued the likelihood of such an injunction being granted, only Gold Reserve has laid out such an analysis in detail. *See* (D.I. 2366 at 18-27; D.I. 2433 at 35-39; D.I. 1991 at 1-14). In addition to this analysis, Gold Reserve emphasizes that, if the 2020 Bondholders are able to exercise their rights under the Pledge and vote their shares now, they could not possibly claim irreparable harm—the second critical factor of the traditional four-factor test. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Further, no party—including the 2020 Bondholders—has ever explained, much less evidenced, how the Gold Reserve/Dalinar Energy debt financing actually violates the Pledge. This is because, as Gold Reserve has long asserted, it does not. *See*, *e.g.*, (D.I. 2366 at 12-15; 2433 at 16 & fn. 7).

**III.    THERE IS NO PROPER BASIS UPON WHICH THE COURT CAN VIOLATE SECTION 324'S REQUIREMENT THAT THE PDVH SHARES BE SOLD TO THE HIGHEST BIDDER: GOLD RESERVE/DALINAR ENERGY**

The October 21 Sale Hearing confirmed that the Special Master and parties who support the Updated Final Recommendation have no viable response to the point that Section 324 requires, without exception, that the Court sell the PDVH Shares to the "highest bidder." Indeed, counsel for the Special Master conceded that they have no case law that would authorize the Court to deviate from the requirements of Section 324. (Hr'g Tr. 247:9-21 (C. Bentley)). Instead, they argue that their position is supported by "common sense," and that Gold Reserve has no case law that says "highest bidder means that certainty cannot be considered." *Id*. But the Section 324 case law cited by Gold Reserve (and any other party, including the oft-cited *Deibler*) shows that Section 324 sales have *always* gone to the highest bidder. Further, in the absence of any case law that establishes an exception, the plain and unambiguous language of the statute controls. *See* (D.I. 2366 at 8-12; D.I. 2433 at 2-5).

What is more, Gold Reserve does not argue that the Court could *never* consider certainty in the Sale Process. Counsel for Amber Energy mischaracterized Gold Reserve's position as arguing for a "gerrymandered view of the statute," but provided no basis to disagree with Gold Reserve's argument other than the Court's evaluation criteria. (Hr'g Tr. 354:10-21 (A. Rossman)). But this is exactly Gold Reserve's point—it did not object to the inclusion of certainty as part of the evaluation criteria, and it did not object to the Special Master vetting bids to determine that they are conforming and actionable. That does not mean that the Court does not *now*, at this final stage of the Sale Process, have to take the highest bid. The Court itself implicitly recognized this in the Stalking Horse Order, where it stated that it was deviating from Section 324 then precisely because the lower-priced Red Tree bid was not the final bid, and that Section 324 only mandated

10

that it select the highest bid as the *winning* bid. (D.I. 1741 at 4-5) (noting that Section 324 requires "attached shares be *sold* 'to the highest bidder'") (emphasis in original).

At the October 21 Sale Hearing, counsel for the Special Master erroneously argued that when the Court's Stalking Horse Order "said that bidders in the Topping Period must place a higher emphasis on price, [the Court was] not saying price versus certainty," but instead "that bidders in the Topping Period needed to place more of an emphasis on price as compared to the $3.8 billion Red Tree bid[.]" (Hr'g Tr. 246:20-247:4 (C. Bentley)). In fact, the Court clearly directed the Special Master to "remain open during the Topping Period to placing greater emphasis on price and lesser emphasis on certainty[;]" cautioned that "the Court expects that any bid it is likely to approve" will need to place "much greater emphasis on price and lesser emphasis on certainty[;]" and explicitly stated that the effect it expected to see from the competitive tension it demanded the Special Master impose in the Topping Period would be "a Final Bid with a price at or exceeding that associated with the Consortium bid while also having a greater likelihood of closing[.]" (D.I. 1741 at 2-3; 6). It is clear that that the Court intended (as Section 324 mandates) for price to be elevated over certainty, and that purchase price should have exceeded the Gold Reserve/Dalinar Energy Stalking Horse bid—none of which was achieved in the Topping Period or, certainly, in the Updated Final Recommendation.

The Special Master and supporters of the Updated Final Recommendation are the parties asserting that the Court should deviate from the plain language of Section 324 and select a bid that, on the undisputed record, is not the highest bid. They therefore bear the burden to establish that this result is permitted under Section 324. With no case law that supports their position, and all Section 324 cases affirming the selection of the highest bidder, the Special Master and others cannot satisfy this burden. As such, Delaware law commands that the Court reject the Updated

11

Final Recommendation and approve the Gold Reserve/Dalinar Energy Improved Bid.

## IV. THE GOLD RESERVE/DALINAR ENERGY FINANCING

The Gold Reserve/Dalinar Energy Improved Bid, at the time of the Sale Hearing, conformed with the Special Master's requirements and had sufficient certainty of closing. The Special Master's counsel confirmed that the Special Master never required Gold Reserve to obtain committed financing to deal with the contingent 2020 Bondholders' risk. (Hr'g Tr. 261:10-14 (C. Bentley)).[5] Nor could he, as it was not a requirement that there be committed financing for anything other than the purchase price of the PDVH Shares. *See* (D.I. 1837 at 26-27) (Special Master finding that the Gold Reserve/Dalinar Energy bid met the requirements for committed financing for its purchase price, irrespective of its additional contingent financing). Therefore, there was no requirement that the $1.8 billion highly confident letter be converted into committed financing—instead, it was merely contingent financing to deal with a contingent risk—the threat that that 2020 Bondholders might be able to interfere with the Gold Reserve/Dalinar Energy Closing, which remains a contingent risk today. Arguments by the Special Master and parties supporting his Updated Final Recommendation insinuate that this is a flaw in the Gold Reserve/Dalinar Energy bid that disqualifies it from consideration (*see, e.g.*, Hr'g Tr. 322:8-19), but that is not true. The Court's only requirements were that the 2020 Bondholders' pledge be acknowledged—and the Gold Reserve/Dalinar Energy bid met this requirement. *See, e.g.*, (D.I. 1517, ¶ 28; D.I. 1554 at 23). The Gold Reserve/Dalinar Energy bid had more than sufficient

---

[5] As Gold Reserve's counsel stated at the October 21 Sale Hearing, the Court's authorization of the termination of the Dalinar Energy SPA has caused dislocation in the Gold Reserve/Dalinar Energy bid's committed debt financing and thus it is not presently in effect. (Hr'g Tr. 178:18-181:8). This is not an impediment to the Court's selection of the Gold Reserve/Dalinar Energy Bid, for the reasons stated. *Id.*

12

committed financing to cover its entire purchase price. None of Gold Reserve/Dalinar Energy's contingent financing was needed to pay an Attached Judgment Holder.

ConocoPhillips, as well as several other parties supporting the Special Master's Updated Final Recommendation, have continued to mischaracterize Gold Reserve/Dalinar Energy's financing and the structure of its transaction. First, they misstated the committed nature of the Gold Reserve/Dalinar Energy financing. ConocoPhillips noted at the October 21 Sale Hearing that "bidders had to come with committed financing," and that is exactly what the Bridge Loan in the Gold Reserve/Dalinar Energy commitment papers is. (Hr'g Tr. 322:8-15 (A. Wolf)). But the Bridge Loan was always intended to be replaced with the Debt Securities, which *cannot* be raised until after Gold Reserve/Dalinar Energy is the Court-approved bid. (D.I. 2433 at 20-22). As stated in the Answering Brief and the financing documents themselves, the Debt Securities are more than "hopes and dreams"—they are a real, concrete plan for raising these funds. *Id.* To be sure, that plan was sufficiently certain enough for the Special Master to recommend the Gold Reserve/Dalinar Energy transaction relying on these Debt Securities. *See* (D.I. 1837).

Second, the second step of the Gold Reserve/Dalinar Energy Closing—the merger with Adolin and CITGO Petroleum—is not a condition to the first step of Closing (that is, the step where the Bridge Loan is funded, the PDVH Shares are acquired, and the senior creditors get paid). Despite ConocoPhillips (and other parties) repeating this refrain in their briefing and at the Sale Hearings, it is incorrect. Gold Reserve explained this in detail in its Post-Hearing Answering Brief. *See* (D.I. 2423 at 24-25). While the ABL Facility is conditioned on the post-Closing merger happening, the Bridge Loan is not. *Id.* While ConocoPhillips' Post-Hearing Answering Brief ignores this, at the October 21 Sale Hearing, counsel for ConocoPhillips admitted that Gold Reserve has "structured their document to give the appearance" that the first step of Closing can

13

occur without the second. (Hr'g Tr. 327:8-10). While ConocoPhillips doubts the transaction will occur exactly as written, it also argues that those same documents are unreliable merely because they do not say that funding will take place with or without a merger. *Id.* This puts Gold Reserve/Dalinar Energy in a 'damned if you do, damned if you don't' position—its documents are faulted for what they do not say, and not given credit for what they *do* say. Such a tortured reading of Gold Reserve/Dalinar Energy's commitment papers—which, again, were sufficient for the Special Master to recommend this transaction to the Court mere months ago, at a time when the 2020 Bondholders threatened the same actions that they threaten today—cannot be accepted.[6]

Third, ConocoPhillips argued at the October 21 Sale Hearing that Gold Reserve has "got their documents mixed up" with regards to the $750 million in pre-Closing preferred equity raised that is exempt from reducing the Bridge Loan (if either are even needed). (Hr'g Tr. 324:14-325:8 (A. Wolf)). But, it is once again ConocoPhillips that has it wrong. ConocoPhillips stated that this $750 million is not "free of restrictions" because "it's a different 750," but failed to explain what documents were mixed up or what other $750 million it was referring to. *Id.* at 325:3-8 (A. Wolf). Under the express terms of the DCL, as previously stated, this $750 million is in fact free to support a potential settlement with the 2020 Bondholder if and when needed. (D.I. 2433 at 28).

## V. THE SPECIAL MASTER DID NOT GENERATE COMPETITIVE TENSION IN THE SALE PROCESS

As Gold Reserve stated at the October 21 Sale Hearing, based on its position as an Attached Judgment Creditor and its participation as a bidder throughout the Sale Process, the Special Master

---

[6] As Gold Reserve noted at the October 21 Sale Hearing, the creditors senior to it are in favor of the Amber Energy bid because, in their view, it has zero risk to closing. (Hr'g Tr. 419:18-420:3 (M. Kirtland)). While this is incorrect, as Gold Reserve has explained at length in its post-hearing briefing (D.I. 2433 at 16-31), the Court must view these arguments from senior creditors with skepticism as they are *not* driven by a desire to maximize value, as the Court recognized early on. *See* (D.I. 234) (noting that "Crystallex's incentives, as creditor, may extend only so far as to ensure that the results of the sales process is sufficient to recover what it is owed, and not necessarily to maximize the value of the PDVH shares").

14

has not generated any competitive tension during the Sale Process. (Hr'g Tr. 195:19-196:2 (M. Kirtland)). Gold Reserve has long complained of these issues. *See, e.g.*, (D.I. 1359-1) (criticizing the Special Master's 2024 sale process). This is evidenced by the history and results of the Sale Process, including:

- Gold Reserve's July 2024 bid had approximately the same purchase price as the $7.9 billion Gold Reserve/Dalinar Energy Improved Bid, which in turn is more than $2 billion higher than the now-recommend Elliott/Amber Energy bid—meaning the Special Master spent more than a year to get bids back to the previous level *set by Gold Reserve* and its bidding partner. *See* (D.I. 1419 at 3).

- During the topping Period, the Special Master did not share with Gold Reserve what other deals were on the table or how Gold Reserve could beat them—rather, counsel for the Special Master offer only the same pablum of "improve your price and certainty, but we will not tell you which one is more important." (Hr'g Tr. 196:8-17 (M. Kirtland)).[7] As a result, the Topping Period ended with only two conforming bids— the Gold Reserve/Dalinar Energy and the Red Tree bids—both of which were near the same figures as in the Stalking Horse period. (GR-063, D.I. 1837, ¶¶ 67-68).

- The Gold Reserve/Dalinar Energy bid only increased in price during the Topping Period because the Special Master refused to provide clear guidance regarding his evaluation methods. (D.I. 2433 at 31-34). The improved purchase price was appropriate, particularly given Section 324 *requires* that the highest bid be selected. *See* (Hr'g Tr. 199:2-18 (M. Kirtland)).

## CONCLUSION

For the foregoing reasons, and those set out in its briefing in advance of the Sale Hearing, and in its Post-Hearing Opening and Answering Briefs, Gold Reserve respectfully requests that the Court reject the Updated Final Recommendation and approve the Gold Reserve/Dalinar Energy Improved Bid.

---

[7] This contradicted the Court's mandate that the Special Master generate competitive tension *throughout* the Topping Period: "the Court ***does*** expect . . . that the Special Master will, continuously and throughout the 30-day Topping Period, evaluate any and all bids received and compare them to the Stalking Horse Bid, engage with bidders (including the Stalking Horse Bidder), and generate as much 'competitive tension' as possible during the Topping Period, and will not wait to undertake these actions until the optional, subsequent five-day period following the Topping Period[.]" (RT-013, D.I. 1554) (emphasis in original).

15

Dated: October 28, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

- and -

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

Katherine G. Connolly (*pro hac vice*)
One Embarcadero Center, Suite 1050
San Francisco, CA 94111
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

- and -

**BRITHEM LLP**

Michael J. Bowe (*pro hac vice*)
Lauren Tabaksblat (*pro hac vice*)

Andrew T. Sutton (*pro hac vice*)
Kate E. Fisch (*pro hac vice*)
565 5th Avenue
New York, New York 10017
Telephone: (646) 653-9378
mbowe@brithem.com
ltabaksblat@brithem.com
asutton@brithem.com
kfisch@brithem.com

*Attorneys for Gold Reserve Ltd.*