IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,  :
:
Plaintiff,  :
:
v.  :    C.A. No.: 17-mc-00151-LPS
:
BOLIVARIAN REPUBLIC OF VENEZULA,  : PUBLIC VERSION
:
Defendant.  :

**THE VENEZUELA PARTIES' OPENING BRIEF IN SUPPORT OF ITS RENEWED MOTION TO DISQUALIFY THE SPECIAL MASTER AND HIS ADVISORS**

OF COUNSEL:

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com


George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

HEYMAN ENERIO
GATTUSO & HIRZEL LLP
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (# 7086)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hegh.law
*Attorneys for the Bolivarian Republic of Venezuela and Petróleos de Venezuela, S.A.*

OF COUNSEL:

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue New
York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com


OF COUNSEL:                              Susan W. Waesco (#4476)
Nathan P. Eimer                          Alexandra M. Cumings (#6146)
Daniel D. Birk                           Phillip Reytan (#7255)
Gregory M. Schweizer                     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Hannah M. Bucher                         1201 North Market Street
Alec Solotorovsky                        Wilmington, DE 19801
EIMER STAHL LLP                          (302) 658-9200
224 South Michigan Avenue                SWaesco@morrisnichols.com
Suite 1100                               ACumings@morrisnichols.com
Chicago, IL 60604                        PReytan@morrisnichols.com
(312) 660-7600
NEimer@eimerstahl.com                    *Attorneys for PDV Holding, Inc. and*
DBirk@eimerstahl.com                     *CITGO Petroleum Corporation*
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com
ASolotorovsky@eimerstahl.com


October 9, 2025

## <u>TABLE OF CONTENTS</u>

STATEMENT OF FACTS ...........................................................................................3

    I.     The SM's Advisors Have Played Crucial Roles in These Proceedings.................3

    II.    The SM and His Advisors Made Misleading Representations to PDVH and CITGO, and No Disclosures to the Republic and PDVSA............................4

    III.   The Truth About Weil and Evercore's Conflicts Emerges. .............................5

          A.     Weil Made Sure to Take Care of Its Growing Client Elliott. ....................6

          B.     Weil Is Also Conflicted by its Representation of Bondholders.................8

          C.     Evercore Is Similarly Conflicted. .................................................8

ARGUMENT .........................................................................................................9

    I.     The SM and His Advisors Are Judicial Officers ..................................9

    II.    The Court Must Disqualify the SM and His Advisors Pursuant to 28 U.S.C. § 455(a). ......................................................................................11

    III.   Disqualification Under 28 U.S.C. § 455(b)(4) Is Also Required...........................16

    IV.   The SM and His Advisors Violated Their Disclosure Obligations......................18

    V.    The Court Must Vacate the Sale Process and Restart the Proceedings. ...............19

CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Antoine v. Byers & Anderson, Inc.*,
   508 U.S. 429 (1993)................................................................................................10

*Gardiner v. A.H. Robins Co.*,
   747 F.2d 1180 (8th Cir. 1984) ...........................................................................20

*Hall v. SBA*,
   695 F.2d 175 (5th Cir. 1983) .............................................................................15

*Jenkins v. Sterlacci*,
   849 F.2d 627 (D.C. Cir. 1988)......................................................................12, 18

*In re Brooks*,
   383 F.3d 1036 (D.C. Cir. 20046)........................................................................20

*In re Kempthorne*,
   449 F.3d 1265 (D.C. Cir. 2006) ...............................................................12, passim

*In re Kensington Int'l Ltd.*,
   353 F.3d 211 (3d Cir. 2003)...........................................................................11, 12

*In re Kensington Int'l Ltd.*,
   368 F.3d 289 (3d Cir. 2004)......................................................................10, passim

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988)......................................................................................11, 12

*Potashnick v. Port City Const. Co.*,
   609 F.2d 1101 (5th Cir. 1980) .......................................................................17, 20

*SCA Servs., Inc. v. Morgan*,
   557 F.2d 110 (7th Cir. 1977) .............................................................................17

*United States v. Schreiber*,
   599 F.2d 534 (3d Cir. 1979)..............................................................................18

FEDERAL STATUTES

28 U.S.C. § 455 ...................................................................................................1, passim

28 U.S.C. § 455(a) ..............................................................................................2, passim

28 U.S.C. § 455(b)(4) .........................................................................................2, passim

28 U.S.C. § 455(c) ..................................................................................................17

28 U.S.C. § 455(d)(4) ........................................................................................16, 17

28 U.S.C. § 455(e) ..................................................................................................17

**RULES - OTHER**

FRCP 53(a)(2) ......................................................................................................1, 10

FRCP 53(b)(3)(A) ...................................................................................................18

**TREATISES**

Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3547 (3d ed.).............................17

**OTHER AUTHORITIES**

*Black's Law Dictionary* (12 ed. 2024)....................................................................17

*Webster's New Universal Unabridged Dictionary* (2003) .......................................17

The Venezuela Parties ("VPs") renew their motion to disqualify the Special Master ("SM") and his advisors Weil, Gotshal & Manges LLP and Evercore Inc. pursuant to FRCP 53(a)(2) and 28 U.S.C. § 455. The SM and his advisors are "arm[s] of the Court" acting with judicial immunity (D.I. 480-1 at 51) and thus have a duty to act as neutral judicial officers and in compliance with judicial ethics requirements. It has recently been uncovered, however, that Weil and Evercore are and have been beholden to bidders and others with interests adverse to the VPs' interests.

At the same time that they were orchestrating the sale process and advising the SM to make a series of seemingly irrational decisions that favored Elliott Investment Management L.P. (with its affiliated entities, "Elliott") and diverted billions of dollars to the 2020 Bondholders ("Bondholders"), Weil and Evercore were advising Elliott and members of the ad hoc group of 2020s in multiple ongoing transactions. Contrary to Weil's representation to the Court that the fees yielded by these representations were "not going to be material," Ex. 1. (Tr. 83:11–14), the conflicted engagements yielded Weil and Evercore more than $100 million in fees since they began to advise the SM, and Elliott has been sending an increasing amount of work in Weil's direction in the past year. From the limited discovery produced by the SM's advisors since the disclosure by an Elliott representative at a September 9 deposition that Weil and Evercore have ongoing relationships with Elliott, we now know several critical facts. The SM's advisors maintain active and growing books of business with Elliott for which they have been paid millions by Elliott and tens of millions by ad hoc groups including Elliott. Weil and Evercore have also represented and continue to represent several large Bondholders, and have been paid tens of millions of dollars by them, too, with tens of millions more in fees promised for ongoing contingent engagements. Moreover, *dozens* of the same individuals—including partners at Weil—that advise the SM in this proceeding separately advocate for or advise Elliott or the Bondholders in other matters. In at least

1

one instance, Evercore's conflicts personnel recently questioned whether it could take on an engagement with an ad hoc group of creditors led by Elliott, but Evercore nevertheless moved forward after noting that the fees would be $8-10 million.

While these facts alone are sufficient to merit disqualification under both 28 U.S.C. § 455(a) (appearance of impropriety) and 28 U.S.C. § 455(b)(4) (financial interest in a party or some other interest that could be substantially affected by the proceedings), there is also strong evidence that these conflicts actually infected the sale process. On multiple instances, including during the Topping Period, Elliott's representative asked his attorney at Weil—the Co-Head of Weil's Restructuring Group—to intercede on Elliott's behalf in order to obtain favorable treatment. Saperstein then relayed Elliott's desires to Weil lawyers representing the SM, emphasizing that he would "***hate for [Elliott] to not want to work with us.***" Ex. 2.

It is difficult to imagine a case where the appearance (to say the least) of impropriety is greater than that here. The Court is selling PDVSA's indirect ownership of CITGO, which, according to the United States, forms "a central piece of the [Venezuelan] national patrimony." D.I. 212-1, at 3-4. These proceedings have been politicized by the Maduro regime, which has labeled the sale process a "robbery" and sought to blame the Republic's and PDVSA's legitimate U.S.-recognized representatives, D.I. 1422, at 12; *see also* D.I. 1273, at 7-8. The corrupt Maduro regime would like nothing more than to portray these proceedings as themselves corrupt—a narrative that the newly-revealed conflicts would only serve to amplify. For the integrity of the judicial process and the vindication of the VPs' right to fair and unbiased proceedings, the only path forward is to disqualify the SM and his advisors. All of their work is tainted, and the process

needs to start over with a new SM.[1]

## STATEMENT OF FACTS

**I.    The SM's Advisors Have Played Crucial Roles in These Proceedings.**

Since the SM's initial appointment (D.I. 258), the Court has treated him as "an arm of the Court" and given him significant discretion in devising and executing a sale process and then recommending bidders. *See* D.I. 277, ¶¶ 2, 20; D.I. 1554, at 26-27. "Immediately upon [his] appointment," the SM retained Weil (and soon thereafter, Evercore), whom he identified as his "subject matter experts." D.I. 348, ¶ 11. Under the Court's orders, these advisors also are "arm[s] of the Court" entitled to judicial immunity. *See* D.I. 277, ¶ 21; D.I. 480-1 at 51; D.I. 481, ¶ 46.

Both have played central roles in the sale process. Indeed, the SM did not testify in support of his process or recommendation at the September hearing. Instead, Evercore's Mr. Hiltz was his sole witness. Nor did the SM present his views directly to the Court at any public hearing, relying on Weil to speak for him. And the available transcripts of the SM's *ex parte* conferences with the Court (D.I. 1284, 1840, 2155) show Weil doing nearly all the talking on the SM's behalf, including blatant advocacy, such as dismissing as "mostly conclusory and frankly, arbitrary" a bidder's argument that the Bondholders had little prospect of obtaining an injunction to stop a sale. D.I. 1840, at 54. The SM has even let his advisors' views trump his own. For example, the SM was "initially leaning" towards picking Gold Reserve as the stalking horse, but Evercore "convinced" him to recommend Red Tree (whose lower bid contained a TSA with Bondholders Evercore and Weil represent) instead. D.I. 2046-3, Eimer Decl. 56, at 309, 311; JTX 655.

The SM's advisors have not only been the principal architects of the recommendations presented to the Court—they have executed the sale process itself. In the summer of 2024,

---

[1] Nothing herein should be construed to imply the VPs' consent to a forced sale under any circumstances, and they preserve all rights and positions, including on appeal.

"Evercore commenced" negotiations to reduce a field of six bidders to one—Elliott—with whom the SM "entered into a period of exclusivity" and ultimately recommended, to near universal disapproval. D.I. 1838, ¶ 14; *see also* D.I. 1445, at 2. And in the first half of 2025, Weil and Evercore (not the SM, who was not even copied on many emails with bidders[2]) conducted the negotiations that resulted in the recommendation to make the bid from Red Tree—an affiliate of Contrarian, a significant Bondholder—the stalking horse bid; Gold Reserve's bid the first final recommendation; and Elliott's bid the updated final recommendation. The recommendations the SM presented to the Court—first to approve the Gold Reserve bid, then to terminate Gold Reserve's SPA and approve Elliott's bid—are the product of Weil's and Evercore's negotiations, their advice to the SM, and their preparation of complex SPAs and related documents.

## II.    The SM and His Advisors Made Misleading Representations to PDVH and CITGO, and No Disclosures to the Republic and PDVSA.

The SM submitted a declaration in May 2021 stating that he did "not believe that there are any grounds for [his] disqualification as a Special Master under 28 U.S.C. § 455." D.I. 278, ¶ 3. The SM has never supplemented that declaration. In October 2024, PDVH and CITGO requested "[d]ocuments sufficient to identify any professional engagements in which" the SM or his advisors "performed work for any bidder." Ex. 3. Finally, in March 2025, the SM produced to CITGO and PDVH, under a Highly Confidential designation, what he identified as a "complete list of professional engagements in which the Special Master, Evercore, or Weil performed work for any bidder participating in Rounds 1 or 2 of the Sale Process," (the "March Disclosure"). Ex. 5.

That allegedly "complete list" identified only one Elliott engagement with Weil, which Weil represented lasted only from July 17 to August 13, 2024. It also listed five engagements for ███████ (a Bondholder), one for Contrarian (a 2020 Bondholder *and* parent of bidder Red

---

[2] See, e.g., Ex. 4 (Elliott transmitting bid letter and markups to "Weil and Evercore teams").

Tree), and several members of bidding groups—and represented that each of those engagements had terminated. As for Evercore, the SM disclosed no Elliott engagements, four "[i]nactive" engagements for ███████████ and two Contrarian engagements (only one active). *Id.* On September 4, 2025, in response to an update request, Weil told counsel for CITGO and PDVH that "neither Weil nor Evercore has had any engagements with any of the bidders that have participated since the start of the stalking horse period." Ex. 6. Soon thereafter, counsel for CITGO and PDVH asked whether Weil or Evercore had any engagements with any of the Bondholders since the March Disclosure. Weil did not respond.

The SM did not provide the March Disclosure to counsel for the Republic or PDVSA. He designated the March Disclosure "Highly Confidential," the highest level of confidentiality reserved for materials that risk "competitive injury," *see* D.I. 1555-1, ¶ 4(b); D.I. 1556. Because of that designation, PDVH and CITGO were not permitted to—and did not—share the March Disclosure with counsel for the Republic or PDVSA.[3] The latter only learned of the March Disclosure after it was offered as an exhibit at the deposition of Mr. Hiltz.

### III.    The Truth About Weil and Evercore's Conflicts Emerges.

The information dam began to break when Michael Turkel, Elliott's assistant general counsel, admitted in his September 9 deposition that Weil is currently representing Elliott. Ex. 7 (Tr. at 237-45). Mr. Turkel further disclosed that Elliott has an ongoing commercial relationship with Evercore, which has advised multiple AHGs of which Elliott has been a member. *Id.* at (Tr. at 250-61). After these disclosures, the Court ordered the SM to provide further information about Weil and Evercore engagements. Ex. 1 (Tr. at 92). Weil agreed to disclose the engagements already flagged in Weil or Evercore's conflicts databases and conflicts Weil or Evercore were "otherwise

---

[3] At the time, the Republic and PDVSA were not signatories to the Confidentiality Agreement, in order to reserve the right to submit their own competing bids, D.I. 1555-1.

aware of." *Id.* at 93.

Thus, on September 12, the SM's counsel provided a list of Weil and Evercore engagements "with bidders in this sale process, including"—for the first time—"any known affiliates of those bidders." Ex. 8 ("September 12 Disclosure"). That disclosure revealed extensive (and some ongoing) engagements and revenues totaling tens of millions of dollars—between Weil or Evercore, on the one hand, and Elliott and its affiliates, other bidders, Bondholders, and AHGs that included bidders and Bondholders. As soon as they received this information, the VPs promptly raised these issues with the Court. D.I. 2287. At the sale hearing, the VPs orally moved to disqualify the SM and his advisors, JTX 101, and have been diligently pursuing this issue since, *e.g.*, D.I. 2312, 2327, 2342, 2345. While discovery produced has been limited (and trickled in as late as October 7), it reveals shocking conflicts of interest playing out during the sale process:

### A.    Weil Made Sure to Take Care of Its Growing Client Elliott.

Weil has represented Elliott in over a dozen matters since 2023, including ongoing ones that are growing exponentially. Ex. 9. In 2023, Weil collected ~$300,000 from Elliott; in 2024, that number rose to nearly $1.25 million; and in just the first half of 2025, Weil collected more than $3.1 million. Ex. 10. These do not include work for which Weil has yet to be paid, including new matters opened as recently as September 10, 2025. Ex. 11. Elliott counted among its Weil lawyers five attorneys (including three partners) who also represented the SM in this proceeding, including Ray Schrock, the SM's former lead counsel who played crucial roles in designing and executing the sale process before leaving Weil in late 2024. *Compare* Ex. 12 *with* Ex. 13.

The Weil partners representing Elliott included Jeffrey Saferstein, Co-Chair of Weil's Restructuring Department, Ex. 14, who has also represented Apollo Global Management, a major

investor in the Elliott bid.[4] Before joining Weil in 2022, Mr. Saferstein was at Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ex. 15, where he overlapped with Mr. Turkel (Elliott's principal representative in the sale process) who also left Paul, Weiss in 2023. Ex. 7 (Tr. at 18). Beginning no later than June 2024, Mr. Saferstein served as an active conduit between Elliott (principally through Mr. Turkel) and the core Weil team executing the sale process. *See, e.g.*, Ex. 16 (agreeing to convey messages about Elliott's bid from Mr. Turkel to Mr. Schrock in June 2024). On November 21, 2024, Mr. Saferstein had a "CITGO discussion" with Gary Holtzer, a member of Weil's Global Leadership and Strategy and Management Committees, and SM team members Chase Bentley and Matt Barr. Ex. 17. At that time, Mr. Bentley was on the cusp of potential promotion to partner in the Restructuring Department run by Messrs. Saferstein and Holtzer.[5]

In 2025, Mr. Saferstein continued to make sure that Mr. Bentley and others paid attention to Elliott's concerns. Ex. 4 (Mr. Turkel emailing Mr. Saferstein in March 2025 to complain about a comment made by Mr. Barr); Ex. 18 (Mr. Bentley promising to provide Mr. Saferstein a "debrief" of a call with Elliott in connection with evaluation of topping period bids).

On June 24, 2025, after receiving a call from Mr. Turkel, Mr. Saferstein wrote Messrs. Bentley and Barr to express Elliott's "frustrat[ion]" with the SM's team: it was "impossible for [Elliott] to meet" the SM's timeline in advance of the June 27 deadline for the submission of the SM's final recommendation. Ex. 2. Mr. Saferstein reminded them about Weil's interest in staying on the right side of Elliott: "***I hate for them to not want to work with us.***" *Id.* (emphasis added). He instructed Mr. Bentley to speak to Mr. Turkel. *See id.* Following that call, Mr. Bentley reported

---

[4] *See* https://www.weil.com/people/jeffrey-saferstein. Mr. Schrock also represents Apollo. https://www.lw.com/en/people/ray-schrock

[5] Weil Announcement, "Weil Elects 18 New Partners and announces New Counsel Class" (Nov. 26, 2024), https://www.weil.com/articles/weil-elects-new-partners-2025-press-release.

that Elliott "realized" the SM's team was saving Elliott "some money in commitment fees" by not submitting a bid in the topping period, and that Elliott would "wait to see what our recommendation is on July 2 and try to beat that with an unsolicited offer." Ex. 18. Mr. Bentley's prediction came true: although Elliott did not have a bid ready for the SM to recommend by July 2 (D.I. 1837), the SM's advisors sought and obtained a new bid deadline, and after Elliott was able to submit its "unsolicited" bid, declared Elliott's bid a Superior Proposal.

### B.     Weil Is Also Conflicted by its Representation of Bondholders.

As for the Bondholders, Weil's business relationships run deep and are even more lucrative. Since 2021, the Bondholders and their affiliates have paid Weil over $62 million, and Weil received an additional $12.8 million from AHGs that include Bondholders. Ex. 19. Even these figures are significantly understated: they do not include work Weil performed for Bondholders on 11 active matters for which Weil has not provided an estimate of forthcoming fees. Ex. 20. Weil represented Bondholders and their affiliates in 116 separate matters since 2021, not including the representations of AHGs that include Bondholders. Ex. 21. At least 21 of the same Weil partners  who advised the SM have also represented Bondholders. *Compare* Ex. 12, *with* Ex. 22. The Bondholders' attorneys at Weil include some of the most active advocates on behalf of the SM in this proceeding, including Messrs. Schrock and Barr.

### C.     Evercore Is Similarly Conflicted.

Evercore also has extensive financial entanglements with Elliott and the Bondholders. Since 2021, it has collected $8.9 million from an AHG of which Elliott is the second-largest member. Evercore also is embarking on ("engagement letter terms not yet finalized") a new representation of an AHG, in whose steering committee Elliott ██████████████████████ and for which Evercore expects a $6 million one-time fee and $175,000 per month. Ex. 23. In the sole email string produced by Evercore (which includes David Ying, one of the SM's principal

advisors), an attorney in Evercore's conflicts group raised a concern about representing Elliott: "[i]f we would be seen as advising Elliott, I believe that[']s a pretty high bar to clear in order to accept a mandate." Ex. 24. Others at Evercore responded that the "[f]ees will be 8-10mm" and that the initial conflicts advice would be "a huge issue for us" and would also implicate "a ton of other important clients." *Id.*

Apart from its representation of AHGs, Evercore has been directly engaged by numerous Bondholders, from which Evercore has received $15.5 million and expects to receive millions more.[6] And since 2021, Evercore has received approximately $75 million for work done for clients affiliated with 2020 Bondholders, and expects to receive tens of millions more.[7]

## ARGUMENT

As relevant here, Section 455 requires disqualification in two situations. First, where the judicial officer's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Second, where he has "a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). Both provisions independently require disqualification of the SM and his advisors and restarting the process with unconflicted advisors.

## I.     The SM and His Advisors Are Judicial Officers

By acting as "an arm of the Court," D.I. 277, ¶ 20, the SM and his advisors assumed the duty to act neutrally to all parties and orchestrate an objective, unbiased sales process. *See In re Kensington Int'l Ltd.*, 368 F.3d 289, 303 (3d Cir. 2004) ("*Kensington II*") (advisors have "a duty

---

[6] Many of Evercore's engagements are structured—like its Sale Fee in these proceedings—with fees to be paid upon the consummation of a transaction. These figures do not include unpaid success fees, which can be astronomical. For example, for a current matter, Evercore reports having received $0, but expects to receive up to $10 million. Ex. 25.

[7] These include arrangements where 2020 Bondholders are "shareholders," "investors," "creditors," "financial sponsors," "affiliates," or members of AHGs that are Evercore clients.

to remain neutral . . . and to provide objective, unbiased information"). Special masters are judicial officers who "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455." FRCP 53(a)(2); *see also* D.I. 443, at 3-4. In appointing the SM and authorizing him to retain advisors, the Court has warned that the SM "owes duties to the Court" and not to "any of the Parties." D.I. 277, ¶ 22;

The same requirements apply to Weil and Evercore, who have acted as judicial officers in these proceedings. Indeed, the court's extension of judicial immunity to the SM, Weil, and Evercore requires, at a minimum, that they serve as judicial officers. *See id.* ¶ 21 & D.I. 481 ¶ 46. "When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993). As judicial officers, Weil and Evercore must be held to the same standard for disqualification as the SM.

And even if Weil and Evercore were somehow exempt from the ethical responsibilities of judicial officers, the SM still must be disqualified because "there is an almost irrebuttable presumption that a [judicial officer] is 'tainted' and must be disqualified where . . . he surrounds himself with individuals who may not be truly disinterested." *Kensington II,* 368 F.3d at 308. The Third Circuit disqualified even a judge when a reasonable person would conclude that his conflicted advisors' "unique level of access and influence[,] the length of their appointment, and the overlapping issues and clients" tainted him. *Id.* at 308-09. The SM's reliance on Weil and Evercore is no different.

As relevant here, Section 455 requires disqualification in two situations. First, where the judicial officer's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Second, where he has "a financial interest in the subject matter in controversy or in a party to the

proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). Both provisions independently require disqualification of the SM and his advisors and restarting the process with an unconflicted Special Master and advisors.

## II.    The Court Must Disqualify the SM and His Advisors Pursuant to 28 U.S.C. § 455(a).

Section 455(a) requires disqualifying the SM, Weil, and Evercore. The test is "whether an 'objective, reasonable layperson,' who is aware of all the facts, would determine that the judicial officer's impartiality might reasonably be questioned." D.I. 443, at 4 (quoting *Kensington II*, 368 F.3d at 301-03). Impartiality must be judged from the perspective of the "man on the street," *i.e.*, "someone outside the judicial system." *Kensington II*, 368 F.3d at 303. Section 455(a) has a low "threshold for conflicts" because laypeople "are often all too willing to indulge suspicions and doubts concerning the integrity of judges," whereas "judicial insiders . . . may regard asserted conflicts to be more innocuous than an outsider would." *Id.* at 302-03 (cleaned up).

The test is <u>not</u> whether the judicial officer is "*actually* biased." *In re Kensington Int'l Ltd.*, 353 F.3d 211, 220 (3d Cir. 2003) ("*Kensington I*"). Disqualification is mandatory even where a judicial officer is well-respected and "[]capable of discharging judicial duties free from bias." *Kensington II*, 368 F.3d at 318. This is because "the goal of section 455(a) is to avoid even the appearance of partiality" in service of "promot[ing] public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). Nor is the judicial officer's "lack of knowledge" regarding a conflict relevant because "[s]cienter is not an element of a violation of § 455(a)." *Id.* at 859. Disqualification "does not depend upon whether" the judicial officer "actually knew of facts creating an appearance of impropriety so long as the public might reasonably believe that he or she knew." *Id.* at 860.

The conflicts created by the multiple roles that the SM's advisors have played require disqualifying the SM and his advisors. *Kensington II*, 368 F.3d at 318 (disqualifying based on a

conflict between the "dual roles [judge's advisors] played" as "objective" advisors in one case and "zealous advocates" in another). While advising the SM on critical and hotly contested issues, Weil and Evercore were, at the same time, serving as advocates and advisors to several of these proceedings' key players. And discovery has confirmed that their conflicts did not create merely an incentive for *potential* bias (even though this would suffice under Section 455(a), *see Kensington I*, 353 F.3d at 220). Rather, the co-head of Weil's Restructuring Department, who worked directly on matters for Elliott and occupied a position of authority over attorneys serving as the SM's direct advisors, expressly advocated for Elliott's interests *in these proceedings*.

We know of one senior partner's back-channel advocacy on behalf of his client Elliott because it was reflected in emails the SM was forced to produce. But bias "does not necessarily manifest itself in the record" and may "leave[] no trace." *In re Kempthorne*, 449 F.3d 1265, 1271 (D.C. Cir. 2006) (cleaned up). This is one of the reasons why the test does not require a party to prove e actual bias, and why the appearance of bias is enough. *See Kensington I*, 353 F.3d at 220; *see also Jenkins v. Sterlacci*, 849 F.2d 627, 635 (D.C. Cir. 1988) (judicial officer's role as a lawyer in an unrelated matter "raised a substantial question as to whether he should have been disqualified" for the "appearance of a conflict of interest").

Thus, even putting aside what we now know about the actual influence Weil lawyers representing Elliott brought to bear on the sale process, the sheer scope of Weil's representations of Elliott and the Bondholders easily meet Section 455(a)'s test: an average layperson would reasonably question the SM and his advisors' impartiality. Take the extensive relationship between Weil and Elliott. In over a dozen separate matters, Weil has represented Elliott and its affiliates. This already deep relationship seems to be growing exponentially: Just in the first half of 2025, Weil collected over $3.1 million in fees from Elliott (vastly outstripping its collections from prior

12

years). Several of the same Weil attorneys who most actively advised the SM—including Mr. Schrock—also represented Elliott. Even if the conflicts here could have been mitigated through disclosure and the use of a firewall (which they cannot), no disclosure was made and no wall was erected. In sum, Elliot deposited $3.1 million—a significant amount of money to any layperson and orders of magnitude greater than prior years—into Weil's coffers just as Weil was advising the SM whether to support Elliott's bid to purchase control of CITGO at a steep discount. To the "man on the street," *Kensington II*, 368 F.3d at 303, this would not pass the smell test.

The appearance of impropriety is all the more stark because these conflicts provide an explanation for why the SM and his advisors (otherwise inexplicably) have made a series of decisions that the VPs have long noted appeared to serve only Elliott and the 2020s, such as:

- Granting Elliott exclusivity and closing the data room to other bidders in August 2024, a decision that the Sale Process Parties universally recognized as detrimental to the sale process, *see* D.I. 1373;

- Recommending a lowball bid by Elliott in September 2024, including a universally condemned escrow structure withholding proceeds potentially for years; give *de facto* priority to the Bondholders; give Elliott the option to rescind at some future point; and allow Elliott to keep interim profits while leaving creditors and VPs unpaid, *see* D.I. 1418;

- Indicating repeatedly that resolution of the 2020 Bondholder Litigation was a gating issue for a successful bid, thus chilling bidder participation and diverting value to 2020s;

- Selecting a lowball stalking horse bid by Contrarian/Red Tree because of a TSA that would pay the 2020s;

- Urging Gold Reserve to settle with the Bondholders or, failing that, to set aside financing capacity to pay a future settlement; and

- Terminating the Gold Reserve SPA and recommending Elliott's far lower "unsolicited" bid, based on Elliott having obtained the support of the 2020s, even before Judge Failla ruled.[8]

---

[8] Apparently recognizing that, at each turn, the SM stacked the deck in favor of his advisors' clients, counsel for Elliott has emphasized that the SM "twice recommended other bidders." JTX 159. But we now know based on testimony at the Sale Hearing that Elliott was waiting to participate in the topping period until after Judge Rakoff issued a decision in the alter ego litigation,

Weil also has extensive relationships with Bondholders. Since 2021, Weil has collected an astronomical $75 million from Bondholders, including AHGs that include the Bondholders. And almost two dozen of the same Weil partners that advised the SM here also served as Bondholders' advocates. When Weil recommended a lower-priced bid with a TSA benefitting the Bondholders, Judge Failla had not ruled in the Bondholders' favor—but the Bondholders' checks had cleared Weil's bank accounts. The "man on the street" would gasp.

Evercore's entanglements with Elliott and the Bondholders are no less troublesome. . Evercore has collected $13.4 million in fees from Elliott affiliates, and plans to receive several million more from a new engagement. As for the Bondholders, again the figures are enormous (and, as Evercore concedes, incomplete): at least $90 million from Bondholders or clients affiliated with them, and millions or tens of millions more expected.

These facts show that this is a textbook case of a "'structural conflict of interests' because [the SM's advisors] were simultaneously serving as advocates" for Elliott and certain 2020 Bondholders. D.I. 443, at 7 (quoting *Kensington II*, 368 F.3d at 303); *see also Kempthorne*, 449 F.3d at 1270 (requiring recusal and suppression of tainted work caused by SM's advisor who had a conflicting interest because of his prior role as employee of an entity that accused a party of misconduct).[9] Just as in *Kensington II*, the SM's advisors "owed [their clients] a fiduciary duty to advance their interests and to see that they received" a favorable outcome in the sale process, and

---

and that it did not engage in the topping period until its "tail end." JTX 373:6-374:4. Elliott simply ran out of time and decided—with Weil's encouragement—to "wait to see" what the SM's final recommendation would be and then "try to beat that with an unsolicited offer." Ex. 18. Whenever the SM and his advisors *could* favor Elliott and the 2020s, they did so.

[9] In 2022, this Court distinguished *Kempthorne* on the (disputed) premise that "Evercore does not stand 'to gain financially from' the sale of the PDVH Shares in the way that the *Kempthorne* advisor would have benefitted from a ruling for his own employer." D.I. 443, at 8. Given the facts today, *Kempthorne* is now precisely on point: both Evercore and Weil stood to gain immensely by the SM recommending a sale to Elliott that included a settlement with the 2020 Bondholders.

"[t]o achieve that end, the very Advisors who were advising [the judicial officer] had to take positions in" both matters "that favored [their clients]." 368 F.3d at 304.

And as in *Kensington II*, the conflict created by the advisors impermissibly "taints" the judicial officer, the SM here. *Id*. at 306. Weil and Evercore's roles as advisors to the SM for multiple years has given them a "unique level of access" and a "unique level of influence" over issues that are central to this case, *id*. at 304, all while maintaining business relationships with Elliott and the Bondholders. Even if there were no allegation of "wrongdoing or bias on [the SM's] part," "there is an almost irrebut[t]able presumption that [he] is 'tainted' and must be disqualified where . . . he surrounds himself with individuals who may not be truly disinterested." *Id*. at 306, 308; *see also Kempthorne*, 449 F.3d at 1270 (holding special master's "reliance upon [his advisor] . . . likely colored the way in which he approached his task, and ultimately his reports and recommendations to the district court" (cleaned up)). Indeed, given their "very broad powers" in designing and overseeing the sales process and their "special position of trust and influence" with the SM as "experts" he relied on "to educate him on all the relevant issues," the SM's advisors were the "substantial equivalent of law clerks," and thus had "a duty to maintain at least the degree of neutrality normally required of law clerks or court-appointed experts." *Kensington II,* 368 F.3d at 307-09; *see also Hall v. SBA*, 695 F.2d 175, 178-79 (5th Cir. 1983) (disqualifying judge because clerk's acceptance of job at firm representing a litigant raised an appearance of impropriety "[w]hether or not the law clerk actually affected the judge's decision").

Weil and Evercore's extensive advocacy for Elliott and the Bondholders is particularly troubling considering its timing. They maintained their extensive representations of Elliott during the SM's exclusive negotiations *with* Elliott in 2024 and related attempts to negotiate a settlement with the Bondholders; his initial selection of Elliott's bid with an escrow structure prioritizing

payment to the Bondholders; and his eventual selection of Elliott's bid as the recommended winner (even after initially recommending Gold Reserve's bid, but changing his mind when Elliott reemerged with a commitment to divert over $2 billion to Bondholders). Later, with Evercore and Weil's advice, the SM selected a joint stalking horse bid by Contrarian and Red Tree even though it was the lowest qualifying bid because it supposedly offered greater certainty due to a TSA that would pay out the Bondholders. All the while, the SM's advisors represented Contrarian and other Bondholders (receiving north of $150 million in fees). Moreover, during the topping period, bidders were continuously pressed to reach a settlement with the 2020 Bondholders, and the SM abandoned his initial recommendation of the Gold Reserve bid because that bid lacked such a settlement. It would be impossible for a reasonable layperson looking at these facts to not conclude that—or, at the very least, question whether—the financial and fiduciary relationships between Weil, Evercore, Elliott, and the Bondholders had an impact on what appears to be the SM's preferential treatment of Elliott and the Bondholders.

## III.    Disqualification Under 28 U.S.C. § 455(b)(4) Is Also Required.

Section 455(b)(4) separately requires that the SM and his advisors be disqualified. A judicial officer must be disqualified if he "has a financial interest in the subject matter in controversy or in a party to the proceeding." 28 U.S.C. § 455(b)(4). A "financial interest" includes "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party," with certain exceptions not relevant here. *Id.* § 455(d)(4). A special master "must be disqualified if he has 'any . . . interest that could be substantially affected by the outcome of the proceeding.'" D.I. 443, at 3 (quoting 28 U.S.C. § 455(b)(4)). The phrase "any . . . interest" covers both financial and non-financial interests. Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3547 (3d ed.) (citing *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980)). Such grounds for disqualification cannot be

16

waived. 28 U.S.C. § 455(e). And the statute requires a judicial officer to "inform himself about his personal and fiduciary financial interests." *Id.* § 455(c). Here, due to their conflicts and the significant stake Weil and Evercore have in fees from their ongoing relationships with Elliott and major Bondholders, the SM and his advisors must be disqualified.

First, Weil and Evercore serve as "adviser[s] or other active participant[s] in the affairs" of Elliott and certain Bondholders. § 455(d)(4); *See Webster's New Universal Unabridged Dictionary* (2003) ("adviser" is "one who gives advice" and "affairs" as "matters of commercial or public interest or concern; the transactions of public or private business or finance"); *Black's Law Dictionary* (12 ed. 2024) ("adviser" is "someone whose job is to counsel on matters within an area of expertise, such as business, economics, law, or politics"). Both provide advice and counsel to Elliott and Bondholders on business, financial, and legal matters within their expertise and are active participants in those parties' business and financial transactions.[10]

Second, given the magnitude of existing and growing business for Elliott and various 2020 Bondholders, Weil and Evercore—and by extension the SM—have financial and business interests that could be substantially affected by the outcome of these proceedings. *See, e.g.*, *SCA Servs., Inc. v. Morgan*, 557 F.2d 110, 115 (7th Cir. 1977) (holding that a partner at a law firm had a "financial interest" for purposes of Section 455 where other lawyers at the firm represented one of the parties to the litigation). If there could be any doubt that Weil and Evercore's interest in continuing to receive these clients' business—and their accompanying tens of millions of dollars

---

[10] *See, e.g.*, Ex. 11 (Weil engagements for Elliott to "assist with" and "advise on" various financings, restructurings, and other business, financial, and legal matters); Ex. 20 (Weil engagements for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to "advise" on various potential investments, financings, IPOs, and other transactions); Ex. 23 (Evercore services to Contrarian, recent engagement "advis[ing]" an AHG in which Elliott was second-largest member, ongoing "strategic advice to Board of Directors" of ▇▇▇▇▇▇▇ and upcoming engagement with an AHG led by Elliott.

of annual fees—could be substantially affected by the sale process's outcome, one need look no further than Saferstein's intercession with his Weil partners on Elliott's behalf for the express purpose of protecting future business opportunities.

## IV.    The SM and His Advisors Violated Their Disclosure Obligations.

Perhaps even more shocking is the conflicted advisors' attitude toward disclosure of their conflicts. A special master must disclose any potential grounds for disqualification under Section 455 for consideration by the Court and parties. *See* FRCP 53(b)(3)(A). A special master—and, by extension, his agents and advisors—are "ethically required to make such a disclosure if . . . [their] impartiality might otherwise have reasonably been questioned." *Jenkins*, 849 F.2d at, 633; *see also United States v. Schreiber*, 599 F.2d 534, 537 (3d Cir. 1979) ("[T]he parties should be apprised of any possible ground for disqualification known privately to the judge."). Section 455(a) creates a "'de facto disclosure requirement'" for judicial officers, and "if there is to be a burden of disclosure, that burden is to be placed on the [judicial officer] to disclose possible grounds for disqualification." *Kensington II*, 368 F.3d at 313. The judicial officers—not the parties who seek recusal—are "in the best position to know of the circumstances supporting a recusal motion." *Id*. at 314. It is improper to place the "burden . . . to uncover" the facts showing a conflicted advisors' conflicts on the parties seeking recusal. *Id*. at 313.

The SM and his advisors all but ignored these disclosure requirements, instead treating these obligations as invitations to engage in delayed, partial, and misleading disclosures. They disclosed nothing whatsoever about Weil's and Evercore's relationships with Elliott, other bidders and Bondholders to the Republic and PDVSA. And when pressed to answer the discovery requests of CITGO and PDVH, they provided only the misleading March Disclosure, and then (in the September 4 response to CITGO's and PDVH's request for an update) provided the out-and-out false representation that "neither Weil nor Evercore has had any engagements with any of the

bidders that have participated since the start of the stalking horse period." *See* Ex. 6. The extensive nature of Weil and Evercore's representations of Elliott and other 2020 Bondholders only began to emerge on September 9, 2025—not as a result of any efforts by the SM or his advisors, but only after Elliott's representative was forced under oath to reveal that Weil and Evercore both had ongoing commercial relationships with Elliott. This disregard of the disclosure obligations of the SM and his advisors independently violates Section 455, exacerbates the appearance of impropriety, and further supports disqualification

## V.  The Court Must Vacate the Sale Process and Restart the Proceedings.

The Court must vacate and restart the fatally tainted sales process the SM's advisors designed and orchestrated. The SM relied on his advisors at all times since his appointment. *See* D.I. 277; D.I. 481, ¶ 45. Weil and Evercore shaped the sale process on a daily basis while their ties to Elliott and the Bondholders deepened. Ensuring public confidence in the integrity of this unprecedented judicial sale requires starting afresh.

Because the SM and his advisors "should have been recused" from these proceedings, "any work produced" by them "must also be 'recused'—that is, suppressed." *Kempthorne*, 449 F.3d at 1269. "[O]nly suppression can ensure neither the [parties] nor the [Court] will rely upon the reports in the future, to the detriment of the 'public's confidence in the judicial process.'" 449 F.3d at 1272. All of the bids the SM recommended are the product of "input" the SM "received *ex parte* and therefore untested by the adversary process." *Id.* at 1271. All reflected the advisors' emphasis on taking care of the Bondholders, manifest not only in the Red Tree and Elliott TSAs, but also in Gold Reserve's reserving sources of financing to settle with the 2020 Bondholders rather than using them to increase its bid.

Even where (unlike here) there is no direct evidence of undue influence from a judicial officer's conflicts, prejudice is presumed. Conflicts "do[] not necessarily manifest [themselves] in

the record" and "may derive from information that leaves no trace." *Id.* (cleaned up). This is why courts jettison a conflicted judicial officer's work product to restore public confidence in the judicial system. *See id.* at 1272; *Gardiner v. A.H. Robins Co.,* 747 F.2d 1180, 1183 (8th Cir. 1984). Here, because the SM's recommendations informed the entirety of the sale process, suppression of his work product requires starting the sale proceedings over with an untainted SM. *See Kempthorne*, 449 F.3d at 1271. Each term of the Elliott SPA the SM now recommends, and of the Gold Reserve SPA he previously recommended, is the product of the negotiations conducted by the SM's conflicted advisors. In *Brooks,* the D.C. Circuit analogized a district court's *de novo* review of a tainted special master's work to a judge's *de novo* review of a law clerk's draft opinion in a criminal case after the clerk visited the crime scene, took fingerprints, and interviewed witnesses. 383 F.3d at 1046. It concluded that reviewing "the law clerk's findings *de novo* would not be assurance against the biases of the clerk affecting the judgement of the court." *Id.* Even more so here, the bids are inextricably the product of Weil's and Evercore's decisions and negotiations. They cannot be cured. *Id.* at 1045.

That efforts will be wasted once the SM and his advisors are disqualified—a result for which blame lies solely at the feet of the SM's team—provides no basis to avoid what Section 455 compels. "[A]ny inconvenience" from a delay "is more than outweighed by the need to protect the dignity and integrity of the judicial process." *Potashnick*, 609 F.2d at 1112.

## **CONCLUSION**

The Court must disqualify the SM, Weil, and Evercore, vacate the incurably tainted proceedings that have occurred to date, and restart the sale process with an untainted SM with unconflicted advisors.

Dated: October 9, 2025

OF COUNSEL:


Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com


George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com


OF COUNSEL:


Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
101 Park Avenue New York,
NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Respectfully submitted,

*/s/ Samuel T. Hirzel, II*
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (# 7086
HEYMAN ENERIO GATTUSO & HIRZEL LLP
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hegh.law
*Attorneys for the Bolivarian Republic*
*of Venezuela and Petróleos de Venezuela, S.A.*

21

OF COUNSEL:

Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Hannah M. Bucher
Alec Solotorovsky
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com
ASolotorovsky@eimerstahl.com

*/s/ Alexandera M. Cumings*
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Phillip Reytan (#7255)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
SWaesco@morrisnichols.com
ACumings@morrisnichols.com
PReytan@morrisnichols.com

*Attorneys for PDV Holding, Inc. and
CITGO Petroleum Corporation*

October 9, 2025

### CERTIFICATE OF SERVICE

I, Samuel T. Hirzel, II, certify that, on October 9, 2025, I served copies of the *[Sealed]Opening Brief* upon counsel of record via e-mail.

/s/ Samuel T. Hirzel, II

Samuel T. Hirzel, II (# 4415)