## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,    :
                             :
       Plaintiff,    :
                             :
       v.    :    Misc. No. 17-151-LPS
                             :
BOLIVARIAN REPUBLIC OF VENEZUELA,    :
                             :
       Defendant.    :

### OPINION

Myron T. Steele, Matthew F. Davis, and Bindu A. Palapura, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Jared R. Friedmann, Matthew S. Barr, David Lender, Chase A. Bentley, and Gregory Silbert, WEIL, GOTSHAL & MANGES LLP, New York, NY

       Attorneys for Special Master Robert B. Pincus


Joseph L. Christensen, CHRISTENSEN LAW LLC, Wilmington, DE

Jason C. Rubinstein, Geoffrey Cajigas, FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS, LLP, New York, NY

       Attorneys for Evercore Group, L.L.C.


Raymond J. DiCamillo, Jeffrey L. Moyer, and Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Robert L. Weigel, Jason W. Myatt, Rahim Moloo, and Zachary Kady, GIBSON, DUNN & CRUTCHER LLP, New York, NY

Miguel A. Estrada, Lucas C. Townsend, and Adam M. Smith, GIBSON, DUNN & CRUTCHER LLP, Washington, DC

       Attorneys for Crystallex International Corporation

Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, DE

Andrew J. Rossman, Susheel Kirpalani, Matthew R. Scheck, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY

Stephen M. Baldini, Stephanie Lindemuth, and Richard J. D'Amato, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, NY

Julius Chen AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, DC

Attorneys for Amber Energy Inc.


Garrett B. Moritz and Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE

Michael S. Kim, Marcus J. Green, Josef M. Klazen, and Lydia L. Halpern, KOBRE & KIM LLP, New York, NY

Richard G. Mason, Amy R. Wolf, and Michael H. Cassel, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY

Attorneys for Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.


Kevin J. Mangan, Matthew P. Ward, and Stephanie S. Riley, WOMBLE BOND DICKINSON (US) LLP, Wilmington, DE

Matthew H. Kirtland, NORTON ROSE FULBRIGHT US LLP, Washington, DC

Katherine G. Connolly, NORTON ROSE FULBRIGHT US LLP, San Francisco, CA

Taylor J. LeMay, NORTON ROSE FULBRIGHT US LLP, Houston TX

Michael K. Bowe, BRITHEM LLP, New York, NY

Attorneys for Gold Reserve Ltd.


Susan W. Waesco, Alexandra M. Cummings, and Phillip Reytan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Nathan P. Eimer, Daniel D. Birk, Gregory M. Schweizer, Hannah M. Bucher, and Alec Solotorovsky, EIMER STAHL LLP, Chicago, IL

Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation

Samuel T. Hirzel, II and Brendan Patrick McDonnell, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Donald B. Verrilli, Jr., Elaine J. Goldenberg, and Ginger D. Anders, MUNGER, TOLLES & OLSON LLP, Washington, DC

George M. Garvey and Adeel Mohammadi, MUNGER, TOLLES & OLSON LLP, Los Angeles, CA

Joseph D. Pizzurro, Kevin A. Meehan, and Juan O. Perla, CURTIS, MALLET-PREVOST, COLT & MOSLE LLP, New York, NY

Attorneys for Bolivarian Republic of Venezuela and Petróleos de Venezuela, S.A.

## OPINION

**STARK, United States Circuit Judge:**

Pending before the Court are (1) the motion to disqualify the Special Master, his advisors, and the undersigned Judge (D.I. 2381) filed by Gold Reserve Ltd. f/k/a/ Gold Reserve Inc. ("Gold Reserve"); and (2) the motion to disqualify the Special Master and his advisors (D.I. 2384 and, together with Gold Reserve's motion, the "Motions") filed by the Bolivarian Republic of Venezuela ("Venezuela" or the "Republic"), Petróleos de Venezuela S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), CITGO Holding, Inc. ("CITGO Holding"), and CITGO Petroleum Corporation ("CITGO" and, together with the Republic, PDVSA, PDVH, and CITGO Holding, "the Venezuela Parties").[1] The Motions from Gold Reserve and the Venezuela Parties (together the "Movants" or "Moving Parties") mark the fourth and fifth times a party or other interested entity has moved to recuse the Special Master and/or his advisors in this matter. (D.I. 443 (denying first motion, filed by PDVSA, PDVH, and CITGO, directed at Special Master and Evercore); D.I. 544 (denying second motion, filed by PDVSA, PDVH, and CITGO, directed at Special Master); D.I. 1180 (same))

For all of the many reasons stated below, the Motions are **DENIED**.

## BACKGROUND

The Court appointed a Special Master, Robert B. Pincus, on April 13, 2021. (D.I. 258) He was recommended for this role by the Venezuela Parties (D.I. 256 at 62-67), after the Court

---

[1] Gold Reserve filed its motion, opening brief, and exhibits in a single, sealed docket entry (D.I. 2381). Redacted, publicly-available versions of Gold Reserve's Motion, brief, and exhibits can be found at D.I. 2389. The Venezuela Parties did not file their motion (D.I. 2384) under seal, but they sealed their opening brief (D.I. 2385) and supporting exhibits (D.I. 2386). Redacted versions of the Venezuela Parties' opening brief can be found at D.I. 2392, while redacted versions of the exhibits are located at D.I. 2394. Where possible, the Court cites to the redacted versions of filings throughout this Opinion.

indicated it needed assistance in carrying out its obligation to enforce judgments by selling the Shares[2] of PDVH, which is attached property in this District that is owned by judgment-debtor PDVSA, which is the alter ego of judgment-debtor Venezuela (D.I. 234 at 34-35).

In May 2021, with the Court's express authorization, the Special Master retained expert legal and financial advisors to enable him to carry out his Court-appointed duties. (D.I. 277 ¶ 13) Specifically, he retained Weil, Gotshal & Manges LLP ("Weil") and Evercore Group L.L.C. ("Evercore") as legal and financial advisors, respectively. (D.I. 277 at 7 ¶ 13; D.I. 560-1 at 2) As will be discussed in detail, the pending Motions are premised on business relationships between the Special Master's advisors, Weil and Evercore (the "Advisors"), on the one hand, and, on the

---

[2] Capitalized terms not otherwise defined in this Opinion have the meaning given to them in the Sixth Revised Proposed Sale Procedures Order (D.I. 481) or the model Long-Form Stock Purchase Agreement ("Model SPA") (D.I. 1557-1). Together, this SPO and Model SPA govern the Sale Process, which the Court will now briefly summarize to provide background.

The Sale Process began with an initial solicitation of bids, after which the Special Master was encouraged, but not required, to recommend a bid to the Court as a Stalking Horse, to set a floor for the bidding. (D.I. 1517 ¶ 10) The selection of a Stalking Horse (Red Tree) triggered the start of the Topping Period, during which bidders had a limited time to submit bids claiming to be superior to the Stalking Horse Bid based on the Court's Evaluation Criteria (i.e., price and certainty of closing). (*Id.* ¶¶ 14-15) After the Topping Period closed, the Special Master assessed all of the Qualified Bids that had been submitted during the Topping Period and, after consulting with the Sale Process Parties, made a Final Recommendation that the Court approve the Gold Reserve Bid. (*Id.* ¶ 16) At that point, the Sale Process entered a No-Shop Period, during which the Special Master was not permitted to solicit additional bids or engage with bidders without Court permission. (D.I. 1557-1 (Model SPA) § 6.16) However, Unsolicited Competing Proposals may be made at any time, including during the No-Shop Period. (*Id.*) When Unsolicited Competing Proposals were submitted after the Topping Period, the Special Master sought the Court's permission to engage with bidders making these proposals, which the Court granted. (*Id.*) The Special Master then determined that one of the Unsolicited Competing Proposals (from Elliott) was superior to his Final Recommended bid, which caused him to make an Updated Final Recommendation that the Court abandon the Gold Reserve Bid and approve the Elliott Bid. This gave Gold Reserve three business days to match or beat the Elliott Bid, and also gave Elliott an opportunity to improve its bid. (D.I. 1557-1 § 6.16(e)) At the end of that three-day period, the Special Master assessed the competing improved bids, by again applying the Court's Evaluation Criteria, and adhered to his Updated Final Recommendation; that is, that the Court approve the Elliott Bid.

other hand, Elliott Investment Management, L.P. ("Elliott"), the company whose bid to purchase the PDVH Shares is the subject of the Special Master's Updated Final Recommendation, and an Ad Hoc Group of Holders of PDVSA 2020 Bonds (the "2020 Bondholders" or "2020s"), who hold claims senior in priority to those of the Attached Judgment Creditors for whom this Court's Sale Process is being conducted, which claims would be essentially settled by the Elliott Bid recommended by the Special Master.[3] The Moving Parties view these relationships as creating conflicts of interest, requiring the disqualification of the Advisors from their role in this matter. The Movants further seek to impute these conflicts to the Special Master himself and, in the case of Gold Reserve, to the Court, which would require recusal of the Special Master and the undersigned Judge as well.[4]

The Movants contend they first discovered the factual bases for their claims during a September 9, 2025 deposition of Michael Turkel, Assistant General Counsel of Elliott Management Corporation. (*See* D.I. 2389 at 4 (Gold Reserve); D.I. 2392 (Venezuela Parties); *see also* Sept. 15, 2025 Tr. (D.I. 2500) at 341-42 (Turkel describing his current employment)) Turkel testified that Weil "serves as outside counsel for Elliott in connection with certain trading issues, credit issues and restructuring matters, and potentially other matters that [he] wouldn't personally be as aware of." (D.I. 2394 Ex. 7 at 243) The day after the Turkel deposition, Gold Reserve sought emergency relief relating to this potential conflict of interest, including a stay of the Sale Hearing

---

[3] For simplicity, the Court uses "Elliott Bid" to refer to the bid by Elliott Investment Management, L.P., which as a formal matter is actually a bid that would be consummated by Amber Energy, Inc., a newly-created entity that is wholly-owned by Elliott Investment Management, L.P. Similarly, for simplicity, the Court uses "Gold Reserve Bid" to refer to the bid by Gold Reserve Ltd., f/k/a Gold Reserve Inc., which as a formal matter is actually a bid that would be consummated by Dalinar Energy Corporation, a newly-created entity that is wholly-owned by Gold Reserve Ltd., f/k/a Gold Reserve Inc.

[4] The Court uses the terms "disqualification" and "recusal" interchangeably.

that was scheduled to begin days later, on September 15. (D.I. 2226)  On September 13, the Court denied the motion to stay while directing the Special Master to respond to Gold Reserve's request; the Court further noted that Gold Reserve could use some of its time at the upcoming Sale Hearing to address the purported conflict issue. (D.I. 2289)  At the opening of the Sale Hearing, Gold Reserve moved to disqualify the Special Master, as did the Venezuela Parties. (Sept. 15, 2025 Tr. (D.I. 2500) at 78-101)  In response, the Special Master offered to produce at least a portion of the requested discovery, and the Court ordered the parties to meet and confer and file several status reports to facilitate this process. (*See id.* at 116-17; *see also* D.I. 2327, 2343-46)  The Court denied the oral motions to disqualify, without prejudice to being renewed and briefed according to a schedule the Court provided after the initial four-day Sale Hearing and the ordered meet-and-confers. (*See* Sept. 15, 2025 Tr. (D.I. 2500) at 114-15; *see also* D.I. 2347 (setting schedule))

Subsequently, the Motions were renewed and fully briefed. (*See* D.I. 2384, 2389, 2450, 2455, 2472, 2475, 2480)  The Court heard oral argument on October 20, 2025. (*See* Oct. 20, 2025 Tr. (D.I. 2510))

## DISCUSSION

Both Motions seek recusal under the same statute, 28 U.S.C. § 455, although they are not identical.  Gold Reserve's motion seeks to disqualify the Special Master, his Advisors, and the Court based on appearance of bias under 28 U.S.C. § 455(a) and actual bias under 28 U.S.C. § 455(b)(1). (D.I. 2389)  The Venezuela Parties also bring their motion under § 455(a) and § 455(b)(4), the latter portion on the grounds that the Advisors have an interest in this proceeding that warrants disqualification, and that interest is further imputable to the Special Master himself, although not to the Court. (D.I. 2392)

4

The Special Master opposes the motions. (D.I. 2450)  So do two of the judgment creditors involved in the Court's Sale Process, Crystallex International Corporation ("Crystallex") and ConocoPhillips Petrozuata B.V. ("ConocoPhillips"), who are Sale Process Parties, as well as Elliott, the Special Master's currently-recommended bidder.  (D.I. 2455, 2480)  These entities argue that the Motions should be denied based on procedural defects – that they are untimely and press issues the Movants have waived – and on the merits.

The Court will first address procedural issues and then turn to the merits, beginning with appearance of bias and then the claims of actual bias and interest in the proceedings.  The Court will next consider the remaining issues, including the Venezuela Parties' contention that the Special Master has not satisfied his disclosure obligations of § 455(c) (D.I. 2392 at 18-19), and Gold Reserve's request for further discovery (D.I. 2389 at 19-20) and a stay of further proceedings (D.I. 2485).

## THE MOTIONS ARE PROCEDURALLY DEFECTIVE

The Motions are procedurally defective because they are untimely and because they are based on waived arguments.  Each of these are independent and sufficient grounds for denying both Motions.

### Timeliness

"[T]he Courts of Appeals cases that have addressed the issue have concluded that parties seeking disqualification under [28 U.S.C.] § 455(a) should do so in a timely manner."  *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3d Cir. 2004) (hereinafter "*Kensington II*"); *see also id.* at 294 (recognizing that motions under 455(b) must be made in timely manner); *see Omega Eng'g,*

*Inc. v. Omega S.A.*, 432 F.3d 437, 448 (2d Cir. 2005) (explaining motions for disqualification "must be brought at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim") (internal quotation marks omitted). The timeliness requirement serves two purposes: "a prompt application affords the district judge an opportunity to assess the merits of the application before taking any further steps that may be inappropriate for the judge to take" and "avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters." *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995). Because disqualification issues have arisen with some frequency in this matter, the Court has had occasion to explain the importance of this requirement and to deny previous motions based on untimeliness. (*See* D.I. 544 at 2-7; D.I. 1180 at 1-3) The Court has specifically warned that – in the context of this unusually complex, lengthy, sensitive, and expensive litigation – if a party believes it has a basis for asserting "meritorious grounds for disqualifying the special master," that is "an emergency that requires contacting the Court or doing your level best to contact the Court within a day, two days maybe, three days at most." (D.I. 544 at 6)

It is undisputed that the Special Master himself has not performed work for Elliott, its affiliates, or the 2020 Bondholders, and so the instant Motions are predicated on Weil and Evercore representing and advising those entities in matters unrelated to this litigation and further unrelated to the Court's Sale Process. The Movants' arguments are untimely because they have been on notice of the relationships they now attack for quite some time but they did not alert the Court of potential issues for months. Specifically, the Movants learned of Evercore and Weil's representation of Elliott, the 2020s, and their affiliates by no later than March 24, 2025, almost six months before they raised concerns with the Court in September 2025. The March date is when the Special Master provided responses to certain discovery requests that had been served by

6

CITGO and PDVH on October 16, 2024. (D.I. 2394 Ex. 3 at 1, 8) In particular, request for production of documents ("RFP") number 14 sought "[d]ocuments sufficient to identify any professional engagements in which [the Special Master] or [his] advisors performed work for any bidder participating in the sale process, whether or not work related to the PDVH Sale Process."[5] (*Id.* at 7) The term "bidder" was not defined in the RFPs. (*See id.* at 1-3 ("Definitions"))

It is also undisputed that the Special Master agreed, in March 2025, to produce, and later did produce, documents sufficient to identify professional engagements Weil had with Elliott – as Elliott was by then a bidder. He did not, however, produce documents relating to engagements Weil and Evercore had with *affiliates* of Elliott, since he believed (reasonably, as the Court explains later in this Opinion) that the RFPs were not seeking documents relating to affiliates of bidders. Hence, on or about March 24, 2025, Gold Reserve and the Venezuela Parties learned that Weil had represented Elliott for four weeks between July 17 and August 13, 2024. (D.I. 2386 Ex. 5) The Movants learned from the same responses that Weil had represented an individual owner of a large number of 2020 Bonds, between April 7 and September 8, 2023, and that Evercore had represented that same individual 2020 Bondholder in one inactive matter and one matter that was still ongoing at the time. (D.I. 2386 Ex. 5)[6] The Movants did not, however, then or for nearly six more months,

---

[5] It is undisputed that the RFPs did not seek documents concerning Weil and Elliott's representation of the 2020 Bondholders.

[6] The Special Master did not disclose the amount of fees from these representations in the March 2025 disclosures, presumably because RFP 14 did not request fee amounts. (D.I. 2394 Ex. 3 at 7) However, discovery later revealed Weil collected a total of $191,584 in fees from these two representations of Elliott. (D.I. 2386 at Ex. 8)

move to disqualify the Special Master or his Advisors on this basis, or even alert the Special Master or the Court that they believed a meritorious basis existed to move for the Special Master's recusal.

The Movants now argue that the Special Master's March 24, 2025 response to RFP 14 was a "misleading representation" because it did not include information regarding Elliott affiliates. (D.I. 2392 at 4-5 (capitalization normalized); D.I. 2475 at 3-5)  The Court is not persuaded.  RFP 14 (to which the Special Master objected as vague) sought information about "bidders," not information about bidders and their affiliates.  There was nothing misleading, or even incomplete, in responding to RFP 14 with information solely about Elliott and not also about Elliott's non-bidding affiliates.[7]

It is true, as the Movants emphasize, that the October 16, 2024 discovery request generally defined Elliott to "include[] all parents, affiliates, and all affiliated Persons." (D.I. 2394 Ex. 3 at 3; *see also* Oct. 20, 2025 Tr. (D.I. 2510) at 34)  This definition impacted the scope of several of the document requests, as they (unlike RFP 14) specifically sought documents relating to "Elliott Investment Management L.P." (*See* D.I. 2394 Ex. 3 RFP #1 (seeking production of "[a]ll communications, and related documents between [the Special Master] and . . . Elliott Investment Management L.P., or any of [its] advisors"), #18 (seeking production of "[a]ll communications, and related documents, related to financing commitments that . . . Elliott Investment Management

---

[7] Movants claim (D.I. 2392 at 5, 18) to find evidence of dishonesty in an email written by the Special Master's counsel at Weil on September 4, 2025, in which he said "neither Weil nor Evercore has had any engagements with any of the bidders that have participated since the start of the stalking horse period" (D.I. 2394 Ex. 6).  That statement was true: in the period since the Sale Process solicited potential Stalking Horse Bids, in February 2025, neither Weil nor Evercore represented any *bidder*, including Elliott.  Counsel was not speaking to whether the Special Master's Advisors had represented a bidder's *affiliate*, as neither RFP 14 nor any other discovery request to that point had sought such information.

L.P. have obtained in connection with the Sale Process")) CITGO and PDVH's decision to call

for production of Elliott's affiliates' documents in these other requests, by virtue of its definition

of "Elliott" as including affiliates, along with their decision *not* to include *affiliates* in RFP 14,

relating to Weil's and Evercore's representation of "any bidder," with "bidder" being undefined,

led the Special Master, not unreasonably, to understand he was being asked in RFP 14 only about

Elliott and not also about Elliott's affiliates.[8] *See* Fed. R. Civ. P. 34(b)(1)(A) (placing burden on

---

[8] At the October 20 oral argument (but not in the briefing), the Movants observed that the Special Master's March response to RFP 14 also provided documents relating to bidder "BV" but not relating to BV's affiliate, "SA." (Oct. 20, 2025 Tr. (D.I. 2510) at 172-83) (referring to D.I. 2386 Ex. 5 & Ex. 8 at 74-77) These disclosures are consistent with how the Special Master handled the Elliott disclosures and do not support the Movants' attacks on the Special Master's truthfulness. BV was, as of March 2025, a "bidder," but SA, a separate though related entity, was not. And RFP 14 did not seek information regarding *affiliates* of bidders.

The evidence and arguments raised by the Venezuela Parties for the first time after the October 20 hearing on the Motions are similarly unpersuasive. On October 24, 2025, the Venezuela Parties wrote to the Court to argue that the Special Master should have known RFP 14 sought information about Elliott affiliates because Elliott's June 2024 bid materials (and, later, its August 8, 2025 bid documents) state that the bid was submitted "on behalf of Elliott Investment Management L.P. (collectively with its affiliate 'Elliott,' 'we' or 'us')." (D.I. 2490 Ex. A at 1) The Court ordered the Special Master to respond to this letter, which he did (D.I. 2512), and then the Venezuela Parties replied (D.I. 2517). Having considered this new (and untimely) contention, the Court concludes it does not alter the overall analysis. Among other problems, the pages cited by the Venezuela Parties from the bid materials do not identify any Elliott affiliate by name, making it unclear whether these materials even provide any substantive content (e.g., a name) Weil and Evercore could have used to query their client databases.

At bottom, the Special Master's understanding of RFP 14 as seeking (in relation to Elliott) documents relating only to Elliott Investment Management, L.P., the sole Elliott entity that has been regularly referred to throughout the last 18 months of the Sale Process as a bidder – *see, e.g.*, D.I. 2180 at 11 n.13 (Venezuela Parties referring to bidder using the shorthand "Elliott"); D.I. 2183 at 9 & n.5 (same for Gold Reserve) – was entirely reasonable, particularly given that the RFPs included "affiliates" as part of some defined terms while not including "affiliates" in the term "bidder," as that latter term was undefined. As the Court noted above, the burden in specifying the

requesting party to "describe with reasonable particularity each item or category of items to be inspected"); *see also Veroblue Farms USA Inc. v. Wulf*, 345 F.R.D. 408, 418 (N.D. Tex. 2021) ("A Rule 34(a) request made with reasonable particularity does not require a reasonable attorney or party attempting to properly respond to ponder and to speculate in order to decide what is or is not responsive.").

The Moving Parties additionally argue that the Special Master's recent September 12 disclosure (D.I. 2386 Ex. 8) demonstrates that his March disclosure was deficient, and further shows he failed to meet his obligation to supplement discovery responses "in a timely manner if [he] learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). But because information related to bidder affiliates was not within the scope of RFP 14, the duty to supplement did not include any duty to make disclosures relating to affiliates. *See generally Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 540 (3d. Cir. 2007) ("[T]he duty of supplementation under Rule 26(e)(2) [regarding expert reports] does not

---

scope of a discovery request rests with the party seeking discovery. *See Veroblue Farms USA Inc. v. Wulf*, 345 F.R.D. 408, 418 (N.D. Tex. 2021).

Nor, despite the Special Master's objections in his responses and his production being limited to Elliott Investment Management, L.P., did the Venezuela Parties ever clarify their purported intent or seek clarification of the Special Master's position. In his initial responses to the October 2024 RFPs, the Special Master stated he would "produce a list of names of any bidder the Special Master or his advisors have performed work for and the date of any such engagements." (D.I. 2512 Ex. A) He did not say he would also disclose the names of any *affiliates* of any bidder, as clearly he (reasonably) did not view the RFPs as requiring him to do so. Yet the Venezuela Parties did not respond with any indication that they also sought documents relating to affiliates of bidders, nor do anything in this regard, until after the September 9 deposition of Mr. Turkel.

While the Movants are correct that the Special Master had an obligation to disclose conflicts of interest – and here, as the Court explains below, there were no such conflicts to disclose – that fact does not alter the obligation of a party seeking discovery to be clear about what it is seeking; nor does it ratchet up the obligation of a producing party to reinterpret and expand on what it reasonably understands is being sought.

require that a party volunteer information that was not encompassed within the scope of an earlier

discovery request") (internal quotation marks omitted); *see also Bistrian v. Levi*, 2022 WL 888878,

at \*7 & n.79 (E.D. Pa. Mar. 25, 2022) (citing *Bowers* for more general proposition that "[i]f an

earlier discovery request did not encompass the information, the duty to supplement does not

apply" under 26(e)(1)); *Avadel CNS Pharms. LLC v. Jazz Pharms., Inc.*, 2025 WL 2691118, at \*2

(D. Del. Sept. 19, 2025) (same).[9]

Finally, the Movants insist their Motions are timely because they learned materially new

information about Weil's and Evercore's representations only at the September 9 deposition of

Elliott Management Corporation's Mr. Turkel and from the Special Master's post-deposition

disclosures. (D.I. 2392 at 5-6) The Court disagrees. While Turkel's testimony and the Special

Master's September responses revealed details about the extent – including in terms of time,

timing, and revenue – of Weil's and Evercore's retentions by Elliott and Elliott's affiliates, this

new evidence was, with respect to the pertinent issue (namely the fact, rather than extent, of the

representation), cumulative of what the Movants had known since at least March: that Weil had

represented Elliott. Nor is there anything nefarious in the timing by which the additional details

were disclosed; it was only in September, at Turkel's deposition and then in the additional

---

[9] The Special Master acknowledges that his September 12 disclosures omitted one Weil representation of Elliott that spanned eight weeks in 2023 and produced $30,000 in fees. (Oct. 20, 2025 Tr. (D.I. 2510) at 177) The Court has seen no evidence that this oversight was anything other than the predictable, perhaps even inevitable, lack of perfection that can occur in a litigation of this magnitude. In any event, the omission is immaterial. The Motions are predicated on the purported existence of a conflict between the Advisors' representations of a bidder and their advice to the Special Master contributing to the selection of that bidder's bid. The Movants knew of the existence of the relationship between Weil and Elliott from the March 2025 disclosures. The recent disclosure of an additional eight-week representation, resulting in an additional $30,000 in fees for Weil, is merely cumulative of what Movants already knew.

11

discovery sought after it, that Movants expanded the previously-sought discovery to include the Advisors' representations of Elliott's *affiliates*.

As concerns timing, other important realities must be pointed out. This is the Venezuela Parties' fourth motion to disqualify the Special Master (not counting the oral motion at the Sale Hearing that the Court denied without prejudice), and it was filed just days before the start of the long-awaited Sale Hearing, at which the Court was scheduled to (and ultimately did) hear evidence relating to whether it should accept the Special Master's Updated Final Recommendation (D.I. 2123) and order the PDVH Shares – currently owned by PDVSA – be sold to Elliott, a recommendation the Venezuela Parties vehemently oppose. The Venezuela Parties have repeatedly, and candidly, made clear that their goal is to prevent the closing of any sale of the PDVH Shares. (*See, e.g.*, Oct. 21, 2025 Tr. (D.I. 2511) at 18) (counsel for PDVH stating that one of his client's goals in these proceedings is "to resist the sale as best [it] could") Gold Reserve, too, opposes the Special Master's most recent recommendation, which came about after the Special Master abandoned his original Final Recommendation that the Court approve a bid from Gold Reserve. (D.I. 2123; *see also* Sept. 17, 2025 Tr. (D.I. 2508) at 936 (Gold Reserve's CEO testifying that success of its bid is "an existential thing" for Gold Reserve)) Strikingly, Gold Reserve has suggested that the conflicts it alleges plague the Court's Sale Process only matter if the Court is going to approve the Elliott Bid and do not prevent the Court from instead approving Gold Reserve's bid. (*See* Sept. 15, 2025 Tr. (D.I. 2500) at 91) ("To the extent the judge is not ruling in favor of the taint and the direction of the taint, there's no [disqualification] concern. However,

once the judge start[s] to rule in the direction of the perceived taint, potentially perceived taint, this becomes the issue."))

While the Court need not make any finding as to the motivations underlying the Motions, the Court is mindful that it must prohibit the "knowing concealment of an ethical issue for strategic purposes." *In re Kensington Int'l Ltd.*, 353 F.3d 211, 222 (3d Cir. 2003) (hereinafter "*Kensington I*"). When "a litigant with knowledge of circumstances suggesting possible bias or prejudice hold[s] back" its purported concerns about disqualifying conflicts, "while calling upon the court for hopefully favorable rulings," yet "then seek[s] recusal when they [i.e., such rulings] are not forthcoming," that litigant's motion to disqualify must be denied. *Kensington II*, 368 F.3d at 312 (internal quotation marks omitted). Here, it is undeniable that both the Venezuela Parties and Gold Reserve have every incentive to prevent – or, at minimum, delay, in part by creating more work – the Court (with the necessary assistance of the Special Master and his Advisors) from completing its evaluation of the Updated Final Recommendation and the pending objections (from the Movants) to it.

The Motions here are untimely and, for that reason, are denied.


Waiver

Disqualification under 28 U.S.C. § 455(a), for appearance of bias, "may be waived by the parties." *Kensington I*, 353 F.3d at 220-21. By contrast, "the grounds for disqualification under § 455(b) generally cannot be waived." *Id.* The portions of the Motions seeking disqualification

under § 455(a) are predicated on grounds the Movants have waived and, for that reason too, are denied.

In 2021, when the Court approved the Special Master's engagement of Weil and Evercore, it further approved of him entering into retention agreements with his Advisors containing industry standard terms, and those terms permitted the Advisors to represent – in unrelated matters – entities that were, are, or might become involved in this Sale Process. (D.I. 277 ¶ 13) (authorizing Special Master to appoint legal and financial advisors) Evercore's engagement letter, which was provided to the Sale Process Parties, including the Venezuela Parties, by no later than October 2022, when it was placed on the Court's public docket (D.I. 480), disclosed that:

> Evercore or one or more of its affiliates may in the past have had, and may currently or in the future have, investment banking, investment management, financial advisory, or other relationships with the Sale Process Parties and their affiliates [and] potential parties to any transaction and their affiliates.

(D.I. 480-1 Ex. 3 ¶ 17) Weil's engagement letter contained similar language: "[Weil] may represent other present or future clients adversely to [the Special Master] in matters not substantively related to the work we are doing for you." (D.I. 2450 Ex. B)[10]

The Venezuela Parties objected to the engagement of Evercore, and in support of their objection they pointed to a particular provision of the Evercore engagement letter relating to

---

[10] As the Movants point out, Weil's retention letter was not shared with the Sale Process Parties in 2021. (D.I. 2468 at 2) It is likewise true that the Moving Parties did not request to see it. (*See, e.g.,* D.I. 2450 at 7 n.5) Reasonable attorneys should have expected that Weil's letter contained a current representation clause similar to Evercore's. The form retention letter for Gold Reserve's attorneys, for example, includes a similar provision. (*See Norton Rose Fulbright Standard Terms of Engagement* § 7.3, available at https://www.nortonrosefulbright.com/en/about/standard-terms-of-engagement (last visited Nov. 10, 2025)) The Court is persuaded this is an industry standard provision, of which the Movants had at least constructive knowledge. *See Goldman Sachs & Co. v. Athena Venture Partners, L.P.,* 803 F.3d 144, 148-49 (3d Cir. 2015) (holding that "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person," may result in waiver of conflict-of-interest claim).

compensation. (D.I. 354 at 1-3)  As they now admit, they did not "single out" the conflicts provision. (Oct. 20, 2025 Tr. (D.I. 2510) at 81)  Their waiver of the grounds on which they now seek to disqualify Evercore (and, by extension, the Special Master) is plain: they had undisputed knowledge of Evercore's possible "current[]" and "future" "relationships with . . . potential parties to any transaction and their affiliates," including bidders for the PDVH Shares; had every reason to draw to the Court's attention anything objectionable about the Special Master's desire to retain Evercore (which they were objecting to); and yet chose not to object on the basis of these current or future relationships. This is a waiver. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 225 (3d Cir. 2007) ("Waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted).

By in or around March 2025, at the latest, the Venezuela Parties and Gold Reserve intentionally and voluntarily relinquished their rights to challenge Weil's and Evercore's retention, in unrelated matters, by participants in the Sale Process. Even if the Court assumes the Movants lacked actual knowledge of the provisions of the retention agreements highlighted above, the Movants knew of the existence of representations by Weil and Evercore via the Special Master's March 2025 disclosures, as already described in the timeliness discussion above. By no later than this time, the Movants had actual or constructive knowledge of the same grounds for seeking disqualification on which they now base their Motions, yet they chose not to move for

disqualification until September.  The Movants did not learn anything materially new between March and September.  Thus, the Court finds that they waived the basis for their motion.

The portions of the Motions seeking disqualification pursuant to § 455(a) are predicated on waived grounds and, for that independent reason, those portions are denied.

### THE MOTIONS ARE MERITLESS

Even if the Motions were not untimely and, in part, waived, they lack merit.  Below the Court explains its reasoning for this conclusion with respect to § 455(a) and, thereafter, § 455(b)(1) and (b)(4).

### A Reasonable Person, with Knowledge of All the Facts, Would Not Reasonably Question the Impartiality of the Court, Special Master, or Advisors

#### *Legal Standards*

Title 28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The requirement to avoid the appearance of bias extends to court-appointed special masters.  *See* Fed. R. Civ. P. 53(a)(2).  It further extends to advisors hired by a special master to assist him in fulfilling his court-ordered duties.  *See In re Brooks*, 383 F.3d 1036, 1045-46 (D.C. Cir. 2004) (suppressing special master's work product due to conflicted advisors).[11]

---

[11] In evaluating an earlier motion to disqualify the Special Master, the Court observed:

> While the Special Master is subject to 28 U.S.C. § 455, the parties have not directed the Court to any cases applying the statute to a special master who has been tasked with implementing a judicial sale to satisfy a judgment.  Nor has the Court found any such case.  Thus, there appears to be no case law directly supporting the Venezuela Parties' position.

Consequently, a judge, special master, and advisor must, pursuant to § 455(a), recuse themselves whenever "a reasonable person, knowing all of the circumstances," would question their ability to render a fair and impartial decision. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988); *see also San Paula State of the Federative Republic of Brazil v. Am. Tobacco Co.*, 535 U.S. 229 (2002) (same). As the Third Circuit has stated, recusal is required whenever "a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *Kensington I*, 353 F.3d at 220.

Importantly, the test for recusal under § 455(a) is from the perspective of a "reasonable layperson," because "people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg*, 486 U.S. at 864-65. The pertinent "hypothetical reasonable person" is "someone outside the judicial system" but she is also someone who is "fully informed of all the surrounding circumstances." *Kensington II*, 368 F.3d at 302-03; *see also United States v. Ciavarella*, 716 F.3d 705, 719 (3d Cir. 2013) (explaining that analysis is from "perspective of a reasonable observer who is informed of all the surrounding facts and circumstances"). "[L]argely inaccurate and uninformed opinions cannot determine the recusal question." *Ciavarella*, 716 F.3d at 719. Just as the Court must be careful to take account of "all of the surrounding facts and circumstances" that would be known to the reasonable observer, *Ciavarella*, 716 F.3d at 723, it must also take care not to give this hypothetical observer too much credit and mistakenly treat such a person as a sophisticated insider, for instance an experienced transactional attorney or investment banker, *see Kensington II*, 368 F.3d at 302-03 (reversing

---

(D.I. 443 at 7) Although this statement continues to be accurate, the Court assumes, without deciding, that the Movants' contention that § 455 applies to the Special Master and his Advisors in the same way it applies to the Court is correct.

17

district court determination that § 455(a) motion should be assessed from perspective of someone with "professional skills and experience in mass-tort [asbestos-related] bankruptcies sufficient to understand the facts presented" as reasonable layperson "must be someone outside the judicial system").

"[T]he burden of establishing a disqualifying interest rests on the party making the assertion." *Schweiker v. McClure*, 456 U.S. 188, 196 (1982). This burden is especially difficult to meet when a party moves for disqualification in a "massive proceeding such as this," after the court has "invested substantial judicial resources." *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001).[12]

### Parties' Arguments

The Movants insist that the Special Master's Advisors are conflicted due to their role advising and representing Elliott and the 2020 Bondholders, even in unrelated matters. In their view, these relationships give rise to bias and financial interests in this proceeding, and, at minimum, the appearance of these types of disqualifying conflicts.

The Moving Parties emphasize that, over the past four years, Weil has earned fees from its representation of Elliott and Elliott's affiliates.[13] These amounts, they contend, are substantial, and

---

[12] This matter is clearly a "massive proceeding" involving the "invest[ment of] substantial judicial resources," as described in *Martin*, 240 F.3d at 226-27. This case is in its ninth year and the docket now exceeds 2500 entries. In the past two months alone, the Court has held a half-day hearing on the disqualification motion and heard five days of evidence and argument on the merits of the Updated Final Recommendation and objections to it; it has also reviewed thousands of pages of pre- and post-hearing briefing.

[13] The Movants have suggested that the Advisors' engagements with Elliott and the 2020s began only after the Advisors were retained by the Special Master in connection with the Sale Process. (*See, e.g.*, Oct. 20, 2025 Tr. (D.I. 2510) at 54) The only support they have cited for this

increasing. In 2023, such fees totaled less than $300,000, then quadrupled in 2024 to $1.2 million, and climbed far further to more than $3.1 million in the first half of 2025. (D.I. 2386 Ex. 10)

The Moving Parties further point to over $62 million in fees that Weil has garnered from its representation of 2020 Bondholders and their affiliates, again in unrelated matters since 2021. (D.I. 2386 Ex. 21) The Movants also note an additional nearly $31 million Weil was paid for representation of ad hoc groups that included one or more 2020 Bondholder, bidder, or affiliate of either. (D.I. 2386 Ex. 8 n.1 & Ex. 19 n.1) Certain of these representations are ongoing, so these amounts are incomplete and will only increase. (D.I. 2385 at 6, 8) (citing D.I. 2386 Exs. 11, 18-21)

The Moving Parties do not rely solely on money paid to Weil by Elliott and the 2020s and their respective affiliates. They also focus on the lack of any "wall" within Weil to screen off the attorneys advising the Special Master from those who are doing work for Elliott, other bidders, the 2020s, or affiliates. The Motions identify Weil attorneys who have represented the Special Master in this proceeding and have also represented Elliott (in unrelated matters). (D.I. 2386 Exs. 12-13) One lawyer, Jeffrey Saferstein, has represented Elliott and also Apollo Global Management, a major investor in the Elliott Bid; prior to joining Weil, Saferstein worked at another law firm, Paul, Weiss, Rifkind, Wharton, & Garrison, LLP, with Michael Turkel, now of Elliott Management Corporation. (D.I. 2385 at 6-7) (citing D.I. 2386 Exs. 14-16) In discovery, the Movants obtained an email, showing that on the day before Topping Bids were due in the Sale Process, a frustrated Turkel called Saferstein, seeking some level of assistance with a bid Elliott planned to make, and

---

allegation is the lack of record evidence of engagements predating 2021. That is the extent of the record evidence, however, only because the scope of discovery sought by the Movants was for engagements beginning in 2021. (*See* D.I. 2223; *see also* Oct. 20, 2025 Tr. (D.I. 2510) at 91 (counsel for Special Master making this point and representing that Weil was retained by Elliott affiliates well before 2021))

Saferstein thereafter wrote to his Weil colleagues working with the Special Master to intone: "I [would] hate for them [i.e., Elliott] to not want to work with us." (D.I. 2386 Ex. 2)  The Moving Parties point out that the Special Master's lead counsel, Chase Bentley, was being considered for promotion to partnership in this very timeframe, and Mr. Saferstein was the head of the restructuring group, of which Mr. Bentley is a member, making it implausible to believe Bentley would do anything other than satisfy Saferstein.  (D.I. 2392 at 7)

The Movants also raise concern with the work Evercore has performed.  While Evercore has never directly represented Elliott or affiliates of Elliott,[14] Evercore has collected over $16.5 million in fees from other bidders and their affiliates.  (D.I. 2386 Ex. 23)  Evercore is also negotiating a new engagement with an ad hoc group in which Elliott holds a near-majority interest, which could generate fees of millions of dollars more.  (*Id.*)  Furthermore, Evercore has numerous engagements with individual 2020 Bondholders, which have resulted in $24.4 million in fees.  (*Id.*))  Evercore also collected $25 million in fees from ad hoc groups involving Elliott, its affiliates, or individual 2020 Bondholders and their affiliates.  (*Id.*)

Lastly, the Moving Parties assert that the Special Master's decisionmaking in the Sale Process has consistently, and inexplicably (until the purported conflicts were exposed), favored Elliott and the 2020 Bondholders.  (D.I. 2392 at 13)  They claim to finally understand why the Special Master has, in their view, run the process in a manner advantaging Elliott, concluding it must be because his Advisors are beholden to Elliott, as a result of their extensive, ongoing representations of Elliott.  (*See, e.g.*, D.I. 2392 at 13 ("[T]hese conflicts provide an explanation for

---

[14] The Venezuela Parties assert, without citing to the record, that Evercore has collected $13.4 million in fees from affiliates of Elliott.  (D.I. 2385 at 13)  The Special Master disputes this allegation, indicating that these fees were derived from representations of ad hoc groups in which an Evercore affiliate was a member.

why the [Special Master] and his advisors . . . have made a series of decisions that the [Venezuela Parties] have long noted appeared to serve only Elliott and the 2020s."); *see also* D.I. 2389 at 17 ("Weil and Evercore have concealed their true relationships with Elliott and the 2020 Bondholders, whose interest the Special Master has consistently favored for no other apparent reason.")) The Movants' evidence of the Special Master unfairly advantaging Elliott and the 2020s is as follows:

- Granting Elliott exclusivity in the data room during the first round of bidding in August 2024 and working exclusively with Elliott from then until recommending Elliott's bid on September 27, 2024.

- Treating a settlement with the 2020s, or somehow persuading the 2020s to be supportive, as a gatekeeping issue for any successful bid.

- Recommending Red Tree Investment LLC's ("Red Tree") stalking horse bid, which had a lower headline price than other stalking horse bids received, including Gold Reserve's, but included a settlement with the 2020s.

- Encouraging Gold Reserve's affiliated acquisition vehicle to reach a settlement with the 2020 Bondholders during the Topping Period.

- Recommending the Elliott Bid as a Superior Proposal and requesting permission to terminate the Gold Reserve Stock Purchase Agreement ("SPA"), all because the Elliott Bid included a settlement with the 2020 Bondholders, even though its headline price was nearly $2 billion lower than that of the Gold Reserve Bid.

- Recommending, after the three-day match period, the improved Unsolicited Competing Proposal of Elliott as his Updated Final Recommendation, instead of the improved Gold Reserve Bid.

(D.I. 2389 at 8-13; D.I. 2392 at 13)

At bottom, the Moving Parties insist that the Special Master's Advisors "cannot provide impartial advice in these proceedings when they simultaneously have direct and highly lucrative relationships with parties who in turn have direct interests in these proceedings." (D.I. 2389 at 16) They further assert that the Advisors' purported conflicts have "actually affected the Special Master's decisions." (*Id.*) (internal alterations and quotation marks omitted)

21

All of the foregoing arguments and allegations are countered by the Special Master, Crystallex, ConocoPhillips, and Elliott (collectively, the "Opponents"), each of whom filed a brief and presented oral argument in opposition to the Motions. With respect to the payments made to Weil for its representations of Elliott and its affiliates – in matters *unrelated* to the Sale Process, as the Opponents repeatedly emphasize (*see, e.g.*, D.I. 2455 at 14; D.I. 2480 at 12-13; D.I. 2450 at 2-3) – the Opponents point out that the total, approximately $4.5 million, is just .05% of all of Weil's revenues from 2021 to 2025, hardly a material amount; it is also far less than the $39.4 million Weil has billed for its representation of the Special Master in this Sale Process. (D.I. 2450 at 7-8) More importantly, they note that just $191,584 of these fees were the result of Weil's representation of Elliott Investment Management L.P., the actual bidder here. (D.I. 2450 at 14) (citing D.I. 2386 Ex. 8 at 1-2) The bulk of the $4.5 million in fees was for representations of Elliott affiliates, almost entirely for Elliott Advisor's (UK) Ltd. (D.I. 2386 Ex. 8) The Special Master also admits that Weil collected just over $2 million in fees from other bidders and their affiliates, but these representations do not form the basis of the instant Motion. (*Id.*) As for Weil's representation of individual 2020 Bondholders (or their affiliates), which resulted in over $62 million in fees, and the $31 million in fees derived from ad hoc groups that included an Elliott affiliate or a 2020 Bondholder, the Opponents stress that these create no conflict because none of the represented entities are parties here, and because the approximately $93 million garnered from these representations pales in comparison to Weil's multibillion dollar annual revenue over the same relevant period, 2021-2025. (D.I. 2450 at 7-8)

Turning to the lack of a wall separating attorneys representing the Special Master and those who have or continue to represent Elliott, the 2020s, or their respective affiliates, the Opponents explain that there is no conflict of interest, so there is also no need to screen off these attorneys

22

from one another. (D.I. 2455 at 14-19; D.I. 2450 at 18) They also offer an innocuous explanation of the email reflecting Mr. Saferstein's interaction with the Weil attorneys who were representing the Special Master. (D.I. 2450 at 17-18) They point out that the evidence shows Mr. Bentley did nothing more than communicate to Elliott Management Corporation's Mr. Turkel the same facts he told other potential bidders: telling him the deadline for Topping Bids, that the deadline was set by the Court and could not be moved by the Special Master, and that it would be better to submit a complete, conforming unsolicited Competing Proposal after the Topping Period rather than a non-qualifying bid during the Topping Period, which the Special Master would be required by the Sale Procedures Order to reject. (D.I. 2450 at 17-18; D.I. 2480 at 14) The Opponents also make the common sense point that any lawyer, just like any professional in any field, hopes to keep clients happy and would "hate" to lose business, but this reality does not mean that the lawyer (or other person in a service industry) will act unethically to do so (or even be suspected by a reasonable, knowledgeable observer to be motivated to act in such a manner). (D.I. 2450 at 20)

As for Evercore's fees, the Opponents stress that Evercore never represented Elliott or its affiliates, and that all of the relevant fees related to Elliott were not directly from Elliott but from ad hoc groups involving Elliott affiliates and all for work that was entirely unrelated to the Sale Process.[15] (D.I. 2450 at 7-8) They also explain that Elliott and its affiliates are well-known for being an outspoken "activist shareholder" (that is, an entity which regularly purchases large stakes in companies with a goal of influencing management) while Evercore is a market leader in defense-side representations, assisting management in battling against just this type of activist shareholder. (D.I. 2455 at 7-8) Emails produced during discovery, showing internal discussions at Evercore as

---

[15] As the Special Master points out (D.I. 2450 at 7.8), Evercore received $16.5 million in fees from other bidders and their affiliates, for matters unrelated to the Sale Process.

to whether it would be a "conflict" to work with ad hoc groups that included Elliott or its affiliates, relate to whether working with a leading activist shareholder in any respect would harm Evercore's defense-side business. (D.I. 2386 at Ex. 24)  They also emphasize that $25 million of the $66 million of Evercore fees about which the Movants raise suspicions were generated from representations of ad hoc groups that happened to include among their memberships an Elliott affiliate or an individual 2020 Bondholder; these were not direct representations of the Elliott affiliate or 2020 Bondholder but, instead, of groups that included them. (D.I. 2450 at 7-8; *see also* D.I. 2386 Ex. 23)  In some of these ad hoc groups, the Elliott affiliate or 2020 Bondholder was just a small participant in the overall group. (D.I. 2386 Ex. 23)

Last, the Opponents dissect the Movants' selective telling of the chronology of the Sale Process and illustrate the unreasonableness of the portrayal of that process as being skewed in favor of Elliott or the 2020s. Each of the points at which something positive happened for Elliott was, they explain, the result of extensive litigation, in which all interested entities, including the Venezuela Parties and Additional Judgment Creditors like Gold Reserve, had an opportunity to be heard. (Oct. 20, 2025 Tr. (D.I. 2510) at 47-48, 50, 74-75)  While the events highlighted by the Moving Parties did happen, so too did many other events, including events that were unfavorable to Elliott. These include Elliott's first 2024 bid and its alternative 2024 bid having to be abandoned, in the face of widespread opposition to it from Sale Process Parties and Additional Judgment Creditors, after the Court rejected the Special Master's motion seeking to enjoin certain "alter ego" litigation pending against the Venezuela Parties in other courts; Elliott's 2025 bids not being recommended by the Special Master as the stalking horse or after Topping Periods; and Elliott, by virtue of being selected the updated final recommended bid only *after* the Topping Period concluded, being liable to pay $75 million to Red Tree (the Stalking Horse Bidder) and $30 million

to Gold Reserve (which was the final recommended bidder before Elliott's unsolicited Competing Proposal was deemed a Superior Proposal), expenditures that are hardly evidence of favoritism. (D.I. 2455 at 3)

As will be explained further below, the Court finds that each of the Movants' contentions lacks merit while each of the Opponents' arguments are persuasive and well-supported in the record. A reasonable lay observer with knowledge of all relevant facts would not have reason to question the impartiality of the Special Master or his Advisors.

*The Knowledge of the Pertinent, Reasonable Observer*

This litigation – which essentially requires the Court to oversee a Sale Process to sell the nation's fifth-largest petroleum refining company, which is ultimately owned by a foreign sovereign nation that is currently headed by a government not recognized by (but instead sanctioned by) the United States, in order to satisfy judgments (of in excess of $22 billion) that total more than even the highest record valuation of that property (approximately $18.6 billion), generating innumerable disputes between the Venezuela Parties and all other participants as well as among creditors of different degrees of seniority, all the while being mindful of litigation in other courts (including the Southern District of New York as well as state courts in Delaware and Texas) that can impact this process, and with knowledge that in the end even a Court-approved sale cannot go to closing without the approval of the Executive Branch (whose Office of Foreign Asset Control, within the Department of Treasury, must grant a license for any deal to be consummated) – is unique in terms of its scale, complexity, duration, cost, and other respects. Crucial to assessing the merits of the pending Motions under the applicable law is that the

reasonable observer, from whose perspective the Motions must be resolved, would understand these unique realities.

In particular, the pertinent, reasonable observer would know at least all of the following:[16]

- The PDVH Shares derive their value entirely from indirect ownership of CITGO, an oil refining company and ongoing concern. The sale of the PDVH Shares is, therefore, a complex process that requires expertise and experience in a wide variety of areas, including corporate law, mergers and acquisitions, finance, tax, antitrust, and regulatory matters.

- The PDVH Shares are being sold according to a Delaware law, 8 Del. C. § 324, that requires them to "be sold at a public sale to the highest bidder." The Special Master was retained (and, in turn, the Special Master retained Weil and Evercore) to set up a process culminating in a public sale of the PDVH Shares, essentially an auction in which nobody could predict who would show up at the sale. (Oct. 20, 2025 Tr. (D.I. 2510) at 29)

- The Court, lacking the necessary expertise and experience, and also lacking the time needed to manage the day-to-day marketing of a large petroleum refining company and to negotiate the elaborate documentation required to complete a sale, needed to appoint a qualified Special Master. (*See* D.I. 443 at 10) (Court explaining it "would not be able to undertake [the sale] successfully without the Special Master's assistance")[17]

- Implementing and managing the Sale Process is extremely challenging, requiring the assistance of a Special Master. (Oct. 20, 2025 Tr. (D.I. 2510) at 26; *see also* D.I. 443 at 10 (holding that reasonable, knowledgeable person would know Court has given Special Master "monumental and challenging" task))

---

[16] At the hearing, the Movants largely agreed to many of these pertinent facts. Those that at least one Moving Party expressly agreed would be known to the pertinent reasonable observer are followed by a citation to the transcript of the October 20 oral argument. To the extent any of the facts listed are contested, the Court finds that a reasonable observer with knowledge of all relevant facts – which is, again, the perspective the Court must adopt in evaluating the Motions – would know all of what is listed.

[17] Gold Reserve excerpts a benign statement the Court made in an *ex parte* conference observing that the undersigned Judge has other cases, and therefore is "dealing with other things," so is not involved with what the Special Master is "doing day-to-day," and learns about major developments (such as bids and the Special Master's recommendations) through briefs and formal filings. (*See* D.I. 2475 at 10) Gold Reserve confirmed at the hearing that it is not suggesting the undersigned Judge has done something wrong in this regard or is supposed to be running the process day-to-day. (*See* Oct. 20, 2025 Tr. (D.I. 2510) at 37)

- The Special Master appointed by the Court, who was recommended by the Venezuela Parties, is highly qualified, but creating and managing the Sale Process is not something "one man can[] do," so the Special Master needed qualified and experienced advisors, "folks who have done this sort of thing before." (Oct. 20, 2025 Tr. (D.I. 2510) at 39-40)

- Specifically, the Special Master required expert legal and investment banking assistance. (*See, e.g.*, D.I. 348 ¶ 2 (Special Master explaining he needs attorney advisors in order to "maximize the value of the PDVH Shares"); *id.* ¶ 14 (Special Master stating that "[t]he resources, capabilities, and experience of Evercore in advising [him] . . . is critical to obtaining a value-maximizing Sale Transaction"))

- To date, these Advisors, Weil and Evercore, have worked thousands of hours on behalf of the Special Master. Weil alone has been paid (by the Sale Process Parties and Additional Judgment Creditors) approximately $39.4 million for its work. (D.I. 2450 at 7-8)

- Firms qualified to provide the Special Master competent advice typically have regular interactions with the types of entities who may be interested in buying an asset like the PDVH Shares. (*See generally* D.I. 348 ¶¶ 11-12 (Special Master selecting Weil based on its "excellent reputation and strong track record of relevant experience" in "the sale of complex and large assets, particularly in a Court supervised process and distressed situation"); *see also* D.I. 2389 (Gold Reserve observing that "Elliott is one of the most prominent restructuring and distressed asset firms in the world, which is the very core of Weil's business"); D.I. 2480 at 2 (Crystallex stating "had the Special Master retained professionals with no such relationships, he would have fairly been chargeable with incompetence, as it was inevitable that any financial or legal advisor who could give him the sort of advice he needed would have represented, or been adverse to, other financial actors, some of whom are among the largest in the world, that have appeared in this case"))

- Evercore and Weil are large, international firms that have enormous annual revenues and a vast number of clients.

- The Sale Process Parties, including the Venezuela Parties, were in regular contact with the Special Master as he formulated and implemented the Sale Process. (*See, e.g.*, Oct. 20, 2025 Tr. (D.I. 2510) at 126) (Crystallex counsel explaining that "the Court designed a transparent process that put the [Sale Process Parties] at the table so that there would be some creditors at least that would have knowledge of what was going on in the process on a [regular] basis and that included . . . Crystallex, ConocoPhillips and the Venezuela Parties. And as a result of that process, [the Sales Process Parties] were privy to

information about who was sending in stuff over the transom, what was going on.")

- The 2020 Bondholders are parties to a pledge that they assert gives them control over 50.1% of CITGO's assets. While the validity of the 2020 Bonds is disputed – and was the subject of litigation in the Southern District of New York, which found the bonds valid under governing Venezuela law, a judgment now on appeal to the Second Circuit – and the ability of the Bondholders to interfere with or enjoin this Court's Sale Process is also controverted, some amount of attention (that amount being contestable) to the 2020s is required by anyone interested in selling or buying the PDVH Shares.

- Elliott and the 2020 Bondholders are not, as a formal matter, parties to this case. Elliott is a bidder for the PDVH Shares and, as part of its bid, it reached an agreement with an ad hoc group representing 75% of the 2020s who have pledged to support the Elliott purchase, and not try to block it.

- During the Sale Process, every interested entity had the opportunity to litigate each one of the Special Master's decisions that form the basis of the disqualification motions. Elliott has lost at certain major points in the Sale Process, and the Court did not always accept the Special Master's recommendations. (Oct. 20, 2025 Tr. (D.I. 2510) at 47-48, 50, 74-75)

- The Sale Procedures Order provides for the possibility of an unsolicited Competing Proposal like Elliott's to displace the Special Master's Final Recommendation. (Oct. 20, 2025 Tr. (D.I. 2510) at 78-79)

- Evercore is a very large anti-activist firm that is regularly adverse to Elliott, an activist shareholder hedge fund.

- The 2020 Bonds are a transferable asset, so the list of entities that own 2020 Bonds is subject to unpredictable change.

- As a result of Elliott's latest bid having been submitted as an unsolicited Competing Proposal, Elliott enjoys no bidder protections and must pay up to $105 million in fees to other bidders. (Oct. 20, 2025 Tr. (D.I. 2510) at 51)

*This Public Sale is Very Public, Reducing Opportunities for Mischief*

The Special Master has not been running a covert Sale Process. Each of the Special Master's major decisions was scrutinized by the Sale Process Parties, Attached Judgment Creditors, other interested entities, and the Court itself. Notably, the Venezuela Parties were

designated early on as Sale Process Parties, meaning they played an active role in the shaping and implementation of the Sale Process, and literally had a "seat at the table" as the Special Master evaluated competing bids. (Collectively, the Sale Process Parties include the senior-most creditor, Crystallex; a large creditor, ConocoPhillips, who has judgments at the top, middle, and near the bottom of the priority order; and the judgment debtor and its affiliated entities.) Relatedly, as even the Venezuela Parties have had to acknowledge, the Court's Sale Process is one of the most, if not the most, widely publicized judicial sales ever held. (*See* Sept. 15, 2025 Tr. (D.I. 2500) at 311) (Randall Weisenburger, Venezuela Parties' expert, agreeing that sale of PDVH Shares was "extensively publicized") "Every move by the Special Master was scrutinized. Every party had ample opportunity to object." (D.I. 2450 at 2) A reasonable observer would not conclude that, under these circumstances, the Special Master or his Advisors would think they could conceal disqualifying conflicts of interest or improperly favor any bidder or other interested entity (e.g., 2020s).

*The Email Messages and Other Communications Between Elliott and the Advisors Would Not
Cause the Pertinent Observer to
Question the Impartiality of the Special Master, His Advisors, or the Court*

The Moving Parties rely heavily on a pair of email exchanges among Weil partners that took place on June 24, 2025, the day before the Court-imposed deadline to submit Topping Bids eligible for consideration as the Special Master's Final Recommendation. (*See* D.I. 2386 Exs. 2 & 18) At the time, Elliott was trying to decide whether it should submit its Topping Bid even though it would be deemed non-conforming under the Sale Procedures Order, since it relied on a settlement with the 2020 Bondholders that was not yet executed. The emails are between Weil partner Jeffrey Saferstein – who heads Weil's restructuring department and served as Elliott's client

contact but is not part of the team advising the Special Master – and Weil restructuring partners Chase Bentley and Matt Barr, who represent the Special Master in this matter.

In the first email, Saferstein informed his partners of a call he received from Elliott Management Corporation's Assistant General Counsel, Michael Turkel, and asked Bentley to "please speak to" Turkel, adding he would "hate for [Elliott] to not want to work with us." (D.I. 2386 Ex. 2) Saferstein further told Bentley that Turkel was "just looking for someone to have a conversation with." (*Id.*) It is apparent, and a reasonable observer with knowledge of all surrounding facts and circumstances would understand, that Turkel contacted Saferstein to communicate his frustration that the Court-imposed deadline to submit final bids would not be extended, and Elliott would therefore be unable to submit a conforming bid on time. Bentley and Barr responded to Saferstein that they had already "told [Turkel] that his bid needs to be done by tomorrow (because that's what the court requires)." (*Id.*) They would make themselves available to talk to Turkel, just as they talked to all potential bidders throughout the Sale Process, but they could not "do anything other than tell others," such as the 2020s, "to talk to" Elliott, and could not force the 2020s to reach a deal with Elliott. (*Id.*) None of this is evidence that the Advisors did anything that was in any way improper and there is no reasonable basis to speculate that they did.

The second exchange, later the same day, was also among Weil attorneys Saferstein, Bentley, and Barr. Bentley wrote to Saferstein and Barr saying he had spoken to Turkel and would "debrief" them about the call "in the next day or so." (D.I. 2386 Ex. 18) When Barr replied that this sounded "ominous," Bentley responded that although "Turkel was frustrated for most of the call, as he always is," two other Elliott-affiliated representatives on the call "realized that in the end we were saving them some money in commitment fees in the event they deliver us a half-baked deal tomorrow," which would have to be rejected as non-conforming. (*Id.*) Bentley then

predicted that Elliott would "submit something not fully committed in the morning and then wait to see what our final recommendation is on July 2 and try to beat that with an unsolicited offer." (*Id.*)

Contrary to the Moving Parties' insinuations, nothing Bentley said to Elliott on this call was anything other than what Elliott could discern for itself – and, no doubt, already knew – from looking at the Court's Sale Procedures Order and model SPA. According to those documents, which had been public for months (and were crafted only after extensive litigation), the Sale Process began with the Special Master soliciting stalking horse bids. (D.I. 1517 at ¶ 10) A stalking horse is "an entity that is willing to place a bid on a debtor's asset in order to either set a baseline bid from which the true value of the [asset] can be assessed or serve as a catalyst to inspire other bidders." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 744 (3d Cir. 2021). Consistent with this purpose, and as part of the Sale Process here, a stalking horse is provided with certain bidder protections ("Stalking Horse Bid Protections") to encourage it to submit a bid that may ultimately be unsuccessful due to the appearance of a superior bid during a designated time, which is referred to here as the Topping Period. (D.I. 1517 ¶¶ 14-16) (providing that Special Master must, at conclusion of Topping Period, consult with Sale Process Parties and then may make Final Recommendation that represents "the best bid after application of the . . . Evaluation Criteria") Certain protections also extend to the bid selected as the Special Master's Final Recommendation at the end of the Topping Period. (*See* D.I. 1554 ¶ 14) These safeguards are important because to qualify for the Special Master's consideration, a bid must be supported by committed financing, which for some borrowers may only be obtainable at a significant cost (e.g., funders may charge fees to keep funds committed for a deal that may or may not be consummated).

31

Although the Special Master selected, and the Court approved, the Red Tree bid as the Stalking Horse Bid, the Special Master ultimately selected the Gold Reserve Bid as his final recommendation, triggering a No-Shop period under the Sale Procedure Order. (D.I. 1841) In turn, Section 6.16 of the Gold Reserve SPA, which is based on the Court's model SPA (D.I. 1557-1), provided that if the Special Master received an unsolicited Competing Proposal during the No-Shop period, he would "determine[] in good faith" whether that bid presents a "Superior Proposal" as compared to Gold Reserve's bid. (D.I. 1841 Ex. B at 62) If Gold Reserve was ultimately unsuccessful at meeting or beating a Superior Proposal during a three-day matching period, the Special Master was permitted to abandon its bid and recommend the Superior Proposal, which would have the consequence of obligating the party who submitted the unsolicited Competing Proposal to pay up to $30 million of Gold Reserve's expenses. (*Id.*)

Mr. Bentley's references in the email messages, and to Mr. Turkel, to the possible submission of an unsolicited Elliott Bid were, therefore, entirely consistent with his obligations under the Sale Procedures Order. He simply reminded a bidder of an aspect of the public Sale Process and the consequences for the bidder of selecting one permitted course of action (submitting a non-confirming bid reliant on an unexecuted settlement agreement during the Topping Period, which could possibly cause the bidder to incur commitment fees it might later regret since the non-conforming bid would inevitably be rejected) over another (waiting and then submitting an unsolicited Competing Proposal and having to pay another bidder up to $30 million). No reasonable observer, who would have knowledge of these surrounding facts and circumstances, would view these emails or the communications they reference as indicating any impropriety, much less what Gold Reserve mischaracterizes as "coaching." (D.I. 2475 at 1, 7; *see also* Oct. 20, 2025 Tr. (D.I. 2510) at 19-21, 24)

32

The other communications of record between Elliott and Weil or Evercore are even more obviously innocuous. In one, Turkel asked Saferstein to ask another Weil lawyer, Ray Schrock, who at the time was lead counsel for the Special Master, whether Schrock would be joining a call, and also asked Saferstein to tell Schrock that Turkel was the Elliott representative on the matter. (D.I. 2386 Ex. 16) In another email, the Special Master was struggling to schedule a call with Elliott, which caused some tension and frustration on Turkel's part. (*Id.* Ex. 4) Turkel copied Saferstein on an email criticizing an earlier comment made by Weil's Mr. Barr. (*Id.*) In yet another email, Evercore expressed concerns about a conflict between Elliott's reputation for shareholder activism and Evercore's business as an anti-activism investor. (*Id.* Ex. 24) (Evercore employee asking Evercore colleague "do you know which Elliott fund owns the stake?" and receiving response "I'm guessing the distressed fund not the activism fund")

The reasonable observer would find each of these communications, individually and collectively, along with their knowledge of all other surrounding facts and circumstances, unremarkable. They are routine communications on their face, and they do not exhibit any greater or specialized access Elliott had to the Special Master's Advisors than that available to any other bidder (or Sale Process Party).

*The Moving Parties' Portrayal of Favoritism Toward Elliott is Selective and Unconvincing*

The decisions of the Special Master identified by the Moving Parties cannot reasonably be viewed as evidencing favoritism towards Elliott or the 2020 Bondholders. The Special Master's reasoning for each of the decisions discussed in the Motions is reasonable and well-documented and, if raised to the Court, was the subject of litigation that the Court resolved on the merits.

First, the Moving Parties complain that the Special Master granted Elliott exclusive access to the data room in summer 2024. (D.I. 2389 at 8; D.I. 2392 at 13) This exclusivity was only granted to Elliott, however, after a bid from a rival bidding consortium (which included Gold Reserve) – which the Special Master preferred, and to which he was seemingly prepared to offer the same exclusivity – had to be rejected because that consortium insisted on a condition (relating to appeals) the Special Master viewed as impossible to meet. (Oct. 21, 2025 Tr. (D.I. 2511) at 61 (counsel for PDVH admitting Elliott was not only party offered exclusivity); *id.* at 217-19 (counsel for Special Master explaining decisionmaking regarding exclusivity)) At that point, the Special Master moved to the Elliott Bid because it was, in his view, the best remaining bid available, and the exclusivity he provided Elliott was based on its position as the then-recommended bidder, not anything about Elliott as Elliott. Thereafter, widespread opposition to the Elliott Bid materialized among creditors (*see, e.g.*, D.I. 1306, 1357, 1373); the Court held a hearing (*see* Oct. 1, 2024 Tr. (D.I. 1357)), denied the Special Master's motion for an injunction of alter ego litigation (D.I. 1248, 1493, 1515), and the Elliott Bid became non-viable (as it was predicated on grant of that motion) (D.I. 1325-1); and the Sale Process was thereafter revised to including a Stalking Horse process and Topping Period (*see* D.I. 1517). None of this was a victory for, or evidence of favoritism toward, Elliott.

As the Sale Process moved forward in 2025, Elliott lost more frequently than it prevailed. Elliott put in a bid to become the Stalking Horse (D.I. 1599, Ex. B-1), but the Special Master recommended Red Tree's bid instead (*see* D.I. 1599). After objections to that recommendation were extensively litigated (*see, e.g.*, D.I. 1635-40, 1656-62, 1664-67, 1675-83, 1688-90, 1692-93, 1695-1705), the Court deemed Red Tree's bid the Stalking Horse Bid (D.I. 1741). Then the Topping Period commenced. As explained above, Elliott's efforts to be deemed the recommended

34

bidder in the Topping Period failed. (*See* D.I. 1842 Ex. B-1) Instead, at the conclusion of the Topping Period, the Special Master recommended Gold Reserve's Bid as the final recommended bid. (D.I. 1847)

It was only thereafter, when Elliott came forward with a new bid, offering in the Special Master's view the best combination of price and certainty of closing, that the Special Master deemed Elliott's August 2025 bid to be a Superior Proposal as compared to the Gold Reserve Bid. (D.I. 2113) The SPA that Gold Reserve had negotiated with the Special Master contained a provision – consistent with the Court's model SPA, which was itself the product of extensive litigation, during which the Court heard from (among many others) the Venezuela Parties (*see, e.g.*, D.I. 1559) and Gold Reserve (*see, e.g.*, D.I. 1560) – explicitly contemplating the possibility that a Superior Proposal would emerge after the Topping Period, and authorizing the Special Master to request the Court's permission to engage in further negotiations with the bidder making a potential Superior Proposal. That Elliott's Bid was selected at the end of this process, in this way, is not the least bit suspicious. It is, rather, the result of the Special Master running a process consistent with the Court's orders and recommending, in the exercise of his expert judgment, the bid he thinks the Court should approve (which is now subject to extensive, pending objections). No reasonable observer, with knowledge of all the surrounding facts and circumstances as outlined throughout this Opinion, would think that any of these decisions (or all of them collectively) was the product of favoritism and bias in favor of Elliott (or the 2020 Bondholders, to which the Court turns next).

*The Litigation History Does Not Demonstrate Favoritism to the 2020 Bondholders*

As explained above, the 2020 Bondholders purport to have an interest in 50.1% of the stock of CITGO Holding, Inc., a subsidiary of PDVH and the sole shareholder of CITGO. These rights – which have just been upheld by the SDNY in a decision now on appeal at the Second Circuit – pose a risk to the sale of the PDVH Shares if the Successful Bidder relies on financing leveraged against the assets of CITGO.[18] If, for instance, a condition of obtaining financing to purchase the PDVH Shares is that the Successful Bidder create an acquisition entity to borrow funds and then merge with CITGO (so the debt can be secured by the assets of CITGO), the 2020s might be able to prevent such a merger by voting their shares against it. *See generally* 8 Del. C. § 251(b)-(c) (requiring majority of shareholders to approve any proposed merger). Alternatively, the 2020s could conceivably seek an injunction to prevent a transaction predicated on leveraging the CITGO assets. At the Sale Hearing, much evidence and argument was directed to whether the 2020s can actually take these actions, and whether approval from the Office of Foreign Assets Control ("OFAC") would be necessary to allow them to do so. (*See, e.g.*, Sept. 15, 2025 Tr. (D.I. 2500) at 127-132, 214-222, 288-292; Sept.18 Tr. (D.I. 2507) at 1542-49; 1571-1580)

The Moving Parties assert, as evidence of bias, that the Special Master consistently advised Gold Reserve and others to improve their bids by addressing the risk posed by the 2020s. (D.I. 2391 at 11 n.6; D.I. 2392 at 16) But any such advice was entirely consistent with the Court's Evaluation Criteria, which include price and certainty of closing. (D.I. 1554 at 24-27) As the Court recognized in its Stalking Horse Order, it was reasonable for the Special Master to believe that "a successful bid in the Sale Process must, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts assessment

---

[18] It is undisputed that the financing supporting the Gold Reserve Bid is structured in this way.

of certainty of closing." (D.I. 1741 at 4) At the same time, the Court emphasized that a settlement with the 2020 Bondholders represented only one manner of addressing the risk, and "reject[ed] any suggestion that a Final Bid must include a settlement with the 2020 Bondholders." (*Id.*) Accordingly, it was reasonable for the Special Master to provide advice to bidders that their bids could be improved by addressing the 2020s risk, whatever it may be, in some manner.

The Moving Parties have provided no evidence that the Special Master required successful bids to include a settlement with the 2020s or crafted or implemented the Sale Process in a manner intended to favor the 2020s. He instead simply endeavored to comply with the Court's Evaluation Criteria and orders and ensure that bidders recognized the reality that the 2020s posed a potential risk to certainty of closing.

### *Payments Received by Weil and Evercore Cannot Reasonably Be Viewed as Problematic*

The Moving Parties make much of the aggregate amount of fees that Weil and Evercore have gained from their representation of Elliott, the 2020 Bondholders, and their respective affiliates, which they calculate as being approximately $170 million. (*See, e.g.*, Oct. 20, 2025 Tr. (D.I. 2500) at 27) (counsel for Gold Reserve asserting "$170 million in fees to the Advisors that was never disclosed trumps everything"). The headline "$170 million" of fees actually consists (i) entirely of fees earned by the Advisors in matters *unrelated* to the Sale Process, and (ii) almost entirely of fees paid by affiliates of Elliott, as opposed to the bidding Elliott entity, individual 2020 Bondholders (not the identical ad hoc group of 2020s that has appeared in this litigation), and fees paid by ad hoc groups that happened to include one or more of the 2020s or an Elliott affiliate. A reasonable lay observer, with knowledge of all the surrounding facts and circumstances, would understand these facts, and also that Weil's representation (in unrelated matters) of Elliott

37

Investment Management, L.P., the actual bidder here, generated only $191,584 in fees. (D.I. 2386 Ex. 8) This amount – as well as the amounts Weil received from Elliott affiliates ($4.43 million), individual 2020 Bondholders ($62.61 million), and ad hoc groups that included Elliot or a 2020 Bondholder or one of their affiliates ($30.91 million) – is immaterial compared to Weil's $4.5 billion revenue during that same period. (*Id.*)

Evercore, one of the largest investment banks in the county, never represented Elliott or its affiliates. It did, however, receive fees from other bidders and their affiliates ($16.5 million), individual 2020 Bondholders ($24.4 million), and ad hoc groups containing a bidder or its affiliate or a 2020 Bondholder ($25 million). (*Id.*) These numbers, individually and collectively, are dwarfed by Evercore's annual revenue, which in 2024 was $2.97 billion. *See* Evercore Inc. Form 10-K (Feb. 21, 2025), available at https://investors.evercore.com/sec-filings/sec-filing/10-k/0001360901-25-000005 (last visited Nov. 10, 2025).

*This Case Is Materially Distinguishable from Kensington*

This case is different from *Kensington*, on which the Movants heavily reply, in critical and dispositive respects, as the Court has previously held and now reiterates. (*See* D.I. 443 at 7 (distinguishing *Kensington* in part because here "neither the Special Master nor Evercore owes competing fiduciary duties to any person or entity"); *see also* D.I. 277 ¶ 22 (order appointing Special Master providing: "The Special Master, as an appointee of the Court to undertake the duties hereunder, owes duties to the Court and does not owe fiduciary or other duties to any of the Parties, or to creditors of any Parties.")) In *Kensington II*, 368 F.3d at 303, the Third Circuit held that certain attorney advisors to a district court judge presiding over an asbestos case were "structural[ly] conflicted" because they served as neutrals in that case while simultaneously

advocating for future claimants in a separate asbestos-related bankruptcy case. The Court of Appeals explained that the advisors' role as a neutral provided "a unique level of access to" and "influence over" the presiding judge, at a time when those same advisors were required in a separate matter "to act as zealous advocates for the future asbestos claimants," whose claims could be benefited (or harmed) by decisions the judge was making in the very case in which the advisors were serving as neutrals. *Id.* at 304. Because the two cases involved "many of the same legal issues (e.g., bar dates, proof of claim forms, medical manifestations, etc.)," the judge was required to recuse himself; otherwise, a reasonable, knowledgeable person could have concluded that the court-appointed advisors, who "held a special position of trust and influence" in relation to the judge, were "not truly disinterested in the outcome of the proceedings" in which they were serving as advisors. *Id.* at 308.

The situation here is markedly different. First, there is no "structural" conflict of interest. *Kensington II*, 386 F.3d at 303. A structural conflict of interest existed in *Kensington* because the attorney advisors were required to provide neutral advice in one matter while, at the same time, being obligated to take positions that favored their clients in another related matter. The two cases involved overlapping legal issues. These troubling features are absent here. While the Special Master's Advisors are neutrals in this Court's Sale Process, they have no concurrent obligation in any other related matter to any participant in the Sale Process. The Moving Parties have identified no overlapping issue between this case and the unrelated matters in which Weil and Evercore have represented Elliott, the 2020s, and/or their respective affiliates. There has been no identification of a legal or factual decision the Court has to make, with input from the Special Master or his Advisors, that will also arise in any other matter in which the Advisors may happen to be working on behalf of Elliott, the 2020s, or their affiliates. Whereas in *Kensington*, 368 F.3d at 302, the

advisors "espoused views [in the related bankruptcy proceedings] on the same disputed issues that [were] the core of the" case before the judge they were advising, nothing similar has or could occur here. *See generally Microsoft Corp. v. United States*, 530 U.S. 1301 (2000) (Rehnquist, C.J., mem.) (declining to recuse from case in which firm where Chief Justice's son worked was representing Microsoft because his "son's personal and financial concerns will not be affected by our disposition of the Supreme Court's Microsoft matters").

Additionally, the Special Master, unlike the advisors in *Kensington*, does not perform an adjudicative function. The merits of the claims against the Venezuela Parties were resolved long ago. More fundamentally, the Special Master is charged with formulating and implementing a complex Sale Process and making a recommendation as to the best bid and whether that bid should be approved. (*See* D.I. 1517) All of his work is subject to the Court's de novo review, which is ongoing.

> *Because There Was No Disqualifying Conflict, There Was No Requirement that Weil or Evercore Screen Off Those Professionals Assisting the Special Master*

The Moving Parties observe that at least five Weil attorneys who have billed time for representing the Special Master in this matter have also billed time for representing Elliott, the 2020s, or one of their respective affiliates. (*See* D.I. 2392 at 6) (citing D.I. 2386 Ex. 12 & Ex. 13) They then make much of the fact that neither Weil nor Evercore implemented ethical screens or "walled off" employees who were working on the Sale Process to prevent them from also participating in these unrelated representations. Such measures are only required where there is a conflict, and the Court finds none here, for the reasons explained throughout this Opinion. The Moving Parties have not adduced any evidence that the Advisors were representing Elliott, the 2020 Bondholders, or their affiliates in matters at all related to the Sale Process. The Court

40

concludes that ethical screens were not required because there is no evidence of a conflict of interest.[19]

***

In sum, a reasonable layperson, who would have knowledge of all of the facts and circumstances outlined above, would not have reason to question the impartiality of the Court, the Special Master, or his Advisors. The Moving Parties have failed to show that recusal is warranted under Section 455(a).

### Gold Reserve Has Not Shown a Violation of § 455(b)(1)

Gold Reserve, but not the Venezuela Parties, additionally moves pursuant to 28 U.S.C. § 455(b)(1), which provides that a judicial offer shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Gold Reserve seeks to disqualify not just the Special Master and his Advisors, but also the undersigned Judge, pursuant to this provision.

The bases for Gold Reserve's motion under § 455(b)(1) are the same as those it offered in support of its motion under § 455(a), described above. That is, it is Gold Reserve's position that the same evidence it contends creates an appearance of bias (because it would cause a reasonable, knowledgeable person to question impartiality) also satisfies its burden to show that the Special Master, Advisors, and the Court are actually biased. (See D.I. 2389 at 3 ("These facts not only reflect, but exacerbate, the appearance of bias, suggesting that the Special Master's apparent bias

---

[19] For at least essentially the same reasons, there is no merit to the Movants' suggestions that Weil attorneys violated their obligations under Model Rule of Professional Responsibility 1.7 (or some unidentified state-specific version of that rule) relating to concurrent conflicts of interest.

in favor of Elliott is actual bias."); *see also id.* at 17 (relying on same "pattern of apparent favoritism" for requested recusals under §§ 455(a) and (b)(1))

For all the same reasons the Court explained at length above in rejecting the Movants' 455(a) motions, the Court now likewise rejects Gold Reserve's evidence and arguments in connection with its motion under § 455(b)(1). Additionally, as the standard for actual bias under § 455(b)(1) is more demanding than the test for appearance of impropriety under § 455(a), *see Liteky v. United States*, 510 U.S. 540, 552 (1994) ("As we have described, § 455(a) expands the protection of § 455(b), but duplicates some of its protections as well – not only with regard to bias and prejudice but also with regard to interest and relationship."); *In re Vascular Access Ctrs., L.P.*, 630 B.R. 137, 158 (E.D. Pa. Bankr. 2021) (holding that party could not satisfy requirements to show bias under § 455(b)(1) where same evidence had failed to meet more liberal § 455(a) standard), it logically follows that Gold Reserve's failure under the latter standard necessarily means it has similarly failed to satisfy the former.

## The Venezuela Parties Have Not Shown a Violation of § 455(b)(4)

The Venezuela Parties also move to disqualify the Special Master and his Advisors under 28 U.S.C. § 455(b)(4), which requires disqualification of a judicial officer who "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." The statute defines "financial interest" as "ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party," subject to certain statutory exceptions not relevant here. 28 U.S.C. § 455(d)(4). The statutory term "other interest" covers both financial and non-financial interests, but when the "other interest" is non-financial it must be

one that "could be *substantially affected* by the outcome of the proceeding." Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3547 (3d ed. 2024) (emphasis added). Critically, whether an interest is disqualifying "depends upon the remoteness of the interest and its extent or degree." *United States v. Stone*, 866 F.3d 219, 229 (4th Cir. 2017).

Neither Elliott nor the 2020s is a party to these proceedings, so the Special Master and Advisors cannot, by definition, have a financial interest in either of these entities that would implicate § 455(b)(4) (whose scope is limited to a "party in the proceeding"). Nor have the Venezuela Parties provided evidence showing that the Special Master or Advisors have a "financial interest in the subject matter in controversy," which is the PDVH Shares. Fees generated in the Sale Process, and Weil's and Evercore's alleged interest in generating more fees from representing the Special Master, Elliott, and the 2020s, do not constitute a "financial interest in the subject matter in controversy," *see In re Digital Music Antitrust Litig.*, 2007 WL 632762, at \*13 n.18 (S.D.N.Y. Feb. 27, 2007) ("[L]egal representation does not qualify as a financial interest in the subject matter of the controversy.") (internal quotation marks omitted), and are not disqualifying for the further reason that they are (at most) "remote, contingent, and speculative," *In re Placid Oil Co.*, 802 F.2d 783, 787 (5th Cir. 1986) (holding that judge who owned stock in non-party state bank did not have financial interest in case involving 23 state banks because effect of favorable ruling on his stock portfolio was remote, contingent, and speculative).

Nor have the Venezuela Parties proven that the Special Master or his Advisors have an "other interest" that "could be substantially affected by the outcome" of this proceeding. The only evidence they point to is, again, the fees Weil and Evercore have earned from representations of Elliott, the 2020s, and their respective affiliates, and the Advisors' generalized interest in earning more fees in the future. (D.I. 2392 at 6) The Court reiterates: the fees Weil received from Elliott

43

and its affiliates since 2021 total $4.65 million, constituting less than 0.05% of the firm's more

than $4.5 billion of revenue over the same period (D.I. 2386 Ex. 8); and Evercore received fees

from other bidders (i.e., not Elliott) and their affiliates ($16.5 million), individual 2020

Bondholders ($24.4 million), and ad hoc groups ($25 million), which individually and collectively,

are dwarfed by Evercore's annual revenue, which in 2024 alone was $2.97 billion (*id.*; *see also*

Evercore Inc. Form 10-K (Fed. 21, 2025), available at https://investors.evercore.com/sec-

filings/sec-filing/10-k/0001360901-25-000005 (last visited Nov. 10, 2025). As to the possibility

of garnering future fees as a result of their work in this Sale Process, this "interest" is, again, far

too "remote, contingent, and speculative" to give rise to a need to disqualify under § 455(b)(4).

*Hook v. McDade*, 89 F.3d 350, 356 (7th Cir. 1996) (addressing "other financial interest"); *see also*

*Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83 (2d Cir. 1996) (internal quotation marks omitted)

("It would simply be unrealistic to assume . . . that partners in today's law firms invariably have

an interest that could be substantially affected by the outcome of any case in which any other

partner is involved.") (internal quotation marks omitted).

Accordingly, the Venezuela Parties have failed to meet their burden to prevail under this

portion of their Motion.


<u>There Was No Violation of § 455(c)'s Disclosure Requirements</u>

The Movants additionally argue that the Special Master and Advisors violated their

disclosure obligations under 28 U.S.C. § 455(c), and that this non-compliance provides yet another,

independent basis for disqualification. (D.I. 2392 at 16-18; *see also* D.I. 2381 at 16 ("[T]he

Advisors' inadequate disclosures and affirmative misrepresentations about these conflicts only

intensifies the personal bias.")) The Court does not agree.

Section 455(c), which is applicable to the Special Master and his Advisors, provides: "A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household." As the Court has already discussed at length, neither the Special Master, nor Weil or Evercore, had any financial interest that is implicated in the Sale Process. There is no evidence that they failed to inform themselves of their pertinent interests or failed to disclose an interest they were required to disclose.

As the Court has also explained, the Special Master complied with his discovery obligations by reasonably and promptly responding to discovery requests concerning potential conflicts (most recently) beginning in March of this year and then on an expedited basis in September and October. Importantly, as is discussed further below, no discovery disputes have been presented to the Court, so the Court has no basis to fault the Special Master (or his Advisors) for failing to provide the Venezuela Parties (or Gold Reserve, for that matter) with any discovery to which they were entitled in response to their discovery requests. There is simply no indication that the Special Master, having been on notice from previous disqualification motions and discovery requests, lost sight of the fact that his fiduciary and financial interests could potentially conflict with his role in the Sale Process and that, accordingly, he needed to keep himself reasonably informed of these interests. The Venezuela Parties have failed to demonstrate that disqualification is warranted under § 455(c).

<u>Gold Reserve's Requests for a Stay and for Further Discovery are Meritless</u>

Gold Reserve has repeatedly requested a stay of the Sale Proceedings until the Court resolves the Motions. While the Court has denied each of these requests (*see* Sept. 15, 2025 Tr.

(D.I. 2500) at 20; Oct. 20, 2025 Tr. (D.I. 2510) at 200-01; Oct. 21, 2025 Tr. (D.I. 2511) at 427-28), Gold Reserve has renewed its request yet again (*see* D.I. 2485). Once again, the Court denies the stay request – this time as moot, given that the Court has now ruled on (and denied) the Motions.

To the extent Gold Reserve is also requesting a stay until the conclusion of appellate review of the Court's ruling on its disqualification motion, as it appears to be (*see* D.I. 2398 at 18-20), this request, too, is denied. After more than eight years of extensive, expensive litigation, the Court is just weeks away from completing its review of the Special Master's Updated Final Recommendation and the objections – principally from the Venezuela Parties and Gold Reserve – to it, which were the subject of a five-day evidentiary hearing in September and October of this year. Halting work on this review, and delaying issuance of the results of that review, would severely prejudice the judgment creditors, who have been attempting for years to enforce their judgments against the Republic and PDVSA. It would also threaten to destroy the recommended Elliott Bid, regardless of whether the Court agrees with the Special Master that it should be approved, simply as a byproduct of delay. This is because the 2020 Bondholders' obligation to support the Elliott Bid – and not employ whatever rights they have in CITGO to try to defeat it – terminates on December 1 unless the Court signs an order adopting the Special Master's recommendation by that date. By contrast, there is essentially no prejudice to the Moving Parties from the Court proceeding with and completing its review. While the Court continues to anticipate it will issue its ruling on the merits of the objections by no later than on or about November 30, as previously announced (*see* D.I. 2505), the Court can now further disclose that (given the amount of issues and briefing, as well as other commitments) it will do so no earlier than November 21, which provides Gold Reserve a week to seek relief from the Court's denial of its requested stay, should it wish to do so. The very advanced stage of the litigation also strongly weighs against a

stay. *See generally Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) (motions for stay pending appeal assessed according to four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies").

Gold Reserve alternatively asks that the Court provide "an adequate period for Weil and Evercore to fully satisfy the discovery requests of Gold Reserve and the other moving parties." (D.I. 2381 at 1, 3-4, 19-20) This request is not well-founded. In the run-up to the hearing on the Motions, Gold Reserve (and the Venezuela Parties) alluded to discovery it was not receiving, or that it might not have time to take (*see, e.g.*, D.I. 2345 at 6), but it never presented any discovery dispute for judicial resolution. No discovery disputes ever crystallized and became ripe. A party cannot stand content with the discovery it has obtained (no matter how difficult or rushed it may have been to obtain it), fully brief a motion based on that discovery, and show up at oral argument on that motion and seek (for the first time) more discovery (when, perhaps, it begins to sense it may not prevail based on the record it has developed).

In Gold Reserve's telling, the process leading to the filing of its motion to disqualify began on September 9, 2025, with the deposition of Elliott Management Corporation's Michael Turkel. The matter was first brought to the Court's attention via Gold Reserve's letter filed on September 10. (D.I. 2223) The Moving Parties subsequently, on September 13, requested an emergency stay of the Sale Hearing as well as discovery on the Special Master's potential conflicts of interest. (D.I. 2286 (Gold Reserve); D.I. 2287 (Venezuela Parties)) The Court denied the stay request the same day, ordered the Special Master to respond with his position on the discovery requests, and

permitted the Movants to submit a reply to the Special Master's response and then be heard at the Sale Hearing, which began on September 15, on their disqualification contentions. (D.I. 2289) When the Movants moved for disqualification at the start of the Sale Hearing, the Court ordered a further meet and confer and the submission of a status report. (Sept. 15, 2025 Tr. (D.I. 2500) at 115-16)

The parties to the disqualification issue – the Special Master, Venezuela Parties, and Gold Reserve – submitted a joint status report concerning discovery on September 17, 2025. (D.I. 2312) In it, they informed the Court that the Moving Parties had served discovery requests on the Special Master and his Advisors on September 16 and they had all agreed to (i) further meet and confer on Friday, September 19, and then to (ii) submit a status report thereafter. (*Id.* at 2)

The second status report was submitted on September 22. (D.I. 2327) It reported that, as planned, the parties met and conferred on September 19, and it provided a list of documents Weil, Evercore, and the Special Master agreed to produce on a rolling basis and no later than October 3. (*Id.*) The Venezuela Parties indicated they were also seeking (1) discovery regarding the 2020 Bondholders; (2) transcripts of any *ex parte* discussions the Special Master or his Advisors may have engaged in with the Court in which there was reference to any disclosure of potential conflicts;[20] and (3) a production deadline of September 26. (*Id.* at 5-6) The Court ordered the parties to continue to meet and confer and to submit another status report by September 26. (D.I. 2332)

---

[20] Participants in the Sale Process have long known of, and approved, the Special Master's ability to contact the Court *ex parte*. (*See, e.g.*, D.I. 277 at 5; D.I. 481 at 30; D.I. 559 ¶ 8) The Court has required the Special Master to docket a notice on each occasion an *ex parte* meeting occurs, and has also docketed transcripts, prepared by court reporters, of these *ex parte* meetings. (*See, e.g.*, D.I. 2115, 2373)

The September 26 joint status report did not present any discovery disputes for the Court to resolve. While the Moving Parties expressed "concerns about whether Weil and Evercore can meet their production commitments in time to allow for briefing and argument within the schedule they have proposed" – a schedule the Court ultimately adopted (D.I. 2345 at 6; D.I. 2347) – and the Movants further expressed a preference for the Court to extend the briefing schedule and continue the Sale Hearing, at no point did they tell the Court they could not be fully and fairly heard on their disqualification motions without additional time or additional discovery beyond what had already been promised to them.

On September 29, the Court entered a schedule, making opening briefs on any motion to disqualify due on October 9, opposition briefs due October 16, and reply briefs on October 19, with oral argument to be heard on October 20, a date the Court had set aside for additional proceedings relating to the Sale Process as long ago as August 22. (*See* D.I. 2110, 2347) From that point forward, the parties did not present any disputes regarding discovery for the Court to resolve, until the October 20 oral argument on the by-then fully-briefed Motions.

Under the circumstances, Gold Reserve was not diligent in seeking discovery. Gold Reserve, like the Venezuela Parties, acknowledges that the Court granted it all the discovery it sought. (Oct 20, 2025 Tr. (D.I. 2510) at 22 (Gold Reserve); *id.* at 71-72 (Venezuela Parties)) Notably, this included the opportunity for the Movants to take depositions prior to the oral argument on their Motions, but they chose not to do so. (*See id.* at 21-23)

The burden is on the Movants to prove they are entitled to have their Motions granted. The Court never declined to order any discovery they sought. That the record they created is not one that has persuaded the Court to grant their Motions does not mean that the Court should have granted them more discovery. Nor that it should give them more time to take discovery now.

CONCLUSION

In 2019, two years after this matter was filed in this District, the Third Circuit instructed the Court that "[a]ny outcome where Crystallex is not paid means that Venezuela has avoided its obligations." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 136 (3d Cir. 2019). In reaching that conclusion, the Court of Appeals affirmed this Court's holding that Crystallex had a right, pursuant to Federal Rule of Civil Procedure 69, to attach the PDVH Shares, "leaving the District Court nothing left to do but execute" the sale of the attached property. *Id.* (internal quotation marks omitted). The Court is obligated to comply with this mandate.

Doing so, under the governing Delaware law, necessitates that the Court conduct a public sale. As a practical matter, the only way for a federal judge to accomplish such a daunting task is to appoint a special master, and that special master cannot carry out the sale of a multibillion-dollar corporation without substantial assistance. (*See* D.I. 1180 at 12-13) ("The Court has needed, and will continue to need, the experience and efforts of the Special Master (and his advisors) to carry out the elaborate process it has adopted.") That necessary assistance includes qualified legal and financial advisors. To be qualified, such legal and financial advisors must have the appropriate experience. That experience must include familiarity and interaction with, and almost certainly retention by, the types of entities that would have the means and interest to bid on a company like CITGO. And it is impossible to know at the start of a sale process which entities will want to participate in such a sale, nor who will present the highest bid at the conclusion of the sale – yet eliminating from the bidding any interested entity that has been represented by the Special Master's qualified Advisors would undermine, if not entirely defeat, the Court's goal, and legal obligation, to conduct the sale in manner maximizing value.

From these realities, it logically follows that in order for the Court to fulfill its obligation to carry out the mandate given to it by the Third Circuit, it is ultimately necessary that the Court have the assistance, through the Special Master, of expert advisors who will inevitably have precisely the types of entanglements with Sale Process participants and bidders that the Movants assert are disqualifying. If the Movants were correct – and, as explained throughout this Opinion, they are not – it would mean, in essence, that the Court must fail.

The Court recognizes that failure is precisely what the Venezuela Parties have always desired, as they candidly admit. (*See, e.g.*, Oct 21, 2025 Tr. (D.I. 2511) at 18) (PDVH's counsel stating that one of his client's purposes in this litigation was "to resist the sale as best we could") Failure is also the result Gold Reserve currently prefers, as it plainly fears that if it cannot prevent the Court from reaching the merits then the Court is going to approve the bid the Special Master recommended instead of its own. (*See generally* Sept. 17, 2025 Tr. (D.I. 2508) at 936) (Gold Reserve's CEO testifying that prevailing in Sale Process is "existential" to Gold Reserve's future) While, as noted earlier, the Court is not making any finding as to the motivations of the Movants, neither is it blind to the facts it has noted.

Accordingly, for the multiple reasons explained at length throughout this Opinion, the Motions are denied. An appropriate order follows.[21]

November 13, 2025
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

---

[21] The Court cautions the reader, especially the Moving Parties and the objectors to the Updated Final Recommendation of the Elliott Bid, that the Court has not decided the merits of the objections. One should not assume from today's Opinion that the Court will, or will not, be approving the Special Master's recommendation.