# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : | |
| Plaintiff, | : | |
| v. | : | Misc. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | |
| Defendant. | : | |

Raymond J. DiCamillo, Jeffrey L. Moyer, and Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE
Robert L. Weigel, Jason W. Myatt, Rahim Moloo, and Zachary Kady, GIBSON, DUNN & CRUTCHER LLP, New York, NY
Miguel A. Estrada, Lucas C. Townsend, and Adam M. Smith, GIBSON, DUNN & CRUTCHER LLP, Washington, DC

    Attorneys for Crystallex International Corporation

Myron T. Steele, Matthew F. Davis, and Bindu A. Palapura, Malisa C. Dang, POTTER ANDERSON & CORROON LLP, Wilmington, DE
Matthew S. Barr, David Lender, Jared R. Friedmann, and Chase A. Bentley, WEIL, GOTSHAL & MANGES LLP, New York, NY

    Attorneys for Special Master Robert B. Pincus

Garrett B. Moritz and Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE
Michael S. Kim, Marcus J. Green, Josef M. Klazen, and Lydia L. Halpern, KOBRE & KIM LLP, New York, NY
Richard G. Mason, Amy R. Wolf, and Michael H. Cassel, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY

    Attorneys for Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.

Samuel T. Hirzel, II and Brendan Patrick McDonnell, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Donald B. Verrilli, Jr., Elaine J. Goldenberg, and Ginger D. Anders, MUNGER, TOLLES & OLSON LLP, Washington, DC

George M. Garvey and Adeel Mohammadi, MUNGER, TOLLES & OLSON LLP, Los Angeles, CA

Joseph D. Pizzurro, Kevin A. Meehan, Juan O. Perla, Robert Groot, and David V. Holmes, CURTIS, MALLET-PREVOST, COLT & MOSLE LLP, New York, NY

Attorneys for Bolivarian Republic of Venezuela and Petróleos de Venezuela, S.A.

Susan W. Waesco, Alexandra M. Cummings, and Phillip Reytan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Nathan P. Eimer, Daniel D. Birk, Gregory M. Schweizer, Hannah M. Bucher, and Alec Solotorovsky, EIMER STAHL LLP, Chicago, IL

Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation

Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, DE

Andrew J. Rossman, Susheel Kirpalani, Matthew R. Scheck, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY

Stephen M. Baldini, Stephanie Lindemuth, and Richard J. D'Amato, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, NY

Julius Chen, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, DC

Attorneys for Amber Energy Inc.

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE

Christopher L. Carter and David K. Shim, MORGAN, LEWIS & BOCKIUS LLP, Boston, MA

Edward H. Davis, Jr. and Fernando J. Menendez, SEQUOR LAW, P.A., Miami, FL

Attorneys OI European Group B.V.

Marie M. Degnan and Randall J. Teti, ASHBY & GEDDES, Wilmington, DE

Joshua S. Bolian and Jared A. Hagler, RILEY & JACOBSON, PLC, Nashville, TN

Attorneys for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.

Rebecca L. Butcher and Jennifer L. Cree, LANDIS RATH & COBB LLP, Wilmington, DE

Steven F. Molo, Justin M. Ellis, Mark W. Kelley, Lauren F. Dayton, Joshua D. Bloom, and Pratik Raj Ghosh, MOLOLAMKEN LLP, New York, NY

Attorneys for Red Tree Investments, LLC

Kevin J. Mangan, Matthew P. Ward, and Stephanie S. Riley, WOMBLE BOND DICKINSON (US) LLP, Wilmington, DE
Matthew H. Kirtland, NORTON ROSE FULBRIGHT US LLP, Washington, DC
Katherine G. Connolly, NORTON ROSE FULBRIGHT US LLP, San Francisco, CA
Taylor J. LeMay, NORTON ROSE FULBRIGHT US LLP, Houston TX
Michael K. Bowe, Lauren Tabaksblat, Andrew T. Sutton, and Kate E. Fisch, BRITHEM LLP, New York, NY

   Attorneys for Gold Reserve Ltd.

Justin M. Forcier, REED SMITH LLP, Wilmington, DE
Francisco Rivero and Arturo Munoz Holguin, REED SMITH LLP, Houston, TX

   Attorneys for Siemens Energy, Inc.

Brian R. Lemon and Andrew S. Dupre, AKERMAN LLP, Wilmington, DE
Miguel López Forastier, Mark D. Herman, José E. Arvelo, and Amanda Tuninetti, COVINGTON & BURLING LLP, Washington, DC

   Attorneys for Valores Mundiales, S.L. and Consorcio Andino, S.L.

Craig Martin, DLA PIPER, Wilmington, DE
James E. Berger, Charlene Sun, Alice A. Gyamfi, New York, NY

   Attorneys for Rusoro Mining Ltd.

John D. Demmy, SAUL EWING, Wilmington, DE
Nicholas Zluticky, STINSON LLP, Kansas City, MO

   Attorneys for Koch Minerals Srl and Koch Nitrogen International Srl

Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, DE
Andrew N. Rosenberg, Jeffrey J. Recher, Paul A. Paterson, and Tyler B. Myers, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, NY

   Attorneys for Ad Hoc Group of 2020 Bondholders

## OPINION

November 25, 2025
Wilmington, Delaware

# TABLE OF CONTENTS

FINDINGS OF FACT.................................................................................................3

I.      Background Facts About Venezuela, Its Oil Reserves, And Ownership Of CITGO ....................................................................................................3

II.     Appointment Of Special Master And Approval Of His Advisors ....................7

III.    U.S. Sanctions On Venezuelan Property And The Necessity Of OFAC Approval ...................................................................................................11

IV.     Designing The Sale Process...........................................................................14

V.      Entry Of The Sale Procedures Order ..............................................................16

VI.     The First, Second, And Third Disqualification Motions .................................18

VII.    Ex Parte Communications Among The Court, Special Master, And His Advisors ....................................................................................................20

VIII.   Involvement Of Additional Judgment Creditors And The Priority "Waterfall" ...................................................................................................22

IX.     The 2020 Bondholders, Their SDNY Litigation, And OFAC .........................26

X.      Alter Ego Litigation ......................................................................................30

XI.     Initial Marketing Process And First, Failed, Amber Energy Bids (2023-24)..32

XII.    Approval Of New Sale Procedures, Including Bidder Protections, Evaluation Criteria, And Model Stock Purchase Agreement ("SPA") ..............................37

XIII.   Outreach To Potential Bidders And Revised Sales Process (2025).................40

XIV.    Stalking Horse Period And Selection of Red Tree Bid....................................43

XV.     Topping Period...............................................................................................48

XVI.    Selection Of The Dalinar Bid As The Final Recommended Bid.....................55

XVII.   Judge Failla Announces Her Intention To Rule In The 2020s Litigation By September 30 ...............................................................................................59

XVIII.  The Special Master Receives Unsolicited Bids And Deems One A Superior Proposal........................................................................................................60

XIX.        Special Master's Updated Final Recommendation Of The Amber Energy Bid .......................................................................................................... 64

XX.         The Fourth And Fifth Motions To Disqualify .................................................. 66

XXI.        Sale Hearing (September And October 2025) ................................................. 68

XXII.       Judge Failla Rules In Favor Of The 2020s, The Special Master Terminates The Dalinar SPA And Executes The Amber SPA, And The Sale Hearing Concludes .......................................................................................................... 71

XXIII.      The Competing Bids Before The Court At The Sale Hearing ......................... 74

XXIV.       The Risk Posed By The 2020s To Dalinar's Ability To Obtain Financing Needed To Close Is Real Yet Is Not Adequately Nor Persuasively Addressed By Gold Reserve ............................................................................................... 78

XXV.        The Amber Bid Is Better – In Terms of Price, Value, And Certainty – Than The Dalinar Bid, Which Is Anyway No Longer Viable .......................................... 80

XXVI.       The Fair Market Value Of The PDVH Shares Is Under $10 Billion ............... 89

XXVII.      The Sale Process Was Fair And Successful, Generating Competitive Tension While According Rights To The Venezuela Parties Far Beyond What Was Required By Delaware Law .......................................................................... 111

CONCLUSIONS OF LAW ........................................................................................................ 112

A.      The Burden Of Proof Is On The Objectors – But, In Any Event, The Supporters Have Proven The Amber Bid Should Be Approved ............................................. 114

B.      The Sale Process Complied With Delaware Law, Was Fair, And Generated A Fair And Lawful Recommended Best Bid ................................................................. 117

        1.   The Special Master Considered Alternative Transactions ....................... 118

        2.   The Special Master Generated Competitive Tension .............................. 119

        3.   The Special Master Ran A "Public Sale" ................................................ 124

        4.   The Special Master Appropriately Considered Contingent Liabilities .... 127

C.      The Fair Market Value Of The PDVH Shares Is Under $10 Billion ............................ 127

D.      Delaware Law Does Not Impose A Strict 50% Fair Market Value Test (But Such A Test Would Be Satisfied By The Amber Bid Anyway) .......................................... 132

E.     The 2020 Bondholders Do, And Always Have, Posed A Real Risk To Any Sale Transaction, A Risk That Needed To Be A Consideration In A Fair Sale Process, And In Any Successful Bid .................................................................................................... 135

F.     The Dalinar Bid Is No Longer Qualified Under The SPO, Or Viable ............................ 144

G.    The Amber Bid, The Only Qualified Bid Before The Court, Has the Highest Sale Price, Yields The Greatest Value, Has The Most Closing Certainty, And Is The Best Overall Bid .................................................................................................................................... 150

H.    Gold Reserve And Elliott Essentially Gambled On The Outcome Of The 2020s Litigation – And Only One Could Win ........................................................................................ 153

I.      The Recommended Amber Bid Does Not Shock The Conscience Or Constitute A Manifest Injustice Under Any Set Of Reasonably Foreseeable Circumstances ............................ 154

J.      Objections To Provisions In Proposed Sale Order ("PSO") And Amber SPA ............... 156

K.    Adverse Humanitarian And Policy Impacts Of The Sale Process Are For The Executive Branch To Evaluate, Not The Court .............................................................................. 158

L.      A Stay Of The Signing Of The Sale Order Is Not Warranted ......................................... 160

CONCLUSION ................................................................................................................................ 162



**STARK, U.S. Circuit Judge:**

Before the Court are the Special Master's Updated Final Recommendation[1] and

objections ("Objections") to it filed by the Republic of Venezuela ("Republic" or "Venezuela"),

Petróleos de Venezuela SA ("PDVSA"), PDVSA Holding Company ("PDVH"), and CITGO

Holding Inc. ("CITGO Holding" and collectively with Venezuela, PDVSA, and PDVH, the

"Venezuela Parties") (D.I. 2180), and by Gold Reserve Ltd. ("Gold Reserve") (D.I. 2183). The

Special Master recommends that the Court conclude its years-long Sale Process by approving the

sale of the PDVH Shares, which are wholly owned by PDVSA – and which have been attached

by various judgment creditors of Venezuela and of PDVSA, who are together owed more than

$20 billion – to a consortium that includes Elliott Investment Management L.P. ("Elliott") and

Amber Energy Inc. ("Amber").

The Court held a four-day evidentiary Sale Hearing between September 15 and 18, 2025.

(*See* Transcript of Sale Hearing (D.I. 2500, 2501, 2502, 2507) ("Tr.")) The Court further heard

extensive closing arguments, from at least 15 lawyers, on October 21, 2025. (D.I. 2511)[2]

The pending disputes have also been the subject of extensive briefing. Prior to the Sale

Hearing, creditors, bidders, the Venezuela Parties, and other interested entities submitted 20

briefs relating to the Special Master's Updated Final Recommendation, collectively spanning at

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in D.I. 481 (the "Sale Procedures Order" or "SPO") or the Updated Final Recommendation (D.I. 2123).

[2] Citations to testimony from the September 15-18, 2025 Sale Hearing are in the form: "(Tr. ([witness last name]) [page number])." (D.I. 2500 (September 15 transcript); D.I. 2101 (September 16 transcript); D.I. 2102 (September 17 transcript); D.I. 2107 (September 18 transcript)) The Court sealed the courtroom for a limited period, at the request of Gold Reserve to protect its confidential information. (*See* Tr. 1131-42) Additionally, approximately 15 minutes of the Sale Hearing was recorded, due to a brief absence of the court reporter. Citations to transcripts from proceedings other than the four-day evidentiary Sale Hearing, including the October 21, 2025 closing arguments (D.I. 2511), are accompanied by the date of the hearing.

least 250 pages. (*See, e.g.*, D.I. 2178, 2180, 2183)  Following the evidentiary portion of the Sale Hearing, these same participants filed two more rounds of briefing (*see, e.g.*, D.I. 2366, 2374, 2433, 2463), as well as proposed findings of fact (*see, e.g.*, D.I. 2426, 2429), and then submitted reply briefs following closing arguments (*see, e.g.*, D.I. 2498, 2495).  These additional submissions totaled more than 800 pages.  The Court also admitted into evidence over 200 exhibits in conjunction with the Sale Hearing.  (*See* D.I. 2321)

Having presided over this litigation for more than eight years and the Sale Process for now nearly three years, having observed the witness testimony at trial and examined the witnesses itself, having heard closing arguments and asked questions of counsel, and having reviewed the briefing, proposed findings of fact, and evidentiary record described above, the Court will **ADOPT** the Special Master's Updated Final Recommendation and **OVERRULE** the Objections to it.

Consistent with Federal Rule of Civil Procedure 52(a), and after having considered the entire record in this case and the applicable law, the Court provides its Findings of Fact followed by its Conclusions of Law.  Additional findings of fact may be set out in the Conclusions of Law.

## FINDINGS OF FACT

### I.     Background Facts About Venezuela, Its Oil Reserves, And Ownership Of CITGO[3]

1.     Because there has been a vast amount of litigation relating to Venezuela and the debts owed by the Republic and the other Venezuela Parties, numerous courts have had occasion to describe certain pertinent background facts that may be useful to providing context regarding the Sale Process.  The Court sets out some of that material in this Part.

2.     As the Southern District of New York recently wrote:

> PDVSA is a Venezuelan state-owned oil company established in 1975 following the nationalization of Venezuela's oil industry. PDVSA was created to coordinate, monitor, and control the state's oil and gas operations.  PDVSA is an agency or instrumentality of Venezuela under 28 U.S.C. § 1603(b), the Foreign Sovereign Immunities Act ("FSIA").   Despite Venezuela's immense hydrocarbon wealth, PDVSA's financial condition had deteriorated sharply by the mid-2010s as the result of, inter alia, a combination of falling global prices of oil and reduced export volumes. By 2016, PDVSA had accumulated over $1 billion in outstanding commercial debt.

*G&A Strategic Invs. I LLC v. Petróleos de Venezuela, S.A.*, 788 F. Supp. 3d 616, 622 (S.D.N.Y. 2025) (internal citations omitted).

3.     As the Third Circuit explained, in affirming this Court's 2018 finding that Venezuela and PDVSA are alter egos:

> [T]he relationship between PDVSA and Venezuela has tightened significantly since 2002, when then-President Hugo Chávez fired roughly 40% of the PDVSA workforce for protesting increased Venezuelan control over the company.   Since then PDVSA's

---

[3] The facts in this Part I, which are derived from various litigations in which one or more of the Venezuela Parties have been involved, appear to be uncontested and have been established and/or understood throughout the instant case.  These facts are provided to set out some of the context in which this unusually complex and long-running litigation has transpired.  No finding the Court is making in any other portion of this Opinion, and no legal conclusion it is drawing, would differ if any or all of the facts in this Part I are wrong, clearly erroneous, or stricken.

> presidents have generally been senior members of the Venezuelan president's cabinet, including members of the Venezuelan military. Venezuela has also passed various laws that require PDVSA to fund both government initiatives and discretionary government funds. Venezuela controls PDVSA's domestic oil production, sales, and pricing.  It also requires that PDVSA supply Venezuela and its strategic allies with oil at below-market rates.
>
> Also relevant to this appeal are the various bonds that PDVSA has issued over the past decade or so. . . . [These] bonds have an outstanding face value of approximately $1.684 billion and are secured by a 50.1% collateral interest in PDVH's shares of Citgo Holding, Inc. as security for the bonds.   According to the Bondholders, PDVSA has also issued roughly $25 billion in bonds to U.S. and non-U.S. capital markets investors.
>
> President Nicolas Maduro became the President of Venezuela in 2013.  [In 2019] Juan Guaidó, Venezuela's opposition leader and president of the National Assembly, . . . made efforts to oust Maduro and take control of the Venezuelan government.  The United States Government recognized Guaidó as the rightful leader of Venezuela on January 23, 2019.
>
> Five days later, as part of a broader effort to convince the Maduro regime to cede power, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") imposed new sanctions against PDVSA by adding it to the List of Specially Designated Nationals and Blocked Persons. . . .  [T]he U.S. Government has also promulgated several executive orders limiting transfer of Venezuelan or PDVSA-controlled assets in the United States.

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 135 (3d Cir. 2019)

("*Crystallex II*") (internal citation modified and headings omitted).

    4.      "Venezuela boasts the largest proven oil reserves in the world, a stockpile long

under the significant control of the state."  *OI Euro. B.V. v. Bolivarian Republic of Venezuela*, 73

F.4th 157, 163 (3d Cir. 2023) (internal quotation marks omitted).

    5.      Venezuela wholly owns PDVSA, a state-run oil company (D.I. 14 at 2; D.I. 26

at 4), which in turn wholly owns PDV Holding Inc., a Delaware corporation (D.I. 14 at 1-2).

4

6.    "Historically, the President of Venezuela had the power to appoint the members of the board of directors of PDVSA by decree." *Jiménez v. Palacios*, 250 A.3d 814, 822 (Del. Ch. 2019), *as revised* (Aug. 12, 2019), *aff'd*, 237 A.3d 68 (Del. 2020) (Table).

7.    PDVH wholly owns CITGO Holding, a Delaware corporation. (D.I. 102 at 1)

8.    CITGO Holding wholly owns CITGO Petroleum Corporation ("CITGO"), which is also a Delaware corporation. (Tr. (Rivett) 1089)

9.    CITGO is the fifth-largest oil refiner in the United States. (Tr. (Hiltz) 277) Its refinery operations are located principally in the Gulf Coast region of the U.S. (Tr. (Hiltz) 1169-70) CITGO also sells petroleum products throughout the East Coast of the United States via approximately 4,000 gas stations. (Tr. (Hiltz) at 1151)

10.    A chart depicting these ownership relationships appears below:



11.    As the Third Circuit explained in *Crystallex II*, 932 F.3d at 133:

In 2002, Crystallex contracted with Corporación Venezolana de Guayanaan, an organ of the Venezuelan government, for the right to develop and extract exclusively for 20 years the gold deposits at Las Cristinas, Venezuela. The deposits are among the world's largest. Per the contract, Crystallex spent hundreds of millions of dollars developing the Las Cristinas site. It also performed various other obligations under the contract.

In 2011, Venezuela nationalized its gold mines and seized the Las Cristinas works without providing compensation. As Crystallex asserts and PDVSA does not dispute, Venezuela then gave the mining rights at Las Cristinas to PDVSA for no consideration, and PDVSA subsequently sold to the Venezuelan Central Bank 40% of its shares in the affiliate that was created to exercise those mining rights.

Later that year, Crystallex filed for arbitration under a bilateral investment treaty between Canada and Venezuela before the International Centre for Settlement of Investment Disputes. . . . [T]he arbitration took place in Washington, D.C., and Crystallex won an arbitration award of $1.2 billion plus interest.

Crystallex had its award. Now it had to collect. . . .

Crystallex filed an action to confirm its award in the U.S. District Court for the District of Columbia. It properly served Venezuela, who appeared to defend it. The Court confirmed the award and entered a federal judgment in favor of Crystallex. After Venezuela failed to satisfy the judgment within 30 days, the Court ruled that Crystallex could execute on it. However, the Court expressly declined to address whether Crystallex could attach assets held by PDVSA and its subsidiaries. Venezuela appealed the ruling, and the D.C. Circuit affirmed it.

12.    Thereafter, on June 19, 2017, Plaintiff Crystallex International Corporation ("Crystallex") filed in this District a registration of a foreign judgment issued by the Clerk of the United States District Court for the District of Columbia (*Crystallex International Corporation v.*

*Bolivarian Republic of Venezuela*, Case No. 16-cv-00661 (D.D.C. Apr. 7, 2017)), for the amount of $1.202 billion plus pre-award interest. (D.I. 1)

13.    Crystallex requested that the Court authorize the issuance of a writ of attachment *fieri facias* ("writ"), to attach the PDVH Shares that belong to PDVSA, whom it alleged is an alter ego of Venezuela, and to further attach any other right or assets incident to that ownership interest that may belong to PDVSA.  (D.I. 2)

14.    On August 19, 2018, the Court issued an opinion granting Crystallex's motion for a writ and denying PDVSA's motion to dismiss. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp.2d 380, 386 (D. Del. 2018) ("*Crystallex I*").

15.    On July 29, 2019, the Third Circuit affirmed this Court's grant of the writ to Crystallex. *See Crystallex II*, 932 F.3d at 126; *see also id.* at 139 ("[S]o long as PDVSA is Venezuela's alter ego . . ., the District Court had the power to issue a writ of attachment on [PDVSA's] non-immune assets to satisfy the judgment against the country.").

16.    In its analysis, the Third Circuit observed: "Venezuela owes Crystallex from a judgment that has been affirmed in our courts. *Any outcome where Crystallex is not paid means that Venezuela has avoided its obligations*." *Id.* at 149 (emphasis added).

17.    The Third Circuit "remand[ed] for further proceedings consistent with [its] opinion." *Id.* at 133.

## II.    Appointment Of Special Master And Approval Of His Advisors

18.    On February 16, 2021, the Sale Process Parties – Crystallex, the Venezuela Parties, and ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V. ("ConocoPhillips") – having agreed that the retention of a special master was necessary to oversee the design and implementation of detailed sale procedures, put

forward three candidates for the Court's consideration, including Robert B. Pincus. (D.I. 244)

ConocoPhillips and the Venezuela Parties recommended appointment of Mr. Pincus, whom they

described as a "well-respected member of the Delaware bar" who was "uniquely qualified . . . to

serve as special master in overseeing a value-maximizing sale" of the PDVH Shares. (*Id.* at 5-6)

They noted, among other qualifications, his 30 years of experience as a partner at Skadden, Arps,

Slate, Meagher & Flom LLP representing "numerous companies" in "hundreds of deals,

including many with a value in excess of a billion dollars" and his "experience with petroleum-

industry clients." (*Id.*) Pincus had also served as a special master in a contentious, long-running,

highly-visible litigation in the Delaware Court of Chancery, making him extraordinarily well-

qualified to take on the tasks required in the instant case. *See, e.g.*, *In re TransPerfect Global,*

*Inc.*, 2018 WL 904160, at *17 (Del. Ch. Feb. 15, 2018) (praising Pincus for his "prudence,"

"sound judgment," and ability to "strategically address [litigation] conduct while minimizing

delay and disruption to the sale process and maintaining a competitive bidding dynamic"); *see*

*also Shawe v. Elting*, 157 A.3d 152, 154 (Del. 2017) (describing culmination of *TransPerfect*

matter involving "a six-day trial filled with unprecedented evidence of a lengthy and seriously

dysfunctional relationship between the [company's] owners").

      19.     On April 13, 2021, after interviewing the three candidates, the Court appointed

Mr. Pincus as Special Master. (D.I. 258)

      20.     On May 27, 2021, the Court entered the Order Regarding Special Master (D.I.

277) directing Mr. Pincus to, among other things, "devise a plan for the sale of shares of PDVH

as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other

judgment creditor added to the Sale by the Court and/or devise such other transaction as would

satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold." (D.I. 277 at 3)

21.    Also on May 27, 2021, the Court approved the Special Master's retention of Weil, Gotshal & Manges LLP ("Weil") and Potter Anderson & Corroon LLP as "transaction counsel" to "represent him in his role as Special Master and to assist him in the performance of his duties as Special Master." (D.I. 277 at 7-8)  It authorized him to retain Evercore Group L.L.C. ("Evercore" and, collectively with Weil, the "Advisors") to assist him as well. (D.I. 277 at 7-8; *see also* D.I. 285 at 2)

22.    Evercore is an independent investment banking advisory and investment management firm. (*See* SM28 (D.I. 1838) (July 2, 2025 Declaration of William O. Hiltz) ("Hiltz Declaration" or "Hiltz Decl.") ¶ 6)[4]  Evercore provides a range of investment banking services to multinational corporations in connection with mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings, and other strategic transactions. (Hiltz Decl. ¶ 6)  Evercore has worked on many of the largest transactions in the world. (Tr. (Hiltz) 524-25)  Evercore also has experience advising on judicial sales. (Tr. (Hiltz) 524-25)

23.    In addition to his July 2, 2025 Declaration, Mr. Hiltz, who is a Senior Managing Director in Evercore's strategic advisory group and head of its Special Committee and Board

---

[4] Throughout this Opinion, the Court cites to materials entered on the docket, evidence admitted during the Sale Hearing, official transcripts, and other publicly-available sources. Materials admitted into evidence at the Sale Hearing are identified by exhibit number, which is comprised of two letters indicating the party who moved for the document's admission (i.e., "SM" for the Special Master, "GR" for Gold Reserve, "RT" for Red Tree, and "VP" for the Venezuela Parties) followed by the two or three digit number the moving party used to identify the exhibit during the hearing. Some admitted exhibits have also been filed on the docket. Where available, the Court will include the docket number and/or exhibit number in the first citation to each reference. Subsequent citations to previously-cited materials will either be to a given-name provided in the first citation or, if none exists, the applicable exhibit number.

Advisory practice, submitted three other declarations. (SM30 (D.I. 2004) (August 7, 2025 Corrected Second Supplemental Declaration) ("Hiltz Second Supp. Decl.") ¶ 1; GR03 (D.I. 2124) (August 29, 2025 Declaration in Support of Special Master's Updated Recommendation) ("Hiltz Updated Rec. Decl.") ¶ 1; *see also* Tr. (Hiltz) 518)

24.      In addition to Mr. Hiltz, who has 49 years of experience in investment banking, including mergers and acquisitions, the Evercore team supporting the Special Master includes senior managing directors David Ying, who specializes in restructuring, and Ray Strong, who specializes in energy. (Tr. (Hiltz) 520, 525)

25.      Amidst much litigation, including briefing and oral argument (*see, e.g.*, D.I. 317-19, 409, 455-57), the Court approved the specific terms of the Special Master's engagement of Evercore on October 11, 2022. (D.I. 481 at 10) On March 15, 2023, the Special Master executed the Court-approved Evercore Engagement Letter, which superseded a previous engagement letter and contained terms approved by the Court. (Hiltz Second Supp. Decl. ¶ 6)

26.      The Evercore Engagement Letter sets forth a fee structure where, in addition to a monthly fee, Evercore will receive a transaction fee calculated as a percentage of the consideration paid for the PDVH Shares. (Hiltz Second Supp. Decl. ¶ 7) Accordingly, the higher the sale price, the greater the compensation received by Evercore. (Hiltz Second Supp. Decl. ¶ 7) This fee structure is customary for financial advisory services of a similar nature. (Hiltz Second Supp. Decl. ¶ 7) The Court found this fee structure to be "(a) fair, (b) reasonable, and (c) appropriate." (Hiltz Second Supp. Decl. ¶ 7) (citing SPO (D.I. 481) at 10)

27.      In connection with its role as financial advisor, Evercore has worked to assist the Special Master in his duty to devise and implement a sale process that maximizes the value of the PDVH Shares. (Hiltz Second Supp. Decl. ¶ 8) Evercore also assisted the Special Master by

10

conducting outreach to potential bidders and assisting in negotiations with bidders throughout the

Sale Process, subject to the Special Master's decisions. (Hiltz Second Supp. Decl. ¶ 25) This

included advising the Special Master in the design of the Sale Process, the marketing of the

PDVH Shares, and the review of bids, including analysis of the extent to which the bids are

likely to satisfy judgment creditors' claims. (Tr. (Hiltz) 526) While Evercore dutifully advised

the Special Master, all material decisions, including the recommendation of bids, were ultimately

made by the Special Master. (Hiltz Second Supp. Decl. ¶ 8)

28.     In the months following the appointment of the Special Master, the Court ruled on

multiple issues raised by the parties, including the establishment of the Sale Procedures Order

(D.I. 481); three motions by PDVSA, PDVH, and CITGO to disqualify the Special Master and,

in some cases, Evercore (D.I. 443 (denying first motion); D.I. 538 (order denying second

motion); D.I. 544 (Court's rationale for denying second motion); D.I. 1180 (order denying third

motion)); a dispute regarding the provision and deposit with the Special Master of the share

certificate demonstrating PDVSA's ownership of 100% of the PDVH Shares (D.I. 644); and

disputes over the terms of the model Stock Purchase Agreement (D.I. 1554). Several of these

issues are described again in more detail below, as necessary.

**III.    U.S. Sanctions On Venezuelan Property And The Necessity Of OFAC Approval**

29.     Even before January 13, 2019, when the United States government recognized

Juan Guaidó as the rightful leader of Venezuela, the Executive Branch began imposing economic

sanctions against the government of Venezuela and its property.

30.     In response to the Maduro regime's "attempts to undermine [Venezuela's]

democratic order," President Trump issued Executive Order ("E.O.") 13835 on May 21, 2018,

which was about 11 months after Crystallex initiated this action.

31.    E.O. 13835 prohibits "[a]ll transactions related to, the provision of financing for, and other dealings in . . . the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest."  Prohibiting Certain Additional Transactions With Respect to Venezuela, 83 Fed. Reg. 24001, § 1(a)(iii) (May 21, 2018); *see also* Taking Additional Steps To Address the National Emergency With Respect to Venezuela, 84 Fed. Reg. 509, 509-10 (Jan. 25, 2019) (amending section 3 of E.O. 13835).

32.    On July 19, 2018, the Department of Treasury's Office of Foreign Assets Control ("OFAC"), which "administers and enforces economic sanctions programs primarily against countries," *About OFAC* (available at https://ofac.treasury.gov/about-ofac), began issuing certain licenses, regulations, and guidance pursuant to Executive Order 13835.

33.    One form of OFAC guidance is Frequently Asked Questions ("FAQs").

34.    FAQ 1123 provides: "OFAC will not take enforcement action against any individuals or entities for participating in, facilitating, or complying with the prefatory steps set out in the [*Crystallex*] court's Sale Procedures Order [D.I. 481], or for engaging in transactions that are ordinarily incident and necessary to participating in, facilitating, or complying with such steps (such as serving as potential or actual credit counterparties)."  (RT50 (OFAC FAQ No. 1123 (May 1, 2023)) ("FAQ 1123") at 2)

35.    All parties to this action agree, and the Court has recognized, that a sale of the PDVH Shares cannot occur until OFAC has specifically licensed whatever sale transaction, if any, the Court ultimately approves.  (*See, e.g.*, D.I. 257)  This is because the PDVH Shares being sold are wholly-owned by PDVSA, which is wholly-owned by Venezuela, and are therefore

12

equity interests in an entity more than 50%-owned by the government of Venezuela, within the

meaning of E.O. 13835 Section 1(a)(iii).

36.     OFAC guidance concerning whether it will issue a license under particular

circumstances is limited.  FAQ 1123 provides only that:

> An additional license will be required before any sale [of the PDVH
> Shares] is executed.  As is standard for OFAC's process before
> providing a license for the disposition of blocked property, the
> United States Government will engage in due diligence about the
> identity of a potential purchaser and will consider relevant details of
> the proposed transaction.  Before a potential purchaser has been
> identified, it would be premature to issue any such license or express
> a definitive view on the issuance of a specific license in a future
> scenario.  OFAC nevertheless intends to implement a favorable
> licensing policy towards such license applications in connection
> with the execution of a sale as contemplated in th[is Court's] Sale
> Procedures Order.  As with all OFAC licenses and statements of
> licensing policy, this licensing policy would be without prejudice to
> reconsideration if U.S. foreign policy and national security interests
> materially change.  In making these licensing determinations, OFAC
> is committed to fair and equivalent treatment of potential creditors.

37.     The Venezuela Parties' requested that this case be stayed until the lifting of the

sanctions.  (D.I. 242)  After extensive litigation, the Court rejected the request.  (*See* D.I. 242-43,

249-50, 253, 256-57)  It held, instead, that the Third Circuit's mandate in *Crystallex II* required

the Court to move the Sale Process forward as far as it could go without requiring any individual

or entity to violate the sanctions.  (D.I. 257)  The Court also repeatedly recognized that the Sale

Process Parties and other participants in the Sale Process were of the unanimous view that no

sale could actually close without a license from OFAC.  (*Id.*)

38.     While the Court properly decided to press forward without any knowledge as to

whether the license required to consummate a sale transaction would ever be forthcoming, the

inherent uncertainty on this point may have reduced the number of bidders willing to participate

and may also have reduced the price willing bidders offered to pay.  This does not mean,

13

however, that the Sale Process was flawed or failed to produce a value-maximizing bid that is worthy of court approval. (*See, e.g., infra* Facts Part XXVII; Law Section B)

## IV.    Designing The Sale Process

39.    To ensure that the Special Master had full and appropriate input in performing the monumental, challenging tasks assigned to him, and to further ensure that he heard from a representative cross-section of constituencies interested in the Sale Process – including a range (especially in terms of priority) of judgment creditors as well as the judgment debtors – the Court appointed Sale Process Parties: Crystallex, ConocoPhillips, and the Venezuela Parties. (D.I. 234)

40.    The Special Master and his Advisors, in consultation with the Sale Process Parties, worked to determine the design for the Sale Process. (Tr. (Hiltz) at 526, 534)

41.    On behalf of the Venezuela Parties, Randall Weisenburger proposed that the Special Master should "solicit[] a broad range of alternative proposals for creative solutions from a number of financial firms, evaluate[] those proposals, and ultimately retain[] the firm with the best, most value-maximizing proposal to execute the proposed transaction." (VP187 (D.I. 1951-2 Ex. 1) (Fifth Supplemental Declaration of Randall J. Weisenburger) ("Weisenburger Decl.") ¶ 10 (citing D.I. 354-1 ¶ 5(a))) Mr. Weisenburger additionally "provided the Special Master with a list of potential sale design alternatives, including a traditional IPO, . . . a private placement transaction, or even a joint venture with a strategic partner." (Weisenburger Decl. ¶ 10) (citing D.I. 354-1 ¶ 12)

42.    Before deciding to recommend the Sale Process the Special Master ultimately recommended to the Court, the Special Master and his Advisors considered a number of

14

alternatives, including those proposed by Mr. Weisenburger. (Tr. (Hiltz) 526, 528-31, 533; Hiltz Second Supp. Decl. ¶¶ 9-12)

43.     The Special Master and his Advisors also considered the prospect of an IPO but rejected the idea for several reasons. (Tr. (Hiltz) 529) First, after a high point in 2021, conditions in the IPO market were generally quite negative when the Special Master and his Advisors began to design the Sale process. (Tr. (Hiltz) 529) Second, Evercore had seen, in recent years, little appetite among institutional investors for primary equity offerings in connection with refining and marketing companies. (Tr. (Hiltz) 530) Third, pursuing an IPO would leave open questions about the governance of CITGO. (Tr. (Hiltz) 530) Fourth, institutional investors had no interest in being a minority partner in a company still owned by PDVSA and reaching a governance arrangement with PDVSA to limit its control was a remote possibility. (Tr. (Hiltz) 530-31) Fifth, the arduous disclosure process involved with an IPO would have required even more cooperation from CITGO than the auction process ultimately employed, and there could be no certainty CITGO would cooperate. (Hiltz Second Supp. Decl. ¶ 11) Sixth, an IPO would require the Special Master and his Advisors to determine the fair value of the PDVH Shares, rather than allowing an open and competitive bidding process to do so, and thus would have rendered the process less "objective in terms of value" for the holders of attached judgments and the Venezuela Parties. (VP073 (Email between Special Master's Advisors re Sale Process) at 1) It is also questionable whether an IPO would have complied with 8 Del. C. § 324. (*See* Tr. (Hiltz) 566; *see also* D.I. 71 at 8 (PDVSA arguing: "Section 324 contemplates execution only by a 'public sale' [and] does not identify any other form of execution on shares."))

15

44.    The sale process ultimately recommended by the Special Master, with the assistance Evercore, was typical of many divestiture sales.  It involved a multi-stage process beginning with the issuance of a teaser to potentially interested parties, a comprehensive diligence phase that included meetings with management and access to a virtual data room, and a series of competitive bidding rounds and negotiations with bidders to select the most favorable bid for the asset.  (Tr. (Hiltz) 526-28)

45.    In Evercore's initial solicitation of bids, bidders were offered the opportunity to bid for all or part of the PDVH Shares, but no bidder came forward with an interest in purchasing less than 100% of the shares.  (Tr. (Hiltz) 529, 533)

46.    The Special Master considered all appropriate options at every stage and cannot fairly be faulted if, with the perfect clarity of hindsight (which was unavailable at the time difficult decisions had to be made), there are indications another approach may have somehow yielded better results.

**V.    Entry Of The Sale Procedures Order**

47.    The Special Master filed an initial proposed Sale Procedures Order on August 9, 2021 (D.I. 302), after which the Venezuela Parties and others engaged in multiple rounds of objections briefing regarding the substance of its terms.  (*See, e.g.*, D.I. 354, 355, 423, 457, 561)

48.    On October 11, 2022, after more than a year of litigation, as well as extensive negotiation between the Special Master and the Sale Process Parties, the Court entered the Sixth Revised Proposed Sale Procedures Order as the governing Sale Procedures Order ("SPO").  (D.I. 481)

49.    The SPO directs the Special Master to engage in a marketing process pursuant to the Bidding Procedures.  (D.I. 481 ¶ D)  The Court found that the Bidding Procedures were

16

"substantively and procedurally fair to all parties and potential bidders," "afford[ed] notice and a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the PDVH Shares," and were "fair, reasonable, and appropriate." (D.I. 481 ¶ C)

50.    The SPO set out that the Sale Process would occur in three phases:

a.    First, during the six (6) months following the entry of the SPO (the "Six-Month Window"), the Special Master would solicit feedback from OFAC and the Sale Process Parties regarding his plan to market the PDVH Shares. (*Id.* ¶ 3)

b.    Second, the Special Master would initiate the marketing process upon the Court's approval of a designated date, at which point the Special Master would, among other things, solicit competitive bids for the PDVH Shares and identify other judgment creditors qualified to participate in the Marketing Process (the "Additional Judgment Creditors" or "AJCs"). (*Id.* ¶ 30)

c.    Third, after consideration of the bids, the Special Master would select the best bid and advise the Court whether to approve that best bid, after which the Court would hold a Sale Hearing to consider the Special Master's recommendations. (*Id.* ¶¶ 2, 12)

51.    The purpose of the Sale Process is to obtain a value-maximizing Sale Transaction, in compliance with Delaware law and to provide the greatest benefit achievable for the judgment creditors. (*See, e.g.*, D.I. 481 ¶¶ D, H, 33, 36; D.I. 1554 at 4 ("[T]he Court has endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH."))

52.    While the "purchase price" of any bid is measured by "the amount of Attached Judgments expected to be satisfied" (D.I. 1528-3 Ex. C (Special Master proposing definition); D.I. 1554 at 16 (Court adopting Special Master's proposal)), other relevant considerations, consistent with the SPO and Delaware law, include (a) the amount of cash actually paid to judgment creditors, (b) the value of a transaction to the judgment debtor, and (c) the likelihood that any bid can actually close and be consummated. (*See, e.g., infra* Law Parts D, G)

## VI.    The First, Second, And Third Disqualification Motions

53.    Motions to disqualify – the Court, the Special Master, and/or his Advisors – have been a feature of the Sale Process from its inception.

54.    On August 25, 2021, the Venezuela Parties filed their first motion to disqualify, which sought to disqualify both the Special Master and Evercore based on the "sale fee" component of Evercore's proposed fee structure.  (D.I. 317, 354)

55.    After briefing and oral argument (*see, e.g.*, D.I. 303, 317, 354, 385, 409), the Court denied the motion, finding that "these proceedings have not been tainted by a proposed contingency fee that has been disclosed and is still being vetted, subject to the parties' objections, and to which all parties other than the judgment debtor have agreed" (D.I. 443 at 9).

56.    In January 2023, the Venezuela Parties filed their second disqualification motion directed toward the Special Master, based on *ex parte* contacts the Special Master had with OFAC.

57.    The Sale Procedures Order had directed the Special Master, in the Six-Month Window, to "solicit and attempt to gain clarity or guidance from [OFAC] of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of

18

the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction." (D.I. 481 ¶ 3)

58.     Consistent with this direction, the Special Master sought to obtain OFAC's position on whether it would grant a license to a transaction that might result from the Sale Process. Among other efforts at such engagement, the Special Master was granted an *ex parte* meeting with representatives of the Executive Branch, including OFAC and the Department of Justice, to be held on January 12, 2023. (D.I. 503 at 2 & Ex. A)

59.     The Venezuela Parties requested permission to attend the Special Master's meeting with OFAC but, after litigation over the issue (*see* D.I. 502-05), the Court denied their request (D.I. 506 at 1).

60.     Shortly after the meeting occurred, the Venezuela Parties moved to disqualify the Special Master on the basis of his purported improper advocacy before OFAC. (*See* D.I. 509 at 10-13)

61.     The Court denied this second motion to disqualify the Special Master on April 4, 2023. (D.I. 538 at 1) As the Court explained, "the motion was untimely [and based on waived grounds] because the grounds for it were known to the moving parties for at least many months prior to the filing of their motion," as the Special Master had previously met with OFAC *ex parte* on several prior occasions. (D.I. 544 at 3-8) In addition, the Court found that the motions "fail[ed] on the merits" because the Special Master did not engage in "advocacy" before OFAC and "the moving parties have no evidence that the *ex parte* meeting on January 12th was materially different than all of the prior meetings." (D.I. 544 at 8)

62.     More than a year later, on April 26, 2024, the Venezuela Parties filed their third motion to disqualify the Special Master, based on evidence they obtained through a Freedom of

Information Act request demonstrating that, in their view, the Special Master did, in fact, engage in improper advocacy before OFAC. (*See* D.I. 1138 at 2) (citing presentation made to OFAC in which Special Master requested that OFAC "provide authorization of the Special Master sale process in the form of a General License or broad specific license") (internal emphasis omitted)

63. The Court denied the Venezuela Parties' motion to disqualify on May 31, 2024. (D.I. 1180 at 1) The Court explained that the motion was untimely and waived, and meritless because "the Venezuela Parties failed to show the Special Master engaged in 'advocacy' before OFAC." (D.I. 1180 at 9)

**VII.    *Ex Parte* Communications Among The Court, Special Master, And His Advisors**

64. As the Court has had occasion to explain: "since it appointed the Special Master, by order dated May 27, 2021, *ex parte* interactions have been expressly permitted and contemplated, and consented to, in the unusual and highly challenging post-judgment circumstances presented by this long-running and enormously contentious litigation." (D.I. 506 ¶ 3 (quoting D.I. 277 ¶ 8: "The Special Master may communicate *ex parte* with the Court, any Party, any Party's attorneys, ConocoPhillips, and ConocoPhillips' attorneys at the Special Master's discretion as necessary to carry out his duties."))

65. The Court's oversight of the Sale Process and ability to manage the litigation depended on an open channel of communication with the Special Master.

66. The Court reminded the parties of the Special Master's ability to meet with the Court *ex parte* on several occasions, and no party objected. (*See, e.g.,* D.I. 409 at 263-53 ("I further want to reiterate, we all know this, but the May 27, 2021 order contemplates and permits *ex parte* discussions with the Special Master. I have had *ex parte* discussions with the Special Master, and I expect to have more after today."); D.I. 443 n.7 ("The parties are reminded that the

20

Court may meet, has met, and expects to continue to meet *ex parte* with the Special Master.");

D.I. 544 at 8 & n.13 (noting that "express language" of "Federal Rule of Civil Procedure 53 and

various cases applying that rule approve[d] of judges authorizing *ex parte* communications by a

special master with the Court or a party") (alteration in original))

67.    On May 10, 2023, the Court issued an order stating its intention "to conduct *ex*

*parte* meetings (by telephone or in person) with the Special Master on an approximately monthly

basis beginning in July 2023."  (D.I. 559 ¶ 8)  In anticipation of those meetings, the Court

ordered the Special Master to "file a notice on the docket" of each *ex parte* conference within

seven days after its conclusion.  (*Id.*)

68.    Ultimately, such meetings took place on the following dates: July 27, 2023 (D.I.

649), August 31, 2023 (D.I. 706), October 9, 2023 (D.I. 742), November 7, 2023 (D.I. 787),

December 1, 2023 (D.I. 793), January 5, 2024 (D.I. 844), February 2, 2024 (D.I. 932), March 29,

2024 (D.I. 1098), June 18, 2024 (D.I. 1191), August 29, 2024 (D.I. 1245), June 24, 2025 (D.I.

1830), August 11, 2025 (D.I. 2048), and August 13, 2025 (D.I. 2048).

69.    The May 10, 2023 Order contemplated that a court reporter would be present to

transcribe what was said in the *ex parte* meetings.  (D.I. 559 ¶ 8)

70.    All *ex parte* meetings held after May 10, 2023 were transcribed and the Court

subsequently docketed all of the transcripts of these meetings (although in some instances the

transcripts are redacted to protect confidential bidder information).  (*See* D.I. 2467, 2545; *see*

*also* D.I. 2473-1, 2473-2, 2473-3, 2473-4, 2473-5, 2473-6, 2473-7, 2473-8, 2473-9, 2473-10,

1840-1, 2155-1, 2155-1)

## VIII. Involvement Of Additional Judgment Creditors And The Priority "Waterfall"

71.     Following the Third Circuit's affirmance of this Court's finding that PDVSA is

the alter ego of Venezuela, numerous additional judgment creditors of the Republic, and of

PDVSA, registered judgments in this District and moved for writs of attachment of the PDVH

Shares.  At least 30 such actions were filed in this District and assigned to the undersigned

Judge.[5]

---

[5] *See, e.g., Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela,* Misc. No. 18-343 (filed Dec. 11, 2018); *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela,* Civ. No. 18-1963 (filed Dec. 12, 2018); *OI European Group B.V. v. Bolivarian Republic of Venezuela,* Civ. No. 19-290 (filed Feb. 2, 2019); *OI European Group B.V. v. Bolivarian Republic of Venezuela,* Misc. No. 19-290 (filed Nov. 4, 2019); *Contrarian Capital Management, L.L.C. v. Bolivarian Republic of Venezuela*, Misc. No. 21-018 (filed Jan. 21, 2021); *Rusoro Mining Limited v. Bolivarian Republic of Venezuela,* Misc. No. 21-481 (filed Nov. 4, 2021); *Contrarian Capital Management, L.L.C. v. Bolivarian Republic of Venezuela*, Misc. No. 22-131 (filed Mar. 18, 2022); *Koch Minerals Sarl v. Bolivarian Republic of Venezuela*, Misc. No. 22-156 (filed Mar. 31, 2022); *Contrarian Capital Management, L.L.C. v. Bolivarian Republic of Venezuela*, Misc. No. 22-263 (filed June 10, 2022); *Siemens Energy, Inc. v. Petroleos de Venezuela, S.A.*, Misc. No. 22-347 (August 16, 2022); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela,* Misc. No. 22-453 (filed Oct. 5, 2022); *Banco San Juan Internacional Inc. v. Petroleos de Venezuela S.A,* Civ. No. 22-1315 (filed Oct. 5, 2022); *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela,* Misc. No. 23-298 (filed June 7, 2023); *Lovati v. Bolivarian Republic of Venezuela*, Misc. No. 23-340 (filed July 13, 2023); *Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela,* Misc. No. 23-360 (filed Aug. 2, 2023); *Pharo Gaia Fund, Ltd. v. Bolivarian Republic of Venezuela,* Misc. No. 23-361 (filed Aug. 2, 2023); *Gramercy Distressed Opportunity Fund LLC v. Bolivarian Republic of Venezuela,* Misc. No. 23-378 (filed Aug. 17, 2023); *Gramercy Distressed Opportunity Fund LLC v. Bolivarian Republic of Venezuela,* Misc. No. 23-379 (filed Aug. 17, 2023); *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela,* Misc. No. 23-397 (filed Sept. 1, 2023); *Ostrider Limited v. PDVSA Petroleo S.A.,* Civ. No. 23-1405 (filed Dec. 7, 2023); *UML Blanford Limited v. PDVSA Petroleo S.A.,* Civ. No. 23-1406 (filed Dec. 7, 2023); *Union Glory Limited v. PDVSA Petroleo S.A.,* Civ. No. 23-1407 (filed Dec. 7, 2023); *Clion Limited v. PDVSA Petroleo S.A.,* Civ. No. 23-1408 (filed Dec. 7, 2023); *Altana Credit Opportunities Fund SPC v. Bolivarian Republic of Venezuela,* Misc. No. 23-608 (filed Dec. 21, 2023); *Devengoechea v. Bolivarian Republic of Venezuela,* Misc. No. 23-609 (filed Dec. 21, 2023); *Clion Limited v. PDVSA Petroleo S.A.*, Civ. No. 23-1409 (filed Dec. 7, 2023); *Cimontubo - Tubagens E Soldadura, LDA v. Petroleos de Venezuela, S.A.,* Misc. No. 24-018 (filed Jan. 11, 2024); *Alya Construtora S.A. v. PDVSA Petroleo S.A.*, Civ. No. 24-513 (filed April 25, 2024); *Serama, S.A. v. Bariven, S.A.*, Civ. No. 24-764 (filed June 28, 2024); *ConocoPhillips Petrozuata*

72.    During the Six-Month Window created by the SPO, the Court considered and ruled on the inclusion in the Sale Process of additional judgments beyond those held by Crystallex and ConocoPhillips. (*See* D.I. 646, 693, 902, 928, 996)

73.    In an order issued on July 27, 2023, following a great deal of litigation, the Court explained that, as part of its effort to comply with the Third Circuit's mandate in *Crystallex II*, it would allow Additional Judgment Creditors to participate in the Sale Process. (D.I. 646; *see also* D.I. 564, 566-67, 569, 571-76, 585-97, 599-612, 626-27, 629-30, 639, 641-42)[6] The Court explained that "[a]llowing creditors with conditional writs of attachments to have their judgments recognized as Additional Judgments vindicates those creditors' diligence in preserving their rights, an important principle embodied in Delaware law," and further found that inhibiting creditors' ability to become AJCs "too early in the sale process" "would be inconsistent with the intent of the SPO, and undermine judicial economy" (D.I. 646 at 13-14).

74.    The Court set out a step-by-step framework for additional creditors to become part of the Sale Process, attach their judgments to the PDVH Shares, and potentially recover from any sale transaction at the conclusion of the process ("Sale Transaction"). (D.I. 646 at 13) The Court also made each AJC responsible to "pay its prospective, per capita share of [certain] expenses" incurred by the Special Master and his Advisors. (*Id.*)

75.    The Court next turned to the issue of priority among the AJCs. After extensive litigation (*see, e.g.*, D.I. 542, 640, 646, 738, 928-29, 943-45, 959, 996, 1036), the Court

---

*B.V. v. Girard Street Investment Holdings LLC*, Civ. No. 24-1140 (filed Oct. 14, 2024); *Asia Genius Investment Limited v. Bariven, S.A.*, Civ. No. 24-1379 (filed Dec. 16, 2024).

[6] All docket index ("D.I.") references throughout this Opinion are to the docket in *Crystallex*, 17-mc-151, unless otherwise noted. Many additional items have been docketed in one or more of the related actions, and many of the same items docketed here in *Crystallex* have, at times, also been docketed there.

established a priority scheme complying with Delaware law's "first-in-time, first-in-line"

principle.  (D.I. 1136 at 3 (citing D.I. 969-1); *see also* D.I. 1102)  Specifically, a judgment

creditor's priority was determined by the date it filed a motion for a writ of attachment that was

ultimately granted, regardless of the date the motion actually was granted.  (*See* D.I. 646 at 23-

25)

76.    Applying this priority scheme, the Court created a ranking of creditors by their

priority dates, thereby creating a "waterfall" order of creditors to whom proceeds from a Sale

Transaction would flow (that is, be paid out).

77.    The waterfall is reproduced below.  It lists Crystallex and then each AJC in order

of priority and also shows the amount of judgment each creditor is attempting to enforce in this

action.  Thus, for example, as shown by the black arrow along the right-hand side of the table, a

completed sale with a purchase price of $5.5 billion would satisfy the judgments of all creditors

up to and through Koch Minerals Sàrl and Koch Nitrogen International Sàrl (collectively,

"Koch"), although Koch would only have a portion of its judgment satisfied.  By comparison, as

shown by the red arrow, a purchase price of $8 billion would satisfy the judgments of all

creditors up to and through Valores Mundiales ("Valores"), although Valores would only have a

portion of its judgment satisfied.

| Priority Order | Creditor | Total Claim ($) as of 6/30/2026 | |
|---|---|---|---|
| 1 | Crystallex | $1,019,679,606.70 | |
| 2 | Tidewater | 78,433,673.51 | |
| 2 | Tidewater (Fees) | 2,872,796.02 | |
| 3 | ConocoPhillips (Petrozuata/Hamaca) | 1,411,834,614.32 | |
| 4 | OIEG | 686,901,600.91 | |
| 4 | Northrup Grumman | 139,450,093.97 | |
| 5 | ACL | 118,908,075.68 | |
| 6 | Red Tree (-2519) | 218,150,048.92 | $5.5 billion |
| 6 | Red Tree (-2523) | 126,066,431.15 | |
| 6 | Red Tree (Fees) | 2,879,450.50 | |
| 7 | Rusoro | 1,568,585,159.10 | |
| 8 | ConocoPhillips (Corocoro) | 48,296,957.36 | |
| 9 | Koch | 470,881,329.32 | |
| 10 | Gold Reserve | 1,255,605,277.03 | |
| 11 | Siemens | 232,705,880.67 | $8.0 billion |
| 12 | Valores Mundiales | 718,140,557.92 | |
| 13 | Contrarian (October 2020) | 291,263,157.16 | |
| 13 | Contrarian (May 2021) | 60,200,257.17 | |
| 13 | Contrarian (October 2021) | 44,451,328.66 | |
| 14 | ConocoPhillips (ICSID) | 11,487,737,435.78 | |
| 15 | Gramercy (18-1371) | 258,703,766.79 | |
| 15 | Gramercy (18-1373) | 281,594,295.25 | |
| 16 | Saint-Gobain | 57,412,278.65 | |
| | **Total** | **$20,680,754,072.56** | |

78.     The amounts of judgments shown in the waterfall here are estimates as of an assumed closing date of the sale of the PDVH Shares of June 30, 2026, and are consistent with the calculations approved by the Court in its Order of April 25, 2024. (*See* D.I. 1136 at 3) (citing D.I. 969-1)  The precise amounts of distributions to creditors will be determined as of the date of the actual closing of the sale.[7]

---

[7] The most recently updated waterfall calculations were provided on August 28, 2025, when the Special Master received correspondence from ConocoPhillips advising that it had recovered the sum of $869,955 on its Petrozuata/Hamaca Judgment against PDVSA and subsidiaries PDVSA Petróleo, S.A. and Corpoguanipa, S.A.  (D.I. 2123 at 4 n.3)  Due to interest accruing and the uncertain date of closing, the amounts listed in the waterfall in this Opinion (like all the amounts provided by the Special Master in any of the calculations he has shared with Sale Process participants) are necessarily illustrative.  But the order of priority is fixed and any variation between the figures in the waterfall shown here and the precise amounts that will be owed and/or paid at closing is not material to any issue being decided by the Court.

### IX.    The 2020 Bondholders, Their SDNY Litigation, And OFAC

79.    The "2020 Bondholders" (also referred to as the "2020s") are owners (or an ad hoc group of such owners, depending on context) of certain bonds issued by PDVSA ("2020 Bonds"), as more fully described throughout this Opinion.

80.    As the Court recently explained, "[t]he 2020 Bondholders purport to have an interest in 50.1% of the stock of CITGO Holding, a subsidiary of PDVH and the sole shareholder of CITGO." (D.I. 2526 at 36)

81.    The source of the 2020s' purported rights is an Indenture, pursuant to which PDVSA issued the Bonds (RT64), and a Security and Pledge Agreement, which provides the Bondholders a security interest in 50.1% of the common stock of CITGO Holding, in the event PDVSA defaults on the Bonds (RT63).

82.    It is undisputed that a default has occurred and, thus:

> [The 2020s'] rights – which have just been upheld by the SDNY in a decision now on appeal at the Second Circuit – pose a risk to the sale of the PDVH Shares if the Successful Bidder relies on financing leveraged against the assets of CITGO.  If, for instance, a condition of obtaining financing to purchase the PDVH Shares is that the Successful Bidder create an acquisition entity to borrow funds and then merge with CITGO (so the debt can be secured by the assets of CITGO), the 2020s might be able to prevent such a merger by voting their shares against it.  *See generally* 8 Del. C. § 251(b)-(c) (requiring majority of shareholders to approve any proposed merger).  Alternatively, the 2020s could conceivably seek an injunction to prevent a transaction predicated on leveraging the CITGO assets.  At the Sale Hearing, much evidence and argument was directed to whether the 2020s can actually take these actions, and whether approval from the Office of Foreign Assets Control ("OFAC") would be necessary to allow them to do so.

(D.I. 2526 at 36)

83.    E.O. 13857 covers the common stock of CITGO Holding because that stock is an "equity interest in any entity in which the Government of Venezuela has a 50 percent or greater

ownership interest." Prohibiting Certain Additional Transactions With Respect to Venezuela, 83 Fed. Reg. 24001, § 1(a)(iii) (May 21, 2018); *see also* Taking Additional Steps To Address the National Emergency With Respect to Venezuela, 84 Fed. Reg. 509, 509-10 (Jan. 25, 2019) (amending section 3 of E.O. 13835).

84.     On July 19, 2018, OFAC issued General License 5, authorizing "all transactions related to, the provision of financing for, and other dealings in" the purported CITGO Holding pledge to the 2020 Bondholders that would otherwise be prohibited under Section 1(a)(iii) of E.O. 13835." OFAC General License No. 5 Authorizing Certain Transactions Related to the Petroleos de Venezuela SA 2020 8.5 Percent Bond ("GL-5") (available at General Licenses Issued Pursuant to Venezuela-Related Executive Order 13835, 85 Fed. Reg. 14572-01, 2020 WL 1185120); *see also* U.S. DEP'T OF THE TREASURY, OFAC FAQ NO. 595 (Nov. 7, 2024) ("FAQ 595") (available at https://ofac.treasury.gov/faqs/595).

85.     On October 24, 2019, OFAC issued General License 5A, which suspended the effectiveness of General License 5. OFAC General License No. 5A Authorizing Certain Transactions Related to the Petroleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020 ("GL-5A") (available at General Licenses Issued Pursuant to Venezuela-Related Executive Order 13835, 85 Fed. Reg. 14572-01, 2020 WL 1185120); *see also* FAQ 595.

86.     On October 29, 2019, PDVSA, PDVSA Petróleo, and PDVH (together the "SDNY VZ Parties") filed a complaint in the United States District Court for the Southern District of New York against MUFG Union Bank N.A. and GLAS Americas LLC, the trustee and collateral agent with respect to the 2020 Bonds, respectively, seeking a judgment declaring the 2020 Bonds invalid, illegal, null, and void ab initio (the "2020s Litigation" or "SDNY

Litigation"). *See Petróleos de Venezuela S.A. v. MUFG Union Bank*, No. 1:19-cv-10023 ("*MUFG*") (S.D.N.Y. Oct. 29, 2019) D.I. 1)

87.     For nearly six years, as the SDNY Litigation has progressed, OFAC has continuously extended the suspension of General License 5, doing so a total of 18 times so far, delineating the series of suspensions as General Licenses 5A through 5S. *See* FAQ No. 595; *see also* U.S. Dep't of the Treasury, General License 5S ("GL-5S") (June 20, 2025) (available at https://ofac.treasury.gov/media/934391/download?inline). Most recently, on June 20, 2025, OFAC issued General License 5S, suspending General License 5 until December 20, 2025. *See* GL-5S.

88.     On October 16, 2020, Judge Failla of the SDNY, who is presiding over the 2020s Litigation, determined that the 2020 Bonds are valid and enforceable under New York law. She entered judgment against the SDNY VZ Parties.

89.     The SDNY VZ Parties appealed Judge Failla's 2020 judgment.

90.     In 2022, the Court of Appeals for the Second Circuit certified questions of law to the New York Court of Appeal, relating to whether the 2020 Bonds' validity was governed by New York or Venezuela law. *See Petróleos de Venezuela S.A. v. MUFG Union Bank*, 51 F.4th 456, 459-60 (2d Cir. 2022). The New York Court of Appeals responded in 2024, having concluded that Venezuela law applies. *See Petróleos de Venezuela S.A. v. MUFG Union Bank*, 41 N.Y.3d 462, 482 (N.Y. 2024). The Second Circuit then vacated the judgment regarding the validity of the Bonds under New York law and remanded the case to Judge Failla to determine the validity of the bonds under Venezuela law. *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 270 (2d Cir. 2024).

91.    OFAC FAQ No. 1124 states: "OFAC will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the P[D]VSA 2020 8.5 percent bonds," but any actions beyond "preserv[ing] the ability to enforce," including in connection with "any sale," would require a specific license.  (RT51 (U.S. Dep't of Treasury, Venezuela Sanctions FAQ No. 1124 ("FAQ 1124") (May 1, 2023)); *see also* RT49 (U.S. Dep't of Treasury, Venezuela Sanctions FAQ No. 808 ("FAQ 808") (May 1, 2023)); FAQ 1123 (May 1, 2023))

92.    In 2024, during the initial marketing process, the Special Master tried to negotiate an agreement with the 2020 Bondholders to eliminate any risk of them interfering with any potential sale of the PDVH Shares.  (Tr. (Hiltz) 595-96, 614)  Bidders would have been able to use the Special Master's settlement if they wished to avail themselves of it but would not have been required to do so.  (Tr. (Hiltz) 595-96)  In attempting to come to this potential agreement, the Special Master sought to create a level playing field among bidders with respect to settlements with the 2020 Bondholders.  (Tr. (Hiltz) 595-96)

93.    On September 13, 2024, the 2020 Bondholders sent a draft transaction support agreement to counsel for the Special Master proposing to release the CITGO Holding Pledge in exchange for $1.684 billion in cash at the closing of the PDVH stock sale.  (VP001.002; VP002.009; Tr. (Hiltz) 615-16; *see also* Apr. 17, 2025 Tr. at 127-28 (counsel for the Special Master explaining that "[t]he Special Master negotiated a deal with the 2020s" and "had a deal in principle"))

94.    Each of the Sale Process Parties – Crystallex, ConocoPhillips, and the Venezuela Parties – strongly opposed the Special Master's deal with the 2020s.  (VP003.002 ("Crystallex is not supportive of it"); Tr. (Hiltz) 614-15) ("[T]he sales process parties were violently objecting

to it . . . ."); VP25 (letter to Special Master from Venezuela Parties expressing strong opposition to his efforts to reach agreement with 2020s); VP27 (same); VP30 (same); VP33 (same))

95. Because of this opposition, the Special Master did not execute an agreement with the 2020s but, instead, ceased his efforts to reach such an agreement. (Tr. (Hiltz) 596, 615)

## X. Alter Ego Litigation

96. As a consequence of Crystallex's and other AJCs' success in proving that PDVSA is the alter ego of Venezuela, and further because the more junior AJCs could see by comparing the waterfall to even the most optimistic (and non-credible) valuations of CITGO that their judgments were not going to be paid from the proceeds of a Sale Transaction, several creditors filed suits seeking to prove that PDVH is also the alter ego of Venezuela and/or PDVSA.

97. Three creditors of the Republic and PDVSA – Girard Street Investment Holdings LLC ("Girard Street"), G&A Strategic Investments I LLC ("G&A"), and Gramercy Distressed Opportunity Fund LLC ("Gramercy") (together the "Alter Ego Claimants") – filed a series of complaints against PDVH in the Southern District of New York and in Texas state court between June 10, 2024 and July 29, 2024. (*See* D.I. 1249 at 12-14; *see also, e.g.*, *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 24-cv-4448 (S.D.N.Y.); *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 23-cv-10772 (S.D.N.Y.); *G&A Strategic Investments I LLC, v. Petróleos de Venezuela, S.A.*, No. 23-cv-10766 (S.D.N.Y.) (consolidated))

98. The Alter Ego Claimants were attempting to collect on default judgments that they held against PDVSA and the Republic by alleging that PDVH is the alter ego of PDVSA. (D.I. 1249 at 14)

99.     These creditors had also participated in this Court's Sale Process but their participation came relatively late, leading their judgments to be placed near the bottom in the priority waterfall.

100.     If the Alter Ego Claimants prevailed on their "reverse veil-piercing" claims (the "Alter Ego Claims"), which would have made PDVH liable for the debts of PDVSA, any future owner of the PDVH Shares may have been responsible for paying all of the debts of PDVSA (and possibly also PDVSA's alter ego, Venezuela), a risk that could impede the Special Master's ability to sell the PDVH Shares in this Court's Sale Process at a price that would pay Crystallex and the AJCs in the waterfall. (*See* D.I. 1327 at 1-2)

101.     On September 9, 2024, the Special Master filed a motion asking the Court to enjoin the relief sought in the cases brought by the Alter Ego Claimants. (D.I. 1248) He argued that the Alter Ego Claims "create a cloud of uncertainty over the PDVH Shares and thereby threaten to inhibit the Special Master's ability to close a value-maximizing sale transaction and fulfil his mandate, since bidders are reasonably concerned about the risk the creditors will later lay claim to the assets the bidders are seeking to purchase." (D.I. 1249 at 2) To solve this problem, the Special Master recommended a bid (the first Amber Energy Inc. bid), which contained an escrow arrangement under which the Court would enjoin the alter ego litigation pending in other courts and then offer the Alter Ego Claimants an opportunity to negotiate and, if necessary, litigate their claims only in this Court. (*See infra* Facts Parts XI)

102.     After expedited briefing (*see, e.g.*, 1249, 1277, 1306, 1327), and oral argument (D.I. 1357), the Court denied the Special Master's motion to enjoin (D.I. 1515). The Court concluded that there was no legal basis for such an injunction; bidders may be willing to purchase the PDVH Shares in the absence of an injunction or could factor the Alter Ego Claims

31

into their bids; the traditional factors for awarding injunctive relief were not satisfied; and injunctive relief could not be appropriately tailored. (D.I. 1515)

## XI.    Initial Marketing Process And First, Failed, Amber Energy Bids (2023-24)

103.    On July 17, 2023, the Court authorized the Special Master to begin preparations to launch Marketing Process on July 24, 2023. (Hiltz Decl. ¶ 8)

104.    On October 23, 2023, the Special Master formally launched the initial marketing process. (Hiltz Decl. ¶ 10; *see also* D.I. 768)

105.    Evercore, in consultation with the Sale Process Parties, initially identified 93 potential bidders for the PDVH Shares, which it placed into three categories. (Tr. (Hiltz) 534; *see also* Hiltz Decl. ¶ 9) The first category included potential strategic buyers, such as other refining and marketing companies and adjacent companies. (Tr. (Hiltz) 534-35) These strategic buyers included both U.S. and foreign pipeline and storage companies, chemical companies, and traders of refined products and crude oil. (Tr. (Hiltz) 534-35) The second category included private equity investors, selected primarily on the basis that they were large enough to complete a transaction of this size. (Tr. (Hiltz) 535) The third category consisted of sovereign wealth funds. (Tr. (Hiltz) 536)

106.    Evercore distributed a multi-page teaser to the 93 potential bidders identified in the initial outreach list, which included a description of CITGO, its financial performance, and the particular opportunity being offered. (Tr. (Hiltz) 527)

107.    In addition to distributing marketing materials, these 93 potential bidders received non-disclosure agreements ("NDAs"). (Tr. (Hiltz) 527)

108.    In advance of the formal launch of the initial marketing process, Evercore prepared a preliminary draft valuation of CITGO in September 2023 (the "Evercore Preliminary

Valuation"). (Tr. (Hiltz) 536-38)  The Evercore Preliminary Valuation was a desktop valuation, based on CITGO's own projections at the time, and Evercore did not make any adjustments to the assumptions, run any sensitivities on the projections, or factor in contingent liabilities (most notably the Alter Ego Claims and the PDVSA 2020 Bondholders' claims). (Tr. (Hiltz) 537-39; *see also* SM04 (Hiltz Second Supp. Decl. Ex. D) (Email from Evercore to CITGO Regarding Evercore Valuation))  Based on these projections, Evercore ascribed a range of valuations to the PDVH Shares with a midpoint discounted cash flow ("DCF") value of $13.2 billion. (Hiltz Second Supp. Decl. ¶ 14)

109.    The projections provided by CITGO that formed the basis of the valuation have proven to be overly optimistic. (Tr. (Hiltz) 537-38; Tr. (Alberro) 827-29)  Mr. Hiltz testified persuasively that no investment banker would "take a valuation that was done two years earlier based on projections that are now completely off and use that as a benchmark to evaluate bids that you were receiving today." (Tr. (Hiltz) 723)  Thus, the Evercore Preliminary Valuation has no probative value in the Court's assessment of the value of the PDVH Shares, as further explained later in this Opinion. (*See infra* Facts Part XXVI; Law Section C)

110.    On December 12, 2023, Evercore began distributing a first-round bid letter to 27 potential counterparties that had executed NDAs. (Tr. (Hiltz) 541-42; SM49 (Letter from Evercore Regarding Bid Process)  Potential bidders were provided with a comprehensive confidential information memorandum ("CIM") that was much more detailed than the teaser they had previously received. (Tr. (Hiltz) 527; VP-071 (CIM))

111.    In response, 12 potential bidders submitted non-binding indications of interest ("IOIs") on or around the January 22, 2024 deadline. (D.I. 1837 ¶ 29; Tr. (Hiltz) 527, 543)  After reviewing the submitted IOIs, including the potential bidders' capacity to actually

complete their proposed transaction, Evercore recommended that the Special Master advance nine of those potential bidders to the second round of the initial marketing process. (D.I. 1837 ¶ 30; Tr. (Hiltz) 528)

112.    On February 12, 2024, Evercore, on behalf of the Special Master, opened the virtual data room (the "VDR") to the nine potential bidders who advanced to the second round and began engaging with them on a near-daily basis regarding their diligence questions and proposed transaction structures. (Tr. (Hiltz) 528) The VDR contained more than 59,000 documents with detailed information regarding PDVH, the PDVH Shares, and CITGO. (Hiltz Decl. ¶ 33; Tr. (Hiltz) 528) Potential bidders were also allowed to meet with CITGO management to learn more about CITGO and discuss any operational questions. (Tr. (Hiltz) 528)

113.    On April 10, 2024, Evercore sent a letter to the nine potential bidders, which included instructions for participation in the second round of bidding. (Hiltz Decl. ¶ 13) Two potential bidders decided not to proceed to the next round so, on May 27, 2024, Evercore sent amended instruction letters to seven active potential bidders. (SM06 (Hiltz Second Supp. Decl. Ex. B) (Special Master's Bid Letter); Tr. (Hiltz) 542; Hiltz Decl. ¶ 13)

114.    On June 11, 2024, the end of the second-round bid deadline, the Special Master received six bids that, after consultation with Evercore, he deemed to be reasonably actionable. (D.I. 1837 ¶ 30; Tr. (Hiltz) 543; Hiltz Decl. ¶ 13)

115.    At the end of the second round of bidding and initial negotiations, the Special Master, with the assistance of his Advisors, determined which of the six qualified bids presented the best potential combination of price and certainty (the "2024 Leading Bid"), and chose to focus on negotiations with the bidder he believed offered that combination (the "2024 Leading

Bidder"). (Tr. (Hiltz) 543-44) However, the Special Master failed to reach agreement with the 2024 Leading Bidder on key terms of the proposed transaction, including its insistence that it obtain committed financing only for 12 months, during which time the Alter Ego Claims would be required to finish in full, including all appeals, including in the U.S. Supreme Court. (D.I. 1325-1 Ex. A. at 3-4) The Special Master therefore had to abandon the bid from the 2024 Leading Bidder. (Tr. (Hiltz) 544)

116.    As a result, on August 8, 2024, the Special Master entered into a period of exclusivity with Elliott Investment Management L.P. ("Elliott"). (Tr. (Hiltz) 545; Hiltz Decl. ¶ 14; D.I. 1837 ¶ 32) After extensive negotiations with Elliott and analysis of the available options, the Special Master determined that Elliott's bid, through its affiliated entity Amber Energy Inc. ("Amber Energy" or "Amber"), was the next best available bid of the six submitted during the second round, and the Special Master recommended that Amber be selected as the Successful Bidder. (Hiltz Decl. ¶ 14)

117.    This first Amber Energy bid offered a purchase price of up to approximately $7.286 billion and proposed addressing the "two big issues" facing bidders – the Alter Ego Claims and the PDVSA 2020 Bondholders' claims – by placing the sale proceeds into escrow to be paid out to the Alter Ego Claimants and 2020 Bondholders if they were successful in their respective litigations and to judgment creditors to the extent the Alter Ego Claimants and 2020 Bondholders were unsuccessful. (Tr. (Hiltz) 545-46; D.I. 1325 (Notice of Special Master's Recommendation ("Initial Recommendation")); *see also* Tr. 345-47 (Turkel))

118.    On September 9, 2024, the Special Master filed his "Alter Ego Motion" which, as previously explained, asked the Court to enjoin the Alter Ego Claimants and any other creditor of

35

a Venezuela Party from pursuing Alter Ego Claims or, in the alternative, channeling all such claims to this Court.  (D.I. 1248)

119.   On September 27, 2024, the Special Master filed the Initial Recommendation, recommending that the Court approve a transaction for the purchase of the PDVH Shares by Amber Energy.  (Hiltz Decl. ¶ 15; D.I. 1325)

120.   The Sale Process Parties and numerous Additional Judgment Creditors raised concerns about the Initial Recommendation and the proposed Amber Energy transaction.  (Hiltz Decl. ¶ 15; *see also* D.I. 1337, 1373-2, 1373-4, 1373-5, 1373-6, 1373-7, 1417, 1418, 1419)  In particular, these parties took issue with the escrow structure of the Amber Energy bid, which required waiting for resolution of the contingent liability issues prior to receiving sale proceeds, and made the amount of proceeds deliverable to the judgment holders contingent on the outcomes of those issues.  (Tr. (Hiltz) 545-46)

121.   In an attempt to address the concerns raised, Amber submitted an alternative term sheet (the "Alternative Transaction Term Sheet"), which did not include escrows.  (Tr. (Hiltz) 546; D.I. 1414 at 1-2 (Special Master status report noting "the dissatisfaction among certain stakeholders, including Crystallex and ConocoPhillips" with Amber's bid and attaching Alternative Transaction Term Sheet, offered "in an effort to garner support among stakeholders"))  However, the Alternative Transaction Term Sheet proposed to pay only $5.286 billion, which was $2 billion less than the initial proposed transaction.  The reaction from Sale Process Parties and Additional Judgment Creditors to the Alternative Transaction Term Sheet was no more favorable than it had been to the first Amber transaction.  (Weisenburger Decl. ¶ 29)

36

122.    After extensive briefing (*see, e.g.*, D.I. 1249, 1277, 1306, 1327), and oral argument (D.I. 1357), the Court denied the Alter Ego Motion in December 2024 (D.I. 1515).

123.    After the Court denied the Alter Ego Motion, and in recognition of the widespread opposition to Amber's first and second bids, the Special Master abandoned the Amber bids. (Tr. (Hiltz) 546)

## XII.    Approval Of New Sale Procedures, Including Bidder Protections, Evaluation Criteria, And Model Stock Purchase Agreement ("SPA")

124.    After the Special Master abandoned the Amber bids, the Court directed the parties to submit briefing on how the Sale Process should proceed, holding a full-day hearing on December 13, 2024 (the "December 13 Hearing"). (D.I. 1507 (Dec. 13, 2024 Tr.); Tr. (Hiltz) 546)

125.    At the conclusion of the December 13 Hearing, the Court directed the Special Master to reopen the VDR by December 18, 2024, which he did, effectively restarting the bidding process. (D.I. 1505; Hiltz Decl. ¶ 16)

126.    On December 31, 2024, the Court issued an order providing an opportunity for potential bidders, including those who participated in previous rounds, to conduct diligence and submit new bids. (D.I. 1517) ("December 31 Order")

127.    The Court also ordered the Special Master and his Advisors to conduct additional marketing, including outreach by Evercore to all parties who previously received marketing materials and a good-faith review and evaluation by Evercore as to whether other parties that might be interested in participating in the Sale Process should be contacted. (D.I. 1517 at 1; Hiltz Decl. ¶ 17)

128.    The revised Sale Process started with the Special Master soliciting bids for a Stalking Horse or Base Bid, with bids due by March 7, 2025. (D.I. 1517 at 4; Hiltz Decl. ¶ 17)

129.    If the Special Master recommend a Stalking Horse bid that was accepted by the Court, the Stalking Horse period would be followed by a Topping Period in which the Special Master was directed to generate "as much 'competitive tension' among bidders as possible." (D.I. 1554 at 12; *see also* D.I. 1517 at 8)  At the conclusion of the Topping Period, the Special Master would select a final recommended bidder, and the parties would then brief any objections and participate in a sale hearing about whether the final recommendation should be confirmed. (D.I. 1517 at 9)  In the alternative, if the Special Master did not receive any bids worthy of Stalking Horse protections at the conclusion of the Stalking Horse period, the Special Master would be permitted to designate a Base Bid (i.e., the leading bid, but one not entitled to traditional bidder protections) and proceed to an auction for the PDVH shares.  (D.I. 1517 at 8; *see also* Weisenburger Decl. ¶ 33)

130.    In addition to the foregoing procedures, the Court's December 31 Order also set forth revised procedures and a timeline for the sale of the PDVH Shares, including (i) procedures for approval of (A) certain bidder protections (the "Bidder Protections") available to any Stalking Horse approved by the Court, (B) material terms of a stock purchase agreement ("SPA," and such terms the "Draft SPA Material Terms") and, subsequently, a draft long-form SPA, and (C) the evaluation criteria for bids (the "Evaluation Criteria"); (ii) deadlines for the submission of bids, the Special Master's recommendations, and objections thereto; (iii) scheduling the Sale Hearing for July 22-24, 2025; and (iv) related relief.  (D.I. 1517)

131.    Pursuant to the December 31 Order, on January 14, 2025 the Special Master filed a joint status report attaching the materials the Court had ordered him to draft, which he had done with input from the Sale Process Parties, AJCs, and other interested entities.  (D.I. 1528; *see also* D.I. 1517 ¶ 3)

38

132.    Several Sale Process Parties and AJCs filed objections to or briefs in support of various aspects of each of the new draft documents. (*See, e.g.*, D.I. 1539-1)  Between January 27 and March 4, 2025, the Court issued a series of orders granting or overruling the objections. (D.I. 1554, 1571, 1583)

133.    The Evaluation Criteria adopted by the Court required that the Special Master take into account a "*non-exhaustive list of considerations*" relating to "the certainty associated with a given bidder and the likelihood its applicable bid will successfully proceed to closing," including "[c]onditionality related to pending or future litigation (including with respect to the [PDVSA] 2020 Bonds and the Alter Ego Claims)."  (D.I. 1528-3 (Evaluation Criteria) at 12 (emphasis added); *see also* D.I. 1554)

134.    On February 6, 2025, Evercore uploaded to the VDR the Draft SPA Material Terms, Bidder Protections, and Evaluation Criteria, as modified in accordance with the January 27 Order.  (Hiltz Decl. ¶ 30)

135.    On February 10, 2025, after consulting with the Sale Process Parties, the Special Master filed a proposed draft long-form SPA (the "Bid Draft SPA") consistent with the Court-approved Draft SPA Material Terms and placed the Bid Draft SPA in the VDR.  (D.I. 1557)

136.    The Venezuela Parties, certain Additional Judgment Creditors, and the 2020 Bondholders submitted objections to the Bid Draft SPA (*see* D.I. 1558, 1559, 1560), to which the Special Master responded (D.I. 1564).

137.    The Court ruled on these issues on February 24, 2025, sustaining some objections and overruling others, and invited a further round of briefing regarding the Court's proposal relating to consent of AJCs to receipt of non-cash consideration.  (D.I. 1571)

138.    Following a subsequent ruling, another round of briefing on the long-form SPA took place, and on March 4, 2025 the Court ruled on a remaining issue concerning non-cash consideration. (*See* D.I. 1583)

## XIII.  Outreach To Potential Bidders And Revised Sales Process (2025)

139.    The new round of bidding was preceded by attempts by the Special Master and his Advisors to reach an even greater number of potential purchasers than in the prior marketing. (Tr. (Hiltz) 547)

140.    On December 17, 2024, Evercore reached out to 41 potential bidders who had previously signed NDAs to determine if they were interested in obtaining VDR access.  (Tr. (Hiltz) 547; Hiltz Decl. ¶ 19)  Of these potential bidders, 28 responded and expressed interest in receiving renewed access.  (Hiltz Decl. ¶ 20)  Twenty-one of these potential bidders provided Evercore with the necessary information to grant them renewed access to the VDR (e.g., names of persons who should receive access).  (*Id.*)  Evercore, on behalf of the Special Master, provided these potential bidders with access to the VDR on December 18, 2024.  (*Id.*)

141.    On January 6, 2025, Evercore reengaged with 65 additional potential bidders who had been contacted earlier in the marketing process or were otherwise known to have participated in prior steps of the process.  (Hiltz Decl. ¶ 21)  Of these 65 potential bidders, five responded affirmatively, and three ultimately signed NDAs and were granted VDR access. (Hiltz Decl. ¶ 22)  Additionally, two new parties expressed interest in the process, signed NDAs, and were granted VDR access.  (*Id.*)

142.    In parallel, Evercore also communicated via emails and calls with CITGO's management team regarding the Stalking Horse marketing process.  (Hiltz Decl. ¶ 23)

143.    Evercore also undertook a detailed review to identify still other potential bidders that might be interested in participating in the marketing process. (Hiltz Decl. ¶ 24)  In particular, Evercore used a large investor database to screen for investors with the following characteristics: (i) prior energy investments across the sector and (ii) assets under management of at least $10 billion. (*Id.*)  From the resulting list, Evercore identified for the Special Master an additional 20 potential bidders. (*Id.*)

144.    On January 13, 2025, CITGO sent the Advisors its own list of 10 potential additional investors. (Tr. (Hiltz) 548; Hiltz Decl. ¶ 25; *see also* Tr. (Weisenburger) 311-12) From this list, Evercore supplemented its previously identified 20 additional potential bidders with the 10 recommended by CITGO, for a total of 30 additional potential bidders. (Hiltz Decl. ¶ 25)

145.    On January 14, 2025, Evercore worked with CITGO's management team to prepare an updated version of the teaser that had been distributed to potential bidders in prior rounds. (Hiltz Decl. ¶ 26)

146.    On January 16, 2025, Evercore reached out by email to the 30 additional potential bidders identified by Evercore and CITGO, attaching the teaser, and asking whether they were interested in participating in the Sale Process. (Hiltz Decl. ¶ 27)  At that point, the Special Master, through his Advisors, had reached out to 136 potential bidders as part of the 2025 process. (Tr. (Hiltz) 548; Hiltz Decl. ¶ 27)

147.    In addition to direct outreach to potential bidders, the sale was advertised in U.S. national newspapers, such as the *Wall Street Journal* on January 12 and 19, 2024, June 1 and 8, 2024, February 24, 2025, March 3, 2025, and May 3 and 10, 2025; and *USA Today* on January 12 and 19, 2024, June 3 and 10, 2024, February 25, 2025, March 4, 2025, and May 5 and 12,

2025; Delaware newspapers such as the *Delaware State News* on January 12 and 19, 2024, June 2 and 12, 2024, February 26, 2025, March 5, 2025, and May 7 and 14, 2025; and the *Wilmington News Journal* on January 12 and 19, 2024, June 4 and 11, 2024, February 25, 2025, March 4, 2025, and May 6 and 13, 2025; and in Venezuela on June 9, 2024, March 2 and 9, 2025, and May 4 and 11, 2025. (Tr. (Hiltz) 539-40; SM23 (Publication Affidavits))

148.    The Venezuela Parties' own witness recognized that the sale was "extensively marketed," "extensively publicized," and that this "comprehensive and complete" outreach ensured that any potential bidder who may be interested in the Sale Process and had the capability to purchase the PDVH Shares was aware of it. (Tr. (Weisenburger) 311)

149.    None of the 30 additional potential bidders contacted in January 2025 expressed interest in obtaining VDR access or participating in the Sale Process. (Tr. (Hiltz) 548; Hiltz Decl. ¶ 28)

150.    In addition to these outreach efforts, Evercore was also contacted by two additional potential bidders during the solicitation period on December 23, 2024 and March 3, 2025. (Hiltz Decl. ¶ 28) Evercore and Weil investigated these additional potential bidders and advised the Special Master they were not viable bidders. (*Id.*)

151.    Overall, since December 18, 2024, 28 potential bidders have been granted VDR access. (Hiltz Decl. ¶ 33)[8] That access provided these potential bidders more than 59,000

---

[8] At even later stages, two additional potential bidders, Black Lion Capital Advisors, LLC ("Black Lion") and Blue Water Venture Partners, LLC ("Blue Water"), were granted access to the VDR after the June 18 Topping Period deadline. (Hiltz Decl. ¶ 60; *see also* D.I. 2352 at 2) This access was granted consistent with the Model SPA provision allowing for unsolicited bids to be submitted at any point prior to execution of a final SPA. (D.I. 1557-1 (Model SPA) § 6.16; *see also* Tr. at 19-36)

detailed, confidential documents regarding PDVH, the PDVH Shares, and CITGO. (*Id.*; *see also* Tr. (Hiltz) 528)

152.    The Special Master and his Advisors were also available throughout every stage of the Sale Process to respond to inquiries from potential bidders and others interested in the Sale Process, and they responded to innumerable inquiries. Between December 18, 2024 and the September 2025 Sale Hearing, Evercore collected more than 1,400 questions from potential bidders and then worked closely with CITGO's management team to provide answers. (Hiltz Decl. ¶ 34) Evercore also coordinated several site visits and one management presentation. (*Id.*)

153.    The Court does not believe there is any additional reasonable marketing step that could have been, but was not, taken.

## XIV.    Stalking Horse Period And Selection of Red Tree Bid

154.    On February 10, 2025, Evercore sent all 26 potential bidders then having VDR access a Stalking Horse bid instruction letter (the "Stalking Horse Bid Letter"). (SM16; Tr. (Hiltz) 548-49; Hiltz Decl. ¶ 32) The Stalking Horse Bid Letter provided potential bidders with information about the Sale Process, including details about the assets being sold (the PDVH Shares) and the required contents for a Qualified Bid. (Tr. (Hiltz) 549; Hiltz Decl. ¶ 32)

155.    On March 7, 2025, the Special Master received Stalking Horse proposals from four bidders (collectively, the "Stalking Horse Bidders"). (Hiltz Decl. ¶ 35) Immediately thereafter, the Special Master, Evercore, and Weil began a careful assessment of the merits of the four Stalking Horse proposals submitted. (Hiltz Decl. ¶ 35) Red Tree Investments, LLC ("Red Tree"), Amber, and Dalinar Energy Corporation ("Dalinar," an affiliate of AJC Gold Reserve) submitted bids as part of the Stalking Horse process. (Tr. (Turkel) 371-72; Tr. (Hiltz) 550)

43

156.     The guidance the Special Master gave bidders during the Stalking Horse round was that he was looking for the best combination of price and certainty, and these are the same criteria he used to evaluate the Stalking Horse proposals, and in particular the Red Tree, Amber, and Dalinar bids.  (Tr. (Hiltz) 550-51)

157.     The Special Master, with the assistance of Evercore and Weil, conducted rigorous assessments of the strengths and weaknesses of each bid.  (Hiltz Decl. ¶ 36)

158.     The Special Master consulted with the Sale Process Parties in connection with his decisionmaking process.  (Hiltz Decl. ¶ 36)

159.     Weil, on behalf of the Special Master, communicated to Dalinar specific concerns regarding its bid.  (Tr. (Hiltz) 551-52)  For example, on March 19, 2025, Chase Bentley of Weil sent an email to Dalinar's counsel outlining the Special Master's concerns about whether "Dalinar and its financing sources" would be able "to close the contemplated acquisition of the PDVH Shares (and associated financing) in the event the 2020s foreclose on the CITGO Holding equity pledge."  (SM17; *see also* Tr. (Hiltz) 552-53; Tr. (Rivett) 1095-96)

160.     Another bidder, Red Tree, is "an indirect subsidiary of Contrarian Funds, LLC, an affiliate of Contrarian Capital Management, LLC."  (D.I. 1596 at 1)  Contrarian entities are junior creditor AJCs in the Court's Sale Process, holding approximately $400 million of judgments that are near the bottom of the priority waterfall.  Contrarian is also a holder of 2020 Bonds.  (*See* VP227 (Dep. X. Xu Tr. at 61); *see also Crystallex II,* 932 F.3d at 135 (identifying Contrarian Capital Management, LLC as "holder[] of PDVSA bonds due to mature in 2020")*.*

161.     The Special Master ultimately recommended the bid submitted by Red Tree as the stalking horse bid (the "Stalking Horse Bid").  (D.I. 1590, 1591, 1596)  Red Tree's Stalking Horse Bid had a headline price of $3.699 billion and also featured a Transaction Support

44

Agreement ("Red Tree TSA"), by which more than 66.67% of the holders of 2020 Bonds pledge

to support the transaction (and not to exercise any right the 2020 Bondholders might have to

block aspects of the Red Tree transaction).  (D.I. 1599)

162.    The Special Master determined that Red Tree had a much higher degree of

certainty of closing than Dalinar because Red Tree had negotiated a settlement agreement with

the 2020 Bondholders, while Dalinar's bid did not adequately address the risk the 2020

Bondholders posed to the structure of Dalinar's bid.  (Tr. (Hiltz) 554)  The Special Master's

main concern with the Red Tree bid was primarily with respect to headline price, which he

communicated to Red Tree.  (Tr. (Hiltz) 554)

163.    The Special Master determined that the balance of the two primary Evaluation

Criteria – price and certainty of closing – used in the selection of the Stalking Horse Bid was not

necessarily the same balance that should be used for the selection of a final bid.  (Tr. (Hiltz) 551)

The goal in selecting a Stalking Horse Bid was to ensure continued participation of as many

qualified bidders as possible, to create competition during the Topping Period.  (Tr. (Hiltz) 551)

164.    As the Venezuela Parties' own witness recognized, closing certainty, rather than

headline price alone, is an important consideration that a seller should take into account when

selecting a stalking horse, such that "a sophisticated seller [may reasonably] select a bid with [a]

lower price [but] more closing certainty."  (Tr. (Weisenburger) 289, 316)

165.    The Special Master's recommendation of Red Tree as the Stalking Horse was

driven by his judgment that Red Tree's Stalking Horse Bid was "the best starting point" and the

bid "best situated to encourage further bidding and generat[e] as much competitive tension

among bidders as possible during the Topping Period."  (Hiltz Tr. 556-57; Hiltz Second Supp.

Decl. ¶ 25 (citing D.I. 1660 at 1))

166.    The headline price of the Dalinar Stalking Horse proposal was $7.081 billion.
(D.I. 1598-1)

167.    The Special Master was concerned that if he selected Dalinar/Gold Reserve's bid,
with its high headline price, "many people who felt they might not be able to get fully to Gold
Reserve's price would throw up their hands and give up because [the Special Master] would
have signaled that price, rather than certainty was the primary criteria," yet the Special Master
had sufficient concerns about the certainty of closing of Dalinar's bid that it would be
detrimental to the value-maximizing goal of the Sale Process to drive away bidders who perhaps
could not pay $7.081 billion but could provide a materially greater chance of closing than
Dalinar/Gold Reserve.  (Tr. (Hiltz) 556, 656)

168.    Rusoro Mining Limited ("Rusoro"), Dalinar, Koch, Siemens Energy, Inc. ("SEI"),
Gold Reserve, and the Venezuela Parties submitted objections to the selection of Red Tree as the
Stalking Horse, and the Special Master and others responded to those objections.  (*See* D.I. 1635-
36, 1638-40, 1656-62, 1664-67)

169.    The Court held a hearing on the Stalking Horse Recommendation on April 17,
2025.

170.    On April 21, 2025, the Court confirmed Red Tree as the Stalking Horse.  (D.I.
1741)  The Court agreed with the Special Master that the Red Tree Stalking Horse Bid
constituted "the best balance of the Evaluation Criteria."  (D.I. 1741 at 2-3) ("Stalking Horse
Order")

171.    In its Stalking Horse Order, the Court gave the Special Master additional
instructions, consistent with the Evaluation Criteria, to consider in selecting the final
recommended bid.  In particular, the Court explained that "[i]t seems sensible to set as the

46

minimum bid for beginning the Topping Period the bid that appears to have the greatest likelihood of closing, even though the Court expects that any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." (D.I. 1741 at 3)

172.    The Court added that the selection of Red Tree as the Stalking Horse "reflects the reality that a successful bid in the Sale Process must, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts the assessment of certainty of closing." (D.I. 1741 at 4)  The Court also stated that it "d[id] not view the risk that the 2020 Bondholders, or other litigants (e.g., plaintiffs pressing any Alter Ego Claims that are ongoing or may yet be filed), will seek to enjoin the Sale Process or transactions (e.g., financing, necessary corporate transactions) as anywhere close to dispositive on the question of whether the Court should accept a Final Bid." (D.I. 1741 at 7; *see also id.* ("[T]he risks associated with the 2020 Bondholders do not appear to be materially greater or more important than other risks."))

173.    The Court further observed in its ruling: "[t]here are numerous ways" the risk posed by the 2020 Bondholders "can be addressed," and "reject[ed] any suggestion that a Final Bid must include a settlement with the 2020 Bondholders." (*Id.* at 4)

174.    The Court warned that it, "or an appellate court," could "reject a Final Bid" that places "substantial value on settlement of the 2020 Bondholders' litigation" and then "subsequent events" – including a finding that "the 2020 Bondholders have no rights to CIT[G]O Holding" or the SDNY "indicating it will stay enforcement of any judgment entered in favor of the 2020 Bondholders" or "OFAC indicating it will continue to suspend GL-5 beyond the date of the expected closing of sale of the PDVH Shares" – "reveal it would be a fundamental injustice

to close on such a Final Bid, when bids with a much greater purchase price were rejected." (*Id.* at 7-8)

175.    The Court noted that it had "serious reservations about the price of the Red Tree bid." (*Id.* at 5) The Court indicated that it "expect[ed] that beginning (but not ending) the bidding in the Topping Period with the Red Tree Stalking Horse Bid will have the effect of creating competitive tension, ultimately resulting in a Final Bid with a price at or exceeding that associated with the [Dalinar] bid while also having greater likelihood of closing than the current [Dalinar] bid." (*Id.* at 6)

176.    In its Stalking Horse Order, the Court also encouraged "[a]ll bidders . . . to engage with the Special Master to demonstrate that their improved bids reflect the best combination of price and certainty." (*Id.* at 8)

## XV.    Topping Period

177.    On April 25, 2025, the Court entered an Order Regarding Schedule for the Remainder of the Marketing Process, providing for the Topping Period to begin on April 28, 2025 and setting subsequent deadlines leading to the Sale Hearing. (D.I. 1745)

178.    On April 28, 2025, Evercore sent a Topping Period bid instruction letter to the same 136 bidders that Evercore had contacted during the prior outreach on December 18, 2024, January 6, 2025, and January 16, 2025. (SM19 (Hiltz Decl. Ex. A) ("Topping Bid Letter"); Tr. (Hiltz) 558-60; Hiltz Decl. ¶ 39) The Special Master and his Advisors drafted the Topping Bid Letter over several weeks with input from the Sale Process Parties. (Hiltz Decl. ¶ 39) The letter provided potential bidders with detailed information about the Sale Process, including information about the assets being sold (the PDVH Shares), and outlined the requirements for qualifying bids. (Topping Bid Letter at 2-7; Tr. (Hiltz) 558-59) The letter expressly included a

deadline of 5:00 PM (Central Time) on May 28, 2025 for potential bidders to submit topping proposals. (Topping Bid Letter at 2; Tr. (Hiltz) 558-59)

179.   As he had throughout the Sale Process, during the Topping Period the Special Master regularly consulted with the Sale Process Parties. (*See, e.g.*, Hiltz Decl. ¶ 40; VP129)

180.   The Special Master and his Advisors held numerous calls with potential bidders to discuss their topping proposals and provide them information to help them formulate the most competitive bids they could. (Hiltz Decl. ¶ 40) While the specific contents of these discussions varied by bidder, depending on what the Special Master and his Advisors viewed as the particular strengths or deficiencies of a bid, the emphasis was on encouraging bidders to "improve on both price and certainty." (Tr. (Hiltz) 560)

181.   For example, Weil, on behalf of the Special Master, continued to communicate to Dalinar/Gold Reserve specific concerns regarding its bid. On May 16, 2025, Andrew Clarke of Weil sent an email to Dalinar's counsel outlining the Special Master's continued concerns about the Dalinar Bid. (SM50) In particular, Mr. Clarke raised questions about "how Gold Reserve proposes to shift the PDVSA 2020s risk away from the Special Master and the holders of Attached Judgments (as is the case in Gold Reserve's Stalking Horse bid), to itself and its financing sources." (*Id.*) He specifically noted that "the risk of a failure for the financing to be available on the Closing Date [is] higher under the Gold Reserve bid" than it was for other bids the Special Master was considering. (*Id.*)

182.   Potential bidders knew and could take into account the amount of Dalinar's Stalking Horse bid during the Topping Period, since Dalinar made it public. (Tr. (Weisenburger) 316-17)

49

183.    During the Topping Period, bidders seeking to compete with Red Tree tried to negotiate an agreement with the 2020 Bondholders, but encountered the challenging reality that the 2020s already had a deal with Red Tree, by which they would be paid $2 billion, which naturally made the 2020s somewhat inflexible during any negotiations. (*See, e.g.*, Tr. (Turkel) 375-76; Tr. (Rivett) 954)  However, given that there was no certainty that the Court would give final approval to Red Tree, on its Stalking Horse Bid or any improved bid it might submit, and given that the 2020s would receive nothing from Red Tree unless Red Tree was selected as the winning bidder, the 2020s did talk with other competing bidders. (*See generally* Tr. (Turkel) 375-78) (describing how, in response to Elliott's initial offer during Topping Period, 2020 Bondholders indicated they would only accept a deal providing them more consideration than the Red Tree TSA)

184.    On May 20, 2025, eight days before the Topping Period was scheduled to conclude, Judge Rakoff of the U.S. District Court for the Southern District of New York ruled on summary judgment motions in three consolidated cases pressing Alter Ego Claims. *See Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 24-cv-4448 (S.D.N.Y.); *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 23-cv-10772 (S.D.N.Y.); *G&A Strategic Investments I LLC v. Petróleos de Venezuela, S.A.*, No. 23-cv-10766 (S.D.N.Y.); *see also* Tr. (Hiltz) 560-61)  Judge Rakoff found no merit to the Alter Ego Claims and dismissed them. *See G&A Strategic Investments I LLC v. Petróleos de Venezuela, S.A.*, 788 F. Supp. 3d 616, 641-42 (S.D.N.Y. 2025).

185.    Michael Turkel, Assistant General Counsel for Elliott Management Corporation, described Judge Rakoff's decision as "fairly monumental," and it was a catalyst that spurred Elliott/Amber's renewed participation in the Sale Process. (Tr. (Turkel) 374, 506)

186.    In light of Judge Rakoff's ruling, on May 23, 2025 the Venezuela Parties moved for an extension of the Topping Period. (D.I. 1757) The Special Master supported extending the Topping Period to give bidders more time to evaluate the impact of the decision and potentially revise their bids. (D.I. 1770 at 2; Tr. (Hiltz) 560-61; Hiltz Second Supp. Decl. ¶ 28) On May 30, 2025, the Court granted the motion and extended the Topping Period to June 18, 2025. (D.I. 1779)

187.    By June 18, the Special Master had received two topping bids for the PDVH Shares: one from Dalinar/Gold Reserve and one from Amber Merger Sub LLC, a wholly-owned subsidiary of Amber, an affiliate of Elliott. (D.I. 1837 ¶ 54; Hiltz Decl. ¶ 42)

188.    Pursuant to the Bidder Protections, the Special Master was permitted to request revised bids from Dalinar, Amber, and Red Tree during the five business days following the end of the Topping Period. (D.I. 1554 at 12) In addition, the court-approved SPA provided for the commencement of a "No-Shop Period" on June 26, 2025, during which the Special Master was required to immediately cease and terminate any discussions or negotiations with potential competing bidders. Together, these provisions effectively gave the Special Master until the end of the day on June 25, 2025 to determine whether he had received a "Superior Proposal," as that term was defined in the Red Tree SPA. (Hiltz Decl. ¶ 43 (citing D.I. 1596-1 §§ 6.16(b), (d), Annex A); D.I. 1545-1 at 5-7)

189.    The Special Master's Advisors, after receiving the updated Topping Bids, prepared a list of questions and open points for each Topping Bidder, suggesting areas where the bid could be improved, seeking clarification on aspects of the bid, and addressing open points on matters such as financing sources, bid structure, and proposed modifications to the SPA. (Hiltz Decl. ¶ 44) After discussing the bids and respective open points with the Special Master,

51

Evercore and Weil held numerous calls with the bidders throughout the five-business day period to discuss and negotiate these open issues and assist the Topping Bidders in making their bids as competitive as possible. (Hiltz Decl. ¶ 44) The Special Master, Evercore, and Weil also participated in several calls with the Sale Process Parties to update them on the bids submitted, discuss the Special Master's assessment of their relative merits, and obtain their input. (Hiltz Decl. ¶ 44)

190.    On June 20, 2025, the Special Master received an additional topping bid from a third bidder, Black Lion (such bid, the "Black Lion Bid"), which was sent directly to the Court via a letter dated June 17, 2025 and was docketed on June 23, 2025. (Hiltz Decl. ¶ 45) (citing D.I. 1822)

191.    After a detailed assessment of each bid, the Special Master determined that he had received a Superior Proposal as compared to the Red Tree Stalking Horse Bid. (Hiltz Decl. ¶ 46) Accordingly, on June 23, 2025, the Special Master delivered a notice to Red Tree to this effect. (Hiltz Decl. ¶ 46)

192.    On June 24, 2025, at the request of the Special Master, the Court held an *ex parte* conference with the Special Master and his Advisors. (*See* D.I. 1840-1) ("June 24, 2025 Tr.")

193.    In the *ex parte* conference, Mr. Bentley of Weil, counsel for the Special Master, asked the Court for guidance on several subjects. First, he inquired whether the Court "would be willing to approve a transaction that didn't improve upon the 2020s deal . . ., meaning make it less advantageous or less beneficial to the 2020s, and more beneficial to the bidder, which by extension would make it more beneficial to the judgment creditors." (June 24, 2025 Tr. 47-48) The Court responded:

> The 2020s are not judgment creditors. They have whatever rights they have. They are litigating them in another court. Perhaps, as

52

they have indicated, they may try to use those rights, whatever they are, to litigate whatever recommendation you may make to me. I think we are all, at least I am[,] prepared for that to happen, if it does. So, I don't – I don't see that I have set up a process that is in any way intended to benefit the 2020 bondholders. I understand that I cannot intentionally take actions to interfere with or deprive them of whatever rights they have. But my process, and the obligation I think I have under the Third Circuit rulings[,] is to maximize value for the judgment creditors that are in my case.

So, I would say at minimum, and again, I think this is all clear from what you already understand from things I have ordered, it is certainly a detriment to any deal if it's one that allows for the scenario whereby the 2020s walk away with a lot of money that they may not even be entitled to in the litigation that they are involved in to try and [en]force their own rights, [if that litigation] suggests or develops in a way that suggests they weren't going to get that money out of that litigation standing up for themselves. So, again, if what you're telling me is all three offers carry the same degree of risk that the 2020s may get more out of my process than they, than they would be clear they could get out of possibly their own litigation, between the time delay between what you recommend to me and when we go to closing, then all three have the same problem. But if one or two don't have that problem, then they are in that respect materially better than the one that does carry that risk.

(June 24, 2025 Tr. 48-50)

194. Mr. Bentley also inquired about the scenario that eventually developed, when the Special Master later received an unsolicited, new Elliott/Amber Energy Bid:

So [the Special Master] could be faced with a transaction that pays materially more to the judgment creditors than the stalking horse bid, but still less than the Gold Reserve bid. And that other bid, I will call it, would have the certainty of having settlement with the 2020s . . . . [I]n the event [the Special Master] is faced with a scenario like that where the gap is tighter, but nevertheless still is not closed, in Your Honor's view it sounded like what you said earlier, albeit in a different context, was the mandate here is to get as much value for the creditors, additional judgment creditors as possible. And so even if Gold Reserve has not improved its bid, it would still provide more value to the judgment creditors in the event they can close. And I just want to make sure that we are not misinterpreting your guidance on the prior, if your guidance on the

prior question does not apply to this scenario that I proposed, I think it would also be helpful to know that.

(June 24, 2025 Tr. 54-56)

195.    The Court responded with its inclinations, which were consistent with its

guidance set forth in the order approving Red Tree as the Stalking Horse:

> No, I think what you're saying accurately reflects my thoughts, as expressed previously, and as they seem to be based on what you're telling me now. So, to be maybe a little clearer, the risk of the 2020s is not one that, just to colloquially speak, you all are the financial people, I don't think it's worth anywhere near $4 billion. I don't know how much it's worth, but I think in general it's a risk that I may be persuaded I should be very comfortable taking unless the gap between a deal that takes that risk off the table and one that means we have to live with that risk is pretty small.
>
> To be concrete, and maybe this is a question to you, I had thought you said with Gold Reserve that you were encouraged, that may not have been your word, that they were working on improving their $7.1 billion deal, and that they had maybe asked you for guidance on whether they should focus on improving by raising their bid and/or by trying to resolve the risk with the 2020s. And that they may be pursuing both, but maybe at some point [they] asked you if they could only do one or the other, which they should do?
>
> . . . But if I – if what you are asking me right now is, let's just say we may, in the context of evaluating bids, have to answer a question such as [what] was better – an increase in the purchase price, you know, of, pick a number for argument $1 billion, versus a settlement with the 2020 creditors? Again, I don't know exactly what the 2020 creditors' settlement is worth, but offhand I'm thinking, you know, the $1 billion sounds like it might be better. Certainly, you know, the bigger the gap, the easier it is to say, you know, we will take the risk on the 2020s.
>
> . . . But I think it was – I think I was clear in court in the rulings, and I am while keeping an open mind, because I don't know what's coming, as I sit here, you know, whatever risk the 2020s are is the risk the 20s are. And if they are going to, you know, try to get an injunction from me or from the Southern District or some other court, that may be a litigation that has to happen. That is not a deal breaker in my mind, it's a risk we would rather not have.

(June 24, 2025 Tr. 56-61)

196.    On June 25, 2025, the Special Master received two revised topping bids, one from Dalinar (the "Dalinar Topping Bid") and one from Red Tree (the "Revised Stalking Horse Bid"). (Tr. (Hiltz) 563; Hiltz Decl. ¶ 47; D.I. 1837 ¶ 58)

197.    Amber did not submit a revised topping bid proposal, so the bid it had submitted on June 18, 2025 was determined to be its final Topping Period proposal. (Hiltz Decl. ¶ 47; *see also* Tr. (Turkel) 421)

198.    Also on June 25, 2025, the Special Master received a bid from an additional bidder, referred to in this case as Bidder B, who had not submitted a bid on the June 18 deadline. (Hiltz Decl. ¶ 48)

199.    The selection of Red Tree as the Stalking Horse created competitive tension during the Topping Period, which prompted Dalinar to increase the headline price of its bid – from $7.081 in the Stalking Horse period to $7.382 in the Topping Period – and prompted other parties to improve their bids as well. (Tr. (Hiltz) 563) While counsel for Gold Reserve said his client acted to improve its bid due to "fear" (Oct. 21 Tr. 198-99), what it "fear[ed]" was losing the auction, which is simply another way of describing competitive tension.

**XVI.    Selection Of The Dalinar Bid As The Final Recommended Bid**

200.    The Special Master, Evercore, and Weil conducted rigorous assessments of the strengths and weaknesses of each Topping Bid and compared the bids side-by-side in a systematic manner, with one another and with the Revised Stalking Horse Bid from Red Tree. (Hiltz Decl. ¶ 49)

201.    In evaluating each bid submitted, the Special Master, Evercore, and Weil considered the purchase price offered for the PDVH Shares and the certainty of closing. (Hiltz

Decl. ¶ 50; *see also* Evaluation Criteria (D.I. 1552-1; D.I. 1554))  The Special Master also assessed each bid's compliance with the Bidding Procedures, the Bid Requirements, and the guidance the Court provided through various orders and during the June 24, 2025 *ex parte* conference.  (Hiltz Decl. ¶ 50)

202.     The Special Master first determined that only the Dalinar Topping Bid and the Revised Stalking Horse Bid from Red Tree (collectively, the "Conforming Bids") conformed with the Bid Requirements.  (D.I. 1837 ¶ 63)

203.     The $8 billion all-cash Black Lion Bid was deemed non-conforming because, among other things, it was subject to outstanding due diligence and financing contingencies. (Hiltz Decl. ¶ 59)

204.     The Special Master deemed the $3.831 billion all-cash Elliott bid non-conforming because it was conditioned on reaching a settlement with the 2020 Bondholders for $2 billion, but no such settlement had yet been reached.  (Hiltz Decl. ¶ 57)

205.     The $3.806 billion bid submitted by Bidder B was deemed non-conforming because it, too, had as a condition a settlement with the 2020 Bondholders, but it had not reached a settlement with them.  (Hiltz Decl.¶ 58)

206.     The two Conforming Bids were Qualified Bids (as defined in the Sale Procedures Order) and also met the other Bid Requirements.  (D.I. 1837 ¶ 63)

207.     Accordingly, the Special Master turned to application of the Evaluation Criteria to the two Conforming Bids, in light of the guidance the Court provided in its Stalking Horse Order (D.I. 1741) and in the June 24 *ex parte* conference.

208.     Red Tree's Revised Stalking Horse Bid did not improve on its purchase price. (D.I. 1837 ¶ 81)  As such, it offered AJCs total consideration of $3.699 billion, comprised of (i)

cash consideration in the amount of $3.319 billion and (ii) consented-to non-cash consideration in the amount of $487 million, with the potential to increase the purchase price by approximately $1.5 billion if it received the requisite consents (although it did not). (Hiltz Decl. ¶ 61; *see also* Tr. (Hiltz) 563-64)

209.    With respect to the Dalinar Topping Bid, the Special Master found Dalinar had improved its purchase price from the Stalking Horse round by approximately $433 million, as the Court had encouraged in its Stalking Horse Order. (D.I. 1837 ¶¶ 79-80) Dalinar accomplished this improvement by discharging the last $200 million of Gold Reserve's judgment, which its earlier bid had not done, and by discharging SEI's approximately $233 million attached judgment. (D.I. 1837 ¶ 80 n.17)

210.    The Dalinar Topping Bid had the higher purchase price of the two qualified Topping Proposals received by the Special Master, exceeding the price of the revised Red Tree Stalking Horse Bid by more than $3.5 billion. (Tr. (Hiltz) 568; Hiltz Decl. ¶ 62)

211.    Unlike the Red Tree Revised Stalking Horse Bid, however, the Dalinar Topping Bid did not include a settlement with the PDVSA 2020 Bondholders; nor did it fully address the Special Master's concerns regarding the risk posed by the 2020s to Dalinar's ability to close its transaction, despite the guidance the Special Master's team had provided Gold Reserve at various times over multiple months. (*See e.g.*, Tr. (Hiltz) 551, 554; Tr. (Rivett) 1092-1101; SM17; SM50)

212.    On July 2, 2025, the Special Master submitted the Notice of Final Recommendation (D.I. 1837) (the "Dalinar Recommendation"), recommending that the PDVH Shares be sold to Dalinar pursuant to the Dalinar SPA. The Dalinar Recommendation was based on the Special Master's determination that the Dalinar Bid was the best bid available at the end

of the Topping Period. (Tr. (Hiltz) 564)  Although, as reflected in the Dalinar Recommendation, the Special Master and his Advisors had reservations about the Dalinar Bid and its ability to close in light of the risks associated with the 2020 Bondholders, the Special Master concluded that the greater than $3.5 billion price differential between the Dalinar Topping Bid and the Red Tree Revised Stalking Horse Bid outweighed concerns about the certainty of the Dalinar Bid. (*See, e.g.*, D.I. 1837 ¶ 82(b); Tr. (Hiltz) 567-68)  In coming to this decision, the Special Master and his Advisors, guided by the Court's Stalking Horse Order and the June 24 *ex parte* meeting, determined that the price differential was so significant that the appropriate decision (considering as well that Red Tree did not improve the price of its Stalking Horse Bid, despite the Court's encouragement) was to put more weight on the substantially higher price than on closing certainty. (Tr. (Hiltz) 567-68; June 24, 2025 Tr. at 51-62)

213.    In recommending the Dalinar Topping Bid, the Special Master explained that a bid "d[id] not need to eliminate all risk related to the PDVSA 2020 Bonds" in order to be named the winning bidder. (D.I. 1837 ¶ 82(b))  He acknowledged there was "at least some chance" that the 2020 Bondholders could successfully enjoin Dalinar's transaction from closing, but "d[id] not believe the combination of the likelihood of such risk and the consequences of it coming to fruition outweigh the expansive gap in purchase price between" Dalinar and Red Tree. (D.I. 1837 ¶ 82(b))

214.    Based on everything he knew at the time, the Special Master found the Dalinar Topping Bid had sufficient "financial wherewithal and certainty of financing" as demonstrated by its financial commitment letters. (D.I. 1837 ¶ 82(e))  The Special Master expressed sufficient "confidence with respect to Dalinar's financial wherewithal and certainty of financing to

recommend approval of the Proposed Sale Transaction," which he concluded was "capable of being timely consummated." (*Id.* ¶¶ 78, 82(e))

215.    While the Special Master believed there was enough of a chance that the Dalinar Topping Bid was capable of closing to recommend it over the much lower-priced Red Tree Revised Stalking Horse Bid, he was, overall, making a relative evaluation of the merits of the two bids, leaving open the possibility that such a relative analysis might yield a different result if the Dalinar Topping Bid were to be compared to another bid. (D.I. 1837 ¶¶ 67-68, 78, 82(b))

## XVII.  Judge Failla Announces Her Intention To Rule In The 2020s Litigation By September 30

216.    During the Topping Period, the Special Master and his Advisors did not support pausing the Sale Process to allow for a decision to come out in the SDNY Litigation because, at that time, there was no indication as to when a decision from Judge Failla would be forthcoming, and CITGO's financial performance had been trending downward. (Tr. (Hiltz) 561-62; Hiltz Second Supp. Decl.) ¶ 27) Accordingly, the Special Master determined there was a significant risk that a delay in the Sale Process for an indefinite period could coincide with additional decline in CITGO's financial performance and a corresponding deterioration of the proposed prices in bids for the PDVH Shares. (Tr. (Hiltz) 561-62; Hiltz Second Supp. Decl. ¶ 27)

217.    On July 10, 2025, eight days after the Special Master issued his Dalinar Recommendation, Judge Failla conducted a teleconference with the parties to the SDNY Litigation (the SDNY VZ Parties as well as MUFG, the trustee for the 2020 Bonds, and GLAS Americas, the collateral agent for the 2020 Bonds). *See MUFG*, D.I. 388 (July 10, 2025 Tr. at 7-8). During the teleconference, Judge Failla indicated that she anticipated issuing a decision on the pending motions, which related to the validity of the 2020 Bonds under Venezuela law, by September 30.

218.    At a status hearing this Court held on August 18, 2025, the Court gave notice that it did not intend to issue its decision on the merits of the Special Master's Dalinar Recommendation before September 30. (D.I. 2171-1 (Aug. 18, 2025 Tr.) at 203-06)

219.    The Court scheduled a four-day Sale Hearing for September 15-18, and set aside October 20-21 for additional hearings, that might be necessitated for reasons including the impact of the anticipated ruling from Judge Failla. (Aug. 18, 2025 Tr. at 203-06)

220.    On September 9, 2025, Judge Failla reiterated that she "intend[ed] to issue [her] decision on the pending cross-motions for summary judgment by the end of September 2025." *MUFG*, D.I. 396 at 4.

## XVIII. The Special Master Receives Unsolicited Bids And Deems One A Superior Proposal

221.    After the June 25, 2025 deadline for Topping Period bids, the Special Master received unsolicited competing proposals: one from Bidder B, one from an entity referred to by the Special Master as Bidder C, and August 8 and 22 bids from Amber. (Tr. (Hiltz) 569; GR03 (Hiltz Updated Rec. Decl.) ¶¶ 7-8, 11)

222.    Bidder B, which had also submitted a bid during the Topping Period, submitted an unsolicited bid on June 30. (Hiltz Updated Rec. Decl. ¶ 7) Pursuant to the material SPA terms (D.I. 1517), the Special Master informed the Court the next day he had received an unsolicited competing proposal and requested permission to engage with Bidder B, which the Court granted. (Tr. (Hiltz) 569; Hiltz Updated Rec. Decl. ¶ 7) The Special Master also notified Dalinar of these developments. (Hiltz Updated Rec. Decl. ¶ 7)

223.    On August 8, 2025, the Special Master received an unsolicited competing proposal from Amber. (Tr. (Hiltz) 570-71; AM42 (D.I. 2123 Ex. E-7) (Amber Aug. 22 Bid Letter) (referencing Amber's "prior proposal, submitted on August 8, 2025")) This Amber bid

60

included a transaction support agreement with the 2020 Bondholders as well as an agreement

from Rusoro and Koch to accept a package of cash and non-cash consideration. (Hiltz Updated

Rec. Decl. ¶¶ 17, 19) The Special Master requested, and received, Court permission to engage

with Amber. (Tr. (Hiltz) 570; Hiltz Updated Rec. Decl. ¶ 8) The Special Master notified

Dalinar on August 11 that he had received Amber's unsolicited competing proposal. (Hiltz

Updated Rec. Decl. ¶ 8)

224.    Having received these unsolicited bids, the Special Master requested to adjourn

the Sale Hearing, which was at that point scheduled to begin on August 18. (D.I. 2047) Only

Gold Reserve, which wholly owns Dalinar, the recommended bidder at the time, opposed the

request. (D.I. 2032; *see also* Hiltz Updated Rec. Decl. ¶ 9)

225.    On August 14, the Court continued the Sale Hearing and instead set an expedited

briefing schedule and a status conference for August 18 to determine the next steps. (D.I. 2056)

The parties filed two rounds of briefs in advance of the August 18, 2025 status conference. (D.I.

2085, 2087-93, 2095-2104, 2106)

226.    On August 18, the Court held a hearing and at its conclusion ordered, among

other things: the Sale Hearing would commence on September 15; all briefing, including any

briefing regarding whether the Special Master had a received a Superior Proposal as that term is

defined in the Dalinar SPA, needed to be completed by September 11; August 22, 2025 would be

the deadline for "best and final bids to be presented directly to the Special Master" and the

Special Master had authority to engage with any bidders he heard from by that date; but any bids

after that deadline would need to be placed on the public docket and not submitted only to the

Special Master. (D.I. 2171-1 at 198-203, 209-11; D.I. 2110 at 3-4; Tr. (Hiltz) 572)

227.    Leading up to the August 22 bid deadline, the Special Master actively engaged with bidders, encouraging them to "put together their best combination of price and certainty." (Tr. (Hiltz) 572-73)

228.    On August 22, the Special Master received revised competing proposals from Amber and Bidder C.  (Tr. (Hiltz) 573-74; Hiltz Updated Rec. Decl. ¶ 11)  The Special Master did not receive an updated proposal from Bidder B.  (Hiltz Updated Rec. Decl. ¶ 11)

229.    Immediately upon receipt of the competing proposals on August 22, the Special Master and his Advisors began carefully comparing the unsolicited bids to then-recommended Dalinar Bid.  (Tr. (Hiltz) 577-78)  Over the next several days, the Special Master and his Advisors also participated in several calls with the Sale Process Parties to update them on the bids received and the Special Master's assessment of their relative merits, and to obtain their input.  (Hiltz Updated Rec. Decl. ¶ 12)

230.    Just as they did when comparing the Topping Proposals, the Special Master and his Advisors, in evaluating each unsolicited bid, considered the Evaluation Criteria, including (i) the purchase price offered for the PDVH Shares and (ii) the certainty of closing.  The Special Master and his Advisors also considered the guidance the Court provided in various orders, at hearings, and in the June 24 *ex parte* conference.  (*See, e.g.*, D.I. 1741; Hiltz Updated Rec. Decl. ¶ 13 (citing D.I. 1837 ¶¶ 7-10, 38, 57, 59-62, 76-77, 82-83))  The Special Master also assessed each bid's compliance with the Bidding Procedures, the Bid Requirements, and other Evaluation Criteria, such as the likelihood of regulatory approval, conditionality related to pending or future litigation or appeals of the Sale Order, certainty of financing, and the conditionality related to other terms proposed by the bidder.  (Hiltz Updated Rec. Decl.) ¶¶ 13, 39)

231.    In determining the purchase price element of each bid, the Special Master and his Advisors assessed the total value of the attached judgments expected to be satisfied by both cash and non-cash consideration, as well as whether any proposed non-cash consideration was consented to by the applicable holder of an attached judgment that would receive it.  (Hiltz Updated Rec. Decl. ¶ 14)

232.    The August 22 revised Amber proposal updated the Amber bid that had been submitted on August 8, by adding an offer to Gold Reserve of $75 million in exchange for extinguishment of $500 million of Gold Reserve's judgment.  (Tr. (Hiltz) 572-73; *see also* Amber Aug. 22 Bid Letter at 2-3)  Amber further offered that if Gold Reserve were to reject the $75 million, this additional consideration could be offered to holders of attached judgments junior to Gold Reserve, if permitted by the Court.

233.    The transaction contemplated by Bidder C included a headline purchase price that could total as much $6.117 billion, comprised of cash and non-cash consideration.  (Hiltz Updated Rec. Decl. ¶ 21)  However, Bidder C did not secure the necessary consent from AJCs for approximately $2.3 billion of the non-cash consideration it was offering.  (Hiltz Updated Rec. Decl. ¶ 21)  Bidder C had also signed an agreement with the 2020 Bondholders to support its proposed transaction.  (Hiltz Updated Rec. Decl. ¶ 21)  But because Bidder C did not have consent from the AJCs for such a substantial portion of its proposed non-cash consideration, the Special Master determined that Bidder C's competing proposal was not superior to the Dalinar Bid.  (Tr. (Hiltz) 574; Hiltz Updated Rec. Decl. ¶ 21)

234.    On August 25, 2025, the Special Master filed a Notice of Determination of Superior Proposal, giving notice of his determination that the Amber Bid of August 22

63

constituted a Superior Proposal, as compared to the previously recommended Dalinar Bid, as the term "Superior Proposal" is defined in the Dalinar SPA. (D.I. 2113)

235.    On August 27, Gold Reserve filed a Motion to Strike the Special Master's Notice, arguing that the Amber Bid violated the Court's Bidder Protections, specifically the No-Shop Period and the requirement to meet or exceed the overbid minimum. (D.I. 2117) Valores Mundiales, S.L. and Consorcio Andino, S.L. (collectively, the "Valores Parties") and SEI joined Gold Reserve's motion. (D.I. 2118, 2121)

236.    On August 28, 2025, during the three-day period provided under the Dalinar SPA for it to do so, Dalinar Energy submitted an Improved Bid. (D.I. 2126-1) The "Dalinar Improved Bid" increased the purchase price by "approximately $518 million" to $7.9 billion, by adding satisfaction of the Valores Parties' $718 million attached judgment while withdrawing and now withholding $200 million of Gold Reserve's own judgment (which would remain outstanding even after consummation of Dalinar's proposed Sale Transaction). (D.I. 2123 at ¶¶ 12-14) Dalinar also purported to have increased its certainty of closing by obtaining a $500 million accordion increase of its asset-backed loan ("ABL") to $1 billion – which it argued provided it, along with $1.8 billion in preferred equity financing already covered by its existing "Highly Confident Letter" (D.I. 1837 Ex. E5) – a total of $2.8 billion in potential financing to resolve any potential claims asserted by the 2020 Bondholders (D.I. 2123 ¶ 17).

## XIX.    Special Master's Updated Final Recommendation Of The Amber Energy Bid

237.    On August 29, 2025, the Special Master filed his Updated Final Recommendation rejecting the Dalinar Improved Bid and recommending that the Court authorize and approve the sale of the PDVH Shares to Amber Energy, pursuant to its improved August 22 Amber Bid (hereinafter the "Amber Bid"). (D.I. 2123 at 1, 8) The Amber Bid's purchase price is $5.892

64

billion, which is more than $2 billion less than the proposed purchase price of the August 28 Dalinar Improved Bid ($7.899 billion). (Tr. (Hiltz) 587)

238.    In spite of this price differential, the Special Master's view is that the Amber Bid is superior to Dalinar's because it includes a $2.125 billion settlement with the 2020 Bondholders in the form of a Transaction Support Agreement ("TSA"). (D.I. 2123 ¶ 16 ("[T]he Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation by delivering a settlement with the PDVSA 2020 Bondholders."); D.I. 2123 Ex. F (the TSA))

239.    The TSA, on which the Special Master placed substantial weight in his Updated Final Recommendation of the Amber Bid, may be subject to termination by any party to it if this Court does not enter a Final Sale Order by December 1, 2025. (Tr. (Turkel) 368-69, 437-39; *see also* TSA § 4.1)

240.    In his Updated Final Recommendation, the Special Master requested that the Court grant him authority to terminate the Dalinar SPA and to execute the Amber Energy SPA. (D.I. 2123 ¶ 25)

241.    On August 30, 2025, Gold Reserve asked the Court to stay any decision on the Special Master's request to terminate the Dalinar SPA until after the Court ruled on Gold Reserve's then-pending Motion to Strike. (D.I. 2128)

242.    On September 5, 2025, several parties filed responses to Gold Reserve's Motion to Strike. (D.I. 2169-72, 2174-76) On September 11, 2025, Gold Reserve filed its reply in support of its Motion to Strike (D.I. 2239), which was joined by the Valores Parties (D.I. 2240) and SEI (D.I. 2241).

243.    On September 6, 2025, Gold Reserve, the Venezuela Parties, SEI, and the Valores Parties (hereinafter the "Objectors") filed their Objections to the Special Master's Updated Final Recommendation of the Amber Bid. (D.I. 2178, 2180-86)

244.    On September 12, 2025, several parties (hereinafter, along with the Special Master, the "Supporters") filed responses to the Objections. (D.I. 2262-68, 2270-75)

245.    On September 14, 2025, the Objectors filed replies in support of their Objections. (D.I. 2290, 2292, 2294, 2299)

## XX.    The Fourth And Fifth Motions To Disqualify

246.    On September 9, 2025, during Gold Reserve's deposition of Michael Turkel, Assistant General Counsel for Elliott Management Corporation, Mr. Turkel testified as to the relationship between Elliott and its affiliates and the Special Master's legal advisor, Weil, and his financial advisor, Evercore. (D.I. 2223)

247.    This prompted Gold Reserve to file a letter on September 10, requesting that the Court order the Special Master's Advisors, Weil and Evercore, to disclose further information about their relationship with Elliott. (D.I. 2223)

248.    At a status conference that same day, the Court ordered Weil and Evercore to make additional disclosures. (Sept. 10, 2025 Status Conference Tr.)

249.    Also on September 10, the Court issued the Sale Hearing Procedures Order (D.I. 2224), which allocated time at the upcoming hearing between all interested parties and set out procedures for handling arguments, witnesses, and exhibits.

250.    On September 12, Weil and Evercore disclosed additional information regarding representations of bidders, 2020s, and their affiliates.

251.    On September 13, Gold Reserve filed an emergency request for a stay of the Sale Hearing in light of the information disclosed by Weil and Evercore. (D.I. 2286)  The Venezuela Parties joined this request. (D.I. 2287)

252.    Later that day, the Court denied the stay requests and ordered the Special Master to respond further by the following evening (D.I. 2289), which he did (D.I. 2302).

253.    At the start of the Sale Hearing on September 15, the Court heard Gold Reserve's argument on conflict of interest issues and its contention that the Sale Hearing should not proceed due to these issues. (Tr. 77-93)  The Venezuela Parties joined Gold Reserve. (Tr. 95-105)  The Court denied the Venezuela Parties and Gold Reserve's (together the "Moving Parties") motions to disqualify without prejudice, and ordered that the Sale Hearing proceed, but furthered ordered the Moving Parties to confer with the Special Master and Elliott regarding the requested discovery. (Tr. 114-17)

254.    Gold Reserve subsequently renewed its disqualification motion, seeking the disqualification of the undersigned Judge as well as the Special Master and the Special Master's Advisors, Weil and Evercore. (D.I. 2389)  The Venezuela Parties, likewise, renewed their motion to disqualify the Special Master and Advisors. (D.I. 2384)  These motions constituted the fourth and fifth disqualification motions the Court had to resolve in this litigation.

255.    After full briefing (*see, e.g.*, D.I. 2392, 2455, 2480, 2450, 2472, 2475), the Court heard oral argument on October 20, 2025. (D.I. 2510)

256.    At the October oral argument, Gold Reserve again moved to stay all proceedings other than the Court's consideration of the motions to disqualify. (*See* Oct. 20 Tr. 56)  At the conclusion of the hearing, the Court denied the stay request and indicated that closing arguments

on the merits (of the Objections to the Updated Final Recommendation of the Amber Bid) would go forward, as scheduled, the next day. (*See* Oct. 20 Tr. 200-01)

257.    On October 23, 2025, Gold Reserve wrote a letter to the Court, reiterating its request that the Court decide the motions to disqualify before any other matter and allow full appellate review of its resolution of those motions before making any other rulings. (D.I. 2485)

258.    On October 28, 2025, Gold Reserve filed a petition for a writ of mandamus in the Third Circuit, asking the Court of Appeals to stay all further proceedings until after this Court decided the disqualification motions and the Third Circuit had completed appellate review of those decisions. *See In re Gold Reserve Ltd.*, No. 25-3091 D.I. 1.

259.    On October 29, this Court notified the parties it intended to decide the motions to disqualify before deciding the merits of the Objections and Updated Final Recommendation, and further that it anticipated resolving the motions to disqualify by November 20 and issuing its merits ruling by November 30. (D.I. 2505)

260.    On November 13, the Court denied the motions to disqualify and all pending requests for a stay. (D.I. 2526)

261.    On November 18, the Third Circuit denied Gold Reserve's mandamus petition. *In re Gold Reserve Ltd.*, No. 25-3091 D.I. 46.

## XXI.    Sale Hearing (September And October 2025)

262.    The Court presided over an evidentiary Sale Hearing on September 15 through September 18 and October 21, 2025.

263.    At the start of the Sale Hearing, the Court heard argument on Gold Reserve's Motion to Strike the Special Master's Notice of Superior Proposal and took the motion under advisement. (Tr. 37-66)  The Court then resolved procedural and evidentiary issues, heard

68

opening statements from the parties, and then began to hear witness testimony. (Tr. 66-77, 119-227, 243-339)

264.     Supporters of the Special Master's Updated Final Recommendation of the Amber Bid, and Objectors to it, presented testimony from fact and expert witnesses and introduced more than 200 exhibits.

265.     The admitted exhibits include the respective experts' reports. (*See* Tr. 692, 727-28, 1026, 1185-86)

266.     The objecting Venezuela Parties called Randall Weisenburger (Tr. (Weisenburger) 243-339), who has held executive level positions at financial institutions that specialize in private equity investing and leveraged acquisitions. Since 2015, Mr. Weisenburger has served as the Managing Member of Mile 26 Capital LLC, a private investment firm. He previously served as the Executive Vice President and Chief Financial Officer of Omnicom Group Inc. from 1998 to 2014. Before joining Omnicom, Mr. Weisenburger was a founding member of Wasserstein Perella, where he specialized in private equity investing and leveraged acquisitions. Over the course of his career, he has participated in or led hundreds of strategic acquisitions worth billions of dollars. Weisenburger has also served on the board of numerous multi-national companies, which has involved him in significant strategic M&A transactions and numerous capital market transactions. Weisenburger currently serves on the board of directors of Valero Energy Corporation, one of the leading independent refiners in the United States. Mr. Weisenburger, thus, is an expert based on his practical experience in both the refining industry and in large complex corporate transactions. (VP188 (Weisenburger CV); Tr. (Weisenburger) 245)

267.    The supporters of the Amber Bid called Michael Turkel, Assistant General Counsel at Elliott Management Corporation.  (Tr. (Turkel) 341-442, 455-516)

268.    The supporters called William Hiltz of Evercore (Tr. (Hiltz) 517-724, 1145-1181).  Mr. Hiltz's expert credentials and experience are detailed elsewhere in this Opinion.  (*See supra* Facts Part II)

269.    The objecting Venezuela Parties called their valuation expert, Dr. José Alberro. (Tr. (Alberro) 726-73, 792-927, 1295-1310)  Dr. Alberro's expert credentials and experience are detailed elsewhere in this Opinion.  (*See infra* Facts Part XXVI)

270.    Objector Gold Reserve called its Chief Executive Officer, Paul Rivett.  (Tr. (Rivett) 927-1145)

271.    Supporter Red Tree called Gary Kleinrichert, a valuation expert.  (Tr. (Kleinrichert) 1185-1262)  Mr. Kleinrichert's expert credentials and experience are detailed elsewhere in this Opinion.  (*See infra* Facts Part XXVI)

272.    Supporter Red Tree called James B. Heaton, III, a probability expert.  (Tr. (Heaton) 1311-35)  Dr. Heaton has a Ph.D. in finance, an MBA, and a J.D., all from the University of Chicago.  (Tr. (Heaton) 1312)  Dr. Heaton spent 18 years practicing law at Barlit Beck LLP, after which he worked as a consultant and expert witness.  (Tr. (Heaton) 1313-15) Dr. Heaton has written academically on litigation, uncertainty, and settlement, and has been qualified as an expert in six cases, including on claims valuation and litigation uncertainty.  (Tr. (Heaton) 1313)

273.    Gold Reserve called its probability expert, John Bennett.  (Tr. (Bennett) 1336-52) Dr. Bennett has a Master's Degree and Ph.D. in economics, and has for the past 12 years worked as a partner in the finance practice of Bates White Economic Consulting.  (Tr. (Bennett) 1336)

**XXII.  Judge Failla Rules In Favor Of The 2020s, The Special Master Terminates The Dalinar SPA And Executes The Amber SPA, And The Sale Hearing Concludes**

274.    On September 18 – the morning of the fourth day of the Sale Hearing and just minutes after the last of the witness concluded his testimony – Judge Failla issued an opinion finding the 2020 Bonds are valid under governing Venezuela law, and granting the 2020s summary judgment. (*See* Tr. 1362-63; *see also MUFG*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025))

275.    Judge Failla wrote:

> In April 2007, October 2010, and January 2011, PDVSA issued $9.15 billion in notes scheduled to come due in 2017 (the "2017 Notes").   As of September 16, 2016, the 2017 Notes had an aggregate outstanding principal balance of $7.1 billion, plus $506 million in interest payments due at various times in 2016 and 2017

> . . . [In September 2016,] the bond swap transaction known as the Exchange Offer was announced.  Under the Exchange Offer, holders of the 2017 Notes could tender their Notes in exchange for a certain amount of [PDVSA 2020 Bonds].  The [PDVSA 2020 Bonds] were secured by PDVH's pledge of 50.1% of the equity in CITGO, as memorialized in the Pledge Agreement executed among PDVH, as pledgor; PDVSA, as issuer; PDVSA Petróleo, as guarantor; GLAS, as collateral agent; and MUFG, as trustee.  The collateral is held as a physical stock certificate by GLAS in a vault in New York.

> . . . PDVSA made the required payments on the 2020 Notes in 2017, 2018, and part of 2019.  But things changed following the reelection of Nicolás Maduro in an election that the United States called neither free nor fair, and which led to the National Assembly's declaration of its president, Juan Guaidó, as Interim President of Venezuela.  On January 23, 2019, President Trump declared the Maduro regime illegitimate, recognized Mr. Guaidó as the Interim President of Venezuela, and recognized the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people.

> . . . On October 15, 2019, the National Assembly passed another resolution (the October 2019 Resolution) . . . . [which] states that the National Assembly had, in [a previous] Resolution, rejected the collateral of 50.1% of the shares in [CITGO]; it further noted that

71

> following the investigations conducted in coordination with the office of the Special Prosecutor, it was concluded that the PDVSA 2020 Bond Indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution, and that the 2020 Bond Indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly." On October 27, 2019, PDVSA defaulted when it failed to make its scheduled principal and interest payments.

*Id.* at *3-4 (internal quotation marks and citations omitted).

276.    Judge Failla analyzed, at length, Venezuelan law and concluded that the 2020 Bonds "are not national public interest contracts." *Id.* at *27. Therefore, they did not require National Assembly approval in order to be valid. *See id.* Hence, she determined the 2020 Bonds are valid.

277.    In light of Judge Failla's decision in favor of the PDVSA 2020 Bondholders, concerns regarding the ability of the Dalinar Improved Bid (hereinafter the "Dalinar Bid") to close have become clearer. By contrast, the Amber Bid is able to proceed to closing without the 2020s having any ability to block the sale of the PDVH Shares due to the TSA. The TSA also provides for a discount of $735 million, by allowing Amber to obtain (and then extinguish) bonds worth in excess of $2.8 billion for $2.125 billion. (Tr. (Hiltz) 580) These issues are addressed in greater detail below. (*See, e.g.*, *infra* Facts Part XIX; Law Section E)

278.    On September 18, during the Sale Hearing, after a break to allow the Court and the litigants to review Judge Failla's 89-page opinion, the Court engaged in discussion with counsel as to what, if any, impact the ruling had on the matters pending before the Court. (*See* Tr. 1363-527)

279.     Later on September 18, the Court denied from the bench Gold Reserve's Motion to Strike the Amber Bid, and granted the Special Master's requests to terminate the Dalinar SPA and to execute the Amber SPA. (Tr. 1528-39)

280.     The September portion of the Sale Hearing then concluded with brief closing arguments from more than a dozen entities. (Tr. 1541-1617)

281.     On September 19, the Special Master terminated the Dalinar SPA and executed the Amber SPA. (D.I. 2319)

282.     On September 25, the Court set out a schedule for post-hearing briefing and submission of proposed findings of fact. (*See* D.I. 2340) Opening and answering briefs, as well as all proposed findings of fact, were submitted by October 15. (*See, e.g.*, D.I. 2362-78, 2418-34)

283.     On October 17, consistent with her opinion, Judge Failla entered judgment in favor of the 2020s and against the SDNY VZ Parties, in the amount of $2.859 billion plus interest. *See Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2958813, at *1 (S.D.N.Y. Oct. 17, 2025).

284.     On October 20, the SDNY VZ Parties filed a notice of appeal in the Second Circuit. *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 25-2652 D.I. 1 (2d Cir. Oct. 20, 2025). Thus, the 2020s Litigation remains ongoing, and there is a chance that on appeal the Second Circuit will not affirm Judge Failla's judgment for the 2020s.

285.     On October 21, 2025, 17 different litigants presented a total of eight hours of closing arguments, and answered the Court's questions, relating to the Special Master's Updated Final Recommendation and the Objections to it. (*See* Oct. 21 Tr. 1-417)

286.    The parties completed briefing on the merits issues in the instant litigation on October 28. (*See* D.I. 2488-95, 2497-99)

## XXIII. The Competing Bids Before The Court At The Sale Hearing

287.    As of the start of the Sale Hearing, the Court had before it the Amber Bid, which was the subject of the Special Master's operative Updated Final Recommendation, and the Dalinar Bid, which had been the subject of the Special Master's preceding Final Recommendation.

288.    The Amber Bid has a purchase price of $5.892 billion. (D.I. 2123 ¶¶ 1, 7, 12) This is comprised of cash consideration of $3.853 billion payable to Crystallex and AJCs in the priority waterfall through to ConocoPhillips for its Corocoro Judgment; (ii) a package of cash and non-cash consideration payable to Rusoro in exchange for which Rusoro has agreed to discharge the entirety of its attached judgment of approximately $1.569 billion; and (iii) non-cash consideration payable to Koch in exchange for which Koch has agreed to discharge the entirety of its attached judgments of approximately $471 million. (D.I. 2123 ¶ 7)

289.    Amber proposes to finance its Sale Transaction with (i) up to $3.775 billion of committed, funded first lien debt financing from a consortium of lenders; (ii) up to $500 million of a $2 billion committed asset-based revolving facility from Barclays Bank PLC and Citigroup Global Markets Inc.; (iii) $2.850 billion of committed financing convertible notes initially issued to a consortium of convertible note holders (the "Convertible Noteholders"), which includes a fully committed accordion feature of up to $570 million; and (iv) $25 million in equity financing from affiliates of Elliott. (D.I. 2123 ¶ 8)

290.    The Amber Bid also includes the TSA essentially resolving the contingent liabilities associated with the 2020 Bondholders. (D.I. 2123 ¶ 9) The counterparties to the TSA

74

are an ad hoc group of 2020 Bondholders that together own over 75% of the 2020 Bonds. (D.I.

2123 ¶ 9; *see also* Tr. (Turkel) 364-65) Under the TSA, the ad hoc group of 2020 Bondholders

have "agreed to provide the requisite consents to cause the Amber Sale Transaction to be

permitted under the indenture governing the PDVSA 2020 Bonds and to cause all of the

purported security interests in the equity of CITGO Holding that secure the PDVSA 2020 Bonds

to be released and terminated in full." (D.I. 2123 ¶ 9)

291.    Any bonds tendered to Elliott under the TSA will be "extinguish[ed]." (Tr.

(Turkel) 351, 365, 393-94, 398); *see also MUFG* D.I. 394 at 2 (counsel for trustee and collateral

agent representing to Judge Failla that Elliott will extinguish bonds tendered to it)) While any

bonds not tendered to Elliott will remain unextinguished (Tr. (Turkel) at 393-94), there is no

realistic chance that a group consisting of at most 25% of the Bondholders can prevent the

Amber transaction from being consummated.

292.    Consistent with the Bidder Protections, Amber will also pay expense

reimbursement fees to Red Tree (for the Stalking Horse Bid) and Gold Reserve (for Dalinar

being selected the winner at the conclusion of the Topping Period) that total $105 million, in

addition to approximately $100 million in court fees (to reimburse the Sale Process Parties and

AJCs who have collectively paid the fees of the Special Master and his Advisors). (Amber Aug.

22 Bid Letter at 2; *see also* D.I. 1517 at 3-4)

293.    Amber has spent over $50 million in fees in connection with its participation in

this Sale Process, none of which will be reimbursed under this Court's orders. (Tr. (Turkel) 345)

294.    Elliott/Amber Energy owns or controls: (a) 4.76% of Phillips 66, a major U.S.

refiner, and has appointed two of its board members; (b) 4.34% of Suncor, an integrated energy

company with significant U.S. and global refining operations, and has appointed three of its

board members; and (c) 5% of BP, an energy major with significant U.S. and global refining operations. (Tr. (Turkel) 471-72)  While these relationships may create potentially complex antitrust issues, the Special Master has considered these issues and does not believe they impose a significant obstacle to the Amber Bid closing. (D.I. 2377 at ¶ 190) (noting Amber SPA contains "hell or high water" obligation to seek antitrust approval)

295.     Elliott has also offered $75 million to Gold Reserve in exchange for Gold Reserve agreeing to discharge $500 million of its attached judgment. (D.I. 2123 ¶ 7)  Gold Reserve has not accepted this offer. (Tr. (Turkel) 354-55)  The Court accords no value to the $75 million of additional consideration, as it has been rejected, and, hence, the entirety of Gold Reserve's judgment will remain unsatisfied even if the Amber Sale Transaction closes.

296.     Amber is a Delaware corporation owned by Elliott Investment Management L.P. and formed for the purpose of acquiring the PDVH Shares, with a management team that brings a wealth of experience in the refining and oil industries. (Tr. (Turkel) 342-43)

297.     Amber is a bona fide, arms-length financial buyer with an interest in owning and operating the CITGO assets held by PDVH and its subsidiaries. (Tr. (Turkel) 342-43, 346)

298.     The other bid that was extensively considered at the Sale Hearing is the Dalinar Bid, which is led by Dalinar, "a Delaware corporation and wholly owned subsidiary of Gold Reserve" that "was formed for the purpose of submitting a bid in the Sale Process, entering into [the SPA] and closing on the Proposed Transaction." (D.I. 2126-1 at 12)  Gold Reserve guarantees Dalinar's obligations under the Dalinar SPA. (*Id.*)

299.     The Dalinar Bid's headline purchase price is $7.9 billion. (D.I. 2123 ¶ 14)

300.     The Dalinar Bid would fully satisfy, in cash delivered at closing of its contemplated Sale Transaction, in the amount of $3.925 billion, the attached judgments of

Crystallex; Tidewater Investment SRL and Tidewater Caribe S.A. (collectively, "Tidewater");

ConocoPhillips (Judgments #1 and #2); OI European Group B.V. ("OIEG"); Northrup Grumman

Ship Systems, Inc./Huntington Ingalls ("Huntington Ingalls"); ACL1 Investments Ltd., ACL2

Investments Ltd., and LDO (Cayman) XVIII Ltd. (collectively, "ACL1"); and Red Tree.

301.    The Dalinar Bid also includes:

a.    A credit bid of Gold Reserve's Attached Judgment (valued at $1,138,508,078.61 as of December 31, 2024) less $200 million.

b.    A credit bid of Koch's entire attached judgment (the "Koch Judgment"), which was valued at $463,374,390 as of December 31, 2024.

c.    A credit bid of Rusoro's entire attached judgment (the "Rusoro Judgment"), which was valued at $1,522,342,917 as of December 31, 2024.

d.    A credit bid of the entire SEI Judgment, valued at $211,384,366.59 as of December 31, 2024.

e.    A credit bid of the Valores Parties' entire attached judgments (the "Valores Judgment"), which are valued at $720 million. (D.I. 2126-1 at 24-27; *see also* D.I. 2123 ¶¶ 13-14)

302.    The Dalinar Bid does not include any resolution of the contingent liabilities associated with the 2020 Bondholders. It does not include anything like the Amber TSA or any other agreement with the 2020s.

303.    Dalinar agreed to inclusion of an "early termination right" in its SPA (D.I. 2126-1 at 5-6), but it is not the termination right the senior creditors requested of it (*see* D.I. 2266 at 12-13) (Crystallex noting this difference). Dalinar has offered only that if its financing is ever threatened by the 2020 Bondholders, Dalinar is required to obtain alternative financing within a

90-day cure period, failing which the Special Master has the right to terminate the Dalinar SPA and pivot to another bid.  (D.I. 2126-1 at 6)  The senior creditors had asked instead for the further protection of "a clear right of termination if the known risk of the 2020 Bondholders materializes" and Gold Reserve "cannot cure that defect within 30 days," as well as a 3% termination fee.  (D.I. 1942 at 9; D.I. 1949 at 2)  Dalinar did not agree to this proposal.

## XXIV.  The Risk Posed By The 2020s To Dalinar's Ability To Obtain Financing Needed To Close Is Real Yet Is Not Adequately Nor Persuasively Addressed By Gold Reserve

304.    The Dalinar Bid proposes the purchase of the PDVH Shares via Gold Reserve's wholly-owned subsidiary, Dalinar Energy Corporation, using a separate special purpose vehicle and Dalinar subsidiary, Adolin Holdings, Inc. ("Adolin").  (Tr. (Rivett) 1043; D.I. 1837 ¶ 72)  Neither Dalinar nor Adolin has any assets.  (Tr. (Rivett) 1043-44)  Dalinar's financing structure, thus, utilizes Adolin as the borrower on a $4.5 billion bridge facility and on a $2 billion ABL.  (D.I. 1837 ¶ 72)

305.    The proposed ABL funding consists of up to $2 billion in commitments (with $350 million committed as part of a pre-fund facility), with an "accordion feature" that allows Dalinar to "request" up to an additional $1 billion of funding from its lenders.  (D.I. 1837 ¶ 72; D.I. 1837-1 at 458, 482)  This additional funding is not actually committed by Dalinar's lenders, nor by any other party; Dalinar's lenders have only agreed to allow Dalinar to request the funding.  (Tr. (Rivett) 993-94)

306.    At closing, if the bridge and ABL pre-fund facility are funded, a two-step transaction will take place: "Adolin will distribute the cash portion of the purchase price to the Escrow Agent (the 'Escrow Disbursement') for distribution to the holders of Attached Judgments . . . consistent with the priority waterfall set by the Court pursuant to the Final Priority Order. Following the Escrow Disbursement, Adolin will merge with and into CITGO Petroleum

Corporation ('CPC'), resulting in CPC being the new borrower on the acquisition financing incurred in connection with the" Dalinar Bid. (D.I. 1837 ¶ 72; Tr. (Rivett) 1043-45) Thus, as the ultimate borrower, the bridge loan and ABL would be obligations of CITGO and both loans would be secured by liens on the assets of CITGO and its subsidiaries. (Tr. (Rivett) 1041)

307. Failure to complete the merger of Adolin with CITGO, or to obtain a lien on all of CITGO's and its subsidiaries' assets, are independent events of default under both the bridge facility and the ABL facility. (D.I. 1837-1 at 521, 543)

308. The bridge facility and ABL are also subject to a series of additional conditions contained in Conditions Annex documents, including that: "There shall not be in effect any Law or Order by a Governmental Body . . . of competent jurisdiction restraining enjoining or otherwise prohibiting the consummation of the Transactions." (D.I. 1837 at 555; *see also id.* at 504, 506, 550, 556, 558) Thus, a condition of funding the bridge loan and ABL is that there be no injunction against the merger of Adolin with CITGO. (Tr. (Rivett) 1054)

309. An injunction enjoining the Dalinar Bid's proposed Sale Transaction, or Dalinar's inability to secure a lien on substantially all of CITGO's assets, would be fatal to the consummation of the Dalinar Bid. (Tr. (Rivett) 1054, 1056)

310. The risk that the 2020 Bondholders may have rights they might be able to exercise in a manner that could prevent these steps – including the need to raise the funding necessary and completing the merger of Adolin and CITGO, to place the debt at CITGO – is, and throughout Gold Reserve's participation in the Sale Process has been, a real risk. It is one the Special Master has repeatedly warned Gold Reserve of and encouraged Gold Reserve to address. (*See, e.g.*, D.I. 1837 ¶ 82) The Court is persuaded that the Dalinar Bid fails to adequately address this risk, making the uncertainty as to whether its proposed transaction can actually be consummated

too great, considering the combination of price and certainty characterizing the Dalinar Bid as compared to the combination of these Evaluation Criteria in the Amber Bid.

## XXV.  The Amber Bid Is Better – In Terms of Price, Value, And Certainty – Than The Dalinar Bid, Which Is Anyway No Longer Viable

311.    The headline price of the Amber Bid, $5.892 billion, is approximately $2 billion less than the headline price of the Dalinar Bid, $7.899 billion.  However, the Dalinar Bid is no longer viable – as its financing is no longer intact – and the prospects for it becoming viable again are not great, for reasons including the realistic risk that the 2020s, now backed by the judgment entered in their favor in the SDNY Litigation, would be able to prevent the financing Dalinar needs and/or prevent the merger transaction (of Adolin into CITGO) on which the Dalinar Bid relies.  Application of the Evaluation Criteria, which include price and certainty of closing, confirm that the Amber Bid is better than the Dalinar Bid.

312.    The Special Master, in consultation with his Advisors, determined that the certainty of closing associated with the Amber Bid was much greater than that associated with the Dalinar Improved Bid, since the Amber Sale Transaction can close regardless of the outcome of the 2020s Litigation.  (Hiltz Updated Rec. Decl. ¶ 22; *see also* Tr. (Turkel) 361-62; Tr. (Hitlz) 586-88)

313.    Amber's agreement with the 2020 Bondholders for consideration of $2.125 billion also secures an effective discount of approximately $735 million on the $2.859 billion (plus interest) judgment recently entered for the 2020s in their SDNY litigation (or alternatively a discount of approximately $895 million on the $3.02 billion the 2020s calculate to be the full value of their claims).  (Tr. (Turkel) 355; Tr. (Hiltz) 580; Hiltz Updated Rec. Decl. ¶ 23; D.I. 2123 ¶ 16 n.10; *MUFG*, 2025 WL 2958813, at *1)

314.    Amber's bid to acquire the PDVH Shares is supported by fully committed financing sufficient to fund the proposed transaction, and Amber is ready, willing, and able to close and begin operating CITGO.  (Tr. (Turkel) 392)

315.    In reaching his Updated Final Recommendation, the Special Master and his Advisors analyzed the outcomes for Crystallex and the AJCs under four potential scenarios, all of which seemed possible as of August 2025.  (Tr. (Hiltz) 577-79)  The Court finds the Special Master's four-part analysis persuasive, providing more evidence supporting his recommendation of the Amber Bid over the Dalinar Bid.

316.    Under the first of the four scenarios, where the Special Master recommends the Dalinar Bid and the 2020 Bondholders lose their litigation, the Special Master believed the Dalinar Sale Transaction would likely go forward and result in approximately $7.9 billion of recovery to creditors.  (Tr. (Hiltz) 579; Hiltz Updated Rec. Decl. ¶ 28)

317.    Under the second scenario, where the Special Master recommends the Dalinar Bid and the 2020 Bondholders win their litigation, the Special Master believed there would be a significant risk that the Dalinar Sale Transaction would not close.  (Tr. (Hiltz) 579)  In that event, the judgment creditors would be paid nothing – unless and until the Court solicited new bids and one of them were selected and eventually closed.  The Special Master further believed that in this event the Amber TSA would be terminated and, with it, the discount of $735 million.  (Tr. (Hiltz) 579-80, 696; Hiltz Updated Rec. Decl. ¶ 23)

318.    Under the third scenario, where the Special Master recommends the Amber Sale Transaction and the 2020 Bondholders win their litigation, the Special Master believed that the Amber Bid would go forward, given the TSA, and capture the benefit of the $735 million

discount. The result would be the satisfaction of $5.892 billion of judgments of Crystallex and

nine AJCs. (Tr. (Hiltz) 580; *MUFG*, 2025 WL 2958813, at *1)

319.    Under the fourth scenario, where the Special Master recommends the Amber Sale

Transaction and the 2020 Bondholders lose their litigation, the Special Master believed that the

Court would be in a position either to (i) let the Amber Bid proceed, and with it satisfy $5.892

billion of judgments in the waterfall, or alternatively (ii) armed with the knowledge of Judge

Failla's decision, reject the Amber Bid on account of it overvaluing a settlement with the 2020

Bondholders. (Tr. (Hiltz) 580-81)  In the event the Court rejected the Amber Bid in this

scenario, the Special Master and his Advisors were confident that they could conduct a quick re-

bidding process and that bidders would redirect some or all of the funds they had previously

allocated to a settlement with the 2020s (or to reserving to address the risk posed by them) to,

instead, improving the consideration available to holders of attached judgments. (Tr. (Hiltz)

580-82)  Accordingly, the Special Master and his Advisors viewed this scenario as a positive

outcome for holders of attached judgments. (Tr. (Hiltz) 587, 695)

320.    The difference in certainty between the Amber Sale Transaction and the revised

Dalinar Bid is significant. (Hiltz Updated Rec. Decl. ¶ 33)

321.    Upon the advice of his Advisors, the Special Master determined that the Amber

Bid does not pose a significant risk from a regulatory approval perspective, including

requirements relating to antitrust regulations and OFAC approval. (Tr. (Hiltz) 677-79; *see also*

Tr. (Turkel) 514-15)  The Special Master determined there was no conditionality relating to

future litigation or appeals. (Hiltz Updated Rec. Decl. ¶ 39)  The Special Master further

determined that Amber has the financial wherewithal and appropriate certainty of financing; the

Amber Bid is fully financed with committed, non-conditional financing. (Tr. (Hiltz) 577; Hiltz

Updated Rec. Decl. ¶ 35)  The Special Master also satisfied himself that no other terms of the Amber Bid introduce concern, and Amber's TSA with the 2020s contains only customary closing conditions.  (Tr. (Hiltz) 676; Hiltz Updated Rec. Decl. ¶ 39)

322.    The Amber Bid virtually eliminates closing risks associated with the SDNY Litigation by delivering an agreement with the 2020 Bondholders that removes the risk of the 2020s attempting to block the sale while the TSA is in place.  (Tr. (Hiltz) 577)

323.    Gold Reserve claims that it improved its closing certainty by upsizing its financing support to fund any required payment to the PDVSA 2020 Bondholders by obtaining the ability to request an increase of its ABL accordion by another $500 million, for a total of up to $1 billion in potential incremental availability.  (Tr. (Hiltz) 585; Hiltz Updated Rec. Decl. ¶ 30)  According to Dalinar, its up to $1 billion in incremental ABL, combined with the $1.8 billion in preferred equity financing covered by its existing highly confident letter from J.P. Morgan, provides $2.8 billion in potential financing to resolve any potential claims asserted by the 2020 Bondholders in the event that they succeed in the SDNY Litigation.  (Hiltz Updated Rec. Decl. ¶ 30)

324.    Gold Reserve's CEO, Mr. Rivett, insisted that the $1.8 billion highly confident letter supporting the Dalinar Bid could be converted to actual committed preferred equity ("pref") financing, and that once selected as the winning bidder, Gold Reserve would be able to obtain better financial terms by "actually hav[ing] a transaction to transact on."  (Tr. (Rivett) 1108-10)  According to Rivett, this "pref financing is readily available at any time," could be obtained within "three to six weeks" if necessary, and J.P. Morgan saw "that there was that demand" for the pref from investors.  (Tr. (Rivett) 1111, 1115-16)

325.     Mr. Rivett also testified that J.P. Morgan's enthusiasm for the Dalinar Energy Bid is what resulted in increasing the ABL by $500 million. (Tr. (Rivett) 1116)  Rivett added that the full $1 billion of the ABL "is definitely available," and could be used to settle with the 2020 Bondholders "depending on the collateral that supports it," including CITGO's actual "collateral, working capital, inventory, [and] receivables," which Gold Reserve would be able to borrow on after closing. (Tr. (Rivett) 1086)

326.     In reality, however, Dalinar's financing is uncommitted and unlikely to be available for the purposes of resolving the contingent liabilities posed by the 2020s.

327.     Dalinar's financing commitment papers do not expressly state that the financing banks would close in the event the 2020 Bondholders were able to successfully enforce their Pledge on the CITGO Holding shares. (Tr. (Hiltz) 584-86; Hiltz Updated Rec. Decl. ¶ 34)

328.     Highly confident letters, even from reputable institutions like J.P. Morgan, do not constitute committed financing because the bank providing such a letter is not obligated to fund. (Tr. (Hiltz) 584-85)

329.     J.P. Morgan has not committed any of the bank's own capital to support the $1.8 billion preferred equity financing raise. (Tr. (Rivett) 978)  The highly confident letter states: "This letter does not constitute a commitment by J.P. Morgan or any of its affiliates to underwrite, place or purchase the Preferred Equity Issuance or to arrange or provide any other financing and there can be no assurance that the sale or placement of the Preferred Equity Issuance will in fact be accomplished." (D.I. 1837 Ex. E-5 at 3; *see also* Tr. (Rivett) 977)

330.     Dalinar's financing package includes debt financing in the form of a $4.5 billion bridge facility. (D.I. 1837 Ex. C at 1, 4)  The bridge facility proceeds are not available to pay the PDVSA 2020 Bondholders. (Tr. (Rivett) 1000)

84

331.    If J.P. Morgan were to raise $1.8 billion in preferred equity while the bridge loan is outstanding, that equity raise would have to be used to reduce the $4.5 billion bridge facility. (D.I. 1837 Ex. C at 4-5)  Thus, the $1.8 billion is not additive to the $4.5 billion.

332.    The bridge facility terms and conditions preclude use of any equity raise proceeds to pay the PDVSA 2020 Bondholders.  (D.I. 1837 Ex. C at 4-5)

333.    Moreover, while Dalinar did take the step of increasing the accordion feature of its ABL by an additional $500 million from its lenders, the Special Master and his advisors were concerned that "there's no assurance that the $1 billion of ABL would be available . . ., in whole or in part, to satisfy" the 2020 Bondholders' claim. (Tr. (Hiltz) 585)  Regardless of the face amount committed under the ABL, the amount that can be drawn at any particular time is limited by the availability of sufficient collateral, which is determined by the Borrowing Base provisions of the ABL.  (D.I. 1837 Ex. B at 1, 3-5)  The ABL terms and conditions also contain a series of "Negative Covenants," one of which is "restricted payments," which is defined to include "any settlement, monetary judgment or other payment made (directly or indirectly through a distribution to a parent entity or affiliate) in respect of the PDVSA 2020 Bond Litigation."  (D.I. 1837 Ex. B at 10-12)

334.    Read together, these provisions establish that the ABL proceeds cannot be used to pay the 2020 Bondholders until at minimum (a) one year after the closing and (b) Gold Reserve's $4.5 billion bridge facility is paid in full.  (Tr. (Rivett) 998-99) (confirming "[t]hat's what it says here," though nonetheless insisting "that's not the understanding with the banks")

335.    Mr. Rivett, Gold Reserve's CEO, testified that he "[a]bsolutely" could convert the $1.8 billion uncommitted financing into committed financing, yet he was unwilling to pay the roughly "$50 to $75 million" in financing commitment fees that would be required to do so.  (Tr.

85

(Rivett) 1108-13) Accordingly, Mr. Rivett's testimony that Gold Reserve was willing to "do whatever it takes" to be named the winning bidder and close on the sale of the PDVH Shares was not credible, as Gold Reserve chose not to pay "the $50 to $70 million to get the committed financing to potentially pay the 2020s if need be." (Tr. (Rivett) 1085, 1114) Rivett's testimony and Gold Reserve's actions (and inaction), instead, exacerbate the skepticism the Special Master and Sale Process participants have expressed as to whether Gold Reserve could obtain the financing necessary to close on the Dalinar Bid.

336.    While the headline price of the Dalinar Bid, $7.9 billion, is higher than the headline price of the Amber Bid, which is $5.892 billion, the expected value of the Dalinar Bid is less than that of the Amber Bid, given the significantly greater non-closing risk associated with the Dalinar Bid.

337.    Expected value analysis is the standard way by which to assess and quantify uncertainty associated with litigation, like the uncertainty associated with the 2020s Litigation. (Tr. (Heaton) 1317-18, 1322; Tr. (Bennett) 1347)

338.    An expected value analysis first assesses the possible litigation outcomes and then assesses probabilities for each possible outcome. (Tr. (Heaton) 1318) The expected value is the sum of the probabilities of each possible outcome multiplied by the value of each possible outcome. (Tr. (Heaton) 1318)

339.    Dr. Heaton assumed two possible outcomes: First, an outcome where the Gold Reserve transaction closed for a headline value of $7.899 billion and second, an outcome where the sale was blocked (e.g., by the PDVSA 2020 Bondholders), where the value of Gold Reserve's bid would be $0. (Tr. (Heaton) 1321)

340.    At the start of the Sale Hearing, a fair assumption was that each of these possible outcomes had an equal likelihood; that is, that each side in the SDNY Litigation had a 50% chance of prevailing in the case. (*See* Tr. (Rivett) 941 (Gold Reserve CEO testifying he was advised outcome in SDNY Litigation was "coin toss"); VP062.005 (Gold Reserve internal analysis assessing possible outcomes in SDNY Litigation as equally likely))

341.    At the start of the Sale Hearing, then, the expected value of the Dalinar Bid was $3.95 billion, which is 50% of the headline value of $7.899 (i.e., ($7.899 + 0)/2).

342.    By the conclusion of the Sale Hearing, the expected value of the Dalinar Bid cannot have been any greater than it was at the start and, almost certainly, was lower. After Judge Failla issued her opinion granting summary judgment to the 2020s, the only realistic way for the 2020 Bonds to be declared invalid is for the SDNY VZ Parties to prevail on appeal.

343.    Gold Reserve argues that the 2020s' victory in the SDNY Litigation, even if it is affirmed in the Second Circuit, does not doom its bid to a zero value, as it insists that numerous additional events are required to occur in order for the 2020s to pose any threat to Gold Reserve's financing and, accordingly, to the Dalinar Bid. (*See, e.g.*, D.I. 2366 at 18)  For reasons explained throughout this Opinion (*see, e.g.*, *infra* Facts Part IX; *infra* Law Section E), the Court disagrees.

344.    As evidenced by the termination of the Dalinar Bid's financing upon the ministerial act of the Special Master terminating the Dalinar SPA and executing the Amber SPA – an act intended simply to align the official paperwork with the reality of the Special Master's current recommendation – even the summary judgment motion in the SDNY Litigation turned out to pose a deadly threat to the Dalinar Bid.

345.    Even if the analysis in the paragraph immediately above is incorrect, the only way the expected value of the Dalinar Bid can exceed that of the Amber Bid is if the risks associated with closing are so low that the expected value of the Dalinar Bid is at least $5.892 billion. That value requires the likelihood of the Dalinar Bid closing being no less 74.58% (i.e., 74.58% x $7.899 = $5.892)[9]

346.    It appears that, for the Dalinar Bid to be able to close, Gold Reserve needs at least one of the following three premises to be correct: (i) the 2020s will lose on appeal, (ii) Dalinar will somehow come up with the financing to reach a settlement with the 2020s, or (iii) Gold Reserve is correct that OFAC action is required in order for the 2020s to exercise their rights and the 2020s will be unable to obtain such OFAC approval. There is no record basis to find that there is at least a 75% likelihood that one or more of these premises will turn out to be correct.

347.    To the contrary, it is inconceivable that today – when the necessary financing commitments are no longer in place, the most recent judicial analysis concludes that the Bonds are valid, and each of the other Gold Reserve contentions as to what must occur before the Bondholders can pose a meaningful risk to the Dalinar Bid are entirely contestable – there is anywhere near a 75% chance the Dalinar Bid would, if the Court approved it, be able to close.

---

[9] This analysis assumes that the Amber Bid has a 100% certainty of closing, yet the Court recognizes nothing is 100% certain. The analysis also simplifies by ignoring the time-value of money. (*See* Tr. (Heaton) 1323, 1326) The Court's simplifying assumptions do not materially alter the analysis because the chances of the Dalinar Bid being able to close, as of today, is so much lower than 75% that the expected value of the Amber Bid is clearly greater than that of the Dalinar Bid.

**XXVI. The Fair Market Value Of The PDVH Shares Is Under $10 Billion**

        **A.**     **The Valuation Witnesses And Their Differing Valuations**

      348.    Delaware law defines "fair market value" as "the price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances." *Poole v. N. V. Deli Maatschappij*, 243 A.2d 67, 70 n.1 (Del. 1968).

      349.    Because the Venezuela Parties are anything but willing sellers, and the Sale Process is instead a forced judicial sale, and also because the circumstances surrounding the Sale Process can hardly be described as "usual and ordinary," the Court cannot rely entirely on the market to reveal the fair market value of the PDVH Shares, and must instead make its own findings based on an evidentiary record that includes expert analyses.

      350.    Red Tree, which supports the Special Master's Updated Final Recommendation, presented the opinion and analysis Gary Kleinrichert, who provided an expert opinion that the fair market value of the PDVH Shares is between $8.4 and $8.6 billion, before considering contingent liabilities, including those associated with the 2020 Bondholders' SDNY Litigation. (*See* RT65 ("Kleinrichert Rep.") ¶ 5; Tr. (Kleinrichert) 1186)

      351.    The Venezuela Parties presented the opinion and analysis of Dr. José Alberro, who prepared three reports in 2025, valuing the PDVH Shares at $18.6 billion. (*See* VP186 (D.I. 1948 Ex. 2) ("July 7 Alberro Rep."); VP184 ("July 26 Alberro Rep."); VP185 ("August 22 Alberro Rep.")) Dr. Alberro's valuation, too, did not account for contingent liabilities.

      352.    The Objectors also direct the Court to a preliminary valuation Evercore undertook in 2023. (*See, e.g.*, Tr. (Weisenburger) 305-06; Tr. (Hiltz) 538-39; Tr. (Alberro) 755-56) This "Evercore Preliminary Valuation" arrived at a draft valuation of PDVH of as much as $13.169

billion.  (Tr. (Alberro) 755-56)  The Evercore Preliminary Valuation did not account for

contingent liabilities.  (Tr. (Hiltz) 539)

353.    In the Sale Process, the actual bids the Court received ranged from $3.7 billion

(Red Tree Stalking Horse Bid) to $10 billion (Blue Water).  (D.I. 2276)  The highest-priced

Qualified Bid – that is, a bid that that fully conformed to the requirements of the Sale Procedures

Order – was Dalinar's Improved Bid with a headline price of $7.9 billion.  (D.I. 1837)

### B.  PDVH's Value Is Derived From Its Indirect Ownership Of CITGO, And CITGO's Value Is Entirely Derived From Its Participation In A Cyclical, And Potentially Declining, Market

354.    As the Venezuela Parties' valuation expert, Dr. Alberro, stated, and all witnesses

recognized, "[n]early all PDVH's income is derived from its 100% ownership of CITGO

Holding."  (July 7 Alberro Rep. ¶ 21)

355.    PDVH's sole asset is its indirect ownership of CITGO, the fifth-largest refining

company in the United States and a marketer of refined petroleum products.  (July 7 Alberro

Rep. ¶¶ 21, 24)

356.    CITGO buys crude oil and other related products, then produces a variety of

goods, such as gasoline, jet fuel, and diesel.  (Tr. (Alberro) 736)

357.    The cash flow that CITGO generates is a function of the volumes for the products

that are taken in, the volumes for products that are produced, and the price at which these two

streams of goods are bought and sold.  (Tr. (Alberro) 736)

358.    Based on forecasts published by three organizations, the Court is persuaded by

expert expectations that petroleum demand is likely to be stable in the near term and decline

slowly thereafter.  The analyses on which the Court is relying were conducted by the

Organization of the Petroleum Exporting Countries ("OPEC"), the International Energy

Association ("IEA"), and RBN Energy. (Tr. (Alberro) at 732; July 7 Alberro Rep. ¶ 69) OPEC represents the interests of oil-producing countries; the IEA represents the interests of oil-consuming countries; and RBN Energy is a consulting firm that publishes forecasts of energy demand and pricing. (Tr. (Alberro) 732; July 7 Alberro Rep. ¶ 71) There is a consensus amongst all three forecasters that demand for refined products will continue to grow until the 2030s, though only IEA and RBN believe demand will begin to decrease gradually from there. (Tr. (Alberro) 732-33; July 7 Alberro Rep. ¶¶ 71-72)

359. Refining margins are likely to remain healthy for a long time. (Tr. (Alberro) 732) The supply of refined products is stable globally and shrinking slightly in North America, as old or inefficient refineries cease production. (Tr. (Alberro) 731; July 7 Alberro Rep. ¶¶ 53-55) There are no new greenfield refinery capacity additions planned in the markets where CITGO competes. (Tr. (Alberro) 73)

360. Evercore's Confidential Information Memorandum ("CIM") prepared for bidders in the Sale Process stated that "[g]lobal demand for refined products is expected to grow throughout the medium term" while only "limited new capacity has been planned post-2025." (VP71 (CIM) at 17)

361. CITGO, however, has experienced a downturn in recent years, which appears to be consistent with a downward trend in its cyclical industry. (Tr. (Alberro) 740; Tr. (Hiltz) 637)

### C. CITGO's Financial Projections Have Historically Overstated Actual Performance And Should Be Adjusted Downward For An Accurate Valuation

362. CITGO's volume forecasts have generally been reliable. (Tr. (Weisenburger) 262; Tr. (Alberro) 737) CITGO's volume forecasts include both input purchases and output sales and are grounded in technical and operational factors. (July 7 Alberro Rep. ¶ 107) Such

technical and operational factors include what kind of crude (and other inputs) to buy and how to transform that crude into which product; those factors are engineering decisions that are made by CITGO engineers and management, who possess unique expertise. (Tr. (Weisenburger) 262; Tr. (Alberro) 737)

363.    By contrast, CITGO management is no more reliable than any other professional organization at forecasting input and output prices. (Tr. (Alberro) 737)  CITGO is a price taker and participates in a competitive input and output market, in which it has to accept the market prices at which it buys inputs and sells its own goods. (Tr. (Weisenburger) 262-63; Tr. (Alberro) 737)

364.    CITGO's projections have historically overstated its actual results. (*See, e.g.*, Tr. (Hiltz) 538) ("The EBITDA that was projected [by CITGO] in those original 2023 projections [for 2025] was double the current [2025] projection for 2025 EBITDA.")

365.    For example, in January 2025 CITGO released a Medium-Term Plan ("MTP") that forecasted EBITDA (earnings before income tax, depreciation, and amortization) for 2025 through 2030. (July 7 Alberro Rep. ¶ 103; CIT-2.20)  For 2025, the MTP's projected EBITDA was $1,457 million. (July 7 Alberro Rep. ¶ 104)  In reality, in June 2025 CITGO management lowered its 2025 EBITDA projections to $1,080 million, which is approximately 25% below the previously-forecasted value. (Tr. (Alberro) 738-39; *see also* Kleinrichert Rep. ¶¶ 104, 107; *infra* Facts Parts XXVII.D-F (further discussing CITGO projections))

### D.    Valuation Methodologies: DCF, Market Multiples, Comparable Transactions

366.    Mr. Kleinrichert and Dr. Alberro agree there are three standard valuation methodologies: the discounted cash flow ("DCF") method; the market multiples method; and the comparable transactions method. (Tr. (Alberro) 749-51; Tr. (Kleinrichert) 1194-95)[10]

### i.    DCF

367.    Valuing a business using DCF is based on the principle that a firm's enterprise value is equal to the net present value of its future cash flows. (Tr. (Weisenburger) 261-62; Tr. (Alberro) 734; *see also* July 7 Alberro Rep. ¶ 129)

368.    The future economic benefits are adjusted to the valuation date using a discount rate that incorporates the time value of money and the risks of those future cash flows. (Alberro July 7 Rep. ¶ 129)

369.    The three key inputs for a DCF valuation are (1) future cash flows, (2) the discount rate (the Weighted Average Cost of Capital ("WACC")), and (3) the perpetuity growth rate. (Tr. (Alberro) 734; July 7 Alberro Rep. ¶ 126)

370.    **Projections**: The first input into a DCF analysis is a projection of future cash flows of the business.

371.    The expert conducting the valuation must make a decision as to which projections are most reliable and should be used to build a DCF model. (Tr. (Alberro) 771)

---

[10] A non-standard method, that appears to have little if any support among valuation experts, is to add the most recent three years of EBITDA, which for CITGO totals $8.8 billion (July 7 Alberro Rep. ¶ 98), and treat this as evidence that the fair market value of the company generating that EBITDA must be, as a matter of common sense, far in excess of that sum. The Venezuela Parties have suggested there is probative value in such a comparison here. (*See, e.g.*, D.I. 2374 at 12; D.I. 2463 at 26) The Court disagrees. (*See, e.g.*, D.I. 2422 at 12) (Red Tree noting that none of Dr. Alberro's three reports mention this method and that, when asked, he could not explain why previous three years of EBITDA would be a reliable indicator of fair market value)

372.    Sometimes experts will use forecasts prepared by the subject business'
management.  This can have the benefit of reducing the risk that the projections are influenced
by bias in favor of a particular outcome in litigation.

373.    Sometimes experts will begin with management forecasts and make adjustments
they believe are necessary to improve their accuracy.  Relevant valuation literature supports
adjusting management projections where appropriate, including where a valuation professional
determines that management's forecasts are too optimistic.  (Kleinrichert Rep. ¶¶ 60-65; RT12
(Shannon P. Pratt and ASA Educational Foundation, *Valuing a Business: The Analysis and
Appraisal of Closely Held Companies*, 6th ed.) at 266-69))

374.    Both Mr. Kleinrichert and Dr. Alberro begin their analyses with the same CITGO
management forecasts that were prepared in January 2025.  (Kleinrichert Rep. ¶ 104)  Both
experts also made adjustments to the CITGO management forecasts: Kleinrichert modified them
downward, consistent with the fact that CITGO has historically underperformed its management
forecasts, while Dr. Alberro modified them upward, for reasons explained below (but which the
Court does not find persuasive).

375.    Because Kleinrichert and Dr. Alberro used the same WACC and same perpetuity
growth rate as one another, the difference in the valuations produced by their DCF analyses are
entirely due to their differing projections.  (Tr. (Kleinrichert) 1228; Kleinrichert Rep. ¶¶ 68-72)

376.    **WACC:** WACC is the weighted average of the cost of equity and the after-tax
cost of debt, with the weights proportionate to the industry peer group's ratio of equity and debt
into total capital.  (Tr. (Alberro) 740-41; July 7 Alberro Rep. ¶ 127)

94

377.    The premise of the WACC is that a company has two sources of financing, equity and debt, and the ability to obtain funds is a function of how much it costs to raise equity and how much it costs to raise debt.  (Tr. (Alberro) 740-41)

378.    The key inputs for WACC are the cost of equity, the cost of debt, and how much to weigh debt and equity.  (July 7 Alberro Rep. ¶¶ 145, 147)

379.    The cost of equity is calculated using the Capital Asset Pricing Model, which adds the risk-free rate (the rate of a risk-free asset, such as a 20-year Treasury bond) and the product of an equity premium (to reflect the additional risk of the asset) and the equity beta, which measures the correlation between a firm's stock and overall market return.  (July 7 Alberro Rep. ¶ 130)

380.    The relevant risk-free rate is 4.87%, which is the daily average on a 20-year Treasury security from April 4, 2025 to July 3, 2025.  (July 7 Alberro Rep. ¶ 140)

381.    The most reliable equity-risk premium comes from Professor Aswath Damodaran of New York University, a well-known expert in valuation, because his methodology is economically consistent and publicly available.  Professor Damodaran's estimate of equity-risk premium is 4.21%.  (July 7 Alberro Rep. ¶ 140)

382.    The most reliable equity beta is the median equity beta of the five companies most comparable to CITGO: Marathon Petroleum Corporation, Phillips 66, Valero Energy Corporation, HF Sinclair Corporation, and PBF Energy Inc. ("Comparable Companies").  (July 7 Alberro Rep. ¶ 139)  That median is 1.009.  (*Id.*)

383.    Kleinrichert and Dr. Alberro, as well as CITGO itself, identify these same five companies as Comparable Companies.  (July 7 Alberro Rep. ¶¶ 134-35; Kleinrichert Rep. ¶ 76)

384.    Kleinrichert and Dr. Alberro both apply the same 8.27% WACC.  (July 7 Alberro Rep. ¶ 147; Kleinrichert Rep. ¶ 69)

385.    **Perpetuity growth rate**: Mathematically, the perpetuity growth rate is calculated using the average inflation rate in the United States from 2000 to 2024, 2.58%, and the global oil demand rate, which the most conservative source, the IEA, projects to be -0.44%.  (July 7 Alberro Rep. ¶ 150)

386.    That math yields an implied perpetuity growth rate of 2.14% for the oil sector, which rounds down conservatively to 2.0%.  (July 7 Alberro Rep. ¶¶ 50-51)

387.    Kleinrichert and Dr. Alberro both apply the same 2.0% perpetuity growth rate. (Tr. (Kleinrichert) 1228)

### ii.    Market Multiples

388.    The market multiples approach values a business by reference to the value of other companies traded in the market, where one can calculate relevant multiples for those other companies, such as enterprise value to EBITDA.  (Tr. (Alberro) 745-46)

### iii.    Comparable transactions

389.    Another method of valuing a business analyzes similar past transactions in the industry to derive multiples of enterprise value from those transactions, and then applying those multiples to value the subject business.  (Tr. (Alberro) 747-48; July 7 Alberro Rep. ¶¶ 198-99)

390.    A comparable transactions analysis begins by identifying a set of comparable transactions.  (Tr. (Alberro) 747-48; July 7 Alberro Rep. ¶ 199)

391.    According to Dr. Alberro, while a comparable transactions method can serve only as a corroborative check, it is less reliable than the DCF method for valuing CITGO because there have been no significant transactions in the refining industry in the last several years.  (Tr.

(Alberro) 750-51)  The last truly comparable transaction involving a business on a scale comparable to CITGO was in October 2018.  (Tr. (Alberro) 750-51; July 7 Alberro Rep. ¶ 212)

392.    In addition, the characteristics of the refining industry limit the use of comparable companies because there are only eight publicly-traded companies operating in the industry, each of which differs meaningfully from CITGO.  (July 7 Alberro Rep. ¶ 212)

### E.    Mr. Kleinrichert's Valuation Has Strong Record Support And Is Persuasive

393.    Mr. Kleinrichert is a Certified Public Accountant, Certified Valuation Analyst, and Accredited in Business Valuation.  (Tr. (Kleinrichert) 1187-88; Kleinrichert Rep. ¶ 2) Kleinrichert spent 18 years at Big Four accounting firms and has 30 years of business valuation experience, leading hundreds of business valuations.  (Tr. (Kleinrichert) 1188-89)  He has been qualified as an expert in at least 30 cases, the majority of which were related to business valuation.  (Tr. (Kleinrichert) 1189)  Kleinrichert's team that assisted in his valuation included individuals with valuation and refinery experience.  (Tr. (Kleinrichert) 1190-91)

394.    Mr. Kleinrichert defined fair market value as "'the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms-length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.'"  (Kleinrichert Rep. ¶ 18 (quoting *International Glossary of Business Valuation Terms of VS 100* at 33); Tr. (Kleinrichert) 1191-92)  Dr. Alberro agreed with this definition.  (July 7 Alberro Rep. ¶ 122)  It is also consistent with Delaware law.  (*See infra* Law Section C)

395.    Kleinrichert performed an independent valuation of 100% of the PDVH equity and determined that the fair market value of those shares as of July 7, 2025 is between $8.382

97

billion and $8.618 billion, before accounting for contingent liabilities such as potential recovery by the 2020 Bondholders in the SDNY Litigation. (Kleinrichert Rep. ¶ 9; *see also* Tr. (Kleinrichert) 1187)

396.    To value the PDVH Shares, Kleinrichert relied on both a DCF analysis and a market multiples analysis. (Tr. (Kleinrichert) 1194; Kleinrichert Rep. ¶ 9)

397.    For his DCF analysis, Kleinrichert used the same WACC of 8.27% and same perpetuity growth rate of 2% that Dr. Alberro also used. (Tr. (Kleinrichert) 1228; Kleinrichert Rep. ¶¶ 68-72)

398.    Kleinrichert's DCF analysis adjusted CITGO management's January 2025 cash flow projections because he determined that CITGO management's forecasts as of January 2025 were unreliable, inconsistent with forecasts for comparable refining companies, and inconsistent with CITGO's historical results. (Tr. (Kleinrichert) 1205-06)

399.    CITGO's historical underperformance compared to its management's own forecasts supports adjusting CITGO's cash flow projections downwards. (Tr. (Kleinrichert) 1210-11; Kleinrichert Rep. ¶ 65)

400.    Kleinrichert demonstrated that CITGO's annual forecasts relative to its actual annual EBITDA from 2019 through 2025 reveal a median "miss percentage" of 63.9%. (Tr. (Kleinrichert) 1229-30, 1232-33)  Kleinrichert did not, however, rely only on CITGO's historical 63.9% underperformance as a basis for adjusting CITGO management's projections. (Tr. (Kleinrichert) 1199, 1210-12, 1221)

401.    Consistent with relevant valuation literature, Kleinrichert used research from third-party sources when making his adjustments. (Kleinrichert Rep. ¶ 66)

98

402.    Between January and July 2025, the consensus forecasts of the Comparable Companies were adjusted downward (i.e., to reflect that the companies expected to have lower cash flows), indicating that CITGO's January 2025 projections did not account for current industry conditions. (Tr. (Kleinrichert) 1199; Kleinrichert Rep. ¶ 109) The downward change in the consensus forecasts supports adjusting CITGO's projected cashflows downwards. (Tr. (Kleinrichert) 1199; Kleinrichert Rep. ¶ 109)

403.    Kleinrichert used two methods to adjust CITGO management's forecasts: an "EBITDA margin" based adjustment and an "EBITDA recovery" based adjustment. (Tr. (Kleinrichert) 1221)

404.    Under both the EBITDA margin and EBITDA recovery methods, Kleinrichert updated CITGO's cash flows projected in January 2025 using consensus analyst projections as of July 2025. (Tr. (Kleinrichert) 1222)

405.    Under both methodologies, Kleinrichert conservatively (i.e., against the interests of Red Tree and the other Supporters, who have an interest in a lower valuation of PDVH, to improve their chances of proving that the Amber Bid they support has a fair value) projected CITGO's EBITDA recoveries to exceed the median recoveries of the Comparable Companies, even though CITGO has historically underperformed them. (Tr. (Kleinrichert) 1222, 1261; Kleinrichert Rep. ¶ 67)

406.    "EBITDA margin" is the ratio of a company's EBITDA to its revenues. (Tr. (Kleinrichert) 1200) Measuring EBITDA margin allows companies to be compared based on their level of profitability. (*Id.*)

407.    Kleinrichert's "EBITDA margin" methodology considered CITGO's historic EBITDA margin relative to that of the Comparable Companies and applied an adjustment to

better align CITGO's January 2025 forecast with the Comparable Companies as of the valuation date. (Tr. (Kleinrichert 1221-22); *see also* Kleinrichert Rep. ¶ 66) Kleinrichert determined that CITGO consistently lagged the Comparable Companies on an EBITDA-margin basis and applied an appropriate adjustment. (Tr. (Kleinrichert) 1253)

408. Kleinrichert used his EBITDA margins method to take the average variance between CITGO's EBITDA margins and the median EBITDA margins of the five Comparable Companies as a basis for reducing PDVH's cash flow forecast. (Tr. (Kleinrichert) 1235-36) Kleinrichert calculated that, on average, CITGO's EBITDA margins were 58.4% of the peer group from 2020 to March 31, 2025, and based on that conclusion, he reduced CITGO's management forecasts in each future period from 2025 through 2030 such that CITGO would have an EBITDA margin equal to 58.4% of the forecasted peer group's EBITDA margin. (Tr. (Kleinrichert) 1236; August 22 Alberro Rep. ¶ 77)

409. "EBITDA recovery" refers to the rate at which a refiner's earnings are forecasted to grow in the future relative to the last twelve months of EBITDA. (Tr. (Kleinrichert) 1204-05, 1246; August 22 Alberro Rep. ¶ 68)

410. Measuring EBITDA recovery allows a comparison of how quickly a company's EBITDA is forecasted to grow compared to the EBITDA growth rates of its peers. (Kleinrichert Rep. ¶ 66)

411. Kleinrichert used the "EBITDA recovery" of the five Comparable Companies as a benchmark to compare against CITGO's EBITDA recovery. (August 22 Alberro Rep. ¶ 68)

412. Kleinrichert adjusted CITGO's January 2025 projections to align CITGO's EBITDA recovery with the consensus forecast for the Comparable Companies. (Tr. (Kleinrichert) 1221; Kleinrichert Rep. ¶ 66)

413.    The inclusion of 2020 and 2021 in Kleinrichert's analysis, which the Objectors fault because the results in those years were unforeseeably impacted by the global pandemic, did not have a material effect on the results of his EBITDA recovery methodology and would only affect the EBITDA margin result for 2026. (Tr. (Kleinrichert) 1253-54)

414.    Using the median value derived from his adjusted projections, Kleinrichert calculated a value for the PDVH Shares under the DCF approach of $8.382 billion, before taking into account any contingent liabilities (including the SDNY Litigation). (Kleinrichert Rep. ¶ 99 n.194)

415.    Kleinrichert's market multiples analysis estimates the value of CITGO using multiples for CITGO and the Comparable Companies. (Tr. (Kleinrichert) 1223-24; Kleinrichert Rep. ¶¶ 74-79)

416.    To conduct his market multiples analysis, Kleinrichert compared the enterprise values (as of the valuation date) of CITGO and its Comparable Companies according to three different metrics: (1) actual EBITDA results for the twelve month period ending March 31, 2025; (2) forecasted results for 2025; and (3) forecasted results for 2026. (Tr. (Kleinrichert) 1223-24; Kleinrichert Rep. ¶¶ 74-79)

417.    Taking the median of the enterprise-value-to-EBITDA multiples under these three approaches, Kleinrichert calculated a value for the PDVH Shares of $8.618 billion, before considering contingent liabilities. (Kleinrichert Rep. ¶ 99)

418.    Kleinrichert gave equal weight to the values he derives from his DCF and market approaches, yielding a range of $8.4 billion to $8.618 billion as the value of the PDVH Shares, without consideration of the contingent liabilities associated with the PDVSA 2020 Bonds. (Tr. (Kleinrichert) 1225)

101

419.    Kleinrichert testified that the contingent liabilities associated with the SDNY Litigation would reduce the value of CITGO up to the full amount of the claims in that litigation. (Tr. (Kleinrichert) 1262; Kleinrichert Rep. ¶¶ 158-62)

420.    The Court has considered Dr. Alberro's criticisms of Mr. Kleinrichert's analysis, including those expressly discussed in the next subpart, and none of them alter the findings and conclusions contained in this Opinion.

421.    The Court finds that Kleinrichert's analysis is well-supported in the record and persuasive.

### G.    Dr. Alberro's Valuation Analysis Is Not Credible

422.    The Court finds that Dr. José Alberro is a qualified valuation expert.  He received a Bachelor of Arts in Economics at the Instituto Tecnológico Autónomo de México, and a Master of Arts and Ph.D. in Economics from the University of Chicago.  (Tr. (Alberro) 728; July 7 Alberro Rep. ¶ 13)

423.    Dr. Alberro has experience in the petrochemical and refining industries, having served as the chief representative of PEMEX, the state oil company of Mexico, during the 1990-1992 NAFTA negotiations; was appointed by the President of Mexico as the founding CEO of Pemex Gas and Basic Petrochemicals; and served on the Board of Directors of Pemex Refining. (July 7 Alberro Rep. ¶ 12)

424.    Dr. Alberro has served as a valuation expert in dozens of arbitrations over the past 20 years.  (Tr. (Alberro) 730; July 7 Alberro Rep. at Appendix A ("Alberro CV"))  His prior representations include being retained by Sale Process Party ConocoPhillips as a valuation expert in an arbitration that produced one of the judgments ConocoPhillips seeks to recover in this case. (Tr. (Alberro) 730-31)

425.    Dr. Alberro was tasked by the Venezuela Parties with assessing "the fair market value of the shares of PDVH." (Tr. (Alberro) 731)

426.    Dr. Alberro used the standard definition of fair market value, as defined under Delaware law, which is "[t]he price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances, after consideration of all available uses and purposes, without any compulsion upon the seller to sell or upon the buyer to buy." (July 7 Alberro Rep. ¶ 122)

427.    Dr. Alberro testified that his valuation is merely "theoretical" and *not* the amount that an "actual buyer" would or should pay for the PDVH Shares. (Tr. (Alberro) 761, 766-67)

428.    Dr. Alberro concluded that the DCF method is the best and most reliable method to establish the fair market value of the PDVH Shares because it reflects CITGO's intrinsic value and minimizes, significantly, the market noise (that is, fluctuations in the market unrelated to the value of the business), and therefore he gave his DCF method 100% weight. (Tr. (Alberro) 750; July 7 Alberro Rep. ¶¶ 125, 212)

429.    Dr. Alberro valued the PDVH Shares as of March 31, 2025, but his opinion would not change if the valuation date were instead July 7 or September 15, 2025. (Tr. (Alberro) 735-36)

430.    Dr. Alberro opined that the fair market value of the PDVH shares is $18.6 billion based on the DCF method. (Tr. (Alberro) 731; July 7 Alberro Rep. ¶¶ 160-67) This valuation lacks credibility.

431.    In carrying out his DCF method, Dr. Alberro arrived at an enterprise value of the PDVH Shares of $18.6 billion by adding the net present value of the cash flow forecasts for 2025

through 2030 ($5.4 billion) to the net present value of the cash flow forecasts into perpetuity ($13.2 billion). (Tr. (Alberro) 742-43; July 7 Alberro Rep. ¶ 167)

432.    To reach these values, Dr. Alberro developed his own forecast of cash flows that incorporated CITGO's volume forecasts but used different forecasts of input and output prices. He did this, he explained, because CITGO, as a processing entity, buys crude oil and other related products, then produces a variety of goods, such as gasoline, jet fuel, and diesel, and it cannot set (nor even predict) the prices for the products it takes in or those it produces. (Tr. (Alberro) 736)

433.    Dr. Alberro modified CITGO's projections based on his review of materials prepared by four well-known consulting firms that are experts in the area of price forecasting: S&P Global Platts, RBN Energy, Turner Mason, and Wood Mackenzie. (Tr. (Alberro) 737-38, 798; July 7 Alberro Rep. ¶ 109)

434.    Dr. Alberro's stated rationale for diverging from CITGO's projections was that the four third-party analysts whose pricing forecasts he used to generate his EBITDA projections provide "more reasonable forecasts than the forecasts provided by only one company, which is CITGO." (Tr. (Alberro) 796)  Dr. Alberro acknowledged, however, that he never spoke with anyone at CITGO about how CITGO management came up with its prices or whether CITGO already consults with third-party analysts when preparing its own projections. (Tr. (Alberro) 797-98)  In fact, in developing its forecasts, CITGO consults essentially the same group of analysts Dr. Alberro considered in developing his modified projections. (Tr. (Hiltz) 1147)  Any benefit to be derived from consideration of these analyst forecasts, therefore, is already accounted for, to the best of CITGO management's ability, in the CITGO management projections.

104

435.    In addition to being unnecessary, the manner in which Dr. Alberro used the
analyst forecasts to modify the CITGO management projections led him to grossly inflate the
projections.

436.    Based on the volume forecasts from CITGO's 2025 MTP and the price forecasts
drawn from the four-party composite forecast, Dr. Alberro opined that the best and most reliable
CITGO EBITDA forecasts are $1.433 billion for 2025; $1.872 billion for 2026; $2.291 billion
for 2027; $2.808 billion for 2028; $3.090 billion for 2029; and $2.947 billion for 2030. (Tr.
(Alberro) 739; CIT-2.15, 2.19; July 7 Alberro Rep. ¶ 120)

437.    In its January 2025 MTP, CITGO management had forecasted EBITDA for 2025
of $1.457 billion. (Kleinrichert Rep. ¶ 107) Dr. Alberro's composite forecast, therefore, was
lower for 2025 ($1.433 billion) than management's own January 2025 forecast ($1.457 billion).
(July 7 Alberro Rep. ¶ 120) However, by the time Dr. Alberro conducted his analysis, in July
2025, CITGO management had updated – and materially reduced – its forecasts. Specifically, in
June 2025, CITGO management updated and lowered its forecast for 2025 EBITDA to $1.080
billion. (Kleinrichert Rep. ¶ 104; *see also* Tr. (Alberro) 803-06) Therefore, Dr. Alberro's
forecast for 2025 EBITDA is approximately 25% higher than the most-current, and more
accurate (since it was projected when half of 2025 had already happened), management forecast
($1.433 billion – $1.080 billion = $353 million ÷ $1.433 billion = .25). (Kleinrichert Rep.
¶¶ 104, 107)

438.    Between January and July 2025, consensus cash flow forecasts for the
Comparable Companies were also meaningfully adjusted downward, providing additional
evidence that Dr. Alberro's effective adherence to management's January 2025 projections was
itself an unduly optimistic choice. (Tr. (Kleinrichert) 1199; Kleinrichert Rep. ¶¶ 108-09)

439.    Dr. Alberro acknowledged that, for some years, his projections were more than 25-40% higher than CITGO management's projections.  (Tr. (Alberro) 901-02)

440.    Dr. Alberro's projections for 2026 through 2030 resulted in cash flows in the aggregate $2 billion higher than CITGO management's forecasts over that initial five-year period.  (Tr. (Alberro) 803)

441.    Dr. Alberro asserted it was reasonable to expect that CITGO's cash flows will exceed its historic results due to "significant strategic capital investments."  (Tr. (Alberro) 887) He provided no analysis to support that claim.  (Tr. (Kleinrichert) 1206-07)

442.    Dr. Alberro's adjustments to CITGO management's projections increased his DCF valuation by $5 billion compared to what the valuation would have been if Dr. Alberro had relied on CITGO's unadjusted forecasts.  (Tr. (Alberro) 906)

443.    The Court finds persuasive Mr. Kleinrichert's assessment that Dr. Alberro's projections are unreliable and result in a "highly flawed and unreliable" analysis that significantly inflates CITGO's fair market value.  (Kleinrichert Rep. ¶ 10; *see also* Tr. (Kleinrichert) 1194, 1204)

444.    Mr. Hiltz, who has expertise in valuing companies, also responded to Dr. Alberro, providing additional persuasive criticisms of Dr. Alberro's analysis.  (Hiltz Supp. Decl. ¶¶ 17-19)

445.    Hiltz persuasively testified that Dr. Alberro's projections were grossly overstated and resulted in a valuation that "doesn't pass a very basic smell test" when looking at it as "a multiple of expected 2025 CITGO EBITDA."  (Tr. (Hiltz) 1146-47)

446.    Making appropriate adjustments to Dr. Alberro's EBITDA projections, and using the WACC and perpetuity growth rates Hiltz supports, while keeping all of the other

106

assumptions in Dr. Alberro's DCF analysis the same, results in a valuation of $9.4 billion, which is further evidence that CITGO's fair value is less than $10 billion. (Tr. (Hiltz) 1152)

447.    Dr. Alberro also performed evaluations using the market multiples and comparable companies methodologies, but he placed zero weight on these results. Therefore, the Court likewise places no weight on them.

448.    Dr. Alberro did not subtract anything from his fair market value on account of contingent liabilities such as the 2020 Bondholders' claims. (Tr. (Alberro) 751-52, 822; Tr. (Hiltz) 1153-54; July 7 Alberro Rep. ¶ 216) Yet Dr. Alberro acknowledged that contingent liabilities "may" have an impact on a company's valuation. (Tr. (Alberro) 852-53) He recognized the fact that the SDNY Litigation would impact how much he (like any rational purchaser) would offer for the shares of PDVH as a potential buyer. (Tr. (Alberro) 918-19)

449.    In Mr. Hiltz's experience, Dr. Alberro's decision to ignore the contingent liability associated with the SDNY Litigation did not accurately reflect how the market would value an asset with a significant multi-billion dollar contingent liability. (Tr. (Hiltz) 1153-54)

450.    During the Sale Process, potential bidders for the PDVH Shares expressed concern about litigation relating to the PDVH Shares, including litigation relating to the PDVSA 2020 Bonds and the Alter Ego Claims. (Tr. (Hiltz) 538-39)

451.    Valuation reference sources, including one cited by Dr. Alberro, confirm that it can be necessary to consider material contingent liabilities when valuing a company. (Tr. (Alberro) 850-52; Tr. (Kleinrichert) 1219-20; RT12 (Pratt, *Valuing a Business*, 6th ed.) at 366, 466 (explaining "[d]iscount for contingent liabilities" "may warrant a separate adjustment to the value"))

107

452.    Dr. Alberro admitted that his "fair market value" analysis does not reflect the value of the PDVH Shares that would be obtained if they were sold on the market (Tr. (Alberro) 769) and he "ha[s] no opinion on the proper value to offer to purchase the PDVH [S]hares" (Tr. (Alberro) 761).

453.    Dr Alberro also "has no opinion" whether there is "anyone, anywhere in the world who would actually pay $18 billion for the PDVH [S]hares." (Tr. (Alberro) 328-29, 761-62)  Dr. Alberro does not know of anyone who is even willing to pay $10 billion for CITGO.  (Tr. (Alberro) 761-62)

454.    Mr. Hiltz also demonstrated that the valuation provided by Dr. Alberro was vastly out of line with the values of the Comparable Companies.  (Tr. (Hiltz) 1146-47; Tr. (Kleinrichert) 1197 (reaching same conclusion))

455.    The ratio between Dr. Alberro's $18.6 billion valuation figure and CITGO's last twelve months of EBITDA (as of the end of the first quarter of 2025) is 35, which is more than *twice* the high end of the EBITDA-to-enterprise value multiple range (6.8 to 15.1) for the five Comparable Companies that Dr. Alberro selected and analyzed.  (Tr. (Alberro) 909, 912-14; July 7 Alberro Rep. ¶ 189; Tr. (Hiltz) 1154-56; Tr. (Kleinrichert) 1194-97)

456.    As Mr. Kleinrichert testified, these relative multiples confirm that Dr. Alberro's valuation is "way out of bounds."  (Tr. (Kleinrichert) 1197)

457.    At bottom, the Court finds Dr. Alberro's $18.6 billion valuation to be not credible.

### H.    Evercore's Preliminary Valuation Is Outdated And Lacks Probative Value

458.    In September 2023, before launching the Marketing Process, Evercore created a deck of preliminary valuation materials.  (Tr. (Hiltz) 640; July 7 Alberro Rep. ¶ 168)

108

459.    Preparing a valuation at the beginning of a sell-side engagement is standard because the seller wants to understand what an asset is worth before going to market and may use the preliminary valuation as a baseline in evaluating offers. (Tr. (Weisenburger) 257-58)  It is not always done, however.  Over his 50-year career, Evercore's Mr. Hiltz has participated in sell-side engagements in which "there [was] no [fairness] opinion given, and the market [was] the arbiter of fair value." (Tr. (Hiltz) 645)

460.    For Evercore's Preliminary Valuation, it used a DCF methodology, based on CITGO's MTP for 2023 through 2028, prepared in September 2023, which resulted in a value of PDVH of $13.2 billion. (Tr. (Hiltz) 755-56; Hiltz Supp. Decl. Ex. C; July 7 Alberro Rep. ¶ 168)

461.    This Evercore Preliminary Valuation, conducted more than two years ago, and therefore is outdated, and also contains errors.  It not a fair measure of the value of the PDVH Shares today. (Tr. (Hiltz) 1158)

462.    Between September 2023 and July 2025, CITGO significantly underperformed the projections used in the Evercore Preliminary Valuation, and market multiples changed as well. (Tr. (Hiltz) 565-66; Tr. (Kleinrichert) 1218-20)

463.    Evercore's Preliminary Valuation did not account for contingent liabilities, including those associated with the 2020 Bondholders.

464.    No reasonable valuation of the fair market value of the PDVH Shares as of the second half of 2025 would put any weight on the 2023 Evercore Preliminary Valuation.

### I.    Sale Process Bids Corroborate Kleinrichert's Valuation And Further Undermine Dr. Alberro's

465.    The offers for CITGO during the Sale Process were indicative of the amount a willing buyer would pay for 100% of PDVH. (Tr. (Hiltz) 566-67)

466.    The public Sale Process was conducted in a manner such that the bids it generated are sufficiently indicative of PDVH's fair market value as to be reasonably viewed, as the Court does view them, as corroborative of Kleinrichert's valuation and as further undermining Dr. Alberro's valuation. (*See* Kleinrichert Rep. ¶¶ 9, 84-91)

467.    The reported purchase prices of bids recommended by the Special Master during the Sale Process, without accounting for any value associated with conditions on such bids, risks of closing, contingent liabilities, or other factors, were: $7.286 billion, recommended by the Special Master on September 27, 2024 (D.I. 1325); $3.699 billion, recommended by the Special Master on March 21, 2025 (D.I. 1596); $7.382 billion, recommended by the Special Master on July 2, 2025 (D.I. 1837); and $5.892 billion, recommended by the Special Master on August 29, 2025 (D.I. 2123).

468.    These recommended bid prices, ranging from $3.699 billion to $7.382 billion, are broadly consistent with Kleinrichert's valuation of $8.2 to $8.6 billion, and provide further evidence that Dr. Alberro's valuation of $18.6 billion is unsupported and not credible.

469.    None of the 136 potential bidders the Special Master reached out to submitted a bid (even a non-conforming bid, e.g., one without committed financing) close to the value Dr. Alberro opined was fair market value. (Tr. (Hiltz) 1146)

470.    As Mr. Hiltz persuasively opined, the Sale Process was a robust open-market process with extensive marketing, and the result of this process provided strong evidence of the value of the PDVH Shares. (Tr. (Hiltz) 566-67, 1146)

471.    In sum, the Court finds that the PDVH Shares it has been marketing in the Sale Process have a fair market value of no more than $10 billion.

XXVII.    **The Sale Process Was Fair And Successful, Generating Competitive Tension While According Rights To The Venezuela Parties Far Beyond What Was Required By Delaware Law**

472.    Mr. Randall Weisenburger provided his "personal opinions" and "personal beliefs" that the Sale Process was flawed, failed to generate competitive tension, and failed to produce a value-maximizing bid.  (Tr. (Weisenburger) 247-50, 270-97, 301-02)

473.    When questioned whether he was "really just speculating now based on [his] own personal opinions," he responded, "[t]hat is what I was asked to do."  (Tr. (Weisenburger) 328)

474.    Notwithstanding his critiques, Weisenburger recognized that the PDVH Shares were extensively marketed, such that any interested investor who wished to know about the sale had access to the information necessary to assess whether to put in a bid.  (Tr. (Weisenburger) 311-12)

475.    Weisenburger acknowledged that Gold Reserve and Amber both increased their prices after the Special Master selected Red Tree as the Stalking Horse Bid.  (Tr. (Weisenburger) 318-19)

476.    Weisenburger further testified that he does not know anyone who would be willing to pay $14.4 billion, or even $10 billion, for the PDVH Shares.  (Tr. (Weisenburger) 326-27)

477.    Weisenburger has no "concrete evidence" that if the Court were to rerun the Sale Process that a bidder would emerge with a higher bid than what has been offered to date.  (Tr. (Weisenburger) 328-29)

478.    Weisenburger's criticisms fail to persuade the Court that its Sale Process was unfair, flawed, or failed.  To the contrary, the Sale Process was fair to the Venezuela Parties and

111

all other participants in it, consistently generated competitive tension, was value-maximizing, and resulted in the Amber Bid, which is a fair bid and warrants judicial approval.

## CONCLUSIONS OF LAW

Crystallex, the plaintiff here, initiated this action in 2017, seeking a writ of attachment on the PDVH Shares. The Court granted the writ in 2018 and then stayed enforcement of its order pending appeal. The Third Circuit affirmed the issuance of the writ in 2019 and remanded the case for further proceedings. This Court lifted its stay in May 2020. Since that time, "the Court has undertaken the challenging and complex task of developing and implementing a process for the sale of a multi-billion-dollar oil company owned by a foreign state unwilling to part with it, where the asset is subject to U.S. sanctions." (D.I. 2493 at 1) The Court's Sale Process is made even more complicated because, no matter its outcome, Additional Judgment Creditors ("AJCs") – who have followed Crystallex and been granted their own writs of attachment on the PDVH Shares – are competing over an asset worth (under even the Venezuela Parties' highly inflated and non-credible estimates) less than the sum of their collective judgments, meaning that, inevitably, some creditors will be left out of the money, and left to consider trying to enforce their judgments elsewhere. Hence, as the Court recently explained:

> This litigation – which essentially requires the Court to oversee a Sale Process to sell the nation's fifth-largest petroleum refining company, which is ultimately owned by a foreign sovereign nation that is currently headed by a government not recognized by (but instead sanctioned by) the United States, in order to satisfy judgments (of in excess of $22 billion) that total more than even the highest record valuation of that property (approximately $18.6 billion), generating innumerable disputes between the Venezuela Parties and all other participants as well as among creditors of different degrees of seniority, all the while being mindful of litigation in other courts (including the Southern District of New York as well as state courts in Delaware and Texas) that can impact this process, and with knowledge that in the end even a Court-approved sale cannot go to closing without the approval of the

112

>         Executive Branch (whose Office of Foreign Asset Control, within
>         the Department of Treasury, must grant a license for any deal to be
>         consummated) – is unique in terms of its scale, complexity,
>         duration, cost, and other respects.

(D.I. 2526 at 25)

Now, more than eight years after Crystallex initially petitioned the Court for relief, the Special Master recommends a bid from Amber Energy (the "Amber Bid"), an affiliate of Elliott, which offers approximately $5.892 billion[11] in value to Crystallex and the AJCs; would extinguish the nine senior-most claims in the waterfall (up to and including Koch); and additionally commits another $2.125 billion to extinguish at least two-thirds of the 2020 Bonds, the holders of which purport to have a claim to 50.1% of CITGO Holding, a claim that, if valid, would be structurally senior to those of the creditors in the Sale Process.

The Court has concluded that the Amber Bid should be, and will be, approved. Not only is Amber's the only viable bid available to the Court at this point, it is also the product of an extensive, highly-publicized Sale Process that was fair, reasonable, and equitable under governing Delaware law. Its price does not shock the conscience and is not manifestly unfair or grossly inadequate. It also enjoys the greatest chance of closing of any bid that has been proposed at any point in the lengthy Sale Process. Thus, for reasons explained below, and as supported by the Findings of Fact set out above, the Court will approve the Special Master's recommendation of the Amber Bid.

---

[11] Amounts of attached judgments (and therefore the amount of judgments extinguished by any bid, which the Court will refer to as the "price" or "headline price" of bids) are estimated as of an assumed closing date of June 30, 2026, according to the claims calculation approved in the Court's memorandum order of April 25, 2024. (*See* D.I. 1136 at 3) (citing D.I. 969-1)

A.    **The Burden Of Proof Is On The Objectors – But, In Any Event, The Supporters Have Proven The Amber Bid Should Be Approved**

Section 324 of title 8 of the Delaware Code authorizes the attachment and sale of the "shares of any person in any [Delaware] corporation," such as the shares of PDVH owned by PDVSA, which is the alter ego of Venezuela. 8 Del. C. § 324(a). The same statute further provides: "So many of the shares . . ., may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt . . . from which the attachment process issued, and after such notice as is required for sales upon execution process." *Id.* For the Court to approve the result of the Sale Process, then, it must be satisfied with the fairness of both the price and the process that led to the highest bid, consistent with Section 324.

On this much, both the Supporters of and Objectors to the Special Master's Updated Final Recommendation are in agreement. They disagree, however, on the issue of which side bears the burden of proof on the matters of price and process. Naturally, each side attempts to saddle its opponents with this burden: the Objectors argue the Special Master must prove the fairness of the process and that his recommended bid has the highest price (*see, e.g.*, D.I. 2433 at 12-13; D.I. 2456 at 33), while the Special Master and his Supporters contend that the Objectors must, in order to defeat the recommendation, prove that either the process was unfair or the Amber Bid does not have the highest price (*see, e.g.*, D.I. 2419 at 5; D.I. 2422 at 1; D.I. 2488 at 1-3). Delaware law is clear: the burden to show deficient procedure or inadequate price, and more generally to persuade the Court that it should not accept the result of the Sale Process, is on

114

those who oppose approval of that result. *See New Castle Cnty. v. Gallen*, 2003 WL 21739069, at *3 (Del. Super. Ct. May 27, 2003), *aff'd*, 839 A.2d 665 (Del. 2003) (Table).[12]

*Gallen* is on point. There, the Delaware Superior Court considered an appeal from confirmation of the results of a sheriff's sale of a home to satisfy a tax lien. The court held that "[t]he burden of establishing a basis for relief is, of course, upon the party seeking to set aside the sale." *Gallen*, 2003 WL 21739069, at *3, *5 (citing 2 Victor B. Woolley, *Practice in Civil Actions in Delaware*, § 1114 (1985)). The court then applied this burden to both a procedural ground for relief (a notice-based objection) as well as a substantive ground (a price-based objection). *Id.* at *3-*6. The Delaware Supreme Court summarily affirmed. *See* 839 A.2d 665 (Del. 2003) (Table).

Other persuasive authorities offer additional support for the conclusion that the burden of establishing the inadequacy of a winning bid, or the process producing it, is on its detractors. *See, e.g.*, *LSF9 Master Participation Tr. v. Truitt*, 2017 WL 8787509, at *3 (Del. Super. Ct. Oct. 24, 2017) (vacating setting aside of sale where objector made "no showing" that winning bid failed to offer fair market value); *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854, 858 (Del. Super. Ct. 1947) (describing types of evidence opponent to sale confirmation could adduce "to show that a much higher price could be obtained on resale"). In addition to caselaw, Woolley's *Practice in Civil Actions in Delaware* – which has been described by the Delaware Superior Court as an "authoritative treatise on Delaware law," *Allstate Ins. Co. v. Rossi Auto Body, Inc.*, 787 A.2d 742, 744 (Del. Super. Ct. 2001), and is frequently cited by the Delaware

---

[12] In interpreting Delaware law, the Court applies precedent of the Delaware Supreme Court, and in the absence of guidance from that court may look to decisions of Delaware's trial courts to assist in predicting how the Delaware Supreme Court would decide an issue. *See New Castle Cnty. v. Nat'l Union Fire Ins. Co.*, 174 F.3d 338, 347 (3d Cir. 1999).

Supreme Court, *see, e.g.*, *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994); *Shipley v. New Castle Cnty.*, 975 A.2d 764, 769-70 (Del. 2009); *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 556 (Del. 1995); *see also E. Sav. Bank, FSB v. CACH, LLC*, 55 A.3d 344, 350 (Del. 2012) ("No Superior Court judge has ever issued a decision that would directly contradict Judge Woolley's interpretation of the applicable statutory law.") – teaches that the party moving "to have the sale set aside, has the opening and closing, as the burden is upon him to support the allegations of the petition [and prevent the sale from closing]." 2 Victor B. Woolley, *Practice in Civil Actions in Delaware*, § 1114 (1985).

The case cited by the Venezuela Parties, *Friendly Finance Corp. v. Hector*, 1999 WL 1847444, at *1 (Del. C.P. Mar. 15, 1999), *overruled on other grounds by Hicklin v. Onyx Acceptance Corp.*, 970 A.2d 244 (Del. 2009), does not alter this conclusion. In *Friendly Finance Corp.*, 1999 WL 1847444, at *1, a creditor attempted to obtain a deficiency judgment following a private sale of a 1990 Mercury Cougar automobile; the sale was carried out pursuant to Uniform Commercial Code ("UCC") procedures, not Section 324. The Court noted the creditor (i.e., the proponent of the sale) met "its burden of proving by a preponderance of the evidence that the public auction . . . was commercially reasonable." *Id.* But this UCC-based analysis does not apply to Delaware's Section 324. Unlike Section 324, the UCC consistently and expressly places the burden of showing that a sale was commercially reasonable on the seller. *See Hicklin*, 970 A.2d at 251 (citing to Delaware's codification of UCC § 9-610(b)). In addition, the UCC's concern that sellers, as "dealers in an industry," may be motivated to "set their own low standards," is absent in a public sale process, which is subject to public and judicial scrutiny. *Id.* at 250 n.12 (citing 6 Del. C. § 9-627(b)(3)).

116

In any event, even if, alternatively, Delaware law placed the burden of proof on the Special Master and the Supporters, they would prevail. They have proven by a preponderance of the evidence that the Sale Process was fair and complied with Delaware law, and that the price of the recommended Amber Bid is likewise fair and may, consistent with Delaware law, be accepted by the Court. The conclusions are supported by the Findings of Fact already set out above as well as the additional conclusions discussed below.

**B.    The Sale Process Complied With Delaware Law, Was Fair, And Generated A Fair And Lawful Recommended Best Bid**

The Objectors assert that the Amber Bid is the product of several purported "process defects" which, in their view, "contributed to [a] deficient outcome." (D.I. 2374 at 16) They insist that the Special Master: (1) failed to consider alternative, value-maximizing transactions; (2) "deliberately failed to generate competitive tension throughout the Sale Process;" (3) did not run a "public sale" within the meaning of 8 Del. C. § 324(a); and (4) placed undue emphasis on contingent liabilities associated with the Alter Ego Claimants and the 2020 Bondholders. They further contend that the Court's own public statements "chilled" bidding and, for that reason and others, "greater value could be obtained if the process were run again." (D.I. 2374 at 15-31)[13] The Court disagrees.

---

[13] The Objectors additionally argue that the Special Master's Advisors were conflicted and these conflicts of interest further diminished the value achieved by the Sale Process. (*See, e.g.*, D.I. 2386 at 28-31) As the Court recently explained at length, in denying the Venezuela Parties' and Gold Reserve's motions to disqualify, the Special Master's Advisors were not conflicted. (D.I. 2526) Hence, all arguments that the Sale Process was flawed because of the purported conflicts of the Advisors, the Special Master, or the Court are meritless and moot.

The Venezuela Parties also contend that the Sale Process deprived them of due process of law in violation of the Fifth Amendment. (D.I. 2374 addendum at 3 ¶ 8; D.I. 2543-1 at 6) This argument, too, is unpersuasive. Over the course of this lengthy litigation, any interested entity – including each of the Venezuela Parties – had ample opportunities to litigate every essential step

### 1. The Special Master Considered Alternative Transactions

First, the Special Master considered and rejected several alternative transactions besides a public auction. For example, in June 2021, Evercore delivered a presentation to the Court, after consulting with the Special Master, stating that "[i]n addition to cash sale of 100% equity in PDVH, value maximization could also potentially be achieved through a combination of (i) initial public offering, (ii) equitization of claims, and (iii) equity or debt financing solutions." (VP-072 at 2)  A September 2023 presentation from Weil and Evercore also advised the Special

---

in the Sale Process.  Early in this case, the Court designated the Venezuela Parties, along with creditors Crystallex and ConocoPhillips, as Sale Process Parties, who were in regular contact with the Special Master as he formulated and implemented the Sale Process. (*See, e.g.*, Oct. 20, 2025 Tr. (D.I. 2510) 126) (Crystallex counsel explaining that "the Court designed a transparent process that put the [Sale Process Parties] at the table so that there would be some creditors at least that would have knowledge of what was going on in the process on a [regular] basis and that included . . . Crystallex, ConocoPhillips and the Venezuela Parties.  And as a result of that process, [the Sales Process Parties] were privy to information about who was sending in stuff over the transom, what was going on")  This provided the Venezuela Parties the additional opportunity to bring to the Court's attention any matter about which they had any concern.  This is far more than what due process requires, which is simply notice "reasonably calculated, under all the circumstance, to appraise interested parties of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr.*, 339 U.S. 306, 314 (1950).  Beyond their general objection to the "truncated time to review and respond to the updated Final Recommendation," the Venezuela Parties point to no specific example of when or how the Court, the Special Master, or anybody else deprived them of sufficient notice or an opportunity to be heard. (D.I. 2374 addendum at 3 ¶ 8)

    And the Venezuela parties had ample opportunity to respond to the Special Master's Updated Final Recommendation.  After the Special Master submitted his recommendation of the Amber Bid on August 29, 2025, the Venezuela Parties had over two weeks to prepare for the Sale Hearing, at which they were provided 7 hours and 45 minutes to present evidence and argument. (D.I. 2123, 2224)  Additionally, they had the opportunity to submit multiple pre-hearing and post-hearing briefs on the Updated Final Recommendation, which they did. (*See, e.g.*, D.I.. 2180, 2262, 2290, 2368, 2427, 2468)  The Court also listened to 90 minutes of closing argument from the Venezuela Parties (not to mention the other Objectors). (D.I. 2466)  Thus, the Court expressly finds that at every stage, including in connection with the Sale Hearing and the Amber Bid, the Venezuela Parties (and all interested parties) have had a fair and reasonable opportunity to review, object, and be heard, which is far more process than due process, or Section 324, commands.

118

Master he might consider a "[s]econdary [IPO] listing to establish enterprise value" and
distribution of "cash and remaining PDVH equity to claimholders." (VP-074 at 2)  At the Sale
Hearing, Evercore's Mr. Hiltz testified that a leveraged recapitalization combined with an IPO or
equitization of shares could be a viable structure if the current Sale Process "failed to produce
reasonable results." (Tr. (Hiltz) 633-34)  The Special Master's choice (and the Court's adoption)
of the Sale Process over these alternatives is entirely reasonable.  Since the start of the Sale
Process, market conditions were, and still are, inhospitable to IPOs generally; and here,
specifically, participation in the initial funding period of an IPO would have required a purchaser
to be willing to enter into a joint venture with PDVSA, at least for some time, and the Special
Master reasonably believed that this requirement would have decreased interest in an IPO
(especially given PDVSA's ownership by a sanctioned foreign government). (*See* Tr. (Hiltz)
530-31)  There is ample evidence the Special Master seriously considered alternatives to a public
auction and found them unlikely to maximize value as compared to a public sale, and the
Objectors have no evidence to the contrary.[14]

### 2.  The Special Master Generated Competitive Tension

Next, the Objectors argue that the Special Master failed to generate competitive tension
in the Sale Process. (D.I. 2374 at 17-21; D.I. 2498 at 14-15)  This contention, too, is
contradicted by the record.  Throughout the Sale Process, the Court's stated objective, consistent

---

[14] The Court further agrees with Crystallex that 8 Del. C. § 324(a) requires a "public sale" to
the highest bidder, making it doubtful whether an IPO or any of the alternative procedures
proposed by the Venezuela Parties would comply with the statute. (D.I. 2364 at 17)  Among
other problems, it is possible, as Crystallex points out, that some of the alternative transactions
the debtors propose could run afoul of the Delaware-law requirement that "the Attached
Judgment Creditors be paid in order of seniority, in cash, unless they agree to receive noncash
consideration or to release their attachments." (*Id.* at 18) (citing *Maryland Nat'l Bank v. Porter-
Way Harvester Mfg. Co.*, 300 A.2d 8, 11 (Del. 1972))

with Delaware law, has been "to maximize the value of the PDVH Shares." (D.I. 469 at 2; *see also* D.I. 1515 at 6) In furtherance of this goal, the Court directed the Special Master to create "as much 'competitive tension' among bidders as possible." (D.I. 1554 at 12) An examination of the bidding history shows that he achieved this goal.

In the first round of bidding in 2024, two bids emerged, both featuring escrow arrangements that would have delayed payment to Crystallex and the Additional Judgement Creditors for years, until final resolution (including exhaustion of all appeals) of the Alter Ego Claims and the 2020s Litigation. The headline price on these bids was $7.286 billion and $5.268 billion. (D.I. 1325 at 2; D.I 1414) Yet, given the escrow arrangements, those figures were subject to reduction based on the contingent liabilities associated with those liabilities. Thus, when the Special Master recommended the first of these bids, from Amber Energy, creditors universally opposed it. Another condition of the 2024 bids was that the Court enjoin the Alter Ego Claims, which the Court refused to do. (D.I. 1248) After the two Amber Energy bids were abandoned, the Court developed Bidder Protections, Evaluation Criteria, and a model Stock Purchase Agreement ("SPA"), and thereafter restarted the bidding process, which resulted in better bids.

In the subsequent Stalking Horse round, which ran from January through April 2025, the Sale Process yielded two Qualified Bids: one from Red Tree, with a headline price of $3.699 billion, and one from Dalinar, with a headline price of $7.081 billion. (D.I. 1599, 1636) The Red Tree bid came with a settlement with the 2020 Bondholders, adding potentially up to approximately $3 billion of value to PDVSA, and increasing closing certainty. (D.I. 1599) Neither of these Qualified Bids contained an escrow nor were conditioned on the Court enjoining any litigation; their headline amounts were not subject to reduction based on contingent

liabilities. They also enjoyed at least some creditor support. These Stalking Horse bids, then, were better bids than the abandoned first and second Amber bids had been, reflecting the competitive tension created during the Stalking Horse round.

The Court approved, over objections, the Special Master's recommendation of Red Tree's bid as the Stalking Horse Bid, agreeing it was "the best starting point" and "best situated to encourage further bidding and generat[e] as much competitive tension among bidders as possible during the Topping Period." (D.I. 1741 at 3) (quoting D.I. 1660 at 1) As Mr. Hiltz explained, and the Court accepted, the Special Master selected Red Tree's Stalking Horse Bid due, in part, to the concern that no entity could match Dalinar's headline price, even though the Dalinar proposed stalking horse bid might not have been sufficiently capable of closing. As the Special Master found, accepting Dalinar's bid at that point might have reduced or eliminated participation and competition in the ensuing Topping Period, creating an unacceptable risk that the Sale Process would stall out with an ultimately non-viable (though, until its inevitable death, also unbeatable) $7.1 billion bid. (Tr. (Hiltz) 556-57) By starting the Topping Period at the lower Red Tree price, $3.7 billion, with the best certainty of closing available, the Court could encourage even better combinations of price and certainty. (*Id.*) The Court agreed with this recommendation, albeit expressing "serious reservations" and noting that a successful final bid would have to place "greater emphasis on price and lesser emphasis on certainty." (D.I. 1741 at 3, 5)

The Topping Period proceeded exactly as the Special Master predicted. During the Topping Period, the Special Master and his Advisors engaged directly with bidders, continuously encouraging them to improve their bids and to propose a transaction with a better combination of higher price and closing certainty than the Red Tree Stalking Horse Bid. During the Topping

121

Period, after Judge Rakoff of the Southern District of New York dismissed the Alter Ego Claims, the Special Master supported and received approval to extend the Topping Period, in order to spur even greater interest in purchasing the PDVH Shares. Which it did. (D.I. 1779)

By the close of the Topping Period, the Special Master had the opportunity to recommend a bid that was, by any measure, a material improvement over the Red Tree Stalking Horse Bid. The Special Master determined at that point he had two bids – the Red Tree Revised Stalking Horse Bid, which did not improve upon the headline price of the Stalking Horse Bid, and a revised bid from Dalinar, which offered significantly more consideration than its prior stalking horse proposal.[15] (D.I. 1837 ¶¶ 79-81) Ultimately, the Special Master rejected Red Tree's Revised Stalking Horse Bid and instead recommended the improved bid from Dalinar, with a headline price of $7.382 billion, about a $433 million improvement over Dalinar's stalking horse bid price. (D.I. 1837 ¶¶ 79-80)[16] The Special Master determined that, given the more than $3.5 billion headline price difference between Dalinar's ($7.382 billion) and Red Tree's ($3.699 billion) latest bids, the lesser certainty of closing attendant to the Dalinar Bid was a risk worth taking. The competitive tension of the Topping Period, then, had produced a better bid than the Stalking Horse Bid.

---

[15] As described in the Findings of Fact, the Special Master received additional bids in the Topping Period, but none were deemed Qualified Bids under the Court's Sale Procedures Order. More specifically, the two other bids submitted in the Topping Period – a $3.831 billion all-cash Elliott bid and a $8.496 billion bid by Bidder B – were both dependent on a deal with the 2020 Bondholders that was not yet executed. (Hiltz Decl. ¶¶ 57-58)

[16] Dalinar achieved this improvement by discharging the last $200 million of Gold Reserve's Attached Judgment (which its stalking horse proposal did not do), and by discharging SEI's approximately $233 million attached judgment. (D.I. 1837 ¶ 80 n.17)

The value-maximizing pressures created by the Sale Process did not end with the end of the Topping Period. The Sale Procedures Order, Model SPA, and Dalinar SPA all contemplated possible unsolicited bids being submitted after the conclusion of the Topping Period. (*See generally* D.I. 481; D.I. 1557-1 § 6.16(e)) And this, too, happened.[17]

On August 8, 2025 the Special Master received an unsolicited bid from Amber Energy, which had returned to the Sale Process after Judge Rakoff's rejection of the Alter Ego Claims. The Special Master requested and obtained Court authority to engage with Amber. Its August 8 unsolicited proposal offered a headline price of $5.892 billion as well as an agreement to pay the 2020 Bondholders $2.125 billion in exchange for their support of the Amber Bid, which not only greatly improved Amber's certainty of closing but also created billions of dollars of value to the judgment debtors, who could look forward to extinguishment of at least two-thirds of the 2020 Bonds. (D.I. 2321-1 Ex. G-2) Amber also improved its price, as compared to its prior offers, by reaching agreements with two more creditors, Rusoro[18] and Koch. (*See id.*; *see also* Tr. (Turkel) 287-88) On August 22, 2025, Amber Energy submitted a revised Unsolicited Competing Proposal, which attempted to improve even further on its headline price by offering an additional

---

[17] Multiple unsolicited bids were submitted after the close of the Topping Period, as is set out in the Findings of Fact. The discussion here focuses on Amber's bids in this time-frame as they are the most pertinent bids.

[18] On November 7, 2025, Gold Reserve filed suit against Rusoro in the Delaware Court of Chancery, alleging Rusoro's alternative support for the Amber Bid constitutes a breach of contract (specifically, Gold Reserve's consortium agreement), which Gold Reserve asserts should bar Rusoro's participation in the Sale Process. *See Gold Reserve Ltd. v. Rusoro Mining Ltd.*, No. 2025-1292-LWW. Participants in the Sale Process have provided several submissions to the Court relating to this new lawsuit, including a request for a conference. (*See, e.g.*, D.I. 2522-25, 2528, 2531) On November 17, the Court ordered Gold Reserve and Rusoro to submit a joint status report (D.I. 2533), which they did on November 19 (D.I. 2536). The Special Master and ConocoPhillips responded on November 20. (D.I. 2537, 2541-42) The Court entered an order on November 21 denying the requested conference and ordering a new status report due by December 12. (D.I. 2546)

$75 million in cash in exchange for extinguishment of $500 million of Gold Reserve's attached judgment (which Gold Reserve did not accept). It is this August 22 Amber Bid the Special Master has recommended the Court approve.

Even at that point, the competitive tension of the Sale Process was not complete. The Dalinar SPA provided Dalinar a three-day match period, during which the Special Master once again engaged directly with Gold Reserve, as well as Amber Energy, encouraging them to continue to improve their bids. Again he succeeded, as Dalinar improved its offer to a headline price of $7.9 billion (up from its previous $7.382 billion offer).[19] (Tr. (Turkel) 287-88) While the Special Master continued to view the Amber Bid as better than even this last Dalinar Bid, the incontrovertible fact remains that there was bidding improvement in the post-Topping Period time.

As this recitation reveals, the Special Master and his Advisors worked diligently throughout the Sale Process, and consistent with the Sale Procedures Order, to create competitive tension. As the evidence demonstrates, they succeeded. There is no merit to the Objectors' contentions to the contrary.[20]

### 3. The Special Master Ran A "Public Sale"

---

[19] This approximately $500 million increase was accomplished through Gold Reserve reaching an agreement with Valores Mundiales, S.L. to satisfy its $718 million attached judgment while withholding $200 million of Gold Reserve's judgment that had been credit bid in the previous iteration of Dalinar's bid. (Tr. (Hiltz) 583)

[20] At one point during closing arguments, counsel for Gold Reserve denied that his client felt any competitive tension, and had instead improved its bids due to "fear." (Oct. 21 Tr. 198-99) As counsel for Amber Energy aptly retorted, "[t]he fear is that [Gold Reserve was] going to lose the bid," which is just another way of saying Gold Reserve was responding to competitive tension. (*Id.* at 351)

Next, the Objectors fault the Sale Process for involving a sale that was not "public," as is required under Delaware law, because other than at certain discrete points in the process (in particular, each time the Special Master recommended a bid to the Court) the exact terms of each bid were not disclosed, allegedly leaving bidders unsure of what they needed to do to be declared the winner. Though the Objectors latch onto this difference between the Sale Process and a "live auction," the Court is not persuaded that it amounts to a procedural defect. The Objectors, like all participants in the Sale Process, knew that bids would be submitted under the governing confidentiality agreement, and that the terms of each bid would not become public until the Special Master made the relevant recommendation (be that of a Stalking Horse, a Final Successful Bidder, or a Superior Proposal). (D.I. 1601, 1837, 2123) Moreover, the Venezuela Parties, who are Sale Process Parties, were offered access to all bids, at all times (even though at a certain point they declined access to confidential information as to the contents of other bids, in order to preserve their right to put in their own bid later in the process). (*See* SM20) Fundamentally, the process of selling a company like CITGO is simply too multifaceted and complex, implicating too much confidential business information (of the bidders as well as CITGO), to allow every detail of every bid to be made publicly-available in real-time. Still, the Court's Sale Process was a "public sale" in all material respects.

Additionally, the active engagement of the Special Master and his Advisors with bidders more than made up for any purported lack of information bidders supposedly suffered as a result of the Sale Process not being "public" in the same way a sheriff's sale of, say, a residential property might be. Moreover, the Sale Process always included the opportunity for any bidder to submit an Unsolicited Competing Proposal *after* a final round bid was recommended and its terms made public, just as Amber Energy did. (D.I. 1557-1) This means that since at least late

125

August 2025, when the Special Master filed his Updated Final Recommendation of the Amber Bid, all bidders have known precisely what bid they need to beat (i.e., they need to offer a better combination of price and certainty of closing than the Amber Bid's $5.892 billion headline price and its $2.125 billion TSA).

It is also undisputed that the Special Master satisfied the notice requirements of 8 Del. C. § 324(a). The statute mandates that debtors not resident in Delaware receive a copy of the Court's Sale Order (D.I. 481) "sent by registered or certified mail, return receipt requested, to such debtor's last known address," and that a notice of the sale be "published at least twice for 2 successive weeks, the last publication to be at least 10 days before the sale, in a newspaper published in the county where the attachment process issued." 8 Del. C. § 324(a) These requirements were met here: the Venezuela Parties consented to and did receive a copy of the Sales Procedure Order ("SPO") via email, and the Special Master published notice of the sale in several publications, including in Delaware and Venezuela newspapers. (D.I. 481 at 7-8 & n.3)

The Special Master also extensively marketed the PDVH Shares to all potential bidders. In the first round of bidding, he contacted 136 potential bidders, including private investment funds, sovereign wealth funds, companies across several industries, and creditors; 27 of those entities signed nondisclosure agreements and were given access to a virtual data room containing tens of thousands of documents relating to CITGO's business so they could begin to assess the value of the PDVH Shares. Once Amber Energy's 2024 bids were withdrawn, the Special Master began the second, 2025 round of bidding solicitation by contacting 136 bidders, 26 of which signed nondisclosure agreements. (Hiltz Decl. ¶ 22) Throughout the Sale Process, any and every person or entity was welcome to submit a bid, which the Special Master was then required to evaluate to determine whether it was a Qualified Bid. (D.I. 481 ¶ 9) Even the

126

Venezuela Parties' expert, Randall Weisenburger, agreed that the Special Master "extensively

marketed" the PDVH Shares to potential bidders, and further affirmed that the sale was

"extensively publicized" and the marketing was "comprehensive and complete." (Tr.

(Weisenburger) 311) Again, then, this sale was public under Delaware law.

### 4. The Special Master Appropriately Considered Contingent Liabilities

The Objectors' final challenge to the fairness of the process is their contention that the

Special Master placed undue emphasis on satisfying contingent liabilities, especially (in 2024)

the Alter Ego Claims and then (in 2025) the 2020 Bondholders' claims, all to the detriment of the

creditors and debtors in this Court's Sale Process. However, as the Court has and will again

explain, *see supra* Facts Part IX; *infra* Law Section E, the 2020 Bondholders do and always have

posed a significant risk to the success of any transaction transferring ownership of CITGO,

including any transaction in the PDVH Shares. The Objectors point to no persuasive evidence

that the Special Master or the Court overstated this risk, or of a causal nexus between any

statements or actions taken in connection with these risks and reduced bid value. While the

contingent liabilities *themselves* undoubtedly reduced the value that any rational bidder would be

willing to pay for the PDVH Shares, there is no credible evidence that the Special Master, his

Advisors, or the Court's consideration of those contingent liabilities independently (or in any

way improperly) reduced the value of the PDVH Shares.

In sum, the Sale Process was procedurally proper under Delaware law.

### C. The Fair Market Value Of The PDVH Shares Is Under $10 Billion

The Court concludes that the fair market value of the PDVH Shares is under $10 billion.

In reaching this conclusion, the Court is persuaded by the expert report, analysis, and testimony

of Red Tree's expert, Mr. Kleinrichert, who credibly estimates that the fair market value of the

PDVH Shares is between $8.4 and $8.6 billion, before accounting for contingent liabilities such as the 2020 Bonds. Furthermore, the Court finds the $18.6 billion valuation of Dr. Alberro, the Venezuela Parties' expert, to be non-credible and unpersuasive.

Under Delaware law, fair market value is what a willing buyer would pay a willing seller in an arms-length transaction. *See DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 369 & n.116 (Del. 2017). To assess this fair market value, Mr. Kleinrichert used two generally-accepted valuation methodologies, discounted cash flow ("DCF") and a market multiples analysis, according the results of each method equal weight. The Court finds Mr. Kleinrichert's analysis under both methodologies persuasive.

A DCF analysis relies on three inputs: (1) projected cash flows, (2) discount rate (also referred to as the weighted average cost of capital or "WACC"), and (3) long-term growth rate, sometimes called "terminal value" or "perpetuity growth rate." Mr. Kleinrichert and Dr. Alberro used the same discount rate and the same long-term growth rate as one another, so the differences between their DCF valuations are based entirely on their differing projections of CITGO's future cash flows.[21]

To determine his projected cash flows, Kleinrichert first reviewed CITGO's January 2025 management projections and determined that certain adjustments were necessary because the projections themselves are unreliable. He used two methods to perform these adjustments. The first was the "EBITDA margins" method,[22] which adjusted the CITGO projections downward to account for CITGO's historical experience of underperforming peer companies. Kleinrichert

---

[21] It is undisputed that the value of the PDVH Shares is derived entirely from the value of CITGO as an ongoing concern.

[22] EBITDA is an acronym for earnings before interest, taxes, depreciation, and amortization.

128

calculated that, on average, CITGO's EBITDA margins were 58.4% of the peer group from 2020

to March 31, 2025, and based on that conclusion, he reduced CITGO's management forecasts in

each future period from 2025 through 2030 such that CITGO would have an EBITDA margin

equal to 58.4% of the forecasted peer group's EBITDA margin. (Tr. (Kleinrichert) 1236)

Kleinrichert's second method, the "EBITDA recovery" method, adjusted the forecasts to

align with the consensus forecast for the Comparable Companies. Each adjustment

(conservatively) resulted in cash flows that reflected a growth rate that exceeded the median

EBITDA growth rate of the Comparable Companies. This means that Kleinrichert's adjusted

projections still envision that CITGO will outperform its peers, which is consistent with the

unadjusted management projections. The median value of the DCF valuation generated using

these adjusted projections is $8.382 billion.

Kleinrichert also performed three separate calculations of CITGO's fair market value

using the market multiples method. The first relied on CITGO's actual EBITDA for the 12

months ending March 31, 2025, resulting in a $4.451 billion value; the second relied on

forecasted results for 2025, which resulted in a $9.062 billion value; and the third, which relied

on forecasted results for 2026, resulted in a $8.618 value. From this data, Kleinrichert selected

as most accurate the median value, $8.6 billion. He then assigned equal 50% weights to the DCF

analysis and the market multiples analysis, to arrive at his valuation of $8.4 (rounded up from

$8.382) billion to $8.6 (rounded down from $8.618) billion.

The Court finds Mr. Kleinrichert's fulsome analysis, which is the product of multiple

calculations and reasoned, well-supported, and standard methodological choices, credible and

persuasive. (*See supra* Facts Part XXVI) His valuation of $8.4 billion to $8.6 billion is also

corroborated by the bids submitted in the Sale Process, each of which represents what a real-

world buyer would be willing to pay for the PDVH Shares as marketed. *See generally DFC Glob. Corp.*, 172 A.3d at 349 (concluding that "economic principles suggest that the best evidence of fair value [i]s the deal price, as it result[s] from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit ha[ve] a chance to bid"). At the conclusion of the Sale Process, those bids were the $5.892 billion Amber Bid (not accounting for any value added by the TSA with the 2020 Bondholders) and the $7.899 billion Dalinar Bid. No Qualified Bid submitted at any point in the Sale Process exceeded $8 billion. Even expanding the universe to consider non-Qualified Bids (e.g., bids that lacked committed financing), the highest headline price of any bid submitted was $10 billion (by Blue Water). (D.I. 2276) Rather than show any deficiency in the Sale Process, these bids are evidence that the fair market value of the PDVH Shares is under $10 billion.

By contrast, Dr. Alberro's $18.6 billion valuation is neither credible nor persuasive. (*See, e.g.*, D.I. 2365 at 3-9) It is, he acknowledges, merely a "theoretical" value and *not* the amount an "actual buyer" would or should pay for the PDVH Shares. (Tr. (Alberro) 765-67) Dr. Alberro's analysis ignores the "willing buyer" aspect of fair market value under Delaware law. *See DFC Glob. Corp.*, 172 A.3d at 369 n.116. He candidly admits that his valuation does not consider important realities that any willing buyer cannot afford to ignore, including, for example, that CITGO's assets are arguably encumbered by a pledge of 50.1% to the 2020 Bondholders. (*See* Tr. (Alberro) 765) Dr. Alberro knows of no one who would actually consider paying $18 billion, or even $10 billion, to buy the PDVH Shares. (*See* Tr. (Alberro) 762-65)

Dr. Alberro's valuation, which is based entirely on his DCF analysis (as he accords no weight to the results of his own market multiples and comparable transactions analyses) is

130

plagued by flawed cash flow projections.  He increased CITGO management's projections to a point where they were, for some years, as much as 40% above what management forecasted (amounting to a $2 billion difference in the aggregate for 2026-30).  (Tr. (Alberro) 803, 901-02) Dr. Alberro's adjustments are based on four pricing forecast models that were already accounted for by CITGO management in arriving at CITGO's own projections.

Dr. Alberro's adjustments resulted in anomalous findings.  In Dr. Alberro's view, CITGO will outperform its own projections and industry-wide projections for every year from 2026 until 2030 – which is problematic for reasons including that, historically, CITGO has underperformed its management forecasts and also underperformed its peer companies.  (Tr. (Kleinrichert) 1222; RT65 (Kleinrichert Rep.) ¶ 67)  As Red Tree observes, "Dr. Alberro's upward pricing adjustments increase his DCF valuation by $5 billion compared to if he simply relied on CITGO's projections."  (D.I. 2365 at 6) (internal emphasis omitted)  Dr. Alberro's justification for this discrepancy – that CITGO has increased, and plans to continue to increase, capital expenditures – is unpersuasive because he does not explain why these expenditures would lead to increased cash flows, or why adjustments were necessary when CITGO's own projections already account for these investments.

It is true that Mr. Kleinrichert, like Dr. Alberro, adjusted CITGO's management forecasts.  But he did so principally for the reason that by the time he was conducting his valuation, in July 2025, CITGO management itself had adjusted its January 2025 forecasts.  (Tr. (Kleinrichert) 1205-06)  CITGO's own downward adjustment in June 2025 amounted to about a 25% reduction from the January 2025 projections and was consistent with an industry-wide downward adjustment.  (*See* Tr. (Kleinrichert) 1205-06; Kleinrichert Rep. ¶ 107)  The reasoning

131

supporting Kleinrichert's specific adjustments to management forecasts is strong, while that offered on behalf of Dr. Alberro's adjustments is not.

Furthermore, Dr. Alberro's valuation implies a valuation of CITGO that is 35 times greater than its expected EBITDA this year.  (Tr. (Hiltz) 1146-47)  As Mr. Hiltz explained, such a valuation "doesn't pass a very basic smell test."  (Tr. (Hiltz) 1147)  It is vastly out of line with the values of companies that even Dr. Alberro considers comparable to CITGO.  (*See* Tr. (Alberro) 908-14; Tr. (Hiltz) 1146-47; Tr. (Kleinrichert) 1197)

Therefore, the fair market value of the PDVH Shares is under $10 billion.

**D.    Delaware Law Does Not Impose A Strict 50% Fair Market Value Test (But Such A Test Would Be Satisfied By The Amber Bid Anyway)**

Under Delaware law, a judicial sale should not be set aside just because the highest bid's price fails to meet or exceed fair market value.  *See Burge*, 648 A.2d at 419 ("[M]ere inadequacy of price, standing alone, is an insufficient ground for setting aside a judicial sale.").  Price is not the only factor courts may need to consider when assessing the adequacy of a bid; instead, the assessment may turn on the particular circumstances of each case.  *See id.* ("Court approval of a disputed sheriff's sale depends on the particular circumstances of the case") (internal quotation marks omitted).  That said, Delaware law does further provide that a judicial sale "*may* be set aside, however, when the sales price is so *grossly* inadequate that it shocks the conscience of the court."  *Id.* (first emphasis added).  In this regard, courts applying Delaware law sometimes employ a "50% test," which "requires special judicial scrutiny" when a sale fails to secure at least 50% of the fair market value of the property being sold.  *Id.*  While the 50% test has been stated in absolutist terms – "[i]f the fair market value of the property is over twice the sales price, the price is considered to be grossly inadequate, shocking 'the conscience of the court,' and justifying the setting aside of the sale," *id.* – Delaware courts do not automatically or

132

categorically reject all sales, regardless of the overall circumstances, simply for falling short of this 50% threshold. *See, e.g.*, *Deibler*, 652 A.2d at 559-60 (affirming Superior Court's confirmation of sale of shares for a price that was "somewhat less than 50% of [their] fair market value" because "in the circumstances it was nevertheless sufficient to affirm the sale"). Instead, Delaware law recognizes that the 50% test cannot, consistent with equity, universally apply to every judicial sale, regardless of the nature of the asset being sold, under all conceivable circumstances. *See id.*

In particular, the 50% rule presumes that "under normal market conditions and normal publicity, a buyer will be available who would be willing to pay at least one-half the fair market value," but Delaware law further understands that factors such as "the magnitude of price and limitations upon the available usage of property" can be "significant in that they materially affect the availability of buyers." *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1145-46 (Del. Super. Ct. 1977). Accordingly, the 50% test has generally been applied "to property of moderate price or property whose available usage attracts widespread buying interest, as in the case of residential property," whereas application of the test "may be unrealistic in the case of property whose price is great or usefulness is limited." *Id.* at 1146. Thus, the 50% test represents just one important touchstone among many when assessing the adequacy of a sales price in a forced judicial sale under Delaware law. *See Burge*, 648 A.2d at 419 ("The 50% test is not the sole touchstone of acceptability.").

Hence, the Venezuela Parties' contention that the Amber Bid must be rejected because it fails the 50% test is unavailing. Notwithstanding the parties' disputes as to the fair market value of the PDVH Shares, it is indisputable that their value is measured in *billions* of dollars, which is incontestably a different galaxy than the values of the properties typically at issue in one of these

133

sales. CITGO cannot be fairly characterized by anyone as a "moderate[ly] price[d] . . . property" but, instead, has a price that is, by any measure, of "great" magnitude. *Girard*, 379 A.2d at 1145-46; *see also Burge*, 648 A.2d at 419 (applying 50% test to sale of residential property with fair market value of between $97,000 and $107,000). Moreover, while, as explained above, the PDVH Shares were marketed widely to any potential interested buyers, that universe consists of perhaps 100 to 200 entities, a far more constricted group than would potentially be interested in buying, for example, a residence or automobile. *See Girard*, 379 A.2d at 1145-46. The contingent liabilities, including the Alter Ego Claims and 2020s Litigation, as well as the impact of U.S. sanctions on transactions in Venezuelan-owned property and the vigor with which the Venezuela Parties are fighting to prevent the Sale Process from being concluded successfully, are among the multiple "limitations upon the available usage of property" that further diminish, if not extinguish, the significance of any 50% test when assessing the adequacy of the Amber Bid. *Id.*

In any event, even if the 50% test were to apply here, the Amber Bid passes such a test. As already explained, the fair market value of the PDVH Shares does not exceed $10 billion. Therefore, any bid with a price exceeding $5 billion has a value that exceeds 50% of fair market value. Amber's Bid, which extinguishes approximately $5.892 billion of Attached Judgments and provides judgment-debtor PDVSA over $8.8 billion in overall debt relief (factoring in value for the extinguishment of 2020 Bonds, which will flow from the TSA), exceeds the 50% threshold and cannot, under any view, be deemed grossly inadequate under Delaware law. Moreover, there can be no argument that the Sale Process has not been subject to judicial scrutiny.

E.    **The 2020 Bondholders Do, And Always Have, Posed A Real Risk To Any Sale Transaction, A Risk That Needed To Be A Consideration In A Fair Sale Process, And In Any Successful Bid**

As the Court recently explained:

> The 2020 Bondholders purport to have an interest in 50.1% of the stock of CITGO Holding, Inc., a subsidiary of PDVH and the sole shareholder of CITGO. These rights – which have just been upheld by the SDNY in a decision now on appeal at the Second Circuit – pose a risk to the sale of the PDVH Shares if the Successful Bidder relies on financing leveraged against the assets of CITGO. If, for instance, a condition of obtaining financing to purchase the PDVH Shares is that the Successful Bidder create an acquisition entity to borrow funds and then merge with CITGO (so the debt can be secured by the assets of CITGO), the 2020s might be able to prevent such a merger by voting their shares against it. *See generally* 8 Del. C. § 251(b)-(c) (requiring majority of shareholders to approve any proposed merger). Alternatively, the 2020s could conceivably seek an injunction to prevent a transaction predicated on leveraging the CITGO assets. At the Sale Hearing, much evidence and argument was directed to whether the 2020s can actually take these actions, and whether approval from the Office of Foreign Assets Control ("OFAC") would be necessary to allow them to do so.

(D.I. 2526 at 36)

Gold Reserve asserts that the risk posed by the 2020 Bondholders is "contingent and speculative" and only becomes relevant to this Court's analysis if several independent events occur, none of which is guaranteed. (D.I. 2366 at 18) These events include: (1) OFAC lifting the long-running suspension of GL-5, a license that Gold Reserve insists the 2020 Bondholders' need before they can exercise their purported rights under the Pledge; (2) the 2020 Bondholders proving to some court, presumably the SDNY, that they meet all the requirements for issuance of an injunction; and (3) the 2020 Bondholders defeating the efforts of SDNY VZ Parties to obtain a stay of enforcement of Judge Failla's order pending appeal of that order in the Second

135

Circuit.[23]  (D.I. 2366 at 18)  Gold Reserve asserts that "[n]o record evidence was proffered to establish that any of these events is probable."  (*Id.*)

The Court agrees with the Supporters that although OFAC has consistently extended the suspension of GL-5, most recently to December 20, 2025, that does not mean the risk posed by the 2020 Bondholders can rationally be ignored.  For one thing, OFAC could decide, at any time, to lift the suspension of GL-5 or to not extend the suspension beyond next month.  Second, OFAC has expressly stated, in FAQ 1124, that it "will not take enforcement action against any person for taking steps to preserve the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PdVSA 2020 8.5 percent bond."  U.S. Dep't of Treasury, Venezuela Sanctions FAQ No. 1124 (May 1, 2023), available at https://ofac.treasury.gov/faqs/1124.  At least one reasonable reading of this guidance is that the 2020 Bondholders are presently free to enforce their rights (whatever those rights may be).  Third, Gold Reserve's view – which is that OFAC will indefinitely prevent the 2020 Bondholders from exercising their rights while nonetheless granting a license to allow the Dalinar Energy Bid to close – seems implausible, especially as OFAC has elsewhere stated that "[i]n making these licensing determinations, OFAC is committed to fair and equivalent treatment of potential creditors."  U.S. Dep't of Treasury, Venezuela Sanctions FAQ No. 1123 (May 1, 2023), available at https://ofac.treasury.gov/faqs/1123. Ultimately, the Court agrees with the Special Master that "it is impossible to fully predict OFAC's decision-making."  (D.I. 2373 at 8)  In such circumstances,

---

[23] Gold Reserve further contends that, for the 2020 Bondholders to present any threat to the Dalinar Energy Bid, two additional conditions must occur: Dalinar must fail to obtain financing to replace its bridge loan, and Gold Reserve must be unable to reach a settlement with the 2020 Bondholders.  (D.I. 2366 at 18)  These issues are addressed in the next section, which concerns the viability and merits of the Dalinar Bid.  (*See infra* Law Section F)

however, it would be imprudent, unwise, and unfair to Crystallex and the AJCs, who have already waited years or decades to collect on affirmed judgments, to bet the success of the Sale Process on a hope that the 2020 Bondholders actually cannot prevent a bid from closing (particularly as the Court has been presented with a better bid that carries no such risk and also has a high headline price and value).

Gold Reserve next contends that the 2020 Bondholders must obtain an injunction in order to interfere with the Dalinar Energy Bid. The 2020 Bondholders, unsurprisingly, disagree. In their view, they could block Adolin, Gold Reserve's wholly-owned acquisition vehicle, from merging with CITGO by voting their purported controlling interest in CITGO Holding, depriving the merger of the legally-required majority shareholder vote. (*See* Tr. (2020s' attorney) 1579) (citing 8 Del. C. § 251(b)-(c))  There is at least a reasonable reading of the current economic sanctions – and particularly Executive Order 13,835, which prohibits any unlicensed "sale, transfer, assignment, or pledging as collateral" of property belonging to the Venezuelan government – leading to a conclusion that there is no present prohibition on voting, as voting is not listed in the prohibited actions. E.O. No. 13,835, 83 Fed. Reg. 24001 (May 24, 2018). The Court is unconvinced that the degree and nature of the risk posed by the 2020 Bondholders is dispositively dependent on their prospects of obtaining an injunction.[24]

Lastly, the Court will not speculate as to whether Judge Failla will or will not stay enforcement of her judgment in favor of the 2020 Bondholders and against the SDNY VZ Parties. On November 17, 2025, Judge Failla, with the consent of the parties before her, extended the automatic stay of enforcement of that judgment pending appeal, *see* Fed. R. Civ. P.

---

[24] The Court makes no assessment of the likelihood the 2020 Bondholders could, if necessary, satisfy all the factors required to persuade a court to grant them an injunction.

62(a), until after this Court issues the instant Opinion, holding in abeyance PDVSA's request that she indefinitely stay the 2020 Bondholders' ability to exercise any of their rights according to the Pledge Agreement. *See MUFG* D.I. 408.[25] The Court does, however, agree with Crystallex that Gold Reserve has put forth "no basis whatsoever to believe that Judge Failla – who just weeks ago upheld the validity of the 2020 Bondholders' rights under the pledge – would now allow the value of those same bonds to be eviscerated by staying the 2020 Bondholders' exercise of their rights while allowing the sale transaction [proposed by Dalinar Energy] to close." (D.I. 2364 at 29-30)

Gold Reserve argues in the alternative that even if the 2020 Bondholders' rights could prove to be an impediment to the consummation of the proposed Dalinar Sale Transaction, the Amber TSA is not reasonably certain to mitigate this risk, and, therefore, does not make the Amber Bid any more certain than Dalinar's Bid to close. Gold Reserve belittles the TSA as merely an "agreement to agree." (D.I. 2366 at 32; *see also* D.I. 2433 at 37) It stresses that there are 12 different parties to the TSA (Amber and 11 independent 2020 Bondholder entities), each of which has a right to terminate the TSA if even a single party fails to "approve, execute and deliver" a number of documents, some of which are not yet drafted. (D.I. 2433 at 38) (citing D.I. 2366 at 27-28, 31) To Gold Reserve, this termination right is one of several "discretionary off-ramps" undermining the likelihood the TSA will resolve the 2020 Bondholders' claims, thereby

---

[25] As Judge Failla's recent order reports, she and the undersigned Judge have conferred with one another on several occasions, including on or about November 13, 2025. *See MUFG* D.I. 408 (S.D.N.Y. Nov. 17, 2025); *see also id.* D.I. 390 (Judge Failla noting she spoke with undersigned Judge regarding "near-term schedule of the two matters"). The two judges have not discussed or disclosed any substantive views on the issues before them but have exchanged thoughts relating to timing and their publicly-expressed desires not to interfere with each other's proceedings. The conversations between the judges were recorded and could be shared with any appellate court that may wish to hear them.

depriving it of all material value to this Sales Process. (*Id.*) Gold Reserve further decries the TSA's reliance, at multiple points, on the parties' anticipated "commercially reasonable efforts" to take a particular action, which Gold Reserve insists is insufficient guarantee that these parties will perform the several steps necessary to accomplish any discharge of the Pledge. (D.I. 2366 at 4; D.I. 2433 at 38-39)

The Court is not persuaded by any of these contentions. The TSA is a contract governed by New York law, in which Amber Energy agrees to pay the holders of the outstanding 2020 Bonds $2.215 billion in exchange for the Bonds, first in a Private Exchange (with an ad hoc group of approximately 75% of the holders bound by the TSA) and then in a Public Exchange (made available to 2020s not bound by the TSA). Upon obtaining the Bonds, Amber Energy will discharge the Collateral, meaning that the Bondholders will no longer have any right to the shares of CITGO Holding.[26] (Tr. (Turkel) 351, 365, 393-94, 398; *see also MUFG* D.I. 394 at 2 (counsel for trustee and collateral agent representing to Judge Failla that Elliott will extinguish

---

[26] The Court disagrees with the Objectors' suggestions that the Bonds may not be extinguished even upon execution of the TSA and a Sale Transaction of the PDVH Shares to Amber. (*See, e.g.*, D.I. 2374 addendum at 4) (Venezuela Parties arguing Amber is not obligated under its agreements to extinguish Bonds and could still attempt to collect on them from PDVSA) As Elliott writes and represents:

> Amber's TSA includes a commitment from holders of 75% of the 2020 Bonds to exchange their bonds for cash [of approximately $1.611 billion]. . . . After that exchange, any remaining 2020 Bondholders will not have any ability to control or direct the pledge of [the] CITGO Holding[] shares. As such, Amber anticipates that the non-signatories will participate in the TSA's 'Public Exchange,' pursuant to which they may exchange their bonds for aggregate consideration of up to $453.95 million in cash. . . . *After Amber acquires the 2020 Bonds, it will extinguish them.*

(D.I. 2382 at 16-17 (emphasis added; internal quotation marks and citations omitted); *see also* Tr. (Turkel) 365 (testifying that Amber will extinguish Bonds it obtains pursuant to TSA))

bonds tendered to it)) Gold Reserve's attempts to demonstrate that a supermajority of Bondholders do not have the power to release the Collateral, making the TSA effectively meaningless (D.I. 2366 at 32-33), fail. The governing documents provide that once Amber Energy holds at least 66.67% of the Bonds, it can extinguish the rights of all Bondholders under the Pledge and Security Agreement (RT63 ("Pledge") § 7.03(b); RT64 ("Indenture") § 5.01(o)), as the Pledge and Indenture expressly provide that a two-thirds supermajority of the Bondholders may vote to extinguish all Bondholders' rights in the Collateral (*see* Pledge § 7.03(b) ("[I]n connection with any . . . proposed release of the Collateral, the consent of the Holders of at least 66.67% aggregate in principal amount of the outstanding Notes shall be required."); *see also* Indenture § 5.01(o) (empowering same 66.67% supermajority of Bondholders to direct Trustee to instruct Collateral Agent to release Collateral)).

Gold Reserve directs the Court to two other provisions of the Pledge and Indenture that it contends undermine the ability of a supermajority of the Bondholders to release the Collateral. The first is § 9.02(a) of the Indenture, which applies to "amend[ments] or supplement[s to] this Indenture, the Guaranty or the Security Documents" and requires the "written consent" of PDVSA to amend, supplement, or waive the Indenture, Guaranty or Security Documents. (D.I. 2366 at 32; Indenture § 9.02) As the 2020 Bondholders persuasively respond, "the TSA and the transactions that it contemplates do not require any amendments or supplements to any of the[] documents" listed in § 9.02(a) but, instead, "simply involve[] one or more direction and indemnity agreements directing the Trustee and the Collateral Agents to effect the collateral

release." (D.I. 2420 at 4) (citing D.I. 2123-1 Ex. F §§ 2.2(b)(ii)-(iv), 2.2(d), 4.1(e))  The Court concludes, then, that § 9.02(a) is inapplicable to the actions contemplated by the TSA.[27]

Gold Reserve next points to § 9.02(b)(vi) of the Indenture, which prohibits amendments that would have the effect of "impair[ing] the right of each Holder to receive payment of principal" and interest.  (D.I. 2366 at 33; *see also* Indenture § 9.02)  This § 9.02(b)(vi), too, is inapplicable because, again, the TSA does not amend or supplement (nor contemplate any amendment nor supplement) of the Indenture or Notes.  (*See* D.I. 2420 at 4)  Moreover, this provision cannot reasonably be read to prohibit a supermajority of the Bondholders from releasing the Collateral when, three paragraphs later, the Indenture explicitly empowers a supermajority to do just that.  (*See* Indenture § 9.02(b)) ("Without the consent of the holder of at least 66.67% aggregate in principal amount of the outstanding Notes, no amendment, supplement, or waiver may release any Lien on Collateral granted for the benefit of the Security Documents, except in accordance with the terms of the relevant Security Documents in this Indenture.")

Gold Reserve's remaining arguments fare no better.  Gold Reserve points to "multiple conditions precedent and termination rights" supposedly embedded in the TSA that make the TSA "highly contingent and easily unwound" by any of the 12 parties to it.  (D.I. 2366 at 27) These include TSA § 4.1(d), which conditions execution of the agreement on documents that have not yet been fully drafted.  (TSA § 4.1(d))  Yet other provisions of the TSA obligate all parties to it, i.e., Amber Energy and the 11 separate 2020 Bondholders, to take "commercially reasonable efforts" to complete all necessary documentation and meet all conditions precedent.

---

[27] The Court has also considered the recent letter filed from Altana Credit Opportunities Fund SPC and Altana Funds Cayman making arguments similar to Gold Reserve's (D.I. 2544), as well as the 2020 Bondholders' persuasive letter responding to it (D.I. 2548).

(*See, e.g.*, TSA §§ 3.1(a)(ii)-(iii), 3.2(a)(i))  Such "efforts clauses" are commonplace in these

types of complex commercial transactions.  *See, e.g.*, Lou R. Kling & Eileen T. Nugent,

*Negotiated Acquisitions of Companies, Subsidiaries, & Divisions* § 13.06 at 13-44 (2020 ed.)

("Kling & Nugent"); *see also Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*,

281 N.E.2d 142 (N.Y. 1972) (enforcing "best efforts" clause under New York law); *Bloor v.*

*Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) (applying *Valkenburgh*); *Mor-Cor*

*Packaging Prods., Inc. v. Innovative Packaging Corp.*, 328 F.3d 331, 333 (7th Cir. 2003)

(nothing that "best efforts" clauses impose "usual obligations").

 Gold Reserve next cites Sections 5.2 through 5.4 of the TSA which, in its view, provide

"a broad array of termination rights to both the 2020 Bondholders and Amber Energy."  (D.I.

2366 at 28)  None of these provisions, however, causes the Court any concern.  Section 5.4, for

example, permits automatic termination of the TSA, by any party to it, if a sale transaction for

the PDVH Shares is not consummated by the "Outside Date" of June 30, 2026, another typical

provision.  *See, e.g.*, *Dermatology Assocs. of San Antonio v. Oliver Street Dermatology Mgmt.*

*LLC*, 2020 WL 4581674, at *22 & n.236 (Del. Ch. Aug. 10, 2020) ("Often, parties to a

transaction agreement identify a 'drop-dead' or 'outside' date, after which the agreement either

automatically terminates or either party can freely terminate if certain conditions are not met.").

Sections 5.2 and 5.3 provide the Bondholders a termination right upon an allegation of a

"material breach" or if any "Definitive Document" is deemed "materially inconsistent with the

TSA."  However, these provisions, which again appear to be commonplace in commercial

agreements, *see, e.g.*, *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 502 (S.D.N.Y. 1994)

(explaining how parties to transaction may be bound to it when they "have committed

themselves to the major terms of a transaction, but other terms remain to be negotiated and

definitive documentation remains to be prepared"), provide narrow termination rights (actionable

only upon a *material* breach or inconsistency) and are subject to the parties' additional obligation

to use "reasonable discretion" in exercising their rights under the TSA.  (TSA §§ 5.2, 5.3)

      Finally, Gold Reserve contends that the "'commercially reasonable efforts' clauses

throughout the TSA create substantial closing uncertainty."  (D.I. 2366 at 28-31)  Gold Reserve

posits that this uncertainty results from New York law's interpretation of "commercially

reasonable efforts" as a "fairly lenient" standard compared to other efforts clauses, such as "best

efforts."  (*Id.* at 29)  Again the Court disagrees.  Efforts clauses are a widely-used tool in

contracts to define a party's level of commitment to achieve a result that is not within that party's

complete control.  *See, e.g.*, Kling & Nugent, § 13.06 at 13-44 ("[P]arties will generally bind

themselves to achieve specified results that are within their control . . . , and reserve a

'reasonable best efforts,' 'commercial[ly] reasonable best efforts,' or 'best efforts' standard for

things outside of their control . . . ."); *see also Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL

4719347, at *8 (Del. Ch. Oct. 1, 2018) (nothing that "drafters commonly add an efforts clause to

define the level of effort that the party must deploy to attempt to achieve [an] outcome" where "a

party's ability to perform its obligations depends on others or may be hindered by events beyond

the party's control"), *aff'd*, 198 A.3d 724 (Del. 2018) (Table).  The TSA uses efforts clauses in

just this way.  (*See, e.g.*, TSA § 3.1(a)(iii)(F)) (committing parties to use commercially

reasonable efforts to seek stay from SDNY, in recognition of reality that it would be the court

that would decide whether to grant stay)  The efforts clauses, and the fact that they require only

143

"commercially reasonable efforts," do not mean the TSA is illusory or that it is immaterial to the Court's analysis of the bids presented to it.[28]

Accordingly, the Court determines that the TSA is reasonably certain to settle the 2020 Bondholders' claims, thereby eliminating any real risk that the 2020 Bondholders could prevent the Amber Bid from closing, and it therefore substantially and materially increases the certainty that the Amber Bid will close.[29]

## F.    The Dalinar Bid Is No Longer Qualified Under The SPO, Or Viable

A summary of the events leading up to and occurring during the Sale Hearing demonstrates that the Dalinar Bid is no longer a Qualified Bid under the SPO and, consequently, is not one the Court could approve at this juncture, even if it wished to do so.

---

[28] The Court also rejects Gold Reserve's contention, joined by the Venezuela Parties, that "the Elliott/Amber Bid is subject to unique regulatory risks." (D.I. 2366 at 34; *see also* D.I. 2433 (Venezuela Parties categorizing this risk as "not immaterial")) Gold Reserve argues that the Amber Bid must, but cannot, receive antitrust approvals in three foreign jurisdictions: Mexico, Morocco, and the Netherlands. (D.I. 2366 at 34) It characterizes these approvals as unlikely because "Elliott has numerous significant equity holdings in the energy and refining industry in multiple jurisdictions." (*Id.* at 34 & n.19) However, each ownership stake identified by Gold Reserve refers to holdings of no more than 4-6% of the pertinent entity. (*See* Tr. (Turkel) 471-73; *see also* D.I. 2183-6) The Court agrees with Amber that the need for these regulatory approvals is not "unique" to its bid and does not serve as a basis for rejecting it. This conclusion is buttressed by the fact that Amber's SPA contains a "hell or high water" provision (which the Special Master, in a further marshalling of the competitive tension created by the Sale Process, extracted from Amber Energy in the post-Topping Period), requiring Amber to make all efforts to obtain the necessary approvals. *See generally Akorn, Inc.*, 2018 WL 4719347, at *46 (explaining that hell-or-high-water covenant generally requires party to "take all actions necessary to secure antitrust clearance").

[29] The TSA is also conditioned on the Court executing a Sale Order by on or before December 1. (TSA § 4.1(h)) The Court addressed this risk, which was arguably entirely within the Court's ability to control, during closing argument. (*See, e.g.*, Oct. 21 Tr. 314-15, 334-42) Gold Reserve does not argue that the risk the Court would fail to issue the instant decision in time for a Sale Order to be signed by December 1, which would allow the 2020 Bondholders to terminate the TSA and, with it, the $735 million discount on their claims, undermines the value of the TSA to the Amber Bid. Any such argument would, in any event, now be moot.

The most recent bidding on the PDVH Shares took place in July and August of 2025. As
the Court has already explained, in July 2025 the Special Master selected Dalinar's Bid as his
Final Recommendation. Thereafter, however, Amber Energy – which was still in the process of
negotiating its TSA with the 2020 Bondholders when the Topping Period closed in June 2025 –
submitted an Unsolicited Competing Proposal, which the Special Master ultimately deemed a
Superior Proposal. (D.I. 2113) That determination triggered a three-day match period under the
then-effective Dalinar SPA, and Dalinar submitted an improved bid. After applying the Court's
Evaluation Criteria of price and certainty of closing, the Special Master recommended the Amber
Bid as his Updated Final Recommendation, and, relatedly, requested the Court's permission to
terminate the Dalinar SPA and to execute the Amber Energy SPA. (D.I. 2123)

Gold Reserve (joined by its consortium partners, SEI and the Valores Parties), filed a
Motion to Strike the Special Master's Notice of Superior Proposal for being, in its view,
inconsistent with the Bidder Protections to which Gold Reserve was entitled as the recommended
bidder in the preceding Final Recommendation. (*See, e.g.*, D.I. 2117 at 4-9 (discussing Bidder
Protections set out by Court); *see also* D.I. 1554) While the Motion to Strike was pending, the
Sale Hearing began, and the Court heard evidence and argument relating to that motion
(alongside evidence and argument directly relating to the merits of the Updated Final
Recommendation and the Objections to it). On the last day of the Sale Hearing, shortly after the
evidentiary portion of the Sale Hearing had been completed, Judge Failla issued her opinion
holding that the 2020 Bondholders are entitled to summary judgment that their Bonds are valid.
*See MUFG*, 2025 WL 2675871. Thereafter, and having already heard extensive argument from
the parties (*see, e.g.*, Tr. 37-65, 1460-67; *see also* D.I. 2169-72 (briefing); D.I. 2175-76 (same);
D.I. 2239-41 (same)), and after further discussion with the interested parties (*see* Tr. 1405-10,

145

1460-67), the Court denied Gold Reserve's Motion to Strike and granted the Special Master's requests to terminate the Dalinar SPA and to execute the Amber SPA (*see* Tr. 1528-39).

In providing its reasoning for these decisions, the Court cautioned that it had not yet decided how it would rule on the merits of the recommendation and Objections. (Tr. 1536-37) The Court further explained that in authorizing termination of the Dalinar SPA and execution of the Amber SPA, it was engaged in a "ministerial" act of aligning the paperwork with the Special Master's actual updated recommendation (to eliminate the discrepancy between the Special Master being a signatory to the Dalinar SPA at a time when he was no longer recommending the Dalinar Bid, and simultaneously not being a signatory to the Amber SPA) consistent with the requirements of the SPO. (*Id.*) The Court emphasized that its ministerial action was intended to be just that, ministerial, and was not meant to displace the financing supporting the Dalinar Bid; that is, "granting the Special Master's request is not preventing the Court from considering the Dalinar Bid as a potentially winning bid." (Tr. 1536-37) Nevertheless, the Court added, "[i]f as a practical matter it turns out that this ministerial action is or does or will kill the Dalinar bid, then the Dalinar bid was never one that was going to prevail on the merits anyway," given its vulnerability to even this mere ministerial act. (Tr. 1536)

In its post-Sale-Hearing briefing on its Objections, Gold Reserve revealed that "the Court's decision to grant the Special Master's request to terminate the Dalinar Energy SPA . . . has caused dislocation with [Dalinar's] lending consortium, as [Gold Reserve's CEO] Mr. Rivett testified at the Sale Hearing" would occur. (D.I. 2433 at 16 n.8) Gold Reserve's counsel, however, remained "confident, based on representations made by its lending consortium, that if the Court approves the Gold Reserve/Dalinar Energy bid then its committed financing will be available to support the existing terms of its Improved Bid." (*Id.*)

Gold Reserve has therefore admitted that, without an approved SPA, its bid no longer has committed financing. This deficiency alone is a sufficient basis for the Court and the Special Master to reject the Dalinar Bid as now non-qualifying. (*See* D.I. 480-1) In the Court's view, this development confirms the precarious nature of the Dalinar Bid, from which it has apparently suffered all along. It now seems that the Dalinar Bid never had a firm likelihood of closing (even though, as of July, it offered the best *combination* of price and closing certainty compared to the available alternatives, given the only other Qualified Bid at the time – Red Tree's $3.699 billion bid – had a price that was so much lower than Dalinar's $7.081 billion price).

While Gold Reserve's counsel sought to minimize these post-hearing developments, it is uncontested that the financing that once supported the Dalinar Bid relied on the upstreaming of CITGO's assets, with and into Adolin, the newly-created merger and acquisition vehicle wholly-owned by Dalinar and, indirectly, by Gold Reserve, and, for that reason, the transaction implicated whatever rights the 2020 Bondholders have under the Pledge.[30] Nevertheless, Gold

---

[30] Gold Reserve argues its financing is structured to avoid the 2020 Bondholders completely, because its transaction involves two steps. In step one, "the proceeds from the bridge loan would be used to satisfy the senior judgment creditors who are to receive cash at Closing" of the sale of the PDVH Shares. (D.I. 2433 at 25) Then, in step two, Dalinar's wholly-owned subsidiary and acquisition vehicle, Adolin, would merge with CITGO. (*Id.*) In Gold Reserve's view, because the first-step payments to Crystallex and senior AJCs are not conditioned on the second-step merger, but will be paid out from the bridge loan, these judgment creditors will be paid cash and they (and, Gold Reserve continues, the Court) need not have any concern with what happens after that first step, including whether the second-step merger can actually occur. (*Id.*) Gold Reserve concludes that this means the senior judgment creditors here would be paid regardless of any efforts the 2020 Bondholders might take to block the second-step merger. (*Id.*)

These arguments fail for two reasons. First, even if the two-step structure of Gold Reserve's transaction somehow renders irrelevant whatever ability the 2020 Bondholders might have to vote their shares against the merger, it does not deprive them of the opportunity of nonetheless seeking an injunction against the first and second steps of the transaction. Second, there is a substantial risk that a court could "collapse" the two steps, viewing them as in reality one step, and further finding that the effect of the overall transaction is to deprive the 2020

147

Reserve asserts that the Dalinar Bid remains a viable alternative to the Amber Bid because the

risk that the 2020 Bondholders will be able to interfere with the closing of the Dalinar Bid –

either by voting their shares against the merger portion of the Dalinar transaction or by obtaining

an injunction against further encumbering the CITGO assets to which the 2020 Bondholders'

Pledge is attached – is contingent upon confluence of several independent, and, in Gold

Reserve's view, unlikely, events.  It adds that even if its predictions are wrong and the 2020

Bondholders prove able to interfere with Dalinar's financing, "Gold Reserve/Dalinar Energy

have arranged for $2.8 billion of contingent financing," which it contends is "sufficient to settle

the 2020 Bondholders' claims should they ever actually be able to threaten the Gold

Reserve/Dalinar Energy closing."  (D.I. 2366 at 23, 25)

 These arguments are not convincing.  As explained in the preceding Section, there is a

realistic possibility that the 2020 Bondholders would be able to disrupt the Dalinar Sale

Transaction, either by voting their shares of CITGO Holding to block the Adolin-CITGO merger

(which is fundamental to the Dalinar Bid) or by seeking an injunction against that transaction.

Furthermore, the record confirms that Gold Reserve does not truly have access to sufficient

financing, at least at this time, to address the issue of the 2020s by paying them.  Given the 2020

Bondholders' recent win in the SDNY – in the form of a judgment for $2.859 billion plus interest

accruing at an average rate of $600,000 for each day after October 17 until the judgment is paid

---

Bondholders of their rights to their collateral under the Pledge and Indenture.  This theory,
perhaps among others, could provide sufficient basis for a court to enjoin the Dalinar Energy
transaction, causing its financing to disappear and leaving the senior judgment creditors waiting
still longer for a viable transaction that could close and pay their judgments.

– and their expected $2.125 billion payment from Amber Energy under the TSA,[31] it is

inconceivable that the 2020 Bondholders would consider making a deal with Gold Reserve at

any significant discount from the judgment.  Gold Reserve's assertion that it can procure this

level of funding, in addition to the cash and non-cash consideration it would already be

committed to pay Crystallex and the AJCs as part of the Dalinar Energy Bid, is not credible.

As Crystallex explains, Gold Reserve's financing falls into three categories:

> (1) a $4.5 billion bridge loan secured by the assets of CITGO
> Petroleum following the proposed merger of Dalinar's subsidiary,
> Adolin Holdings, Inc., into CITGO; (2) a $1.8 billion highly
> confident letter with J.P. Morgan to raise preferred equity financing;
> and (3) a $2 billion asset-backed loan ("ABL") with an accordion
> feature worth up to an additional $1 billion.

(D.I. 2364 at 26-27)  However, the financing documents reveal that Gold Reserve cannot

actually obtain the maximum amounts from all three categories.  Gold Reserve's bridge loan

(category (1) financing) includes a condition that any financing obtained through the issuance of

preferred equity (category (2) financing) before or after closing of the Sale Transaction will

reduce the amount of bridge loan funding available on a dollar-for-dollar basis.  (D.I. 1837-1 Ex.

C at 4-5))  Moreover, the ABL (category (3) financing) by its express terms cannot be used to

pay the 2020 Bondholders within the first year after closing or while the bridge loan remains

outstanding.  (D.I. 1837-1 Ex. B at 12 & Ex. C at 4)  In reality, then, these constraints limit the

amount of financing Gold Reserve can raise to a maximum of $7.5 billion ($4.5 billion bridge

loan plus $3 billion ABL, but no net additional funds from the preferential equity financing since

---

[31] The discount contained in the Amber Energy TSA was negotiated prior to Judge Failla
ruling in favor of the 2020 Bondholders in the SDNY Litigation.  There is no reason to believe
that the 2020 Bondholders, now having prevailed in the trial court and having an understanding
of what the Second Circuit appeal from that ruling will entail, would offer this or any similar
discount to Gold Reserve or anybody else at this point.

any amount raised in that manner would reduce the bridge loan by the same amount). (D.I. 1837-1 Ex. C at 1, 4) Gold Reserve contends that, by the time of closing, the bridge loan will be replaced with committed financing that will not have to be reduced by any future distribution to the 2020 Bondholders. (Tr. (Rivett) 995-1004) But the Court agrees with ConocoPhillips that Gold Reserve's representation that it will find new, committed financing at closing amounts to "little beyond speculation." (D.I. 2375 at 21) At bottom, the $2.8 billion Gold Reserve insists it can raise to pay the 2020 Bondholders is (in addition to almost certainly being insufficient to reach a deal with the 2020 Bondholders) is illusory.

In sum, the Dalinar Bid is no longer a Qualified Bid because it is no longer backed by committed financing. (*See* D.I. 480-1) And, even if the Dalinar Bid remained a Qualified Bid, its financing structure is not sufficient to realistically deal with the risk posed by the 2020 Bondholders, a risk that has only become more pronounced after Judge Failla's summary judgment ruling. Thus, the Dalinar Bid is no longer viable, and even if it were, it does not offer an attractive or workable alternative to the Amber Bid, to which the Court now turns.

**G.     The Amber Bid, The Only Qualified Bid Before The Court, Has the Highest Sale Price, Yields The Greatest Value, Has The Most Closing Certainty, And Is The Best Overall Bid**

The Amber Bid, which is the only Qualified Bid currently before the Court, necessarily has the highest sale price, as it is the only Qualified Bid. It also yields the greatest value and is the best bid, overall, that has ever been submitted during the course of this judicial sale – a reality confirmed by the Special Master's application of the Evaluation Criteria: price and certainty. In particular, the Amber Bid includes a purchase price of $5.892 billion, which is approximately $2 billion higher than the next-highest bid that also included a TSA with the 2020 Bondholders: the Red Tree Stalking Horse Bid of $3.699 billion. The Amber Bid fully resolves

150

the judgments of Crystallex and the next nine creditors in the Court's priority waterfall:

Tidewater, ConocoPhillips, OIEG, Northrup Grumman, ACL, Red Tree, Rusoro, ConocoPhillips

again, and Koch. It pays cash to each of these judgment creditors, in amounts equal to the full

attached judgments of Crystallex, Tidewater, ConocoPhillips, OIEG, Nothrup Grumman, ACL,

and Red Tree, and in less-than-full value amounts consented-to by Rusoro, ConocoPhillips, and

Koch to extinguish these last three judgments. (*See* D.I. 2382 at 18)

The $5.892 billion headline price and extinguishment of that amount of judgments

against the Venezuela Parties via the payout of $5.038 billion in cash (*see* D.I. 2382 at 5), is only

the beginning of the value created by the Amber Bid. Most notably, Amber Energy will,

pursuant to the TSA, further pay an additional $2.125 billion to the 2020 Bondholders, which

will result in: (a) elimination of any risk the 2020 Bondholders might otherwise pose to

consummation of a sale of the PDVH Shares, as the TSA will lead to the extinguishment of the

Pledge and Indenture; (b) elimination of at least $2.125 billion of contingent liabilities owed by

PDVSA, which issued the 2020 Bonds in exchange for $3.02 billion (*see* D.I. 2373 at 34),

amounts PDVSA may have to pay back in some form, at some time, even if the Bonds are not

valid (since PDVSA did receive $3 billion from the Bondholders); and (c) a "discount" of $735

million from resolution of the 2020 Bondholders' rights for this much less than the amount of the

judgment entered by Judge Failla in favor of the 2020 Bondholders (a "discount" that arguably is

growing by approximately $600,000 in interest every day, which, absent the TSA, PDVSA and

PDVH would eventually have to pay, unless they succeed in overturning the SDNY judgment on

appeal). In this regard, the TSA is beneficial to the Venezuela Parties, as it avoids the real risk

that the 2020s Litigation will end with an order that the Venezuela Parties (not Amber Energy)

pay the 2020 Bondholders at least $3 billion, and possibly more. *See generally Deibler*, 652

A.2d at 559-60 ("[There is] no reason not to take . . . financial benefit to the debtor [into account when determining adequacy of price]."). All told, between discharging debt owed to judgment creditors and making payments to increase the probability of closing, Amber's Bid extinguishes nearly $9 billion in Venezuelan debt.[32] (*See* D.I. 1528-3 (Evaluation Criteria) at 12) (describing "non-exhaustive list of considerations")

Largely as a result of its TSA component, the Amber Bid comes with a very high degree of closing certainty, thereby representing the best combination of price and certainty of any Qualified Bid that has been submitted at any point in the Sale Process. It provides complete relief to Crystallex and complete or partial relief to nine AJCs, and does so with a transaction that cannot be thwarted by the 2020 Bondholders, regardless of whatever enforceable rights they may have in connection with CITGO. The Amber Bid also pays $75 million to Red Tree, whose Stalking Horse Bid was topped, and $30 million to Gold Reserve, whose Final Recommendation bid was topped, all consistent with the SPO and the Court's Bidder Protections. (D.I. 481; D.I. 1554 at 7-14) It also repays the Sale Process Parties and AJCs who funded the costs of the Special Master and his Advisors, without whose collective assistance the Court could never have devised nor implemented the Sale Process. (D.I. 256 at 88-89)

---

[32] Amber Energy has also offered to pay an additional $75 million to the next AJC in the waterfall, which is Gold Reserve, in order to extinguish $500 million of Gold Reserve's $1.256 billion judgment. (*See* D.I. 2123 at ¶ 7) The Court has not accorded any value to the Amber Bid for this feature of its offer because, to date, Gold Reserve has rejected the offer. Contrary to the Special Master's and Elliott's insistence (*see, e.g.*, D.I. 2382 at 19-21; D.I. 2374 at 29; D.I. 2424 at 17-18), the Court cannot skip over Gold Reserve and allow Amber Energy to offer this additional consideration to creditors below Gold Reserve in the waterfall (*see* D.I. 1583 at 2) (citing *Porter-Way Harvester*, 300 A.2d at 11, for the proposition that Delaware's absolute priority rule requires distributions be made "on the basis of priority of liens" and barring junior creditors from receiving consideration until every senior creditor is either paid in full or consents to distribution to a more junior creditor).

Based on its numerous meritorious features, the Amber Bid warrants Court approval.

**H.     Gold Reserve And Elliott Essentially Gambled On The Outcome Of The 2020s Litigation – And Only One Could Win**

The Elliott-Amber and Gold Reserve-Dalinar Bids reflect fundamentally different approaches to meeting the Court's Evaluation Criteria of price and certainty of closing. Amber's Bid sacrificed some amount of price in exchange for a high degree of certainty, whereas Dalinar's Bid prioritized price at the expense of certainty. Both entities' improved bids were submitted in August 2025, when it was known that Judge Failla intended to issue her summary judgment opinion in the SDNY Litigation by no later than September 30, 2025 – before this Court could complete its review of any recommendation from the Special Master and objections to it. In that moment of collective uncertainty as to whether Judge Failla would rule that the 2020 Bonds were valid or invalid, and where both outcomes seemed plausible, Amber effectively bet on a finding of validity – which would, Amber believed, doom the Gold Reserve Bid to failure, given the structure of its financing, as seems to have now happened – while Gold Reserve took the opposite proposition, essentially betting on a finding of invalidity – which would have reduced or perhaps removed a threat to its financing and allowed it to argue that Amber's Bid unjustly transferred $2.125 billion to holders of invalid Bonds, money that could and should be used to pay more AJCs participating in this Court's Sale Process.

In essence, Gold Reserve and Amber took opposite sides of a bet that could only pay off for one of them. In the end, Amber's number came up and Gold Reserve's did not. There is nothing unlawful, wrong, or otherwise unjust in effectuating the logical consequences of the two bidders' voluntary bidding decisions and approving the Amber Bid.

153

**I.      The Recommended Amber Bid Does Not Shock The Conscience Or Constitute A Manifest Injustice Under Any Set Of Reasonably Foreseeable Circumstances**

Notwithstanding the realities described above, most especially that the 2020 Bondholders prevailed in their litigation with the SDNY VZ Parties, the Objectors criticize the Amber Bid for diverting $2.215 billion in consideration to the 2020 Bondholders, when this money could otherwise be used to satisfy attached judgments in the waterfall.  They assert it would be a fundamental injustice to allow the 2020 Bondholders to, in their view, exploit this Court's Sale Process, undertaken for the benefit of (and largely paid for by) Crystallex and the AJCs, by extracting value from CITGO to which they may not even be entitled (as the Second Circuit could well rule).  (D.I. 2366 at 15-17)  The Objectors, and particularly Gold Reserve, also emphasize the fact that Contrarian, a junior AJC in the waterfall, is a holder of 2020 Bonds and indirect parent of Red Tree.  (*See* D.I. 2374; *see also Crystallex II,* 932 F.3d at 135 (identifying Contrarian Capital Management, LLC as "holder[] of PDVSA bonds due to mature in 2020").  This, the Objectors argue, only heightens the unfairness of the outcome now being approved by the Court, as it effectively blesses the 2020 Bondholders' hijacking of the process for their own benefit.  (D.I. 2366 at 18-27)

Under Delaware law, the Court would have to reject the Special Master's Updated Final Recommendation if it involved a purchase price so "gross[ly] inadequa[te]" as to "shock[] the conscience of the Court." *Girard*, 379 A.2d at 1145.  Here, however, for reasons that are evident throughout this Opinion, the Amber Energy purchase price is not grossly inadequate; nor does anything about that price, or any other aspect of the Amber Bid, shock the judicial conscience.

The Objectors suggest that the only way for this Court to resolve this dispute in a just manner is to delay the sale until the parties in the SDNY Litigation have exhausted all appellate rights and the validity of the 2020 Bonds is certain.  This is not a sufficient reason to refrain from

confirming the sale to Amber. This Court is tasked with resolving the parties' disputes as they presently exist, based on all that is known today. As of today, the 2020 Bonds are valid. Thus, the presence of a non-zero chance that the 2020 Bonds may in the end be deemed by an appellate court to be invalid is simply part of the context within which the Court must make its decision, but it is not a reason to shirk its obligation to the parties to resolve their dispute in a timely fashion, which is itself an especially weighty concern given that Crystallex came to this court with a judgment entitling it to payment more than eight years ago. (D.I. 1) As the Court has previously observed, "[e]ach day that Crystallex does not recover on its judgment is arguably something of an affront to the United States judicial system." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803, at *18 (D. Del. Jan. 14, 2021). More delay would only compound injustices exacted long ago. As the Court has frequently repeated (including in this Opinion), the Third Circuit has instructed that "every day Crystallex is not paid means that Venezuela has avoided its obligations." *Crystallex II*, 932 F.3d at 136.

Accordingly, the Objectors' insistence that the only way to avoid injustice is to impose further delay in compensating Crystallex and the first nine AJCs in the waterfall is untenable. The Venezuela Parties have always been free to avoid any prejudice resulting from the timing of the Sale Process by paying Crystallex and the AJCs what they are owed. Moreover, the Court's approval of the Sale Transaction proposed in the Amber Bid does not constitute a manifest injustice to the junior creditors, beginning with Gold Reserve and those junior to it, whose judgments will not be satisfied by the Amber Bid. The Court essentially leaves those AJCs

155

where it found them – they retain their judgments and may seek to enforce them by attaching other property of the judgment debtors, wherever they can find such property.[33]

The Court, of course, cannot see the future with any degree of clarity and necessarily lacks the wisdom only hindsight can bring. But, under any realistic set of future events, including even if the Second Circuit reverses the SDNY in the 2020s Litigation, the decision the Court needs to make now, based only on all that can be known now, favors approval of the Updated Final Recommendation of the Amber Bid.

**J.      Objections To Provisions In The Proposed Sale Order ("PSO") And Amber SPA**

Without waiver of their rights to object to approval of the Amber Bid, or waiver of any of their Objections that are the subject of other parts of this Opinion, the Venezuela Parties and Gold Reserve have stated objections to specific provisions of Amber Energy's Proposed Sale Order ("PSO"), which the Court will be signing to effectuate its approval of the Amber Bid and its overruling of the Objections. The Objectors have also stated objections to specific provisions of the Amber SPA. Throughout the briefing process relating to the Sale Hearing, and as recently as November 20, 2025 (*see* D.I. 2543), the Special Master, Sale Process Parties, Amber Energy and Gold Reserve have met and conferred and reduced the number of these specific objections to the PSO ("PSO Issues") and Amber SPA ("SPA Issues"). The Court now addresses the handful of remaining disputes requiring judicial resolution.

---

[33] The statements in this paragraph are incontrovertible legal propositions, which bind the Court even if, as the Objectors would insist, as a factual matter the Venezuela Parties are unable to pay their debts (for reasons including the non-recognized Maduro regime currently being in control of Venezuela) and there may not be any further attachable property of the Venezuela Parties to be found in the United States.

**PSO Issue 1 (relating to injunctions)**

The objection is SUSTAINED. Whether Amber and its Affiliates, successors, or assigns can be sued and made liable on future claims from the Republic, PDVSA, PDVH, CITGO, Crystallex, ConocoPhillips, the AJCs, any party with an attached judgment, and any affiliate or successor or assignee of any of the foregoing parties, can, if necessary, be litigated post-closing in an appropriate judicial forum.

**PSO Issue 2 (relating to First Amendment activity)**

The objection is SUSTAINED. Whether Amber and its Affiliates can be sued and made liable on future claims can, if necessary, be litigated post-closing in an appropriate judicial forum.

**PSO Issue 3 (relating to recoveries)**

The objection by Gold Reserve is OVERRULED and the language proposed by the Supporters is ADOPTED. The Court agrees with the Supporting Parties that if a judgment creditor "receives only a right, promise or potential (by court order or otherwise) to recover in the future, its right to recovery in these proceedings should not be reduced because it has not yet received actual payment." (D.I. 2543-1 Ex. A at 8)[34]

**SPA Issue 1 (relating to contracts)**

The objection is OVERRULED. The Court agrees with Amber regarding the potential for "misaligned incentives between the departing and incoming owners," and the disputed

---

[34] *See also* D.I. 2548 at 2-3 (Red Tree and OIEG arguing, persuasively: "The Court's sale procedure order does not provide for any offset against an Attached Judgment if a creditor becomes merely *entitled* to receive payment, and Gold Reserve offers no authority for such an offset. . . . Red Tree and OIEG are entitled to enforce their judgments both here and [elsewhere] simultaneously, as long as their claims are paid only once. . . . Gold Reserve, which is out of the money in Delaware, should not receive a windfall simply because more senior creditors *might* receive money elsewhere.") (emphasis in original).

provision (§ 6.1(b)(xi)) is a reasonable and apparently standard approach to addressing such conflicts.  (D.I. 2543-1 Ex. A at 10)  If, prior to closing, there is "a change in government in Venezuela and the subsequent lifting of sanctions" (D.I. 2543-1 Ex. A at 11), the Venezuela Parties may renew their request for modification of this provision in this or any appropriate judicial forum.

### SPA Issue 2 (relating to termination)

The objection is OVERRULED.  As explained elsewhere in this Opinion (*see supra* Law Section G), approval of the Amber Bid will not cause a fundamental injustice even if Judge Failla's ruling in the SDNY Litigation is overturned on appeal.

### K.    Adverse Humanitarian And Policy Impacts Of The Sale Process Are For The Executive Branch To Evaluate, Not The Court

From the inception of this litigation, the Venezuela Parties have eloquently, and movingly, impressed upon the Court the massive, tragic humanitarian crisis playing out in Venezuela and afflicting the Venezuelan people. (*See, e.g.*, D.I. 226 at 30-32; D.I. 243 at 3, 18-20)  Some observers have characterized recent events in Venezuela as one of the largest humanitarian crises in the world. *See, e.g.*, Editorial Board, Latin America has Never Seen a Crisis Like Venezuela Before, *Washington Post* (Jan. 9, 2019).  The United States government submitted a Statement of Interest reminding the Court of these tragic realities. (*See* D.I. 212 at 2) ("Venezuela is currently in the midst of an unprecedented humanitarian, political, and economic crisis.")  The United States has also warned the Court that the Maduro regime has attempted to (and presumably will continue to) exploit the Sale Process, and particularly any actual sale of CITGO, for anti-United States, and anti-democracy, propaganda purposes. (*See, e.g.*, D.I. 212-1 at 4) (letter from Elliott Abrams, Special Representative for Venezuela, stating: "It is clear that its loss through a forced sale in a U.S. court would be a great political victory for the Maduro

regime, which has already claimed that the United States and Guaidó are conspiring to 'steal' CITGO.")

The Court takes all of these concerns extremely seriously. However, as the Third Circuit suggested in 2019, *see Crystallex II*, 932 F.3d at 151 ("[I]t is nonetheless conceivable that short- or long-term U.S. foreign policy interests may be affected by attachment and execution of PDVSA's assets. The Treasury sanctions provide an explicit mechanism to account for these."), and this Court expressly held in 2021, evaluation of these issues – and the more general, and weighty, concerns of American foreign policy and national security – and how those policy and humanitarian considerations should be weighed relative to the federal judiciary's obligation to enforce affirmed judgments of United States courts, are matters for the Executive Branch to assess. (*See* D.I. 234 at 15 ("The OFAC licensing process is important for another reason: it provides a mechanism by which the interests the government has expressed to the Court can be taken into account by the Executive Branch itself. . . . The Court understands that the process by which OFAC reviews an application for such a license includes consideration of the foreign policy and national security interests the government has asked the Court to consider in this litigation."); *id.* at 34 ("[T]he OFAC licensing process provides the better mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact."))

All participants in the Sale Process agree that for any transaction, including the now judicially-approved Amber Bid, to be consummated, a license is required from OFAC. The Executive Branch has sole and exclusive control over OFAC's decision. The body to whom the concerns described in this section of the Opinion should be directed is the Executive Branch of the United States government.

159

**L.    A Stay Of The Signing Of The Sale Order Is Not Warranted**

Finally, the Court denies the Venezuela Parties' motion for an administrative stay, which seeks to provide time for the Court to consider their motion for a stay pending appeal, and further denies their motion for a stay pending appeal. (*See* D.I. 2374 at 39-40; *see also* D.I. 2539, 2540, 2550 (Amber Energy correctly describing latest stay motion as "premature" as it seeks to "stay a not-yet-entered sale order")) While the Court agrees with the Venezuela Parties that it is important to protect their appellate rights (*see, e.g.*, D.I. 2540 at 1), the Court can accomplish this same end by denying the stay requests and requiring notice, and a seven-day window, if and when OFAC grants a license and the Amber Sale Transaction is ready to close.

When determining whether to grant a stay pending appeal, courts consider the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks omitted). An administrative stay, which seeks to create time for the trial or appellate court to consider whether to grant a full stay pending appeal, and to "minimize harm while an appellate court deliberates" the merits of a stay pending appeal, does not necessarily require the movant to show the *Nken* factors favor it. *See generally United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Mem) (Barrett, J., concurring).

Here, the *Nken* factors weigh against granting a stay pending appeal. For the reasons provided above, it is unlikely that the Venezuela Parties will succeed on the merits of any of the issues resolved by this Opinion. In their most recently-filed motion for a stay pending appeal, the Venezuela Parties contend they are likely to prevail on their arguments that the attachments

160

stemming from judgments against the Republic are invalid under Federal Rule of Civil Procedure 69 and Delaware law, and are further likely to succeed on their argument that the Special Master and his Advisors should have been disqualified. (*See* D.I. 2540 at 6-18) The Court has addressed these issues at length and, again, does not find the Venezuela Parties have met their burden under *Nken*. *See, e.g.*, *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, 2023 WL 7182179, at *8-11 (D. Del. Nov. 1, 2023); *see also* D.I. 2526.

The public interest and the interests of Crystallex and at least nine AJCs would also be adversely affected by granting the stay, as it would freeze progress toward the ultimate enforcement of "judgment[s] that ha[ve] been affirmed in our courts," undermining the integrity of the federal judiciary and the public's confidence in it, and exacerbating the ongoing harm to adjudicated judgment creditors. *Crystallex II*, 932 F.3d at 149. More particularly, if the Court does not sign a final sale order by December 1, 2025, the TSA – with its $735 million discount on the 2020 Bondholders' contingent liability – may be terminated (as the 2020 Bondholders' right to terminate becomes operative after December 1, 2025), which could lead to negative (and entirely avoidable) consequences for the Sale Process and the judgment creditors.

Weighing against these harms is the lack of any persuasive showing that the Venezuela Parties will be irreparably harmed in the absence of their requested stay. All of the purported harms the Venezuela Parties seek to avoid will only be triggered by the closing of the Sale Transaction. Those harms include "replacing [CITGO] management, selling equity, and disposing of assets;" distributing payments to creditors that will be difficult or impossible to recoup; injuring "the reputation and functioning of the Republic's opposition government . . . if the sale closes . . . ." (D.I. 2540 at 18-19) But the sale the Court is approving cannot close unless and until OFAC grants a license and the Court will, and hereby does, stay that closing

until no earlier than seven (7) days after the Special Master dockets a notice indicating that OFAC has granted such a license, all other regulatory and other necessary approvals have been obtained, and the Sale Transaction is ready to close. This provides the Venezuela Parties with sufficient time to seek a stay pending appeal from the Third Circuit. Therefore, no formal administrative stay is required.[35]

## CONCLUSION

The Amber Bid, the only Qualified Bid before the Court, and the bid the Special Master recommends the Court approve, is the product of the Court's years-long Sale Process, which was a fair, equitable, and public process. The Amber Bid offers the best overall combination of price and certainty of closing of any bid submitted. It pays the judgments of ten creditors to whom the Court has granted writs of attachment, extinguishing $5.892 billion of judgments. It also extinguishes, through the TSA, an additional approximately $3 billion of debt of the Venezuela Parties, by largely or entirely resolving the 2020 Bondholders' interests. The Amber Bid provides this latter relief at a discount of $735 million. If OFAC grants a license to Amber Energy, and if this Court's judgment is not reversed on appeal, many of the judgment-creditors who have spent years and millions of dollars trying to recover on billions of dollars of judgments, to compensate them for harm inflicted by one or more of the Venezuela Parties years or decades ago, will finally obtain relief. The Amber Bid is neither grossly inadequate nor manifestly unjust and therefore should be, and now is, approved. An appropriate order follows.

---

[35] In *In re Gold Reserve Ltd.*, No. 25-3091 (3d Cir.) (Nov. 3, 2025), Gold Reserve's recently-filed (and denied) mandamus action, the Special Master represented to the Third Circuit: "Given the numerous steps that must be taken prior to closing, including obtaining regulatory approval in multiple countries, the Special Master expects the transaction will take months to close, leaving ample time after the district court's rulings for this Court to entertain a renewed stay request by Gold Reserve." *In re Gold Reserve Ltd.*, No. 25-3091 ECF No. 9. The Court assumes these representations, which were made just three weeks ago, remain true today.