

Travis S. Hunter
302-651-7564
hunter@rlf.com

January 27, 2026

**VIA ECF**

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

      Re: *Crystallex International Corporation v. Bolivarian Republic of Venezuela et al.*,
          C.A. No. 17-mc-151-LPS

Dear Judge Stark:

Pursuant to this Court's order, D.I. 2617, Crystallex respectfully submits this response to the Venezuela Parties', D.I. 2625, and Gold Reserve's, D.I. 2624, letter briefs opposing Crystallex's and Conoco's proposal that the Special Master's fees and costs (the "DQ Expenses") incurred in connection with the Venezuela Parties' and Gold Reserve's failed motions to disqualify (the "DQ Motions") should be allocated to the Venezuela Parties and Gold Reserve, *see* D.I. 2606 at 3 of 10.

In its Sale Procedures Order, the Court retained discretion to allocate payment of the Special Master's fees and expenses to specific parties "if circumstances require (*e.g.*, if any single Sale Process Party generates an inordinate number of disputes or if a Sale Process Party's position in a dispute is found to be unreasonable)." D.I. 481, ¶ 47.[1] Here, the circumstances make clear that the Venezuela Parties and Gold Reserve should bear sole responsibility for the DQ Expenses incurred to oppose their tactical, untimely, and meritless motions to disqualify the Special Master, his advisors, and (in the case of Gold Reserve) this Court.

The DQ Motions were transparently tactical attempts to derail the Sale Process at the eleventh hour, filed only after it became clear that Amber, not Gold Reserve, submitted the best bid under Delaware law and the criteria prescribed by this Court. The Venezuela Parties have a long and well documented history of dilatory and obstructive motion practice, and have candidly conceded that their goal in all proceedings before this Court has been "to resist the sale as best we could." D.I. 2526 at 54.[2] Gold Reserve, for its part, left no doubt that it was motivated solely by the desire

---

[1] The Sale Process Order refers to payment by Sale Process Parties and Additional Judgment Creditors. The Venezuela Parties are Sale Process Parties and Gold Reserve does not dispute that these provisions apply to it with equal force.

[2] References to the Court's Opinion denying the DQ Motions are to the PACER-generated page number—e.g., 33 of 54.

One Rodney Square ■ 920 North King Street ■ Wilmington, DE 19801 ■ Phone: 302-651-7700 ■ Fax: 302-651-7701

www.rlf.com

The Honorable Leonard P. Stark
January 27, 2026
Page 2

to stop the selection of a rival at any cost, repeatedly suggesting that the Court should be concerned about the damage that Gold Reserve's motion could cause to the reputation of the presiding judge unless, of course, the Court saw things its way and ruled for Gold Reserve. In this vein, Gold Reserve repeatedly referenced the judge who had presided over the *Kensington* litigation, who despite his formerly superlative and "stellar" reputation as "one of the best judges in the circuit" was "mandamus[ed] … twice." D.I. 2500 at 80:5-22, 81:15-20, 88. The unmistakable import of Gold Reserve's argument was that the same reputational hit was the Court's fate here if Gold Reserve's belated, meritless motion were not resolved by simply accepting Gold Reserve as the winner. *Id*. at 91:4-6 ("To the extent the judge is not ruling in favor of the taint and the direction of the taint, there's no such concern."). This combination of stick and carrot is not part of any recognized legal standard, and it laid bare the unreasonable nature of Gold Reserve's last-ditch ploy to gain tactical advantage in the Sale Hearing.

The Venezuela Parties and Gold Reserve protest that their motivations cannot be considered here because the Court did not explicitly find that they were motivated by bad faith. D.I. 2625 at 1; D.I. 2624 at 2 n.1. That is irrelevant. The Court was not required to find that the DQ Motions were filed in bad faith to deny them, nor is bad faith the touchstone for finding here that the Venezuela Parties and Gold Reserve created inordinate expense for the other Sale Process Parties. Furthermore, it is unsurprising that the Court and parties declined to delve into ancillary issues given the expedited timeline for briefing and resolution of these disputes alongside the Sale Hearing. Still, the Court should not be "blind" to reality, D.I. 2526 at 54, and, now that the issue is before the Court, it should take the obvious facts surrounding the DQ Motions into account to find that they were both unreasonable and not in good faith all along.

The Venezuela Parties and Gold Reserve also insist they cannot be held responsible for the DQ Expenses because the Court did not explicitly deem the DQ Motions "unreasonable" when it denied them for lack of merit. D.I. 2624 at 2-3; D.I. 2625 at 1-2. That is quite a gloss on the Court's opinion, and it does not withstand scrutiny, especially when one considers that the denied DQ Motions invoke a reasonable person standard. Rejecting even the evidence Gold Reserve and the Venezuela Parties relied on most heavily—emails between Mr. Turkel and attorneys at Weil—the Court found that "[n]one of this is evidence that the Advisors did anything that was in any way improper and there is no reasonable basis to speculate that they did." D.I. 2526 at 33. With respect to every other allegation in the DQ Motions, the Court found that "no reasonable observer" would see impropriety in the Special Master's or his advisors' conduct. *E.g.*, *id.*, at 25, 35 ("[T]he Court finds that each of the Movants' contentions lacks merit while each of the Opponents' arguments are persuasive and well-supported in the record. A reasonable lay observer with knowledge of all relevant facts would not have reason to question the impartiality of the Special Master or his Advisors."). The Court also found that the DQ Motions were based on alleged conflicts of interest that had been waived years ago and were in any event untimely because the movants had actual or constructive knowledge of the facts months before they moved for disqualification. *Id*. at 18-19. If an untimely motion based on waived claims and factual allegations that "no reasonable person" would credit is not unreasonable, then it is difficult to imagine what is.

The Honorable Leonard P. Stark
January 27, 2026
Page 3

The DQ Motions were also unreasonable and not brought in good faith because they were based on selective and distorted narratives with no support in the record. *See, e.g.*, *id.* at 36 ("The Moving Parties' portrayal of favoritism toward Elliott is selective and unconvincing") (capitalization amended). Even *now*, Gold Reserve maintains that the "undisputed evidence" shows "$170 million in fees [was] paid to both Advisors by Elliott Management" and that this evidence "was only discovered in September 2025." D.I. 2624 at 3. But those claims have already been debunked. "The headline '$170 million' of fees actually consists … almost entirely of fees paid by affiliates of Elliott, as opposed to the bidding Elliott entity, individual 2020 Bondholders (not the identical ad hoc group of 2020s that has appeared in this litigation), and fees paid by ad hoc groups that happened to include one or more of the 2020s or an Elliott affiliate." D.I. 2526 at 40-41. And the evidence learned at the September 2025 deposition of Michael Turkel "was, with respect to the pertinent issue (namely the fact, rather than the extent, of the representation), cumulative of what the Movants had known since at least March." *Id.* at 14. Neither of Gold Reserve's descriptions of the supposedly "undisputed evidence" are true, and they never were.

The need to continually correct these sorts of misrepresentations undermines the Venezuela Parties' and Gold Reserve's defense that the Special Master would not have dedicated significant resources to opposing the DQ Motions if they were frivolous. *See* D.I. 2624 at 5; D.I. 2625 at 2-3. To the contrary, it is hardly surprising that the Special Master expended significant time and money to correct the misstatements, half-truths, and material omissions that littered the DQ Motions. Crystallex did, too. And that is to say nothing of the potential risk posed by the DQ Motions—even frivolous claims must be thoroughly refuted when they threaten to derail a multi-billion-dollar sale that has been years in the making—or the voluminous and expedited discovery the Special Master and his advisors were compelled to undertake in response to the Venezuela Parties' and Gold Reserve's conspiracy theories.

The voluminous discovery compelled by the seemingly serious (albeit meritless) allegations in the DQ Motions should have brought an end to this dispute. "[S]erious charges of misconduct … must be supported by *evidence* and not mere suspicion or coincidence." *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 231 F. Supp. 3d 19, 21 (D. Del. 2017) (Stark, J.). Thus, even when a party begins with a good faith suspicion of misconduct, it must carefully and soberly reconsider its position based on the evidence produced in discovery and credible, innocuous explanations offered by the other side. *Id*. at 23 ("[A] full and thoughtful reassessment of the entire record—unimpaired by hopes of benefitting from the situation by having sanctions imposed on an opponent—should have led [movant's] counsel to the conclusion that the Sanctions Motion should be withdrawn."). Such caution is required "especially when a party decides to file such an attack in Court, leveling potentially career-ending allegations in a public forum," *id.* at 21, as the Venezuela Parties and Gold Reserve did here, D.I. 2526 at 44 n.19 ("[T]here is no merit to the Movants' suggestions that Weil attorneys violated their obligations under Model Rule of Professional Responsibility 1.7 (or some unidentified state-specific version of that rule) relating to concurrent conflicts of interest."). The decision to file the DQ Motions based on misleading allegations of wrongdoing and the subsequent decision to maintain those allegations despite clearly innocuous explanations for each

The Honorable Leonard P. Stark
January 27, 2026
Page 4

charge "multiplied the proceedings, in an unreasonable manner, increasing costs, by intentional misconduct." *W.L. Gore & Assocs.*, 231 F. Supp. 3d at 23.

The Venezuela Parties and Gold Reserve try to avoid responsibility for the DQ Expenses by pointing to the high burden to impose sanctions or fee shifting for frivolous or vexatious conduct in a typical case. *See* D.I. 2624 at 2 n.1; D.I. 2625 at 1-2. While Crystallex submits that the DQ Motions are clearly meritless and vexatious under any analysis, that is not the standard here. This is a unique case with bespoke rules to govern an expensive and time-consuming sale process, with provisions that allow for the re-allocation of costs "if the circumstances require." D.I. 481, ¶ 47. With respect to the expenses at issue here (the costs of underwriting the expenses of the Special Master and his advisors), this is not a case governed by the American Rule or ordinary cost-shifting rules. If it were, Crystallex would be seeking reimbursement of its own fees and expenses in addition to re-allocating the Special Master's fees to the Venezuela Parties and Gold Reserve. Instead, the Sale Process Parties and many Additional Judgment Creditors are forced to share in the expenses of the process on the theory that those outlays are essential to move the Sale Process forward and will benefit most creditors. But the rules of the road expressly provide for a different allocation when one party is responsible for unreasonable expenses that ought not, in fairness, be visited upon all parties generally. *See id.*; Fed. R. Civ. P. 53(g)(3) (requiring courts to allocate special master fees "after considering," among other things, "the extent to which any party is more responsible than other parties for the reference to a master"); *Jarzyna v. Home Props., L.P.*, 783 F. App'x 223, 227 (3d Cir. 2019) (affirming district court's allocation of "the bulk of the special master fees" to one party "because he was mostly responsible for the waste of resources caused by the parties' various discovery disputes").

Taking a wholly unreasonable position in a dispute—especially one, as here, that affirmatively seeks to prejudice many of the creditors paying the freight—is just one example of the circumstances that would justify allocating costs to one party. D.I. 481, ¶ 47. That standard is clearly met here with respect to both the Venezuela Parties and Gold Reserve. "[G]enerat[ing] an inordinate number of disputes" is another circumstance that justifies re-allocating expenses. *Id.* Although one usually only gets three strikes, the DQ Motion was the Venezuela Parties' "fourth" swing and miss on a meritless motion to disqualify or recuse. D.I. 2526 at 4, 12. So, for this reason too, the circumstances require allocating the DQ Expenses to the Venezuela Parties.

Gold Reserve suggests that other circumstances of the case—specifically its contribution to the Special Master's bills for work performed on the original Amber bid in 2024—weigh against re-allocating the DQ Expenses now. D.I. 2624 at 4-5. But, as Gold Reserve concedes, negotiating with Amber in 2024 was part of the Special Master's "core function" of "attempting to sell the PDVH Shares." *Id.* (cleaned up). Whatever the outcome of those efforts, the Special Master cannot be accused of pursuing anything other than what he believed would serve the parties to this case and fulfill his mandate to sell the PDVH Shares. Here, by contrast, the Special Master incurred significant fees solely to respond to collateral attacks on the sale from a disgruntled bidder and a determined deadbeat debtor intent on resisting the sale at any cost. Because those collateral

The Honorable Leonard P. Stark
January 27, 2026
Page 5

attacks on the sale were plainly meritless on both the facts and the law, the Venezuela Parties and Gold Reserve should be responsible for the DQ Expenses incurred responding to them.

                                             Respectfully submitted,

                                             */s/ Travis S. Hunter*

                                             Travis S. Hunter (#5350)

CC: All counsel of record