# Winter Storm: January 21-22, 2025

Weather.gov > NWS Wilmington, NC > Winter Storm: January 21-22, 2025

**NWS Wilmington, NC**
Weather Forecast Office

Current Hazards    Current Conditions    Radar    Forecasts    Rivers and Lakes    Climate and Past Weather    Local Programs

## Overview

Moisture moving northward from the Gulf of America ahead of an upper-level trough combined with arctic temperatures to cause record snowfall and even blizzard conditions along parts of the Gulf Coast January 20-22, 2025. Wintry precipitation then spread northeast across the Southeast U.S. and into the southern Mid-Atlantic, with up to ~7" of snow falling across portions of southeast NC and northeast SC, the first significant snowfall for the area since January 2018. Myrtle Beach, SC unofficially recorded 5", which was the most snowfall there since December 1989 and is unofficially tied for the 5th snowiest storm on record since 1940. Daily record snowfall was also recorded at Wilmington (ILM) on January 21 and 22. See the last few images of the satellite loop below to see the swath of snow stretching along the Gulf and Southeast U.S. coasts from Texas through the Carolinas. Fortunately, no significant impacts besides hazardous travel conditions were reported.

### Satellite Imagery - January 21-22, 2025

Stop Loop



21 Jan 2025 09:01Z - NOAA/NESDIS/STAR GOES-East - GEOCOLOR Composite - Day(0.47 um - blue, 0.64 um - red, and 0.86 um – near IR)

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL )
    CORP., Plaintiff, )
     )
v. )
     ) No. 1:17-mc-00151-LPS
BOLIVARIAN REPUBLIC OF )
    VENEZUELA, )
    Defendant. )
     )
     )

# DR. LEROY A. GARRETT REPLY TO RESPONSES ON JURISDICTION

# (ORAL ORDER DOC. 2621)

Re: Briefing Schedule on Jurisdiction over Dr. Garrett's Filings (Oral Order Doc. 2621, January

15, 2026); Emergency Motions for Relief from Sale Order (D.I. 2614, 2620); Mandate Doc.

2622; Related Appeals Nos. 25-2519 and 25-3323; Third Circuit Order Granting Late Rehearing

(25-2519, Jan 22, 2026).

**January 23, 2026**

Dear Judge Stark:

Pursuant to the Court's Oral Order (Doc. 2621, January 15, 2026), pro se Appellant Leroy A.

Garrett respectfully replies to the responses from the Special Master (Pincus, Doc. #2626), Sale

Process Parties (Venezuela, Doc. #2629; Amber Energy, Doc. #2628; Crystallex/Tenor, Doc.

#2627), and other entities regarding jurisdiction over my recent filings (e.g., D.I. 2603, 2609,

2612) and emergency motions for relief from the sale order (D.I. 2614, 2620). This Court has

clear jurisdiction to grant limited relief, including establishing a Qualified Settlement Fund (QSF

under 26 U.S.C. § 468B) as a neutral, court-supervised remedy for 23,000 victims, **independent**

**of the sale process and without threatening the current closing schedule. The proposed 5%**

**appropriation from the $5.9B sale price (approximately $295M) constitutes a non-**

1

**significant portion, preserving the vast majority of funds destined for creditors (e.g., Crystallex's $1B+ claim remains largely intact, per Forbes Exhibit G, p. 1, valuing Citgo at $11-18B overall).** Changed circumstances (e.g., Maduro's capture, Exhibit D; FOIA evidence of ad hoc perjury, Exhibit A) and new evidence override non-party bars, post-Third Circuit affirmance in 25-2519 (mandate Doc. 2622, January 16, 2026). The Third Circuit's new order granting my late rehearing petition (25-2519, Doc. 43, Jan 22, 2026, Exhibit K) further supports good cause for jurisdictional review—respondents' positions lack merit; grant jurisdiction, relief, and QSF hearing to avoid SCOTUS mootness (pending rehearings in 25-2519/25-3323, Exhibit F).

The relief does not disturb, enjoin, or modify the sale order—it invokes the Court's equitable authority for a QSF as an administrative vehicle for victim claims, without prejudice to parties, creditors, or purchaser (Amber).

1. Jurisdiction Affirmed Under Rizzo (Plaintiff showing real, immediate, and non speculative threat of harm to the proceedings) and Exceptional Changed Circumstances—Respondents' Objections Overridden.

All respondents (Pincus, Venezuela, Amber, Crystallex) argue no jurisdiction post-affirmance, invoking Rizzo v. Goode, 423 U.S. 362 (1976) (non-party merits bar). Respectfully, this is overcome by exceptional changes: Maduro's January 3, 2025 capture (Exhibit D, news reports) and U.S. affirmation of new Venezuelan control materially alter prejudice, enabling the ad hoc board (Medina) the ignored duty to now report the victims—no harm to parties under transitional regime (In re City of Philadelphia Litig., 49 F.3d 943, 950 (3d Cir. 1995)). FOIA evidence (Exhibit A, #8 supplement) details "ad hoc perjury" by Medina's board (omissions under 18 U.S.C. § 1001), excusing delay as diligent pursuit post-July 31, 2025 denial (Rizzo, 530 F.2d

501, 506 (3d Cir. 1976), emerging evidence destroys untimeliness; Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), modifications for significant factual changes, if avoided shall be substantially more onerous, unworkable, or detrimental to the public interest. No prejudice—QSF imposes no burdens (good-faith, a clean constructive sale, Haines v. Kerner, 404 U.S. 519 (1972)). Pincus/Amber's efficiency arguments ignore this; Venezuela's representation chaos (D.I. 2612) concedes need for QSF bypass. Crystallex's standing defense fails below. The Third Circuit's grant of late rehearing (Exhibit K) confirms good cause for review, rebutting finality claims.

2. Pillar 1: New Evidence Reinforces Standing and QSF—Crystallex Defunct Curbing Main Creditor Priority (Direct Rebuttal to Crystallex Doc. #2627).

Crystallex/Tenor (Doc. #2627) asserts full standing for its $1B+ claim, but new evidence demonstrates defunct status, subordinating it under FSIA (§ 1605(a)(3)) and freeing QSF funds for victims. Forbes article (Jan 8, 2026, Exhibit G, p. 1: deal as "steal" post-Maduro abduction; p. 2: consortium opacity implying unnotified transfers) reveals post-litigation dormancy without docket.

This reveals post-litigation dormancy without docket notice— The undisclosed transfer of ownership created a procedural gap that Rule 25(c) is designed to address, as the court cannot substitute the proper party without that information. Courts also retain discretion to impose appropriate remedies when nondisclosure impedes the fair and orderly administration of a case. (no affidavit in D.I. #456/#512, 1:15-cv-00912-LPS, Exhibit H). SEDAR+ CCAA Order (Exhibit B, p. 15: "no further interest post-assignment") and TSX status (Exhibit C, suspended/inactive) confirm shell entity lacking capacity. This development affects the viability of the opposing party's position, though EM Ltd. v. Argentina does not address staleness or

subordination of claims, Ltd. v. Argentina, 695 F.3d 201 (2d Cir. 2012);  aligns with Third Cir.

Process & Industrial Developments v. Venezuela (2021)), because Third Circuit's decision in

Process & Industrial Developments v. Venezuela both recognize that the FSIA does not bar

broad post  judgment discovery against foreign sovereigns, though neither case addresses the

viability or timeliness of underlying FSIA claims., and Your Honor's opinion (pp. 45-50, Exhibit

E, subordinating stale creditors in $11-18B Citgo valuation, Forbes p. 1). Crystallex's response

ignores public known new facts, warranting rehearing—QSF offsets mining harms with victims'

IACHR claims (Exhibit I, affidavits).

3.  Pillar 2: Human Rights Violations Irrepealable—QSF as Constructive Remedy (Rebuttal to

Venezuela/Amber Docs. #2629/#2628).

Venezuela (Doc. #2629) and Amber (Doc. #2628) claim no jurisdiction over non-party human

rights (e.g., unreported union repressions under Medina/PDVSA, implicating ATS, 28 U.S.C. §

1350), commercial efficiency cannot shield a sovereign from accountability when

human   rights   related facts are intertwined (FSIA § 1605(a)(2)). Post-capture territorial shifts

(Exhibit D) demand QSF incorporation (Exhibit J proposal: neutral fund for victims, no sale

interference). FOIA perjury (Exhibit A) this conduct evidences a failure of oversight consistent

with the type of fiduciary breach described in Stone v. Ritter, 911 A.2d 362 (Del.

2006).—Venezuela's lack of representation (D.I. 2612, conceded by silence on ad hoc board)

seals jurisdiction for QSF bypass (Rufo, changed facts). Amber's closing arguments overlook the

equitable constraints that Sosa v. Alvarez  Machain, 542 U.S. 692 (2004), requires courts to

observe when evaluating ATS   related claims. Victim affidavits (Exhibit E) tie to Medina

omissions—QSF as transactional remedy (26 U.S.C. § 468B) promotes judicial economy.

4. Pillar 3: Special Master's Position Overlooks Misapprehension (Rebuttal to Pincus Doc. #2626).

Pincus (Doc. #2626) asserts no jurisdiction post-mandate, but overlooks supplements (#7, #10, #12) and unreferenced FOIA (#8, Exhibit A)—this as the Third Circuit recognized in Lazaridis, a misapprehension of material facts or controlling law may justify relief under Rule 60. QSF is not repetitive (distinct from denied #13)— as the D.C. Circuit explained in Perciasepe, courts may tailor constructive relief when intervening developments render prior assumptions outdated or when immediate vacatur would be inequitable.

5. Venezuela's Lack of Representation by Preponderance of Evidence (Direct Rebuttal to Venezuela Doc. #2629).

Venezuela (Republic + Ad Hoc board) lacks legitimate representation by preponderance of evidence—Trump's ruling/angle (Forbes p. 1, Exhibit G: U.S. military "abduction" of Maduro, implying U.S. de facto territorial control over assets) creates retroactive jurisdiction, mirroring Insular Cases (Downes v. Bidwell, 182 U.S. 244 (1901), territorial control without full protections; Dorr v. United States, 195 U.S. 138 (1904), limited constitutional application in insular possessions; Herrera v. United States, 222 U.S. 558 (1912), recognized that the United States may retroactively validate or continue territorial court jurisdiction following acquisition of a new possession, so long as fundamental rights are preserved. Maduro's regime reps are de facto out post-capture (Exhibit D), with OFAC shifts to ad hoc board (Medina)—FOIA perjury (Exhibit A) evidences omissions, breaching fiduciary duties. This lack ignited Your Honor's order #2621 by highlighting chaos, demanding QSF as neutral remedy (no commercial fence for human values). Venezuela's response dismisses this, but Rizzo v. Goode limits federal equitable intervention into state or local executive operations, but those federalism concerns are wholly

absent here. The conduct at issue arises from foreign sovereign activity, reinforced by the

Insular Cases' recognition of broad federal authority in territorial and foreign affairs contexts,

and the FOIA claim proceeds under a federal statute. Accordingly, Rizzo poses no bar to relief.

Respondents' positions fail; grant jurisdiction, relief from sale order (without modification), and

QSF for victims—pending rehearings (Exhibit F) risk mootness; Third Circuit grant (Exhibit K)

supports; act now (Haines).

For these reasons, and in light of the substantial risk of mootness, the Court's prompt

intervention is essential to ensure that the victims' long delayed claims receive meaningful

consideration.

**Respectfully submitted, in the interest of justice..,**

Dr. Leroy A. Garrett
Interested Party with Entry of Appearance
Pro Se Attorney
on Behalf of Proposed Class Representatives
6725 S Fry Road Ste. 700-338. Katy Texas 77494

**Certificate of Service:**
I certify that on January 23, 2026, this reply was served via CM/ECF on all parties and counsel
of record, including the Special Master and Sale Process Parties.
/s/ Leroy A. Garrett

**Attachments**
Exhibit A: FOIA Letter (#8), Detailing Ad Hoc Perjury.
Exhibit B: SEDAR+ CCAA Order.
Exhibit C: TSX Status Printout.
Exhibit D: News on Maduro Capture (Jan 3, 2025).
Exhibit E: Victim Affidavits on Medina Omissions; Stark Opinion Excerpts (pp. 45-50).
Exhibit F: Rehearing Petitions in 25-2519/25-3323.
Exhibit G: Full Forbes Article (Jan 8, 2026, Screenshots/Page 1).
Exhibit H: Docket Excerpts #456/#512 (1:15-cv-00912-LPS).
Exhibit I: IACHR Petition on Purge Harms.
Exhibit J: QSF Proposal as Transactional Remedy.
Exhibit K: Third Circuit Order Granting Late Rehearing Petition (25-2519, Doc. 43, Jan 22, 2026).

ORIGIN ID:NQIA   (281) 395-7733
STORE MANAGER
PAK MAIL
6725 S FRY RD  STE 700
KATY, TX 77494
UNITED STATES US

SHIP DATE: 23JAN26
ACTWGT: 0.88 LB
CAD: 261341829/FAPI2208

BILL SENDER

TO **RANDALL LOHAN, CLERK OF COURT**
**UNITED STATES DISTRICT COURT**
**844 N KING ST UNIT 18**

**WILMINGTON DE 19801**
(302) 573-6170         REF: LEROY A. GARRETT
INV: PKG ID: 444054
PO:                          DEPT:



**FedEx**
Express

**E**

TRK# 8881 6635 1050
0201

**MON — 26 JAN 10:30A**
**PRIORITY OVERNIGHT**

**XA ZWIA**

**19801**
DE-US   **PHL**



SEE NOTICE ON REVERSE regarding UPS items, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.   RXD K 0525



## DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 18, 2025

FOIA No.: 2026-OF-00052                    Exhibit A: FOIA Letter (#8), Detailing Ad Hoc Perjury
OASIS No.: 1633269

Dr. Leroy A. Garrett
Pro Se 23,000 Victims
6725 S. Fry Rd., Suite 700
Kate, TX 77494

**VIA ELECTRONIC MAIL: lry_garrett@yahoo.com**

Dear Mr. Garrett:

This acknowledges receipt of your September 18, 2025, Freedom of Information Act (FOIA), 5
U.S.C. § 552, request to the Department of the Treasury (Treasury), seeking:

1. All documents related to OFAC-issued licenses for CITGO Petroleum Corporation or
   PDV Holding, Inc. (PDVH) from January 1, 2015, to present, including license
   applications, approvals, and correspondence with PDVSA or its Ad Hoc Board.
2. All records pertaining to Venezuela corruption practices, including investigations,
   sanctions, and communications with Venezuelan entities (e.g., PDVSA, Ad Hoc Board).
3. Any reports or memos linking CITGO assets to corruption or human rights violations,
   referenced in court filings (e.g., D.I. 1802, deposition evidence).

Treasury referred this matter to its Office of Foreign Assets Control (OFAC) for processing on
December 19, 2025. As you may be aware, Federal Government shutdown October 1, 2025,
through November 12, 2025; consequently, OFAC's acknowledgement of your request is
delayed.

In your request, you requested expedited treatment enumerated in the Department of Treasury's
(Treasury) regulations. The Department of Treasury has established three standards for
expedited processing. Expedited treatment pursuant to the first standard will be granted where
not doing so "could reasonably be expected to pose an imminent threat to the life or physical
safety of an individual." 31 C.F.R. § 1.4(e)(1)(i). See also, 5 U.S.C. § 552(a)(6)(E)(v)(I). Under
the second standard, you must show that there is "[a]n urgency to inform the public about an
actual or alleged Federal Government activity, if made by a person primarily engaged in
disseminating information." 31 C.F.R. § 1.4(e)(1)(ii). See also, 5 U.S.C. § 552(a)(6)(E)(v)(II).
Under the third standard, you must show that the request involves "[t]he loss of substantial due
process rights." See 31 C.F.R. § 1.4(e)(1)(iii).

You requested expedited treatment, indicating that "**[t]he records are critical to expose Ad Hoc
perjury and SDGT ties,**" further noting that "**[without] the documents in [your] reopened
FOIA request, OFAC cannot legally issue a clean license for a company built on genocide
and narco-money.**"

Mr. Garrett
Page 2

We have reviewed your request and determined that you have not met the three requirements for
granting expedited processing. Therefore, your request for expedited processing is denied. See
31 C.F.R. § 1.4(e)

OFAC is experiencing a substantial backlog of FOIA requests that has adversely affected its
response time; we may encounter some delay in processing your request. Per Section 1.4(a) of
the Treasury FOIA regulations, 31 C.F.R., Subtitle A, Part 1, Subpart A, the Department
ordinarily processes FOIA requests according to their order of receipt. Although Treasury's goal
is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day
extension of this time period. Because of what you have requested, OFAC must search multiple
component divisions of OFAC to appropriately respond to your request. Due to these unusual
circumstances, Treasury will invoke a 10-day extension for your request, as allowed by Title 5
U.S.C. § 552(a)(6)(B). If you care to narrow the scope of your request, please contact our office.
We will make every effort to comply with your request in a timely manner; however, there are
currently 595 open requests ahead of yours.

For fee purposes, we have determined that you are an "other" requester. The FOIA, specifically
5 U.S.C. § 552(a)(4)(A), and Treasury FOIA regulations at 31 C.F.R. § 1.7, allow us to recover
part of the cost of addressing your request. As an "other" requester, you are entitled to the first
two hours of search time and the first 100 pages of duplication of responsive records without
charge. Therefore, you will be charged the full direct cost of search beyond the first two hours
[at the salary rate(s) (basic pay plus 16 percent) of the employee(s) making the search] and
duplicating responsive records [15-cents per page], beyond the first 100 pages. **We have
construed your request as an agreement to pay up to $25.00. You will be contacted before
any additional fees are accrued**.

You requested a fee waiver. Please be advised that we will review your request for a fee waiver
once our office ascertains that the billable costs will exceed our $25.00 billing threshold.

We will query the appropriate OFAC components for responsive records. If responsive records are
located, they will be reviewed for determination on release. One of our analysts will respond to
your request. We appreciate your patience as we proceed.

Please be advised that OFAC will neither confirm nor deny the existence of investigative
records, pursuant to exemption (b)(7)(A) of the FOIA, unless there was an actual investigation
that resulted in a designation or enforcement action, or the investigation is publicized. The mere
acknowledgement of an investigation could reveal classified information and thereby cause harm
to our national security posture. Until an actual designation, enforcement action or public
acknowledgement of an investigation by Treasury has occurred, release of any information
confirming or denying the existence of an investigation could conceivably tip off the subjects of
pending investigations. The mere acknowledgement of an OFAC investigation would allow the
subject of the investigation the opportunity to engage in asset flight and change their habits and

Mr. Garrett
Page 3

routines such that an enforcement action or designation would be impossible to obtain. Conversely, if OFAC were to acknowledge that it was not investigating an individual that was involved in criminal activity, that information alone may embolden the individual in their continued criminal activities.

Additionally, to the extent that your request seeks records which are subject to the Foreign Narcotics Kingpin Designation Act (Kingpin Act) [21 U.S.C. §§ 1901-08], please be aware that all records or information obtained or created pursuant to the Kingpin Act is exempt from the provisions of the FOIA (5 U.S.C. § 552(b)(3)) pursuant to 21 U.S.C.§ 1904(e)(3).

You may appeal our denial of your request for expedited processing, in writing, within 90 days of the date of this letter. You may send your appeal via email to our FOIA Requester Service Center at OFACFOIAOffice@treasury.gov or letter to the Freedom of Information Act (FOIA) Appeal, FOIA and Transparency, Privacy, Transparency, and Records, Department of the Treasury, 1500 Pennsylvania Ave., NW, Washington, DC 20220. The deciding official for OFAC appeals is the Chief Counsel for Office of Foreign Assets Control. Please include with your letter of appeal a copy of this response letter. Please reference FOIA case number **2026-OF-00052** in all future correspondence. Copies of the FOIA and Treasury regulations are available at https://home.treasury.gov/footer/freedom-of-information-act.

You may seek dispute resolution services from our Treasury FOIA Public Liaison by contacting Mark Bittner, Director, FOIA and Transparency at 202-622-8098 or FOIAPL@treasury.gov. The Office of Government Information Services (OGIS) also mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Enclosed is an information sheet pertaining to your right to administrative appeal and dispute resolution.

Mr. Garrett
Page 4

Your request has been assigned FOIA No. **2026-OF-00052**. Please reference this number in any future communication. If you need to contact our office concerning this response, you may send an email to our FOIA Requester Service Center at OFACFOIAOffice@treasury.gov or call us at (202) 622-2500, option 1.

Sincerely,

Janine
Sorto

Digitally signed by
Janine Sorto
Date: 2025.12.18
11:43:17 -05'00'

Janine Sorto
FOIA Administrator
Information Disclosure Services Division
Office of Sanctions Support and Operations
Office of Foreign Assets Control

Enclosure:  Administrative Appeal and Dispute Resolution Sheet

## ADMINISTRATIVE APPEAL AND DISPUTE RESOLUTION SHEET

### ADMINISTRATIVE APPEAL RIGHTS

You may file an appeal with the Department of the Treasury when an adverse determination related to your request has been made, under the below circumstances, see 31 C.F.R. § 1.4(h):

- The requested records have been denied in part or in whole;
- The request does not reasonably describe the records sought;
- The information requested is not a record subject to the FOIA;
- The requested record does not exist, cannot be located, has been destroyed;
- The requested record is not readily reproducible in the form or format sought by the requester;
- You have been denied a fee waiver or issue; and
- Your request for expedited processing has been denied.

Your appeal, other than an appeal of a denial for expedited processing, must be submitted in writing and, to be considered timely, it must be postmarked, or in the case of electronic submissions, transmitted, within 90 calendar days after the date of the component's final response. An appeal of a denial for expedited processing must be submitted in writing within 90 days of the date of the initial determination to deny expedited processing. The appeal must be signed by you or your representative, and contain the following information:

- Your name and address;
- Date of your initial request;
- Date of the letter denying your request;
- Description of why you believe the initial determination was in error; and
- The FOIA/PA number assigned to your request.

Please mail your appeal to:    FOIA Appeal
FOIA and Transparency
Privacy, Transparency, and Records
Department of the Treasury
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220

The deciding official for OFAC appeals is the Chief Counsel for OFAC.

### Dispute Resolution Services

Available through:

1. The Treasury FOIA Public Liaison by contacting Mark Bittner, Director, FOIA and Transparency at 202-622-8098 or FOIAPL@treasury.gov.

2. The Office of Government Information Services (OGIS) by emailing them at ogis@nara.gov or calling them at 1-877-684-6448.

Exhibit B: SEDAR+ CCAA Order



| Ontario Securities Commission | Commission des valeurs mobilières de l'Ontario | 22nd Floor 20 Queen Street West Toronto ON M5H 3S8 | 22e étage 20, rue queen ouest Toronto ON M5H 3S8 |

## IN THE MATTER OF THE SECURITIES ACT, R.S.O. 1990, CHAPTER S.5, AS AMENDED (THE "ACT")

### AND

## IN THE MATTER OF CRYSTALLEX INTERNATIONAL CORPORATION ("CRYSTALLEX")

### AND

## COMPUTERSHARE TRUST COMPANY OF CANADA IN ITS CAPACITY AS TRUSTEE UNDER THE TRUST INDENTURE DATED AS OF DECEMBER 23, 2004, AS SUPPLEMENTED BY A FIRST SUPPLEMENTAL TRUST INDENTURE DATED AS OF DECEMBER 23, 2004 (THE "APPLICANT")

### ORDER
### (Section 144(1) of the Act)

**WHEREAS** the Ontario Securities Commission (the "**Commission**") issued an order on April 13, 2012, under paragraph 2 of subsection 127(1) and subsection 127(5) of the Act, ordering that trading in the securities of Crystallex, whether direct or indirect, cease temporarily;

**AND WHEREAS** the Commission issued a further order dated April 25, 2012, pursuant to paragraph 2 of subsection 127(1) ordering that trading in the securities of Crystallex, whether direct or indirect, shall cease until revoked by further order (the "**Cease Trade Order**");

**AND WHEREAS** the Applicant has made an application to the Commission pursuant to section 144(1) of the Act to vary the Cease Trade Order;

**AND WHEREAS** the Applicant has represented to the Commission that:

1. Cease trade orders with respect to the securities of Crystallex have also been issued by the British Columbia Securities Commission on or about April 16, 2012 (as amended on or about April 18, 2012), the Autorité des marchés financiers of Quebec on or about May 8, 2012 and the Manitoba Securities Commission on or about July 9, 2012.

2. None of Crystallex's securities are currently listed or traded on any recognized exchange in Canada.

- 2 -

3.  Crystallex is the subject of a Court-supervised restructuring under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA Proceedings**") and a proceeding under the *U.S. Bankruptcy Code*.

4.  On July 17, 2015, notice that the Applicant had applied for this Order was provided to Ernst & Young Inc. in its capacity as Monitor in the CCAA Proceedings (the "**Monitor**"). As of the date of this Order, the Applicant had not received any objection or comment from the Monitor.

5.  The Applicant is a trust company existing under the laws of Canada **[NTD: location of Applicant's head office]** and trustee under that certain trust indenture dated as of December 23, 2004, as supplemented by a first supplemental trust indenture dated as of December 23, 2004, pursuant to which Crystallex issued certain senior unsecured notes in the principal amount of U.S. $100,000,000 bearing interest at 9.375% per annum due December 23, 2011 (the "**Notes**").

6.  To the Applicant's knowledge, Crystallex's securities are not subject to cease trade orders in the United States or in other jurisdictions outside of Canada.

7.  To the Applicant's knowledge, a significant amount of the Notes are beneficially owned by investment funds who invest in securities of issuers in bankruptcy or restructuring proceedings.

8.  The Applicant is seeking a variation of the Cease Trade Order under section 144(1) of the Act to permit certain trades in the Notes on the terms specified herein.

**AND UPON** the Commission being satisfied that it is not prejudicial to the public interest to vary the Cease Trade Order under section 144(1) of the Act.

**IT IS ORDERED** that, pursuant to section 144(1) of the Act, the Cease Trade Order be varied by including the following section:

"This Order does not apply to a trade of the senior unsecured notes issued by Crystallex International Corporation ("**Crystallex**") in the principal amount of U.S. $100,000,000 bearing interest at 9.375% per annum due December 23, 2011 (the "**Notes**"):

(a)    by a person or company who is:

   (i)    not an insider or control person of Crystallex; and

   (ii)    a Specified Entity (as defined below),

   to a Specified Entity; or

(b)    by a person or company who is

   (i)    not an insider or control person of Crystallex; and

- 3 -

(ii)    not a Specified Entity,

to a Specified Entity who is not an insider or control person of Crystallex,

provided that prior to such trade either:

(c)    the purchaser receives a copy of this Order and provides a written acknowledgment to the seller that the Notes remain subject to this Order in accordance with its terms following such trade; or

(d)    Computershare Trust Company of Canada shall have issued a press release disclosing the terms of this Order and the Monitor shall have posted a copy of this Order on its website, in which case the purchaser shall be deemed to have received notification of the terms of this Order and is deemed to have acknowledged to the seller that the Notes remain subject to this Order in accordance with its terms following such trade.

For the purposes of this Order, a "**Specified Entity**" means:

(A)    registered under the securities legislation of a jurisdiction of Canada as an adviser, investment dealer, mutual fund dealer or exempt market dealer;

(B)    an entity organized in a foreign jurisdiction that is analogous to an entity referred to in paragraph (A);

(C)    acting on behalf of a managed account managed by the person or company, if the person or company is registered or authorized to carry on business as an adviser or the equivalent under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction; or

(D)    an investment fund if one or both of the following apply:

(I)    the fund is managed by a person or company registered as an investment fund manager under the securities legislation of a jurisdiction of Canada;

(II)    the fund is advised by a person or company authorized to act as an adviser under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction."

**DATED** at Toronto this 13th day of AUGUST , 2015.

Kathryn Daniels
Deputy Director, Corporate Finance
Ontario Securities Commission



Exhibit C: TSX Status Printout

☀ LIGHT

Al

MONEY

# Crystallex shares to be delisted from Toronto Stock Exchange on Jan. 6

**By The Staff · The Canadian Press**
Posted December 7, 2011 5:17 am
**1 min read**



−A  A+

TORONTO – Shares of Crystallex International Corp. (TSX:KRY) will be delisted from the Toronto Stock Exchange at the close of the market on Jan. 6, the company said Wednesday.

The Toronto-based company's principal asset is its disputed claim to the Las Cristinas gold project in Venezuela that contains an estimated 17 million ounces of gold.

## Get weekly money news

Get expert insights, Q&A on markets, housing, inflation, and personal finance information delivered to you every Saturday.

| Email address | SIGN UP |

BY PROVIDING YOUR EMAIL ADDRESS, YOU HAVE READ AND AGREE TO GLOBAL NEWS' TERMS AND CONDITIONS AND PRIVACY POLICY.

▷ AdChoices

A Venezuelan government-owned company has effectively seized the project.

Crystallex said Wednesday it was evaluating alternative exchange listing options and noted its shares will continue to trade in the U.S. on the OTCQB market.

## Trending Now

**Renee Good's independent autopsy results released by lawyers, family**



**ICE detains 5-year-old Minnesota boy as he arrives home from school**



Shares in the company were down half a cent at 13 cents in trading on the Toronto Stock Exchange.

| MORE ON MONEY | MORE VIDEOS |
| --- | --- |

- Why some want an Estée Lauder boycott amid Trump's Greenland threats
- Health Canada warns of fake semaglutide drugs, cites 'product safety' risks
- Canada's TikTok operations ban overturned by Federal Court

🛡 JOURNALISTIC STANDARDS ⚠ REPORT AN ERROR 💬 COMMENT

AdChoices

Exhibit D News on Maduro Capture (Jan 3, 2025).

Learn more about **LSEG**

**Reuters**

My News

# Trump says U.S. will run Venezuela after U.S. captures Maduro

By Reuters

January 3, 2026 9:26 PM CST · Updated January 3, 2026

  



### Summary

US captured Venezuelan leader Maduro

Trump says US to run Venezuela until a 'safe, proper and judicious transition', U.S. oil companies

Trump says he is not afraid of putting 'boots on the ground' in the country

Maduro arrived in the US Saturday evening

Venezuelan Vice President Delcy Rodriguez makes defiant speech on state television

WASHINGTON, Jan 3 (Reuters) - U.S. President Donald Trump said on Saturday he was putting Venezuela under temporary American control after the United States captured President Nicolas Maduro in an audacious raid and whisked him to New York to face drug-trafficking charges.

"We will run the country until such time as we can do a safe, proper and judicious transition," Trump said during a press conference at his Mar-a-Lago resort in Florida. "We can't take a chance that someone else takes over Venezuela who doesn't have the interests of Venezuelans in mind."

The Reuters Tariff Watch newsletter is your daily guide to the latest global trade and tariff news. Sign up here.

Trump said as part of the takeover, major U.S. oil companies would move into Venezuela, which has the world's largest oil reserves, and refurbish badly degraded oil infrastructure, a process experts said could take years.

Critics said his focus on oil at the press conference raised questions about his administration's efforts to frame the capture of Maduro and a series of deadly missile attacks on alleged drug boats as a law enforcement operation aimed at choking off drug shipments to the U.S.

As part of the dramatic overnight operation that knocked out electricity in parts of Caracas and included strikes on military installations, U.S. Special Forces captured Maduro in or near one of his safe houses, Trump said.

Maduro and his wife, Cilia Flores, were transported to a U.S. Navy ship offshore before being flown to the U.S. on Saturday evening.

Video showed a plane arriving at Stewart International Airport about 60 miles (97 km) northwest of New York City, with several U.S. personnel boarding the aircraft after it landed. A Justice Department official confirmed Maduro had landed in New York, and video later showed a large convoy arriving at the Metropolitan Detention Center in Brooklyn under a heavy police presence.

Maduro, who was indicted on various U.S. charges, including narco-terrorism conspiracy, is expected to make an initial appearance in Manhattan federal court on Monday, according to a Justice Department official. His wife also faces charges, including cocaine importation conspiracy.

It is unclear how Trump plans to oversee Venezuela. U.S. forces have no control over the country itself, and Maduro's government appears not only to still be in charge but to have no appetite for cooperating with Washington. Trump did not say who will lead Venezuela when the U.S. cedes control.

Maduro's apparent successor, Venezuelan Vice President Delcy Rodriguez, appeared on Venezuelan television Saturday afternoon with other top officials to decry what she called a kidnapping.

"We demand the immediate release of President Nicolas Maduro and his wife Cilia Flores," Rodriguez said, calling Maduro "the only president of Venezuela." A Venezuelan court later ordered Rodriguez to assume the position of interim president.

In the U.S. some legal experts questioned the legality of an operation to seize the head of state of a foreign power, and Democrats who said they were misled during recent briefings demanded a plan on what would now follow.

**POTENTIAL POWER VACUUM**

In Venezuela, the streets were mostly calm on Saturday. Soldiers patrolled some parts and small pro-Maduro crowds gathered in Caracas.

Others expressed relief. "I'm happy, I doubted for a moment that it was happening because it's like a movie," said merchant Carolina Pimentel, 37, in the city of Maracay.

At his press conference, where he was accompanied by Secretary of State Marco Rubio and Secretary of Defense Pete Hegseth, Trump did not provide specific answers to repeated questions about how the United States would run Venezuela given its government and military are still functioning.

"The people that are standing right behind me" - such as Rubio and Hegseth - would oversee the country, Trump said.

He said he was open to sending U.S. forces into Venezuela. "We're not afraid of boots on the ground," he said.

The removal of Maduro, whom critics called a dictator as he led Venezuela with a heavy hand for more than 12 years, could open a power vacuum in the country, which is bordered by Colombia, Brazil, Guyana, and the Caribbean.

Trump publicly closed the door on working with opposition leader Maria Corina Machado, widely seen as Maduro's most credible opponent.

Feedback



[1/12] A still image from video posted by the White House's Rapid Response 47 account on X.com, which originated from the @PaulDMauro account, shows Venezuela's President Nicolas Maduro being walked in... Purchase Licensing Rights  Read more

Trump said the U.S. has not been in contact with Machado, who was awarded the Nobel Peace Prize last year. "She doesn't have the support within or the respect within the country," he said.

**RECALLING PAST REGIME CHANGES**

Trump's comments about an open-ended military presence in Venezuela echoed the rhetoric around past invasions in Iraq and Afghanistan, both of which ended in American withdrawals after years of costly occupation and thousands of U.S. casualties.

He said on Saturday that as president, including his first term, he has overseen military actions that were "only victories." But none of those involved removing another country's leader.

Trump in the past criticized such interventions, calling the Iraq invasion "a big fat mistake" during a 2016 presidential debate, and saying in 2021 that he was "especially proud to be the first president in decades who has started no new wars."

Before Saturday, the U.S. had not made such a direct intervention in the region since the invasion of Panama 37 years ago to depose military leader Manuel Noriega over allegations that he led a drug-running operation. The United States has leveled similar charges against Maduro, accusing him of running a "narco-state" and rigging the 2024 election.

Maduro, a 63-year-old former bus driver handpicked by the dying Hugo Chavez to succeed him in 2013, has denied those claims and said Washington was intent on taking control of his nation's oil reserves.

Trump's action recalls the Monroe Doctrine, laid out in 1823 by President James Monroe, laying U.S. claim to calling the shots in the region, as well as the "gunboat diplomacy" seen under President Theodore Roosevelt in the early 1900s.

Trump nodded to the comparisons during his press conference, suggesting an updated version of it might be called the "Donroe Doctrine."

While various Latin American governments oppose Maduro and say he stole the 2024 vote, Trump's boasts about controlling Venezuela and exploiting its oil revive painful memories of past U.S. interventions in Latin America that are generally opposed by governments and people in the region.

Argentina's President Javier Milei lauded Venezuela's new "freedom" while Mexico condemned the intervention and Brazil's President Luiz Inacio Lula da Silva said it crossed "an unacceptable line."

Russia and China, both major backers of Venezuela, criticized the U.S. action.

"China firmly opposes such hegemonic behaviour by the U.S., which seriously violates international law, violates Venezuela's sovereignty, and threatens peace and security in Latin America and the Caribbean," China's foreign ministry said.

**POLITICAL RISKS TO TRUMP AT HOME**

A U.S. occupation "won't cost us a penny" because the United States would be reimbursed from the "money coming out of the ground," Trump said, referring to Venezuela's oil reserves, a subject he returned to repeatedly during Saturday's press conference.

The idea that a country's oil reserves can pay for an American invasion also recalls the 2003 Iraq war. In the run-up to the invasion, U.S. officials repeatedly stated that the cost would largely be covered by Iraq's assets, including its oil. Various estimates by academics say the actual cost to the United States of its years-long entanglement in Iraq ended up being at least $2 trillion.

Trump's focus on foreign affairs provides fuel for Democrats to criticize him ahead of midterm congressional elections in November, when control of both houses of Congress is at stake. Republicans control both chambers by narrow margins.

Opinion polls show the top concern for voters is high prices at home, not foreign policy.

Trump also runs the risk of alienating some of his own supporters, who have backed his "America First" agenda and oppose foreign interventions.

Voicing those concerns, Marjorie Taylor Greene, a Georgia Republican who has broken with Trump in recent months, said on social media, "This is what many in MAGA thought they voted to end. Boy were we wrong."

Reporting by Reuters bureaux worldwide; Writing by Andrew Cawthorne, Raphael Satter, Tim Reid; Editing by William Maclean, Sergio Non, Ross Colvin, Rod Nickel and Lincoln Feast

Our Standards: **The Thomson Reuters Trust Principles.** ⬈

Suggested Topics:

( Americas )

| Purchase Licensing Rights |

**Read Next**

Americas
**Cubans rally against US 'imperialists' before Havana embassy**
20 hours ago

Americas
**Colombia to launch $1.7 billion anti-drone shield**
January 16, 2026

Science
**NASA rolls giant SLS rocket to launchpad for second Artemis moon mission**
2 hours ago

Americas
**EU and Mercosur sign trade deal after 25 years of negotiations**
3 hours ago

## Sponsored Content

Dianomi Advertise Here ▷



**8 Ways to Prepare for Tax Filing Season**

Sponsored by
Charles Schwab



**Uncover ETF trends and build stronger portfolios with active insights**

Sponsored by
J.P. Morgan Asset Management



**2026 Schwab Market Outlook: What's Ahead?**

Sponsored by
Charles Schwab

## Sponsored Content

Dianomi Advertise Here ▷

**2026 Schwab Market Outlook: What's Ahead?**
Sponsored by Charles Schwab
 

**The Guide to ETFs: Your roadmap for navigating the ETF landscape**
Sponsored by J.P. Morgan Asset Management


**Understanding the 1099-DIV Tax Form**
Sponsored by Charles Schwab


**Seniors Born Between 1941-1979 Can Receive These 10 Benefits**
Sponsored by FinanceBuzz


**How Long Does $2.5 Million Last in Retirement?**
Sponsored by SmartAsset


**See How Some Retirees Use Options Trading As A Safe Way To Earn Income**
Sponsored by TradeWins


World >

Case 1:17-mc-00151-LPS     Document 2637-1     Filed 01/29/26     Page 24 of 82 PageID #:
73991
Case 1:17-mc-00151-LPS     Document 2388-2     Filed 10/10/25     Page 2 of 11 PageID #:
61040

Exhibit E: Victim Affidavits

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

In re: PDV Holding, Inc. (Citgo Petroleum Corporation Auction)

Case No. 1:15-cv-00912-LPS

Hon. Leonard P. Stark

POWER OF ATTORNEY AND ATTESTATION OF HARM FOR AGENT REPRESENTATION

Exhibit C: PoA (One of Five)

Submitted by: Dr. Leroy A. Garrett, Pro Se / Proposed Class Representative

Date: October 6, 2025

Re: Authorization of Agent for Petroleum Holocaust Class Action Claims

POWER OF ATTORNEY AND ATTESTATION OF HARM

I. Appointment and Authority

I, Mayda Carrizo, residing at 9701 Fontainebleau Blvd. Apt. 212, Miami, FL, 33172, being of sound mind and over 18 years, hereby appoint Leroy A. Garrett, residing at 6725 S FRY RD STE 700-338, KATY, TX 77494, as my attorney-in-fact to represent me in the Petroleum Holocaust class action (Case No. 1:15-cv-00912-LPS, U.S. District Court for the District of Delaware) concerning harms from the 2002–2003 Petróleos de Venezuela, S.A. (PDVSA) general strike.

Agent's Responsibilities:

• File and manage claims on my behalf in the proposed Qualified Settlement Fund (QSF) under IRC § 468B.

• Coordinate notice and claims intake, including liaising with the Court, Special Master Robert Pincus, or Plaintiffs' Steering Committee (PSC).

• Provide evidence of my harm (as attested below) to satisfy preliminary burden-of-proof requirements under FRCP Rule 23(a)(3)–(4).

• Negotiate settlements and represent my interests in court proceedings, ensuring due process per *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950).

• One PoA per agent is sufficient to establish authority, scalable for global class members (~50,000 claimants).

II. Attestation of Harm (Burden of Proof)

I attest under penalty of perjury (28 U.S.C. § 1746) that I suffered harms from the 2002–2003 PDVSA general strike, including lost wages as a fired worker, health issues from fuel shortages, economic displacement to the United States of America. This attestation serves as prima facie evidence of my

Case 1:17-mc-00151-LPS     Document 2637-1     Filed 01/29/26     Page 25 of 82 PageID #:
73992
Case 1:17-mc-00151-LPS     Document 2388-2     Filed 10/10/25     Page 3 of 11 PageID #:
61041

claim's typicality and commonality with the class, per FRCP Rule 23(a)(2)–(3) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), for inclusion in the QSF.

**III. Duration and Revocation**

This PoA is effective immediately upon execution and remains valid until revoked in writing by me or completion of the QSF distribution (estimated 3 years, per Exhibit B).

**Principal's Signature:**

Signed: _M Carrizo R_

Mayda Carrizo

Date: 10/06/2025

**Notarization:**

On this _06_ day of October 2025, before me, a Notary Public, appeared Mayda Carrizo, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this PoA.

Notary Public: _____

[Seal]



> Notary Public State of Florida
> Joaquin Alvarado-Oracon
> My Commission HH 454375
> Expires 11/3/2027

**IV. Agent's Acceptance and Commitment**

I, Dr. Leroy A. Garrett, accept the appointment as attorney-in-fact for Mayda Carrizo. I commit to:

- Represent the principal's interests diligently, avoiding conflicts per FRCP Rule 23(a)(4).

- Submit claims and evidence (including this attestation) to the QSF administrator (e.g., Epiq Systems).

- Coordinate with Dr. Garrett, the PSC, and the Rule 53 commission to ensure equitable claim processing.

- Comply with Court and Special Master oversight, reporting progress as required.

**Agent's Signature:**

Signed: _Leroy G Garrett_

Dr. Leroy A. Garrett

Date: _10 / 08 / 2025_

**Notarization:**

On this _8_ day of October 2025, before me, a Notary Public, appeared [Agent's Full Name], known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this acceptance.

Notary Public: _Masooma_



> MASOOMA QUTUBUD
> Notary Public, State of
> Comm. Expires 06-01
> Notary ID 13313(

> MASOOMA QUTUBUDDIN
> Notary Public, State of Texas
> Comm. Expires 06-01-2029
> Notary ID 133130814

Case 1:17-mc-00151-LPS    Document 2637-1    Filed 01/29/26    Page 26 of 82 PageID #:
73993
Case 1:17-mc-00151-LPS    Document 2388-2    Filed 10/10/25    Page 4 of 11 PageID #:
61042

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**In re: PDV Holding, Inc. (Citgo Petroleum Corporation Auction)**

**Case No. 1:15-cv-00912-LPS**

**Hon. Leonard P. Stark**

**POWER OF ATTORNEY AND ATTESTATION OF HARM FOR AGENT REPRESENTATION**

**Exhibit C: PoA (One of Five)**

**Submitted by: Dr. Leroy A. Garrett, Pro Se / Proposed Class Representative**

**Date: October 3, 2025**

**Re: Authorization of Agent for Petroleum Holocaust Class Action Claims**


**POWER OF ATTORNEY AND ATTESTATION OF HARM**

### I. Appointment and Authority

I, Mirela Del Carmen Faieta Rosales residing at 2487 Prophetstown Rd, Avon, IN 46123, being of sound mind and over 18 years, hereby appoint Dr. Leroy A. Garrett, residing at 6725 S Fry Rd STE 700-338, Katy, TX 77494, as my attorney-in-fact to represent me in the Petroleum Holocaust class action (Case No. 1:15-cv-00912-LPS, U.S. District Court for the District of Delaware) concerning harms from the 2002–2003 Petróleos de Venezuela, S.A. (PDVSA) general strike.

**Agent's Responsibilities:**

• File and manage claims on my behalf in the proposed Qualified Settlement Fund (QSF) under IRC § 468B.

• Coordinate notice and claims intake, including liaising with the Court, Special Master Robert Pincus, or Plaintiffs' Steering Committee (PSC).

• Provide evidence of my harm (as attested below) to satisfy preliminary burden-of-proof requirements under FRCP Rule 23(a)(3)–(4).

• Negotiate settlements and represent my interests in court proceedings, ensuring due process per *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950).

• One PoA per agent is sufficient to establish authority, scalable for global class members (~50,000 claimants).

### II. Attestation of Harm (Burden of Proof)

I attest under penalty of perjury (28 U.S.C. § 1746) that I suffered harms from the 2002–2003 PDVSA general strike, including "lost wages as a fired worker," "health issues from fuel shortages," "economic displacement to the United States of America". This attestation serves as prima facie evidence of my

claim's typicality and commonality with the class, per FRCP Rule 23(a)(2)–(3) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), for inclusion in the QSF.

### III. Duration and Revocation

This PoA is effective immediately upon execution and remains valid until revoked in writing by me or completion of the QSF distribution (estimated 3 years, per Exhibit B).

Principal's Signature:

Signed: _Mfauta]_

Mirela Del Carmen Faieta Rosales

Date: _10 | 4 | 2025_

### Notarization:

On this 4 day of October 2025, before me, a Notary Public, appeared Mirela Del Carmen Faieta Rosales, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this PoA.

Notary Public: _____

> KYLE RUTHIG
> Notary Public - Seal
> Hendricks County - State of Indiana
> Commission Number NP0727223
> My Commission Expires Jun 14, 2028

### IV. Agent's Acceptance and Commitment

I, Dr. Leroy A. Garrett, accept the appointment as attorney-in-fact for Mirela Del Carmen Faieta Rosales. I commit to:

- Represent the principal's interests diligently, avoiding conflicts per FRCP Rule 23(a)(4).

- Submit claims and evidence (including this attestation) to the QSF administrator (e.g., Epiq Systems).

- Coordinate with Dr. Garrett, the PSC, and the Rule 53 commission to ensure equitable claim processing.

- Comply with Court and Special Master oversight, reporting progress as required.

Agent's Signature:

Signed: _Jerry Garrett_

Dr. Leroy A. Garrett

Date: _10/8/2025_

### Notarization:

On this 8 day of October 2025, before me, a Notary Public, appeared Dr. Leroy A. Garrett, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this acceptance.

Notary Public: _Masoomor_

> MASOOMA QUTUBUDDIN
> Notary Public, State of Texas
> Comm. Expires 06-01-2029
> Notary ID 133130814

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**In re: PDV Holding, Inc. (Citgo Petroleum Corporation Auction)**

**Case No. 1:15-cv-00912-LPS**

**Hon. Leonard P. Stark**

**POWER OF ATTORNEY AND ATTESTATION OF HARM FOR AGENT REPRESENTATION**

**Exhibit C: PoA (One of Five)**

**Submitted by:** Dr. Leroy A. Garrett, Pro Se / Proposed Class Representative

**Date:** October 6, 2025

**Re:** Authorization of Agent for Petroleum Holocaust Class Action Claims


**POWER OF ATTORNEY AND ATTESTATION OF HARM**

### I. Appointment and Authority

I, Biaggio Correale, residing at 9288 SW 146th PL, Miami, FL, 33186, being of sound mind and over 18 years, hereby appoint Leroy A. Garrett, residing at 6725 S FRY RD STE 700-338, KATY, TX 77494, as my attorney-in-fact to represent me in the Petroleum Holocaust class action (Case No. 1:15-cv-00912-LPS, U.S. District Court for the District of Delaware) concerning harms from the 2002–2003 Petróleos de Venezuela, S.A. (PDVSA) general strike.

**Agent's Responsibilities:**

- File and manage claims on my behalf in the proposed Qualified Settlement Fund (QSF) under IRC § 468B.

- Coordinate notice and claims intake, including liaising with the Court, Special Master Robert Pincus, or Plaintiffs' Steering Committee (PSC).

- Provide evidence of my harm (as attested below) to satisfy preliminary burden-of-proof requirements under FRCP Rule 23(a)(3)–(4).

- Negotiate settlements and represent my interests in court proceedings, ensuring due process per *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950).

- One PoA per agent is sufficient to establish authority, scalable for global class members (~50,000 claimants).

### II. Attestation of Harm (Burden of Proof)

I attest under penalty of perjury (28 U.S.C. § 1746) that I suffered harms from the 2002–2003 PDVSA general strike, including lost wages as a fired worker, health issues from fuel shortages, economic displacement to the United States of America. This attestation serves as prima facie evidence of my

claim's typicality and commonality with the class, per FRCP Rule 23(a)(2)–(3) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), for inclusion in the QSF.

### III. Duration and Revocation

This PoA is effective immediately upon execution and remains valid until revoked in writing by me or completion of the QSF distribution (estimated 3 years, per Exhibit B).

**Principal's Signature:**

Signed: _____

Biaggio Correale

Date: 10/06/2025

**Notarization:**

On this 0th day of October 2025, before me, a Notary Public, appeared Biaggio Correale, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this PoA.

Notary Public: _____

[Seal]

> BELKYS SANTAMARIA
> Notary Public · State of Florida
> Commission # HH 259959
> My Comm. Expires May 2, 2026

### IV. Agent's Acceptance and Commitment

I, Dr. Leroy A. Garrett, accept the appointment as attorney-in-fact for Biaggio Correale. I commit to:

- Represent the principal's interests diligently, avoiding conflicts per FRCP Rule 23(a)(4).

- Submit claims and evidence (including this attestation) to the QSF administrator (e.g., Epiq Systems).

- Coordinate with Dr. Garrett, the PSC, and the Rule 53 commission to ensure equitable claim processing.

- Comply with Court and Special Master oversight, reporting progress as required.

**Agent's Signature:**

Signed: _____

Dr. Leroy A. Garrett

Date: 08/10/2025.

**Notarization:**

On this 8 day of October 2025, before me, a Notary Public, appeared [Agent's Full Name], known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this acceptance.

Notary Public: _____

> MASOOMA QUTUBUDDIN
> Notary Public, State of Texas
> Comm. Expires 06-01-2029
> Notary ID 133130814

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

In re: PDV Holding, Inc. (Citgo Petroleum Corporation Auction)

Case No. 1:15-cv-00912-LPS

Hon. Leonard P. Stark

POWER OF ATTORNEY AND ATTESTATION OF HARM FOR AGENT REPRESENTATION

Exhibit C: PoA (One of Five)

Submitted by: Dr. Leroy A. Garrett, Pro Se / Proposed Class Representative

Date: October 3, 2025

Re: Authorization of Agent for Petroleum Holocaust Class Action Claims

## POWER OF ATTORNEY AND ATTESTATION OF HARM

### I. Appointment and Authority

I, Esneider Jose Segovia Silva residing at 2487 Prophetstown Rd, Avon, IN 46123, being of sound mind and over 18 years, hereby appoint Dr. Leroy A. Garrett, residing at 6725 S Fry Rd STE 700-338, Katy, TX 77494, as my attorney-in-fact to represent me in the Petroleum Holocaust class action (Case No. 1:15-cv-00912-LPS, U.S. District Court for the District of Delaware) concerning harms from the 2002–2003 Petróleos de Venezuela, S.A. (PDVSA) general strike.

Agent's Responsibilities:

• File and manage claims on my behalf in the proposed Qualified Settlement Fund (QSF) under IRC § 468B.

• Coordinate notice and claims intake, including liaising with the Court, Special Master Robert Pincus, or Plaintiffs' Steering Committee (PSC).

• Provide evidence of my harm (as attested below) to satisfy preliminary burden-of-proof requirements under FRCP Rule 23(a)(3)–(4).

• Negotiate settlements and represent my interests in court proceedings, ensuring due process per *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950).

• One PoA per agent is sufficient to establish authority, scalable for global class members (~50,000 claimants).

### II. Attestation of Harm (Burden of Proof)

I attest under penalty of perjury (28 U.S.C. § 1746) that I suffered harms from the 2002–2003 PDVSA general strike, including "lost wages as a fired worker," "health issues from fuel shortages," "economic displacement to the United States of America". This attestation serves as prima facie evidence of my

claim's typicality and commonality with the class, per FRCP Rule 23(a)(2)–(3) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), for inclusion in the QSF.

### III. Duration and Revocation

This PoA is effective immediately upon execution and remains valid until revoked in writing by me or completion of the QSF distribution (estimated 3 years, per Exhibit B).

Principal's Signature:

Signed: _Esnider J. Segia_

Esneider Jose Segovia Silva

Date: _10/04/2025_

### Notarization:

On this _4_ day of October 2025, before me, a Notary Public, appeared Esneider Jose Segovia Silva, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this PoA.

Notary Public: _[signature]_

> ·KYLE RUTHIG
> Notary Public - Seal
> Hendricks County - State of Indiana
> Commission Number NP0727223
> My Commission Expires Jun 14, 2028

### IV. Agent's Acceptance and Commitment

I, Dr. Leroy A. Garrett, accept the appointment as attorney-in-fact for Esneider Jose Segovia Silva. I commit to:

- Represent the principal's interests diligently, avoiding conflicts per FRCP Rule 23(a)(4).

- Submit claims and evidence (including this attestation) to the QSF administrator (e.g., Epiq Systems).

- Coordinate with Dr. Garrett, the PSC, and the Rule 53 commission to ensure equitable claim processing.

- Comply with Court and Special Master oversight, reporting progress as required.

Agent's Signature:

Signed: _[signature]_

Dr. Leroy A. Garrett

Date: _10/0/2025._

### Notarization:

On this _8_ day of October 2025, before me, a Notary Public, appeared Dr. Leroy A. Garrett, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this acceptance.

Notary Public: _Masooma_

> MASOOMA QUTUBUDDIN
> Notary Public, State of Texas
> Comm. Expires 06-01-2029
> Notary ID 133130814

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

In re: PDV Holding, Inc. (Citgo Petroleum Corporation Auction)

Case No. 1:15-cv-00912-LPS

Hon. Leonard P. Stark

POWER OF ATTORNEY AND ATTESTATION OF HARM FOR AGENT REPRESENTATION

Exhibit C: PoA (One of Five)

Submitted by: Dr. Leroy A. Garrett, Pro Se / Proposed Class Representative

Date: October 7, 2025

Re: Authorization of Agent for Petroleum Holocaust Class Action Claims

## POWER OF ATTORNEY AND ATTESTATION OF HARM

### I. Appointment and Authority

I, Agata Maria Mistretta Giaramita residing at 16828 SW 137th Ave. Apt. 1434 Miami, FL 33177, being of sound mind and over 18 years, hereby appoint Dr. Leroy A. Garrett, residing at 6725 S Fry Rd STE 700-338, Katy, TX 77494, as my attorney-in-fact to represent me in the Petroleum Holocaust class action (Case No. 1:15-cv-00912-LPS, U.S. District Court for the District of Delaware) concerning harms from the 2002–2003 Petróleos de Venezuela, S.A. (PDVSA) general strike.

### Agent's Responsibilities:

• File and manage claims on my behalf in the proposed Qualified Settlement Fund (QSF) under IRC § 468B.

• Coordinate notice and claims intake, including liaising with the Court, Special Master Robert Pincus, or Plaintiffs' Steering Committee (PSC).

• Provide evidence of my harm (as attested below) to satisfy preliminary burden-of-proof requirements under FRCP Rule 23(a)(3)–(4).

• Negotiate settlements and represent my interests in court proceedings, ensuring due process per *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950).

• One PoA per agent is sufficient to establish authority, scalable for global class members (~50,000 claimants).

### II. Attestation of Harm (Burden of Proof)

I attest under penalty of perjury (28 U.S.C. § 1746) that I suffered harms from the 2002–2003 PDVSA general strike, including lost wages as a fired worker, health issues from fuel shortages, economic displacement to the United States of America. This attestation serves as prima facie evidence of my

Case 1:17-mc-00151-LPS    Document 2637-1    Filed 01/29/26    Page 33 of 82 PageID #:
74000
Case 1:17-mc-00151-LPS    Document 2388-2    Filed 10/10/25    Page 11 of 11 PageID #:
61049

claim's typicality and commonality with the class, per FRCP Rule 23(a)(2)–(3) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), for inclusion in the QSF.

### III. Duration and Revocation

This PoA is effective immediately upon execution and remains valid until revoked in writing by me or completion of the QSF distribution (estimated 3 years, per Exhibit B).

Principal's Signature:

Signed: _Agata Kfistrie_

Agata Maria Mistretta Giaramita

Date: _10/7/25_



Notarization:

On this ⁊ day of October 2025, before me, a Notary Public, appeared Agata Maria Mistretta Giaramita, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this PoA.

Notary Public: _____

### IV. Agent's Acceptance and Commitment

I, Dr. Leroy A. Garrett, accept the appointment as attorney-in-fact for Agata Maria Mistretta Giaramita. I commit to:

- Represent the principal's interests diligently, avoiding conflicts per FRCP Rule 23(a)(4).

- Submit claims and evidence (including this attestation) to the QSF administrator (e.g., Epiq Systems).

- Coordinate with Dr. Garrett, the PSC, and the Rule 53 commission to ensure equitable claim processing.

- Comply with Court and Special Master oversight, reporting progress as required.

Agent's Signature:

Signed: _____

Dr. Leroy A. Garrett

Date: _10/8/2025_

Notarization:

On this 8 day of October 2025, before me, a Notary Public, appeared Dr. Leroy A. Garrett, known to me (or satisfactorily proven) to be the person whose name is subscribed, and acknowledged execution of this acceptance.

Notary Public: _Masooma_

MASOOMA QUTUBUDDIN
Notary Public, State of Texas
Comm. Expires 06-01-2029
Notary ID 133130814

*EXH - F .*

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CRYSTALLEX INTERNATIONAL )
    CORP. )
Plaintiff-Appellee, )
                         ) No. 25-3323
                         )
BOLIVARIAN REPUBLIC OF )
    VENEZUELA )
Defendant-Appellee, )
                         )
LEROY A. GARRETT, )
    on behalf of 23,000 Victims of the )
    Petroleum Holocaust (ILO Case )
    No. 2249), )
Appellant.

---

Appeal From The United States District Court For The District Of Delaware
No. 1:17-mc-151-LPS, Judge Leonard P. Stark

---

**PETITION FOR PANEL REHEARING UNDER FRAP 40: OVERLOOKED POST-CAPTURE DEVELOPMENTS FAVORING VICTIMS (NOVEMBER 3, 2025), INCLUDING INSULAR ANALOGS, HUMAN RIGHTS VIOLATIONS, ABUSE OF COMMERCIAL PRIVILEGE, UNREFERENCED FOIA EVIDENCE ON AD HOC PERJURY, AND QSF FOR TRANSACTIONAL EXPEDIENT CONSTRUCTIVE REMEDY**

**Filed**: January 17, 2025

## I. INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 40(a), pro se Appellant Leroy A. Garrett respectfully petitions this Panel (Judges Shwartz, Freeman, and Chung) for rehearing of the Court's November 25, 2025, order (amended and certified as mandate on January 16, 2026,

Document 39-2), which summarily affirmed the District Court's denial of intervention and reconsideration, dismissed the remainder for lack of jurisdiction, and denied all pending motions. This petition is timely filed within 14 days of the mandate.

The Panel overlooked or misapprehended material facts and law in my supplemental filings (#12 "Supplemental Notice to Status Update" and #13 motion for full remand), which alerted the Court to intervening circumstances: Nicolás Maduro's capture on November 3, 2025, and the U.S. President's affirmation of new Venezuelan control. These developments validate my claims as a victim (tied to Horacio Medina's failures as union leader/ad hoc chief to report victims, "Stark" actions, and unreported harms in the Crystallex expropriation), retroactively reinforcing jurisdiction and standing. A full hearing is indispensable to incorporate two strategic pillars: (1) Insular Cases analogs with modern sovereign precedents, and (2) irrepealable human rights violations. This counters the false assertion of no meaningful case, exposing an abuse of commercial privilege detrimental to human values. Additionally, the unreferenced FOIA letter (#8) destroys the untimeliness finding by evidencing "ad hoc perjury" on the board's omissions, providing a diligent reason for delay. **At core, this petition seeks a Qualified Settlement Fund (QSF, under 26 U.S.C. § 468B) as a transactional expedient constructive remedy to facilitate victim distributions post-remand, overlooked in the order's denial of #13.**

As a pro se litigant, I request liberal construction under *Haines v. Kerner*, 404 U.S. 519 (1972). Rehearing is necessary to prevent injustice, as the order curtailed my updates despite listing them as "submitted."

## II. POINTS OVERLOOKED OR MISAPPREHENDED

## A. Overlooked Intervening Circumstances: Maduro's Capture and Regime Change (November 3, 2025).

The Panel overlooked my #12 Supplemental Notice (filed post-November 3, 2025), which updated the Court on Maduro's capture and its impact. This event—U.S. forces capturing Maduro amid sanctions and opposition recognition—led to U.S. executive affirmation of transitional control (e.g., opposition leaders like Edmundo González or ad hoc boards). This shifts Venezuelan sovereign defenses under FSIA (28 U.S.C. § 1604), potentially waiving immunity and accelerating enforcement proceedings.

For victims like me (affected by unreported union harms during 2002-2013 expropriations), this favors disclosure (e.g., via my FOIA filings, #8) and inclusion in resolutions. The Panel misapprehended this as irrelevant to untimeliness, when is evident that *there are Material developments in related proceedings (as above referenced, These developments create a changed procedural context that warrants allowing this submission.), No prejudice to any party (Acceptance of our filing does not alter briefing schedules, impose new burdens, or disadvantage any litigant. The issues are already fully joined, and consideration of this filing will not disrupt the orderly resolution of any appeal), Good-faith delay supported by emerging evidence (victims impliedly assumed Ad Hoc representation as trusted and effective)*. See *Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992)* (allows modification of decrees based on significant changes in law or fact.).

**B. Misapprehended Victim Claims and Medina's Role, Including Pillar 1: Insular Cases and Modern Analogs Reinforcing Jurisdiction/Standing; and Overlooked FOIA Evidence Destroying Untimeliness.**

The order adopted the District Court's pre-capture reasoning without addressing my supplements (#7, #10, #12) on Horacio Medina (ad hoc PDVSA chief, 2020-2023) failing to report victims. Under new control, Medina's board could now address this, giving me standing as a non-corporate victim. The Panel overlooked how this overcomes *Lazaridis v. Wehmer*, 591 F.3d 666,

3

669 (3d Cir. 2010), as these are "new" facts, not repetitive. Moreover, the unreferenced FOIA

letter (#8, already submitted and listed but not addressed in the order) provides indispensable

evidence destroying the untimeliness bar: It describes the ad hoc board's (Medina and his union

ties') omissions to report victims as "ad hoc perjury," evidencing fiduciary breach and fraud

(e.g., false statements under 18 U.S.C. § 1001). This diligent pursuit of FOIA disclosures

excuses my intervention delay under *Agostini v. Felton, 521 U.S. 203 (1997)* ((recognizing that

significant changes in law or fact justify revisiting prior orders), as it shows I acted upon

government-confirmed perjury post-District Court denial—directly tying to Medina's breach of

duties (*Stone v. Ritter*, 911 A.2d 362 (Del. 2006)). The court's failure to reference #8 constitutes

a misapprehension warranting rehearing.

Furthermore, the current Venezuelan territorial situation post-capture acts as an incontrovertible

aspect, retroactively reinforcing our jurisdiction and standing based on the victims fall within the

scope of the alter-ego relationship recognized under the Bancec doctrine, given the Chavista

government's pervasive control over PDVSA and its U.S. subsidiary PDVH. Drawing on the

Insular Cases—e.g., *Downes v. Bidwell*, 182 U.S. 244 (1901) (territorial control without full

protections); *Dorr v. United States*, 195 U.S. 138 (1904) (limited constitutional application in

insular possessions); and *Herrera v. United States*, 222 U.S. 558 (1912) (United States assumes

sovereignty, even if the underlying legal framework was enacted earlier)—Venezuela's de facto

U.S.-influenced status mirrors these, necessitating equitable intervention for victims. Modern

analogs like *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (applying FSIA retroactively to

claims arising from pre-war expropriation of property during the Nazi era, which widely mirrors

the Venezuelan Petroleum Holocaust), and *Once PDVSA and PDVH are treated as Venezuela's*

*alter egos under the Bancec doctrine, they share the sovereign's status for FSIA purposes.*

4

*Veil-piercing does not eliminate immunity, but it identifies the state as the true defendant, meaning FSIA's exceptions—not corporate formalities—govern jurisdiction. When an exception applies, the sovereign and its alter egos are equally subject to suit and enforcement, allowing victims to reach the petroleum entities the regime controlled.*, this provides a deep caveat: beyond established the alter ego liaison assisting the victims, Maduro's post-capture, U.S. affirmation, create a retroactive jurisdiction, making a full hearing indispensable to pierce the commercial veil. Denying reconsideration curtails due process for pro se victims in sovereign cases. See *Rubin v. Islamic Republic of Iran, 138 S. Ct. 816 (2018)* (explicitly distinguishes victims from commercial creditors, and confirms that victims can invoke FSIA exceptions even when they do not meet commercial-creditor requirements).

## C. Overlooked Jurisdictional Implications for Merits and Motions, Including Pillar 2: Human Rights Violations Cannot Be Repealed by Commercial Efficiency.

The Panel dismissed merits appeals under *Rizzo* at 508, but misapprehended my stay motions (#5, #9) as the panel's prior dismissal under Rizzo cannot stand because the jurisdictional landscape has materially changed. Post-capture developments—including the United States' own recognition and control determinations—confirm FSIA jurisdiction that was not part of the earlier record. The panel's order did not address these intervening facts, contrary to I.O.P. 10.6. Moreover, because PDVSA and PDVH functioned as alter egos of the Chavista regime, victims occupy a jurisdictional posture distinct from commercial creditors: FSIA's exceptions, not commercial-creditor standards, govern access to the courts. My claims arise from human-rights violations—union repression and state-directed abuses—governed by the ATS and international norms, which cannot be displaced by the commercial-activity framework. New FOIA disclosures further show that earlier jurisdictional representations were incomplete. Taken together, these

developments eliminate the basis for dismissal under Rizzo, which applies only when jurisdiction is wholly absent.

**D. Pillar 3: False Assertion of No Meaningful Case—Abuse of Commercial Privilege Detrimental to Human Values, Including Overlooked QSF Remedy.**

The Panel's summary affirmance falsely asserts we lack a meaningful case, one thing is a stubborn denial of our rights by trying to fence us out from a strictly commercial perspective—which is indeed an abuse to privilege such right detrimentally from protecting human values. This oversight of my updates (#12/#13) and unreferenced FOIA (#8) ignores how post-capture developments create a substantive claim for victims, warranting rehearing to affirm human values over commercial fences. See *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (supports claims grounded in specific, universally recognized human-rights norms, independent of commercial-activity frameworks). **The order also overlooked my core petition for a Qualified Settlement Fund (QSF) as a transactional expedient constructive remedy (26 U.S.C. § 468B), to equitably distribute funds for unreported victims via Medina's board post-remand—misapprehended as part of denied #13 motion, but essential for constructive relief beyond denial.**

### III. ARGUMENT IN SUPPORT

The Three Pillars and FOIA Evidence Render a Full Hearing Indispensable. Rehearing will correct these oversights via: (1) Insular/modern analogs for retroactive standing; (2) Irrepealable human rights trumping efficiency; (3) Exposing the false no-meaningful-case assertion as abusive, including QSF for transactional expedient constructive remedy; and the overlooked FOIA (#8) destroying untimeliness through "ad hoc perjury" proof. No further briefing/oral

6

argument needed, but if granted, remand to District Court for updated hearing incorporating these elements, including QSF establishment.

## IV. CERTIFICATE OF COMPLIANCE

This petition contains approximately 2,500 words, excluding exempted parts, complying with FRAP 40(d)(3).

/s/ Leroy A. Garrett

Pro Se Appellant

## V. CERTIFICATE OF SERVICE

I certify service on January 17, 2026 via PACER on all parties/counsel (e.g., Crystallex's counsel, and Venezuela's at).

/s/ Leroy A. Garrett

Respectfully submitted,

**/s/ Leroy A. Garrett**

Pro Se Petitioner

**Attachments:**

1. November 25, 2025, Order (with January 16, 2026)

2. Order Document 39-2

3. The Insular Cases (*Federal Bar*)

4. Insular Cases modern analogs – Altmann

5. Insular Cases modern analogs – Simon

6. FOIA Letter (#8 Filing), Detailing "Ad Hoc Perjury" on Medina/Ad Hoc Board Omissions.

7.  Proposal for Qualified Settlement Fund (QSF) as Transactional Expedient Constructive

Remedy.

8.  Affidavit on human rights violations;

9. News on Maduro capture, President Trump Remarks (November 3, 2025);

10. Medina-related evidence. (Ad Hoc – President of Victims Union Unapetrol)

*EXH ~F*

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CRYSTALLEX INTERNATIONAL )
    CORP. )
Plaintiff-Appellee, )
                   ) No. 25-2519
                   )
BOLIVARIAN REPUBLIC OF )
    VENEZUELA )
Defendant-Appellee, )
                   )
LEROY A. GARRETT, )
    on behalf of 23,000 Victims of the )
    Petroleum Holocaust (ILO Case )
    No. 2249), )
Appellant. )

---

Appeal From The United States District Court For The District Of Delaware
No. 1:17-mc-151-LPS, Judge Leonard P. Stark

---

**COMBINED PETITION FOR PANEL REHEARING UNDER FRAP 40: OVERLOOKED POST-CAPTURE DEVELOPMENTS FAVORING VICTIMS (NOVEMBER 3, 2025), INCLUDING INSULAR ANALOGS, HUMAN RIGHTS VIOLATIONS, ABUSE OF COMMERCIAL PRIVILEGE, UNREFERENCED FOIA EVIDENCE ON AD HOC PERJURY, AND QSF FOR TRANSACTIONAL EXPEDIENT CONSTRUCTIVE REMEDY**

**Filed**: January 17, 2025

## I. INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 40(a), pro se Appellant Leroy A. Garrett respectfully petitions this Panel (Judges Shwartz, Freeman, and Chung) for rehearing of the Court's November 25, 2025, order (amended and certified as mandate on January 16, 2026,

Document 39-2), which summarily affirmed the District Court's denial of intervention and reconsideration, dismissed the remainder for lack of jurisdiction, and denied all pending motions. This petition is timely filed within 14 days of the mandate.

The Panel overlooked or misapprehended material facts and law in my supplemental filings (#12 "Supplemental Notice to Status Update" and #13 motion for full remand), which alerted the Court to intervening circumstances: Nicolás Maduro's capture on November 3, 2025, and the U.S. President's affirmation of new Venezuelan control. These developments validate my claims as a victim (tied to Horacio Medina's failures as union leader/ad hoc chief to report victims, "Stark" actions, and unreported harms in the Crystallex expropriation), retroactively reinforcing jurisdiction and standing. A full hearing is indispensable to incorporate two strategic pillars: (1) Insular Cases analogs with modern sovereign precedents, and (2) irrepealable human rights violations. This counters the false assertion of no meaningful case, exposing an abuse of commercial privilege detrimental to human values. Additionally, the unreferenced FOIA letter (#8) destroys the untimeliness finding by evidencing "ad hoc perjury" on the board's omissions, providing a diligent reason for delay. **At core, this petition seeks a Qualified Settlement Fund (QSF, under 26 U.S.C. § 468B) as a transactional expedient constructive remedy to facilitate victim distributions post-remand, overlooked in the order's denial of #13.**

As a pro se litigant, I request liberal construction under *Haines v. Kerner*, 404 U.S. 519 (1972). Rehearing is necessary to prevent injustice, as the order curtailed my updates despite listing them as "submitted."

## II. POINTS OVERLOOKED OR MISAPPREHENDED

### A. Overlooked Intervening Circumstances: Maduro's Capture and Regime Change (November 3, 2025).

The Panel overlooked my #12 Supplemental Notice (filed post-November 3, 2025), which updated the Court on Maduro's capture and its impact. This event—U.S. forces capturing Maduro amid sanctions and opposition recognition—led to U.S. executive affirmation of transitional control (e.g., opposition leaders like Edmundo González or ad hoc boards). This shifts Venezuelan sovereign defenses under FSIA (28 U.S.C. § 1604), potentially waiving immunity and accelerating enforcement proceedings.

For victims like me (affected by unreported union harms during 2002-2013 expropriations), this favors disclosure (e.g., via my FOIA filings, #8) and inclusion in resolutions. The Panel misapprehended this as irrelevant to untimeliness, when is evident that *there are Material developments in related proceedings (as above referenced, These developments create a changed procedural context that warrants allowing this submission.), No prejudice to any party (Acceptance of our filing does not alter briefing schedules, impose new burdens, or disadvantage any litigant. The issues are already fully joined, and consideration of this filing will not disrupt the orderly resolution of any appeal), Good-faith delay supported by emerging evidence (victims impliedly assumed Ad Hoc representation as trusted and effective)*. See *Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992)* (allows modification of decrees based on significant changes in law or fact.).

**B. Misapprehended Victim Claims and Medina's Role, Including Pillar 1: Insular Cases and Modern Analogs Reinforcing Jurisdiction/Standing; and Overlooked FOIA Evidence Destroying Untimeliness.**

The order adopted the District Court's pre-capture reasoning without addressing my supplements (#7, #10, #12) on Horacio Medina (ad hoc PDVSA chief, 2020-2023) failing to report victims. Under new control, Medina's board could now address this, giving me standing as a non-corporate victim. The Panel overlooked how this overcomes *Lazaridis v. Wehmer*, 591 F.3d 666,

3

669 (3d Cir. 2010), as these are "new" facts, not repetitive. Moreover, the unreferenced FOIA letter (#8, already submitted and listed but not addressed in the order) provides indispensable evidence destroying the untimeliness bar: It describes the ad hoc board's (Medina and his union ties') omissions to report victims as "ad hoc perjury," evidencing fiduciary breach and fraud (e.g., false statements under 18 U.S.C. § 1001). This diligent pursuit of FOIA disclosures excuses my intervention delay under *Agostini v. Felton, 521 U.S. 203 (1997)* ((recognizing that significant changes in law or fact justify revisiting prior orders), as it shows I acted upon government-confirmed perjury post-District Court denial—directly tying to Medina's breach of duties (*Stone v. Ritter*, 911 A.2d 362 (Del. 2006)). The court's failure to reference #8 constitutes a misapprehension warranting rehearing.

Furthermore, the current Venezuelan territorial situation post-capture acts as an incontrovertible aspect, retroactively reinforcing our jurisdiction and standing based on the victims fall within the scope of the alter-ego relationship recognized under the Bancec doctrine, given the Chavista government's pervasive control over PDVSA and its U.S. subsidiary PDVH. Drawing on the Insular Cases—e.g., *Downes v. Bidwell*, 182 U.S. 244 (1901) (territorial control without full protections); *Dorr v. United States*, 195 U.S. 138 (1904) (limited constitutional application in insular possessions); and *Herrera v. United States*, 222 U.S. 558 (1912) (United States assumes sovereignty, even if the underlying legal framework was enacted earlier)—Venezuela's de facto U.S.-influenced status mirrors these, necessitating equitable intervention for victims. Modern analogs like *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (applying FSIA retroactively to claims arising from pre-war expropriation of property during the Nazi era, which widely mirrors the Venezuelan Petroleum Holocaust), and *Once PDVSA and PDVH are treated as Venezuela's alter egos under the Bancec doctrine, they share the sovereign's status for FSIA purposes.*

*Veil-piercing does not eliminate immunity, but it identifies the state as the true defendant, meaning FSIA's exceptions—not corporate formalities—govern jurisdiction. When an exception applies, the sovereign and its alter egos are equally subject to suit and enforcement, allowing victims to reach the petroleum entities the regime controlled.*, this provides a deep caveat: beyond established the alter ego liaison assisting the victims, Maduro's post-capture, U.S. affirmation, create a retroactive jurisdiction, making a full hearing indispensable to pierce the commercial veil. Denying reconsideration curtails due process for pro se victims in sovereign cases. See *Rubin v. Islamic Republic of Iran, 138 S. Ct. 816 (2018)* (explicitly distinguishes victims from commercial creditors, and confirms that victims can invoke FSIA exceptions even when they do not meet commercial-creditor requirements).

## C. Overlooked Jurisdictional Implications for Merits and Motions, Including Pillar 2: Human Rights Violations Cannot Be Repealed by Commercial Efficiency.

The Panel dismissed merits appeals under *Rizzo* at 508, but misapprehended my stay motions (#5, #9) as the panel's prior dismissal under Rizzo cannot stand because the jurisdictional landscape has materially changed. Post-capture developments—including the United States' own recognition and control determinations—confirm FSIA jurisdiction that was not part of the earlier record. The panel's order did not address these intervening facts, contrary to I.O.P. 10.6. Moreover, because PDVSA and PDVH functioned as alter egos of the Chavista regime, victims occupy a jurisdictional posture distinct from commercial creditors: FSIA's exceptions, not commercial-creditor standards, govern access to the courts. My claims arise from human-rights violations—union repression and state-directed abuses—governed by the ATS and international norms, which cannot be displaced by the commercial-activity framework. New FOIA disclosures further show that earlier jurisdictional representations were incomplete. Taken together, these

5

developments eliminate the basis for dismissal under Rizzo, which applies only when

jurisdiction is wholly absent.

**D. Pillar 3: False Assertion of No Meaningful Case—Abuse of Commercial Privilege
Detrimental to Human Values, Including Overlooked QSF Remedy.**

The Panel's summary affirmance falsely asserts we lack a meaningful case, one thing is a

stubborn denial of our rights by trying to fence us out from a strictly commercial perspective—

which is indeed an abuse to privilege such right detrimentally from protecting human values.

This oversight of my updates (#12/#13) and unreferenced FOIA (#8) ignores how post-capture

developments create a substantive claim for victims, warranting rehearing to affirm human

values over commercial fences. See *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (supports

claims grounded in specific, universally recognized human-rights norms, independent of

commercial-activity frameworks). **The order also overlooked my core petition for a Qualified**

**Settlement Fund (QSF) as a transactional expedient constructive remedy (26 U.S.C. §**

**468B), to equitably distribute funds for unreported victims via Medina's board post-**

**remand—misapprehended as part of denied #13 motion, but essential for constructive**

**relief beyond denial.**

### III. ARGUMENT IN SUPPORT

The Three Pillars and FOIA Evidence Render a Full Hearing Indispensable. Rehearing will

correct these oversights via: (1) Insular/modern analogs for retroactive standing; (2) Irrepealable

human rights trumping efficiency; (3) Exposing the false no-meaningful-case assertion as

abusive, including QSF for transactional expedient constructive remedy; and the overlooked

FOIA (#8) destroying untimeliness through "ad hoc perjury" proof. No further briefing/oral

argument needed, but if granted, remand to District Court for updated hearing incorporating these elements, including QSF establishment.

## IV. CERTIFICATE OF COMPLIANCE

This petition contains approximately 2,500 words, excluding exempted parts, complying with FRAP 40(d)(3).

/s/ Leroy A. Garrett

Pro Se Appellant

## V. CERTIFICATE OF SERVICE

I certify service on January 17, 2026 via PACER on all parties/counsel (e.g., Crystallex's counsel, and Venezuela's at).

/s/ Leroy A. Garrett

Respectfully submitted,

**/s/ Leroy A. Garrett**

Pro Se Petitioner

**Attachments:**

1.  November 25, 2025, Order (with January 16, 2026)

2. Order Document 39-2

3. The Insular Cases (*Federal Bar*)

4. Insular Cases modern analogs – Altmann

5. Insular Cases modern analogs – Simon

6. FOIA Letter (#8 Filing), Detailing "Ad Hoc Perjury" on Medina/Ad Hoc Board Omissions.

7.  Proposal for Qualified Settlement Fund (QSF) as Transactional Expedient Constructive Remedy.

8.  Affidavit on human rights violations;

9. News on Maduro capture, President Trump Remarks (November 3, 2025);

10. Medina-related evidence. (Ad Hoc – President of Victims Union Unapetrol)

Exhibit H: Docket Excerpts #456/#512 (1:15-cv-00912-LPS).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

Plaintiff,

v.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

Defendant.

C.A. No. 17-mc-151-LPS

**CRYSTALLEX INTERNATIONAL CORPORATION'S RESPONSE TO REVISED
PROPOSED SALE PROCEDURES ORDER AND SPECIAL MASTER'S UPDATED
RECOMMENDATION REGARDING EVERCORE ENGAGEMENT**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: April 11, 2022

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff*

Plaintiff and Judgment Creditor Crystallex International Corporation ("Crystallex") respectfully submits this response to the Revised Proposed Sale Procedures Order and Special Master's Updated Recommendation Regarding Evercore Engagement Letter (D.I. 451) (the "Special Master's Proposal"). As detailed herein, while the Revised Proposed Sale Procedures Order envisions a complex sale process for the sale of the PDVH Shares that the goes well beyond the straightforward requirements of Delaware law, provided that they are implemented as expected, the Revised Proposed Sale Procedures Order resolves Crystallex's objections to the Special Master's prior proposals.[1] However, Crystallex objects to the Special Master's Updated Recommendation Regarding Evercore Engagement Letter and the overly generous investment banking fees to which Evercore Group L.L.C. ("Evercore") would be entitled under the Special Master's and Evercore's latest proposal.

## NATURE AND STAGE OF THE PROCEEDINGS

On January 14, 2021, the Court authorized preparations for a judicial sale and called for the appointment of a Special Master to implement and handle the day-to-day conduct of the sale of the PDVH Shares. *See* D.I. 234 at 35. The Court subsequently entered an Order establishing the general parameters of the Special Master's responsibility to prepare "a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex . . . ."). D.I. 277 at 3. In response, the Special Master submitted proposed sale procedures to the Sale Process Parties and this Court, which have been updated and revised on multiple occasions.

After several rounds of briefing and a full day hearing, on March 2, 2022, this Court issued a March 2, 2022 Opinion rejecting certain purported "'fundamental problems' with the Proposed

---

[1] To the extent not otherwise defined herein, capitalized terms have the same meaning ascribed to them in the Special Master's Proposal.

1

Sale Procedures Order" identified by the Venezuela parties. D.I. 443 at 1-2. The Court found that (i) the proposed sale process was not tainted by any purported conflict of interest of the Special Master's financial advisor, Evercore, and (ii) while OFAC considerations are relevant to the completion of the sale of the PDVH Shares, sanctions do not prohibit the Court from advancing the sale process so long as no final transfer takes place without OFAC approval (or a change in the current sanctions regime). D.I. 443 at 12, 39-40. The Court further directed the Special Master and the Sales Process Parties to prepare a revised sale procedures order implementing its decision and addressing as many remaining disputes as possible. D.I. 444 at 1-2. The resulting proposal, the Special Master's Fourth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters, was filed with this Court on March 31, 2022. D.I. 451.

## SUMMARY OF ARGUMENT

1.     As detailed in Crystallex's prior objection to the Special Master's initial sale procedures proposal (D.I. 316), the Delaware law requirements for the sale of the attached PDVH Shares at public auction are clear and straightforward. The Revised Proposed Sale Procedures Order contemplates a sale process that Crystallex believes is unnecessarily long and overly complicated. However, the Revised Proposed Sale Procedures Order is now consistent with all applicable state law requirements. Accordingly, while Crystallex reserves its rights with respect to the implementation of the Revised Proposed Sale Procedures Order, it respectfully requests that this Court approve the sale process set forth therein.

2.     The Revised Proposed Evercore Engagement Letter that accompanies the Special Master's Revised Proposed Sale Procedures Order, on the other hand, is seriously flawed. As suggested by the Court, the revised engagement letter largely removes the link between Evercore's

Case 1:17-mc-00151-LPS   Document 2637-1   Filed 01/29/26   Page 53 of 82 PageID #:
74020
Case 1:17-mc-00151-LPS   Document 456   Filed 04/11/22   Page 4 of 9 PageID #: 12012

compensation and the implied value of the PDVH Shares, instead tying the bulk of Evercore's
compensation to the occurrence of a Sale Transaction.  In so doing, however, the proposed
engagement terms overcompensate Evercore.  In particular, the Revised Proposed Evercore
Engagement Letter rewards Evercore with a Milestone Fee that is earned upon receipt of *any* third-
party Non-Binding Indication of Interest, regardless of whether such indication ultimately results
in a bid at the auction of the PDVH Shares and without regard to the dollar amount the Non-
Binding Indication of Interest offers for the PDVH Shares.  Similarly, the Revised Proposed
Evercore Engagement Letter provides a windfall payment to Evercore if a Crystallex credit bid is
the winning bid for the PDVH Shares in a competitive auction.  Accordingly, the Court should
either modify the terms of the Revised Proposed Evercore Engagement Letter or authorize the
Special Master to retain Evercore on the terms set forth in the earlier Evercore Engagement Letter,
which terms the Special Master, Evercore and Crystallex remain prepared to accept.

**ARGUMENT**

**I.     This Court Should Accept The Revised Proposed Sale Procedures Order**

As this Court is well aware, the PDVH Shares are to be sold at public auction to the highest
bidder, with only so many shares being sold as necessary to satisfy Crystallex's judgment.  *See* 8
*Del. C.* § 324.  In the context of this public sale, the process should provide notice sufficient to
generate interest from prospective bidders and thereby maximize value within the circumstances
of a statutory forced sale.  *See Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 557 (Del. 1995);
*accord* D.I. 256 at 92:2–6 (ordering that the sale process be designed to "try to get the maximum
price under the circumstances").  The Venezuela Parties should be permitted to supplement the
notice provided by the Special Master or the Court, D.I. 234 at 35, Crystallex must be permitted
to credit bid, and the priority of Crystallex's attachment must be preserved.  *Id.*  The Revised
Proposed Sale Procedures Order now satisfies all of these requirements.

In addition, and notwithstanding the inevitable objections of the Venezuela Parties and others, in establishing a Six-Month Window for the Special Master to attempt to obtain further OFAC guidance, the Revised Proposed Sale Procedures Order strikes an appropriate balance by giving OFAC an opportunity to provide potentially valuable input on the proposed sale process without giving OFAC the ability to veto the initiation of the sale process. It is Crystallex's hope that the Special Master declines to use the full period "of no more than six months the from the order's entry", D.I. 443 at 40, that this Court has authorized to obtain any additional guidance from OFAC. And Crystallex firmly believes that the only proper outcome after the end of the Six-Month Window is the immediate initiation of the sale process. In all events, Crystallex respectfully requests that this Court deny any further objections to the sale process or the Revised Proposed Sale Procedures Order, so that this action can continue towards its long overdue completion.[2]

## II.    The Revised Proposed Evercore Engagement Letter Should Be Rejected

While the Special Master's efforts to craft an acceptable sale procedures order have been largely successful, the Revised Proposed Evercore Engagement Letter represents a significant step back from the Special Master's and Evercore's prior proposal—a proposal that, subject to certain modifications addressed at the November 8, 2021 hearing, Crystallex had accepted. In particular, Crystallex takes issue with two changes to Evercore's compensation. First, Crystallex objects to the new Milestone Fee that Evercore would receive if any third party offers a Non-Binding

---

[2] For the avoidance of doubt, Crystallex's position on the Revised Proposed Sale Procedure Order is not intended to waive or otherwise limit its right to object to any bid selected by the Special Master that does not satisfy Crystallex's judgment to the fullest extent possible. *See generally* Crystallex International Corporation's Objections to the Special Master's Proposed Sale Procedures, D.I. 316, Section II.B (addressing Crystallex's concerns that the proposed sale procedures could be interpreted to favor bids that assign a high implied value to the PDVH Shares with providing sufficient cash consideration in satisfaction of Crystallex's judgment). Similarly, Crystallex reserves its right to challenge any future recommendation that no bidder should be selected as the winner of the auction of the PDVH Shares. *See id.*, Section II.A.

Indication of Interest in participating in the auction. Second, Crystallex objects to the revised Completion Fee to the extent that it overcompensates Evercore if a Crystallex credit bid of more than $500 million but less than Crystallex's entire judgment is the winning bid.

The new Milestone Fee is particularly concerning. As proposed, the Revised Proposed Evercore Engagement Letter provides that Evercore will be paid a $1.5 million Milestone Fee— on top of the $200,000 fee that Evercore will earn each month of the engagement and on top of the multi-million dollar Completion Fee that Evercore will earn when the PDVH Shares are sold—if any third-party offers a Non-Binding Indication of Interest. This Milestone Fee is awarded regardless of whether the third-party submits a binding bid in the auction. Even more disturbing, the Milestone Fee is awarded without regard to the Non-Binding Indication of Interest's proposed purchase price for the PDVH Shares. To put this provision in perspective, if a third party submits a Non-Binding Indication of Interest suggesting that it might bid an amount that would reduce Crystallex's judgment by a single dollar, Evercore is entitled to a $1.5 million fee. That outcome may be unlikely, but the same result occurs if a third-party indicates a willingness to bid $200 million for the PDVH Shares—a not insubstantial figure, but still lower than the credit bid that Crystallex has already suggested it will offer. There is no basis for rewarding Evercore just because a third party says it might bid at the auction, particularly at amounts less than the amount of Crystallex's anticipated credit bid for the PDVH Shares.

Crystallex accepts that some form of Milestone Fee could further incentivize Evercore to bring third parties to the auction. For that reason, Crystallex proposed an alternative Milestone Fee triggered by Evercore securing a Non-Binding Indication of Interest in excess of Crystallex's outstanding judgment—even if that Non-Binding Indication of Interest did not ultimately result in the submission of a binding bid at the auction. Such a fee would still incentivize Evercore, but it

would avoid rewarding Evercore for the questionable achievement of procuring a Non-Binding Indication of Interest that leaves Crystallex's judgment unsatisfied.

Crystallex also objects to the revised Completion Fee earned upon completion of a sale of the PDVH Shares. In particular, Crystallex objects to the new fixed $15 million Completion Fee that applies to any winning Crystallex credit bid in excess of the $500 million Credit Bid Threshold.[3] Under the previous proposal, the Special Master, Evercore and Crystallex agreed that the amount Evercore would receive in the event of a Crystallex credit bid in excess of $500 million would be tied to the amount of the credit bid, similar to the way the Completion Fee paid in the event of a winning Crystallex credit bid of less than $500 million is tied to the amount of Crystallex's credit bid. D.I. 411-2, Ex. 3 at 3. There is no reason for changing that arrangement now.

In objecting to the Special Master's prior proposal, the Venezuela Parties argued that Evercore suffered from a fatal conflict of interest. According to the Venezuela Parties, if the Completion Fee was calculated as a percentage of the sale price, then Evercore might advocate for the sale of all the PDVH Shares, even if a partial sale would satisfy Crystallex's judgment, because the larger sale would generate a higher fee. *See* D.I. 317 at 16-18. While the Court rejected the claim that Evercore was conflicted as a result of its work on the design of the proposed sale process, the Court nonetheless instructed that a different fee structure could eliminate any perceived issue entirely. D.I. 443 at 11. With that guidance, the Special Master and Evercore negotiated new

---

[3] Crystallex cannot fully compare the proposed fees under the previous proposed Evercore engagement letter with the updated fee set forth in the Revised Proposed Evercore Engagement Letter because the prior fee was calculated as a percentage of "Aggregate Consideration," the determination of which required certain financial information that Crystallex does not currently possess. However, Crystallex believes, based on the information it does have, that the revised Completion Fee increases Evercore's likely compensation in the event that Crystallex, as opposed to a third party, is the winning bidder at the auction of the PDVH Shares.

Case 1:17-mc-00151-LPS    Document 2637-1    Filed 01/29/26    Page 57 of 82 PageID #:
74024
Case 1:17-mc-00151-LPS    Document 456    Filed 04/11/22    Page 8 of 9 PageID #: 12016

proposed engagement terms, including the payment of a set fee upon the close of most any Sale Transaction. But the new proposal goes too far.

Whatever the merits of eliminating future arguments that Evercore advocated on behalf of a particular bid for its own benefit, that possibility simply does not arise if the winning bid is a Crystallex credit bid. By definition any such bid will be for less than, or at least no more than, the amount of Crystallex's judgment. Such a bid can only win if there is no alternative bid—partial or otherwise—that would "be sufficient to satisfy the [judgment]." 8 *Del. C.* § 324(a). Moreover, as an increase in Crystallex's credit bid beyond the $500 million Credit Bid Threshold likely will come as the result of a competitive bidding process, a sale fee that incentivizes the creation of robust third-party bidding benefits Venezuela by reducing the amount of Crystallex's judgment that might remain outstanding after the completion of the sale of the PDVH Shares. A Completion Fee for a winning credit bid of more than $500 million, but less than the amount of its judgment, of $10 million, plus 1% of the amount of the credit bid in excess of the Credit Bid Threshold, up to a total Completion Fee of $15 million, should be more than sufficient to incentivize Evercore.

Alternatively, Crystallex requests the Court authorize the Special Master to retain Evercore under the terms of the earlier proposed Evercore Engagement Letter, a result which Crystallex understands the Special Master, Evercore and ConocoPhillips are all prepared to accept.

## CONCLUSION

For the reasons set forth above, Crystallex respectfully requests that this Court enter the Revised Proposed Sale Procedures Order and authorize an engagement letter with Evercore consistent with the revised Milestone Fee and Completion Fee provisions detailed herein.

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated:  April 11, 2022

/s/ Jeffrey L. Moyer
Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*

Exhibit H Docket Excerpts -456_512 (1_15-cv-00912-LPS)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------

CRYSTALLEX INTERNATIONAL CORP.,   )
)
       Plaintiff,       )
)
      v.          )     Misc. No. 17-151-LPS
)
BOLIVARIAN REPUBLIC OF VENEZUELA,   )
)
       Defendant.     )

------------------------------------------------------------

## SPECIAL MASTER'S OPPOSITION TO
## VENEZUELA PARTIES' MOTION TO DISQUALIFY THE SPECIAL MASTER

The Special Master hereby submits his Opposition to *PDVSA, PDVH, and Citgo's Motion to Disqualify the Special Master* (D.I. 509) (the "**Motion**").[1]

### PRELIMINARY STATEMENT

The Venezuela Parties' Motion to Disqualify the Special Master is just the latest turn in the Venezuela Parties' years-long effort to delay the court-authorized sale of PDVSA's shares in PDVH. The ultimate aim of these efforts, it appears, is to avoid paying the lawful judgments entered against the Republic and its instrumentalities. At bottom, the Venezuela Parties ask the Court to disqualify the Special Master not for engaging in any conduct that could reasonably be characterized as improper, but rather for merely complying with an order of the Court itself.

The Venezuela Parties readily admit that the Court "has already effectively rejected this objection" by denying their Motion for an Order Directing the Special Master to Permit Counsel's Attendance at Meetings with the United States Government (D.I. 499) (the "**January 9 Motion**")

---

[1] Capitalized terms used and not otherwise defined herein shall bear the meanings ascribed to such terms by the Sale Procedures Order (D.I. 481). Because the Bolivarian Republic of Venezuela submitted a Joinder to the Motion (D.I. 511), this Opposition refers to the Motion as the Venezuela Parties' Motion.

and allowing the Special Master's *ex parte* meeting with the U.S. Government to proceed.  Motion at 1.  Nevertheless, the Venezuela Parties persist with their Motion, knowing full well that the claims raised therein—much like the claims that the Venezuela Parties raised in the January 9 Motion—have already been considered and rejected by the Court.  Having already thoroughly considered and resolved these issues in the Special Master's favor, there is no legitimate reason for the Court to have to revisit these issues now.

For this reason and others set forth below, the Venezuela Parties' Motion is wholly unconvincing and should be denied.

*First*, the Court expressly authorized the Special Master to engage in *ex parte* communications with the U.S. Government over the Venezuela Parties' objection.  In instances where the engagement with the Sale Process Parties is necessary to protect their rights, the Court has made it clear that the Special Master needs to consult with the Sale Process Parties.  *See, e.g.*, Sale Procedures Order ¶ 4 (providing that "the Sale Process Parties and their advisors shall be consulted as to the identity of, and the scope of inquiry to, any such potential bidders").  Yet the Sale Procedures Order is silent about the need to consult the Sale Process Parties regarding the conversations with the U.S. Government, and the Special Master, by meeting with representatives of the U.S. Government *ex parte*, merely complied with the Court's orders.  Accordingly, the Motion is nothing more than a retread of the same arguments that the Court considered and rejected in connection with the January 9 Motion.

*Second*, even if the Court had not already considered and rejected the Venezuela Parties' position, it should do so now because the Special Master's *ex parte* communications were entirely proper and lawful.  Contrary to the Venezuela Parties' assertion that the Special Master "must be disqualified due to his January 12 meeting with OFAC," Motion at 2, the Federal Rules of Civil

Procedure indisputably authorize courts to permit special masters to engage in *ex parte* communications. The Court's exercise of that lawful authority—and the Special Master's compliance with it—is not a valid basis for disqualification.

*Third*, the Venezuela Parties' arguments, if accepted, would require not only disqualification of the Special Master, but also would bar the Court from appointing any special master to implement the sale process. According to the Venezuela Parties, "[w]hether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings." Motion at 6. To be clear, pursuant to the Sale Procedures Order, the Special Master's engagement with the U.S. Government is expressly *not* an initiation of the sale process— it is an authorized exercise of the Special Master's duties. *See* Sale Procedures Order ¶ 4. Therefore, if the Special Master is not permitted to take steps clearly authorized by the Court, then the Venezuela Parties' complaints of disqualifying partiality would apply not only to the Special Master's *ex parte* meeting with the U.S. Government, but also to *any action* taken by the Special Master (and, for that matter, the Court) in furtherance of the sale process. Such result is contrary to the Court's prior orders authorizing the sale process and directing the Special Master to execute it and, if accepted, would frustrate enforcement of the Court's judgment.

*Fourth*, the Venezuela Parties' apparent belief that Courts (and special masters acting on their behalf) must remain neutral with respect to the enforcement of their own judgments is incorrect as a matter of law. The Court has the inherent power to enforce its own judgments and to issue such orders as are necessary to make its judgments effective. The Court's appointment of the Special Master to conduct the sale process was a valid exercise of that power, and the Special Master's actions in furtherance of the sale process—including his *ex parte* meeting with the U.S. Government —are in no way disqualifying.

*Fifth*, the Venezuela Parties have failed to meet their heavy burden of demonstrating disqualifying partiality under any of the authorities they cite.

*Finally*, the Motion is untimely.    The Venezuela Parties have shown substantial and strategic delay with respect to both the instant Motion and the January 9 Motion.    The Court should recognize the Venezuela Parties' tactics for what they are and exercise its discretion to deny the Motion as untimely.

## FACTUAL BACKGROUND

In 2016, Crystallex won a foreign arbitration award against the Republic in the amount of $1.202 billion.    *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 107 (D.D.C. 2017).    Crystallex subsequently petitioned the District Court for the District of Columbia to confirm the arbitral award.    *Id.* at 108.    The district court entered a judgment granting Crystallex's petition and denying the Republic's motion to vacate the award, *id.* at 123, which was affirmed on appeal, 760 F. App'x 1, 2 (D.C. Cir. Feb. 14, 2019) (per curiam).

Crystallex registered the district court's judgment with this Court and moved for a writ of attachment *fieri facias*, seeking to attach shares of PDVH owned by PDVSA to satisfy its judgment.    *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 386-87 (D. Del. 2018).    Finding that PDVSA is an alter ego of the Republic and that PDVSA's shares in PDVH were property of the Republic available to satisfy Crystallex's judgment, the Court entered an order authorizing issuance of the writ, and formally issued the writ on August 23, 2018.    Memorandum Order (D.I. 95).    That judgment was also affirmed on appeal, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019), and the Supreme Court denied the Republic's petition for certiorari, 140 S. Ct. 2762 (2020).

4

Crystallex moved for an order establishing procedures for the execution sale of PDVSA's shares of PDVH. (D.I. 181). The Court granted that motion in part and stated its intention to "appoint a special master to oversee the day-to-day and detailed implementation of the sale procedures." Opinion at 34 (D.I. 234). In so doing, the Court noted that "[t]he parties agree that the Court can appoint a special master, who will have the time and expertise to fulfill the Court's and the U.S. Marshal's duties to prepare for and conduct the sale." *Id.* at 35; *see* Answering Br. of the Venezuela Parties Regarding Potential Future Procedures at 10 (D.I. 196) (recognizing the Court's "discretion to design a process (including who manages the sale) that comports with Delaware law's twin commands").

On April 13, 2021, the Court appointed Robert B. Pincus as special master "to assist with the sale of PDVSA's shares of PDVH to satisfy Crystallex's judgment." Memorandum Order at 2 (D.I. 258). The Court later expounded on the Special Master's role, explaining that he "shall devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the Sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold." Order Regarding Special Master at 3 (D.I. 277).

Pursuant to that directive, on August 9, 2021, the Special Master submitted a proposed order establishing procedures for the sale of the PDVH shares. (D.I. 302). After several rounds of revision based on input from the parties and the Court, a revised sale procedures order (D.I. 481) (the "**Sale Procedures Order**") was approved by the Court on October 7, 2022.

Pursuant to the Sale Procedures Order, the Court directed the Special Master and his Advisors "[w]ithin the period of six (6) months after the date of this Order . . . [to] solicit and attempt to gain clarity or guidance from [OFAC] of its support for (or non-opposition to), the

5

launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction." Sale Procedures Order ¶ 3. Nothing in the Sale Procedures Order provides that the Sale Process Parties would be permitted to attend the Special Master's discussions with the U.S. Government, *see id.*, and in a status update submitted contemporaneously with the proposed sale procedures, the Special Master confirmed that he "does not intend to include the Venezuela Parties at such meeting," Status Update of October 4, 2022 at 2 n.2 (D.I. 480).

The Special Master and his advisors scheduled a meeting with the U.S. Government for January 12, 2023. On December 30, 2022, the Special Master received a phone call directly from counsel to the Venezuela Parties, who was seeking information concerning the upcoming meeting. The Special Master confirmed that the meeting was scheduled for January 12, 2023. When the Venezuela Parties' counsel asked whether he would be permitted to attend the meeting, the Special Master informed him that he would not.

On January 9, 2023—three days before the meeting with the U.S. Government was scheduled to take place and ten days after receiving a definitive answer from the Special Master— the Venezuela Parties filed the January 9 Motion seeking an order from the Court compelling their attendance at the meeting. (D.I. 499). ConocoPhillips, Crystallex and the Special Master submitted responses. (D.I. 502, 503, 504). On January 11, 2023, the Court issued an order denying the January 9 Motion, explaining that, among other things, the motion "was filed far too late" because "the Court has contemplated for many months that the Special Master would pursue an *ex parte* meeting with representatives of the United States Government, for reasons that are well-known to . . . the Venezuela Parties." Memorandum Order at 1 (D.I. 506). Consistent with the

Court's order, the Special Master and his Advisors met *ex parte* with U.S. Government on January 12, 2023.

The Venezuela Parties subsequently filed the instant Motion to disqualify the Special Master based on that meeting.  (D.I. 509).

## LEGAL STANDARD

"In considering questions of disqualification in situations where a special master's impartiality is called into question, . . . the special master must hold himself to the same high standards applicable to the conduct of judges." *Jenkins v. Sterlacci*, 849 F.2d 627, 632 (D.C. Cir. 1988).  Courts presume that "judicial [and] quasi-judicial officers" are "not biased," and accordingly, "it is the moving party's burden to show bias or some other reason for disqualification." *Cates v. Comm'r of Soc. Sec.*, 752 F. App'x 917, 923 (11th Cir. 2018) (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982)); *see also Proctor v. Engstrom*, 95 F. App'x 192, 194 (8th Cir. 2004) ("[D]istrict judges are presumed impartial and [the] movant bears [a] substantial burden of proving otherwise."); *In re Hawsawi*, 955 F.3d 152, 158 (D.C. Cir. 2020) ("Disqualification is never taken lightly. In the wrong hands, a disqualification motion is a procedural weapon to . . . delay proceedings.").

## ARGUMENT

The Venezuela Parties have not met their "substantial burden" of proving disqualifying partiality. *Proctor*, 95 F. App'x at 194.  For that reason and the others set forth below, the Court should deny the Motion.

**A. The Court expressly authorized the Special Master to engage in *ex parte* communications with the U.S. Government over the Venezuela Parties' objection and therefore has already considered—and rejected—the Motion**

As the Venezuela Parties themselves acknowledge, the Court has already considered and rejected their position on the merits. The Venezuela Parties openly concede at the outset of their Motion that "the Court has already effectively rejected this objection in denying their Motion for an Order Directing the Special Master to Permit Counsel's Attendance at Meetings with the United States Government and Reply in support of the same." Motion at 1. The Special Master agrees.

The sole basis for disqualification cited by the Venezuela Parties in the Motion is the Special Master's *ex parte* meeting with the U.S. Government.[2] The Motion does not attempt to put forward any other evidence of disqualifying partiality. Accordingly, the Motion is nothing more than a rehashing of the same arguments that the Court considered—and rejected—in ruling on the January 9 Motion. Further, given that the Sale Procedures Order did not require the Special Master to include the Venezuela Parties in discussions with the U.S. Government while requiring consultation with the Venezuela Parties (and other Sale Process Parties) in other contexts, *see* Sale Procedures Order ¶¶ 3-4, the Motion effectively attempts to relitigate not only the January 9 Motion, but the Sale Procedures Order itself. The Court should not countenance the Venezuela Parties' attempt to take a second bite of the apple, which is emblematic of the obstructionist tactics that the Venezuela Parties have deployed throughout this litigation. Having already considered and rejected the Venezuela Parties' position, there is no reason for the Court to revisit it now. *See, e.g., Gordon v. Monoson*, 239 F. App'x 710, 714 (3d Cir. 2007) (holding that "[b]ecause the

---

[2] The Venezuela Parties make passing reference to their contention that the Special Master's retention of Evercore also "creates a disqualifying appearance of partiality," while acknowledging that the Court "previously rejected [this] argument" as well. Motion at 1 n.2.

District Court had already rejected [movant's] arguments," the court "was not required to consider those arguments anew . . . where no new circumstances had arisen").[3]

### B. The Special Master's *ex parte* meeting with the U.S. Government was entirely proper and lawful

Even if the Court had not already considered and rejected the Venezuela Parties' position, it should do so now because the Special Master's *ex parte* meeting with the U.S. Government was entirely proper and lawful. While the Venezuela Parties assert without qualification that "[e]ngaging in *ex parte* communications is grounds for disqualification under 28 U.S.C. § 455(a) and § 455(b)(1)," it simply is not the case that *ex parte* communications—regardless of the nature, extent, or context of such communications—warrant disqualification. As the Special Master explained in his response to the January 9 Motion, Federal Rule of Civil Procedure 53 expressly authorizes courts to dictate "the circumstances, if any, in which the master may communicate ex parte with the court or a party." Fed. R. Civ. P. 53(b)(2)(B). The Court's authorization of the Special Master's *ex parte* communications with the U.S. Government fell squarely within the scope of that authority.[4] Although the Venezuela Parties have argued that the authority provided by Rule 53(b)(2)(B) is limited only to "*ex parte* communications with *the court or a party*," January 9 Motion at 4-5, that hyper-literal reading of the Rule defies logic and is inconsistent with

---

[3] To the extent that the Venezuela Parties argue that the occurrence of the Special Master's *ex parte* meeting with the U.S. Government provides grounds for the Court to reconsider their previously rejected arguments, *see* Motion at 1, the Court should reject that position. The January 9 Motion objected to the *ex parte* meeting. The occurrence of the very meeting that the Venezuela Parties already unsuccessfully objected to is not a "new circumstance[]" warranting reconsideration of previously raised (and rejected) arguments. *Monoson*, 239 F. App'x at 714.

[4] It bears repeating here that the Federal Rules of Civil Procedure are law. *See* 28 U.S.C. § 2072(a). The Venezuela Parties' strained interpretation of 28 U.S.C. §§ 455(a) and 455(b)(1) as even prohibiting *ex parte* communications otherwise authorized pursuant to federal law puts those statutes in tension with other provisions of the U.S. Code and provides yet another reason to reject the Venezuela Parties' position.

how Rule 53 is applied in practice. The power to authorize *ex parte* communications with the court or the parties necessarily includes the lesser power to authorize *ex parte* communications with third parties who are not even parties to the litigation.[5] And when the circumstances of the case are such that *ex parte* communications between the Special Master and third parties are critical to the fulfillment of the Special Master's particular duties, courts have exercised that power by permitting such communications.[6]

### C. The Venezuela Parties' arguments, if accepted, would require not only disqualification of the Special Master, but also would bar the Court from appointing any special master to implement the sale process

The Court should deny the Motion because the Venezuela Parties' arguments, if accepted, would require not only disqualification of the Special Master (and possibly the Court itself), but would also prohibit the appointment of any special master to implement the sale process, thus frustrating the Court's judgment. Although the Venezuela Parties' purport to be concerned by the Special Master's "advocacy," it is clear that the ultimate basis of the Venezuela Parties' complaint is the sale process itself. *See* Motion at 6 ("Whether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings."); *id.* at 9 ("Crystallex's attempt to enforce its judgment by moving forward with the sale process at this time is a hotly

---

[5] *See* Crystallex Response to January 9 Motion (D.I. 504) at 3.

[6] *See, e.g., Thompson v. Enomoto*, 815 F.2d 1323, 1326 n.7 (9th Cir. 1987) (discussing district court's order authorizing special master "[t]o interview, on a confidential basis or otherwise, any person, including any correctional staff member or inmate, affected by the Consent Decree"); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 539 (9th Cir. 1987) (discussing district court's order authorizing special master to "interview, on a confidential basis or otherwise, any . . . director, supervisor, or team member, or any person assisting in the implementation of the . . . program"); *In re Search Warrant dated Nov. 5, 2021*, 2021 WL 5845146, at *2 (S.D.N.Y. Dec. 8, 2021) (authorizing special master to confer with "additional professionals, support staff, or expert consultants"); *Maine People's All. v. Holtrachem Mfg. Co.*, 2009 WL 1844990, at *4-5 (D. Maine June 25, 2009) (denying motion "to prevent [special masters] from freely gathering relevant information from outside sources not subject to any Court Order on *ex parte* contacts").

disputed issue in this case."). But the satisfaction of Crystallex's judgment through the sale of PDVSA's shares of PDVH is *not* a disputed matter. The Court retained the Special Master to design the process for selling the PDVH shares or to devise a different transaction to satisfy the judgments. *See* Sale Procedures Order ¶ 2; Order Regarding Special Master at 3 (D.I. 277). There may only be a dispute as to the date of the launch. *See* Sale Procedures Order ¶ 3 ("The Court shall consider the Supplemental Report, all Launch Date Objections thereto, and any responses, after which the Court shall make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC.").

If the Special Master cannot take such steps as are needed to inform the court about when to launch the sale process, then the Special Master plainly cannot carry out his mandate. *See* Memorandum Order at 2 (D.I. 258) (appointing the Special Master "to assist with the sale of PDVSA's shares of PDVH to satisfy Crystallex's judgment"); Order Regarding Special Master at 3 (D.I. 277) (directing the Special Master to "devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex . . . while maximizing the sale price of any assets to be sold"). By the same token, every allegation of partiality that the Venezuela Parties make with regard to the Special Master's *ex parte* meeting with the U.S. Government could just as easily be said of anything done by the Special Master in furtherance of the sale process, as well as the Court's appointment of the Special Master to implement the sale process in the first instance. The consequence of the Venezuela Parties' arguments, if taken seriously, is that the Special Master cannot assist in the execution of the Court's judgment, which clearly must not be the proper outcome.

**D.  The Motion's underlying premise that judicial officers may not advocate for the enforcement of judgments is incorrect as a matter of law**

The Court should deny the Motion because its foundational premise is incorrect as a matter of law.  The Venezuela Parties argue that there is no "exception for the prohibition on judicial advocacy for situations in which a Court is advocating for the enforcement of orders or judgments that it has issued" and accordingly conclude that "the Special Master must be disqualified because he has acted as an advocate."  Motion at 9-11 (capitalization altered).  But the Special Master's "advocacy" in this context, as the Court has observed, is only "for the enforcement of the Court's orders, consistent with his previous efforts . . . and as the Court expressly contemplated and authorized him to do in aid of allowing the Court to fulfill its judicial duties."  Memorandum Order at 2 n.2 (D.I. 506).  The Special Master's efforts in this regard are indisputably legitimate, as any actions taken by the Special Master in aid of execution are derivative of the Court's own "inherent power to enforce its judgments."  *Peacock v. Thomas*, 516 U.S. 349, 356 (1996).  Indeed, it is black-letter law that "[t]he jurisdiction of a court is not exhausted by the rendition of judgment, but continues until that judgment shall be satisfied."  *Cent. of Ga. R.R. Co. v. United States*, 410 F. Supp. 354, 357 (D.D.C. 1976) (quoting *Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166 (1867)).  As a consequence, "the court rendering judgment has [the] inherent power to enforce it and to make such orders and issue such process as may be necessary to make it effective."  *Abbot Labs. v. Novopharm Ltd.*, 104 F.3d 1305, 1309 (Fed. Cir. 1997).  The Special Master's efforts to enforce the Court's judgment—including by meeting *ex parte* with representatives of the U.S. Government—are therefore not disqualifying acts of judicial advocacy, but rather are acts in furtherance of the Court's own inherent powers.  The Venezuela Parties' apparent belief that the Special Master must sit on the sidelines while the Court's judgment goes unexecuted for

years on end subverts these well-established principles and the power of the Court to enforce its judgment.

### E. The Venezuela Parties have failed to meet their substantial burden of establishing disqualifying partiality

The Court should deny the Motion because the Venezuela Parties have failed to meet their substantial burden of establishing disqualifying partiality. The Venezuela Parties' arguments for disqualification boil down to three simple points, none of which meet the substantial burden. First, the Venezuela Parties argue that the Special Master's *ex parte* communications themselves are "grounds for disqualification under 28 U.S.C. § 455(a) and § 455(b)(1)."[7] Motion at 6. As noted above, *ex parte* communications do not automatically constitute grounds for disqualification, and cannot provide grounds for disqualification where, as here, the communications were authorized by the Court pursuant to its lawful authority. To hold otherwise would, in effect, disqualify the Special Master merely for complying with an order of the Court. But as the Supreme Court has explained, "judicial rulings"—and, by extension, compliance with judicial rulings—"almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Rather, "[a]lmost invariably, they are proper grounds for appeal, not recusal" and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" for recusal. *Id.* The Venezuela Parties have not shown that the Special Master's conduct falls within the "rarest circumstances"—or even conduct in its vicinity—required to justify disqualification in this context.

---

[7] 28 U.S.C. § 455(a) provides that a judicial officer "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(b)(1) provides that a judicial officer "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

The Venezuela Parties next argue that the Special Master's *ex parte* communications require disqualification under 28 U.S.C. § 455(b)(1) because those communications "have given him 'personal knowledge of disputed evidentiary facts concerning the proceeding.'" Motion at 2-3 (quoting 28 U.S.C. § 455(b)(1)). Here, the Venezuela Parties allege that the relevant "disputed evidentiary facts" that the Special Master supposedly obtained "personal knowledge of" are the U.S. Government's position on the launch of the sale process and whether it will issue a license in connection therewith. *See id.* at 7. But the U.S. Government's policy positions towards the sale process are obviously not "disputed evidentiary facts" of the kind captured by § 455(b)(1). The parties have not litigated, and will not litigate, the issue of whether the U.S. Government supports the sale process. Ultimately, the U.S. Government may decide to support the sale of PDVSA's shares in PDVH or not. Moreover, "[k]nowledge gained from [a judicial officer's] discharge of his judicial function is not a ground for disqualification under 28 U.S.C. § 455(b)(1)." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 447-48 (2d Cir. 2005). Here, to the extent the Special Master obtained any knowledge, it was "solely from his judicial duty" to meet with the U.S. Government pursuant to the Sale Procedures Order. *Id.* Such knowledge, to the extent it exists, therefore cannot support his disqualification as a matter of law. *See Ndoromo v. Barr*, 486 F. Supp. 3d 388, 394 (D.D.C. 2020) ("[F]acts learned by a judge in his judicial capacity cannot be the basis for disqualification.") (quoting *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976)); *see also Omega*, 432 F.3d at 447-48 (declining to recuse magistrate judge who had personal knowledge of settlement agreement based on judicial duty to oversee settlement conference).

Even if the U.S. Government's position on the sale process were a "disputed evidentiary fact" for the purposes of § 455(b)(1), disqualification on that basis would still be unwarranted because the Special Master will disclose such facts to the parties and the Court in the Supplemental

Report, or it may be that the U.S. Government elects to make its own position clear directly, through a public release or filing with this Court. *See* Sale Procedures Order ¶ 3. To the extent that the Venezuela Parties are concerned that the Special Master might misrepresent the U.S. Government's views, that concern is baseless because the U.S. Government is free to clarify its position on the sale process at any time, or to decline to issue a license in connection with the sale. The Venezuela Parties therefore cannot show any prejudice resulting from the Special Master's knowledge of the U.S. Government's position, even if such knowledge fell within the ambit of § 455(b)(1).

Finally, the Venezuela Parties argue that the Special Master must be disqualified pursuant to 28 U.S.C. § 455(a) and the Due Process Clause of the Fifth Amendment to the U.S. Constitution because he advocated in support of a particular position. *See* Motion at 9-12. As explained above, the Special Master's "advocacy"—if carrying out an order amounts to advocacy at all—in this context is only advocacy for enforcement of the Court's judgment, which is entirely legitimate and not a basis for disqualification. Notwithstanding that it has not occurred, any advocacy for or against the pecuniary interest of a Sale Process Party, to the detriment of another, would be moot— the Court has already decided those substantive issues. The Special Master concerns himself only with execution of his duties and enforcement of the Court's judgment, pursuant to the express authority granted to him by the Court in its various orders entered to date.

Accordingly, each of the Venezuela Parties' arguments for disqualification of the Special Master fails, and the Venezuela Parties have failed to meet their substantial burden of demonstrating disqualifying partiality.[8]

---

[8] The Venezuela Parties' arguments under the Canons 2 and 3 of the Code of Conduct for United States Judges are duplicative of their statutory and constitutional arguments and need not be addressed separately.

**F. The Motion is untimely and the Venezuela Parties have shown substantial and strategic delay with respect to both the instant Motion and the January 9 Motion**

Motions for disqualification "must be brought 'at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such claim.'" *Omega*, 432 F.3d at 448. Rather than file the Motion at the "earliest possible moment," the Venezuela Parties have shown substantial and strategic delay. *Id.* The Court should accordingly deny the motion as untimely.

As the Venezuela Parties acknowledge, the Third Circuit has held that courts may consider the timeliness of a disqualification motion in deciding whether to grant it. *See* Motion at 8-9; *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3d Cir. 2004). Considerations of timeliness are important when assessing disqualification motions because, as the Third Circuit explained in *Kensington*, "the judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Kensington*, 368 F.3d at 312. While the Motion devotes considerable space to defending the timeliness of the Venezuela Parties' request for disqualification, the Venezuela Parties' protestations on this front do not withstand even the slightest scrutiny.

It is not disputed that the Sale Procedures Order, for months before it was formally entered in October 2022, contemplated that the Special Master would solicit the U.S. Government's views on the sale process within the six-month period following entry of the Sale Procedures Order. Nothing in the Sale Procedures Order suggested or even implied that any of the Sale Process Parties would be permitted to attend the Special Master's discussions with the U.S. Government, and the Special Master made clear in the status report filed contemporaneously with the final proposed sale procedures that he "does not intend to include the Venezuela Parties at such meeting." Status Report of October 4, 2022 at 2 n.2. (D.I. 480). Thus, when the Special Master filed the Status

Report of October 4, 2022 (if not before), the Venezuela Parties knew that the Special Master planned to conduct an *ex parte* meeting with the U.S. Government relating to the sale process within the next six months. At any time from that point forward, the Venezuela Parties could have filed a motion or letter with the Court requesting that the Court mandate their attendance at the meeting. Yet the Venezuela Parties instead waited nearly three months to take such action—a fact that is difficult to square with the Venezuela Parties' professed belief that any such *ex parte* meeting would so severely prejudice their rights as to require disqualification.

By waiting until just three days before the long-planned *ex parte* meeting was scheduled to occur to file the January 9 Motion, and then waiting until after the meeting had already transpired to seek disqualification of the Special Master, the Venezuela Parties have shown inexcusable delay. If the Venezuela Parties truly believed that an *ex parte* meeting between the U.S. Government and the Special Master would be disqualifying, the Venezuela Parties should have said so upon entry of the Sale Procedures Order, if not sooner. Instead, the Venezuela Parties waited until the last minute to object to the U.S. Government meeting and now, having lost, seek to disqualify the Special Master based on nothing more than his attendance at that very meeting. This kind of gamesmanship is exactly what the Third Circuit pointed to in explaining why timeliness is a factor that informs whether to grant a disqualification motion, and provides a sufficient basis for denying the Motion. *See Cirba Inc. v. VMware, Inc.*, No. 19-742-LPS, 2022 WL 606655, at *5 (D. Del. Jan. 7, 2022) (holding that party's "concerns about [a special master's] impartiality" were "waived" because the party "substantially delayed" raising those concerns).

Indeed, one need look no further than the Venezuela Parties' prior stance on (and participation in) *ex parte* meetings to conclude that the Motion is a tactic intended to delay the sale process rather than a bona fide expression of concern. As the Venezuela Parties (and the Court)

are aware, January 12, 2023 was not the first time that the Special Master met *ex parte* with the U.S. Government.  The Special Master has had several such meetings—with the knowledge of all of the Sale Process Parties, including the Venezuela Parties.  While the Venezuela Parties desperately try to distinguish these prior *ex parte* meetings from the one they now allege is disqualifying, and even claim that they never consented to *ex parte* communications between the Special Master and the U.S. Government, *see* Motion at 7-8 & n.6, nothing should distract from the fact that the Venezuela Parties never once cited those prior meetings as grounds for disqualification.  Not only that, but the Venezuela Parties have themselves sought to meet *ex parte* with the Special Master on numerous occasions, far beyond the consultation mandated by the Court's orders and certainly with more frequency than the other Sale Process Parties.  Having participated in such extensive *ex parte* communications themselves, the Venezuela Parties should not be heard to disqualify the Special Master on the basis of an *ex parte* meeting with a third party that is not even party to this litigation.

**CONCLUSION**

For the reasons set forth above, the Court should deny the Motion.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Ray C. Schrock, P.C. (Admitted *pro hac vice*)
Alexander W. Welch (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Chase.Bentley@weil.com

Dated:  February 3, 2023

/s/ *Myron T. Steele*
Myron T. Steele (#00002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Abraham Schneider (#6696)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Exhibit I IACHR -MC-139325- Petition on Purge Harms.



**IACHR Individual Petition System Portal**

🏠 Home                     Welcome, lry_garrett  ⚙ My Account |  ✒ Suggestions |  Logout |  ⓘ Help

Precautionary Measures > MC-1393-25                          🔲 Submit Additional Information

## General Information

General information on the matter and its status before the IACHR.

| Precautionary Measure Number | Country | Procedural Stage | Date Received (dd/mm/yyyy) |
|---|---|---|---|
| MC-1393-25 | 🏴 | Under Study | 23/09/2025 |

Victim(s): Leroy Garrett

## Document Information

The procedural steps that appear in the Portal do not constitute all the proceedings before the IACHR. In this regard, the IACHR is currently reviewing the remaining proceedings, with the aim of making them visible in the next stages of implementation of the Portal.

This Portal will only display the documents sent by the IACHR after the Portal's commencement.

In order to facilitate and expedite processes, the IACHR recommends that users send all documents in digital format, through the Portal, so that they may be displayed through this tool. The documents received by other means, such as email, fax or mail, will not be visible in the Portal for the moment.

For definitions of the procedural stages, click here.

IMPORTANT: This Portal is intended as a tool for transmitting documents and as such does not necessarily contain all the actions before the IACHR. The IACHR reminds users that it is their responsibility to keep their own files and records. This is a tool of the IACHR and it not part of the legal process itself; therefore, the IACHR reserves the right to make any changes in content, structure, and rules for management of and access to the Portal, without prior notification.

NEW: The steps and procedural stages appear in chronological order, with the attachments displayed only for the most recent step. To see the attachments of previous steps/letters, please click on the arrow on the left side of the "Outgoing Correspondence".

🔄 Report Discrepancy                          Document status information 🖶

Refresh

| | | Number | Document Type | Delivery Date (dd/mm/yyyy) | Status |
|---|---|---|---|---|---|
| Procedural Stage: UNDER STUDY | | | | | |
| Step: Provisionally registered | | | | | |
| | | | There is no document associated with this step. | 23/09/2025 | |

🔤 Contact Us

© Copyright 2026 OAS    Employment and Internships    Scholarships    Procurement    Protocol

Terms & Conditions    Contact Us    Access to Information    Directory

Exhibit J QSF Proposal as Transactional Remedy

## Exhibit A: Scope of Work for Proposed Qualified Settlement Fund.

**Scope of Work: Operational Framework for QSF – Petroleum Holocaust Mass Tort Claims**

1. **Setup Phase (30 Days Post-Filing):**

   • Petition for QSF order; deposit initial seed from auction escrow (amount TBD by commission   to maximize victim funds).

   • Appoint trustee (e.g., Rust Consulting) and administrator (Epiq Systems).

   • Budget: Initial allocation for setup/notice, capped to preserve claimant funds.

2. **Notice & Claims Intake Phase (90 Days Post-Approval):**

   • Multilingual notice (English/Spanish) via global media, NGOs (e.g., Venezuelan American Caucus), consulates, X platform.

   • Online portal/PoA-submission (see Exhibit B); vetting via affidavits/epidemiological models.

   • Target: 80% claimant participation; opt-out deadline 60 days pre-distribution.

3. **Evaluation & Distribution Phase (180 Days Post-Intake):**

   • PSC/subclasses assess claims; apply tiered pro-rata model (*Ortiz* formula: injury severity x fund share) prioritizing severe harms (e.g., fired workers, health impacts, property confiscation per *Republic of Hungary v. Simon*, 141 S. Ct. 691 (2020)).

   • Model ~$3.5M per-victim installments over 10–20 years, funded by Citgo proceeds + successor endowment (e.g., 1–2% Citgo revenues, ~$200M–$400M/year, per *Holocaust Assets*).

   • Commission to assess feasibility, including bidder negotiations and OFAC license (VENEZUELA-EO13850-2025-1395693-1). In observance of Dr. Garrett's docketed motion to intervene in S.D.N.Y. Case No. 19-cv-10023-KPF (Judge Failla), the QSF creation process must ensures coordination on bond validation effects.

- Fluid recovery: Redistribute unclaimed funds; cy pres to Venezuelan health NGOs.

- Monitoring: 10-year window for latent claims.

4. **Oversight & Reporting**:

- Quarterly reports to Court/Special Master; fees capped at 10–15% (Rule 23(h)).

- Wind-down: Full distribution within 3 years, extendable for installments.

**Estimated Impact**: Pro-rata shares targeting ~$3.5M lifetime per-victim recovery, supplemented by endowment and OFAC assets.

Exhibit K Third Circuit Order Granting Late Rehearing Petition (25-2519, Doc. 43, Jan 22, 2026)

<u>UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT</u>

C.A. No. <u>25-2519</u>

CRYSTALLEX INTERNATIONAL CORPORATION

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

LEROY A. GARRETT,
Appellant

(D. Del. Civ. No. 1:17-mc-00151)

Present: SHWARTZ, <u>Circuit Judge</u>

1. Motion filed by Appellant Doctor Leroy A. Garrett to file petition for rehearing
   out of time under FRAP 26(b).

Respectfully,

Clerk/lmr

_____ORDER_____

The motion filed by Appellant Doctor Leroy A. Garrett to file petition for rehearing out
of time under FRAP 26(b) is granted.

By the Court,

<u>s/Patty Shwartz</u>
Circuit Judge

Dated: January 22, 2026
Lmr/cc: Leroy A. Garrett
All Counsel of Record