# EXHIBIT A



224 South Michigan Avenue
Suite 1100
Chicago, Illinois 60604
Tel 312 660 7600   Fax 312 692 1718

Nathan P. Eimer

(312) 660-7601
neimer@eimerstahl.com

April 27, 2026

**_Via Email_**

Chase A. Bentley
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
Chase.Bentley@weil.com

     Re: Crystallex International Corp. v. Bolivarian Republic of Venezuela, D. Del. No.
       1:17-mc-00151-LPS

Dear Chase:

    I write on behalf of PDVH and CITGO





April 27, 2026
Page 2

Related to the Special Master's concern with party compliance under the Court's orders and applicable agreements, you undoubtedly are aware of the Wall Street Journal op-ed by Greg Goff and Paul Foster, Amber's CEO and Chairman, respectively. Greg Goff & Paul Foster, *The Treasury Can Set Citgo Free*, Wall St. J. (Apr. 23, 2026), https://www.wsj.com/opinion/the-treasury-can-set-citgo-free-e19da14a.

The op-ed publicly reveals, and then defamatorily mischaracterizes, material, non-public, proprietary, and competitively sensitive information Amber obtained from CITGO, in clear violation of the Confidentiality Agreement and Clean Team Addendum signed by Elliott Investment Management in 2024 (together, the "NDA").[1] The disclosures made in the Wall Street Journal op-ed include highly competitively sensitive information about CITGO's strategic projects and analyses from CITGO's management presentations, Medium Term Plans and plans presented to Amber at their visits to the CITGO refineries in January and February of 2026, including a plan to expand production at the Corpus Christi refinery, an impending project to enable the production of jet fuel at Corpus (which the refinery does not currently produce), and an upgrade at the Lake Charles refinery designed to increase premium gasoline production.[2] These plans, and other ideas, along with projected increases in production quantities derived from CITGO's own analyses, are now in the minds of CITGO's competitors. Goff and Foster shamelessly recast these plans as their own.

Goff and Foster's outrageous, damaging, and unsupported suggestion that CITGO is on the brink of causing "oil spills, explosions, life-threatening injuries or worse" likewise is a shameless distortion of the truth. CITGO's Process Safety metrics (including its refineries, terminals, pipeline operations, and lubricant plants) for both high- and moderate-consequence events were better than industry benchmarks for 2019 to 2024.[3] And on personal safety, CITGO's record bests the industry range.[4]

---

[1] D.I. 2556 at 93 (§ 6.5) (Amber acknowledging in the SPA it is bound by the Confidentiality Agreement between Elliott and the Special Master).

[2] *See, e.g.*, Medium Term Plan 2026–2031, Final Presentation, Jan. 2026 ("2026 MTP"), at 40–42 (DataSite 2.1.13.9); CCR Strategic Plan – Backup Slides, Jan. 22, 2026 at 7 (DataSite 2.1.3.2.1.1.5); 2026 MTP at 44–46.

[3] Process safety performance serves as an indicator of loss of containment of hazardous materials or energy and is arguably the most relevant safety metric in the process industry. AFPM incident classification uses tiered metrics for process safety and personnel injuries based on severity. Tier 1 represents high-consequence, severe, or actual serious releases or injuries (fatalities, hospitalization), while Tier 2 represents moderate-consequence, lower-severity events or high-potential near misses that did not result in major injuries. CITGO's process safety metric for Tier 1 incidents for the 2019-2024 period is 0.048, compared to an industry average 0.065, as reported by AFPM, and its Tier 2 is 0.092 compared to an industry average of 0.159 as reported by AFPM for the same period. CITGO shares best practices through AFPM, where it is an active participant, and CITGO's HSE team brings experience from across the refining sector.

[4] CITGO's average total recordable incident rate (TRIR)—OSHA-recordable injuries and illnesses per 100 full-time employees per year—was 0.24 from 2019 through 2025 (excluding 2020, which was distorted by COVID-related illnesses). The AFPM TRIR average incident rate for 2019 through 2024 was 0.30, where the industry range was 0.30 to 1.10. CITGO's average DART rate (days away, restricted or transferred) over the same period was 0.09, versus an industry average of 0.15; last year's DART rate was 0.17. Performance varies year to year across refiners, and the U.S. industry overall has a strong HSE track record.

**Chicago ● Madison ● Silicon Valley ● San Francisco ● Nashville**



April 27, 2026
Page 3

It seems Amber is now willing to tarnish CITGO's reputation with employees, suppliers, customers, and communities and create doubts about our health, safety, and environmental (HSE) practices in front of U.S. Government agencies to which CITGO reports its environmental and safety results—using misleading characterizations of information Amber promised to keep in confidence—in order to advance its own demand for an OFAC license at all costs.

CITGO has accommodated Amber's demands for increased due diligence on financial updates of the company, capital project scope, economics, plans for large turnarounds, organization, personnel interviews, and compensation and to review CITGO's safety programs, tour its refineries, and meet with its operations and HSE leaders—yet Amber has offered no safety recommendations.

In the Confidentiality Agreement, Elliott "recognize[s] and acknowledge[s] the competitive value and confidential nature of the Confidential Information and the damage that would result to [CITGO] if such information is disclosed." Confidentiality Agreement § 9. There can be no question that Amber knew of its obligations under the NDA, that it gained access to CITGO's confidential information pursuant to the NDA, and that publicly disclosing this information in a national newspaper would violate the NDA's terms.

Further, Section 6.7 of the SPA provides, in relevant part, that the "Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party." We would be surprised and disappointed to learn that the Special Master consented to publication of such highly charged, damaging, and defamatory statements in one of the nation's most widely circulated newspapers—doubly so without first consulting with CITGO, which has been praised by the Court and the Special Master for its adherence to the Court's direction that it cooperate with the Special Master's requests despite CITGO's opposition to the sale process itself.

Amber's misuse of the information it received pursuant to its access rights also violates Sections 6.2 and 6.10 of the SPA. *See* SPA § 6.2(a) (providing that Amber's "access" to CITGO's management, "books and records," "information, assets, operations and properties" and "activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business"); *id.* § 6.10(b)(ii) (stating that "the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not … unreasonably interfere with the ongoing operations of the Acquired Companies"); *see also* SPA § 6.14 ("The restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.").

The Bidding Procedures incorporated into the Sale Procedures Order provide that access to the Virtual Data Room and other due diligence materials may be terminated if a bidder breaches the confidentiality agreement, D.I. 480-1 at 43, and the Confidentiality Agreement

**Chicago • Madison • Silicon Valley • San Francisco • Nashville**

EimerStahl LLP

April 27, 2026
Page 4

provides that, if Amber breaches the agreement, it could "result in irreparable harm to [CITGO] and that money damages may not be a sufficient remedy for any such breach" and that CITGO and the Special Master "shall be entitled to seek equitable relief, including, without limitation, injunction and specific performance, as a remedy for any breach." Confidentiality Agreement § 9. The SPA also permits the Special Master to seek injunctive relief to prevent or restrain any breach of its terms. Please advise within 5 days whether the Special Master plans to seek an injunction from the Court enjoining Amber from further violations of the Confidentiality Agreement, barring Amber from further access to CITGO's confidential information or personnel, and requiring Amber to issue a public retraction of its statements and consent to CITGO's publication of a response. Please also advise within 5 days: (1) whether Amber sought and received the Special Master's approval to publish the article, and if so, why CITGO was not consulted prior to publication; and (2) if the Special Master did not consent, what the Special Master intends to do about Amber's breach of Section 6.7.

CITGO reserves all rights and remedies available to it under NDA, the Sale Order, and otherwise, for Amber's violations and defamatory statements and to protect its business and reputation. CITGO has consistently provided Amber the access and information required under the Sale Order and has gone above and beyond to ensure a seamless transition if the Sale Order is ultimately affirmed and OFAC permits the Amber transaction to proceed. However, CITGO can no longer rely on Amber or its officers and directors to honor their obligations under the NDA, and must assume that Amber and its affiliates will continue to misuse the material, non-public confidential information provided to them in ways that interfere with and damage CITGO's business—including by creating unwarranted anxiety among employees and in the communities in which CITGO operates and by disclosing CITGO's strategic information to competitors. Going forward, until the Court enters an order enjoining or otherwise preventing Amber from further violating the Confidentiality Agreement and interfering with CITGO's business, CITGO will provide Amber nothing beyond what is strictly required under the Sale Order.

Sincerely,

/s/ Nathan P. Eimer

Nathan P. Eimer

cc:
Honorable Leonard P. Stark (via ECF filing)
George M. Garvey (via email)
Donald B. Verrilli (via email)
Juan O. Perla (via email)
Robert A. Profusek (via email)