**PUBLIC VERSION – D.I. 2668**

# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347

_____

(302) 658-9200
(302) 658-3989 FAX

Alexandra M. Cumings

(302) 351-9248
(302) 425-4670 FAX
acumings@morrisnichols.com

May 12, 2026

**_SUBMITTED VIA E-FILE_**                          PUBLIC VERSION

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439

> Re:    *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
>         D. Del. No. 1:17-mc-00151-LPS

Dear Judge Stark:

CITGO and PDVH have again written to the Special Master asking whether he will enforce the SPA and the Confidentiality Agreement, under which CITGO shared material confidential information with Amber with the expectation that those agreements—and the Special Master—would protect it. *See* Ex. A, attached. CITGO and PDVH write now to advise the Court of the steps CITGO and PDVH are taking to again raise the conflict of interest involving the Special Master's counsel, and to request the Court's oversight of that conflict. Weil Gotshal cannot fairly investigate or advise the Special Master regarding alleged violations of the SPA and the Confidentiality Agreement by a company controlled by its client, Elliott. The Special Master's slow response, and his refusal thus far to act on Amber's contractual violations and defamatory op-ed, only deepen the concern about the impartiality of this process.

CITGO and PDVH also write in response to Amber Energy's May 5, 2026 submission (D.I. 2666), which confirms rather than cures the violations at issue. Amber's response makes three main points: that the op-ed reflected only industry knowledge, that similar disclosures appeared in Amber CEO Gregory Goff's declaration filed under seal in the Third Circuit, and that Section 6.7 of the SPA did not require preclearance because the op-ed concerned only post-closing plans. None of these defenses is persuasive. The op-ed did not speak in general terms. It used specific CITGO strategic initiatives, timelines, volumes, and investment themes that Amber learned through confidential materials and management presentations and then recast them publicly as Amber's own plan as part of its effort to obtain OFAC approval.

The Honorable Leonard P. Stark
May 12, 2026
Page 2

## The Op-Ed

As described in detail in the attached declaration of CITGO's Chief Operating Officer, Edgar Rincon (Ex. B), Amber leadership's April 23 op-ed reveals and co-opts CITGO's own confidential strategies and plans, about which it learned from confidential information in the virtual data room and in meetings held with CITGO personnel over the past several months. For its part, CITGO has gone above and beyond its obligations under the SPA to regularly meet with Amber personnel to ensure that, if the transaction closes, the transition can be seamless. Amber has now proven an unreliable beneficiary of that cooperation. While Amber claims that its op-ed only proposes *sui generis* ideas developed from its leadership team's own experience and/or recitations of information CITGO has publicly revealed already (D.I. 2666 at 1–2), the text of the op-ed and the facts prove otherwise.

One example starkly illustrates the failure of Amber's defense: In the op-ed, Amber announces "its" plan to invest "roughly $1 billion"[1] to expand crude oil processing capacity at CITGO's Corpus Christi (CCR) refinery by up to 125,000 barrels per day by 2030. Every element of that claim—the $1 billion investment figure, the 125,000-barrel capacity increase, and the 2030 timeline—comes directly from CITGO.

In CITGO's confidential 2026–2031 Medium-Term-Plan (MTP), which Amber received in the virtual data room and which was presented to Mr. Goff and others at Amber at management meetings, CITGO identified numerous strategic projects to expand processing and improve yield at the Corpus Christi refinery. Among those projects identified for consideration in the MTP is a Crude Expansion Project that would add ███ barrels per day of crude processing capacity by ███████████████████████ at a cost of approximately $███ million. Rincon ¶ 5(a). CITGO developed ████████ process configuration, ████████████████████ ████████████████ after months of studies, defined a project execution strategy, and prepared an indicated cost estimate for use in internal economic evaluations and internal approvals. At a meeting at the Corpus Christi refinery on January 12, 2026, CITGO management presented this plan to Mr. Goff and other Amber representatives. Amber liked the proposal but asked whether it could be upscaled. In response, and based on its existing, confidential engineering work, CITGO is considering modifying the project to add up to 125,000 barrels per day of capacity. CITGO shared the proposed configuration with Amber. Combined, the incremental investment ███████ ████████ and the incremental cost of associated strategic projects previously identified by CITGO sums to a conservative estimate of about $███ million, which is, as the op-ed describes, "roughly $1 billion."

---

[1] As described further below, this is a remarkable change for Mr. Goff, who in his declaration to the Third Circuit in December complained in general terms that CITGO was spending too much on strategic expansion projects when he wanted the Third Circuit to accelerate its decision to prevent CITGO from undertaking the supposedly wasteful projects he now champions as his own. *See* D.I. 2666-1; Am. Mot. To Expedite, *Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*, Nos. 25-3347, et seq., No. 25-3347 (3d Cir. Dec. 15, 2025), Dkt. No. 109.

The Honorable Leonard P. Stark
May 12, 2026
Page 3

The op-ed's "roughly $1 billion" investment, "up to 125,000 barrels a day" capacity increase, and "1.9 billion gallons a year" of refined products are not Amber's plans or Amber's estimates. They are CITGO's confidential project, and CITGO's confidential bundling of additional confidential projects to match a financing target Amber identified—published in the *Wall Street Journal* as Amber's own. The "1.9 billion gallons" figure is itself a direct arithmetic extrapolation from the 125,000-barrel capacity figure CITGO provided to Mr. Goff (125,000 (barrels per day) × 42 (gallons per barrel) × 365 (days per year) ≈ 1.9 billion gallons per year). Amber's submission to this Court offered no explanation for any of these figures, and none is possible: they exist only because CITGO supplied them (in the virtual data room, subject to the protection of the Confidentiality Agreement).

Similarly, "Amber's" planned expansion at the Corpus Christi refinery that would generate an additional 29,000 barrels of jet fuel per day is nothing more than public disclosure of a confidential project included in CITGO's MTP to generate ▮▮▮▮ barrels of jet fuel per day at that site. Corpus Christi does not currently sell jet fuel, but CITGO's confidential MTP contains a plan to do so by ▮▮▮▮ and the figures Amber presents in its op-ed are sourced directly from CITGO's own highly confidential internal analysis, which was disclosed to Amber in the virtual data room. *See* Rincon Decl. ¶ 5(b).

Amber claims that selling jet fuel at Corpus Christi was an obvious idea any operator could have proposed. But Amber's op-ed does not merely claim that jet-fuel production would be a good idea; it discloses that Corpus Christi will be selling jet fuel ▮▮▮▮▮▮ and discloses specific volumes, derived from another specific refinery project under execution, on a specific timeline. Those claims come from CITGO's confidential plans, too. Moreover, by presenting them in the *Wall Street Journal* as "our plans" and "our estimates," Amber is disclosing and publicly taking credit for confidential projects CITGO is already advancing—the first of which will be online in the ▮▮▮▮▮▮▮▮▮, before Amber possibly could cause any of its own "investments" to come to fruition. That Amber's op-ed is aimed directly at Washington likely explains why it wants to take credit for CITGO's own work. If Amber itself is not offering anything beyond what CITGO was already doing, OFAC has no reason to approve the sale for a grossly inadequate price—much less at a time when the United States' foreign policy toward Venezuela is shifting.

Finally, Amber cannot seriously point to a November 2025 CITGO press release that stated it planned "additional upgrades" in 2026 at its Corpus Christi refinery to suggest that the specific, competitively sensitive revelations in the op-ed, such as disclosure of Corpus Christi's jet fuel production plan and expected production capacity, were somehow in the public domain. D.I. 2666 at 2. That vague and high-level reference to possible future upgrades is far removed from publicly disclosing CITGO's internal strategic planning, including specific project configuration, production volumes, timing, capital ranges, and economic assumptions. A generic public statement that CITGO expected further improvements at Corpus Christi did not give Amber license to publicize detailed plans and projections that it learned only through confidential diligence and management presentations.

The Honorable Leonard P. Stark
May 12, 2026
Page 4

The Goff Declaration

For its part, the Goff Declaration is a remarkable document. It was filed under seal in the Third Circuit to support Amber's effort to expedite the Third Circuit appeal, and its fundamental premise was that, in Amber's view, CITGO could not be trusted to run itself in the interim because (1) it was a poor steward of its funds and (2) it was spending too much on strategic projects that Amber could not control. That premise was baseless (both because CITGO has been operated in a responsible and successful manner and because, as Mr. Rincon describes, the SPA protects Amber from any misuse of funds by CITGO). But, more fundamentally, Mr. Goff (joined by Mr. Foster) has now completely switched his story in the op-ed. No longer is he concerned about some unspecified set of supposedly wasteful capital expenditure plans and strategies. Instead, he now claims those strategies CITGO confidentially shared with him (many praised by Mr. Goff and his team privately to CITGO management in the months between his December declaration and his April op-ed) were Amber's ideas, that Amber wants to spend more money on them, and that they will be of great benefit to the American public. It is clear that Amber and Mr. Goff will say whatever they feel they need to say to suit their needs at the moment without regard to its accuracy or their responsibility under the SPA and the Confidentiality Agreement.

Amber's recitation of the Goff Declaration's filing history also is incomplete. CITGO did consent to the filing of a public version of the Goff Declaration in the Third Circuit after concluding that the specific confidential information contained within it—unlike the much more specific, competitively sensitive information disclosed in the op-ed—was not material enough to warrant sealing in a federal court (had Amber proposed to disclose that information in a national newspaper in violation of the NDA's use restrictions, CITGO would not have agreed). Amber ultimately never filed an unredacted version in the Third Circuit. Accordingly, CITGO has not—until now—had an opportunity to respond to it and correct its inaccuracies and misrepresentations. CITGO's conclusion that the Goff Declaration did not contain competitively sensitive information was not a concession that it was *accurate.* The Goff Declaration is rife with misleading statements that Mr. Rincon corrects in his declaration.[2]

Amber's Weak Defense

Amber's response (D.I. 2666) to CITGO's April 28 letter to the Court (D.I. 2664) is internally inconsistent and legally unsound. First, Amber argues that the op-ed disclosed nothing confidential because the ideas were obvious to experienced refinery operators or could be derived from public or consultant materials. But that misses the point. Amber did not publish broad observations about refinery optimization; it published a concrete set of proposals, projected benefits, and investment concepts that closely track CITGO's confidential planning. And Amber cannot justify disclosing CITGO's information by pointing to high-level public statements by other

---

[2] Amber ostensibly filed the Goff Declaration to defend its discussion in the op-ed regarding CITGO's safety record by comparing it to the discussion of the same topic in the Goff Declaration. D.I. 2666 at 2–3. For the reasons described in Mr. Rincon's declaration, the Goff Declaration's discussion of CITGO's safety record is deeply misleading. And, for the reasons described above and in the Rincon Declaration, information about CITGO's safety record was not the only confidential information revealed in the op-ed.

The Honorable Leonard P. Stark
May 12, 2026
Page 5

refining companies about their own operations or investment priorities. General market commentary and public-company disclosures do not make CITGO's nonpublic plans, volumes, timing, economics, or project configuration fair game for public use. Second, as to CITGO's safety record, Amber points to CITGO's prior consent to the public filing of portions of Mr. Goff's declaration. As demonstrated in Mr. Rincon's declaration, the Goff Declaration's description of CITGO's safety record was misleading in the first instance—a mischaracterization that was carried over into the op-ed. Moreover, CITGO's consent to a public filing of the Goff Declaration (to which it intended to respond if filed publicly) did not authorize Amber to use confidential information for a national media campaign. Third, Amber argues that Section 6.7 does not apply because the op-ed concerned "post-closing plans." That argument fails on its face. The op-ed advocated for governmental approval of the transaction, touted the supposed public benefits of Amber's acquisition of CITGO, and sought to influence the final regulatory step needed to close. Under any ordinary reading of the SPA, that is a public statement relating specifically to the transaction. Addressing each contractual violation in turn:

- **SPA Section 6.7.**[3] Section 6.7 squarely bars public statements about the transaction without the Special Master's consent, including statements designed to promote the deal, characterize confidential information, or disparage the other party. Amber's op-ed does all three—(1) it openly pushes for OFAC approval, (2) it divulges confidential information learned from the virtual data room or in meetings with CITGO personnel, and (3) it implies that, absent Amber's leadership, serious safety incidents are imminent. Amber nevertheless argues that Section 6.7 does not apply because the op-ed supposedly addressed only post-closing plans rather than the SPA or the transaction itself. That contention is untenable. The op-ed repeatedly discusses the transaction expressly, by name, and for the admitted purpose of obtaining governmental approval. *See* Goff & Foster ("Last November, a federal court … approv[ed] the company's sale to Amber Energy…. This transaction—which is fully financed and backed by a broad consortium of American investors—would resolve about $9 billion of legal claims against Venezuela."). It then urges the U.S. Government to permit the transaction to close. *See id.* ("A single government approval could unlock private investment in this company, Citgo Petroleum, modernizing its refineries and putting downward pressure on fuel prices."); *id.* ("All we need is approval for the sale from the Office of Foreign Assets Control, the Treasury agency that enforces sanctions against targeted foreign regimes like Venezuela."). There is no serious way to characterize the op-ed as anything other than a public effort to advance the transaction. Amber's suggestion that approval of this one sale would put downward pressure on fuel prices nationwide is not just speculative; it highlights the advocacy-driven nature of the

---

[3] In relevant part, Section 6.7 reads: "The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party… For the avoidance of doubt, nothing in this Section 6.7 shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions."

The Honorable Leonard P. Stark
May 12, 2026
Page 6

piece. If Section 6.7 does not require consent for a national op-ed urging federal approval of the very sale at issue, it is difficult to see what statement would fall within the provision.[4]

- **SPA Sections 6.2 and 6.10.** These provisions demand that Amber's access to CITGO's confidential information and management not be abused in a manner that interferes with the ongoing and normal operations of CITGO. Amber claims its op-ed does not run afoul of these provisions. Yet it strains credulity to suggest that publishing an article that reveals strategic, confidential information and that is clearly designed to convince the U.S. Government that CITGO is on the precipice of causing imminent "oil spills, explosions, life-threatening injuries or worse" has no impact on CITGO's operations. Such statements affect CITGO's relationships with its employees, contractors, customers, competitors, regulators, and the communities in which it operates. And Amber's attempt to recast its defamatory suggestion that CITGO is on the verge of catastrophe as simply discussing the logical consequence of deferred investment is obvious backpedaling. D.I. 2666 at 2. No reader would interpret a statement about such catastrophic events made by a company with access to confidential CITGO information as anything other than a warning.

- **The Confidentiality Agreement.** Amber's only retort to its violations of the confidentiality agreement is that, in fact, no information in its op-ed was confidential at all. Mr. Rincon has rebutted that point.

<u>The Broader Context</u>

As the Court will recall, despite competent expert testimony explaining that CITGO's value last fall was $18.6 billion, and Evercore valuing the company at $13.2 billion even before any corrections to its methodological errors, the Court concluded instead that it was fair to sell the PDVH Shares for $5.9 billion (an issue pending on appeal). The current events Amber now invokes to push through this grossly inadequate sale only make its purchase price more of a conscience-shocking windfall. In the months since the Sale Hearing, the value of publicly traded refiners has increased significantly. The industry's predictions about electrification of motor vehicles and the so-called "Peak Oil" date (after which oil consumption will begin to decline) are aligned with Dr.

---

[4] In a footnote, Amber suggests that the op-ed also falls outside of Section 6.7's reach because *some* of the information in it purportedly comes from the publicly filed Goff Declaration and CITGO's public statements. D.I. 2666 at 3 n.6 (citing Section 6.7(y)). This is a misreading of 6.7(y) and a confusion of the NDA violation (about CITGO's confidential information) with the SPA violation (about making public statements about the sale). Section 6.7(y) only carves out statements "concerning the Transactions" that are "consistent with previous releases or announcements made by [Amber] with respect to which [Amber] has complied with" Section 6.7. The op-ed's statements about the sale were not consistent with any previous releases or announcements consented to by the Special Master. Moreover, for the reasons described above and in Mr. Rincon's declaration, Amber's assertion is untrue. The Goff Declaration was not previously filed in unredacted form, and neither it nor CITGO's public statements disclosed the specific, competitively sensitive information that Messrs. Goff and Foster included in the op-ed.

The Honorable Leonard P. Stark
May 12, 2026
Page 7

Jose Alberro's even more conservative assumptions, driving a durable increase in their value over the longer term.[5] The Court may recall that Dr. Alberro's principal correction to the 2023 Evercore valuation was to apply a 2.0% perpetuity growth rate instead of zero. The tables below show the change in valuations of CITGO's peers since the Sale Hearing both before and after initiation of U.S. operations in Iran.

| Company | Value* 8-1-25 | Value* 2-27-26 | +/- |
|---|---|---|---|
| Phillips 66 | $123.15 | $154.33 | +25.3% |
| Marathon | $165.53 | $198.15 | +19.7% |
| Valero | $133.18 | $204.64 | +53.7% |
| Sinclair | $42.36 | $50.01 | +18.1% |
| PBF | $21.68 | $35.57 | +64.1% |
| **Average** | | | **+ 36.18%** |

* Closing market price per common share

| Company | Value* 8-1-25 | Value* 5-8-26 | +/- |
|---|---|---|---|
| Phillips 66 | $123.15 | $171.56 | +39.3% |
| Marathon | $165.53 | $244.87 | +47.9% |
| Valero | $133.18 | $241.06 | +81.0% |
| Sinclair | $42.36 | $72.43 | +70.1% |
| PBF | $21.68 | $56.55 | +160.8% |
| **Average** | | | **+ 79.82%** |

* Closing market price per common share

If one simply applies the average increase as of last week to the $8.4 billion DCF valuation presented by Gary Kleinrichert[6] (Red Tree's expert and the only valuation expert opposing Dr. Alberro), the result is $15.1 billion—easily more than double the $5.9 billion Amber price. In other words, assuming *arguendo* that Mr. Kleinrichert's valuation was correct and that CITGO's value grew in line with the industry average since then, the Court could not approve the Amber bid if it had to decide the matter today. And events since the Sale Hearing affirm that Mr. Kleinrichert's valuation was *not* correct. The principal disagreement between Mr. Kleinrichert and Dr. Alberro was over the cash flow forecasts to be used in the DCF valuation—Mr. Kleinrichert assumed lower and Dr. Alberro assumed higher. CITGO is currently forecasting EBITDA of $3.2–3.6 billion for full-year 2026 (Rincon Decl. ¶ 13), which exceeds *any* annual EBITDA figure in Dr. Alberro's

---

[5] For example, U.S. auto manufacturers took more than $50 billion of write-downs last year on their electrification assets. *See, e.g.*, Rajat Shrestha, et al., *For the US EV Market, a More Turbulent Road Lies Ahead*, World Resources Institute, (Apr. 14, 2026), https://www.wri.org/insights/us-state-of-electric-vehicles; Seeking Alpha, *EV Company News For The Month of April 2026* (May 6, 2026), https://seekingalpha.com/article/4899868-ev-company-news-for-the-month-of-april-2026.

[6] D.I. 2274-6 (Kleinrichert Report) at 54 (Sale Hearing Ex. RT-065).

The Honorable Leonard P. Stark
May 12, 2026
Page 8

forecast for 2025–2030.[7] CITGO's 2026 forecast is entitled to significant weight since the year is nearly half over—it is really a forecast for only seven months. The parties opposing Dr. Alberro's valuation argued that his earnings forecast—based on CITGO's projected volumes and a composite of consultant price forecasts—was too aggressive. The current year shows that, if anything, it was too conservative.

Finally, CITGO, the same company Amber is now denigrating in a desperate and transparent attempt to obtain an OFAC license, ended 2025 with a Cash and Cash Equivalents balance of $1.95 billion. Furthermore, CITGO projects an EBITDA of about $3.4 billion for full-year 2026 and Cash and Cash Equivalents at 2026 year-end of about $3.7 billion, assuming no material full-year changes in working capital.  Rincon Decl. ¶ 13. Practically speaking, this means that if the Amber transaction closes, Amber will effectively pay only $2.2 billion ($5.9 billion minus $3.7 billion) for the business and future cash flows of CITGO. No wonder Amber is desperate to salvage this deal.

Such an outcome is plainly unfair—to CITGO, to the Venezuelan people, and to the out-of-the-money creditors. Recent developments in Venezuela only enhance the obvious unfairness of the result of this sale process. The circumstances involving the Venezuelan Government, its relations with the United States, and sentiment about it and PDVSA's defaulted debt have materially changed since Nicolas Maduro was captured by the United States on January 3, 2026. Since then, U.S. policy has, as it should be, been to help Venezuela re-enter the global economy and financial markets and to help PDVSA restore production and operations. Those aims likely require restructuring all of the Republic and PDVSA's $150–$180 billion debt, not just that of the handful of claimants before this Court. Indeed, CITGO could and should play a key role in the restructuring of PDVSA/Venezuela debt—an outcome that would comport with U.S. and Venezuelan interests, but is incompatible with a sale to Amber. More than ever before, licensing a sale of the PDVH Shares to Amber for its paltry bid would be counterproductive to U.S. foreign policy.

Amber knows this to be true, which is why it is willing to breach its contractual commitments to publicly lobby for OFAC approval. It is desperate to have its deal approved—a deal facilitated by conflicted counsel representing the Special Master and approved for a price that "shock[s] the conscience," *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994), and has only become more shocking in the months since. It is willing to tarnish CITGO's reputation, violate confidentiality agreements, defy the Special Master by willfully violating the SPA, and do just about anything else it can to muscle through approval of a deal no one can reasonably defend. Amber can accuse CITGO of trying to delay the sale as much as it wants, but the story here is not delay—it is the historic windfall for a hedge fund that has extracted an unconscionable bargain from a conflicted and failed process.

---

[7] D.I. 2274-5 (Alberro Report) at 62, Table 7 (Sale Hearing Ex. VP-186).

The Honorable Leonard P. Stark
May 12, 2026
Page 9

Respectfully,

/s/ Alexandra M. Cumings

Alexandra M. Cumings (#6146)

cc:    Counsel of Record (via ECF)