# EXHIBIT A

quinn emanuel trial lawyers | austin
300 West 6th Street, Suite 2010, Austin, Texas 78701-3901 | TEL (737) 667-6100 FAX (737) 667-6110

WRITER'S DIRECT DIAL NO.
**(737) 667-6102**

WRITER'S EMAIL ADDRESS
**matthewscheck@quinnemanuel.com**

May 14, 2026

VIA EMAIL – HIGHLY CONFIDENTIAL
Mr. Chase Bentley
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
chase.bentley@weil.com

Re: Responses to CITGO's April 28 and May 12 Letters

Dear Chase:

We are writing to (i) memorialize the items we discussed in our Zoom meetings on April 29 and May 6 regarding CITGO's assertions surrounding an April 23 *Wall Street Journal* op-ed by Greg Goff and Paul Foster, and (ii) provide additional responses to the further allegations levied in CITGO's May 12 letter (D.I. 2668). As set forth in our May 5 letter to the Court (D.I. 2666) and in Zoom meetings with you and your team, the assertions by CITGO and PDVH are baseless.

As you are aware, CITGO and PDVH filed a letter with the Court on April 28 (D.I. 2664), which also attached a letter from them to you, dated April 27 (D.I. 2664-1). The April 28 letter makes the general accusation (at 1) that the op-ed "revealed—and distorted—confidential, non-public, proprietary information." It does not identify what specific confidential, non-public, or proprietary information was purportedly revealed. The April 27 letter asserts (at 2) that the confidential information includes "[1] a plan to expand production at the Corpus Christi refinery, [2] an impending project to enable the production of jet fuel at Corpus (which the refinery does not currently produce), and [3] an upgrade at the Lake Charles refinery designed to increase premium gasoline production."

On our April 29 and May 6 Zoom meetings, we addressed each of the foregoing assertions, as well as the discussion of CITGO's safety performance in the op-ed. The safety performance issue had previously been discussed in the Goff Declaration, which was publicly filed on December 15, 2025, and to which CITGO and PDVH had no objection. Below we memorialize the points made in our discussions and address CITGO's May 12 letter.

### *1. "A plan to expand production at the Corpus Christi refinery"*

There is nothing confidential or proprietary about a plan to expand production at the Corpus Christi refinery or to begin producing jet fuel there, particularly in light of the well-publicized jet fuel shortage, which only underlined the need for jet fuel and the opportunity for Amber to address it. These are obvious steps for a refiner to take—which is why refiners have taken them (*see* May 5 Letter at 2 & n.2), why it makes sense that CITGO had a plan to do so (as it asserts), and why Amber would pursue a project capitalizing on the same opportunity. But Amber's plan is not CITGO's plan, and Amber did not reveal CITGO's plan or confidential information.

As discussed during our meetings, process unit sizes at the Corpus Christi refinery and others are available via regulatory reporting and industry publications, and those parameters are a factor in determining a refinery's strengths and weaknesses, thus allowing Amber to make an informed decision about how to address those weaknesses. It is well known in the industry that CITGO's crude oil processing units at Corpus Christi are smaller than its downstream units, and thus there is an opportunity to increase the size of the crude oil processing units to expand production of clean products, namely gasoline, diesel and jet fuel, amongst others. Amber retained multiple technical consultants and spent millions of dollars throughout the process to understand the earnings power of the Corpus Christi refinery and its position in the Gulf Coast refining market. Those consultants maintain proprietary databases containing potential expansion options, avenues to increase profitability, and estimated charges and yields that inform their opinions. Amber's plans are its own, and the opportunities they would capitalize on are known to the industry and/or derived from public and consultant-generated data, consultant modeling, and public reporting. *See* May 5 Letter at 1.

The op-ed described Amber's plans for "a roughly $1 billion expansion" that would "increase crude-oil processing capacity by up to 125,000 barrels a day by the end of 2030." As discussed during our May 6 Zoom meeting, that figure was based on Amber's conclusion that 300,000 barrels per day is a threshold necessary to achieve economies of scale to be competitive in the refining market over the long term. Moreover, as discussed, crude oil processing unit expansions are neither unique nor unexpected—they are being actively done on the Gulf Coast. For example, ExxonMobil's publicly disclosed expansion of its Beaumont refinery involved an expansion in production of 250,000 barrels per day and a cost of approximately $2 billion.[1] The timeline for that construction was approximately four years, which is also the timeline reference in the op-ed (finishing in 2030).

In response, CITGO points to slides in its 2026-2031 Medium-Term-Plan ("MTP") that call for [redacted] *See* MTP at 40, 42 (discussing splitter [redacted]); *see also* CCR Strategic

---

1 *See* ExxonMobil, *ExxonMobil Boosts Fuel Supply with $2 Billion Beaumont Refinery Expansion* (Mar. 16, 2023), https://corporate.exxonmobil.com/news/news-releases/2023/0316_exxonmobil-boosts-fuel-supply-with-2-billion-dollar-beaumont-refinery-expansion

Plan – Backup Slides, Jan 22, 2026, at 14 (discussing [redacted]").[2] Thus, neither the cost, nor the increase in production described as part of Amber's plan tie out to CITGO's Corpus Christi expansion plan.[3] Furthermore, CITGO's plan contemplates [redacted], whereas Amber's plan contemplates a greenfield crude unit expansion, which is an integrated part of the refinery.

Unable to point to anything tangible, CITGO insists that it "is ***considering*** modifying [its] project to add up to 125,000 barrels per day of capacity," and that CITGO shared "the proposed configuration with Amber." May 12 Letter at 2 (emphasis added). CITGO does not point to any document reflecting this purportedly considered configuration, but does admit that this consideration came *after* Amber asked if CITGO's plan could be upscaled. Effectively, because CITGO has so much as "considered" adopting Amber's plan for a more significant expansion of production as CITGO's own, it is now seeking to manufacture a confidentiality breach from Amber describing its own plan.

CITGO's attempt to manufacture a similarity in cost between its plan and Amber's plan is even further from reality. CITGO asserts that the cost of increasing the size of [redacted] (roughly $[redacted] million, as discussed above), together with "the incremental cost of associated strategic projects previously identified by CITGO sums to a conservative estimate of about $[redacted] million." May 12 Letter at 2. CITGO does not identify what "strategic projects" it is including to reach this $[redacted] million cost estimate, nor does it cite to anything for this supposed "$[redacted] million" estimate. Nor is it clear how this estimate could be considered "conservative" given that CITGO is adding various strategic projects beyond those cited in its own MTP, which total $[redacted] million in projected costs. *See* 2026 MTP at 42. In any event, the cost of Amber's plan refers solely to the expansion in production, not additional "strategic projects," and thus CITGO is not making a like-for-like comparison when it claims that Amber's disclosure of a $1 billion expansion equates to CITGO's apparent plan for $[redacted] million between expansion and other projects.

***2. "[A]n impending project to enable the production of jet fuel at Corpus"***

A refinery's plan to produce jet fuel is similarly not itself confidential or proprietary. The fact that Amber plans to do so and that CITGO has its own plans to do so is simply consistent with the entire industry. *See* May 5 Letter at 2 n.2 (citing numerous examples of refiners' projects to expand production of jet fuel). Jet crack spreads (a measure of the profitability for a refinery to produce jet fuel from crude oil) reached historically high levels in early 2026, rendering the proposed

---

[2] CITGO's May 12 letter and the Rincon Declaration state that the project would add [redacted] barrels per day for a cost of approximately $[redacted] million. May Letter at 2; Rincon Decl. ¶ 5(a). It is not clear why the declaration of CITGO's Chief-Operating-Officer is inconsistent with CITGO's own internal presentations.

[3] As CITGO acknowledges (May 12 Letter at 3), the 1.9 billion gallons per year is simply math, reflecting 125,000 barrels per day x 42 (gallons per barrel) x 365 (days per year). Because the 125,000 barrels per day increase in Amber's plan is not CITGO confidential information, neither is the simple mathematical result of 1.9 billion gallons per year that derives from that per-day figure.

expansion into this territory a glaringly obvious strategic objective for CITGO's Corpus Christi refinery.[4]

CITGO and PDVH do not disagree that a plan to produce jet fuel is not itself confidential or proprietary. Instead, they now assert (May 12 Letter at 3) that the op-ed's reference to generating an additional 29,000 barrels per day of jet fuel is a "public disclosure of a confidential project included in CITGO's MTP to generate [redacted] barrels of jet fuel per day" at Corpus Christi. But the two plans differ not just in their projected volume, but also in the source and fundamental nature of this jet fuel production.

As reflected in the op-ed, the production of jet fuel is tied to Amber's plan for a $1 billion Corpus Christi expansion by the end of 2030, and is derived directly from Amber's projected 125,000 barrels per day increase discussed above. The production of jet fuel from a crude processing unit, or the jet fuel yield, is primarily determined by the chemical properties of the crude oil processed rather than the processing unit itself. In other words, crude assays, which are chemical evaluations of a specific crude oil feedstock, provide essential data on potential product yields (i.e., what percentage of product—like jet fuel—will be produced from a particular barrel of crude). Those crude assays are available through third-party vendors and independently corroborated across multiple third-party databases. Given its location, Corpus Christi is primarily refining WTI crude oil from the Permian Basin. The crude assays for WTI consistently show jet fuel yield as a percentage of crude at approximately 20%,[5] which often varies plus or minus 3%, depending on, among other things, the individual refiner's ability to blend naphtha relative to the flash point.[6] The op-ed figure of 29,000 barrels per day implies a jet yield of approximately 23% of the 125,000 barrels per day capacity, which falls within the aforementioned range of yields one would expect from WTI.

CITGO, on the other hand, cites a plan to sell jet fuel [redacted], and the possibility of increasing jet fuel production to [redacted] barrels per day [redacted] if another of CITGO's potential projects—not the Corpus Christi expansion Amber's plan depends on—occurs and is completed. *See* CCR Strategic Plan—Backup Slides, at 17.[7] More fundamentally, CITGO's plan focuses on

---

4 *See, e.g.*, Tsvetana Paraskova, *Jet Cracks Soar to Record Highs as Iran War Breaks Fuel Markets*, Yahoo! Fin. (Mar. 9, 2026), https://finance.yahoo.com/news/jet-cracks-soar-record-highs-160000900.html (describing 350% year over year increase).

5 *See, e.g.*, https://corporate.exxonmobil.com/-/media/global/files/crude-oils/pdf/2024/wti_light.pdf.

6 *See, e.g.*, Chuck Sorensen, *Petroleum-Based Jet Fuel Production & SAF*, LEC Partners (Aug. 21, 2023), https://lee-enterprises.com/petroleum-based-jet-fuel-production-saf/ ("[T]here is a boiling point overlap between the end of kerosene and the front end of gasoil which is the refinery precursor to diesel fuel. Refiners often adjust the degree distillation range overlap between these products to increase or decrease the production of one product over another, subject to constraints imposed by each product's specifications.").

7 The Rincon Declaration cites to a different document (REL_DATASITE0200012164 at 7). That appears to be a mistaken citation.

using [redacted] to produce jet fuel. *Id*. Amber's plan, on the other hand, involves installing new jet-fuel Merox units. Accordingly, nothing about the plans, other than the general (non-proprietary) plan to increase jet fuel is the same.

The fact that these different plans yield similar jet fuel production is neither surprising nor probative. CITGO, of course, would be operating from the same baseline 20% jet-fuel yield for WTI.

***3. "[A]n upgrade at the Lake Charles refinery designed to increase premium gasoline production"***

As discussed during our Zoom meetings, and as set forth in our May 5 Letter, the op-ed's reference to a $250 million upgrade to the Lake Charles refinery is Amber's plan, and it seeks to capitalize on opportunities already known to the industry. There is simply nothing proprietary about upgrading a refinery to increase premium gasoline production. The premiumization trend in the US gasoline pool is extensively documented in public data, and industry leaders have been consistently upgrading their refineries to increase premium gasoline production.[8] It is similarly known that Lake Charles's geographic position gives it access to both Gulf Coast rack markets and export terminals. This is important, because premium gasoline commands a meaningful export premium in certain markets (e.g., Latin America and West Africa) where octane standards are rising.[9] In other words, everyone in the industry sees the value in increasing premium gasoline production; it certainly was not lost on Amber's leadership who have decades of experience in the Gulf Coast market.

Nor do CITGO and PDVH cite to anything in any of their letters reflecting a planned $[redacted] upgrade at Lake Charles. Instead, they cite generally to discussions about Lake Charles and materials that contain $[redacted] million worth of potential upgrade projects that CITGO might or might not do over the next [redacted] *See, e.g.*, Lake Charles Strategic Vision, at 5. Their May 12 Letter appears to recognize that CITGO does not have a monopoly on the idea of upgrading a refinery to increase premium gas production, as it contains almost no discussion of the Lake Charles refinery.

***4. The Goff Declaration***

As discussed on our May 6 Zoom, and as reflected in the correspondence attached to our May 5 Letter (D.I. 2666-2), CITGO consented to the public filing of the Goff Declaration (which Amber submitted in connection with its successful motion to expedite) in the pending Third Circuit appeal of this case. That declaration (including the version that CITGO's counsel agreed did not have to

8 *See* May 5 Letter at nn. 1, 2; Blink Charging Co., Annual Report (Form 10-K) (Mar. 31, 2026), at 14 ("To meet higher fuel efficiency and greenhouse gas emissions standards for passenger vehicles, automobile manufacturers are increasingly using technologies, such as turbocharging, direct injection and higher compression ratios, which require high octane gasoline.").

9 *See, e.g.*, Asian Clean Fuels Ass'n, *Global Octane and Fuel Quality Trends 2019/2020 and Beyond*, In Focus (Feb. 2020), https://acfa.org.sg/newsletters/global-octane-fuel-quality-trends..

be maintained under seal) made public CITGO's safety performance, and Amber's assessment thereof, in the same manner in which the op-ed discussed CITGO's safety performance. Upon CITGO's agreement that the declaration could be unsealed, Amber filed the less-redacted copy filed on the appellate docket maintaining under seal only limited items related to Amber's then-confidential information. *See* May 5 Letter, Ex. A (D.I. 2666-1) (attaching the version filed in the Third Circuit). CITGO and PDVH do not dispute any of these points, which should put to rest any suggestion that either the Goff Declaration or any of the safety-related information in the op-ed (which restated information disclosed in the Goff Declaration months earlier) posed any breach of confidentiality.

To the extent that CITGO now suggests that in agreeing to unseal the declaration, it had concluded only that the Goff Declaration did not contain information that was so confidential to warrant sealing in federal court, not that the Goff Declaration did not violate the NDA, that baffling contradiction should be given no weight. If CITGO believed anything revealed in the less-redacted Goff Declaration constituted a breach of any agreement, it of course had the obligation to raise that point when granting its consent to publicly file that less-redacted declaration. The obvious inference is that CITGO did not raise that point because it did not believe it was a breach.

The real issue appears to be that CITGO and Mr. Rincon do not feel they had an opportunity to respond to the Goff Declaration on the merits, and they take that opportunity now through a 17-page declaration from Mr. Rincon that purports to "correct" the allegedly "misleading" allegations in the Goff Declaration and take issue with supposed "inconsistencies" in Mr. Goff's perspective between December and May. *See* May 12 Letter at 4 & n.1; Rincon Declaration ¶ 9.[10] Those contentions are wrong on the merits. But more importantly they are entirely irrelevant to the contract issues that CITGO purports to raise in its letters to you and Judge Stark, which turn not on whether CITGO agrees with Mr. Goff's perspectives, but instead whether expressing them breached any contractual obligation. As described during our meetings and as set forth in our May 5 Letter and herein, there have been no such breaches.

Amber did not disclose CITGO's crude processing plans. And, in any event, CITGO ignores the more fundamental point reflected in Amber's May 5 Letter: the categories of investment described in the op-ed—expanding crude processing capacity, adding jet fuel production, and increasing premium gasoline output—are well-known strategic objectives pursued by refiners across the world, as the foregoing discussion and examples demonstrate. The decision to pursue these types of projects is driven by publicly available data, including regulatory filings disclosing unit sizes and configurations, commercially available crude assays, and widely recognized market trends such as rising jet crack spreads and premiumization of the gasoline pool. These are not the types of competitively sensitive details that confidentiality obligations protect. What is proprietary and

---

[10] CITGO and PDVH, as well as Mr. Rincon, assert that "Amber ultimately never filed an unredacted version in the Third Circuit," and thus "CITGO has not—until now—had an opportunity to respond to it and correct its inaccuracies and misrepresentations." May 12 Letter at 4; Rincon ¶ 9. But, as just described, Amber filed with its May 5 Letter the version of the Goff Declaration that is on the public Third Circuit docket. This is not the first time that any of the statements about CITGO in the Goff Declaration are being publicly filed—that is simply wrong.

confidential in the refining industry—and what companies like CITGO vigilantly guard—is the detailed commercial and marketing information relating to the sale of refined products: pricing strategies, distribution arrangements, customer contracts, and payment terms. Beyond not disclosing any of CITGO's plans, Amber also did not disclose any of this type of information about CITGO (or Amber for that matter). The omission of that category of information from the op-ed is not coincidental—it reflects Amber's deliberate compliance with its confidentiality obligations.

Sincerely,

Matthew R. Scheck